IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. JAYSON JEFFREY PENN,
2. MIKELL REEVE FRIES,
3. SCOTT JAMES BRADY,
4. ROGER BORN AUSTIN,
5. TIMOTHY R. MULRENIN,
6. WILLIAM VINCENT KANTOLA,
7. JIMMIE LEE LITTLE,
8. WILLIAM WADE LOVETTE,
9. GARY BRIAN ROBERTS,
10. RICKIE PATTERSON BLAKE,

    Defendants.

## GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR A BILL OF PARTICULARS

The government respectfully requests that the Court deny all ten defendants' motions for a bill of particulars. As explained in response to the first round of motions filed by Mr. Penn and Mr. Austin, while the government acknowledges that discovery is voluminous, the defendants are not adrift in a sea of documents. Rather, the information the government has provided to the defendants goes well beyond what is necessary to provide them a meaningful ability to prepare a defense, fair notice as to the nature of the charges to minimize surprise at trial, and protection against double jeopardy.

## BACKGROUND

Before addressing the substance of the defendants' motions, it is first instructive to summarize the information and direction that the defendants have at their disposal in this case.

On October 6, 2020, a grand jury sitting in this district returned a 42-page, 151-paragraph Superseding Indictment charging all ten defendants with one count of conspiring to restrain trade in violation of the Sherman Act, 15 U.S.C. § 1, and charging defendant Jimmie Little with making false statements in violation of 18 U.S.C. § 1001 and obstructing justice in violation of 18 U.S.C. § 1512(c)(2). *See* Superseding Indictment ("Sup. Ind.") ¶¶ 1-145 (Count 1), ¶¶ 146-149 (Count 2), ¶¶ 150-151 (Count 3), ECF No. 101.

With respect to Count 1, the Sherman Act charge, the very first paragraph of the Superseding Indictment sets forth the approximate timeframe of the conspiracy—2012 to 2019—and identifies ten conspirators, *i.e.*, the defendants. The second paragraph describes the overall nature of the conspiracy—a continuing agreement, understanding, and concert of action among the defendants and co-conspirators—as well as the object of the conspiracy—to rig bids and to fix, maintain, stabilize, and raise prices and other price-related terms for broiler chicken products sold in the United States. The Superseding Indictment also anonymously identifies 16 individuals employed by several broiler chicken suppliers who acted in furtherance of the conspiracy, Sup. Ind. ¶¶ 22-33, and the government provided the defendants with a legend to de-anonymize the names of those individuals, Exhibit A (e-mail from Michael T. Koenig dated October 29, 2020, and attachment).

The Superseding Indictment next contains a lengthy "Means and Methods" section that describes the operation of the conspiracy at a high level, Sup. Ind. ¶¶ 47-50, and details 14 episodes that exemplify the operation of the conspiracy with particularity, *id.* ¶¶ 51-143. The high-level description explains that the defendants participated in a continuing network of broiler chicken suppliers and co-conspirators to engage in anti-competitive conduct, *i.e.*, bid rigging and price fixing, *id.* ¶¶ 47, 48(a)-(b), to monitor each other, and to protect the purpose and effectiveness of the conspiracy, *id.* ¶¶ 48(c), 49. The 14 episodes serve as examples of the continuing network in action over the years and identify selected acts in furtherance of the conspiracy by each defendant.

As to Count 2 and Count 3 against Mr. Little, the Superseding Indictment clearly alleges that he knowingly and willfully made false statements to federal agents on August 31, 2020, when he stated that (1) he had no contact with individuals at competing suppliers outside of speaking to the individuals at industry trade shows, and (2) he had not called—or sent text messages to—any individuals at competing suppliers. Sup. Ind. ¶¶ 147-48. The Superseding Indictment further alleges that Mr. Little's false statements were material to, and obstructed, the investigation in this matter. *Id.* ¶¶ 147, 151.

All ten defendants were arraigned on the Superseding Indictment on October 13, 2020, and all ten defendants were granted pre-trial release subject to certain conditions imposed by the Court. One of those conditions—7(g)—prohibits the defendants from initiating contact with a few dozen individuals identified as co-conspirators, witnesses, or victims in two attachments ("no contact" lists) to the order. *See, e.g.*, ECF No. 165

(Attachment A relating to co-conspirators and witnesses); ECF No. 164 (Attachment B relating to victims).

