IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No.: 20-CR-152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.     JAYSON JEFFREY PENN,
2.     MIKELL REEVE FRIES,
3.     SCOTT JAMES BRADY,
4.     ROGER BORN AUSTIN,
5.     TIMOTHY R. MULRENIN,
6.     WILLIAM VINCENT KANTOLA,
7.     JIMMIE LEE LITTLE,
8.     WILLIAM WADE LOVETTE,
9.     GARY BRIAN ROBERTS,
10.    RICKIE PATTERSON BLAKE,

    Defendants.

## DECLARATION OF KIMBERLY PRYOR IN SUPPORT OF NON-PARTY PILGRIM'S PRIDE CORPORATION'S MOTION TO QUASH AND/OR MODIFY SUBPOENA

1.     I, Kimberly Pryor, am the General Counsel of Pilgrim's Pride Corporation ("PPC" or the "Company"). I respectfully submit this declaration in support of Non-Party Pilgrim's Pride Corporation's Motion to Quash And/Or Modify Subpoena. The facts contained in this declaration are, to the best of my knowledge, true and correct.

2.     I understand that, on July 29, 2021, the Court entered an order authorizing the Defendants in this action to issue a subpoena to PPC (the "Subpoena"), which Defendants subsequently served on PPC.

Background

3. PPC is a chicken producer headquartered in Greeley, Colorado. I understand that, from 2012 to 2019, PPC earned approximately $51 billion in net sales; sold approximately 57 billion pounds of chicken; and did business with approximately 6,000 unique customers. Those customers include, without limitation, purchasers of small quantities of chicken on the spot market, quick-service restaurant chains, local, regional and national distributors, retail and grocery chains, and federal, state and local government programs. PPC currently sells more than 20,000 unique products through a sales force of approximately 150 individuals.

4. PPC is a defendant in a series of consolidated civil antitrust actions pending in the United States District Court for the Northern District of Illinois, captioned *In Re Broiler Chicken Antitrust Litigation,* No. 16-CV-8637 (N.D.Ill.) ("*Broilers*"). That litigation consists of more than 160 opt-out plaintiffs across more than 70 separate complaints.

5. On July 1, 2019, PPC also received a grand jury subpoena (the "DOJ Subpoena") from the United States Department of Justice ("DOJ") in connection with DOJ's antitrust investigation concerning the sale of broilers chickens in the United States.

6. In the *Broilers* litigation, PPC has produced approximately 1,144,118 documents, comprised of approximately 10,614,500 pages. In response to the DOJ Subpoena, PPC produced an additional approximately 1,712,234 documents, comprised of approximately 5,102,098 pages, including approximately 865,606 documents from the files of, or e-mails to and from, the former PPC employees who have been indicted by the government in this or a related case[1] – namely,

---

[1] *See United States v. McGuire, et al*, 21-cr-00246-dd (D. Colo. 2021).

Roger Austin, Bill Lovette, Jayson Penn, Tim Stiller, Jason McGuire, Scott Tucker, Justin Gay, Scott Brady, Bill Kantola, and Jimmie Little.

7. PPC also has produced every email communication between more than two dozen of its current or former employees (including each of the former PPC employees who are individual defendants in this or the related case) and PPC's competitors, regardless of subject matter, that Pilgrim's was able to locate after a reasonable search. It is the Company's understanding and expectation that DOJ has provided, and/or will be providing, all of these documents to the Defendants.

<u>The Subpoena Is Overly Burdensome And Oppressive</u>

8. Requiring PPC to comply with the Subpoena would be extremely burdensome and oppressive. For example, taking into account the full breadth of the broad defined terms, Request No. 1 effectively seeks any and all communications (to or from any of PPC's thousands of employees) or documents relating to the price of broiler chickens offered to any of PPC's approximately 6,000 customers over the course of eight years. For many of our salespeople, this request could require the production of nearly every work-related e-mail they sent or received for eight years. This is not a narrow request seeking specific documents.

