**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Action No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1. **JAYSON JEFFREY PENN,**
2. **MIKELL REEVE FRIES,**
3. **SCOTT JAMES BRADY,**
4. **ROGER BORN AUSTIN,**
5. **TIMOTHY R. MULRENIN,**
6. **WILLIAM VINCENT KANTOLA,**
7. **JIMMIE LEE LITTLE,**
8. **WILLIAM WADE LOVETTE,**
9. **GARY BRIAN ROBERTS,**
10. **RICKIE PATTERSON BLAKE,**

     Defendants.

---

**UNITED STATES' CONSOLIDATED RESPONSE TO
DEFENDANTS' MOTIONS TO DISMISS THE SUPERSEDING INDICTMENT**

---

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 4

    A. The Broiler Chickens Industry ................................................................... 4

    B. The Charges .............................................................................................. 5

    C. The Defendants' Motions to Dismiss ........................................................ 6

RULE 12 STANDARD ............................................................................................... 7

ARGUMENT .............................................................................................................. 9

  I. The Superseding Indictment Properly Alleges a *Per Se* Unlawful Price-Fixing Conspiracy that Each Defendant Knowingly Joined ........................................... 9

    A. The Superseding Indictment Alleges the Elements of a Price-Fixing Conspiracy and Puts the Defendants on Notice of the Charges .............. 12

    B. The Defendants' Arguments Regarding the Adequacy of the Allegations Are Meritless ............................................................................................. 14

    C. The Defendants' Argument that the Superseding Indictment Should Be Dismissed for Failure to State a *Per Se* Offense Should Be Rejected ..... 19

  II. The Due Process Clause Does Not Preclude this Prosecution Because the Sherman Act Provides Fair Notice that Price-Fixing Conspiracies Are Unlawful and the *Per Se* Rule Is Not an Evidentiary Presumption ................................. 22

    A. The Sherman Act Provides Fair Notice of Criminality and Is Not Unconstitutionally Vague ......................................................................... 22

    B. The *Per Se* Rule Is a Construction of the Sherman Act, Not an Evidentiary Presumption .......................................................................... 28

  III. The Superseding Indictment Was Timely Because the Conspiracy Continued Through at Least Early 2019 ........................................................................... 33

    A. A Sherman Act Conspiracy Is a Continuing Offense and Remains Actionable Until Its Purpose Has Been Achieved or Abandoned ............. 34

    B. Mr. Roberts Is Liable for His Co-Conspirators' Acts in Furtherance of the Conspiracy .............................................................................................. 37

    C. The Conspiracy Continued While Conspirators Sold and Accepted Payment for Price-Fixed Chickens ............................................................ 38

    D. An Evidentiary Hearing on the Statute of Limitations Defense Is Not Permitted by Rule 12 and Would Impermissibly Intrude on the Role of the Jury .......................................................................................................... 41

CONCLUSION ........................................................................................................ 43

**INTRODUCTION**

Count 1 of the Superseding Indictment charges an ordinary, though no less criminal, *per se* unlawful conspiracy among competing broiler chicken suppliers to fix prices. The defendants move to dismiss the charge on various grounds, but the motions are premised on mischaracterizations of the Superseding Indictment and are foreclosed by controlling Supreme Court and Tenth Circuit precedent. They all should be denied.[1]

From the outset, Count 1 states the offense, alleging that the defendants and their co-conspirators, "[b]eginning at least as early as 2012 and continuing through at least early 2019 . . . entered into and engaged in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States" and that the "combination and conspiracy . . . was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1." ECF No. 101 ¶1. The Superseding Indictment states that the conspiracy consisted of a "continuing agreement, understanding, and concert of action among the Defendants and co-conspirators" and that its "substantial terms" were "to rig bids and to fix, maintain, stabilize, and raise prices and other price-related terms for broiler chicken products sold in the United States."[2] *Id.* ¶2.

---

[1] The government submits this consolidated response to all ten defendants' motions to dismiss pursuant to the Court's order. ECF No. 312.

[2] For ease of reference, the conduct is referred to here as price fixing, a term that includes agreements among competitors to fix, maintain, stabilize, and raise prices and other price-related terms and to rig bids. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223-24 (1940); *United States v. Joyce*, 895 F.3d 673, 677 (9th Cir. 2018).

The defendants' arguments ignore, dismiss, or mischaracterize those allegations, whose clear import is a *per se* unlawful conspiracy, that is, an agreement among competitors to fix prices that the defendants knowingly joined. Those allegations alone satisfy the applicable pleading standard, by stating the elements of the offense, identifying the nature of the unlawful restraint of trade, and providing key particulars about it.

In any event, Count 1 provides further context for the conspiracy, describing how the defendants, understanding the purpose was to fix broiler chicken prices, including by rigging bids, disclosed to each other their non-public bids, prices, and negotiating positions (before submitting them to the customer), monitored each other's prices to customers, and accepted payments for broiler chicken products at fixed prices. The Superseding Indictment also alleges fourteen episodes to illustrate how the agreement worked, including dates, prices, and discussions in furtherance of the alleged conspiracy. While the defendants' arguments regarding the significance of, and inferences from, those episodes may be appropriate for the jury after all the evidence is presented, their arguments have no place under Federal Rule of Criminal Procedure 12. Under the Rule 12 standard, the defendants have no basis to complain they lack fair notice of the charge against which they must defend.

The two constitutional challenges to the prosecution are also baseless. Section 1 of the Sherman Act and over a century of decisions construing it provide ample notice that it outlaws price-fixing agreements among competitors, treating them under the *per se* rule as unlawful in and of themselves. Vagueness challenges to Section 1, like those

2

of the defendants here, have been rejected by every court to consider them, including the Supreme Court in *Nash v. United States*, 229 U.S. 373 (1913). Likewise, the argument that the *per se* rule is an unconstitutional presumption has been rejected by every court to consider it. The *per se* rule is not an evidentiary presumption at all, but a construction of the statutory language deeming price fixing among competitors an unreasonable restraint of trade.

Lastly, on its face, Count 1 was timely returned in October 2020, well within the five-year limitations period. Specifically, the Superseding Indictment alleges the defendants participated in a conspiracy that continued through at least early 2019 and, moreover, alleges specific acts in 2017, 2018, and 2019. Mr. Roberts—the only defendant who poses a statute-of-limitations defense—has three central contentions— (1) the statute of limitations begins to run at the conspiracy's formation, (2) a defendant must commit an act within the limitations period, and (3) a conspirator's receiving payments at fixed prices are not acts in furtherance showing the conspiracy's continuation. All of those are belied by controlling precedent holding that a price-fixing conspiracy is a continuing offense that continues at least as long as any of the conspirators act in furtherance of it, including by receiving the anticipated economic gain in the form of payments.

The defendants' motions to dismiss should be denied.

## BACKGROUND

A.     *The Broiler Chickens Industry*

During the conspiracy period, broiler chickens were chickens raised and sold as meat for human consumption. ECF No. 101 ¶ 3. In the United States, several companies, referred to as suppliers, produced broiler chicken products for sale directly or indirectly to restaurants, grocery retailers, and other customers. *Id.* Those suppliers were competitors in the sale of broiler chicken products, operating at the same level of the market for broiler chicken products. *Id.* ¶¶ 3-4.

Broiler chicken customers purchased various broiler chicken products depending on their needs, including 8-piece chicken-on-the-bone (commonly referred to as "8-piece COB"), wings, dark meat, and boneless chicken products, such as breasts and tenders. *Id.* ¶¶ 4-7, 10. Customers that purchased large volumes of broiler chicken products generally received bids from, and negotiated prices and price-related terms (such as discounts and credit terms) with, suppliers directly or, in the case of many quick-service restaurants (QSRs), through a buying cooperative. *Id.* ¶ 4. For customers that purchased 8-piece COB products, the price of 8-piece COB often formed the basis for the price of other broiler chicken products such as dark meat. *Id.* ¶ 6. In other cases, prices for broiler chicken products like wings were sometimes tied to a market index. *Id.* ¶ 7. Bids and negotiations between broiler chicken suppliers and customers occurred at regular points during the year or sometimes at other times. *Id.* ¶ 8.

