```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO
 2
     Criminal Action No. 20-CR-00152-PAB
 3
     UNITED STATES OF AMERICA,
 4
          Plaintiff,
 5
     vs.
 6
     JAYSON JEFFREY PENN,
 7   MIKELL REEVE FRIES,
     SCOTT JAMES BRADY,
 8   ROGER BORN AUSTIN,
     TIMOTHY R. MULRENIN,
 9   WILLIAM VINCENT KANTOLA,
     JIMMIE LEE LITTLE,
10   WILLIAM WADE LOVETTE,
     GAR BRIAN ROBERTS,
11   RICKIE PATTERSON BLAKE,

12        Defendants
     _____
13
                        REPORTER'S TRANSCRIPT
14                          James Hearing
     _____
15

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17   Chief Judge, United States District Court for the District of

18   Colorado, commencing at 8:31 a.m., on the 2nd day of September,

19   2021, in Courtroom A201, United States Courthouse, Denver,

20   Colorado.

21

22

23

24    Proceeding Recorded by Mechanical Stenography, Transcription
       Produced via Computer by Janet M. Coppock, 901 19th Street,
25          Room A257, Denver, Colorado, 80294, (303) 335-2106
```

```
 1                          APPEARANCES
 2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3   Torzilli, U.S. Department of Justice, 450 Fifth Street N.W.,
 4   Washington, DC 20530, appearing for Plaintiff.
 5          Anna Tryon Pletcher and Michael Tubach of
 6   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 7   San Francisco, CA 94111-3823;
 8          Chad David Williams of Davis Graham & Stubbs, LLP,
 9   1550 17th Street, Suite 500, Denver, CO 80202, appearing for
10   Defendant Penn.
11          David Beller, Richard Kornfeld and Kelly Page of
12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13   CO 80202, appearing for Defendant Fries.
14          Bryan B. Lavine  of Troutman Pepper Hamilton Sanders,
15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16           Laura Kuykendall and Megan Rahman of Troutman Pepper
17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18   appearing for Defendant Brady.
19          Michael Felberg and Julie Withers of Reichman,
20   Jorgensen, Lehman, Feldberg, LLP, 750 Third Avenue, 24th Floor,
21   New York, NY 10017;
22          Laura F. Carwile of Reichman, Jorgensen, Lehman,
23   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,
24   CA 94065; appearing for Defendant Austin.
25
```

```
 1                    APPEARANCES (Continued)

 2          Caroline Rivera of Latham & Watkins LLP, 1271 Avenue

 3    of the Americas, New York, NY 10020;

 4          Elizabeth B. Prewitt of Latham & Watkins, LLP,

 5    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

 6          Marci Gilligan LaBranche of Stimson, Stancil,

 7    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

 8    80218, appearing for Defendant Mulrenin.

 9          James A. Backstrom, Counselor at Law, 1515 Market

10    Street, Suite 1200, Philadelphia, PA 19102-1932;

11          Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

12    Bethesda, MD 20814, appearing for Defendant Kantola.

13          Jennifer Lynn Derwin and Mark A. Byrne of Byrne &

14    Nixon, LLP, 888 West Sixth Street, Suite 1100, Los Angeles, CA

15    90017;

16          Dennis J. Canty, Canty Law Corporation,

17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18    appearing for Defendant Little.

19          John Anderson Fagg, Jr. and James McLoughlin of

20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22          Craig Allen Gillen and Anthony Charles Lake of

23    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

24    Atlanta, GA 30339;

25
```

4

```
 1              APPEARANCES (Continued)
```

 2          Richard L. Tegtmeier of Sherman & Howard, LLC,

 3     633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

 4     for Defendant Roberts.

 5          Barry J. Pollack of Robbins, Russell, Englert, Orseck

 6     & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

 7     DC 20006;

 8          Wendy Johnson RMP, LLP, 5519 Hackett Road, Suite 300,

 9     Springdale, AR 72762, appearing for the Defendant Blake.

10

11                         PROCEEDINGS

12          *THE COURT:*  There is an awful lot of blue and gray

13     suits today.

14          The matter before the Court is United States of

15     America versus Jayson Jeffrey Penn and others.  This is

16     Criminal Case 20-CR-152.

17          I will take entries of appearances, first of all, on

18     behalf of the United States.

19          *MR. KOENIG:*  Thank you, Your Honor.  Michael Koenig on

20     behalf of the United States.  With me today is Heather Call,

21     Carolyn Sweeney, Paul Torzilli, and our special agent, LaNard

22     Taylor, of the FBI.

23          *THE COURT:*  And good morning to each of you.

24          Next on behalf of Mr. Penn?

25          *MR. TUBACH:*  Good morning, Your Honor.  Michael Tubach

1    on behalf of Mr. Penn.  He is seated next to me.  Also we have

2    Anna Pletcher of my office, Brian Quinn of my office and Chad

3    Williams of Davis Graham & Stubbs.

4            THE COURT:  Okay, great.  Good morning to each of you.

5            Next on behalf of Mr. Freis?

6            MR. KORNFELD:  Good morning, Your Honor.  Rick

7    Kornfeld on behalf of Michael Fries who is at my side.  Also

8    present on behalf of Mr. Fries are my colleagues, David Beller

9    and Kelly Page.

10           THE COURT:  Good morning to each of you as well.

11           And on behalf of Mr. Brady?

12           MR. LAVINE:  Good morning, Your Honor.  Bryan Lavine

13   here with Mr. Brady and with two of my colleagues, Megan Rahman

14   and Laura Kuykendall.

15           THE COURT:  And good morning to each of you as well.

16   On behalf of Mr. Austin?

17           MR. FELDBERG:  Good morning, Your Honor.  Michael

18   Feldberg for Mr. Austin.  Mr. Austin is with me.  My colleagues

19   Julie Withers and Laura Carwile are with us as well.

20           THE COURT:  And on behalf of Mr. Mulrenin, and

21   hopefully I pronounced that right.

22           MS. PREWITT:  Good morning, Your Honor.  Elizabeth

23   Prewitt on behalf of Mr. Mulrenin who is here, as well my

24   colleague Caroline Rivera in the back and my co-counsel Marci

25   LaBranche from Stimson, Stancil, LaBranche  & Hubbard here in

1    Denver.

2          THE COURT:  Good morning to each of you.

3          On behalf of Mr. Kantola?

4          MS. HENRY:  Good morning, Your Honor.  Roxann Henry on

5    behalf of Mr. Kantola who is standing here to my right and

6    James Backstrom who is standing next to me on my left.

7          THE COURT:  Good morning to each of you.

8          On behalf of Mr. Little?

9          MR. BYRNE:  Good morning, Your Honor.  Mark Byrne and

10   Dennis Canty on behalf of Mr. Little.  General Derwin also from

11   our firm is appearing remotely.  And Mr. Little, you granted

12   his motion not to appear.  He is remote.  I asked him to turn

13   on his camera when we introduce ourselves.  Hopefully, he will

14   do that.  He is there.  I saw him.

15         THE COURT:  No problem.  He may not, but sometimes

16   there is some technical issues.

17         MR. BYRNE:  But he is listening at the very least.

18         THE COURT:  Okay.

19         On behalf of Mr. Lovette?

20         MR. FAGG:  Good morning, Your Honor.  John Fagg here

21   and I am here with Mr. Lovette.  Also with me is my co-counsel,

22   Jim McLoughlin.

23         THE COURT:  Good morning to you.

24         And on behalf of Mr. Roberts?

25         MR. GILLEN:  Good morning, Your Honor.  Craig Gillen

1   on behalf of Mr. Roberts.  Mr. Roberts is here.  In addition,

2   we have Mr. Tegtmeier from Denver and my partner from Atlanta,

3   Anthony Lake.

4              THE COURT:  And good morning to each of you.

5              And on behalf of Mr. Blake.

6              MR. POLLACK:  Good morning, Your Honor.  Barry

7   Pollack.  With my is Wendy Johnson on behalf of Mr. Blake.

8   Mr. Blake is here with me at counsel table.  And also appearing

9   remotely is Courtney Millian.

10             THE COURT:  Good morning to each of you as well.

11             Let me just mention -- provide a polite warning that

12  this is obviously an in-person hearing, a public hearing.  We

13  have opened it up for VTC so that some people who may have

14  difficulty attending can listen.  That's usually fairly

15  unusual.  But nonetheless, anyone in the courtroom and also

16  anyone who may be listening in audio or VTC cannot record the

17  hearing in any way.  The only person recording the hearing, of

18  course, is our court reporter, so make sure that you don't do

19  anything like that.

20             When we have -- you would be surprised at how the

21  rumors get around that there might have been a recording, but

22  when that happens, I have the U.S. Marshals investigate it.  So

23  make sure that you don't do that.  And that's also for members

24  of the public who may happen to be listening in.

25             Anything as a preliminary matter before we begin

1    today?

2         MR. TUBACH:  Your Honor, Michael Tubach on behalf of

3    Jayson Penn again.  If I could have the Court's indulgence to

4    make two brief introductory points, that may help put this

5    hearing in perspective from defendant's point of view.

6         THE COURT:  No.  There is no such thing in my opinion

7    as an opening statement in a *James* hearing, so I will decline

8    that.  I will let the defendants know that -- and the

9    government too -- I have read everyone's briefs, so I think I

10   am pretty ready to go.

11        MR. TUBACH:  Thank you.

12        THE COURT:  That being said, is the United States

13   ready to call its witness?

14        MR. KOENIG:  Yes, Your Honor.  If I may, could I use

15   the technology podium over there?

16        THE COURT:  Yeah, absolutely.

17        MR. KOENIG:  Before we call our special agent, I would

18   like to just give you a quick road map of how we are going to

19   proceed.

20        THE COURT:  Yeah, I would appreciate that.  You can go

21   to podium for that just so it's amplified better.  And your

22   name is pronounced Koenig; is that correct?

23        MR. KOENIG:  That is correct.

24        THE COURT:  Okay.

25        MR. KOENIG:  We tested this yesterday, so I don't know

1  why it's not showing up on the screen.

2          THE COURT:  Let's see if Ms. Grimm can activate that

3  screen.

4          MR. KOENIG:  There we are.  Thank you, Your Honor.

5          The government intends to proceed today with the *James*

6  hearing by calling Special Agent LaNard Taylor of the Federal

7  Bureau of Investigation.

8          THE COURT:  And Mr. Koenig, just so we are not unfair

9  to Mr. Tubach, I would like this not to be in the form of an

10  opening, but just really a very practical brief explanation,

11  not an opening.

12          MR. KOENIG:  Sure, absolutely.

13          He is going to testify about the conspiracy in

14  general, and then he is going to go through five summary

15  exhibits that we can enter into evidence for the purposes of

16  this hearing as well as the underlying exhibits.  And then, you

17  know, we get into specifics with respect to each of those.

18          That's really a road map I just wanted to give you.

19  It's a lot of material to cover.  We had estimated in our

20  filings that it would take four hours.  I don't know if we'll

21  get through all of it today, but we'll move --

22          THE COURT:  Well, you should try.  *James* hearings

23  don't usually last.  I indulged you by having a one-day

24  hearing.  Of course, we are going to do it in two parts, but

25  they typically do not last that long.  This is not a *James*

LaNard Taylor - Direct

1    trial.  This is a hearing.  And as a result, I would hope that

2    we are not going to spend all day direct.

3           MR. KOENIG:  Okay.  So the government calls Special

4    Agent LaNard Taylor of the Federal Bureau of Investigation.

5       (**LaNard Taylor** was sworn.)

6           THE WITNESS:  Yes, I do.

7           COURT DEPUTY CLERK:  Please state your name and spell

8    your first and last name for the record.

9           THE WITNESS:  Yes, ma'am.  LaNard Taylor.  First name

10   is L-A-N-A-R-D.  Last name Taylor, T-A-Y-L-O-R.

11          THE COURT:  Go ahead, Mr. Koenig.

12                       **DIRECT EXAMINATION**

13   BY MR. KOENIG:

14   Q.  Special Agent Taylor, where are you employed?

15   A.  I am employed with the FBI.

16   Q.  How long have you been an agent at the FBI?

17   A.  Just over five years.

18   Q.  Is this your first job in law enforcement?

19   A.  It is not.

20   Q.  What other law enforcement positions have you held?

21   A.  I was a police officer in the city of Tampa, Florida.

22   Q.  And at the FBI what unit are you in?

23   A.  Currently in the International Corruption Unit.

24   Q.  What is the International Corruption Unit?

25   A.  We are responsible for investigating violations of the

LaNard Taylor - Direct

1    Foreign Corrupt Practices Act, kleptocracy violations and

2    antitrust violations.

3    Q.   And when you went to the International Corruption Unit, did

4    you receive any special training specific to the ICU?

5    A.   Yes, sir.

6    Q.   And what was?

7    A.   We received at least a couple days training on the separate

8    violations of antitrust, NFCPA, and we also have continuing

9    training by way of our in-service yearly.

10   Q.   Thank you.  While you were at the ICU, did there come a

11   time when you were assigned to investigate possible antitrust

12   violations in the broiler chicken industry?

13   A.   Yes.

14   Q.   During the course of your investigation, did you have any

15   law enforcement partners?

16   A.   Yes, sir.

17   Q.   Who was that?

18   A.   United States Department of Agriculture - Office of

19   Inspector General and the United States Department of

20   Commerce - Office of Inspector General.

21   Q.   And is the broiler chicken industry the subject matter of

22   your testimony today?

23   A.   Yes, sir.

24   Q.   Would you please describe your investigation at a general

25   level.

LaNard Taylor - Direct

1   A.   Sure.   So our investigation included a number of

2   interviews, reviewing documents and other investigative methods

3   in which we investigated the broiler chicken industry and the

4   potential price fixing bid rigging schemes.

5   Q.   And what sort of investigative steps did you take?

6   A.   I am sorry?

7   Q.   Did you mention investigative steps?

8   A.   Yes, sir.

9   Q.   I'm sorry, I missed it.   And what did your investigation

10  uncover?

11  A.   We uncovered a concerted and a coordinated effort on behalf

12  of companies and their employees to raise prices in the

13  industry.

14  Q.   In the broiler chicken industry?

15  A.   Yes, sir.

16  Q.   And what was the time frame of that conspiracy?

17  A.   The main focal point of this conspiracy for our -- for

18  purposes of our investigation is roughly in or around 2012 to

19  at least 2019.

20  Q.   Did your investigation reveal the exact start date of the

21  conspiracy?

22  A.   No, sir.

23  Q.   Why do you think that is?

24  A.   Well, I think it's incredibly difficult especially going a

25  decade back to identify, you know, specific, you know, times

LaNard Taylor - Direct

1   when somebody enters into a conspiracy in part because by

2   nature of a conspiracy, they are, you know, secretive in

3   nature.  So there is not always an e-mail or text message that

4   indicates when somebody knew of and when they joined the

5   conspiracy.

6   Q.  But you certainly are able to tell by when the conspiracy

7   was up and running?

8   A.  Yes, sir.

9   Q.  Did your investigation uncover evidence that the conspiracy

10  started somewhere before 2012?

11  A.  Yes, sir.  There is evidence that there was communications

12  and other evidence prior to the 2012 time frame, yes, sir.

13  Q.  Like approximately how far?

14  A.  So I've seen communications as early back at 2010, so 2010,

15  2011, that time frame.

16  Q.  Could you describe the operation of the conspiracy at a

17  general level?

18  A.  Yes, sir.  As I indicated just a few moments ago, in this

19  industry there was a concerted effort to raise prices.  And

20  that was achieved by, you know, the suppliers through their

21  employees, of course, communicating with one another, getting

22  on the same page about, you know, pricing events or bids or

23  what have you or any other type of, you know, pricing events

24  and, you know, raising the prices or agreeing to raise the

25  prices together.

14

LaNard Taylor - Direct

1    Q.   Okay.  So can you just give us a little more detail about

2    like pricing events and how -- was there a network of some

3    sort?

4    A.   Yes, sir.  So when I use the term pricing event, I don't

5    necessarily always mean a contract negotiation, right?  So it

6    could be a contract negotiation for bid.  It could be a

7    discount for a customer.  There is a plethora of things.  It

8    could be that I consider a pricing event, but in this network

9    as you put it, these individuals contacted each other.  A lot

10   of these individuals overlapped with different customers and so

11   they were able to call each other, ask for prices, ask for

12   other guidance on whether they were going to change prices, go

13   up, or whether they were going to give a discount, so on and so

14   forth.

15   Q.   Okay.  And then did they use the information they received

16   to inform their decision making going forward?

17   A.   Yes, sir.

18   Q.   You mentioned pricing events.  Was every single pricing

19   event a collusive event?

20   A.   No, sir, I don't believe every single one was its own

21   separate event, if that's what --

22   Q.   Every time there was a negotiation, did every member of the

23   conspiracy always plug into their network?

24   A.   No, sir.

25   Q.   Okay.  Did your investigation reveal any attempts to

LaNard Taylor - Direct

1  conceal the conspiracy?

2  *A.*  Yes, sir.

3  *Q.*  Okay.  And can you give me a few examples?

4  *A.*  Yes, sir.  I have seen communications where a member of the

5  conspiracy told another member don't put competitor names in

6  e-mails.  I have seen -- I have interviewed at least one person

7  who indicated that one of the individuals involved in the

8  conspiracy tried to give him instructions on what to do when

9  meeting with lawyers and that sort of thing.

10 *Q.*  Okay.  All right.  I would like to turn now to the

11 participants in the conspiracy.

12           Did your investigation reveal any defendants in this

13 case participated in the conspiracy?

14 *A.*  Yes, sir.

15 *Q.*  Which ones?

16 *A.*  All 10 defendants.

17 *Q.*  Based on your investigation, were the defendants in this

18 case the only people that participated in the conspiracy?

19 *A.*  They were not.

20 *Q.*  Who else participated?

21 *A.*  There were other individuals, four namely who were

22 subsequently charged but not in this case, and there were other

23 unindicted co-conspirators and people in the companies who

24 haven't been charged.

25 *Q.*  And how in your investigation did you determine whether

LaNard Taylor - Direct

1   someone was a member of the conspiracy?

2   *A.*   I think primarily we were able to, like I said, go back, we

3   are talking again a decade or more and, you know, look at

4   communications between them, look at the pattern of behavior

5   and, you know, their knowledge of it and their participation in

6   it and, you know, I guess that sort of thing, if that answers

7   your question.

8   *Q.*   Sure.  How about direct communications with other

9   competitors?

10  *A.*   Absolutely.  That was certainly a determining factor, yes,

11  sir.

12  *Q.*   And reporting on communications --

13  *A.*   Yes, sir.

14  *Q.*   -- to competitors?  Possession of confidential pricing

15  information from competitors?

16  *A.*   Absolutely.

17  *Q.*   I would like to direct your attention to what we will call

18  for purposes of this hearing just a Demonstrative 1.

19          Do you see Demonstrative 1?

20  *A.*   Yes, sir, I do.

21  *Q.*   Okay.  Now, what are we looking at here?

22  *A.*   We are looking at a list of, you know, defendants,

23  co-conspirators, and I think they are organized by the

24  companies in which they worked for.

25  *Q.*   And they worked for those companies during the relevant

LaNard Taylor - Direct

1   times of the conspiracy?

2   A.  Yes, sir.

3   Q.  Was there some switching back and forth among companies

4   that is not reflected here?

5   A.  Yes, sir.  There was some individuals on here who switched

6   companies and subsequently worked for other broiler chicken

7   suppliers.

8   Q.  Okay.  So I would like to direct your attention to the

9   little logos, little pictures.  Can you explain what each one

10  of those represents?

11  A.  Sure.  They are the logos for the companies that were

12  involved in the conspiracy.

13  Q.  Can you just go through them, please?

14  A.  Sure.  On the left, the furthest left you have Pilgrim's,

15  Pilgrim's Pride.  You can Claxton Poultry, Tyson Foods, Case

16  Farms, Koch Foods, George's Inc., Mar-Jac Poultry and Perdue.

17  And then finally you have Kelly's Foods, who is not a supplier,

18  they are a food distributor, related to at least one of the

19  individuals listed as a co-conspirator.

20  Q.  Aside from Kelly's Foods, did all of these companies

21  produce broiler chicken products?

22  A.  Yes, sir, they did.

23  Q.  Were they competitors?

24  A.  Yes, sir.

25  Q.  And how do you know that?

1    A.  Well, in part because in many of the communications they

2    identify themselves as competitors.  I think the customers

3    perceived them as competitors.  They bidded on a lot of the

4    same products.  They discussed those bids.  And, you know, it

5    was clear to us reviewing the documents and the other

6    interviews and so forth that these companies were competitors

7    of each other.

8    Q.  You said you believe customers viewed them as competitors.

9    What's your basis for saying that?

10   A.  Largely based on a lot of the communications and we

11   interviewed some of the customers where they've indicated to us

12   that they believe these companies are competitors of each other

13   and they believe they were competing for their business, their

14   being the customer.

15   Q.  Okay.  And did any of those customers tell you that they

16   were aware of the conspiracy you had uncovered?

