1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 20-CR-00152-PAB
3
UNITED STATES OF AMERICA,
4
      Plaintiff,
5
vs.
6
JAYSON JEFFREY PENN,
7   MIKELL REEVE FRIES,
    SCOTT JAMES BRADY,
8   ROGER BORN AUSTIN,
    TIMOTHY R. MULRENIN,
9   WILLIAM VINCENT KANTOLA,
    JIMMIE LEE LITTLE,
10  WILLIAM WADE LOVETTE,
    GAR BRIAN ROBERTS,
11  RICKIE PATTERSON BLAKE,

12      Defendants

13  _____

                   REPORTER'S TRANSCRIPT
14                 Excerpt of Trial to Jury
                   Testimony of James Olson
15  _____

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17  Chief Judge, United States District Court for the District of

18  Colorado, commencing at 11:20 a.m., on the 27th day of October,

19  2021, in Courtroom A201, United States Courthouse, Denver,

20  Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106

```
1                        APPEARANCES
2           Michael Koenig, Carolyn Sweeney, Heather Call and Paul
3    Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of
4    Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing
5    for Plaintiff.
6           Anna Tryon Pletcher and Michael Tubach of
7    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
8    San Francisco, CA 94111-3823;
9           Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10   N.W., Washington, DC 20006, appearing for Defendant Penn.
11          David Beller, Richard Kornfeld and Kelly Page of
12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13   CO 80202, appearing for Defendant Fries.
14          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16           Laura Kuykendall and Megan Rahman of Troutman Pepper
17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18   appearing for Defendant Brady.
19          Michael Felberg of Reichman, Jorgensen, Lehman,
20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21   10017;
22
23
24
25
```

```
 1                    APPEARANCES (Continued)

 2           Laura F. Carwile of Reichman, Jorgensen, Lehman,

 3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

 4    CA 94065; appearing for Defendant Austin.

 5           Elizabeth B. Prewitt of Latham & Watkins, LLP,

 6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

 7           Marci Gilligan LaBranche of Stimson, Stancil,

 8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

 9    80218, appearing for Defendant Mulrenin.

10           James A. Backstrom, Counselor at Law, 1515 Market

11    Street, Suite 1200, Philadelphia, PA 19102-1932;

12           Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13    Bethesda, MD 20814, appearing for Defendant Kantola.

14           Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15    Street, Suite 1100, Los Angeles, CA 90017;

16           Dennis J. Canty, Canty Law Corporation,

17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18    appearing for Defendant Little.

19           John Anderson Fagg, Jr. and James McLoughlin of

20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25
```

1           APPEARANCES (Continued)

2           Craig Allen Gillen and Anthony Charles Lake of

3   Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4   Atlanta, GA 30339;

5           Richard L. Tegtmeier of Sherman & Howard, LLC,

6   633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7   for Defendant Roberts.

8           Barry J. Pollack of Robbins, Russell, Englert, Orseck

9   & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10  DC 20006;

11          Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12  5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13  for the Defendant Blake.

14

15                          PROCEEDINGS

16      *MS. SWEENEY:*  The government is now prepared to call

17  James Olson.

18     (**James Olson** was sworn.)

19          *THE WITNESS:*  I do.

20          *COURT DEPUTY CLERK:*  Please state your name and spell

21  your first and last name for the record.

22          *THE WITNESS:*  James Olson, J-A-M-E-S, O-L-S-O-N.

23          *THE COURT:*  Mr. Olson, if you don't mind, if you could

24  adjust the microphone a little bit, try to raise it a bit and

25  try to lean into it.  We will try to adjust it, too, so the

James Olson - Direct

1   volume is up, but we want to make sure we can hear you.  Great.

2   Thank you.

3          Go ahead.

4                    **DIRECT EXAMINATION**

5   *BY MS. SWEENEY:*

6   *Q.*  Good morning, Mr. Olson.  Are you currently employed?

7   *A.*  No.

8   *Q.*  What was the last place of your employment?

9   *A.*  I was employed at Harman Management Corporation.

10  *Q.*  If I call it HMC, will you understand what I am referring

11  to?

12  *A.*  Yes.

13  *Q.*  What was your position at HMC?

14  *A.*  I was CEO.

15  *Q.*  How long did you work at Harman Management Corporation?

16  *A.*  Since 1976.

17  *Q.*  And how long were you CEO?

18  *A.*  Since 19 -- let's see, 2003, 2003.

19  *Q.*  So when did you leave your position as CEO at Harman

20  Management Corporation?

21  *A.*  I started my retirement in 2016 and it was a gradual

22  retirement over four years.  I retired in the fall of 2020.

23  *Q.*  And between 2003 and 2016, what was your position at Harmon

24  Management Corporation?

25  *A.*  I am sorry.  Repeat that?

James Olson - Direct

1  *Q.*  Between 2003 and 2016, what was your position at Harman

2  Management Corporation?

3  *A.*  I was the CEO.

4  *Q.*  So when did you -- and I apologize if you repeated this

5  already, but when did you end your time as CEO at HMC?

6  *A.*  I ended it in 2016, but it was a gradual retirement.  I

7  still held some responsibilities as we transferred it to the

8  new CEO.

9  *Q.*  Thank you.  What were your responsibilities as CEO at HMC?

10  *A.*  I was the final decision maker on any major decisions.  I

11  set strategy, set the culture for the company, oversaw finance,

12  IT, real estate, insurance and legal matters.

13  *Q.*  And did your responsibilities include ensuring supply of

14  food to HMC restaurants?

15       *MR. McLOUGHLIN:*  Objection, foundation.

16       *THE COURT:*  Overruled.

17  *A.*  Indirectly, yes.

18  *BY MS. SWEENEY:*

19  *Q.*  Could you describe what type of business --

20       *THE COURT:*  One moment, Ms. Sweeney.  Mr. Keech, could

21  you raise the level of that microphone?

22       *MS. SWEENEY:*  Your Honor, if it continues, I can move

23  to the other lectern to see if that's the problem as well.

24       *THE COURT:*  I doubt it, but we can try.

25  *BY MS. SWEENEY:*

James Olson - Direct

1   *Q.*  So what type of business is HMC?

2   *A.*  We are a franchise of Kentucky Fried Chicken.

3   *Q.*  What is a franchise?

4   *A.*  A franchise is being able to have the licensed rights to

5   operate a Kentucky Fried Chicken restaurant from a parent

6   company, in our case Kentucky Fried Chicken Corporation.  You

7   pay a fee to have the rights.  You go through an approval

8   process.  And then you're licensed to use the name, the marks,

9   the products and the processes.

10  *Q.*  So when was HMC founded?

11  *A.*  It was in the early sixties.

12  *Q.*  And who founded HMC?

13  *A.*  Our founder, Pete Harman.

14  *Q.*  Can you provide some background as to the Harman Management

15  Corporation?

16  *A.*  Before Harman Management was formed in the sixties, Pete

17  Harman was the first franchisee with Colonel Harland Sanders

18  who originated the concept.  Pete Harman grew --

19          *MR. TUBACH:*  Objection.  It's hearsay.

20          *THE COURT:*  Overruled.

21  *A.*  Pete Harman was influential within the brand.  He helped

22  the colonel find other restauranteurs to agree to license the

23  recipe, the original recipe, and he was a good partner with the

24  colonel over the years.

25  *BY MS. SWEENEY:*

James Olson - Direct

1   Q.  When you say the colonel, who are you referring to?

2   A.  Colonel Harland Sanders, the originator of the recipe of

3   original recipe chicken.

4   Q.  You mentioned earlier that HMC had franchises.  Franchises

5   of what?

6   A.  We primarily are Kentucky Fried Chicken restaurants.  We do

7   have a few Taco Bell restaurants also.

8   Q.  How many Kentucky Fried Chicken restaurants does HMC own?

9   A.  Currently we own 289.

10  Q.  From the perception of the public -- are there other KFCs

11  that are not franchise restaurants?

12  A.  Yes.  There are about 50 that the parent company, Kentucky

13  Fried Chicken Corporation, owns and operates.

14  Q.  From the perception of the public, can you tell the

15  difference between a franchise store and a corporate store?

16          MR. McLOUGHLIN:  Objection, Your Honor, to determine

17  what the perception of the public might be.

18          THE COURT:  Sustained, not enough foundation.

19  BY MS. SWEENEY:

20  Q.  So you talked about KFC franchise stores and KFC corporate

21  stores.  Is there a difference between the two?

22          MR. McLOUGHLIN:  Objection to form.

23          THE COURT:  Overruled.

24  A.  A restaurant should have no visible changes in image,

25  signage for products or service levels.  Obviously, there are

James Olson - Direct

1  different levels of performance in every restaurant, but the

2  standards are the same.

3  *BY MS. SWEENEY:*

4  *Q.*  You mentioned that HMC owns hundreds of KFC restaurants; is

5  that right?

6  *A.*  Yes.

7  *Q.*  Where are they located?

8  *A.*  In the state of Washington, HMC is the state of Washington,

9  California, Colorado, Utah, Wyoming, Nebraska, South Dakota and

10  Ohio.

11  *Q.*  How many KFCs does HMC own in the state of Colorado?

12  *A.*  Approximately, 52.

13  *Q.*  And how long has HMC had KFC restaurants here in Colorado?

14  *A.*  I believe it was 1979.

15  *Q.*  And has HMC had Colorado KFC restaurants for the entire

16  time of your employment at HMC?

17  *A.*  No.

18  *Q.*  So can you explain that answer?

19  *A.*  Yes, I am sorry, we did have them.

20  *Q.*  Can you explain that answer?

21  *A.*  Well, I started at HMC in 1976 and then we bought the

22  stores in 1979.

23  *Q.*  And HMC continued to have ownership of the KFC restaurants

24  in Colorado?  Did HMC continue to have ownership of the KFC

25  restaurants in Colorado through the time of your retirement?

James Olson - Direct

1   A.   Yes.

2   Q.   Mr. Olson, are you familiar with the term Yum Brands?

3   A.   I am.

4   Q.   What is it?

5   A.   Yum Brands is kind of the umbrella corporation, the

6   publicly-traded company that owns the rights to Kentucky Fried

7   Chicken, Taco Bell, Pizza Hut and the Habit Burger.

8   Q.   And are Yum Brands related to HMC?

9   A.   Not directly.

10   Q.   Can you describe what you mean by that?

11   A.   We work directly with -- HMC works directly with the brand

12   company, so we would work directly with KFC corporate and with

13   Taco Bell corporate.

14   Q.   And what would be the purpose for working directly with KFC

15   corporate and Taco Bell corporate?

16   A.   That's who we receive -- or HMC receives our franchise

17   rights from.

18   Q.   Mr. Olson, after you retired did you remain involved in the

19   chicken industry?

20   A.   Yes.

21   Q.   How so?

22   A.   I remained as chairman of the board of HMC.

23   Q.   How long have you been on the board of HMC?

24   A.   Since 1991, I believe.

25   Q.   And how long were you chairman of the board?

James Olson - Direct

1    A.  Since approximately 2005.

2    Q.  Can you describe what type of store KFC is?

3    A.  It's commonly called a fast-food concept or a quick-service

4    restaurant concept, QSR for short.

5    Q.  What's the difference between fast-food or quick-service

6    restaurant or a QSR that you just described?

7    A.  Just a term that's used.

8    Q.  So are fast-food and QSR and quick-service the same?

9    A.  Yes.

10   Q.  What does KFC stand for?

11   A.  Kentucky Fried Chicken.

12   Q.  What types of products does KFC sell?

13   A.  We sell chicken.  We sell it in various forms.  We sell it

14   in bone-in form.  That's the common chicken that you would cook

15   at home that you would buy at a supermarket.  We also sell it

16   in tenders or strips.  That's a further processed product that

17   does not have bones in it.  We also sell chicken sandwiches.

18   And we've had other products over the years that have been on

19   and off the menu that are all chicken.

20   Q.  Focusing your attention to the year 2014 and 2015, were

21   there any other products that KFC sold at that time?

22   A.  Yes.  We sold hot wings.  We sold a product called popcorn

23   chicken and we sold a product called boneless chicken.

24   Q.  And I would like to direct your attention to a new topic

25   and to the years 2012 through 2016.  So focused on those years

James Olson - Direct

1   2012 to 2016, in your role as CEO of Harman Management

2   Corporation, did you know how KFC restaurants, the agency-owned

3   KFC restaurants purchased chicken?

4   A.   Yes.

5   Q.   How did they purchase chicken?

6   A.   Chicken was contracted for the KFC system through a company

7   called Restaurant Supply Chain Solutions known as RSCS.   They

8   would negotiate with the different chicken vendors and secure

9   sourcing, negotiate pricing, determine transportation and

10  oversee distribution.   And as HMC is a member of the RSCS, we

11  would buy chicken through the RSCS.

12  Q.   So just to clarify, when you said they would negotiate, who

13  is the "they" that you were referring to?

14  A.   The RSCS.

15  Q.   Does RSCS stand for anything?

16  A.   Restaurant Supply Chain Solutions.

17  Q.   What is RSCS?

18  A.   It's a cooperative corporation.   It's owned by the members.

19  The members are the stockholders who are franchisees, as well

20  as KFC corporate restaurants.   Each of them buy a share of

21  membership in the RSCS and are given benefits through that

22  cooperative effort.

23  Q.   So how is HMC related to RSCS?

24  A.   We are a stockholder member and we have a membership for

25  each -- HMC has a membership for each one of the restaurants

James Olson - Direct

 1    that is in the HMC family.

 2    *Q.*  And continuing to focus on the years 2012 to 2016, did you

      personally have a role at RSCS?

 4    *A.*  Yes, I did.

 5    *Q.*  What was your role?

 6    *A.*  I was on the board of directors for the RSCS.

 7    *Q.*  What was your position on the board of directors?

 8    *A.*  I was director most years.  I was chairman for a couple of

 9    those years.

10    *Q.*  When were you chairman?

11    *A.*  I don't recall.

12    *Q.*  Was it between the years of 2012 and --

13              *MR. McLOUGHLIN:*  Objection, leading, Your Honor.

14              *THE COURT:*  Overruled.

15    *BY MS. SWEENEY:*

16    *Q.*  Was it between the years of 2012 and 2016?

17    *A.*  It could have been.  I can't say for sure.

18    *Q.*  Did you represent a certain constituency on the board?

19    *A.*  Yes.  Directly HMC has a permanent seat as a director on

20    the RSCS board.  That was given from the early days of the

21    foundation of the RSCS.  So I -- directly I represent HMC as a

22    director on the RSCS board.

23    *Q.*  You mentioned directly.  Is there any other representation

24    that you had on the board?

25    *A.*  It was my belief and thinking that I represented

James Olson - Direct

1    franchisees on the West Coast.  Since most of our restaurants
2    were on the West Coast, I felt I represented their interest as
3    well.
4    Q.  Can you describe again what RSCS's role is in purchasing of
5    chicken for the HMC-owned KFC restaurants?
6    A.  Their role, the RSCS's role is to source supply, to
7    negotiate price, to ensure QA, to determine freight costs for
8    the movement of the product and to negotiate distribution cost
9    from the regional distribution centers.
10   Q.  When you said source supply, what did you mean by the word
11   source?
12   A.  To go out and find people that could provide chicken
13   products within the specifications that KFC corporate
14   determined.
15   Q.  When you said negotiate price, how would -- how did that
16   affect the purchases by HMC KFC restaurants?
17           MR. McLOUGHLIN:  Objection, Your Honor.
18           THE COURT:  Overruled.
19   A.  I am not sure I am clear on the question.
20   BY MS. SWEENEY:
21   Q.  Sure.  I will ask it a different way.  When you said that
22   RSCS was involved in negotiating price, did that negotiated
23   price relate in any way to the HMC-owned KFC restaurants?
24   A.  Yes.  We had to purchase chicken from the RSCS.  We
25   couldn't buy chicken locally or as we chose.  We had to buy it

James Olson - Direct

1   from approved vendors that were approved by KFC Corporation.

2   And as a member of the RSCS, we had to buy chicken from them.

3   Q.  So would HMC buy chicken directly from RSCS?

4   A.  We would buy chicken from the vendors, but the price would

5   be negotiated by the RSCS.

6   Q.  And how was that price that was negotiated with the RSCS,

7   was that price formalized?

8   A.  Yes.  There was a contract signed by the RSCS management

9   team.

10  Q.  How often were supply contracts negotiated between the

11  years of 2012 and 2016?

12  A.  For '12, '13 and '14, those contracts were annual which had

13  been a historical practice.  The RSCS signed a three-year

14  contract starting for the 2015 year.

15  Q.  In your role on the board of RSCS, were you involved in or

16  informed of the RSCS contract negotiations?

17  A.  Yes.

18  Q.  At what point in the negotiations was the board involved,

19  were you involved?

20  A.  For the 2015 year?

21  Q.  Yes.

22  A.  We were involved in late summer, early fall, after the

23  first round of negotiations happened between the RSCS team,

24  purchasing team, and the vendors.

25  Q.  You mentioned the first round of negotiations.  Could you

James Olson - Direct

1    describe what you're talking about?

2    A.  Typically the RSCS purchasing team would meet with the

3    vendors and get initial thought on what they thought pricing

4    was going to be for the coming year.  They would meet again two

5    or three more times before a final contract was finalized.

6    Q.  And you talked about they would come in two or three more

7    times.  Is that related in any way to the word "round" you used

8    earlier?

9    A.  Yes.

10   Q.  How are the two related?

11   A.  There would be an early meeting in like August, September,

12   which would be the first round.  They would -- they being the

13   purchasing team -- would meet again with vendors approximately

14   a month later.  And typically a third round would be in

15   December when a final contract was signed.

16   Q.  Focusing on the year 2014 as you described before, focusing

17   on the year 2014, at what point was the board advised -- I

18   think you said they were involved or informed of this contract

19   negotiation process.

20   A.  I can't say.  I can't pick a particular meeting that we

21   were informed of it, but I knew of it by probably August.

22   Q.  And was that before the contract was signed or after?

23   A.  Before.

24   Q.  And if you could just remind us, who was that contract --

25   generally who were those contracts being negotiated with?

James Olson - Direct

1   A.   The contract was negotiated between the RSCS and whichever

2   chicken vendors they chose to negotiate with.

3   Q.   When you say chicken vendors, can you describe what it is

4   you are talking about?

5   A.   Are you asking for names of companies?

6   Q.   Sure.  If you could describe just what you mean by chicken

7   vendors.

8   A.   They would be the people that would grow, process and

9   package the chicken for distribution that met the

10  specifications of KFC corporate out to the franchised and

11  company stores.

12  Q.   Between 2012 and 2016 -- well, which chicken vendors did

13  KFC -- HMC-owned KFC restaurants purchase from?

14  A.   My recollection is that we were with George's, we were with

15  Pilgrim's Pride, Mar-Jac and Tyson.

16  Q.   Are you familiar with the term chicken supplier?

17  A.   Yes.

18  Q.   Is the term chicken supplier related in any way to the term

19  chicken vendor?

20  A.   Yes, and I think I also used processor.  They would process

21  the chicken, but that would be a chicken supplier.

22  Q.   So were you involved in the purchase of chicken for the

23  HMC-owned KFC restaurants?

24  A.   Yes.

25  Q.   How were you involved?

James Olson - Direct

1    *A.*  I was involved as a director of the RSCS in terms of

2    providing insight and coaching to the management team on their

3    negotiations.  I was also involved as the CEO of HMC with

4    individual vendors on negotiating terms.

5    *Q.*  And what terms would you negotiate as the CEO of HMC?

6         *MR. McLOUGHLIN:*  Objection, Your Honor, as to time,

7    dates and years.

8         *THE COURT:*  Overruled.  Go ahead.

9    *A.*  Can you ask the question again?

10   *BY MS. SWEENEY:*

11   *Q.*  In your role as CEO of HMC, you said that you were involved

12   in negotiations specifically with the chicken suppliers.  What

13   were those negotiations?

14   *A.*  They would be more financial terms or delivery terms.  We

15   couldn't negotiate the price.  The fixed price of the product

16   was determined by the RSCS.  But we could talk about things

17   like payment terms that were quicker than what the RSCS had

18   negotiated, guaranteed loads, short weight credits, things that

19   were outside the scope of the contract with the RSCS.

20   *Q.*  And what was the purpose of those negotiations?

21   *A.*  Cost reduction.  We were trying to find something that

22   benefited both the chicken supplier and HMC that could benefit

23   them, benefit us and provide some savings.

24   *Q.*  Could you describe how the terms that you just described

25   would lead to cost reduction for HMC?

James Olson - Direct

1    *A.*  You know, years, I can't remember which year, but for many

2    years we had something called a short weight credit.  The

3    chicken shows up and within the specifications that it has to

4    be within a certain weight range.  If the case of chicken

5    showed up below that weight range, we could turn in a request

6    for a short weight credit from the chicken processor.

7            That was a very cumbersome act for both HMC and our

8    distributor and it was also cumbersome for the chicken

9    processor.  So one year we determined with the chicken

10   processors that we would waive doing that and have some

11   discount from what the negotiated price was from the RSCS.

12   *Q.*  Were your negotiations throughout the year successful?

13   *A.*  Yes.  Typically there was a working -- business working

14   mentality that would look for solutions that would benefit both

15   parties.

16   *Q.*  And can you describe what you mean -- or can you describe

17   when you say -- when I said they were successful, can you

18   describe why you thought they were successful?

19   *A.*  By the agreement of the chicken processor to the idea, it

20   seemed to be beneficial to them.  And we were provided a

21   discount from the RSCS negotiated price, so we felt it was a

22   benefit to us.

23   *Q.*  So the end result was that you got a discount?

24   *A.*  Yes.

25   *Q.*  And you described these negotiations generally.  Did these

James Olson - Direct

1    negotiations -- directing your attention to the year 2014, did

2    these negotiations occur then?

3    A.   Yes.

4    Q.   What type of chicken did HMC-owned KFC restaurants

5    purchase?

