1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2

   Criminal Action No. 20-CR-00152-PAB
3

   UNITED STATES OF AMERICA,
4

        Plaintiff,
5

   vs.
6

   JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
   SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
   TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
   JIMMIE LEE LITTLE,
10 WILLIAM WADE LOVETTE,
   GAR BRIAN ROBERTS,
11 RICKIE PATTERSON BLAKE,

12      Defendants

13 _____

                      REPORTER'S TRANSCRIPT
14                  Excerpt of Trial to Jury
                  Testimony of Joseph Brink, Vol. 2
15 _____

16         Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 8:37 a.m., on the 17th day of November,

19 2021, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25       Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                            APPEARANCES
 2           Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3    Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of
 4    Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing
 5    for Plaintiff.
 6           Anna Tryon Pletcher and Michael Tubach of
 7    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 8    San Francisco, CA 94111-3823;
 9           Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10    N.W., Washington, DC 20006, appearing for Defendant Penn.
11           David Beller, Richard Kornfeld and Kelly Page of
12    Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13    CO 80202, appearing for Defendant Fries.
14           Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15    LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16            Laura Kuykendall and Megan Rahman of Troutman Pepper
17    Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18    appearing for Defendant Brady.
19           Michael Felberg of Reichman, Jorgensen, Lehman,
20    Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21    10017;
22
23
24
25
```

93

```
1                      APPEARANCES (Continued)
2              Laura F. Carwile of Reichman, Jorgensen, Lehman,
3     Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,
4     CA 94065; appearing for Defendant Austin.
5              Elizabeth B. Prewitt of Latham & Watkins, LLP,
6     555 11th Street, N.W., Suite 1000, Washington, DC 20004;
7              Marci Gilligan LaBranche of Stimson, Stancil,
8     LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO
9     80218, appearing for Defendant Mulrenin.
10             James A. Backstrom, Counselor at Law, 1515 Market
11    Street, Suite 1200, Philadelphia, PA 19102-1932;
12             Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,
13    Bethesda, MD 20814, appearing for Defendant Kantola.
14             Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth
15    Street, Suite 1100, Los Angeles, CA 90017;
16             Dennis J. Canty, Canty Law Corporation,
17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,
18    appearing for Defendant Little.
19             John Anderson Fagg, Jr. and James McLoughlin of
20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,
21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.
22
23
24
25
```

```
1              APPEARANCES (Continued)

2          Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5          Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8          Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                    PROCEEDINGS

16         THE COURT:  Anything to take up before we bring the

17   jury back?  Looks like everyone is present and accounted for.

18         Okay.  Let's go ahead and bring the jury in.  And if

19   you can get the witness.

20         (Jury present.)

21         THE COURT:  Good morning, ladies and gentlemen.  Hope

22   you had a good evening.  We are ready to continue with the

23   direct of Mr. Brink.

