# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

     Plaintiff,

v.

**1. JAYSON JEFFREY PENN,**
**2. MIKELL REEVE FRIES,**
**3. SCOTT JAMES BRADY,**
**4. ROGER BORN AUSTIN,**
**5. TIMOTHY R. MULRENIN,**
**6. WILLIAM VINCENT KANTOLA,**
**7. JIMMIE LEE LITTLE,**
**8. WILLIAM WADE LOVETTE,**
**9. GARY BRIAN ROBERTS,**
**10. RICKIE PATTERSON BLAKE,**

     Defendants.

---

## UNITED STATES' OPPOSITION TO DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29

---

The government respectfully submits this opposition to the defendants' motions for judgment of acquittal pursuant to Fed. R. Crim. P. 29 (ECF 874-882, 884). Viewed in the light most favorable to the government, there is ample evidence for a rational jury to find beyond a reasonable doubt that each defendant knowingly joined a conspiracy to fix prices and rig bids for broiler chicken products sold in the United States. Instead of identifying genuine gaps in the proof at trial, the defendants' motions each resort to misleading characterizations of the evidence and the law. The defendants' motions should be denied as the government has more than met its burden to show the

evidence is not so "nonexistent or so meager" that only an *unreasonable* jury could find the defendants guilty. *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982).

## LEGAL STANDARD

To evaluate motions under Rule 29, the trial court must determine if, "viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004); *see also United States v. Jorgenson*, 451 F.2d 516, 521 (10th Cir. 1971). All the evidence, "both direct and circumstantial, together with the reasonable inferences to be drawn therefrom," must be viewed in the government's favor. *United States v. Dalton*, No. 5:16-cr-2905 RB, 2017 WL 3588785, at *1 (D.N.M. Mar. 7, 2017), *aff'd*, 918 F.3d 1117 (10th Cir. 2019). Rule 29 does not allow the weighing of conflicting evidence, witness credibility, or whether evidence was improperly admitted. *Delgado-Uribe*, 363 F.3d at 1081; *United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir. 1994). The deferential standard at this stage "permit[s] the court to enter a judgment of acquittal only if the evidence that [the] defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *White*, 673 F.2d at 301. The court simply determines "whether [the] evidence, if believed, would establish each element of the crime." *Delgado-Uribe*, 363 F.3d at 1081 (internal quotation omitted) (alteration in original).

## ELEMENTS OF THE OFFENSE

A *per se* violation of Section 1 of the Sherman Act for price fixing[1] has three elements: (1) a conspiracy existed between two or more competitors to fix prices; (2) the defendants knowingly joined the conspiracy; and (3) the conspiracy was in the flow of or substantially affected interstate commerce. 15 U.S.C. § 1; *see also* ABA Section of Antitrust Law, Model Jury Instructions in Criminal Antitrust Cases 47 (2009); ECF 553 (Order denying defendants' motions to dismiss) at 4; *United States v. Metro. Enters., Inc.*, 728 F.2d 444, 449-51 (10th Cir. 1984).

The "essence of conspiracy is agreement," which needs not be formal or explicit. *United States v. Consol. Packaging Corp.*, 575 F.2d 117, 126 (7th Cir. 1978) (citing *Pereira v. United States*, 347 U.S. 1, 11 (1954)). "It is sufficient to show that [co-conspirators] tacitly came to a mutual understanding." *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 474 (10th Cir. 1990); *id.* ("The agreement may be shown by a concert of action by members who participate with knowledge of the common purpose."). The existence of an agreement or mutual understanding between conspirators may be proven in myriad ways. In antitrust cases, agreement can be proven "only by the circumstances and acts of the members, such as their course of dealings." *Id.*; *see also Am. Tobacco Co. v. United States*, 328 U.S. 781, 809-10 (1946); *United States v. Beachner Const. Co.*, 729 F.2d 1278, 1283 (10th Cir. 1984).

---

[1] "Price fixing" as referenced in this brief includes agreements among competitors to fix, maintain, stabilize, and raise prices and other price-related terms, as well as to rig bids. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223-24 (1940); *United States v. Joyce*, 895 F.3d 673, 677 (9th Cir. 2018) ("[B]id rigging is a form of horizontal price fixing").

The government does not need to show that the defendants agreed on a particular price to be charged. An agreement to increase or stabilize prices, or to limit price decreases, also violates the Sherman Act. Such agreements are *per se* violations regardless whether they relate to the final price or to components of price, such as costs, discounts, or credit terms. *See, e.g.*, *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648-49 (1980) (an agreement to eliminate discounts "falls squarely within the traditional *per se* rule against price fixing"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 10-4572 SI, 2013 WL 6174683, at *5 (N.D. Cal. Nov. 20, 2013), *aff'd*, 637 F. App'x 981 (9th Cir. 2016).

To show each defendant knowingly joined the conspiracy, the government must prove he "knew at least the essential objectives of the conspiracy," *United States v. Carnagie*, 533 F.3d 1231, 1238 (10th Cir. 2008), and not that he knew of the "full extent of the conspiracy," *Metro. Enters.*, 728 F.2d at 451. "To prove knowledge of the essential objectives of a conspiracy, . . . the government only needs to demonstrate the defendant shared a common purpose or design with his alleged coconspirators." *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006) (internal quotation omitted). In Sherman Act cases, that shared purpose or design can be "to circumvent price competition and enhance profitability." *United States v. Mobile Materials, Inc.*, 881 F.2d 866, 871 (10th Cir. 1989).

## ARGUMENT

The government has presented more than sufficient evidence for a reasonable jury to find each element of a Sherman Act Section 1 violation beyond a reasonable

doubt. Robert Bryant, a Pilgrim's Pride Corporation ("Pilgrim's") salesperson, testified at trial to his and others' participation in the charged price-fixing conspiracy. In addition to that direct evidence, the documents in the record (including emails, text messages, and call records) established the existence of a single conspiracy in the flow of interstate commerce. The documentary evidence further shows each defendant—whether through express agreement, a common course of dealing, or other circumstances—knowingly and actively participated in the conspiracy. Taken together, and cast in the light most favorable to the government, there is ample evidence from which a rational jury could find each defendant guilty beyond a reasonable doubt.

The defendants' Rule 29 motions mischaracterize evidence in the defendants' favor or repackage arguments already rejected by the Court. But none of their arguments satisfies the heavy burden of Rule 29. At this stage, "[t]he prosecution need not rebut all reasonable hypotheses other than guilt," *United States v. Sellers*, 871 F.2d 1019, 1021 (11th Cir. 1989), and the evidence below shows the jury needs to make no leap in logic to find each defendant guilty.

## I.   Substantial Evidence Established the Existence of a *Per Se* Unlawful Price-Fixing Conspiracy

The record in this case contains substantial evidence establishing the existence of a price-fixing conspiracy, both through a government witness, Mr. Bryant, and through hundreds of documents admitted at trial. To avoid repetition, this section (Part I) focuses on Mr. Bryant's direct testimony of the existence of an overarching conspiracy, and the following section (Part II) on the individual involvement of each defendant, which further establishes the existence of the conspiracy. The evidence in both sections

should be considered in tandem to meet the first element: That a conspiracy existed

between two or more competitors to fix prices in the broiler chicken industry.

Mr. Bryant, divisional planner and later director of sales of Pilgrim's fresh food

unit, provided direct testimony of the conspiracy. He testified in detail about the

suppliers repeated sharing of future pricing information for KFC (as well as for other

customers) in 2014 and 2017. Mr. Bryant explained he "received competitor pricing and

used that pricing to submit bids to customers and asked others to retrieve competitor

pricing." Certified Reporter's Transcript for Mr. Bryant ("C.R. Tr. Bryant") Nov. 1 at

15:14-16. The sharing of prices, including future prices, was a "two-way street"—

meaning Pilgrim's received the competitors' prices and the competitors received

Pilgrim's. *Id.* at 20:11-21:2.[2]

More importantly, Mr. Bryant repeatedly testified that the *purpose* of sharing

---

[2] Testimony from several customer witnesses made clear that the information exchange was itself improper, as it led to less competitive bids. Sara Fisher, Senior Manager of Poultry Procurement at Restaurant Supply Chain Solutions ("RSCS"), explained that RSCS did not want suppliers to share that information with each other during the 2017 negotiations. *See* Real-time Transcript ("R. Tr.") Nov. 4 at 200:3-9; R. Tr. Nov. 5 at 51:9-16. Robert Lewis, a former buyer at KFC and RSCS, similarly testified that he never asked competing chicken suppliers to discuss the bids they were submitting to RSCS during the 2014 negotiations, and that doing so would be morally wrong. Certified Reporter's Transcript for Mr. Lewis ("C.R. Tr. Lewis") Nov. 3 at 87:21-88:20. Telly Smith, Golden Corral's Vice President of Purchasing and Distribution, testified that he never asked suppliers to talk with each other about their bids in connection with the 2014 bidding process, because confidentiality was important for Golden Corral to receive low prices. R. Tr. Nov. 8 at 21:9-13, 30:6-20, 54:25-55:10. Mike Ledford of RSCS (during 2012 and 2013 contract negotiations) and Chick-fil-A (beginning in May 2014) provided similar testimony. *See, e.g.*, Certified Reporter's Transcript for Mr. Ledford ("C.R. Tr. Ledford") Nov. 9 at 134:22-24. Mr. Ledford testified that he wanted the best price—"a fair price"—and that competitor communications could artificially keep the price higher. *Id.* at 134:25-135:12.

