# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.   JAYSON JEFFREY PENN,
2.   MIKELL REEVE FRIES,
3.   SCOTT JAMES BRADY,
4.   ROGER BORN AUSTIN,
5.   TIMOTHY R. MULRENIN,
6.   WILLIAM VINCENT KANTOLA,
7.   JIMMIE LEE LITTLE,
8.   WILLIAM WADE LOVETTE,
9.   GARY BRIAN ROBERTS, and
10.  RICKIE PATTERSON BLAKE,

    Defendants.

**DEFENDANTS' MOTION PURSUANT TO RULE 17(c) FOR COURT ORDER AUTHORIZING SUBPOENAS DUCES TECUM TO PRODUCE DOCUMENTARY EVIDENCE IN ADVANCE OF TRIAL**

Defendants, by and through undersigned counsel, and pursuant to Federal Rule of Criminal Procedure ("Rule") 17(c), respectfully request that the Court issue an order authorizing the issuance of the attached subpoena duces tecum to require the production of documentary evidence in advance of trial.

**I.      INTRODUCTION**

The prosecution has alleged a wide-ranging conspiracy to fix prices and rig bids for broiler chicken products, allegedly involving multiple broiler chicken suppliers. Dkt. 101 ("Super. Indict.") ¶¶ 51–145. After conducting extensive investigation and reviewing the

voluminous discovery provided by the government, Defendants are requesting relevant and targeted documents from RSCS, KFC/Yum, Golden Corral, and Church's. Each of these entities has in its possession documents vital to the defenses in this case, as outlined below and as explained in greater detail in the *ex parte* memorandum filed contemporaneously with this Motion. Defendants' *ex parte* memorandum explains in detail why the documents are essential to Defendants' preparation of their defense. The memorandum has been filed on an *ex parte* basis because it discloses Defendants' trial strategy and defenses.

Defendants make these requests in good faith, knowing that (i) key documents have not been produced by the government, and are therefore unlikely to have been obtained in its investigation, (ii) Defendants can only obtain them directly from the entities listed here, and (iii) these documents are essential to prepare their defenses in advance of trial and to avoid future delay.

## II.   BACKGROUND

On June 2, 2020, the grand jury returned a one-count indictment in this case against four defendants for a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Dkt. No. 1 ("Indict.") ¶ 1. The government alleged a conspiracy between 2012 and 2017 consisting of a "continuing network" whose purpose was "to suppress and eliminate competition through rigging bids and fixing prices and price-related terms for broiler chicken products sold in the United States." *Id*. ¶¶ 28–29. The indictment described eight specific pricing incidents involving five customers (*id.* ¶¶ 32–77), but suggested that these incidents were only "part" of the alleged conspiracy. *Id*. ¶ 28 ("It was part of the conspiracy . . . ."); *id*. ¶ 29 ("It was further part of the conspiracy . . . ."); *id*. ¶¶ 30, 31 (same).

On October 6, 2020, the grand jury returned a superseding indictment in this case against

ten defendants for one count of a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[1] Dkt. No. 101, Super. Indict. ¶¶ 1.  The superseding indictment again alleges a conspiracy whose purpose was "to suppress and eliminate competition through rigging bids and fixing prices and price-related terms for broiler chicken products sold in the United States" (*id*. ¶ 47), but in a broader price-fixing and bid-rigging conspiracy than the original indictment.  Specifically, the superseding indictment describes fourteen separate pricing incidents (*id.* ¶¶ 51–143), spanning seven years (*id.* ¶ 1), involving eight customers and one distributor (*id.* ¶¶ 36–44).  The government again alleges that the incidents described in the indictment only formed "part" of the alleged conspiracy.  *Id.* ¶¶ 47–50 ("It was part of the conspiracy . . . ."); *id*. ¶ 48 ("It was further part of the conspiracy . . . ."); *id*. ¶¶ 49, 50 (same).