The government also provided the defendants with full discovery to date in an organized and digestible manner. Production volumes were accompanied by annotated indices to guide the defendants in their review of the documents. *See, e.g.*, Exhibit B (annotated index example). The documents themselves are electronically searchable, both for metadata (*e.g.*, To, From, Date, Subject, etc.) and for content.[1]

As part of discovery, the government provided, and continues to provide, the defendants with insight into its investigation and theory of the case. Significantly, more than 40 interview reports were produced and additional reports will be produced in the future as interviews occur. Along the same lines, the government sent the defendants two letters—the first was more than 75 pages[2] and the second was 50 pages—summarizing information received, mostly through attorney proffers, in the course of the investigation. To the extent such information is received going forward, the government will write additional summary disclosure letters. The government produced several white papers received from subjects of the investigation.[3] Finally, the government identified

---

[1] There are a relatively small number of documents, such as scanned copies of handwritten notes, that are not fully electronically searchable. There are also documents that were produced to the government with unpopulated metadata fields. The government produced those documents to the defendants as received.

[2] Defendants Austin, Brady, and Fries received a letter of 87 pages prior to the Superseding Indictment and the remaining defendants received a letter of 79 pages post-Superseding Indictment that was shorter due only to formatting.

[3] The white papers contain factual content as well as substantial amounts of argument made by attorneys on behalf of the submitting subjects. The government redacted the attorney argument portions of the white papers before producing them to the defendants.

for the defendants a small subset—around 5,300—of the approximately 12.5 million documents as highly relevant to the government's case.

## LEGAL STANDARD

"'The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense.'" *United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1988) (quoting *United States v. Cole*, 755 F.2d 748, 760 (11th Cir. 1985)). "A bill of particulars, however, is not a discovery device," *Dunn*, 841 F.2d at 1029, and "[i]t is not the function of a bill of particulars to disclose in detail the evidence upon which the Government will rely at the trial," *United States v. Barbieri*, 614 F.2d 715, 719 (10th Cir. 1980) (quotation marks omitted).

In addition, defendants are not entitled to a particularization of specific legal theories, especially where the charging instrument adequately sets forth the government's general theory of the case. *See United States v. Levine*, 983 F.2d 165, 167 (10th Cir. 1992) ("Since the defendant is not entitled to know all the evidence the government intends to produce, but only the theory of the government's case, the district court [does] not abuse its discretion in denying defendant's motion for a bill of particulars where defendant has been served with a sufficient indictment.") (quotation marks omitted) (alteration in original); *United States v. Gabriel*, 715 F.2d 1447, 1449 (10th Cir. 1983) ("A bill of particulars may not be used to compel the Government . . . to explain the legal theories upon which it intends to rely at trial.") (quotation marks omitted).

Accordingly, where the charging instrument sets forth the elements of the offenses charged as well as a factual basis for those charges, and where the defendants have been provided full discovery, a bill of particulars is unnecessary. *See, e.g., United States v. Kunzman*, 54 F.3d 1522, 1526 (10th Cir. 1995) (affirming a district court's denial of a bill of particulars where the indictment "described the defendants' scheme in detail and provided dates, places and the persons involved in various transactions" and where there was full discovery).

## ANALYSIS

All ten motions for a bill of particulars should be denied because the Superseding Indictment sets forth the elements of the charges and provides a detailed factual basis for those charges, and because the government has provided full discovery. *See Kunzman*, 54 F.3d at 1526; *Levine*, 983 F.2d at 167. Each count in the Superseding Indictment very plainly contains the elements of the offense. Count 1 alleges (a) the existence of a conspiracy to rig bids and to fix, maintain, stabilize, and raise prices and other price-related terms for broiler chicken products, Sup. Ind. ¶¶ 1-2; (b) the defendants, by their actions, knowingly joined the conspiracy, *id.* ¶¶ 47-50; and (c) the broiler chicken products that were the subject of the conspiracy were sold in interstate commerce, *id.* ¶¶ 144-45. *See United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 474-75 (10th Cir. 1990) (explaining the substantive elements of *per se* offenses of the Sherman Act).