9. Specifically, Request No. 1 seeks "All BIDS or CONTRACTS for the sale or purchase of BROILER CHICKEN PRODUCTS." To fully appreciate the scope and burden of Request No. 1, the following defined terms need to be considered: (a) "all" is defined as "any and all;" (b) "bid" is defined as "offer, quote, submission, proposal, or proposition, relating to a PRICE offered;" (c) "contract" is defined as "any formal or informal agreement or any formal or informal modification thereto to purchase or sell broiler chicken products or otherwise conduct business

3

with chicken purchasers;" (d) "relating to" is defined as "concerning, describing, evidencing, supporting, discussing, consisting of, referring to, reflecting on, embodying, dealing with, or being in any way legally, factually, or logically connected with;" (e) "price" is defined as "a cost, worth, value, rate, fee, fare, toll, bill, expense, due, valuation, charge, or any element that makes up a cost, either monetary or otherwise;" (f) "broiler chicken products" are defined as "any products, items, merchandise, stock, or yield related to chicken;" and (g) "chicken purchaser" is defined as "any individual or COMPANY that negotiates for, purchases, procures, buys, trades for, pays for, or otherwise acquires broiler chicken products directly from a company that manufactures or produces those products, either individually or collectively as a purchasing cooperative; including, but not limited to, the following companies: a. RSCS, b. KFC, c. SMS, d. Popeyes, e. Golden Corral, f. Church's, g. SYSCO, h. John Soules Foods, i. Chick-Fil-A, and j. Costco."

10. Parsing through the definitions, Request No. 1 seeks (i) any and all offers, quotes, submissions, proposals, or propositions, relating to a cost, worth, value, rate, fee, fare, toll, bill, expense, due, valuation, charge, or any element that makes up a cost, either monetary or otherwise for the purchase or sale of any products, items, merchandise, stock, or yield related to chicken; **_and_** (ii) any and all formal or informal agreements or any formal or informal modification thereto to purchase or sell broiler chicken products or otherwise conduct business with any individual or company that negotiates for, purchases, procures, buys, trades for, pays for, or otherwise acquires any products, items, merchandise, stock, or yield related to chicken directly from a company that manufactures or produces those products, either individually or collectively as a purchasing cooperative; including, but not limited to, the following companies: a. RSCS, b. KFC, c. SMS, d.

4

Popeyes, e. Golden Corral, f. Church's, g. SYSCO, h. John Soules Foods, i. Chick-Fil-A, and j. Costco.

11. Because PPC does not maintain a database containing all of its formal and informal contracts and bids, the Company would need to independently identify such materials through a search of tens of millions of emails, texts, and documents pertaining to hundreds of relevant custodians.[2]

12. In my opinion, based on my experience in responding to discovery in *Broilers* and to the DOJ Subpoena, collecting, reviewing, and producing the documents requested by this Subpoena would be an oppressive, burdensome, and disruptive task for PPC that would cost many millions of dollars and likely would take more than six months to complete.

13. Moreover, in the *Broilers* litigation, PPC already has produced (with tremendous effort and at great expense) comprehensive sales data that includes detailed pricing and other information for every transaction between PPC and all of its customers and counterparties between 2004 and 2019. PPC also agreed in the *Broilers* litigation to search for and produce any contract that covered a duration of over six months for 111 of its customers. A few examples of the numerous contracts produced in response to that agreement in *Broilers* can be found at the following Bates number ranges, all of which I understand Defendants already have in their

---

[2] Given that there currently are approximately 150 salespeople, when one includes sales people who have left the company in the past eight years along with marketing, management, accounting, and other employees who might have relevant communications "concerning, describing, evidencing, supporting, discussing, consisting of, referring to, reflecting on, embodying, dealing with, or being in any way legally, factually, or logically connected" to bids, the potential number of custodians would exceed 200 and could be much higher.

5

possession: PILGRIMS-0010496898–PILGRIMS-0010499323 and PILGRIMS-0010611864–PILGRIMS-0010612069.

14. Likewise, in response to the DOJ Subpoena, PPC produced hundreds if not thousands of additional contracts, and tens or even hundreds of thousands of communications between PPC and its customers. On information and belief, Defendants received all of this information from DOJ and had the same in their possession prior to moving this Court for issuance of the Subpoena.