B.    *The Charges*

On June 2, 2020, a grand jury sitting in this district returned an Indictment charging four current and former executives and employees of broiler chicken suppliers (Messrs. Penn, Fries, Brady, and Austin) with one count of conspiring to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. ECF No. 1. Four months later, on October 6, 2020, the grand jury returned a Superseding Indictment adding six additional current and former executives and employees of broiler chicken suppliers (Messrs. Mulrenin, Kantola, Little, Lovette, Roberts, and Blake), charging them and the first four defendants with conspiring to restrain trade in violation of Section 1 of the Sherman Act. ECF No. 101 ¶¶ 1-145 (Count 1).[3]

Specifically, the Superseding Indictment charges that from at least as early as 2012 through at least early 2019, all ten defendants, along with co-conspirators, "entered into and engaged in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States." *Id.* ¶ 1. The Superseding Indictment further charges that the conspiracy was a "*per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1." *Id.* The charged conspiracy "consisted of a continuing agreement, understanding, and concert of action among the Defendants and co-conspirators, the

---

[3] Mr. Little was also charged with making false statements in violation of 18 U.S.C. § 1001 and obstructing justice in violation of 18 U.S.C. § 1512(c)(2). *Id.* ¶¶ 146-49 (Count 2), ¶¶ 150-51 (Count 3). Mr. Little's motion to dismiss, ECF No. 306, does not challenge those counts.

substantial terms of which were to rig bids and to fix, maintain, stabilize, and raise prices and other price-related terms for broiler chicken products sold in the United States." *Id.* ¶ 2. As outlined in the Superseding Indictment, the defendants participated in a continuing network of suppliers and co-conspirators with "an understood purpose" of suppressing and eliminating competition by entering into price-fixing and bid-rigging agreements. *Id.* ¶ 47.

The Superseding Indictment details various means and methods of the conspiracy, describing how the defendants used their continuing network, in particular: to reach agreements and understandings to submit aligned bids and offer aligned pricing; to participate in conversations and communications with the shared understanding that the purpose of the conversations and communications was to rig bids and to fix, maintain, stabilize, and raise prices and other price-related terms; to monitor bids and prices and price-related terms offered by suppliers and co-conspirators; and to protect the purpose and effectiveness of the conspiracy. *Id.* ¶¶ 47-49. The Superseding Indictment further describes fourteen episodes that illustrate the operation of the conspiracy between 2012 to 2019 and details certain acts each defendant took in furtherance of the conspiracy. *Id.* ¶¶ 51-143.

### C.   The Defendants' Motions to Dismiss

All defendants moved to dismiss Count 1 of the Superseding Indictment for failure to state an offense. ECF Nos. 295, 296, 302, 303, 305, 306, 307, 308, 309. Additionally, Mr. Roberts moved to dismiss the count as barred by the statute of

limitations. ECF No. 293. Taken together, the defendants' motions to dismiss argue that

the Superseding Indictment was insufficiently pled because:

- despite the clear language alleging that every defendant conspired to fix prices, the required elements for a Sherman Act Section 1 violation are not alleged with specificity, ECF Nos. 295 at 4-6 (Kantola); 296 at 5-8 (Fries & Brady); 302 at 5-7 (Austin); 303 at 6-11, 13-15 (Lovette); 305 at 3-7 (Roberts); 306 at 3-4 (Little); 307 at 6-9 (Mulrenin); 308 at 6-10 (Penn); 309 at 9-11 (Blake);

- the communications, pricing information, and other details provided in the fourteen episodes do not adequately allege each defendant's knowing participation in the conspiracy, ECF Nos. 295 at 5-6 (Kantola); 296 at 10 (Fries & Brady); 302 at 9-10 (Austin); 303 at 6-11 (Lovette); 305 at 3-7 (Roberts); 306 at 6 (Little); 307 at 9-11 (Mulrenin); 308 at 13-15 (Penn); 309 at 11-13 (Blake);

- the longstanding rule that price-fixing conspiracies among competitors are *per se* unlawful, *see e.g., United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940), should not apply here, ECF Nos. 295 at 7-9 (Kantola); 296 at 9-10 (Fries & Brady); 302 at 7-9 (Austin); 303 at 12-13 (Lovette); 305 at 7 (Roberts); 306 at 4-6 (Little); 307 at 5 (Mulrenin); 308 at 10-13 (Penn); 309 at 9-11 (Blake);

- Section 1 of the Sherman Act, which has produced decades of prosecutions affirmed by district courts, courts of appeals, and the Supreme Court, does not provide fair notice of criminality and is unconstitutionally vague, ECF Nos. 295 at 9-11 (Kantola); 307 at 2 n.1 (Mulrenin); 309 at 13-15 (Blake); and

- the statute of limitations begins running when a criminal conspiracy is formed rather than when it is completed, and each defendant must commit overt acts within the limitations period, ECF No. 293 at 6-11(Roberts).

For the reasons discussed below, none of the defendants' arguments have merit,

and their motions should be denied.

## **RULE 12 STANDARD**

"An indictment is sufficient if it sets forth the elements of the offense charged,

puts the defendant on fair notice of the charges against which he must defend, and

enables the defendant to assert a double jeopardy defense." *United States v. Washington,* 653 F.3d 1251, 1259 (10th Cir. 2011) (quoting *United States v. Gama-Bastidas*, 222 F.3d 779, 785 (10th Cir. 2000)). "While detailed allegations might well have been required under common-law pleading rules, they surely are not contemplated by Rule 7(c)(1), which provides that an indictment 'shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (internal citation omitted).

"To determine the sufficiency of an indictment the court examines the entire document." *United States v. Metro. Enters., Inc.*, 728 F.2d 444, 453 (10th Cir. 1984). That examination focuses solely on an indictment's allegations, which "are to be taken as true." *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006) (quoting *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994)). And a court's examination should be guided "by practical rather than technical considerations." *United States v. Powell*, 767 F.3d 1026, 1030 (10th Cir. 2014) (quoting *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997)); *United States v. Hill*, 526 F.2d 1019, 1027 (10th Cir. 1975) ("The elements need not be alleged in terms, and a pleading is good if it fairly imports knowledge, intent, or malice where these are elements of the crime.") (internal quotation marks and citation omitted).

On a motion to dismiss an indictment for failure to state an offense, "the question is not whether the government has presented sufficient evidence to support the charge, but solely whether the allegations in the indictment, if true, are sufficient to establish a violation of the charged offense." *Todd*, 446 F.3d at 1068. Thus, a "motion to dismiss an

indictment will be denied if the dispute centers on factual questions, as such questions are within the province of the jury." *United States v. LaHue*, 998 F. Supp. 1182, 1184 (D. Kan. 1998), aff'd, 170 F.3d 1026 (10th Cir. 1999).

## **ARGUMENT**

I.      **The Superseding Indictment Properly Alleges a *Per Se* Unlawful Price-Fixing Conspiracy that Each Defendant Knowingly Joined**

Section 1 of the Sherman Act outlaws "[e]very . . . conspiracy, in restraint of trade or commerce among the several States," 15 U.S.C. § 1, and "the phrase 'restraint of trade' is best read to mean 'undue restraint.'" *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018). Restraints can be unreasonable (that is, undue) and thus unlawful in one of two ways, under the *per se* rule or the rule of reason. *Id.* at 2283-84. In contrast to the rule of reason's fact-specific inquiry into a particular restraint's effects, *see id.* at 2284, the *per se* rule treats "categories of restraints as necessarily illegal" and thus "eliminates the need to study the reasonableness of an individual restraint." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007); *see also State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) ("Some types of restraints . . . have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se.*"); *United States v. Brighton Bldg. & Maint. Co.*, 598 F.2d 1101, 1106 (7th Cir. 1979) ("[T]he Per se rules define types of restraints that are illegal without further inquiry into the competitive reasonableness . . . It is as if the Sherman Act read: 'An agreement among competitors to rig bids is illegal.'") (internal quotation marks and citation omitted).

"[P]rice-fixing agreements are unlawful per se under the Sherman Act." *Socony-Vacuum*, 310 U.S. at 218; *see Leegin*, 551 U.S. at 886 ("Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices . . ."); *United States v. Reicher*, 983 F.2d 168, 170 (10th Cir. 1992) (explaining that bid rigging is a *per se* violation of the Sherman Act, meaning it is "illegal without elaborate inquiry as to the precise harm [it has] caused or the business excuse for [its] use") (internal quotation marks and citation omitted). Indeed, a "horizontal agreement," meaning an agreement among actual or potential competitors, "to fix prices is the archetypal example of such a practice." *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980); *see also Socony-Vacuum*, 310 U.S. at 218. And as noted above, price fixing includes agreements among competitors to fix, maintain, stabilize, and raise prices and other price-related terms and to rig bids.

A *per se* violation of Section 1 of the Sherman Act for price fixing consists of three elements: (1) a conspiracy existed between two or more competitors to fix prices; (2) the defendants knowingly joined the conspiracy; and (3) the conspiracy was in the flow of or substantially affected interstate commerce.[4] 15 U.S.C. § 1; *see also Metro. Enters.*, 728 F.2d at 449–51.