17   A.  No, sir.  Generally, most of the customers that we've

18   interviewed said they were unaware, and they actually expressed

19   some shock that this type of behavior existed in the industry.

20   Q.  Okay.  You see the names on Demonstrative 1, there is color

21   coding.  Do you see that?

22   A.  Yes, sir.

23   Q.  Can you explain what that color coding means?

24   A.  Sure.  The red indicates defendants that are charged in

25   this case.  The green indicates co-conspirators who were

LaNard Taylor - Direct

1    subsequently charged and separately.  And the purple are

2    individuals who have not been charged, but are for the purposes

3    of this investigation considered co-conspirators.

4    Q.  So let's go to the Pilgrim's column.  Could you read the

5    Pilgrim's names into the record, please?

6    A.  Sure.  Jayson Penn, Roger Austin, Jimmie Little, Bill

7    Lovette, Jason McGuire, Tim Stiller, Justin Gay, Scott Tucker,

8    Robbie Bryant, Tommy Lane, Larry Pate and Brenda Ray.

9    Q.  And during the relevant periods of the conspiracy, were all

10   those names you just read employees of Pilgrim's Pride?

11   A.  They were.  And I do want to add one thing, that while

12   these names like, for instance, Bill, that's not his true name,

13   but it is the name they commonly go by.

14   Q.  Okay.  Thank you for that. All right.  Now, each name that

15   you just read, did they in some way have at Pilgrim's

16   responsibility for sales or negotiations or pricing or

17   oversight of the people who have those responsibilities?

18   A.  Yes, sir.

19   Q.  Let's move on to Claxton?  Can you read those names into

20   the record?

21   A.  Michael Fries, Scott Brady, and Walter Cooper.

22   Q.  And they were all employees of Claxton during the relevant

23   periods of the conspiracy?

24   A.  Yes, sir.

25   Q.  Okay.  Can you -- were each of those employees responsible

20

LaNard Taylor - Direct

 1    for negotiations, sales, pricing or oversight of those

 2    responsibilities?

 3    A.   Yes, sir.

 4    Q.   Okay.  Tyson, who are those names?

 5    A.   Tim Mulrenin, Brian Roberts, Steven Cullen and Carl Pepper.

 6    Q.   And they were all employees of Tyson during the relevant

 7    periods of the conspiracy?

 8    A.   Yes, sir.

 9    Q.   And did they have responsibility for sales, negotiation,

10    pricing or oversight?

11    A.   Yes, sir.

12    Q.   Case Farms?

13    A.   Mitch Mitchell.

14    Q.   Okay.  And he was an employee during the relevant times?

15    A.   Yes, sir.

16    Q.   And did he have sales, pricing and negotiation

17    responsibilities?

18    A.   Yes, sir.

19    Q.   All right.  Let's go to Koch Foods.

20    A.   Bill Kantola, Joe Grendys and Bruce MacKenzie.

21    Q.   They were all employees of Koch Foods during the relevant

22    times of the conspiracy?

23    A.   Yes, sir.

24    Q.   Did they have responsibility for sales, negotiations,

25    pricing or oversight during that time?

21

LaNard Taylor - Direct

1   A.   Yes, sir.

2   Q.   Move to George's.

3   A.   Ric Blake.

4   Q.   Was he an employee of George's during the relevant times of

5   the conspiracy?

6   A.   Yes, sir, he was.

7   Q.   Did he have responsibility for sales, negotiation or

8   pricing?

9   A.   Yes, sir.

10  Q.   Mar-Jac.

11  A.   We have Tommy Francis, Kevin Grindle, Pete Martin and Greg

12  Tench.

13  Q.   And they were all employees of Mar-Jac's during the

14  relevant periods?

15  A.   Yes, sir.

16  Q.   Did they all have responsibility for sales, pricing,

17  negotiations or oversight?

18  A.   Yes, sir.

19  Q.   And Perdue?

20  A.   We have Kevin Ilardi and Searcy Wildes.

21  Q.   They were employees of Perdue during the relevant time?

22  A.   Yes.

23  Q.   Did they have responsibility for sales, pricing,

24  negotiation or oversight?

25  A.   Yes, sir.

LaNard Taylor - Direct

1    Q.  Finally, what is Kelly's Foods?  I think you mentioned it

2    before.

3    A.  Yes, sir.  They are a food distribution company based in

4    Florida.

5    Q.  And what's the name under there?

6    A.  Chris Sharp.

7    Q.  And what were his responsibilities?

8    A.  He was a senior level executive at Kelly Foods.  He is

9    responsible for the interaction with customers, facilitating

10   the relationship with the customer, so forth and so on.

11   Q.  Did he also have responsibility or did he also communicate

12   with suppliers about pricing?

13   A.  He did.

14   Q.  All right.  Were each of the people listed in the

15   demonstrative part of the conspiracy?

16   A.  Yes, sir.

17   Q.  Okay.  Did your investigation reveal that any of those

18   people withdrew from the conspiracy at any point?

19   A.  I don't -- I don't recall seeing any communications where

20   anyone explicitly withdrew although, like we mentioned earlier,

21   some individuals changed companies, but that didn't necessarily

22   mean they withdrew.

23   Q.  One caveat I will point out is Mr. Wildes.

24   A.  Yes, sir.  Unfortunately, yes, sir.

25   Q.  Why did you say unfortunately?

LaNard Taylor - Direct

1  A.  As it was indicated to us, Mr. Wildes passed away a few

2  years ago.

3  Q.  Are there additional co-conspirators whose names we did not

4  cover?

5  A.  Yes, sir.  There is other people involved that are not

6  listed on here.

7  Q.  All right.  On the screen is what's been marked as

8  Exhibit 1.  You see Exhibit 1?

9  A.  Yes, sir, I do.

10  Q.  What is Exhibit 1?

11  A.  It is -- it's titled a Conspiracy Guide, but essentially

12  it's a road map of the conspiracy and it's organized by the

13  relevant episodes or the relevant customers.  And it gives a

14  brief synopsis of the document that's tied to that episode or

15  customer and, you know, a portion of what that -- what that

16  document is -- represents.

17  Q.  If you could just explain briefly the organization by going

18  through the columns.

19  A.  Sure.  So the first column, as I said, represents the

20  actual episode that is, you know, delineated in this conspiracy

21  guide, or if the document is not related to a specific episode,

22  in some instances it's related to a specific customer.  And

23  then as you will see in Lines 4 and 5, there are at least a

24  couple documents that are not related to any episode or any

25  customer in particular.

LaNard Taylor - Direct

1   Q.   Okay.

2   A.   So in Column B you have the list of co-conspirators,

3   whether they be the currently charged defendants or any other

4   co-conspirators.  And that same color scheme still exists in

5   that column.

6   Q.   Could I just pause there?  Is that an exhaustive -- for

7   every episode are the names in Column B an exhaustive list of

8   everyone who was involved in that episode?

9   A.   No, sir.  And, in fact, that list is not exhaustive of

10  everybody who is even involved in certain documents that are

11  listed on here.  So there is other people involved in the

12  documents, but this list is not exhaustive.

13  Q.   All right.  Column C?

14  A.   That is the dates that -- you know, of each individual

15  document.

16  Q.   Okay.  And Column D?

17  A.   D as I said is -- in most instances there is an exact quote

18  from the document.  In some of them there is a summary in part

19  because, you know, the document was extremely long or for some

20  other reason it wasn't able to be quoted in there, so yeah,

21  that's what the documents represent.

22  Q.   Okay.  Column E.

23  A.   Column E is the source of the document, so the exact Bates

24  number where that document was derived.

25  Q.   And Column F?

LaNard Taylor - Direct

1    *A.*   Column F is the conspiracy guide exhibit number, so yeah,

2    it's exactly what it says.

3    *Q.*   So the 1- refers to the documents on the Exhibit 1 itself?

4    *A.*   Yes, sir.   The conspiracy guide is Exhibit 1, so anytime

5    you have the prefix of 1, it's referring to the conspiracy

6    guide.

7    *Q.*   And then Column G.

8    *A.*   Column G is the *James* log, the corresponding *James* log

9    entry for that document.   And when you see the prefix of 2, I

10   believe -- I am not sure -- I think it's already marked as

11   Exhibit No. 2, so the *James* log itself is No. 2.   And the

12   number that precedes it -- I am sorry, that follows is the

13   *James* log entry.

14   *Q.*   Okay.   Yeah, we will get to the *James* log in a bit.

15            And so 1-001 and 2-001, actually the same document

16   just marked separate because they are referred to on the two

17   different spreadsheets?

18   *A.*   That's correct.   Yes, sir.

19   *Q.*   And then what's Column H?

20   *A.*   Column H is titled the other relevant *James* log entries, so

21   it provides relevant documents to most of the documents and

22   puts some context around the main document.

23   *Q.*   Okay.   So they are related to the episode in the row that

24   they are in?

25   *A.*   They are.

LaNard Taylor - Direct

1    *Q.*  All right.  Does Exhibit 1 contain all the evidence

2    relevant to the conspiracy?

3    *A.*  No, sir.

4    *Q.*  And based on your investigation, are the episodes in

5    Exhibit 1 the only episodes of the conspiracy?

6    *A.*  No, sir.

7    *Q.*  Did you review Exhibit 1 for accuracy?

8    *A.*  Yes, sir.

9    *Q.*  And how did you do that?

10   *A.*  I was able to review the Bates numbers of the original

11   documents.  I have gone through and made sure to the best of my

12   ability that these quotes are actually accurate or the

13   summaries are accurate, the dates are accurate, so I was able

14   to look at the underlying document to make sure that they are

15   represented accurately.

16   *Q.*  Does Exhibit 1 accurately reflect the contents of the cited

17   documents?

18   *A.*  Yes, sir.

19         *MR. KOENIG:*  Your Honor, at this time the government

20   offers Exhibit 1 for purposes of the *James* hearing and also the

21   1 series of underlying exhibits for purposes of *James* hearing.

22         *THE COURT:*  And by the 1 series, you mean each of the

23   underlying documents referenced in the conspiracy guide?

24         *MR. KOENIG:*  Well, I mean the ones in Column F, the 1-

25   series.

LaNard Taylor - Direct

1      THE COURT:  Well, for example, do you mean 1-001?

2      MR. KOENIG:  Yes.

3      THE COURT:  Any objection?

4      MS. HENRY:  Your Honor, we object --

5      THE COURT:  Because we have so many people, you need

6  to identify yourself and your client.

7      MS. HENRY:  Roxann Henry.  We object to the extent

8  that there is a number of bracketed material in here and the

9  summaries may not exactly be accurate, but to the extent that

10 this is Mr. Taylor's personal summary and it was taken as that,

11 we don't object.

12      THE COURT:  Okay.  All right.  Exhibit 1 and the

13 underlying documents referenced in it will be admitted for

14 purposes of this hearing.

15      Go ahead.

16 BY MR. KOENIG:

17 Q.  Agent Taylor, I would like to take you through an example

18 from Exhibit 1.  And so I will direct your attention to Rows 91

19 through 161 which obviously you can't see entirely on the

20 screen.  What do Rows 91 through 161 represent?

21 A.  They are related to the episode entitled KFC's Eight-Piece

22 COB Supply for 2015.

23 Q.  Can you explain for the Court what that means in sort of

24 layman's terms?

25 A.  Yes, sir.  Based on our investigation we understand this to

LaNard Taylor - Direct

1    be the negotiations for KFC's eight-piece chicken on the bone

2    supply for 2015, which means these negotiations occurred in

3    2014.

4    Q.   Could you provide a little background as to what was going

5    on at that time just to give some context for this episode?

6    A.   What was going on as it relates to?

7    Q.   Yeah, just some context for this episode.  You know, was

8    there an RFP sent out?

9    A.   I see.  Yes, sir.  So during this time KFC through their

10   purchasing cooperative, RSCS, they were soliciting bids for

11   their products for their customer, obviously, which is KFC.

12   And they had reached out to their suppliers and asked for bids

13   on specific items.

14   Q.   Okay.  You said RFCS.  What is that?

15   A.   That is the purchasing cooperative for KFC.  They were

16   previously known by another name, I believe it was UFPC, but

17   again they are the purchasing cooperative for KFC, so they do

18   the negotiations on behalf of KFC.  And although they are a

19   purchasing cooperative, they don't actually purchase product

20   themselves.

21   Q.   So they negotiate the prices for the individual franchisees

22   for KFC.

23   A.   Yes, sir.

24   Q.   Just for the record, what is KFC?

25   A.   That's a fast food company, Kentucky Fried Chicken.

LaNard Taylor - Direct

1   Q.  So you said there was an RFP sent out.  Can you explain

2   that generally, when that was sent and what it required?

3   A.  Yes, sir.  So generally these negotiations occur sometime

4   in the fall.  In this instance we are talking August, so the

5   RFP would have been sent out -- the first communication on this

6   I believe it says August 7, so the RFPs were likely sent out

7   before that.

8          So from my understanding of the RFP process through

9   this investigation is that the customer sends out an RFP or

10  request for proposal to particular suppliers and they ask the

11  suppliers what kind of pricing they would be able to provide

12  for specific items.  And the suppliers respond with the pricing

13  and their volume they are able to commit to for that particular

14  item.

15  Q.  And are there multiple rounds of negotiations?

16  A.  Sometimes, yes, sir.

17  Q.  So in this particular one, did you review the documents for

18  the request for proposal that was sent out?

19  A.  Yes, sir.

20  Q.  And which suppliers was it sent to?

21  A.  I believe there was like seven, but --

22  Q.  Okay.

23  A.  There was Pilgrim's, Tyson.  I believe it was Case,

24  Mar-Jac, Claxton.  Without having them all in front of me, I

25  don't know if I can recite all seven, but I believe it was

LaNard Taylor - Direct

1   seven.

2   Q.   So you said Pilgrim's, Claxton, Tyson, Case, right?

3   A.   Yes, sir, Mar-Jac.

4   Q.   Mar-Jac.  Was Koch?

5   A.   Koch.

6   Q.   And George's?

7   A.   Yes, sir, that's it.

8   Q.   And did the solicitation request that first round get

9   submission?

10  A.   Yes, sir.

11  Q.   Was there a due date?

12  A.   Yes, sir.  It was August 19, 2014.

13  Q.   Did you interview anyone regarding these negotiations?

14  A.   Yes, sir.

15  Q.   Okay.  And what was -- who was one of those people?

16  A.   Well, one of those people was Bob Lewis who was the

17  negotiator from KFC, you know, in this negotiation.

18  Q.   Okay.  Any others?

19  A.   Yes, yes.

20  Q.   How about was there anybody from Pilgrim's?

21  A.   Yes, sir, Mister -- yes.

22  Q.   Who was that?

23  A.   Mr. Robbie Bryant.

24  Q.   And remind the Court, please, who Robbie Bryant is.

25  A.   He is listed on the demonstrative as a co-conspirator in

LaNard Taylor - Direct

1    purple, but Mr. Bryant worked for Pilgrim's and he served in

2    several different roles.  I think he ended up being a director

3    of some sort, but he was involved in negotiations and pricing

4    discussions for KFC -- for Pilgrim's to KFC.

5    *Q.*  And Mr. Bryant is still a current employee of Pilgrim's to

6    your knowledge?

7    *A.*  Yes.

8    *Q.*  All right.  So what did Mr. Bryant tell you about the

9    negotiations?  Let's point to early August.

10   *A.*  Sure.  So Mr. Bryant indicated that there were a series of

11   meetings between the Pilgrim's employees, which would be

12   Mr. Bryant himself, Mr. McGuire and Mr. Austin.  He also

13   indicated that they met with RSCS during that time frame.  And

14   he indicated there was also a post-meeting, so they obviously

15   got with each other after the meeting with RSCS to kind of

16   debrief.

17   *Q.*  So when was the middle meeting, that negotiation meeting

18   with RSCS?

19   *A.*  So I believe that meeting was on August 1st of 2014.

20   *Q.*  And what's your basis for that?

21   *A.*  I've seen a PowerPoint presentation that was prepared by

22   Pilgrim's in which it's dated August 1st, 2014, and that was,

23   based on what Mr. Bryant has explained to us, that was used by

24   Pilgrim's in that meeting with RSCS.

25   *Q.*  Now, you said that Mr. McGuire, Mr. Bryant and

32

LaNard Taylor - Direct

1    Mr. Austin -- and those are all three Pilgrim's employees at

2    the time?

3    A.  Yes, sir.

4    Q.  Okay.  You said that they met before that meeting?

5    A.  Yes, sir.  They discussed -- they were supposed to discuss

6    the upcoming, you know, negotiations with KFC.

7    Q.  What did Mr. Bryant tell you about what happened at that

8    meeting?

9    A.  At which meeting?

10   Q.  The first meeting, the one before the meeting with RSCS.

11   A.  Mr. Bryant indicated that Mr. McGuire had let them know

12   about some significant price increases that were set to occur.

13   He indicated to us -- Mr. Bryant indicated to us that he

14   believed the idea of the price negotiations probably happened

15   in -- at the corporate headquarters, but he wasn't exactly

16   sure.  But he said Mr. McGuire informed them, them being

17   Mr. Bryant and Mr. Austin, of Pilgrim's proposed price

18   increases to various customers.

19   Q.  And did Mr. Bryant give you an indication as the relative

20   size of the price increases as compared to previous years?

21   A.  He described them as -- I don't recall him giving us an

22   exact number as far as size, but he described them as historic

23   and he said they were significant.

24   Q.  Okay.  And what was Mr. Bryant's -- what did Mr. Bryant

25   tell you that his and Mr. Austin's reaction was to what

LaNard Taylor - Direct

1    Mr. McGuire said at the meeting?

2    A.  He indicated that he, Mr. Bryant, and Mr. Austin were

3    initially hesitant.  They did not -- they were not necessarily

4    convinced that these price increases were going to work.

5    Q.  Okay.  And what did Mr. Bryant tell you was his basis for

6    thinking that the price increases wouldn't stick?

7    A.  Well, again he described them as historic.  And I know he

8    had indicated to us that if these didn't work, then they would

9    possibly lose business.  He would have to find something to do

10   with the volume of chicken that he had.  I'm not sure if that

11   answers your question, but ...

12   Q.  Sure.  So he was afraid that the competition -- is that

13   what you are getting at -- that the competition would not

14   follow and that's why they would lose business?

15   A.  Well, can you repeat your question?

16   Q.  Sure.  Is what you are getting at that his point was that

17   he was afraid they would lose business because the competition

18   wouldn't follow the price increase?

19   A.  That's right, and they were losing business to a

20   competitor.

21          MR. POLLACK:  Your Honor, I am sorry, Barry Pollack on

22   behalf of Mr. Blake.  I understand that this is a *James* hearing

23   and a government agent and we are relaxing the rules a little

24   bit, but the leading is going a little bit too far.

25          THE COURT:  Sustained.

LaNard Taylor - Direct

1   *BY MR. KOENIG:*

2   *Q.*   And what did -- let's move to the second meeting with RSCS.

3   *A.*   Yes.

4   *Q.*   Who from Pilgrim's Pride attended that meeting?

5   *A.*   The same three individuals, Mr. McGuire, Mr. Austin and

6   Mr. Bryant.

7   *Q.*   And who told you that?

8   *A.*   Mr. Bryant.

9   *Q.*   Did Mr. Bryant tell you what RSCS's reaction to the

10  proposed price increases was?

11  *A.*   He did.  He, Mr. Bryant, indicated to us that RSCS said no

12  way to those price increases.

13  *Q.*   Let's move to the third meeting, the one that was right

14  after RSCS.  Did Mr. Bryant tell you what happened at that

15  third meeting?

16  *A.*   Yes, sir.  So he indicated that -- Mr. Bryant indicated

17  that after the meeting they discussed -- you know, obviously

18  they discussed the meeting.  And there was -- since there was

19  several meetings, I can't remember exactly which one there was,

20  but there was a meeting after RSCS's meeting with Pilgrim's in

21  which they indicated that -- well, Mr. McGuire indicated that

22  they were going to stick with the price increases and that they

23  wanted to make sure that their competitors were onboard with

24  those price increases.

25  *Q.*   What -- do you remember what Mr. Bryant reported

1    Mr. McGuire saying?

2    A.  Yes, sir.  So like I said, he indicated that -- Mr. Bryant

3    indicated to us during the interview that Mr. McGuire --

4            MR. FELDBERG:  Your Honor, Michael Feldberg for

5    Mr. Austin.  Could we ask for what Mr. Bryant said as opposed

6    to what he indicated?

7            THE COURT:  No.  The objection is overruled.

8            Go ahead.

9    A.  So Mr. Bryant indicated to us that Mr. McGuire was going to

10   proceed with the price increases.  And then he asked Mr. Austin

11   to put Pilgrim's strategy out to the industry that Pilgrim's

12   intended to raise the prices.

13   BY MR. KOENIG:

14   Q.  And what was Mr. Bryant's reaction?

15   A.  Mr. Bryant said he was shocked.  He had not heard such a

16   thing before.  He had not heard anyone ask somebody else to put

17   something like that out to the industry, but he also indicated

18   that Mr. Austin went along with it and no one flinched at the

19   idea that Mr. McGuire asked to put that out to the industry.