6    A.   Previously mentioned items, chicken on the bone, further

7    processed chicken which is chicken that was used for chicken

8    sandwiches, for tenders or strips, popcorn chicken, hot wings.

9    Q.   You mentioned chicken on the bone.  Could you describe

10   further what that is?

11   A.   Yeah.  If you think about a live chicken, the chicken

12   processor would take that chicken, end its life and pluck it

13   and then take off pieces of that chicken, meaning the head, the

14   neck, the feet.  They would eviscerate it.  And then you're

15   ending up with a chicken body or carcass that is the wings,

16   legs, thighs and breasts of the chicken.

17   Q.   So what product at KFC did the chicken on the bone go into?

18   A.   I am sorry?  Say that again?

19   Q.   What product at KFC did the chicken on the bone go into?

20   A.   It went into our bone-in original recipe chicken and our

21   bone-in crispy chicken.

22   Q.   What size bird did the chicken on the bone come from that

23   HMC-owned KFC stores purchased?

24   A.   There is a specification called out by KFC corporate and

25   that bird weight was an average of 2-1/2 pounds.

James Olson - Direct

1   Q.  And was that the weight of the bird when it was still

2   alive?

3   A.  Oh, no.

4   Q.  Can you describe what 2-1/2 pounds, how that relates to the

5   size of the bird?

6   A.  That's the end body of the processed chicken when it's only

7   the wings, legs, thighs and breast.

8   Q.  And how many pieces, if any, was chicken on the bone?

9   A.  It was cut into eight pieces.

10  Q.  You talked about some further processed products.  You

11  mentioned sandwiches, tenders, strips and hot wings.  What size

12  chicken did those come from in 2014 and 2015?

13  A.  My best recollection is that they came from both small bird

14  and large birds.

15  Q.  When you say small bird, what do you mean?

16  A.  Small bird is that 2-1/2 pound bird.

17  Q.  When you say large bird, what do you mean by that?

18  A.  It would be a processed product where its finished weight

19  was 3-1/2 pounds or larger.

20  Q.  And you talked about chicken on the bone coming from about

21  a 2-1/2 pound bird.  Was that also true in 2014 and 2015?

22  A.  Yes.

23  Q.  Of the products that you've discussed, chicken on the bone

24  and the further processed, could you give a percentage as to

25  which was -- or could you give an estimation as to which was

James Olson - Direct

1    the largest of the products that was purchased by HMC-owned KFC

2    stores?

3    A.   Chicken on the bone.

4    Q.   Can you give some magnitude to that?

5    A.   I would say 55 percent.

6    Q.   In total about how much chicken was purchased for the

7    HMC-owned KFC stores between 2012 and 2016?

8    A.   Between 35 million and 40 million pounds.

9    Q.   And was that for the whole time period that I described,

10   2012 to 2016?

11   A.   No, annually.

12   Q.   So every year.

13   A.   Yes.

14   Q.   Between those years again focusing on 2012 to 2016, were

15   you involved in selecting the chicken suppliers that the

16   HMC-owned KFC restaurants purchased from?

17   A.   No.

18   Q.   Did you have any influence in selecting those suppliers?

19   A.   Yes.

20   Q.   Can you describe that?

21   A.   As a director of the RSCS, I would always push for the

22   lowest priced chicken supplier to be allocated more to the West

23   Coast, and that was because freight to move that product to the

24   West Coast was much higher than it was for KFC restaurants in

25   the southeast or the midwest, so the freight increase would be

James Olson - Direct

 1   offset by the lower price of the chicken supplier trying to

 2   equate some balance.

 3   Q.  When you said you would push for it, can you describe how

 4   you would push for it?

 5   A.  I would talk with the management team at the RSCS.  It was

 6   their job to allocate where the product went, which suppliers

 7   were sent to which regions in the country.  The job of the

 8   cooperative is to try and find -- to treat all members equally,

 9   and therefore that was a way to compensate for the higher

10   freight costs for the West Coast.

11   Q.  When you said the job of the cooperative was to treat all

12   the members equally, can you describe what that means

13   practically?

14   A.  That to the best of the RSCS's ability, they were to try

15   and create equality across the board, so that just -- that's

16   trying to treat all the members equally.

17   Q.  And did RSCS -- approximately how many suppliers did RSCS

18   source from?

19   A.  It would vary in different years.  It would vary between

20   how many chicken-on-the-bone suppliers and how many further

21   processed suppliers, but probably in totality I would think 13.

22   Q.  And you mentioned about four suppliers that you believe the

23   HMC-owned KFCs purchased from between 2012 and 2016; is that

24   right?

25   A.  Yes.

24

James Olson - Direct

1    Q.  When those purchases were made, were they made through the

2    contracts, the RSCS contracts you described earlier?

3    A.  Yes.

4    Q.  And were the prices on all of those contracts the same?

5    A.  No.

6    Q.  Was that a problem?

7    A.  No.

8    Q.  Why not?

9    A.  You would assume that different companies would -- excuse

10   me.  You wouldn't assume.  I would assume as a customer and an

11   end user that the chicken suppliers would charge different

12   prices because they have different cost structures, different

13   strategic plans, and I would expect some variance.

14   Q.  Was it a problem for the hundreds of KFC stores that HMC

15   owned?

16           MR. McLOUGHLIN:  Objection to form.

17           THE COURT:  Overruled.

18   A.  No.

19   BY MS. SWEENEY:

20   Q.  Why not?

21   A.  It was part of being -- part of the -- it was for HMC,

22   being a part of the RSCS, you assumed that you would have to

23   buy off the contracts that the RSCS negotiated.  So being a

24   member meant that you gave up that right to try and negotiate

25   individually, and you had to take the benefits of the

James Olson - Direct

1    cooperative along with some items that could be perceived as a

2    negative.

3    Q.  So from your perspective the membership in RSCS, you just

4    said you gave up your ability to separately negotiate supply

5    prices?

6    A.  Yes.

7    Q.  Can you describe practically how the chicken would get from

8    a chicken supplier or chicken vendor, as you described, to a

9    KFC restaurant?

10   A.  The RSCS would negotiate a freight line to pick product up

11   from the chicken supplier and move it to a distribution center

12   that was regionally located all across the United States.

13   Harmon Management was served by four different of those

14   distribution centers in Colorado, in California, Utah and in

15   Portland.

16   Q.  I am sorry, you said Colorado, California, Utah and what

17   was the last?

18   A.  Portland.

19   Q.  You mentioned earlier that George's was one of the vendors

20   that the HMC-owned KFC restaurants purchased from; is that

21   right?

22   A.  Yes.

23   Q.  I would like to ask you a few questions about that.  Where

24   is George's located?

25   A.  I believe they are located in Arkansas.

26

James Olson - Direct

1  Q.  And you just mentioned the four locations of the

2  distribution centers.  Did HMC ever have distribution centers

3  in Arkansas?

4  A.  No.

5  Q.  So practically how did the chicken get from George's in

6  Arkansas to HMC's distribution centers in Colorado, California,

7  Utah or Portland and then to the ultimate restaurants?

8  A.  The RSCS would negotiate with the freight line to pick the

9  product up from George's in this case and to take that product

10  to one of the distribution centers.  The product would be

11  stored at the distribution center, and then that distribution

12  company would be responsible to take orders from an individual

13  franchisee and to deliver the chicken and other products to

14  that location.

15  Q.  When you say the ultimate franchisee, what are you

16  referring to?

17  A.  I don't think I said ultimate.  Maybe I did.  To each

18  individual franchisee.

19  Q.  When you say franchisee, do you mean KFC restaurant?

20  A.  Yes.

21  Q.  So who would place the order at the distribution centers

22  for the chicken?

23  A.  For the distribution centers?

24  Q.  Who would place the orders with the distribution centers to

25  get the chicken?

James Olson - Direct

1  *A.*  The restaurant manager would put in an order from the

2  distribution center.  The manager of the distribution center

3  would determine how much product they needed from the chicken

4  supplier.

5  *Q.*  So the chicken would travel from George's in Arkansas to

6  one of the four distribution centers that you described to the

7  restaurant.

8  *A.*  Yes.

9  *Q.*  Mr. Olson, are you familiar with someone by the name Brian

10  Roberts?

11  *A.*  I am.

12  *Q.*  Do you know Mr. Roberts?

13  *A.*  I do.

14  *Q.*  How do you know him?

15  *A.*  We have partnered with him for many years purchasing

16  products from different companies that he's worked for over the

17  years.

18  *Q.*  And what are some of the different companies he has worked

19  for over the years?

20  *A.*  I believe I said -- I think I'd said earlier that it was

21  Sanderson Farms, but I believe it was Simmons I first met him

22  at.  And then he worked at Marshall Durbin and also at Tyson.

23  *Q.*  What was your relationship with Mr. Roberts?

24  *A.*  It was I would say a friendly business relationship.  It

25  wasn't purely business and it wasn't purely friendship.  It was

James Olson - Direct

1    a friendly business relationship.  We got along.  I liked

2    Brian, thought he represented his businesses well, and we

3    enjoyed doing business with him.

4    *Q.*  Have you ever met him face to face?

5    *A.*  Yes.

6    *Q.*  About how many times?

7    *A.*  Dozens, two, three dozen times.

8    *Q.*  Over the course of how long?

9    *A.*  10 years.

10   *Q.*  Do you see him here in the courtroom today?

11   *A.*  I believe I do.

12   *Q.*  Would you be able to identify him by describing where he is

13   sitting or something he is wearing?

14   *A.*  Yes.

15   *Q.*  Could you do so?

16   *A.*  Yup.  He is sitting right behind you and just waved to me.

17   He has got a blue shirt and blue tie on.

18        *MS. SWEENEY:*  Your Honor, the government would ask

19   that the record reflect the witness identified Defendant

20   Roberts.

21        *THE COURT:*  It shall.

22   *BY MS. SWEENEY:*

23   *Q.*  Would you recognize a photo of Defendant Roberts if I were

24   to show you a picture of him?

25   *A.*  Yes.

James Olson - Direct

1    Q.  There should be a file folder in front of you, and I would

2    ask you to open it up and look at Exhibit 9251.  And please

3    look up at me when you're done.

4            Do you recognize this document?

5    A.  Yes.

6    Q.  What is it?

7    A.  It's Brian Roberts.

8    Q.  Is it him or is it a depiction of him?

9    A.  It's him.

10   Q.  Is it a photograph?

11   A.  Yes.

12   Q.  How do you know that it's a photograph of Defendant

13   Roberts?

14   A.  I don't know how to answer that.  It looks like a

15   photograph to me.

16   Q.  And how do you know it's a photo of him?

17   A.  Because I recognize him.

18   Q.  Is it a fair and accurate depiction of Defendant Roberts?

19   A.  Yes.

20   Q.  Now turning your attention, are you familiar with someone

21   by the name of Ric Blake?

22   A.  I am.

23   Q.  Do you know Mr. Blake?

24   A.  I do.

25   Q.  How do you know him?

James Olson - Direct

1    A.  Again, he was a long-term chicken supplier with us.  We

2    worked with him for many years through the George's company, we

3    meaning RSCS.  Both Ric and Brian were thought highly of within

4    the HMC organization.  In fact, we bestowed upon both of them a

5    title of business partner, not a vendor.  A lot of people think

6    of their suppliers as vendors, but we thought of both of these

7    gentlemen that they went above and beyond the normal vendor

8    role and we designated them a title of business partners.  And

9    we invited them on to our HMC's annual convention where we

10   would take all of our franchise partners on a trip someplace

11   and we had certain business partners join us.  And both of

12   those two gentlemen were considered in that class.

13   Q.  Was there anyone else at George's that you worked with

14   aside from Mr. Blake?

15   A.  Not that I did.

16   Q.  Did you ever meet Mr. Blake face to face?

17   A.  Yes.

18   Q.  How many times?

19   A.  Dozens again.

20   Q.  Over the course of how many years?

21   A.  Again, over 10 years.

22   Q.  Do you see him here in the courtroom today?

23   A.  I do.  Yes, I do.

24   Q.  Could you identify him by describing where he is sitting or

25   something that he is wearing?

James Olson - Direct

1   *A.*   Yup.  He has got the mask on.  He is waving.  He has a

2   brown-gray suit, pin-striped shirt, looks like brown tie.  Am I

3   close?

4          *MS. SWEENEY:*  The government would ask that the record

5   reflect that the witness has identified Defendant Blake.

6          *THE COURT:*  It shall.

7          It's noon, Ms. Sweeney.  Would now be a convenient

8   time to take our lunch break?

9          *MS. SWEENEY:*  Your Honor, may I have two questions?

10          *THE COURT:*  Sure.

11   *BY MS. SWEENEY:*

12   *Q.*   Would you recognize a picture of Defendant Blake if I were

13   to show you one of him?

14   *A.*   Yes.

15   *Q.*   I would like to direct your attention to Government's

16   Exhibit 9236 in the folder in front of you.  Do you recognize

17   it?

18   *A.*   I do.

19   *Q.*   What is it?

20   *A.*   It's a picture of Ric Blake.

21   *Q.*   How do you know?

22   *A.*   It looks just like him.

23   *Q.*   Is it a fair and accurate depiction of Defendant Blake?

24   *A.*   Yes.

25          *MS. SWEENEY:*  I apologize, that was four questions,

James Olson - Direct

1   but we are ready to recess.

2        THE COURT:  As a lawyer you never promise how many

3   questions you might have because you never keep it.

4        MS. SWEENEY:  As it came out of my mouth, Your Honor,

5   I knew it would likely be four.  I apologize for that.

6        THE COURT:  No problem.

7        Ladies and gentlemen, we will go ahead and take the

8   lunch break now.  We will reconvene at 1:30.  Keep the

9   admonitions in mind.  And if you go outside, as I mentioned to

10  you yesterday, try to keep those yellow juror buttons visible.

11  Don't let anyone try to talk to you about the case.  And we

12  will see you back at 1:30.  The jury is excused.

13        (Jury excused.)

14        Mr. Olson, you can step down.  Thank you very much.

15  And if you can come back, then, at 1:30.

16        Anything before we recess?

17        Yes, Mr. Tubach.

18        MR. TUBACH:  Your Honor, just briefly, I understand

19  the Court issued an order this morning that I have not yet had

20  a chance to read that relates to handwritten notes of

21  Mr. Martin.  We had anticipated filing a brief, didn't

22  understand the Court was going to be issuing an order as

23  quickly as it did.  We would like the opportunity to file that

24  brief immediately and have the Court at least consider the

25  arguments we are making.  We think there is a serious

James Olson - Direct

1    confrontation clause issue.

2          THE COURT:  Yes.  If you could file that.  So you are

3    going to file it over the lunch hour?

4          MR. TUBACH:  We'll file it very quickly, yeah.

5          THE COURT:  I will take a look at that.

6          MR. TUBACH:  Thank you very much.  I appreciate it.

7          THE COURT:  Anything else?  We will be in recess --

8          MS. SWEENEY:  I apologize, Carolyn Sweeney for the

9    United States.  One quick logistical question.  In terms of

10   scheduling the witness after Mr. Olson, we are planning for

11   one-to-one cross, but I just wanted to get your sense if we

12   should be planning.  We don't want, obviously, witnesses to not

13   be ready when the Court is ready, but we wanted to get your

14   sense on if you had a thought of what the planning amount is.

15         THE COURT:  I'm sorry, I didn't quite understand the

16   question.

17         MS. SWEENEY:  Sure.  So we have a number of custodian

18   witnesses who are ready to testify when we are finished with

19   Mr. Olson's testimony.  In terms of estimating, we are planning

20   to have them here and ready to go about -- however long

21   Mr. Olson is, we are planning for a one-to-one time on cross.

22   So we just wanted to advise you and see if you have a different

23   sense as to if we should have our witnesses here earlier.

24   That's really the question.

25         THE COURT:  The answer is have them ready once

James Olson - Direct

1      Mr. Olson leaves the witness stand.

2            *MS. SWEENEY:*  Yes, Your Honor.  Thank you.

3            *THE COURT:*  You knew that would be the answer.  That's

4      what we have to do.  Especially with custodians, there may be a

5      lot of them.  They may get stacked up and they will undoubtedly

6      not like that, but it's just the way that we will have to go

7      throughout the trial.

8            Mr. Pollack?

9            *MR. POLLACK:*  Yes, Your Honor.  With the custodians,

10     one of the issues with respect to authenticity is as I

11     understand it some of the documents that the government wants

12     authenticated were not actually collected from the source.

13     They are not documents that were sent to a supplier via Grand

14     Jury subpoena, but rather were collected indirectly.  And the

15     supplier provided them in the civil class action and then

16     several steps later the plaintiff's attorney provided them to

17     the Department of Justice.

18            As I understand the Court's ruling on the motion *in*

19     *limine*, there is to be no mention of the civil class action, so

20     I just wanted to make sure we are all on the same page in terms

21     of how witnesses are going to refer to what they did with the

22     documents if the answer is something other than, I gave them to

23     the Department of Justice.

24            *THE COURT:*  Well, it depends.  Obviously if the

25     government has to take a roundabout route, which I said that

James Olson - Direct

1   the government could, I think that they should start off by

2   doing it without much detail so that it, as you suggest, leaves

3   out details regarding why they were produced to that particular

4   person or entity or however, but nonetheless allows the

5   government to establish the fact that those came from this

6   particular company.

7           MR. POLLACK:  Company or law firm.

8           THE COURT:  Well, that's where we start to get a

9   little bit tricky.

10          MR. POLLACK:  I believe that some of these documents

11  were provided by plaintiff's law firm.

12          THE COURT:  Sure.  Not knowing all the details, I

13  can't quite guide you specifically, but we should try to keep

14  from the jury the fact that they were provided to a plaintiff's

15  law firm through the course of litigation.  So it would be

16  better to leave out those details if at all possible so long as

17  we have someone within the chain, we might say, that, you know,

18  can establish that that document or these documents came from

19  the -- we will call them supplier.

20          Once again, I don't quite know how it will be done,

21  but I do want to make sure that we don't interject.  And the

22  witnesses should be prepared so they don't just volunteer, you

23  know, details about law firms, plaintiffs, lawsuits, that type

24  of thing.

25          MS. SWEENEY:  And, Your Honor, just if I may be heard

James Olson - Direct

1    on this.

2         THE COURT:  Sure.

3         MS. SWEENEY:  The government's plan is to refer to the

4    other litigation as another matter.  And to ask leading

5    questions to get around that, we have talked to the witnesses

6    and advised them that we plan to refer to it as another matter.

7    And when we use the terms "another matter," we are talking

8    about the Northern District of Illinois broiler chicken

9    litigation.

10        THE COURT:  Yes, use some type of term like that that

11   is not likely to be understood by the jury as involving other

12   litigation.  But in addition to telling the witness that you

13   will be using that type of term, you need to in addition prep

14   the witness so that the witness understands the sensitivity of

15   it and does not -- because after all, they are under oath, they

16   have to tell the truth, but they can tell the truth without

17   mentioning specifics that would then foil the attempt of using

18   a vague term.

19        MS. SWEENEY:  Yes, Your Honor, and I believe we have.

20        THE COURT:  Anything else, Mr. Pollack?

21        MR. POLLACK:  No, that's fine, Your Honor.

22        THE COURT:  We will be in recess.

23        (Recess at 12:07 p.m.)

24        (Reconvened at 1:32 p.m.)

25        THE COURT:  Ms. Prewitt, do you have an issue?

James Olson - Direct

1          *MS. PREWITT:*  The defendants conferred over lunch.  I

2     think we are making some progress over stipulations.  And we

3     would like to request some time perhaps after Mr. Olson steps

4     off the stand so we can just confer with the government and try

5     to iron some things out.

6          *THE COURT:*  That could be good.  So you would suggest

7     taking a recess.  How long do you think it might be?

8          *MS. PREWITT:*  I think it would be more than 15

9     minutes.  I think half an hour is probably the quickest given

10    the amount of work we need to do.

11         *THE COURT:*  Mr. Koenig, your thought on that?  Does

12    that sound good to you?

13         *MR. KOENIG:*  Yeah, that sounds good.

14         *THE COURT:*  I think that could ultimately save us

15    quite a bit of time, so we will plan on doing that once

16    Mr. Olson is done.

17         Let's bring Mr. Olson in at this time.

18         *MS. PREWITT:*  Your Honor, would it be okay if we

19    stayed in the courtroom?

20         *THE COURT:*  That's perfectly fine.  We will have the

21    jury excused and you can use the courtroom.

22         Mr. Olson, if you don't mind, could you resume the

23    witness stand?

24         And Mr. Keech, could you get the jury?

25         *COURT DEPUTY CLERK:*  Yes, Your Honor.

James Olson - Direct

1          THE COURT:  Thank you.

2          (Jury present.)

3          Please be seated.

4          Go ahead, Ms. Sweeney.

5          MS. SWEENEY:  Thank you, Your Honor.

6          Good afternoon, Mr. Olson.

7          At this time, Your Honor, the government moves to

8   admit Government Exhibits 9251 and 9236 into evidence.

9          THE COURT:  All right.  Any objection, first of all,

10  to the admission of Exhibit 9251?

11         MR. GILLEN:  No objection.  Your Honor.

12         THE COURT:  9251 will be admitted.  And what was

13  the --

14         MS. SWEENEY:  The second exhibit was 9236.

15         THE COURT:  Any objection to the admission of 9236?

16         MR. BELLER:  Your Honor, on behalf of Mr. Fries, we

17  object to the admission of both photographs, and I am happy to

18  state the bases if the Court wishes.

19         THE COURT:  You should because I don't understand the

20  basis for it.

21         MR. BELLER:  The basis for it is that I don't believe

22  that it's relevant for Mr. Fries.  I also believe that the

23  depictions of those particular photographs and the way they are

24  depicted is not probative to any fact as to Mr. Fries.  It is

25  certainly prejudicial.