24         Mr. Torzilli, go ahead.

25         MR. TORZILLI:  Thank you, Your Honor.
```

Joseph Brink - Direct

1        (**Joseph Brink** was previously sworn.)

2                    **DIRECT EXAMINATION CONTINUED**

3    *BY MR. TORZILLI:*

4    *Q.*   Good morning, Mr. Brink.

5    *A.*   Good morning.

6    *Q.*   Did there come a time in 2014 when you brought in a new

7    chicken supplier to supply chicken to Pollo Tropical?

8    *A.*   Yes.

9    *Q.*   Why did you bring in a new chicken supplier to supply your

10   restaurants?

11   *A.*   We brought in a new supplier to add more volume of chicken

12   due to the fact that we were getting less chicken offered by

13   our current supplier.

14   *Q.*   Can you explain why -- can you explain the circumstances as

15   to why you were getting less chicken from your current

16   suppliers?

17   *A.*   Pilgrim's did not give us our volume that we were having.

18   They reduced our volume.  And so we had to bring in another

19   supplier to help mitigate the difference and to have protection

20   as we are in a growth mode at that time.

21   *Q.*   So Pilgrim's was raising your price at that time?

22   *A.*   Yes.

23   *Q.*   And they were reducing your volume?

24   *A.*   Yes.

25   *Q.*   Who was the new chicken supplier that you were bringing

Joseph Brink - Direct

1  onboard?

2  *A.*  Mar-Jac.

3  *Q.*  Can you explain the process that you undertook to bring

4  Mar-Jac onboard?

5  *A.*  We brought in Mar-Jac.  We have a process where suppliers

6  have to get approved.  We have paperwork from the QA

7  department.  We have to do plant inspections.  We have to have

8  the product produced, brought into our test kitchen at the

9  corporate office to have them test the product to make sure it

10 works.  Then we have it go to the restaurant and do a test,

11 make sure it works.  Then we do a bigger test and then they're

12 approved.

13 *Q.*  Is that time and expense that folks at Pollo Tropical need

14 to expend?

15 *A.*  Yes.

16 *Q.*  Did you ultimately negotiate an agreement for chicken

17 supply with Mar-Jac?

18 *A.*  Yes.

19 *Q.*  Do you recall the prices that you agreed to with them?

20 *A.*  I do believe like 19 cents a pound increase like we have

21 right now.

22 *Q.*  So the agreement that you had with Mar-Jac was at the same

23 price levels as the agreements that you ultimately reached with

24 Pilgrim's?

25 *A.*  Correct.

Joseph Brink - Direct

1    Q.   And that you reached with Claxton?

2    A.   Correct.

3    Q.   And how about compared to the agreement that you reached

4    with Holmes?

5    A.   Holmes was less.

6    Q.   I want to go back to our discussion about stair-stepping.

7    And can you remind us what the purpose of stair-stepping prices

8    was in 2014?

9    A.   The purpose of the stair-stepping was to take a large price

10   increase and have an increase spread out over X period amount

11   of time.

12   Q.   Did you ask Holmes whether they would be willing to

13   stair-step their proposed increase?

14   A.   Yes.

15   Q.   And what did you agree to with Holmes on stair-stepping?

16   A.   I don't recall.

17   Q.   Do you recall the time period that the stair-stepping would

18   occur?

19   A.   One year or two years.  I don't really remember exactly.

20   Q.   Did Claxton agree to stair-stepping their increase?

21   A.   Yes.

22   Q.   Do you recall the circumstances of the stair-stepping that

23   you agreed to with Claxton?

24   A.   We took a large like 10-cent increase in January, and then

25   we had a smaller increase in April and a last increase in July.

Joseph Brink - Direct

1  *Q.*  So by July 1st of 2015 the price increase was fully

2  incorporated into the purchases that Pollo was making?

3  *A.*  Correct.

4  *Q.*  And did you ask Pilgrim's whether they would be willing to

5  stair-step the increase?

6  *A.*  Yes, I did.

7  *Q.*  What response did you get from Pilgrim's about

8  stair-stepping the increase?

9  *A.*  They would not cooperate.  The pricing started on

10  January 1st, the full impact.

11  *Q.*  So they rejected your request for stair-stepping the

12  increase?

13  *A.*  Yes.

14  *Q.*  Do you know why?

15  *A.*  No, I do not.

16  *Q.*  You said you came to an agreement with Claxton.  Will you

17  look at Tab 11 of your binder?  You should find there an

18  exhibit that's marked as GX-9726.  Do you see it?

19  *A.*  Yes, I do.

20  *Q.*  Do you recognize it?

21  *A.*  Yes, I do.

22  *Q.*  What is it?

23  *A.*  This is our contract that we issued to Claxton for our

24  chicken for 2015.

25  *Q.*  Is this a document that's in the files of Pollo Tropical?

Joseph Brink - Direct

1    *A.*  Yes, it is.

2    *Q.*  Is the agreement that's contained in Government

3    Exhibit 9726 signed?

4    *A.*  No, it is not.

5    *Q.*  Why is it not signed?

6    *A.*  That is our contract.  We gave it to Claxton and it was

7    going back and forth between the legal departments.  And as of

8    August it still was not completed of 2015.

9    *Q.*  And so the contract for calendar year 2015 was never

10   signed?

11   *A.*  Correct.

12   *Q.*  Did you -- did Pollo Tropical and Claxton abide by -- in

13   your view abide by the terms that are contained in what has

14   been marked as 9726?

15   *A.*  Yes.

16   *Q.*  And was the agreement that's contained in 9726 created and

17   maintained in the regular course of Pollo Tropical's business?

18   *A.*  Yes.

19   *Q.*  And is it a regular part of Pollo Tropical's business to

20   create and maintain agreements with its chicken suppliers?

21   *A.*  Yes.

22   *Q.*  And as far as you know, is the information contained in

23   9726 true and accurate?

24   *A.*  Yes, it is.

25            *MR. TORZILLI:*  Your Honor, offer 9726 into evidence.

Joseph Brink - Direct

1       *MR. BELLER:*  If I may have a moment.

2       *THE COURT:*  You may.

3       *MR. BELLER:*  No objection.

4       *THE COURT:*  Any other objections to Exhibit 9726?

5       All right.  Exhibit 9726 will be admitted.

6       *MR. TORZILLI:*  Thank you, Your Honor.

7       Mr. Brink, you can put that document aside.

8  *BY MR. TORZILLI:*

9  Q.  Did Claxton ever offer a two-year agreement to Pollo

10 Tropical in the negotiations in 2014?

11 A.  Yes, they did.

12 Q.  Do you have an understanding as to why they wanted a

13 two-year contract?

14 A.  To protect themselves for the pricing stair-stepping and

15 they have the volume for two years.

16 Q.  What do you mean by protect themselves?

17 A.  That they were giving a discount on their pricing, so they

18 still had the volume of business for the following year.

19 Q.  What do you mean by discount?  You had testified earlier to

20 a significant price increase.  How does discount figure into

21 what you're describing?

22 A.  They were stair-stepping the price increase, so the full

23 impact of our price increase started in July, not January 1st.

24 So they did not give us a full impact for the full calendar

25 year.

Joseph Brink - Direct

1    *Q.* So you understood that they wanted 18 months worth of the

2    full impact of the price increase?

3    *A.* Yes.

4    *Q.* And what was your response to that proposal?

5    *A.* No.

6    *Q.* Did you ever give an indication to Claxton that you wanted

7    a two-year agreement?

8    *A.* No.

9    *Q.* Why didn't you want a two-year agreement?

10   *A.* I would not accept a price for two years at the current

11   level of the pricing because it was way too high.

12   *Q.* Did there ever come a time when anyone from Claxton told

13   you that Pollo Tropical was changing the agreement?

14        *MR. BELLER:* Objection, vague as to who the speaker is

15   for the determination of hearsay.

16        *THE COURT:* It's a yes/no question.  He can answer.

17   Overruled.

18   *A.* Yes.

19   *BY MR. TORZILLI:*

20   *Q.* Who communicated that to you?

21   *A.* Walter Cooper.

22   *Q.* What did he say?

23   *A.* He said that --

24        *MR. BELLER:* Objection, hearsay.

25        *THE COURT:* Overruled.

Joseph Brink - Direct

1    *A.*  He said it's supposed to be a two-year agreement.

2    *BY MR. TORZILLI:*

3    *Q.*  And what was your response?

4    *A.*  I said our pricing is for the one year.  We can work on the

5    volume for two years, but I would not commit to pricing for two

6    years.

7    *Q.*  So just to be clear, you never indicated to Claxton that

8    you were willing to agree to a two-year contract.

9          *MR. McLOUGHLIN:*  Objection, leading, Your Honor.

10          *THE COURT:*  Sustained.

11   *BY MR. TORZILLI:*

12   *Q.*  Did you ever indicate to Claxton an interest in a two-year

13   contract?

14   *A.*  No.

15   *Q.*  How did the prices that you ultimately agreed to with

16   Pilgrim's, with Claxton and with Mar-Jac compare to each other?

17   *A.*  They were -- at the end they were pretty much the same

18   price.

19   *Q.*  And by pretty much the same price, what do you mean,

20   please?

21   *A.*  Because the stair-stepping, by July they were all the same.

22   *Q.*  By July 1 of 2015 the prices for all three suppliers were

23   the same?

24   *A.*  Correct.

25   *Q.*  Was that true for the split WOG product?

Joseph Brink - Direct

1    *A.*  Correct.

2    *Q.*  Was that also true for the sized breast product?

3    *A.*  Correct.

4    *Q.*  Sir, how long have you been negotiating chicken contracts

5    with suppliers?

6    *A.*  Since 1994.

7    *Q.*  Do you consider yourself a tough negotiator?

8    *A.*  I think I'm fair, yes.

9    *Q.*  Do you consider yourself a successful negotiator?

10   *A.*  Yes.

11   *Q.*  Have you successfully negotiated deals with Mr. Little and

12   with Mr. Cooper, mutually beneficial deals over the years?

13   *A.*  Yes.

14        *MR. McLOUGHLIN:*  Objection, Your Honor.

15   *Q.*  Was 2014 --

16        *THE COURT:*  Hold on.  I haven't ruled on the

17   objection.  Overruled.

18   *BY MR. TORZILLI:*

19   *Q.*  Would you repeat your answer?

20   *A.*  Yes.

21   *Q.*  Was 2014 different?

22   *A.*  Yes.

23   *Q.*  How was it different?

24   *A.*  It was different because the pricing was the highest price

25   increase that we ever received from a chicken company, and

Joseph Brink - Direct

1    there was no negotiation, no talking.  And the matrix of

2    pricing did not match what we had done in the past.

3    *Q.*  Was it typical in your dealings historically with

4    Mr. Little and Mr. Cooper that they would compromise from their

5    initial or opening proposals?

6    *A.*  Typically, yes.

7    *Q.*  Was 2014 different in that regard?

8    *A.*  Yes.

9    *Q.*  How so?

10   *A.*  Pilgrim's offered the price and they would not -- they

11   would not discuss.  They said this is the price.  There is no

12   negotiation.  We want the same margins as large birds.  This is

13   the price.  Take it or leave it.

14   *Q.*  Did you ever explain to Mr. Little the potential or likely

15   impact to Pollo Tropical if the proposed price increases were

16   agreed to?

17          *MR. BELLER:*  Objection, relevance and hearsay, Your

18   Honor.

19          *THE COURT:*  Sustained.

20   *BY MR. TORZILLI:*

21   *Q.*  Sir, I'm going to show you a document that's been marked as

22   Government Exhibit 555.

23          *MR. TORZILLI:*  Your Honor, permission to approach the

24   witness?

25          *THE COURT:*  Yes.

Joseph Brink - Direct

1        MR. BELLER:  May we have a paper copy, please?

2        MR. TORZILLI:  I'll see if I have one.

3   BY MR. TORZILLI:

4   Q.   Do you recognize Exhibit 555?

5   A.   Yes.

6   Q.   What is it?

7   A.   This is an e-mail that I sent to Jimmie Little on

8   October 8th, 2014.

9   Q.   Is this an e-mail that you sent to him in connection with

10  the negotiations that you were having with Mr. Little for Pollo

11  Tropical's chicken supply for the following calendar year?

12  A.   Yes.

13        MR. TORZILLI:  Move to admit Exhibit 555.

14        MR. CANTY:  Objection, hearsay, relevance.

15        THE COURT:  We are not there quite yet.  Any objection

16  to the admission of Exhibit 555?

17        MR. McLOUGHLIN:  Objection with respect to 555, Your

18  Honor, that it is hearsay and cannot be admitted for the truth

19  of the matter asserted by Mr. Brink in the e-mail.  If the

20  government is offering it under some other exception, that's

21  different, but it's hearsay as offered.

22        THE COURT:  I am sorry.  Mr. Canty, what was your

23  objection again?

24        MR. CANTY:  Objection, hearsay and relevance.

25        THE COURT:  Mr. Beller?

Joseph Brink - Direct

1        MR. BELLER:  Your Honor, the Court has sustained this

2    exact objection now twice.  One of it was yesterday quite

3    lengthy on side bar.  One of it was to the last question.  So

4    in addition to what my colleagues have objected, I would add

5    that to their list of objections.

6        THE COURT:  All right.  Mr. Beller's objection will be

7    sustained.

8    BY MR. TORZILLI:

9    Q.  Mr. Brink, what was the magnitude in percentage terms of

10   the price increase that you ultimately agreed to with Mar-Jac,

11   Pilgrim's and Claxton?

12       MR. BELLER:  Objection, relevance, foundation and

13   vague.

14       THE COURT:  Overruled.  He can answer.

15   A.  It was about 20, 25 percent price increase.

16   BY MR. TORZILLI:

17   Q.  Why, sir, were you willing to agree to price increases of

18   that magnitude?

19   A.  I was not willing.  I had no choice.

20   Q.  What do you mean by you had no choice?

21   A.  They would not negotiate.  They would not compromise.  I

22   had to book chicken to protect the brand.

23       MR. TORZILLI:  Thank you, sir.  No further questions.

24       THE COURT:  All right.  Cross-examination?

25       Mr. Canty?

Joseph Brink - Cross

**CROSS-EXAMINATION**

*BY MR. CANTY:*

Q.  Good morning, Mr. Brink.  My name is Dennis Canty.  I
represent Jimmie Little and we are going to ask you some
questions this morning.  Along the lines of what you were
mostly asked about being a tough negotiator and a successful
negotiator, I want to talk to you about some of your
negotiation strategies.

You maintain multiple suppliers for Pollo Tropical; is
that correct?

A.  Yes.

Q.  Okay.  And using multiple suppliers can help to verify
pricing assertions made by suppliers regarding market trends.
Is that fair to say?

A.  Yes.

Q.  You verify what suppliers tell you about the market by
comparing their pricing, right?

A.  Yes.

Q.  Okay.  If one supplier gives you a high price and tells you
it's due to market trends, you can look at pricing from other
suppliers and if their pricing isn't as high, then you have
evidence that market trends don't support the price, right?

A.  Yes.

Q.  Conversely, if you check with other suppliers and their
price is similar, could that be evidence that market trends do

Joseph Brink - Cross

1    support the price increase?

2    A.  Could be.

3    Q.  It's nice to get pricing information from multiple

4    suppliers because it keeps all of them honest.  Is that fair to

5    say?

6    A.  That is true.

7    Q.  You can make sure that they're telling you the truth in

8    your negotiations?

9    A.  I can't tell if they're telling me the truth.  I just get

10   pricing.

11   Q.  But if they are lying to you -- if one of them is lying to

12   you about pricing and about what they're contentions are about

13   the market, you can catch them in the lie if you can talk to

14   the other suppliers, right?

15   A.  I don't know.

16   Q.  Is it important to you that suppliers are honest with you

17   in negotiations?

18   A.  Yes.

19   Q.  That they give you truthful information?

20   A.  Yes.

21   Q.  Because if you're not, the relationship between the parties

22   who are negotiating can break down?

23   A.  Yes.

24   Q.  In negotiating with chicken suppliers, you invoke

25   competitors as being lower priced in order to encourage

Joseph Brink - Cross

1   suppliers to lower their prices, right?

2   *A.*   Yes.

3   *Q.*   And you use this strategy regularly, right?

4   *A.*   I use strategies, multiple strategies.

5   *Q.*   But that's one of them, right?

6   *A.*   That's one of them.

7   *Q.*   And from your perspective there is nothing wrong with that.

8   *A.*   I was just doing my job.

9   *Q.*   And you used that strategy in 2013 in negotiating with

10  Pilgrim's and Claxton for the year 2014 contracts, right?

11  *A.*   I don't recall.

12  *Q.*   You negotiated with chicken suppliers on behalf of Pollo

13  Tropical for their 2014 contract year, right?

14  *A.*   Yes.

15  *Q.*   Okay.  And do you recall using information about

16  competitors' prices to encourage Pilgrim's to lower its price

17  for split WOGs in 2014?

18  *A.*   I don't remember.

19  *Q.*   Who at Pilgrim's did you negotiate with for the 2014

20  contract?

21  *A.*   I do believe it was Jimmie Little.

22        *MR. CANTY:*  Your Honor, could I hand up some exhibits

23  through Ms. Grimm?

24        *THE COURT:*  Yes, you may.

25  *BY MR. CANTY:*

Joseph Brink - Cross

1   Q.  Would you please take a look at what we've marked for

2   identification as Exhibit I-225, please.

3   A.  Yes.

4   Q.  Can you identify it for us, please?

5   A.  It's an e-mail from myself to Matthew Boarman.

6   Q.  And it's an e-mail you sent to Mr. Boarman on November 5,

7   2013, right?

8   A.  Correct.

9   Q.  Who is Matthew Boarman?

10  A.  He was a salesperson at Pilgrim's that we were dealing

11  with.

12  Q.  Did you negotiate with Matthew Boarman for the purchase of

13  chicken from Pilgrim's in 2014?

14  A.  I must have.  I don't remember.

15  Q.  For the 2014 contract year, pardon me, right?

16  A.  Correct.

17  Q.  And this e-mail concerns the 2013 negotiations for the 2014

18  contract year, right?

19  A.  Yes.

20  Q.  Which you were then involved in.

21  A.  Yes.

22  Q.  And this e-mail that you wrote accurately reflects events

23  that were happening to your knowledge at the time of those

24  negotiations?

25  A.  Yes.

Joseph Brink - Cross

1   *Q.*  And you were conveying a message to Mr. Boarman on

2   November 5th, 2013, weren't you?

3   *A.*  Yes.

4   *Q.*  What did you want Mr. Boarman to know?

5   *A.*  I wanted him to know that his prices were too high and he

6   needed to lower his pricing.

7          *MR. TORZILLI:*  Your Honor, objection to further use of

8   the document.  It's not been received into evidence.

9          *THE COURT:*  Well, I'm not sure what use is being put

10  to it, but I don't understand --

11         *MR. CANTY:*  To refresh recollection under 803(5).  The

12  foundation has been laid for that.  It can be read into the

13  record although the evidence has not been admitted as an

14  exhibit.

15         *THE COURT:*  Well, my point is that it hasn't been used

16  yet.  The objection is overruled.  We'll see.

17  *BY MR. CANTY:*

18  *Q.*  So you wanted Pilgrim's to lower its price on split WOGs

19  for the 2014 contract year, right?

20  *A.*  Correct.

21  *Q.*  Okay.  And what information did you share with Mr. Boarman

22  in order to get Pilgrim's to do that?

23  *A.*  I just gave him that there is two competitors, that he

24  needs to lower his pricing to be in the same ball park.

25  *Q.*  Why did you want them to be in the same ball park?

112
Joseph Brink - Cross

 1  *A.*  To have pricing to be -- basically be the pricing to be.

 2  *Q.*  Is the idea that the suppliers' pricing should be the same,

 3  is that helpful to Pollo Tropical's business?

 4  *A.*  It makes it easier for operations and the distributor.

 5  *Q.*  How so?

 6  *A.*  For the pricing to be invoiced and everything else for the

 7  restaurants.

 8  *Q.*  So having suppliers with the same price is something that

 9  is an advantage to Pollo Tropical.

10  *A.*  I wouldn't say an advantage, no.

11  *Q.*  Is it something you were seeking in the negotiations in

12  2013?

13  *A.*  I was seeking to get the best price.

14  *Q.*  And to do so did you tell Mr. Boarman what his competitors'

15  price was?

16  *A.*  I said that would put them in the same playing field.  I

17  gave them guidance and a range.

18  *Q.*  Did you tell Mr. Boarman that, "I just received pricing

19  from two of your competitors and you need to lower the price of

20  WOGs from 89 cents to 88 cents delivered"?

21        *MR. TORZILLI:*  Objection, reading from a document not

22  in evidence.

23        *THE COURT:*  Sustained.

24  *BY MR. CANTY:*

25  *Q.*  Mr. Brink, did you tell Mr. Boarman what his competitors'

Joseph Brink - Cross

1    price was on November 5th, 2013?

2    A.   No.  I said it would put them on the same playing field,

3    give him a range.

4    Q.   You gave him a range?

5    A.   Guidance basically, helping them to get to where we need

6    them to be.

7    Q.   What was the guidance?

8    A.   Telling him he was too high, he needs to lower his pricing.

9    Q.   What was the range?

10   A.   He was a penny too high.

11   Q.   Did the negotiations in 2013 continue from here?

12   A.   I assume so.

13   Q.   Do you recall what happened next?

14   A.   No, I do not.

15   Q.   Did you follow up with Mr. Boarman?

16   A.   I do not remember.

17   Q.   Let's take a look at Exhibit I-226, if you could.

18        Can you identify Exhibit I-226 for us?

19   A.   It's an e-mail that I sent to Matt Boarman on 11/15.

20   Q.   That's 11/15/2013?

21   A.   Yes.

22   Q.   You sent him an e-mail on November 15th at 1:11 p.m.?

23   A.   I guess the time -- it says 6:22:16.  I don't know what

24   time.

25   Q.   I am sorry, the first e-mail on the chain starting from

114

Joseph Brink - Cross

1   below, right?

2   *A.*   I'm sorry.

3   *Q.*   Let me do it this way.   There are several e-mails in the

4   chain, right?

5   *A.*   Yes.

6   *Q.*   And it begins with you sending Mr. Boarman an e-mail on

7   November 15 at 1:11 p.m.?

8   *A.*   Yes.

9   *Q.*   And then he responds to you and then you respond to him,

10   correct?

11   *A.*   Yes.

12   *Q.*   These e-mail messages between you concern the 2013

13   negotiations for the 2014 contract year, right?

14   *A.*   Yes.

15   *Q.*   And which you were then involved in, true?

16   *A.*   Yes.

17   *Q.*   And do these e-mails accurately reflect what was happening

18   to your knowledge at the time of those negotiations?

19   *A.*   Yes.

20   *Q.*   So you followed up with Mr. Boarman on November 15th.   And

21   did you ask him about chicken prices for 2014?

22        *MR. TORZILLI:*   Objection, Your Honor.   The document

23   hasn't been received into evidence.

24        *THE COURT:*   Sustained.

25   *BY MR. CANTY:*

115

Joseph Brink - Cross

1    *Q.*  Did you check in with Mr. Boarman on November 15th?

2    *A.*  Yes.

3    *Q.*  Okay.  And what was the subject of your inquiry?

4    *A.*  I asked him, "Are we ready to go on chicken prices for next

5    year?"

6    *Q.*  And he responded to you, right?

7    *A.*  Yes.

8    *Q.*  And gave you some information?

9    *A.*  Yes.

10   *Q.*  And you responded to that, right?

11          *MR. TORZILLI:*  Objection, Your Honor.  The document

12   has not been received into evidence.

13          *THE COURT:*  The witness appears to be just reading

14   from the document.  There is no -- no independent recollection

15   has been established for this.  Sustained.

16          *MR. TORZILLI:*  Your Honor, may I ask that the document

17   be removed from display?

18          *MR. McLOUGHLIN:*  Your Honor, if we could ask

19   Mr. Torzilli to speak up a little bit.  I can't hear him.

20          *THE COURT:*  Sure, if you would, Mr. Torzilli.

21          *MR. TORZILLI:*  Yes, Your Honor.

22          *THE COURT:*  The document should be taken down unless

23   his recollection is properly refreshed.

24          *MR. CANTY:*  Your Honor, we offer Exhibit I-226 into

25   evidence.

Joseph Brink - Cross

1            *THE COURT:*  Any objection to the admission of Exhibit

2  I-226?

3            *MR. TORZILLI:*  Objection, hearsay.

4            *THE COURT:*  Response?

5            *MR. CANTY:*  The witness has testified it's an e-mail

6  he sent and it's a recorded recollection.

7            *THE COURT:*  Objection sustained.  It's hearsay.

8  *BY MR. CANTY:*

9  *Q.*  Mr. Brink, did you share with Mr. Boarman in November of

10  2013 what his competitors' prices were?

11  *A.*  I stated that there was the pricing and they were too high

12  compared to his other competitors.

13  *Q.*  Did you list his competitors by name in giving him

14  competitive pricing?

15  *A.*  Yes.

16  *Q.*  Who were those competitors?

17  *A.*  Claxton and Holmes.