prices with competitors was to raise prices or to resist price decreases—for Pilgrim's and for its competitors. *Id.* at 16:18-23 ("Q. … So what was the purpose of getting the competitors' pricing? A. Depended on the situation, but it was either to increase prices or limit a decrease in price. Q. Okay. For just Pilgrim's? A. No, for the other -- other competitors involved as well."), 68:19-23 ("Q. And what was the purpose of sharing prices with competitors? . . . A. To increase prices or to limit a decrease in price."),; 69:6-14 ("Q. And was it increasing or resisting a decrease for just Pilgrim's? A. No. Q. For who? A. For all the parties involved. Q. The competitors. A. The competitors, yes. Q. Together. A. Together, yes."), 103:5-11. The suppliers exchanged pricing information precisely to avoid competing and instead to maintain or increase prices:

> Q. So what was your understanding of what was used instead of a blind bid?
> A. My understanding was that we had competitor information that we used during the bid process to influence the outcome of the bid.
> Q. Influence in what way?
> A. To maintain the price increases that we asked for.
> Q. So by "we," who do you mean?
> A. We being Pilgrim's and our competitors.
> Q. So what was the goal?
> A. The goal was to raise – to increase prices.

C.R. Tr. Bryant Nov. 2 at 197:15-25.

Mr. Bryant trusted the information he received about competitors' future pricing and, in turn, trusted the competitors not to use Pilgrim's pricing information to undercut Pilgrim's. C.R. Bryant Tr. Nov. 1 at 75:7-11, 107:22-25 ("Q. And again, did you have an expectation as to whether if a competitor in this bid received Pilgrim's bid information they would use it to undercut Pilgrim's? A. That was not my expectation, no.").

The defendants' recycled assertions that there is no agreement and only information exchange therefore misses the mark and misrepresents the record. *See* ECF 874 (Austin) at 4; ECF 875 (Fries) at 2, 15; ECF 876 (Kantola) at 3, 12; ECF 877 (Roberts) at 13; ECF 878 (Brady) at 11-12; ECF 879 (Blake) at 8-9; ECF 880 (Penn) at 7-9; ECF 881 (Lovette) at 5-6; ECF 882 (Little) at 4-5; ECF 884 (Mulrenin) at 3-4. As this Court explained in rejecting the same argument the first time, the "indictment does not allege that, because defendants shared pricing information, they participated in a conspiracy. Rather, it states that the defendants agreed to rig prices and, to that end, shared pricing information." ECF 553 at 8-9. In other words, it "is illegal if the information sharing is 'part of the sum of the acts which are relied upon to effectuate the conspiracy.'" *Id.* at 9 (quoting *Am. Tobacco Co.*, 328 U.S. at 809). Based on all the evidence in the record, including the documentary evidence described in Part II, a rational jury could easily conclude that the defendants in fact shared prices in furtherance of a common unlawful goal: to raise prices, stabilize prices, or prevent price decreases.

Indeed, Mr. Bryant detailed instances in which competing suppliers succeeded in using Pilgrim's pricing information (which Pilgrim's shared) in order to increase or stabilize prices. The success provides further evidence that the goal of the conspiracy was not to undercut competitors, but instead to suppress or eliminate competition. For example, Mr. Bryant confirmed there was "an agreement" among the suppliers to raise prices together with respect to the 2014 KFC pricing negotiation. C.R. Tr. Bryant Nov. 2 at 216:19-217:6, 218:21-219:4. ("A. It was my understanding that there was an

agreement. Q. And what was the nature of the agreement in your understanding? A. To raise prices. Q. Together. A. Together, yes. Q. As competitors. A. That's correct."). Specifically, Mr. Bryant testified that he learned of a plan in summer of 2014 to increase prices to quick-service restaurants (QSRs) from his manager, Jason McGuire. C.R. Tr. Bryant Nov. 1 at 155:24-156:7. Pilgrim's planned to "blitz" its customers by visiting several customers in a short period and delivering the message that, given the decrease in supply and profitability of small birds, Pilgrim's needed to increase prices. *Id.* at 157:15-158:10. Mr. Bryant recalled visiting Popeyes, Church's, and KFC as part of the "blitz," and testified first about a July 2014 meeting with Popeyes. *Id.* at 159:16-162:14. During that meeting, when the Popeyes procurement representatives left the room, Mr. McGuire instructed defendant Roger Austin to share Pilgrim's justification for a price increase with "the industry"—meaning competitors—and to build support among competitors for price increases that fall. *Id.* at 162:15-163:18.

Pilgrim's subsequently met with representatives from KFC's procurement cooperative, RSCS, on August 1, 2014 to lay foundation for the anticipated price increase. *Id.* at 165:22-166:7, 169:13-21. Around that time, Mr. Bryant learned that Pilgrim's would be asking for a price increase of about 15-20 cents a pound—a much greater increase than he had ever seen in his career. Mr. Bryant was concerned that Pilgrim's would lose business as a result. *Id.* at 170:14-172:23. But Mr. Bryant's concerns were assuaged by an August 20, 2014 email (GX 1066) in which Mr. Austin reported that KFC was surprised by the level of price increases sought by Pilgrim's competitors. C.R. Tr. Bryant Nov. 1 at 174:23-176:4. As Mr. Bryant testified, this

information helped Pilgrim's in their next meeting with RSCS and KFC, because Pilgrim's now had confirmation that its competitors sought similar price increases. *Id.* at 177:14-178:8. And indeed, at that meeting, defendant Austin told KFC that there would be no negotiation on pricing. C.R. Tr. Bryant Nov. 2 at 209:18-212:3.

Around the time of these meetings, Mr. Bryant overheard two phone conversations between defendant Austin and competitors, one with defendant Scott Brady of Claxton Poultry and the other with defendant Bill Kantola of Koch Foods. *Id.* at 213:19-214:16. Mr. Bryant understood the conversations to refer to Pilgrim's refusal to negotiate with KFC—that is, defendant Austin reported to defendants Brady and Kantola that Pilgrim's was not budging on price. On one of the calls, defendant Austin "was saying something to the effect of, 'I told them the price is the price. I just need to know how many loads they want at that price.'" *Id.* at 213:19-214:16; 215:2-6. Mr. Bryant understood that defendant Austin refused to negotiate with KFC because Pilgrim's competitors were also raising prices. He explained that, because other competitors were unwilling to concede on price, there was no need for Pilgrim's to negotiate. *Id.* at 215:19-23 ("[W]e knew that our competitors were raising prices similar to what we were raising prices and they were not going to concede price either, so there wasn't a need to negotiate."). And Mr. Bryant understood that all the competitors for KFC did in fact receive "historic" price increases that year due to the effort to build "pricing support" among competitors. *Id.* at 218:6-219:23.

Mr. Bryant testified about how the chicken suppliers again conspired to limit price decreases to KFC a few years later in 2017. C.R. Tr. Bryant Nov. 1 at 98:11-15 ("A. . . .

in 2017 it was about limiting a price decrease. Q. Together? A. Together, yes. Q. Competitors together. A. Correct."). Pilgrim's was scheduled to meet with KFC and RSCS on January 27, 2017. *Id.* at 89:22-90:2. Prior to that meeting, on January 17, defendant Austin told Mr. Bryant that Claxton would meet with RSCS "Thursday and i will get a blow by blow Friday morning. Koch meets with them in Friday"—both before Pilgrim's meeting with RSCS. GX 1882. Mr. Bryant understood defendant Austin to mean that he would speak with defendants Brady and Kantola after they met with RSCS. C.R. Tr. Bryant Nov. 1 at 95:15-97:9. When Mr. Bryant and others from Pilgrim's later met with KFC and RSCS, they did not disclose that they had already learned what occurred at Claxton's and Koch's meetings. *Id.* at 97:10-15. Mr. Bryant explained that they would not have wanted KFC and RSCS to know they were sharing this kind of information: "the customer would probably perceive that as [Pilgrim's] undermining their bid process," because competitors were "[w]orking together against [the customer's] best interests" and instead in the competitors' "collectively best interest." *Id.* at 97:17-98:8. Based on Mr. Bryant's testimony, a jury hardly needs to draw any inferences to conclude that a conspiracy existed.