The case went to trial on October 25, 2021 and lasted until December 16, 2021.  During the first trial, the government called dozens of witnesses, the vast majority of which were document custodians, and introduced hundreds of exhibits, including voluminous telephone records from Defendants.  After weeks of testimony, the first trial ended in a mistrial, with the jury being unable to reach a verdict as to any of the ten defendants that any of them conspired to rig bids or fix prices in the broiler chicken industry.  Dkt. No. 920.  The government reported on the record it intended to retry the case, *id.*, and the retrial is scheduled to begin on February 22, 2022.  Dkt. No. 925.

Mr. Peter Suerken, the "quarterback" of the 2015 KFC contract negotiations,[2] which is one of the fourteen incidents of alleged price fixing in the superseding indictment, was not

---

[1] The superseding indictment included additional counts against Jimmie Little, but those have been dismissed.  Dkt. Nos. 688, 828, 835.
[2] Lewis Trial Tr. Vol. I 17:22-25.

3

identified as a witness for the government during the first trial and he did not testify.[3] In the government's witness list filed on January 14, 2022 for the February 2022 retrial, the government identified Mr. Suerken as a witness for the government and has indicated it intends to call him as a witness a trial. Dkt No. 936. The government has also identified exhibits it may seek to introduce at trial during his testimony in its exhibit list filed on January 14, 2022. Dkt. No. 935. The government's January 14 witness list also identified Steve McCormick, another RSCS employee not previously identified for the first trial as a witness for the retrial, Dkt. No. 936. The government has disclosed that it will call Telly Smith, the head of purchasing at Golden Corral, to testify at the retrial. *Id.* Finally, the government has disclosed that it will now call Dean Bradley, formerly a purchaser for Church's Chicken, for the first time on retrial. *Id.*

To date, Defendants are aware of one interview of Mr. Suerken by the government. The government produced a written report of that interview, consisting of three sentences, as well as the audio recording of the interview, which lasted almost two hours. During the interview, Mr. Suerken made statements regarding the 2015 KFC contract negotiations and speculated regarding the connection between the 2015 KFC contract negotiations and his eventual separation from RSCS in 2017.

Mr. Smith testified as a government witness at the first trial. *See* Trial Tr. 1877:9-2029:7 (Nov. 8, 2021). However, to this date, Defendants have received virtually no documents from his employer, Golden Corral. Out of the nearly 15 million documents that the government has produced in this case, only **28** are from Golden Corral. The sparse collection includes a few supply contracts, pricing proposals, and purchase orders (many of which are unsigned), and a handful of emails.

---

[3] Defendants did identify Mr. Suerken as a potential witness on their witness list filed on October

These production gaps became apparent during Mr. Smith's cross-examination at the first trial. For instance, much of Mr. Smith's direct testimony described negotiations in 2014 with Pilgrim's Pride, which he described as giving him "sticker shock" and being "adversarial." *See id.* at 1896:8-12; 1905:11-14. However, Defendants have not received productions of certain basic materials such as signed contracts, purchase data, internal analyses, or email discussions that would help the jury evaluate whether Mr. Smith's description of these negotiations is accurate.

In addition, Mr. Smith testified on cross-examination about negotiations relating to purchases of wings from Pilgrim's Pride in 2013 that put these "adversarial" 2014 negotiations in a greater context. *See, e.g.*, *id.* at 1964:17-1965:9. For instance, Golden Corral had a contractual obligation to purchase 6 million pounds of wings from Pilgrim's at $2.005 per pound for 2013, which Golden Corral did not honor. *Id.* at 1984:1-10. Mr. Smith only testified that "to [his] recollection" Golden Corral fulfilled its obligations. *Id.* at 1984:11-17. But he then clarified that he only "remember[ed] sticking with the dollar figure" and did not remember whether Golden Corral actually purchased 6 million pounds of wings in 2013 as called for under the terms of the contract. *Id.* at 1984:18-22. The government's production of documents from Golden Corral contains no documents relating to its purchase of wings from any chicken supplier in 2013, which would enable the jury to evaluate whether Mr. Smith's description of Golden Corral's behavior relating to these purchases is accurate.