Likewise, Counts 2 and 3 of the Superseding Indictment, Sup. Ind. ¶¶ 146-51, contain allegations that track the statutory language, 18 U.S.C. §§ 1001, 1512(c)(2), and in so doing inherently set forth the elements of the offenses. *See United States v.*

6

*Salazar*, 720 F.2d 1482, 1486 (10th Cir. 1983) ("An indictment generally is sufficient if it sets forth the offense in the words of the statute so long as the statute adequately states the elements of the offense.").

The Superseding Indictment also provides a detailed factual basis for each count. Count 1 more-than adequately describes 14 episodes in 93 paragraphs, Sup. Ind. ¶¶ 51-143, which exemplify the operation of the continuing network with names, dates, and times. *Kunzman*, 54 F.3d at 1526 (holding that no bill of particulars was necessary where the indictment "described the defendants' scheme in detail and provided dates, places and the persons involved in various transactions"). Counts 2 and 3 (by reference to Count 2) describe the nature of the false statements and why they were false. Sup. Ind. ¶¶ 148-49.

Finally, the defendants have been provided full discovery as described above. Indeed, a major theme of their arguments is that the discovery is too voluminous. But that does not justify a bill of particulars. The Tenth Circuit explained in *United States v. Ivy*:

> By providing complete discovery containing sufficient information to allow them to prepare their defense, the government gave [the defendants] the tools necessary to anticipate and forestall any surprise that might have resulted from the indictment. Once the government provided these tools, it was [the defendants'] responsibility to use them in preparing their defense, regardless of whether the discovery was copious and the preparation of the defense was difficult.

83 F.3d 1266, 1282 (10th Cir. 1996). As in *Ivy*, the defendants here now possess the tools—and the time, with trial scheduled for August 2021—to prepare their defenses, and it is incumbent upon them to do so without the government providing a bill of particulars.

The defendants disagree, as evidenced by their 10 motions, which make overlapping, albeit somewhat uniquely framed, requests for particularization. It should be noted, however, that many of the defendants' briefs fault the Superseding Indictment for a lack of particularization as to numerous aspects of the alleged conspiracy but present an enumeration of requests for particularization that do not correspond on a one-to-one basis to all of the faults they identify. The government has attempted to group the explicitly enumerated requests for particularization and any implied requests for particularization below and explain why each should be denied.

*The Agreement.* Several defendants request particularization of the conspiratorial agreement.[4] The gist of their request is that they do not know what the term "continuing network" means or how the 14 episodes—characterized by some defendants as "disjointed"—fit into the overarching conspiracy. A corollary request, due to the allegedly "disjointed" nature of the episodes, is for particularization of the objective of the conspiracy.[5]

A bill of particulars is not an appropriate vehicle for compelling the government to disclose or to attempt to limit the specific legal theories it will rely upon throughout the litigation and trial. *See Gabriel*, 715 F.2d at 1449. A bill of particulars is unnecessary to explain the government's general theory of the case if that theory is otherwise elucidated by the Superseding Indictment. *See Levine*, 983 F.2d at 167. Along the lines

---

[4] ECF No. 179 at 6 (Austin); ECF No. 180 at 7 (Brady); ECF No. 181 at 7 (Fries); ECF No. 183 at 8 (Penn); ECF No. 203 at 7 (Roberts); ECF No. 204 at 6 (Kantola); ECF No. 205 at 13 (Lovette). Mr. Lovette also requests particularization of "how the conspiracy continued" throughout the relevant period and across the episodes identified in the indictment, ECF No. 205 at 5, which the government construes as falling within the requests for particularization of the agreement.

[5] ECF No. 204 at 4 (Kantola).

explained in the government's July 3 brief, *see* ECF No. 68 at 12, the Superseding Indictment does exactly that: it provides a general description of the agreement underlying the conspiracy, *see* Sup. Ind. ¶¶ 47-50, and then provides 14 episodes in 93 paragraphs that exemplify the conspiracy, *see id.* ¶¶ 51-143. No further particularization is needed.

The defendants' contention that the government's theory of the case is flawed because the term "continuing network" is "undefined," *see, e.g.*, ECF No. 180 at 5-6 (Brady), or because the 14 episodes appear to them as "disjointed," *see, e.g.*, ECF No. 181 at 8 (Fries), is a red herring.