15. In another example, Request No. 2 of the Subpoena seeks *all* purchase orders between PPC and its competitors. The detailed sales data that PPC produced includes transaction-level data for every transaction between PPC and its competitors, and that information demonstrates the volume of commerce exchanged between PPC and its competitors. Producing the purchase orders themselves would add very little (if any) information beyond what is located in the sales data, and it would be extremely burdensome given that PPC entered into numerous transactions to purchase and sell approximately $2 billion worth of products with its competitors over the applicable period.

16. Similarly, Request No. 4 seeks "*all* documents containing or reflecting" (emphasis added) PPC's organizational charts. Because PPC has over 32,000 employees who work in over a dozen locations, it would be incredibly time-consuming and expensive to locate all documents "containing or reflecting" these charts. This is particularly true given that Defendants already have received certain information pertaining to PPC's organizational structure. In the *Broilers* litigation, PPC produced 64 pages of organizational charts – the very first documents that PPC produced in the *Broilers* litigation, in a consecutive Bates number range beginning with

PILGRIMS-0000000001. Moreover, dozens and perhaps hundreds of organizational charts were produced throughout PPC's production in *Broilers* that were attached to emails or were located on custodians' computers.

17. Request 5 seeks various employment-related documents, including employment contracts, compensation and bonus information, stock grants, key performance indicators and performance evaluations. Because PPC does not maintain a central database of these documents, and may not possess many of them, collecting these documents will be a burdensome and time-consuming exercise.

18. Request 6 seeks expense reports, calendar entries and performance reviews (regardless of topic) from Beto Esteves. Mr. Esteves is a former PPC employee who left in 2016 and focused primarily on international sales, not domestic sales. Because Mr. Esteves left the company many years ago, PPC does not possess any "calendar entries" for Mr. Esteves. However, PPC has already produced thousands of documents from Mr. Esteves's email files, including any responsive calendar "invites."

19. As yet a final example of how onerous and burdensome complying with the Subpoena would be for PPC, Request No. 11 seeks "[a]ll DOCUMENTS containing or reflecting records of any investigation, review, fact-finding, or analysis, including interviews of any person, conducted by PILGRIM'S PRIDE from September 2, 2016 onward related to the bidding, sale, or pricing of BROILER CHICKEN PRODUCTS, any investigation by the DEPARTMENT OF JUSTICE or the FBI, any alleged or potential violation of the U.S. antitrust laws, or any of Jayson Penn, William 'Bill' Lovette, Roger Austin, Jimmie Little, Jason McGuire, Justin Gay, Tim Stiller, or Scott Tucker" from September 2, 2016 onward.

7

20.     This request would literally require PPC to review the files of its in-house and outside counsel who worked on any antitrust investigations relating to more than 160 different plaintiffs' claims in more than 70 complaints, as well as the lawyers who have worked on the DOJ's grand jury investigation in this matter (and any other antitrust matter, whether civil or criminal, over the past five years).  I estimate that this would require organizing a review of the files and communications of more than 50 different lawyers, and likely would yield only their clearly privileged and work product protected internal and external communications and documents concerning antitrust work for PPC.  I understand that, in the meet and confer process, Defendants have advised our outside counsel that, while they are not seeking the production of any privileged documents, they expect PPC to produce all facts contained in such privileged materials.  The burden and expense – not to mention the time it would take – to review and then to prepare privilege logs and/or redactions in response to such a request (even assuming Defendants' position is correct that they are entitled to that information – which it is not) would be absolutely enormous.

21.     Based on the foregoing, I believe that compliance with the Subpoena likely would require PPC to collect, search, and review tens of millions of emails, texts, and other documents, would cost PPC many millions of dollars or more, would be burdensome, disruptive and unreasonable, and would at take least six months, if not longer.

22.     The technological and legal burden of collecting and reviewing these documents within any timeframe between now and the currently scheduled trial of this matter also would likely cause a significant disruption in PPC's information technology (IT) and legal departments, and materially hinder PPC's ability to comply with its obligations in numerous other legal matters,

while requiring PPC to reproduce to Defendants millions of pages of documents and information that Defendants already have and/or will be receiving from the government.

23. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 13, 2021 in San Antonio, Texas.

/s/ Kimberly Pryor
Kimberly Pryor