 For the first element, "[a] conspiracy is a combination of two or more persons acting in concert to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means*." Metro. Enters.* 728 F.2d at 450. Such a conspiracy need not be

---

[4] The defendants do not challenge the interstate commerce element. *See* ECF Nos. 293, 295, 296, 302, 303, 305, 306, 307, 308, and 309.

formal or even explicit. "While a conspiracy involves an agreement to violate the law, it is not necessary that the persons charged meet each other and enter into an express or formal agreement, or that they stated in words or writing what the scheme was or how it was to be effected. It is sufficient to show that they tacitly came to a mutual understanding . . ." *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 474 (10th Cir. 1990) ("The agreement may be shown by a concert of action by members who participate with knowledge of the common purpose."). The Supreme Court has described the Sherman Act's conspiracy element as calling for "a unity of purpose or a common design and understanding, or a meeting of minds." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946).

The second element is an intent element that is satisfied when a defendant knowingly joins a conspiracy having a *per se* illegal object, such as price fixing. *See Metro. Enters.*, 728 F.2d at 449-50 (finding proof of the "requisite intent . . . was satisfied by showing that the appellants knowingly joined and participated in a conspiracy to rig bids"); *United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676, 684 (5th Cir. 1981) (holding that "because fixing prices is by itself an unreasonable restraint of trade, an intent to fix prices is equivalent to an intent to unreasonably restrain trade"); *United States v. Koppers Co.*, 652 F.2d 290, 295 n. 6 (2d Cir. 1981) ("Where per se conduct is found, a finding of intent to conspire to commit the offense is sufficient; a requirement

that intent go further and envision actual anti-competitive results would reopen the very questions of reasonableness which the per se rule is designed to avoid.").[5]

A.      *The Superseding Indictment Alleges the Elements of a Price-Fixing Conspiracy and Puts the Defendants on Notice of the Charges*

Viewed practically and as a whole, the Superseding Indictment is more than adequate. Paragraph 1 identifies the relevant statutory provision—Section 1 of the Sherman Act, 15 U.S.C. § 1—and sets forth the elements of a *per se* violation of that provision by alleging the nature and time of the conspiracy, and by identifying all ten defendants as having "entered into and engaged in" a "combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products." ECF No. 101 ¶ 1. Paragraph 1 also states

---

[5] Certain defendants rely on *United States v. United States Gypsum Co.*, 438 U.S. 422 (1978), a rule of reason case, to argue for a higher standard of intent. *See, e.g.*, ECF Nos. 295 at 4 n.10 (Kantola); 302 at 9 (Austin); 305 at 3 (Roberts); 306 at 6 (Little). For *per se* offenses, like the price-fixing conspiracy charged here, their argument is incorrect. Because price fixing is itself an unreasonable restraint of trade, an intent to price fix is itself an intent to unreasonably restrain trade. *See, e.g.*, *Koppers*, 652 F.2d at 925 n.6; *United States v. Brown*, 936 F.2d 1042, 1046 (9th Cir. 1991) (holding the intent requirement of *Gypsum* does not apply to charges of *per se* violations); *United States v. Coop. Theatres of Ohio, Inc.*, 845 F.2d 1367, 1373 (6th Cir. 1988) ("Contrary to the defendants' contentions, the government is not required in a *per se* case to show that the conspirators entered into the agreement with knowledge of its probable anti-competitive effects."); *United States v. W.F. Brinkley & Son Constr. Co.*, 783 F.2d 1157, 1162 (4th Cir. 1986) ("Since in a price-fixing conspiracy the conduct is illegal *per se*, further inquiry on the issues of intent or the anti-competitive effect is not required. The mere existence of a price-fixing agreement establishes the defendant's illegal purpose since the aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition.") (internal quotation marks and citation omitted); *Brighton Bldg. & Maint.*, 598 F.2d at 1106 ("We do not read Gypsum as indicating that once defendants are proved to have intentionally made an agreement which is unlawful Per se, there must be an instruction that the defendants cannot be convicted unless they are found to have intended to restrain trade or commerce.").

that the "combination and conspiracy" constituted a "*per se* unlawful, and thus unreasonable, restraint" of interstate trade and commerce in violation of Section 1 of the Sherman Act. *Id.* Paragraph 2 further details the charged conspiracy, stating, in part, that it "consisted of a continuing agreement, understanding, and concert of action among the Defendants and co-conspirators, the substantial terms of which were to rig bids and to fix, maintain, stabilize, and raise prices and other price-related terms" for broiler chicken products in the United States. *Id.* ¶ 2. Those allegations alone meet the applicable pleading standard.

But the Superseding Indictment goes above and beyond the applicable pleading standard. It alleges in the "Means and Methods" section that, as part of the unlawful agreement, the defendants participated in a "continuing network of Suppliers and co-conspirators, an understood purpose of which was to suppress and eliminate competition through rigging bids and fixing prices . . ." ECF No. 101 ¶ 47. In the same section, the Superseding Indictment alleges that the defendants used the continuing network to reach agreements to submit aligned bids, prices, and price-related terms, and to communicate non-public information with each other with the shared understanding that the purpose of those communications was to rig bids and to fix prices. *Id.* ¶ 48.a-b. Moreover, Count 1 of the Superseding Indictment includes an additional 93 paragraphs, many of which contain multiple sub-parts, that detail fourteen episodes illustrating the defendants' participation in the unlawful conspiracy. *Id.* ¶¶ 51-143.

While certain defendants take issue with the term "continuing network," the allegations show that the defendants participated in a network that facilitated their communication with each other as needed over multiple years to fix prices. The allegations describe a conspiracy closely resembling the "plug-in" conspiracy at issue in *United States v. Consolidated Packaging Corp.*, which was upheld as a *per se* illegal price-fixing conspiracy. 575 F.2d 117, 121 (7th Cir. 1978) (describing a "custom-made conspiratorial understanding . . . [whereby] [w]henever the needs of any conspirator might require it, the conspirator had only to plug into the system, get 'on the phone,' and make the necessary arrangements. This system which developed and remained viable among them to be available for use by any conspirator was a pervasive aspect of the conspiracy."). Thus, the Superseding Indictment provides the defendants with clear notice of the charged conspiracy to fix prices and their knowing participation in that conspiracy, and that is all the law requires.

B.    The Defendants' Arguments Regarding the Adequacy of the Allegations Are Meritless

The defendants' motions make several arguments attacking the adequacy of the allegations in the Superseding Indictment. None have merit.

First, the defendants' arguments that Count 1 fails to allege an agreement with sufficient specificity, *see, e.g.*, ECF Nos. 295 at 4-5 (Kantola); 296 at 5-8 (Fries & Brady); 302 at 5-7 (Austin); 306 at 3-4 (Little); 307 at 6-9 (Mulrenin); 308 at 6-10 (Penn); 309 at 9-11 (Blake), or to allege a single conspiracy, *see, e.g.,* ECF No. 303 at 13-15 (Lovette), ignore the first two paragraphs of the Superseding Indictment. Those paragraphs specifically allege that from at least as early as 2012 and through at least

14

early 2019, the defendants entered into and engaged in a continuing agreement among particular chicken suppliers to rig bids and fix, maintain, stabilize, and raise prices and other price-related terms for broiler chicken products sold in the United States. ECF No. 101 ¶ 1-2. Thus, rather than merely reciting the statutory language as the defendants claim, Paragraphs 1 and 2 identify (1) the type of conspiracy in restraint of trade: price fixing; (2) the price-fixed product: broiler chicken products; (3) the participants: employees of various chicken suppliers, and others; (4) the time period: at least as early as 2012 until at least early 2019; and (5) the geographic scope: throughout the United States. *Id.* Again, the law requires nothing more.

Second, the defendants argue the Superseding Indictment fails to allege that they knowingly joined the conspiracy, *see, e.g.*, ECF Nos. 295 at 5-6 (Kantola); 296 at 10 (Fries & Brady); 302 at 9-10 (Austin); 303 at 6-11 (Lovette); 305 at 3-7 (Roberts); 306 at 6 (Little); 307 at 9-11 (Mulrenin); 308 at 13-15 (Penn); 309 at 11-13 (Blake), but that argument also fails. "[T]he charge of conspiracy to violate a criminal law has implicit in it the elements of knowledge and intent." *Metro. Enters.* 728 F.2d at 453 (citing *Schnautz v. United States*, 263 F.2d 525, 529 (5th Cir.), cert. denied, 360 U.S. 910 (1959); *Madsen v. United States*, 165 F.2d 507 (10th Cir.1947)). In *Metropolitan Enterprises*, although the word "intent" did not appear in the indictment, the Court found the intent element sufficiently pled given the nature of a conspiracy charge and the allegation that the defendants, by conspiring, intended to produce anticompetitive effects. 728 F.2d at 453. There, the indictment similarly charged the defendants with

"entering into an agreement and action" to rig bids, which the Court highlighted because entering into an agreement implies a voluntary and intentional act. *Id.*

Here, the Superseding Indictment goes further, alleging that the defendants "entered into and engaged in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms," ECF No. 101 ¶ 1, and "participated in a continuing network" that they utilized to "submit aligned—though not necessarily identical—bids and to offer aligned—though not necessarily identical—prices, and price related terms," *id.* ¶¶ 47, 48.a.