20   Q.  If I could direct your attention to Rows 91 and 92 of

21   Exhibit 1.  Do you see those?

22   A.  I do.

23   Q.  And what is reflected in Rows 91 and 92 of Exhibit 1?

24   A.  91 and 92 are communications between Mr. McGuire and

25   Mr. Penn.

36

LaNard Taylor - Direct

1   *Q.*   Okay.  And if you could read into the record what

2   Mr. McGuire communicated to Mr. Penn.

3   *A.*   Sure.  On August 7, 2014, Mr. McGuire communicated to

4   Mr. Penn, "We are going to change the small bird industry this

5   upcoming year no doubt.  I told Tommy after the KFC meeting

6   last week that we just need our competition to get out of the

7   way so we can get some things done, be better for us and them

8   in the end."

9   *Q.*   Thank you.  What is your understanding of small bird

10  industry?

11  *A.*   Simply put, it's the industry that -- it's a small bird, a

12  small chicken, and they are primarily used by the quick service

13  restaurant or fast food restaurant, so ...

14  *Q.*   So what is your understanding of Tommy?

15  *A.*   I believe him to be referring to Tommy Lane.

16  *Q.*   Why is that?

17  *A.*   Well, Tommy Lane also was a Pilgrim's employee and he is

18  responsible for their pricing on the back end, so he was not in

19  a customer facing role, per se, but he was certainly

20  responsible for pricing at Pilgrim's.

21  *Q.*   All right.  And then Row 92, could you please read what

22  Mr. Penn said to Mr. McGuire?

23  *A.*   Yes.

24      *THE COURT:*  Actually, I don't think that we need to

25  read things that are in exhibits.  It speaks for itself.

LaNard Taylor - Direct

1        MR. KOENIG:  All right.  Fair enough.

2   BY MR. KOENIG:

3   Q.  All right.  If I could direct your attention to Rows 95

4   through -- remind the Court, please, when the first round bids

5   were due.

6   A.  August 19, 2014.

7   Q.  And if I could direct your attention to Rows 102 through

8   110.  Do you see that?

9   A.  Yes, sir.

10  Q.  All right.  And what is reflected in Rows 102 through 110?

11  A.  This is a series of phone calls that occurred between

12  competitors, but also in our company phone calls as well.

13  Q.  And could you identify -- what date was that?

14  A.  August 18, 2014, so the day before the bids were due.

15  Q.  And how many inter-competitor calls were there, and if you

16  could identify which row.

17  A.  I believe that's Row 102 with Mr. Little from Pilgrim's to

18  Mr. Kantola at Koch; Lines 104 from Mr. Austin at Pilgrim's to

19  Mr. Brady at Claxton; Line 106, Mr. Austin at Pilgrim's to

20  Mr. Kantola at Koch; Lines 108, I believe that is, Mr. Little

21  at Pilgrim's to Mr. Pepper at Tyson; 109, which is Mr. Gay at

22  Pilgrim's to Mr. Brady at Claxton, and I believe that's it.

23  Q.  And if I could direct your attention to Rows 111 through

24  114.  Do you see those?

25  A.  I only see 111 and 112.

LaNard Taylor - Direct

1   Q.  Let's start with Row 111.  What is reflected there?

2   A.  That is a -- I am having a hard time making sure the left

3   aligns with the center, but I believe that's the one where it's

4   a call from Mr. McGuire to Mr. Austin.

5   Q.  And then if I could direct your attention to Row 113.  I

6   won't have you read that into the record, but what was -- just

7   generally describe what is represented in Row 113.

8   A.  In Row 113, this is a communication from Mr. McGuire to

9   Mr. Penn in which he gives Mr. Penn a summary of a discussion

10  that he had with Roger Austin.  And in there he states that

11  Roger did some checking around today, and then he included the

12  list of total increases that competitors were intending to

13  propose to the customer.

14  Q.  So you see -- how many competitors' prices are listed

15  there?

16  A.  I believe there is five.

17  Q.  And those had not been submitted, right?

18  A.  They had not been submitted yet.

19  Q.  And what was your basis for saying that he was summarizing

20  a conversation, Mr. McGuire was summarizing a conversation he

21  had with Mr. Austin?

22  A.  Just before this e-mail, as we indicated, Mr. McGuire just

23  talked to Mr. Austin by phone.  And now in this e-mail

24  following that phone call he is telling Mr. Penn that Roger did

25  some checking around today.  And he also said specifically

LaNard Taylor - Direct

1    something about George's where Roger said these guys were the

2    cheapest, so ...

3    Q.  Based on your investigation, what is -- what do you

4    understand Roger did some checking around to mean?

5    A.  I believe that means Roger Austin called competitors and

6    found out what the competitor prices were for that

7    particular -- that particular increase.

8    Q.  What is your basis for that understanding?

9    A.  I believe that that phrase, Roger did some checking around,

10   or phrases similar to that, we have seen that throughout this

11   investigation.  And normally that indicates that that person

12   called the competitors and there is usually some phone calls

13   that either preceded that or followed that phrase.

14   Q.  And did that happen in this case?

15   A.  It did.  It happened prior to Mr. McGuire saying Roger did

16   some checking around.

17   Q.  Those are the inter-competitor phone calls you just

18   referenced?

19   A.  Yes, sir.

20   Q.  And then in Row 114, what is your understanding of -- well,

21   what is the date of the communication in 114?

22   A.  It looks like it's August 18th -- yes, August 18, 2014, so

23   the same day as the previous e-mail.

24   Q.  And what is your understanding of Bill?

25   A.  I believe Mr. Penn to be referring to Bill Lovette who he

LaNard Taylor - Direct

1    reported to.

2    Q.  If I could then direct your attention to Rows 115 through

3    118.  Do you see those?

4    A.  Yes, sir.

5    Q.  What is the date associated with those rows?

6    A.  August 21st, 2014.

7    Q.  And can you just describe generally what -- well, remind

8    the Court, please, what the submission for the first round date

9    was, bid was.

10   A.  August 19th, 2014.

11   Q.  And by August 21st did your investigation reveal whether

12   competitors had submitted their first round bids by then?

13   A.  Yes, sir.

14   Q.  The first one in 115, what is your understanding of "them"?

15   A.  I believe Mr. McGuire to be referring to RSCS as them.

16   Q.  And what is the basis for your understanding?

17   A.  Because Pilgrim's had just submitted their first round bid

18   to RSCS, and he is asking Mr. Austin who was responsible for

19   the account for Pilgrim's.

20   Q.  In Line 16, what is your understanding of the word "they"?

21   A.  Same thing.  I believe Mr. Austin now is still referring to

22   RSCS.

23   Q.  And Line 117, what is your understanding of "everyone

24   else"?

25   A.  I believe Mr. McGuire is referring to other competitors, so

LaNard Taylor - Direct

1    how high other competitors were in their proposals.

2    Q.  And what is your basis for that?

3    A.  Mr. McGuire obviously in the previous e-mail, he knew what

4    the increases were for the other competitors, so on this -- in

5    this particular line, I believe that's what he is referring to.

6    Q.  After the first round bid submissions, did RSCS meet with

7    the various suppliers?

8    A.  They did.

9    Q.  And what was the purpose generally of those meetings?

10   A.  They give feedback to the suppliers about the proposal they

11   submitted, and sometimes they ask them to go back and rework it

12   or, you know, adjust their calculations of some sort.

13   Q.  Could I direct your attention to Row 124, please?

14   A.  Sure.

15   Q.  What is the date associated with 124?

16   A.  August 26, 2014.

17   Q.  All right.  If you could just explain what's reflected in

18   124.  You don't have to read it in the record, but ...

19   A.  Okay.  So 124 is an e-mail from Mr. Austin to Mr. Penn in

20   which he essentially summarizes his meeting with RSCS.

21   Q.  And what does he say that RSCS requested?

22   A.  He is indicating that RSCS asked Pilgrim's to reduce their

23   proposed price increase by approximately one half.

24   Q.  And then what did Mr. Austin tell Mr. Penn?

25   A.  He told Mr. Penn that he told RSCS, he being Mr. Austin

LaNard Taylor - Direct

1   told RSCS that they planned to hold firm on their proposed

2   increase.

3   Q.   He told them or he planned to tell them?

4   A.   I'm sorry.  He planned to tell them that they intended to

5   hold firm on their planned price increase.

6   Q.   What is your understanding of "I told Roger to proceed"?

7   A.   This communication is between Mr. Penn and Mr. Lovette.

8   And I believe Mr. Penn is telling Mr. Lovette that he told

9   Roger Austin to proceed with telling RSCS that they were going

10  to hold on their price increase.

11  Q.   And Rows 125 through 127, what's reflected there?

12  A.   Phone calls between -- it was -- there was phone calls

13  between Mr. Austin and Mr. Penn, Mr. Lovette and Mr. Austin,

14  and then subsequently Mr. Austin and Mr. Brady of Claxton.

15  Q.   And what date were those calls?

16  A.   August 26.

17  Q.   Okay.  So Mr. Austin called Mr. Brady.  Remind me quick,

18  please, where Mr. Brady works at that time.

19  A.   Claxton Poultry.

20  Q.   And Row 128, what is reflected there?

21  A.   Row 128 is a text message from Mr. Brady to Mr. Fries in

22  which he tells Mr. Fries that he had talked to Roger, and I

23  believe that Roger to be referring to Mr. Roger Austin who he

24  had just talked to on the phone.  He told him he had just

25  talked to Roger, and I guess Roger had given him an indication

LaNard Taylor - Direct

1   that Greeley or Pilgrim's had told him not to come down on

2   pricing for KFC.

3   Q.  When you say Pilgrim's, how did you come to that

4   conclusion?

5   A.  Pilgrim's corporate headquarters is based in Greeley,

6   Colorado, and Mr. Brady refers to them as Greeley.

7   Q.  What is your understanding of Bob?

8   A.  I believe he is referring to Bob Lewis who is the

9   negotiator that I indicated earlier that we interviewed as part

10  of this investigation.  He was one of the negotiators for RSCS.

11  Q.  All right.  If I could direct your attention now to rows

12  130 to 133.  I understand you can't see 133 yet, but we will

13  get there.

14          What is the date associated with those rows?

15  A.  August 27, 2014.

16  Q.  And do those rows reflect any inter-competitor calls?

17  A.  Yes, sir.

18  Q.  And which ones are those?

19  A.  Mr. Fries at Claxton called Mr. Tench at Mar-Tec.

20  Mr. Brady at Claxon called Mr. Kantola at Koch.  And I can't

21  133.

22  Q.  In 132, what happened there?

23  A.  Mr. Brady texted Mr. Fries, Koch is not moving either, and

24  that was subsequent to his phone call with Mr. Kantola at Koch

25  Foods.

44

LaNard Taylor - Direct

1   Q.  And now you can see 133.  Can you explain what's going on

2   in Row 133?

3   A.  Sure.  Mr. Fries responded to Mr. Brady's text by saying:

4   Tench is at 11.  They are agreeing to anything today, just

5   listening.  Though I will note that that bracketed -- the name

6   Tench, that's not how it's listed in the actual text message.

7   I believe in the text message he actually spells it T-I-N-C-H,

8   but I believe him to be referring to Greg Tench of Mar-Jac.

9        And he says, Tench is at 11.  I believe that's the

10  meeting time that Mar-Jac had with RSCS.  And then lastly he

11  said -- in the text message it says "They are agreeing to

12  anything today, just listening."  I believe that there should

13  be a "not" in there because I just don't think it makes sense

14  for them to be agreeing to anything and just listening at the

15  same time.  I am not sure that's possible.

16       MR. FAGG:  Your Honor, John Fagg for Mr. Lovette.  We

17  object to the government -- renewing the objection of Ms. Henry

18  earlier when they insert bracketed text into this document that

19  changes the meaning of what the text itself says.

20       THE COURT:  He is testifying as to his opinion or his

21  interpretation based upon his review of it as to what it should

22  be.  He has explained -- and it's bracketed, so he is not

23  testifying that there was a "not" there.  He is just explaining

24  his interpretation.  For purposes of this hearing, that's fine.

25  Overruled.

LaNard Taylor - Direct

1       Go ahead.

2           MR. KOENIG:  Thank you, Your Honor.

3   BY MR. KOENIG:

4   Q.  Okay.  So let's pause here.  There is a lot of rows in

5   Exhibit 1, and we obviously have to keep trucking here.  So can

6   you explain whether your investigation revealed any patterns

7   among episodes?

8   A.  Yes, sir, it did.  I think the overarching pattern that

9   kept repeating itself was when there was a pricing event, I am

10  not going to say absolute, but many times when there was a

11  pricing event there was a series of phone calls between

12  competitors, and in those phone calls these competitors

13  received information about their competitors' pricing or their

14  negotiation tactics or whether they were going to give some

15  type of concession to the customer.

16          And then that was in many instances reported back to

17  supervision or other individuals in the company, and then

18  subsequently these competitors gave their response to the

19  customer.  So that was kind of the repetitive theme that we saw

20  throughout this investigation.

21  Q.  And did you see when there was the reporting back, you say

22  it was reporting back and then going to the customers.  Did you

23  see any evidence of between the reporting back and the talking

24  to customers what -- was there anything that happened in

25  between there?

LaNard Taylor - Direct

1    A.  I'm not sure I understand your question.

2    Q.  Let's go back up to Row 113 of Exhibit 1.

3    A.  Okay.

4    Q.  And I'd direct your attention to the line starting

5    "Considering."

6    A.  Sure.

7    Q.  Okay.  Can you explain what's going on in that sentence?

8    A.  Yes, sir.  So Mr. McGuire in this particular e-mail, I

9    believe he is letting Mr. Penn know -- he is giving him a list

10   of total increases for all the competitors that are listed.

11   And then after he gives the list of price increases, the total

12   increases, he then goes on to say, you know, considering we

13   want to be the leaders in this, this being the price increases,

14   that would put us at .1616 per pound increase.

15           So I guess to answer your question, if I am answering

16   it correctly, the thing that happened in the middle was once

17   they gathered the pricing, they then used -- in many instances

18   used that information to formulate their own pricing opinion or

19   their own position on whatever the pricing event was before

20   reporting that back to the customer.

21   Q.  Thank you.  So you mentioned that Exhibit 1 contains many

22   episodes, correct?

23   A.  Yes, sir, it does.

24   Q.  Did your investigation reveal that all of the episodes were

25   part of a single conspiracy?

LaNard Taylor - Direct

1   A.   I believe that it was, yes.

2   Q.   Okay.  And why do you believe that?

3   A.   Well, when looking at all of the episodes across the entire

4   investigation, it appeared to be the same network of

5   individuals tapping into the network when they needed pricing

6   information or any other type of pricing-related information.

7   So these individuals, though they were not the same people in

8   every single episode, there was a lot of overlap, and then, you

9   know, they were able to tap into that network.

10       They didn't have to start from ground zero every time.

11   They already knew the people to call.  There was no hesitation

12   on who to call.  You know, they didn't really express any fear

13   in calling the people that they were comfortable with.  So to

14   put it -- I guess to summarize that part I would say it's not

15   like they had to start from scratch every time.  They knew

16   where to go.  It was the same type of behavior and it was the

17   same repetitive conduct that we saw.

18   Q.   Okay.  Did you notice any -- throughout the episodes any

19   common objective?  And if so, what was it?

20   A.   Yes, sir.  I believe the common objective among all of them

21   was to raise their prices and they needed each other.  As

22   indicated in this, in Line 113, they kind of needed and used

23   each other to form the basis of their own price increases to

24   know where they were as it relates to other competitors.

25   Q.   Did your investigation reveal any jargon common to the

LaNard Taylor - Direct

1   episodes?

2   A.   Yes, sir.

3   Q.   And what were some of those?

4   A.   There were a number of, I guess, phrases you would use as

5   jargon, per se, one being, for instance, holding firm.  I think

6   we saw that in one of the documents.  Holding firm was used a

7   lot.  And that from my understanding and through our reading of

8   documents and interviewing witnesses, holding firm essentially

9   meant that they were not -- the companies were not intending to

10  move on their price.  They were going to stay at whatever price

11  they were at.  So that was one thing.

12          Another one was due diligence.  They used terms like

13  due diligence.  And oftentimes we saw that that meant, you

14  know, going out and finding out what the competitors were at,

15  whether it be on pricing or again any other type of pricing

16  event or pricing-related information.

17  Q.   Were there terms similar to due diligence that had similar

18  meaning; and if so, what were they?

19  A.   So there were a lot of terms.  They called it intel.  I

20  have seen documents where they refer to, "I am getting pricing

21  information as, you know, intel" or "being provided good intel"

22  or that type of thing.  There were a bunch of different phrases

23  mentioned.

24  Q.   They all generally meant what?

25  A.   Generally they all meant that these competitors would reach

LaNard Taylor - Direct

1   out to each other and glean information from each other about,

2   you know, pricing-related information.

3   Q.   Okay.  Let me just quick direct your attention to -- if I

4   can get over there -- apologies for the delay -- Row 7 of

5   Exhibit 1.  Do you see that?

6   A.   Yes, sir.

7   Q.   And what type of communication is reflected there?

8   A.   This is a communication from Ms. Ray at Pilgrim's.

9   Q.   What's her first name?

10  A.   Brenda Ray.  First name is Brenda, last name is Ray.  This

11  is an e-mail Ms. Ray sent to multiple individuals within

12  Pilgrim's in which she explained that she received a call from

13  a, quote, friendly competitor.

14  Q.   Is that another term that you recall as jargon you have

15  seen elsewhere?

16  A.   Yes, sir.

17  Q.   All right.  Did your investigation uncover any sort of

18  mutual expectation when there was this exchange of negotiating

19  positions?

20  A.   I would say the mutual expectation was that once one

21  supplier gave their prices to another one, that it was a

22  two-way street.  They were expecting something in return.  But

23  then also I think, and this is based on at least one of the

24  interviews that we did, I believe it was Mr. Bryant where he

25  indicated that, you know, in one instance Pilgrim's didn't give

LaNard Taylor - Direct

1    their pricing information to a competitor to undercut them.

2    Like they weren't attempting to undercut them.  They weren't --

3    the competitor raised their prices too.  So I am not sure if

4    that answers your question --

5    Q.  Yes.

6    A.  -- but I believe the expectation was not that, you know,

7    I'm not going to give you my pricing information for you to

8    turn around and undercut me with it.

9    Q.  Did you discover evidence in your investigation that the

10   conspiracy was viewed more broadly than any given customer at

11   any given time?

12   A.  I'd say so, yes, sir.  I don't think the communication or

13   the -- I don't think any of the communication or the sharing of

14   information was tied to one particular customer.

15   Q.  Let's go back to the example in Row 7 we just looked at.

16   A.  Okay.

17   Q.  Okay?  Can you explain, is that tied to any particular

18   customer or any particular time?

19   A.  No, it's not.  It was more of a general statement made by

20   Ms. Ray about Pilgrim's taking contract pricing up in general.

21   It wasn't tied to a specific customer.

22   Q.  If I can direct your attention to Row 36 of Exhibit 1.

23   A.  Okay.

24   Q.  Can you explain was that -- that is an e-mail, correct,

25   from who to who?

LaNard Taylor - Direct

1    A.   From Mr. Penn to Mr. Lovette.

2    Q.   What's the date?

3    A.   January 1st, 2013.

4    Q.   I am sorry, January what?

5    A.   I am sorry, January 27, 2013.  I apologize.

6    Q.   And is that tied to any particular customer or time frame?

7    A.   It is not.

8    Q.   If we go back down to Line 91, we talked earlier about

9    change the small bird industry.

10   A.   Yes, sir.

11   Q.   Is that along the same lines?

12   A.   Yes, sir.  I mean, Mr. McGuire in this e-mail is not

13   talking about a customer in particular.  He is talking about

14   changing the small bird industry as a whole.

15   Q.   Thank you.  I would like to direct your attention now to

16   Exhibit 2, what's been marked as Exhibit 2 anyway.

17        Do you see Exhibit 2?

18   A.   Yes, sir, I do.

19   Q.   What is Exhibit 2?

20   A.   Exhibit 2 is the *James* log.  Yeah, it's the *James* log.

21   Q.   Could you just be a little more specific what it reflects?

22   A.   Sure.  It reflects documents that were being presented for

23   the purposes -- or being submitted for the purposes of this

24   *James* hearing, but similarly to the conspiracy guide it goes

25   through each line and indicates what the -- what the document

LaNard Taylor - Direct

1    is, you know, what it says and then what the source -- what the

2    summary is for.

3    Q.   And then over on the -- okay, fair enough.   Okay.   Did you

4    review Exhibit 2 for accuracy?

5    A.   Yes, sir.

6    Q.   And how did you do that?

7    A.   Similarly to the conspiracy guide, I looked at the

8    underlying documents.   I took the Bates number, looked at the

9    underlying document and looked at the statements that are

10   listed in here.

11   Q.   And does Exhibit 2 accurately reflect the contents of this

12   set of documents?

13   A.   Yes, sir.

14   Q.   Do you remember before we were talking about the 1- series

15   of exhibits?