James Olson - Direct

1              THE COURT:  Any objection?

2              MS. JOHNSON:  Yes, Your Honor, Wendy Johnson for

3     Mr. Blake.  We would object.  And I apologize to the Court.  I

4     don't know which number the Blake photo was, but we would

5     object specifically to Mr. Blake's photo.  It's irrelevant.  He

6     has been identified in court.  He stood up in opening.  The

7     witness identified him.  There is no relevance and we don't see

8     the reasoning for have the photograph introduced.

9              THE COURT:  And yes, it's 9236, the photo of

10    Mr. Blake.

11             MR. BELLER:  May I supplement my objection?

12             THE COURT:  Very quickly.

13             MR. BELLER:  Simply to say other photographs that were

14    more flattering were provided to the People, and the People are

15    choosing not to introduce the photographs that were otherwise

16    provided, but are instead choosing to provide these two

17    photographs.

18             THE COURT:  Mr. McLoughlin?

19             MR. McLOUGHLIN:  Yes.  For Mr. Lovette we would join

20    in the objections and reiterate the point that accurate

21    photographs were provided by the defense and the government

22    declined to use them.

23             THE COURT:  The government can choose its own

24    evidence.  The issue is whether it's admissible.  I find that

25    both photographs are.  9236 and 9251 will be admitted.

40

James Olson - Direct

1    *BY MS. SWEENEY:*

2    *Q.*   Mr. Olson, did there come a time where chicken suppliers

3    could not fully supply HMC's KFC restaurants?

4    *A.*   At various times over the years that would happen caused by

5    weather or a truck couldn't get through.  Are you referring to

6    a specific time?

7    *Q.*   I am directing your attention to 2014.  And Mr. Olson, I

8    just ask that you lean into the microphone.  I am struggling to

9    hear you.

10    *A.*   I am about 2 inches away, maybe 1.

11    *Q.*   Thank you.  Directing your attention to 2014, was there a

12    time when the chicken suppliers could not fully supply HMC's

13    KFC restaurants?

14    *A.*   Yes.

15    *Q.*   And when was that in 2014?

16    *A.*   It was over the Mother's Day weekend.

17    *Q.*   How do you remember that it was Mother's Day?

18    *A.*   Mother's Day is traditionally are peak day of the year and

19    it's the year we sell the most chicken.  We had spot shortages

20    throughout our HMC system and it caused some friction and some

21    internal struggles to make sure our stores had as much chicken

22    as possible.

23    *Q.*   You described Mother's Day as one of the peak days of the

24    year.  Why is it a peak day of the year?

25    *A.*   It started in the early days when we first got onto

41

James Olson - Direct

1   television and we didn't have a big television budget.  So

2   we -- we meaning at the time was called an NAC, it was the

3   advertising council -- would put money into holidays in order

4   to advertise Kentucky Fried Chicken and it increased sales.

5        Mother's Day was very successful because it gave mom a

6   day off from cooking and it kind of caught on.  And even though

7   we haven't advertised on Mother's Day particularly in past

8   years, the tradition has been set and people still come in and

9   we have a real spike in sales on Mother's Day.

10  Q.  When you said we was the national ad council, was that a

11  part of KFC?

12  A.  Yes.  It's an advertising council.  It's made up of

13  corporate members and franchisees.

14  Q.  Do you know what happened on Mother's Day 2014?

15  A.  Within Harman Management?

16  Q.  With the Harman Management owned KFC restaurants, do you

17  know what happened on Mother's Day 2014?

18  A.  Yeah.  There were -- there wasn't enough chicken to go

19  around, basically, and distribution centers were pressing the

20  chicken processers, the chicken suppliers to give them extra

21  loads.  And when -- depending on the success of that, we also

22  had to try and move chicken between distribution centers.  If

23  one distribution center had some inventory, they were moving it

24  to another distribution center to try and meet their needs.

25  And then internally there were areas where stores were swapping

James Olson - Direct

1    product between stores in order to keep people in supply.

2    Q.  Did it affect any of HMC's KFC stores?

3    A.  Yes.  There were some that had to close early.

4    Q.  Did you have any role in securing chicken that Mother's Day

5    weekend of 2014?

6    A.  No.

7    Q.  What was your reaction to the shortage that weekend?

8    A.  My reaction was to talk to our distributors and find out

9    what they were doing to secure more supply.

10   Q.  Did you take any other steps after that weekend in response

11   to the supply shortage?

12   A.  For long-term or within that weekend?

13   Q.  Let's start within that weekend and then let's turn to

14   long-term.

15   A.  No, there wasn't anything else I did other than talk to the

16   distributors that we were associated, we meaning Harman

17   Management, was associated with.

18   Q.  And in the long term did you take any steps as a result of

19   that weekend?

20   A.  Yes.

21   Q.  What were those steps?

22   A.  I put together an e-mail that I sent to the CEO of the

23   RSCS, and I listed various ideas that I thought could be

24   mutually beneficial to the system and to the chicken suppliers.

25   Q.  And now I would like to direct your attention to 2014.

James Olson - Direct

1    Earlier we were talking about chicken supply contracts that

2    were negotiated with RSCS.  Was one of those chicken -- I

3    believe you said that one of those chicken supply contracts was

4    negotiated in 2014; is that correct?

5    A.  Could you restate that again?

6    Q.  Sure.  So we were talking about chicken supply contracts

7    before the lunch break that were negotiated with RSCS.  And I

8    believe you said that one of the chicken supply contracts was

9    negotiated in the year 2014; is that correct?

10   A.  Yes.

11   Q.  And what years was that covering supply for?

12   A.  It was a three-year contract.

13   Q.  So what are the three years that it covered?

14   A.  It would cover 2015, 2016 and 2017.

15   Q.  What happened with that contract?

16   A.  It went into force.

17        MR. McLOUGHLIN:  Objection, Your Honor.  In addition

18   to form, lack of foundation.

19        THE COURT:  Overruled as to both.

20   BY MS. SWEENEY:

21   Q.  So what happened with that contract?

22   A.  It went into force.

23   Q.  Could you explain a little further?

24   A.  Franchisees, all the members of the co-op, including the

25   corporate stores, were obligated to meet the requirements of

James Olson - Direct

1    that contract, and that was -- it included a large increase in

2    price.

3    Q.  So let's talk about the negotiations of that contract.

4    What was your understanding of the market dynamics going into

5    that contract negotiations?

6    A.  As a director, I knew that chicken suppliers were saying

7    that there was more profit for them in moving to larger birds

8    and getting out of the small bird category.  And from my

9    knowledge and experience in the business for as long as I have

10   been in it, I believe that's true.  There was a higher profit

11   margin for them in the bigger birds.

12        I understood as a director that they were going to

13   make that move relatively quickly.  And that was a concern for

14   the RSCS because KFC corporate hadn't changed their

15   specifications yet.  And if the chicken suppliers moved out of

16   the small bird category, we wouldn't have product to sell.  So

17   the RSCS purchasing team in negotiations with the chicken

18   suppliers came back with that we needed to do a three-year

19   contract and that we needed to accept plus/minus 10 cent

20   increase per pound in cost.

21   Q.  You mentioned a change in the KFC specifications.  Can you

22   describe what you mean by that?

23   A.  KFC prescribes that we sell a product within a certain

24   weight specification of the chicken, and that's a 2-1/2 pound

25   chicken.  If we went to a 3-1/2 pound chicken, we meaning the

James Olson - Direct

1   whole system, corporates stores, KFC franchisees, if we moved

2   to buy 3-1/2 pound chicken, not only would it disrupt the

3   financial dynamics of our pricing, but it would disrupt our

4   processes.  Our fryers aren't set up to cook that size chicken.

5   So being a franchisee, we can't determine the spec of this

6   chicken.  We can't change the process of cooking the chicken.

7   We were kind of caught in the middle of what was happening in

8   the market by the decision of moving to bigger birds.

9   Q.   And when did you learn about this shift that you just

10  described from the smaller birds to the larger birds?

11  A.   There had been -- I had heard about it as a -- as the CEO

12  of Harman Management and as a director of the RSCS.  There had

13  been talk about a shift to bigger birds for a couple of years,

14  but there hadn't been any real decision and action to make that

15  happen.  So it was common knowledge in the summer and fall of

16  2014, but then when the negotiations went into play, I believe

17  it was August or September of '14 is when the reality hit that

18  we were kind of stuck.

19  Q.   And what do you mean by when you say you were kind of

20  stuck?

21  A.   Again, as we are leading our company, I can't change.  I

22  can't make an agreement to buy a bird outside the spec of

23  Kentucky Fried Chicken Corporation's requirements.  I can't do

24  that.  The RSCS isn't supposed to by spec outside of what KFC

25  says too.  So if all the chicken suppliers moved out of our

James Olson - Direct

1    spec, there weren't other chicken suppliers that could fill

2    that void and we would be stuck without product.  We would have

3    a supply issue.

4    Q.  Could HMC purchase chicken products from other suppliers

5    than the ones that you had been dealing with?

6    A.  Not unless it was approved by both KFC corporate and the

7    RSCS.

8    Q.  Did there come a time in the year 2014 when you were

9    negotiating the three-year contract that you became involved in

10   contract negotiations?

11           MR. McLOUGHLIN:  Objection to form, Your Honor.  I

12   think the witness has established that you, as in he, is not

13   negotiating a contract.  We have not identified who was

14   negotiating the contract.

15           THE COURT:  Objection sustained as to the word "you."

16   If you could clarify.

17           MS. SWEENEY:  Sure.

18   BY MS. SWEENEY:

19   Q.  Mr. Olson, did there come a point in time in 2014 that you

20   personally became involved in that contracting process?

21   A.  I never became involved in the contracting process on the

22   price of the product itself.

23   Q.  Did there ever come a time in 2014 when you personally

24   became involved in contract negotiations with chicken

25   suppliers?

James Olson - Direct

1    A.   Yes.

2              MR. McLOUGHLIN:   Object to form.

3              THE COURT:   Overruled.   He answered.

4    BY MS. SWEENEY:

5    Q.   I am sorry, could you repeat that?

6    A.   Yes.

7    Q.   And when was that?

8    A.   In the fall, probably October or November of 2014.

9    Q.   And can you explain what your negotiations, your personal

10   negotiations were with the chicken suppliers?

11   A.   I met individually with Tyson and George's and we discussed

12   terms similar to those that I had discussed earlier that I

13   was -- I could not change the price of the chicken, but I could

14   talk to the suppliers about other variables, whether it be

15   financial terms or contract ideas similar to the ones I said

16   was short weight, quick pay, guaranteed loads.   So I could talk

17   to them about terms that were outside or in addition to the

18   contract that the RSCS negotiated.

19   Q.   And what was the purpose of those negotiations?

20   A.   To get some discount from what the stated contract was.

21   Q.   And that would be a discount for whom?

22   A.   Harman Management Corporation.

23   Q.   At the time that you started these negotiations, was the

24   RSCS supply contract finalized?

25   A.   No.

James Olson - Direct

1          MR. McLOUGHLIN:  Objection.  Your Honor, it would be

2    A, double hearsay because he was not involved; and B, we

3    haven't established any foundation that he knew the date it

4    was -- for any of these particular suppliers actually

5    negotiated and agreed as opposed to later signed.  There are a

6    variety of problems with the question.

7          THE COURT:  Sustained, foundation.  If you could lay

8    foundation for his knowledge.

9          MS. SWEENEY:  Thank you.

10   BY MS. SWEENEY:

11   Q.  Do you know -- were you informed when the RSCS contract was

12   finalized?

13   A.  As a director on the board, yes.

14   Q.  And were you aware --

15         MR. McLOUGHLIN:  I apologize, Your Honor.  Object to

16   form.  Contract with what supplier?  There are quite a few.

17         THE COURT:  Overruled.

18   BY MS. SWEENEY:

19   Q.  Were you aware -- as a member of the board of RSCS, were

20   you aware of the contract negotiations that RSCS was engaging

21   in?

22   A.  Yes.

23   Q.  And were you aware of -- earlier you described various

24   rounds of negotiations.  Were you aware of the various rounds

25   of negotiations that RSCS was engaging in?

James Olson - Direct

1    A.   Yes.

2    Q.   So these negotiations that you were -- that you, Mr. Olson,

3    were engaged in with the chicken suppliers, you said with

4    George's and with Tyson's, were you aware of where in that

5    contract process based on your time at RSCS, on the board of

6    RSCS, where in the contract process your negotiations fell?

7    A.   As stated earlier, it was either in October or November.

8    Q.   Were you aware when you engaged in these negotiations with

9    George's and Tyson, were you aware or did you know if the final

10   RSCS contract was signed at that point?

11   A.   I did not know.

12   Q.   You did not know if it was signed at that point?

13   A.   No.

14   Q.   All right.  So you were discussing the negotiations that

15   you had --

16   A.   Can I restate that?  Because I knew it wasn't signed.  The

17   way you asked the question, I --

18   Q.   So at the time --

19           THE COURT:  I don't think he is finished with his

20   answer.

21           MS. SWEENEY:  I apologize.

22           Go ahead, Mr. Mr. Olson.

23   A.   Just the way you stated the question was kind of a double

24   negative where I got spun around, but I knew the contract

25   wasn't going to be signed until December.

James Olson - Direct

1    *BY MS. SWEENEY:*

2    *Q.*  So at the time that you were engaging in these negotiations

3    with George's and Tyson, you just said you knew the contract

4    was not going to be signed until December.

5    *A.*  Yes.

6    *Q.*  So was the contract signed in November of 2014, the RSCS

7    contract?

8    *A.*  No.

9    *Q.*  Thank you.  Turning to the negotiations that you had with

10   Tyson's and with George's -- and we will start with Tyson.  I

11   will ask you a few questions about that.  Who did you meet with

12   at Tyson's for the negotiations that you personally had that

13   you have been describing?

14   *A.*  Brian Roberts.

15   *Q.*  And what did Defendant Roberts tell you -- when you had

16   these negotiations, what was the manner of negotiation?

17   *A.*  It was informal.  We went to dinner.  We talked as we

18   usually would talk, talk about background, family, got around

19   to business, talked about brainstorming on ideas that could

20   possibly net us some discounts from what the negotiated RSCS

21   price was.

22   *Q.*  So the meeting was in person?

23   *A.*  Yes.

24   *Q.*  And you said it was over dinner?

25   *A.*  Yes.

James Olson - Direct

1    *Q.*  You said how they could net us.  Who is us that you are

2    referring to?

3    *A.*  Harman Management Corporation.

4    *Q.*  What did Defendant Roberts tell you in these negotiations?

5    *A.*  Kind of the bottom line was there wasn't any movement this

6    year.

7    *Q.*  Can you describe what you understood by that?

8    *A.*  That the price set by the RSCS was going to be the price we

9    had to live with, that there wasn't going to be any terms

10   outside of that that we could work on.

11   *Q.*  Had you had these negotiations in prior years?

12   *A.*  Yes.

13   *Q.*  What had been the outcome of these negotiations in prior

14   years?

15   *A.*  Always something favorable.  We usually could work together

16   to find something that we thought was mutually beneficial, you

17   know, not just one-sided, but something that could work for

18   both parties.

19   *Q.*  And as you just described, is that how the negotiations

20   went in 2014?

21   *A.*  No.

22   *Q.*  How would you describe that they went in 2014?

23   *A.*  There wasn't any real discussion other than the statement

24   that the price was what it was and there wasn't any chance of

25   making any changes to it.

James Olson - Direct

1   Q.   Did you plead your case on behalf of HMC?

2   A.   Yes.

3   Q.   What did you say?

4   A.   I think I said the obvious.  Brian has been in the business

5   a long time, so knowing that there was a 10-cent hike in

6   chicken prices, it's going to be financially difficult for us.

7   A penny a pound to us is about $400,000 to us, meaning HMC.

8   It's about $400,000 impact on bottom line profits.  So a

9   10-cent increase is easily calculated to be about a $4 million

10  impact, so that was going to affect Harman Management

11  Corporation and our partners running the restaurants.

12  Q.   And did you say that to Defendant Roberts?

13  A.   No, I think I generalized it.  I don't think I specifically

14  threw those numbers out.  I think I said something like --

15         MR. BELLER:  Objection, hearsay.

16         THE COURT:  Overruled.

17  A.   I believe I said something like, "You know how much this is

18  going to impact us."

19  BY MS. SWEENEY:

20  Q.   And what did he say in response?

21  A.   He seemed to have -- it's a judgment on my call, but from

22  our relationship over the years, I think he felt --

23         MR. McLOUGHLIN:  Objection, Your Honor.  The question

24  is what he said and this becomes an opinion or judgment

25  question.

James Olson - Direct

1        THE COURT:  Yeah, sustained.  So if you could state

2    the question to Mr. Olson again.

3        MS. SWEENEY:  Yes, Your Honor.

4    BY MS. SWEENEY:

5    Q.  Mr. Olson, what did Defendant Roberts say in response?

6    A.  I can't remember verbatim what he said.

7    Q.  And I think you said this earlier, but were your

8    negotiations with Tyson successful this year in 2014?

9    A.  No.

10   Q.  I would like to turn to your negotiations with George's.

11   Who at George's did you meet with?

12   A.  Ric Blake.

13   Q.  And what was the manner -- where did that meeting occur?

14   A.  I can't recall that meeting.  I recall the meeting.  I

15   can't recall the location of the meeting.

16   Q.  Were you in person or over the phone or by e-mail?

17   A.  In person.

18   Q.  What did Mr. Blake tell you at that meeting?

19   A.  Very similar response, that although we had worked on

20   creative ideas in the past, there wasn't any movement this

21   year.

22   Q.  And what did you tell him?

23        MR. BELLER:  Objection, hearsay.

24        THE COURT:  Overruled.

25   A.  I said the same thing, that this was a huge impact to our

James Olson - Direct

1  system, and we were hoping we could find some alternatives for

2  some discounts that would help offset the increase.

3  *BY MS. SWEENEY:*

4  Q.  And what was his response?

5  A.  I don't remember verbatim what he said.

6  Q.  Were you -- what was the ultimate result of that meeting

7  with Mr. Blake at George's?

8  A.  There was no new outcome, so there wasn't any real result

9  other than not having a result.

10  Q.  And by not having a result, was HMC able to get the

11  additional discount that year from George's?

12  A.  No.

13  Q.  How about from Tyson's?

14  A.  No.

15  Q.  When you negotiated with Defendant Roberts and Defendant

16  Blake, did you negotiate with them together?

17  A.  No.

18  Q.  Why not?

19  A.  I don't think that's how you do business.

20  Q.  Can you explain a little further?

21  A.  Yeah.  Whatever -- you know, if one of our business

22  partners had offered something, I wouldn't share that with the

23  other.  That's not -- in my system of operating, that's not

24  appropriate behavior.  I think that would be unfair to one

25  person that gave us a discount to share that with somebody

James Olson - Direct

1    else.

2    *Q.*  So did you share the fact of the discount with one company

3    with the other company in 2014?

4    *A.*  No.

5    *Q.*  Did you share the fact of the discount from one company

6    with another company prior to 2014?

7    *A.*  Never.

8    *Q.*  How about after 2014?

9    *A.*  No.

10   *Q.*  Did you want Defendant Roberts and Defendant Blake to be

11   talking about prices?

12          *MS. JOHNSON:*  Objection.

13          *MR. BELLER:*  Objection.

14          *MR. McLOUGHLIN:*  Objection.

15          *THE COURT:*  I am not sure what the question means, so

16   I will sustain it as being vague.

17   *BY MS. SWEENEY:*

18   *Q.*  When you were in the negotiation and completing the

19   negotiation in 2014, did you expect Defendants Roberts and

20   Blake to talk about prices?

21          *MR. McLOUGHLIN:*  Your Honor, objection with respect to

22   the witness' expectation.  The crazy point is his expectation

23   is purely idiosyncratic, it is personal, and it is not relevant

24   to the issues the jury has to decide.  But to the extent it

25   might be, it's substituting his opinion for that of the jury.

James Olson - Direct

1        MR. BELLER:  Thank you, Your Honor.  And I object

2  under all of those grounds in addition to relevance as to

3  Mr. Fries and Claxton Poultry.

4        THE COURT:  Objections will be overruled.  The witness

5  can answer.

6  A.  Can you state it again?

7  BY MS. SWEENEY:

8  Q.  Sure.  So in your negotiations in 2014 or after, did you

9  expect Defendants Blake and Roberts to talk about prices?

10  A.  No.

11  Q.  Why not?

12        MR. McLOUGHLIN:  Your Honor, same objection and an

13  additional objection as to Mr. Lovette.

14        MR. GILLEN:  And I object.  It assumes facts not in

15  evidence.

16        THE COURT:  Objections will be overruled.  He may

17  answer.

18  BY MS. SWEENEY:

19  Q.  Why not?

20  A.  I expect both suppliers to be working earnestly to give us

21  their best price, and I think for them to share their

22  information ends up not having as much of a free market.

23        MR. McLOUGHLIN:  Objection, move to strike.

24        THE COURT:  That will be denied.

25  BY MS. SWEENEY:

James Olson - Direct

1    Q.  When you talked -- can you explain a little further what

2    you meant by not a free market?

3            MR. McLOUGHLIN:  Same objection, Your Honor, as to

4    this witness offering opinions about what a free market is.

5    It's a legal conclusion for Your Honor to instruct the jury and

6    for the jurors to decide.

7            THE COURT:  I am going to sustain that objection.

8    BY MS. SWEENEY:

9    Q.  Coming out of those meetings, what was your reaction,

10   Mr. Olson?

11   A.  I -- I was -- I think I would term it I was very

12   questioning what was going on.

13   Q.  What did you mean by you were very questioning?

14           MR. McLOUGHLIN:  Objection, Your Honor.  May we be

15   heard over the microphones?

16           THE COURT:  Yes.

17      (At the bench:)

18           THE COURT:  Go ahead, Mr. McLoughlin.

19           MR. McLOUGHLIN:  Your Honor, we know from the 302 that

20   what the witness is about to say is he suspected there was

21   collusion, although he did not know for sure.  That is his

22   speculation.  It is prejudicial.  It does not have a foundation

23   in fact.  It is based on his conversation that they wouldn't

24   give him a discount as to terms that are not at issue in this

25   case which is discounts on freight or something else.  It

James Olson - Direct

1    doesn't even go to the RSCS price.  And for him to be allowed

2    to speculate that there was collusion on an ancillary contract

3    that is not the subject of this case is, A, prejudicial, B,

4    irrelevant, and it's hearsay.  And it would ultimately result

5    in an opinion that is based or should be based on Rule 702, not

6    701.