18  *Q.*  And did you give Mr. Boarman the exact price to the penny

19  that Claxton and Holmes were charging?

20  *A.*  Yes.

21  *Q.*  What was that price?

22  *A.*  88 cents.

23  *Q.*  Why did you do that?

24  *A.*  I wanted them to get the pricing down so we can have

25  pricing that would be to the company -- that's going to be

Joseph Brink - Cross

1   beneficial to both parties.

2   *Q.*  Can you look at Exhibit I-231, please.  When you are ready,

3   can you identify Exhibit -- I231 for us?

4   *A.*  This is our contract that we issued to Claxton Poultry.

5   *Q.*  Is it the contract for the 2014 supply?

6   *A.*  Yes.

7   *Q.*  And looking at the last page, is that your signature?

8   *A.*  Yes, it is.

9   *Q.*  Did you sign this document on or about December 10, 2013?

10  *A.*  Yes, I did.

11  *Q.*  Does Pollo Tropical enter into contracts like these in the

12  regular course of its business?

13  *A.*  Yes.

14  *Q.*  And does it keep records such as these in the regular

15  course of its business?

16  *A.*  Yes.

17  *Q.*  And is this an accurate copy of the contract for the 2014

18  supply year?

19  *A.*  It looks like it.

20       *MR. CANTY:*  We offer I-231.

21       *THE COURT:*  Any objection to the admission of I-231?

22       *MR. TORZILLI:*  No objection, Your Honor.

23       *THE COURT:*  I-231 will be admitted.

24       *MR. CANTY:*  Looking at the first page of I -- may we

25  publish?

Joseph Brink - Cross

1          THE COURT:  You may.

2     BY MR. CANTY:

3     Q.  Looking at the first page of I-231, what is the 2014

4     product price per pound with Claxton?

5     A.  88 cents.

6          MR. CANTY:  Let's look at Exhibit I-228, if we could.

7     BY MR. CANTY:

8     Q.  Can you identify Exhibit I-228 for us?

9     A.  This is the contract from our company to Pilgrim's Pride.

10    Q.  It's for the 2014 contract year?

11    A.  Yes.

12    Q.  Is that your signature on the last page?

13    A.  Yes, it is.

14    Q.  Does Pollo Tropical enter into contracts like these in the

15    ordinary course of its business?

16    A.  Yes.

17    Q.  And keeps records such as this in the ordinary course of

18    its business?

19    A.  Yes.

20    Q.  And is this from your perspective an accurate copy of the

21    2014 contract with Pilgrim's for the 2014 supply year?

22    A.  Yes.

23          MR. CANTY:  We offer I-228.

24          THE COURT:  Any objection to the admission of I-228?

25          MR. TORZILLI:  No, Your Honor.

Joseph Brink - Cross

1          THE COURT:  I-228 will be admitted.

2          MR. CANTY:  May we publish?

3          THE COURT:  You may.

4    BY MR. CANTY:

5    Q.  The first page, what is the price, the contract price for

6    2014 for split WOGs with Pilgrim's?

7    A.  88 cents.

8    Q.  Identical to Claxton, right?

9    A.  Same price.

10   Q.  That's a product of your tough negotiation, right?

11   A.  It's the final price that we agreed to.

12   Q.  You wanted them both at 88 cents, right?

13   A.  I wanted the best price to be.

14   Q.  Now, for the 2015 contract year Mr. Little was the

15   Pilgrim's representative that you worked with, right?

16   A.  What year now?

17   Q.  The 2015 contract year, 2014 negotiations.

18   A.  Correct.

19   Q.  And when Mr. Little -- when did Mr. Little first reach out

20   to you to talk about pricing for 2015?

21   A.  It was -- I do recall we met for lunch late August, early

22   September.  We had a meeting just to catch up on stuff, and

23   then that's when the topic of pricing for 2015 was brought up.

24   The meeting stopped.  And then two weeks later we started

25   having our conversations for pricing.

Joseph Brink - Cross

1        MR. CANTY:  Let's pull up Government Exhibit 561,

2    please.

3    BY MR. CANTY:

4    Q.  Can you identify Government Exhibit 561 for us?

5    A.  I can barely read it.  These are e-mails back and forth

6    from Jimmie Little and myself.

7    Q.  Are these e-mails between you and Mr. Little on August 13th

8    and 14th of 2014?

9    A.  Yes.

10   Q.  Do they accurately reflect the negotiations you were having

11   with Mr. Little at the time?

12   A.  I don't remember.

13   Q.  You testified that you met Mr. Little for lunch at Pollo

14   Tropical in Addison, Texas, right?

15   A.  Correct.

16   Q.  Does this appear to you to be the messages between you and

17   he leading up to that meeting?

18   A.  I don't remember.

19        MR. CANTY:  Your Honor, this exhibit has been the

20   subject of prior discussions and the government plans to

21   introduce it.  It's been ruled admissible.  We offer it at this

22   point.

23        THE COURT:  Any objection to the admission of

24   Exhibit 561?

25        MR. TORZILLI:  Your Honor, we don't object, but from

Joseph Brink - Cross

1  previous discussions that were had, we understand that it's

2  associated with a limiting instruction that Your Honor is

3  prepared to give.

4       THE COURT:  Well, not necessarily.  It's being offered

5  right now.  So the question is whether there is any objection

6  to it.

7       MR. TORZILLI:  No, we don't object to the admission of

8  this.

9       THE COURT:  Mr. McLoughlin?

10      MR. McLOUGHLIN:  Your Honor, pursuant to the Court's

11  prior ruling, we would request a limiting instruction.

12      THE COURT:  Let me take a look at what that limiting

13  instruction was.  Let's go on side bar.

14     (At the bench:)

15      THE COURT:  So refresh my memory, what was the

16  limiting instruction?

17      MR. TORZILLI:  I think the limiting instruction was

18  that Mr. Brink's statements were only offered for the effect on

19  the recipient for a non -- for that nontruth purpose.

20      THE COURT:  Okay.  Was there anything else that was

21  part of the limiting instruction?

22      MR. TORZILLI:  Your Honor, may I have a moment to

23  confer and confirm that?

24      THE COURT:  Sure.

25      MR. TORZILLI:  Thank you, Your Honor.  After

Joseph Brink - Cross

1    conferring with my colleagues, I confirm that the limiting

2    instruction is as I stated it.

3         THE COURT:  Okay.  Mr. McLoughlin, does that sound

4    right to you?

5         MR. McLOUGHLIN:  It does, Your Honor.

6         THE COURT:  Mr. Canty, anything from you?

7         MR. CANTY:  No, Your Honor.

8         MS. HENRY:  Your Honor, on behalf of Defendant

9    Kantola, since we have the issue of continuing -- we have

10   limiting instructions among everyone, we do not agree to the

11   limiting instruction and do not request it.

12        THE COURT:  Okay.  Anything more on that, Ms. Henry?

13        MS. HENRY:  No, Your Honor.

14        MR. POLLACK:  Your Honor, Gary Pollack on behalf of

15   Mr. Blake.  We will opt out and not join in Ms. Henry's

16   request.  We would like a limiting instruction.

17        THE COURT:  Okay.  Then I will go ahead and provide

18   that limiting instruction as to Mr. Brink's statements.  Thank

19   you.

20      (In open court:)

21        THE COURT:  Ladies and gentlemen, Exhibit 561 will be

22   admitted.

23        Can you display that on my screen, please?

24        However, ladies and gentlemen, the statements of

25   Mr. Brink's will be admitted for a limited purpose, namely not

Joseph Brink - Cross

1   for the truth of the matters asserted, but rather only for the

2   effect on the listener.

3           Exhibit 561 will be admitted with that limitation.

4           Go ahead, Mr. Canty.

5       *MR. CANTY:*  Thank you, Your Honor.

6   *BY MR. CANTY:*

7   *Q.*  Do you see Exhibit 561?  Government Exhibit 561 begins with

8   an e-mail from Mr. Little to you on August 13.

9           *THE COURT:*  Mr. Canty, did you want to display that?

10          *MR. CANTY:*  That would be preferable, Your Honor.

11          *THE COURT:*  You may.

12          *MR. CANTY:*  Thank you.

13  *A.*  Yes.

14  *BY MR. CANTY:*

15  *Q.*  He is asking you to send current specs for breasts and

16  splits, right?

17  *A.*  For both brands.

18  *Q.*  And he wants to review these so that we can start talking

19  about 2015 pricing; isn't that right?

20  *A.*  He said he needed them to review for 2015 discussions.

21  *Q.*  Okay.  So -- and discussions, I mean, we're going to be

22  talking about pricing, right?

23  *A.*  I assume so.

24  *Q.*  I'm trying to pinpoint the date on which you and Mr. Little

25  first had a lunch in 2014 to discuss the concept of 2015

Joseph Brink - Cross

 1    pricing and the price increases that you talked about

 2    yesterday.  Does this e-mail refresh your recollection that

 3    that meeting with Mr. Little would have occurred on August 14

 4    of 2014 or thereabouts?

 5    A.  I don't remember exactly, but I do remember we were looking

 6    at getting Pilgrim's the opportunity to bid for chicken breasts

 7    for both brands at the time we owned and giving him the specs.

 8    And that's what -- primarily the meeting was to go, to see how

 9    it was going, the specifications.  Can they do it?  That's the

10    first question.  Can they do it?  Are they able to do it?  And

11    that was the whole process of starting the specification

12    exchange.

13    Q.  So you did have lunch with Mr. Little on August 14, 2014?

14    A.  I assume that's the date.  I don't remember the date

15    exactly, but it's about that time.

16    Q.  All right.  Do you recall whether at that meeting

17    Mr. Little talked to you about the price increases for 2015?

18    A.  Towards the end of our lunch the discussion came up about

19    chicken pricing for 2015, and that's when he said, "It will be

20    2."  I said, "2 cents?"  He said, "No.  It will start with a

21    2."  And that's when the meeting ended.

22    Q.  And that's what I was trying to do.  I was trying to get a

23    feel for when that conversation happened, and August 14 --

24    A.  I assume that's the date.  I don't know for sure.  I assume

25    that's the date.

Joseph Brink - Cross

1    *Q.*  Do you have an understanding of why Mr. Little was

2    preparing you for a price increase for the year 2015?

3    *A.*  Do not know.

4    *Q.*  Let's look at Government Exhibit 548 which you were asked

5    about yesterday and is in evidence.

6            *MR. CANTY:*  May we publish, Your Honor?

7            *THE COURT:*  You may.

8    *BY MR. CANTY:*

9    *Q.*  Do you recall this e-mail from September 16, 2014?

10   *A.*  Yes.

11   *Q.*  And Mr. Little is checking in with you wanting to know what

12   works for you to know 2015 pricing?

13   *A.*  Correct.

14   *Q.*  And what he is saying in his e-mail to you is that he

15   doesn't want you to be surprised by the price increase, right?

16   *A.*  Correct.

17   *Q.*  He wants you to be ready, right?

18   *A.*  It says, "I don't want you to be surprised not be ready."

19   *Q.*  He had a typo in the beginning of the e-mail, right?  It

20   said "I don't want you to be ready"?  In fact, what he meant

21   was the opposite?

22   *A.*  Yes.

23   *Q.*  So you understood that Mr. Little was coming to you with

24   this pricing information as early as he could because he didn't

25   want you to be surprised.  He wanted you to be ready, right?

Joseph Brink - Cross

1    *A.*   That's what he said.   We don't do chicken typically that

2    early in the year.

3        *MR. CANTY:*   Let's look at Government Exhibit 547, if

4    we could.   I will give the government a moment to take a look

5    at what I'm talking about.   And I will begin by saying I

6    believe this is something that the government plans to admit

7    and has been already ruled on and will offer it at this time.

8    We offer 547.

9        *THE COURT:*   Any objection to the admission of

10   Exhibit 547?

11       *MR. TORZILLI:*   Your Honor, I don't think it's been

12   raised in previous proceedings.

13       *MR. McLOUGHLIN:*   I apologize, Your Honor.   I cannot

14   hear Mr. Torzilli.

15       *THE COURT:*   Mr. Torzilli, could you articulate that a

16   little bit louder?

17       *MR. TORZILLI:*   I don't think this was raised in

18   previous proceedings, Your Honor.

19       *MR. CANTY:*   If I am wrong, I'll move on.   Does the

20   government have an objection?

21       *THE COURT:*   That's ultimately the issue.   So any

22   objection to the admission, not just by the government, but by

23   anyone to Exhibit 547?

24       *MR. TORZILLI:*   It's hearsay, Your Honor.

25       *THE COURT:*   Response?

Joseph Brink - Cross

1        MR. CANTY:  We'll withdraw, Your Honor.

2        THE COURT:  Okay.  547 will be withdrawn, the request

3    to admit it.

4    BY MR. CANTY:

5    Q.  Let's look at Government Exhibit 9740, which I believe you

6    were asked about yesterday.  And I want to draw your attention

7    to the last and next to last page where that last message is

8    split across.

9        MR. CANTY:  May we publish, Your Honor?

10       THE COURT:  I'm sorry.  Which exhibit number is this

11   one?

12       MR. CANTY:  9740.

13       THE COURT:  Has it been admitted?  Okay.  It has been

14   admitted and may be published.

15   BY MR. CANTY:

16   Q.  And this is when you first received Claxton pricing for

17   2015; is that right?

18   A.  Correct.

19   Q.  And here on September 22nd, 2014, Mr. Cooper gives you

20   pricing of $1.07 delivered on split WOGs, right?

21   A.  Yes.

22   Q.  Did Mr. Cooper ever at any time in 2014 give you an FOB

23   price for split WOGs?

24   A.  I do not remember.

25   Q.  His pricing was always delivered pricing, wasn't it?

Joseph Brink - Cross

1    A.  At the beginning he gave me pricing, but I do believe later

2    on I broke out the pricing because I got the freight adjusted

3    later on.  This was the first pass of pricing.

4    Q.  Did Mr. Cooper ever give you an FOB price?

5    A.  Later on in the year, yes, he did.

6    Q.  When was that?

7    A.  I do not remember the actual date.

8    Q.  Is it fair to say that going into negotiations with chicken

9    suppliers, you have an idea of the volume that Pollo Tropical

10   is going to need over the course of the year?

11   A.  I'm sorry, what now?

12   Q.  Sure.  When you go into negotiations with chicken

13   suppliers, you have an idea of the volume that Pollo Tropical

14   is going to need for the coming year, right?

15   A.  Correct.

16   Q.  Okay.  And one of the things you're trying to do during

17   negotiations is figure out how much chicken, how much volume

18   you can get from each supplier, true?

19   A.  I'm sorry, I don't understand your question.

20   Q.  Sure.  One of the things you're trying to figure out in

21   negotiations is how much volume each supplier is going to get,

22   right?

23   A.  I'm asking suppliers how much chicken volume can they do

24   for us.

25   Q.  Okay.  With the idea that between all of the suppliers,

129

1   some of them will take this much -- some of this -- each of

2   them will take a part of the volume that makes up your annual

3   need, true?

4   A.   Correct.

5   Q.   Okay.  Mr. Cooper in No. 3 in this e-mail says, "Increase

6   in volume between 500K," 500,000, "to 1 million pounds on the

7   splits."  Do you see that?

8   A.   Yes.

9   Q.   He is saying that he can increase volume.

10  A.   Yes.

11  Q.   Right?  He can double the volume that you might ask of him,

12  right?

13  A.   That is not correct.

14  Q.   Okay.  How do you interpret that?

15  A.   This is -- he wanted to increase his current volume by that

16  much.

17  Q.   His current volume.

18  A.   Correct.

19  Q.   And when -- so that's an interesting point too.  You're

20  saying right now in 2013 as -- in 2014 as you are talking to

21  him, he is saying he could give you more volume on the splits?

22  A.   That's what I took out of it, yes.

23  Q.   Anytime that -- well, strike that.

24       In doing so, in doing so he is competing with the

25  suppliers, is he not?

Joseph Brink - Cross

1    A.   Yes.

2    Q.   He is saying, I can give you this volume.  Give it to me

3    instead of the other suppliers, right?

4    A.   No.

5    Q.   Okay.  Explain your answer, please.

6    A.   He is just giving me his ability of how much chicken he can

7    do for us for the next calendar year.

8    Q.   For the next calendar year.

9    A.   Correct.

10   Q.   So he is saying, give me that volume.  Don't give it to

11   another supplier, right?

12   A.   No.  Is just saying this is how much chicken he can give,

13   that he can provide for our company.

14   Q.   Mr. Cooper wants as much volume as you can give him, right?

15   A.   I don't know what he wanted.

16   Q.   But he's telling you, I'll take up to a million pounds,

17   right?

18   A.   He just said they had the ability to take on more chicken.

19   Q.   Did you respond to Mr. Cooper?  You did, right?

20   A.   I'm sure I did.

21   Q.   You told Mr. Cooper that his pricing, the $1.07 a pound,

22   was a larger increase than Pilgrim's, right?

23   A.   I don't remember.  I don't see it here on the e-mails.

24        MR. CANTY:  Can we scroll up a page?

25   A.   This is a reference because of the fact that they were

Joseph Brink - Cross

1   going to change the way how they were going to bill us on our

2   chicken.  So our final end case weights were going to be

3   higher; therefore, the pricing per case is going to be higher

4   than Pilgrim's.

5   *BY MR. CANTY:*

6   *Q.*  Okay.  So is it your testimony sitting here today that when

7   you said to Walter, "This is a larger increase than Pilgrim's,"

8   you weren't talking about the $1.07 per pound in 2015?

9   *A.*  It was a combination of both.  The final end product, we

10  buy it by the case.  So if we're buying per the case and the

11  case weights are now higher than our spec range, we are paying

12  more money for our chicken overall compared to the competitor.

13  *Q.*  Is it your testimony that you were telling Mr. Cooper that

14  $1.07 a pound was a larger increase than Pilgrim's or you

15  weren't?

16  *A.*  I'm talking about combination of both.  It takes, one, with

17  the change of a spec range equals our case weight.  That is

18  what we get charged by Claxton, a fixed case weight price.

19  *Q.*  You didn't have pricing from Pilgrim's on September 22,

20  2014, did you?

21  *A.*  Yes, I did.

22  *Q.*  You did.

23  *A.*  On an e-mail -- on a phone conference.

24  *Q.*  And you testified that -- let's go up the chain to the top.

25          I think you testified yesterday about the increase is

Joseph Brink - Cross

1    19 cents per case, meaning 19 cents per pound, and that is

2    basically what Pilgrim's is charging us, right?

3    A.  Correct.

4    Q.  And that's the price that you testified yesterday you got

5    from Pilgrim's in a conference call, right?

6    A.  I do believe, yes.

7    Q.  You testified that you had a conference call with

8    Mr. Little and your CFO on September 22?

9    A.  Yes.

10   Q.  And Mr. Little told you a price, right?

11   A.  Yes.

12   Q.  A price that was a 19-cent increase?

13   A.  Yes.

14   Q.  And he said the price is the price?

15   A.  Yes.

16   Q.  And you had until 2:00 p.m. to accept the price?

17   A.  Correct.

18   Q.  Would you agree with me, sir, that if Mr. Little didn't

19   have a price yet to give you on September 22, that your

20   testimony is just plain false?

21   A.  Excuse me?  I don't understand the question.

22   Q.  Isn't it a fact, sir, that on September 22 Mr. Little

23   didn't yet have a price from the pricing group at Pilgrim's

24   that he could give you?

25            MR. TORZILLI:  Objection, foundation.

Joseph Brink - Cross

1          *THE COURT:*  Overruled.  He can answer if he knows.

2   *A.*  I was given the price over the phone from Jimmie Little of

3   19 cents per pound.

4   *BY MR. CANTY:*

5   *Q.*  Do you recall that Mr. Little gave you a -- during that

6   call Mr. Little gave you a range of what you might expect to

7   see in 2015 and not an actual price?

8   *A.*  No.

9   *Q.*  Do you recall what range of price increase that was that

10  Mr. Little gave you during the call?

11         *MR. TORZILLI:*  Objection, foundation.

12         *THE COURT:*  Overruled.  He can answer if he

13  understands.

14  *A.*  I don't understand your question.

15         *MR. CANTY:*  Let's pull up Government Exhibit 563 and

16  564 side by side, if we could.  Your Honor, these are

17  government exhibits we have gone over already that the

18  government indicated they wished to introduce after the

19  testimony of Mr. Brink, and we would move them into evidence

20  now instead.

21         *THE COURT:*  First of all, the fact that the government

22  may have an intention that was expressed outside, not in front

23  of the jury, is irrelevant and should not be mentioned.  And

24  you're offering both of these now?

25         *MR. CANTY:*  Yes.

Joseph Brink - Cross

1         THE COURT:  Any objection to the admission of

2    Exhibit 563 and 564?

3         MR. TORZILLI:  No objection, Your Honor.

4         THE COURT:  Exhibits 563 and 564 will be admitted.

5         MR. CANTY:  Permission to publish, Your Honor?

6         THE COURT:  You may.

7    BY MR. CANTY:

8    Q.  Let's look at Exhibit 563 first.

9         My question to you, Mr. Brink, is you're aware that

10   Mr. Little in giving you pricing for the 2015 contract year

11   needed to go back to the pricing group at Pilgrim's and get

12   pricing information, right?

13        MR. TORZILLI:  Your Honor, I object.  The witness is

14   not a participant in either of the two e-mails that are being

15   displayed to him.

16        THE COURT:  I am going to sustain the objection.  He

17   can -- if you could rephrase that, Mr. Canty.

18   BY MR. CANTY:

19   Q.  Mr. Brink, did you understand that in getting pricing and

20   offering you and Pollo Tropical pricing for the year 2015,

21   Mr. Little would need to go to the Pilgrim's pricing group and

22   get that pricing to be able to give it to you?

23        MR. TORZILLI:  Objection, foundation.

24        MR. CANTY:  I asked for his understanding.

25        THE COURT:  Overruled.  He can answer if he knows.

Joseph Brink - Cross

1    *A.  I do not know.*

2    *BY MR. CANTY:*

3    *Q.  Was it your understanding in the course of your*

4    negotiations with Mr. Little over the years that Mr. Little set

5    the prices for Pilgrim's?

6    *A.  Again, I got pricing.  I don't know where all the pricing*

7    comes from in the company.

8    *Q.  Was it your understanding that Mr. Little came up with the*

9    pricing or that someone else at Pilgrim's did?

10   *A.  I do not know.*

11   *Q.  Let's look at Government's Exhibit 564.  That's an e-mail*

12   from Mr. Little to Mr. Boarman on September 23rd, 2014.  That's

13   the day after your conference call, right?

14   *A.  That's the date, yes.*

15   *Q.  Okay.  And what Mr. Little says to Boarman is that, "Joe*

16   did not handle the 15 to 22 cent increase well as expected!"

17           Do you see that?

18   *A.  Yes.*

19   *Q.  Does that refresh your recollection that what Mr. Little*

20   told you on your conference call was that there would be a

21   range of 15 to 22-cent increase?

22   *A.  No.*

23   *Q.  And you maintain your testimony that Mr. Little gave you a*

24   price of a 19-cent increase?

25           *MR. CANTY:  Yes.  Let's look at Government*

Joseph Brink - Cross

1   Exhibit 566, please, which is in evidence.

2           May we publish, Your Honor?

3           THE COURT:  You may.

4           MR. CANTY:  Let's look at the beginning e-mail all the

5   way to the bottom, if we could.

6   BY MR. CANTY:

7   Q.  Do you remember being asked questions about this e-mail

8   yesterday?

9   A.  Yes.

10  Q.  September 29th is a full week after your alleged conference

11  call with Mr. Little, right?

12  A.  Yes.

13  Q.  And at your request he is sending pricing and supply for

14  2015 via e-mail, right?

15  A.  Correct.

16  Q.  And he gives you $1.02 FOB, right?

17  A.  Correct.

18  Q.  Is that a 19-cent increase over the 88 cents from 2013?

19  A.  That's not apples to apples.  It's not the same pricing

20  parameters.  We had delivered pricing.  This is FOB pricing,

21  not the same pricing matrix.

22  Q.  I understand that FOB is not the same as delivered.  We

23  went over that yesterday.  Mr. Little doesn't give you freight

24  in this e-mail, does he?

25  A.  On this e-mail, no, he does not.

Joseph Brink - Cross

1   Q.  Mr. Little doesn't give you freight until, if we look at

2   this e-mail further up, until October 2nd, 2014; isn't that

3   right?

4   A.  I can't tell here.  October 2nd, yes.