This evidence, combined with the many statements and actions of the defendants described in Part II, makes clear that there was a conspiracy among competing broiler chicken suppliers.

## II.    Each Defendant Knowingly Joined the Price-Fixing Conspiracy

*Roger Austin*. Defendant Austin was Vice President of Fresh Foodservice at Pilgrim's during the conspiracy period. GX 1882. His knowing membership in the

conspiracy is established both by documentary evidence as well as Mr. Bryant's testimony.

The jury has seen direct evidence of defendant Austin asking competitors to raise prices alongside Pilgrim's. Immediately before defendant Austin submitted Pilgrim's bid to KFC for the 2013 calendar year, he reached out to defendant Brady and not only shared Pilgrim's pricing, but also expressly told defendant Brady to increase Claxton's prices to Pilgrim's level. As defendant Brady reported to defendant Fries, Austin "said to raise our [Claxton's] prices, on wings he is market and market plus .10." GX 14-2 (GX 1427). Defendant Brady planned to let defendant Austin know Claxton was "trying" to increase its prices. *Id*. Viewed in the light most favorable to the government, that exchange shows an explicit agreement—at defendant Austin's behest—among competitors to raise prices against a common customer. Similarly, when KFC requested in 2013 that its suppliers provide a reduced-weight product, defendants Brady and Austin coordinated their responses instead of competing independently. GX 16-1 (GX 1607, 1601). As defendant Brady reported, he "talked with roger [Austin] about the KFC sizes and he *is in agreement with us*." GX 1615 (emphasis added).

Defendant Austin's knowledge of the goals of the conspiracy—to suppress or eliminate competition—is corroborated by testimony from Mr. Bryant. Mr. Bryant testified that defendant Austin frequently shared confidential pricing information (including future prices) as part of a "two-way street" with competitors to raise prices or resist price decreases. C.R. Tr. Bryant Nov. 1 at 103:21-104:8, 105:19-106:9, 107:15-

16. Mr. Bryant testified that defendant Austin "would use his contacts at other companies" (including defendants Kantola and Brady) to obtain competitor information, which Pilgrim's used to guide its bids. *Id*. at 99:19-22. It was "common place for him [defendant Austin] to talk to people outside or with competitors and then relay that information back," including information related to current and anticipated pricing. *Id.* at 25:11-25; *see also id.* at 122:4-25, 125:2-127:9; GX 1919.[3]

Mr. Austin's outreach to competitors was so frequent that other employees at Pilgrim's, such as co-conspirator Timothy Stiller, *expected* competitor pricing information from him, C.R. Tr. Bryant Nov. 1 at 120:5-121:11, and Mr. Bryant testified of an instance in which he, too, directly asked defendant Austin "to go get pricing information from competitors," which Mr. Bryant admitted at trial was "wrong." *Id.* at 115:5-116:8. Specifically, Mr. Bryant said to defendant Austin in January 2017 that he "would like to know where we need to be #2 in price [for KFC] if you can find out." GX 1882. *See also* C.R. Tr. Bryant Nov. 1 at 99:10-13. Defendant Austin then made phone calls to competitors, (GX 18-1 (GX 1959)), and "gave [Mr. Bryant] each company's price on both eight-piece and dark meat" during a phone conversation. C.R. Tr. Bryant Nov. 1 at 102:1-4. Mr. Bryant "used that information to formulate [Pilgrim's] bid submission for 2017," with the joint goal (alongside Pilgrim's competitors) of resisting price decreases.

---

[3] Any claim that GX 1919 contains current pricing rather than future bids is of no moment. The same is true for defendant Kantola's effort to explain that GX 1919 did not contain accurate pricing for Koch Foods that year. ECF 876 at 8-9. It does not change Mr. Bryant's unequivocal testimony regarding the purpose for collecting prices in the first place.

*Id*. at 102:16-103:11. Significantly, Mr. Bryant testified that it was in part through defendant Austin's actions that Mr. Bryant understood the purpose of the conspiracy (including to limit price decreases in 2017) in the first place. *Id.* at 102:16-103:11, 107:15-21, 127:2-15.

The record also includes numerous calls between defendant Austin and his competitors, including calls mere hours before key bids were submitted. Cast in the light most favorable to the government, it is clear those calls were made to increase or hold firm on prices together with competitors. For example, as part of the "blitz" to raise prices in 2014, defendant Austin not only received competitor information from his subordinate, defendant Little (see below), but also reached out directly to defendants Brady and Blake in the days before initial bids were due to KFC on August 19, 2014. *See* GX 10-1 (GX 1236); GX 9264 (Austin's contact list associating George's number with defendant Blake).[4]

That chain of calls resulted in two very significant emails to defendant Penn. The first email attached a spreadsheet showing several competitors' current and "new" margins—information that would not be shared with competitors in a truly competitive environment. GX 10-1 (GX 1035, 1036). The second email—the "Roger did some checking around email," GX 10-1 (GX 9744)—lays out competitors' anticipated price and margin increases (including for Claxton and George's), which defendant Penn later reviewed with defendant Lovette. GX 10-1 (GX 1074); *see also* GX 1035, 1036. The

---

[4] The phone number (800-800-2449) is saved as Ric Blake, and only as Ric Blake, in Roger Austin's contact list. GX 9264.

email reporting the competitors' future price increases confirms the goal of collecting that information was not to undercut competitors, but instead for Pilgrim's to increase prices together with its competitors: "Considering the numbers [competitor proposed increases] above and the fact that we wanted to be the leader this would put us in at .1616/lb increase (.06 in cost and .10 in margin)." GX 10-1 (GX 9744).

Defendant Austin's commitment to raising prices for Pilgrim's and its competitors did not stop after the initial round of bidding. On August 26, 2014, after first-round bids to KFC were submitted, defendant Austin reported Pilgrim's plan to hold firm on prices to defendant Brady (Claxton). As defendant Brady reported: "I talked to roger [Austin] about KFC and Greeley [Pilgrim's headquarters] told him [Austin] not to come down on price. He called bob [Lewis] today and told him." GX 10-2 (GX 1238). On September 3, 2014, defendant Austin again reassured his competitor, defendant Brady, that Pilgrim's would not budge. GX 10-3 (GX 1238).

Defendant Austin engaged regularly in that course of dealing—*i.e.*, getting the "pulse" from competitors during active negotiations in order to hold firm or increase Pilgrim's prices—across different customers. *Suntar Roofing, Inc.*, 897 F.2d at 474 (Sherman Act violation may be disclosed by members' "course of dealings."); *Am. Tobacco Co.*, 328 U.S. at 809-10 (Sherman Act conspiracy "may be found in a course of dealings or other circumstances"); *Beachner Const. Co.*, 729 F.2d at 1283 ("It is enough that the participating parties have a tacit understanding based upon a long course of conduct."). For example, on November 28, 2012, defendant Austin told defendant Penn that RSCS was resisting Pilgrim's pricing and explained he would be

"having some other discussions today to get the pulse." GX 1544. And he followed through: defendant Austin had calls that same day with his competitors, including defendants Blake, Brady, Kantola, and Mr. Eric Oare (then at Marshall Durbin, another competitor). GX 14-3 (GX 1428, 1442). Defendant Austin then provided those competitors' upcoming 8-piece quotes to defendant Penn, who sent them to defendant Lovette. GX 14-3 (GX 1546, 1522, 1523). As another example, defendant Austin said that he planned to "do some scouting tomorrow and see what the pulse is" regarding whether suppliers planned to charge KFC for a request to switch to using no human antibiotics. GX 18-1 (GX 1849). Defendant Austin then spoke on the phone with defendants Kantola, Brady, Blake, and Mr. Tench. GX 18-1 (GX 1961).[5] From this and substantial additional evidence in the record, a rational jury could conclude defendant Austin knowingly joined the unlawful price-fixing conspiracy.

*Jayson Penn and Bill Lovette*. Defendants Penn and Lovette were high-level executives of Pilgrim's; defendant Penn was Executive Vice President for most of the conspiracy period, and he reported to defendant Lovette, the CEO. *See* C.R. Tr. Bryant

---

[5] The government also offered evidence that defendant Austin monitored current pricing information from competitors as a way to ensure competitors did not deviate from the agreement. Mr. Bryant testified that, in 2017, defendant Austin told him he tracked competitor pricing for several years, and he "had everyone's pricing dating back to the nineties." C.R. Tr. Bryant Nov. 1 at 25:11-26:7. Mr. Bryant expressed his understanding that defendant Austin collected competitor pricing "basically to keep score on where we [Pilgrim's] were at and if others had submitted where he thought that they were going to submit on pricing." *Id*. at 26:8-17. Current pricing information was helpful to "see where everybody [competitors] actually did end up for sure." *Id*. at 28:6-14. Mr. Bryant therefore confirmed that tracking current pricing can be a "monitoring mechanism." *Id*. at 28:6-16. This testimony was corroborated by GX 7046, a spreadsheet admitted against defendant Austin, which includes a detailed list of hundreds, if not thousands, of entries tracking competitor prices from at least 2000.