For the first time, on retrial, the government will call Dean Bradley. Mr. Bradley was an employee at Church's Chicken who negotiated with suppliers. As such, he is a central figure in certain episodes identified in the Superseding Indictment, including the Church's 2013 Freezing

---

6, 2021 (Dkt. No. 589), but no defendant called Mr. Suerken to testify during the first trial.

Charge and the Church's Quality Assurance Costs for 2014. Because of his role as a buyer for Church's, he also figures prominently in relevant instances of shortages, and efforts by Church's and the suppliers (including Mr. Little for Pilgrims, Mr. Kantola for Koch, and Mr. Pepper for Tyson) to cover those shortages.

Accordingly, Defendants have drafted the requested subpoenas in a targeted way to obtain a limited set of relevant, admissible documents (i) pertaining to Mr. Suerken's termination from RSCS, bonus information for new government witnesses Mr. Suerken and Mr. McCormick, and documents regarding the July 2014 board meeting; (ii) seeking certain financial information from KFC/YUM!; (iii) seeking certain limited information from Golden Corral to fill in these evidentiary gaps from the first trial; and, (iv) pertaining to Dean Bradley at Church's.

Evidence provided from these requests is necessary to counter the government's allegations that Defendants engaged in a Sherman Act conspiracy and to cross examine Mr. Suerken, Mr. McCormick, Mr. Smith, and Mr. Bradley. For the reasons set forth below, Defendants cannot properly prepare for trial without these documents. Defendants apply for the issuance of a pretrial subpoena to allow sufficient time for production and review of the materials in advance of the February 22, 2022 trial date, considering the scope of the alleged conspiracy and continued large scale productions simultaneously being made by the government (including as recently as February 3, 2022), which also require Defendants' regular and ongoing evaluation.

This request is timely because it was filed in advance of the pretrial motions deadline. *See* Dkt. No. 944 (establishing February 3, 2022 as the pre-trial motions deadline for the retrial); Dkt. No. 936 at 3 (noting that motions for issuance of Rule 17(c) subpoenas were due by the pretrial motions deadline for first trial and motions for issuance of Rule 17(c) subpoenas filed

6

after that date were untimely).

## III. LEGAL STANDARD

Rule 17(c) authorizes a court to issue a subpoena duces tecum directing a witness to produce any "books, papers, documents, data, or other objects the subpoena designates" in court before trial so that the parties and their attorneys may "inspect all or part of them." The purpose of Rule 17(c) is to expedite trial, and such subpoenas are "encouraged in complex criminal cases." *United States v. Nixon*, 418 U.S. 683, 699 n.11 (1974).

In *Nixon*, the Supreme Court set out a four-part test for the issuance of a Rule 17(c) subpoena: the moving party must show (1) that the documents are relevant and evidentiary; (2) that they are not otherwise procurable reasonably in advance of trial by the exercise of due diligence; (3) that the party cannot properly prepare for trial without the production and failure to do so may unreasonably delay trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition." *Id.* at 699; *see also United States v. Abdush-Shakur*, 465 F.3d 458, 467 (10th Cir. 2006). Put another way, the moving party "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." *Nixon*, 418 U.S. at 700. A court may quash a Rule 17(c) subpoena if production of the documents would be "unreasonable or oppressive, but not otherwise." *Id*. at 699.

## IV. ARGUMENT

Defendants' requests, enumerated below in Section 1, satisfy each element of the *Nixon* test and should be approved.

### 1. Relevance

#### a. RSCS

The government alleges Restaurant Supply Chain Solutions ("RSCS") was a victim of the alleged conspiracy. *See* Dkt. 195 at 3. Five of the pricing episodes described in the superseding

7

indictment relate to RSCS's negotiations with chicken suppliers on behalf of KFC. Super. Indict. ¶¶ 51–65, 71–76, 87–107, 129–35.