The law has long recognized conspiracies comprising an agreement or understanding based on an extended course of conduct, enduring for years or decades, among a network of competitors to eliminate or reduce competition in a particular industry. *See, e.g.*, *United States v. Beachner Constr. Co.*, 729 F.2d 1278, 1282 (10th Cir. 1984) (affirming a conviction involving a 25-year "continuous, cooperative effort among Kansas asphalt contractors to rig bids"); *United States v. Consolidated Packaging Corp.*, 575 F.2d 117, 119 (7th Cir. 1978) (affirming a conviction involving "a fourteen-year, nationwide, industry-wide, price-fixing conspiracy by twenty-three folding carton companies and fifty of their executives").

In such conspiracies, every co-conspirator may not participate in every episode but the network is generally available as needed, *e.g.*, *United States v. Mobile Materials, Inc.*, 881 F.2d 866, 871 (10th Cir. 1989) (explaining in the context of a multi-year conspiracy to rig bids for Oklahoma highway construction projects, "[t]he conspiracy was self-perpetuating and could be plugged into at any time"); *Consolidated*

9

*Packaging*, 575 F.2d at 121 ("Whenever the needs of any conspirator might require it, the conspirator had only to plug into the system, get 'on the phone,' and make the necessary arrangements."), for a common anti-competitive objective, *Beachner*, 729 F.2d at 1283 ("[A] common objective was shared by each participating contractor: *to eliminate price competition and ensure higher individual profits.*") (emphasis in original). "The many minor individual or particular conspiracies which the system fostered and spawned were evidence of the effectiveness of the general conspiracy." *Consolidated Packaging*, 575 F.2d at 121.

The defendants here "participated in a continuing network of Suppliers and co-conspirators, an understood purpose of which was to suppress and eliminate competition through rigging bids and fixing prices and price-related terms for broiler chicken products sold in the United States." Sup. Ind. ¶ 47. And in so doing, they fostered and spawned many smaller anti-competitive episodes, *id.* ¶¶ 48(a), (b), that are exemplified thereafter, *e.g.*, *id.* ¶¶ 51-63 ("QSR-1's Dark Meat, Wings, and 8-Piece COB Supply for 2013"), 64-65 ("QSR-1's 2013 Request to Supply Reduced-Weight Product"), etc. Bearing in mind that "[t]he government need not show that every attempt to rig bids was successful or that every bid on a project was the product of collusion," *Mobile Materials*, 881 F.2d at 873, and that the sufficiency of the evidence "to establish a single conspiracy is a factual matter," *id.* at 872, the question of whether any given episode is sufficiently "disjointed" to remove it from the scope of the overall conspiracy is an issue for another day.

Accordingly, the defendants' requests for further particularization of the agreement should be denied.

10

*Start Date of the Conspiracy.* Several defendants request particularization of the conspiracy's start date.[6] Aside from an unstated assumption that they must be provided an exact start date—seemingly for the sake of completeness—to prepare their defenses, the requesting defendants rely primarily on the fact that, even though the Superseding Indictment alleges the conspiracy began at least as early as 2012, Sup. Ind. ¶ 1, some of the "highly relevant" documents identified by the government are dated as far back as 2006, and therefore the defendants could be subject to unfair surprise with a much earlier start date.

As a threshold matter, an indictment is not defective merely because it alleges a conspiracy with an uncertain start date. *United States v. Patterson*, 713 F.3d 1237, 1249-50 (10th Cir. 2013). Conspiracies "generally are not born full grown," "[r]ather they mature by successive stages," *Blumenthal v. United States*, 332 U.S. 539, 556 (1947), thus making a given conspiracy's exact start date elusive but making that conspiracy no less illegal. In short, the defendants do not require an exact start date to prepare their defenses.

Nor will the defendants be subject to unfair surprise in the absence of a particularized start date. The highly relevant documents—at least those which have an electronically populated date field—do in fact span 2006 to 2020; however, the below histogram demonstrates that the vast majority of highly relevant documents (that have a populated date field) are within the 2012 to 2019 range identified in the superseding indictment.

---

[6] ECF No. 179 at 4 (Austin); ECF No. 180 at 5 (Brady); ECF No. 181 at 4 (Fries); ECF No. 204 at 4 (Kantola); ECF No. 208 at 5 (Little).