Additionally, Count 1's allegations include details related to fourteen episodes that were part of the charged conspiracy. *Id.* ¶¶ 51-143. Those allegations show, in part, how the conspiracy worked and actions each defendant took in its furtherance and are themselves sufficient to allege that each defendant knowingly joined the conspiracy. The episodes demonstrate how the defendants' "continuing network," *id.* ¶ 47, was able to exist because of their recurring communications of reliable information, and thus allowed for future communications of sensitive, non-public information that the defendants relied on to keep their pricing higher and resist customers' efforts to negotiate lower pricing.

In the "QSR-3's 8-Piece COB Supply for 2015" episode, for example, the Superseding Indictment reflects a conversation between Mr. Penn and another Pilgrim's employee, who informed Mr. Penn that another competitor co-conspirator (Supplier-7) was "0.02 higher than us and they are not going to negotiate." *Id.* ¶ 109. Mr. Penn's response was "Good deal. Last time they did cave a cent or two," and his subsequent

reference to that supplier as a "solid competitor," *id.*, demonstrates his trust, based on that supplier's prior actions, that it would continue to keep its pricing up, and thus, that Pilgrim's could do the same.

Similarly, in the "QSR-1's Dark Meat Supply for 2014" episode, Mr. Brady texted Mr. Fries that "Roger [Austin] is at .30 back and not moving." *Id.* ¶ 74.c. Based on that information, and trusting that the information was accurate (*i.e.*, that Mr. Austin was not moving his bid), Mr. Fries directed Mr. Brady not to move either: "Stay .305 then[.]" *Id.*

The "QSR-1's 8-Piece COB Supply for 2015" episode likewise demonstrates the defendants taking actions in reliance on information they learned from each other. As Mr. Brady explained to Mr. Fries, "I talked to roger [Austin] . . . and Greeley [Pilgrim's headquarters] told him not to come down on price. He called [the buyer] today and told him." *Id.* ¶ 99.c.

Those episodes and others illustrate the defendants' "shared understanding" that the purpose of their continuing network was to fix prices. *Id.* ¶¶ 47, 48.b.[6] *Cf. Consol. Packaging*, 575 F.2d at 126-28 ("Tacit understanding created and executed by a long course of conduct is enough to constitute agreement even without personal communication.").

Third, in attacking the adequacy of the Superseding Indictment, the defendants seek to have the Court improperly look beyond the allegations and weigh the evidence.

---

[6] And contrary to Mr. Lovette's argument, ECF No. 303 at 13-15, the episodes in the Superseding Indictment do not represent multiple conspiracies, but rather demonstrate the operation of the single price-fixing conspiracy alleged at the very outset of the Superseding Indictment. ECF No. 101 ¶¶ 1-2.

*See, e.g.,* ECF Nos. 296 at 6-8, 10 (Fries & Brady); 303 at 8-11 (Lovette); 306 at 3, 5-6 (Little); 307 at 9-10 (Mulrenin); 308 at 4 (Penn). They emphasize how few episodes they appear in and downplay their roles in the episodes. However, weighing the allegations, as if they were trial evidence, including the extent of each defendant's participation in the conspiracy, is not permissible under Rule 12. *Todd*, 446 F.3d at 1067 ("Challenging an indictment is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence."); *United States v. Pope*, 613 F.3d 1255, 1261 (10th Cir. 2010) ("Rule 12 is not a parallel to civil summary judgment procedures.").

The defendants' motions ask the Court to ignore the well-established Rule 12 standard and assess the Superseding Indictment's allegations as if they were evidence or even the whole of the government's evidence, in effect treating them as Rule 29 motions for acquittal or even civil motions for summary judgment. The question is not how the defense assesses the strength of the government's case based on the allegations alone, but whether the Superseding Indictment complies with the relevant pleading requirements. As the Court explained in its order denying the defendants' motions for bills of particulars, the Superseding Indictment names the defendants and pleads an agreement ("to suppress and eliminate competition through rigging bids and fixing prices" for broiler chicken products), provides further context for the agreement, and describes dates, prices, and discussions regarding the alleged conspiracy. ECF No. 257 at 5 (quoting Superseding Indictment). Indeed, from the Superseding Indictment's very outset, it alleges the nature of the charged price-fixing conspiracy with the detail

required by Rule 12, ECF No. 101, ¶¶ 1-2, and thus it "sets forth the elements of the charge and the government's general theory of the case." ECF No. 257 at 5. The defendants' arguments about how they interpret the episodes and the inferences they draw therefore are beside the point.

C.     The Defendants' Argument that the Superseding Indictment Should Be Dismissed for Failure to State a Per Se Offense Should Be Rejected

The defendants' argument that the Superseding Indictment alleges only an agreement to exchange pricing information, *see, e.g.,* ECF Nos. 295 at 7-9 (Kantola); 296 at 9-10 (Fries & Brady); 302 at 7-9 (Austin); 303 at 12-13 (Lovette); 306 at 4-6 (Little); 307 at 8 (Mulrenin); 308 at 10-13 (Penn), ignores the plain language of Count 1 alleging that "the substantial terms" of the charged conspiracy "were to rig bids and to fix, maintain, stabilize, and raise prices and other price-related terms for broiler chicken products sold in the United States." ECF No. 101 ¶ 2. Their contention that the conduct is subject to the rule of reason and not *per se* unlawful is thus meritless.

The fundamental problem with the defendants' argument is that it confuses the means with the ends. The Superseding Indictment explicitly alleges that the defendants and their co-conspirators exchanged bidding and pricing information "with the shared understanding that the purpose of the conversations and communications was to rig bids, and to fix, maintain, stabilize, and raise prices and other price-related terms, including discount levels, for broiler chicken products . . ." ECF No. 101 ¶ 48.b. Their exchange of pricing and other competitive information was not an end in itself. Rather, it was a means to carry out their conspiracy to suppress and eliminate competition through bid rigging and fixing price terms. It is immaterial that an exchange of

information, by itself, would not be *per se* unlawful. *See Am. Tobacco*, 328 U.S. at 809-10 ("Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition.").

For example, in the "QSR-1's Dark Meat, Wings, and 8-Piece COB Supply for 2013" episode, the Superseding Indictment reflects communications among Messrs. Austin, Brady, Fries, Kantola, Lovette, Penn, and co-conspirators during price negotiations with QSR-1, including the exchange of competitors' bid pricing. ECF No. 101 ¶¶ 56-60. During those communications, Mr. Brady texted Mr. Fries that he "talked to roger [Austin] . . . [h]e said to raise our prices, on wings he is market and market plus .10." *Id.* ¶ 56. Mr. Fries responded, "Tell him we are trying!" *Id.* Mr. Brady and Mr. Austin's exchange demonstrates their concerted effort to raise prices and illustrates the "understood purpose" to fix prices. *Id.* ¶ 47.

Similarly, in the "QSR-1's 8-Piece COB Supply for 2015" episode, the Superseding Indictment alleges a multitude of communications among all defendants and other co-conspirators in the midst of negotiating prices with QSR-1, including what prices they were submitting to QSR-1, *id.* ¶¶ 87-107, and assurances that certain co-conspirators would not be coming down on price, *id.* ¶¶ 99.c, 100. Those communications demonstrate, as alleged, that the communications between the defendants and co-conspirators were made with the purpose and understanding to fix prices and rig bids for broiler chickens. The exchange of information was simply a means to that end.

Furthermore, an unlawful conspiracy under Section 1 of the Sherman Act does not require that the conspirators "meet each other and enter into an express or formal agreement, or that they state[] in words or writing what the scheme was or how it was to be effected. It is sufficient to show that they tacitly came to a mutual understanding . . ." *Suntar Roofing*, 897 F.2d at 474. Likewise, "[i]t is enough that the participating parties have a tacit understanding based upon a long course of conduct." *United States v. Beachner Const. Co.*, 729 F.2d 1278, 1283 (10th Cir. 1984). In *Beachner*, for example, the Tenth Circuit concluded that evidence "that a contractor would participate in a bid-rigging plan with the belief that future benefits of some kind would be returned to him" showed "that a common objective was shared by each participating contractor: to eliminate price competition and ensure higher individual profits," and thus was sufficient to establish a bid-rigging conspiracy. *Id.* (emphasis omitted). *See also Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) ("Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement."); *United States v. Foley*, 598 F.2d 1323, 1331-32 (4th Cir. 1979) (holding that defendants' exchange of future commission rates, followed by efforts to hold each other to those planned rates, was sufficient to infer a price-fixing conspiracy); *Consol. Packaging*, 575 F.2d at 126-28 (holding that suppliers' ongoing practice of exchanging price information in advance of bidding and adjusting their bids accordingly was sufficient to support conviction for price fixing).