16   A.   Yes, sir.

17   Q.   Is there a similar 2- series of exhibits?

18   A.   Yes, sir.

19   Q.   What do those represent?

20   A.   I believe the 2, I believe you stated earlier the 2

21   represents the *James* log.   And then the number following that,

22   001, that would be the *James* log entry, so that would be this

23   first line.

24   Q.   Okay.   I am sorry, I forget if I asked you, does Exhibit 2

25   accurately reflect the contents of those other documents?

LaNard Taylor - Direct

1  *A.*  Yes, sir.

2       *MR. KOENIG:*  At this time we would offer Exhibit 2 for

3  purposes of this *James* hearing, as well as the underlying 2

4  series of exhibits for today's purposes.

5       *THE COURT:*  Any objection to that for purposes of this

6  hearing?

7       *MR. FAGG:*  Yes, Your Honor.  John Fagg for

8  Mr. Lovette.  We do object to this *James* log.  This, as you can

9  see from the document, is dated 8/31 of 2021.  The government

10  had a deadline to submit its *James* log and it did so, and this

11  is an amendment that we just received 48 hours ago.  So we

12  object to this being untimely submitted.

13      *THE COURT:*  All right.  Go ahead.

14      *MS. HENRY:*  Roxann Henry, Your Honor.  We also would

15  object that we do not believe that it does accurately reflect

16  all of the documents.

17      *THE COURT:*  The objections will be overruled.  The

18  *James* log and the underlying documents will be admitted for

19  purposes of this hearing.

20      Go ahead.

21      *MR. TUBACH:*  Michael Tubach on behalf of Jayson Penn.

22  I didn't want to stand up and join the objection if other

23  defendants make it.  Should we be doing that if we join in the

24  objections?  I feel we will be doing a lot of joining.

25      *THE COURT:*  That is a problem, and with this many

 1   attorneys it's a tricky one.  So far I think that everyone is

 2   proceeding in a very orderly fashion, so why don't we go ahead

 3   and have joinders so we make a good record.  And then we'll see

 4   what -- how we do it at trial, but why don't we do a joinder

 5   for now.

 6          So let me open that up.  I will withhold my ruling.

 7   Any -- Mr. Tubach, anything to join?

 8          MR. TUBACH:  I just want to join in both of the

 9   objections.  Thank you.

10          MR. FELDBERG:  Michael Feldberg for Mr. Austin.  We

11   join both objections.

12          MR. KORNFELD:  Your Honor, on behalf of Mr. Fries,

13   Rick Kornfeld.  We would also join in both those objections.

14          MS. PREWITT:  Liz Prewitt on behalf of Tim Mulhenin.

15   We also join.

16          MR. GILLEN:  Craig Gillen on behalf of Mr. Roberts.

17   We join as well.

18          THE COURT:  Anyone not join?  All right.  The

19   objections will be overruled for the same reasons that I just

20   mentioned, all right?  Yes.

21          MR. FAGG:  Your Honor, Mr. Fagg for Mr. Lovette again.

22   One other objection which doesn't necessarily apply to all of

23   the underlying documents in the James log, but there were

24   certain documents that we would object to to the extent that

25   the government does not cite the entire document in the James

LaNard Taylor - Direct

1    log and then what is included, whether it's the underlying

2    e-mail itself or an attachment to the e-mail.  Perhaps we could

3    address that as specific documents raised, but I did want to

4    raise that objection.

5            THE COURT:  I don't understand the objection.  What's

6    the issue?

7            MR. FAGG:  To the extent the underlying documents

8    themselves are not a complete copy of the exhibit that they

9    contend that they are, we object to the government relying on

10   it if it is not a complete document that reflects the entire

11   document as it existed, including attachments.  And there are

12   certain documents in there to which this applies and we are

13   happy to address those specifically.

14           THE COURT:  I am going to overrule that objection.  Of

15   course, the government has the burden.  And I'll have to take a

16   look at each of the documents to see whether or not it's

17   supported.  I will, of course, give you an opportunity to

18   explore on cross-examination anything that you may need to in

19   terms of the completeness of a given document, but at this

20   point in time I don't find that to be an objection that would

21   preclude the Court from considering the indicated hearsay

22   statement.

23           MR. FAGG:  Thank you, Your Honor.

24           MS. HENRY:  Your Honor, Roxann Henry.  We would join

25   in the objection.

LaNard Taylor - Direct

1      THE COURT:  Anyone not join in the objection?  Okay.
2  I will assume each of the defendants joins that objection as
3  well.
4      MR. KOENIG:  And while we are at it, Your Honor, can I
5  just do some housekeeping things?  We have a number of *James*
6  log entries we would like to withdraw.
7      THE COURT:  Yes, go ahead and you can do that now.
8      MR. KOENIG:  Sure.  *James* log entry 17.  That's 17,
9  109.
10      THE COURT:  Hold on one second.  Okay.  Go ahead.
11      MR. KOENIG:  So it was 17, 109.
12      THE COURT:  Hold on.  109?
13      MR. KOENIG:  Yup.
14      THE COURT:  Okay.  Hold on.  All right.  Go ahead.
15      MR. KOENIG:  129.
16      THE COURT:  All right.
17      MR. KOENIG:  204.
18      THE COURT:  All right.
19      MR. KOENIG:  And finally, 225.
20      THE COURT:  All right.  Go ahead.
21      MR. KOENIG:  And one last thing, we would like to
22  withdraw Mr. Cullen as a declarant, not necessarily as a
23  co-conspirator to be considered, but as a declarant.
24      THE COURT:  What do you mean?
25      MR. KOENIG:  Well, you know what, if we can, we'll

LaNard Taylor - Direct

1    come back and I think we have to find his -- he has only one

2    entry in the *James* log that we need to get rid of and I didn't

3    have the number with me.  So with the Court's indulgence, we

4    will come back to that and let you know that single number.

5              *THE COURT:*  Okay.

6              *MR. KOENIG:*  Okay.  Thank you.

7    *BY MR. KOENIG:*

8    *Q.*  All right.  Special Agent Taylor, I would like to direct

9    your attention to what's been marked as Government Exhibit 3.

10   Do you see that?

11   *A.*  Yes, sir.

12   *Q.*  What is Government Exhibit 3?

13   *A.*  It is -- well, the graphic of it is the same as we looked

14   at earlier where it lists the companies and the individuals

15   that work for them.  And as indicated in the title, it's the

16   "as of" dates, so these are the dates that at least I believe

17   each individual was involved in the conspiracy.

18   *Q.*  Is it -- do you mean it's the date that they started in the

19   conspiracy?

20   *A.*  No, sir.  I mean at least -- at least on this date they

21   were involved in this conspiracy.  They could have very likely

22   been involved earlier, but this is the dates that we believe it

23   was at least.

24   *Q.*  And did you review Exhibit 3 for accuracy?

25   *A.*  Yes, sir, I did.

LaNard Taylor - Direct

1   *Q.* And how did you do that?

2   *A.* Again, I went through the documents.  Well, I reviewed the

3   exhibit itself and then I reviewed the underlying document.

4   And, yeah, that's how I reviewed it.

5   *Q.* And does Exhibit 3 accurately reflect the evidence that's

6   in Exhibit 3?

7   *A.* Yes, sir.

8          *MR. KOENIG:* Your Honor, at this time the government

9   offers Exhibit 3 for purposes of today's *James* hearing.

10          *THE COURT:* Any objection to the admission for

11   purposes of this hearing of Exhibit 3?

12          Exhibit 3 will be admitted.

13          *MS. HENRY:* Excuse me.  Roxann Henry.  Is it just the

14   first page of Exhibit 3 that's being admitted?

15          *THE COURT:* No, he did not say that.  He said

16   Exhibit 3.

17          *MR. KOENIG:* We will proceed through the pages.

18          *MS. HENRY:* Okay.

19          *THE COURT:* Go ahead.

20          *MR. KOENIG:* Thank you, Your Honor.

21   *BY MR. KOENIG:*

22   *Q.* All right.  I am on Page 2.  I am showing you Page 2 of

23   Exhibit 3, Special Agent Taylor.  Can you explain what is

24   represented on Page 2?

25   *A.* On Page 2, this is a communication between Mr. Penn and

LaNard Taylor - Direct

1    Mr. Lovette in which they are discussing -- you know, they are

2    discussing pricing and, you know, fixed pricing, so forth and

3    so on.  But they also talk about -- well, not they.  Mr. Penn

4    indicates that we've heard that what Claxton is willing to do

5    on their pricing.  And in this document it appears as though

6    Mr. Penn has an idea of what the buyer is saying to them, and

7    he attributes everything to the buyer saying as "the buyer is

8    insisting, the buyer says."  But then when he gets to Claxton,

9    he does not attribute that to the buyer.  He says, "We have

10   heard." So in my opinion in initially reviewing this document,

11   you know, I believe that, you know, that's -- yeah, that's

12   what's going on in the document.

13   Q.  Just for going forward purposes, on the left on the

14   columns, what does the bold and underline represent?

15   A.  It indicates the individuals that are involved in this

16   particular document.

17   Q.  Okay.  And is it your opinion that as of August 22nd, 2011,

18   both Mr. Penn and Mr. Lovette were participating in the

19   conspiracy?

20   A.  Yes, sir, I believe so.

21   Q.  And what is the basis for that?

22   A.  Again, I believe this particular document showed that

23   Mr. Penn -- it's talking about what the competitor's pricing

24   position would be for the following year.  And like I said

25   before, it appears that he has the knowledge of it and it's not

LaNard Taylor - Direct

1   necessarily coming from a buyer as he indicated with everything

2   else.

3           *MR. FAGG:*  John Fagg for Mr. Lovette.  I object to the

4   extent that Special Agent Taylor is saying that this document

5   is talking about a competitor's pricing position.  This

6   document does not talk about a competitor's pricing position.

7   I understand we are going to have an opportunity for

8   cross-examination, but to the extent that he is saying what

9   this document says, we would object to that line of testimony.

10          *THE COURT:*  All right.  Anyone not join?

11          The objection is overruled.  He is offering his

12  understanding of what it is based upon his knowledge of the

13  discovery.  That's appropriate for this type of hearing.

14          Go ahead, Mr. Koenig.

15          *MR. KOENIG:*  Thank you, Your Honor.

16  *BY MR. KOENIG:*

17  *Q.*  Let's go to Page 3 of Exhibit 3.  And so who is highlighted

18  on the left?

19  *A.*  Roger Austin.

20  *Q.*  And does the exhibit cited 2-006, based on that exhibit do

21  you believe that as of November 21st, 2011 Mr. Austin was a

22  participant in the conspiracy?

23  *A.*  Yes, sir, I believe so.

24  *Q.*  What's your basis for that?

25  *A.*  In this e-mail again from Mr. Penn to Mr. Lovette, Mr. Penn

LaNard Taylor - Direct

1    is indicating that Mr. Austin, who I believe Roger to be -- I

2    believe Roger is Mr. Austin -- he is talking about the group

3    consensus about again pricing positions for that particular

4    year.

5    Q.   Okay.  And what is your understanding of group consensus?

6    A.   I believe him to be referring to customers -- I am sorry,

7    competitors.

8    Q.   And why do you believe that?

9    A.   When we talk about group consensus, based on the review of

10   documents, we have seen this type of phrase used before and to

11   be referring to other competitors.

12   Q.   And does this in your opinion also show Mr. Penn and

13   Mr. Lovette's participation as of November 21st, 2011?

14   A.   Yes, sir, I believe so.

15   Q.   All right.  I am showing you Page 4 of Exhibit 3.  Who is

16   highlighted on the left?

17   A.   Jimmie Little.

18   Q.   Can you explain briefly what is -- was being shown here in

19   the e-mail?

20   A.   This e-mail includes a chain, originally was sent by

21   Church's, so a representative from Church's, in which they are

22   asking suppliers to respond to -- as it relates to proposed

23   claims and as the total of the e-mail says Proposed Claims and

24   Product Reporting Procedures.  And he is asking them to

25   respond.  But then it appears as though he only got one

LaNard Taylor - Direct

1   response.  And he subsequently says:  Your silence will be

2   interpreted as agreement.  So then Mr. Little responds to all:

3   Pilgrim's does not agree.

4   Q.  He responds to all.  Who is all?

5   A.  I am sorry.  All would be all of the competitors that the

6   representative from Church's had included on the original

7   e-mail.  And then Mr. Blake then responds:  Nor does George's.

8   And then Mr. Little sends Mr. Blake an e-mail and asks him:

9   Did you send this to Malin, who was the Church's person who

10  originally sent out the e-mail.

11  Q.  What is the date of this document?

12  A.  August 25th, 2011.

13  Q.  That's *James* hearing Exhibit 2-002?

14  A.  Yes, sir.

15  Q.  Did you review a document from three days later?

16  A.  Yes.

17  Q.  And let me see if I can bring that up.

18         All right.  I am showing you what is marked as

19  Exhibit 2-004.  Do you see that?

20  A.  Yes, sir.

21  Q.  Is this the document you said you reviewed from just a

22  couple days later?

23  A.  Yes, sir, three days later.

24  Q.  Okay.  And can you explain, please, what's going on in this

25  document?

LaNard Taylor - Direct

1    *A.*   Yes, sir.   In this document Mr. Little and Mr. Blake are

2    engaged in a conversation about Church's as indicated in the

3    subject line of the e-mail.   And in the e-mail Mr. Little

4    indicates to Mr. Blake that he is holding firm on George's -- I

5    am sorry, on Church's corporation shares.   He is holding firm

6    that they share all their collected data.   And Mr. Little was

7    insistent that Church's needed to share all the data that they

8    were requesting.   And he is asking for Mr. Blake of George's to

9    make sure that he is onboard with whatever position Pilgrim's

10   is taking.

11   *Q.*   Does this relate to 2-002?

12   *A.*   It does.   It's a follow-on to that same e-mail.

13   *Q.*   That's not part of the same e-mail, but it's --

14   *A.*   It's a follow-on to that e-mail.

15   *Q.*   It's the same episode?

16   *A.*   Yes, sir.   It's not the same e-mail chain, just to be

17   clear.   It's not same e-mail chain, but it's a follow-off

18   e-mail that relates to the same subject.

19   *Q.*   How does Mr. Blake respond?

20   *A.*   Mr. Blake responds, "I am in," after Mr. Little asks, "Was

21   he onboard?"   And then -- and then Mr. Little says, you know,

22   something.

23   *Q.*   Between Exhibits 2-002 and 2-004 what is your opinion as to

24   whether -- when Mr. Little, if at all, was participating in the

25   conspiracy?

LaNard Taylor - Direct

 1    A.   Yes, sir.  I believe at least on this e-mail three days

 2    later, August 28th, where he's asking for a competitor to be

 3    onboard with Pilgrim's strategy, I believe at least on this

 4    date of August 28th that Mr. Little was involved.

 5    Q.   Okay.  And on the 25th of Exhibit 2-002, am I correct in

 6    understanding that there were -- well, let me just go back

 7    here.  Okay.  And does this -- this is Page 4 from Exhibit 3.

 8    You do have customers -- competitors discussing a customer,

 9    correct?

10    A.   Yes, sir.

11    Q.   All right.  Let's go to Page 5.  Who are the names

12    highlighted on the left?

13    A.   Jason McGuire, Larry Pate, and Brenda Ray.

14    Q.   And based on this Page 5 of Exhibit 3, do you believe that

15    all three, Mr. McGuire, Mr. Fate and Ms. Ray, were

16    participating in this conspiracy?

17    A.   Yes, sir.

18    Q.   Let's start with Mr. Pate and Ms. Ray.  What date do you

19    believe they were participating in the conspiracy?

20    A.   I believe -- just to be clear, you said Mr. Pate and

21    Ms. Ray?

22    Q.   Yes.

23    A.   I believe at least August 31st, 2012.

24    Q.   And why do you believe that?

25    A.   In this e-mail Ms. Ray -- I think we reviewed it earlier --

65

LaNard Taylor - Direct

1    she indicates that she received a call from a friendly

2    competitor.  So to me, I believe Ms. Ray is engaged in that

3    behavior where she is talking about with a "friendly

4    competitor" as she deems it.  They are talking about Pilgrim's

5    increasing prices and other competitors following suit, this

6    particular competitor.  And then Mr. Pate subsequently asks who

7    that friendly competitor was and Ms. Ray indicates to him that

8    it was George's.

9    Q.  So based on this, again why do you believe Ms. Ray was a

10   participant in the conspiracy?

11   A.  I believe, like I said, I mean, when you use the term

12   "friendly competitor," I believe she's clearly engaged in that

13   behavior that we talked about where she is sharing -- well,

14   sharing of information with competitors.  She is engaged in

15   this.  And she is talking about that competitor following suit

16   on these price increases regardless of what the customer is

17   saying.

18   Q.  And for Mr. Ray, is he just a passive recipient of the

19   information?

20   A.  I am assuming you are referring to Mr. Pate?

21   Q.  Mr. Pate, sorry.

22   A.  I think he may have been until he sent that e-mail asking

23   who the friendly competitor was, which to me at least indicates

24   that, you know, he wanted the information.  He was aware of

25   this -- that there was this friendly competitor and he too

LaNard Taylor - Direct

1    wanted in on who the competitor was.

2    Q.   And did your investigation reveal instances where -- strike

3    that.

4         Let's move to Mr. McGuire on September 1st, 2012.

5    Does that communication -- well, what is the communication?

6    What is going on here?  It's a little complicated.

7    A.   Yeah.  So Mr. Penn after receiving this e-mail -- he was on

8    the original e-mail.  Mr. McGuire was not.  Mr. Penn forwarded

9    that e-mail to Mr. McGuire.  And when I say that e-mail, I mean

10   the e-mail from Mrs. Ray.  Mr. Penn forwarded Mrs. Ray's e-mail

11   to Mr. McGuire.  And he says, you know, FYI, do not forward.

12   He says "fwd," but I believe that to be the shorthand for

13   forward.  And he tells Mr. McGuire, this is not exactly a legal

14   conversation, and so that's what's going on.

15   Q.   So is it your opinion that Mr. McGuire as of September 1st,

16   2012 was participating in the conspiracy?

17   A.   Yes, sir.

18   Q.   And why is that?

19   A.   Well, based on what we've seen, particularly in this

20   investigation, it did not appear that people who were involved

21   in the investigation looped other folks in who were not a part

22   of the investigation, if that makes sense what I am saying.

23   They did not, you know, send e-mails to, you know, random

24   strangers talking about the legality of something if he did not

25   believe that person was involved in the conspiracy and that

67

LaNard Taylor - Direct

1    information would not get him in trouble, I guess.

2    Q.  Page 5 -- no, 6 of Exhibit 3, who is highlighted on the

3    left?

4    A.  Tim Stiller.

5    Q.  And so the date is -- what's the date?

6    A.  September 19, 2014.

7    Q.  Okay.  And what is -- is it your opinion that Mr. Stiller

8    as of that date was a participant in the conspiracy?

9    A.  Yes, sir, I believe so.

10   Q.  And why is that?

11   A.  Well, Mr. Stiller again, as we indicated earlier, was a

12   part of the negotiation team with Pilgrim's, and, yeah, he was

13   in part of the pricing and negotiation and so forth.  But in

14   this particular communication, he's indicating to the employee

15   that they, they, being Pilgrim's, secured a price increase.

16   The price increases that Mr. Bryant had described to us as

17   historic and substantial, they secured those price increases

18   for KFC and Boston Market, and there were still others to come.

19   And then it appears in the last e-mail he's telling that

20   employee everybody's getting that price increase, which to me

21   told me that Mr. Stiller was aware of the strategy to increase

22   prices.

23        And there was another -- and I also understand that a

24   subsequent document Mr. Stiller indicated that customers

25   just -- they don't have choices, that they had to take the

LaNard Taylor - Direct

1   price increases because they didn't have choices.  So it looks

2   like Mr. Stiller is letting somebody else know like, hey, this

3   is the strategy and it's happening and everybody is happening

4   and they don't have choices.

5   Q.  And we will pull that document up at a later point.

6         Okay.  Let's move on to Page 7 of Exhibit 3.  Who is

7   highlighted on the left there?

8   A.  Justin Gay and Scott Tucker.

9   Q.  And what -- so what is the date associated with the top

10  e-mail or top box on the page?

11  A.  November 28th, 2012.

12  Q.  Was it your opinion that Mr. Tucker and Gay were

13  participants in the conspiracy as of that date?

14  A.  Yes, sir.

15  Q.  Why is that?

16  A.  So if we are looking at -- well, just take the first box

17  where Mr. Austin is e-mailing Mr. Penn, Mr. Tucker and Mr. Gay,

18  he is talking about the discussions today to get the pulse.

19  That too was one of those jargon terms that we have seen,

20  getting the pulse.  I have seen that to mean finding out where

21  competitors were on whatever the information they were trying

22  to figure out.  So clearly Mr. Austin is communicating to

23  Mr. Penn, Mr. Tucker and Mr. Gay that he was going to find out

24  where competition was on these prices.

25         And then a little further down they are also on the

LaNard Taylor - Direct

1   e-mail where Mr. Austin said he had some better information and

2   he would call Mr. Penn the next day.  And then Mr. Tucker as

3   you can see on the November 29th, 2012 communication, he sent

4   Mr. Austin a spreadsheet which included prices for competitors,

5   and then Mr. Penn subsequently forwarded that spreadsheet which

6   included the competitor prices to Mr. Lovette.