7         THE COURT:  Let me just ask one thing before I give

8    Mr. Tubach an opportunity.  I think that was him.

9         MR. GILLEN:  Mr. Gillen.

10        THE COURT:  Yeah, make sure you identify yourselves

11   when we speak.

12        It's not clear to me from the witness' testimony what

13   discounts he was negotiating.  Of course, as Mr. McLoughlin

14   alluded to, the witness had testified that he didn't have any

15   ability to change the prices of the chicken, so the discounts

16   are a bit of a mystery to me.

17        But perhaps Ms. Sweeney, you could explain what you

18   anticipate that the witness would be talking about in terms of

19   these discounts and then why that would be relevant to any

20   ability he would have to form an opinion about collusion.

21        MS. SWEENEY:  Yes, Your Honor.  Can you hear me?

22        THE COURT:  Yes.

23        MS. SWEENEY:  Great.  So this morning it might have

24   been a function of the lunch break, but this morning he

25   described that he would engage in these negotiations on

James Olson - Direct

1    price-related terms, so on the price of -- the pricing terms

2    and there are a few others that would ultimately end up giving

3    the HMC franchise a discount in prices.

4         THE COURT:  As to what?

5         MS. SWEENEY:  As to the prices that his franchises --

6    so the 200 some stores that KFC owns, the price they would pay

7    chicken suppliers for chicken.  So the testimony that he has

8    provided and is about to provide goes to the overarching scheme

9    the government has charged and the united front that the

10   defendants are putting up in these 2014 contract negotiations.

11        THE COURT:  Right.  But what testimony do you

12   anticipate from Mr. Olson regarding his -- we could call it a

13   conclusion.  Is he going to draw some conclusion that there was

14   some type of collusion among chicken suppliers or at least the

15   two that he was dealing with?

16        MS. SWEENEY:  No, Your Honor.  He will not draw a

17   conclusion.  In our conversations with him, he has not drawn a

18   conclusion.  He is stating his state of mind at the time that

19   he had suspicions, but that he wasn't -- he never ran them down

20   and he wasn't sure if they were true, but they were suspicions

21   in his mind.

22        THE COURT:  Okay.  But you intend to elicit and you

23   think that he will say that he had suspicions?

24        MS. SWEENEY:  I believe, yes, we intend to elicit that

25   he had suspicions and also that he was not sure of whether or

James Olson - Direct

1    not the suspicions were true, so it will be clear it goes to

2    his state of mind.

3              THE COURT:  Why would his state of mind about

4    something that might otherwise be prejudicial and irrelevant be

5    somehow relevant?

6              MS. SWEENEY:  Your Honor, as you stated in your motion

7    in limine, ECF 604, that the witness' state of mind that

8    something may be wrong or improper may be probative to the

9    jury's determination of the elements of Count One.

10             THE COURT:  True, but it can't be just suspicion about

11   something that the witness really doesn't know about.

12             Mr. Gillen, I am going to give you a chance to weigh

13   in because I think that maybe you had said something.  Go

14   ahead.

15             MR. GILLEN:  Yes, Your Honor.  First of all, the

16   testimony should be stricken for the following reasons:  No. 1,

17   this testimony is being elicited concerning an alleged

18   negotiation over some sort of, as he said, quick pay or quick

19   discount pay on items he has explicitly admitted that he was

20   not a part and could not be a part of the formal negotiations

21   which forms the basis for the charges in this indictment.

22   That's entirely left up to the RSCS.  That he was not a party

23   to that, he was not a party to any of those negotiations.  As a

24   matter of fact, I think that franchisees such as Mr. Olson are

25   prohibited from attempting to negotiate separately around RSCS

1    in terms of pricing.

2         So what we have here is we have him saying I wanted to

3    get a better deal from Tyson and from Mr. Roberts, Mr. Blake.

4    I wanted to get a better deal from them and I wanted it so that

5    I could get the financing, as he described, financing terms

6    that had been negotiated in the past.  That's No. 1.

7         No. 2 is that he is saying that he was involved in

8    these activities or these meetings in October and November

9    subsequent to the series of meetings and conversations that

10   Tyson -- that Mr. Roberts and Mr. Blake would have had with

11   RSCS representatives.  So the party is over by that time.

12   Whether the contract had been signed, ultimately was signed in

13   December is not the point.

14        No. 3, the question that I find to be highly improper

15   by the government is did you expect Mr. Roberts and Mr. Blake

16   not to talk or discuss these matters.  And there is no

17   evidence, I find no evidence whatsoever that the government is

18   going to be able to prove any sort of conversation by Mr. Blake

19   and Mr. Roberts about whether they are going to give a discount

20   to Harman which is not a part of this indictment.  This is a

21   rabbit hole the government wants us to chase down so that they

22   can continue to, in my mind, mislead this jury about the

23   central issues.

24             THE COURT:  All right.  Ms. Sweeney, anything else?

25             MS. SWEENEY:  In responding to Mr. Gillen, I believe

James Olson - Direct

1    it was -- this evidence is highly probative of the charged

2    conspiracy which is an overarching conspiracy by the defendants

3    to discuss prices and is one example of the united front that

4    the defendants posed in 2014 in negotiation for chicken prices.

5            THE COURT:  My ruling is as follows.  The fact that

6    the two suppliers at issue were -- decided not to negotiate on

7    prices, this isn't price for chicken.  These are things other

8    than the price for chicken.  But to an owner, a franchise owner

9    such as HMC, a dollar is a dollar, so they would be interested

10   in conducting those negotiations.  I think that that could be

11   some evidence of what could be called a united front.

12           However, Mr. Olson's speculation about what that may

13   mean and his suspicions, I haven't heard any foundation for him

14   having that, particularly since he is just talking to two

15   different people as far as I can tell.  And as a result, that's

16   improper opinion evidence and I will not allow the government

17   to ask a question that it anticipates would elicit that answer.

18           MS. JOHNSON:  Your Honor, Wendy Johnson for Mr. Blake.

19           I just want to point out to the Court -- and I thank

20   you for the ruling -- but it seems that the government is

21   conflating the negotiations, if they happened, of the separate

22   issues with what the testimony has shown already, which the

23   witness has already stated he was not involved and could not be

24   involved with the RSCS negotiations.  That's the testimony.

25   And my fear is that any further testimony about these

James Olson - Direct

1    extraneous negotiations for HMC independently would be

2    confusing to the jury and prejudicial to the defendants because

3    they will assume, and rightfully so, that it could be conflated

4    and could be the same negotiations as the RSCS negotiations.

5           THE COURT:  I don't think so, especially given the

6    fact that cross-examination can make that distinction, but I

7    don't think that the distinction will -- is subject to such

8    confusion that the jury won't be able to understand it.

9           Thank you.

10          MR. McLOUGHLIN:  Your Honor, Jim McLoughlin for

11   Mr. Lovette.  Mr. Lovette would join in the objection of

12   Mr. Blake's counsel.

13          MR. TUBACH:  Michael Tubach.  I will join in that too.

14          MS. HENRY:  Roxann Henry.  I would join that again and

15   also point out that it's irrelevant to my client and

16   prejudicial.

17          MR. LAVINE:  Your Honor, Bryan Lavine.  I also join in

18   that objection, please.

19          MR. BELLER:  This is David Beller on behalf of Mikell

20   Fries.  I also join in that objection and note an ongoing

21   continuing objection as to hearsay in that none of these

22   negotiations were actually included in the government's

23   801(d)(2)(E) filings, the ruling by the Court, and ultimately

24   as testified by this witness, this has nothing to do with my

25   client.  So I persist, respectfully, that all of this

1    information is hearsay and is prejudicial as to my client.

2    Thank you.

3            MR. FELDBERG:  Michael Feldberg for Mr. Austin.  I

4    join the last objection from Mr. Beller.

5            MR. LAVINE:  Your Honor, Bryan Lavine.  I also join in

6    that objection.

7            THE COURT:  Okay.  The last three objections will each

8    be overruled.  This is a charged conspiracy.  It doesn't really

9    matter whether we are talking about a particular defendant's

10   client because of the charge of the conspiracy.  It wouldn't

11   necessarily matter otherwise because it may be relevant to some

12   defendants, not necessarily others.  As to all the other

13   objections, each of those will be overruled.  All right.  Thank

14   you.

15           MS. JOHNSON:  Mr. Johnson for Mr. Blake, we do join in

16   the last objections.

17           THE COURT:  Okay.  That will be denied for the same

18   reason.

19           MR. McLOUGHLIN:  As does Mr. Lovette, Your Honor.

20           MR. TUBACH:  Michael Tubach, I hate to keep doing

21   this.  Can we have one objection count for all?

22           THE COURT:  We can.  The defendants were supposed to

23   get back to me whether they had some type of an agreement.

24   They never did.  So that needs to be taken care of because this

25   is going on way too long.  The jury is going to get bored out

James Olson - Direct

1    of its mind.

2            Thank you.

3        (In open court:)

4            The objection will be sustained in part and overruled

5    in part.

6            MS. SWEENEY:  I am sorry, Your Honor.  I didn't hear

7    what you said.

8            THE COURT:  The objection will be sustained in part

9    and overruled in part.

10   BY MS. SWEENEY:

11   Q.  Mr. Olson, what eventually happened at the end of your

12   negotiations in 2014 with the two chicken suppliers?  What

13   eventually happened?

14           MR. McLOUGHLIN:  Objection to form.

15           THE COURT:  Mr. McLoughlin, did you make that

16   objection?

17           MR. McLOUGHLIN:  Yes.

18           THE COURT:  Maybe we can get the microphone positioned

19   a little closer to you because I can just barely hear when you

20   do object.  What was the objection?

21           MR. McLOUGHLIN:  Objection to form, foundation, what

22   happened.

23           THE COURT:  Overruled.

24   A.  There were no discounts allowed for Harmon Management

25   Corporation.  And Harman Management Corporation abided by the

James Olson - Direct

1    pricing that had been negotiated by the RSCS.

2    *BY MS. SWEENEY:*

3    *Q.*   And what was that pricing?

4    *A.*   There was different pricing from different suppliers.

5    *Q.*   Can you give a ball park of the pricing?

6          *MS. JOHNSON:*   Objection, Your Honor.  A ball park,

7    it's irrelevant.  If the witness can testify to the specifics,

8    we are fine with that, but a ball park is irrelevant.

9          *THE COURT:*   It's not irrelevant, but it is vague.  I

10   will sustain it on that ground.

11   *BY MS. SWEENEY:*

12   *Q.*   Mr. Olson, do you recall what the price increase was from

13   the suppliers that the HMC-owned KFC restaurants were

14   purchasing to?

15   *A.*   One was a little under 10 cents a pound and one was a

16   little over 10 cents a pound.

17         *MS. SWEENEY:*   Your Honor, may I have a minute to

18   confer with my colleagues?

19         *THE COURT:*   You may.

20   *BY MS. SWEENEY:*

21   *Q.*   And Mr. Olson, just to clarify your last answer, was the

22   final price a little bit over and a little bit under 10 cents a

23   pound?

24         *MS. JOHNSON:*   Objection, Your Honor.  It's unclear

25   what the final price is.  We are now talking about two

James Olson - Direct

1  different negotiations and it's unclear, so I would object for

2  those reasons.

3      THE COURT:  Overruled.

4  BY MS. SWEENEY:

5  Q.  So Mr. Olson, the final RSCS contract price that HMC-owned

6  KFC restaurants purchasing chicken from, you mentioned one was

7  a little over 10 cents and one was a little under 10 cents.

8  Were those the final negotiated prices around that 10-cent

9  mark?

10 A.  That was the negotiated increase.

11 Q.  The negotiated increase you said?

12 A.  Yes, increase.

13 Q.  Mr. Olson, in your time at HMC, did you ever negotiate with

14 chicken suppliers jointly?

15 A.  Never.

16 Q.  At any point in 2012 or 2016 did you ever ask suppliers to

17 coordinate their pricing?

18 A.  No.

19 Q.  At any point in that time period did you ever ask the

20 chicken suppliers to coordinate on how high price increases, if

21 there were price increases, should be?

22 A.  No.

23      MR. McLOUGHLIN:  Objection, Your Honor.  We have

24 already established this witness is on the board of directors.

25 He did not negotiate pricing in any of those years with any of

James Olson - Cross

1  these suppliers except possibly two suppliers with a discount

2  particular to Harman.   Any question about what a price increase

3  would be with regard to RSCS, which this question does, is

4  double hearsay and outside the scope of his knowledge and it

5  lacks a foundation.

6       *THE COURT:*   I will sustain the objection.   He already

7  testified that he never negotiated pricing for chicken.

8       *MS. SWEENEY:*   The government has no further questions

9  for this witness.

10      *THE COURT:*   Thank you.

11      Cross-examination?

12      Mr. Gillen, go ahead.

13                          **CROSS-EXAMINATION**

14  *BY MR. GILLEN:*

15  *Q.*  Good afternoon, Mr. Olson.

16  *A.*  Hello.

17  *Q.*  My name is Craig Gillen.   I represent Mr. Roberts.   I have

18  a few questions to ask you.

19      First of all, let's go back.   You mentioned the market

20  dynamics in 2014, correct?

21  *A.*  Yes.

22  *Q.*  And the market dynamics in 2014 was such that there was a

23  concern by KFC and RSCS about suppliers changing from small

24  bird plants to big bird plants, correct?

25  *A.*  Yes.

James Olson - Cross

1   Q.  And the concern there was -- I believe you testified that

2   the concern was that if a supplier can make more money per

3   pound on a big bird plant, then that would drive the incentive.

4   The market incentive would be for them to transfer that small

5   bird plant to a big bird plant, correct?

6   A.  It could.

7   Q.  I am sorry?

8   A.  It could.

9   Q.  And the worry and the concern inside of KFC was that --

10          MS. SWEENEY:  Objection, Your Honor, foundation.

11          THE COURT:  Well, let's hear the question first.

12  BY MR. GILLEN:

13  Q.  Your worry and concern was that in the event that there was

14  this trend of transferring small bird to big bird plants, if

15  that continued it could have an absolutely devastating effect

16  on your business, KFC business, right?

17  A.  Yes.

18  Q.  Okay.  And so now we've got the dynamic set.  We have a

19  disaster on Mother's Day, correct?

20  A.  Yes.

21  Q.  And when I mean disaster, there are, as you testified,

22  literally some KFC stores running out of chicken on Mother's

23  Day of all days, right?

24  A.  Yes.

25  Q.  And as we indicated, Mother's Day is the day that

70

James Olson - Cross

1   historically for KFC that is the biggest sales day of the year,
2   correct?
3   A.   Yes.
4   Q.   And so that in the spring of 2014 continued to set off
5   alarm bells within KFC that we have potentially a big supply
6   problem, correct?
7   A.   Yes.
8   Q.   And that is one of the reasons that, of course, within KFC
9   you knew that there were going to be price increases because of
10  supply and demand, right?
11  A.   Not necessarily.
12  Q.   Oh, you didn't know that.  Well, did you not suspect that
13  when people can make more money selling big bird than a small
14  bird, that that might create less of a supply on the
15  marketplace?
16          MS. SWEENEY:  Object, Your Honor, as to foundation.
17          THE COURT:  Overruled.
18  A.   Could you ask that again, please?
19  BY MR. GILLEN:
20  Q.   Did you understand that if somebody has got -- can
21  transform a small bird to a big bird plant, that that's going
22  to create a supply problem in the small bird production,
23  correct?
24  A.   Yes.
25  Q.   You have got to answer yes or no.

James Olson - Cross

1   A.   Yes.

2   Q.   I am sorry, it's difficult to hear.  Thank you.

3          Now, when you have a lower supply -- and you have been

4   in business for how many years?

5   A.   45 years.

6   Q.   And you know supply and demand.  When you have a higher

7   demand and you've got a supply problem, what happens?  Prices

8   go up, right?

9   A.   They could.

10  Q.   So prices go up when you've got a problem with supply and

11  demand.  And you saw in the Mother's Day period there is a

12  potential big problem that we've got to deal with, right?

13  A.   Yes.

14  Q.   Now, one of the ways that internally -- and now, you're not

15  only dealing from the Harman company on the -- for the KFC

16  franchise within that entity, but you're also on the board,

17  correct?

18  A.   Correct.

19  Q.   At that time were you the chairman of the board for RSCS?

20  A.   I don't recall.

21  Q.   But you were on the board.  You do remember that.

22  A.   Yes.

23  Q.   So you were there and watching kind of what was happening,

24  what the strategy was, correct?

25  A.   Yes.

72

James Olson - Cross

1  Q.  And one of the things that KFC wanted to do because they

2  understood the problems of, you know, you don't want to run out

3  of chicken every day like you did on Mother's Day, do you?

4  A.  No.

5  Q.  So what you want to do is you want to try to stabilize the

6  marketplace as best you can, correct?

7  A.  Or change the marketplace.

8  Q.  Well, or change it for the better for you, correct?

9  A.  Yes.

10  Q.  But in order to work to address the risk that you had about

11  the problem with supply and demand, internally KFC is going, we

12  need to have -- not like we usually do a one-year contract.  We

13  need a three-year commitment from these people, right?

14  A.  I am not sure where that initiated.

15  Q.  Well, it initiated from KFC, right?

16  A.  I don't know.

17  Q.  Well, it initiated -- you don't know who suggested that

18  there be a three-year contract rather than a one-year contract?

19  A.  I do not.

20  Q.  You were on the board of RSCS in the summer of 2014, and

21  you're telling this jury that you don't know who came up with

22  the idea for a three-year contract.

23        MS. SWEENEY:  Object, Your Honor, asked and answered.

24  BY MR. GILLEN:

25  Q.  Was it the suppliers or --

James Olson - Cross

1          THE COURT:  Mr. Gillen, you've got to wait for me to

2     rule on objections.

3          MR. GILLEN:  I apologize, Your Honor.

4          THE COURT:  The objection is overruled.  Now you can

5     ask another question.

6          MR. GILLEN:  Thank you.

7     BY MR. GILLEN:

8     Q.  Now, what we have here is you're telling us as a member of

9     the board of RSCS in the summer of 2014 you don't know whether

10    it was KFC or whether it was the suppliers that came up with

11    the idea of having a three-year contract?

12    A.  Or if it was me.

13    Q.  I am just asking, you or KFC or RSCS or the suppliers on

14    one side, who was it?

15    A.  I don't know.

16    Q.  You have forgotten or you just never knew?

17    A.  I don't know.

18    Q.  Okay.  So now we've got the scenario set up, and I think

19    the way that you described it in your testimony was that the

20    franchisees, they were going to have to accept the contracts

21    because of what was happening in the market.  Do you remember

22    that phrase you used, what was happening in the market?

23    A.  Yeah.

24    Q.  So when you are talking about having to accept the prices

25    that were put on the -- through the negotiations of the

74

James Olson - Cross

1   contract through RSCS, that was a result of what was happening

2   in the market, correct?

3   A.  That was what was told to me as a director.

4   Q.  And being told to you as the director, the people telling

5   you were the people negotiating on behalf of RSCS, correct?

6   A.  Yes.

7   Q.  Let's go over some of those names.  Now, in the summer of

8   2014, there was a man by the name of Pete Suerken, correct?

9   A.  Yes.

10  Q.  Now, Pete Suerken, what was his position at RSCS?

11  A.  He had different positions over the years.  He may have

12  been over purchasing at that time.

13  Q.  Well, he was the No. 1 negotiator in the summer of 2014 for

14  the KFC contracts for 2015, correct?

15       MS. SWEENEY:  Objection as to foundation.

16  BY MR. GILLEN:

17  Q.  Is that correct or not?

18       THE COURT:  Mr. Gillen, once again, you have got to

19  let me rule on objections.  Overruled.

20       Go ahead.

21  BY MR. GILLEN:

22  Q.  Isn't it correct that Pete Suerken was in charge of the

23  negotiations for RSCS that summer of 2014 through the fall of

24  2014 negotiating the KFC 2015 contract?

25  A.  I can't say for a fact I know that.

James Olson - Cross

1   Q.  Well, do you know that Pete Suerken -- who was?  Who do you

2   think was in charge, Mr. Olson?

3   A.  There were various people involved at the time.

4   Q.  Well, we've got Pete Suerken and you know that he was

5   involved, correct?

6   A.  Yes.

7   Q.  And then we've got Rich Eddington.  Do you know who Rich

8   Eddington is?

9   A.  I do.

10  Q.  Tell the jury who Rich Eddington is.

11  A.  He was involved on the purchasing team for chicken.

12  Q.  And Rich Eddington was someone who had come over -- in the

13  summer of 2014, he had come over from Mar-Jac over to work for

14  RSCS, correct?

15  A.  I don't know where he came from.

16  Q.  You do not know where Mr. Eddington came from.

17  A.  Yes.

18  Q.  Do you know when he came to RSCS?

19  A.  I believe it was the spring of '14, approximately.

20  Q.  Well, it was in the summer -- was he -- he was involved in

21  the KFC negotiations?

22  A.  Yes.

23  Q.  And then there was Mr. Lewis, correct?

24  A.  Yes.

25  Q.  So we have got three people there.  And what they would do

James Olson - Cross

1   is they would send out -- they communicated with the suppliers,

2   sometimes collectively, through e-mails, but would meet with

3   them individually, correct?

4   A.   That's my understanding, yes.

5   Q.   And there were different meetings and different e-mails set

6   up.  The one thing that we can be sure of is that you were not

7   in a single one of those meetings, were you?

8   A.   No.

9   Q.   So when we are talking about the negotiations for the KFC

10  2015 contract, we can be sure that you did not attend a single

11  meeting with a supplier; isn't that right?