5   Q.  And with that freight added, then we get -- we come to

6   $1.07125, right?

7   A.  Correct.

8   Q.  But it's not until October 2 that you get that full price

9   from Mr. Little, right?

10  A.  In writing, yes.

11       MR. CANTY:  Now let's go back down to the first couple

12  e-mails in that chain beginning with Mr. Brink's e-mail

13  replying on September 30th.

14  BY MR. CANTY:

15  Q.  Now, Mr. Little is giving you $1.02 FOB pricing on split

16  WOGs, right?

17  A.  Yes.

18  Q.  And you reply to him among other things -- I am going to

19  select some sentences here -- "Your competitors have submitted

20  pricing that matches you but it was delivered pricing."

21       Do you see that?

22  A.  Yes.

23  Q.  Again -- and below, "Again your pricing below should be

24  delivered to current final destination points and then you

25  match your competitors."

Joseph Brink - Cross

1              Do you see that?

2    *A.*    Yes.

3    *Q.*    As of September 30, 2014, had any other supplier offered

4    you a price of $1.02 delivered on split WOGs?

5    *A.*    On split WOGs?

6    *Q.*    Yeah.

7    *A.*    I had one supplier, yes, lower, not same price.

8    *Q.*    Listen to my question.  As of September 30, 2014, had any

9    other supplier offered you a price of $1.02 delivered on split

10   WOGs?

11   *A.*    I don't recall exactly the dates.

12   *Q.*    You had two other competitors, right?  It was Claxton and

13   Holmes?

14   *A.*    Correct.

15   *Q.*    And Claxton we know we saw was at $1.07, right?

16   *A.*    Uh-huh.

17   *Q.*    And Holmes you testified yesterday was 10 cents lower than

18   everybody, right?

19   *A.*    Right.

20   *Q.*    So that's lower than $1.02, right?

21   *A.*    I guess so.

22   *Q.*    So when you're telling Mr. Little that you have a

23   competitor at $1.02, that's not true, is it?

24   *A.*    I'm not giving the actual pricing.  It is I had suppliers

25   who had lower pricing.

Joseph Brink - Cross

1    *Q.* Well, you double-down.  October 2 at 11:08 a.m. --

2           *MR. CANTY:* Can we go up and see that?

3    *BY MR. CANTY:*

4    *Q.* You said, "Again your competitors are lower than you with

5    delivered pricing compared to your FOB pricing.  Pilgrim's

6    needs to match to show compromise." Do you see that?

7    *A.* Uh-huh.

8    *Q.* You're telling Mr. Little that Pilgrim's needs to match

9    $1.02 to show compromise, right?

10   *A.* No.  I'm telling him he needs to lower his price to show

11   compromise.

12   *Q.* Higher up at 8:22 a.m. you do it again.  "Again this is not

13   going to work and Pilgrim's needs to match pricing from your

14   competitors." Do you see that?

15   *A.* Yes.

16   *Q.* And what you're telling Mr. Little is that you have

17   competitors at $1.02 delivered and he needs to match that,

18   right?

19   *A.* No, I'm not, because that's not what it states here.

20   *Q.* You're not telling Mr. Little he needs to match the $1.02?

21   *A.* No.

22   *Q.* Yesterday when the government was asking you questions,

23   Mr. Torzilli, he said:  What are you trying to refer to when

24   you say "then you match your competitors?"

25           And your testimony, Answer:  That he should have his

140

Joseph Brink - Cross

1   final delivered pricing in to us so I could match up the final

2   cost going into a distributor, so I can match apples to apples

3   or chicken to chicken.

4           Do you remember that?

5   A.  Correct.

6   Q.  So not only were you lying to Mr. Little in your e-mail,

7   but now you were lying to this jury about your lying, right?

8   A.  No.  You asked if this pricing was to matching the FOB.  He

9   lists the freight costs.  So I am looking at FOB plus freight

10  equals a final cost to our distributor.  His final pricing was

11  higher than the competitors.  That's what I'm talking about.

12  Q.  I want to talk a little bit about -- Holmes Foods had --

13  what was Holmes Foods' price for 2015?

14  A.  I don't remember exactly.  I think they were about 9 or 10

15  cents less total delivered cost than Pilgrim's.

16  Q.  And it was different than Pilgrim's, right?

17  A.  Correct.

18  Q.  So if anybody said that in the 2014, 2015 time period that

19  Holmes Foods agreed with Pilgrim's on a price, that would be

20  flat out wrong, wouldn't it?

21  A.  I don't understand your question.

22          MR. TORZILLI:  Objection, foundation.

23          THE COURT:  Overruled.

24  BY MR. CANTY:

25  Q.  That would be flat out wrong, wouldn't it?

Joseph Brink - Cross

1   A.   I don't understand your question.

2   Q.   Sure.  Pilgrim's price for 2015 was what?

3   A.   Delivered, $1.07125.

4   Q.   And Holmes was?

5   A.   I would have to look at the exact price, but it was less.

6   Q.   But at least 9 or 10 cents less, right?

7   A.   Correct.

8   Q.   So if anybody said that those two companies agreed on a

9   price, that would be flat out wrong, right?

10          MR. TORZILLI:  Objection, also vague.

11          THE COURT:  Sustained.  It is unclear.

12          MR. CANTY:  That's all I have, Your Honor.

13          THE COURT:  Thank you, Mr. Canty.

14          Additional cross-examination?

15          Mr. Beller, go ahead.

16          MR. BELLER:  Thank you, Your Honor.

17                          **CROSS-EXAMINATION**

18   BY MR. BELLER:

19   Q.   Good morning, Mr. Brink.  Mr. Brink, my name is David

20   Beller.  I represent Mikell Fries of Claxton Poultry.  I am

21   going to be asking you some questions today as well, okay?

22   A.   Okay.

23   Q.   So I want to talk about who you were doing business with

24   while you were negotiating on behalf of Pollo Tropical.  So you

25   know, Mr. Brink, that you are testifying today in a federal

Joseph Brink - Cross

1  criminal case against individuals, right?

2  A.  Correct.

3  Q.  Okay.  And so the individuals that you dealt with were

4  Jimmie Little at Pilgrim's, right?

5  A.  Correct.

6  Q.  John Cortill at Holmes Foods.

7  A.  Correct.

8  Q.  Walter Cooper at Claxton Poultry.

9  A.  Correct.

10  Q.  And Mr. Cooper at Claxton Poultry had the title of sales

11  manager.

12  A.  Correct.

13  Q.  Scott Brady of Claxton Poultry was not your main point of

14  contact.

15  A.  Correct.

16  Q.  Mikell Fries was not your main point of contact.

17  A.  Correct.

18  Q.  Mikell Fries in 2014 when you were negotiating with

19  Mr. Cooper also had the title of sales manager.

20  A.  I do not know.

21  Q.  Fair.  You were not negotiating with Jerry Lane, who was

22  then the president/CEO of Claxton Poultry.

23  A.  Correct.

24  Q.  And while you know Mr. Fries, you did not deal with him on

25  pricing.

Joseph Brink - Cross

1   A.   Correct.

2   Q.   Same questions with Mr. Brady.  While you may know

3   Mr. Brady, he was not negotiating with you on pricing for Pollo

4   Tropical.

5   A.   Correct.

6   Q.   Your job, Mr. Brink, as I understand it, is to obtain

7   competitive pricing from suppliers for chicken in addition to

8   other supplies, fair?

9   A.   Correct.

10  Q.   And I believe you testified on direct examination that you

11  conduct market research to maintain awareness about current and

12  market pricing.

13  A.   I said I look at the pricing of feed and things that go

14  into the cost of chicken.

15  Q.   Sure.  And one of those things is that you look at the

16  Urner-Barry Market Index to research trends.

17  A.   That's one of the markets I look at.

18  Q.   Now, on the Urner-Barry market we are talking about split

19  WOGs, correct?

20  A.   I was looking at the price of corn.

21  Q.   Oh, excuse me.  So you're looking at the price of feed on

22  Urner-Barry.

23  A.   No, I'm looking at the price of corn first on the Chicago

24  Mercantile Exchange.  I look at the reports and look at the

25  trends of grain, as that is one of the main ingredients that

Joseph Brink - Cross

1   goes into the cost of producing chickens.

2   Q.  I understand that.  Do you also look at Urner-Barry chicken

3   prices?

4   A.  Yes.

5   Q.  Okay.  And so on Urner-Barry chicken prices there is many

6   different categories, right?

7   A.  Correct.

8   Q.  One of the categories is WOG, meaning without giblets.

9   A.  Correct.

10  Q.  You purchase WOGs, but your WOGs are split, correct?

11  A.  Correct.

12  Q.  So it's not necessarily an exact comparison; is that right?

13  A.  Correct.

14  Q.  And you also look at Urner-Barry eight-piece cut-up, right?

15  A.  No.

16  Q.  So let me understand.  So WOGs get -- you purchased WOGs

17  that are cut.

18  A.  But they are not cut into eight-piece cut.

19  Q.  I completely understand.  Bear with me.  Answer my

20  question.  You purchase WOGs that are cut.

21  A.  Correct.

22  Q.  Okay.  So if you're looking at Urner-Barry WOG price, that

23  is not what you're buying.  You're buying a WOG that has been

24  cut.

25  A.  Correct.

Joseph Brink - Cross

1    Q.   Now, what you're not buying to your point is a WOG that has

2    been cut into eight pieces.

3    A.   Correct.

4    Q.   So when we're looking at an Urner-Barry market, your

5    product fits somewhere in between a WOG price and a WOG

6    eight-piece price.

7    A.   Okay.

8    Q.   Is that right?

9    A.   Probably.

10   Q.   Because the WOG eight-piece is cut on the exact same

11   machine as your WOG that is cut in half, right?

12        MR. TORZILLI:  Objection, foundation.

13        THE COURT:  He can answer if he knows.

14   A.   I don't know if it's the same machine.

15   BY MR. BELLER:

16   Q.   Understood, and I appreciate that answer.  For purposes of

17   my clarification because you have said that you study the

18   markets and you consult with the markets, I am trying to get an

19   idea of which markets you're looking at.

20   A.   I get reports from different markets.

21   Q.   All right.  And you would agree with me that Pollo Tropical

22   only sells Grade A meat, right?

23   A.   Yes.

24   Q.   Okay.  Now, these market reports that you're looking at

25   that are provided to you you would agree with me are relied on

Joseph Brink - Cross

1    by people in the broiler industry.

2             *MR. TORZILLI:*  Objection, foundation.

3             *THE COURT:*  He can answer if he knows.

4    *A.*  I do not know.

5    *BY MR. BELLER:*

6    *Q.*  Well, you certainly rely on them.  That's what you had

7    testified to, right?

8    *A.*  Correct.

9    *Q.*  And you are in the broiler industry.

10   *A.*  I am in the restaurant industry.

11   *Q.*  Purchasing broilers.

12   *A.*  And other products too.

13   *Q.*  I appreciate that.  Let me be clear because I didn't ask

14   you about other products.

15             You are in the broiler industry and you purchase

16   broilers.  Is that a true statement?

17             *MR. TORZILLI:*  Your Honor, may we have a side bar?

18             *THE COURT:*  Yes.

19        (At the bench:)

20             *THE COURT:*  Mr. Torzilli, go ahead.

21             *MR. TORZILLI:*  I wanted to make an objection at side

22   bar rather than in open court, but we object to counsel's

23   continued punditry and verbal reactions to the witness' answer

24   such as, "that's fair" or "very good" or "I understand."  We

25   think it's inappropriate being done on a continual basis.

Joseph Brink - Cross

1        THE COURT:  Mr. Beller?

2        MR. McLOUGHLIN:  Your Honor, if I may before

3   Mr. Beller.  This is Jim McLoughlin.  For cross-examination in

4   a federal criminal trial that objection is meritless.  It is

5   perfectly appropriate for a lawyer to try to establish a

6   dialogue with a witness in cross-examination and have a two-way

7   communication.  And for the government to object to that effort

8   in cross-examination has no foundation in the rules of

9   evidence.  It has no foundation in due process.  And that kind

10  of restriction on the ability to cross-examine as one will

11  creates a due process issue.

12       MR. BELLER:  Your Honor, what I would add quite

13  briefly is the government continually objects based upon their

14  feelings, thoughts and emotions.  Unfortunately, I am not

15  trained on their feelings, thoughts and emotions.  If the

16  government would like to object based on law or based on the

17  rules of evidence, that gives me an opportunity to be able to

18  respond with the education and experience I have.  I do not

19  believe that there is a basis for this objection nor has there

20  been one stated.  If they would like to state a basis in law, I

21  would be thrilled to be able to respond.

22       THE COURT:  Here is the deal.  I disagree with

23  Mr. McLoughlin.  There is no exception for cross-examination in

24  a criminal case.  Questions are to be put to the witnesses and

25  attorney commentary on them afterwards can be inappropriate.

Joseph Brink - Cross

1   Mr. Beller's commentary is typically unobjectionable.  It's

2   just keeping the flow going and that's fine.

3            However, attorneys cannot comment on an answer, cannot

4   endorse an answer, cannot cast doubt on an answer through a

5   statement of the attorney, so that would be an appropriate

6   objection.  And I didn't hear Mr. Beller do anything of that

7   nature, but if he did, that would be inappropriate, but I

8   haven't heard that.  So I don't -- his comments that he does as

9   a matter of style through his cross-examinations I haven't

10  found to stray into some impropriety, all right?

11           Anything else, Mr. Torzilli?

12           *MR. TORZILLI:*  No, sir.  Thank you, Your Honor.

13           *THE COURT:*  Thank you.

14     (In open court:)

15  *BY MR. BELLER:*

16  *Q.*  So where we were -- what we were talking about when we left

17  off is that you purchase chicken from chicken suppliers.

18  *A.*  Correct.

19  *Q.*  That chicken is referred to as broilers.

20  *A.*  Some of the chickens.

21  *Q.*  You purchase chickens from broiler suppliers, yes?

22  *A.*  Yes.

23  *Q.*  And therefore you operate and work within the broiler

24  industry.

25  *A.*  I don't consider that.  I operate in the restaurant

Joseph Brink - Cross

1   industry.

2   Q.  Who purchases from broilers.

3   A.  Correct.

4   Q.  Purchases broilers.  So we will keep going.  In the

5   restaurant industry --

6   A.  Yes.

7   Q.  -- you look at market reports such as corn.

8   A.  Correct.

9   Q.  You look at market reports such as Urner-Barry and chicken

10  markets, the Urner-Barry chicken market.

11  A.  Is one of the markets I look at, yes.

12  Q.  One of them.  And so now I'm understanding.  So it is in

13  the restaurant industry that you rely on these market reports.

14  A.  I don't rely on them.  I use them as guides.

15  Q.  Very good.  What is the difference between relying on them

16  and using them?

17  A.  I take the reports and look at the reports as a guide to

18  determine what the pricing should look like based upon all the

19  factors that are out there.

20  Q.  And you use them as well to inform your perspective in

21  negotiating with the suppliers.

22  A.  Yes.

23  Q.  And because that research, Mr. Brink, can help to

24  understand not only current market trends -- well, current

25  market trends regarding procured material.

Joseph Brink - Cross

1    *A.*  I don't understand your question.  I'm sorry.

2    *Q.*  Well, let me ask you again because I think perhaps I put

3    the wrong emphasis on certain words.

4         The research can help to understand current market

5    trends regarding procured material, but also the feed inputs

6    that may impact future poultry procurement.

7    *A.*  Yes.

8    *Q.*  You also verify pricing assertions that are made by the

9    suppliers regarding those market trends.

10   *A.*  I verify -- I don't understand what you meant by verifying.

11   *Q.*  Do you recall speaking with the Department of Justice on

12   October the 4th, 2021?

13   *A.*  Yes.

14   *Q.*  At that particular meeting Ms. Call was present; is that

15   right?

16   *A.*  I don't remember who was present.

17   *Q.*  Well, do you recall Mr. Torzilli being present?

18   *A.*  I do believe he was there.

19   *Q.*  Do you recall Special Agent Repp being present?

20   *A.*  I don't remember all the people that were there.

21   *Q.*  That's okay.  That's why I have to ask these questions.

22        Do you recall Special Agent Taylor being present?

23   *A.*  Again, I don't remember all the agents who were there.

24   *Q.*  Is that a no?

25   *A.*  I don't remember.

Joseph Brink - Cross

1   Q.   Okay.  Do you recall telling them, and I quote, "Using

2   multiple suppliers can help to verify pricing assertions made

3   by suppliers regarding market trends"?

4        MR. TORZILLI:  Objection to quoting from an interview

5   report.

6        THE COURT:  Overruled.

7   A.   I do believe -- yes.

8   BY MR. BELLER:

9   Q.   So you asked me what verify means, and I suppose I am

10  asking you.  You said, "Using multiple suppliers can help to

11  verify pricing assertions made by suppliers regarding market

12  trends."  So what did you mean by verify?

13       MR. TORZILLI:  Objection, Your Honor, quoting from an

14  interview report which is not a statement of the witness.

15       THE COURT:  He endorsed the statement and can explain

16  the meaning of a particular term.  Overruled.

17  A.   I got supplier bids from multiple suppliers.  And if there

18  are variances that show up, then I know I have a major issue on

19  pricing.  When suppliers don't -- usually with bids they are

20  relatively close.  This time there was a large gap in pricing.

21  BY MR. BELLER:

22  Q.   Good.  So what we were talking about was actually market

23  trends and the Urner-Barry reports.

24  A.   No, I was talking about the final pricing that I got from

25  the suppliers.

Joseph Brink - Cross

1  *Q.* So in terms of understanding what trends in the market

2  reports and how those trends helped inform you on pricing, I

3  want to ask you a couple more questions.

4      Claxton's price in 2014 was 88 cents a pound, right?

5  *A.* Yes.

6  *Q.* You would agree with me that that was significantly below

7  these market trend reports that you consulted.

8  *A.* I don't remember.

9  *Q.* Well, in 2016, so two years later, it was 98 cents a pound;

10  is that right?

11      *MR. TORZILLI:* Objection, scope as to the year 2016

12  relative to what was covered on direct.

13      *THE COURT:* Overruled.

14  *A.* I don't remember.

15  *BY MR. BELLER:*

16  *Q.* Well, do you remember that in 2016 Claxton's price was

17  significantly less than the market trends that you considered?

18  *A.* I don't remember.

19  *Q.* So we're talking about these grain trends or feed trends

20  that you were looking at that you were consulting.  One of them

21  was corn, right?

22  *A.* Yes.

23  *Q.* And those informed you as to what kind of negotiations or

24  what kind of prices may be coming at you.  I think that was

25  your testimony.  Is that fair?

Joseph Brink - Cross

1    *A.*   Yes.

2    *Q.*   Now, you had negotiated for the last several years a fixed

3    price.

4    *A.*   Yes.

5    *Q.*   A fixed price is different than a cost-plus price, right?

6    *A.*   Correct.

7    *Q.*   And in that a fixed price does not vary at all based on

8    what's happening in the grain market.

9    *A.*   Correct.

10   *Q.*   A fixed price does not change based on what's happening

11   with the corn market.

12   *A.*   At that period of time, correct.

13   *Q.*   Yeah, at that period of time.  And so hypothetically if you

14   have entered into an 88-cent contract with Claxton Poultry to

15   supply you chicken and corn goes out the roof, Claxton Poultry

16   has to eat that difference.

17          *MR. TORZILLI:*  Objection to the hypothetical.

18          *THE COURT:*  Overruled.  He can answer.

19   *A.*   I don't know how Claxton purchased their chicken -- I mean

20   their corn.  I don't know how they book their corn.  I don't

21   know their time frames.  I don't know any of those internal

22   triggers that they use in their company, so I do not know.  I

23   can't answer that.

24   *BY MR. BELLER:*

25   *Q.*   Well, and you didn't have to know because you had a fixed

Joseph Brink - Cross

1    price.

2    A.   Correct.

3    Q.   And just like there was instability or unknowns for the

4    supplier regarding feed market, there were those same unknowns

5    for you.

6    A.   I don't understand what you're asking.

7    Q.   Well, that's because it was a terrible question.  Let me

8    try again.

9            If your contract price is 88 cents --

10   A.   Yes.

11   Q.   -- and corn becomes extremely inexpensive.

12   A.   Yes.

13   Q.   You don't get the benefit of that corn price going down

14   during that contract year.

15   A.   Correct.

16   Q.   And so what you were doing when you're negotiating is you

17   were looking at these market reports for a fixed period of time

18   to determine what price chicken may be based on that corn price

19   at that moment in time.

20   A.   I'm looking at the pricing of corn for the futures going

21   into the following contract year.

22   Q.   Great.  And so when we're talking about futures, these are

23   contracts that may be a year in advance.  It may be two years

24   out, for example.

25   A.   On what?  I am sorry.  I don't understand what you are

Joseph Brink - Cross

1    asking.

2    Q.  When you're purchasing chicken and you're signing contracts

3    with suppliers --

4    A.  Yes.

5    Q.  -- you're signing a contract for a year or sometimes even

6    two.

7    A.  Correct.

8    Q.  So while you can look at futures in these markets, it

9    doesn't tell you whether there's going to be a drought in 18

10   months.

11   A.  Correct.

12          MR. BELLER:  Your Honor, this is a good time.

13          THE COURT:  It is a good time because it's right on

14   time.

15          And, ladies and gentlemen, we will go ahead and take

16   our mid-morning break for 20 minutes, so plan on reconvening at

17   25 minutes until 11:00.

18          The jury is excused.

19          (Jury excused.)

20          Mr. Brink, you are excused until after the break.

21   Thank you.

22          I would like to let the jury know at the time they are

23   excused for lunch what the schedule will be like tomorrow so

24   they can plan accordingly.  Are we still -- assuming that we're

25   going to devote tomorrow to working through exhibits?  Okay.

Joseph Brink - Cross

1    If there is a dissenter, you can let me know.  Otherwise, I am

2    assuming that's the case.

3            MR. FELDBERG:  No dissenter, but if tomorrow will be a

4    non-jury day, may defendants be excused?

5            THE COURT:  For their planning purposes that is also

6    true, okay?  I will let them know that, then.

7            We will be on break until 25 minutes until 11:00.

8    Thank you.

9        (Recess at 10:16 a.m.)

10       (Reconvened at 10:40 a.m.)

11           THE COURT:  Ms. Grimm, let's go ahead and get the

12   jury.  Yes, we can get the witness too.

13           (Jury present.)

14           THE COURT:  Mr. Beller, go ahead.

15           MR. BELLER:  Thank you.

16   BY MR. BELLER:

17   Q.  So Mr. Brink, I want to talk to you about the market

18   conditions in the summer of 2014.  That summer something

19   happened with beef and pork, right?

20   A.  Yes.

21   Q.  And on direct examination you testified that because corn

22   prices were coming back in line, the price of chicken should

23   have decreased because the commodity market was correcting

24   itself on feed costs.

25   A.  Correct.

Joseph Brink - Cross

1  Q.  The price of beef and pork are going all over the place

2  during this period of time even though these two meat markets

3  are eating the same corn that the chicken are eating.

4  A.  Well, yeah, but how they eat and how fast they grow and

5  process are completely different.

6  Q.  Absolutely, and we are going to get into that in just a

7  moment.  But even though corn prices are coming down in the

8  summer of 2014, that did not change the instability in the beef

9  and the pork markets, did it?

10 A.  I don't recall the exact matters for pork and beef at that

11 time.

12 Q.  Okay.  Because of these corn prices, you on behalf of Pollo

13 budgeted for a projected increase.

14 A.  I'm sorry, what did you say?  I don't understand your

15 question.

16 Q.  Yeah.  In the summer of 2014, you budgeted for an increase

17 in the price of chicken.

18 A.  No.

19 Q.  On March the 5th of 2021, you met with the government.

20 A.  Yes.

21 Q.  You were asked a series of questions by the government.