Nov. 1 at 9:23-10:1; GX 3028. Viewed in the light most favorable to the government, the evidence demonstrates that both defendants knew of the goals of the conspiracy and knowingly became part of it.

That defendant Penn knew of the essential objectives of the conspiracy is clear from the documentary evidence. In August 2012, defendant Penn received an email from a subordinate at Pilgrim's, who said she "received a call today from a friendly competitor telling [her] it's all over the market that Pilgrim's is taking contract pricing up." GX 3037. The "friendly competitor" *thanked* Pilgrim's "for taking the lead" and assured Pilgrim's that "they are following as are others." *Id*. Rather than expressing confusion or disavowing involvement, defendant Penn forwarded the message to another subordinate, co-conspirator McGuire, saying "FYI. Do not fwd. not exactly a legal conversation." *Id.* This consciousness of guilt demonstrates that defendant Penn was aware the aims of the conspiracy were not innocuous; rather, he knew that the ultimate goal of the conspiracy was to "tak[e] contract pricing up" (GX 3037) with friendly competitors, and not to compete. *See United States v. Brown*, 943 F.2d 1246, 1251-52 (10th Cir. 1991) (holding a jury could reasonably infer that a defendant had joined a conspiracy when evidence showed he was aware of criminal conduct, did not object, and participated in its concealment). And there was a sequel: On August 7, 2014, immediately before Pilgrim's achieved historic price increases, defendant Penn forwarded yet another message to co-conspirator McGuire, with a note that "In 2013 I had a few owners of small bird companies thank us via me for getting our act together. I guess it will happen again…good work. Forward…" GX 1056. It requires common

sense, not "inference stacking," ECF 880 at 13, for a jury to conclude that competitors were thanking defendant Penn for leading contract prices up, rather than down.

There is also direct evidence that defendants Penn and Lovette knowingly joined the conspiracy and acted in furtherance of it. The jury saw evidence that defendant Penn encouraged subordinates to participate in the conspiracy and personally reached out to his contacts—all with defendant Lovette's knowledge and encouragement. As described above, Mr. Bryant testified of a plan to increase prices to QSRs, which he learned from his manager, co-conspirator McGuire, who reported in turn to defendant Penn. C.R. Tr. Bryant Nov. 1 at 9:19-10:9, 32:19-21, 157:11-14. As part of contract negotiations for calendar year 2015, KFC's purchasing cooperative asked for initial bids from suppliers by August 19, 2014, and nine defendants—including defendant Penn— exchanged a flurry of inter-competitor calls in the days leading up to the deadline.

In particular, defendant Penn directly had three calls with defendant Brian Roberts, on August 15, 2014. GX 10-1 (GX 1231). Defendant Penn was also in contact with his subordinates, defendant Austin and co-conspirator McGuire, during the time period from August 15th to 19th. On August 19th, 2014, Penn's direct report, McGuire, circulated an email to Penn and others explaining "Roger [Austin] did some checking around today," sharing "the range of the total increases(margin and costs)" Pilgrim's competitors—Koch, Case, Claxton, George's, and Mar-Jac—were planning to submit for KFC's business. GX 10-1 (GX 9744, 1074). Rather than questioning the evident source of the information (*i.e.*, defendant Austin's conversations "checking around" with competitors) defendant Penn discussed how Pilgrim's should make use of the

information with defendant Lovette. *See* GX 10-1 (GX 1074) (defendant Penn saying he "[w]ill review with Bill [Lovette] in am" and "[w]ill advise" co-conspirator McGuire on next steps). Pilgrim's subsequently went forward with the price increase.

Defendant Lovette also participated in the conspiracy with a clear understanding of its aims. The government put forth evidence, when viewed in the light most favorable to the government, that defendant Lovette expressly agreed with co-conspirator Joe Grendys, CEO of Pilgrim's competitor Koch, to say "NO!" to Sysco's proposal for 65-day payment terms. GX 803. But in general, as the CEO, defendant Lovette did not need to reach out directly to Pilgrim's competitors; instead, he could depend on subordinates to be his boots on the ground. *See United States v. Lischewski*, 860 F. App'x 512, 515 (9th Cir. 2021) (upholding instruction in Sherman Act criminal case that the jury "could find [the defendant] 'knowingly participate[d] in effecting the illegal conspiracy by . . . indirectly or directly authorizing, ordering, or helping a subordinate perpetrate the crime.'"). For example, after defendant Austin reported to defendant Penn reactions from KFC to the proposed price increase for calendar year 2015, defendant Penn forwarded the message directly to defendant Lovette: "I told Roger [Austin] to proceed." GX 1051. Defendant Lovette then personally reached out to defendant Austin with a lengthy call. GX 10-2 (GX 1237).

After the call, defendant Austin spoke with defendant Brady, who reported in a text message, "I talked to roger [Austin] about KFC and Greeley [Pilgrim's headquarters] told him not to come down on price." GX 10-2 (GX 1237, 1238). A reasonable jury could reasonably conclude that defendant Lovette authorized and encouraged Austin's

participation in the conspiracy. And, because an executive who "'authorizes, orders, or helps perpetrate' a conspiracy 'knowingly participates' in that conspiracy," *Lischewski*, 860 F. App'x at 515 (quoting *United States v. Brown*, 936 F.2d 1042, 1047-48 (9th Cir. 1991)), the jury can readily infer that defendant Lovette knowingly joined the conspiracy. *See also Brown*, 936 F.2d at 1048 (executives can be criminally liable under Section 1 of the Sherman Act if they "knowingly consented to their subordinates' participation in the conspiracy").

The evidence is therefore sufficient to show that defendants Penn and Lovette not only participated directly in the conspiracy, but also approved and encouraged subordinates to participate in the conspiracy.

*Jimmie Little*. Until he retired, defendant Little was a sales employee of Pilgrim's Pride during the conspiracy period. Contemporaneous documents, as well as testimonial evidence from Mr. Bryant, show defendant Little to be a knowing and willing participant of the conspiracy.

The record is replete with instances of defendant Little contacting competitors in order to coordinate prices and hence suppress competition. For example, on October 8, 2012, before the first-round bids for KFC for calendar year 2013 were due, defendant Little exchanged calls with his competitors—namely, defendants Kantola and Brady. GX 14-1 (GX 1438, 1432, 1434). The following day, defendant Little again called defendant Kantola. GX 14-1 (GX 1432). Based on the identical dark meat bids the three suppliers subsequently proposed, a rational jury can readily infer the purpose of the calls was to align prices: Defendant Brady bid a dark meat price of 30 cents back—meaning 30

cents less than the 8-piece prices—on behalf of Claxton, (GX 14-1 (GX 1505, 9692));

Koch Foods *increased* its proposal from 30.5 cents back to a higher price of 30 cents

back on the day bids were due (and after defendant Kantola's calls with defendants

Little, Austin, and Brady, (GX 14-1 (GX 1409, 1410, 9691)); and defendant Austin,

Little's supervisor, proposed 30 cents back on behalf of Pilgrim's. GX 14-1 (GX 1524,

9693).

 The government also put forth evidence that the clear purpose of defendant

Little's outreach to competitors was to suppress competition. On May 31, 2013,

Church's Chicken—for whom defendant Little served as the primary contact for Pilgrim's

(*see* GX 3028 at 56-61)—asked defendant Little whether Pilgrim's intended to charge a

cost for frozen dark meat. GX 109. Church's made the same request to co-conspirator

Carl Pepper at Tyson. GX 120. The effect on the two is clear. That afternoon, co-

conspirator Pepper had two calls with defendant Little (GX 143) and subsequently told

others at Tyson: "Pilgrims told me they would be around .025 to .03 on 8pc & dark

meat." GX 1-1 (GX 120). It is clear from the subsequent email (GX 120) what the two

competitors discussed: Pushing back together against their common customer. That

evening, defendant Little told Church's that there "will need to be a freezing charge for

both." GX 108.

 Defendant Little again coordinated with competitors to impose costs on Church's

Chicken related to new quality-assurance (QA) requirements. After Church's shared

revised QA requirements in December 2013, co-conspirator Pepper asked whether

other competitors would push back by adding to their pricing. GX 2-1 (GX 224) (Pepper:

"I would be surprised if they [other suppliers] don't say something. Might call a couple of them and ask"). Defendant Little told the Church's buyer he needed to discuss the new requirements. GX 247. However, what followed were discussions between defendant Little and his competitors. Co-conspirator Pepper called defendant Little, and learned Pilgrim's was "planning on adding to their cost to do this. They also didn't like it just showing up also." GX 2-1 (GX 221). Defendant Little subsequently called defendant Kantola, who revealed the call involved a discussion of future pricing by emailing both Pilgrim's and Tyson's future pricing for Church's to his colleague at Koch. GX 6134.