Defendants have drafted the requested subpoena in a targeted way to obtain a limited set of relevant, admissible documents solely in the possession of RSCS that they cannot otherwise procure. Defendants seek:

(1) **Request No. 1:**  executed and signed board minutes from the KFC negotiating co-operative's board meeting which occurred July 21-22, 2014, which were kept in the ordinary course of the board's business, and show that the board was provided a report and poultry project summary presented by McKinsey and Company, as well as detail the board's purchasing objectives in 2014 for the upcoming 2015-2017 contract cycle;

(2) **Request Nos. 2 and 4:**  bonus information for Pete Suerken and Steve McCormick for the period relevant to the superseding indictment; and,

(3) **Request No. 3:**  information on the termination of Pete Suerken from RSCS.

Acquiring these documents is essential to Defendants' preparation of their defense, as they will likely help refute the government's allegations of price fixing and bid rigging. The *ex parte* memorandum filed in support of this motion explains in detail why these documents are essential to Defendants' preparation of their defense.

### b.    Kentucky Fried Chicken/YUM! Brands Inc.

Kentucky Fried Chicken and its "ultimate parent company," Yum! Brands ("KFC/Yum") is also an alleged victim in the superseding indictment. *See* Dkt. 195 at 3.  As noted above, five of the pricing episodes described in the superseding indictment relate to KFC/Yum. Super. Indict. ¶¶ 51–65, 71–76, 87–107, 129–35.

The government's current production does not appear to provide financial information

necessary to Defendant's potential case about KFC/Yum during the alleged conspiratorial period. In addition, Defendants are seeking documents sufficient to show the number of newly-opened and permanently closed KFC franchises in the years relevant to the superseding indictment. Defendants have drafted their requests to KFC/Yum in a targeted way to obtain a limited set of relevant, admissible documents solely in the possession of KFC/Yum that cannot be otherwise obtained. Defendants seek documents sufficient to show profits and financial information (sales, costs, and margins) directly related to dates and incidents listed in the superseding indictment and to refute allegations on behalf of Defendants of price-fixing and bid rigging (Requests 3, 2, 1, and 4, respectively). Defendants also seek documents sufficient to show the number of newly-opened and permanently closed KFC franchises in the years relevant to the superseding indictment (Requests 5 and 6).

### c. Golden Corral

**Request 1 and 3.** Telly Smith testified that in April and May 2013, he approached Pilgrim's Pride seeking to re-negotiate the contract price that Golden Corral had previously agreed to pay Pilgrim's Pride for wings in 2013. Trial Tr. 1977:10-1984:5 (Nov. 8, 2021). Defendants are in possession of certain emails related to Golden Corral's effort to re-negotiate its contractual obligations, but only where a Pilgrim's Pride employee is a recipient or sender of the email. The government's production of documents includes no documents from Golden Corral (such as internal emails or analyses) related to this effort to re-negotiate the 2013 contract, which would only be in Golden Corral's possession. This information is relevant (1) to establish that Golden Corral had shown itself to be an untrustworthy buyer, (2) to explain why Mr. Smith may have viewed the negotiations with Pilgrim's Pride in subsequent years as "adversarial," which had nothing to do with coordination of pricing among competitors; and (3) to explain Pilgrim's

9

internal communications the government introduced in the first trial in which Messrs. Lovette, Penn, and Sandri made sarcastic comments about Golden Corral.  In the first trial, the Court allowed a similar line of questioning as relevant for this purpose.  *Id.* at 1979:12-23.  In an effort to narrowly tailor the request to only receive relevant documents, Defendants have restricted the dates to only cover the two months discussed at trial, plus one buffer month before and four months after.  *Cf. id.* at 1977:10-1984:5 (discussing negotiations in April and May 2013).