11



In the event some of the relatively small number of documents outside that date range are proposed as exhibits by the government, the defendants will certainly have adequate opportunity to lodge objections with the Court and avoid unfair surprise.

*End Date of Conspiracy.* At least four defendants request a particularization of the conspiracy's end date.[7] The primary argument is that because there are no factual allegations beyond August 2017—"other than a general statement that Defendants 'sold and accepted payment for broiler chicken products that are the subject of the allegations in the indictment . . . until at least approximately early 2019'"—the defendants "must guess whether the conspiracy ended in September 2017 or whether the government will raise at trial and seek to hold [them] responsible for any conduct arising after that date under the auspices of Paragraph 48's [Sup. Ind. ¶ 48] undefined 'continuing network' or otherwise." ECF No. 180 at 6.

The argument reflects a misconception of black-letter law. A conspiracy continues "until its purpose has been achieved or abandoned," *United States v. Kemp &*

---

[7] ECF No. 181 at 9 (Fries); ECF No. 180 at 6 (Brady); ECF No. 183 at 13 (Penn); ECF No. 205 at 2, 5, 7, 13 (Lovette).

12

*Assocs.*, Inc., 907 F.3d 1264, 1270 (10th Cir. 2018) (internal quotation marks omitted), which means that an antitrust conspiracy does not end with the last bid rigged or last price fixed, but continues while the conspirators receive payment for the goods that are the object of the conspiracy, *see id.* Here, even if there were no unlawful bid rigging or price fixing after August 2017—and the government does not concede that there were no such acts after that date—the Superseding Indictment alleges the receipt of payments until at least early 2019, Sup. Ind. ¶ 50. Therefore, the alleged conspiracy itself lasted until at least early 2019. *See Kemp*, 907 F.3d at 1270. That does not put the end date at precisely early 2019, but it does mean the defendants need not guess whether the conspiracy continued after 2017.

*Identities of All Co-Conspirators.* All or nearly all of the defendants request the identities of all co-conspirators.[8] Those requests should be denied, not only for the reasons stated in the government's July 3 brief, *see* ECF No. 68 at 9-11; *see also United States v. Hajduk*, 370 F. Supp. 2d 1103, 1112-13 (D. Colo. 2005) ("The government is not required to identify unindicted co-conspirators."), but also because the government has continued to provide substantial information to the defendants identifying co-conspirators. Most obviously, between the original Indictment and the Superseding Indictment, the number of defendants charged increased from four to ten, thus identifying six more co-conspirators. The government also provided a legend to de-anonymize the Superseding Indictment and thereby identified 16 individuals employed

---

[8] ECF No. 179 at 5-6 (Austin); ECF No. 181 at 9-10 (Fries); ECF No. 183 at 13-14 (Penn); ECF No. 203 at 8-9 (Roberts); ECF No. 204 at 4 (Kantola); ECF No. 205 at 7-9 (Lovette); ECF No. 206 at 4-7 (Blake); ECF No. 207 at 3 (Mulrenin); ECF No. 208 at 5-6 (Little).

13

by several broiler chicken suppliers who acted in furtherance of the conspiracy. Coupled with the "no contact" lists, the defendants know the identities of dozens of people who had roles in the conspiracy. As evidence continues to develop in the ongoing investigation and as the government prepares its case for trial, a few other co-conspirators may be identified but they will be disclosed to the defendants through interview reports and pre-trial evidentiary disclosures. Suffice it to say, any fear the defendants have of unfair surprise due to unidentified co-conspirators are plainly unfounded.[9]

*Joining the Conspiracy.* Every defendant requests the dates and actions by which he joined the conspiracy.[10] But the government does not need to show exactly when and how a given defendant joined the conspiracy; the government only needs to prove that he did in fact join the conspiracy. *See Blumenthal*, 332 U.S. at 557 (explaining that "the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it"); *United States v. Ostrer*, 481 F. Supp. 407, 417 (S.D.N.Y. 1979) (rejecting a bill of particulars request for the dates each co-conspirator joined the conspiracy). As such, the requested particulars would not meaningfully aid the

---

[9] The defendants' similar requests for all rigged bids, fixed prices, etc., should be denied. The government relies on its submission of July 3 and the arguments therein. *See* ECF No. 68 at 11-12.