Here, the defendants' course of conduct alleged in the Superseding Indictment—including communications of pricing, bids, and information about competing suppliers'

negotiation status and intentions during the bid process—states an agreement to suppress competition by fixing prices and rigging bids. That is precisely the type of price-fixing agreement that has long been held to be a *per se* violation of the Sherman Act. *See Socony-Vacuum*, 310 U.S. at 217-18; *Leegin*, 551 U.S. at 886; *Reicher*, 983 F.2d at 170. And even without the detailed allegations contained in the episodes, the express allegation in the first two paragraphs of the Superseding Indictment that the defendants entered into and engaged in a conspiracy to fix broiler chicken prices in the United States, ECF No. 101 ¶¶ 1-2, is by itself sufficient to state a *per se* unlawful offense. The defendants' motions to dismiss for failure to state a *per se* offense should be denied.

**II.    The Due Process Clause Does Not Preclude this Prosecution Because the Sherman Act Provides Fair Notice that Price-Fixing Conspiracies Are Unlawful and the *Per Se* Rule Is Not an Evidentiary Presumption**

Three defendants—Messrs. Kantola, Mulrenin, and Blake—challenge the constitutionality of the Sherman Act as it is applied to them in the Superseding Indictment. ECF Nos. 295, 307, and 309. But the Constitution provides their motions no support because Section 1 and the cases construing it provide abundant notice that price fixing is unlawful and the *per se* rule condemning price fixing without further inquiry into its effects is not an unconstitutional evidentiary presumption.

   *A.    The Sherman Act Provides Fair Notice of Criminality and Is Not Unconstitutionally Vague*

Messrs. Kantola and Mulrenin argue that Section 1 of the Sherman Act is void for vagueness and does not provide fair notice of criminality. ECF Nos. 295 at 9-11 (Kantola); 307 at 2 n.1 (Mulrenin, adopting Kantola's argument). Their argument is

meritless. As one district court recently concluded when considering the same argument: "No court has found section one of the Sherman Act unconstitutionally void for vagueness, and it is noteworthy that the only vagueness challenge to section one of the Sherman Act that made it to the Supreme Court was rejected." *United States v. Harwin*, No. 20-cr-115, 2021 WL 719614, at *7 (M.D. Fla. Feb. 24, 2021).

To comport with due process, a criminal statute need only provide "reasonably clear" notice to a defendant "that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997). A statute is not unconstitutionally vague if the criminal offense it prohibits is defined "(1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v. United States*, 561 U.S. 358, 402-03 (2010); *see also United States v. Gaudreau*, 860 F.2d 357, 362 & n.14 (10th Cir. 1988) ("Such broad arguments [that the language of a statute itself must define a crime] are foreclosed by decisions of the Supreme Court. The Court has consistently held statutes sufficiently certain when they employ words or phrases with 'a well-settled common law meaning, notwithstanding an element of degree in the definition as to which estimates may differ . . .'" (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)); *Atlas Bldg. Prods. Co. v. Diamond Block & Gravel Co.*, 269 F.2d 950, 955 (10th Cir. 1959) (noting that the criminal sanctions of the Sherman Act "have long since been sustained as against the claim of unconstitutional vagueness.").

To satisfy constitutional requirements, notice of criminality can be provided either by a statute "standing alone or as construed." *Lanier*, 520 U.S. at 266-67 ("[C]larity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute."). If prior court precedent sets out a clear "guiding principle," that is sufficient specificity to satisfy the constitutional requirements. *See Salman v. United States*, 137 S. Ct. 420, 428-29 (2016) (holding precedent had established a sufficiently clear standard for determining criminal liability under the statute at issue); *see also Skilling*, 561 U.S. at 412-13 (upholding statute as sufficiently clear under the Court's interpretation of the statute).

Over a century ago, the Supreme Court held that the Sherman Act is not unconstitutionally vague, and that the Due Process Clause is not an obstacle to criminal prosecution of Sherman Act violations. As Mr. Kantola recognizes, ECF No. 295 at 10, the Supreme Court addressed this very question in *Nash*, 229 U.S. 373, in which the Court rejected a void for vagueness challenge to Section 1 of the Sherman Act. There, the defendants challenged their indictments for antitrust violations—including conspiring to fix prices—arguing that the Sherman Act's prohibition of "unreasonable" restraints of trade was too vague a standard to support "criminal operation of the statute." *Id.* at 376-77. The Court rejected that argument, reasoning that "the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree." *Id.* at 377.[7]

---

[7] The discussion in *Nash* focused on whether the unreasonableness standard of the Sherman Act described in *Standard Oil Co. of New Jersey v. United States* is unconstitutionally vague. *Nash*, 229 U.S. at 376-77. In *Standard Oil*, the Court defined

The Court concluded that "there is no constitutional difficulty in the way of enforcing the criminal part of the act." *Id.* at 378, *see also Gypsum*, 438 U.S. at 439 (1978) ("[I]n *Nash*[] the Court held that the indeterminacy of the Sherman Act's standards did not constitute a fatal constitutional objection to their criminal enforcement."); *Johnson v. United States*, 576 U.S. 591, 603-04 (2015) ("As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'" (quoting *Nash*, 229 U.S. at 377)).

The defendants' attempts to distinguish *Nash* ignore the well-established vagueness doctrine. The defendants argue that, even though the Supreme Court found that Section 1 of the Sherman Act was sufficiently specific to pass constitutional muster when it was punished as a misdemeanor, the case is no longer applicable now that a violation of the Sherman Act is treated as a felony. ECF No. 295 at 10. But the holding in *Nash* did not turn on the punishment for the crime; rather it turned on the Sherman Act itself, its common law underpinnings, and the cases interpreting it.

The important question is whether "ordinary people can understand what conduct is prohibited . . . in a manner that does not encourage arbitrary and

---

"unreasonableness" to include that conduct which is *per se* illegal, as well as that which is illegal upon weighing the facts and circumstances. 221 U.S. 1, 58 (1911) ("[T]he prohibition or treating as illegal all contracts or acts which were unreasonably restrictive of competitive conditions, either from the nature or character of the contract or act, or where the surrounding circumstances were such as to justify the conclusion. . ."). *Nash's* holding includes within its ambit the *per se* violations of the Sherman Act and criminal application of the statute. *See Nash*, 229 U.S. at 376.

discriminatory enforcement." *Skilling*, 561 U.S. at 402-03. And the prohibition on price fixing provided by Section 1 as construed by the courts readily meets that standard. In 1940, the Supreme Court emphasized the clarity and durability of this construction of the Sherman Act, explaining that "for over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful per se under the Sherman Act" and "'are, without more, unreasonable restraints within the meaning of the Sherman Act because they eliminate competition.'" *Socony-Vacuum*, 310 U.S. at 218 (quoting *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 458 (1940)).

This Court should not rule to the contrary, as the Supreme Court—which maintains the "prerogative alone to overrule one of its precedents," *Khan*, 522 U.S. at 20—has stood by its binding precedent in *Nash*. *See also Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

Under the *Khan* principle, the increase in punishment cannot have abrogated *Nash*. Courts around the country have continued to follow *Nash*—even after the crime became a felony. *See, e.g., United States v. Hsiung*, 778 F.3d 738, 750 n.6 (9th Cir. 2015) ("In light of our holding and Supreme Court precedent, we cannot embrace the defendants' argument that adopting a *per se* standard violates the fair notice principle of the Due Process Clause."); *United States v. Miller*, 771 F.2d 1219, 1225 (9th Cir. 1985)

("The indictment charges Miller with price-fixing. Because price-fixing has repeatedly been held to be *per se* illegal under the Sherman Act, Miller could not have had any reasonable doubt that his conduct violated section one." (citations omitted)); *Harwin*, 2021 WL 719614 at *7 (rejecting vagueness challenge); *United States v. Usher*, No. 17-CR-19, 2018 WL 2424555, at *8 (S.D.N.Y. May 4, 2018) (rejecting an argument that defendants lacked notice of their conduct's unlawfulness because "it is widely understood that price fixing is unlawful conduct subject to prosecution"); *United States v. Cinemette Corp. of Am.*, 687 F. Supp. 976, 979 (W.D. Pa. 1988) ("In light of . . . the substantial case law holding that restrictions upon competitive bidding constitute price-fixing, a *per se* violation of the Sherman Act, the Court finds little merit in defendants' claims that they were not given fair notice that split agreements could constitute violations of § 1."); *United States v. Pook*, Crim No. 87-274, 1988 WL 36379, at *1 (E.D. Pa. Apr. 18, 1988) (rejecting claim of ignorance that bid rigging at auction would be subject to criminal prosecution because "[t]he Sherman Act has uniformly been interpreted to make agreements that tamper with price structures illegal" and defendants are "charged not only with knowledge of the statute, but also with knowledge of its judicial gloss.").