7   Q.  And that was all subsequent to Mr. Austin -- well, let's go

8   to November 28th.  What is the second, third and fourth line

9   there?

10  A.  Those are phone calls that transpired between Mr. Blake of

11  George's and Mr. Austin, obviously at Pilgrim's.  And then

12  Mr. Austin called Mr. Brady at Claxton and then Mr. Austin

13  called Mr. Kantola at Koch and said I will call you tomorrow

14  around lunchtime and I'll have some better information.

15  Q.  And does he make the call?

16  A.  Yes, sir.

17  Q.  So whom?

18  A.  To Mr. Tucker.

19  Q.  Thank you.  Thank you.  Who is highlighted on the left on

20  Page 8?

21  A.  Robbie Bryant.

22  Q.  Is it your opinion -- what is the date associated with

23  this?

24  A.  December 24th, 2013.

25  Q.  Is it your opinion that as of that date Mr. Bryant was a

LaNard Taylor - Direct

1  participant in the conspiracy?

2  A.  Yes, sir.

3  Q.  And why is that?

4  A.  In the line where Mr. Bryant is -- where he is named, he is

5  clearly being told by Mr. Little that he found out what Tyson's

6  price was for 2014, so again he's -- Mr. Little is

7  communicating to Mr. McGuire and Mr. Bryant about competitor

8  pricing for that particular year.

9  Q.  Okay.  And what's the first line of the rectangle there?

10  A.  That is a line that shows a phone call where Mr. Little

11  called Mr. Kantola.

12  Q.  Where is Mr. Kantola?

13  A.  Koch Foods.

14  Q.  Okay.  Page 9, who is highlighted on the left?

15  A.  Tommy Lane.

16  Q.  And what's the date associated with this e-mail?

17  A.  The e-mail is February 6, 2013.

18  Q.  Is it your opinion that as of that date Mr. Lane was a

19  participant in the conspiracy?

20  A.  Yes, sir, I believe so.

21  Q.  And why is that?

22  A.  I believe that this e-mail showed that Mr. Lane possessed

23  competitor pricing information.  And it says -- in the e-mail

24  he says competition and spread from competition, and it is --

25  what we've seen in our investigation is that sometimes -- well,

LaNard Taylor - Direct

1    hang on.  Let me back up.  What we have seen in the

2    investigation is that usually when the price is this specific

3    down to, you know, three, four, five decimal points, that

4    generally came from a competitor.  So when I see where the

5    competition is, to me that indicates that he is in possession

6    of competitor information.

7    Q.  That was not received from the customer.  Is that what

8    you're saying?

9    A.  I don't believe --

10   Q.  Let me just back up.  How did customers in the course of

11   your investigation, how did customers typically communicate, if

12   at all, the competition's prices to a supplier?

13   A.  So generally customers indicated -- they would indicate a

14   price range or a price direction.  You know, I have seen a

15   customer tell a supplier, hey, you're too high on this.  You

16   need to come down.  And sometimes even they may tell them, you

17   know, you're forcing it high or, you know, I have people coming

18   in 2 to 3 cents below you.  But generally what we have seen in

19   the customers we've interviewed, they've indicated to us that

20   they would not give a supplier exact pricing information from a

21   customer -- I mean  -- yeah, from a customer.  And I say

22   generally because there are -- there at least was in one

23   instance where a customer did that, but that wasn't the norm

24   and that wasn't the practice that we've seen most often in the

25   investigation.

LaNard Taylor - Direct

1    *Q.*  Was that customer KFC?

2    *A.*  Which customer?

3    *Q.*  The one you just mentioned where did it actually happen.

4         *MS. PREWITT:*  Objection, Your Honor, on behalf of Tim

5    Mulrenin.

6         *THE COURT:*  Overruled.

7    *A.*  I can't recall exactly who the customer was, but I know it

8    was a communication that was sent to Mr. Brady in which he told

9    him do not -- don't share with anybody except Mr. Fries.  But I

10   can't remember exactly who the customer was, but I know it was

11   a customer.

12        *THE COURT:*  Mr. Koenig, would now be a good time for

13   our mid-morning break?

14        *MR. KOENIG:*  Sure.  Let me just see.  Yeah, actually

15   we will be switching to Claxton next here.

16        *THE COURT:*  Ladies and gentlemen, we will go ahead and

17   break until 10:30.  Please note that there are bathrooms on

18   every floor, so that you can either take the elevators or you

19   can take the stairs to go up and access those maybe a little

20   bit easier.  We will be in recess until 10:30.  Thank you.

21        (Recess at 10:17 a.m.)

22        (Reconvened at 10:32 a.m.)

23        *THE COURT:*  Mr. Koenig, go ahead.

24        *MR. KOENIG:*  Thank you.  Your Honor.  May I just swap

25   somebody's computer out?

LaNard Taylor - Direct

1        THE COURT:  Right.  You may need to use the document

2   viewer too and a hard copy.

3        MR. KOENIG:  The document which?

4        THE COURT:  The document viewer, that gray thing next

5   to the computer screen at the podium.

6        MR. KOENIG:  Actually, it's just starting to come up

7   here.

8        THE COURT:  Okay.  The attorneys, by the way, just for

9   purposes down the road, make sure you each know how to work the

10  document viewer because you never know when the technology is

11  going to have some perplexing and unexplained problem.

12       MR. FAGG:  Your Honor, my apologies, but it appears

13  our monitor is not working.  Does everyone else appear to have

14  something shown?

15       THE COURT:  Let's see when Mr. Koenig is ready to go,

16  let's see if we still have that problem.  You may need to hit

17  the -- these are ancient computer terms, I am not sure how to

18  pronounce then now, but the degauss or degauss.  I am not sure

19  if the plug would matter, but maybe there are some control

20  buttons on the screen.  Otherwise, we will call IT if we need

21  to.

22       Mr. Fagg, one thing you could always do if the big

23  flat screens are working even though yours may not be, you may

24  need to reposition yourself if we can't get that monitor

25  working.

LaNard Taylor - Direct

1        MR. FAGG:  Okay.  Thank you.  It was working earlier.

2        THE COURT:  Go ahead, Mr. Koenig.

3        MR. KOENIG:  Thank you, Your Honor.

4   BY MR. KOENIG:

5   Q.  Now, I am showing you, Special Agent Taylor, Page 10 of

6   Exhibit 3.  Do you see that?

7   A.  Yes, sir.

8   Q.  Whose name is highlighted on the left?

9   A.  Michael Fries.

10  Q.  What's the date associated with this page of Exhibit 3?

11  A.  November 13, 2012.

12  Q.  And is it your opinion that as of that date Mr. Fries was a

13  participant in the conspiracy?

14  A.  Yes, sir.

15  Q.  And why is that?

16  A.  As shown in this text message exchange between Mr. Brady

17  and Mr. Fries, Mr. Fries is in possession of this competitor

18  pricing information, and moreover he is communicating back

19  through Mr. Brady to communicate with the customer what they

20  intended to do.  So, for instance, Mr. Brady tells Mr. Fries,

21  he says to raise our prices on wings and he goes on.  And then

22  Mr. Brady tells -- I am sorry, Mr. Fries tells Mr. Brady:  Tell

23  him we are trying.

24  Q.  Who is him?

25  A.  Roger Austin.

75

LaNard Taylor - Direct

1    Q.  And he works for a competitor?

2    A.  He works for Pilgrim's Pride, yes, sir.

3    Q.  Let's go to Page 11 of Exhibit 3.  Whose name is

4    highlighted on the left?

5    A.  Scott Brady.

6    Q.  And what is the date associated?

7    A.  December 26th, 2011.

8    Q.  Where did Mr. Brady work at this time?

9    A.  At this time he worked for Pilgrim's Pride.

10   Q.  And when did he switch over to Claxton?

11   A.  I believe it was sometime in 2012, so the following year.

12   Q.  And can you explain -- do you believe as of the 26th of

13   December 2011 Mr. Brady was a participant in the conspiracy?

14   A.  Yes, sir.

15   Q.  And why is that?

16   A.  As indicated in the 8:51 a.m. e-mail, Mr. Brady is

17   indicating that he talked to Bill Kantola -- he says Bill.  I

18   believe him to be referring to Bill Kantola as evident by the

19   previous e-mail that Jimmie Little sent where he specifically

20   talked about Kantola at Koch.  But Mr. Brady said he talked to

21   Bill on Friday, and so he knew what Koch Foods -- what kind of

22   pricing they had received.  So not only is he in possession of

23   it, but he is communicating that to -- at this time it was

24   internal -- another Pilgrim's employee.

25   Q.  Okay.  And let me direct your attention to the subject

LaNard Taylor - Direct

1  Line.  It says RE Church's?

2  *A.*  Yes.

3  *Q.*  What is Church's?

4  *A.*  A fast food company.

5  *Q.*  And I think the Church's came up in a few previous

6  exhibits, right?

7  *A.*  Yes, it did.

8  *Q.*  And that's the same Church's we are talking about here?

9  *A.*  Yes, sir.

10  *Q.*  And that's a customer.

11  *A.*  Yes, sir.

12  *Q.*  And just for the sake of the record, we mentioned Yum

13  Brands at some point?

14  *A.*  Yes, sir.

15  *Q.*  What is Yum Brands?

16  *A.*  It is a brand of restaurant chain, so it includes KFC,

17  Pizza Hut, Taco Bell and a couple other things I think they

18  have in their portfolio, but Yum Brands is essentially the

19  parent company for lack of better terms.

20  *Q.*  Thank you.  Moving on to Page 12 of Exhibit 3, whose name

21  is highlighted on the left?

22  *A.*  Walter Cooper.

23  *Q.*  What's the date associated with this page?

24  *A.*  November 7, 2012.

25  *Q.*  Is it your opinion that Mr. Cooper was a participant in the

LaNard Taylor - Direct

1   conspiracy as of that date?

2   A.   Yes, sir.

3   Q.   Why?

4   A.   I believe in this communication between Mr. Pate and

5   Mr. McGuire, he being Mr. Pate is indicating that he knew what

6   Claxton, because Mr. Cooper worked for Claxton, he knew what

7   Claxton's price was in negotiation with Pollo Tropical, which I

8   believe is what the PT refers to, but moreover, he indicates

9   that we are both holding firm, which I believe alludes to an

10  agreement of some sort that both of the companies were going to

11  hold firm or not move and they were both going to be at that

12  .90 or 90 cents.

13  Q.   Page 13 of Exhibit 3, whose names are highlighted on the

14  left?

15  A.   Tim Mulrenin, Brian Roberts and Carl Pepper.

16  Q.   And what are the dates associated on this page?

17  A.   The telephone call is between Mr. Pepper and Mr. Kantola at

18  Koch and then Mr. Pepper and Mr. Little at Pilgrim's, the date

19  that's reflected is May 31st, 2013.  And then the communication

20  from Mr. Pepper to Mr. Roberts and Mr. Mulrenin, the date is

21  June 3rd, 2013.

22  Q.   Is it your opinion that as of June 3rd, 2013 Mr. Mulrenin

23  and Roberts were participants in the conspiracy?

24  A.   Yes, sir.

25  Q.   Why is that?

LaNard Taylor - Direct

1   *A.*   As indicated in the top portion with the phone calls, it

2   was -- it appears that Mr. Pepper had communicated with his

3   competitors, that being Mr. Kantola of Koch again and

4   Mr. Little at Pilgrim's.  Subsequently, a couple days later he

5   sends an e-mail to Mr. Roberts and Mr. Mulrenin and he outlines

6   exactly -- he outlines the fact that he talked to the

7   competitor where he says Pilgrim's told me.  And then he goes

8   on to talk about actual price points and what their, their

9   being Pilgrim's, plan was for the next year.  So I believe this

10  shows Mr. Mulrenin and Mr. Roberts were in possession of not

11  only the price points, but they knew how the price would

12  direct.

13  *Q.*   And is it your opinion that as of May 31st, 2013,

14  Mr. Pepper was a participant in the conspiracy?

15  *A.*   Yes, sir.

16  *Q.*   And why is that?

17  *A.*   You know, as I just stated, he was -- he is communicating

18  with the competitors and he was again the driving force in that

19  bottom e-mail where he is showing -- he outlines what his role

20  was, that he talked to the competitors and he reporting that

21  back to his supervision.

22  *Q.*   Okay.  Page 14 --

23          *MR. KOENIG:*  Your Honor, if I may, this is what I

24  referred to before we would like to withdraw Mr. Cullen as a

25  declarant.  What I mean is we would also like to withdraw *James*

LaNard Taylor - Direct

1    log Exhibit 140.

2          THE COURT:  Hold on one second.  So on the *James* log

3    entry 140 is withdrawn.  And in regard to Mr. Cullen you are

4    saying he is not what?

5          MR. KOENIG:  We are not using him as a declarant.

6    This is his only document, so we are withdrawing it from

7    consideration.  I didn't want it to be construed as we don't

8    think he is a co-conspirator, but for purposes of today's *James*

9    hearing we are only going through co-conspirators who are also

10   declarants in the *James* log.

11         THE COURT:  Okay.

12         MR. KOENIG:  So the short of it is 140 we are

13   withdrawing.

14         THE COURT:  All right.  Go ahead.

15         MR. KOENIG:  Thank you.

16   BY MR. KOENIG:

17   Q.  Slide 15, who is highlighted on the left?

18   A.  Carl Pepper.

19   Q.  What's the date associated?

20   A.  August 23rd, 2012.

21   Q.  Is it your opinion Mr. Pepper was a participant as of the

22   23rd of August 2012?

23   A.  Yes, sir.

24   Q.  Why is that?

25   A.  As indicated in the e-mail that we just spoke about,

80

LaNard Taylor - Direct

 1   Mr. Pepper is describing what he found out about Pilgrim's,

 2   which is a competitor of Tyson, and what savings -- what price

 3   point they are on savings.  And they are clearly referring to a

 4   customer because in the subject line it says Boston Market.

 5   And I believe this date precedes the e-mail between Mr. Pepper

 6   and Mr. Mulrenin and Roberts.

 7   Q.  Page 16, who is highlighted on the left?

 8        MR. GILLEN:  Pardon me, I object, Your Honor,

 9   Mr. Gillen.  I am having a hard time hearing whether the

10   witness is relating this particular e-mail to the e-mail he

11   just described on June the 3rd, 2013.  I couldn't -- I

12   apologize.  I had a hard time hearing.

13        THE COURT:  And I am sorry, which?  Were you talking

14   about the previous page, Page 15?  Mr. Gillen?

15        MR. GILLEN:  Yes, Your Honor.  I am talking about I

16   believe he mentioned on this e-mail, which is an August 23rd,

17   2012, and then referenced back to the -- I believe he

18   referenced back to the e-mail between Pepper and Mulrenin and

19   Roberts.  I am trying to find out if that's what he said.  I am

20   sorry, I had a hard time hearing it.  I don't know whether

21   that's the linkage he is trying to make.

22        THE COURT:  If you could ask the witness to repeat

23   that particular answer or ask a question that is pertinent to

24   that issue that Mr. Gillen brought up.

25   BY MR. KOENIG:

LaNard Taylor - Direct

1  Q.  Sure.  If I could, Special Agent Taylor, go back to Page 13

2  of Exhibit 3.

3  A.  Yes, sir.

4  Q.  And you testified that your opinion was as of June 3rd,

5  2013, Mr. Mulrenin and Roberts were participants of the

6  conspiracy at that point, correct?

7  A.  Yes, sir.

8  Q.  And you also said that on the 31st of May 2013 Mr. Pepper

9  was a co-conspirator or participant.

10  A.  Yes, sir.

11  Q.  Okay.  And then we moved forward to Page 15.  And my

12  apologies for the duplication, but does the e-mail on Page 15

13  bear relationship to the e-mail on Page 13?

14  A.  No, sir.  I think the distinction I was attempting to make

15  was that in the previous slide you asked me was as of May 31st,

16  2013, was Mr. Pepper part of the conspiracy and I indicated

17  yes.  But now in this current slide I was just making a

18  distinction that this date is prior to that other e-mail, so

19  this date now, it kind of moves the goal post a little further

20  back for Mr. Pepper in particular.  I was not referring to

21  Mr. Mulrenin or Mr. Roberts.

22      THE COURT:  Mr. Koenig, hold on one second.  I wanted

23  to let people know, too, that if you're having trouble hearing

24  for whatever reason, partly because of we're all wearing masks

25  and it makes it a little more difficult to hear people, but we

LaNard Taylor - Direct

1   have headphones over there, which are not very fashionable, but

2   nonetheless work.  And if anyone wants to use one of those,

3   hopefully they are -- sometimes we have a little bit of

4   problems with an individual pair, but feel free to use those

5   too, okay?

6            Sorry, Mr. Koenig.  Go ahead.

7            *MR. KOENIG:*  Thank you, Your Honor.

8   *BY MR. KOENIG:*

9   *Q.*  Let's move to Page 16 of Exhibit 3.  Whose name is

10  highlighted on the left?

11  *A.*  Mitch Mitchell.

12  *Q.*  What's the date associated with this slide?

13  *A.*  It is August 29th, 2014.

14  *Q.*  And is it your opinion that as of that date Mr. Mitchell

15  was a participant in the conspiracy?

16  *A.*  Yes, sir.

17  *Q.*  And why is that?

18  *A.*  So as indicated in the top line, it just says someone from

19  Mar-Jac called Mr. Penn.  And then the following line indicates

20  that Mr. Fries called Mr. Martin and Mr. Martin -- Mr. Fries

21  works at Claxton and Mr. Martin works at Mar-Jac.  In the

22  bottom, that reflects handwritten notes that were from

23  Mr. Martin in which he indicated he talked to Mitch and he said

24  they are holding .19 plus.  So that's particularly by

25  Mr. Mitchell.

LaNard Taylor - Direct

1          In this investigation we discovered that Case was one

2     of the competitors or one of the suppliers that received an RFP

3     or they were bidding on products for KFC.  And the reason I

4     know this, I believe this is tied to KFC, is because on these

5     handwritten notes at the very top right it has the name Steven

6     Campisano on it and I know he work for RSCS.  I actually

7     interviewed him and I understand he works for RSCS.

8     Q.   Slide 17.  Whose name is highlighted on the left?

9     A.   Bill Kantola.

10    Q.   And what is the date associated with this e-mail?

11    A.   December 26, 2011.

12    Q.   And we saw this e-mail previously, right?

13    A.   Yes, sir.

14    Q.   With respect to whom?

15    A.   I believe this one was with respect to Mr. Scott Brady.

16    Q.   Is it your opinion -- what's the date associated with it

17    again?

18    A.   December 26, 2011.

19    Q.   And is it your opinion that as of that date Mr. Kantola was

20    a participant in the conspiracy?

21    A.   Yes, sir.

22    Q.   Why is that?

23    A.   As previously -- as I previously testified, Mr. Brady

24    indicated that he had talked to Bill in response to an e-mail

25    from Mr. Little and Mr. Brady appears to have possession of

LaNard Taylor - Direct

1   what Koch Foods' price point was as a result of that

2   communication with Mr. Brady.

3   Q.  Thank you.  Slide 18, whose names are highlighted on the

4   left?

5   A.  Joel Grendy and Bruce MacKenzie.

6   Q.  What dates are associated with those slides?

7   A.  November 2nd, 2012 and November 5th, 2012.

8   Q.  Is it your opinion that Mr. Grendys and Mr. MacKenzie as of

9   November 11, 2012 were participants in the conspiracy?

10  A.  Just to be clear, you said November 11, 2012?

11  Q.  I am sorry, I meant November 2nd, 2012.

12  A.  Yes, sir.

13  Q.  And why is that?

14  A.  In reading this e-mail, I believe Mr. MacKenzie is

15  reporting to Mr. Grendys what Koch's prices were in relation to

16  their competition, and that's indicated in the sentence where

17  he says:  Listed is what we bid in round one and where our

18  competition is.  So it's clear that he has -- at least clear to

19  me that he has possession of the competition's pricing.

20          As a result, Mr. Grendys' response to him tells him to

21  -- an additional column with Koch's current pricing.  And then

22  Mr. MacKenzie goes on on November 5th, 2012 to explain about

23  incumbents and, you know, where he guesses Pilgrim's -- was the

24  one that didn't have wings.  But in the last sentence he says,

25  Bill, who I believe is referring to Bill Kantola, was going to

85

LaNard Taylor - Direct

1    get them pricing.  So that to me, that shows that Mr. MacKenzie

2    was aware how Mr. Kantola was going to get the pricing and that

3    he was going to be in possession of such pricing.

4    Q.  So even if on November 2nd, say, you're not sure the source

5    of where the competition is, as of November 5th certainly is it

6    your opinion that -- what is your opinion of what is getting us

7    pricing, "Bill is getting us pricing" means?

8    A.  Yeah, I believe that means Mr. Kantola was going to call

9    his competitors and get pricing on those incumbents that they

10   were talking about in that e-mail, which are their competitors.