12  A.   Yes, that's correct.

13  Q.   We can also be sure that when we have the e-mails

14  concerning communications back from the suppliers to RSCS and

15  RSCS back to the suppliers, that you were not copied or cc'd on

16  a single one of those e-mails, were you?

17  A.   I can't recall any e-mails or correspondence.

18  Q.   And when the proposal for a bid was sent out by RSCS asking

19  the supplier to submit their numbers, you didn't do that, did

20  you?

21  A.   No.

22  Q.   And when they responded to the request from RSCS for a

23  proposal for KFC, they didn't send it to you, did they?

24  A.   No.

25  Q.   As a matter of fact, is there any meeting or e-mail or any

James Olson - Cross

1  kind of document or proposal that was sent to you at all in the

2  summer of 2014 that had anything to do with -- from the

3  suppliers about this contract?

4  *A.*  No.  That would be inappropriate.

5  *Q.*  As a matter of fact, you say the word it would be

6  inappropriate.  Let's talk about that.  And it would be

7  inappropriate for you, Mr. Olson, to communicate directly with

8  any of the suppliers about pricing because that would be in

9  violation of your membership with the RSCS; isn't that right?

10 *A.*  I am unclear on the question.

11 *Q.*  Well, I will clarify it.

12         You said it would be inappropriate.  It would be

13 inappropriate for you as a franchisee to try to negotiate

14 separate and apart from RSCS a separate pricing for the KFC

15 contracts in 2015; isn't that right?

16 *A.*  Are you asking about the discounts?

17 *Q.*  I am asking about the contract.  We are talking in this

18 case about the contract, the KFC contract for 2015, okay?

19 *A.*  Okay.

20 *Q.*  It would be inappropriate for you as a franchisee to

21 attempt to go around the corner, scoot around the corner and

22 bypass RSCS and try to negotiate separately with any of the

23 suppliers on pricing; isn't that right?

24 *A.*  On the base contract that they signed, absolutely correct.

25 *Q.*  I'm not saying base -- the contract about the pricing for

James Olson - Cross

1    the chicken for three years.  That's what I am talking about.

2    A.   Okay.

3    Q.   And it would be inappropriate for you to engage in any

4    negotiations or try to circumvent RSCS in any way to try to

5    work a separate deal, the Harman Group as a franchisee; isn't

6    that right?

7    A.   I would say no because I think you're including the

8    discount conversations I had with your client.

9    Q.   No, I am talking about the contract that was signed that

10   KFC had for the -- this is about the 2015 pricing contract,

11   okay?  So when I ask you a question, keep in mind I am asking

12   you about the pricing contract, all right?

13   A.   Okay.

14   Q.   It would be inappropriate for you as a franchisee to try to

15   go around the corner and try to circumvent RSCS and try and

16   negotiate pricing on the contract separately, wouldn't it?

17   A.   In my definition of my understanding of what you're asking

18   me, absolutely correct.

19   Q.   Thank you.  And so what happened is that there were

20   negotiations on the contract that went out, and then there were

21   meetings and discussions about what the terms would be with

22   RSCS and the respective suppliers, correct?

23   A.   With me?

24   Q.   No, not with you.  RSCS met with and communicated with the

25   various suppliers to make sure that they would work out

James Olson - Cross

1  whatever deal they had individually with those suppliers,

2  correct?

3  A.   Yes.

4  Q.   And on the pricing you were not involved in that at all.

5  A.   Correct.

6  Q.   Correct?  Now, what you're telling us is that in October,

7  now, the second wave -- do you even know when the suppliers

8  sent in their bids for 2014?

9  A.   I believe it was August or September.

10  Q.   Do you know the dates in August?

11  A.   No, I do not.

12  Q.   So you are unaware of the dates that RSCS actually asked

13  people to submit their pricing bids, correct?

14  A.   I do not know the date.

15  Q.   Well, then can you tell us the date of what the second wave

16  would be or the follow-up for proposal?  Do you know when that

17  was?

18  A.   No.

19  Q.   But what you do know is that your meeting, informal dinner

20  that you had with Mr. Roberts, that was either in October or

21  November, right?

22  A.   Yes.

23  Q.   And by that time the various suppliers had met with and

24  discussed with RSCS kind of what the terms would be for each

25  one of them; isn't that right?

James Olson - Cross

1    A.   Correct.

2    Q.   So what we had is by the time that you have dinner with

3    Mr. Roberts, that the Tyson position and virtually everybody's

4    position regarding what the pricing contract was going to be

5    with KFC, that those terms had already been agreed upon, right?

6    A.   I don't think they were agreed upon until December.

7    Q.   Formally signed in December, but they had been agreed upon,

8    right?

9    A.   I don't know that.

10   Q.   Well, you know how -- you tell me how it works in the

11   chicken business.  When you sit there and you have a

12   negotiation and then you say -- don't you say to somebody,

13   okay.  All right.  We are good with these terms.  And those are

14   the handshake deals that you have with folks.  And then, you

15   know, you get the lawyers to figure out the documents that are

16   signed in December, right?

17   A.   Okay.

18   Q.   Right?  You are in the chicken business for all these

19   years.  Is that right or not?

20   A.   I don't know what being in the chicken business has to do

21   with it, but --

22   Q.   Well, we are talking about the chicken business.

23   A.   There is usually a time frame from anywhere from minutes to

24   days or weeks before a contract is signed.

25   Q.   In the chicken industry is it not common when you are

James Olson - Cross

1    working out and negotiating a deal that there is an agreement

2    where there is an agreement and a handshake deal, and then down

3    the road the terms have been typed up by the lawyers who might

4    do it and it gets signed in December, right?

5    A.   Sure.  There is going to be a time difference.

6    Q.   Because in this industry a handshake means a lot, doesn't

7    it?

8    A.   It should.

9    Q.   And you've been in the chicken industry -- or you are not

10   now.  You are retired.  But all those years it meant a lot to

11   you, a handshake, didn't it?

12   A.   Yes.

13   Q.   Now, what you were then telling us about and telling the

14   jury about is not the KFC pricing contract.  It's something

15   quite different that had nothing to do with the terms of the

16   KFC pricing contract, right?

17   A.   Yes.

18   Q.   So what you're saying is that you had some side business

19   deal that you wanted to address with Mr. Roberts and Mr. Blake

20   respectively, right?

21   A.   Yes.

22   Q.   And when you were telling us about that, you weren't saying

23   that there was anything that you were trying to do to get Tyson

24   to come down off their profit margin or to do anything else on

25   that KFC 2015 pricing contract, right?

James Olson - Cross

1   A.   I couldn't.

2   Q.   You couldn't.  And you didn't, did you?

3   A.   No.

4   Q.   But what you were trying to do is you were trying to go

5   around and say, okay, look, you're a business partner.  We

6   value you.  We value you, Mr. Roberts.  We value you,

7   Mr. Blake.  Can't we do something on, you know, getting us some

8   financing terms, for example, right?

9   A.   Yes.

10  Q.   And that's a way where you're saying, well, you know, it

11  would be improper and we couldn't negotiate what the price is,

12  but we can talk about maybe how we are going to be paying for

13  that, right?

14  A.   Yes.

15  Q.   So when we talk about deals about pricing -- excuse me,

16  about financial terms, it's about, you know, let me give you an

17  example.  I don't know whether this is something you would do

18  or not.  To say, okay, gee, if we pay in 15 days, will you give

19  us 1 percent or 2 percent discount off; is that right?

20  A.   Yes.

21  Q.   And so that really didn't have anything to do with the

22  actual pricing of the contract.  This had to do with you're

23  trying to work out some benefits that would be, as you said,

24  creative that would be to the benefit of your company, correct?

25  A.   And to the supplier also.

James Olson - Cross

1   *Q.*   Right.  So, for example, like that, if somebody said, well,

2   you know, okay, what about -- I think you said quick pay or

3   something like that.  A quick pay would be a benefit to me if I

4   am selling you something.  If you say, I'll pay you in 15 days,

5   okay?  I'll cut off a percentage or two, right?  That way that

6   would be a benefit to you and a benefit to Tyson or any other

7   company, right?

8   *A.*   Yes.

9   *Q.*   So those are the sorts of things that you were trying to

10   work with when you were talking to Mr. Roberts and Mr. Blake,

11   correct?

12   *A.*   Correct.

13   *Q.*   Now, we have already established -- excuse me.  Strike

14   that.

15        You said on direct examination that you believe that

16   it was October or November when you and Mr. Roberts had dinner,

17   correct?

18   *A.*   Yes.

19   *Q.*   And so at that stage were you aware that the dust had

20   settled on the terms that had been reached with RSCS and, for

21   example, Tyson's?

22   *A.*   I don't believe I knew that until the first week of

23   December.

24   *Q.*   So your testimony is you didn't know that until December.

25        And again, what you said is I think when you testified

84

James Olson - Cross

1    about whether or not the franchises would take it, they took

2    the price increase, the market had dictated that and that you

3    had to accept that, right?

4    A.   Yes.

5    Q.   So your issue was you were hoping to get a little bit of an

6    extra.  It had nothing to do with the contract pricing.  You

7    were trying to get an extra deal that you would work to be

8    creative and to be imaginative so that you could get a benefit

9    for your company which would also benefit Tyson, correct?

10   A.   Correct.

11   Q.   So and what you then I believe said was that when you asked

12   Mr. Roberts about that, he just frankly said, "I can't do

13   anything.  I can't do anything for you on that," right?

14   A.   Yes.

15   Q.   So that's all he said to you.  When you were asking about

16   these creative things that you wanted as a side deal, he just

17   said, "I can't help you on that," right?

18   A.   That's correct.

19   Q.   And that's all he said, isn't it?

20   A.   I don't remember anything beyond that.

21   Q.   Okay.  And then -- and I assume you guys talked some more,

22   finished up your meal and went about your way; is that right?

23   A.   Yes.

24   Q.   Now, Mr. Blake wasn't at dinner with you all, was he?

25   A.   No.

85

James Olson - Cross

1   *Q.*  So you had dinner with Mr. Roberts and dinner with

2   Mr. Blake, correct?

3   *A.*  I can't recall if it was a dinner.

4   *Q.*  So you don't know whether with Mr. Blake if it was a dinner

5   or not.

6   *A.*  I can't recall that, no.

7   *Q.*  With Mr. Roberts you know it was.

8   *A.*  Yes.

9   *Q.*  So what you're saying is that both of them said, "Can't

10  help you," basically.

11         *MS. SWEENEY:*  Objection, hearsay.  He is eliciting

12  what the defendant said.  He represents Mr. Roberts.

13         *THE COURT:*  Well, it's true, but it's the same thing

14  that you elicited, so I will overrule the objection.

15  *BY MR. GILLEN:*

16  *Q.*  And that's basically "I can't help you this year,"

17  basically, right?

18  *A.*  Yes.

19         *MR. GILLEN:*  That's all I have, Your Honor.  Thank

20  you.

21         *THE COURT:*  Thank you, Mr. Gillen.

22         Mr. Tubach.

23         *MR. TUBACH:*  Thank you, Your Honor.  One moment.  With

24  the Court's permission I have some documents in a binder I

25  would hand up to the witness.

James Olson - Cross

| | |
|---|---|
| 1 | *THE COURT:*  You can hand them to Mr. Keech.  He will |
| 2 | hand them to the witness. |
| 3 | **CROSS-EXAMINATION** |
| 4 | *BY MR. TUBACH:* |
| 5 | *Q.*  Mr. Olson, I have some documents there I may or may not |
| 6 | show you.  I will direct you to the tab when I want to show |
| 7 | them to you, okay? |
| 8 | *A.*  Sure. |
| 9 | *Q.*  My name is Michael Tubach.  I represent Mr. Penn.  I have |
| 10 | just a couple questions for you. |
| 11 | *A.*  Okay. |
| 12 | *Q.*  You testified earlier that there was a potential for small |
| 13 | bird producers to move to big bird production, correct? |
| 14 | *A.*  Yes. |
| 15 | *Q.*  You knew, though, in fact, that that just wasn't a |
| 16 | potential.  That in fact had been happening for at least 10 |
| 17 | years in the chicken business prior to 2014, right? |
| 18 | *A.*  Yes. |
| 19 | *Q.*  And, in fact, you saw documents in 2014 that showed that |
| 20 | from 40 small bird producers it had got down to 30 between 2005 |
| 21 | and 2014, right? |
| 22 | *A.*  There had been consolidation. |
| 23 | *Q.*  Well, not just consolidation, but the number of small bird |
| 24 | plants had changed between 2005 and 2014, right? |
| 25 | *A.*  That's correct. |

James Olson - Cross

1   Q.  And that number had gone down from about 40 to about 30,

2   correct?

3   A.  That sounds reasonable.

4   Q.  You talked earlier also about a three-year deal and that

5   this was basically something new that was being negotiated in

6   2014 for 2015, '16 and '17, right?

7   A.  Yes.

8   Q.  Had you ever negotiated -- or you didn't, but had RSCS ever

9   negotiated a three-year deal prior to 2014?

10  A.  Not to my knowledge until before 1996.  If it happened, it

11  happened then.

12  Q.  That was historic, right?

13  A.  Yes.

14  Q.  And a three-year deal, you testified earlier that meant

15  that you were stuck with that price, right?

16  A.  Yes.

17  Q.  That, of course, also meant that the suppliers were stuck

18  with supplying small bird for those three years, right?

19  A.  Correct.

20  Q.  They were committed to supplying the volume that they had

21  contracted to supply for that entire three-year period, right?

22  A.  Which was the reason we agreed to the three years.

23  Q.  Well, it's not just what you agreed to.  In fact, wasn't it

24  you, sir, who suggested the three-year contract?

25  A.  I made a suggestion of that, yes.

James Olson - Cross

1    Q.  Let me show you a document.  We will go to our first

2    document.  Why don't you take a look at Exhibit -- it's Tab 5.

3              MR. TUBACH:  And we have copies for counsel.

4    BY MR. TUBACH:

5    Q.  It's Exhibit C-755.  Take a look at that and let me know

6    when you have had a chance to look at it.

7    A.  I recognize the document.

8    Q.  This is a document you created, correct?

9    A.  Yes.

10   Q.  And this is a two-page document in which you summarized --

11   you say at the top, How to Increase Supply Capacity for COB,

12   right?

13   A.  Correct.

14   Q.  And COB is short for chicken on the bone, correct?

15   A.  Yes.

16   Q.  Do you know why you created this document?

17   A.  I created this in June of 2014, early part of June.  It was

18   two, three weeks after Mother's Day when we had our historical

19   shortage.  And I was using my career's knowledge and my

20   knowledge of the relationships I had with suppliers and also my

21   knowledge from my role as a director to give the CEO of the

22   RSCS my ideas on possible solutions that would benefit the

23   system, and by the system I mean the franchise stores, and also

24   the suppliers.  I was looking for a solution that could work

25   out for both parties.

James Olson - Cross

1    Q.  Take a look, if you would, at Tab 4 which may give us an

2    exact date.

3         MR. TUBACH:  And that's for the record Defense Exhibit

4    C-754.

5         THE COURT:  Until an exhibit has been admitted, ladies

6    and gentlemen, it won't be shown to you.  Once it's admitted,

7    then as long as an attorney asks that it be so-called published

8    to you -- that's a technical term -- then it will be displayed

9    on your screen and on the public monitors too, okay?

10        Go ahead, Mr. Tubach.

11        MR. TUBACH:  Thank you, Your Honor.

12   BY MR. TUBACH:

13   Q.  Have you had a chance to take a look at Tab 4, Exhibit

14   C-754?

15   A.  I have.

16   Q.  I am only interested in the very first e-mail on the bottom

17   of the second page.  Have you had a chance to look at that?

18   A.  Yes.

19   Q.  That's an e-mail that you wrote on June 9th, 2014 to Steve

20   McCormick, right?

21   A.  That's what I just stated, yes.

22   Q.  And who is Mr. McCormick?

23   A.  He is the CEO of the RSCS.

24   Q.  And attached to that e-mail was the document we have just

25   been talking about which was C-755, correct?

90

James Olson - Cross

1    *A.*   Yes.

2              *MR. TUBACH:*   I move into evidence C-755 and C-754.

3              *MS. SWEENEY:*   I object as to hearsay and authenticity

4    of the documents, and in addition it is not relevant.

5              *THE COURT:*   And what is being displayed, 754 right

6    now?

7              *MR. TUBACH:*   What's on the screen is 754.  And I am

8    only moving into evidence the portion -- it's a longer e-mail,

9    but only that first part that's now up on the screen.  It goes

10   to the timing of the sending of the document.  That's not

11   non-hearsay.

12             *THE COURT:*   What's the government's objection to 755?

13             *MS. SWEENEY:*   I am sorry?

14             *THE COURT:*   To 755.

15             *MS. SWEENEY:*   755, Your Honor, is hearsay.  It's an

16   out-of-court statement repeated in court for the truth of the

17   matter.

18             *THE COURT:*   Objection will be overruled.  C-755 will

19   be admitted.

20             And what's the objection to C-754?

21             *MS. SWEENEY:*   So Your Honor, we would ask that the

22   defendant redact the portions that are not admitted into

23   evidence.

24             *MR. TUBACH:*   I will be happy to do that, Your Honor.

25             *THE COURT:*   Yeah, because Mr. Tubach, you are only

James Olson - Cross

1   moving the admission of what's being displayed on the screen

2   which I assume is a very -- I don't know what page that's on,

3   but just the -- a very --

4           MR. TUBACH:  It's the very bottom of the last page.

5   We will be happy to redact anything that is not currently --

6   well, was --

7           THE COURT:  What was, yes.

8           That objection will be overruled as well.  That

9   portion that was displayed of C-754 will be admitted.

10          MR. TUBACH:  Thank you, Your Honor.  I would ask to

11  publish Exhibit 755 to the jury.

12          THE COURT:  All right.  So ladies and gentlemen, this

13  is then, assuming that I grant that, which I do, then C-755

14  will be -- may be published to the jury.

15          MR. TUBACH:  Why don't we show C-755.

16  BY MR. TUBACH:

17  Q.  I would like to focus in on, Mr. Olson -- if we could pull

18  up specifically two -- the language that's the No. 2 and

19  highlight and bring that up.

20          Now, this is your statements to the CEO of RSCS about

21  how they could try to ameliorate this supply problem, right?

22  A.  Yes.

23  Q.  And so one of the things you said on 2a is, "As chicken

24  suppliers have consolidated their business and there are fewer

25  production lines for 2.8 birds, the capacity for flexibility is

James Olson - Cross

1    near non-existent," right?

2    A.   Yes.

3    Q.   And just so we have for the record here 2.8 birds, that is

4    shorthand, wasn't it, for 2.8-pound birds?

5    A.   Yes.

6    Q.   And that's just another way of saying small birds, right?

7    A.   Yes.

8    Q.   Let's look at 2b.  You were of the opinion in June of 2014

9    that there is, quote, "little or no reason for suppliers to add

10   new lines," right?

11   A.   To add any lines.

12   Q.   Yeah, to add new lines.  What that meant was add small bird

13   capacity, right?

14   A.   Right.

15   Q.   New lines meaning new lines within the plant that can

16   process small birds, right?

17   A.   You can't amortize a new line with a one-year contract.

18   Q.   So you anticipated my next question.  If you look at 2c,

19   your suggestion was, "The RSCS needs to change from year to

20   year contracts with the suppliers to longer term contracts

21   (3 years?) which will allow them to invest in new line

22   capacity," right?

23   A.   That's correct.

24   Q.   That was your recommendation to the CEO of RSCS, right?

25   A.   Yes.

James Olson - Cross

1   Q.  And the reason to recommend that was to assure that your

2   franchises would have enough chicken to sell and you would

3   never have another Mother's Day disaster, right?

4   A.  And beyond that point.

5   Q.  And beyond that.  Not just Mother's Day, but every day.

6   A.  To solve the short-term problem of supply.  It's to

7   hopefully solve the long-term problem by giving us three years

8   to see if we could migrate to bigger birds and to find out if

9   there were other solutions to the problem besides just those

10  two options.

11  Q.  And what you were proposing was that RSCS would, in fact,

12  basically pay for that additional capacity within the suppliers

13  and allow them to pay that off through higher prices amortizing

14  the cost of those new lines, right?

15  A.  That was a suggestion to look into, yes.

16  Q.  But RSCS, they didn't adopt a suggestion that the suppliers

17  could amortize the cost of those new lines by just increasing

18  their prices, right?

19  A.  Could you restate that?

20  Q.  Sure.  Your suggestion was that the suppliers ought to be

21  able to recoup their cost of investing in new lines by just

22  adding a little more to the price of chicken and pay it off

23  over time, right?

24  A.  It was a suggestion for the CEO, Steve McCormick, to look

25  into to see if that was something feasible and it was something

James Olson - Cross

1   that even the suppliers would be interested in.

2   Q.  But that was never done, was it?

3   A.  Not to my knowledge, no.

4   Q.  Now, you wrote this two-page document and sent it to

5   Mr. McCormick.  You did that as part of a whole process that

6   RSCS was going through in trying to make a strategic decision

7   about how to solve this supply problem, right?

8   A.  If you're -- are you referring specifically to another

9   party?

10  Q.  Well, yes.  I am asking specifically about the consulting

11  company.

12  A.  Yes, McKinsey was hired.  That was approved by the board of

13  directors.

14  Q.  And this was part of that process of hiring McKinsey and

15  having them conduct all this work, right?

16  A.  I don't know if this document had any bearing on that or

17  not.  I was never told that.

18  Q.  I am sorry?

19  A.  I was never told that.

20  Q.  You do recall that RSCS hired McKinsey & Company to help it

21  come up with ideas for solving a supply problem, right?

22  A.  Yes.

23  Q.  Do you recall when that was?

24  A.  I don't.

25  Q.  Take a look at what's Tab 2.  It's Defense Exhibit H-609.

95

James Olson - Cross

1   I will give you a chance to take a look at that.  Let me know

2   when you have had a chance to review it.