22 A.  Yes.

23 Q.  You answered their questions to the best of your ability.

24 A.  I do recall, yes.

25 Q.  And you were asked about what you were budgeting going into

158

Joseph Brink - Cross

1   the contract negotiation in the summer of 2014.  Do you recall

2   that?

3   *A.*  I don't remember exactly.  I don't remember because we were

4   doing our forecasts for 2015.  I was doing it in the middle of

5   August and September during the process when I got approached

6   by the chicken companies.

7   *Q.*  So yes, you do remember speaking to them and being asked

8   questions in March of 2021?

9   *A.*  I guess so, yes.

10  *Q.*  Do you recall telling them in March of 2021 that that

11  summer the budget was predicted to increase by a couple of

12  cents?

13  *A.*  I thought it was going to be an increase or a decrease with

14  a couple of cents because of the market conditions of the corn.

15  *Q.*  So yes, you told them that you were going to be budgeting

16  for an increase by a couple of cents.

17  *A.*  I don't remember.  I guess so.

18  *Q.*  A few cent increase to be on the safe side.

19  *A.*  Correct.

20  *Q.*  Because you would agree with me, Mr. Brink, that you knew

21  the prices were going to be going up.  You just didn't know to

22  what degree.

23  *A.*  I don't know how long or when the prices were going to go

24  up or down.

25  *Q.*  But in the summer of 2014, you knew they were going up.

Joseph Brink - Cross

 1   *A.*  They were up because that was a time of year when chicken

 2   and beef and pork are always up for grilling season.

 3   *Q.*  What you did not tell the government in March of 2021 is

 4   that beef and pork and chicken were going up because of

 5   grilling season.

 6   *A.*  I don't remember.

 7   *Q.*  What you told them was that their markets -- that something

 8   happened in those markets, that the price of corn was coming

 9   down and you were budgeting for chicken prices to go up, fair?

10   *A.*  Repeat that again, please?

11   *Q.*  What you told the government in March of 2021 is that there

12   was something happening in the beef and pork markets.

13   *A.*  Yes.

14   *Q.*  Corn was coming down.

15   *A.*  Yes.

16   *Q.*  And you were budgeting for increases in the chicken market

17   going up.

18   *A.*  I don't remember exactly, but that sounds about right.

19   *Q.*  You did not tell them that prices are always going up

20   during that period of time because of the summer and grilling

21   season.

22   *A.*  I don't remember.

23   *Q.*  Chicken size depends on a lot of different factors.  You

24   would agree with me there?

25   *A.*  I don't understand what you're asking.

160

Joseph Brink - Cross

1   *Q.* Well, if you feed a chicken for an extra week or two, it's

2   going to grow larger.

3   *A.* Correct.

4   *Q.* So how long they're in the broiler house eating has an

5   impact on what their size is.

6   *A.* Correct.

7   *Q.* So if corn is very inexpensive, it economically makes sense

8   to continue to feed those birds for an extra week or two and

9   get a much larger bird.

10       *MR. TORZILLI:* Objection, foundation.

11       *THE COURT:* He can answer if he knows.  Overruled.

12  *A.* I don't know what the chicken companies do internally and

13  what their practices are on how and when they feed chickens,

14  when they process chickens and when they sell them to the

15  restaurants.

16  *BY MR. BELLER:*

17  *Q.* So yesterday when you were testified you were asked about a

18  large bird versus a small bird and the margins.

19  *A.* Yes.

20  *Q.* And Mr. Torzilli asked you about the margins between a

21  small bird and a large bird.

22  *A.* Correct.

23  *Q.* And you testified to the jury that the margin for a large

24  bird is going to be much larger.

25  *A.* Correct.

Joseph Brink - Cross

1    Q.  And it's going to be much larger because you get a much

2    larger bird, right?

3    A.  Correct.

4    Q.  But it's the same amount of manpower to process the bird.

5    A.  Correct.

6    Q.  And the way you get a larger bird is you keep feeding a

7    bird.

8    A.  But it's a different species of bird.  You're looking at a

9    small bird versus a large bird.  They are completely different.

10   Q.  I am sorry, because I thought your testimony to the jury

11   just a moment ago is that you didn't know the ins and outs of

12   raising a bird, so I want to focus on that.

13   A.  No, no.  My question -- my answer to you is I don't know

14   how -- when the chicken companies will feed the chickens, when

15   they process the chickens and everything else.  I was told by

16   the industry and everything else that the larger birds, which

17   is a completely different species of chicken, they, of course,

18   take longer to feed because they're a bigger bird, but that is

19   a whole different process, a whole different chicken than a

20   3-pound broiler chicken.

21   Q.  So it is your testimony to the jury that a small chicken

22   and a large chicken are different species of chickens?

23   A.  They are different breeds.

24   Q.  Different breeds of chickens.

25   A.  Yes.

Joseph Brink - Cross

1    Q.  So you are unaware that it's the exact same breed only fed

2    for an extra two weeks?

3    A.  No.  I know the breeds of a chicken just recently, a few

4    years ago.  Back then I did not know about all the different

5    breeds of chickens and how it works.

6    Q.  And who do you consult with or who is your expert that

7    tells you that a small bird and a large bird are different

8    breeds of chickens?

9    A.  We met with all the chicken companies to verify all of our

10   species of chickens and what we're using, and that is what --

11   we met with all the chicken companies.

12   Q.  When you say all the chicken companies, tell me who you met

13   with.

14   A.  We met with Claxton.  We met with Koch, George's, Mar-Jac.

15   I think those are the big ones we met with.

16   Q.  And they advised you, to make sure that I'm understanding,

17   that the difference between a 3-pound chicken and a 9-pound

18   chicken is that they are completely different breeds.

19   A.  They are different -- there is breeds and there is the

20   Cobb.  There is Ross.  There is all different species and some

21   species of birds grow larger than the other species of birds.

22   Q.  Understood.  So let's go back to what my question was just

23   a moment ago.  And that was you believe that corn prices should

24   drive the price of the chicken for purposes of setting your

25   price.

Joseph Brink - Cross

1    A.   It should, yes.

2    Q.   Okay.  Despite you, as you have said to the jury, not being

3    a chicken grower.

4    A.   Correct.

5    Q.   When chicken -- when corn is very expensive --

6    A.   Yes.

7    Q.   -- it makes sense to process the chicken at a younger age.

8    A.   I don't know.  I don't know the process of chickens.

9    Q.   So you don't know the process of chickens, but you know

10   that if corn is expensive, that the chicken would be expensive.

11   Am I understanding you properly?

12   A.   Well, if the chicken -- if the feed cost is one of the most

13   important input costs in a chicken company, it's only logical

14   that the chicken costs would go up if the chicken prices --

15   corn goes up.  If the corn prices go down, then chicken prices

16   should go down.

17   Q.   Okay.  And if chicken prices are low based on what you said

18   was logic, if chicken prices are low, it makes sense to try to

19   feed the chicken for an extra week and get a larger chicken.

20   A.   Again, I don't know how the chicken companies -- when they

21   process chickens what the advantages are.  I know that weather

22   sometimes makes a big difference on chickens, but I don't know

23   the feeding habits of how many days they feed a broiler and how

24   many days they actually process the chicken.  It's up to them

25   on what their variability is.  I don't run a chicken plant.

Joseph Brink - Cross

1   *Q.*   And so that means you also agree that you don't know the

2   correlation between corn price and chicken processing.

3   *A.*   I do not -- I don't know the exact process between with

4   what suppliers do on their internal side of when they feed

5   chickens, when they process them.  I know the pricing

6   correlation of corn because that is an impact to cost of goods

7   on a chicken.

8   *Q.*   And you know that based on logic.

9   *A.*   Based upon we've been told and logic.

10  *Q.*   Okay.  Because you're not a chicken producer and you don't

11  know, as you said, what it takes to grow a chicken.

12  *A.*   I don't understand your question.

13  *Q.*   My question is, was that your testimony to the jury just

14  now, that you are not a chicken producer?

15  *A.*   Correct.

16  *Q.*   And that you don't know the process and the different

17  factors that it takes to grow a chicken.

18  *A.*   I don't know all the processes, correct.

19  *Q.*   So I want to talk to you, then, about the small bird supply

20  in 2014.

21  *A.*   Okay.

22  *Q.*   It was tight.

23  *A.*   Yes.

24  *Q.*   And you knew it was tight in 2014.

25  *A.*   I don't remember exactly how tight it was, but I know it

Joseph Brink - Cross

1    was tight.

2    *Q.* And when we say that supply was tight, that meant there

3    weren't enough small birds to meet the demand of the people

4    wanting to buy them.

5    *A.* Correct.

6    *Q.* Demand was up in the summer of 2014 for these small birds.

7    *A.* I assume so.

8    *Q.* And because of this basic principle of supply and demand,

9    the market showed increases.

10   *A.* Okay.

11   *Q.* Is that a yes?

12   *A.* Yes.

13   *Q.* And part of the reason you knew supply was tight and demand

14   was up is because you spoke to the chicken suppliers in 2014.

15   *A.* No.  I don't understand the question.

16   *Q.* My question is your knowledge that supply was tight and

17   demand was up you gained because you spoke to chicken suppliers

18   in 2014.

19   *A.* They provided information, yes.

20   *Q.* So yes, you spoke to chicken suppliers in 2014.

21   *A.* In September and October, yes.

22   *Q.* Okay.  And you were informed in 2014 whether it's the

23   summer or the fall that many of the suppliers were either not

24   accepting new customers or there was no additional chicken

25   supply.

Joseph Brink - Cross

1          *MR. TORZILLI:*  Objection, calls for hearsay.

2          *THE COURT:*  Overruled.

3   A.   I don't remember all the parameters for every supplier.

4   *BY MR. BELLER:*

5   Q.   Do you recall being interviewed by the government on

6   March 5th, 2021?

7   A.   Yes, I guess so.

8   Q.   Do you recall being asked the same question that I just

9   asked you, and your answer to the government on March the 5th

10  of 2021 is that suppliers either were not accepting new

11  customers or there was no chicken supply.

12  A.   I don't remember, but there was a tight supply of chicken

13  in that summer time period.

14  Q.   So you testified to the jury just this morning that you

15  were shocked by the pricing that came in 2014, right?

16         *MR. TORZILLI:*  Objection, misstates testimony.

17         *THE COURT:*  Overruled.

18  A.   I was shocked by the amount of the increase, yes.

19  *BY MR. BELLER:*

20  Q.   All right.  And however, while being shocked by the amount

21  of increase -- well, let me back up.  You agreed to that

22  increase insofar as at least Pilgrim's is concerned.

23  A.   I agreed to the pricing because I was told there was no

24  negotiation.  I had to protect the brand and secure the

25  chicken, as we were told if we don't, we're going to lose our

167

Joseph Brink - Cross

1   volume.  At that period of time we had to protect the brand.

2   Q.  Let me ask you my question.  You agreed to the increase in

3   2014 with Pilgrim's.

4   A.  Yes.

5   Q.  And this increase with this shocking price that you were

6   forced to enter into.

7   A.  Yes.

8   Q.  And even by paying Pilgrim's this shocking price, they

9   still did not have as much volume as you needed.

10  A.  They initially did not provide the volume, but at the end

11  they gave me the volume that we originally were going to have.

12  Q.  So it wasn't such a shocking price that they were willing

13  to give you even more chicken.

14  A.  No, Pilgrim's gave me the chicken that we originally were

15  using for that year, for next year.

16  Q.  Now, anyplace that serves chicken is a competitor to Pollo

17  Tropical.  Am I repeating your testimony properly?

18  A.  Yes.

19  Q.  You compete, I believe you said, with KFC, Popeye's,

20  Bojangles?

21  A.  Any chicken company, yes, pretty much any chicken company

22  that produces chicken in our markets.

23  Q.  Chipotle?

24  A.  Chipotle, yes.

25  Q.  So if supply is tight in 2014, that also means that you are

Joseph Brink - Cross

1  competing with these other buyers for the same supply.

2  A.  Yes.

3  Q.  When supply is tight, prices go up.

4  A.  Yes.

5  Q.  Even if corn is down, if supply is tight, prices go up.

6  You would agree with me.

7  A.  To a point.

8          MR. BELLER:  If we can show the witness an exhibit

9  that is introduced into evidence, and that's Government

10  Exhibit 9740?

11          THE COURT:  You may.

12          MR. BELLER:  And if we may publish, Your Honor.

13          THE COURT:  You may.

14  BY MR. BELLER:

15  Q.  Mr. Brink, I want to ask you a little bit about this

16  exhibit that Mr. Torzilli asked you about yesterday.  And I

17  want to ask you about a couple of lines that you were not asked

18  about.  So if we look at the middle of the second page, this is

19  an e-mail from you to Mr. Walter Cooper dated Monday,

20  September 22nd at 1:50 in the afternoon.  Do you see that?

21  A.  Yes.

22  Q.  You say to Mr. Cooper, "This is a larger increase than

23  Pilgrim's," right?

24  A.  Yes.

25  Q.  And that was based on an initial, I guess, price estimate

Joseph Brink - Cross

1   from Mr. Cooper that the price of chicken moving forward was

2   going to be $1.07 a pound, right?

3   *A.*   Part of it.

4   *Q.*   Well, we say part of it and we can talk a little bit about

5   that because actually included in that price is the actual

6   freight, right?

7   *A.*   Yes, in this price.  But the pricing here on this e-mail

8   was regarding the fact that they were going to have our chicken

9   not be our set invoice weight and having it be higher weights

10  in our boxes which will make our case price higher which makes

11  our total cost higher.

12  *Q.*   Let me go back to the question that you were asked, and

13  that is $1.07 includes freight.

14  *A.*   Correct.

15  *Q.*   Thank you.  And your response to Mr. Cooper's e-mail is,

16  "This is a larger increase than Pilgrim's."

17  *A.*   Keep going down further.  "If we are paying these higher

18  prices, we will not pay more for than our spec allows," because

19  they were going to change our spec of our weights in our

20  chicken boxes.  That makes our total cost higher.

21  *Q.*   Mr. Brink, you were not asked any of that.  Let me ask my

22  question.  And my question is you wrote to Mr. Cooper.

23  *A.*   Yes.

24  *Q.*   "Walter, this is a larger increase than Pilgrim's."

25  *A.*   Correct.

Joseph Brink - Cross

1   Q.   Thank you.  Now let's go to Mr. Cooper's response.  And

2   this is an e-mail that you were asked about at length on direct

3   examination.  Mr. Cooper tells you, and this is the bottom of

4   Paragraph 1 -- excuse me, the last sentence on Paragraph 1

5   where Mr. Cooper says to you, "We have to be very careful,

6   especially in a fixed agreement, who we partner with.  We only

7   have so many pounds and have to do our best to place them

8   correctly."

9        That's what he stated to you, right?

10  A.   Yes.

11  Q.   Fixed meaning an agreement that doesn't vary based on corn

12  and soybean meal.

13  A.   Correct.

14  Q.   The next paragraph he talks about other concessions that

15  Claxton is willing to make.  He says, "Is Pilgrim's willing to

16  do all of this?"  Right?

17  A.   Yes.

18  Q.   The beginning of his next paragraph, "My guess is no,"

19  right?

20  A.   Yes.

21  Q.   Then if we go to the top of the next page.  So "If we are

22  higher than Pilgrim's, we are worth it," right?

23  A.   That's what he wrote.

24  Q.   He writes, "We have been approached by other customers

25  requesting pricing and supply."

Joseph Brink - Cross

1          That's the prior page, excuse me.  Yes?

2   *A.*  Yes.

3   *Q.*  He tells you that he has other buyers for your chicken.

4   *A.*  Yes, he did.

5   *Q.*  That, "We have been approached by other customers

6   requesting pricing and supply."

7   *A.*  Yes.

8   *Q.*  He admits to you that not all of those other customers are

9   within your specifications.

10  *A.*  He says some are, some aren't.

11  *Q.*  That's right.  Next page, he points to the problems in the

12  past you've had with Pilgrim's and tells you, "We did the right

13  thing."

14  *A.*  Correct.

15  *Q.*  And this is all in response to you telling Mr. Cooper that

16  Claxton is higher than Pilgrim's.

17  *A.*  Correct.

18  *Q.*  And I want to focus on the times of these two e-mails.  You

19  would agree with me that Mr. Cooper's response is within six

20  minutes of you writing to him.

21  *A.*  Yes.

22  *Q.*  Mr. Cooper in this e-mail is undercutting Pilgrim's by

23  giving you step pricing.

24  *A.*  I don't -- here, right here on the e-mail here on the

25  9th -- the 22nd and there was a 6-minute response later, there

Joseph Brink - Cross

1    was no talking about stair-stepping on this e-mail.  Yeah,

2    right here it is.  It says here, "I hope for Pollo that

3    Pilgrim's will consider step pricing."

4    Q.  And the e-mail that led to this exchange was Mr. Cooper

5    conceding and giving you the price increase on stair-step

6    pricing.

7    A.  I did not have the final pricing yet, but they were talking

8     about they were going to work with us on stair-stepping.

9    Q.  If we can go to the preceding e-mail, please, the preceding

10   e-mail sent on the same day at 12:47 p.m. by Walter Cooper to

11   Joe Brink.

12   A.  Correct.  That's the first e-mail.  I was talking about the

13   one you were talking about which was six minutes in between.

14   There was no listing of stair-stepping pricing.

15   Q.  You haven't been asked a question, Mr. Cooper.  Mr. Brink,

16   excuse me.

17        My question is Mr. Cooper told you that he was willing

18   to give you stair-step pricing.

19   A.  Correct.

20   Q.  And that this is something that Pilgrim's he guessed was

21   unwilling to do for you.

22   A.  That's what he said on the last e-mail on the 22nd.

23   Q.  You --

24        MR. BELLER:  I am done with that.  Thank you.

25   BY MR. BELLER:

173

Joseph Brink - Cross

1  Q.  You testified on direct examination that this

2  September 22nd exchange is the same day that you had a

3  discussion with Mr. Little.

4  A.  Correct.

5  Q.  You have met with the government seven times?

6  A.  I don't know the amount of times.

7  Q.  Well, you met with the government as recently as was it

8  yesterday or Monday night?

9  A.  I think it was Monday night.

10  Q.  Monday night you met with the government.  And the purpose

11  to meet with the government was to practice your testimony,

12  right?

13  A.  They were asking questions to explore the truth and I was

14  giving my answers.

15  Q.  And you did that with them six other times, correct?

16  A.  I don't know the amount of times.

17  Q.  Do you recall -- we've spoken about March 5th.  Do you

18  recall that, that time?

19  A.  About that time period, yes.

20  Q.  Do you recall another time was April the 21st?

21  A.  I don't remember all the dates.

22  Q.  And "I don't know" is an okay answer.

23  A.  I don't know.

24  Q.  Do you recall meeting with them on October the 4th?

25  A.  Yes.

174

Joseph Brink - Cross

1  *Q.*  Do you recall meeting with them on October the 19th?

2  *A.*  Yes.

3  *Q.*  Do you recall meeting with them on November the 8th?

4  *A.*  Yes.

5  *Q.*  Do you recall meeting with them on November the 14th?

6  *A.*  Yes.

7  *Q.*  Do you recall meeting with them on November the 16th?

8  *A.*  Yes.

9  *Q.*  November the 16th is the first time in any of those seven

10  meetings that you have ever disclosed that you had a telephone

11  conversation with Jimmie Little on September the 22nd, 2014.

12  *A.*  The date -- I went to my calendar and I found the date.  I

13  told them we had a meeting.  And I looked at my calendar -- I

14  found the calendar and I found the dates.

15  *Q.*  Let me ask my question again.

16        On November the 16th, 2021 is the first time you have

17  ever told the Department of Justice that you met with

18  Mr. Jimmie Little on September the 22nd, 2014.

19        *MR. TORZILLI:*  Objection, misstates prior testimony.

20        *THE COURT:*  Overruled.  He can answer.

21  *A.*  That was the first time I actually gave the actual date.  I

22  knew -- confirmed the date and what our meeting was.

23  *BY MR. BELLER:*

24  *Q.*  Is that a yes?

25  *A.*  Yes.

Joseph Brink - Cross

1   *Q.* Thank you.  You were asked many times yesterday by the

2   government regarding this statement of, "Take it or leave it."

3   Do you recall those questions and your answers?

4   *A.* Yes.

5   *Q.* At no time did Walter Cooper of Claxton Poultry ever tell

6   you that Claxton Poultry's price was take it or leave it.

7   *A.* Correct.

8        *MR. TORZILLI:* Objection, calls for hearsay.

9        *THE COURT:* Sustained.

10   *BY MR. BELLER:*

11   *Q.* Are you aware of Claxton Poultry ever taking a position

12   that the price was take it or leave it?

13   *A.* They never mentioned that.

14   *Q.* Never in text message?

15   *A.* I don't recall.

16   *Q.* Never in a letter or a memo?

17   *A.* I do not recall.

18   *Q.* And never in a pricing proposal.

19   *A.* I do not recall.

20   *Q.* Many customers just like you use many suppliers.  You're

21   aware that many other buyers of chicken also purchase from many

22   different suppliers.

23   *A.* I'm sorry, what?  I don't understand your question.

24   *Q.* Do you know if KFC has more than one chicken supplier?

25   *A.* Yes.

Joseph Brink - Cross

1    *Q.*  Do you know if Popeye's has more than one chicken supplier?

2    *A.*  I assume they do.

3    *Q.*  Do you know if Wal-Mart has more than one chicken supplier?

4    *A.*  I assume they do.

5    *Q.*  Do you know if Chipotle has more than one chicken supplier?

6    *A.*  I don't know, but I assume so.

7    *Q.*  Well, you do know based on your experience in the

8    restaurant industry that there are times where chicken

9    suppliers must speak with other chicken suppliers.

10   *A.*  I don't know that.

11   *Q.*  If Holmes cannot deliver your product, you have to source

12   that product from another supplier.

13   *A.*  If -- yes and no.  If there is an issue with chicken from a

14   supplier, then my distributor tells me there is an issue.  Then

15   we call our back-up suppliers and we initiate, say, hey, we

16   need a load coming into Kelly's to cover because of a hurricane

17   or whatever weather conditions or whatever is happening that we

18   had to go to a different plant.  But we initiate it.

19   *Q.*  And excuse me to the court reporter.  If we can read back

20   my question, please.

21           (The record was read by the court reporter.)

22   *BY MR. BELLER:*

23   *Q.*  Is that a yes?

24   *A.*  No.

25   *Q.*  You don't know?

Joseph Brink - Cross

1    *A.*   I don't know.  When we have an issue, I take care of it

2    with the chicken companies.  I don't know the internal

3    mechanisms if they are talking to each other to cover supply.

4    I don't know that.

5    *Q.*   You just don't know.

6    *A.*   I don't know.

7    *Q.*   Okay.  And so if they run out of boxes, you don't know if

8    they have to speak in order to source boxes.

9    *A.*   I don't know.

10   *Q.*   If they run out of labels, you don't know if they have to

11   speak to cover each other on labeling.

12   *A.*   Again, I don't understand why they would be calling each

13   other on labels when they are all USDA labels and they are

14   marked per labels for the companies.

15   *Q.*   My question is, do you know?

16   *A.*   I do not know.

17   *Q.*   Thank you.  Do you know if they have to speak to each other

18   regarding maybe one plant goes on strike and they don't have

19   enough workers to process their chicken?

20   *A.*   I do not know.