Defendant Little also had a significant role in obtaining Pilgrim's historic price increases in 2014, including with customers KFC and Pollo Tropical. With regard to KFC, defendant Little connected with competitors immediately before first-round bids were due.[6] On August 15, 2014—four days before initial bids to KFC were due on August 19, 2014 and the day Tyson was set to receive feedback on its bid for RSCS (GX 1175)—co-conspirator Pepper called defendant Little. GX 10-1 (GX 1233). On August 18, 2014, the day before the KFC bids were due, defendant Little had phone calls with defendant Kantola and Mr. Pepper. Shortly thereafter, defendant Little connected with his supervisor, defendant Austin, who managed the KFC accounts. GX 10-1 (GX 1235). Shortly thereafter, defendant Austin conveyed the information he learned from defendant Little and his other conspirators to co-conspirator McGuire, who

---

[6] Defendant Little's supervisor, defendant Austin, managed the KFC account. Mr. Bryant testified about how Pilgrim's employees who had contacts with the industry could be "trusted" to discuss raising prices with competitors; those employees were directed to do so, even for accounts for which they were only indirectly responsible. C.R. Tr. Bryant Nov. 1 at 24:7-12, 145:24-147:3.

reported to defendant Penn both the spreadsheet with competitors' future margins and the email with "Roger did some checking around." GX 10-1 (GX 9744, 1074); *see also* GX 1035, 1036.

Defendant Little coordinated with co-conspirator Walter Cooper of Claxton during the 2014 negotiations with Pollo Tropical. Certified Reporter's Transcript for Mr. Brink ("C.R. Tr. Brink") Nov. 16 at 18:11-19. Towards the start of negotiations, defendant Little called Cooper immediately before and after meeting with the purchaser for Pollo Tropical, Joe Brink. GX 5-1 (GX 561, 584); C.R. Tr. Brink Nov. 16 at 68:19-70:24. As negotiations progressed, Mr. Brink repeatedly expressed shock at the price increases Pilgrim's sought, and defendant Little in turn coordinated his response by calling his competitor. *See, e.g.*, GX 5-1 (GX 564, 500, 587, 566, 589). Notably, on September 22, defendant Little refused to negotiate with Pollo Tropical during a conference call and instead conveyed that "the price is the price"; defendant Little then gave Pollo Tropical an ultimatum to make a commitment to Pilgrim's that afternoon. C.R. Tr. Brink Nov. 16 at 36:10-37:18, 60:25-63:2. Immediately after delivering that message, defendant Little called co-conspirator Cooper (Claxton), who emailed Pollo Tropical that afternoon with his "guess" that Pilgrim's would tell Pollo Tropical "the price is the price" and not budge. GX 9740.

On October 2, 2014, Mr. Brink again expressed to defendant Little that "this is not going to work and pilgrims needs to match pricing from your competitors." GX 5-1 (GX 566). Mr. Brink testified that he meant that defendant Little should lower his pricing. C.R. Tr. Brink Nov. 17 at 179:8-22. Within two hours, defendant Little called co-conspirator

Cooper. The following day, Little told Mr. Brink that, rather than negotiating, Pilgrim's "will need to hold on our pricing." GX 5-1 (GX 566).

Finally, Mr. Bryant's testimony corroborated that defendant Little knowingly joined the conspiracy. At trial, Mr. Bryant explained that Little engaged in conduct Mr. Bryant described as price fixing. C.R. Tr. Bryant Nov. 1 at 29:24-30:2. He recalled defendant Little saying that he had talked to a contact at Holmes (a Pilgrim's competitor) and telling Mr. Bryant what pricing Holmes would submit for a shared customer. *Id.* at 30:16-21. Mr. Bryant understood that defendant Little was collecting this information in order to increase pricing together with Holmes, without concern for losing volume by being undercut by competition. *Id.* at 31:2-7 ("Q: And what is your understanding of the reason he was collecting that pricing information? A: To -- at this point it was to increase prices without a concern of losing volume. Q: Increase together with Holmes? A: That's correct."). *See also id.* at 29:24-30:13.

Based on all of the above, a rational jury could conclude that defendant Little knowingly participated in the conspiracy.

*Mikell Fries and Scott Brady*. During the conspiracy period, defendant Brady was a Vice President of Claxton, and defendant Fries the President. The evidence in the record establishes that both agreed to fix prices in in service of suppressing or eliminating competition. As described earlier, during negotiations with KFC in 2012, defendant Brady reported via text message to defendant Fries that he "talked to roger [Austin from Pilgrim's] . . . He said to raise our prices, on wings he is market and market plus .10." Rather than repudiating the invitation, defendant Fries responded, "Tell him

24

we are trying!" Defendant Brady replied, "Will do." GX 14-2 (GX 1427). That exchange standing alone is strong evidence of an unlawful agreement.

Defendants Fries and Brady made a similar agreement the following year, when KFC's purchasing cooperative asked what was needed for Pilgrim's and Claxton to supply a reduced-weight product. GX 16-1 (GX 1607, 1601). Rather than pushing back independently, defendant Brady spoke with defendant Austin, on March 8, 2013, when KFC's request was still pending. Defendant Brady subsequently told defendant Fries that "I talked to roger [Austin] about the KFC sizes and he is *in agreement with us*." GX 1615 (message 3) (emphasis added).

Those agreements are precisely the kind of evidence which shows defendants Brady and Fries knowingly effected the objectives of the conspiracy, *see Mobile Materials*, 881 F.2d at 873 (permitting "testimony about the various agreements which facilitated the objective of the conspiracy"), and contradicts defendants Brady's and Fries' assertions that the government needs to rely on "guilt by association," and that neither defendant had any knowledge of the objectives of the conspiracy. ECF 875 (Fries) at 14; ECF 878 (Brady) at 2-3.

Brady's and Fries' membership in the conspiracy can also be inferred from a course of conduct—*i.e.*, their repeated exchange of price information with their competitors, with the understanding that competitors would hold strong on price rather than use the information to compete. For example, a day after KFC's purchasing cooperative gave feedback for the first round of submissions for dark meat supply in 2013, Brady coordinated with Claxton's competitors before responding to the customer.

GX 17-1 (GX 1700-1). That day, defendant Brady had calls with defendants Mulrenin, Little, Kantola, and Mr. Gay—with a call to Fries in between. GX 17-1 (GX 9720, 9716, 9722, 9721). On November 19, 2013, the day after KFC's purchasing cooperative expressed disappointment with Pilgrim's pricing, defendant Brady contacted defendant Austin and subsequently reassured defendant Fries that "Roger [Austin] is at .30 back and not moving." GX 17-1 (GX 1734). Defendant Fries used his knowledge that Pilgrim's was holding firm to keep Claxton's own prices firm, rather than to undercut his competitor; he told defendant Brady to "Stay .305 then." *Id*. Defendant Brady submitted final bids later that day. GX 17-1 (A-626, A-627).

Similarly, too, during the 2014 KFC negotiations, defendant Brady had several calls with competitors in the period from August 15-19, 2014, immediately before the bid for KFC was due, for the purpose of increasing prices with competitors. He had three calls with defendant Roberts on August 15; one call with defendant Mulrenin; and one call with Mr. Pepper. GX 10-1 (GX 1231, 1232, 1234). On August 18, defendant Brady had yet more calls with his competitors; with Pilgrim's employees, including defendant Austin and co-conspirator Justin Gay. GX 10-1 (GX 1236, 1239). The content of the calls is readily inferred from the inclusion of Claxton's anticipated price and margin increases in the "Roger did some checking around" email. GX 1074, 1035, 1036. Defendant Brady again plugged into the network on August 26 and 27, 2014, by speaking with both defendants Kantola and Austin, after which he told defendant Fries: "I talked to roger [Austin] about KFC and Greeley [Pilgrim's] told him not to come down on price . . ." and "Koch is not moving either." GX 10-2 (GX 1238). Defendant Fries

reciprocated, adding that "Tinch… [is not] agreeing to anything today, just listening," based on his conversation earlier that day with Greg Tench (Mar-Jac). GX 10-2 (GX 1238).

On August 29, 2014, Mr. Lewis of RSCS emailed suppliers to notify them that RSCS was finalizing commitments and pricing for KFC for 2015. GX 10-3 (GX 1160). On September 3, when final pricing was due, defendant Brady had at least five calls with defendant Kantola, three calls with defendant Austin, and three calls with defendant Mulrenin. The content of those calls is readily apparent: defendant Brady reported to Fries that "Roger [Austin] and bill [Kantola] are not moving." GX 10-3 (GX 1238).