**Request 2.**  Mr. Smith testified that he could not remember whether Golden Corral fulfilled its contractual obligations in 2013 to purchase 6 million pounds of wings at $2.005.  *Id.* at 1984:18-24.[4]  This is relevant for the same reasons as Requests 1 and 3.  Moreover, this number should be easily ascertainable through Golden Corral's 2013 purchase data.  Nonetheless, Defendants have not been able to ascertain whether such purchases were actually made from the data currently available to them, which was produced by entities other than Golden Corral.  Request 2 therefore seeks Golden Corral's purchase data, but only as it relates to the year 2013 and the product wings.  Moreover, Defendants are not seeking all data, but only data "sufficient to show" the price and quantity of these purchases.  Production of this information should directly resolve the confusion in Mr. Smith's testimony during the first trial.

**Request 4-6.**  The core of Mr. Smith's direct testimony at the first trial related to negotiations in 2014 for the 2015 contract.  However, the small number of documents that Defendants have received from Golden Corral indicates that they have not received a full production of documents related to this time period.  To take one example, Defendants do not have a contract signed by both Pilgrim's Pride and Golden Corral for 2015 supply, even though Mr. Smith testified that Golden Corral purchased chicken products from Pilgrim's Pride that

---

[4] Defendants believe that the references in the transcript to a price of $2.05 are incorrect. *Cf.* GX-

year. Request 5 specifically requests this contract.[5] Defendants also believe that many other communications among Golden Corral employees related to these negotiations exist, beyond the 28 Golden Corral documents that Defendants have received, which would be relevant to put the negotiation in greater context. Requests 4 and 6 seek these communications, beginning in May 2014 and extending through the end of the year. Mr. Smith testified that the procurement process "typically starts every August" and seeks supply for "the following year." *Id.* at 1884:16-1885:7. The requested May through December timeframe is intended to capture communications over this general timeframe, with a few buffer months to capture related communications that may have occurred earlier or later.

### d. Church's

The requests seek documents of one type and one source: email communications from the account of the witness, Dean Bradley. While the government's production of documents does contain some email communications between Mr. Bradley and some Defendants, the documentation is limited and incomplete with respect to conversations internal to Church's or between Church's and other suppliers. The requests use the documents Defendants do have (usually government trial exhibits) to identify the subject matter at issue and orient the responding party's search for relevant information. The documents requested can be admitted, used to refresh Mr. Bradley on the events of almost nine years ago, or to impeach him.

**Requests 1 and 2.** These requests call for emails that relate directly to the Church's 2013 Freezing Charge episode.

**Requests 3 and 4.** These requests identify two specific instances in which one or more

---

404 (showing $2.005 contract price).
[5] The date ranges for Request 5 are narrowly tailored to account for the fact that such a contract would ordinarily be signed in the previous year, 2014.

11

suppliers had a shortage in deliveries of chicken to Church's.

**Request 5**.  This request calls for Mr. Bradley's emails related to his negotiations with suppliers for the 2014 contract year.

**Request 6.**  This request directly relates to the episode of Church's Quality Assurance Costs for 2014.  It calls for the remainder of Mr. Bradley's email communications that relate to the QA Audit charge he discusses with Mr. Pepper.

### 2.     Admissibility

With respect to admissibility, many of these documents may constitute business records or may be tendered for a purpose other than proving the truth of the matter asserted (such as impeachment).  Fed. R. Evid. 803(6), 801(d)(1)(B).  Further, the government has indicated that it intends to call Mr. Suerken, Mr. McCormick, Mr. Smith, and Mr. Bradley as witnesses.  Further questions of admissibility should be reserved for trial.

### 3.     Not otherwise procurable in advance of trial

The documents are not otherwise procurable reasonably in advance of trial, which is set to begin in less than three weeks.  The subpoenas seek documents possessed by RSCS, KFC/Yum, Golden Corral, Church's Chicken, and their employees.  Defendants have conducted diligent searches for these documents in the voluminous productions and have concluded these documents are not in Defendants' possession.  Defendants have no reasonable means by which to access them absent these subpoenas.