[10] ECF No. 179 at 4-5 (Austin); ECF No. 180 at 7 (Brady); ECF No. 181 at 7-9 (Fries); ECF No. 183 at 15 (Penn); ECF No. 203 at 7 (Roberts); ECF No. 204 at 4 (Kantola); ECF No. 205 at 9-11 (Lovette); ECF No. 206 at 8-9 (Blake); ECF No. 207 at 6-7 (Mulrenin); ECF No. 208 at 6 (Little). Mr. Blake also requests particularization of "through whom [he] allegedly joined the conspiracy," ECF. No. 206 at 2, which the government construes as falling within the scope of this request.

14

defendants in their preparation of a defense and, in any event, with full discovery they now have the ability to construct a time line if they so desire.

*Theory of Participation and Acts in Furtherance.* Each defendant requests, in varying forms, a particularization of the government's theory of how, and the full extent to which, he participated in the conspiracy.[11] Their requests should be denied.

A bill of particulars cannot be used to demand the government's legal theories or otherwise attempt to limit the government's proof at trial. *Gabriel*, 715 F.2d at 1449; *see also Dunn*, 841 F.2d at 1030.[12] It is also well established that "the government may prove at trial overt acts other than those alleged in the indictment." *United States v. Stoner*, 98 F.3d 527, 533 (10th Cir. 1996). Therefore, the government does not need to particularize every act in furtherance of the conspiracy for a given defendant. *United*

---

[11] ECF No. 179 at 6 (Austin); ECF No. 180 at 4 (Brady); ECF No. 181 at 6 (Fries); ECF No. 183 at 14-15 (Penn); ECF No. 203 at 8 (Roberts); ECF No. 204 at 4 (Kantola); ECF No. 205 at 9-11 (Lovette); ECF No. 206 at 7-12 (Blake); ECF No. 207 at 8 (Mulrenin); ECF No. 208 at 6-7 (Little).

[12] In spite of the very clear language in *Gabriel* that "[a] bill of particulars may not be used to compel the Government . . . to explain the legal theories upon which it intends to rely at trial," 715 F.2d at 1449 (quotation marks omitted), Mr. Penn and Mr. Lovette cite *Dunn* for the proposition that a bill of particulars entitles them to learn "the *theory* of the government's case," 841 F.2d at 1030 (emphasis in original), and therefore to learn the government's legal theories as to how they themselves have criminal liability and "how the acts charged occurred within the limitations period." ECF No. 183 at 14 (Penn); ECF No. 205 at 9, 12 (Lovette). In so doing, they incorrectly equate "the legal theories upon which [the government] intends to rely at trial" (*Gabriel*) with "the theory of the government's case" (*Dunn*). Indeed, the very case cited in *Dunn* denied a bill of particulars seeking "the 'when, where, and how' of every act in furtherance of the conspiracy" because the indictment and discovery provided the defendant with sufficient information to prepare for trial, to avoid surprise, and to plead double jeopardy. *See United States v. Giese*, 597 F.2d 1170, 1181 (9th Cir. 1979). In any event, Mr. Penn is mentioned over 40 times and Mr. Lovette is mentioned nearly 20 times in the Means and Methods section of the Superseding Indictment, so they have a very good idea of the government's theory of liability.

States v. Welch, 198 F.R.D. 545, 550 (D. Utah Jan. 12, 2001) ("It is not required to mention *all* overt acts known to the Government, nor is a bill of particulars proper for such purpose.") (emphasis in original).[13]

*Most Recent Act in Furtherance.* Mr. Roberts and Mr. Little request particularization of his most recent act in furtherance of the conspiracy.[14] For Mr. Roberts and Mr. Little, the most recent acts alleged in the Superseding Indictment occurred in 2014, more than 5 years before the dates they were charged. *See* Sup. Ind. ¶¶ 94(a) (August 18, 2014, for Little), 104 (September 3, 2014, for Roberts). Given that the statute of limitations for a Sherman Act violation is 5 years, 18 U.S.C. § 3282, they argue, at least implicitly in the case of Mr. Little, that they require particularization of their most recent acts in furtherance to prepare their respective statute-of-limitations defenses.[15]

Again, the defendants' argument misconceives the law. "Passive nonparticipation in the continuing scheme is not enough to sever the meeting of minds that constitutes the conspiracy," *Smith*, 568 U.S. 106, 112-13 (2013), and accordingly "a defendant's

---

[13] Mr. Brady also asks whether the 14 episodes specified in the Superseding Indictment are the totality of episodes in the charged conspiracy. ECF No. 180 at 7. The government construes the request as falling in this category.