Nor have more recent vagueness decisions by the Supreme Court undercut *Nash*'s holding; to the contrary, those decisions favorably cite *Nash* to underpin their own reasoning. *See, e.g.*, *Johnson*, 576 U.S. at 603-04; *United States v. Powell*, 423 U.S. 87, 93 (1975).

Additionally, where a statute incorporates a *mens rea* requirement, that requirement "relieve[s] the statute of the objection that it punishes without warning an offense of which the accused was unaware." *Screws v. United States*, 325 U.S. 91, 102 (1945); *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 21 (2010) ("[T]he knowledge requirement of the statute further reduces any potential for vagueness, as we have held with respect to other statutes containing a similar requirement"). To commit the crime of *per se* unlawful price fixing under Section 1 of the Sherman Act, a defendant must knowingly enter an agreement to fix prices. *See, e.g., Metro. Enters.*, 728 F.2d at 450 (holding proof of the "requisite intent . . . was satisfied by showing that the appellants knowingly joined and participated in a conspiracy to rig bids"). Nothing more is required.

B. The Per Se *Rule Is a Construction of the Sherman Act, Not an Evidentiary Presumption*

Mr. Blake incorrectly challenges the *per se* rule as an unconstitutional evidentiary presumption. ECF No. 309 at 13-14. Under long-standing Supreme Court and Circuit precedent, "[i]t is well established, of course, that price fixing agreements," including bid-rigging agreements, "are illegal per se under the Sherman Act, without regard to the reasons advanced to justify them." *Morton Salt Co. v. United States*, 235 F.2d 573, 579 (10th Cir. 1956); *see also Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 344 (1982) ("*Standard Oil* recognized that inquiry . . . ended once a price-fixing agreement was proved."); *Socony-Vacuum*, 310 U.S. at 217-18; *Addyston Pipe & Steel Co. v. United Sates*, 175 U.S. 211, 238 (1899); *Reicher*, 983 F.2d at 171-72.

Mr. Blake nevertheless argues that (1) *per se* treatment of certain categories of agreements in Sherman Act cases unconstitutionally presumes an element of the crime, and (2) there is no controlling Supreme Court precedent on the issue, since the most recent Supreme Court decisions pre-date the modern conclusive-presumption jurisprudence. ECF No. 309 at 13-14. Mr. Blake thus urges the Court to find that *per se* treatment of anticompetitive agreements like the one alleged in the Superseding Indictment violates a defendant's Fifth and Sixth Amendment rights. *Id.*

Mr. Blake is wrong on both counts. On its face, Section 1 proscribes "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. The Supreme Court has long understood Section 1 "to outlaw only unreasonable restraints" of trade, in light of the background in which it was passed. *Am. Express*, 138 S. Ct. at 2283 (emphasis omitted). And as discussed above, the Supreme Court has recognized that certain categories of agreements are in and of themselves unreasonable restraints of trade, that is, *per se* unlawful. *Id.* at 2283-84. The *per se* rule is an interpretation of the Sherman Act itself, not an evidentiary presumption. *F.T.C. v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 432–33 (1990) ("The *per se* rules are, of course, the product of judicial interpretations of the Sherman Act . . ."). Thus, when courts "describe[] conduct as *per se* unreasonable," they merely give "definition" to the statutory prohibition, *United States v. Manufacturers' Ass'n of the Relocatable Bldg. Indus.*, 462 F.2d 49, 52 (9th Cir. 1972), much as they do when they interpret the scope of other federal criminal laws, *see, e.g., Salman*, 137 S. Ct. at 429. And because *per se* unlawful restraints fall within Section 1's prohibition "as a matter of law," there is no

question of reasonableness to submit to the jury. *United States v. Trenton Potteries Co.*, 273 U.S. 392, 400 (1927); *see also United States v. Gaines*, No. 20-CR-20, 2020 WL 5215386, at *3 (D. Minn. Aug. 4, 2020) ("The per se rule is not an evidentiary presumption that removes from jury consideration key elements of the offense, but rather a substantive interpretation of the statute."), report and recommendation adopted, 2020 WL 5204284 (D. Minn. Sept. 1, 2020).[8]

Thus, by construing Section 1 to outlaw price fixing as a *per se* unlawful restraint, the "Supreme Court declared what must automatically be treated as unreasonable within the meaning of its earlier judicially-created rule of reason." *Koppers*, 652 F.2d at 294. Accordingly, in "cases involving behavior such as bid rigging, which has been classified by courts as a per se violation, the Sherman Act will be read as simply saying: 'An agreement among competitors to rig bids is illegal.'" *Id.* (quoting *Brighton Bldg. & Maint.*, 598 F.2d at 1106). Rather, the question for the jury—in a criminal or civil antitrust case—is simply whether the *per se* unlawful restraint, that is, the unreasonable restraint, occurred. *Koppers*, 652 F.2d at 294 (citing Robert H. Bork, *The Antitrust Paradox: A Policy at War with Itself* 18 (1978)), cert. denied, 454 U.S. 1083 (1981); *see*

---

[8] The defendants cite the recent Supreme Court decision in *National Collegiate Athletic Ass'n v. Alston (NCAA)*, 141 S. Ct. 2141 (2021), to argue that, because in civil rule of reason cases the element of unreasonableness is a question of fact, it should also be analyzed as a question of fact for the jury in a criminal case. ECF No. 295 at 7-8 (Kantola). Their argument ignores the fundamental principle that *per se* conduct is by definition an unreasonable restraint of trade, and is treated as such in both criminal and civil cases. As the Court in *NCAA* recognized, "some agreements among competitors so obviously threaten to reduce output and raise prices that they might be condemned as unlawful *per se* or rejected after only a quick look." *NCAA*, 141 S. Ct. at 2156, citing *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 n.3 (2006).

*also In re Cox Enters., Inc.*, 871 F.3d 1093, 1097 (10th Cir. 2017) ("Under a *per se* rule,

plaintiffs prevail simply by proving that a particular contract or business arrangement . . .

exists."). As a result, "it cannot be said that the judicially-created per se mechanism

relieves the government of its duty of proving each element of a criminal offense under

the [Sherman] Act." *Koppers*, 652 F.2d at 294.

To be sure, courts have called the *per se* rule a presumption, but as the Ninth

Circuit explained, calling the *per se* rule a presumption "is no more than a pedagogic

instrument, since the substantive rules of antitrust are no more rules of evidence than

substantive rules of any legal area." *Manufacturers'*, 462 F.2d at 52. There, the appeals

court rejected defendant's "attempt to trap the Court in its own rhetoric," and held that

"[t]he *per se* rule does not establish a presumption. It is not even a rule of evidence." *Id.*

> The *per se* rule does not operate to deny a jury decision as to an element
> of the crime charged, since "unreasonableness" is an element of the crime
> only when no *per se* violation has occurred. To put it differently
> "reasonableness" must be viewed as a legal term, and not in its ordinary
> sense. When the Court describes conduct as *per se* unreasonable, they
> do no more than circumscribe the definition of "reasonableness."

*Id.*

As recounted above, over a century of binding Supreme Court precedent has

construed Section 1 of the Sherman Act to condemn categorically price-fixing

conspiracies among competitors as unlawful restraints without further inquiry. The

courts of appeals that have considered Mr. Blake's argument in the past recognize

those cases as binding precedent and consistently reject the argument. *See United*

*States v. Sanchez*, 760 F. App'x 533, 535 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 909

(2020) ("Defendants' argument that *Manufacturers'* is clearly irreconcilable with

intervening Supreme Court decisions relating to mandatory evidentiary presumptions in criminal law is irrelevant, because *Manufacturers'* held that the per se rule is not an evidentiary presumption at all") (emphasis omitted); *United States v. Giordano*, 261 F.3d 1134, 1143-44 (11th Cir. 2001) ("Appellants' argument in effects asks us to overrule *Socony-Vacuum*. Like other circuits that have been asked to overrule *Socony-Vacuum*, we decline to do so."); *Koppers*, 652 F.2d at 293 ("This argument asks us in effect to overrule the Supreme Court's decisions in *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940), and in *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972). We decline the invitation, not only because we lack the power but also because the record here reveals the wisdom and applicability to this case of the per se rule established in those decisions."); *Manufacturers'*, 462 F.2d at 50 ("Appellants' contention that the *per se* rule constitutes an unconstitutional conclusive presumption misunderstands the Sherman Act."); *Cargo Serv. Stations*, 657 F.2d at 683-84 (recognizing binding precedent and finding that it did not deny due process); *Brighton Bldg. & Maint.*, 598 F.2d at 1106 (recognizing binding precedent); *United States v. Fischbach & Moore, Inc.*, 750 F.2d 1183, 1195-96 (3d Cir. 1984) (same).

Because the *per se* rule is an interpretation of the Sherman Act and not an evidentiary presumption (much less a conclusive one), and given the binding Supreme Court precedent condemning price-fixing agreements as *per se* unlawful, this prosecution and the application of the *per se* rule do not violate the Fifth or Sixth Amendments.