11   Q.  Slide 19, who is highlighted on the left?

12   A.  Ric Blake.

13   Q.  And this is an e-mail we went through before, correct?

14   A.  Yes, sir.

15   Q.  With respect to whom?

16   A.  This was with respect to Mr. Little.

17   Q.  And what's the date associated with this slide?

18   A.  August 25th, 2011.

19   Q.  And we also looked at Exhibit 2-004.  Do you remember that?

20   A.  Yes, sir.

21   Q.  And what was the date of that e-mail?

22   A.  It was three days later, so that would have been August 28,

23   2011.

24   Q.  Okay.  And so is it your opinion that like Mr. Little,

25   Mr. Blake was a participant in the conspiracy as of at least

LaNard Taylor - Direct

1    August 25th through August 28th, somewhere in that time period

2    in 2011?

3    A.   Yes, sir.

4    Q.   And just explain again why is that?  Do you need me to pull

5    up that exhibit, Exhibit 2004?

6    A.   I do not.  I remember the exhibit.  It was the discussion

7    between Mr. Little and Mr. Blake where he asked was he onboard

8    with -- you know, I guess demanding that Church's produce all

9    the data that he wanted and Mr. Blake indicated that he was

10   onboard.

11   Q.   What I am showing you on the screen is 2004.  Is that the

12   e-mail you were talking about?

13   A.   Yes, sir.

14   Q.   And that's the conversation where it says "I am in"?

15   That's dated August 28th of 2011?

16   A.   Yes, sir.

17   Q.   Page 20, who's highlighted on the left?

18   A.   Tommy Francis.

19   Q.   And what's the date associated with this slide?

20   A.   May 7, 2013.

21   Q.   Is it your opinion that Mr. Francis was a participant in

22   the conspiracy as of that date?

23   A.   Yes, sir.

24   Q.   And why is that?

25   A.   Mr. Francis, this e-mail is from Mr. Francis to Mr. Roberts

LaNard Taylor - Direct

1   at Tyson, which are two competing companies, in which

2   Mr. Francis is asking Mr. Roberts if he had everyone's Popeye's

3   pricing.  And I believe when he refers to everyone, I believe

4   he is referring to other competitors.

5   Q.  Why is that?

6   A.  Based on the review of the documents I have seen.  And in

7   the context of this e-mail, I believe "everyone" is referring

8   to the competition.

9   Q.  What about generally across episodes, have you seen that

10  term everyone's pricing or things similarly?

11  A.  Definitely I have seen these similar.  I can't pinpoint

12  exactly what document where he says everyone, but definitely

13  that type of jargon was used.

14  Q.  Page 21 of Exhibit 3.

15         MR. GILLEN:  Your Honor, I would object to the

16  testimony regarding Mr. Francis in that at least the redacted

17  documents that we had received from the government, my

18  understanding is they had deleted that from their *James* log.

19  And I believe that was No. 46 on the *James* log, that they had

20  withdrawn that, so I do not understand why there would be a

21  reference to -- I believe that's still in reference to

22  Mr. Francis, Francis in the log.  So I would object on

23  relevance because my understanding is they have withdrawn that

24  46 as a co-conspirator declaration by Mr. Francis.

25         THE COURT:  This is more in reference to Mr. Grindle.

LaNard Taylor - Direct

1    Therefore, the relevance objection will be overruled.

2          Go ahead.

3          MR. KOENIG:  I think he was talking about the previous

4    slide actually, slide 46.

5          THE COURT:  Yes.  Okay, that makes sense.  Let's see.

6    That's not -- Exhibit 2-46.  Oh, I don't know -- I will get a

7    response from the government, then, in terms of something being

8    withdrawn.

9          MR. KOENIG:  I don't have the list of all withdrawals

10   in front of me, but just because something is withdrawn from

11   consideration under 801(d)(2)(E) for admissibility, it doesn't

12   mean it's not admissible for other reasons.  And what we are

13   trying to show here is not admissibility of this particular

14   statement by this declarant.  We are just trying to show

15   that's -- he was involved in the conspiracy, that being

16   Mr. Francis at this point.

17         THE COURT:  I agree with the government.  The

18   objection is overruled.

19   BY MR. KOENIG:

20   Q.  Okay.  Page 21 of Exhibit 3, who is highlighted on the

21   left?

22   A.  Kevin Grindle.

23   Q.  What's the date associated with this slide?

24   A.  February 14, 2014.

25   Q.  And is it your opinion that Mr. Grindle was a participant

LaNard Taylor - Direct

1    in the conspiracy as of that date?

2    A.   Yes, sir.

3    Q.   Why is that?

4    A.   Mr. Grindle worked at Mar-Jac and he is e-mailing Mr. Brady

5    at Claxton informing Mr. Brady that he planned to get them

6    Mar-Jac's KFC's numbers for period three as soon as he had

7    them, so yeah.

8    Q.   Okay.  And just let me direct your attention down.  It says

9    From and To in the bottom of the e-mail, From Kevin, To Kevin.

10   Have you seen that before?

11   A.   You mean seen this document?

12   Q.   Yeah, just the To and From being to the same person.

13   A.   Yes, sir.  Based on the investigation and the documents, it

14   wasn't uncommon to see someone e-mail and on the face of the

15   e-mail it shows a To and From line and shows themselves.  In

16   some instances they blind copy other people and, yeah,

17   sometimes they blind copy other people so you wouldn't see them

18   on that initial e-mail.

19   Q.   But in any event, you have -- okay.  That's great.  I'll

20   move on.

21        Slide 22 of Exhibit 3, who is highlighted on the left?

22   A.   Mr. Pete Martin.

23   Q.   And what's the date?

24   A.   January 27, 2013.

25   Q.   And is it your opinion that as of January 27, 2013

LaNard Taylor - Direct

1    Mr. Martin was a participant in the conspiracy?

2    A.   Yes, sir.

3    Q.   And why is that?

4    A.   So this e-mail sent from Mr. Penn to Mr. Lovette in which

5    he describes Mr. Martin pulling him, being Mr. Penn, aside and

6    thanking Pilgrim's for being a better competitor.   Then

7    Mr. Penn goes on to, you know, to talk -- he is going on to

8    tell Mr. Lovette how their competition is viewing them

9    differently now and, you know, he can go to these conferences

10   and know that the competition is viewing them differently.

11           The term "better competitor," "stronger competitor," I

12   believe a lot of that is the same type of jargon that we saw

13   with the "friendly competitor" statement.   Although it's not

14   that exact term, in context we have seen that it means a lot of

15   the same things.

16   Q.   And in the context of this, do you see where it says:   We

17   have made the industry better by being stronger competitors?

18   A.   Yes, sir.

19   Q.   What is your understanding of what that means?

20   A.   Again, the word "stronger competitors," at least from what

21   we've seen in some of the -- like some of the documents we have

22   seen, when people are talking about changing the industry or

23   making the industry better and being stronger or friendly

24   competitors, I believe they are referring to everybody kind of

25   being on the same page, being onboard with each other, and

1    making sure that we are, you know, stronger competitors

2    together as opposed to, you know, like us not getting together,

3    if that makes sense.

4    Q.   Okay.  Thank you.  All right.  Slide 23, who is highlighted

5    on the left?

6    A.   Mr. Greg Tench.

7    Q.   What's the date associated with the rectangle at the

8    bottom?

9    A.   It is August 27, 2014.

10   Q.   Okay.  And is it your opinion that Mr. Tench was a

11   participant in the conspiracy by that date?

12   A.   Yes, sir.

13   Q.   And why do you say that?

14   A.   In this -- in this document you can see Mr. Fries contacted

15   Mr. Tench.  And then subsequently you see a text message

16   between Mr. Fries and Mr. Brady in which he explains Tench is

17   at 11.  I believe him to be referring to a meeting time.  And

18   they are not agreeing to anything and they are just listening.

19   I am sorry, in the text they say they are agreeing, but I think

20   as we talked about earlier, I think that is likely to mean --

21   Q.   Were there negotiations ongoing at this point?

22   A.   Yes.  That's what they are talking about.  The 11, I

23   believe him to be referring to the meeting time that they,

24   being Mar-Jac, had with the customer.

25   Q.   What customer?

LaNard Taylor - Direct

1   A.  This would have been RSCS.  If you see the e-mail above,

2   it's referring to -- it says Rich Eddington.  He works for

3   RSCS.

4   Q.  Slide 24, who is listed on the left?

5   A.  Kevin Ilardi and Searcy Wildes.

6   Q.  What's the date associated with this slide?

7   A.  April 1st, 2014.

8   Q.  Is it your opinion that as of that date Mr. Ilardi and

9   Mr. Wildes were participants in the conspiracy?

10  A.  Yes, sir.

11  Q.  Why?

12  A.  Because as indicated in the communication between

13  Mr. Wildes and -- well, first off, Mr. Wildes had been in

14  communication with a competing company, so Mr. Wildes and

15  Mr. Brady at Claxton Poultry, they were in communication with

16  each other.  And then Mr. Wildes, as you can see in the

17  communication, subsequently gave information to Mr. Ilardi who

18  he reported to about what he had found out.  So that is keeping

19  consistent with the network and the pattern that we discussed

20  earlier.

21  Q.  Slide 25, who is listed on the left?

22  A.  Chris Sharp.

23  Q.  And what's the date of the bottom box there?

24  A.  October 27, 2014.

25  Q.  And is it your opinion that Mr. Sharp was a member of the

LaNard Taylor - Direct

1  conspiracy as of that date or was participating in the

2  conspiracy as of that date?

3  *A.* Yes, sir.

4  *Q.* And why is that?

5  *A.* If you can give me one second. Let me read all the boxes.

6  So in this exchange you can see Mr. Tench at Mar-Jac was

7  communicating with Mr. Cooper of Claxton Poultry. And then you

8  see Mr. Sharp engaged in some of these e-mails with Mr. Tench

9  in which they are, you know, talking about pricing information

10  and, you know -- yeah, talking about the pricing information

11  that -- yeah. I mean, this was kind of hard for me to just put

12  in context because I am drawing from other documents too.

13  *Q.* Sure.

14  *A.* But --

15  *Q.* Okay. So Mr. Sharp worked for a distributor, right?

16  *A.* He did.

17  *Q.* And that distributor is Kelly Foods?

18  *A.* Yes.

19  *Q.* Are they a competitor of any of the suppliers?

20  *A.* They are not.

21  *Q.* And what was going on -- who is the customer that we are

22  talking about here?

23  *A.* The customer is Pollo Tropical.

24  *Q.* And what was going on with Pollo Tropical and Mar-Jac at

25  this time?

94

LaNard Taylor - Direct

1    *A.*  So I believe Mar-Jac was trying to get in on Pollo

2    Tropical's business, and Kelly's Foods was facilitating that,

3    Mar-Jac getting in the business.

4    *Q.*  And the top box you see October 16, 2014, correct?

5    *A.*  Yes.

6    *Q.*  And what does the e-mail -- what does the communication

7    there represent?

8    *A.*  It represents Mr. Tench e-mailing Kelly Foods without --

9    obviously it says without copying Mr. Brink.  Joe Brink was the

10   buyer for Pollo Tropical.  And in that e-mail it talks about

11   supplying Pollo Tropical, but then he goes on to give the

12   pricing, the current pricing for Pilgrim's and Claxton, which

13   are competitors of Mar-Jac where Mr. Tench works.

14   *Q.*  I think it says prices lower than.

15         MR. POLLACK:  Your Honor, again I am going to object

16   to the leading.

17         THE COURT:  Sustained.

18   *BY MR. KOENIG:*

19   *Q.*  That's fair.

20         And what price did Mar-Jac end up getting or proposing

21   to Pollo Tropical?

22   *A.*  So it looks like the WOGs were $1.05 per pound and the

23   boneless breasts were $2.15 per pound.

24   *Q.*  And then the 27th what price did they propose?

25   *A.*  So it looks like there was a -- I guess a staired -- like a

LaNard Taylor - Direct

1    gradual increase or, yeah, a decent way to put it, where the

2    proposal was a dollar per pound starting on January 1st.  And

3    then it would escalate to $1.07 per pound on April 1st and

4    would remain for the rest of the 2015 calendar year.  Then it

5    says Mr. Tench proposed $2.35 per pound for all of calendar

6    year 2015.

7    Q.  Okay.  All right.  Let me move on now to Exhibit 5, what's

8    been marked as Exhibit 5.

9         THE WITNESS:  Can I ask one thing before you move on?

10   Can I ask of the Court, I know we just had a break, but I need

11   to use the restroom.

12        THE COURT:  You say what?

13        THE WITNESS:  I know we just had a break, but I need

14   to use the restroom.

15        THE COURT:  I understand.  Why don't we recess for

16   five minutes, all right?  The Court will be in recess for five

17   minutes until 11:15.  Thank you.

18             (Recess at 11:10 a.m.)

19             (Reconvened at 11:16 a.m.)

20        THE COURT:  Mr. Koenig, go ahead.

21   BY MR. KOENIG:

22   Q.  Special Agent Taylor, I am showing you what's been marked

23   as Exhibit No. 5.  Do you see recognize Exhibit 5?

24   A.  Yes, sir.

25   Q.  And what is Exhibit 5?

LaNard Taylor - Direct

1    *A.*  It essentially is the summary just listing the dates of the

2    previous document we just went through, so this lists the dates

3    that we just discussed.

4    *Q.*  So the columns, just run through the couples, if you could,

5    for me.

6    *A.*  Sure.  The names, I think it's the names of the individuals

7    associated.  The date is the no later than date that we believe

8    that the individual entered into the conspiracy.  And then the

9    corresponding *James* log exhibit numbers is on the far right.

10   *Q.*  And did you review Exhibit 5 for accuracy?

11   *A.*  I did.

12   *Q.*  How did you do that?

13   *A.*  Going through the documents we just reviewed and, you know,

14   comparing it to this.

15   *Q.*  And does Exhibit 5 accurately reflect the evidence?

16   *A.*  It does, although I will say for Mr. Little and I believe

17   Mr. Blake, I think that was where we said at least August 25th

18   to August 28 time frame, this says August 25th.  I know the

19   testimony I just gave said that range of August 25th to

20   August 28th.

21        *MR. KOENIG:*  At this time the government offers

22   Exhibit 5 for purposes of today's *James* hearing.

23        *THE COURT:*  Any objection to the admission of

24   Exhibit 5?

25        *MR. GILLEN:*  No objection, Your Honor.

97

LaNard Taylor - Direct

1       THE COURT:  Exhibit 5 will be admitted.

2       MR. KOENIG:  Court's indulgence for one minute here.

3  Your Honor, I apologize.

4  BY MR. KOENIG:

5  Q.  Special Agent Taylor, again my apologies to the Court for

6  the delay.  I am showing you what has been marked as Exhibit 6.

7  Do you recognize Exhibit 6?

8  A.  Yes, sir.

9       MR. FAGG:  Your Honor, objection.  John Fagg for

10  Mr. Lovette.  Exhibit 6 is an exhibit at that we received last

11  night at 11:30 p.m.

12       THE COURT:  I didn't have Exhibit 6 on my list.

13       MR. FAGG:  So we would object to the government using

14  Exhibit 6 at this hearing.

15       THE COURT:  And what is Exhibit 6?

16       MR. KOENIG:  I was going to ask the witness that, but

17  Exhibit 6 is the *James* log.  And then recognizing that we

18  thought we were going to be tight for time, yesterday we spent

19  the day trying to make things more efficient.  And so what

20  we've done, if I can scroll over here, is created categories

21  for the different *James* log entries.  And then I was going to

22  ask Special Agent Taylor to explain why, you know, each

23  category furthers the conspiracy rather than going through, you

24  know, 330 individual exhibits and then --

25       THE COURT:  Well, isn't it true that the *James* log

LaNard Taylor - Direct

1  already includes different categories or you use codes that are

2  taken from a case?

3        MR. KOENIG:  Sure.  And we just thought this would

4  make it easier for presentation purposes.  If Your Honor thinks

5  that the coding is sufficient, we would be fine to rest on that

6  in Exhibit 2.

7        THE COURT:  It seems like the coding explains the

8  basis for the government's proffer.  Let me ask you this,

9  Mr. Koenig.  You indicated that you thought that this would

10 save time, but as I said, we're not going to go through all the

11 entries.  So would Exhibit 6 really save time?

12       MR. KOENIG:  Well, when you put it that way, I guess

13 it wouldn't.  So we are happy to withdraw it and just rest on

14 Exhibit 2.

15       THE COURT:  Okay.

16 BY MR. KOENIG:

17 Q.  I have a few housekeeper sort of clean-up questions, if you

18 don't mind.  Special Agent Taylor, I believe I heard this in

19 one of your answers that you said you've seen the term "holding

20 firm" in one of the documents.  Do you recall saying that?

21 A.  Yes, sir.

22 Q.  And were you referring to, you know, the whole body of our

23 documents or the documents that are being discussed here today?

24 A.  I wasn't referring to specifically to these documents.  I

25 meant just in totality of all the documents that at least I've

LaNard Taylor - Direct

1    reviewed, some of which may not be here, but in totality.

2    Q.   You've seen the phrase outside of what's in the documents

3    we looked at today?

4    A.   Yes, sir.

5    Q.   Okay.  With Mr. Bryant you testified that he was shocked at

6    the -- what he heard Mr. McGuire say to Mr. Austin?

7    A.   Yes, sir, I did.

8    Q.   Can you remind the Court what it is that Mr. McGuire told

9    Mr. Austin?  And when he said it, just give us the background,

10   you know, just reorientate us.

11   A.   Sure.  What I was testifying to was a meeting that occurred

12   post Pilgrim's and RSCS meeting, so this occurred after they

13   had already met with RSCS.  In that meeting where Mr. McGuire

14   was talking about the price increases, he instructed --

15   Mr. McGuire instructed Mr. Austin to put Pilgrim's strategy out

16   to the industry and that strategy being raising the prices, at

17   least in this particular negotiation, on RSCS.  Does that get

18   your question?

19   Q.   Yeah.  That's just to reorient us.

20        When he said -- what's your understanding based on

21   your interview of Mr. Bryant, what's your understanding of what

22   industry meant?

23   A.   The industry based on our interview refers to competition,

24   competitors in the broiler chicken industry.

25   Q.   And then do you recall when you are going through the sort

LaNard Taylor - Direct

1    of "as of" dates in Exhibit 3?

2    A.   Yes, sir.

3    Q.   And Mr. Bryant, do you recall we looked at a document dated

4    2013 as being his "as of" date?

5    A.   I don't recall the exact document or date -- or the date on

6    the document, I should say.

7    Q.   Let me ask you this.  Before the meeting in 2014, was

8    Mr. Bryant aware or participating in the conspiracy?

9    A.   Repeat that question, please.

10   Q.   Before the -- let me scratch that.  What was your

11   understanding of what Mr. Bryant meant when he said to you that

12   he was shocked at what Mr. McGuire said?

13   A.   I believe -- well, Mr. Bryant indicated to us he was

14   shocked that Mr. McGuire would tell, you know, somebody else,

15   in this case Mr. Austin, to call competitors or "put this out

16   to the industry" because he had not heard anybody do that

17   before.  Mr. Bryant did indicate that previous to that,

18   sometime I believe he said in 2010, he had heard that

19   Mr. Austin had competitive information, but he didn't know

20   where it came from so it didn't really -- it didn't really give

21   him, you know, it didn't give him pause.  I don't know if

22   that's the exact term, but, you know, it didn't cause him to

23   pause and question it.

24        But in this scenario, in this episode where he clearly

25   understands what Mr. McGuire is telling Mr. Austin to do, he

LaNard Taylor - Direct

1   said that was problematic to him and that's why he was shocked

2   because, you know, now he understands that Mr. Austin would be

3   calling competitors specifically and telling them what the

4   price increase was -- what the strategy was to increase prices.

5   Q.  Thank you.  You also at one point mentioned the word

6   "follow suit," I believe.

7   A.  I did.

8   Q.  And can you remind the Court, please, what you meant or

9   what context the phrase "follow suit"?

10      MS. PREWITT:  Objection, Your Honor, for Mr. Mulrenin.

11  I don't recall the use of the word -- the phrase "follow suit."

12  Perhaps the court reporter can read it back, but I don't recall

13  that.

14      THE COURT:  I don't recall that having been asked

15  before, but nevertheless, it's an appropriate question to be

16  asked.  The objection will be overruled.

17  A.  So the term "follow suit" is a term that I just used.  I

18  wasn't referring to it as being one that specific individuals

19  use in their e-mails, but the term follow suit as when I used

20  it meant that these competitors intended to have their

21  competition do the same things, you know, price along the same

22  lines they are or, as indicated in the e-mail between

23  Mr. Little and Mr. Blake, he wanted to make sure that he was

24  onboard.  So that's what I mean when I say follow suit.

25  BY MR. KOENIG:

LaNard Taylor - Direct

1   Q.  Follow suit, did you mean anything along the lines -- well,

2   were they following suit based on --

3            MS. PREWITT:  Objection, Your Honor.

4            THE COURT:  Hold on.  Let's hear the question.

5   BY MR. KOENIG:

6   Q.  What type of information were they using, the

7   co-conspirators, to "follow suit"?