3            MS. SWEENEY:  Objection, Your Honor.  The document is

4   being published to the jury.

5            MR. TUBACH:  I didn't ask for that to happen.

6            THE COURT:  It can't be.  That was a mistake.

7            Go ahead, Mr. Tubach.

8            MR. TUBACH:  I am just waiting for the witness to

9   finish looking at the document, Your Honor.

10           THE COURT:  Sure.

11  A.  Do you want me to read the entire document?

12  BY MR. TUBACH:

13  Q.  No.  I am just asking if you recognize the document.

14  A.  I don't think I have ever seen it before.

15  Q.  Does that help refresh your memory, though, that on or

16  around June 3 of 2014 McKinsey & Company had been engaged by

17  RSCS to help it analyze this small bird supply problem?

18           MS. SWEENEY:  Objection, Your Honor, improper

19  questioning.  The witness said he didn't recognize the

20  document.

21           THE COURT:  Well, he hasn't answered whether it

22  refreshes his recollection.  That's the question.

23  BY MR. TUBACH:

24  Q.  Does that help refresh your recollection about roughly when

25  this happened?

James Olson - Cross

1    A.  I haven't read the whole document so I don't know if this

2    is like an RFP or if it's an actual contract that they were

3    going to enter into.

4    Q.  Fair enough.  Let's take a look at Tab-3, if you would.

5            MR. TUBACH:  This is for the record Defense Exhibit

6    H-610.

7    BY MR. TUBACH:

8    Q.  Again, I am only interested in the -- it's an e-mail

9    string.  I am only interested in the very last e-mail on the

10   very bottom e-mail on the very last page.

11   A.  On the last page?

12   Q.  Yeah, you don't need to read the whole thing.  That's an

13   e-mail from you to Mr. McCormick on June 5, right?

14   A.  Yes.

15   Q.  Do you see that?

16   A.  Yes.

17   Q.  A short e-mail, right?  That's June 5 of 2014.  In this

18   e-mail you are asking McCormick -- you are telling him that you

19   haven't heard from McKinsey yet; isn't that right?

20   A.  Yes.

21   Q.  He said, "Wasn't that supposed to happen prior to the

22   meeting on the 11th," right?

23   A.  Yes.

24   Q.  Do you recall sending this e-mail?

25   A.  No, I don't.

James Olson - Cross

1   Q.   Do you recall that McKinsey was supposed to contact you as

2   part of the process of McKinsey's retention and investigation

3   of this supply problem?

4   A.   I don't recall that specifically, but reading this e-mail

5   it makes me conclude that at some point someone said I was

6   going to be called.

7   Q.   And you said that the RSCS board approved the hiring of

8   McKinsey, right?

9   A.   Yes.

10  Q.   And you were on the board at the time, right?

11  A.   I was.

12  Q.   And did you approve that?

13  A.   Yes.

14  Q.   And how much did it cost to have McKinsey conduct the study

15  that they conducted?

16  A.   I don't recall.

17  Q.   Would you take a look back at Exhibit -- Tab 2 for you,

18  Exhibit H-609?  And I want to focus specifically on Page 4.

19          Before I ask you specifically about that page, I

20  wanted to ask you before RSCS hired McKinsey, were you familiar

21  with McKinsey & Company?

22  A.   Yes.

23  Q.   Had you worked with them before?

24  A.   No.

25  Q.   Had RSCS ever worked with them before?

James Olson - Cross

1   A.   I believe so.

2   Q.   Do you know when?

3   A.   I can't recall a date.

4   Q.   But you don't recall -- at least on the time that you were

5   serving on the RSCS board, you don't recall ever working with

6   McKinsey before?

7   A.   I don't have a specific memory, no.

8   Q.   So do you recall that -- and would it be fair to say that

9   McKinsey & Company is one of the premier consulting firms in

10  the country?

11  A.   Yes.

12  Q.   Perhaps the premier consulting firm?

13  A.   Possibly.

14  Q.   So looking now at Page 4, does that refresh your

15  recollection about the cost to RSCS of hiring McKinsey?  That

16  second full paragraph, it was about a million dollars, wasn't

17  it?

18          MS. SWEENEY:  Objection.

19          THE COURT:  That's an inappropriate comment.  He has

20  to look at the document and if it refreshes his memory, that's

21  fine.  You can't read from the document, Mr. Tubach.

22          MR. TUBACH:  I wasn't.

23          THE COURT:  You mentioned the number.  That's

24  inappropriate.  Go ahead.

25  A.   Yes, I have read it.

James Olson - Cross

1    *BY MR. TUBACH:*

2    Q.  Thank you.  Does that sound about right to you, that it

3    cost -- forget about the document now, that it was about a

4    million dollars?

5    A.  Yes.

6    Q.  Let me finish my sentence.  A million dollars that RSCS

7    spent to have McKinsey conduct this study, right?

8    A.  That's correct.

9    Q.  Was that unusual for RSCS to spend that kind of money

10    hiring a consultant?

11    A.  Yes.

12    Q.  And you were -- would you say you were relatively involved

13    in McKinsey's work over the following six weeks to prepare its

14    study?

15    A.  No, I wasn't involved.

16    Q.  You were not involved at all?

17    A.  Not that I recall.

18    Q.  Let's see if we can refresh your recollection.  Let's take

19    a look at Tab 6, if you would.

20        *MR. TUBACH:*  For the record, it's H-611.

21    *BY MR. TUBACH:*

22    Q.  This is an e-mail.  Do you recall receiving this e-mail

23    that's H-611?

24        *MS. SWEENEY:*  Objection, Your Honor.  He is showing

25    the document to refresh his recollection, so the process for

James Olson - Cross

1    refreshing recollection is just to ask if it refreshes his

2    recollection.

3            THE COURT:  I believe his question was whether he had

4    seen it.  He can answer that question.  Overruled.

5    A.  I am sure I saw it.  I am an addressee.

6    BY MR. TUBACH:

7    Q.  And do you recall that you were invited to a poultry

8    kickoff meeting with McKinsey for them to conduct their study

9    on around June 12th, 2014?

10   A.  I don't.

11   Q.  And looking at this document doesn't refresh your

12   recollection?

13   A.  No.

14   Q.  Who is Susan Adzick?

15   A.  She works with McLane Distribution Centers.

16   Q.  So you don't recall a meeting on June 12th at which

17   McKinsey, Young, RSCS, McLane and you were the only franchisee

18   representative participated in a kickoff meeting?

19   A.  I don't.

20   Q.  Do you recall participating in a second review meeting on

21   or about July 10th, 2014?

22   A.  No.

23   Q.  Why don't you take a look at Tab 7, H-612.

24   A.  You said H-612?

25   Q.  For you it's just Tab 7.  Do you recall receiving an e-mail

James Olson - Cross

1    on May 27, 2014 from the CEO of RSCS inviting you to a poultry

2    progress review meeting on July 10, 2014?

3    *A.*  Is this the meeting held in Tyson's headquarters?

4    *Q.*  I can't answer that question, sir.  Do you remember?

5    *A.*  I remember attending a meeting with many of the people that

6    are listed there at Tyson's headquarters.

7    *Q.*  And it could have been around July of 2014?

8    *A.*  Seven years ago, yes, it could have.

9    *Q.*  And you recall that there was a board meeting of the RSCS

10   at which McKinsey presented its results to RSCS that you had

11   asked for as a board member, right?

12   *A.*  Yes.

13   *Q.*  In fact, you got a sneak preview of that board

14   presentation, you alone with McKinsey.  Do you recall that?

15   *A.*  No.

16   *Q.*  Let me show you -- why don't you take a look at Tab 8.

17        *MR. TUBACH:*  For the record it's H-613.

18   *BY MR. TUBACH:*

19   *Q.*  Do you recall receiving this invitation to a meeting on

20   July 18th, 2014?

21   *A.*  This looks like it was a phone call meeting.

22        *MS. SWEENEY:*  Objection, Your Honor.  Improper

23   refreshing his recollection.

24        *MR. TUBACH:*  I am not asking for his recollection.  I

25   am asking if he recalls being invited to this meeting.

James Olson - Cross

1      *THE COURT:*  He is not attempting to refresh

2   recollection.  He is just asking the witness if he is familiar

3   with the document.  Overruled.

4   *A.*  My life was meetings, so --

5   *BY MR. TUBACH:*

6   *Q.*  I am sorry?

7   *A.*  My life was meetings.

8   *Q.*  My life was meetings.

9   *A.*  Yes.  So this is a meeting seven years ago.

10  *Q.*  Understood.  So as you sit here today, you don't recall one

11  way or the other whether you had a phone call with McKinsey

12  prior to that board presentation being presented to the whole

13  board?

14  *A.*  No.  That would not have been unusual.

15  *Q.*  And do you recall being sent the presentation prior to its

16  being presented at the board meeting?

17  *A.*  No, but that wouldn't be unusual either.

18  *Q.*  Take a look at Tab 9 and 10, if you would.

19      *MR. TUBACH:*  For the record it's Exhibit H-614 and

20  H-615.  For the moment we are just going to do 614, and now we

21  are going to do 615.

22  *BY MR. TUBACH:*

23  *Q.*  Have you had a chance to take a look at what for you is Tab

24  9 and 10 and for the record is H-614 and H-615.  I know you are

25  going through 615 now.  Can we start with 614 in Tab 9?  You

James Olson - Cross

1    don't have to read through that entire document in H-615.

2    A.   Okay.

3    Q.   So you were sent the presentation that McKinsey prepared

4    ahead of the actual board meeting; is that right?

5    A.   Yes.

6    Q.   And that was in anticipation of the conference call that

7    you had with McKinsey that's reflected in Tab 8 for you which

8    is H-613, right, on July 18, 2014?

9    A.   I am sorry, one more time?

10   Q.   Sure.  The board presentation that was sent to you ahead of

11   time --

12   A.   Yes.

13   Q.   -- was in anticipation of that conference call you had with

14   McKinsey on July 18, 2014, the one that's in for you Tab 8, for

15   the record H-613.

16   A.   Okay.

17   Q.   Is that right?

18   A.   Yeah.  I would have to go back and look at the date, but I

19   am sure that's correct.

20   Q.   The date on H-613, Tab 8, is July 10 for a July 18 meeting.

21   And on Tab 9, H-614, is also July 18.

22   A.   Okay.

23   Q.   Do you recall reviewing this what is H-615, Tab 10?  Do you

24   recall reviewing that?

25   A.   I do.

James Olson - Cross

1   *Q.* And you recall that conference call with McKinsey.  Did you

2   provide them any input?

3   *A.* I am sure I did.

4   *Q.* Do you recall at this point any idea what it was?

5   *A.* No.

6   *Q.* If there is something incorrect in here, do you think you

7   probably would have pointed it out to them if you knew it was

8   wrong?

9   *A.* Yeah.

10  *Q.* And was there anything in here that you recall as you sit

11  here today disagreeing with?

12  *A.* As I sit here today, I can't recall anything.

13  *Q.* Do you recall taking any notes of that meeting?

14  *A.* No.

15  *Q.* Is it your practice to take notes of meetings?

16  *A.* Yeah.

17  *Q.* And do you know what you might have done with those notes

18  if you took any notes?

19  *A.* I probably thinned them out as I got retired.

20  *Q.* Okay.  Very good.

21          *THE COURT:*  Mr. Tubach, sorry, it's 3:15 or almost

22  3:15.  Would this be a convenient place for the mid-afternoon

23  break?

24          *MR. TUBACH:*  Absolutely, Your Honor.

25          *THE COURT:*  Great.

James Olson - Cross

1          Ladies and gentlemen, we will go ahead and take the

2     mid-afternoon break at this time.  We will plan on reconvening

3     at 25 minutes to 4:00.  Keep the admonitions in mind.  The jury

4     is excused.

5          (Jury excused.)

6          THE COURT:  Mr. Olson, once again you are excused and

7     then we will reconvene at 3:30 -- what did I say, 25-minute to

8     4:00?  And that's actually what I wanted to ask about.  Is it

9     logistically difficult to do 15 minutes?  Do we still want to

10    stick with 20?

11         MR. TUBACH:  15 is fine with us, Your Honor.  I am not

12    going to have that much more.

13         THE COURT:  I am saying just in general from this

14    point going forward, do we need to take 20-minute breaks?  Can

15    we take 15-minute breaks?  People obviously need to have the

16    ability to take a break, but I was just curious.

17         MR. TUBACH:  I have got to go to the fourth floor to

18    use the restroom, which is like seven floors up, so I would

19    prefer the 20 if we can get it.

20         THE COURT:  If 20 works, that's fine.  Cumulatively,

21    you can do the math, it adds up.  But on the other hand I don't

22    want to rush people, so we will stick with 20.  And speaking of

23    that so we aren't talking about things during the entire break

24    instead of taking a break, anyone have anything else?

25         All right.  We will be in recess.  Thank you.

James Olson - Cross

1          (Recess at 3:17 p.m.)

2          (Reconvened at 3:38 p.m.)

3              THE COURT:  Let's bring the jury back in.

4              MR. TUBACH:  Your Honor, should we have the witness

5     come in now or wait until the jury is seated?

6              THE COURT:  Good point.  Let's bring Mr. Olson back

7     in.

8              (Jury present.)

9              THE COURT:  Mr. Tubach, go ahead.

10             MR. TUBACH:  Thank you, Your Honor.

11    BY MR. TUBACH:

12    Q.  Welcome back, Mr. Olson.

13         During our break did you meet with anyone from the --

14    the lawyers from the Justice Department?

15    A.  No.

16    Q.  Did you speak with anyone from the Justice Department at

17    all?

18    A.  No.

19    Q.  Thank you, sir.

20         Do you recall attending a board meeting on July 21st

21    and July 22nd in Chicago of the RSCS board in 2014?

22    A.  That's a typical time to have a board meeting.

23    Q.  Okay.  Let me ask you a more direct question.  Do you

24    recall a board meeting in which McKinsey presented the results

25    of its study to the RSCS board?

James Olson - Cross

1   *A.*   I remember them reporting to the board.  I don't remember

2   the dates.

3   *Q.*   Do you remember attending a board meeting in Chicago at the

4   Trump International Hotel?

5   *A.*   I remember being in the Trump.

6   *Q.*   Take a look at Tab 11 for you, Exhibit C-116 for the

7   record.

8         Have you seen this document before?  I am not going to

9   ask you to read the whole thing.  It's many pages long.  Do you

10  think you have seen this document before?

11  *A.*   Yes.

12  *Q.*   And you have seen it in your capacity as a board member

13  because you have to prove the minutes of the board, right?

14  *A.*   That's correct.

15  *Q.*   Is this the minutes of the board for July 21 and 22, 2014?

16  *A.*   Yes, it is.

17         *MR. TUBACH:*  I will move Exhibit C-116 into evidence.

18         *THE COURT:*  Any objection to C-116?

19         *MS. SWEENEY:*  Your Honor, I don't believe Mr. Tubach

20  has laid the proper foundation.  It seems like he is trying to

21  get it in as a business record, but he has laid no foundation

22  for it.

23         *THE COURT:*  So what's the objection?

24         *MS. SWEENEY:*  So the objection is to hearsay.  There

25  is no foundation.

James Olson - Cross

1      MR. TUBACH:  Your Honor, this clearly is a record of

2  the minutes of the board of directors of the corporation.  It's

3  quintessential.

4      THE COURT:  It's hearsay.  It will be refused.

5      MR. TUBACH:  I am sorry, I didn't hear.

6      THE COURT:  It's hearsay and it will be refused.  It

7  doesn't meet the business record exception for the reasons I

8  mentioned in my order concerning business records.

9      MR. TUBACH:  Thank you, Your Honor.

10      THE COURT:  Go ahead.

11  BY MR. TUBACH:

12  Q.  Mr. Olson, do you recall that in that presentation that

13  McKinsey gave it was a lengthy presentation, right?

14  A.  Yes.

15  Q.  And you recall that Pete Suerken was there, right?

16  A.  I believe he was.  I don't recall for sure.

17  Q.  But you believe he was there.

18  A.  Yes.

19  Q.  And there were folks from McKinsey there, right?

20  A.  Yes.

21  Q.  And what was the upshot of the presentation that McKinsey

22  made to you?  What's your take-away from that meeting, from

23  that presentation?

24  A.  That the supply issue was complicated and that the outcome

25  was that we needed to put some product into a frozen state to

James Olson - Cross

1   help boost supply going into peak periods.

2   Q.  Do you recall McKinsey telling you in that meeting that the

3   supply of small birds had been shrinking over time?

4   A.  Yes.

5   Q.  And that the reason for that was because big birds were

6   much more profitable to make than small birds, right?

7   A.  Yes.

8   Q.  Why don't you take a look at Tab 12, which is for the

9   record Exhibit 7 -- C-781.

10          MR. TUBACH:  And just as a housekeeping matter, Your

11  Honor, the first page of this document has what's called a slip

12  sheet in it because it was produced in native format, so we

13  simply affixed the same Bates label to the slip sheet, as well

14  as the first page of the actual document.

15  BY MR. TUBACH:

16  Q.  Mr. Olson, have you seen -- putting aside the first page of

17  Tab 12, Exhibit C-781, have you seen this document before?

18  A.  Yes, I have.

19  Q.  And what is it?

20  A.  It's the McKinsey report produced for the RSCS and shown to

21  the board.

22  Q.  And this was the presentation that they made that you

23  participated in as a board member, correct?

24  A.  Yes.

25  Q.  And is this a presentation that RSCS relied upon in making

James Olson - Cross

1    its decisions about how to increase the supply of small birds?

2    A.   I am sure they relied on it, yes.

3    Q.   Not they; you, sir, RSCS, the board of directors.

4    A.   Yes.

5    Q.   And you also relied on this document for the purpose of

6    deciding that the strategy that RSCS would pursue was to try

7    and do a three-year contract, right?

8    A.   Yes.

9    Q.   And that was your idea, right?

10   A.   I don't know if I originated it.  I offered that as an idea

11   to Steve McCormick.

12   Q.   And was there anything in this document that you didn't

13   already know when you got it?  You have been in the chicken

14   business a long time.  McKinsey had spent six weeks intensively

15   studying.  Was there anything in here that you learned that you

16   didn't already know?

17   A.   It's hard to answer that without totally reviewing this

18   document and going back and recollecting what I knew before and

19   after seven years ago.

20   Q.   Fair enough.  Do you recall what the difference in

21   profitability was between big birds and small birds on a

22   per-pound basis roughly?

23   A.   I believe it was over the 10-cent increase.

24   Q.   It was about 20 cents per pound difference, right?

25   A.   It could have been.

James Olson - Cross

1    Q.  Does that sound right to you?

2    A.  It's possible.  I can't say for sure.

3    Q.  But in that meeting McKinsey told you that the difference

4    between the big bird profitability and the small bird

5    profitability was about 20 cents per pound, right?

6              MS. SWEENEY:  Objection, Your Honor, hearsay.

7              THE COURT:  Overruled.

8    A.  I would have to look through this document again to confirm

9    that.

10   BY MR. TUBACH:

11   Q.  Sure.  Take a look at Page 8 of the document.

12   A.  I see it.

13   Q.  Do you recall that McKinsey in its presentation informed

14   the RSCS board of directors and Pete Suerken, the chief

15   negotiator for RSCS for chicken, that the difference between

16   big bird profitability and small bird profitability is about 20

17   cents.

18   A.  Yes.

19   Q.  And small bird profitability was 10 cents per pound and big

20   bird profits was about 30 cents per pound, right?

21   A.  That's what McKinsey said, yes.

22   Q.  And they also told you in that meeting that the demand for

23   small birds had been going up, right?

24   A.  Yes.

25   Q.  For example, Chick-fil-A was buying a lot of small birds,

James Olson - Cross

1    right?

2    *A.*   I don't know what they were buying.

3    *Q.*   So you don't know one way or the other whether Chick-fil-A

4    was buying small, medium or big birds?

5    *A.*   No.

6    *Q.*   You knew the rotisserie chickens at the supermarket, those

7    precooked rotisserie chickens, those are small birds?

8    *A.*   Yes.

9    *Q.*   And that demand had been growing quite a bit.

10   *A.*   Yes.

11   *Q.*   And Popeye's had been growing quite a bit, right?

12   *A.*   Yes.

13   *Q.*   And so you understood that the demand for small birds had

14   been going up, right?

15   *A.*   Correct.

16   *Q.*   And you understood that the supply of small birds had been

17   going down, right?

18   *A.*   Yes.

19   *Q.*   I believe you testified about that earlier.  And did you --

20   did McKinsey tell you in that presentation that KFC's 2014

21   pricing, the pricing that was then in the contract, was about

22   14 percent below the market price at that time?

23   *A.*   I don't recall them saying that.

24   *Q.*   Take a look at Slide 12, if you would.

25           Do you know what the Georgia Dock is, sir?

James Olson - Cross

1    *A.*   Yes.

2    *Q.*   What is it?

3    *A.*   It's a standard or a benchmark for chicken sold in the

4    general market on the open market.

5    *Q.*   And it's a public benchmark, right?

6    *A.*   Yes.

7    *Q.*   And you can look it up.  You maybe have to pay a fee, but

8    it's public data you can look up, right?

9    *A.*   Yes.

10   *Q.*   So you recall McKinsey telling the board of directors in

11   July of 2014 that the KFC price in 2014 was 14 percent below

12   the Georgia Dock Index for small birds.

13   *A.*   As I hope it would be.

14   *Q.*   So that's a yes.

15   *A.*   That's what the cooperative is supposed to do.  It's not

16   supposed to negotiate the same price that a small mom-and-pop

17   operator who buys off the Georgia Dock would buy for.

18   *Q.*   I am not asking right now for the reasons it should be

19   less.  I am just asking whether or not that was the case.

20   *A.*   Yes.

21   *Q.*   Okay.  14 percent below the Georgia Dock, right?  Right?

22   *A.*   Yes.

23   *Q.*   But that meant that if they can sell their chicken

24   elsewhere, the suppliers are better off selling to people other

25   than KFC, is that right, for more money?