21   *Q.*   Do you know if they have to speak to each other if there is

22   a COVID outbreak in a plant and they can't process all their

23   chicken?

24   *A.*   I do not know.

25   *Q.*   Do you know if they have to speak to each other if there is

Joseph Brink - Cross

1    a computer hack and they need assistance feeding their

2    chickens?

3    A.  I do not know.

4    Q.  Do you know if they have to speak to each other if there is

5    a coccidia outbreak and one of their houses are sick?

6            MR. TORZILLI:  Objection, foundation.

7            THE COURT:  Overruled.  He can answer if he knows.

8    A.  I do not know.

9    BY MR. BELLER:

10   Q.  Mr. Canty asked you about Exhibit 527.

11           MR. BELLER:  Your Honor, can we confirm that that is

12   in evidence, please?

13           THE COURT:  Yes.

14           MR. BELLER:  Excuse me, Your Honor, it's actually 566.

15           THE COURT:  566 has been admitted.

16           MR. BELLER:  Thank you.

17           If we can show 566 to the witness, please.

18   BY MR. BELLER:

19   Q.  Mr. Brink, I am hoping that you will take a moment to read

20   through this e-mail to yourself, and then let me know when you

21   get to the part where you state that competitors have to match.

22           MR. BELLER:  May we publish, please?

23           THE COURT:  You may.

24   A.  I don't understand where you are asking for me to read.

25   BY MR. BELLER:

Joseph Brink - Cross

1   Q.  I am asking you to look for the portion where it says that

2   the competitors need to show compromise and the competitors

3   need to match.  Have you gotten to that section?

4   A.  I am reading it still.  Yes, I see it here, yes.

5   Q.  This is an e-mail from you to Mr. Jimmie Little at

6   Pilgrim's Pride, right?

7   A.  Correct.

8   Q.  You wrote to Jimmie Little at Pilgrim's Pride on October

9   the 3rd of 2014 regarding pricing.  "Again this is not going to

10  work and Pilgrim's needs to match pricing from your

11  competitors," right?

12  A.  Lower their pricing, yes.

13  Q.  My question was, is that what you wrote to Jimmie Little --

14  A.  Yes.

15  Q.  -- on October the 3rd of 2014?

16  A.  Yes.

17  Q.  If you read down, you also wrote to Jimmie Little on

18  October the 2nd, 2014, you would agree with me that you wrote

19  to Jimmie Little again, "Pilgrim's needs to match to show

20  compromise."

21  A.  Meaning they need to lower their pricing.  That's what I

22  meant by writing that.

23  Q.  I understand.  My question, however, is did you write

24  "Pilgrim's needs to match to show compromise," on October the

25  2nd, 2014?

Joseph Brink - Cross

1    A.   Yes.

2    Q.   You testified both yesterday as well as this morning that

3    Holmes was a competitor of Pilgrim's and Claxton, right?

4    A.   Correct.

5    Q.   Holmes was 10 cents cheaper than Pilgrim's and Claxton, I

6    think you said 9 to 10 cents.

7    A.   Correct.

8    Q.   Holmes is a single plant facility in Texas?

9    A.   Correct.

10   Q.   Claxton is a single plant facility in Claxton, Georgia?

11   A.   Correct.

12   Q.   You have stores in the south in Georgia and Florida.

13   A.   Correct.

14   Q.   You have stores in Texas.

15            MR. TORZILLI:  Objection, foundation.

16            THE COURT:  Overruled.

17   A.   Correct.

18   BY MR. BELLER:

19   Q.   Holmes is providing chicken primarily to your stores in

20   Texas.

21   A.   Correct.

22   Q.   Claxton is providing chicken primarily to your stores in

23   the south, namely Georgia and Florida.

24   A.   Correct.

25   Q.   Holmes by and large is not shipping chicken from their

Joseph Brink - Cross

1  small plant in Texas all the way to Orlando or Miami, Florida.

2  A.  That is not correct.

3  Q.  You got a load.

4  A.  The load, yes.

5  Q.  The majority -- my question was carefully worded.  The

6  majority, the majority of the product from Holmes is going to

7  your stores in Texas.

8  A.  Correct.

9  Q.  Freight from Claxton, Georgia to Orlando is significantly

10 different than freight from Texas to Orlando, Florida.

11 A.  Correct.

12 Q.  Sir, I want to talk to you a little bit more specifically

13 about your negotiations with Mr. Cooper.  Mr. Cooper, as we

14 established, informs you that the FOB price is $1.07, right?

15 A.  FOB price?  I don't remember.  I thought it was delivered

16 pricing.

17 Q.  It is delivered pricing, excuse me, that the delivered

18 pricing is $1.07.

19 A.  That sounds correct.

20 Q.  As we've established, you asked for a stair-step increase

21 starting in January of 2015.

22 A.  Correct.

23 Q.  You asked for that stair-step price on November the 30th of

24 2014, right?

25 A.  I don't recall the actual date.

Joseph Brink - Cross

1          MR. BELLER:  If we can have Exhibit 500, please,

2     government's exhibit.

3          Your Honor, I believe this is admitted and published.

4          MR. TORZILLI:  Your Honor, to the extent it's not, the

5     government agrees to its admission into evidence.

6          MR. BELLER:  Thank you, Your Honor.  And based on that

7     stipulation, I would offer it into evidence and ask that it be

8     published.

9          THE COURT:  Any objection to the admission of

10    Exhibit 500?

11         All right.  Exhibit 500 will be admitted.

12         MR. BELLER:  And if we can publish, please.

13         THE COURT:  You may.

14    BY MR. BELLER:

15    Q.   Are you able to see that okay, Mr. Brink?

16    A.   Yes.

17    Q.   Mr. Brink, my question was that Mr. Cooper responded to

18    your request for stair-step pricing on October the 2nd in 2014.

19    If you can take a moment to simply confirm your ability to

20    answer my question.

21    A.   Reading this e-mail here that you have shown, all I see is

22    October 13th, 14th dates here.

23    Q.   Okay.  And it may need to be the next page.

24    A.   On October 2nd here is when Walter started to give me

25    options for stair-stepping pricing.

Joseph Brink - Cross

1   *Q.*  So is that a yes?

2   *A.*  Yes.

3   *Q.*  All right.  And Mr. Cooper also lowers your price by a

4   penny.

5   *A.*  Correct.

6   *Q.*  Lowers your price because he was able to source freight

7   from Claxton, Georgia to Orlando, Florida for a penny less than

8   he had originally quoted you.

9   *A.*  Correct.

10  *Q.*  So instead of $1.07 including freight, it's now $1.06

11  including freight.

12  *A.*  Correct.

13  *Q.*  That six is actually freight, right?

14  *A.*  I don't understand your question, I am sorry.

15  *Q.*  In other words, the chicken that you were buying was

16  costing you $1.  And the additional 6 cents was for freight.

17  *A.*  No, I don't believe so.  I think it was the other way

18  around.  It was a dollar -- the freight went down a penny.  It

19  was like 5 cents and went to 4 cents, so whatever the price was

20  was the freight that went down.

21      MR. BELLER:  If we can bring the exhibit back up and

22  publish it for both the jury and the witness.

23  *BY MR. BELLER:*

24  *Q.*  You can take a moment to review.

25  *A.*  I am reviewing -- what am I looking for?  This is all the

Joseph Brink - Cross

1    stair-stepping information.  Here the freight, he was able to

2    lower the freight by a penny, so that would put them at $1.06

3    per pound delivered.

4    Q.   Right.  He offers you this penny reduction without you

5    asking.

6    A.   I don't recall if I asked for it.

7    Q.   You and Mr. Cooper engaged in a back-and-forth over the

8    amount and the timing of the increase.

9    A.   Correct.

10   Q.   You requested a dime increase go into effect January of

11   2015?

12   A.   Correct.

13   Q.   And an 8-cent increase go into effect in July of 2015?

14   A.   The original, yes.

15   Q.   And what was being negotiated was a two-year deal.

16   A.   Not on pricing.

17        MR. BELLER:  If we could have Exhibit 500 brought back

18   up, please.

19   BY MR. BELLER:

20   Q.   Mr. Brink, I want to draw your attention to the e-mail with

21   Walter Cooper dated Monday, October 13th at 2:38 p.m.  That is

22   the bottom of Page 2 going onto the top of Page 3.

23        If you could read the line from Mr. Cooper to you at

24   the top of Page 3.

25   A.   "I now have authority to offer you a two-year agreement

Joseph Brink - Cross

1    based on being able to agree to one of the below."

2    Q.  And there is then a discussion regarding a couple of

3    options for stair-step.

4    A.  Correct.

5    Q.  And so my question was at the time the two of you were

6    discussing a two-year agreement.

7              MR. BELLER:  We're done with the exhibit.

8    A.  Okay.

9    BY MR. BELLER:

10   Q.  That's a question.

11   A.  I'm sorry.  I didn't understand your question.

12   Q.  You were discussing and negotiating a two-year agreement.

13   A.  Walter proposed a two-year agreement, yes.

14   Q.  Very good.  The two-year agreement was for this stair-step.

15   In other words, Claxton was going to reduce the amount of the

16   increase over a six-month period of time in exchange for this

17   two-year agreement.

18   A.  That was the proposal.

19   Q.  And so if we did a 10-cent increase in January, that would

20   make your chicken in January 98 cents delivered.

21   A.  That sound correct.

22   Q.  98 cents delivered is the same amount that Holmes was

23   providing chicken to you for.

24   A.  I don't remember the exact price for Holmes, but it's

25   pretty close.  The Holmes pricing was for the whole year.

Joseph Brink - Cross

1   Q.  You said it was about half of the amount.  Half of the

2   amount here would be about 98 cents?

3   A.  Uh-huh.

4   Q.  Again, that included the freight.

5   A.  Correct.

6   Q.  During this same period of time that you were paying

7   Claxton 98 cents including freight, you were paying Pilgrim's

8   Pride $1.02 not including freight.

9   A.  We paid -- I don't understand your question because

10  everything is paid by freight included.

11  Q.  Well, you went through a very long examination with

12  Mr. Canty where you had indicated that the $1.02 did not

13  include freight; is that right?

14  A.  Correct.

15  Q.  And so the $1.02 that was negotiated with Pilgrim's did not

16  include freight.

17  A.  We never finalized the price.  We finalized the final cost

18  with freight.

19  Q.  The $1.02 that was being discussed during negotiation did

20  not include freight.

21  A.  That was FOB, correct.

22  Q.  The 98 cents to Claxton Poultry did include freight.

23  A.  Correct.

24  Q.  When you sent the contract, so after a lengthy

25  back-and-forth with Mr. Cooper, you two agree on the

Joseph Brink - Cross

1  stair-step, right?

2  A.  Eventually, yes, we did.

3  Q.  And looking at exhibit -- the exhibit that you were just

4  looking at, Mr. Cooper said we're able to offer you a two-year

5  deal with stair-step following, with the following stair-step.

6  A.  That was one of the proposals, yes.

7  Q.  When you sent the contract over to Claxton Poultry, the

8  contract was drafted and originated by you or by Pollo

9  Tropical.

10  A.  Yes.

11  Q.  And the contract that was e-mailed over was only for a

12  year.

13  A.  This is not the agreement that we agreed to at the very

14  end.

15  Q.  I understand that.  That's the contract.  We're getting

16  there.

17  A.  Okay.

18  Q.  When you signed a contract or rather when you drafted a

19  contract with Pollo Tropical -- or excuse me, with Claxton, you

20  sent the contract over, it included a stair-step and was only

21  written for a single year.

22  A.  Correct.

23  Q.  You signed Pilgrim's contract on February the 14th, 2015;

24  is that right?

25  A.  I don't remember the dates, but it could be.

188

Joseph Brink - Cross

1    Q.  You signed Pilgrim's contract in 20 of 2015.  Yes?

2    A.  I don't have the contract here.  It sounds correct.

3    Q.  You never signed the Claxton contract.

4    A.  We never got a contract finalized, yes.  We never signed

5    it.

6    Q.  You continued to push and negotiate with Claxton through

7    December of 2014.

8    A.  Yes.

9    Q.  Despite the fact that the contract was never signed,

10   Claxton continued to operate under sort of a gentleman's

11   agreement and continued to give you this stair-step pricing,

12   right?

13          MR. TORZILLI:  Objection to the use of gentleman's

14   agreement.

15          THE COURT:  Overruled.  He can answer.

16   A.  We had the agreement drafted.  It was going back and forth

17   between legals on both companies.  It was August and September

18   and it still was not finalized between the two companies.

19   BY MR. BELLER:

20   Q.  Claxton continued to operate under the terms and conditions

21   of the unsigned contract.

22   A.  Correct.

23   Q.  And that included giving you this stair-stepped reduced

24   pricing.

25   A.  Correct.

Joseph Brink - Cross

1   *Q.* Claxton Poultry had supplied Pollo Tropical with chicken

2   for the last, what, 12, 13 years?

3   *A.* Or longer.

4   *Q.* In that 12, 13 or longer year time, they have been your

5   only constant chicken supplier.

6   *A.* I don't understand the question.  What do you mean constant

7   chicken supplier?

8   *Q.* Your other chicken suppliers have come and gone.

9   *A.* Correct.

10  *Q.* Claxton is the only one that has stayed with you during

11  that period of time.

12  *A.* Correct.

13  *Q.* The contract that was being negotiated, but never signed,

14  was for all of 2015.

15  *A.* Correct.

16  *Q.* While there was some discussion or confusion that it may

17  have been or was supposed to be a two-year contract, right?

18  *A.* Our contracts were for 2015.

19  *Q.* In August of 2015 with no signed contract you advised

20  Claxton that they are going to be losing volume for the coming

21  year.

22  *A.* Correct.

23  *Q.* You are told or you understand the position of Claxton at

24  that point was that they were operating under the belief that

25  you all had a contract.

190

Joseph Brink - Cross

1    A.  The volume was going down in 2015 as we changed our product

2    specifications, we were buying different kind of chickens, and

3    our sales were down because of --

4    Q.  You are not answering the question you're being asked, so I

5    am going to try it again.

6           Claxton was concerned at the loss of volume because

7    they believed that they were operating under a contract with

8    you.

9    A.  But the contract was for one year.

10   Q.  And this is in August of 2015 that you two were having this

11   discussion.

12   A.  Probably.

13   Q.  They had given you stair-step pricing up until July of

14   2015.

15   A.  Yes.

16   Q.  And in August you tell them that you are taking away

17   volume.

18   A.  Yes.

19   Q.  In August of 2015, you tell them you're taking away volume

20   and you want to renegotiate because you're no longer willing to

21   adhere to the contract.

22   A.  The contract was for one year.

23   Q.  And you weren't willing to adhere to the contract because

24   you never signed it.

25   A.  It was never finalized by both companies.

Joseph Brink - Cross

1    Q.  You never signed it.

2    A.  It was never signed by any party.

3    Q.  Is that a yes or a no?  You either signed it or you didn't

4    sign it, Mr. Brink.

5    A.  I did not sign it.

6    Q.  You did not sign the contract.  You advised Mr. Cooper that

7    he better get better on pricing if he wanted to keep your

8    business.

9    A.  I guess so.

10   Q.  Mr. Cooper told you, "I thought this was a two-year

11   contract."

12         MR. TORZILLI:  Objection, calls for hearsay.

13         THE COURT:  Sustained.

14   BY MR. BELLER:

15   Q.  Did you believe that Claxton thought it was a two-year

16   contract?

17   A.  No.

18   Q.  With Holmes Poultry you had a two-year contract.

19   A.  I do believe so.

20   Q.  And if we can see I -- let me back up.

21         You had tried to have the employer -- or to have all

22   the different suppliers enter into two-year contracts.

23   A.  We were trying to have the pricing broke apart over a

24   two-year period to make the price increase be smaller over two

25   years.

192

Joseph Brink - Cross

1  *Q.* And that's what you thought all of your suppliers were

2  going to do over that two-year period of time.

3  *A.* But they did not do that.

4  *Q.* And Claxton gave you a stair-step price for six months.

5  *A.* Right.

6  *Q.* And then in month seven you said, "We don't have a signed

7  contract," right?

8  *A.* I did say that.

9  *Q.* I have one last series of questions for you.

10      You had stated earlier on your examination that you

11  consult with different market reports.  We went through that.

12  *A.* Yes.

13  *Q.* One of those reports is the Urner-Barry.

14  *A.* Yes.

15  *Q.* You consult with those reports throughout negotiation.

16  *A.* Yes.

17  *Q.* You ask suppliers to show you these market reports --

18  *A.* Yes.

19  *Q.* -- to justify their prices.

20  *A.* Yes.

21  *Q.* As we just got done going through, in 2014 one of the

22  Pilgrim's negotiation price points was $1.02.

23  *A.* FOB.

24  *Q.* FOB plus freight of 5 cents.

25  *A.* 5 -- a little more, yes.

193

Joseph Brink - Cross

1   Q.  5 and a few hundredths of a penny.

2   A.  Correct.

3   Q.  Claxton was one of six delivered?

4   A.  At the end, yes.

5   Q.  The Urner-Barry market report average for 2014 for the

6   entire year was $1.15.

7   A.  Okay.

8   Q.  Yes?

9   A.  I assume so.  I don't have the reports.  I don't know.

10  Q.  Would it assist you if you had the opportunity to look at

11  an Urner-Barry report?

12  A.  I would like to have more time to study it, but I don't

13  remember.  We had contract pricing through 2014.

14  Q.  Absolutely.  You have contract pricing through 2014.  And

15  your contract pricing through 2014 was 88 cents for Claxton

16  Poultry when the 2014 market index that you says drives or

17  facilitates negotiation was $1.15 per pound, right?

18  A.  That was the spot market pricing, correct.

19  Q.  Right, the spot market price that you consult and consider

20  in determining what price should be.

21  A.  It's one of the factors, correct.

22  Q.  That $1.15 market price does not include freight.

23  A.  On the Urner-Barry?

24  Q.  Yeah.

25  A.  Correct.

194

Joseph Brink - Cross

1   Q.  And so if Claxton Poultry had negotiated 88 cents including

2   freight, you would agree with me that that is significantly

3   less than the $1.15 annual average of the market that you claim

4   that you consult to determine and drive and negotiate prices.

5           MR. TORZILLI:  Objection, foundation.

6           THE COURT:  Overruled.

7   A.  That is one -- our pricing that we got for 2014 was based

8   upon 2013's.

9   BY MR. BELLER:

10  Q.  And in 2014 the pricing, the average pricing was $1.15.

11  And by your answer I assume that means that the 2015 pricing

12  was based on the 2014 average and the 2014 average was $1.15.

13  A.  I don't remember the exact averages, but it was a tool that

14  we used.  We have always been paying lower than the market

15  price.

16  Q.  Significantly 20 to 25 cents lower.

17  A.  We have always been lower, correct.

18  Q.  And here if the market price was $1.15 and you were paying

19  Claxton for 2015 $1, you were still paying 15 cents less than

20  the market price.

21  A.  I guess so.

22  Q.  It wasn't a shocking number after all.

23  A.  It was a shocking number because of the corn prices.

24  Q.  And you, Mr. Brink, won the battle of the chicken in 2014,

25  right?

Joseph Brink - Cross

1    A.   Basically we got everybody to be agreeing to the weights of

2    the chicken so we can have pricing going into the system

3    correctly.

4    Q.   Is that a yes that you won the battle of the chicken in

5    2014?

6    A.   I won the battle of the chickens is a generic -- just that

7    we got it done.

8    Q.   And that's what you boasted to your co-worker in December

9    of 2014 is we won the battle of the chicken.

10   A.   We won the battle of the chicken was referring to getting

11   everything corrected and having it ready to go.

12   Q.   Yes, that's what you said to a co-worker.

13   A.   Correct.

14        MR. BELLER:   I have nothing further.   Thank you.

15        THE COURT:   Thank you, Mr. Beller.

16        Additional cross-examination?

17        Mr. McLoughlin?

18                          **CROSS-EXAMINATION**

19   BY MR. McLOUGHLIN:

20   Q.   Good afternoon, sir.   My name is Jim McLoughlin and I

21   represent Bill Lovette.   Let's get some basics out of the way,

22   sir.

23        In the negotiations with Pilgrim's that you've talked

24   about, you never met with or spoke to Bill Lovette, did you?

25   A.   Correct.

Joseph Brink - Cross

1    *Q.* And you never had any e-mail or other communication with

2    Bill Lovette, did you?

3    *A.* Correct.

4    *Q.* And, in fact, you told the government you've never met Bill

5    Lovette, correct?

6    *A.* Correct.

7    *Q.* Now, you also told the government that you had no personal

8    information that any of your suppliers were communicating with

9    each other about your contract; is that correct?

10   *A.* Correct.

11   *Q.* So having no personal knowledge of that allegation, you

12   were unhappy about the price that you were paying in 2015 after

13   the 2014 negotiations, correct?

14   *A.* Correct.

15   *Q.* And part of the reason you were unhappy is because as the

16   chief procurement officer, it's your responsibility to acquire

17   the products that Fiesta Restaurant Group or Pollo Tropical

18   needs to run its business at the lowest possible price,

19   correct?

20   *A.* Correct.

21   *Q.* And that is so that Fiesta Restaurant Group which owned

22   Pollo Tropical can maximize its profits for its shareholders;

23   is that correct?

24   *A.* Ultimately, I guess so, yes.

25   *Q.* Well, is there anything about that that confuses you that

Joseph Brink - Cross

1  you have to guess?

2  *A.*  Well, I purchase the product to get the lowest price so we

3  can keep the pricing as best we can to our consumers.

4  *Q.*  Because that drives volume and that increased volume drives

5  profits, correct?

6  *A.*  Correct.

7  *Q.*  Okay.  Now, can we also agree that as your supplier, the

8  Pilgrim's Pride company had no obligation to sell you chicken

9  for less money than they could sell it to somebody else,

10  correct?

11  *A.*  I do not know.  That's their obligation.

12  *Q.*  I'm sorry, sir.  How many years have you been in the

13  chicken business and procuring chickens?

14  *A.*  A long time, since '94.

15  *Q.*  Since '94.  2004 -- 18 years ball park?

16  *A.*  Ball park.

17  *Q.*  What did you do before that?

18  *A.*  I was in operations.

19  *Q.*  For what?

20  *A.*  Restaurants, for Grandy's.

21  *Q.*  What did you do before you were in operations for

22  restaurants?

23  *A.*  Before that I was a molecular biologist.

24  *Q.*  Do you have a university degree?

25  *A.*  Yes.

Joseph Brink - Cross

1    Q.  In molecular biology?

2    A.  No, in biology.

3    Q.  In biology.  Did you ever take any business courses?

4    A.  In college, yes.

5    Q.  You did.  Okay.  So based on your college business courses

6    and your years in business, is it your testimony to the jury

7    that you don't know whether Pilgrim's Pride had no duty to sell

8    Pollo Tropical chicken for less than they could sell it to

9    somebody else?

10   A.  That's their obligation.  I'm saying I don't know what

11   Pilgrim's Pride was wanting to do with their chicken volume.

12   It's their obligation to do what they want to do with their

13   customers.

14   Q.  I didn't ask you what they wanted to do.  Sir, let me

15   rephrase it for you.

16          Was it your view in September and October of 2014 that

17   Pilgrim's Pride had a duty to sell you chicken for less than

18   they could sell it to somebody else?

19   A.  I don't know.

20   Q.  You don't remember?

21   A.  I know that they can sell chicken to whomever they wish to.

22   They didn't have to give me chicken.

23   Q.  Okay.  So is that a yes to my question that they didn't

24   have an obligation to sell you chicken if they could sell it to

25   somebody else for more.

Joseph Brink - Cross

1   *A.*   That's their obligation.  That's the whole process, yes.

2   *Q.*   When you say that's their obligation, that's their

3   obligation to their shareholders, right, to maximize their

4   profit, correct?

5   *A.*   I don't know what their obligations is to shareholders.

6   *Q.*   How long have you worked for a public company?