Viewed in the light most favorable to the government, the above communications were not merely "the legal practice of passing along mostly historical price information of competitors." ECF 875 (Fries) at 8. Rather, they were the routine methods by which the defendants reassured each other to raise or to hold firm on price increases against a common customer. As such, a jury could conclude that both defendants Fries and Brady participated in the conspiracy.

_Timothy Mulrenin and Brian Roberts_. Defendant Mulrenin was director of sales for national accounts at Tyson Foods (GX 744) and defendant Roberts vice president of sales for national accounts (GX 221).

In negotiations for KFC for calendar year 2015, Mr. Lewis told each chicken supplier (including Tyson) that bids were due on August 19, 2014. _See, e.g._, GX 1138; GX 1137. Defendant Roberts submitted Tyson's bid eight days early (GX 1190, 1191)— but not before he spoke with his competitor, defendant Brady. GX 10-1 (GX 8005). In

the ensuing days, before Tyson's competitors submitted their own bids, defendant

Roberts had numerous calls with his competitors: three calls with defendant Penn and

four calls with defendant Brady. GX 10-1 (GX 1231). On the day of the August 19

deadline, Tyson's competitors submitted pricing proposals reflecting significant

increases, including proposed doubling of profit margins—just as Tyson had. *See, e.g.*,

GX 1105; GX 1133 at 2. And Tyson, led by defendant Roberts, ended up negotiating an

even higher profit margin than it had initially proposed. GX 10-4 (GX 1127 at 2). Cast in

the proper light, the evidence is more than sufficient to show that defendant Roberts

coordinated Tyson's price increase with his competitors and therefore participated in the

conspiracy.[7]

Defendants Mulrenin and Roberts, as managers, approved and encouraged their

subordinate, Mr. Pepper's participation in the conspiracy. For example, after Church's

Chicken asked in May 2013 what Tyson may charge for supplying frozen product, co-

conspirator Pepper gathered information from competitors and shared his proposal with

defendants Roberts and Mulrenin. Pepper proposed charging "just a freezer cost.

Pilgrim's told me they would be around .025 to .03 on 8pc & dark meat and Koch told

me they were .025 on 8pc and at this time was not charging for dark but would probably

change to .025 for next year." GX 120. When Church's shared new QA requirements for

---

[7] This evidence is part of an ongoing course of conduct, in which defendant Roberts
connected with competitors during active negotiations from as early as 2012. For
example, GX 1431-1 shows defendant Roberts calling defendant Blake a day before the
deadline for submitting initial bids for KFC in 2012. And GX 10-1 (GX 8005) shows
defendant Roberts called defendant Brady two hours before defendant Roberts
submitted Tyson's initial bid for KFC 2015.

2014 in December 2013, co-conspirator Pepper kept defendants Roberts and Mulrenin

apprised of whether competitors were pushing back: "Talked to Jimmy [*sic*.] Little and

he said they were planning on adding to their cost to do this." GX 224, 221.

Defendant Mulrenin also used or directed his subordinate, Mr. Pepper, to use

competitors' pricing information to formulate Tyson's bids. In September 2015, the

purchasing cooperative for Popeyes requested a discount in order to run a promotion.

After learning from Mr. Pepper that he has "talked to a couple company's and they are

thinking .02 for September," defendant Mulrenin used the information, not to undercut

competitors, but instead to set Tyson's own price at the same two cents. GX 617.

Likewise, as Tyson was preparing to submit its bid to Popeyes, which they understood

was due on September 5 (GX 7-1 (GX 744)), Mr. Pepper called defendant Blake and

reported the results to Mulrenin: "Got a general idea what Georges is doing." GX 7-1

(GX 755). Defendant Mulrenin responded "I will call you as soon as I can" and directed

Pepper to notify Steven Cullen—a Tyson employee who had responsibility for pricing.

GX 7-1 (GX 756). Pepper later reported that he had called Mr. Cullen and "told him what

I heard GEORGES was doing & also told him about Mar Jac. Said would get back with

me this afternoon." GX 7-1 (GX 757). Defendant Mulrenin then thanked co-conspirator

Pepper for his work. GX 7-1 (GX 758).

That evidence belies defendant Mulrenin's assertion that there "is no evidence

that Mr. Mulrenin said or did anything in furtherance of the conspiracy charge" and that

he was at most a "passive recipient" of competitive intelligence. ECF 884 at 4, 8-9.

Indeed, defendant Mulrenin not only authorized Mr. Pepper's contact with competitors,

*see Lischewski*, 860 F. App'x at 515, but also personally contacted competitors to share and coordinate pricing as seen in GX 355. In the spring of 2014, defendant Mulrenin reached out to defendant Brady (GX 354) and shared confidential information on anticipated bids, including when Tyson's bid to Chick-Fil-A was due, how much Tyson was planning to charge Chick-Fil-A for switching to antibiotic-free chicken, and the current status of Tyson's bid (*i.e.*, that Tyson's bid was not yet completed but was still a "[w]ork in progress"). *See* GX 3-1 (GX 355). In return, defendant Mulrenin learned what Claxton, Perdue, and Pilgrim's would each be charging. *Id*.

Viewed in the light most favorable to the government, a rational jury could reasonably conclude from the documentary evidence that defendants Mulrenin and Roberts knowingly joined the conspiracy.[8]

<u>Bill Kantola</u>. Defendant Kantola was a sales executive at Koch Foods throughout the conspiracy period. He had a key role in negotiating contracts with relevant customers. *See, e.g.*, R. Tr. Nov. 4 at 191:20-24 (Sara Fisher); C.R. Tr. Lewis Nov. 3 at 28:5-17 (Robert Lewis); C.R. Tr. Ledford Nov. 8 at 20:18-23 (Mike Ledford). Throughout

---

[8] Despite defendants Roberts' and Mulrenin's attempts to minimize their roles in negotiations (ECF 877 at 10; ECF 884 at 5), customer testimony at trial established that both were extensively involved in contracting. James Olson, the CEO of Harman Management Corporation (HMC) (a franchise of KFC, *see* Certified Reporter's Transcript for Mr. Olson ("C.R. Tr. Olson") Oct. 27 at 5:8-7:2), testified that defendant Roberts represented Tyson in negotiations. C.R. Tr. Olson Oct. 27 at 50:9-14. Mike Ledford of RSCS testified that defendants Mulrenin and Roberts were the primary individuals he dealt with from Tyson during the 2012 and 2013 contract negotiations. C.R. Tr. Ledford Nov. 8 at 19:18-20. Robert Lewis of RSCS said he met with defendant Roberts and negotiated prices with him in 2014. C.R. Tr. Lewis Nov. 3 at 25:7-8, 33:4-9, 74:18-19. Ms. Fisher of RSCS also testified that she sent initial requests for bids to defendant Mulrenin and that he supervised her day-to-day contact, co-conspirator Pepper. R. Tr. Nov. 4 at 190:16-191:2.

the trial, the jury heard ample testimonial and documentary evidence of Kantola's knowing participation in the conspiracy.

At trial, Mr. Bryant testified that he witnessed telephone calls between defendant Austin and defendant Kantola, C.R. Tr. Bryant Nov. 1 at 18:8-19, 44:11-21, and that Mr. Bryant received information from defendant Austin that came from defendant Kantola. *Id.* at 43:2-44:21, 46:15-24. Mr. Bryant explained that defendants Austin and Kantola had communicated over a long period, starting before 2010—and, after 2014, the information defendant Kantola shared became "more pricing centric information and what Koch's position was on a particular . . . pricing or spec or whatever the customer question was at that particular time." *Id.* at 46:21-47:2. Mr. Bryant further testified that he understood defendants Austin and Kantola shared prices in furtherance of an unlawful goal: to "raise or prevent a price decrease" for both Pilgrim's and Koch. *Id.* at 47:3-8.

Mr. Bryant's testimony is borne out by the rest of the record, which shows defendant Kantola coordinated with competitors during key points in negotiations in an effort to raise prices. On September 28, 2012, Mr. Ledford of RSCS (which, at that time, went by the acronym UFPC) sought first-round bids for supplying KFC for calendar year 2013. In the days leading up to the due date of October 10, 2012, defendant Kantola had at least seven calls with competitors, including with defendants Brady and Little. GX 14-1 (GX 1429, 1432). On October 9, 2012, defendant Brady submitted Claxton's dark meat price of "8 piece -.30." GX 14-1 (GX 1505, 9692). A day later, defendant Kantola told a colleague that Koch should increase the price for dark meat: "We are changing

the dark meat to -.3000 from .3050 to see if we can pull that off." GX14-1 (GX 1409).

Koch submitted its offer of 30 cents back, as did Pilgrim's. GX 14-1 (GX 1406, 9690).