### 4.     Documents are needed to prepare for trial

Production of the documents will enable Defendants to prepare for trial.  Regarding the subpoenas to RSCS and KFC/YUM!, Defendants need access to the documents to counter the government's allegations that they entered into an agreement to fix prices and/or rig bids in 2014 for the 2015 KFC contract specifically, and generally between 2012 and 2019.  Defendants also

need this information to impeach the credibility of government witnesses, including employees of RSCS and KFC/Yum.

Further, production of the documents from Golden Corral will enable Defendants to better prepare for the cross-examination of Mr. Smith. Even after his testimony in the first trial, there remains an open question as to whether and to what extent Golden Corral actually fulfilled its contractual obligations to Pilgrim's Pride in 2013. If, as Defendants expect, Golden Corral did not fulfill its contractual obligations, this failure is important to explain that Pilgrim's conduct in subsequent negotiations and the sarcastic comments of Messrs. Lovette and Penn related to Golden Corral – which are specifically quoted in the superseding indictment – had nothing whatsoever to do with the government's charged price-fixing conspiracy. Failure to fulfill contractual obligations would also be relevant to impeach Mr. Smith.

Defendants need access to Church's documents to effectively combat the government's allegations regarding the conspiracy as a whole, the Church's Freezing Charge, the Church's Quality Assurance Charge, and to illuminate the process by which suppliers and purchasers covered shorts.

### 5. Documents are sought in good faith

Defendants make this request in good faith, tailoring the subpoenas as narrowly as possible to target material evidence that Defendants have not obtained in the government's myriad productions. For example, although RSCS maintained an active business relationship with the suppliers named in the superseding indictment throughout the alleged conspiracy period, the current government productions contain *zero* documents of the kind sought by these requests. Further, the requests are narrowly tailored to fill certain gaps identified as a result of Mr. Suerken's and Mr. McCormick's identification as new government witnesses.

Likewise, Requests 1 and 3 to Golden Corral only seek limited communications from the

13

chicken-wing segment (a small portion of Golden Corral's business) for a seven-month period. Requests 4 and 6 to Golden Corral do the same for an eight-month period. Request 5 is narrowly tailored to missing signed contracts over a one-year period. Request 2 seeks only purchase data "sufficient to show" the Golden Corral's price and quantity of wing purchases (and not purchases of other kinds of chicken) over a one-year period. Golden Corral could likely respond to Requests 2 and 5 by pulling data from a central repository and would not need to conduct custodial searches. The Golden Corral subpoena is narrowly tailored to fill in certain gaps that only became apparent during the examination of Telly Smith in the first trial.

The Church's requests use the documents Defendants do have (usually government trial exhibits) to identify the subject matter at issue and orient the responding party's search for relevant information.

Defendants do not intend to make burdensome requests or engage in "fishing expeditions." Defendants have good reason to believe that the additional documents sought by these subpoenas exist and seek to procure them for the sole purpose of trial preparation. The *Nixon* elements weigh in favor of granting production prior to trial, and issuance of Defendants' proposed subpoenas would further the purposes of Rule 17(c) in minimizing any undue delay at trial itself.

## V.    CONCLUSION

Pretrial production of additional documents for use in connection with new witnesses not previously called in the first trial is necessary in this complex case so that Defendants can properly prepare for the retrial. Likewise, pretrial production of documents necessary to fill in certain gaps that only became apparent during the examination of Telly Smith in the first trial is necessary so Defendants can properly prepare for the retrial. Defendants have constructed the

14

requests narrowly to target documents solely in the possession of RSCS, KFC/YUM!, Golden Corral, and Church's in the good-faith belief that these documents are essential to preparation of their defense and cannot otherwise be obtained by them.  Issuance of these subpoenas prior to trial is essential to ensure trial can proceed without delay once it begins.