[14] ECF No. 203 at 10 (Roberts); ECF No. 208 at 7 n.2 (Little).

[15] At the time of their respective last alleged acts in 2014, Mr. Roberts was an employee of Supplier-3 and Mr. Little was an employee of Supplier-1. In 2016, Mr. Roberts left Supplier-3 and became an employee of Supplier-4, and Mr. Little retired from Supplier-1. (The government notes, as does Mr. Little in his brief, ECF No. 208 at 3 n.1, there are documents that make it unclear whether he retired in 2016 or 2017. For present purposes, the government assumes Mr. Little retired in 2016.) Even if the defendants claim that those changed employment circumstances constitute withdrawal from the conspiracy, such a claim would be irrelevant to a statute-of-limitations defense because they occurred less than 5 years before charging.

membership in the conspiracy, and his responsibility for its acts, endures even if he is entirely *inactive* after joining it," *id.* at 114 (emphasis in original). Therefore, even assuming Mr. Roberts and Mr. Little did nothing in furtherance of the conspiracy for the last 6 or so years—which the government does not concede with respect to either defendant—they remain liable for the conspiracy until its purpose was achieved or abandoned, *Kemp*, 907 F.3d at 1270, or until they withdrew, *Smith*, 568 U.S. at 114. Thus, absent withdrawal—the facts relevant to which are uniquely within the defendants' control, *see Id.* at 113 (explaining that because a "defendant knows what steps, if any, he took to dissociate from his confederates," "[h]e can testify to his act of withdrawal or direct the court to other evidence substantiating his claim")—Mr. Roberts and Mr. Little are liable for the conspiracy through at least early 2019 regardless of when their last act in furtherance occurred.[16]

*Obstruction.* Mr. Little requests particularization with respect to Count 3. ECF No. 208 at 7-9. The request should be denied. The Superseding Indictment plainly alleges in Count 2 the factual allegations that are incorporated into Count 3, *i.e.*, that Mr. Little falsely told federal agents that (1) he had no contact with individuals at competing suppliers outside of speaking to them at industry trade shows, and (2) he had not called—or sent text messages to—any individuals at competing Suppliers. Sup. Ind.

---

[16] Relatedly, Mr. Little's additional request for particularization of acts in furtherance of, and benefits derived from, the conspiracy after he retired, ECF No. 208 at 7, is irrelevant to his liability unless he withdrew from the conspiracy. Mr. Lovette separately requests particularization of the facts implicating him that occurred within the 5-year statute of limitations because, he argues, anything that occurred before then is time barred. ECF No. 205 at 12-13. That is not legally correct, *Kemp*, 907 F.3d at 1270, and, in any event, Mr. Lovette will have an opportunity to move to dismiss on statute-of-limitations grounds before trial.

17

¶¶ 147-48. Those statements form the core of the charge; it is difficult to fathom what additional detail Mr. Little requires.[17]

## CONCLUSION

For the reasons discussed above, defendants' motions should be denied in full.

Respectfully submitted this 14th day of December, 2020.

By: _____

Michael T. Koenig
Heather D. Call
Carolyn M. Sweeney
Paul J. Torzilli
Trial Attorneys
Antitrust Division
U.S. Department of Justice
Washington Criminal II Office
450 Fifth Street, N.W.
Washington, D.C. 20530
Tel: (202) 616-2165
Email: michael.koenig@usdoj.gov

---

[17] Mr. Little's request for a particularization of exactly how his false statements obstructed official proceedings, ECF No. 208 at 8-9, is an inappropriate attempt to use a bill of particulars to compel the government to explain its legal theories. *See Gabriel*, 715 F.2d at 1449.

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel of record in the above-captioned matter.

                                        Michael Koenig,
                                        Trial Attorney
                                        United States Department of Justice
                                        Antitrust Division
                                        450 Fifth Street, N.W.
                                        Washington, D.C. 20530
                                        Tel: (202) 616-2165
                                        Email: michael.koenig@usdoj.gov