The motions to dismiss on constitutional grounds should be denied.

**III.    The Superseding Indictment Was Timely Because the Conspiracy Continued Through at Least Early 2019**

Mr. Roberts' motion to dismiss the Superseding Indictment as untimely, ECF No. 293, is meritless as well. The Superseding Indictment alleges that the conspiracy continued until at least early 2019, ECF No. 101 ¶ 1, and specifically alleges acts done by conspirators in furtherance of their conspiracy in 2017, 2018, and 2019, including communications among the conspirators as well as selling and accepting payments for broiler chicken products that were the subject of price fixing until at least approximately early 2019, *id.* ¶¶ 50, 129-43. As this Court has already recognized, "[t]he superseding indictment states that the conspiracy ran through 2019; there is no guesswork involved." ECF No. 257 at 6. Because the Court is bound by the language of the Superseding Indictment at the motion to dismiss stage, *United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1270 (10th Cir. 2018), those allegations are more than sufficient to show the conspiracy continued within five years of the Superseding Indictment's return on October 6, 2020. *See* 18 U.S.C. § 3282(a).

At trial, Mr. Roberts may argue to the jury that the government failed to prove the conspiracy continued until October 6, 2015, or to attempt a withdrawal defense, in which case it would be his burden to prove he took affirmative action to defeat or disavow the conspiracy before that date. But such potential factual disputes cannot be decided on a motion to dismiss, nor can they be resolved through a pretrial evidentiary hearing because they cannot be determined without a trial of the general issue, that is, they are relevant to the question of guilt or innocence. *See Pope*, 613 F.3d at 1259; *cf.* Fed. R. Crim. P. 12(b)(1) (authorizing pretrial resolution of issues that the court can determine

"without a trial on the merits"). Because "contested facts surrounding the commission of the offense," including the existence of the conspiracy, its duration, the acts in furtherance, and the defendant's participation, would be of some "assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *Pope*, 613 F.3d at 1259.

Faced with an indictment plainly charging a conspiracy that continued well past October 2015, Mr. Roberts bases his motion on three legally erroneous arguments: (1) that the conspiracy was completed, causing the statute of limitations to run, at the moment of its formation; (2) that each participant in the conspiracy must commit overt acts within the period of the statute of limitations; and (3) that the co-conspirators' receipt of the conspiracy's proceeds, *i.e.*, payments at fixed prices, was not part of the continuing conspiracy. Controlling precedent has rejected each of those arguments.

> A.    *A Sherman Act Conspiracy Is a Continuing Offense and Remains Actionable Until Its Purpose Has Been Achieved or Abandoned*

For "conspiracy statutes that do not require proof of an overt act, the indictment satisfies the requirements of the statute of limitations if the conspiracy is alleged to have continued into the limitations period." *United States v. Fishman*, 645 F.3d 1175, 1191 (10th Cir. 2011) (quoting *United States v. McNair*, 605 F.3d 1152, 1213 (11th Cir. 2010)). And a conspiracy in violation of Section 1 of the Sherman Act does not require any allegation or proof of an overt act. *Socony-Vacuum*, 310 U.S. at 224-25 n.59 ("[A] conspiracy to fix prices violates [section 1] of the [Sherman] Act though no overt act is shown . . ."); *Nash*, 229 U.S. at 378 (same).

It is well settled that a price-fixing conspiracy in violation of the Sherman Act is a continuing offense, meaning that it continues beyond the conspiracy's initial formation. *United States v. Kissel*, 218 U.S. 601, 608 (1910) ("A conspiracy is a partnership in criminal purposes . . . as such it may have continuation in time."); *see also United States v. Inryco, Inc.*, 642 F.2d 290, 293 (9th Cir. 1981); *United States v. Anderson*, 326 F.3d 1319, 1328 (11th Cir. 2003) ("The conspiracy continued until the conspirators received the full economic benefits anticipated by their bid-rigging scheme."). As Mr. Roberts acknowledges in his motion, ECF No. 293 at 6-7, that means a Sherman Act conspiracy "remains actionable 'until its purpose has been achieved or abandoned, and the statute of limitations does not run so long as the co-conspirators engage in overt acts designed to accomplish its objectives." *Kemp & Assocs., 907 F.3d at 1270* (quoting *Inryco*, 642 F.2d at 293 (citing *Kissel*, 218 U.S. at 607)); *see also United States v. Mobile Materials, Inc.*, 881 F.2d 866, 874 (10th Cir. 1989) ("[A]bsent an affirmative showing of the termination of the agreement, the conspiracy must be presumed to have continued.") (quoting *United States v. Portsmouth Paving Corp.,* 694 F.2d 312, 318 (4th Cir. 1982).

*Kissel* rejected the very same argument Mr. Roberts now advances that the offense was complete and the statute of limitations triggered when the conspiracy began. There, the Supreme Court explained that "the argument . . . does not suffice to prove that a conspiracy, although it exists as soon as the agreement is made, may not continue beyond the moment of making it. It is true that the unlawful agreement satisfies the definition of the crime, but it does not exhaust it." *Kissel*, 218 U.S. at 607. An

agreement can thus be both completely formed and continuing for statute of limitations purposes. *See also Kemp & Assocs.*, 907 F.3d at 1270-72 (reversing dismissal on statute of limitations grounds and holding that antitrust conspiracy continued past its formation, through the allocation of customers, and until the conspiracy reaped the economic reward by receiving payments); *United States v. Evans & Assocs. Constr. Co.*, 839 F.2d 656, 661 (10th Cir.1988) (holding that statute of limitations began running when final payment on contract obtained through rigged bids was received, not when rigged bids were submitted).

None of the cases Mr. Roberts cites undermines the controlling precedents. *Socony-Vacuum* and *United States v. Gasoline Retailers Ass'n, Inc.* speak to what is needed to form an unlawful Sherman Act conspiracy, not whether a conspiracy is continuing or when it ends. *Socony-Vacuum*, 310 U.S. at 224-25 n.59; *Gasoline Retailers*, 285 F.2d 688, 691 (7th Cir. 1961). As the court in *United States v. New York Great Atlantic & Pacific Tea Co.* recognized, while *Nash* and *Socony-Vacuum* "settle it that the offense of conspiracy under the Sherman Act is complete when the agreement or conspiracy is formed," it "is settled, too, that a conspiracy in restraint of trade is, or may be, a continuing offense." 137 F.2d 459, 463 (5th Cir. 1943) (citing *Kissel*, 218 U.S. 601). And a "conspiracy thus continued is in effect renewed during each day of its continuance." *Id.* (quoting *United States v. Borden Co.*, 308 U.S. 188, 202 (1939). *United States v. Reitmeyer*, the other case on which Mr. Roberts relies, is inapposite because it involved neither Sherman Act nor other conspiracy charges. 356 F.3d 1313 (10th Cir. 2004).

B. *Mr. Roberts Is Liable for His Co-Conspirators' Acts in Furtherance of the Conspiracy*

The Superseding Indictment alleges one continuing conspiracy in which all defendants participated. Each participant in a conspiracy is liable for the acts of his co-conspirators until the conspiracy ends or he withdraws. *United States v. Cherry*, 217 F.3d 811, 817 (10th Cir. 2000) ("A conspirator . . . is only liable for the acts of co-conspirators 'until the conspiracy accomplished its goals or that conspirator withdraws.'") (quoting *United States v. Brewer*, 983 F.2d 181, 185 (10th Cir. 1993)). As the Supreme Court recently ruled in *Smith v. United States*:

> Having joined forces to achieve collectively more evil than he could accomplish alone, Smith tied his fate to that of the group. His individual change of heart (assuming it occurred) could not put the conspiracy genie back in the bottle. We punish him for the havoc wreaked by the unlawful scheme, whether or not he remained actively involved. It is his withdrawal that must be active, and it was his burden to show that.

568 U.S. 106, 114 (2013). As a result, there is no requirement that the government prove, let alone that the Superseding Indictment allege, that a defendant personally committed acts in furtherance of the conspiracy within the limitations period.

It is thus immaterial to the motion whether Mr. Roberts participated in each episode or any episode after October 6, 2015. Nor would it matter if Mr. Roberts ceased participating prior to that date. As the Court already noted in its Order on defendants' motions for bills of particular, "a defendant's 'passive nonparticipation' is insufficient to demonstrate that the defendant in fact left the conspiracy." ECF No. 257 at 8 (citing *Smith*, 568 U.S. at 112-13); *see also United States v. Hughes*, 191 F.3d 1317, 1321 (10th Cir. 1999) ("Mere cessation of one's participation in a conspiracy is insufficient to

demonstrate withdrawal.").[9] If Mr. Roberts wants to mount a withdrawal defense, "the law is clear that the defendant bears the burden of establishing withdrawal from a conspiracy." *Hughes*, 191 F.3d at 1322; *see Smith*, 568 U.S. at 109-14 (affirming conviction where jury was instructed that "[o]nce the government has proven that a defendant was a member of a conspiracy, the burden is on the defendant to prove withdrawal from a conspiracy by a preponderance of the evidence"). And as noted above, the law is equally clear such a defense would raise a factual dispute that must be resolved at trial, not through a motion to dismiss.