8   A.  If I understand your question correctly, they were using

9   information that was -- I mean, I guess price sensitive

10  information that -- for instance, to give the example again

11  with Mr. Blake and Mr. Little, that was Pilgrim's position in

12  which Mr. Little had asked Mr. Blake:  Are you onboard with

13  this?  So it was a position that Pilgrim's held and he wanted

14  to see if George's, who Mr. Blake worked for, was going to do

15  the same thing as Pilgrim's.  So I am not sure if that answers

16  your question, but ...

17           MR. KOENIG:  Your Honor, I believe that wraps up our

18  presentation.  Would it be okay if I just had a minute to

19  consult just to make sure there is no loose ends?

20           THE COURT:  Of course.

21           MR. KOENIG:  Thank you, Your Honor.  At this time I

22  believe the government will rest.  And I believe we've shown

23  all the three things that we need to show, that the conspiracy

24  existed, that the declarant --

25           THE COURT:  Not time for argument, but if you are

LaNard Taylor - Direct

1    resting, that's fine.

2         *MR. KOENIG:*  All right.  Thank you.

3         *THE COURT:*  Have the defendants discussed how they

4    want to proceed in terms of cross-examination?

5         *MS. PREWITT:*  Yes, Your Honor, Elizabeth Prewitt for

6    Defendant Mulrenin.  We, in the interests of efficiency, the

7    defendants have conferred on this and we have come up with some

8    common areas of inquiry.  And on behalf of the defendants, we

9    thought it might be efficient if one of us take that on.  And I

10   will be doing that on behalf of defendants.  But I want to be

11   clear, I see 10 defendants here.  They really have some

12   questions they would like to pose this witness, so I am

13   certainly not going to be taking all the time and they will be

14   expecting to get up and pose their own questions, Your Honor.

15        *THE COURT:*  Right.  And as I said before, of course,

16   some of the -- well, the documents being proffered are relevant

17   to sometimes different defendants.  Typically, although the

18   briefs were limited to 10 pages, the defendants oftentimes in

19   their individual briefs address those documents.  I understand

20   it's nice to cross-examine someone too, but keeping in mind our

21   limitations, those being we have another session, but the

22   defendants should take that into account too.  The same point

23   may have already been made in the brief effectively.

24        *MS. PREWITT:*  I assure you, Your Honor, we have

25   discussed that and that is our plan for today and in the next

LaNard Taylor - Cross

1   hearing.

2          THE COURT:  Go ahead, Ms. Prewitt.  Cross-examination.

3                    **CROSS-EXAMINATION**

4   BY MS. PREWITT:

5   Q.  Agent Taylor, good day.  It's been a long day so far.

6   A.  So far, yes, ma'am.

7   Q.  All right.  I would like to talk a little bit about your

8   background.

9   A.  Yes, ma'am.

10  Q.  Because you testified earlier that you have been with the

11  FBI for five years; is that correct?

12  A.  Just over five years, yes, ma'am.

13  Q.  And prior to that you were a police officer?

14  A.  Yes, ma'am, I was.

15  Q.  Can you tell us a little bit about what you did as a police

16  officer?

17  A.  Well, I was on patrol.  I was a field training officer.  I

18  was a gang liaison.  I did quite a bit.  I was a

19  community-oriented police officer.  I was in the COP unit.  I

20  was in hostage negotiation team.

21  Q.  Did you deal with drug crimes, for example?

22  A.  I did.

23  Q.  But prior to working on this matter, you don't have much

24  experience in investigating antitrust crimes, do you?

25  A.  That is correct.

LaNard Taylor - Cross

1   Q.   And, in fact, this is your -- this is your only antitrust

2   investigation; is that right?

3   A.   It is not the only one, not the only antitrust

4   investigation that I have worked on.

5   Q.   But it's your first major account for looking at this

6   investigation; isn't that right?

7   A.   I think that's fair to say yes, ma'am.

8   Q.   In terms of the broiler chicken industry, other than your

9   experience with this matter, you don't have any other

10  experience with that industry and how it functions and how

11  suppliers interact with each other, do you?

12  A.   That's correct.

13  Q.   And, in fact, you don't have any experience within any food

14  supplier distribution industry even putting aside chicken,

15  broiler chicken; isn't that right?

16  A.   You mean prior to this or --

17  Q.   Prior to this experience, you don't have any experience

18  conducting investigations in the food distribution industry of

19  any sort.

20  A.   Yes, ma'am, that's correct.

21  Q.   So you don't have any basis to offer an opinion as to

22  whether the type or level of interaction among suppliers is

23  unusual as compared to other industries, do you?

24       MR. KOENIG:   Objection.

25       THE COURT:   What's the objection?

LaNard Taylor - Cross

1          MR. KOENIG:  She is stating facts not in the record

2   basically.

3          THE COURT:  Overruled.  I offered you that podium.  It

4   turns out it doesn't seem like that microphone is working.  I

5   think that essentially it's not plugged in.

6          MS. PREWITT:  Would you like me to move?

7          THE COURT:  Why don't you move just because with the

8   masks and everything, it is a little bit difficult to hear for

9   some people.

10          MS. PREWITT:  Thank you, Your Honor.

11  BY MR. PREWITT:

12  Q.  So, in fact, you don't know whether the jargon that you

13  referred to earlier in testimony is, in fact, common jargon

14  used in other industries, do you, common, legitimate, ordinary

15  course of business jargon, do you?

16  A.  Well, I do believe that in -- these terms are used

17  throughout the industry and in other industries.  Yeah, I

18  believe --

19  Q.  But for proper purposes not in furtherance of a conspiracy;

20  isn't that correct?

21  A.  Absolutely, sure.

22  Q.  This is normal terminology that can be used outside of the

23  conspiracy, right?

24  A.  It can be, absolutely.

25  Q.  Earlier in your testimony you were talking about the

LaNard Taylor - Cross

1    investigative techniques you employed in this investigation.

2    A.   Yes, ma'am.

3    Q.   And that included what?

4    A.   Interviews, subpoenaed documents, recorded phone calls, the

5    normal investigative methods we've used in pretty much any FBI

6    investigation.

7    Q.   But no wiretaps.

8    A.   No, ma'am.

9    Q.   And no surveillance.

10   A.   We have done surveillance, but I am not sure in what --

11   surveillance can be construed in different ways.  There is

12   different types of surveillance.  I am not sure exactly what

13   you are talking about.

14   Q.   You didn't conduct any surveillance to capture the

15   conspiracy in action, did you?

16   A.   Well, no, ma'am.

17   Q.   Now, approximately how many consensual tapes did you

18   record?

19   A.   Well, when you say did I record, you mean me being the FBI

20   because I understand --

21   Q.   You and your colleagues at the FBI in the context of this

22   investigation.

23   A.   I can't give you an exact number, but I would say maybe two

24   or three.  I don't recall the exact number.

25   Q.   So when I am referring to consensual recordings, I am

LaNard Taylor - Cross

1   referring to consensual recordings on your behalf when you

2   secretly tape somebody you're interviewing and also consensual

3   recordings that you asked others to make of co-conspirators.

4   A.  I think I am hearing you.

5          THE COURT:  Sorry about that.  If people have their

6   cellphones on anything other than airplane mode, that could

7   occasionally cause interference.

8          You can reposition yourself or whatever you want to

9   do, Ms. Prewitt.

10          MS. PREWITT:  I will note for the record I am being

11   waved over by counsel.  I usually do what I am told, so thank

12   you.

13   BY MR. PREWITT:

14   Q.  Now, the question posed to you earlier was approximately

15   how many consensual recordings did you or the other of your

16   colleagues in connection with this investigation undertake.

17   And by consensual recordings, I am talking about recording

18   devices you or other agents wore to record interviews or wire

19   recording devices used by and placed on individuals to make

20   tapes of conversations with co-conspirators or alleged

21   co-conspirators.

22   A.  Sure.  I think the answer I gave you a few moments ago

23   which was two to three, that was specifically about individuals

24   that we asked to contact other co-conspirators.  I guess the

25   reason I didn't include ours, because we don't consider them

109

LaNard Taylor - Cross

1   consensual recordings.  But I'm assuming based on your

2   definition, I don't know how many recordings that I have done,

3   but, I mean, there was -- I don't want to give you a number,

4   but I know I have done a few of them for sure.

5   Q.  Amongst all of the federal agents involved in this

6   investigation, more than 10?

7   A.  I don't know that it was more than 10.

8   Q.  With respect to those recordings, isn't it a fact that

9   there is not a single recording where there is an individual

10  that admitted to the conspiracy charged?

11  A.  I don't -- I don't recall a recording in which somebody

12  admitted I think in the context of what you're using.  I don't

13  recall that.

14  Q.  In the course of all of these recordings, did any

15  individual admit their participation in the charged conspiracy?

16  A.  Well, the reason I am having difficulty answering that

17  question because when you say admit, yeah, nobody said, hey, I

18  admit I was, you know, involved in the conspiracy --

19  Q.  Thank you.

20  A.  -- but that's generally not what happens when you interview

21  somebody as an FBI agent.

22  Q.  I will take your answer.

23          With respect to the -- let's talk about interviews.

24  Approximately how many interviews did agents conduct in this

25  case?

LaNard Taylor - Cross

1    A.  Far more than I can count off the top of my head.

2    Q.  So 50, a hundred?  Does that sound about right?

3    A.  Sure, yeah, somewhere in there.

4    Q.  And in the context of all of those interviews, there is not

5    a single witness that admitted to acting as a co-conspirator

6    within this charged conspiracy; is that right?

7    A.  That is not right.

8    Q.  Well, who admitted to their participation?

9    A.  Mr. Bryant.

10   Q.  Other than Mr. Bryant, who else?

11   A.  Mr. Pepper.

12   Q.  What did Mr. Pepper say?

13   A.  He said a lot, but when you -- I don't know exactly what

14   you're trying to draw from your question.

15   Q.  My question to you is you read the indictment, correct?

16   A.  I have.

17   Q.  And my question to you is whether there is any individual

18   who has admitted their participation in the charged indictment.

19   A.  And my answer is yes.

20   Q.  And that is Mr. Bryant, correct?

21   A.  Yes, and Mr. Pepper.  And I would have to look at the list

22   of the -- of the interviews we have done, but yes, people have

23   admitted that they were involved in this -- in the charge.

24   Q.  What I am asking you is very specific.  I am asking you

25   whether anyone admitted that they were a co-conspirator in the

LaNard Taylor - Cross

1    charged indictment.

2    A.   I think my answer -- maybe I am not understanding your

3    question, but my answer is the same.

4    Q.   They participated in the conspiracy, they participated in a

5    conspiracy to rig bids and fix prices, let's just start with

6    that.   Is there any individual who said, I participated in a

7    conspiracy to rig bids or fix prices?

8    A.   Well, no, of course not.

9    Q.   Well, did anybody say that in terms slightly more broad?

10   A.   I mean, I think to go back to my answer, yes, people have

11   indicated to us that they participated in this conspiracy to

12   share prices and --

13   Q.   That's not the question.   I think this is a good moment to

14   talk about sharing prices.

15   A.   Sure.

16   Q.   Now, I know you don't have much experience with antitrust

17   investigations, but you've been briefed on the law applicable

18   in this investigation and this indictment, correct?

19   A.   I have been briefed on it, yes, ma'am.

20   Q.   And you know, then, that sharing price information is not

21   price fixing on its own.

22   A.   I don't -- I don't pretend to be a lawyer.   I don't want to

23   make any lawyerly conclusions, so I don't think I am qualified

24   to answer a legal question like that.

25   Q.   So Mr. Taylor, it's not a legal -- I mean, you are the case

LaNard Taylor - Cross

1   agent for this entire investigation, the lead case agent.

2   A.   Sure.

3   Q.   Correct?

4   A.   I am one of the case agents.

5   Q.   Okay.  But you are testifying here today as the

6   government's witness in connection with this *James* hearing,

7   right?

8   A.   That's correct.

9   Q.   Okay.  Now --

10         MR. KOENIG:   Your Honor, I object to this line of

11   questioning.  It seems to be going down the lines of whether

12   the facts he testified to are legally sufficient to establish

13   price fixing, and that seems to go beyond.

14         THE COURT:   I will overrule the objection.  I think

15   that the point is that Ms. Prewitt is just trying to define the

16   question that she's asking and is asking him whether he

17   understands what she is meaning by some type of -- she hasn't

18   said this, but -- illegal conspiracy.

19         Go ahead.

20         MS. PREWITT:   Thank you, Your Honor.

21   BY MS. PREWITT:

22   Q.   So you haven't answered the question, and I am going to

23   pose it to you again.  Isn't it in fact the case that sharing

24   price information, just sharing it and not -- and nonetheless

25   pricing independently, right, amongst competitors, right,

1  sharing but still pricing and independently, that that is not a

2  price fixing agreement.

3  *A.* I don't -- I mean, I can't make the same assessment of that

4  you're making. I think there are a lot of thing that go into

5  that, a lot of different factors. There is a lot of different

6  variables that I am sure the government attorneys consider when

7  they're talking about whether something is deemed price fixing

8  or not.

9  *Q.* Well, isn't it a fact that even if the defendants and

10  others all shared prices they planned to quote, it would not be

11  a crime if they each submitted their quotes independently and

12  outside of an agreement to fix prices or rig bids?

13  *A.* Can you repeat your question?

14  *Q.* Even if the defendants and other co-conspirators, those

15  that you talked about today in the course of your testimony,

16  even if they all shared prices they were planning to quote, it

17  would not be a crime if they each at the end of the day

18  submitted their quotes to the customer independently without

19  collusion and without an agreement?

20  *A.* Again, I think I will -- I don't know that I am the right

21  person to ask what would be a crime or not. In this context

22  you are asking me to say if they didn't do something would that

23  be a crime, and I don't know that I have an answer to that.

24  *Q.* Agent Taylor, you have sworn out search warrants, haven't

25  you?

LaNard Taylor - Cross

1    *A.*  I have.

2    *Q.*  And you have had to go before magistrates or judges in

3    connection with those search warrant applications?

4    *A.*  Yes, ma'am.

5    *Q.*  And in the context of that search warrant application, you

6    swore out the violation that you were affirming that you had

7    evidence to support.

8    *A.*  Yes, ma'am.  I swore out affidavits saying that I believe

9    this evidence supports probable cause that this violation

10   likely occurred.

11   *Q.*  Agent Taylor, how can you swear that out if you don't know

12   the basic premise that competitors can lawfully share

13   information without reaching an agreement?

14   *A.*  I am not -- I don't know that you are asking -- I feel like

15   the question that you just said was a little bit different from

16   the last one, so can you repeat it?

17   *Q.*  Mr. Taylor, how can you swear out the affidavit you

18   mentioned without an understanding that a sharing of

19   information among competitors in and of itself is not a crime

20   and that there has to be an agreement and the agreement is the

21   crime itself?

22   *A.*  I mean, I swore out the affidavit by presenting the facts

23   to the magistrate.  And I do -- as you said before, I was

24   briefed on what the elements of the crime are.  But to go as

25   far as to say this is a crime --

LaNard Taylor - Cross

1    Q.  I am sorry.  Finish your response.  I am sorry.

2    A.  I just didn't want to go as far as to say this is a crime.

3    I don't think that's my -- and in the affidavit, in all of my

4    affidavits, I communicate to the magistrate that I believe

5    these are facts that support that, but I don't necessarily say

6    I say this is a crime.

7    Q.  But one of the elements is an agreement between

8    co-conspirators; is that right?

9    A.  Sure.  I believe so.

10   Q.  And so when you testified earlier about pricing information

11   being exchanged, that in and of itself does not an antitrust

12   violation make.

13        THE COURT:  That sounds like a statement.

14   BY MR. PREWITT:

15   Q.  I am sorry, that does not constitute an antitrust

16   violation, just sharing a current pricing information amongst

17   competitors.

18        MR. KOENIG:  That's again -- what's the question?

19        THE COURT:  Ms. Prewitt, it sounds like what you are

20   trying to drive at is whether when he answered questions on

21   direct he was making an assumption about certain types of

22   behavior in offering opinions as to whether, for instance,

23   people --

24        MS. PREWITT:  That's right.

25        THE COURT:  Could you focus in on that?  Could you

LaNard Taylor - Cross

1    reformulate your question?

2            *MR. PREWITT:*  Okay.  Let's turn to -- Your Honor, if

3    it's all right with Your Honor, I will get back to that.

4            *THE COURT:*  That's fine, whatever you want to do.

5    *BY MR. PREWITT:*

6    *Q.*  So isn't it in fact the case that you have spoken openly

7    about -- in the context of your interviews of witnesses and

8    otherwise about the fact that what is competitively sensitive

9    information is -- might have one meaning to one person and

10   another meaning to another person; isn't that right?

11   *A.*  I don't recall that in particular, so I don't know what

12   document or what interview you are referring to, but I don't

13   recall that particularly.

14   *Q.*  Well, what about interviews with, for example, Mr. Bradley

15   and Mr. Bowlen about what is considered in the industry

16   competitive sensitive information?  Do you remember those

17   discussions?

18   *A.*  I remember the interview of Mr. Bradley, but I don't

19   remember exactly what that referenced.  But if I saw it, I am

20   sure it would refresh me.

21   *Q.*  But do you recall that different witnesses gave different

22   answers when referring to the same type of a cost component or

23   a price, that one thought it was competitively sensitive and

24   the other didn't?

25   *A.*  I do believe that there was some variation of what

LaNard Taylor - Cross

1    different people thought was competitively sensitive, if that

2    answers your question.

3    Q.   Thank you.  Now, you talked a lot about communications

4    among and between competitors.  And you talked about -- let's

5    talk for a second about what you in your Grand Jury testimony

6    deemed as legitimate reasons for competitors to talk to one

7    another.  Do you remember that?

8    A.   You said my Grand --

9    Q.   During your Grand Jury testimony, right, and actually both

10   appearances before the Grand Jury before both the original and

11   superseding indictment, you mentioned that there were

12   legitimate reasons for competitors to talk to one another; is

13   that right?

14   A.   Yes, ma'am.

15   Q.   And, for example, that would involve covering shortages,

16   right?

17   A.   Yes, ma'am.

18   Q.   And that would be for the benefit of the customer.

19   A.   That is my understanding, yes, ma'am.

20   Q.   And that would be reasons for the co-conspirators and the

21   defendants to talk to one another, correct?

22   A.   That's what I have been told, yes, ma'am.

23   Q.   And you know that in fact that many of these individuals

24   that the government is calling as co-conspirators are

25   interconnected in that way and others in this industry; isn't

LaNard Taylor - Cross

1    that right?

2    *A.*  Can you rephrase that question?

3    *Q.*  All of these individuals that you referred to as

4    co-conspirators work within an industry, right, where they are

5    connected to one another in terms of mutual customers, correct?

6    *A.*  Yes.

7    *Q.*  And sometimes those customers are very explicit about the

8    fact that they expect these particular individuals to work well

9    together.

10   *A.*  I don't know exactly what you're referring to when you say

11   that.

12   *Q.*  Well, what about -- we talked about covering shortages; is

13   that right?

14   *A.*  Yes, but I don't know if that's an example of them saying

15   they want to work well together.

16   *Q.*  For example, you are aware that sometimes customers would

17   expect suppliers to source supply when their supply failed, and

18   they expected they would call competing chicken suppliers who

19   could supply that product and cover that shortage, correct?

20   *A.*  Yes, but though I will say when we talked about the

21   variation of answers, we got a variation of answers on that one

22   too, because there was at least one customer, although I don't

23   remember exactly which one, who said they didn't know that the

24   customer -- that the suppliers were doing that amongst

25   themselves.  And if there was a shortage, that they would take

LaNard Taylor - Cross

1   care of -- that they being the customer would do that.  So I

2   think there is some variation in there as well.

3   Q.  And there were other examples where customers expected

4   competitors to communicate with one another, isn't that right,

5   completing suppliers; isn't that right?

6   A.  I don't know exactly what other scenarios you are referring

7   to.

8   Q.  Industry best practices for the benefit of the customer to

9   make sure that the supply wasn't interrupted and the products

10  were produced according to specification; isn't that correct?

11  A.  I don't know that I would say that they expected them to

12  communicate.  Can you repeat the question because I am not sure

13  I'm following.

14  Q.  So in other words, there were other occasions where

15  customers communicated to competing suppliers that they wanted

16  for them to share best practices to make sure that supply was

17  not interrupted and the products were produced according to

18  specification; isn't that right?

19  A.  I don't know about the product being interrupted, but to

20  your point about the specifications, yes.  And I believe there

21  was some talk around -- I think there was at least one time

22  when one of the customers was moving to like an antibiotic-free

23  or no antibiotic ever.  And yeah, there was some facilitation

24  on the customer's behalf for the suppliers to talk, so yes.

25  Q.  And that was a reason for competing suppliers to get on the

120

LaNard Taylor - Cross

1    phone to call and to text each other for that purpose?

2    A.   To communicate, yes, ma'am.

3    Q.   Now, you talked about, you know, phone calls, right?  And

4    you referred to the conspiracy Government Exhibit A.  Do you

5    recall that?  That's the conspiracy guide chart that you were

6    shown?