114

James Olson - Cross

1   *A.*  To a certain point.

2   *Q.*  That's what McKinsey told you, right?

3   *A.*  If the demand was to pick up 175 truckloads a week and they

4   could sell that at a higher Georgia Dock price, obviously yes,

5   if there was a market for that.

6   *Q.*  Understood.  And do you recall anything that Pete Suerken

7   said in that July 2014 board meeting relating to the market

8   dynamics for small birds?

9           *MS. SWEENEY:*  Objection, hearsay.

10           *THE COURT:*  Response?

11           *MR. TUBACH:*  It's not going to the truth, Your Honor.

12   It's going to the knowledge of RSCS going into these

13   negotiations.

14           *THE COURT:*  The effect on the listener?

15           *MR. TUBACH:*  Yes.

16           *THE COURT:*  Anything else on that?

17           *MS. SWEENEY:*  No, nothing further.

18           *THE COURT:*  Overruled.

19           So ladies and gentlemen, certain statements that a

20   person outside the court may make which would otherwise be

21   hearsay can be considered by the jury not for the truth of the

22   matter.  So, for instance, a witness might say what someone

23   else said to him or her.  You can consider that statement for

24   how it may have affected that person's future actions or lack

25   of actions, but not -- it I tell you.  If I only admit it for

James Olson - Cross

1    that purpose and not for the truth of the matter, then you can

2    consider it for that, but you can't assume that what was said

3    to the person was true, okay?

4              Go ahead, Mr. Tubach.

5         MR. TUBACH:  Thank you, Your Honor.

6    BY MR. TUBACH:

7    Q.  Again, do you recall anything Mr. Suerken saying in that

8    meeting about the small bird market?

9    A.  I can't think of the specific comment that he made.

10   Q.  You can't recall him, for example, disagreeing with

11   McKinsey's presentation, right?

12   A.  I don't recall him disagreeing, no.

13   Q.  And part of McKinsey's presentation, one of its key

14   findings was that if the current trends continued, that KFC ran

15   a significant risk of supply shortages which could cost the KFC

16   system in the range of $500 million to $1-1/2 billion in

17   revenue.  Do you remember that?

18   A.  I don't remember those numbers.

19   Q.  Take a look at Page 5, if you would.

20   A.  Page 5 of this document?

21   Q.  Of this document, yes, thank you, and specifically this

22   third key finding.

23   A.  That's correct.  That's what it says in the deck.

24   Q.  And do you recall McKinsey telling you that basically

25   unless things change, KFC had some serious risk issues that

James Olson - Cross

1   could be extremely expensive for them?

2   *A.*   I recall it after reading it right now.

3   *Q.*   You do recall that.

4   *A.*   After reading it right now.

5   *Q.*   Thank you.

6        *MS. SWEENEY:*   Your Honor, objection.   Just if we could

7   have a short side bar about the refreshing recollection.

8        *THE COURT:*   Okay.   Let's have a short side bar.

9      (At the bench:)

10        *THE COURT:*   Ms. Sweeney, what's your objection?

11        *MS. SWEENEY:*   Yes, Your Honor.   So for this question

12   and the past few questions Mr. Tubach has asked the witness if

13   he remembered something and then the witness just would read

14   something and say, well, I see that I have read it now, which

15   is improper refreshing of recollection where he should be

16   reading the document and then look up and testifying from his

17   own memory.   So it appears to be sort of an end around to get

18   information into the jury that is not otherwise admitted.

19        *THE COURT:*   Well, it is true that normally in terms of

20   refreshing recollection it's appropriate to show the witness a

21   document and have the witness look away from the document, ask

22   if that refreshes their recollection and then have the witness

23   testify as to whether or not his recollection has been

24   refreshed.

25        This witness has already indicated that he has seen

James Olson - Cross

1    the McKinsey report.  He has seen drafts of the McKinsey report

2    and he has been at a presentation where the McKinsey report has

3    been presented.  As a result, it's already been established

4    that he's seen this report, and for that reason I think that

5    Mr. Tubach has got a little bit of leeway in terms of asking

6    questions about it.  Moreover, I don't know, but I would assume

7    that maybe someone from McKinsey is going to be coming in and

8    testifying about the report.  So in essence I don't think that

9    any type of unfairness is being -- has taken place.

10             MR. TUBACH:  Thank you, Your Honor.  You are exactly

11   correct.  There is going to be a McKinsey witness testifying

12   later.

13             THE COURT:  Thank you.

14        (In open court:)

15             THE COURT:  The objection is overruled.

16             Go ahead, Mr. Tubach.

17   BY MR. TUBACH:

18   Q.  I want to turn to another topic now, if I could.

19             Do you recall your testimony earlier today where you

20   testified that you gave -- I believe your words were insight

21   and coaching to the RSCS negotiators?

22   A.  Yes.

23   Q.  And you had some expertise to offer them.

24   A.  Correct.

25   Q.  And was one of those people Mike Ledford?

118

James Olson - Cross

1   A.  I sent it directly to Steve McCormick.

2   Q.  But I don't mean just specifically that two-page document.

3   My question is a broader one which is when you testified

4   earlier about providing insight and coaching to the RSCS

5   negotiators, is that something you did over the years?

6   A.  Yes.

7   Q.  Did you speak with -- do you know who Mike Ledford is?

8   A.  Yes.

9   Q.  Who was he?

10  A.  He was over purchasing.

11  Q.  At RSCS, right?

12  A.  At the RSCS.

13  Q.  And he was for a time the chief negotiator for RSCS, right?

14  A.  Yes.

15  Q.  And in the early days I believe it was called UFPC; is that

16  right?

17  A.  And earlier than that the NPC.

18  Q.  Your memory outdates me.

19         Did you ever talk to Mike Ledford about the pricing

20  negotiations?

21  A.  I can't recall specific conversations, but it would be in

22  the course of director talking to him whether formally during a

23  board meeting or informally about what was happening with

24  supply and what was happening with prices.

25  Q.  Of course.  Yeah, I am not asking about any specific

James Olson - Cross

1    conversation at this point.  My question is just you did over

2    the course of the years have conversations with Mr. Ledford

3    about the state of the chicken negotiations and the chicken

4    prices; is that right?

5    *A.*   Yes.

6    *Q.*   And that was both in your capacity as a board member and in

7    your capacity just informally speaking to Mr. Ledford.

8    *A.*   Mostly in my role as a director.

9    *Q.*   During board meetings?

10   *A.*   Yes.

11   *Q.*   Okay.  But you also had side conversations with him at

12   times?

13   *A.*   Sure.

14   *Q.*   And you testified earlier that it was not important for

15   RSCS that the suppliers' prices be close together?  Did I hear

16   that right?

17   *A.*   That's correct.

18   *Q.*   Do you understand a concept called price parity, price

19   parity?

20   *A.*   I have a -- my definition of it.  I am not sure that's

21   correct.

22   *Q.*   And price parity is basically when prices are close

23   together, right?

24   *A.*   Okay, fair.

25   *Q.*   Can we use that term?

James Olson - Cross

1  A.   Yeah.

2  Q.   And do you recall that it was Mr. Ledford's expressed

3  strategy to get suppliers into price parity?

4        MS. SWEENEY:   Objection, Your Honor, foundation.

5        MR. TUBACH:   I am asking if he recalls.

6        THE COURT:   He is just asking.   Overruled.

7        MR. TUBACH:   I am trying to lay a foundation.

8        THE COURT:   Overruled.

9  A.   I don't remember that, and that would go against the

10  direction and purpose of the cooperative.

11  BY MR. TUBACH:

12  Q.   Let me show you what's been marked as -- and this is a

13  document that's not in your binder.

14        MR. TUBACH:   So I will have to hand it to the

15  courtroom clerk.   It's Defense Exhibit F-815.

16  BY MR. TUBACH:

17  Q.   First, Mr. Olson, this is a long document, 34 pages or

18  something.   I am not going to ask you to read through the whole

19  thing.   Take a look at the front page and glance through it.   I

20  just want to ask you first whether you have ever seen this

21  document before.

22  A.   I don't recall seeing it.

23  Q.   Is this the kind of document that would be prepared for

24  presentation to the RSCS's board of directors?

25  A.   I don't recall seeing this much detail.

James Olson - Cross

1    Q.  So it's your testimony that it was not RSCS's policy to

2    tighten the difference between suppliers' prices as much as

3    possible?

4    A.  No, it is not.

5    Q.  I think we have double negatives.  Your testimony is that

6    RSCS or its predecessor, UFPC -- and it's the same company,

7    right?

8    A.  Yes.

9    Q.  They just changed the name?

10   A.  Right.

11   Q.  I am just going to refer to it as RSCS.  Is that okay?

12   A.  Okay.

13   Q.  So is it your testimony that RSCS did not want the

14   suppliers to have the same pricing?

15   A.  They want the suppliers to give them their very best price.

16   Q.  And they were indifferent, as you recall, indifferent as to

17   whether suppliers' prices were the same or not.

18   A.  Indifferent, yes.

19   Q.  Thank you.  One more topic I would like to cover with you.

20   You can put that document away, sir.

21        Do you recall a proposal in around March of 2013 where

22   RSCS suggested to its suppliers that they should lower the

23   weight of the chicken that they were selling to KFC?

24   A.  I do remember a conversation about that topic.

25   Q.  And the reason for lowering the weight of the chicken is

James Olson - Cross

1    because you in your business buy by the pound and you sell by

2    the piece, right?

3    A.   Correct.

4    Q.   And when you sell by the piece, if you can reduce the

5    weight of the bird, the weight of those pieces, you can make

6    more money, right?

7    A.   Yes.

8    Q.   Because if you're selling 15 pieces of chicken and you can

9    make -- you can pay less for them, you can make more money,

10   right?

11   A.   Yes.

12   Q.   Do you recall having a -- strike that.

13           Do you recall that Mr. Ledford was at some point in

14   2013, March of 2013, asking the suppliers whether they could

15   lower the weight of their chicken?

16   A.   I don't know if Mr. Ledford did.  I know that was a topic

17   that was discussed.

18   Q.   Was that an idea that you supported, sir?

19   A.   I could see myself supporting it and not supporting it.

20   Q.   Do you recall --

21   A.   If I could explain.

22   Q.   Sorry, I didn't mean to interrupt you.

23   A.   I could see supporting it because there was discussion that

24   the market was there.  As the market was shifting, we could

25   pick up product in that part of the supply curve.  There was

James Olson - Cross

1    also a change in process on injection, pumping the bird up with

2    the marinate, which gave us the same size as the prior

3    specification would have been.  It was an idea that was tested

4    and not followed up on.

5    Q.  Tested in the sense that consumer tested?

6    A.  I'm not sure it was consumer tested.  It didn't get past

7    KFC's standards, KFC corporate.

8    Q.  And the basic idea, though, was that this idea that you

9    sometimes supported or maybe you didn't support was that you'd

10   be charging the consumers the same, but paying less for it

11   yourself, and that's how you make more money, right?

12   A.  Yes.

13           MR. TUBACH:  Thank you.  Your Honor, I have no further

14   questions.

15           THE COURT:  Thank you.

16           Mr. McLoughlin, cross-examination?

17                        **CROSS-EXAMINATION**

18   BY MR. McLOUGHLIN:

19   Q.  Good afternoon, sir.  My name is Jim McLoughlin and I

20   represent Mr. Lovette.  And I will have hopefully a few

21   questions for you, but lawyers are usually lying when they say

22   it's two.  I have a binder that I may give to you with

23   documents, but we may be able to make due with the binder you

24   still have, I think.

25   A.  I do.

James Olson - Cross

1    *Q.* Great. Sir, let me ask you to turn to the document that

2    was admitted C-755.

3    *A.* Can you tell me what tab that is?

4    *Q.* Is that Tab 8? Five, thank you, Tab 5.

5         And, sir, if you take a moment to read on the first

6    page a little section there called Whole Bird Utilization.

7    Have you read it?

8    *A.* I am familiar with it, yes.

9    *Q.* Great. So if I understand the concept, Yum and RSCS would

10   commit to purchasing the entire flock of birds of specific

11   weight ranges or their parts which would allow you to buy more

12   from a supplier and make it more efficient for the supplier to

13   supply KFC; is that fair?

14   *A.* Yes.

15   *Q.* And so if I understood you, you understood that helping the

16   supplier use the whole bird would make it more efficient and

17   cost effective for the supplier and for the buyer.

18   *A.* That was my hope and intention, yes.

19        *MR. TUBACH:* Your Honor, Michael Tubach. This

20   document has actually been admitted into evidence.

21        *MR. McLOUGHLIN:* Can we display this, please?

22        *THE COURT:* Absolutely.

23        *MR. McLOUGHLIN:* And Paragraph No. 3? Thank you.

24   *BY MR. McLOUGHLIN:*

25   *Q.* Do you recall where you got the idea of suggesting that

125

James Olson - Cross

1   whole bird utilization would be better for the supplier and if

2   you could manage to restructure your operations better or more

3   efficient for KFC as well?

4   A.   I recall just having casual conversations with the chicken

5   purchasers trying to understand how they proceeded, why there

6   were certain supply issues.  And one of the replies I got back

7   was that sometimes the chicken suppliers didn't have

8   destinations for the parts of the chicken that we weren't using

9   in the KFC brand.

10        I also got a glimpse into that by doing a plant tour

11   of the Marshall Durbin processing company and asked questions

12   while it was during that plant tour about what happened to the

13   different parts of the chicken.

14   Q.   And so if I'm understanding you, what your purchasers told

15   you is that the suppliers were looking to sell the entire bird

16   at the best price, and if you could help them with that, that

17   could benefit you.

18   A.   I don't know if they said the suppliers were looking for

19   it.  I think it was my initiating the conversation with them on

20   what happens?  You know, why can't we -- why are chicken

21   breasts so high?  Well, it's because they got -- if you get

22   dark meat, you split it off.  You can't sell enough dark meat

23   to make up for all the white meat that's being used on further

24   processed.  So it was in that kind of a conversation of

25   understanding the issues that suppliers had.  I don't think I

James Olson - Cross

1   recall anybody saying that suppliers were requesting that.

2   Q.  And your expectation was that that would be mutually

3   beneficial, so suppliers could very well like the idea.

4   A.  Like everything on this list, there were things that I

5   thought should be looked into to see if there was a good

6   solution that worked for the suppliers and for the system.

7   Q.  Okay.  Now, if you could turn to -- back to your Tab 11, I

8   think it is, the McKinsey presentation.

9   A.  That's not No. 11 in my book.

10  Q.  Excuse me, sir?

11  A.  That's not No. 11 in my book.

12      MR. TUBACH:  I believe it's Tab 12.

13      MR. McLOUGHLIN:  Tab 12, thank you.

14      THE COURT:  Mr. McLoughlin, sorry.  Rather than by tab

15  number, we need to make a record as to exhibit number.  I think

16  that's H-615.

17      MR. McLOUGHLIN:  Yes, Your Honor, H-615.

18  BY MR. McLOUGHLIN:

19  Q.  So sir, with respect to --

20      MR. TUBACH:  Your Honor, I am sorry to interrupt.

21  Actually Tab 12 is C-781.

22      MR. McLOUGHLIN:  There are multiple copies.

23      MR. TUBACH:  615 was Tab 10.  I apologize for having

24  so many tabs.

25      MR. McLOUGHLIN:  The document number is C-781.

James Olson - Cross

1      *THE COURT:*  Okay, great.  Thank you.

2   *BY MR. McLOUGHLIN:*

3   *Q.*  I would like to ask you for a moment to take a look at

4   Pages 10 and 11 of that document.

5   *A.*  Okay.

6   *Q.*  Great.  So in this period of time, 2014, among KFC's or

7   RSCS's competitors to buy small birds were Church's; is that

8   correct?

9   *A.*  Yes.

10  *Q.*  And El Pollo Loco; is that correct?

11  *A.*  I am not real familiar with their spec.

12  *Q.*  Does Page 10 refresh your recollection on that, sir?

13      *MS. SWEENEY:*  Objection, Your Honor.  He didn't say he

14  didn't remember.

15  *A.*  Page 10 shows that they are.

16      *THE COURT:*  Overruled.  Go ahead.

17  *A.*  Page 10 shows that they sell a bigger bird.

18  *BY MR. McLOUGHLIN:*

19  *Q.*  And Popeye's and Bojangles also had specs that overlapped

20  KFC's, so you competed with them to buy small birds, correct?

21  *A.*  Yes.

22  *Q.*  And the retail grocers such at Wal-Mart and Kroger and

23  Publix and Costco also had specs that crossed over to KFC's,

24  and you were competing with them as well, were you not?

25  *A.*  Yes.

James Olson - Cross

1   *Q.* And is it fair to say that competing against Wal-Mart and

2   Costco in 2014 was difficult?  They were tough.

3   *A.* They were a competitor, yes.

4   *Q.* And, in fact, if you'll flip to Page 11, does that refresh

5   your recollection that Wal-Mart had overtaken KFC as Pilgrim's

6   biggest customer?

7   *A.* Yes.  They sold a different product than us, but they were

8   selling whole birds.

9   *Q.* And they were using the small birds for rotisserie chicken.

10  *A.* Yes.

11  *Q.* In fact, another one of your competitors, Popeye's, had

12  grown over 20 percent in the prior five years and they too were

13  buying more small birds.

14  *A.* Yes.

15  *Q.* It's fair to say, isn't it, sir, that the challenges that

16  KFC was facing in -- going into 2014, 2015 with respect to the

17  volume of the competition, the demand for those small birds and

18  the issues in supply that we've talked about put you at a

19  historic point which is why you spent a million dollars on

20  McKinsey to try and come up with the best strategy for KFC for

21  dealing with this historic situation; isn't that fair?

22  *A.* That's fair.

23  *Q.* And isn't it fair also, sir, to -- didn't you also

24  understand at the time that your suppliers who were selling to

25  the Wal-Marts and the Publix and the Costcos and the Popeye's

James Olson - Cross

1    had a pretty good idea of what the market value of their small

2    birds was because of all the people they were selling to and

3    they knew what they were willing to pay?

4    A.  Could you repeat that again?

5    Q.  Sure.  I apologize.  That was too long.  Isn't it true that

6    you understood in 2014 that your chicken suppliers, because of

7    all of their communications in selling to your competitors, had

8    a pretty good idea what their small birds were worth?

9    A.  I would be speculating on what they thought.

10   Q.  Now, sir, one thing I have appreciated in your testimony

11   was you are pretty straightforward about the fact that as the

12   CEO of HMC, it was your job to maximize profit for the

13   shareholders; is that fair?

14   A.  Yes.

15   Q.  So if you were a CEO of a chicken supplier, you would have

16   exactly the same objective, correct?

17   A.  Yes.

18   Q.  And to the extent those two goals might conflict because

19   they want more money for their birds and you want to pay less,

20   so long as you're playing fair, that is the way the system

21   works; isn't that correct?

22   A.  Yes.

23   Q.  And for a number of years prior to the mid 2000s, KFC had

24   been very successful in negotiating with those suppliers to get

25   the lowest price that would allow it to be a low price supplier

James Olson - Cross

1   to the public, right?

2   A.  I believe so.

3   Q.  But in 2014 the market changed.  And you understood that,

4   didn't you?

5   A.  I understood things had changed.  I was also looking for if

6   this was a new dynamic that we were working in, we needed to

7   look at how we were dealing with our suppliers differently,

8   where we were sourcing our products, how we were sourcing them,

9   the examples of the whole bird utilization, earlier mentioned

10  amortizing equipment lines.  These were all suggestions that I

11  had that I thought were going to work for the system, not just

12  for the franchisees.

13  Q.  And let me ask you -- I am going to change subjects just a

14  little bit.

15         About how many times did you meet with the government

16  in interviews?

17  A.  For this trial?

18  Q.  Yes, sir.

19  A.  Three or four.

20  Q.  Okay.  And do you recall about when they -- either they

21  asked you or you volunteered to be a witness?

22  A.  Six months ago.

23  Q.  Did they ask you or did you volunteer?

24  A.  I was volunteered.

25  Q.  You were volunteered.  Okay.

James Olson - Cross

1    *A.*   The attorney for the KFC concept of the RSCS --

2              *MS. SWEENEY:*  Objection, Your Honor.

3              *THE COURT:*  Do you want to ask a new question,

4    Mr. McLoughlin?

5              *MR. McLOUGHLIN:*  Yes.

6              *THE COURT:*  Go ahead.

7    *BY MR. McLOUGHLIN:*

8    *Q.*   So do you recall that in your interview on March 12, 2021,

9    which I believe was the first interview --

10   *A.*   Sound says right.

11   *Q.*   -- that you told the FBI that the reason for the increase

12   in the price of small birds was, quote, "that suppliers were

13   moving to large birds because they were more profitable."  Do

14   you recall that?

15   *A.*   Yes.

16   *Q.*   Now, sir, in your testimony you indicated that you believe

17   you represented the West Coast franchisees on the RSCS board;

18   that fair?

19   *A.*   Yes.

20   *Q.*   And is it also fair to say that there were some natural

21   tensions among franchisees because everybody wanted to pay the

22   lowest price for chicken which maximized their profits; is that

23   fair?

24   *A.*   Yes, that's fair to say.

25   *Q.*   Is it also fair to say that if there was a big differential

James Olson - Cross

1  between prices payed on the West Coast and the East Coast or

2  the north and the south or from a particular distribution

3  center that was being supplied by a particular supplier, if

4  there were big differences so the franchises were paying very

5  different prices, that was a real headache for RSCS and KFC?

6  A.  That's the purpose of the RSCS is to have difference in

7  prices.  Their job isn't to have price parity.  Their job is to

8  get the lowest price across the nation.  If you bundle up all

9  the costs across the nation, their job is to get the lowest

10  total cost.

11  Q.  And part of their objective was to have all of the

12  franchisees pay the same local costs because they didn't want

13  franchisees complaining that somebody had an advantage; is that

14  fair?

15  A.  That's not their goal, no.  They may try and do some

16  things.