7   *A.*   About six years.

8   *Q.*   You are in the senior management of that public company,

9   aren't you?

10  *A.*   Yes.

11  *Q.*   And as the senior officer of a public company, is it your

12  testimony you don't know the obligations of a public company to

13  its shareholders?

14        *MR. TORZILLI:*  Your Honor, I am going to object.

15  These questions are speculative, and I am happy to have a side

16  bar to elaborate.

17        *MR. McLOUGHLIN:*  Your Honor, there is absolutely

18  nothing speculative about this gentleman's testimony.

19        *THE COURT:*  I think we are sidetracked right now.  I

20  am going to sustain the objection.

21  *BY MR. McLOUGHLIN:*

22  *Q.*   So you just said for a moment a moment ago in response to a

23  question from Mr. Beller that price in 2014 was based on the

24  price in 2013 for chicken.  Was that what you said?

25  *A.*   Uh-huh.

200

Joseph Brink - Cross

1    *Q.*  Sir, is it also fair to say that when a company like

2    Pilgrim's Pride gave you a price, they weren't looking

3    backwards.  They were actually looking forwards to what they

4    could sell it to someone else in 2015 in order to decide what

5    price to quote you?

6            *MR. TORZILLI:*  Objection, foundation.

7            *THE COURT:*  Overruled.  He can answer.

8    *A.*  I don't know how Pilgrim's determined their pricing

9    structure when they gave me the pricing for our contract.

10   *BY MR. McLOUGHLIN:*

11   *Q.*  So shouldn't have the answer to Mr. Beller have been I

12   don't know instead of price in 2014 was based on 2013?

13   *A.*  I said that's -- I don't know how Pilgrim's does their

14   pricing models and how they did it, determined the pricing they

15   gave to us.

16   *Q.*  Now, would you agree with me that basic economics price is

17   determined by the intersection of supply and demand?

18   *A.*  That's one aspect, yes.

19   *Q.*  What other aspects are there?

20   *A.*  Corn, feed.

21   *Q.*  Sir, I didn't ask you about chickens.  I said about

22   generally with respect to basic economics for the sale of a

23   product, any product, it is at the intersection of supply and

24   demand.

25   *A.*  Yes.

Joseph Brink - Cross

1  *Q.* And, in fact, it doesn't matter how much it cost you to

2  make the product. If there is no demand for it, you're not

3  going to be able to sell it above your cost. And if there is a

4  large demand for it, you can sell it for a profit. Isn't that

5  basic economics?

6  *A.* Yes.

7  *Q.* So when you say you were looking at corn and apparently

8  exclusively corn to decide how much a chicken company was going

9  to ask for their product, did you look at the demand side for

10 that product?

11 *A.* Yes.

12 *Q.* What did you look at for the demand side? Was it the

13 Urner-Barry Index?

14 *A.* I have several reports I get. Urner-Barry is one of them.

15 *Q.* What were the others?

16 *A.* American Restaurant Association, ArrowStream.

17 *Q.* Sir, let's just say the three-year average from 2012 to

18 2015, how many small birds did Chick-fil-A buy?

19 *A.* I do not know.

20 *Q.* Do you know, did their purchases increase over those years?

21      *MR. TORZILLI:* Objection, foundation.

22      *MR. McLOUGHLIN:* Your Honor, I believe I am entitled

23 to test his knowledge of the industry given his testimony.

24      *THE COURT:* Overruled. He can answer if he knows.

25 *A.* I assume -- Chick-fil-A was growing in customer store

Joseph Brink - Cross

1    count, so I assume their chicken purchases also increased.

2    *BY MR. McLOUGHLIN:*

3    *Q.*  And Costco was also growing in rotisserie chicken, wasn't

4    it?

5    *A.*  Yes.

6    *Q.*  So you would assume their purchases were going up, correct?

7    *A.*  I don't know exactly how much purchases there were, but we

8    can assume.

9    *Q.*  And the same is true with respect to Wal-Mart, isn't it?

10   *A.*  Again, I don't know how many stores, the growth and

11   everything else, but yes, we can assume.

12   *Q.*  Isn't it a fact, sir, that going into 2014 you had no clear

13   view of the demand side for small birds?

14   *A.*  I know the demand for our company.  I do not know the

15   demand from every company.

16   *Q.*  Right.  And so at the same time, sir, when you didn't know

17   what the demand was across the market for small birds, do you

18   know how many small bird plants were converted to large bird

19   plants over the prior five years?

20   *A.*  Not exactly.

21   *Q.*  Give me your approximate understanding.

22   *A.*  I don't know how many plants had converted over the years.

23   *Q.*  So when you said not exactly, the real answer is I have no

24   idea.

25   *A.*  I have no idea exactly how many numbers were converted.

Joseph Brink - Cross

1    Q.   Okay.  And at the same time you don't know small bird

2    demand.  And, sir, when we talk about this, you said in

3    response to a question about being in the broiler chicken

4    business, you are in the restaurant business, correct?

5    A.   Correct.

6    Q.   You don't really know the chicken processing growing

7    business, do you?

8    A.   Not to the level that they do.

9    Q.   Right.  And earlier if I understood your testimony having

10   said you don't really understand the business, you testified in

11   response to a government question that basically the cost of

12   labor to produce a small bird and a large bird is approximately

13   the same.  Do you remember that testimony?

14   A.   That's what I was told by the suppliers in the past.

15   Q.   What provider told you that?

16   A.   I don't remember which suppliers we spoke to regarding all

17   of this.

18   Q.   Just one.  I am just asking for one.

19   A.   I would probably assume it was Pilgrim's.

20   Q.   But you don't know.  You are assuming.

21   A.   I am assuming.

22   Q.   What year did they tell you that?

23   A.   2010, 2011.

24   Q.   Okay.  Have you ever been in a small bird processing plant?

25   A.   Yes.

204

Joseph Brink - Cross

1   Q.  Have you ever been in a large bird processing plant?

2   A.  No.

3   Q.  Do you understand that one of the differences between a

4   large bird plant and a small bird plant is in a small bird

5   plant they basically take the chicken and cut the chicken, but

6   basically stays in one piece, and in a large bird plant they

7   take it apart.

8   A.  Correct.

9   Q.  Okay.  How many employees are in a small bird plant in a

10  processing line?

11          MR. TORZILLI:  Objection, foundation.

12          THE COURT:  Overruled.  He can answer if he knows.

13  A.  I do not know.

14  BY MR. McLOUGHLIN:

15  Q.  If I told you it was seven, would you be able to disagree?

16  A.  On the processing plant?

17  Q.  On a line in a processing plant.

18  A.  I don't know exactly how many employees.  They are all over

19  the place and at the end the production line there is packers

20  and everything else.  I don't know the actual number of

21  employees on a line.

22  Q.  Right.  So if I suggested to you that the average would be

23  three hangers, one floor cleaner, one machine operator, one

24  scaler and one stacker for a total of seven, you would not be

25  able to disagree, would you?

Joseph Brink - Cross

1          MR. TORZILLI:  Objection, foundation.

2          THE COURT:  Sustained as to form.

3     BY MR. McLOUGHLIN:

4     Q.  Isn't it true that you don't know how many hangers there

5     are on a line in a small bird plant?

6     A.  When you go into a plant, I have never counted how many

7     hangers are hanging chicken in the line because typically we're

8     not allowed to go into the dirty part of the plant and the

9     clean part of the plant.

10    Q.  Sir, did I ask you why you don't know?

11    A.  I'm just telling you I don't know the exact numbers.

12    Q.  No, sir, you're not telling me that.  Isn't it true you

13    told me everything but I don't know?

14    A.  Okay.  I do not know the actual numbers.

15    Q.  Okay.  Let's talk about a large bird plant.  How many

16    employees are on a line in a large bird plant?

17    A.  I do not know.

18    Q.  Can you give me an approximate number?

19    A.  I do not know.

20    Q.  If I suggested to you there would be one loader, four

21    shoulder cutters, two pullers, one floor cleaner, two wing

22    cutters, one wing grader, two wing scalers and a wing boxer for

23    a total of approximately 30, would you disagree?

24         MR. TORZILLI:  Objection, form and foundation.

25         THE COURT:  Sustained.

Joseph Brink - Cross

1    *BY MR. McLOUGHLIN:*

2    Q.  Sir, do you have any idea whether or not the number of

3    employees on a single line in a large bird plant is 30 or more?

4    A.  I have no idea.

5    Q.  So if you have no idea how many people it takes to run a

6    line in a small bird plant and a large bird plant, isn't it

7    true that you have absolutely no idea what the average labor

8    cost is per bird for a small bird and a large bird?

9    A.  That's not correct.  I was told that the finished -- for

10   chicken breast meat that they get more chicken produced with

11   the same amount of labor.  That's what I was told.

12   Q.  That's what you were told.

13   A.  Yes.

14   Q.  But you can't tell us --

15   A.  That's why the plants converted to large birds.

16   Q.  You can't tell us who.

17   A.  I don't remember.

18   Q.  You can't tell us when.

19   A.  It's been years ago.  I do not remember.

20   Q.  Listening to these questions, sir, does it occur to you

21   that maybe your information might be incorrect or your

22   recollection might be failing?

23   A.  I do not know.

24   Q.  But certainly you would agree with me that the jury should

25   not rely on your testimony with respect to that cost

Joseph Brink - Cross

1  differential because you don't know.

2  A.  I do not know.

3  Q.  You don't know whether they should rely or not?

4  A.  I was told information that I was utilizing from my past

5  experience.

6  Q.  Okay.  Sir, I think it's been established that you used

7  competitors' pricing, including the exact price, to try to push

8  down the price of a competing supplier.  Is that a fair summary

9  of where we are in your testimony?

10 A.  I gave ranges, yes.

11 Q.  I'm sorry, this is a yes or no, sir.  You did more than

12 give a range.  You gave a specific number of 88 cents, didn't

13 you, or do we have to go over that again?

14 A.  One year, yes, I did, yes.

15 Q.  And when you said to other suppliers, "They gave me the

16 same number, but theirs is delivered and yours is FOB," that's

17 pretty precise guidance, isn't it?

18 A.  It's giving guidance, yes.

19 Q.  I didn't say giving guidance.  I said precise guidance.

20 Isn't that precise guidance?

21 A.  It can be, yes.

22 Q.  What's different between "is" and "can be" that you picked

23 can be?

24 A.  I interpret it as a guidance.  That's my interpretation.

25 Q.  Now, when you were giving that guidance over those years,

Joseph Brink - Cross

1  sir, it was your expectation that the person to whom you would

2  give that guidance would then respond by lowering their price;

3  isn't that correct?

4  A.  That was my goal, yes.

5  Q.  And so you communicated that information to them with the

6  expectation and purpose to generate a reaction in them which is

7  lower price, correct?

8  A.  Correct.

9        MR. McLOUGHLIN:  Your Honor, based on the witness'

10  testimony, I would move the admission of the exhibits that

11  Mr. Canty previously proposed on the ground that they are

12  outside the hearsay rule because they are admissible for the

13  effect on the listener and also for future conduct, so that

14  would be I-231 and I-228.

15        THE COURT:  Let's take them one at a time.  Could

16  those be displayed on the monitor for my benefit?  I-231 has

17  already been admitted.

18        MR. McLOUGHLIN:  Excuse me, Your Honor.  I think I

19  have got the wrong one.  It's I-226 and I-225, my apologies,

20  225 and 226.  I was on the wrong page.

21        THE COURT:  Any objection to the admission of I-226?

22        MR. TORZILLI:  I'm sorry, Your Honor.  226?

23        MR. McLOUGHLIN:  It's actually I-5226 and I-5225.  No?

24  I-226 and 225.

25        MR. TORZILLI:  Being asked whether to object on I-226,

209
Joseph Brink - Cross

1    I do on the grounds that it's hearsay.

2              THE COURT:  All right.  Objection is sustained.  It is

3    hearsay and there is no hearsay exception for it.

4    BY MR. McLOUGHLIN:

5    Q.  Sir, now, you talked a little bit about the pricing

6    negotiations, and we've talked about this stair-step concept of

7    pricing.  Do you recall that?

8    A.  Yes.

9    Q.  And in fact, stair-step pricing means you had a lower

10   annual price for the year for chicken from that supplier,

11   correct?

12   A.  Yes.

13   Q.  Which is to say quite simply Claxton negotiated with you

14   and gave you a lower price than Pilgrim's Pride.

15   A.  For the year, yes.

16   Q.  For the year.

17             THE COURT:  Mr. McLoughlin, it's just about noon.  A

18   few more questions is fine, but if you could look for a

19   convenient --

20             MR. McLOUGHLIN:  This is as good a place as any, Your

21   Honor.

22             THE COURT:  Ladies and gentlemen, we are going to

23   break for lunch.  Let me give you information about our

24   schedule for planning purposes.  And that is tomorrow we are

25   going to meet just among the attorneys and myself so that we

1   can go through more exhibits, so we won't have court tomorrow.

2   No court, of course, on Friday either.  So what that means is

3   that -- we will this afternoon, though.  Once we break then

4   this evening, you won't be coming back until Monday at 8:30,

5   okay?  I just wanted to let you know that so you can plan

6   ahead, all right?

7           In the meantime, keep all those admonitions in mind.

8   Keep your yellow juror buttons visible.  It's a little colder

9   today, so if you go out, try to keep those visible like, for

10  instance, if you go to a restaurant or something like that.

11          The jury is excused for lunch.  We will reconvene at

12  1:30.  Thank you.

13          (Jury excused.)

14          Mr. Brink, you can be excused until 1:30.  Thank you.

15          Anything we should talk about?  Mr. Koenig?

16          *MR. KOENIG:*  Sure, Your Honor.  In the event that we

17  did get through the witnesses before the end of the day, our

18  suggestion would be respectfully to start in on the documents

19  to get a head start on tomorrow, if possible.

20          *THE COURT:*  As opposed to?

21          *MR. KOENIG:*  Well, I mean, if we get through -- who is

22  the last one today, Hoyt.

23          *THE COURT:*  Oh, the witnesses that we talked about

24  yesterday, yeah, right.  I think that that probably makes

25  sense.

Joseph Brink - Cross

1          MR. KOENIG:  That's all I was --

2          THE COURT:  Anyone have any thoughts on that?  That

3    would seem logical.  That would be consistent with what we have

4    been talking about since we anticipated yesterday that going

5    through the witnesses that were referred to would be our agenda

6    for today, and then our next order of business would be to go

7    through documents.  So were we to in essence get through all

8    the witnesses that we talked about yesterday, I think it makes

9    sense that we go ahead and excuse the jury and then start

10   working on those exhibits.

11         Anyone else have anything to bring up?

12         All right.  We will be in recess.  Thank you.

13      (Recess at 12:02 p.m.)

14      (Reconvened at 1:33 p.m.)

15         THE COURT:  Let's go ahead and bring the jury back in.

16         (Jury present.)

17         THE COURT:  And here comes Mr. Brink.

18         All right.  Mr. McLoughlin, go ahead.

19         MR. McLOUGHLIN:  Thank you, Your Honor.

20   BY MR. McLOUGHLIN:

21   Q.  Mr. Brink, let's quickly do a little housekeeping, please.

22         MR. McLOUGHLIN:  Can I get that binder?  Can we pull

23   up Government Exhibit 592, please?

24   BY MR. McLOUGHLIN:

25   Q.  Mr. Brink, do you recognize Government Exhibit 592 as the

Joseph Brink - Cross

1    contract for the year of 2015 between Pollo Tropical and

2    Mar-Jac Poultry?

3    A.   Yes.

4    Q.   So is that your signature on Page 9 of the contract?

5    A.   Yes.

6    Q.   And is this a business record of this contract that your

7    company keeps in the ordinary course of its business?

8    A.   Yes.

9    Q.   And is this a business record that you rely on in the

10   ordinary course of Pollo Tropical's business?

11   A.   Yes.

12        MR. McLOUGHLIN:   Your Honor, we would move the

13   admission of Government Exhibit 592.

14        THE COURT:   Any objection to the admission of

15   Exhibit 592?

16        MR. TORZILLI:   No objection, Your Honor.

17        THE COURT:   Exhibit 592 will be admitted.

18        MR. McLOUGHLIN:   Can we pull up, please, Government

19   Exhibit 558?

20   BY MR. McLOUGHLIN:

21   Q.   Sir, do you recognize this as the contract between -- that

22   being Government Exhibit 558 as the contract between Pollo

23   Tropical and Pilgrim's Pride for the year 2013?

24   A.   Yes.

25   Q.   And, sir, is this contract a business record that Pollo

Joseph Brink - Cross

1    Tropical keeps in the ordinary course of its business?

2    A.   Yes.

3    Q.   And is this a document, being the contract, that you and

4    Pollo Tropical relied on in the ordinary course of the

5    company's business?

6    A.   Yes.

7         MR. McLOUGHLIN:   We would move the admission of

8    Government Exhibit 558, Your Honor.

9         THE COURT:   Any objection to the admission of

10   Exhibit 558?

11        MR. TORZILLI:   No objection, Your Honor.

12        THE COURT:   Exhibit 558 will be admitted.

13        MR. McLOUGHLIN:   Now, can we pull up just for the

14   witness, please, Defense Exhibit A-706?

15   BY MR. McLOUGHLIN:

16   Q.   And, sir, I would ask you to review A-706 and let me know

17   when you are ready.

18   A.   Yes.

19   Q.   Sir, let us start at the bottom of the first page.  Is the

20   message that is at the bottom of the first page that shows it

21   is between you sending an e-mail to Walter Cooper on

22   December 17, 2014 at 9:05 p.m. a message that you sent to

23   Mr. Cooper in the ordinary course of Pollo Tropical's business?

24   A.   Yes.

25   Q.   And Mr. Cooper responded to you on December 22 at 9:30 a.m.

214

Joseph Brink - Cross

1  Does that refresh your recollection that Mr. Cooper

2  communicated to you that the contract you sent him in the first

3  e-mail or attached to the first e-mail was a one-year contract,

4  and he told you he was under the impression that the term of

5  the agreement was supposed to be a two-year contract?

6          *MR. TORZILLI:*  Objection, improper refreshment.

7          *THE COURT:*  Overruled.

8  *A.*  Yes.

9  *BY MR. McLOUGHLIN:*

10  *Q.*  Okay.  And when he asked you in that form of the question

11  that Claxton was under the impression that the agreement was to

12  last for two years until December 31, 2016, isn't it true that

13  you said to him, "It is but the volume will change in 2016.

14  The volume will increase in 2016"?

15          *MR. TORZILLI:*  Objection.  The document is not in

16  evidence.

17          *THE COURT:*  Sustained.

18  *BY MR. McLOUGHLIN:*

19  *Q.*  Sir, did you tell Mr. Cooper on December 22, 2014 in

20  writing that, in fact, he was correct that the agreement

21  between Pollo Tropical and Claxton was supposed to be for two

22  years and, in fact, was for two years?

23          *MR. TORZILLI:*  Objection.  The document is not in

24  evidence and the witness is referring to the document in

25  answering counsel's questions.

Joseph Brink - Cross

1          THE COURT:  Sustained.

2          MR. McLOUGHLIN:  Will you please take down the

3     document, please?

4          Madam court reporter, would you read my question back,

5     please.

6          (The record was read by the court reporter.)

7          MR. McLOUGHLIN:  That's a yes or no, sir.

8     A.  I don't know.  It was -- basically it was an agreement he

9     wanted two years, but we do not put two-year pricing on a

10    contract.

11    BY MR. McLOUGHLIN:

12    Q.  Sir, I didn't ask you what the contract was.  I asked you

13    what you told Mr. Cooper.  Did you not tell Mr. Cooper on

14    December 22, 2014, it, being the contract, is a two-year

15    contract, but the volume will change in 2016?  Yes or no?

16         MR. TORZILLI:  Objection, hearsay.

17         THE COURT:  He asked what he told Mr. Cooper.

18    Overruled.

19    BY MR. McLOUGHLIN:

20    Q.  Yes or no?

21    A.  Yes.

22    Q.  And you also told him having confirmed it was a two-year

23    contract that the volume will increase in 2016, did you not?

24    Yes or no?

25    A.  That was in the e-mail, yes.

216

Joseph Brink - Cross

1  *Q.* And when you sent that e-mail to him, you knew that you

2  were speaking on behalf of your employer and that he, as an

3  employee of Claxton, would rely on your representation to him,

4  didn't you?

5          *MR. TORZILLI:* Objection, foundation.

6          *THE COURT:* Overruled.

7  *A.* I replied back to him saying that that was correct.  We

8  thought -- we wanted a two-year agreement, but we would not do

9  a two-year on pricing.  We did two-year volume.

10 *BY MR. McLOUGHLIN:*

11 *Q.* Sir, that's fascinating, but it has nothing to do with what

12 I asked you.

13         *MR. TORZILLI:* Objection.

14 *BY MR. McLOUGHLIN:*

15 *Q.* Isn't it true that when you sent the e-mail you knew, as an

16 employee of Pollo Tropical, that he, as an employee of Claxton,

17 would rely on your representation to him that it was a two-year

18 contract?  Yes or no?

19 *A.* Yes.

20 *Q.* I am sorry, I didn't hear you.

21 *A.* Yes.  My voice is going.  I'm sorry.

22 *Q.* And, in fact, you expected that Claxton would continue to

23 supply your company with chicken at a reduced price in reliance

24 on your telling him it was a two-year contract; isn't that

25 true?

Joseph Brink - Cross

1          *MR. TORZILLI:*  Objection as to his expectation.

2          *THE COURT:*  Overruled.  He can answer.

3    *A.*  No.

4    *BY MR. McLOUGHLIN:*

5    *Q.*  No?

6    *A.*  No.

7    *Q.*  Okay.  Now, sir, you also told him the volume would

8    increase in 2016, didn't you?

9    *A.*  Yes, we did.

10   *Q.*  And you expected he would rely on that, yes?

11   *A.*  Yes, at the time, yes.

12   *Q.*  And that would, in fact, be an inducement that Claxton

13   continue to supply chicken to Pollo Tropical at the contract

14   price; isn't that right?

15   *A.*  Yes.

16   *Q.*  And that is why you also told him it was a two-year

17   contract because you expected that he would rely on that to

18   continue to supply chicken to Pollo Tropical at the contract

19   price.

20   *A.*  Yes.

21   *Q.*  But you knew when you sent it that because you had not

22   signed it, you could walk away when you needed to, didn't you?

23   *A.*  That is not correct.

24   *Q.*  Did you think you had a binding contract when you sent that

25   e-mail?

Joseph Brink - Cross

1   A.  We sent the contract and I thought it was going to get

2   signed.  And it went through legal as I stated before.  If it

3   got approved by legal by both parties, it would have been

4   signed.

5   Q.  I am sorry, sir.  I didn't ask you any of that.  I asked

6   you when you sent the e-mail, did you believe you had a binding

7   contract, you, Mr. Joseph Brink?

8          MR. TORZILLI:  Objection, calls for a legal

9   conclusion.

10         THE COURT:  Overruled.

11  A.  I sent the contract.  The e-mail was all in progress, so I

12  thought we were having a contract in progress.

13  BY MR. McLOUGHLIN:

14  Q.  Is that a yes or no to my question, sir, or would you like

15  to read it back?

16         MR. McLOUGHLIN:  Can you read it back, please?

17         (The record was read by the court reporter.)

18  A.  I said yes.

19  Q.  Thank you.  Now, sir, in terms of your time in the

20  industry, are you familiar with the National Chicken Council in

21  the United States?

22  A.  Yes.

23  Q.  And can you tell the jury just generally what the National

24  Chicken Council is?

25  A.  It's a council of all chicken suppliers that represent the

Joseph Brink - Cross

1   chicken council -- all chicken suppliers.

2   Q.   And it also has associate members who are organizations

3   that purchase chicken, correct?

4   A.   I assume so, yes.