As another example, on May 31, 2013, defendant Kantola spoke with Mr. Pepper hours after Church's Chicken asked Tyson for pricing estimates on freezing costs. Within twenty minutes, Mr. Pepper reported that "Koch told me they were .025 on 8pc and at this time was not charging for dark but would probably change to .025 for next year." GX 1-1 (GX 143, 120). Defendant Kantola's decision to share this competitively sensitive information was reciprocal. Later that year, after Church's Chicken circulated new quality-assurance requirements for 2014, defendant Kantola spoke with a competitor, defendant Little and, within 15 minutes of the call, reported to another Koch employee: "So here's why Tyson is so popular with Church's: FOB Pricing for January: Koch---$0.9192  Pilgrim's---$0.9189  Tyson---$0.8849." GX 2-1 (GX 245, 6134).

As with other defendants, defendant Kantola also tapped into the network of competitors the day before the KFC initial bid was due on August 19, 2014 in order to increase prices. On August 18, 2013, defendant Kantola joined in the flurry of inter-competitor communications by calling defendant Little (Pilgrim's). GX 10-1 (GX 1235). The call records show a that, following the Kantola-Little call, defendant Little had a call with defendant Austin within the hour, and defendant Austin had a call with Mr. McGuire the same day. Mere minutes after the Austin-McGuire call, Mr. McGuire circulated a spreadsheet containing current and new margins sought by Koch, defendant Kantola's employer. *See* GX 1035, 1036. Shortly after that email, Mr. McGuire emailed defendant Penn the "Roger did some checking around" email, which included Koch's anticipated

price increase to KFC. GX 9744.

The purpose of these communications—to hold firm on the anticipated price increases—is apparent from the contemporaneous exchanges. After initial bids were submitted, defendant Kantola and defendant Brady had a call on August 27, 2014. Within half an hour, defendant Brady assured defendant Fries: "Koch is not moving either." GX 10-2 (GX 1238). The following week, defendant Kantola again reassured competitors that Koch was standing firm on the price increase: On September 3, 2014, around the time final pricing was due (GX 10-3 (GX 1160)) defendants Kantola and Brady exchanged at least five calls with each other and, after twenty minutes of their last call, defendant Brady reported to defendant Fries that "Roger and bill [Kantola] are not moving." GX 10-3 (GX 1241, 1238).

Other competitors also readily approached defendant Kantola for competitively sensitive information. *See Beachner Const. Co.*, 729 F.2d at 1282 (upholding finding of conspiracy where district court's holding was based in part on how "the participating contractors took no precautions and expressed no fear when approaching a fellow contractor to rig a bid"). In February 2017, defendant Austin told Mr. Stiller of Pilgrim's that he would "tell industry" that Pilgrim's was "going to hold" on prices for KFC. GX 18-3 (GX 1856 and 1858). After Mr. Stiller prompted defendant Austin three days later— "Shall we plan call for Wednesday am to discuss COB? Give you some time to do your due diligence [*sic.*]," (GX 18-3 (GX 1862))—defendant Austin called defendant Kantola within the hour. GX 18-3 (GX 1960). The government has therefore put forth substantial evidence from which a jury can conclude that defendant Kantola knowingly participated

in the charged conspiracy.[9]

_Ric Blake_. Defendant Blake was Director of National Accounts for George's. Evidence at trial showed that he, too, knew the essential objectives of the conspiracy, and joined it by directly communicating with competitors in service of its anticompetitive goal.

In the days before responses to KFC's request for information was due on October 10, 2012 (GX-14-1 (GX 1438)), defendant Blake plugged into the network of conspirators to coordinate prices; he called defendant Kantola, co-conspirator Pepper, and defendant Roberts. Defendant Blake reached out again to competitors before second-round bids were due on November 14, 2012 (GX 1439): He had calls with co-conspirator Pepper and defendant Brady on November 13, 2012 (GX 1440, 1426). Five minutes after defendant Blake's call with defendant Brady, defendant Brady reported on what the two discussed: "George's is .30 back on dark meat." GX 14-2 (GX 1427). After KFC's purchasing cooperative asked if any supplier would lower prices to 31 cents back instead of 30 back (GX 14-2 (GX 1526 and 1528)), George's did not budge—and it submitted a final contract for dark meat at 30 cents back (F-759). Despite defendant Blake's argument that "[t]hese calls were not recorded, and no witness testified about their content," ECF 879 at 7, the content of the calls is a fair inference based on their

---

[9] Defendant Kantola recycles an argument that the government has failed to prove his alleged conduct fell within the statute of limitations. _See_ ECF 553 at 14 (rejecting argument on statute of limitations at the motion to dismiss stage). But defendant Kantola argues he withdrew from the conspiracy without addressing the Tenth Circuit's elements for the affirmative defense of withdrawal. _United States v. Varah_, 972 F.2d 357 (10th Cir. 1992); _United States v. Powell_, 982 F.2d 1422, 1435 (10th Cir. 1992).

timing and defendant Brady's texts to defendant Fries.

Defendant Blake's membership in the conspiracy—and knowledge of its purposes—is further illustrated by the course of conduct surrounding key periods in negotiations, and how other co-conspirators expressed no reservations when connecting with him. *Beachner Const. Co.*, 729 F.2d at 1282. Twice defendant Austin said he would get the "pulse" for Pilgrim's on KFC negotiations—in November 2012 (GX 14-3 (GX 1544)) and in February 2017 (GX 18-1 (GX 1849))—and, both times, defendant Blake and defendant Austin contacted each other within two hours. GX 14-3 (GX 1428); GX 18-1 (GX 1961). Defendant Blake also joined the flurry of inter-competitor calls prior to the due date for KFC initial bids on August 19, 2014. He had a call with Mr. Pepper on August 15, 2014 (GX 10-1 (GX 1234)), and defendant Austin on August 18, 2014. *See* GX 9624 (defendant Austin's contact list associating George's number with defendant Blake). Again, the jury could reasonably infer the competitors exchanged price and margin information during those calls; later that day, George's anticipated total increase appeared in the "Roger did some checking around" email. GX 10-1 (GX 1074).

Defendant Blake's involvement in price fixing for KFC 2014 is corroborated by customer testimony. Notably, after confirming that defendant Blake was a key negotiator at George's, C.R. Tr. Olson Oct. 27 at 29:23-30:22, James Olson of HMC (KFC franchisee) testified to defendant Blake's uncharacteristic inflexibility the year of 2014, as well as the striking similarity between the meetings he had with defendant Blake and defendant Roberts that year. *Id*. at 148:18-149:4. Although Blake had sought creative

ways to mitigate the price increases in the past, he held firm that year, and HMC did not receive any pricing concessions. *Id*. at 53:10-21.

And, in 2017, defendant Blake was again in touch with his competitors during active negotiations to supply Popeyes for calendar year 2018. On September 6, 2017, the buyer for Popeyes prompted co-conspirator Pepper that it had not yet received Tyson's bid. Rather than submitting the bid, co-conspirator Pepper immediately called defendant Blake and other competitors. That afternoon, after his call with defendant Blake, co-conspirator Pepper made clear that the two spoke about George's anticipated pricing. In a text to defendant Mulrenin, defendant Brady reported: "Got a general idea what Georges is doing." GX 7-1 (GX 754, 757).[10] Viewed in the light most favorable to the government, defendant Blake's connection to the conspiracy is far from "mere association" or "mere presence." ECF 879 at 13. There is more than sufficient evidence from which a rational jury could conclude that defendant Blake knowingly joined the conspiracy.

****************************

The evidence recounted above plainly establishes, not only that the conspiracy existed, but also that each defendant was a knowing participant. Throughout their motions for acquittal, the defendants claim they did not knowingly join the conspiracy,

---

[10] The government also introduced GX 6088 and 6089, which shows that defendant Blake kept meticulous records of all his competitors' prices throughout several years. Combined with Mr. Bryant's testimony regarding defendant Austin's version of a similar spreadsheet, a rational jury could reasonably infer that defendant Blake's records were used as a way to monitor competitors and ensure their compliance with the agreement. *See* C.R. Tr. Bryant Nov. 1 at 26:1-28:16.

and repeatedly characterize the evidence in their favor as "consistent" with independent conduct or competition. ECF 874 (Austin) at 6; ECF 875 (Fries) at 13; ECF 876 (Kantola) at 3; ECF 877 (Roberts) at 11; ECF 878 (Brady) at 14; ECF 879 (Blake) at 5, 7; ECF 880 (Penn) at 6; ECF 881 (Lovette) at 3; ECF 882 (Little) at 5; ECF 884 (Mulrenin) at 3-4.  But that is not the correct standard in assessing a Rule 29 motion. "It is not enough for a defendant to put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." *United States v. Thompson*, 473 F.3d 1137, 1142 (11th Cir. 2006), *abrogated on other grounds by United States v. DiFalco*, 837 F.3d 1207 (11th Cir. 2016). At this stage, a court should not usurp the role of the jury as fact finder unless the evidence is so "nonexistent or so meager" that only an irrational jury could find guilt. *White*, 673 F.2d at 301. Not so here. As described above, the jury saw substantial evidence that—through express agreement, a course of dealing, or other circumstances—each one of the ten defendants knowingly joined the conspiracy.