Dated:  February 3, 2022                                   Respectfully submitted,

| s/ *Michael F. Tubach* | s/ *Richard K. Kornfeld* |
|---|---|
| Michael F. Tubach (Cal. Bar No. 145955) | Richard K. Kornfeld |
| O'MELVENY & MYERS LLP | Recht Kornfeld, P.C. |
| Two Embarcadero Center, 28th Floor | 1600 Stout Street, Suite 1400 |
| San Francisco, CA 94111-3823 | Denver, CO  80202 |
| Telephone: 415-984-8700 | 303-573-1900 |
| Facsimile: 415-984-8701 | Fax: 303-446-9400 |
| E-mail:  mtubach@omm.com | Email: rick@rklawpc.com |
| *Attorney for Defendant Jayson Jeffrey Penn* | *Attorney for Defendant Mikell Reeve Fries* |

| s/ *Bryan B. Lavine* | s/ *Michael S. Feldberg* |
|---|---|
| Bryan B. Lavine | Michael S. Feldberg |
| Troutman Pepper Hamilton Sanders LLP | Reichman Jorgensen LLP Lehman & Feldberg LLP |
| 600 Peachtree Street, N. E., Suite 3000 | 750 Third Avenue, 24th Floor |
| Atlanta, Georgia 30308 | New York, New York 10017 |
| 404-885-3170 | 212-381-4970 |
| Fax: 404-962-6613 | Fax: 212-381-4971 |
| Email: bryan.lavine@troutman.com | Email: mfeldberg@reichmanjorgensen.com |
| *Attorney for Defendant Scott James Brady* | *Attorney for Defendant Roger Born Austin* |

| s/ *Elizabeth B. Prewitt* | s/ *James A. Backstrom* |
|---|---|
| Elizabeth B. Prewitt | James A. Backstrom |
| Latham & Watkins LLP | James A. Backstrom, Counsellor at Law |
| 1271 Avenue of the Americas | 1515 Market Street, Suite 1200 |
| New York, NY 10020 | Philadelphia, PA 19102-1932 |
| Tel: (212) 906-1200 | 215-864-7797 |
| Fax: (212) 751-4864 | Email: jabber@backstromlaw.com |
| Email: elizabeth.prewitt@lw.com | *Attorney for Defendant William Vincent Kantola* |
| *Attorney for Defendant Timothy R. Mulrenin* | |

| s/ *Mark a. Byrne* | s/ *John A. Fagg, Jr.* |
|---|---|
| Mark A. Byrne (Cal. Bar No. 116657) | John A. Fagg, Jr. |
| BYRNE & NIXON LLP | Moore & Van Allen PLLC |
| 888 West Sixth Street, Suite 1100 | 100 North Tryon Street, Suite 4700 |
| Los Angeles, CA 90017 | Charlotte, NC 28202 |

15

| | |
|---|---|
| Telephone: 213-620-8003 | 704-331-3622 |
| Facsimile: 213-620-8012 | Fax: 704-378-2092 |
| Email: markbyrne@byrnenixon.com | Email: johnfagg@mvalaw.com |
| *Attorney for Defendant Jimmie Lee Little* | *Attorney for Defendant William Wade Lovette* |
| | |
| s/ *Craig A. Gillen* | s/ *Barry J. Pollack* |
| Craig A. Gillen | Barry J. Pollack |
| Gillen Withers & Lake, LLC | Robbins Russell Englert Orseck Untereiner & Sauber LLP |
| 400 Galleria Parkway, Ste 1920 | |
| Atlanta, GA 30339 | 2000 K Street N.W., 4th Floor |
| Telephone: (404) 842-9700 | Washington, DC 20006 |
| Facsimile: 404-842-9750 | 202-775-4514 |
| E-mail: cgillen@gwllawfirm.com | Fax: 202-775-4510 |
| *Attorney for Defendant Gary Brian Roberts* | Email: bpollack@robbinsrussell.com |
| | *Attorney for Defendant Rickie Patterson Blake* |

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of February, 2022, I electronically filed the foregoing **DEFENDANTS' MOTION PURSUANT TO RULE 17(c) FOR COURT ORDER AUTHORIZING SUBPOENA DUCES TECUM TO PRODUCE DOCUMENTARY EVIDENCE IN ADVANCE OF TRIAL** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

*s/ Bryan B. Lavine*
Bryan B. Lavine

16