Accordingly, even assuming Mr. Roberts had done nothing in furtherance of the conspiracy after October 6, 2015, he would have no statute of limitations defense because he remains liable for the conspiracy and responsible for "the havoc wreaked by the unlawful scheme," *Smith*, 568 U.S. at 114, until its purpose was achieved or abandoned or he takes affirmative action to withdraw, "either by reporting to the authorities or by communicating his intentions to the coconspirators," *United States v. Powell,* 982 F.2d 1422, 1435 (10th Cir.1992).

C.    *The Conspiracy Continued While Conspirators Sold and Accepted Payment for Price-Fixed Chickens*

Lastly, controlling precedent belies Mr. Roberts' assertion that the payments collected by the conspirators for the price-fixed broiler chicken products are merely the consequence or result of the earlier conspiracy and not acts in furtherance of it, *see*

---

[9] While Mr. Roberts cites a 2009 model jury instruction for the proposition that the government must prove that each defendant continued to be a member of the conspiracy within the period of the statute of limitations, that proposition was firmly rejected by the Supreme Court in *Smith*, 568 U.S. at 112-14.

ECF No. 293 at 7, 9-10. "[A] criminal conspiracy to restrain trade by collusive, anti-competitive bidding continues for the purposes of the five year statute of limitations until either the final payments are received under the illegal contract or the final distribution of illicit profits among the conspirators occurs." *United States v. Dynalectric Co.*, 859 F.2d 1559, 1565 (11th Cir .1988) (citing, among other cases, *Evans & Assocs.*, 839 F.2d 656).

Recently, the Tenth Circuit reversed a dismissal of an antitrust indictment premised on the same error Mr. Roberts now invites. *Kemp & Assocs.*, 907 F.3d at 1270-72. Specifically, the lower court rejected the government's argument that the receipt of payments were acts in furtherance of the conspiracy that showed the offense continued, reasoning that this "theory . . . 'confuses the results of a conspiracy with the actual conduct in furtherance of it.'" *Id.* at 1271 (quoting *United States v. Kemp & Assocs., Inc.*, Case No. 2:16-CR-403, 2017 WL 3720695 at *2 (D. Utah Aug. 28, 2017)). The appeals court did not agree, holding that a "Sherman Act violation [is] 'accomplished both by the submission of noncompetitive bids, *and* by the request for and receipt of payments at anti-competitive levels.'" *Id.* (emphasis in original) (quoting *Evans & Assocs.*, 839 F.2d at 661 (bid rigging conspiracy continues so long as the firms receive payments on the unlawfully obtained contracts)); *accord United States v. A-A-A Elec. Co.*, 788 F.2d 242, 244 (4th Cir. 1986) ("Sherman Act conspiracy [to rig bidding for single project] continues through the time of illegal payoffs and receipt of payments"); *United States v. Girard*, 744 F.2d 1170, 1172-74 (5th Cir. 1984) (conspiracy to defraud by rigging bids to secure contract did not end with the contract's award but continued as

conspirator accepted contractual payments because his "interest lay not in securing the contract itself, but in obtaining the money thereunder").

As the Tenth Circuit explained, the "obvious reason that two firms would suppress and eliminate competition . . . would be to reap the economic benefits." *Kemp & Assocs.*, 907 F.3d at 1271; *see also Evans & Assocs.*, 839 F.2d at 661 (co-conspirator's receipt of money under the contract at issue "was sufficient to delay the start of the statute"). Similarly, outside the context of the Sherman Act and as a matter of conspiracy law generally, "[i]t is well settled that the distribution of the proceeds of a conspiracy is an act occurring during the pendency of the conspiracy." *United States v. Morgan*, 748 F.3d 1024, 1036-37 (10th Cir. 2014) (quoting *United States v. Davis*, 766 F.2d 1452, 1458 (10th Cir. 1985) and collecting cases). Just as in those cases, the price fixing and bid rigging alleged here were not done for their own sake, but rather to increase the participants' profits for broiler chicken products, and as the conspirators continued to act to reap that illicit gain, the conspiracy continued.

Like the indictment at issue in *Kemp & Assocs.*, *see* 907 F.3d at 1272, the Superseding Indictment alleges on its face that the receipt of the payments was part of the conspiracy and actually occurred. *See* ECF No. 101 ¶ 50 (alleging that "[i]t was further part of the conspiracy that" the conspirators "sold and accepted payment for broiler chicken products that are the subject of the allegations in this Indictment in the United States through until at least approximately early 2019"). Indeed, with respect to fixing QSR-1's 8-piece COB supply for 2015, in which Mr. Roberts is alleged to have participated personally, the Superseding Indictment alleges that "it was further part of

the conspiracy that . . . as late as approximately December 26, 2015, Supplier-1 sold

and accepted payment for 8-piece COB through a distributor to QSR-1 franchisees in

the United States" at a price set through coordination among the co-conspirators. *Id.*

¶ 107. To be sure, just as the Superseding Indictment alleges conspiratorial acts in

addition to payments after October 2015, the government expects the evidence at trial

to prove that the conspirators continued to carry out the conspiracy within five years of

the Superseding Indictment's return through the receipt of payments and other acts in

furtherance of the conspiracy. But it is premature to assess that evidence. And, in any

event, Mr. Roberts' description of those payments as "merely the consequence or

result" of the conspiracy, ECF No. 293 at 10, is a mischaracterization of the alleged

facts and a misstatement of the controlling law.

> D. *An Evidentiary Hearing on the Statute of Limitations Defense Is Not Permitted by Rule 12 and Would Impermissibly Intrude on the Role of the Jury*

Finally, there is no basis for Mr. Roberts' request "that an evidentiary hearing be

held on the issue of whether the Government's prosecution of Defendant is barred by

the statute of limitations." ECF No. 293 at 12. Such a hearing would contradict well-

established precedent that an indictment must be "tested solely on the basis of the

allegations made on its face," and that courts "should therefore avoid considering

evidence outside the indictment when testing the indictment's legal sufficiency." *Todd*,

446 F.3d at 1067. Moreover, because the "[c]ommission of the crime within the statute-

of-limitations period is not an element of the conspiracy offense," the government "need

not allege the time of the offense in the indictment." *Smith*, 568 U.S. at 112 (emphasis

omitted). Thus, dismissal on statute of limitations grounds requires the time bar to be clear on the face of the indictment and require no further development of facts. *See also United States v. Sampson*, 371 U.S. 75, 78-79 (1962) (finding it irrelevant that charges had not been established by evidence, because on a motion to dismiss "the indictment must be tested by its sufficiency to charge an offense").

Mr. Roberts has failed to identify any legal authority to the contrary, nor has he provided any other support or explanation for his request for an evidentiary hearing. As explained above, to the extent there are potential factual disputes about the existence of the conspiracy, how long it continued, what acts furthered it, and how Mr. Roberts participated, they are relevant to guilt or innocence and thus cannot be resolved by a Rule 12 motion or hearing. *Pope*, 613 F.3d 1259. It "disserves judicial economy to hold a separate 'mini-trial' on a defense only to repeat the exercise with largely the same evidence a short time later at the trial itself," and it "risk[s] trespassing on territory reserved to the jury as the ultimate finder of fact." *Id.* As a result, a Rule 12 dismissal or a pretrial evidentiary hearing are not permissible avenues to resolve the statute of limitations defense where the indictment on its face does not conclusively establish the defense. Accordingly, like the other motions to dismiss, Mr. Roberts' motion to dismiss on statute of limitations grounds must be evaluated based on the four corners of the Superseding Indictment. And as discussed above, the Superseding Indictment properly alleges a conspiracy continuing through 2019 and was therefore timely returned by the grand jury in 2020. Mr. Roberts' motion to dismiss, including his request for an evidentiary hearing, should be denied.

## **CONCLUSION**

For all the reasons set forth above, the defendants' motions to dismiss, ECF Nos. 293, 295, 296, 302, 303, 305, 306, 307, 308, and 309, should be denied.

Dated: August 30, 2021          Respectfully submitted,

/s/ Michael Koenig
MICHAEL KOENIG
HEATHER CALL
PAUL TORZILLI
CAROLYN SWEENEY
Antitrust Division
U.S. Department of Justice
450 Fifth Street NW, Suite 11048
Washington D.C. 20530
Tel: (202) 616-2165
michael.koenig@usdoj.gov
Attorneys for the United States