7    A.   Yes, ma'am.

8    Q.   Now, you don't know what was said in any of these calls; is

9    that right?

10   A.   Well, that's --

11   Q.   You do not know what was said in those calls, do you?

12   A.   Well, I do know what was said in some calls because it was

13   reported to us.

14   Q.   I am sorry.  Are any of the calls that are on the

15   Government Exhibit No. 1, are any of these consensual recorded

16   calls for which you have a transcript?

17   A.   They are not, no.

18   Q.   Thank you.  I am talking about the phone calls on the

19   conspiracy guide, right?

20   A.   Yes, ma'am.

21   Q.   You don't know what was discussed during those calls, do

22   you?

23   A.   Well, I do.  I do.  In some of the calls, I do.  Because

24   there is text messages that subsequently reflect that I talked

25   to this person and they said this, so that gives me an

LaNard Taylor - Cross

 1  indication of what was discussed in that conversation.

 2  Q.  My question to you was not whether you had indication or

 3  you had formulated an opinion on what was discussed.  My

 4  question to you was whether you knew what was discussed on

 5  those calls.

 6  A.  And my answer is the same, yes, ma'am.  It's indicated in

 7  there.

 8  Q.  I am sorry.  Go ahead.

 9  A.  It's indicated in there.  It's the same answer.  I am

10  sorry.

11  Q.  So you did not listen in on any of those calls?

12  A.  I did not listen in on the calls.

13  Q.  So you're just putting the calls with a text or e-mail and

14  you're coming to a conclusion, aren't you?

15  A.  That's correct.

16  Q.  But Agent LaNard, we just established the fact that

17  competitors do have in this industry legitimate lawful reasons

18  other than discussing prices.

19  A.  Sure, absolutely.  They could be on -- I am sure they very

20  well could be on the phone talking about legitimate business,

21  but I still know what they talked about.  It could be two

22  things at one time.  Both can be true.

23  Q.  Agent Taylor, even a discussion of, as we referred to

24  before, a discussion of prices could be not necessarily part of

25  the conspiracy charged.  It could be other than in furtherance

LaNard Taylor - Cross

1    of the conspiracy charged or the government charged.

2    A.  Are you asking me or are you telling me?

3    Q.  I am asking you.  The discussion of prices or anticipated

4    prices in the course of these events could be for a purpose

5    other than for fixing prices; isn't that right?

6    A.  I don't know that.  I don't know that I can draw that

7    conclusion without understanding what example you're using.

8    Q.  Now, let me talk to you a little bit about -- let's look

9    at -- I want to talk to you about some of the terminology.  And

10   you have some experience with drug crimes.  14 years as a

11   prosecutor with the antitrust division did not give me the

12   depth of experience that you have in terms of understanding the

13   lingo and the terminology, okay?  So I am going to have to rely

14   on you.  What are the drug terminology that's used for

15   quantity?  Do you even remember some from your days as a police

16   officer?

17   A.  To be fair, I didn't only work drugs.  I worked other

18   crimes as well.

19   Q.  Understood.  But do you remember some of the terms you used

20   for quantity?  And I don't know, but I know they are used,

21   correct?

22   A.  They are used.

23   Q.  Okay.  What kind of code words?

24        MR. KOENIG:  Your Honor, I object.  I don't see the

25   relevance of this.

LaNard Taylor - Cross

1          *THE COURT:*  It's a bit far afield.  I will sustain it.

2    *BY MR. PREWITT:*

3    *Q.*  So you talked about using jargon, right?

4    *A.*  Yes, ma'am.

5    *Q.*  And you indicated that jargon was indicative to you of a

6    conspiracy; isn't that correct?

7    *A.*  I did not -- I don't think I indicated that, no, ma'am.

8    *Q.*  Well, you considered that language that was carrying out

9    the objectives of the conspiracy, correct?

10   *A.*  It can be.  It's not absolute, but it can be.

11   *Q.*  But in the context of the documents that were shown to you

12   by the government in this case, you indicated at the time you

13   considered those to be statements that reflected -- words used

14   that reflected these were statements in furtherance, correct?

15   *A.*  Yes, ma'am.

16   *Q.*  And you've used, for example, intel.

17   *A.*  I did, yes.

18   *Q.*  And you just formulated the basis that use of intel is one

19   you have seen among other documents that would indicate that

20   this -- indicate that the document was, in fact, a statement in

21   furtherance, correct?

22   *A.*  It would indicate that -- can you repeat your question

23   before I answer?

24   *Q.*  So looking at the document, there is a reference to the

25   word "intel," right?

LaNard Taylor - Cross

1    A.   I know I testified to that.  I don't remember which

2    document it said intel in it.

3    Q.   At the time you testified that the use of that word --

4    A.   I did.

5    Q.   -- was indicative of the fact that the statement was in

6    furtherance of the conspiracy, right?  In that statement that

7    word "intel" was being used to further the objectives of the

8    charged conspiracy, correct?

9    A.   So I will say I don't know exactly which document you are

10   referring to.  And when I testified to the word "intel," it was

11   in response to whether there was any jargon that I had seen

12   across the industry.  And the answer is yes, that word intel I

13   have seen, but I am not sure it was tied to a particular

14   document that was shown today.

15   Q.   So let me just, to make sure I understand, you say that

16   you've seen several instances where intel is used as

17   essentially jargon or a code word, right, for the conspiracy?

18   A.   Yes, ma'am.

19   Q.   And the same is true for due diligence.  That's a word

20   that's used --

21   A.   Yes, ma'am.

22   Q.   -- in the course of -- you think it's jargon or a code word

23   used in the course of the conspiracy, right?

24   A.   Yes, ma'am.

25   Q.   And the same is with holding firm, that that's something

LaNard Taylor - Cross

1   that you considered to be jargon that's really used for the

2   purpose of this furthering the conspiracy, correct?

3   *A.*  In these examples, yes, ma'am.

4   *Q.*  So approximately how many times have you seen "holding

5   firm" used in a statement in furtherance of the conspiracy?

6   *A.*  I cannot give you an exact number.

7   *Q.*  Can you give an approximate?

8   *A.*  I don't have a number for you.

9   *Q.*  What about for due diligence?

10  *A.*  Again, I don't have a number for you.

11  *Q.*  Or intel?

12  *A.*  I don't have a number for you.  But I will say there is

13  millions of documents associated with this case, so I don't

14  want to give you a number and, you know, it would be wrong.

15  *Q.*  And so, you know, in fact, your investigation here and your

16  involvement has involved also taking notes of interviews,

17  correct?

18  *A.*  Yes, ma'am.

19  *Q.*  And you didn't lead the questioning in the in-office

20  interviews, did you?

21  *A.*  That's -- it depends on which interview you are talking

22  about.  There are instances in which --

23  *Q.*  The interviews of witnesses in government offices or in

24  zoom meetings with lawyers present, you did not conduct those

25  interviews, did you?

LaNard Taylor - Cross

1    A.  I did, actually.  There is -- there are interviews in which

2    we led, but there is also interviews where there is shared

3    responsibility for asking questions, so it's not like one

4    person has the responsibility for all the questions.

5    Q.  But for the majority of these interviews in this case, it

6    was the government that was conducting the interviews, correct,

7    in-office interviews?

8          MR. KOENIG:  Your Honor, I object again.  What's the

9    relevance?

10          THE COURT:  Overruled.

11          Ms. Prewitt, you have about two minutes left.

12          MS. PREWITT:  I am sorry?

13          THE COURT:  Two minutes left.

14          Your Honor, I would like to show the first -- we will

15    just take the first document in the log, Pollo Tropical.  This

16    is the log No. 1.

17    BY MR. PREWITT:

18    Q.  Do you see that document?

19    A.  Yes, ma'am, the e-mail.

20    Q.  So this is one where the charged conspiracy begins in 2012.

21    So the charged conspiracy begins in 2012, right?

22    A.  Again, as I have testified to earlier, I never said we had

23    an exact date.  I said the focal point of the investigation was

24    2012, but there was activity that occurred before 2012.

25    Q.  Okay.  And this is an internal communication between Penn

1  and Lovette, correct?

2  *A.*  Yes, ma'am, it is.

3  *Q.*  And this does not involve conversations from Heather, does

4  it?  It's between two individuals at Pilgrim's, correct?

5  *A.*  It is between two individuals at Pilgrim's.

6          *THE COURT:*  Ms. Prewitt, is this Exhibit No. 2-001?

7          *MS. PREWITT:*  Yes, Your Honor.  This is -- it's the

8  log entry No. 1.

9          *THE COURT:*  Which is Exhibit 2-001 I think on the

10  exhibit list.

11          *MS. PREWITT:*  Thank you, Your Honor.

12          *THE COURT:*  You are out of time, okay?

13          So we will pick up again then on Wednesday at 8:30.

14  One thing -- one collateral benefit of such a hearing is that

15  we see how the courtroom fits everybody.  Obviously, with this

16  many defendants it's a challenge no matter what, but I want you

17  to think about it because if we can figure out rules or

18  guidelines or something so that every -- it's not so much a

19  problem, obviously, with the government.  They fit around a

20  table.  But for the defendants it is.  I would suggest that, of

21  course, looking forward to the trial you are going to have a

22  client and I would suggest you probably have just one attorney

23  at the table.  Other attorneys would be in the gallery.

24          For purposes on Wednesday you might want to

25  experiment -- do what you want to do, but we do want to figure

1    out what we can do.  Obviously, we can't do any construction

2    work or anything, expend money to reconfigure the courtroom.

3    We are not going to do that for purposes of the trial, but

4    those would be good things to think about just so your clients

5    have access to at least the lead lawyer, and other attorneys

6    who may be present in the courtroom, they are seated in a place

7    that makes sense for you.

8            You'll notice if you take a look at our revised jury

9    protocols that in the event that the jury has some people who

10   are not fully vaccinated, those people have to be socially

11   distanced and they won't be in the jury box.  They are going to

12   be over in this area here.  If that's the case, then we'll have

13   less room for the attorneys.  The attorneys will tend to be

14   over more.  And moreover, I am not going to have a situation

15   where there are jurors, for instance, in the front row over

16   there and there are attorneys right behind them looking over

17   their shoulder.  That's not going to happen.  So that would

18   cause there to be less room for the attorneys too.

19           In the event that we have a lot of public interest, we

20   could potentially set up an overflow courtroom where we have a

21   closed circuit feed into it and people could watch it from

22   there.  We could do that.  So that could help alleviate some

23   issues.  It could make room for the public, for instance, okay?

24           Anything real quick that we should take up at this

25   time?  Mr. Koenig?

1          *MR. KOENIG:*  Thank you, Your Honor.  I just have a

2    couple quick questions.  First, on Wednesday the 8th I am

3    wondering if there is any sense of the -- if there is any time

4    limit on the defendants' cross because I want to make sure they

5    don't run up to noon and we don't have an opportunity for

6    redirect.  I think we took about two and a half hours.

7          *THE COURT:*  More like three.

8          *MR. KOENIG:*  Okay, three.

9          *THE COURT:*  Well, I do think -- I think maybe

10   coordinate with the defendants on that.  I do think it's

11   appropriate that the government have some time for redirect.

12         *MR. KOENIG:*  I don't think we need more than a half

13   hour.  It depends --

14         *THE COURT:*  Talk to defense counsel.  I want them to

15   have a shot, but I would like for there to be some time for

16   redirect as well.  I think that's fair.

17         Anything else, Mr. Koenig?

18         *MR. KOENIG:*  Normally during a trial we would not be

19   in communication with the witness during the trial, although we

20   are preparing for trial.  Are we permitted to speak with

21   Special Agent Taylor?

22         *THE COURT:*  Yes, I am going to give you permission to

23   do so.

24         *MR. KOENIG:*  What's that?

25         *THE COURT:*  I am going to give you permission to do

1  so, but I don't want you to prep him as to issues that are

2  going to come up on Wednesday.

3          MR. KOENIG:  Fair enough.

4          THE COURT:  You may have other reasons to communicate

5  with him because, as you said, he is one of the principal case

6  agents, but not for purposes of preparing him for Wednesday.

7          MR. KOENIG:  Okay.  And one third related point, and

8  this is for trial for planning purposes.  What is Your Honor's

9  practice of does the agent, our case agent, sit at the table

10 or --

11         THE COURT:  Pursuant to rule you have the right to

12 have an advisory witness.  So if that's your case agent, yes,

13 your case agent would sit at the table.

14         MR. KOENIG:  Okay.  So even if that case agent is

15 going to testify.

16         THE COURT:  Yup.

17         MR. KOENIG:  And given the length of the trial, can we

18 alternate our advisory agent throughout the trial, like Agent

19 Taylor for a few days and then --

20         THE COURT:  Well, we'll have to talk about that.  The

21 defense counsel may want to weigh in on that.  As a practical

22 reason, they may -- well, they are going to have their client.

23 That's outside of the rule.  That would be an exception, but

24 maybe there is no objection.  Yeah, I don't know how you've

25 used your case agents.  If there are more than one case agent

1    and they had a differentiation of responsibilities and the

2    trial is going to play out so that one is more relevant at some

3    times than another, we can think about it.

4         MR. KOENIG:  Thank you very much.

5         THE COURT:  Anything on behalf of the defendants that

6    we should take up.  Mr. Gillen?

7         MR. GILLEN:  Yes.  For Wednesday we had subpoenaed

8    Mr. Pepper.  And with consent, given the circumstances that he

9    filed with the Court, we consented for purposes of the *James*

10   hearing to have him appear on a video.  And I just wanted to

11   logistically talk through that or alert the Court that that

12   would take at least -- I don't think a lot of time, but some of

13   the time on Wednesday.  I just wanted to alert the Court to

14   that issue.

15        THE COURT:  Okay.  And that issue reminded me,

16   Mr. Gillen, it would not be him just listening in, but --

17        MR. GILLEN:  Being sworn in and giving -- being sworn

18   in and him giving some brief testimony.

19        THE COURT:  Okay.

20        Mr. Koenig?

21        MR. KOENIG:  Sorry.  Just for a little bit of

22   background, we have been informed by Mr. Pepper's lawyer that

23   he plans to take the Fifth, so I don't know if that, you know,

24   what the purpose of calling him is, but --

25        THE COURT:  Once again, I think that you need to talk

1    about that.  If we know that he is going to take the Fifth to

2    any substantive question, then I'd question why we would call

3    him for that purpose.

4         MR. GILLEN:  Well, the reason would be, Your Honor,

5    that at least during the truncated cross-examination done today

6    they referenced Mr. Pepper as someone who said he was involved

7    in a conspiracy, but we couldn't get any further than that with

8    him.  If he is also the same man that is going to take the

9    Fifth, we need to have that as part of the record for the Court

10   to consider whatever credibility should be attributed to

11   declarations by Pepper to Agent Taylor in consideration of

12   whether the government has met its burden.  I don't think it

13   will take the court a long time, but I do want it to be a part

14   of the record.

15        And the reason why the defense agreed to accommodate

16   him and his counsel were the fact that he did make those

17   assertions regarding his intentions to take the Fifth, No. 1,

18   and No. 2, because of health issues.  Because of that, we then

19   stated our -- that we did not oppose the motion that was filed

20   with the Court.

21        THE COURT:  Well, making a record as to what he may do

22   may -- you may be able to effectuate that without calling him.

23   If you know because you've asked his attorney -- assuming he

24   has an attorney -- questions, I am going to ask him this

25   question.  Will he plead the Fifth?  Yes.  It seems to me that

1    we could put that on the record.

2            You could get some type of document that reflects that

3    and move the admission of it, and that way we don't have to

4    waste time -- and we're short on time -- calling Mr. Pepper and

5    asking him a question where you know he is going to plead the

6    Fifth.

7            MR. GILLEN:  That's the reason why I brought it up to

8    the Court, because I am aware of the time issues, but also am

9    aware of the concerns the defense has with relying on

10   declarations of Mr. Pepper and at the same time he is taking

11   the Fifth.

12           THE COURT:  Sure.  It sounds like once again it would

13   be an effective cross-examination of Special Agent Taylor

14   perhaps still.  We haven't necessarily gone into that yet.  I

15   am just saying try to think creatively about ways to achieve

16   the goal without wasting the time of calling Mr. Pepper if

17   there is a good faith basis to believe that Mr. Pepper is

18   simply going to plead the Fifth.

19           MR. GILLEN:  I ask the Court's indulgence.  Mr. Tubach

20   asked to say a brief word on this issue.

21           THE COURT:  It sounds like the floor of the senate.

22   But go ahead, Mr. Tubach.

23           MR. TUBACH:  Very briefly, I do think it's

24   important -- again Michael Tubach.  We do think it's important

25   that if Mr. Pepper ended up being a witness at trial, that we

1   have him on the record taking the Fifth here.

2          THE COURT:  Why?  I mean, this is a *James* hearing.

3   This is not some type of, I don't know, civil case.

4          MR. TUBACH:  It would be his refusal to answer the

5   questions we asked him.  We would be entitled to cross-examine

6   him on that.

7          THE COURT:  You could pull up all sorts of witnesses

8   and put them on the record and ask them great stuff before

9   trial, but why for purposes of a *James* hearing would that be an

10  appropriate thing if you know what he is going to say?

11         MR. TUBACH:  It undercuts the notion that he was

12  interviewed 10 or 12 times by the government, and he has now

13  decided to take the Fifth all of the sudden.  It undercuts his

14  reliability as a witness.

15         THE COURT:  I know, but why can't that point be made

16  if those questions are posed or you ask his attorney, what's he

17  going to say?  And the attorney says, he is going to plead the

18  Fifth.  And then you put that in a memo and no one disagrees

19  with it.  That seems -- that would seem to achieve the exact

20  same thing without taking up time.

21         MR. TUBACH:  I hear the Court's concern.

22         THE COURT:  That's the only thing.  That would be a

23  lot more efficient and achieve the exact same result.  I would

24  know that he is pleading the Fifth, and that would seem to

25  allow defense counsel who choose to to make that point.

1    MR. TUBACH:  I understand, Your Honor.  They made a

2  filing, Docket 418, where the lawyers made that representation.

3  We assume Mr. Pepper will follow that recommendation, but

4  that's --

5    THE COURT:  Yeah, we never a hundred percent know, but

6  here I would guess, assuming that he has got a credible

7  attorney, that you would, you know, 99 percent know.

8    MR. TUBACH:  Thank you.

9    THE COURT:  Okay?

10   Yes?  Mr. Kornfeld, go ahead.

11   MR. KORNFELD:  Just a couple of brief logistical

12  issues.  No. 1, I haven't talked to my client and I don't think

13  the other lawyers talked to theirs, but would the Court

14  entertain a motion to waive defendant's presence, in-court

15  presence for next Wednesday if -- I think nine of the 10 are

16  from out of state.

17   THE COURT:  Yes.  I think I indicated that or at least

18  hoped that that message was clear.  Not that the defendants, if

19  they choose, can't attend.  They, of course, can.  But if they

20  want to waive their presence for the purposes of Wednesday,

21  they may do so.

22   MR. KORNFELD:  Thank you.  And I think you are right,

23  I think you did indicate.  I just wanted to be sure.

24   And the second thing is we sort of take you up on your

25  invitation to discuss the seating chart at trial.  Can we

1    assume that if different lawyers have different roles as to a

2    particular witness or whatever, that we would have leave to

3    switch seats?

4              THE COURT:  Right.  That only makes sense.

5              MR. KORNFELD:  Thank you.

6              Mr. Fagg?

7              MR. FAGG:  John Fagg for Mr. Lovette.  Very briefly on

8    the logistics point, is there any capability to bring in any

9    additional table space where we could have, for example,

10   technology folks who are helping with the exhibits?

11             THE COURT:  Well, we have some tables down in the jury

12   assembly room like a folding table, but I just don't know.

13   Once you start setting up tables, you start taking up a lot of

14   room and we have to have -- because there will be circulation,

15   as Mr. Kornfeld just mentioned, so we are going to have

16   movement.  And I don't want to make it too much of an obstacle

17   course, so that's possible and you can think about it, but we

18   can't move the furniture that we have in place now around very

19   much, so it probably would be in addition to it.  I don't know

20   where it would really go.  But once again, I am open to

21   suggestion, but it may be tricky.

22             MR. FAGG:  Thank you, Your Honor.  We will think

23   creatively.

24             THE COURT:  Okay.  That's great.

25             All right.  Then we will be in recess until Wednesday

1    at 8:30.

2        (Recess at 12:15 p.m.)

1                                    INDEX

2    WITNESSES

3         LaNard Taylor

4              Direct Examination By Mr. Koenig                10

5              Cross-examination By Ms. Prewitt               103

6                                  EXHIBITS

7    Exhibit        Offered   Received   Refused   Reserved   Withdrawn

8    1                        27

9    3                        58

10   5                        96

11                        REPORTER'S CERTIFICATE

12        I certify that the foregoing is a correct transcript from

13   the record of proceedings in the above-entitled matter.   Dated

14   at Denver, Colorado, this 3rd of September, 2021.

15

16                              S/Janet M. Coppock

17

18

19

20

21

22

23

24

25