17  Q.  Would it surprise you that that was something they worried

18  about?

19  A.  Would it surprise me that what?

20  Q.  That they would worry about the franchisees feeling they

21  were hard done by because somebody got a better price?

22  A.  They were constricted on what they could do by the purpose

23  of what a co-op is.  And their job as they were directed to do

24  is to get the lowest national price, the total bundled price

25  nationally.  That was their responsibility.  After that fact

James Olson - Cross

1    they may try and do some allocation changes which would help

2    balance some things out.

3           For instance, the price of chicken to the store is a

4    combination of the price of the negotiated contract with the

5    chicken suppliers, it's freight and it's the distribution cost

6    out of the distribution center.  So the RSCS staff could look

7    at that and say I'm going to try and take a higher priced

8    supplier and put it into a low freight route which then helps

9    balance out the high/lows across the nation.  But nobody

10   complained about the prices that the RSCS was getting.  They

11   complained about the freight that they were paying across the

12   country.

13   Q.  Right.  But HMC didn't pay a bundled price that was uniform

14   across the country.  You bought from specific sources, specific

15   distributors and paid a specific price; isn't that right?

16   A.  Right, correct.

17   Q.  And the price that the distributor charged was affected by

18   the price that the supplier charged; isn't that correct?

19   A.  Yes.

20   Q.  And so if a supplier to one distributor was charging more

21   than the supplier to a different distributor, franchisees might

22   pay a different price, freight and everything else being equal;

23   isn't that correct?

24   A.  Yes.

25   Q.  And in that case when the franchisees found out about it,

James Olson - Cross

1    they weren't happy; isn't that correct?

2    A.   They would voice displeasure.

3    Q.   Is that the same as not being happy?

4    A.   Well, yes, because they have a choice whether they were in

5    the co-op.  And if they thought they could buy better outside

6    the co-op, they have a right to do that.  But obviously when

7    you have 95 percent, 94, 95 percent of the franchisees that are

8    members, they think their total market basket of prices that

9    they get is better by going through the co-op.

10   Q.   Right.  Now, let me ask you, sir, when you were

11   negotiating -- let me strike that.

12           How long has it been since you as the CEO -- since

13   when, 1996?

14   A.   Yes.

15   Q.   How long has it been since you sat in a negotiating room

16   and negotiated for a day or two or three or four with a

17   supplier of anything?

18   A.   Never for that long.

19   Q.   Right.  You would go in, maybe have dinner and then leave

20   it to somebody else, right?

21   A.   My job wasn't to negotiate prices, particularly for

22   chicken.

23   Q.   Right.  Is it unfair to assume that at some point in your

24   career or in conduct by the people who worked for HMC or RSCS,

25   they might have said to one supplier, you know, you're high.

James Olson - Cross

1    You're 5 cents over this guy.  You should lower your price.

2            *MS. SWEENEY:*  Objection, calls for speculation.

3    *BY MR. McLOUGHLIN:*

4    *Q.*  I am asking, sir, about your experience over the last 40

5    years.

6            *THE COURT:*  Overruled.

7    *A.*  That negotiation with chicken suppliers would have only

8    happened by me or by the president of the distribution company

9    that we used in most of our markets, and I don't think we ever

10   said that.

11   *BY MR. McLOUGHLIN:*

12   *Q.*  Well, but I'm not just asking about you, sir, or HMC.  I am

13   also asking about RSCS and the people that work for RSCS.

14   *A.*  I can't speculate on what they might say.

15   *Q.*  And is it fair to say that if two competitors know each

16   other's price, one competitor might decide to beat that price

17   to get more volume; isn't that fair?

18   *A.*  It's possible, yes.

19   *Q.*  Okay.  And so when two competitors have information about

20   each other's prices, for example, like KFC might have about

21   Popeye's or Chick-fil-A, you can make an independent decision

22   based on that information to lower your prices or compete in

23   some other way, can't you?

24   *A.*  Yes.

25   *Q.*  And however that plays depends upon the circumstances and

James Olson - Cross

1    the individual; is that correct?

2    A.  I am not sure what that totally means.

3    Q.  And I won't give you a count, sir, but I am just about

4    done.  Thank you.

5            Now, do you recall ever getting any internal materials

6    about the conditions of the market from within KFC?

7    A.  I can't remember specifics.  I think we would get general

8    information at the advertising committee meetings.  And often,

9    most often the RSCS would record at those meetings.

10           MR. McLOUGHLIN:  Your Honor, if I may approach the

11   clerk, we are just going to ask about one document.

12   BY MR. McLOUGHLIN:

13   Q.  The clerk, sir, is showing you Exhibit C-121.  While we are

14   running around here, I am going to specifically direct you to

15   Page 6.  Please feel free to look at any pages.  And I am going

16   to jump gears a little bit on you, sir.

17           When you were meeting with the government these three

18   or four times, at least once and maybe on October 26th you

19   discussed your testimony with the government, didn't you?

20   A.  Yes.

21   Q.  Did you discuss your testimony with the government on other

22   occasions other than October 26 or just on the 26th?

23   A.  I believe the first interview we had was just getting

24   background on me and my knowledge and experience, and there

25   were two or three meetings where there was more direct

James Olson - Cross

1   questions.

2   Q.   And that would maybe be October 22nd and then October 26th?

3   A.   Yeah.

4   Q.   Okay.  And on October 26th or October 22nd, did they go

5   over specific questions and answers with you?

6   A.   Yes.

7   Q.   And did they ever suggest to you what the substance of one

8   of your answers could be modified to be or how it might be best

9   articulated?

10   A.   No.  They told me two things.  One is I used pronouns too

11   much and they said that fell into hearsay, so make sure I was

12   identifying who I was speaking at and about and for and always

13   tell the truth.  Those were the two take-aways.

14   Q.   Did they tell you if you were asked this question I just

15   asked you that that should be your answer, that they always

16   tell you to just tell the truth?

17   A.   No.  I think it was like, you know, I want to make sure I

18   do a good job.  And they said, "All you have to worry about is

19   telling the truth."

20   Q.   To that point if we could go to Exhibit C-121.

21        Is this a document you recall having seen during your

22   years on the board of directors of RSCS?

23   A.   Yes.

24   Q.   Okay.  Do you recall seeing this specific document as you

25   have gone through it?

James Olson - Cross

1    *A.*   I can't say I specifically remember each page of the

2    document, but I am sure I saw it.

3    *Q.*   But you generally remember it.

4    *A.*   Yes.   It would be common to get these reports.

5    *Q.*   Great.   And these reports were given for the purpose of

6    updating the board on what the plan was, right?

7    *A.*   Yes.

8    *Q.*   And they were also for the purpose of getting feedback from

9    the board as to whether this concept was something the board

10   wanted to be pursued; is that fair?

11   *A.*   Yes.

12   *Q.*   And so these were prepared to give the board the best

13   information that was available within KFC so you could make the

14   best decision, correct?

15   *A.*   Correct.

16   *Q.*   And this is the general format in which they were generally

17   prepared, yes?

18   *A.*   Right.   It would vary over the years, but this was pretty

19   common.

20   *Q.*   And in your memory of this document, seeing this document,

21   sir -- again I am going to ask you to go to Page 6.   And in or

22   about August 14, 2014 -- let me stop.   I apologize.   And who

23   prepared these generally for the board?   It was the purchasing

24   people, correct?

25   *A.*   Correct.

James Olson - Cross

1    *Q.*  So in August of 2014 the purchasing people told the board

2    that on Page 6 prices for breast meat and tenders have peaked

3    mere record levels due to limited egg supply, poor hatch

4    ability and high demand.

5            *MS. SWEENEY:*  Objection, Your Honor.  He is reading

6    from evidence that is not admitted into the record.

7            *MR. McLOUGHLIN:*  Your Honor, I move the admission of

8    C-121.

9            *THE COURT:*  Let me rule on the objection first.

10   Sustained.

11           *MR. McLOUGHLIN:*  I move C-121.

12           *THE COURT:*  Hold on.  You have got to let me talk.

13   Any objection to the admission of Exhibit C-121?

14           *MS. SWEENEY:*  Yes, Your Honor.  The government objects

15   on the basis of hearsay.

16           *THE COURT:*  Response?

17           *MR. McLOUGHLIN:*  Your Honor, first it is not admitted

18   for the truth of the matter asserted.

19           *THE COURT:*  What's it admitted for then?

20           *MR. McLOUGHLIN:*  It is admitted to identify the

21   perspective and understanding of the purchasers from RSCS at

22   the time they were negotiating, their understanding of the

23   market conditions.  We are not saying this is an accurate

24   description of those conditions.  What we're saying is that's

25   what they believed when they went into the negotiations.  That

James Olson - Cross

1   was what they were telling their board.  And it doesn't -- and

2   this gentleman recognizes it.  He has said in terms of

3   reliability that they gave the board the best information they

4   could that was available to them, which is indicia of

5   reliability under the hearsay rule.  So with respect to the

6   fact that it's as to their understanding and what information

7   they were using to develop their strategy, it is not for the

8   truth of the condition of the egg hatchability market.  It is

9   what they believe and it is therefore admissible.

10          THE COURT:  And they meaning who again?

11          MR. McLOUGHLIN:  RSCS, its purchasing people and its

12   board of directors.

13          THE COURT:  Sustained.

14   BY MR. McLOUGHLIN:

15   Q.  Mr. Olson, do you have any recollection of being told by

16   the RSCS purchasing people that conditions were -- let's call

17   it ripe for a historic rise in prices of the chickens that you

18   bought?

19   A.  At some point.  I don't know at the point of this document.

20   Q.  But at some point during the process for 2000 -- in 2014 to

21   the year 2015, do you recall that?

22   A.  Yes.

23          MR. McLOUGHLIN:  No more questions, Your Honor.

24          THE COURT:  Thank you, Mr. McLoughlin.

25          Ms. Henry?

James Olson - Cross

**CROSS-EXAMINATION**

1

2  *BY MS. HENRY:*

3  *Q.*  Good afternoon, Mr. Olson.

4  *A.*  Hello.

5  *Q.*  My name is Roxann Henry and I represent Mr. Bill Kantola,

6  who is on the other side of the binders there.

7         Isn't it true that you have never had any dealings

8  whatsoever with Mr. Kantola?

9  *A.*  That is true.

10  *Q.*  In fact, you don't know him.

11  *A.*  Pardon me?

12  *Q.*  In fact, you don't know him.

13  *A.*  The first time I've seen him.

14  *Q.*  And isn't it correct also that your company, HMC, that the

15  HMC restaurants weren't getting their chicken from Koch Foods,

16  Mr. Kantola's employer?

17  *A.*  We did get some chicken from Koch Foods.

18  *Q.*  When did you get that chicken from Koch Foods?

19  *A.*  I think in both years, but possibly just '14.

20  *Q.*  You have no personal knowledge of anything that Mr. Bill

21  Kantola did or did not do, do you?

22  *A.*  No.

23         *MS. HENRY:*  Thank you.

24         *THE COURT:*  Thank you, Ms. Henry.

25         Yes, Mr. Beller, go ahead.

James Olson - Cross

1              MR. BELLER:  Thank you, Your Honor.

2                        **CROSS-EXAMINATION**

3    BY MR. BELLER:

4    Q.  Good afternoon, Mr. Olson.

5    A.  Hello.

6    Q.  Mr. Olson, I represent Mr. Mikell Fries of Claxton Poultry.

7    So I want to ask about your testimony related to your time as

8    CEO and chairman of HMC, okay?

9    A.  Okay.

10   Q.  You had testified to the jury that the individuals who

11   supplied the restaurants, upwards of 300 restaurants, were

12   George's, Pilgrim's, Mar-Jac and Tyson, right?

13   A.  Yes.

14   Q.  Claxton Poultry did not supply HMC with chicken broilers,

15   correct?

16   A.  Not in that time period.

17   Q.  Well, in fact, Mr. Olson, Claxton Poultry has never

18   supplied any HMC franchisee with chicken.

19   A.  I have seen the Claxton name.  It may not have been on

20   chicken on the bone.  It could have been some other products.

21   Q.  Okay.  So fair to say that you have no knowledge, no

22   specific knowledge of Claxton Poultry ever supplying one of

23   your franchisees?

24   A.  With chicken on the bone, no, I don't.

25   Q.  With chicken on the bone.  Well, and any specific knowledge

James Olson - Cross

1    of any other product to any franchisee of HMC ever.

2    A.   There could have been other products besides chicken on the

3    bone.

4    Q.   There could have been, none that you are aware of.

5    A.   Yes.

6    Q.   And you don't know my client, Mr. Mikell Fries?

7    A.   No.

8    Q.   You have never negotiated with Mikell Fries?

9    A.   Never.

10   Q.   You also don't know the salesperson for Claxton Poultry,

11   Scott Brady, correct?

12   A.   I don't know him and --

13   Q.   You've also never negotiated with Scott Brady.

14   A.   No.

15   Q.   The prior president of Claxton Poultry, you never

16   negotiated with him either; is that right?

17   A.   No.

18   Q.   Mr. Lane?

19   A.   No.

20        MR. BELLER:  Thank you, Your Honor.  I have no further

21   questions.

22        THE COURT:  Thank you, Mr. Beller.

23        Ms. Johnson?

24                        **CROSS-EXAMINATION**

25   BY MS. JOHNSON:

1   *Q.*  Mr. Olson, good afternoon.  The good news is I am last.  I

2   have a few -- just a few questions for you, sir.

3           Now, just to be clear, I want to clear up a couple of

4   things.  It's been a long day and I understand that, but I

5   think you told Mr. McLoughlin that you were interviewed several

6   times by the government, correct?

7   *A.*  Yes.

8   *Q.*  And by my count I believe it's five.  Would you agree with

9   that?

10  *A.*  You probably have records on that, so it could be true,

11  yeah.

12  *Q.*  And, in fact, maybe at least three times within the last

13  six days; is that correct?

14  *A.*  Yes.

15  *Q.*  And then a couple of earlier ones.

16  *A.*  Yeah.  I probably didn't count the one when I arrived here.

17  *Q.*  Fair enough.  So I just want to also be clear when you were

18  speaking with Ms. Sweeney earlier today, she asked you a

19  question whether or not you were involved or informed of the

20  RSCS negotiations and your answer was yes.  And I just want to

21  make sure, I think the testimony just clarified that, but to be

22  clear, you were only informed.  You were not involved during

23  the 2014 time period; is that correct?

24  *A.*  Yes, that would be more accurate.  Thank you.

25  *Q.*  And a little bit later Ms. Sweeney asked if you were

James Olson - Cross

1   involved or had influence.  And again, same question.  To be

2   clear, you were only -- you only had influence.  You were not

3   involved; is that correct?

4   A.   Unless you are thinking of as involved as a director.

5   Q.   Fair enough.  But in the data -- in the actual room where

6   it happened, so to speak, in the negotiations themselves you

7   were not involved.

8   A.   No.

9   Q.   Now, you spoke about Mr. Blake.  He is my client.  But you

10  could not recall where you met with Mr. Blake in 2014; is that

11  correct?

12  A.   That's correct.

13  Q.   Do you recall what state it was in?

14  A.   No.

15  Q.   And typically when you have meetings, which I believe you

16  referred earlier that you have lots of meetings, and I can

17  appreciate that, how do you go about setting up your meetings?

18  A.   In this case it would have been organized through the

19  president of our distribution company.

20  Q.   So you would have had a call or an e-mail or a text or a

21  meeting planner or something?

22  A.   Or a verbal communication.

23  Q.   Verbal?

24  A.   Between the president of Quality Distributing and myself

25  that there was going to be a meeting.

James Olson - Cross

1   Q.   And we've talked about Quality Distributing.  It's come up

2   a little bit.  That's Gary Rancatore?

3   A.   Yes.

4   Q.   And you didn't testify that way today, but did you tell the

5   government that Mr. Rancatore was in the meeting with you and

6   Mr. Blake?

7   A.   Yes.

8   Q.   And we know that you weren't discussing the RSCS

9   negotiation.  Was it about the distributing functions that

10  Mr. Rancatore would have been involved in?

11  A.   Yes.

12  Q.   And that would make sense because you would talk about the

13  pricing, the period, payment early, because that's what the

14  distributing companies do, correct?

15  A.   Yes.  They are the one that purchases the products that end

16  up in our restaurants.

17  Q.   And do you own part of Quality Distributing or did you in

18  2014?

19  A.   I did and I do.

20  Q.   And wasn't there a time that RSCS and really your company

21  as well moved over to McLane Distributing?

22  A.   Yes.  Quality Distributing was sold and at that time we

23  moved our business over to Tyson or -- excuse me, Tyson -- to

24  McLane.

25  Q.   To McLane Distributing.

James Olson - Cross

1  *A.*  Yes.

2  *Q.*  And they performed a similar function to Quality

3  Distributing, correct?

4  *A.*  Yes.

5  *Q.*  Would it surprise you that that happened in July of 2014?

6  *A.*  No.

7  *Q.*  No, it would not surprise you?

8  *A.*  No.

9  *Q.*  So when again generally was this meeting with Mr. Blake?

10  *A.*  October or November.

11  *Q.*  So Mr. Rancatore and you -- if you had moved over to

12  McLane, what possible reason would you have to try to negotiate

13  pricing, payment terms, because wouldn't that be going through

14  McLane?

15  *A.*  Yes.  We had kind of a dual system.  McLane would charge

16  the restaurants.  They would be paying bills but -- this is

17  kind of complicated.  McLane would order the goods and deliver

18  it to the store.  We would bill the stores through the old

19  Quality Distributing pricing system, so that's where we would

20  take any discounts that came in.

21  *Q.*  True.  But the bottom line is George's paid McLane, did

22  they not?

23  *A.*  Yes.

24  *Q.*  Okay.  Are you aware that the government has provided

25  50 million documents -- you probably have already heard that

James Olson - Redirect

1    today -- in discovery, and there is not one single phone call

2    between you and Mr. Blake in all of 2014.

3    A.   That doesn't surprise me.

4    Q.   And there is not one single text message?

5    A.   Again, doesn't surprise me.

6    Q.   Not one single meeting planner?

7    A.   Nope.

8         *MS. JOHNSON:*  That's all I have.  Thank you.

9         *THE COURT:*  Thank you, Ms. Johnson.

10        Redirect?

11                    **REDIRECT EXAMINATION**

12   *BY MS. SWEENEY:*

13   Q.   Good afternoon, Mr. Olson.  You spoke at length with

14   Mr. Tubach about a number of meetings that you did not recall

15   happening, is that right, or you did not recall attending; is

16   that right?

17   A.   Not initially, no.

18   Q.   But you testified here earlier today about a meeting with

19   Mr. Roberts that you did remember.

20   A.   Yes.

21   Q.   And a separate meeting with Mr. Blake that you remember.

22   A.   Correct.

23   Q.   Of all the meetings -- you said your life was full of

24   meetings -- why do you remember those two meetings?

25   A.   Because the mutually beneficial communication we had didn't

James Olson - Redirect

1    exist in those meetings, which seemed a change to me.  I

2    remember more clearly the meeting with Brian because it was so

3    similar to the meeting with Rick that it gave me time to pause

4    and think about -- I questioned why was this happening.

5           MR. McLOUGHLIN:  Your Honor, objection.  I think we

6    are going to get into matters -- speculation that Your Honor

7    has already ruled was inappropriate.

8           THE COURT:  Assuming his answer is done, we didn't,

9    and I will overrule the objection.

10   BY MS. SWEENEY:

11   Q.  Mr. Olson, you spent a lot of time talking with the various

12   defense counsel about Defense Exhibit C-755; is that right?

13   A.  I can't remember which one that was.

14   Q.  I don't know what tab in the binder in front of you, but

15   the document has been entered into evidence.  And you testified

16   this was a list of ideas that you put together?

17   A.  Yes.

18          MR. TUBACH:  It's Tab 5.

19          THE COURT:  Thank you.

20   BY MS. SWEENEY:

21   Q.  And could you just remind us why you put this list

22   together?

23   A.  I was hopeful that we could find some solutions that worked

24   for both the chicken suppliers and for the franchisees and

25   company stores so that we could remove future issues with

1    supply.

2    Q.   And did any of the solutions that you put together in this

3    list include having suppliers coordinate on price or on price

4    terms?

5         MR. McLOUGHLIN:   Your Honor.   The document is quite

6    clear.   The document speaks for itself.   This is argument.

7         THE COURT:   Overruled.

8    A.   No.

9         MS. SWEENEY:   Thank you.   The government has no

10   further questions.

11        THE COURT:   Any request that Mr. Olson remain?

12        MR. TUBACH:   With the Court's permission, could I ask

13   one more question of the witness?

14        THE COURT:   No.   We just don't have time in this trial

15   to do recross.   So back to the question of whether Mr. Olson is

16   subject to recall.

17        MR. GILLEN:   Not by Mr. Roberts, Your Honor.

18        MS. JOHNSON:   No, Your Honor.

19        THE COURT:   Anyone who wants him to be?

20        Okay.   Thank you very much, Mr. Olson.   You are

21   excused.

22

23

24

25

```
 1                              INDEX
 2   WITNESSES
 3      James Olson
 4           Direct Examination By Ms. Sweeney            5
 5           Cross-examination By Mr. Gillen             68
 6           Cross-examination By Mr. Tubach             86
 7           Cross-examination By Mr. McLoughlin        123
 8           Cross-examination By Ms. Henry             141
 9           Cross-examination By Mr. Beller            142
10           Cross-examination By Ms. Johnson           143
11           Redirect Examination By Ms. Sweeney        148
12                             EXHIBITS
13   Exhibit        Offered  Received  Refused  Reserved  Withdrawn
14   C-754                    91
15   C-755                    90
16   9236                     40
17   9251                     40
18                     REPORTER'S CERTIFICATE
19      I certify that the foregoing is a correct transcript from
20   the record of proceedings in the above-entitled matter.  Dated
21   at Denver, Colorado, this 4th day of December, 2021.
22
23                            S/Janet M. Coppock
24
25
```