5   Q.   And it has meetings periodically that are attended by

6   people with an interest in the industry including chicken

7   suppliers and purchasers and others; is that correct?

8   A.   Yes.

9   Q.   Have you ever attended a meeting?

10  A.   No.

11  Q.   Do you know people who have?

12  A.   Not personally, no.

13  Q.   Did you ever read any of their publications?

14  A.   I don't recall.

15  Q.   The National Chicken Council was a fairly well-known

16  organization in the industry, isn't it?

17  A.   Yes.

18  Q.   Relatively prestigious to be on the board of that

19  organization would you say?

20        MR. TORZILLI:   Objection, foundation.

21        THE COURT:   Overruled.   He can answer if he knows.

22  A.   I don't know.

23  BY MR. McLOUGHLIN:

24  Q.   And you're generally aware that their annual meeting of the

25  National Chicken Council or their quarterly meetings get a

1   pretty robust attendance; is that fair?

2   A.   I don't know.

3   Q.   Never attended.

4   A.   Never attended.

5   Q.   Now, sir, in 2014 when you were negotiating with Pilgrim's,

6   with Mr. Little, you were told that Pilgrim's would have to

7   restrict the volume to 125,000 pounds per week plus or minus

8   10 percent; is that correct?

9   A.   That was the final agreement we got to, correct.

10  Q.   And the reason -- one of the reasons for that was that

11  Pilgrim's informed you that it just didn't have the volume to

12  commit to Pollo Tropical in excess of that amount because of

13  other commitments; is that correct?

14  A.   I don't remember all that.

15  Q.   What do you remember?

16  A.   That I didn't have enough chicken.  And they went back and

17  came up with a solution.  And instead of having an annual

18  commitment, we got down to a weekly agreement plus or minus

19  10 percent.

20  Q.   And that was because they couldn't commit unrestricted

21  volume to you; isn't that correct?

22  A.   We didn't have restricted volume.  We had annual volumes.

23  Q.   No, I'm sorry, sir.  I think you misunderstood my question.

24          The reason they limited you to 125,000 pounds per week

25  is because they didn't have the volume to commit that you could

221

Joseph Brink - Cross

1    take as much as you wanted; isn't that correct?

2    A.   Yes.

3    Q.   And that was because demand was high.  Everyone was telling

4    you that; isn't that correct?

5    A.   Yes.

6    Q.   And you told the FBI and the government that you went

7    around to other suppliers to see if you could acquire some more

8    chicken, and they all told you that they didn't it have to

9    sell.  Is that fair what you told the government and the FBI?

10   A.   I called other suppliers.  Some said yes.  Some said no.

11   Q.   And the ones that said no said they didn't have supply.

12   A.   Correct.

13   Q.   The only one that said yes was Mar-Jac, right?

14   A.   Correct.

15   Q.   And then you purchased about 3 million pounds from Mar-Jac,

16   right?

17   A.   Correct.

18   Q.   Now, you were asked if Claxton has one plant, correct?

19   A.   Correct.

20   Q.   Mar-Jac has how many plants?

21   A.   For the chicken plants, I think there is two.

22   Q.   Two.  And Holmes had one small bird plant?

23   A.   Correct.

24   Q.   Do you know how many small bird plants Pilgrim's had?

25   A.   No, I know they have a lot.  They have several.  I don't

Joseph Brink - Cross

1  know exactly how many chicken plants they have.  They have so

2  many brands they purchased over the years, I don't know the

3  exact number.

4  Q.  But it is a large number, isn't it?

5  A.  The largest supplier, had the most plants.

6  Q.  So in some sense Claxton or Holmes wasn't really competing

7  with Pilgrim's because they could not meet the volume

8  commitments that Pilgrim's could should Pilgrim's have that

9  volume available because Pilgrim's just had more plants than

10  they did; isn't that correct?

11  A.  In theory, yes.

12  Q.  And in reality too.  Let's not talk about theory.  Let's

13  talk about reality.  Wasn't that the reality in 2014?

14  A.  I don't understand.  What do you mean?

15  Q.  Do you understand the difference between reality and

16  theory?

17  A.  Well, yes, but I don't know what you're asking, your

18  question.

19  Q.  Isn't it true that in reality, because Pilgrim's had so

20  many more facilities, that Claxton or Holmes could not provide

21  you the supply across the country that you needed to get from

22  Pilgrim's?

23  A.  If Pilgrim's has more capacity, they should have

24  availability of product, correct.

25  Q.  And you relied on that expectation, didn't you?

Joseph Brink - Cross

1    A.  They were one of the suppliers.  They weren't the main

2    supplier.

3    Q.  Sir, is there a problem with just yes or no to a question?

4    A.  Okay.  I say I don't know, my answer.

5    Q.  I am asking you what you relied on.

6    A.  I relied on our current suppliers, their volumes and their

7    ability to take care of our current business and with our

8    growth models.  That's what I relied on.

9    Q.  And we've agreed, haven't we, that given that Claxton and

10   Holmes only had one plant each, they couldn't fill the void

11   that Pilgrim's -- losing Pilgrim's would create; isn't that

12   right?

13   A.  If I lost Pilgrim's, I would have to find another supplier,

14   correct.

15   Q.  So in some sense they really didn't compete because they

16   couldn't deliver what Pilgrim's was delivering; isn't that

17   correct?

18   A.  Objection, asked and answered.

19        THE COURT:  Overruled.

20   A.  Pilgrim's was my main -- my only supplier until I added

21   Mar-Jac on my sized breast.

22   BY MR. McLOUGHLIN:

23   Q.  All right.  I think we are about done, sir.

24        Now, would you agree with me that Pollo Tropical does

25   not have the right to dictate the profit margin of any other

224

Joseph Brink - Cross

1    company?

2    A.  Yes.

3    Q.  And so when you testified that when you were told that

4    Pilgrim's wanted the same margin for its small bird as large

5    birds, when you said that was not acceptable, that was not

6    within your purview, was it?

7    A.  That's my opinion.

8    Q.  Well, you used it as more than an opinion.  You expressed

9    it to Pilgrim's.

10   A.  Because we are looking at different cost models.  We are

11   looking at size birds -- small bird plants versus large bird

12   plants.

13   Q.  Right.  And haven't we already established that it's not

14   your right to tell Pilgrim's how to run its business?

15   A.  They have every right to do what they want to do.

16   Q.  Now, sir, 2015 was a reasonably good year for Fiesta Group

17   and Pollo Tropical, wasn't it?

18   A.  I assume so.

19   Q.  Well, you were an employee then, right?

20   A.  Correct.

21   Q.  And in that year didn't annual revenues grow by 12-1/2

22   percent to $687.4 million?

23   A.  I don't remember exactly.

24        MR. McLOUGHLIN:  Your Honor, may I provide the witness

25   a document to help him refresh his recall?

Joseph Brink - Cross

1          THE COURT:  You may.

2          MR. McLOUGHLIN:  And I have copies for the government

and the Court and one for me.

BY MR. McLOUGHLIN:

Q.  If you look at the first page, the same store sales at

Pollo Tropical increased in 2015, did they not?

A.  The comparable sales increased, yes, at both brands.

Q.  The comparable sales for the jury is sales at existing

stores, not increased volume as a result of a new store

opening, correct?

A.  Correct.

          MR. McLOUGHLIN:  Thank you, Your Honor.  I have no

further questions.  Thank you, Mr. Brink.

          THE COURT:  Thank you.

          Additional cross-examination?

          Go ahead, Ms. Pletcher.

                    **CROSS-EXAMINATION**

BY MS. PLETCHER:

Q.  Good afternoon, Mr. Brink.  My name is Anna Pletcher and I

represent Mr. Penn.

          You have never met Mr. Penn, have you?

A.  No, I have not.

Q.  And you have never spoken to him?

A.  No.

          MS. PLETCHER:  Thank you.  That's all my questions.

Joseph Brink - Cross

1      THE COURT:  Thank you, Ms. Pletcher.

2          Mr. Pollack, go ahead.

3                    **CROSS-EXAMINATION**

4  BY MR. POLLACK:

5  Q.  Good afternoon, Mr. Brink.  You testified that your

6  suppliers were Pilgrim's, Claxton and Holmes; is that right?

7  A.  In 2014, yes.

8  Q.  And then eventually Mar-Jac as well?

9  A.  Yes.

10  Q.  The company George's was not one of your suppliers?

11  A.  Correct.

12  Q.  And so all of the testimony you gave yesterday, all of the

13  testimony that you gave today, none of that relates to

14  George's, correct?

15  A.  Correct.

16  Q.  And Mr. Blake was an employee of George's until he retired

17  back in 2018.  Do you know Mr. Blake?

18  A.  No, I do not.

19          MR. POLLACK:  Thank you, Mr. Brink.

20          THE COURT:  Thank you, Mr. Pollack.

21          Ms. Henry?

22                    **CROSS-EXAMINATION**

23  BY MS. HENRY:

24  Q.  Good afternoon.  I think we are getting toward the end

25  here.  I am Roxann Henry and I represent Mr. Bill Kantola.

Joseph Brink - Cross

1   Koch Foods was not involved in the 2014 negotiations that

2   you've discussed here; isn't that correct?

3   *A.*   Correct.

4   *Q.*   Nor was Mr. Bill Kantola?

5   *A.*   Correct.

6   *Q.*   Koch Foods did come in as a new competitor in 2016 to Pollo

7   Tropical, didn't it?

8   *A.*   Correct.

9   *Q.*   And when it came in, it took away sales volume that

10  otherwise would have gone to the prior incumbents or other

11  suppliers, correct?

12  *A.*   Correct.

13          *MS. HENRY:*   No further questions.

14          *THE COURT:*   Thank you, Ms. Henry.

15          Mr. Gillen?

16                          **CROSS-EXAMINATION**

17  *BY MR. GILLEN:*

18  *Q.*   Good afternoon.   Craig Gillen representing Mr. Roberts.   A

19  quick question.

20          The testimony today and yesterday had nothing to do

21  with Tyson, correct?

22  *A.*   Correct.

23  *Q.*   Had nothing to do with Brian Roberts, correct?

24  *A.*   Correct.

25  *Q.*   And nothing to do with Tim Mulrenin, correct?

Joseph Brink - Redirect

1    A.  Correct.

2          MR. GILLEN:  That's all I have.  Thank you, Your

3    Honor.

4          THE COURT:  Thanks you, Mr. Gillen.

5          We may have gotten to everyone, I am not sure, but

6    anyone else?

7          All right.  Redirect.

8                    **REDIRECT EXAMINATION**

9    BY MR. TORZILLI:

10   Q.  Good afternoon, Mr. Brink.  Just a few questions for you to

11   follow up on some of the points that were raised with you on

12   cross-examination.

13         MR. TORZILLI:  If I can ask, Your Honor, for the IT

14   technician for defense counsel if they could call up I-228,

15   please.  It was admitted into evidence this morning.  And if,

16   Your Honor, we can have permission to publish I-228.

17         THE COURT:  Yes, you may.

18         MR. TORZILLI:  Thank you.

19   BY MR. TORZILLI:

20   Q.  Sir, do you recognize the exhibit on the screen, I-228?

21   A.  Yes.

22   Q.  What is it?

23   A.  It's the contract between Pilgrim's Pride and Pollo

24   Tropical.

25   Q.  Who signed that contract on behalf of Pollo Tropical?

Joseph Brink - Redirect

1   *A.*   I did.

2   *Q.*   And who signed that contract on behalf of Pilgrim's Pride?

3   *A.*   Jayson Penn.

4         *MR. TORZILLI:*   Thank you.   We can take that exhibit

5   down.   Thank you.   Now if we can call up Exhibit 500,

6   Ms. Golshanara.   Thank you.   And I believe this has been

7   received into evidence and request that it be published.

8         *THE COURT:*   It has been admitted and may be published.

9         *MR. TORZILLI:*   Thank you, Your Honor.

10  *BY MR. TORZILLI:*

11  *Q.*   Sir, do you recognize Exhibit 500?

12  *A.*   Yes.

13  *Q.*   You were asked about it on cross-examination?

14  *A.*   Yes.

15  *Q.*   Let's look at an e-mail that starts at the bottom of Page 2

16  and then goes on to the top of Page 3.   It's an e-mail written

17  by Mr. Cooper.

18  *A.*   Yes.

19  *Q.*   Who did he write that e-mail to?

20  *A.*   He wrote the e-mail to me.

21  *Q.*   And what does he say in that e-mail?

22  *A.*   He said, "Joe, we apologize for misunderstanding concerning

23  stair pricing.   Please see our e-mail below sent on 10/2."   And

24  he lists the different options for price stepping.

25  *Q.*   Then what does his next sentence say?

Joseph Brink - Redirect

1   A.  "I now have authority to offer you a two-year agreement

2   based on being able to agree to one of the below."

3   Q.  Based on this exhibit, Mr. Brink, who is Mr. Cooper getting

4   his authority from?

5   A.  From whoever makes the decisions at Claxton.

6          MR. TORZILLI:  Okay.  Can we look at a first page of

7   Exhibit 500?

8   BY MR. TORZILLI:

9   Q.  Who are these e-mails on this first page to and from?

10  A.  These appear to be -- these are e-mails between Walter

11  Cooper and Mikell Fries.

12         MR. TORZILLI:  Thank you, sir.  We can take that

13  exhibit down.

14  BY MR. TORZILLI:

15  Q.  This morning, Mr. Brink, you were asked about the loss of

16  volume of split WOG products in your purchases from Claxton.

17  Do you remember those questions?

18  A.  Yes.

19  Q.  And was there an answer that you did not have the

20  opportunity to complete?

21  A.  Yes.

22  Q.  Can you now complete your answer that you were unable to

23  this morning regarding the loss of volume of split WOG products

24  that you were purchasing from Claxton?

25         MR. BELLER:  Objection, vague and non-responsive.

Joseph Brink - Redirect

1          *THE COURT:*  Overruled.

2     *BY MR. TORZILLI:*

3     *Q.*  You can answer.

4     *A.*  We as a company were trying to combat the high prices of

5     chicken and were looking at different chicken products to

6     mitigate the price increase.  We looked at buying hind saddles,

7     which is the back half of the chicken, as a way to decrease our

8     cost of chicken.  And doing so is about 20 percent of our

9     volume.  We were anticipating going to hind saddles which would

10    take away from the whole chickens.  We did offer Claxton

11    opportunity to do the hind saddle product for us.  We gave them

12    the first chance.  And they were not able to do it.

13    *Q.*  Can you explain what a hind saddle is, please, sir?

14    *A.*  The hind saddle is --

15          *MR. BELLER:*  I am going to object as outside the

16    scope.

17          *THE COURT:*  Response?

18          *MR. TORZILLI:*  It was only outside -- to the extent it

19    was outside the scope, which I don't believe it was, it was

20    because he wasn't able to complete an answer to a question he

21    was asked.

22          *MR. BELLER:*  Because it wasn't responsive, Your Honor.

23    It's outside the scope.

24          *THE COURT:*  Sustained.

25    *BY MR. TORZILLI:*

Joseph Brink - Redirect

1    Q.  When the volume of split WOG product that you were

2    purchasing from Claxton decreased, was it your intention to try

3    to give Claxton an opportunity to make up for that lost volume

4    by purchasing a different product from Claxton?

5    A.  Yes.

6    Q.  You were also asked on cross-examination whether chicken

7    suppliers must speak with each other when orders can't be

8    filled.  Do you remember that?

9    A.  Yes.

10   Q.  And you said no and it's the response --

11        MR. BELLER:  Objection, leading.

12        THE COURT:  We haven't heard the whole question yet.

13   Overruled.

14   BY MR. TORZILLI:

15   Q.  What was your answer to those questions?

16        MR. McLOUGHLIN:  Objection, just repeating his answer,

17   asked and answered.

18        THE COURT:  Overruled.

19   BY MR. TORZILLI:

20   Q.  What was your answer, sir?

21   A.  My answer was if there is a shortage of chicken, if we had

22   an issue, that should be coming from me calling the other

23   suppliers to see if I can pick up some product to help offset a

24   supply issue at another plant.

25   Q.  So in your view when there is an order that a chicken

233

Joseph Brink - Redirect

1    supplier can't fill, is there any reason for that chicken

2    supplier to be communicating with another chicken supplier?

3    A.  No.

4    Q.  Is there ever a reason for chicken suppliers to speak to

5    each other about prices, bids or negotiations?

6    A.  No.

7    Q.  Why not?

8         MR. McLOUGHLIN:  Objection, Your Honor.

9         THE COURT:  Overruled.

10   A.  Because we want a fair price competitive process to have

11   fair competitive pricing.

12   BY MR. TORZILLI:

13   Q.  And why would communication among chicken suppliers on the

14   subjects that -- those subjects potentially be counter to that?

15   A.  It would defeat the purpose.

16        MR. McLOUGHLIN:  Objection, Your Honor, calls for

17   expert testimony.  This gentleman is not qualified to give an

18   opinion and this is beyond the scope of the cross-examinations

19   which did not go into this issue.  We are not going to have the

20   opportunity to cross-examine him as we have with some of the

21   other witnesses on this issue.

22        THE COURT:  Overruled on both counts.

23   BY MR. TORZILLI:

24   Q.  You can complete your answer, sir.

25   A.  I forgot what I was saying.  I'm sorry.

Joseph Brink - Redirect

1          MR. TORZILLI:  If we could ask the court reporter to

2     read back the question.

3               (The record was read by the court reporter.)

4     A.  Because it would defeat the purpose of having pricing

5     that's independent of each other so I can compare pricing

6     between all companies.

7     BY MR. TORZILLI:

8     Q.  You were also asked on cross-examination about small bird

9     chicken supply being short in the year 2014.  Do you remember

10    those questions?

11    A.  Yes.

12    Q.  And what was your -- the basis for your understanding that

13    small bird chicken supply was short in 2014?  How did you know

14    that?  How did you learn that?

15    A.  Suppliers were calling, telling me that they were having

16    major shortages of chicken.

17    Q.  So suppliers were telling you that?

18    A.  Yes.

19    Q.  Other than what suppliers told you, was there any

20    independent way for you to verify whether small bird supply was

21    short in 2014?

22         MR. McLOUGHLIN:  I object to the hypothetical, Your

23    Honor, as to what research he could do.  If he wants to ask him

24    did he do anything else, great, but this hypothetical about

25    what research he might have done given all the sources I think

Joseph Brink - Redirect

1    is improper as to form and foundation.

2           THE COURT:  Overruled.

3    BY MR. TORZILLI:

4    Q.  You can answer, sir.

5    A.  Basically reading reports that -- coming up on chicken

6    companies and everything else, the overall response was there

7    was a high demand and a low availability of chicken.

8    Q.  Is short chicken supply a reason for competing chicken

9    suppliers to coordinate their bids in negotiations?

10          MR. BELLER:  Your Honor, that is so wholly improper as

11   to the relevance for this jury's determination of whether or

12   not that fact even happened.  I completely object to this line

13   of questioning.  It has happened with every witness and this

14   Court has upheld that objection every single time.

15          THE COURT:  Mr. Beller, let's go side bar.

16      (At the bench:)

17          THE COURT:  Mr. Beller, that objection was -- went a

18   bit beyond the bounds.  You cannot, No. 1, indicate some of

19   your own statistics in terms of how often I've sustained

20   objections.  That's improper.  Also the beginning of the

21   objection was improper as well.  The basic objection will be

22   sustained, namely that the question was -- lacks the foundation

23   for this particular witness.

24          Anything else, Mr. Torzilli, on that?

25          MR. TORZILLI:  No, sir.

236

Joseph Brink - Redirect

1          THE COURT:  Thank you.

2          MR. BELLER:  My apologies.

3       (In open court:)

4          THE COURT:  The objection will be sustained.

5          MR. TORZILLI:  Thank you, Your Honor.

6    BY MR. TORZILLI:

7    Q.  Mr. Brink, you were asked on cross-examination about your

8    giving specific guidance to suppliers during your negotiations

9    with them.  Do you recall that?

10   A.  Yes.

11   Q.  Can you tell us what the purpose was of your giving

12   specific guidance to suppliers during the negotiations?

13   A.  Trying to get them to get their pricing lower to be more

14   competitive.

15   Q.  And why did you want that?

16   A.  Because I need to get the pricing the best I can be for the

17   company that we both can live with, I can live with and the

18   company -- chicken companies can live with so we both can

19   recede and not have issues going down in the future.

20   Q.  On cross-examination you were asked about following corn

21   and feed prices.  Do you remember that?

22   A.  Yes.

23   Q.  Mr. Brink, have chicken suppliers ever agreed with you

24   during your career purchasing chicken that corn and feed prices

25   are a good way to forecast the trend of chicken prices?

1          MR. BELLER:  Objection, relevance, 404(b).

2          MR. McLOUGHLIN:  Objection, Your Honor, also hearsay

3     particularly given the witness -- they asked him.  He couldn't

4     remember who told him what about this issue.  It's clearly

5     hearsay.

6          THE COURT:  I am going to sustain it on relevance

7     grounds.

8     BY MR. TORZILLI:

9     Q.  Sir, do you have an understanding of whether others beside

10    yourself in the chicken industry view corn and feed as a source

11    of information to forecast chicken prices?

12         MR. BELLER:  Same objection, Your Honor.

13         MR. McLOUGHLIN:  Also objection as to foundation, Your

14    Honor, as to what he would know and how he would know it.

15         THE COURT:  Sustained, relevance.

16         MR. TORZILLI:  May I confer?

17         THE COURT:  Yes.

18    BY MR. TORZILLI:

19    Q.  Sir, when you gave specific guidance to suppliers during

20    your negotiations with them, did you have an expectation as to

21    whether they would communicate that guidance with one another?

22    A.  No.

23         MR. McLOUGHLIN:  Object, Your Honor.  Assumes facts

24    that are simply not in evidence.

25         THE COURT:  I am going to sustain that objection.

1          *MR. TORZILLI:*  Nothing further.

2          *THE COURT:*  All right.  Is Mr. Brink subject to

3     recall?  Okay.  Mr. Brink, you are excused.  Thank you very

4     much.

5          *THE WITNESS:*  Thank you.

6          Mr. McLoughlin?

7          *MR. McLOUGHLIN:*  Your Honor, I am informed that the

8     answer to the last question after the objection was sustained

9     is in the transcript.  We would request to strike the answer.

10         *THE COURT:*  Ladies and gentlemen, that answer of

11    Mr. Brink the jury should disregard because the Court did

12    sustain the objection, okay?

13              (The remainder of the proceeding was not transcribed.)

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2    WITNESSES

3        Joseph  Brink

4            Direct Examination Continued By Mr. Torzilli      95

5            Cross-examination By Mr. Canty                   107

6            Cross-examination By Mr. Beller                  141

7            Cross-examination By Mr. McLoughlin              195

8            Cross-examination By Ms. Pletcher                225

9            Cross-examination By Mr. Pollack                 226

10           Cross-examination By Ms. Henry                   226

11           Cross-examination By Mr. Gillen                  227

12           Redirect Examination By Mr. Torzilli             228

13                            EXHIBITS

14   Exhibit        Offered   Received  Refused  Reserved  Withdrawn

15   I-228                    119

16   I-231                    117

17   500                      182

18   558                      213

19   561                      123

20   563                      134

21   564                      134

22   592                      212

23   9726                     100

24

25

1                    REPORTER'S CERTIFICATE

2        I certify that the foregoing is a correct transcript from

3   the record of proceedings in the above-entitled matter.  Dated

4   at Denver, Colorado, this 5th day of December, 2021.

5

6                              S/Janet M. Coppock

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25