## III.    The Evidence Proves a Single Overarching Conspiracy

The defendants argue there can be no overarching conspiracy (and at most, multiple conspiracies), because the allegations involve distinct contracts. ECF 882 (Little) at 2; ECF 876 (Kantola) at 13-14; ECF 874 (Austin) at 3 n.1; ECF 880 (Penn) at 2 n.1. But the Tenth Circuit rejected precisely this argument in *Beachner Const. Co.*, 729 F.2d at 1282-83, when it refused to adopt the view that "each project [alleged in a bid-rigging conspiracy] produced separate conspiracies involving separate agreements

to rig particular projects let by the state on particular dates." The mere fact that conspirators "participated in numerous separate transactions does not convert a single conspiracy to multiple conspiracies." *United States v. Calderon*, 127 F.3d 1314, 1329 (11th Cir. 1997) (internal citations omitted).[11]

In the Tenth Circuit, the ultimate question in assessing whether there is a single conspiracy is whether the record "is sufficient to establish that [all conspirators] had a *single, common and continuing objective* . . . . If so, there would be but one conspiracy even though its purposes were advanced . . . by diverse parties." *Beachner Const. Co.*, 729 F.2d at 1281 (quoting *United States v. Wilshire Oil Co. of Texas*, 427 F.2d 969, 976 (10th Cir. 1970), *cert. denied*, 400 U.S. 829 (1970)) (emphasis in original).

In Sherman Act cases in particular, the common objective shared among all co-conspirators is to suppress or eliminate competition. In *Beachner Const. Co.*, which involved bid rigging for certain contracts for asphalt paving, the Tenth Circuit upheld the finding of a single conspiracy because the overarching "common objective" was "to eliminate price competition and ensure higher individual profits." 729 F.2d at 1283. In *Mobile Materials*, the Tenth Circuit likewise held there was "ample evidence of a single conspiracy to submit collusive, noncompetitive and rigged bids, or to withhold bids," 881

---

[11] Contrary to the defendants' suggestion, evidence about various distinct contracts does not establish multiple conspiracies, but instead shows the many ways the conspiracy was effectuated and connects each of the defendants to the overarching conspiracy. *See Mobile Materials*, 881 F.2d at 873 (rejecting defendants' argument that jury was misled by evidence of "unrelated" jobs, as "testimony about the *various agreements which facilitated the objective* of the conspiracy was permissible") (emphasis added). As in *Mobile Materials*, the evidence in this case reflects "significant overlap in personnel, method of operation, and purpose." *Id.* at 872 (internal quotations omitted).

F.2d at 872, where the shared purpose was "to circumvent price competition and enhance profitability." *Id*. at 871 (citing *Beachner Const. Co.*, 729 F.2d at 1283).

The government more than satisfied this standard with the evidence in the record, which is to be judged—as with the rest of the evidence at this stage—in the light most favorable to the government. *Id*. at 872; *Carnagie*, 533 F.3d at 1237. Mr. Bryant's testimony, as well as the many documents in the record (discussed in Part II), make clear that the shared goal of the conspiracy was to circumvent or eliminate price competition. *See* C.R. Tr. Bryant Nov. 1 at 98:11-15; *id.* at 218:23-219:4.

In addition to proving a shared common objective, *see Beachner Const. Co.*, 729 F.2d at 1281-82, the government demonstrated several other indications that there is only a single conspiracy: (1) there was a "common method" or course of dealing among competitors, such that a defendant would call competitors to discuss negotiating positions during key periods of the bidding process; (2) there was "common . . . jargon" used by conspirators, including repeated references to "the industry," meaning competing suppliers, *see, e.g.*, C.R. Tr. Bryant Nov. 1 at 143:9-17; GX 900 at 3 ("[T]he industry is saying we want 20."); GX 1856 ("Need you [*sic.*] tell industry we are going to hold"); (3) the participating conspirators "took no precautions and expressed no fear when approaching a fellow [conspirator]," to share price information in service of the common objective; and (4) "the . . . scheme was self-perpetuating in nature and could be 'plugged into' at any time," as the evidence showed the scheme lasted for at least seven years. The Tenth Circuit considered those factors, among others, to be compelling in reaching its holding in *Beachner Const. Co.* that there was only a single

conspiracy. 729 F.2d at 1282-83; *see also In re Grand Jury Proceedings*, 797 F.2d 1377, 1384-85 (6th Cir. 1986).

Crucially, evidence at trial demonstrated interdependence among the co-conspirators—*i.e.*, that "the activities of alleged co-conspirators in one aspect of the charged scheme were necessary or advantageous to the success of the activities of co-conspirators in another aspect of the charged scheme, or the success of the venture as a whole." *United States v. Pickel*, 863 F.3d 1240, 1253 (10th Cir. 2017) (internal citations omitted). To show interdependence, the government must provide "proof that [conspirators] intended to act together for their shared mutual benefit within the scope of the conspiracy charged." *United States v. Evans*, 970 F.2d 663, 670-71 (10th Cir. 1992). In *Beachner Const. Co.*, the Tenth Circuit held sufficient for interdependence that "the weight of the evidence in the record shows that a contractor would participate in a bid-rigging plan with the belief that future benefits of some kind would be returned to him." 729 F.2d at 1283. Similarly, cast in the light most favorable to the government, the evidence shows each supplier was confident in submitting price increases only based on a belief that its competitors would follow or not undercut it. This interdependence is supported by both testimonial and documentary evidence. For example, Mr. Bryant testified he was never afraid that competitors would undercut Pilgrim's prices—and he would have otherwise been concerned about seeking historic price increases in 2014 were it not for the competitors' own price increases. *See* C.R. Tr. Bryant Nov. 1 at 21:3-15, 107:22-108:12, 175:24-176:4. And GX 5-1 (GX 519-1) shows the success of the conspiracy depended on whether customers "ha[d] options" (or competitors to turn to)

when confronted with price increases. Each of the co-conspirators benefited from the ongoing participation of others. The mutual benefits of the conspiracy—to obtain higher prices or stabilize prices for the competitors—could not fully be realized unless competitors participated. When confronted with a threat to what the defendants believed were unfavorable prices or price-related terms (including terms of sale, as in the case of Sysco), they tapped into the network of competitors to resist or fight against the threat together. This mutual benefit and interdependence demonstrate a common objective and a single conspiracy.[12]

## IV. The Conspiracy Was in the Flow of or Substantially Affected Interstate Commerce

Finally, the defendants do not challenge the interstate commerce element in their motions for acquittal, *see* ECF 874-882, 884, and a rational jury could conclude beyond a reasonable doubt that the conspiracy was in the flow of or substantially affected interstate commerce.[13] Several customers testified to how QSRs were located in different states and how broiler chicken products were shipped across state lines to various restaurants, distributors, or franchisees. *See, e.g.*, C.R. Tr. Olson Oct. 27 at 9:4-14 (James Olson); C.R. Tr. Lewis Nov. 3 at 9:17-24 (Robert Lewis); R. Tr. Nov. 4 at 161:19-22, 168:12-20 (Sara Fisher); R. Tr. Nov. 8 at 15:4-5, 50:23-51:12 (Telly Smith);

---

[12] The jury may also be instructed on single vs. multiple conspiracies. *See* ECF 592 at 27 (Defendants' proposed jury instructions). If the Court decides to give such an instruction, the jury presumably would follow it. *See* ECF 889 at 4-5.

[13] The government has also introduced sufficient evidence from which the jury can find venue by a preponderance of the evidence. Customers testified regarding franchisees and distribution centers located in Colorado, *See, e.g.*, C.R. Tr. Olson Oct. 27 at 9:11-14 (James Olson); R. Tr. Nov. 8 at 50:23-51:4 (Telly Smith). *See United States v. Johnson*, 323 U.S. 273 (1944).

R. Tr. Nov. 15 at 214:5-215:1 (Meyer Skalak).

## CONCLUSION

Based on the evidence in the record and fair inferences drawn from that evidence, a rational jury may find each defendant guilty beyond a reasonable doubt. For that reason, the government respectfully requests that the defendants' motions for acquittals pursuant to Rule 29 be denied.


Dated: December 6, 2021          Respectfully submitted,

/s/ Michael T. Koenig
MICHAEL KOENIG
HEATHER CALL
PAUL TORZILLI
CAROLYN SWEENEY
Antitrust Division
U.S. Department of Justice
450 Fifth Street NW, Suite 11048
Washington D.C. 20530
Tel: (202) 616-2165
Email: michael.koenig@usdoj.gov
*Attorneys for the United States*