1   IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF COLORADO
2

Criminal Action No. 20-CR-00152-PAB
3

UNITED STATES OF AMERICA,
4

        Plaintiff,
5

vs.
6

JAYSON JEFFREY PENN,
7   MIKELL REEVE FRIES,
    SCOTT JAMES BRADY,
8   ROGER BORN AUSTIN,
    TIMOTHY R. MULRENIN,
9   WILLIAM VINCENT KANTOLA,
    JIMMIE LEE LITTLE,
10  WILLIAM WADE LOVETTE,
    GAR BRIAN ROBERTS,
11  RICKIE PATTERSON BLAKE,

12      Defendants

13  _____

                    REPORTER'S TRANSCRIPT
14                  Trial to Jury, Vol. 10

15  _____

16       Proceedings before the HONORABLE PHILIP A. BRIMMER,

17  Chief Judge, United States District Court for the District of

18  Colorado, commencing at 8:35 a.m., on the 8th day of November,

19  2021, in Courtroom A201, United States Courthouse, Denver,

20  Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Janet M. Coppock, 901 19th Street,
25      Room A257, Denver, Colorado, 80294, (303) 335-2106

```
1                          APPEARANCES
2            Michael Koenig, Carolyn Sweeney, Heather Call and Paul
3    Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of
4    Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing
5    for Plaintiff.
6            Anna Tryon Pletcher and Michael Tubach of
7    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
8    San Francisco, CA 94111-3823;
9            Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10   N.W., Washington, DC 20006, appearing for Defendant Penn.
11           David Beller, Richard Kornfeld and Kelly Page of
12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13   CO 80202, appearing for Defendant Fries.
14           Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16            Laura Kuykendall and Megan Rahman of Troutman Pepper
17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18   appearing for Defendant Brady.
19           Michael Felberg of Reichman, Jorgensen, Lehman,
20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21   10017;
22
23
24
25
```

1    APPEARANCES (Continued)

2         Laura F. Carwile of Reichman, Jorgensen, Lehman,

3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4    CA 94065; appearing for Defendant Austin.

5         Elizabeth B. Prewitt of Latham & Watkins, LLP,

6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7         Marci Gilligan LaBranche of Stimson, Stancil,

8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9    80218, appearing for Defendant Mulrenin.

10        James A. Backstrom, Counselor at Law, 1515 Market

11   Street, Suite 1200, Philadelphia, PA 19102-1932;

12        Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13   Bethesda, MD 20814, appearing for Defendant Kantola.

14        Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15   Street, Suite 1100, Los Angeles, CA 90017;

16        Dennis J. Canty, Canty Law Corporation,

17   1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18   appearing for Defendant Little.

19        John Anderson Fagg, Jr. and James McLoughlin of

20   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

```
1                    APPEARANCES (Continued)

2           Craig Allen Gillen and Anthony Charles Lake of

3  Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4  Atlanta, GA 30339;

5           Richard L. Tegtmeier of Sherman & Howard, LLC,

6  633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7  for Defendant Roberts.

8           Barry J. Pollack of Robbins, Russell, Englert, Orseck

9  & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10 DC 20006;

11          Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12 5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13 for the Defendant Blake.

14

15                       PROCEEDINGS

16          THE COURT:  We are back on the record in 20-CR-152 and

17 everyone seems to be present.

18          Let me report on one development over the weekend.

19 Ms. Ramsey, one of our jurors, called, notified that she is

20 sick.  We don't know with what.  She is going to get tested

21 today.  We are going to see if we might be in contact with her

22 and ask that, assuming that she doesn't feel too sick, that she

23 get at least a rapid test.  My guess is that she is probably

24 getting a PCR test; and if so, she won't have those results

25 back until probably late in the evening on day two.
```

1          Her symptoms may be consistent with COVID-19, but may

2    be not.  We'll just have to see.  Ms. Grimm is notifying the

3    jurors of the same.  We do have at least one juror who is

4    unvaccinated.  The question then becomes whether or not that

5    unvaccinated juror or any others would have to be quarantined

6    and therefore excused as well.

7          Ms. Ramsey did not develop symptoms yesterday until

8    later in the day, not first thing in the morning.  Just by

9    sheer coincidence, of course, given the fact that we dismissed

10   the jury to talk about exhibits at 11:00, approximately

11   11:00 o'clock, under the CDC's definition of close contact, the

12   jurors did not have close contact with Ms. Ramsey within the

13   time period that she experienced symptoms.  As a result, there

14   is no mandatory quarantining for any unvaccinated jurors.

15         However, I don't know what the reaction of the

16   vaccinated -- or unvaccinated jurors, any of the jurors will

17   have to this news.  Of course, we don't know what the results

18   are yet of the test, but we will give them information about

19   places downtown that they can go get tested if they want.

20   Under CDC guidance a fully vaccinated person who may have had

21   close contact -- once again, they haven't had close contact,

22   but if they wanted to, they could -- the CDC recommends that

23   they get tested within five to seven days, probably timed to

24   the incubation period.

25         So anyway, we are, in any event, whether the test is

1    positive or negative, we are losing Ms. Ramsey.  And I'll

2    suggest a way that the jurors can reorganize themselves within

3    the jury box.  I think we could get Mr. Kahler off his folding

4    chair and be able to sit in a more comfortable seat that he

5    won't have to crane his neck.  So anyway, that's the story.

6    We'll see how it all goes, but that's the development there.

7             Anything that we need to take up before we bring the

8    jury back in?

9             Mr. Beller?

10            MR. BELLER:  Thank you, Your Honor.  For the purposes

11   of creating a clear record, I am hoping the Court might

12   indicate where Ms. Ramsey sits within the jury box.  And also

13   since we do not know which juror is unvaccinated, if the Court

14   can place approximately the distance from the unvaccinated

15   juror to Ms. Ramsey.

16            THE COURT:  Yes.  Ms. Ramsey is -- or was seated in

17   seat number -- it would be seat No. 11 counting from the back

18   row the first seat closest to the bench being seat No. 1.  So

19   she was in the middle row, the second from the end.

20            And what I would -- I will be suggesting to the jury

21   that what they can do is see whether Ms. Bernhardt would feel

22   comfortable -- Ms. Bernhardt is in the first seat, middle row

23   in the left -- move in too.  She still will be maintaining two

24   seats of social distancing, and then that would allow

25   Mr. Kahler to occupy the seat that Ms. Bernhardt was previously

1    seated in or Mr. Kahler could go into that seat, whichever, but

2    if he wants to.  He doesn't have to if he doesn't want to.  He

3    can stay put.

4         Anything we should take up at this time?

5         MR. TUBACH:  Your Honor, we filed a very brief motion

6    yesterday evening regarding any testimony by Mr. Smith about

7    charitable work.

8         THE COURT:  Yeah, let's take that up real quickly.

9    Does the government anticipate any testimony about charitable

10   works?

11        MR. KOENIG:  No.

12        THE COURT:  Okay, not an issue.

13        Let's go ahead and bring the jury back in.

14        (Jury present.)

15        THE COURT:  Good morning, ladies and gentlemen.  I

16   hope you had a good weekend.  So I think that Ms. Grimm

17   notified you about Ms. Ramsey; and so as a result, because she

18   is sick, she is not going to be here.  Once we find out what

19   her test results are, we will let you know.  But Ms. Grimm I

20   think gave you some information about places that you can be

21   tested downtown.  If you want to do that, you certainly can.

22        And Mr. Kahler, are you -- so Mr. Kahler, one thing

23   that you might want to think about doing or the rest of you

24   could do so is we could, for instance, have Mr. Reynolds move

25   over one.  And then either you could take the seat -- still

 1   with social distancing that middle seat, yes, the one that

 2   Mr. Reynolds just pointed to, or you could stay put, whatever

 3   you want to do.  We might be able to readjust a little bit,

 4   give you a more comfortable chair if you choose to do so.

 5           JUROR:  I appreciate it.

 6           THE COURT:  Okay.  Take a look after the break or

 7   think about that.  Okay.  Thank you.  That sounds good.

 8           All right.  Then why don't we proceed today.

 9           Is the government ready to proceed, then?

10           MS. CALL:  Yes, Your Honor.

11           THE COURT:  Go ahead.

12           MS. CALL:  Your Honor, the microphone doesn't appear

13   to be turning on.

14           THE COURT:  Do we have a new battery for that,

15   Ms. Grimm?

16           COURT DEPUTY CLERK:  I replaced it last evening on

17   Friday, but ...

18           MS. CALL:  It appears to be working now.

19           Before the government calls its first witness, it has

20   a number of documents to offer into evidence.

21           THE COURT:  All right.

22           MS. CALL:  First is Government Exhibit 6198.

23           THE COURT:  All right.  And ladies and gentlemen, some

24   of these documents may be ones that I talked to you about on

25   Friday, namely that because we took our break, we were going to

1  be discussing those documents outside of your presence since it

2  would have been outside of your persons anyway with the use of

3  the transceivers.

4      So this was a document -- and let's go -- speaking of

5  transceivers, let's go transceiver real quick.

6      (At the bench:)

7      THE COURT:  So here is the question.  We had talked

8  about this, but I forgot to check with you on the answer.  Do

9  the defendants wish that I indicate whether an objection was

10  overruled as to a given exhibit or should I just go ahead and

11  say admitted, refused?

12      MR. TUBACH:  Michael Tubach, Your Honor, for Mr. Penn.

13  I prefer the Court not indicate we had objected.  Simply

14  indicate that this is a document admitted pursuant to the

15  Court's prior order.

16      MR. POLLACK:  Your Honor, I just -- that's fine.  I

17  just wanted to note 6198, which is the one that the government

18  is starting with, is the one that was admitted with a limiting

19  instruction.  I just wanted to make sure that would be given.

20      THE COURT:  Yes.  Anything that I indicated a limiting

21  instruction would be given for, obviously I will be giving that

22  limiting instruction.  The first exhibit that's been moved is

23  one of them.  Thank you.

24      (In open court:)

25      THE COURT:  Ladies and gentlemen, as to Exhibit 6198,

1    that exhibit is being admitted for a limited purpose only,

2    namely that the jury can consider this particular exhibit to

3    prove the existence of a conspiracy, but not as to whether any

4    defendant was a member of that conspiracy.  It is admitted.

5         MS. CALL:  Your Honor, for purposes of logistics, we

6    are trying to figure out what may work best.  We can scroll

7    through the document slowly so the jurors can read it, but we

8    also do have paper copies to hand up through Ms. Grimm so they

9    can read at their own pace.

10        THE COURT:  We are not going to do paper copies.

11        Because some of these exhibits, ladies and gentlemen,

12   are multi-page ones, and I am going to give you an opportunity

13   to take a look at them, when you finish reading a page, can you

14   look up at me?  Then once I have got all eyes on me, I know we

15   can go to the next page.

16        MS. CALL:  Permission to publish Government

17   Exhibit 6198?

18        THE COURT:  You may.

19        JUROR:  I can't see that.

20        THE COURT:  Too hard to read?  I think what we will do

21   is we will go half and half so those jurors who have a little

22   bit farther view will be able to see that.

23        So can we blow up the first half?

24        MS. CALL:  Yes, Your Honor.  And because it is an

25   e-mail, we will do the bottom half first and then the top half.

1          THE COURT:  Are we ready for the top half?  Okay, now

2     we can display the top half, first page.

3          Is this a one-page document, Ms. Call?

4          MS. CALL:  Yes, Your Honor.

5          THE COURT:  Has everyone had a chance to read that

6     one?

7          Ms. Jorgensen are you good?

8          JUROR:  Yes.

9          THE COURT:  Next, Ms. Call?

10         MS. CALL:  Next is Government Exhibit 3037.

11         Permission to publish?

12         MR. POLLACK:  Your Honor --

13         THE COURT:  Yes.  As Mr. Pollack was about ready to

14    point out, ladies and gentlemen, this document will have a

15    limiting instruction as to the -- everything except for the top

16    e-mail.  The lower part of the document, same limiting

17    instruction.  Namely, the jury can consider this exhibit to

18    prove the existence of a conspiracy, but not as to whether any

19    defendant was a member of that conspiracy.

20         So that applies -- that limiting instruction applies

21    after the very first e-mail down, all right?

22         You may display it.  It has been admitted.

23         Is that the entirety of that exhibit?

24         MS. CALL:  Yes, Your Honor.

25         THE COURT:  Okay.  Next exhibit?

1          *MS. CALL:*  The next exhibit is Government Exhibit 1190

2     and the attachment 1191.

3          *THE COURT:*  And both of those are admitted.

4          *MS. CALL:*  Permission to publish Exhibit 1190?

5          *THE COURT:*  You may.

6          All right.  Next one?

7          *MS. CALL:*  The next is Government's Exhibit 1175.

8          *THE COURT:*  And by previous ruling, that has been

9     admitted.

10         *MS. CALL:*  Permission to publish?

11         *THE COURT:*  You may.

12         Ms. Call, you are displaying which exhibit now?

13         *MS. CALL:*  It should be Government Exhibit 1175.

14         *THE COURT:*  All right.  Next one?

15         *MS. CALL:*  Next exhibit is Government Exhibit 1074.

16         *THE COURT:*  Hold on.  And by prior ruling, that has

17    been admitted and it may be displayed.

18         All right.  Are we good on that one?

19         Next one?

20         *MS. CALL:*  I believe we were showing the lower e-mail,

21    so now we will show the top.

22         *THE COURT:*  Sure.

23         All right.  Next?

24         *MS. CALL:*  The next exhibit is Government

25    Exhibit 1075.

1    THE COURT:  By prior ruling, ladies and gentlemen,

2  that has been admitted.

3         It may be displayed.

4         MS. CALL:  Thank you.

5         THE COURT:  Okay.  Everyone good?  Looks like it.

6         MS. CALL:  If you can go to the top portion of that

7  e-mail.

8         THE COURT:  Top portion, yes.

9         All right.  Are we good on that one?  Okay.

10        Next exhibit?

11        MS. CALL:  The next exhibit is Government

12  Exhibit 1058.

13        THE COURT:  And by prior ruling, ladies and gentlemen,

14  that one has been admitted and may be displayed.

15        MS. CALL:  This, Your Honor, is two pages.  Perhaps

16  could we do the two pages side by side and zoom in on the lower

17  portion first?

18        THE COURT:  Yes.

19        Everyone good on that portion?

20        Okay.  You can display the top part.

21        Everyone good?

22        All right.  Next exhibit?

23        MS. CALL:  Your Honor, the next exhibit is Government

24  Exhibit 1063.  I believe you had reserved ruling on this one.

25        THE COURT:  I will sustain the objection as to that

1    one.  I agree that the information contained on it is not by

2    any type of automatic process, but which is simply information

3    that constitutes hearsay, so I will sustain the objection.

4         *MS. CALL:*  May I be heard briefly?

5         *THE COURT:*  Yes.

6         *MS. CALL:*  I believe that the case *Anello* that we

7    referred Your Honor to was not under 801(d)(2)(E), but stated

8    that contact information is non-hearsay when shown for the

9    purpose of showing the means of contacting another person.  So

10   essentially based on the effect on the listener, the

11   non-hearsay purpose for it here is the phone number contained

12   in that exhibit shows Defendant Penn's knowledge of means of

13   contacting another person.

14        *THE COURT:*  Yeah, I don't think that *Anello* is on

15   point.  And I do find it's distinguishable and will overrule

16   that particular point.

17        *MS. CALL:*  The next exhibit is Government Exhibit

18   1247.

19        *THE COURT:*  By previous ruling, ladies and gentlemen,

20   Exhibit 1247 will be admitted.

21        *MS. CALL:*  Permission to publish?

22        *THE COURT:*  You may.

23        *MS. CALL:*  I believe this one is one e-mail, so we

24   will do top down for this one.

25        *THE COURT:*  That's appropriate.

1        Everyone good on that one, on that portion of it?

2        All right.  We can display a lower portion.

3        Everyone good on that portion?

4        All right.  The next portion can be displayed.

5        Everyone good on that one?

6        *MS. CALL:*  The next exhibit is Government's Exhibit

7    1051.

8        *THE COURT:*  And by previous ruling, ladies and

9    gentlemen, that one has been admitted and may be displayed to

10   the jury.

11       Everyone good now?

12       Okay.  Next portion.  All right.  Then the next

13   portion.

14       People ready?  There is one more part of this at the

15   very beginning of the exhibit.

16       Next exhibit, Ms. Call?

17       *MS. CALL:*  Next is Government's Exhibit 1238.

18       *THE COURT:*  By previous ruling, ladies and gentlemen,

19   this is admissible and may be published.

20       Everyone ready on that one?

21       Okay.  Next exhibit?

22       *MS. CALL:*  Next is Government's Exhibit 1160.

23       *THE COURT:*  Ladies and gentlemen, you have seen this

24   particular exhibit before, but each time you've done so I have

25   provided a limiting instruction that it can be considered for

 1    the truth of the matter.  The government moved that it be

 2    considered for all purposes and I have allowed that.  So now

 3    Exhibit 1160 can be considered by you for the truth of the

 4    matter asserted as well, and that may be displayed.

 5              MS. CALL:  Thank you.

 6              THE COURT:  Are we good on that one?

 7              Okay.  Next exhibit?

 8              MS. CALL:  Next is Government's Exhibit 9672.  It

 9    consists of a toll record and we are just requesting that this

10    be admitted at this time but not published.

11              THE COURT:  All right.  And by previous ruling that is

12    admitted.

13              MS. CALL:  Next is Government's Exhibit 955.

14              THE COURT:  Ladies and gentlemen, this exhibit will be

15    admitted.  However, anything that a person you'll see named

16    Mr. Justice, statements by him are not admissible for the truth

17    of the matter asserted.  Otherwise, the document is admissible

18    and may be shown to the jury.

19              And is there more than that one?

20              MS. CALL:  Yes, Your Honor.  There is a top half.

21              THE COURT:  Is everyone good on this one?

22              All right.  The top portion may be displayed.

23              People good on that portion?

24              Okay.

25              Next exhibit?  Next is Government's Exhibit 953.

1    THE COURT:  Ladies and gentlemen, as to this exhibit,
2  that portion of it that contains statements by an individual
3  named Mr. Slider, his statements are to be considered by you
4  not for the truth of the matter asserted.  Otherwise, the
5  document is admissible.
6    MS. CALL:  Permission to publish?
7    THE COURT:  You may.
8    MS. CALL:  This is a two-page document, so we will
9  start on the second page.
10    THE COURT:  Everyone good on that portion?
11    All right.  Next portion?
12    Everyone good on that portion?  We will wait for just
13  a second.  Everyone good?
14    All right.  Next portion.
15    MS. CALL:  The last portion at the top of the
16  document.
17    THE COURT:  Everyone good on that document?
18    Okay.  Next document?
19    MS. CALL:  Next is Government's Exhibit 940.
20    THE COURT:  By previous ruling, ladies and gentlemen,
21  that document has been admitted and it may be displayed.
22    MS. CALL:  Thank you.
23    THE COURT:  All right.  Everyone good?  Okay.
24    Next document?
25    MS. CALL:  The next and last one, Your Honor, is

1877

Telly Smith - Direct

1  Government Exhibit 901, and I believe you had reserved ruling

2  on this as well.

3          THE COURT:  I still reserve ruling on it.  I haven't

4  had a chance to look over all the material yet.

5          MS. CALL:  We can introduce that later.  Thank you,

6  Your Honor.

7          May I confer for one moment?

8          THE COURT:  Yes.

9          MS. CALL:  The government will now call its next

10 witness, Telly Smith.

11     (**Telly Smith** was sworn.)

12          THE WITNESS:  I do.

13          COURT DEPUTY CLERK:  Please state your name and spell

14 your first and last name for the record.

15          THE WITNESS:  Telly Smith, T-E-L-L-Y, S-M-I-T-H.

16          MR. KOENIG:  Your Honor, if I may pass the witness a

17 binder and the Court a binder through Ms. Grimm?

18          THE COURT:  Yes, you may.

19                    **DIRECT EXAMINATION**

20 BY MR. KOENIG:

21 Q.  Good morning, Mr. Smith.

22 A.  Good morning.

23 Q.  Where do you work?

24 A.  I work for Golden Corral restaurants.

25 Q.  What is Golden Corral?

Telly Smith - Direct

1   *A.* Golder Corral is a 354-unit buffet chain. We are in 40

2   states. We are based in Raleigh, North Carolina.

3   *Q.* Does Golden Corral have a mission statement?

4   *A.* Yes, sir. The mission statement is making pleasurable

5   dining affordable for every guest and every day.

6   *Q.* Does Golden Corral have principles?

7   *A.* Yes. Our principles are primarily --

8           *THE COURT:* Hold on. Go ahead.

9           *MS. PAGE:* Objection, relevance, Your Honor, 402.

10          *MR. TUBACH:* And vague and ambiguous.

11          *THE COURT:* All right. Response on relevance?

12          *MR. KOENIG:* It's very relevant. They are principles

13  that guide how they, you know, buy their products and sell them

14  and --

15          *THE COURT:* I will sustain the objection in part. If

16  you can without identifying the principles ask him how the

17  principles apply to the purchasing issue.

18  *BY MR. KOENIG:*

19  *Q.* Does Golden Corral have principles?

20  *A.* Yes. Our main principles --

21  *Q.* Hold on. And how do they apply to your outlook in terms of

22  procurement and what you sell?

23  *A.* Okay. These principles are variety, value and abundance.

24          *MR. TUBACH:* Objection, Your Honor.

25          *THE COURT:* Overruled.

Telly Smith - Direct

BY MR. KOENIG:

Q.   Could you repeat those principles, please?

A.   Variety, value and abundance.

Q.   What do those mean?

A.   What those mean is we offer our guests a low price for an all-you-can-eat experience.  We allow them to choose from over 150 choices again for one low price, yeah.

Q.   All right.  So how important is price in the food that you're procuring?

A.   From a procurement standpoint, it's extremely important. We have to be competitive in our marketplace.  So we have to offer a low price in conjunction with who our competitors are and we have to have -- because it's an all-you-can-eat environment and there is so much variety involved, we have to make sure that we have the best price possible on our products.

Q.   And how long have you worked at Golden Corral?

A.   31 years in February.

Q.   How old were you when you started?

A.   I was 16 years old.

Q.   What position did you have when you started?

A.   I washed dishes.

Q.   Through the years can you just briefly let the jury know what positions you've had at Golden Corral?

A.   Sure.  I washed dishes and did some cooking and baking through high school, waited tables into college.  And then I

Telly Smith - Direct

1  got into the Golden Corral management program from there and

2  became an assistant manager in a few different restaurants.  I

3  eventually became what's called a partner manager and a general

4  manager in certain locations.

5        And I eventually became a district manager and

6  regional manager and oversaw operations in several midwestern

7  states.  I then moved to North Carolina in around 2008 and

8  oversaw some equipment division purchasing for several years

9  before taking over as the vice-president of purchasing and

10  distribution in 2011.

11  Q.  And is that your current position?

12  A.  Yes, sir.

13  Q.  What are your responsibilities as the vice-president of

14  purchasing and distribution?

15  A.  Our responsibilities, I manage a team who manages every

16  aspect of our supply chain.  We monitor and administer

17  contracts for various different products, proteins, nonfoods,

18  vegetables, seasonings, sauces, so forth.  We also manage

19  services which could be pest control, could be garbage, could

20  be armored car, a number of those things, chemicals,

21  institutional chemicals, things like that.

22  Q.  Okay.  Does part of your job responsibilities include

23  procurement of proteins?

24  A.  Yes.

25  Q.  And what proteins are we talking about?

Telly Smith - Direct

1   *A.*   The main protein would be chicken, then beef, pork,

2   seafood.   That pretty much limits that, those proteins.

3   *Q.*   Let's back up in time to 2014.   Do you have an

4   understanding of what Golden Corral's overall food spend was in

5   2014?

6   *A.*   Overall food spend back then was --

7   *Q.*   Just yes or no.

8   *A.*   Yes.

9   *Q.*   And why do you know -- without telling me the number just

10  yet, why do you know what food spend was in 2014?

11  *A.*   It's very similar from year to year, so it's not -- it

12  doesn't fluctuate tremendously from year to year aside from

13  commodity pressures.

14  *Q.*   Okay.   Is it part of your job to know the amount of money

15  that Golden Corral spends on food?

16  *A.*   Yes, sir.

17  *Q.*   So for 2014 how much was that amount?

18  *A.*   Overall our approximate spend in 2014 was about

19  600 million.

20  *Q.*   And what about 2015?

21  *A.*   2015 was probably similar, maybe a little more.

22  *Q.*   All right.   So now in 2014 and 2015 did Golden Corral buy

23  broiler chicken products?

24  *A.*   We did.

25  *Q.*   What kinds?

Telly Smith - Direct

1    A.   We purchased -- our main product was an eight-piece cut,

2    product that we used for fried chicken and then a few other

3    recipes.  We also purchased a whole bird that was also called a

4    WOG.  That one, that would be a little less volume on that one

5    we also purchased a lot of chicken breasts, chicken tenders and

6    then thigh meat.

7    Q.   You mentioned the term WOG.  What does that mean?

8    A.   Without giblets.

9    Q.   How would you say -- do you have an understanding of the

10   importance of chicken to Golden Corral?

11   A.   Yes.

12   Q.   And what is your basis for that understanding?

13   A.   That understanding is twofold.  By volume, chicken is our

14   No. 1 purchase across all products and all proteins.  The

15   second piece is that by our own research through guest

16   feedback, our guests tell us that fried chicken is their

17   favorite product.

18   Q.   And in 2014 approximately how many pounds of broiler

19   chicken products did Golden Corral purchase?

20   A.   I would say approximately 30 million pounds in total.

21   Q.   And is it a similar number for 2015?

22   A.   Similar, yes, sir.

23   Q.   Has there ever been a time when Golden Corral has -- a

24   particular restaurant, for example, has run out of chicken?

25   A.   Yes.

Telly Smith - Direct

1    Q.  And what happens?  When was that?  I am sorry.

2    A.  I can't think of a specific instance.  I know that there

3    were situations when even I was an operator out in the midwest

4    and there were either a supply issue or there was a service

5    issue where we would run out of chicken.

6    Q.  And what happened when you ran out of chicken?

7    A.  Our guests don't respond well to that.  They get quite

8    upset over that product.

9    Q.  You may have already said this, but just to make sure.  So

10   in 2014 and 2015 what broiler chicken products were the most

11   important to Golden Corral?

12   A.  I believe eight-piece chicken would have been the most

13   important in both years.

14   Q.  And why is that?

15   A.  Because again that is our No. 1 product that our guests

16   enjoy.

17   Q.  Okay.  Are you familiar with the term supplier partner?

18   A.  Yes, sir.

19   Q.  What is your understanding -- do you have an understanding

20   of what that term means?

21   A.  Yeah.  That's a term that we call our partners.  You know,

22   some people call them vendors.  Some people call them

23   suppliers.  We use the term supplier partner.

24   Q.  And what does that generally mean?

25   A.  It generally means that the -- it's a partnership.  The

Telly Smith - Direct

1   relationship has to work well for both sides.  The term

2   supplier means an entity that will procure products for you and

3   provide products to you, but the partner piece means that we're

4   kind of in this together.

5   Q.  So were the companies that you bought chicken from, that

6   Golden Corral bought chicken from, were they considered

7   supplier partners?

8   A.  Yes, sir.

9   Q.  In the process of procuring broiler chicken products, could

10  you describe the importance of competition among the suppliers?

11  A.  It's extremely important.  As I mentioned earlier, getting

12  the lowest price product for our operators and for our guests

13  is key to our business model.  So competition helps us look at

14  the marketplace and find who has the lowest, you know,

15  qualified product for us.

16  Q.  Can you explain to the jury, please, just in general the

17  procurement process in terms of timing and what happens?

18  A.  Sure.  The procurement process for a product line bone-in

19  chicken typically begins in the August time frame.  That's when

20  we have a lot of discussions with prequalifying some of our

21  suppliers, so to speak, having discussions about supply, having

22  discussions about the ability to deliver to our distribution

23  centers.  That process typically starts about every August.

24       And then usually around the end of August, first of

25  September, we will send out an RFP letter, which is request for

Telly Smith - Direct

1    proposal or request for price.  This letter kind of details out

2    for the qualified bidders kind of what we are looking for, how

3    we are looking for it.  It shows our projected volume.  And it

4    kind of indicates what we're looking for in the bid process.

5    Q.  And when you say your projected volume, what time period

6    are you talking about?

7    A.  The next following year, the calendar year.

8    Q.  So this is a year-to-year negotiation?

9    A.  Yes, sir.

10   Q.  Did there come a time in 2014 when you started negotiating

11   for broiler chicken products?

12   A.  Yes.

13   Q.  And what was your -- did you have a role in that?

14   A.  I did.  I had a supervisory role in that in the beginning.

15   I have a team member that typically administered that, started

16   the early conversations, administered the letter and then

17   collected the bid results.

18   Q.  What do you mean by the letter?

19   A.  We put out an RFP letter.  This letter outlines kind of

20   what our objectives are for the year, outlines what we think is

21   going on in the marketplace.  It outlines again what our

22   specifications are, how we plan to buy the product.  And it

23   shows what our demand is when it comes to the amount of volume

24   that we are willing to put out by distribution center.

25   Q.  You mentioned that you were in a supervisory role, right?

Telly Smith - Direct

1    A.  Yes, sir.

2    Q.  And you had an employee who handled the sort of day-to-day

3    beginning; is that right?

4    A.  That's correct.

5    Q.  What's the name of that employee?

6    A.  Her name was Lee Moriggia.

7         THE COURT:  Mr. Smith, could you spell the last name?

8         THE WITNESS:  M-O-R-I-G-G-I-A.

9         THE COURT:  Go ahead.

10        MR. KOENIG:  Thank you, Your Honor.

11   BY MR. KOENIG:

12   Q.  All right.  And so in 2014 you sent out or Ms. Moriggia

13   sent out an RFP letter?

14   A.  That's correct.

15   Q.  Did you have any role in the creation of that letter?

16   A.  Yes.  I authored the letter.

17   Q.  Okay.  Going into the bidding process, had you done any

18   research into the chicken -- broiler chicken industry?

19   A.  Yes.

20   Q.  And what kind of research did you do?

21   A.  We gathered together some third-party information that we

22   have access to that kind of helped us look into, you know, what

23   chicken production looked like for the next year when it came

24   to egg sets or chicks placed, what the projection levels were

25   projected to be, industry-wide information that's pretty much

Telly Smith - Direct

1    available to anybody.  We were able to also gain some

2    information from our current suppliers at the time as to what

3    the environment looked like as far as production.

4         And then we also looked at what grain prices were

5    doing, being it's one of the biggest drivers on the cost of a

6    pound of chicken.  We looked at what, you know, both corn and

7    soy meal were doing at the time to kind of make an assessment

8    of what we felt the year was supposed to look like.

9    Q.  All right.  If we could, the corn and soy meal, can you

10   explain to the jury what that is?

11   A.  Well, both corn and soy meal are both key components in

12   feed.  And feed prices are one of the main drivers in the

13   production of chicken.

14   Q.  All right.  What did your research reveal in terms of feed

15   prices at that time?

16   A.  Both corn and soy meal at the time were at I believe a

17   four-year low going into that season.

18   Q.  Okay.  And did you draw any conclusions therefore as to

19   what the price of chickens was going to be like going forward?

20   A.  Our expectation based on that would have been that our

21   chicken prices for the following year should have been either

22   the same or lower than they were the previous year.

23   Q.  Okay.  If I can ask you to turn to Tab 10 be in the binder

24   in front of you and look at what's been marked as Government

25   Exhibit 413.

Telly Smith - Direct

1      Do you recognize 413?

2   A.   Yes, sir.

3   Q.   What is it?

4   A.   This is the aforementioned RFP letter that went out to all

5   the qualified bidders for the fresh chicken bid for 2015.

6   Q.   And at that time who were the qualified bidders?

7   A.   I don't know all of them, but I know that Tyson would have

8   been involved, Mar-Jac, Pilgrim's Food, I believe George's,

9   Claxton, Koch Foods would have been involved.  There may be

10  some others, but I don't remember.

11  Q.   And is it your understanding that the RFP went out to all

12  those companies?

13  A.   Yes, sir.

14  Q.   It says in the From line -- well, what was the purpose of

15  this letter again?

16  A.   The purpose of this letter was to solicit a proposal from

17  qualified bidders.  It was to formally tell our partners,

18  supplier partners, you know, where our positions were going

19  into the next year.  It was telling them what we knew about

20  what the marketplace, meaning what commodities were doing for

21  the year.  And it was also to inform on what our specifications

22  were, what our volume was going to be, and then also navigate,

23  you know, what the time frame is that we would need to receive

24  bids back.

25      MR. KOENIG:  Your Honor, at this time the government

Telly Smith - Direct

1    would offer Government Exhibit 413 into evidence.

2           THE COURT:  Any objection to the admission of

3    Exhibit 413?

4           Exhibit 413 will be admitted.

5           MR. KOENIG:  Permission to publish?

6           THE COURT:  You may.

7           MR. KOENIG:  All right.  If you could just blow up the

8    top, the header.

9    BY MR. KOENIG:

10   Q.  All right.  Do you see where it says the From line is Lee

11   Moriggia?

12   A.  Yes.

13   Q.  And that is the employee you mentioned previously?

14   A.  Yes.

15   Q.  But even though -- is it your testimony that even though

16   she is in the From line and you are not, you did, in fact,

17   author this letter?

18   A.  Yes.

19   Q.  If I could direct your attention to the first paragraph,

20   the last two sentences starting with the word, "Thanks"?

21   A.  Okay.

22   Q.  Would you mind reading those sentences to the jury?

23   A.  "Thanks to an even better grain harvest again this year,

24   the costs to grow a pound of chicken will be at its lowest cost

25   in many years.  The Poultry industry looks to expand more of

Telly Smith - Direct

1   their output, which makes 2015 a profitable year for all of

2   us."

3   Q.  Let's just break down, what did you mean in the first

4   sentence?  What did you mean by that?

5   A.  I was indicating to them that we know, as well as they

6   should know, that grain costs were very good.  Grain harvest

7   was very good.  The input costs to grow chicken was going to be

8   very good, so there shouldn't be any upward pressure on that

9   product.

10  Q.  Okay.  The next sentence, "The Poultry industry looks to

11  expand more of their output," what did you mean by that?

12  A.  I talked about this earlier.  It was where we had used some

13  industry available information to view what production looked

14  like into the next year, which was larger than the previous

15  year, which indicated to us that there was going to be more

16  than plenty chicken on the market to meet our needs.

17  Q.  And what gave you -- can you just explain with a little

18  more specificity what gave you the impression that output would

19  be expanded?

20  A.  My team and I, we look at third-party information.  We look

21  at commentary from certain sources.  Everything we looked at at

22  that time showed that between egg sets and chicks placed --

23          MR. FAGG:  Objection, Your Honor, hearsay.

24          THE COURT:  Sustained.

25  BY MR. KOENIG:

Telly Smith - Direct

1  Q.  All right.  The final clause there is "which makes 2015 a

2  profitable year for us all."  What does that mean?

3  A.  We are indicating to our partners that again it's a

4  partnership.  It's for both of our benefit.  And we want -- if

5  they're healthy, we care about that, so we want to make sure

6  that both parties come out with a respectable agreement.

7  Q.  And what do you mean by a respectable agreement?

8  A.  Meaning an agreement we can both live with and an agreement

9  where we are happy with the price.

10  Q.  If I can direct your attention now to the fourth paragraph.

11  Do you see that?

12  A.  Yes.

13  Q.  If you could just read those first two sentences to the

14  jury, please.

15  A.  "Your proposal will be for an annual fixed pricing with an

16  annual volume commitment.  Based on your aggressive bid price,

17  you may be awarded volume from one or more MBM centers."

18  Q.  What's an MBM center?

19  A.  At the time MBM stands for Meadowbrook Meat.  That was our

20  distributor.  That was our main line distributor.  They are now

21  called McLane.  They were purchased several years ago, but MBM

22  was our distributor at the time.

23  Q.  Can you explain just briefly the process by which chicken

24  gets from a supplier to a Golden Corral restaurant?

25  A.  Sure.  It's up to the distributor at their discretion to

Telly Smith - Direct

1  place purchase orders with a chicken processor based on its

2  demand.  We ask that they -- we bring those products in in full

3  truckload levels.  And so the distributor places the purchase

4  order.  The product arrives at the distribution center.  The

5  distribution center itself does the last mile distribution to

6  our restaurants.

7  Q.  And MBM was one of those.

8  A.  MBM is the last mile, right.

9  Q.  The second sentence of that paragraph where it says, "Based

10  on your aggressive bid price," can you explain what that means?

11  A.  Yes.  I was indicating that were a supplier to bid

12  aggressively, meaning with a low price, they could be awarded

13  volume from more than one MBM center, so more volume in

14  exchange for a lower price.

15  Q.  I am sorry, I couldn't understand that last part.

16  A.  More volume in exchange for a lower price.

17  Q.  Okay.  And maybe we can just unpack it a little bit more.

18  When you said aggressive, what is that -- what was your -- did

19  you have an expectation with regard to whether bids would be

20  aggressive?

21  A.  Yeah.  I mean, aggressive is a term meaning lower.  That's

22  kind of -- where we are looking at it is that if someone's

23  being very, very aggressive in their price, then they could

24  come in and outbid other qualified bidders.  And so that's kind

25  of what we meant by aggressive bid price.

Telly Smith - Direct

1  Q.  Could you explain how, if at all, competition creates in

2  your view an aggressive bid?

3  A.  Well, absolutely.  Every company has its own cost of doing

4  business and every company has the opportunity to bid their

5  best price to retain the business.  So each company has that

6  opportunity.  They can be aggressive and they can be awarded

7  business.

8  Q.  Okay.  In connection with this RFP, did you ever ask

9  suppliers, chicken suppliers, to contact each other to talk

10  about their bids?

11  A.  No.

12  Q.  Why not?

13  A.  Well, because -- we expect our partners to be confidential

14  with our information.  We do our best to be confidential with

15  their information.  And privacy and confidentiality is

16  paramount to having a competitive bid.

17  Q.  Why is that?

18  A.  Because if one supplier knows what another supplier is

19  bidding, then it's possible that those numbers could not be as

20  aggressive as they normally would have been.

21  Q.  And by aggressive you meant what?

22  A.  Lower in price.

23  Q.  In response to Government Exhibit 413, the RFP, did Golden

24  Corral, in fact, receive bids?

25  A.  Yes.

Telly Smith - Direct

1  Q.  Bids for chicken.

2  A.  Yes.

3  Q.  From which companies?

4  A.  Tyson, Pilgrim's, Mar-Jac, George's, Koch.  I don't

5  remember the others.

6  Q.  Okay.  All those companies you just named, did you at the

7  time consider them to be competitors?

8  A.  Yes.

9  Q.  At any time did you ask any of the companies you just named

10  to coordinate their bid submissions?

11  A.  No.

12  Q.  Why not?

13  A.  Because that would not -- that goes against the process.

14  We were putting out this information to request proposals from

15  each company.

16  Q.  Thank you.  You were expecting -- can you repeat your

17  answer, please?

18        MR. TUBACH:  Objection, asked and answered.

19        THE COURT:  Sustained.

20  BY MR. KOENIG:

21  Q.  Who did you deal with at Mar-Jac?

22  A.  I believe at the time it was Kevin Grindle.

23  Q.  And who is Kevin Grindle?

24  A.  Kevin Grindle would have been a national sales executive.

25  Q.  At Mar-Jac?

Telly Smith - Direct

1  A.  At Mar-Jac.

2  Q.  Did there come a time when you received a bid from Mar-Jac?

3  A.  Yes.

4  Q.  Do you remember approximately when that was?

5  A.  It would have been between the time that we issued the RFP

6  and the time that the date was due, so I don't remember the

7  specific date.

8        MR. KOENIG:  Okay.  Actually, can we pull up 413

9  again?

10       Your Honor, may we publish to the jury again?

11       THE COURT:  Yes.

12       MR. KOENIG:  Can we go down to the final paragraph?

13 BY MR. KOENIG:

14 Q.  Can you read that second sentence, please?

15 A.  "Please submit your completed package using the attached

16 pricing sheet prior to October 1st, 2014."

17 Q.  Is that October 1st, 2014 the deadline you just mentioned?

18 A.  Yes, sir.

19 Q.  And what was the date of the RFP again, do you remember?

20 A.  September 12th.

21 Q.  Okay.  So if you could just explain -- having those

22 bookends, can you explain when you received Mar-Jac's bid?

23 A.  We would have received Mar-Jac's bid before October 1st,

24 likely somewhere around September 30th.

25 Q.  Did you review Mar-Jac's bid?

Telly Smith - Direct

1   A.  Not at first.  Eventually, yes, I did.

2   Q.  And why do you say not at first?

3   A.  Because at first it would have been our commodities buyer's

4   position to do that, Lee Moriggia.  So she would have been the

5   first to take the first look at those and kind of analyze.

6   Q.  And then pass that information to you?

7   A.  And then present that information to me.

8   Q.  What was your reaction when you saw Mar-Jac's bid?

9   A.  I don't specifically remember a reaction to Mar-Jac's bid.

10  I know that most of the bids that year came in, it was a bit of

11  a sticker shock.  I remember seeing really high bids that year

12  from all of them.  I don't remember theirs specifically.

13  Q.  Okay.  Did there come a time -- well, did you receive a bid

14  from Pilgrim's?

15  A.  Yes.

16  Q.  And who did you deal with at Pilgrim's?

17  A.  I believe at the time it was Scott Tucker.

18  Q.  And who is Scott Tucker?

19  A.  Scott Tucker was a national sales executive, national

20  accounts.

21  Q.  At Pilgrim's?

22  A.  At Pilgrim's.

23  Q.  And when did you receive Pilgrim's bid?

24  A.  I don't know the specific date, but it would have been

25  before October 1st, 2014 per the guidelines of the RFP.

Telly Smith - Direct

1    Q.   And again did you review Pilgrim's bid?

2    A.   I would have reviewed Pilgrim's bid after my staff did.

3    Q.   Did you receive a bid from Tyson?

4    A.   Yes.

5    Q.   Same time frame?

6    A.   Yes.

7    Q.   And did you review that bid?

8    A.   Again, after my staff would have.

9    Q.   All right.  Now, let's just, if we can, circle back.

10       The bids you received, what was your general reaction

11   to the bids that you received?

12       MR. FAGG:  Objection, asked and answered.

13       THE COURT:  Overruled.

14   BY MR. KOENIG:

15   Q.   What was your general reaction to the bids that you

16   received?

17   A.   Our general reaction was one of sticker shock.  We were

18   expecting same or lower prices based on all of the market

19   drivers at the time.  And we saw really high prices in the

20   initial bids.

21   Q.   And could you explain the importance of the price of

22   chicken to Golden Corral?

23   A.   Well, yes.  It being our No. 1 item, keeping its price as

24   low as possible and stable is of paramount concern.  You know,

25   our restaurants aren't able to change their prices on the fly.

Telly Smith - Direct

1    They have to keep the prices --

2            *MR. FAGG:*  Your Honor, may we be heard at side bar?

3            *THE COURT:*  Yes.

4        (At the bench:)

5            *THE COURT:*  Go ahead, Mr. Fagg.

6            *MR. FAGG:*  Your Honor, we object to this line of

7    questioning on the ground that this violates the prior ruling

8    of the Court that ultimate consumer prices are not at issue in

9    this case, and this witness continues to testify about issues

10   related to ultimate consumer pricing.

11           *THE COURT:*  Response, Mr. Koenig?

12           *MR. KOENIG:*  He is not talking about anything

13   specific.  He is talking about what motivates them and why they

14   need lower chicken prices.  It's not our intent to go into the

15   prices to consumers going up or down, but it is clearly

16   relevant to state-of-mind negotiations.

17           *THE COURT:*  Well, how much detail is he going to go

18   into?

19           *MR. KOENIG:*  That was about it, actually.

20           *THE COURT:*  All right.  As long as that's it, then I

21   agree with Mr. Fagg that any more would overemphasize a general

22   point that he has already made.

23           All right.  Thank you.

24       (In open court:)

25           *THE COURT:*  Objection is sustained.

Telly Smith - Direct

1   *BY MR. KOENIG:*

2   *Q.*  How many years have you been involved in the chicken

3   procurement process at Golden Corral?

4   *A.*  Approximately, 11.

5   *Q.*  And during that time what was the sort of typical change of

6   chicken prices year to year?

7   *A.*  Due to various factors, our chicken prices would typically

8   change 5 to 7 cents per year, and that's due to grain costs,

9   freight costs, things of that nature.

10  *Q.*  That's 5 to 7 cents per pound?

11  *A.*  Per pound, yes.

12  *Q.*  In 2014 what is your recollection of how much chicken

13  prices changed?

14          *MR. TUBACH:*  Objection, compound.

15          *THE COURT:*  Hold on one second.

16          *MR. TUBACH:*  It's a compound question, Your Honor.  It

17  wasn't all one price.

18          *THE COURT:*  Overruled.  He can answer.

19  *A.*  Could you repeat the question, please?

20  *BY MR. KOENIG:*

21  *Q.*  Yeah.  In 2014 how much did -- approximately how much did

22  chicken prices change for Golden Corral?

23  *A.*  So in the 2014 year for the 2015 year, we typically -- I

24  think we saw 15 cents, 12 to 15 cents for that year.  That's

25  for the 2015 contract year.

Telly Smith - Direct

1   Q.   Okay.  And was it part of your job to explain price changes

2   to the franchisees?

3   A.   Yes.

4   Q.   Did you do that in 2014?

5   A.   Yes.

6   Q.   When was that?

7   A.   Early October 2014 we have a national convention.  All of

8   our franchisees attend.  And it's part of my duties to give a

9   15-minute speech on what's going on in the world of supply

10  chain and commodities.

11  Q.   So early October, was that after you received the bids?

12  A.   Yes.

13  Q.   And after you had reviewed them?

14  A.   Yes.

15  Q.   Could I ask you to turn to Tab 2 in the binder in front of

16  you?  Tab 2 is what has been marked as Government Exhibit 401.

17       Do you recognize 401?

18  A.   I do.

19  Q.   What is it?

20  A.   This is the transcript copy, the teleprompter copy of my

21  speech in 2014.

22  Q.   And in that speech did you address changes to chicken

23  prices?

24  A.   I did.

25           MR. KOENIG:  The government moves to admit 401.

Telly Smith - Direct

1          THE COURT:  Any objection to the admission of

2    Exhibit 401?

3          MR. TUBACH:  No objection, Your Honor.

4          THE COURT:  All right.  Exhibit 401 will be admitted.

5          MR. KOENIG:  Permission to publish?

6          THE COURT:  You may.

7    BY MR. KOENIG:

8    Q.  If I could direct your attention to the final sentence of

9    Page 2 in 401.

10   A.  Okay.

11   Q.  Could you please read that sentence to the jury.

12   A.  "Now let's talk about the commodity landscape for 2015."

13   Q.  And what were you intending to communicate by saying that?

14   A.  I was attempting to talk to our franchisees about what the

15   pricing and the commodities -- our experience may look like for

16   2015.

17   Q.  Now let me direct your attention to the first sentence on

18   Page 3.

19          If you could read that, please.

20   A.  "There is so much corn, the farmers ran out of places to

21   store it."

22   Q.  And what did you mean by that?

23   A.  I was attempting to describe that the harvest was so large,

24   that a lot of the farmers were running out of bin space to

25   store it.  And because of that, it was causing a downward

Telly Smith - Direct

1    pressure in the corn market making the corn prices lower so

2    they would continue to sell it to make space.

3    Q.  Did you have an expectation of what that lowering of corn

4    price would do to the price of chicken?

5    A.  It would either keep it stable or lower the price of

6    chicken.

7    Q.  And why is that?

8    A.  Because corn along with soy meal are one of the two biggest

9    input drivers of producing chicken.

10   Q.  And is that consistent with the message that was delivered

11   in the RFP that you wrote?

12   A.  I'd say yes.

13   Q.  Let me direct your attention to Page 4, the last two

14   paragraphs.  Do you see that?

15   A.  "Although the cost to grow a pound of chicken will be

16   lowest in four years, we don't think the poultry industry will

17   pass those savings on."

18   Q.  And then the next sentence -- or paragraph?

19   A.  "Demand for chicken next year should remain strong, and

20   available supply will be tight.  It is possible that our

21   chicken prices could go higher next year."

22   Q.  All right.  So when you said you don't think the poultry

23   industry will pass those savings on, what did you mean by that?

24   A.  When speaking to this audience, we very rarely gave

25   specifics because agreements weren't finalized.  Contracts

Telly Smith - Direct

1    weren't done.  So we were indicating here that -- we had

2    already done a lot of negotiation.  We had already seen the

3    RFPs.  We knew kind of where prices were going.  And so

4    although we knew and had demonstrated earlier that we thought

5    the environment was great for low cost chicken in the 2015

6    year, we don't think we were going to get it.

7    Q.   And why is that?

8    A.   Because the chicken industry wasn't going to let -- was

9    going to keep prices higher.

10   Q.   What gave you that impression?

11   A.   Based on the negotiations and the bids that we received

12   previously.

13   Q.   Did you attempt to negotiate prices -- you can take that

14   down.

15        Did you attempt to negotiate prices downwards with the

16   suppliers?

17   A.   Yes.

18   Q.   Which ones in particular?

19   A.   All of them, Pilgrim's, Tyson, Mar-Jac, the rest, yes.

20   Q.   And how did you go about doing that?

21   A.   We spent time talking about the markets.  We spend time

22   trying to understand --

23        MR. TUBACH:  Object, Your Honor, to the term "we,"

24   lack of foundation.

25        THE COURT:  Well, I'll sustain the objection.  If you

Telly Smith - Direct

1    can clarify who you mean by we.

2    *BY MR. KOENIG:*

3    *Q.*  What did you mean by we?

4    *A.*  We is myself and my team, meaning Lee Moriggia.

5    *Q.*  So what did you and Lee Moriggia do?

6    *A.*  We began talking --

7         *MR. TUBACH:*  Objection, lack of foundation to the

8    extent he is talking about what other people did.

9         *THE COURT:*  Overruled.

10   *BY MR. KOENIG:*

11   *Q.*  Go ahead.

12   *A.*  We spent time discussing the situation with our supply

13   partners, trying to understand where they were coming from,

14   trying to understand where the higher prices were coming from

15   in a really good environment.  And then we began attempting to

16   lower the price across all suppliers by just discussing what --

17   you know, freight rates and better ways to get the pricing down

18   in each distribution center.

19   *Q.*  All right.  Let's talk about your negotiations with

20   Pilgrim's.  Did you have those types of discussions with

21   Pilgrim's?

22   *A.*  Yes.

23   *Q.*  With who?

24   *A.*  Mainly Scott Tucker.

25   *Q.*  Okay.  And did you have an opportunity to observe his

Telly Smith - Direct

1  reaction to what you were saying?

2  *A.*  I did.

3  *Q.*  And what was it?

4  *A.*  Scott -- Scott -- they held firm on a lot of their prices

5  for that year.  In fact, I recall a time when the negotiations

6  were slow and they were kind of bottle-necked.  And I recall a

7  time when I am pretty sure it was Scott that called me standing

8  in my driveway while I was at home after work and basically

9  gave me an hour to accept their price or they were going to

10  sell the birds elsewhere.

11  *Q.*  Okay.  And based on your years of negotiating with chicken

12  suppliers, was that unusual?

13  *A.*  It is unusual.  It felt a lot more adversarial and more

14  tense than it had in the past.

15  *Q.*  And did Mr. Tucker give you any sort of explanation as to

16  why chicken prices were going up?

17  *A.*  Their explanation, and not necessarily in that phone call,

18  but in previous discussions was that --

19          *MR. FAGG:*  Objection, Your Honor, hearsay.

20          *THE COURT:*  Overruled.

21  *A.*  -- was that in previous discussions they were telling us

22  that there was going to be a constriction in supply on small

23  birds going into the next year, which is not a factor that we

24  could see at all from our perspective.  They felt that they had

25  buyers for the birds.  Therefore, their, I guess, ultimatum to

Telly Smith - Direct

1  me was you've got an hour to purchase these birds or we are

2  going to sell them to someone else, which we declined to do at

3  that time.

4  *BY MR. KOENIG:*

5  *Q.*  And how did -- what was your reaction to the explanation

6  that Mr. Tucker gave you?

7  *A.*  Our reaction to the explanation was we didn't see at the

8  time -- I mean, we knew that there was going to be some

9  additional demand in the chicken world in the next year because

10 of competing proteins.  We had just come off of a year that had

11 high beef prices and high pork prices, so that's going to put a

12 lot of pressure on chicken, but not necessarily bone-in

13 chicken.

14 *Q.*  Why not?

15 *A.*  Boneless chicken is typically where that pressure goes at

16 the grocery store.

17 *Q.*  Can you explain why --

18 *A.*  Yeah, our perspective on that is a grocery store shopper is

19 not going to --

20        *MR. FAGG:*  Objection, Your Honor, calls for

21 speculation.

22        *MR. TUBACH:*  And lacks foundation.

23        *THE COURT:*  Overruled.

24 *A.*  Our experience in that matter is that a typical grocery

25 store shopper does not turn down a sirloin steak or a filet to

Telly Smith - Direct

1    buy drumstick chicken.  So that particular segment which is

2    only used in the restaurant industry in the chicken house --

3    the chicken chains and the buffet chains primarily, not

4    speaking about retail, we didn't see --

5         MR. TUBACH:  Objection.  This is getting into expert

6    testimony of some kind.  He is no expert on grocery shopping

7    whatsoever.

8         THE COURT:  If you can lay additional foundation.

9    Sustained.

10   BY MR. KOENIG:

11   Q.  Okay.  We'll move on.

12   A.  Okay.

13   Q.  So you got that explanation from Mr. Tucker, correct?

14   A.  Yes.

15   Q.  Did you get a similar explanation from any other suppliers?

16   A.  We would have got a similar explanation from all of the

17   suppliers.  We heard the bird supply reduction almost

18   universally.

19   Q.  All right.  And how would you describe generally the

20   atmosphere, the negotiations that year among yourself and

21   suppliers?

22   A.  It was more tense and adversarial than I remember in the

23   past.  It had a feeling of take-it-or-leave-it to it, I don't

24   know how you describe that, but it was just generally a tense

25   environment all the way around.

Telly Smith - Direct

1   Q.  Did it cause you any fear that you wouldn't be able to buy
2   the chicken you wanted?
3   A.  Yes.
4   Q.  Why?
5   A.  In supply chain, rule No. 1 is don't run out.  So there was
6   always a fear that you didn't have available product for your
7   restaurants to operate with.  So I recall during that year in
8   particular that supply was not a constant, that there was an
9   issue where we could possibly not have supply.
10  Q.  Was that unusual?
11  A.  It was unusual.
12  Q.  So can you describe what other years are typically like?
13  A.  Other years are typically, you know, more cordial, I guess.
14  And it's about two parties coming to the table to try to come
15  up with the best number based on the market factors that are
16  out there.  That's about the best I can describe it.
17  Q.  You mentioned a phone call that you had with Mr. Tucker in
18  your driveway?
19  A.  Yes.
20  Q.  How many phone calls did you receive in the fall of 2014?
21  A.  I couldn't tell you, fifty a day maybe.
22  Q.  And do you remember all of those phone calls?
23  A.  No.
24  Q.  So why is it you remember this particular phone call?
25  A.  Because mainly of its content.  I remember a feeling of I

Telly Smith - Direct

1  can't believe what I'm hearing as I am standing in my driveway,

2  you know, being given this ultimatum, so that sticks out in my

3  mind.

4  Q.  Did you do anything to go to other suppliers to try to find

5  other sources of chicken for 2015?

6  A.  Yes.

7  Q.  What did you do?

8  A.  My team and I, which would have been Lee Morrigia,

9  contacted other vendors, other supplier partners, who had not

10 been close on the original bids and started talking to them.

11 We also began contacting any other chicken partners in the

12 space to see if they would be interested in supplying chicken

13 to Golden Corral.

14 Q.  And what was the result of that?

15 A.  The result was we could not find another qualified bidder,

16 and we ended up staying with Pilgrim's, Mar-Jac and Tyson for

17 the year.

18        THE COURT:  Could you look for a convenient breaking

19 spot, Mr. Koenig?

20        MR. KOENIG:  This is fine.

21        THE COURT:  Ladies and gentlemen, let's go ahead and

22 take our mid-morning break at this time.  Why don't we plan on

23 reconvening 25 minutes of 11:00.  Keep the admonitions in mind.

24 The jury is excused.

25             (Jury excused.)

Telly Smith - Direct

1          We will be in recess.  Thank you.

2      (Recess at 10:17 a.m.)

3      (Reconvened at 10:37 a.m.)

4          THE COURT:  Let's go ahead and bring the jury in and

5   we'll get our witness back.

6          (Jury present.)

7          THE COURT:  Go ahead, Mr. Koenig.

8   BY MR. KOENIG:

9   Q.  All right.  Mr. Smith, did there come a time during the end

10  of 2014 after you had negotiated your pricing for 2015 that you

11  created a spreadsheet?

12  A.  Yes.

13  Q.  Can I ask you to turn to Tab 23 and look at what has been

14  marked for identification as Government Exhibit 480?

15          Do you recognize Government Exhibit 480?

16  A.  Yes.

17  Q.  Is that the spreadsheet you mentioned?

18  A.  Yes.

19  Q.  When did you create this spreadsheet?

20  A.  This spreadsheet would likely have been created after the

21  negotiations were finalized, after the contracts were signed,

22  after all the bidding was completed.  This is an internal

23  document that we use --

24  Q.  Okay.  I will cut you off there.  We will get into that.

25  A.  All right.

Telly Smith - Direct

1   *Q.* And you created it before the 2015 prices went into effect;

2   is that correct?

3   *A.* That's correct.

4   *Q.* Is this the type of spreadsheet that you create as part of

5   a regular business activity?

6   *A.* Yes.

7   *Q.* And the information that's on it, do you have firsthand

8   knowledge of the information that's in there?

9   *A.* Yes.

10  *Q.* And you created it in the ordinary course of business?

11  *A.* Yes.

12  *Q.* It is a regularly conducted activity?

13  *A.* Yes.

14  *Q.* Have you created a spreadsheet like this in other years?

15  *A.* Yes.

16  *Q.* Do you rely on it?

17  *A.* I would say yes.

18       *MR. KOENIG:* Your Honor, at this time the government

19  moves to admit Government Exhibit 480.

20       *THE COURT:* Any objection to the admission of 480?

21       Exhibit 480 will be admitted.

22       *MR. KOENIG:* Permission to publish?

23       *THE COURT:* You may.

24  *BY MR. KOENIG:*

25  *Q.* Let me direct your attention to Page 1.

Telly Smith - Direct

1        Ms. Pearce, if you could just -- okay, great.

2        Mr. Smith, could you explain at a high level what this
3   spreadsheet is?

4   A.   At a high level this spreadsheet was a way for me to
5   demonstrate internally to our internal stakeholders and senior
6   management what the results were of the 2014 bid for 2015.
7   This spreadsheet lays out all the volume assumptions.  It lays
8   out all the distribution centers.  It lays out all the awarded
9   suppliers in each of those distribution centers, the prices per
10   distribution center.  And then it also outlines our total spend
11   for the year and what our spend for the year increased or how
12   that increased versus the previous year.

13   Q.   And correct me if I'm wrong, but because you created this
14   in 2014, this is a projection?

15   A.   That is correct.

16   Q.   And what did you base the -- for example, do you see the
17   column that says Projected 8pc LBS?

18   A.   Yes.

19   Q.   What did you base that projection on?

20   A.   We based that projection on our forecast for the next year.

21   Q.   How do you come up with a forecast?

22   A.   We use historicals, the previous years, how many pounds of
23   chicken we use per restaurant, on average how many units counts
24   we were going to have in the next year, where those units were
25   going to be located.  So we always do a forecast of this nature

Telly Smith - Direct

1   to help understand where our pounds are going to be used

2   throughout the system.

3   Q.  How much total eight-piece volume did you project Golden

4   Corral buying in 2015?

5   A.  15.1 million pounds.

6   Q.  Can you remind the jury again what a WOG is?

7   A.  A WOG is a whole chicken.  It is typically used like a

8   rotisserie chicken or a whole bird.  WOG stands for without

9   giblets.

10  Q.  And how much did you project poundage you would buy in

11  WOGs?

12  A.  8.8 million pounds.

13  Q.  And the next column there in that first top left chart, it

14  says Leg Qtrs Volume Assumptions.  Can you explain to the jury,

15  please -- do you see that where it says that?

16  A.  Uh-huh.

17  Q.  Can you explain to the jury what a leg quarter is?

18  A.  A leg quarter is the dark meat side of the bird.  So

19  instead of eight-piece includes the breast and the wing, the

20  leg quarters only includes the dark meat, which is the thigh

21  and the legs.  And that product is used to supplement

22  eight-piece usage.  It's also used for various other recipes.

23  Q.  And what was your projection for the number of pounds

24  Golden Corral would buy of leg quarters in 2015?

25  A.  6.9 million.

Telly Smith - Direct

1    Q.  All right.  Now, can I direct your attention to the larger

2    chart right underneath there?  Do you see that?

3    A.  Yes.

4    Q.  Could you just explain what the first column means, Center?

5    A.  Center meaning distribution center.  And what's listed

6    there is the state that the distribution center is located in.

7    So North Carolina means Rocky Mount, North Carolina.  Oklahoma

8    means Oklahoma City.  Georgia means Cordele, Georgia.  Ohio

9    means Columbus, Ohio.  Florida means Lakeland, Florida.  And

10   Colorado means Denver.

11   Q.  Did those -- any of those centers distribute chicken to

12   Golden Corral restaurants outside of the state they are located

13   in?

14   A.  Yes.

15   Q.  So in order to get from a distribution center to a Golden

16   Corral restaurant, it was sometimes necessary to ship across

17   state lines?

18   A.  Yes.

19   Q.  All right.  And then what's represented in the next column?

20   It doesn't have a title.

21   A.  The next column is where we put in the awarded supplier,

22   the supplier partner who won the bid based on the negotiations.

23   Q.  And what do you mean by won the bid?

24   A.  Meaning they came in at the best possible price for that

25   distribution center including freight.

Telly Smith - Direct

1   Q.  What do you mean by best possible price?

2   A.  The best price that we were possibly able to get from them.

3   Q.  All right.  And then let's go over to the column that says

4   Projected 8pc LBS.  Do you see that?

5   A.  Yes.

6   Q.  What is represented by the numbers in those columns?

7   A.  That is projected the number of pounds each distribution

8   center that I've lined out in the first column will use, and

9   that's how many pounds would have been awarded to the supplier

10  partner.

11  Q.  All right.  And the same explanation for the Projected WOG

12  LBS and LQ LBS?

13  A.  That's correct.

14  Q.  What does LQ stand for?

15  A.  Leg quarters.

16  Q.  Let's go to the next column, Delivered Cost - 8pc/WOG.  Do

17  you see that?

18  A.  Yes.

19  Q.  What do those numbers represent?

20  A.  Those numbers represent the finalized prices that we --

21  from our contracts with the supplier partners.

22  Q.  Okay.  So that's the price per pound for eight-piece and

23  WOG.

24  A.  Yes, sir.

25  Q.  Can I direct your attention to the fourth row down?  It

Telly Smith - Direct

1   says .98.  Do you see that?

2   A.   Yes.

3   Q.   And why does it say .98 there?

4   A.   There is an asterisk at the bottom of the document.  We

5   were testing a new product piece mix from Tyson that had fewer

6   wings and breasts in the bag and it had more thighs and drums.

7   And so because of the higher number or higher amount of lower

8   value dark meat in the box, they could lower the price to 98

9   cents a pound.  This was a test.

10  Q.   So was that unique to the Ohio distribution center?

11  A.   That was unique to the Ohio distribution center.

12  Q.   So comparing the .98 in that row to the other prices in

13  that row, is that like an apples-to-apples comparison?

14  A.   No, it is not.  They are two different products.

15  Q.   And then the next column I want to direct your attention to

16  is the one the third to the last that says +/-PY.  Do you see

17  that?

18  A.   Yes.

19  Q.   What does that represent?

20  A.   That's plus or minus prior year.  That is the price

21  difference between what we were projecting to pay for the next

22  following year, 2015, based on the contract versus what we paid

23  in 2014 based on actuals.

24  Q.   Okay.  If you could for the first three -- well, for all of

25  them except for Ohio, which you said was not an

Telly Smith - Direct

 1    apples-to-apples, could you just read those price increases?

 2    A.  17 cents, 13 cents, 16 cents, 15 cents, 10 cents.

 3    Q.  All right.  And I should have asked you to do this before.

 4    So 17 cents, what supplier is that associated with?

 5    A.  That's associated with Pilgrim's.

 6    Q.  And 13 cents?

 7    A.  Tyson Foods.

 8    Q.  16 cents?

 9    A.  Mar-Jac.

10    Q.  Skipping the next one and going to 15 cents?

11    A.  Mar-Jac.

12    Q.  And 10 cents in the last one.

13    A.  Tyson.

14    Q.  And what did you testify before the typical price increase

15    year to year was or change?

16    A.  A typical change would be 5 to 7 cents per pound.

17    Q.  Okay.  So if this were a chart from a typical year, it

18    would show somewhere possibly in the 5 to 7-cent range.

19    A.  Yes, sir.

20    Q.  All right.  Let me draw your attention to the top right set

21    of boxes.  Do you see those?

22    A.  Yes.

23    Q.  Could you explain to the jury what is represented there?

24    A.  The box on the left represents total projected spend for

25    2015, which is $30.6 million.  Then the box on the right is the

Telly Smith - Direct

1  total increase in chicken product pricing for that year which

2  is $4,100,000.

3  Q.  Is $4,100,000 a significant amount of money to Golden

4  Corral?

5  A.  Yes.

6  Q.  And if we go to the second column again in the lower bigger

7  chart, all the companies listed there, did you view them as

8  competitors?

9  A.  Yes.

10  Q.  At any time did you ask those companies to coordinate their

11  bids or prices?

12  A.  No.

13  Q.  Did you ever suspect -- well, why not?

14  A.  We would not have asked them.  This is a competitive

15  bidding situation, so we would not have asked them to

16  coordinate or to communicate with each other on those bids.

17  Q.  And did you ever suspect that that was happening?

18       MR. TUBACH:  Objection, Your Honor.

19  A.  No.

20       THE COURT:  I am sorry, what?  What was the objection?

21       MR. TUBACH:  The objection is this is exactly the

22  testimony the Court prior ruled inadmissible under a prior

23  witness.

24       If I could be heard on side bar perhaps.

25       THE COURT:  Sure.

Telly Smith - Direct

1          (At the bench:)

2               THE COURT:  Mr. Tubach, go ahead.

3               MR. TUBACH:  Your Honor, you previously sustained a

4     line of questioning just like this one with respect to the

5     witness Mr. Olson getting into his suspicions about potential

6     collusion or something.  There is no basis for this.  It's pure

7     speculation on the witness' part.  He has no firsthand

8     knowledge.

9               THE COURT:  Mr. Koenig, what answer do you anticipate

10    the witness giving?

11              MR. KOENIG:  No.

12              THE COURT:  Okay.  Are you going to go into that any

13    further?

14              MR. KOENIG:  I had planned to ask him why he didn't

15    suspect it.

16              THE COURT:  What answer do you anticipate he would

17    give to that question?  Mr. Koenig, I think it's a good idea

18    always to move away.

19              MR. KOENIG:  Yes.  You told me that before and I

20    apologize.

21              THE COURT:  And keep your voice relatively low.  These

22    microphones really pick up very low voices.

23              MR. KOENIG:  Okay.  He would say I believe that he

24    thought it was wrong.

25              THE COURT:  Thought what was wrong?

Telly Smith - Direct

1           MR. KOENIG:  That his supplier partners would be

2    coordinating on price.

3           THE COURT:  But he doesn't have any knowledge of that.

4           MR. KOENIG:  Well, I think that he -- this is what his

5    state of mind was is that he, you know, never anticipated that

6    this type of thing would happen because they were partners and

7    they wouldn't do something that could wrong them.

8           THE COURT:  Okay.  You can answer him whether he ever

9    suspected, but assuming that he answers that question no, then

10   I will cut it off at that point because otherwise it just would

11   be pure speculation.  And he has already testified about why he

12   thought that a competitive bidding system was important to his

13   company, all right?

14          MR. KOENIG:  Very well.

15          THE COURT:  Anything else, Mr. Tubach?

16          MR. TUBACH:  No, Your Honor.

17          THE COURT:  All right.  Mr. Fagg, go ahead.  Maybe it

18   wasn't Mr. Fagg.  Someone made a comment.

19          MS. PREWITT:  Your Honor, Ms. Prewitt for

20   Ms. Mulrenin.  I think this really is going to speculation.

21   And I, you know, I don't think that this witness actually has a

22   factual basis to have any belief that there was a sharing of

23   prices, an alignment of bids.  So I would like them to lay some

24   proffer about what the factual basis is that this witness will

25   offer before he is allowed to speculate.

Telly Smith - Direct

1      THE COURT:  Well, the anticipated answer to whether he

2  ever suspected is no.  Was there a 302 on this witness?

3      MR. KOENIG:  Yeah.  There has been a couple.

4      THE COURT:  And his answers indicate a lack of

5  suspicion?

6      MR. KOENIG:  Yes.

7      THE COURT:  I disagree with Ms. Prewitt on this point.

8  A person involved in price negotiations with all the various

9  suppliers certainly would have a basis to believe through the

10  negotiations or at least to suspect whether there has been some

11  type of price collusion, so he can answer the question.  But

12  assuming he says no, it will end at that point.

13      (In open court:)

14      THE COURT:  Objection is overruled.

15  BY MR. KOENIG:

16  Q.  Mr. Smith, did you ever suspect the competitors that you've

17  listed here in the first column, did you ever suspect that they

18  were coordinating prices?

19  A.  I did not.

20  Q.  Excuse me?

21  A.  I did not.

22      MR. KOENIG:  Thank you.

23      May I have a moment?

24      THE COURT:  Yes.

25      MR. KOENIG:  No further questions.

Telly Smith - Cross

1      *THE COURT:*  All right.  Thank you.

2             Cross-examination, Mr. Tubach?

3                      **CROSS-EXAMINATION**

4    *BY MR. TUBACH:*

5    *Q.*  Good morning, Mr. Smith.

6    *A.*  Good morning .

7    *Q.*  My name is Michael Tubach.  I represent Jayson Penn.

8             One thing out of the way.  You have never met Jayson

9    Penn, correct?

10   *A.*  I don't believe so, no.

11   *Q.*  You've never spoke with him?

12   *A.*  I don't believe so.

13   *Q.*  Now, you testified earlier that in 2015 you received bids

14   from multiple suppliers, correct?

15   *A.*  Yes.

16   *Q.*  And your expectation you testified was that before you got

17   those bids which arrived sometime around September 30th,

18   correct?

19   *A.*  In 2014?

20   *Q.*  2014, yes.

21   *A.*  Yes.

22   *Q.*  That sometime before -- until those bids arrived, you

23   expected prices to go down; is that right?

24   *A.*  I expected prices to be the same or lower.

25   *Q.*  Same or lower.  Now, you testified you looked at some data

Telly Smith - Cross

1   to try to help you understand that, right?

2   A.   Yes.

3   Q.   And you testified you looked at egg sets, right?

4   A.   Uh-huh.

5   Q.   Tell us how far out in the future --

6          MR. KOENIG:   Objection.   I believe they objected when

7   he got into egg sets, so he did not actually testify on egg

8   sets.

9          THE COURT:   He mentioned egg sets.   Overruled.

10  BY MR. TUBACH:

11  Q.   Tell us how long it is that when looking at egg sets you

12  can predict what the supply of the chicken can be.   How far out

13  does that tell you?

14  A.   Without looking at the specific data, it would be hard.   I

15  would have to study it.   But many times it's six months out to

16  nine months.

17  Q.   Egg sets are six to nine months out?   Is that your

18  testimony, sir?

19  A.   Uh-huh.

20  Q.   How long does an egg take to hatch?

21  A.   I don't recall.

22  Q.   21 days, isn't it?

23  A.   Uh-huh.

24  Q.   21 days; is that correct?

25  A.   I guess, yes.

1924

Telly Smith - Cross

1    Q.  Well, don't guess, sir.  Do you know?  Is it 21 days or

2    not?

3    A.  I don't know it's 21.

4    Q.  So you have no idea.  Is that your testimony?  You have no

5    idea?

6    A.  I don't know.

7    Q.  Do you think it's roughly 21 days?

8    A.  I would say that's probably accurate.

9    Q.  How long does it take for a chick once it's hatched to be

10   ready for slaughter as a small bird?

11   A.  I am sorry, I would have to study that again.  I don't have

12   that fresh in mind.

13   Q.  It's about four weeks, though, isn't it?

14   A.  Again, I would have to study it.

15   Q.  As you sit here today, you have no idea?

16   A.  I don't recall.

17   Q.  So then what's your basis for saying it was six to nine

18   months?

19   A.  That would have been the span of the data that we were able

20   to look at at the time of what that was going to kind of

21   encompass in the chicken market.

22   Q.  I am asking specifically about egg sets, sir.

23   A.  I can't remember from that time.

24   Q.  So you have no idea how long it takes an egg to get to a

25   slaughtered chicken; is that right?

1925

Telly Smith - Cross

1  A.  I don't recall.

2  Q.  Does it sound right that it's about seven weeks?

3          MR. KOENIG:  Objection, foundation.

4  BY MR. TUBACH:

5  Q.  Three weeks for the egg to hatch, four weeks for the

6  chicken to grow?

7          THE COURT:  Sustained.

8  BY MR. TUBACH:

9  Q.  Do you have any doubt that it's seven weeks, sir?

10  A.  I don't have any reason to doubt that.

11  Q.  If you are looking at egg sets before you send out your bid

12  proposal in September of 2014, that's not even going to get you

13  into 2015, is it?

14  A.  I think what we were looking at at the time, and again I

15  would have to go back and refresh, we were looking at more

16  forward data that kind of -- maybe not egg sets that were going

17  today, but in the future, planned egg sets.

18  Q.  Planned egg sets.  So your testimony on direct is that you

19  look at egg sets, right?

20          MR. KOENIG:  Your Honor, objection.  That wasn't his

21  testimony.

22          THE COURT:  He can answer if he understands the

23  question.  Overruled.

24  BY MR. TUBACH:

25  Q.  Your testimony was about egg sets, right?

1926

Telly Smith - Cross

1   A.  I did mention egg sets.

2   Q.  And did you look at all at hatchability?  Do you know what

3   hatchability is, sir?

4   A.  I would have to refresh my information on that.  It's been

5   a while.

6   Q.  As you sit here today, do you have any information that you

7   can give us about what hatchability is?

8   A.  Not at the moment.

9   Q.  Do you have any information you can give us about breeder

10  stock and how long it takes for breeders to turn into chickens

11  that eventually can be slaughtered and processed?

12  A.  Not at this time.

13  Q.  Okay.  Are you an economist?

14  A.  I am sorry?

15  Q.  Are you an economist?

16  A.  No, I'm not.

17  Q.  Have you studied any economics in high school?

18  A.  Formally I have studied economics, yes.

19  Q.  You formally studied economics?

20  A.  Yeah, I had economics classes in college, yes.  And I study

21  a lot of information about the marketplace, read a lot of

22  third-party information.

23  Q.  Were you an economics major in college?

24  A.  I was not.

25  Q.  What was your major in college?

Telly Smith - Cross

 1   *A.*  Business administration.

 2   *Q.*  Okay.  Now, you testified that in -- also I believe you

 3   told the FBI in an interview that you relied on economists to

 4   help you understand the market.

 5           *MR. KOENIG:*  Objection, foundation.

 6   *BY MR. TUBACH:*

 7   *Q.*  Do you recall that?

 8           *THE COURT:*  Overruled.  He can answer.

 9   *A.*  I don't recall using the word economists.

10           *MR. TUBACH:*  Why don't we get out Exhibit I-148.

11   Sorry, I-120, apologies.

12           Permission to approach the witness?

13           *THE COURT:*  Yes, you may.

14   *BY MR. TUBACH:*

15   *Q.*  Do you have I-120 in front of you, sir?

16   *A.*  Yes, I do.

17   *Q.*  Okay.  This is a summary of an interview you had on

18   June 4th, 2020 with the Department of Justice.  And do you

19   recall that interview?

20   *A.*  I recall an interview, yes.

21   *Q.*  And do you recall being asked -- do you recall giving the

22   following testimony?

23           *MR. KOENIG:*  Objection.  A, it's not testimony.  B,

24   it's a summary.  And C, it is not in evidence and he is about

25   to read off the document.

Telly Smith - Cross

1    THE COURT:  Sustained.

2    BY MR. TUBACH:

3    Q.  Sir, do you recall giving testimony --

4         MR. KOENIG:  Objection.

5         MR. TUBACH:  Let me strike that and start over.  I am

6    using the word testimony.

7    BY MR. TUBACH:

8    Q.  Do you recall speaking to the FBI and the Department of

9    Justice on or about June 4, 2020?

10   A.  I recall that, yes.

11   Q.  And do you recall telling them that the data you used was

12   Urner-Barry, ArrowStream, National Restaurant Association and

13   economists for chicken, beef and pork?  Look on the third

14   paragraph of Page 1, the bottom of the third paragraph.

15        MR. KOENIG:  Objection.  This is just improper

16   refreshment.

17        MR. TUBACH:  I am not refreshing.  I am impeaching

18   him, Your Honor.

19        MR. KOENIG:  He said he didn't remember.

20        THE COURT:  I am going to sustain the objection.  If

21   you could have him -- if you could go through a refreshment

22   process.

23   BY MR. TUBACH:

24   Q.  Sir, do you recall telling the FBI that you used economists

25   as part of your third-party market price verification?

Telly Smith - Cross

1    A.   I don't recall that, no.

2    Q.   Now, could you please read the last sentence of the third

3    paragraph of I-120?

4    A.   It says --

5              MR. KOENIG:  Objection.

6              THE COURT:  Mr. Smith, just to yourself.

7              THE WITNESS:  Oh, okay.  Okay.

8    BY MR. TUBACH:

9    Q.   You have read it?

10   A.   I have.

11   Q.   And, in fact, you did tell the FBI on June 4th that you

12   used economists, didn't you?

13   A.   I have not seen this document, so it doesn't refresh my

14   memory.

15   Q.   So you think the FBI got this wrong?

16             MR. KOENIG:  Objection.

17             THE COURT:  Overruled.

18   A.   I -- I don't know.  I don't know.

19   BY MR. TUBACH:

20   Q.   You testified that your chicken was No. 1 at Golden Corral,

21   something like that, right?

22   A.   Yes, sir.

23   Q.   Your total food purchases at Golden Corral in 2014 were

24   roughly 600 million, correct?

25   A.   Correct.

Telly Smith - Cross

1   Q.   And your total chicken purchases were just under

2   30 million, correct?

3   A.   Correct.

4   Q.   About 26 million?

5   A.   Yeah, 26 to 30.

6   Q.   So if I am doing my math right, that means your chicken

7   purchases were less than 5 percent of your total food purchases

8   for 2014; is that right?

9   A.   Sounds about right.

10  Q.   So 95 percent of the food that you were buying wasn't

11  chicken at all.

12  A.   95 -- that sounds right.

13  Q.   Do you consider yourself an expert in chicken, sir?

14  A.   I would not consider myself an expert in chicken.

15  Q.   Now, you testified that when you received the bids on

16  September 30th, on or about September 30 of 2014, these are the

17  bids for 2015 pricing, that they gave you -- I believe your

18  words were sticker shock; is that right?

19  A.   That is correct.

20  Q.   And you had assumed based on your testimony that because

21  corn prices were going down, that means chicken prices were

22  going to go down, right?

23  A.   Our assumptions were the chicken prices would stay the same

24  or go lower.

25  Q.   Now, when you spoke to the franchisees in October of 2014

Telly Smith - Cross

1  just a month later, less than a month later, right?

2  A.  Uh-huh.

3  Q.  And that's what's been admitted into evidence, Government

4  Exhibit 401, right?  Could you turn to that, please?  I believe

5  that's in your binder, sir, the binder the government gave you.

6  A.  Which section, please?

7       MR. KOENIG:  Tab 2.

8  BY MR. TUBACH:

9  Q.  Tab 2, Exhibit 401.

10  A.  Okay.

11  Q.  You were asked a couple questions about that by the DOJ.

12  I would like to focus on some other statements you made here.

13  Look at the first page, if you would.

14       About halfway down you say, "With grain and feed

15  prices so favorable going into the year, stable protein costs

16  should have been a given.  That didn't happen," right?

17  A.  Correct.

18       MR. TUBACH:  If we could publish this to the jury,

19  please.

20       THE COURT:  Yes, you may.

21       MR. TUBACH:  And if we could pull up the bottom half

22  starting with "What happened."  And I have a copy for the

23  Court, if the Court would like a copy.

24       THE COURT:  No, thank you.  I am good.  Thank you.

25  BY MR. TUBACH:

Telly Smith - Cross

1    Q.  Could you read that part of your speech to the franchisees

2    in October of 2014?

3    A.  "What happened was that Supply and Demand completely

4    dictated the commodity environment.  Rules were broken, current

5    events contradicted normal patterns, and unrelated commodities

6    became linked.  Every action had a reaction, and beef was the

7    genesis."

8    Q.  So your view in October 2014 was that beef was the genesis

9    for the supply and demand completely dictated in the commodity

10   environment, right?

11   A.  This was speaking about this about the year 2014, yes.

12   Q.  This is what you believed in October 2014 when you gave

13   this speech to your franchisees, right?

14   A.  About 2014, yes.

15   Q.  And you said, "High beef demand and low supply took beef

16   prices higher than anyone thought they would go," right?

17   A.  Yes.

18   Q.  You believed that was true, right?

19   A.  Yes.

20   Q.  You did research to verify that was true.

21   A.  Yes.

22   Q.  You also said, "Dairy prices soared due to the challenges

23   with beef and strong exports to emerging markets," right?

24   A.  Yes.

25   Q.  And you verified that, right?

Telly Smith - Cross

1  A.  Yes.

2  Q.  You also testified -- you told the franchisees that, "A

3  swine disease with a high mortality rate for piglets wreaked

4  havoc on the pork industry, taking prices to record levels,"

5  right?

6  A.  Yes.

7  Q.  And then finally, why don't you read that last sentence

8  that starts, "The retail."

9  A.  "The retail and foodservice industries, who found

10  themselves unable to feature beef and pork due to high prices,

11  turned to chicken, hammering the chicken industry into short

12  supply and higher prices."

13  Q.  So in October of 2014, you were of the view that the market

14  had turned to chicken because of the high prices for beef and

15  pork and that the chicken industry had been hammered due to the

16  short supply and high prices, right?

17  A.  That is correct.

18  Q.  And you had no idea whether that dynamic was going to

19  change going into the future, did you?

20  A.  We didn't.

21  Q.  That's my question, sir.

22  A.  Okay.

23  Q.  If you could turn to the page -- if you look at the numbers

24  at the very bottom that ends in 63.  Do you see about

25  two-thirds of the way down it says, "On Chicken"?  Do you see

Telly Smith - Cross

1    that?

2    *A.*   Uh-huh.

3    *Q.*   If you could just answer audibly.

4    *A.*   Yes.

5    *Q.*   Thank you.  And you said, "The challenges to the beef and

6    pork industry have put a lot of pressure on chicken

7    processers;" is that right?

8    *A.*   That's correct.

9    *Q.*   And, "For most of this year, chicken demand has greatly

10   outstripped supply," correct?

11   *A.*   Yes.

12   *Q.*   What happens when demand outstrips supply, sir?

13   *A.*   Typically prices go up.

14   *Q.*   It has nothing to do with input, does it?

15   *A.*   It depends on the cut, but yeah, I agree.

16   *Q.*   So it doesn't matter what's happening to the price of corn.

17   If demand is greatly outstripping supply, the prices are going

18   to go up, right?  Right?

19   *A.*   Yes.

20   *Q.*   You also said, "On top of that, many processers are moving

21   to larger birds with better efficiency and higher

22   profitability, leaving less small birds available for the

23   retail and foodservice industries," right?

24   *A.*   Correct.

25   *Q.*   That was your view in October -- I believe it was

Telly Smith - Cross

1    October 21, 2014, correct?

2    A.   That was the information I was given from our suppliers.

3    Q.   Well, that was the view you gave to your franchisees, sir;

4    isn't that right?

5    A.   Yes, but that's where I got that information.

6    Q.   And you believed it.

7    A.   I did at the time.

8    Q.   You have no reason to believe it's not true.  That's

9    exactly what was happening in 2014, wasn't it?

10   A.   Yes.

11   Q.   You didn't learn all this information that we have just

12   gone through here between September 30th and October 21st, did

13   you?

14   A.   No, sir.

15   Q.   This was your view of the market that you had learned being

16   in the market throughout the year 2014, right?

17   A.   Correct.

18   Q.   And your view of the market throughout 2014 was that the

19   chicken market was getting hammered in your view, right?

20   A.   Correct.

21   Q.   And you knew the supply of small bird plants had been going

22   down for years, right?

23   A.   I did not.

24        MR. KOENIG:  Objection, foundation.

25   BY MR. TUBACH:

1936

Telly Smith - Cross

1    *Q.* You didn't know that?

2    *A.* For years, I don't believe that.

3    *Q.* You don't believe that's true?

4    *A.* No.

5    *Q.* So you believe it's false that 10 of the 40 small bird

6    plants had converted to large birds in the 10 years before

7    2014?

8             *MR. KOENIG:* Objection, foundation.

9             *THE COURT:* Sustained.

10   *BY MR. TUBACH:*

11   *Q.* Do you have any knowledge one way or the other, sir, about

12   how many plants converted from small bird to big bird?

13   *A.* I do not know that information.

14   *Q.* You've heard of a company called Sanderson Farms?

15   *A.* I have heard of Sanderson.

16   *Q.* And do you know they used to make small birds?

17   *A.* I believe so.

18   *Q.* And they got out of that business entirely.

19            *MR. KOENIG:* Objection, foundation.

20            *THE COURT:* Sustained.

21   *BY MR. TUBACH:*

22   *Q.* If you know, sir.

23   *A.* I don't know much about them.

24   *Q.* Well, Sanderson Farms isn't one of the suppliers to Golden

25   Corral in 2014 at all, are they?

Telly Smith - Cross

1   A.   It was not.

2   Q.   And isn't the reason, to the extent you know, the reason

3   why Sanderson Farms wasn't supplying to Golden Corral was

4   because Golden Corral needed small birds and Sanderson Farms

5   didn't make any?

6   A.   It's plausible.

7   Q.   Plausible?

8   A.   Yes, that's plausible.

9   Q.   If they made small birds, you probably would have

10  approached them and asked for a bid, right?

11  A.   I would say so, yes.

12  Q.   Would you agree, sir, that fast-food restaurants that

13  primarily by chicken like KFC, Popeye's, et cetera, that those

14  buyers would probably know more about the chicken market than

15  you do?

16          MR. KOENIG:   Objection, foundation.

17          THE COURT:   Overruled.

18  A.   I am sorry, could you repeat the question?

19  BY MR. TUBACH:

20  Q.   Sure.  Would you expect, sir, that buyers, people in your

21  position but who work for KFC, Popeye's and the like, probably

22  know more about the chicken market than you do because you only

23  buy 5 percent of your food is chicken.  Does that make sense to

24  you?

25  A.   It's possible, yes.

Telly Smith - Cross

1    Q.  Did you know -- tell me if you don't.  Did you know that

2    KFC buyers were paying $1.40 a pound?

3            MR. KOENIG:  Objection, foundation.

4            MR. TUBACH:  I am asking if he knows.

5    A.  I don't know.

6            THE COURT:  Sustained.

7    BY MR. TUBACH:

8    Q.  Do you have any information one way or the other about how

9    much fast-food restaurants were paying in 2014 to buy extra

10   chicken?

11   A.  I do not.

12   Q.  Did you have any information at all about the market for

13   small birds going as high as $1.40 in June of 2014?

14           MR. KOENIG:  Objection, foundation.

15           THE COURT:  Sustained.

16   A.  I do not.

17           THE COURT:  Mr. Smith, if the Court sustains an

18   objection, then you don't answer, all right?

19           THE WITNESS:  Got it.  Yes, sir.

20   BY MR. TUBACH:

21   Q.  Now, you testified that you got your first bids around

22   September 30th, right?

23   A.  Yes.

24   Q.  And it was your testimony that Pilgrim's Pride held its

25   prices firm.  That was your testimony just earlier this

Telly Smith - Cross

1   morning, right?

2   A.  I don't recall held prices firm, I don't recall saying

3   that.

4   Q.  You don't recall saying that Pilgrim's Pride held firm on

5   price?

6   A.  Held firm on price?

7   Q.  Just an hour ago?

8   A.  Okay, yes.

9   Q.  Let's take a look at the initial bid that Pilgrim's Pride

10  submitted.  This is D-788 and D-789.

11          MR. TUBACH:  Permission to approach, Your Honor.

12          THE COURT:  You may.

13  BY MR. TUBACH:

14  Q.  Sir, do you have Exhibits 788 and 789 in front of you?

15  A.  I do.

16  Q.  And I am interested only in the bottom e-mail, not that top

17  one, the one that's dated September 30 of 2014.

18          You testified earlier that Lee Moriggia was the person

19  who worked for you who was working on the chicken negotiations

20  in 2014, correct?

21  A.  That's correct.

22  Q.  And Scott Tucker was the person who was at Pilgrim's

23  primarily interacting with Ms. Moriggia?

24  A.  That's correct.

25  Q.  Take a look at Exhibit 789, if you would.

Telly Smith - Cross

1    MR. KOENIG:  Objection, Your Honor.  He is not on the

2  document.

3    THE COURT:  I am sorry, what?

4    MR. KOENIG:  He is not on the original e-mail and he

5  said he got summaries from Moriggia.

6    THE COURT:  Overruled.  He can look at it.

7  BY MR. TUBACH:

8  Q.  Do you recognize document D-789 as the bid that Pilgrim's

9  submitted on or about September 30th, 2014?

10  A.  I mean, it's clearly a bid proposal.  I don't know if it's

11  this bid, but it's a bid proposal.

12  Q.  I will represent to you, sir, that the attachment on 789 is

13  the attachment to 788.

14    MR. KOENIG:  Objection, foundation.

15    THE COURT:  Sustained.

16  BY MR. TUBACH:

17  Q.  Sir, have you seen the September 30th, 2014 bid from

18  Pilgrim's before?

19  A.  Yes.

20  Q.  Okay.  And when you are looking at D-789, does that look

21  like the bid that Pilgrim's submitted on or about

22  September 30th, 2014?

23  A.  Yes.

24  Q.  Thank you.  And is the bid such as the one that's Exhibit

25  D-789, is that the kind of document that Golden Corral relies

Telly Smith - Cross

1    on in the ordinary course of its business, the bids that it

2    receives?

3    A.   Correct.

4    Q.   And keeps them in the ordinary course of business during

5    the course of its negotiations for chicken?

6    A.   Yes.

7    Q.   And it uses this information in running its business,

8    correct?

9    A.   Yes.

10          MR. TUBACH:   I move Exhibit D-789 into evidence.

11          THE COURT:   Any objection to the admission of D-789?

12          MR. KOENIG:   Just D-789?

13          THE COURT:   At this point that's all that's been

14   moved.

15          MR. KOENIG:   No objection.

16          THE COURT:   D-789 will be admitted.

17   BY MR. TUBACH:

18   Q.   And do you recall that this was received on or about

19   September 30th, 2014?

20   A.   Yes.

21          MR. TUBACH:   I would like to publish the top portion

22   of this to the jury with the Court's permission.

23          THE COURT:   Oh, the second page?

24          MR. TUBACH:   Yes.

25          THE COURT:   Yes, you may.

1942

Telly Smith - Cross

1  BY MR. TUBACH:

2  Q.  Actually, I will come back to that.

3          Did you also receive bids from Mar-Jac?

4  A.  Yes.

5          MR. TUBACH:  Thank you.  We can take that down, thank

6  you.

7          Could I have Exhibit C-861 and C-862?

8          Your Honor, could I approach the witness?

9          THE COURT:  You may.

10          MR. TUBACH:  The Court's indulgence one moment.

11          THE COURT:  Sure.

12  BY MR. TUBACH:

13  Q.  Sir, take a look at C-861 and 862, if you would.  I realize

14  you are not on C-861.

15          Do you recall seeing a bid on or about September 30th

16  from Mar-Jac Poultry that is C-862?

17  A.  I am looking at a bid document, but whether these go

18  together, I can't tell you that, but yes.

19  Q.  But as a general matter, did Ms. Moriggia send you the bid

20  proposals that she had gotten from chicken suppliers for your

21  review?

22  A.  Yes.

23  Q.  And you recall seeing the Mar-Jac bid that came in on or

24  about September 30th, 2014?

25  A.  Yes.

Telly Smith - Cross

1   Q.  And is what's in Exhibit 862, do you recall if this is the

2   bid that you received from -- rather your company received on

3   or about September 30th from Mar-Jac?

4   A.  Yes.

5   Q.  And as I asked you in the previously bid, is this something

6   the company relied on in the course of its business?

7   A.  Yes.

8   Q.  And it used it in -- kept it in the ordinary course of

9   business?

10  A.  Yes.

11  Q.  And you relied on it in conducting your business?

12  A.  Yes.

13          MR. TUBACH:  I would move admission of C-862, Your

14  Honor.

15          THE COURT:  Any objection to the admission of C-862?

16          MR. KOENIG:  No objection.

17          THE COURT:  C-862 will be admitted.

18  BY MR. TUBACH:

19  Q.  You also received a bid from a number of other companies,

20  right?

21  A.  Yes.

22  Q.  And as you sit here today, do you have any understanding as

23  to what those bids were or how much they were?

24  A.  I do not.

25  Q.  From what companies did you receive bids?

1944

Telly Smith - Cross

1    *A.*  I recall receiving bids from Mar-Jac, Pilgrim's Pride.  I

2    recall Tyson Foods.  I believe George's and Koch's were in

3    there.  I don't remember any of the others.  I am sure there

4    were more.

5    *Q.*  And the spreadsheet that you went through with counsel,

6    government counsel earlier, that was a spreadsheet of finalized

7    prices, correct?

8    *A.*  That is correct.

9    *Q.*  So that was not the bids themselves.

10   *A.*  Correct.

11   *Q.*  Now, you recalled that you -- you testified that you

12   received a call from Scott Tucker while you were sitting in

13   your driveway, right?

14   *A.*  Yes.

15   *Q.*  And it was on a Friday you said, I think?

16   *A.*  I think so.

17   *Q.*  And your testimony was that he gave you one hour to accept

18   the bid or reject it.

19   *A.*  I remember that, yes.

20   *Q.*  And you said that the price was $1.18, right?

21   *A.*  I don't believe I said that.

22   *Q.*  Is that what you told the FBI, sir?

23   *A.*  I don't recall saying that, but it's possible.

24   *Q.*  Well, let's take a look at Exhibit I-120 again.

25            Do you have that in front of you?

Telly Smith - Cross

1   *A.*   Yes.

2   *Q.*   If you look on Page 2, the very top there, do you recall

3   telling the FBI that Tucker had related to you --

4       *MR. KOENIG:*   Objection.

5       *THE COURT:*   Sustained.   If we can follow the same

6   process with refreshing recollection.

7       *MR. TUBACH:*   I am using this to impeach the witness.

8   I am not trying to refresh his recollection.   I am impeaching

9   the witness.

10       *THE COURT:*   Okay.   He has already made a statement,

11   then you can.   Overruled.

12       *MR. KOENIG:*   Can I ask for clarification, please?

13       *THE COURT:*   Yes.

14       *MR. KOENIG:*   I thought you said -- is it Exhibit I-128

15   or is it I-120.

16       *THE COUT:*   It's I-120.

17       *MR. TUBACH:*   I-120.

18       *MR. KOENIG:*   I would object to the characterization of

19   this being an FBI report.

20       *MR. TUBACH:*   You are right.   I will correct that.

21   *BY MR. TUBACH:*

22   *Q.*   This is a report from the United States Department of

23   Commerce, Office of Inspector General, Office of

24   Investigations, correct?

25   *A.*   Yes, that's what it says on the form.

Telly Smith - Cross

1    Q.  And one of the people who was there was Special Agent

2    Matthew Koppenhaver of the Department of Commerce, correct?

3    A.  Yes, that's correct.

4    Q.  And did you tell Agent Koppenhaver that Mr. Tucker called

5    you and was offering chicken at $1.18 per pound and gave you

6    one hour to accept or decline the offer?

7            MR. KOENIG:  Objection.  The reading of the document

8    is improper.

9            MR. TUBACH:  I am impeaching him.

10           THE COURT:  Overruled.  He can answer.

11   BY MR. TUBACH:

12   Q.  Do you see that language right there, sir?

13   A.  Yes.

14   Q.  Did you tell the FBI that?

15   A.  I don't remember that.

16   Q.  Do you have any reason to believe that Agent Koppenhaver

17   got this part wrong?

18   A.  No, but that looks correct.

19   Q.  So at least back in June of 2020 your best memory was that

20   Pilgrim's was pricing chicken at $1.18 a pound to you and gave

21   you one hour to accept or reject, right?

22   A.  I remember the one hour to accept or reject.  I don't

23   remember the $1.18 piece.

24   Q.  Well, why did you tell the agent it was $1.18, then?

25           MR. KOENIG:  Objection.

Telly Smith - Cross

1        *THE COURT:* Overruled.

2    *A.* I don't remember doing that, but I guess I did.

3    *BY MR. TUBACH:*

4    *Q.* But the bid process had actually been going on for a little

5    while prior to that phone call, hadn't it?

6    *A.* It had.

7    *Q.* So, in fact, Pilgrim's had submitted a bid on

8    September 30th, right?

9    *A.* Yes, correct.

10   *Q.* And so about three weeks earlier than the phone call,

11   right?

12   *A.* Yes, that's correct.

13   *Q.* And he called you the Monday -- you spoke to him on the

14   Monday before that Friday call.  Do you recall that?

15   *A.* I do not.

16   *Q.* Let me take a look at Government Exhibit 497.

17        *MR. TUBACH:* Permission to approach, Your Honor?

18        *THE COURT:* Yes.

19   *BY MR. TUBACH:*

20   *Q.* Do you have Government Exhibit 497 in front of you, sir?

21   *A.* I do, yes.

22   *Q.* This is a document you have never seen before, right?

23   *A.* I have never seen this document.

24   *Q.* This is a phone bill for someone who is not you, correct?

25   *A.* It is not me.

1948

Telly Smith - Cross

1  *Q.*  And it's a phone bill for Mr. Tucker?

2  *A.*  It appears so.

3  *Q.*  Take a look, if you would, at the document -- look at the

4  numbers on the bottom right.  It's a document that is 316.  Do

5  you see that?  It's a couple pages in.

6  *A.*  Okay.

7  *Q.*  And if you look down to the third to the bottom entry,

8  that's your telephone number, right?

9  *A.*  Third from the bottom?

10  *Q.*  Yes.

11  *A.*  That is my office phone number, yes.

12  *Q.*  That number is 919-881-4546?

13  *A.*  Yes.

14  *Q.*  And the date of this phone call was October 13, correct?

15  *A.*  Yes.

16  *Q.*  And you spoke to Mr. Tucker for 11 minutes, right?

17  *A.*  Yes.

18       *MR. TUBACH:*  And I believe this document is

19  self-authenticating and I move to admit it.

20       *THE COURT:*  It's already been admitted.

21       *MR. TUBACH:*  Thank you.  If we can publish this to the

22  jury.

23       *THE COURT:*  You may.

24       *MR. TUBACH:*  Just that page and just the bottom of the

25  No. 316.

Telly Smith - Cross

1  *BY MR. TUBACH:*

2  Q.  So what's being shown on the screen now, that's your

3  telephone number.  And it shows that you and Mr. Tucker spoke

4  for 11 minutes on that day, correct?

5  A.  Yes.

6  Q.  Do you recall that Mr. Tucker told you in that phone call

7  that he needed an answer by Friday because they had other

8  customers --

9       *MR. KOENIG:*  Objection.

10  Q.  -- they needed to try to supply if you were not going to

11  buy chicken from them?

12       *THE COURT:*  Mr. Koenig, go ahead.

13       *MR. KOENIG:*  I was objecting and hoping the question

14  would end, but what is the foundation for this is I guess my

15  objection.

16       *THE COURT:*  I am going to sustain it on it's a hearsay

17  question.

18       *MR. TUBACH:*  Your Honor, we are not offering that

19  question for the truth of the matter asserted.  We are only

20  offering it to show whether he recalls what that conversation

21  was about which explains the October 17 phone call later.

22       *THE COURT:*  Still sustained.

23  *BY MR. TUBACH:*

24  Q.  Let me show you what's been marked as F-466.  While I am

25  giving this out, do you recall what you talked to Mr. Tucker

1950

Telly Smith - Cross

1  about on October 13?

2  A.  I do not.

3      MR. TUBACH:  May I approach, Your Honor?

4      THE COURT:  You may.

5      MR. KOENIG:  Your Honor, I object.  This is not an

6  e-mail that he has ever seen.  It's an internal --

7      MR. TUBACH:  I am going to use it to try to refresh

8  his recollection about that phone call.

9      THE COURT:  Anything can be used to refresh

10  recollection.  Overruled.

11  BY MR. TUBACH:

12  Q.  Sir, I want you to read to yourself, not out loud to the

13  jury, read to yourself the e-mail in the middle of the document

14  I am showing you that is from Scott Tucker.  It says Monday

15  October 13, 2014, 3:44 p.m.  Do you see that?  Do you see that

16  e-mail?

17  A.  Yes, I do.

18  Q.  Could you just read that to yourself?  And I'll have a

19  question for you.

20  A.  I did.

21  Q.  Does that refresh your recollection that Mr. Tucker told

22  you he needed to know by the end of business day on Friday

23  whether you were going to be wanting to buy chicken from

24  Pilgrim's or whether they were going to have to move on to

25  another customer?

Telly Smith - Cross

1    A.  No, it does not.

2    Q.  So you have no recollection one way or the other about

3    anything on October 13?

4    A.  I do not.  I am sorry.

5    Q.  Now, putting a short fuse on a negotiation is something

6    that you had done yourself in past negotiations, right?

7    A.  Please explain short fuse.

8    Q.  To try to pressure someone into agreeing to what you want

9    them to do.

10   A.  Offering a short time line to make a decision?

11   Q.  Yeah, exactly.

12   A.  Yes.  Never an hour, I don't believe.

13   Q.  It's a pretty common tactic, isn't it?

14   A.  Uh-huh, yes, it is.

15   Q.  And you used it yourself, right?

16   A.  Never an hour, no.

17   Q.  You've used it for a day, right?

18   A.  Possibly.

19   Q.  So like let's get this done today?

20   A.  Possibly, yes.

21   Q.  So that's the kind of pressure that you would exert when

22   you thought it was in your interests to exert that pressure to

23   get the best deal for Golden Corral, right?

24   A.  Possibly, yes.

25   Q.  Now, the negotiations continued after October 17, though,

Telly Smith - Cross

1  right?

2  A.  They did continue, yes.

3  Q.  After that phone call that you remember so vividly standing

4  in your driveway?

5  A.  Yes.  They did come back to the table and we did have

6  additional conversations.

7  Q.  And, in fact, those conversations resulted in Pilgrim's

8  reducing its price further; isn't that right?

9  A.  That's correct.

10 Q.  And in fact, you told them what price they needed to be at

11 in order to get the business, didn't you?

12 A.  I don't believe I told them the specific number.

13 Q.  Well, let's look at Exhibit No. D-783.

14 A.  Okay.

15 Q.  Sir, while I am handing this out, do you recall giving a

16 specific number or you just don't recall?

17 A.  As a matter of business, we did not give out specific

18 numbers.

19 Q.  Okay.

20      MR. KOENIG:  Objection to this as well.  I don't

21 believe he said -- he didn't say he doesn't remember.  He just

22 said that wasn't their practice.

23      THE COURT:  I haven't heard the question yet.  The

24 objection is premature.

25 BY MR. TUBACH:

Telly Smith - Cross

1    *Q.*  Before looking at that document, take a look back at

2    Exhibit 497, would you?

3    *A.*  Okay.

4    *Q.*  And look at the very last page of that document.

5            *MR. TUBACH:*  If we could pull that up for the jury,

6    the bottom third of the one that ends in Bates No. 321.

7            *THE COURT:*  You may.

8            *MR. TUBACH:*  Thank you, Your Honor.

9    *BY MR. TUBACH:*

10   *Q.*  Do you see an entry there on November 7 at 1:51 p.m.?

11   *A.*  I do.

12   *Q.*  And that's your telephone number, correct?

13   *A.*  It is correct.

14   *Q.*  And it shows you spoke to Mr. Tucker for five minutes on

15   November 7 at about 1:51 p.m.

16   *A.*  Yes.

17   *Q.*  Do you recall that discussion?

18   *A.*  I do not recall that discussion.

19   *Q.*  Take a look at Exhibit D-783.  And I am particularly

20   interested in the e-mail that begins November 7 at 4:32 p.m.

21   from Scott Tucker.  Take a look at that e-mail and particularly

22   the portion that says, "CG Keep Business Price."

23   *A.*  Okay.

24   *Q.*  Do you recall yourself or Ms. Moriggia telling Pilgrim's

25   that they needed to be at $1.02 per pound for eight-piece and

Telly Smith - Cross

1  WOGs in order to keep the business?

2  A.  No, I do not recall that.

3  Q.  Do you know whether Lee Moriggia may have done that?

4  A.  I don't know whether she would have done that, but as a

5  matter of business, we do not do that.

6  Q.  As a matter of business, you don't do what exactly, tell

7  suppliers?

8  A.  We don't give out specific prices.

9  Q.  I am sorry.  Let me finish my question.  As a matter of

10  business practice, you don't tell suppliers what price they

11  need to be at to keep the business?

12  A.  As a matter of practice, we do not do that.

13  Q.  So they just have to guess at what price you want them to

14  be at?

15  A.  They have to rebid aggressively.

16  Q.  Is it your testimony, sir, that Lee or you never provided

17  pricing to suppliers about where they needed to be?

18  A.  I'm not aware that we ever did that.  As a matter of

19  business, we don't do that.

20  Q.  Do you know whether, in fact, Ms. Moriggia provided exact

21  pricing information of competitors to other suppliers?

22  A.  As a matter of business, we do not do that.

23  Q.  Well, that wasn't my question.  Not what your matter of

24  business was.  My question is do you recall her doing that?

25  A.  I did not witness her doing that.

Telly Smith - Cross

1       MR. TUBACH:  Let's look at Exhibit C-391.

2           Permission to approach?

3       THE COURT:  You may.

4    BY MR. TUBACH:

5    Q.  Do you have that document in front of you, sir?

6    A.  I do.

7    Q.  Let me just get there myself.

8       MR. KOENIG:  Your Honor, objection.  He didn't say he

9    didn't recall.  He is not on the e-mail.

10          THE COURT:  Overruled.

11   BY MR. TUBACH:

12   Q.  You have had a chance to look at Exhibit C-391?

13   A.  Yes.

14   Q.  And Lee Moriggia is the person who worked for you, right?

15   A.  That's correct.

16   Q.  And did you authorize her to disclose to a competitor, to

17   one chicken supplier that another chicken supplier had promised

18   to sell chicken for .99 cents delivered?

19   A.  I did not.

20   Q.  That's an exact price, isn't it?

21   A.  I don't understand the context around what this discussion

22   was, but it's listed as an exact price.

23   Q.  Well, you can look at the context.  Look at the e-mail

24   immediately below that one and then read the one from

25   Ms. Moriggia on November 3rd, 2014 at 11:52 a.m.

Telly Smith - Cross

1    A.   I can see at 10:57 she is asking them to rebid the East

2    Coast.

3    Q.   Yes.  And now keep reading, farther down.  The e-mails, you

4    have got to read from the bottom up, right?  Start with the one

5    at the bottom of the first page.

6    A.   Okay.

7    Q.   You can look at the one on the top of the second page if

8    that helps you get oriented.

9         Do you have the context now, Mr. Smith?

10   A.   I believe so, yes.

11   Q.   Okay.  And so Ms. Moriggia was sharing exact pricing

12   information of one competitor with another competitor, wasn't

13   she?

14        MR. KOENIG:  Objection.  It does not say one

15   competitor.

16        THE COURT:  Overruled.  He can answer.

17   A.   It is not specifically listing a competitor here.  She is

18   listing a price.

19   BY MR. TUBACH:

20   Q.   But it says, "We have .99 cents delivered."  "We have" to

21   you, sir, in this business knows we have --

22   A.   I am sorry.

23   Q.   You have got to let me finish.  You know in this business

24   that means they have someone who is committed to sell chicken

25   for .99 delivered, right?

Telly Smith - Cross

1   A.  "We have" may be another bid.  "We have" may be our current

2   price.  That's the context I don't know what it is.

3   Q.  So your testimony is that in November 2014 you had .99

4   delivered pricing.  That was actual bid pricing?

5            MR. KOENIG:  Objection.

6            THE COURT:  Overruled.

7   A.  That could have been an FOB price for our current or that

8   could have been another bid.  I don't know.

9   BY MR. TUBACH:

10  Q.  But it was exact pricing, right?

11  A.  Yes.

12  Q.  So you don't know one way or the other whether Ms. Moriggia

13  told Pilgrim's on November 7 that they needed to be at $1.02 in

14  order to keep the business, right?

15  A.  I have not witnessed that at all, no, sir.

16  Q.  But you told Pilgrim's that they needed to beat $1.02 to

17  keep the business, didn't you?

18  A.  I don't remember having that conversation.  It doesn't

19  sound like something we would have done as a course of

20  business.

21           MR. TUBACH:  Let's take a look at Government

22  Exhibit 424.

23           Permission to approach, Your Honor?

24           THE COURT:  You may.

25           MR. KOENIG:  Your Honor, objection.  Government

Telly Smith - Cross

1  Exhibit 424, the redacted version of this that does not have

2  almost all of the entire front page, and we told counsel that

3  we were redacting that whole front page.

4       MR. TUBACH:  I am only interested in the part that

5  starts in the very back and works up the e-mail chain until we

6  get to the last e-mail from Mr. Smith at the bottom of the

7  first page.

8       THE COURT:  Does that address the government's

9  concern?

10       MR. KOENIG:  I believe so.

11       THE COURT:  Okay.  Go ahead.

12  BY MR. TUBACH:

13  Q.  Take a look at Government Exhibit 424.  Do you see that in

14  front of you?

15  A.  Yes, sir.

16  Q.  And let's -- this is an e-mail chain between you and

17  Mr. Tucker at Pilgrim's, correct?

18  A.  It is.

19  Q.  Okay.  And you sent and received these e-mails on or about

20  it -- looks like they all took place on November 10, 2014,

21  correct?

22  A.  That's correct.

23  Q.  These are part of the negotiations between you and

24  Mr. Tucker?

25  A.  Yes.

1959

Telly Smith - Cross

1    Q.  And the very first e-mail from Mr. Tucker, he tells you --

2    he asks you --

3            MR. KOENIG:  Objection, reading from a document not in

4    evidence.

5            THE COURT:  Sustained.

6            MR. TUBACH:  Yes, thank you, Your Honor.

7    BY MR. TUBACH:

8    Q.  Do you recall being asked by Mr. Tucker in an e-mail on

9    November 10th at 9:00 in the morning whether if Pilgrim's could

10   get to $1.02 delivered on eight-piece and WOGs, whether they

11   would keep the two distribution centers that they had been

12   supplying for 2015?

13           MR. KOENIG:  Again, just reading a document in the

14   form of a question.

15           THE COURT:  Sustained as hearsay.

16   BY MR. TUBACH:

17   Q.  Do you recall telling Mr. Tucker anything about what

18   pricing Pilgrim's needed to be at to retain the business for

19   2015?

20   A.  No, sir.

21   Q.  Do you recall sending the e-mail on the bottom of the

22   second to the last page on November 10th at 10:18?

23           THE COURT:  I am sorry, do you mind using a Bates

24   stamp number for that, because I show that is not the second to

25   the last page.

Telly Smith - Cross

1    MR. TUBACH:  Yes.  I am looking at 854, if you look at

2    that.

3    BY MR. TUBACH:

4    Q.  Do you see that, the one at the bottom where it says "Yes"

5    and goes on?

6    A.  Yes.  Can you repeat the question, please?

7    Q.  Of course.  Absolutely.

8          Do you recall that on November 10th you told

9    Mr. Tucker that if they bid $1.02, $1.02 per pound, they would

10   keep the business at the two distribution centers they had been

11   supplying the previous year, right?

12         MR. KOENIG:  Objection.

13         THE COURT:  Overruled.  He can answer.

14   A.  The way I read this is on November 10th, Scott gave me a

15   bid of $1.02 is what he gave me on e-mail and wanted to know if

16   he could keep his business at $1.02.  I agreed.  He bid the

17   $1.02 and I accepted that bid.

18   BY MR. TUBACH:

19   Q.  So you told him that if he bid $1.02, he could have the

20   business, right?

21   A.  He bid $1.02 and I agreed.

22   Q.  The exact language from Mr. Tucker, sir -- this is to

23   impeach, Your Honor -- is "If I can get them," meaning his guys

24   at Pilgrim's, "get them to the $1.02 delivered on eight-piece

25   and WOGs, do we keep the Columbus and Rocky Mount business for

Telly Smith - Cross

1    next year," correct?

2    *A.*   He bid $1.02 and --

3    *Q.*   I am asking if that's what it says, sir.

4    *A.*   That's what the document says.

5    *Q.*   Okay.  And your response was "Yes," correct?

6    *A.*   It was yes in response to this bid.

7              *MR. TUBACH:*  Your Honor, could we have a brief side

8    bar?

9              *THE COURT:*  Yes.

10      (At the bench:)

11             *THE COURT:*  Go ahead, Mr. Tubach.

12             *MR. TUBACH:*  Your Honor, this is a document the

13   government intends to introduce into evidence immediately after

14   this witness leaves the witness stand.  I think in fairness, I

15   should be allowed to ask him about the entire document without

16   having to play these games.

17             *THE COURT:*  Response to that, Mr. Koenig?

18             *MR. KOENIG:*  Sure, you can cross on the document as

19   long as it's appropriate.

20             *THE COURT:*  Well, I think that the issue is not

21   whether or not the government intends to admit it necessarily,

22   but whether we anticipate its admission thereby enabling him to

23   be asked about things that you might not otherwise be able to

24   ask him about.

25             *MR. TUBACH:*  I think, Your Honor, the Court already

Telly Smith - Cross

1   ruled that it would be admissible.  That was shorthand for my

2   point.

3           THE COURT:  It still doesn't answer my question.  Are

4   there going to be objections to 424?

5           MR. TUBACH:  Your Honor, I believe those have already

6   been ruled upon.

7           THE COURT:  So the answer to my question is yes?

8           MR. TUBACH:  No further objections, Your Honor.

9           THE COURT:  All right.  Then under those

10  circumstances, Mr. Koenig, you have no objection.  In fact, do

11  you have any objection to the admission of the document at this

12  time?

13          MR. KOENIG:  No.

14          THE COURT:  That might be an easier way to do it.

15          MR. KOENIG:  Thank you, Your Honor.

16          THE COURT:  Thank you.

17      (In open court:)

18          MR. TUBACH:  Your Honor, we move the admission of

19  Government Exhibit 424 starting at the very back and ending at

20  the bottom of the first page of that exhibit, the e-mail from

21  Mr. Smith.  The rest can be redacted.

22          MR. KOENIG:  I apologize, can we have one more side

23  bar?

24          THE COURT:  All right.  We can.

25      (At the bench:)

Telly Smith - Cross

1        THE COURT:  go ahead, Mr. Koenig.

2        MR. KOENIG:  Previously when we -- when I objected

3   about the redaction, it was just to what could be shown to

4   Mr. Smith because he is not on that.  But the Court did rule

5   that the document in its entirety without redactions is

6   admissible, so we would ask that the entire document be

7   admitted, not with the redactions.

8        THE COURT:  Well, it sounds like it may be an

9   incremental process, but I don't think that there is anything

10   per se objectionable about the offering of just a portion,

11   especially since on the fly defendants' IT person has been able

12   to obscure the other parts.  And then if you want to move the

13   admission of the rest of it even on redirect, of course, you

14   could do that.

15        MR. TUBACH:  Your Honor, I am happy to move the whole

16   document into evidence.  I heard Mr. Koenig to say he was

17   redacting the first page, which is why I only moved the portion

18   into evidence.

19        THE COURT:  I understand.  It sounds like to me it's

20   been previously redacted.  Is that not true or is the form that

21   appears in 424 the unredacted form?

22        MR. KOENIG:  The form is the unredacted form.  What we

23   were going to show Mr. Smith possibly was the redacted form

24   just because he was not on that.

25        THE COURT:  I see.  Sounds like there is no objection

Telly Smith - Cross

1  to the admission of the entirety of 424, so that should solve

2  the problem, all right?

3       (In open court:)

4          THE COURT:  Mr. Tubach, are you now offering or moving

5  the admission of the entirety of 424?

6          MR. TUBACH:  Yes, the entirety of 424.

7          THE COURT:  Any objection?

8          MR. KOENIG:  No objection.

9          THE COURT:  Okay.  424 will be admitted.

10 BY MR. TUBACH:

11 Q.  So, in fact, sir, the bid that Pilgrim's ended up

12 submitting that was awarded was $1.02 per pound, wasn't it?

13 A.  That sounds correct, yes.

14 Q.  And that was based on your guidance, however you want to

15 characterize it, in Government Exhibit 424, right?

16 A.  No.  That was based on his bid which we accepted.

17 Q.  You testified earlier that these were adversarial or tense

18 negotiations.  Do you recall that?

19 A.  Yes.

20 Q.  These were not the first tense or adversarial negotiations

21 you had had with Pilgrim's Pride, were they?

22 A.  Likely not.

23 Q.  Well, you recall a specific incident a year earlier in

24 which there was quite adversarial interactions with Pilgrim's

25 Pride, don't you?

Telly Smith - Cross

 1  *A.*  A year earlier meaning which year?

 2  *Q.*  2013.

 3  *A.*  Yes.

 4  *Q.*  It had to do with wings, didn't it?

 5  *A.*  It did.

 6  *Q.*  And, in fact, this relationship was so strained that from

 7  2015 on Pilgrim's hadn't supplied any chicken to Golden Corral,

 8  correct?

 9  *A.*  I believe that's correct.

10  *Q.*  Now, the wings incident in 2013 actually starts in 2012,

11  doesn't it?

12  *A.*  The bid process started in 2012, yes.

13  *Q.*  And in 2012 you wanted to buy wings from Pilgrim's Pride,

14  right?

15  *A.*  Yes.

16  *Q.*  And the reason you wanted to buy wings was because Golden

17  Corral was going to be doing a big promotion on wings in 2013,

18  right?

19  *A.*  Correct.

20  *Q.*  I believe it was going to be like a 21-week promotion,

21  right?

22  *A.*  It was most of the summer, yes.

23  *Q.*  And when you discussed supplying -- getting wings from

24  Pilgrim's Pride, what kind of pricing were you looking for in

25  terms of was it market pricing or fixed pricing?  Do you

1966

Telly Smith - Cross

 1    recall?

 2    A.  We were at the time looking for fixed pricing.

 3    Q.  And why was it you were looking for fixed pricing,

 4    Mr. Smith?

 5    A.  When it comes to our limited time offers, our promotions,

 6    the financials have to be predictable.  So anything that's

 7    market-based or moved around doesn't necessarily work for us,

 8    so for a short window we always try for a fixed base pricing.

 9    Q.  But this fixed pricing wasn't just for the promotion.  It

10    was for the entire contract, wasn't it?

11    A.  It was for the -- the contract was for the promotional

12    window.

13    Q.  And the contract also included eight-piece and WOGs, right?

14    A.  Other parts of the contract, yes.

15    Q.  Now, the other reason why you wanted fixed pricing, sir,

16    was because the wing market was going up in 2012, wasn't it?

17    A.  It had been inclining, yes.

18    Q.  And you know why too, right?  Do you want me to help you?

19    A.  I know my reason why I think it is.

20    Q.  Let me see if they are the same.

21    A.  Okay.  The reason I think it was is because another large

22    restaurant competitor was accumulating in cold storage a wing

23    product that it was going to use for a national promotion.

24    Q.  Exactly.  It was McDonald's, right?

25    A.  Yes.

Telly Smith - Cross

1    Q.  And McDonald's was going to come out with something called

2    the Mighty Wing.

3    A.  Yes.

4    Q.  And they were quietly going around the market buying up and

5    freezing large volumes of wings to use in the Mighty Wing

6    promotion for 2013, right?

7    A.  That's correct.

8    Q.  And that was driving prices up in 2012, right?

9    A.  Yes.

10   Q.  And that's part of the reason why you wanted flat pricing

11   because you didn't want to get stuck in 2013 with prices going

12   even higher and you've got to run this promotion, right?

13   A.  Well, that and we needed fixed pricing for our promotion,

14   yes.

15   Q.  Because you didn't want to get upside down on the market in

16   case the market ran away from you, right?

17   A.  Correct.  It ended up going the other way.

18   Q.  We'll get to that.  But your reason for doing it in 2012 is

19   because you were afraid the market was going to run away from

20   you, right?

21   A.  At the time that's what we believed.

22   Q.  In fact, you were so adamant that you called fixed pricing

23   a deal breaker.  Do you recall that?

24   A.  I do recall that.

25   Q.  So you were not going to do a deal with Pilgrim's unless

1968

Telly Smith - Cross

1  they gave you fixed pricing on the wings, right?

2  A.  Sounds accurate, yes.

3  Q.  That's what a deal breaker means, right?

4  A.  Yes.

5  Q.  And Pilgrim's didn't want to do a flat pricing, did they?

6  A.  I don't recall that part.

7  Q.  They wanted to do --

8  A.  They ended up doing it.

9  Q.  They did, but they wanted to do market pricing, didn't

10 they?

11 A.  I don't recall that piece.

12 Q.  Would it make sense for a supplier who sees the market

13 going like this, going up, to want to do a market price as

14 opposed to a flat price?

15 A.  Sometimes it makes sense doing that way.  Otherwise it

16 makes sense to build risk into the product and charge a higher

17 fixed price.

18 Q.  But in any event, Pilgrim's agreed with your deal breaker

19 which was to do a fixed price for wings for 2013, right?

20 A.  Yes.

21 Q.  Let's take a look at Government Exhibit 404.  Look at what

22 I believe is Tab 4 counsel is saying is in your notebook.

23      Do you have that?

24 A.  I do.

25 Q.  And this is the -- do you recognize this document, sir?

Telly Smith - Cross

1    A.   I do recognize it, yes.

2    Q.   This is the contract between Golden Corral and Pilgrim's

3    Pride for 2013, right?

4    A.   Yes, it appears so.

5    Q.   And that's your signature on the bottom right?

6    A.   It is.

7         MR. TUBACH:   And this is a document -- I don't recall,

8    Your Honor, if this document has been admitted into evidence

9    already.   If it is not, I am happy to go through the

10   formalities or move it into evidence.

11        THE COURT:   One second.   I don't show it as having

12   been admitted.

13        MR. TUBACH:   I will lay the foundation, Your Honor.

14   BY MR. TUBACH:

15   Q.   This is a document Golden Corral used in the ordinary

16   course of its business?

17   A.   Yes.

18   Q.   And it relies on this document in conducting its business?

19   A.   Yes.

20   Q.   And it's accurate and reliable as far as you know?

21   A.   As far as I know.

22        MR. TUBACH:   Move the admission of 404.

23        THE COURT:   Any objection to the admission of

24   Exhibit 404?

25        MR. KOENIG:   No, Your Honor.

Telly Smith - Cross

1          *THE COURT:*  404 will be admitted.

2          And before we ask any more questions, it's noon now.

3   If you have a couple --

4          *MR. TUBACH:*  No.

5          *THE COURT:*  Ladies and gentlemen, we will go ahead and

6   take the lunch break.  So we will plan on reconvening at 1:30.

7   Keep the admonitions in mind.  Keep the yellow juror buttons

8   visible.  And be careful in the hallways and in and outside of

9   the courtroom, and to the extent that you can, keep those

10  yellow buttons visible, all right?

11         The jury is excused.

12         (Jury excused).

13         Please be seated.

14         Mr. Smith, you are excused until 1:30.

15         *THE WITNESS:*  Thank you, Your Honor.

16         *THE COURT:*  Let's talk about two things.  First of

17  all, I indicated to the government today that I was taking

18  under advisement the ruling of Exhibit No. 901.  I will rule on

19  that now.

20         The objections will be overruled as to hearsay.  I do

21  find based upon the Fifth Circuit case that was cited by the

22  United States, *Flores*, 63 F.3d 1342, and also some other courts

23  have ruled similarly, but the statement by Mr. Kantola in

24  Exhibit 901 is a statement by a defendant; and as a result, it

25  is not hearsay and therefore that is admissible.

Telly Smith - Cross

1          MR. TUBACH:  Your Honor, will the Court be giving a

2     limiting instruction as that would only be admissible as to

3     Mr. Kantola and none of the other defendants?

4          THE COURT:  That's the next issue.  I think that is

5     appropriate.  I will be giving a limiting instruction to that

6     extent.

7          MS. HENRY:  Your Honor, if I may be heard.  I just

8     wanted to point out that the 2011 amendment that the government

9     referenced in its brief as the basis for some change in the

10    process, that in the comments to that amendment explicitly it

11    said that, quote, "These changes are intended to be stylistic

12    only.  No change in application of the exclusion is intended."

13    I wanted to make certain I brought that up.

14         THE COURT:  Right.  As the Fifth Circuit noted in the

15    *Flores* opinion, "Admissions of a party opponent are not hearsay

16    and therefore independently admissible."

17         One other thing and that is I haven't been paying too

18    much attention, but one question that you need to think about,

19    for instance, Mr. Tubach, I think he admitted D-789.  The first

20    page of that was a native document, and then the next two pages

21    were nonnative.  They were essentially printouts from it.  So

22    the question is whether when such a document is admitted,

23    whether the two nonnative pages are being admitted along with

24    the native document.

25         MR. TUBACH:  I suppose, Your Honor, it would make

Telly Smith - Cross

1  sense to admit the first page, only so -- what I am really

2  trying to do is avoid the jurors getting confused.  As I am

3  trying to think through my own mind, is the first page going to

4  confuse them or help them?

5       THE COURT:  Actually, I am confusing you.  Sorry.

6  So the question is whether or not we are admitting in essence

7  two documents, the exhibit in paper format, but also the native

8  version which the first page is meant to be a place holder of,

9  because although you didn't actually show the jury, it may have

10  been published just for a couple seconds, but what was being

11  published was clearly an Excel spreadsheet, so it was being

12  shown to the jury in native format.

13       MR. TUBACH:  I guess my suggestion, Your Honor, would

14  be as a default it would make sense just to admit the paper

15  unless there is some reason to admit the actual native document

16  for them to view on a computer.

17       THE COURT:  There is a reason not to because it will

18  complicate things a great deal when it comes time to gathering

19  up the exhibits that go back to the jury because those exhibits

20  would all have to be put on a thumb drive and even though they

21  already had the information in the Pages 2 and 3, so that's why

22  I wanted to ask about that.

23       MR. TUBACH:  And I am fine not -- certainly for this

24  purpose not doing so.

25       THE COURT:  Why don't we adopt, then, as our default

Telly Smith - Cross

1    that in such an exhibit, the admission of the exhibit will not

2    include the native format.  But that doesn't prevent a party

3    from also asking that the native version be admitted knowing

4    that if it is, we'll have to make sure that it's submitted on a

5    thumb drive.

6          The jurors -- then we will have to solve the problem

7    about -- I think that we actually have this exhibit machine of

8    sorts, but we are not there yet.  We will have to check that,

9    but it may be able to open Excel spreadsheets, but we will work

10   on that issue when it comes time for that, all right?

11         Mr. Koenig?

12         *MR. KOENIG:*  I just had one suggestion.  One of the

13   things that we have done is print a PDF from the native and

14   then mark it as an excerpt of the exhibit, and that seems to

15   solve the problem because you get to -- you aren't seeing

16   something that's unintelligible or --

17         *THE COURT:*  Right.  I don't think that's necessarily

18   the problem, although maybe I am not understanding your point,

19   Mr. Koenig, but I am just saying that in the event that, for

20   instance, a native version of a document that is being

21   submitted and it's not reflected on paper, then we'll have to

22   worry about how to get that back to the jury, okay?

23         Anything else to take up real briefly?

24         All right.  We will be in recess until 1:30.  Thank

25   you.

Telly Smith - Cross

1    (Recess at 12:06 p.m.)

2    (Reconvened at 1:34 p.m.)

3         THE COURT:  Let's go ahead and bring the jury back in.

4         (Jury present.)

5         THE COURT:  Mr. Tubach, go ahead whenever you are

6    ready.

7    BY MR. TUBACH:

8    Q.  Welcome back, Mr. Smith.

9    A.  Yes, sir.

10   Q.  We left off last and we were talking about the McDonald's

11   Mighty Wings.  Do you recall that?

12   A.  I do.

13   Q.  I believe it was your testimony that McDonald's had been

14   quietly going about the market buying up lots of wings and

15   freezing them in anticipation of this promotion called the

16   Mighty Wings, right?

17   A.  That was my understanding.

18   Q.  And that's what made the prices go up, right?

19   A.  Yes.

20   Q.  So you did a fixed contract with Pilgrim's for 2013, right?

21   A.  Yes.

22   Q.  And let's look at Government Exhibit 404.  It should be in

23   your binder.  I think it's Tab 2, maybe.  Tab 4, thank you.

24        MR. TUBACH:  I believe this has been admitted, Your

25   Honor.  If we can publish this to the jury.

Telly Smith - Cross

1         THE COURT:  You may.

2         MR. TUBACH:  And if we could blow up the part that

3   starts Golden Corral, the third paragraph on down to just

4   before the signatures.

5   BY MR. TUBACH:

6   Q.  And so what this contract said is that, "Golden Corral

7   Corporation and Pilgrim's Pride have agreed that pricing is to

8   remain fixed for calendar year 2013," correct?

9   A.  That is correct.

10  Q.  Now, it says, "Volume levels are estimated."  You had --

11  and you can see a little farther down the contract price for

12  what's called non-marinated wings is $2.005 FOB, right?

13  A.  Correct.

14  Q.  And there is a $.03 freight charge.

15  A.  That's correct.

16  Q.  That meant if someone wanted to come pick it up from

17  Pilgrim's Pride, they would pay $2.005.  Otherwise, Pilgrim's

18  would deliver it to the distribution center for another $.03.

19  A.  That's correct.

20  Q.  And the estimated volume there was 6 million pounds, right?

21  A.  Yes.

22  Q.  And that was the parties' best estimate at the time of what

23  this 21-week promotion that we talked about earlier, what that

24  promotion would require, right?

25  A.  Yes.

Telly Smith - Cross

1    Q.  In fact, it was really Golden Corral's estimate, wasn't it?

2    A.  It was our estimate, yes.

3    Q.  It wasn't -- Pilgrim's had no way to estimate how many

4    chicken wings your customers were going to eat, correct?

5    A.  That's correct.

6    Q.  So this is Golden Corral, your best estimate of what that

7    promotion would take, right?

8    A.  Yes.

9    Q.  And you budgeted for that in the promotion, right?

10   A.  Yes.

11   Q.  In fact, that's why you wanted fixed pricing was so that

12   you would know exactly what that promotion would cost Golden

13   Corral and the franchisees, right?

14   A.  Yes.

15   Q.  Now, this -- the price itself, $2.005, that was fixed for

16   the duration of the year, wasn't it?

17   A.  That is correct.

18   Q.  And just before the signature line, this reads, "This

19   contractual agreement is legal and binding to the terms

20   contained herein."  Do you agree with that?

21   A.  Yes.

22   Q.  That's your signature right below there, isn't it?

23   A.  Yes.

24   Q.  Now, what happened is once 2013 rolled around, the Mighty

25   Wings didn't end up being so mighty, right?

Telly Smith - Cross

 1  A.  That's my understanding.

 2  Q.  They were sort of a flop, right?

 3  A.  My understanding, yes.

 4  Q.  Customers didn't really like them?

 5  A.  I guess.  I don't --

 6  Q.  For whatever reason.  Maybe you tried them, maybe you

 7  didn't.  But whatever happened, the Mighty Wings did not do

 8  well, right?

 9  A.  Correct.

10  Q.  So then in April of 2013 you came back to Pilgrim's and

11  said you wanted a market price now, didn't you?

12  A.  I don't remember it being market price.  I remember asking

13  them for an adjustment.

14  Q.  Let's take a look at D-725.

15          MR. TUBACH:  Permission to approach, Your Honor?

16          THE COURT:  You may.

17  BY MR. TUBACH:

18  Q.  I want to show you -- do you have D-725 in front of you?

19  A.  Yes.

20  Q.  You do?  Okay.  Take a look at it.  I want you to focus in

21  particular on the last paragraph of the bottom e-mail.

22          MR. KOENIG:  Objection.  He is looking at an e-mail

23  again that is not his and there is no lack of recollection.

24          MR. TUBACH:  He said he didn't recall asking for

25  market price.

Telly Smith - Cross

1    *THE COURT:*  Overruled.

2  *BY MR. TUBACH:*

3  *Q.*  Have you had the chance to read the sentence that has, "The

4  buyer would like," et cetera?

5  *A.*  This e-mail didn't come from me.

6  *Q.*  Oh, no, I completely agree.  This is not an e-mail you

7  received.

8  *A.*  I didn't receive this or send this.

9  *Q.*  What I am doing is showing you this because I want to try

10  and refresh your recollection.

11          Have you had a chance to read that last paragraph

12  there?

13  *A.*  I have.

14  *Q.*  Does that refresh your recollection on or about April 12 of

15  2013 you told Pilgrim's that you wanted to move to a

16  market-related price?

17  *A.*  It does not.  What I recall is that I had asked for a

18  reduction.  The structure of that reduction, whether it be

19  market or a new fixed price, I don't remember.

20  *Q.*  So you don't recall at this point whether you asked for

21  market price or whether you just wanted a lower price.

22  *A.*  I don't recall that.

23  *Q.*  But you wanted a lower price.

24  *A.*  Yes.

25  *Q.*  Even though that $2.005 was in your budget for that

Telly Smith - Cross

1   promotion, right?

2   *A.*   Yes.

3   *Q.*   Money was already in the budget and ready to be spent,

4   right?

5   *A.*   Yes.

6   *Q.*   But the money had gone south on you.

7   *A.*   Yes.

8   *Q.*   So you went back to Pilgrim's and said, I know we got a

9   deal, but I want a better deal.

10  *A.*   In good faith we went back to them and asked them for a

11  price adjustment.

12  *Q.*   Not for good faith or bad faith.  You went back to

13  Pilgrim's and said, I want a lower price than the contractual

14  agreement that I signed; isn't that right, sir?

15  *A.*   Yes.

16        *MR. KOENIG:*  Objection.  This is pretty far afield.  I

17  would object on scope.  We asked about 2014 and that's it.

18        *THE COURT:*  Response?

19        *MR. TUBACH:*  Your Honor, this goes to the adversarial

20  and tense nature we talked about earlier and explained, one

21  being the e-mail that the government is eager to admit into

22  evidence.  I don't have much more on in.

23        *THE COURT:*  Yeah, that was the question.  Overruled.

24  *BY MR. TUBACH:*

25  *Q.*   Now, in fact, in prior years you had refused to increase

Telly Smith - Cross

1   the price when the market went in the other direction, didn't

2   you?

3   A.   I don't -- I don't recall a situation like that.  It's

4   possible, but I don't recall it.

5   Q.   Do you recall a situation when corn prices went through the

6   roof in 2007, 2008?

7   A.   I was not in a purchasing capacity at that time, so no.

8   Q.   Do you recall any situation, sir, when Pilgrim's Pride

9   stuck by its deal even though the market went up and they could

10  have gotten more for their chicken selling it elsewhere?

11  A.   I don't recall that specific situation, no.

12  Q.   They never backed out of a deal, though, did they?

13  A.   I don't remember that.

14  Q.   And, in fact, in 2013 itself the WOG market had gone higher

15  than what the contracted price was under Exhibit 404, wasn't

16  it?

17  A.   I don't have any information to speak to that.

18  Q.   Let's look at Exhibit E-262.  For your purposes, Mr. Smith,

19  I am only interested in the bottom two e-mails because the

20  other ones don't -- you weren't on those, so I am just going to

21  ask you about the bottom two e-mails.

22       MR. KOENIG:  Objection.  Again, all he said was I

23  don't have any information to speak to that.  He didn't say

24  anything about not remembering.

25       THE COURT:  Overruled.

Telly Smith - Cross

1    *BY MR. TUBACH:*

2    Q.  Okay.  Have you had a chance to read those bottom two

3    e-mails?

4    A.  I have.

5    Q.  The first e-mail is from Mr. Boarman at Pilgrim's Pride?

6    A.  Yes.

7    Q.  He was one of the people that you were in touch with

8    regarding this contract, right?

9    A.  Yeah, I remember Matthew Boarman.

10   Q.  Do you recall receiving this e-mail on or about May 15 or

11   so?

12   A.  I am reading it, yes.

13   Q.  Well, you recall receiving this e-mail, don't you?

14   A.  I don't recall receiving this e-mail, but it appears I did.

15   Q.  Do you recall responding to the e-mail on May 15th at 9:55?

16   A.  It appears I did, yes.

17   Q.  Take a look on the very last page at the second bullet

18   point.

19           Does that refresh your recollection, Mr. Smith, that

20   the WOG prices for 2013 in the contract were $0.15 cents a

21   pound less than the market price?

22           *MR. KOENIG:*  Objection.

23           *THE COURT:*  Sustained.

24   *BY MR. TUBACH:*

25   Q.  Does this refresh your recollection, Mr. Smith, about

1982

Telly Smith - Cross

1   whether there was any difference between the market price at

2   the time of April -- May of 2013 and your contract price with

3   Pilgrim's?

4   *A.*  It really does not.  I will also point out we fulfilled our

5   agreement with them that year.

6   *Q.*  Sir, that wasn't my question.

7        *MR. TUBACH:*  Move to strike.  It's non-responsive,

8   Your Honor.

9        *THE COURT:*  That will be declined.

10   *BY MR. TUBACH:*

11   *Q.*  So you don't have any information one way or the other

12   about whether the market for WOGs had gone up in 2013; is that

13   right?

14   *A.*  I am reading it in this e-mail, but my recollection from

15   eight years ago, I don't remember.

16   *Q.*  You certainly didn't offer to increase the price for WOG,

17   did you?

18   *A.*  No.

19   *Q.*  So basically your contract was sort of a contract is a

20   contract unless it doesn't suit you.  Is that your approach to

21   contracts?

22   *A.*  No.

23   *Q.*  Is that what you mean by a supplier partner, that you can

24   refuse to fulfill your contractual obligations if you don't

25   feel like it?

Telly Smith - Cross

1    A.   No.

2    Q.   Now, you went to other suppliers, right, to try to get a

3    lower price for the wings, didn't you?

4    A.   We did.

5    Q.   And you went to -- including to suppliers who weren't

6    supplying you with wings at all for 2013 under the contract,

7    right?

8    A.   That, I don't remember.  I do remember going to other

9    suppliers and asking for a reduction in price and for the most

10   part received them.

11   Q.   Yeah, you went to Tyson.  They were supplying wings, right?

12   A.   That sounds accurate.

13   Q.   And they agreed to reduce the price, didn't they?

14   A.   They did.

15   Q.   Other suppliers you went to who had never been supplying

16   wings to you and you bought some from them, didn't you?

17   A.   That, I don't remember.

18   Q.   What you also did is you basically reduced that promotion

19   from 21 weeks down to nine weeks and then down to five weeks.

20   Do you remember that?

21   A.   That -- I am sorry, that doesn't sound accurate.

22   Q.   Do you recall reducing the promotion in any way?

23   A.   We may have reduced the promotion for a few weeks, but it

24   wasn't that drastic.  We spent most of the summer serving wings

25   that year.

1984

Telly Smith - Cross

1   *Q.* And you would agree with me, wouldn't you, that Pilgrim's

2   was -- the folks interacting with you from Pilgrim's were very

3   unhappy at the prospect of Golden Corral not fulfilling its

4   contractual obligation to pay $2.05 for 6 million wings, right?

5   *A.* I don't know what their frame of mind was.

6   *Q.* Well, they expressed that to you, didn't they?

7   *A.* I don't remember that, no.

8   *Q.* You don't remember that?

9   *A.* Was it contentious?  I remember that being contentious,

10  absolutely.

11  *Q.* It was contentious because they wanted you to stick with

12  the $2.05 and 6 million pounds under the contract, right?

13  *A.* Which to my recollection we did.

14  *Q.* To your recollection you did that?

15  *A.* We did.

16  *Q.* You are sure about that.

17  *A.* To my recollection, we stayed with that.

18  *Q.* You bought 6 million pounds of wings in 2013 at $2.005?

19  *A.* I don't remember the amount that was estimated, but I do

20  remember sticking with the dollar figure.

21  *Q.* But you don't know whether you bought 6 million, do you?

22  *A.* I don't remember that.

23  *Q.* You had said you were going to buy 6 million pounds, right?

24  *A.* We had estimated 6 million pounds.

25  *Q.* But the estimate to you didn't include going to other

Telly Smith - Cross                                                    1985

1   suppliers and buying a bunch from them so you wouldn't have to

2   buy 6 million from Pilgrim's, did it?

3   A.   Again, I don't recall that.

4   Q.   You will agree with me, though, that this whole wings issue

5   poisoned the relationship with Pilgrim's Pride.

6   A.   I wouldn't use the word poisoned.  It was a contentious

7   situation, but we moved past it and decided to do business yet

8   another year.

9   Q.   And then after that, the parties did not do business after

10  that, did they?

11  A.   We did not move forward again after, I believe, 2015.

12  Q.   And the folks you were negotiating with at Pilgrim's

13  expressed to you that they didn't trust Golden Corral to keep

14  its word on the contract that they had signed; isn't that

15  right?

16  A.   I am sorry, I don't recall that.

17  Q.   You don't recall that.

18  A.   No.

19  Q.   Now, I want to get back to 2015 pricing.

20          Your testimony earlier today was that Pilgrim's held

21  firm on a lot of their prices for that year.  That's what you

22  testified to earlier this morning.  Does that sound right?

23  A.   Yes.

24  Q.   Okay.  Let's take a look at D-789, which I believe should

25  be in front of you.  It's been admitted into evidence.  Do you

Telly Smith - Cross

 1  have that in front of you?  It's a paper copy.

 2          MR. TUBACH:  If we could publish this to the jury,

 3  please.

 4          THE COURT:  You may.

 5  A.  I have it.

 6          MR. TUBACH:  I am just waiting for it to be published

 7  to the jury.  Give us one second.

 8  BY MR. TUBACH:

 9  Q.  And this you testified earlier was the Pilgrim's bid that

10  was submitted on or about September 30th, 2014, correct?

11  A.  I have testified that this was a Pilgrim's bid, yes.

12  Q.  And the initial bid, what's the price that Pilgrim's

13  offered to sell chicken for the Columbus, Ohio distribution

14  center?

15  A.  $1.12 a pound.

16  Q.  Give or take, yeah, call it $1.12.  When it says Deliver

17  Pricing up at the top there, that means that Pilgrim's was

18  offering to sell chicken to Golden Corral and have it delivered

19  to your Columbus, Ohio distribution center for $1.12 a pound.

20  A.  That's correct.

21  Q.  Now, take a look at the -- at C-862.  That's the Mar-Jac

22  bid that's been admitted into evidence.

23          MR. TUBACH:  If we can publish that to the jury.

24          THE COURT:  You may.

25          MR. TUBACH:  If we could blow up those numbers a

Telly Smith - Cross

1    little bit so the jury can see them a little bit, those top

2    numbers under MBM Center, eight-piece cut up.

3    *BY MR. TUBACH:*

4    *Q.*  So you had testified earlier this was the initial Mar-Jac

5    bid that they submitted.

6    *A.*  Okay.

7    *Q.*  My question is for the Columbus, Ohio, what was their bid

8    to deliver chicken to Columbus, Ohio?

9    *A.*  $1.10.

10   *Q.*  They list some others.  And the prices there are all

11   different because there may be freight charges that are

12   different to get them to the different distribution centers

13   throughout the country.  Does that sound right?

14   *A.*  That is correct.

15   *Q.*  Now, take a look back at Exhibit -- Government Exhibit 424.

16          *MR. TUBACH:*  This has been admitted into evidence,

17   Your Honor, and I ask that it be published to the jury.

18          *THE COURT:*  It may.

19          *MR. TUBACH:*  If we go to the very last page, there is

20   some way to get that -- or sorry, the second to the last page.

21   And if we can get the header on the page just before that -- I

22   don't know if that's possible -- so we can have them together.

23   Any way to blow those up so folks can actually read it?  I am

24   just interested in the e-mail on the top of the second to the

25   last page.  No, my apologies.  It's the number 855 at the

Telly Smith - Cross

1    bottom and just the top e-mail there.  There we go.  We will

2    get the header information in a second.

3    *BY MR. TUBACH:*

4    *Q.*  You would agree with me this is an e-mail from Scott Tucker

5    to you on November 10, 2014, right?

6    *A.*  Yes.

7    *Q.*  And the text is up there on the screen there, what it says,

8    is, "Telly, I don't want to push on our guys too hard on this

9    unless I can assure them we can work it out on our end.  If I

10   can get them to the $1.02 delivered on eight-piece and WOGs, do

11   we keep the Columbus and Rocky Mount business for next year?"

12          That's what it says, right?

13   *A.*  Yes, it does.

14   *Q.*  And you characterized that as a bid.

15   *A.*  I did.

16   *Q.*  Then go to the e-mail from Mr. Smith.  And your response

17   was, "Yes.  Per our protocol, you can retain the business in

18   those two centers as the incumbent."  Incumbent there means

19   Pilgrim's had been supplying the business to those two

20   distribution centers in the prior years, so as the incumbent

21   they had the right to keep it, right?

22   *A.*  That's correct.

23   *Q.*  And the e-mail goes on to -- the e-mail chain goes on to

24   discuss pricing.  And you and Mr. Tucker came to an agreement

25   about what the size of the chicken would be, right?

Telly Smith - Cross

1989

1    A.  Okay, yes.

2    Q.  So this $1.02 per pound, that's 10 cents less than the bid

3    they initially submitted, isn't it?

4    A.  Yes, that's correct.

5    Q.  And that's exactly -- this e-mail has that $1.02.  Why

6    don't we take a look at the bid itself.

7            MR. TUBACH:  Let's go to E-568 and E-569.

8            Permission to approach?

9            THE COURT:  You may.

10   BY MR. TUBACH:

11   Q.  Take a look at e-568, if you would.  Do you have that in

12   front of you?

13   A.  Yes, I do.

14   Q.  That's an e-mail that Mr. Tucker sent to you, correct?

15   A.  Yes.

16   Q.  And this e-mail is dated November 12, 2014?

17   A.  Yes.

18   Q.  That's just two days after that e-mail exchange you had

19   with Mr. Tucker about the $1.02?

20   A.  Yes.

21   Q.  And you received this e-mail on or about November 12?

22   A.  Yes.

23   Q.  And attached to that e-mail is a further bid, correct?

24   A.  I would have to assume this document was attached to this

25   document.

Telly Smith - Cross

1    *Q.*  Yes.  I will represent to you, sir, it is.

2          Take a look at E-569, if you would.

3          *MR. KOENIG:*  Objection, foundation.

4          *THE COURT:*  Sustained.

5    *BY MR. TUBACH:*

6    *Q.*  Sir, do you recall receiving this bid on or about

7    November 12 or another pricing proposal from Pilgrim's Pride?

8    *A.*  It appears I received a bid, yes.

9    *Q.*  Take a look at E-569.  And is this a bid that Pilgrim's

10   Pride sent to you, in fact, you personally --

11   *A.*  Yes.

12   *Q.*  -- on or about November 12, 2014?

13   *A.*  Yes.

14   *Q.*  And is this a bid as with the others that are kept in the

15   ordinary course of Golden Corral's business?

16   *A.*  Yes.

17   *Q.*  Golden Corral relies on it in its business?

18   *A.*  Yes.

19   *Q.*  And it keeps that and uses it in the course of its

20   business, correct?

21   *A.*  Yes.

22          *MR. TUBACH:*  I move both E-568 and E-569 into

23   evidence.

24          *THE COURT:*  First of all, as to E-568, any objection?

25          *MR. KOENIG:*  Hearsay.

1991

Telly Smith - Cross

1        *THE COURT:* Response?

2        *MR. TUBACH:* Your Honor, it goes to show simply the

3   date that it's being sent, nothing else. I don't need the text

4   in it at all. I am happy to redact all the text of the e-mail.

5        *THE COURT:* Any objection to the document E-568 as

6   redacted to take out everything below the subject line; is that

7   right, Mr. Tubach?

8        *MR. TUBACH:* Yes, Your Honor. Thank you.

9        *MR. KOENIG:* Just so I am clear, counsel is agreeing

10  that the date and e-mail headers is not hearsay?

11       *MR. TUBACH:* All I am asking to admit is the

12  information down to the subject line and everything else gets

13  redacted.

14       *THE COURT:* Yeah, he is saying everything below the

15  subject line. I am not sure -- that's the offer.

16       *MR. KOENIG:* No objection.

17       *THE COURT:* So E-568 as redacted will be admitted.

18       *MR. TUBACH:* And then E-569, I believe I will also

19  move that into evidence, Your Honor.

20       *THE COURT:* I am sorry, you did.

21       Any objection to the admission of E-569?

22       *MR. KOENIG:* No, sir.

23       *THE COURT:* He E-569 will be admitted.

24       *MR. TUBACH:* If we could publish E-569 to the jury,

25  please.

Telly Smith - Cross

1    THE COURT:  You may.

2    MR. TUBACH:  Thank you.

3    BY MR. TUBACH:

4    Q.  And the pricing here to both -- to Rocky Mount is $1.02

5    delivered; is that right?

6    A.  It appears so, yes.

7    Q.  And that's exactly the price that you told Mr. Tucker two

8    days earlier Pilgrim's needed to bid if it wanted to be awarded

9    the business, right?

10   A.  No.

11   Q.  Right.  You characterized it, the prior one, as also a bid,

12   correct?

13   A.  It is a bid.

14   Q.  Is this also a bid?

15   A.  This is also a bid.

16   Q.  Did they bid twice?

17   A.  This is probably formalizing that.

18   Q.  Now, you testified earlier that in relation to Government

19   Exhibit 400, that speech that you gave at the convention -- do

20   you recall that?

21   A.  Yes.

22   Q.  We don't need to look at it.  I am just going to ask you

23   generally about that.

24       You testified that that was just for 2014.  That

25   wasn't a speech about what happened in 2015.  Do you recall

Telly Smith - Cross

1    that testimony?

2    A.   There is two parts to the speech.   There is one part that

3    talked about 2014, what happened that year, during that year,

4    and there is another part of the speech that characterizes what

5    happens in the next year.

6    Q.   Okay.   Well, let's look at that.   Let's look at Government

7    Exhibit 401.   You have that probably in the binder, I think.

8            MR. KOENIG:   Tab 2.

9            MR. TUBACH:   Thank you.   Tab 2, Mr. Smith.

10           If we could publish this to the jury, Your Honor.

11   This has been admitted.

12           THE COURT:   You may.

13   BY MR. TUBACH:

14   Q.   This is the page that ends in 063 at the bottom.   I believe

15   it's Page 4.   If we can blow up just the part that starts On

16   Chicken to the end of the page.

17           This is the part where you are talking about -- the

18   very bottom there you are talking about future, right?

19   A.   Correct, yes.

20   Q.   And what you say for future is, "Demand for chicken next

21   year should remain strong, and available supply will be tight.

22   It is possible that our chicken prices could go higher next

23   year," right?

24   A.   Yes.

25   Q.   And you were referring to 2015, right?

Telly Smith - Cross

1  A.  I was.

2  Q.  You also gave a speech in 2015, right?

3  A.  I did.

4  Q.  You do this every year, right?

5  A.  Every year.

6  Q.  Let's take a look at Government Exhibit 400.

7          MR. KOENIG:  It's Tab 1.

8          MR. TUBACH:  Thank you, counsel.  It's Tab 1 in the

9  binder.

10  BY MR. TUBACH:

11  Q.  You have looked at this before, right, sir?

12  A.  Yes.

13  Q.  You looked at this in preparation for your testimony here

14  today?

15  A.  I believe so, yes.

16  Q.  And this speech was given roughly October of 2015, correct?

17  A.  Yes.

18  Q.  And when you gave that speech, you were looking back on

19  what had actually happened in 2015 and looking forward to 2016,

20  right?

21  A.  That's correct.

22  Q.  Now, take a look at the page that ends with Bates No. 053,

23  and focus particularly on the middle part that says, "As we

24  said earlier."  Do you see that?

25  A.  Yes.

1995

Telly Smith - Cross

1   Q.  And so take a look at that and I'll have some questions for

2   you.  You can just read down to the -- before the, "For 2016,"

3   okay?  Have you had a chance to read that?

4   A.  Yes.

5   Q.  Now, you recall that in the 2015 speech you gave, you also

6   said that supply and demand is what drove chicken prices?

7   A.  I did mention that, yes.

8   Q.  You did mention it.  It was the only thing you mentioned,

9   wasn't it?  Higher demand boosted the poultry industry, right?

10  A.  Yes.

11  Q.  That's what you said in 2015?

12  A.  Yes.

13  Q.  And you were talking about that year, the 2015 year, right?

14  A.  Yes.

15  Q.  And you also said that many processers had moved to a

16  larger bird away from small bird which reduced supply, right?

17  A.  That is correct.

18  Q.  That's demand and supply, right?

19  A.  Yes.

20  Q.  And not only that, chicken continued to be the lowest

21  priced protein of beef, pork and chicken, right?

22  A.  That is correct.

23  Q.  And that's going to drive more demand of chicken, right?

24  A.  Mostly the boneless chicken, yes, but --

25  Q.  All chicken, right?

Telly Smith - Cross

1    *A.*  No, mostly the boneless chicken.

2    *Q.*  When folks were coming to your restaurants, you gave all

3    this testimony earlier about what happened when people went to

4    grocery stores.  I am asking about going to your restaurant.

5    What happens is if beef and pork are more expensive, you are

6    going to offer more chicken, right?

7    *A.*  In our restaurants it actually had the opposite effect.

8    When beef prices and pork prices are higher, those are the

9    items that our guests focus on.

10   *Q.*  So you are saying your demand for beef and pork were higher

11   than chicken.

12   *A.*  That's correct.

13   *Q.*  But overall in the industry, beef and pork prices were

14   going through the roof.

15   *A.*  That's correct.

16   *Q.*  And chicken prices were not.

17   *A.*  That's correct.

18   *Q.*  You testified earlier about corn.  You thought prices for

19   chicken were going to go down because of corn prices.

20   *A.*  I thought prices were going to stay the same or go lower.

21   *Q.*  Thank you, stay the same or go down.  Now, what is the one

22   thing that beef, chicken and pork all need?

23   *A.*  Corn and soy meal.

24   *Q.*  Right.  And the prices for beef and chicken and pork are

25   going all over the place even though they are eating the same

Telly Smith - Cross

1   corn, aren't they?

2   A.   They are for different factors, for different reasons.

3   Q.   Right.   It had nothing to do with the price of corn, what

4   happened to the price of beef, the price of chicken or the

5   price of pork.

6   A.   Again, they are all different, yes.

7   Q.   All different markets determine what that price is going to

8   be, right?

9   A.   All different factors, yes.

10          MR. TUBACH:   Thank you.   I have no further questions.

11          THE COURT:   Additional cross-examination?

12          Ms. Henry, go ahead.

13                    **CROSS-EXAMINATION**

14   BY MS. HENRY:

15   Q.   Good afternoon.

16   A.   Yes, ma'am.

17   Q.   My name is Roxann Henry and I represent Mr. William

18   Kantola.

19          You don't know Mr. Kantola, do you?

20   A.   No, ma'am.

21          THE COURT:   Ms. Henry, do you mind --

22          MS. HENRY:   No further questions.

23          THE COURT:   Everyone hear that?   Okay.   Thank you,

24   Ms. Henry.

25          Additional cross?

Telly Smith - Cross                                                1998

1          Yes.

2                          **CROSS-EXAMINATION**

3    *BY MR. POLLACK:*

4    *Q.*  Good afternoon, Mr. Smith.

5    *A.*  Good afternoon.

6          *MR. POLLACK:*  I would like to start, if I can, by

7    putting Government Exhibit 413 on the screen for the jury.

8          *THE COURT:*  Which one was that again?

9          *MR. POLLACK:*  413.

10         *MR. KOENIG:*  It's Tab 10.

11   *BY MR. POLLACK:*

12   *Q.*  Mr. Smith, you were shown this by Mr. Koenig this morning?

13   *A.*  I believe so, yes.

14   *Q.*  This is what was sent out on behalf of Golden Corral in

15   September of 2014 to their 2014 approved suppliers asking for

16   them to put in bids to get contracts for the 2015 year?

17   *A.*  Yes, sir.

18   *Q.*  And how would this document have gone out?  Would it have

19   gone out by e-mail?

20   *A.*  That document would have gone out as an e-mail attachment.

21   *Q.*  And so if we had all the e-mails, we could see exactly who

22   this document went out to, correct?

23   *A.*  I would assume so, yes.

24   *Q.*  But Mr. Koenig didn't show you any e-mails as to who this

25   went out to, did he?

Telly Smith - Cross

1   A.   No, he did not.

2   Q.   He just asked you from memory who you thought it went out

3   to, correct?

4   A.   Correct.

5   Q.   And do you see at the bottom right-hand corner where it

6   says "MJPoultry"?

7   A.   Okay.

8   Q.   Do you know whether that means that this particular copy

9   went out to MJ Poultry and was produced by MJ Poultry?

10  A.   I do not know that.

11          MR. KOENIG:   Objection, foundation.

12          THE COURT:   He indicated he didn't know.   Overruled.

13  BY MR. POLLACK:

14  Q.   In any event, you testified by memory as to who you think

15  that it went out to, correct?

16  A.   That is correct.

17  Q.   And you included George's on that list, correct?

18  A.   I believe so, yes.

19  Q.   Do you remember meeting with the government on

20  September 30th of this year, 2021?

21  A.   I believe so, yes.   I don't have a calendar in front of me,

22  but I believe so.

23  Q.   You had a number of meetings with Mr. Koenig and others

24  with the government?

25  A.   Yes.

Telly Smith - Cross

1   *Q.* And do you remember in the September 30th meeting, do you

2   remember Mr. Koenig being one of the people there?

3   *A.* I believe so.

4   *Q.* And do you remember saying on that occasion that your

5   memory was that in 2014 Tyson, Pilgrim's Pride and perhaps

6   Mar-Jac and Case Farms were the supplier partners for Golden

7   Corral?

8   *A.* It's possible, yes.

9   *Q.* And you did not list George's as one of them.

10  *A.* I don't remember.

11  *Q.* Do you remember meeting with the government on

12  October 20th, 2021?

13  *A.* Again, without a calendar I couldn't tell you for sure, but

14  it sounds plausible.

15  *Q.* And do you remember on that occasion again that Mr. Koenig

16  was there?

17  *A.* Yes.

18  *Q.* And do you remember on that occasion saying that in 2014

19  Golden Corral's qualified bidders were Case Farms, Claxton,

20  Koch Foods, Mar-Jac, Pilgrim's Pride and Tyson Foods?

21  *A.* Okay.

22  *Q.* You did not list George's.

23  *A.* Okay.

24  *Q.* And you were doing your best to give your accurate

25  recollection in both those interviews, right?

Telly Smith - Cross

1   A.   I was trying to go off memory.

2   Q.   And you also met with the government yesterday, did you

3   not?

4   A.   I did.

5   Q.   And yesterday when you met with the government, was

6   Mr. Koenig there?

7   A.   Yes.

8   Q.   And yesterday when you met with the government, did you

9   tell them that the bidders in 2014 were Tyson Foods, Pilgrim's,

10  Claxton, Koch, House of Raeford and Mar-Jac?

11  A.   Sounds right.

12  Q.   And you did not list George's.

13  A.   I must have omitted it.

14  Q.   And you were trying to be accurate on that occasion.

15  A.   Yes, sir.

16  Q.   When you went from memory this morning and you thought that

17  George's was one of the suppliers, did Mr. Koenig remind you

18  that on at least three prior occasions he had asked you the

19  same question and not on a single one of those occasions had

20  you listed George's?

21  A.   No, sir.

22       MR. KOENIG:   Your Honor, may we have a brief side bar?

23       THE COURT:   Yes.

24   (At the bench:)

25       THE COURT:   Mr. Koenig, go ahead.

Telly Smith - Cross

1          MR. KOENIG:  Your Honor, I object to this trying to

2     inject my name or any prosecutor's name into the questioning.

3     That's just not relevant to the issues.  And he is trying to

4     imply that somehow we have done something wrong, and I just

5     think it's highly inappropriate.

6          THE COURT:  Response, Mr. Pollack?

7          MR. POLLACK:  I am not sure I heard the rule of

8     evidence that Mr. Koenig cited, but it seems like a perfectly

9     appropriate testimony to me.

10         THE COURT:  I am going to sustain that objection.  The

11    problem is that assuming that there was a special agent,

12    someone who could be a testimonial witness, then asking about

13    what the prosecutors did or that type of thing is unnecessary.

14    I think it does create a 403 prejudice factor.  You can ask

15    generally, you know, did someone at the meeting remind you,

16    something of that nature, but trying to interject Mr. Koenig in

17    when he is a non-testimonial witness to the proceeding I think

18    does not have a proper purpose.

19         MR. POLLACK:  Your Honor, I understand the Court's

20    ruling, but to be clear, I was asking if Mr. Koenig asked him

21    this this morning.  I can't ask that about one of the agents.

22         THE COURT:  I am sorry, why not?

23         MR. POLLACK:  I was talking about Mr. Koenig's

24    examination of him.  The agents didn't examine him.

25         THE COURT:  You can ask him about that.  I think

Telly Smith - Cross

1    Mr. Koenig's point was that -- was whether during one of the

2    prep sessions Mr. Koenig asked him a question.

3         MR. POLLACK:  Maybe I misunderstood.  I wasn't clear.

4    The question I was trying to ask him was whether during

5    Mr. Koenig's examination he pointed out to the witness on three

6    prior occasions he had said something different.

7         THE COURT:  Yeah, that's perfectly fine, of course.

8    It was my understanding and maybe Mr. Koenig's too -- I don't

9    know if there was confusion on that on your part, Mr. Koenig.

10   Perhaps not.

11        MR. KOENIG:  I understood him to be specifically

12   pointing out to me as though I was trying to mislead the jury

13   by not correcting him on George's, and that strikes me as 403

14   and just completely inappropriate.

15        THE COURT:  I will overrule that objection.  The

16   jury's heard it and can properly assess to the extent it was

17   misleading or unfair or anything of that nature, all right?

18        Thank you.

19      (In open court:)

20        THE COURT:  Objection is overruled.

21        Go ahead, Mr. Pollack.

22   BY MR. POLLACK:

23   Q.  And Mr. Smith, again just going from memory this morning,

24   your memory was that not only was the request sent to George's,

25   but that George's also responded to the request?

Telly Smith - Cross
2004

1   *A.* I don't recall if George's responded to the request.

2   *Q.* And, in fact, if we can put up 480, which is on the screen,

3   these are the supplier partners that you entered into

4   agreements with for the 2015 year?

5   *A.* Yes, sir.

6   *Q.* And they are Pilgrim's, yes?

7   *A.* Yes.

8   *Q.* Tyson?

9   *A.* Yes.

10  *Q.* Mar-Jac?

11  *A.* Yes.

12  *Q.* And not George's.

13  *A.* Correct.

14  *Q.* And Mr. Koenig certainly didn't show you any document

15  suggesting that you had any conversations with anybody at

16  George's in 2014 that were adversarial?

17  *A.* I -- no, sir.

18  *Q.* Didn't show you any documents that suggested that George's

19  had said take it or leave it?

20  *A.* No, sir.

21  *Q.* And putting George's as a company aside, Mr. Smith, I am

22  correct you don't even know Mr. Blake; is that correct?

23  *A.* Say the name again, please?

24  *Q.* Ric Blake, you don't even know him?

25  *A.* No, sir.

Telly Smith - Cross

1             MR. POLLACK:  Thank you.  Nothing further.

2             THE COURT:  Thank you, Mr. Pollack.

3             Additional cross?

4             Yes, Ms. Prewitt?

5                         **CROSS-EXAMINATION**

6    BY MS. PREWITT:

7    Q.  Hello, Mr. Smith.

8    A.  Hello.

9    Q.  My name is Elizabeth Prewitt and I represent Timothy

10   Mulrenin, okay?

11   A.  Okay.

12   Q.  I am going to ask you some questions today about prices

13   that were submitted by Tyson Foods to Golden Corral, okay?

14   A.  Okay.

15   Q.  Just to be clear, you and I have not met before; is that

16   right?

17   A.  No.

18   Q.  This is the first time we are speaking.

19   A.  Yes, ma'am.

20   Q.  Now, you will recall that Mr. Koenig when he was

21   questioning you asked you about suppliers' sales

22   representatives that you were aware of, right?

23   A.  Yes.

24   Q.  Specific people, right?

25   A.  Yes.

Telly Smith - Cross

1   Q.  The people who sold or were seeking to sell to Golden

2   Corral, correct?

3   A.  Yes.

4   Q.  Okay.  And he specifically asked you about who the sales

5   representative was at Pilgrim's, correct?

6   A.  Correct.

7   Q.  And he also asked you about Mar-Jac.  Do you remember that?

8   A.  Yes.

9   Q.  He asked you who was the sales representative from Mar-Jac,

10  right?

11  A.  Yes.

12  Q.  Now, you recall that Mr. Koenig never asked you about who

13  the sales representative for Tyson was; isn't that right?

14  A.  That's correct.

15  Q.  And he skipped over that, correct?

16  A.  Yes.

17  Q.  Okay.  And, in fact, as you were just testifying about, you

18  met with the government several times in preparation for your

19  testimony today; isn't that right?

20  A.  Yes.

21  Q.  And on those occasions you told them, in fact, that you

22  didn't even know who Tim Mulrenin was; isn't that right?

23  A.  That is correct.

24  Q.  And you said you didn't know who Brian Roberts was; isn't

25  that correct?

2007
Telly Smith - Cross

1    A.  Correct.

2    Q.  And, in fact, you told them you didn't know who Carl Pepper

3    was; isn't that right?

4    A.  Correct.

5    Q.  That's because they didn't, as far as you are aware, and

6    you should know, service the Golden Corral account, correct?

7    A.  That is correct.

8    Q.  Okay.  Now, you told that to the government when you were

9    interviewed by them on September 30th; isn't that right?

10   A.  Told what?  I am sorry?

11   Q.  You told the government when you were interviewed on

12   September 30th this year, not that long ago, that those

13   individuals did not service the Golden Corral account, correct?

14   A.  I believe so, yes.

15   Q.  Now, and you will remember that Mr. Koenig spent some time

16   showing you the prices that were submitted by Tyson Foods in

17   connection with that 2015 contract.  Do you remember that?

18   A.  I believe so.

19   Q.  And you remember the part where he pointed out specifically

20   the Ohio location and the price that Tyson submitted.  Do you

21   remember that?

22   A.  That is correct, yes.

23   Q.  And he said you couldn't compare apples to orange.  You

24   couldn't compare it, right?

25   A.  Yes.

Telly Smith - Cross

1    Q.  Let's take a look at that.

2         MS. PREWITT:  Can you please put up Government

3    Exhibit -- I think it's 480.

4    BY MS. PREWITT:

5    Q.  I am going to ask you some questions about the prices

6    submitted by Tyson Foods in connection with this 2015 contract,

7    okay?

8         Take a look first at the part that Mr. Koenig directed

9    you to.  That's the Ohio plant price location.  Do you recall

10   that?

11   A.  Yes.

12   Q.  And he said that really couldn't be compared with the other

13   prices, right?

14   A.  It's a different product, yes.

15   Q.  That's reflected in that footnote, right, at the bottom of

16   the page?

17   A.  That's correct.

18   Q.  Let's take a look at some of the other prices that Tyson

19   submitted, okay?

20   A.  Okay.

21   Q.  Let's look with Oklahoma.  Do you see that price there?

22   A.  Yes.

23   Q.  What is that price?

24   A.  $1.04.

25   Q.  And then move over to the delivered cost leg quarters.

2009

Telly Smith - Cross

1   A.   That's correct.

2   Q.   And that's .73?

3   A.   .73.

4   Q.   Would you agree that's the lowest price that's been

5   submitted as reflected in that chart?

6   A.   That is correct.

7   Q.   Now let's draw your attention down to CO.  Is that

8   Colorado?

9   A.   Colorado.

10   Q.   Now, taking a look at that price, would you say that's the

11   second lowest price that's been submitted if you knock out the

12   Ohio price?

13   A.   Equal to North Carolina, but yes.

14   Q.   Taking a look, if you move your eye over to the left, you

15   will see the percentage of system, the percentage of system

16   column, do you see that?

17   A.   Yes.

18   Q.   What does that reflect, sir?

19   A.   That represents the amount of pounds that each of these

20   distribution centers distributed.  So of the total pounds, this

21   distribution center, for example, North Carolina was

22   22.9 percent of our system.

23   Q.   So if you add it all up, would you say that Tyson had on

24   average the lowest price and had a greater volume of sales as a

25   result, sales of chicken, correct?  I will represent to you,

2010

Telly Smith - Cross

1   although I am not a math master and certainly not at chicken

2   math, this is about 55 percent, does that sound about right, in

3   total?

4          *MR. KOENIG:*  Objection.

5          *THE COURT:*  He can answer.

6   *A.*  Yes.

7   *BY MS. PREWITT:*

8   *Q.*  Moving to the third page of this exhibit, I would like you

9   to take a look at the price listed at the top, to the bottom

10  right, the Tyson price.  Sir, let me just ask you the question.

11  Is that the Tyson price submitted?

12  *A.*  It appears so, yes.

13  *Q.*  And how does that compare to the other prices submitted by

14  other suppliers?  Because if you go down, you'll see other

15  suppliers mentioned, correct?

16  *A.*  Yes.

17  *Q.*  Sir, does it appear to be the second lowest price?

18  *A.*  That sounds accurate.

19  *Q.*  Okay.  Now, that's not the only time that Tyson was a low

20  priced bidder to Golden Corral; wasn't that correct?

21  *A.*  I am not sure what you are referring to.

22  *Q.*  Well, Mr. Tubach posed some questions to you earlier about

23  this Mighty Wing promotion.  Do you recall that?

24  *A.*  Yes.

25  *Q.*  And in connection with that, Tyson moved from a secondary

2011

Telly Smith - Cross

1   supplier position and actually was supplying Golden Corral at

2   an even lower price; isn't that right?

3   A.   I don't remember the secondary supplier piece, but they did

4   lower their price from their initial fixed price that we had

5   asked for.

6   Q.   And as a result of that, they actually were able to achieve

7   more volume and sell more to Golden Corral because of that

8   lower price, correct?

9   A.   That part I don't remember.

10  Q.   Now, do you recall that Tyson actually took business away

11  from Pilgrim's Pride because of its lower price in connection

12  with that one episode?

13  A.   I don't believe that that's accurate.

14  Q.   You testified earlier in response to Mr. Koenig's questions

15  that a low price bid was an aggressive and competitive bid; is

16  that right?

17  A.   Yes.

18  Q.   Having taken a look at the prices that were submitted by

19  Tyson, isn't it fair to say that that was an aggressive low bid

20  relative to the other submitting suppliers?

21  A.   As compared to the other submitting suppliers, yes; not

22  compared to the previous year.

23  Q.   Sir, I direct your attention to that exhibit, 480.  Do you

24  recall that?

25  A.   It's no longer on the screen.

Telly Smith - Cross

1    Q.   Okay.  But that's the question I posed to you.  In

2    connection with that bid submission, the one that you have been

3    questioned about, the one involving 2015 supply of chicken to

4    Golden Corral, isn't it correct that Tyson was the low priced

5    aggressive bidder?

6    A.   I would agree with that, yes.

7    Q.   Earlier, sir, you testified that the low price aggressive

8    bidder was in your mind a competitive bidder; is that correct?

9    A.   Yes.

10   Q.   So sitting here today having looked at that contract, it is

11   your view that Tyson Foods was bidding competitively for that

12   contract; isn't that correct?

13   A.   I would agree with that.

14        MS. PREWITT:  Thank you.  No further questions, Your

15   Honor.

16        THE COURT:  Thank you, Ms. Prewitt.

17        Additional cross?

18                    **CROSS-EXAMINATION**

19   BY MR. FAGG:

20   Q.   Good afternoon, Mr. Smith.

21   A.   How are you?

22   Q.   My name is John Fagg and I represent Bill Lovette.  I just

23   have a few questions for you.  As a fellow North Carolinan, I

24   will say welcome to Colorado and hopefully we will get you out

25   of here soon.

2013

Telly Smith - Cross

1    A.  Thank you.

2    Q.  Sir, you have never met Bill Lovette, have you?

3    A.  I have not.

4    Q.  And you have never spoken with him?

5    A.  I have not.

6    Q.  And you have never negotiated with him over any terms or

7    contracts, correct?

8    A.  I have not.

9    Q.  Sir, I would like to ask you briefly about one of the

10   government's exhibits.  I believe it's the last document in

11   your binder.  It's Exhibit 481.

12           Does that say 481 on it?

13   A.  It does.

14   Q.  Okay, great.  And, sir, have you seen this document before?

15   A.  I believe I have.

16   Q.  This is one of the documents that the government discussed

17   with you in one of your five meetings that you had with them?

18   A.  Yes.

19   Q.  And is this a document that you created?

20   A.  It is.

21   Q.  And is it a document that is -- if you flip over to the

22   second page, sir, is it a document that is showing historical

23   chicken prices that Golden Corral paid?

24   A.  Yes.

25   Q.  Is this a document that you relied upon in the course of

2014

Telly Smith - Cross

1   your work at Golden Corral?

2   A.   Yes, I'd say so.

3        MR. FAGG:   Your Honor, we would offer this document

4   into evidence.

5        THE COURT:   All right.  And I believe, Mr. Fagg, you

6   described it as having two pages?  I just have one.  Is it a

7   one-page document or two?

8        MR. FAGG:   May I approach, Your Honor?  It's a

9   two-page document.

10       THE COURT:   Is the first page a native cover sheet

11  maybe?  I don't know.  In the government's notebook I just have

12  one page, but you can hand that up to Ms. Grimm.  Thank you.

13       Any objection to the admission of Exhibit 481?

14       MR. KOENIG:   Are we talking about the two-page version

15  or the one-page version?  I am not sure where this page came

16  from.

17       THE COURT:   Well, I didn't know there were two

18  versions.  Mr. Fagg handed me a two-page one where what's shown

19  in the notebook -- yeah, it seems to be marked differently.

20       MR. FAGG:   Your Honor, may I approach the witness to

21  see if he has the same document?

22       THE COURT:   Yes.

23       MR. KOENIG:   No objection.

24       THE COURT:   So we are talking now about the two-page

25  version?

2015
Telly Smith - Cross

1              MR. KOENIG:  Yes.

2              THE COURT:  We will have to make sure that the

3    two-page version then becomes the version that goes back to the

4    jury.

5              MR. KOENIG:  Of course.  I am not sure what happened

6    here, but...

7              THE COURT:  So Exhibit 481, two pages, will be

8    admitted.

9              MR. FAGG:  Thank you, Your Honor.

10   BY MR. FAGG:

11   Q.  So Mr. Smith, just to make sure that we're clear here on

12   the record, what I've just handed you is a two-page version of

13   Exhibit 481, GX-481.  I just want to make sure after you have

14   had an opportunity to review it that this is a spreadsheet that

15   you believe you created.

16   A.  I am not sure where the two-page version came from.  I

17   created the one-page version, but this may be --

18   Q.  Do you have any reason, sir, as you sit here today to look

19   at the second page and believe that you did not create that?

20   A.  No.  I am just trying to understand what the differences

21   are, but it looks fine to me.

22   Q.  I believe the first page was inadvertently admitted

23   previously.

24   A.  Okay.

25   Q.  Sir, you can set that aside.

Telly Smith - Cross

1          You never worked for -- you have never worked for any

2   chicken suppliers, correct?

3   A.   No, sir.

4   Q.   And I believe you testified earlier that chicken was about

5   5 percent of the food that you purchased year in and year out,

6   correct?

7   A.   5 percent -- I have to clarify, 5 percent by spend, not

8   by -- 5 percent by, yeah, spend -- or tonnage, not by spend,

9   that's what I meant to say.

10  Q.   5 percent of the product by tonnage you purchased was

11  chicken, correct?

12  A.   Yes.

13  Q.   You talked earlier about forecasting.  Do you remember

14  that?

15  A.   Yes.

16  Q.   And the team at Golden Corral who was doing the forecasting

17  was you and your colleague, Ms. Moriggia?

18  A.   Along with our finance team, yes.

19  Q.   And Ms. Moriggia is not an economist, is she?

20  A.   She is not.

21  Q.   And she is also not an expert in chicken, correct?

22  A.   That is correct.

23  Q.   And the people who would be the experts in chicken are the

24  chicken suppliers, correct?

25  A.   Yes.

Telly Smith - Cross

1   Q.  And the chicken suppliers you would expect, would you not,

2   would do their own forecasting.

3   A.  You would expect, yes.

4   Q.  Given that that's the product that they sell.

5   A.  Correct.

6   Q.  And are you aware, sir, when the chicken suppliers do their

7   forecasting, that they look at things beyond just feed costs?

8   A.  I am sure they do, yes.

9   Q.  Such as supply?

10  A.  Yes.

11  Q.  And anticipated demand?

12  A.  That's correct.

13  Q.  Now, sir, I believe you testified that you had been in this

14  industry for about 31 years?

15  A.  I have been with my company 31 years, yes; in supply chain,

16  11.

17  Q.  Right.  In your current role or similar role within the

18  supply chain for the last 11 years, right?

19  A.  That's correct.

20  Q.  And is it fair to say you have developed a way of doing

21  business over the course of those -- at least the last 11

22  years?

23  A.  Yes, sir.

24  Q.  And you've developed a way that you like to negotiate,

25  right?

Telly Smith - Cross

1    A.   Yes, sir.

2    Q.   And I believe that you've described that way you negotiate

3    sometimes is deploying a Jekyll and Hyde approach with

4    Ms. Moriggia?

5    A.   Did I say that at this meeting?

6    Q.   That's my question to you, sir.

7    A.   Okay.  I would characterize that as potentially accurate.

8    I would say we have used that approach before.

9    Q.   Play off of each other a little bit.

10   A.   Yes.

11   Q.   One of you is nice.  One of you is not so nice.

12   A.   Always respectful.

13   Q.   And you have also described, sir, about the relationships

14   that you have -- you, when I say you, I mean Golden Corral,

15   okay -- the relationships that Golden Corral has at least from

16   your perspective with the suppliers is something you have

17   described as a strategic partnership, yes?

18   A.   That's correct.

19   Q.   And you have found that this strategic partnership is a way

20   to bring more value to Golden Corral.

21   A.   Bring more value to Golden Corral and our partners, yes.

22   Q.   And so you try to prioritize doing business with these

23   strategic partners, yes?

24   A.   That's correct.

25   Q.   And I think as you just mentioned, you are trying to seek

2019

Telly Smith - Cross

1  out mutual benefit to both Golden Corral and to the suppliers,

2  right?

3  A.  Yes.

4  Q.  And there is nothing with taking that sort of approach, is

5  there?

6  A.  No.

7  Q.  And you also said that as part of that dynamic, it's

8  important from your perspective to -- for there to be -- to

9  take into consideration the supplier health, right?

10  A.  Yes.

11  Q.  And the supplier satisfaction, right?

12  A.  Yes.

13  Q.  So as a result of that strategy, that meant that certain

14  suppliers got more business from Golden Corral than did others,

15  correct?

16  A.  I would say that's accurate.

17  Q.  And that's just business, right?

18  A.  Yes.

19  Q.  And if Golden Corral doesn't like a price that a supplier

20  is giving them, then Golden Corral can go to another supplier,

21  yes?

22  A.  Yes.

23  Q.  And if Golden Corral doesn't like the way that it is being

24  treated or the way that the negotiations are proceeding, it can

25  go to another supplier, yes?

2020

Telly Smith - Cross

1    A.   Yes.

2    Q.   And it's true, is it not, that not all suppliers and

3    customers are really a good fit, right?

4    A.   I would say that's accurate.

5    Q.   And there is no hard feelings there.   That's just business.

6    A.   That's accurate.

7    Q.   I think as you talked about the strategic partnership, some

8    of the things that you said -- that I believe that you think

9    are important are driving growth?

10   A.   Yes.

11   Q.   And that's driving mutual growth, right --

12   A.   Yes.

13   Q.   -- by the customer and the supplier, yes?

14   A.   Yes.

15   Q.   Trust?

16   A.   Absolutely.

17   Q.   Loyalty?

18   A.   Yes.

19   Q.   And thinking in lockstep.

20   A.   Could you rephrase that one?

21   Q.   Sure.   Is that a phrase that you'd used before, thinking in

22   lockstep with one another, being aligned in your thinking?

23   A.   Aligned in our thinking, yes.

24   Q.   And it is on those suppliers that Golden Corral wishes to

25   focus its energy, its efforts and its --

Telly Smith - Cross

1    *A.*  Of course.

2    *Q.*  Are you aware, sir, that Pilgrim's Pride has and has had

3    something called its key customers?

4    *A.*  Did you say key customer?

5    *Q.*  Key customers.

6    *A.*  I don't recall that, but it doesn't surprise me.

7    *Q.*  It doesn't surprise you that other companies have the same

8    sort of thought about relationships that Golden Corral has,

9    correct?

10   *A.*  Agree.

11   *Q.*  And you are aware, are you not, that Pilgrim's Pride

12   believes that Golden Corral breached the contract in 2013

13   related to wings?

14   *A.*  No, I would have no knowledge of that.

15   *Q.*  You have no knowledge that Pilgrim's Pride believes that

16   that contract was breached?

17   *A.*  That's correct.

18        *MR. KOENIG:*  Asked and answered.

19        *THE COURT:*  Overruled.

20        *MR. FAGG:*  No further questions.  Thank you.

21        *THE COURT:*  Thank you, Mr. Fagg.

22        Additional cross?

23        Mr. Feldberg?

24                    **CROSS-EXAMINATION**

25   *BY MR. FELDBERG:*

2022

Telly Smith - Cross

1   Q.  Mr. Smith, my name is Michael Feldberg.  I represent Roger

2   Austin.

3           MR. FELDBERG:  Could we call up Government Exhibit 480

4   which is in evidence and publish it to the jury, Your Honor?

5           THE COURT:  You may.

6           MR. FELDBERG:  And could we highlight, please, and

7   enlarge the fifth column from the right, Delivered Cost

8   eight-piece/WOG.

9   A.  Yes, sir.

10  Q.  And Mr. Smith, let's leave out for a moment the Tyson Ohio

11  delivered cost of .98 because, as you testified, Tyson was

12  experimenting with a different product.  Do you recall that?

13  A.  Yes.

14  Q.  So let's take a look at the other five prices there.

15  What's the spread between the highest and the lowest?

16  A.  Looks like 6 cents.

17  Q.  Would it be 7 cents, sir, a low of $1.04 and a high of

18  $1.11?

19  A.  Yes, 7 cents.

20  Q.  So there is a 7 cents spread between the highest price and

21  the lowest price, correct?

22  A.  Yes.

23          MR. FELDBERG:  And could we enlarge the box in the top

24  left corner of Exhibit 480 that says 8pc Volume Assumptions.

25  BY MR. FELDBERG:

2023

Telly Smith - Cross

1   Q.   Mr. Smith, your volume assumption for 2015 was 15,118,780

2   pounds of eight-piece, correct?

3   A.   Yes, sir.

4   Q.   Now, taking a price somewhat in the middle of that 7-cent

5   spread, if you bought all that chicken, the total cost would be

6   a little north of $16 million; is that correct?

7   A.   I -- I can't speak to the math, but I will take your word

8   for it.

9   Q.   If it were $1 a pound, it would be $15,118,780, correct?

10  A.   Sounds right.

11  Q.   If we took, say an average figure of $1.07, it would be a

12  little higher than that, correct?

13  A.   Yes.

14  Q.   About $16 million sound right?

15  A.   Sounds in the ball park.

16  Q.   And a 7-cent difference on $16 million would amount to how

17  much, sir?

18  A.   I am sorry, I can't do the math in my head.

19  Q.   A little over a million dollars, correct?

20  A.   Okay.

21  Q.   Is that right?

22  A.   Sounds accurate.

23  Q.   Okay.  Now, could we go back to the column -- the third

24  column from the right on the first page of Government

25  Exhibit 480 that says +/-PY?

Telly Smith - Cross

1   A.   Yes.

2   Q.   And the PY is prior year, correct?

3   A.   That is correct.

4   Q.   And what's the range of different prices from the prior

5   year, again leaving out the Tyson Ohio product?

6   A.   It appears to be 4 cents.

7   Q.   Would it be 7 cents, sir, from a high of 17 cents to a low

8   of 10 cents?

9   A.   Oh, I didn't see that.  Yes, 7 cents.

10  Q.   So there was a 7-cent range among the different suppliers

11  in the incremental cost over the prior year, correct?

12  A.   Yes.

13  Q.   They took different approaches.

14  A.   I didn't understand the last statement.

15  Q.   Well, one of them charged 17 cents more than the prior

16  year.  One of them charged 10 cents more than the prior year.

17  They were different, correct?

18  A.   Yes.

19  Q.   And Tyson took a completely different approach by creating

20  a different product, correct?

21  A.   Correct.

22  Q.   Sir, in your negotiations with suppliers, would you from

23  time to time tell one supplier "You're a nickel high" or "you

24  need to come down 7 to 10 cents"?

25  A.   We sometimes gave directional information.

2025

Telly Smith - Cross

1   *Q.*  Did you sometimes say to one supplier, "You're a nickel

2   high" or "you need to come down 7 to 10 cents"?  Would you be

3   that specific?

4   *A.*  I don't remember saying that, but I remember giving some

5   directional information, sure.

6   *Q.*  Do you recall being interviewed by representatives of the

7   Department of Justice and the Department of Commerce, Office of

8   Inspector General, Office of Investigations on June 4th, 2020?

9   *A.*  I vaguely remember that meeting, yes.

10  *Q.*  And at that time did you tell the government

11  representatives that you related to suppliers, "You are a

12  nickel high" or "you need to come down 7 to 10 cents"?

13  *A.*  I don't remember specifically saying that, but I do

14  remember giving directional information, yes.

15  *Q.*  I am asking you about the specifics, Mr. Smith.  Do you

16  have a recollection one way or the other?

17  *A.*  I do not recall those numbers, but I recall giving

18  directional information.

19  *Q.*  Would you give directional information by specifying a

20  nickel or 7 to 10 cents?

21  *A.*  It's possible.

22          *MR. FELDBERG:*  Thank you.

23          Nothing further, Your Honor.

24          *THE COURT:*  Thank you, Mr. Feldberg.

25          Additional cross-examination?

2026

Telly Smith - Redirect

1                    All right.  Redirect?

2                    **REDIRECT EXAMINATION**

3       *BY MR. KOENIG:*

4       *Q.*  Mr. Smith --

5       *A.*  Yes.

6       *Q.*   -- do you remember being asked on cross about your remarks

7       in 2014 -- I am sorry, your speech in 2014?

8       *A.*  Yes.

9       *Q.*  And do you recall being questioned about supply?

10      *A.*  Yes.

11      *Q.*  Supply issues?

12      *A.*  Correct.

13      *Q.*  And who did you say told you about the supply issues?

14               *MS. PAGE:*  Objection, hearsay.

15               *THE COURT:*  Overruled.  He was asked who.

16      *A.*  I don't remember the specific person, but we would have got

17      a lot of that information from our partners.

18      *BY MR. KOENIG:*

19      *Q.*  By partners, who do you mean?

20      *A.*  Our chicken supply partners.

21      *Q.*  So if there was a supply problem, in your mind would that

22      justify coordination of prices by competitors?

23      *A.*  No, sir.

24      *Q.*  Why not?

25      *A.*  Because that still defeats the purpose of the competitive

Telly Smith - Redirect

1    bid process, and there is no guarantee that we would receive

2    the best, most accurate price.

3    Q.   The best, most accurate price?

4    A.   Yes.

5    Q.   Do you recall being asked about this $1.02 price offered to

6    you by Pilgrim's?

7    A.   Yes.

8    Q.   Did you actually end up getting that price?

9    A.   I believe we did.  I believe $1.02 plus distribution is

10   $1.07.

11   Q.   Okay.  And if a supplier comes off on price, would that in

12   your mind justify coordination among suppliers?

13           MS. PAGE:  Objection, speculation.

14           THE COURT:  Overruled.

15   A.   Could you rephrase the question, sir?

16   BY MR. KOENIG:

17   Q.   Sure.  If a supplier during negotiations comes down in

18   price, does that make coordination among suppliers okay?

19           MR. TUBACH:  Objection, Your Honor.  Calls for a legal

20   conclusion.

21           THE COURT:  Overruled.

22   A.   No.

23   BY MR. KOENIG:

24   Q.   Why not?

25   A.   Because again, it comes back again to the competitive

Telly Smith - Redirect

1   process.  If someone comes down on price, that means they're

2   moving into a better position with us in order to gain the

3   business.

4   Q.  Do you recall being asked about the range of prices at the

5   different distribution centers?

6   A.  Yes, sir.

7   Q.  As long as there is a range, does that justify coordination

8   among competitors?

9   A.  No, sir.

10  Q.  Why not?

11  A.  The range really doesn't have anything to do with, you

12  know, coordination.  The range really is a factor of the best

13  price the supplier can offer and, you know, the freight costs

14  that get the product to the distribution centers.  It would not

15  justify coordination.

16  Q.  And finally, do you recall being asked about Tyson's price

17  being the lowest on that chart?

18  A.  Yes, sir.

19  Q.  Does the fact that one of the suppliers has the lowest

20  price justify coordination among competitors?

21  A.  It does not.

22  Q.  Why not?

23  A.  Same reasons I said earlier.  There is not much here that

24  does justify that, but in particular just because you have the

25  lowest one doesn't really mean much in my view.

2029

Telly Smith - Redirect

 1           *MR. KOENIG:*  Can I confer for just a second?

 2           *THE COURT:*  You may.

 3           *MR. KOENIG:*  Nothing further, Your Honor.

 4           *THE COURT:*  Is Mr. Smith subject to recall?

 5           All right.  Thank you very much, Mr. Smith.  You are

 6   excused.

 7           *THE WITNESS:*  Thank you, Your Honor.

 8           *MS. PREWITT:*  Your Honor, may I have a side bar,

 9   please?

10           *THE COURT:*  Yes, you may.

11      (At the bench:)

12           *THE COURT:*  Go ahead, Ms. Prewitt.

13           *MS. PREWITT:*  Your Honor, the government has zero

14   factual basis to pose that question to the witness regarding

15   Tyson colluding.  I didn't object to the question, but I think

16   this is a habit we are seeing with respect to the questions

17   posed.  They are assuming facts that they actually understand

18   and know not to be a basis for the question.

19           *THE COURT:*  Mr. Koenig, any response?

20           *MR. KOENIG:*  Not really other than I think it's a

21   perfectly legitimate question.  They are trying to inject

22   factors that, you know, are trying to explain away the conduct,

23   and we're trying to rebut that and I think fairly.

24           *THE COURT:*  Anything else, Ms. Prewitt?

25           *MS. PREWITT:*  Yeah, Your Honor.  I think the issue is

Telly Smith - Redirect

1   that he posed Tyson into the question to raise an inference in

2   the minds of the jury and an inference that he knows there is

3   no factual basis for.

4        THE COURT:  All right.  I haven't seen any pattern

5   that would suggest an improper purpose or improper -- or

6   attempt to create an improper conclusion by the jury, but we'll

7   see how things go from here on out.  You can obviously bring it

8   up later if you feel the same thing is going on.

9        MS. PREWITT:  Thank you, Your Honor.

10        THE COURT:  All right.  Thank you.

11        The United States may call its next witness.

12        MR. KOENIG:  Your Honor, at this time we have exhibits

13   we would like to offer.

14        THE COURT:  Go ahead.

15        MR. TUBACH:  Your Honor, it might be efficient to do a

16   brief side bar.

17        THE COURT:  Yes, you may.

18      (At the bench:)

19        THE COURT:  Go ahead, Mr. Tubach.

20        MR. TUBACH:  Your Honor, I think there are a number of

21   exhibits that the government is about to introduce which the

22   Court has not ruled on yet, I think, like up to maybe five, six

23   or seven or even more.  These are ones we didn't cover on

24   Friday afternoon.  And I fear we are going to be in the same

25   position we didn't want to be in on Friday, which we are

Telly Smith - Redirect

1    sitting at side bar arguing over documents.  I wanted to alert

2    the Court so we don't get into that position.

3         THE COURT:  Mr. Koenig, are the documents that you are

4    talking about the ones you have listed in the middle of Page 3

5    on Docket No. 793?

6         MR. KOENIG:  793, I don't know that I have 793.  Was

7    that the notice?

8         THE COURT:  Yes.  You may not know what docket number

9    that was assigned, but that was the notice that was recently

10   filed of amended and supplemental witness list and schedule of

11   exhibits.

12        MR. KOENIG:  Yes, it includes those, and then I

13   believe there are three additional that we were going to offer.

14        THE COURT:  Okay.  What are the numbers of those three

15   additional?

16        MR. KOENIG:  We have 9707, 9708, and 9709.

17        THE COURT:  9707, 970 -- what is this?

18        MR. KOENIG:  9708 and 9709.

19        THE COURT:  Okay.  And Mr. Tubach, in terms of I think

20   424 has already been admitted, but of the ones that are listed

21   on Page 3 of Docket No. 793 and in addition to the three that

22   Mr. Koenig just mentioned, do you anticipate lengthy side bars

23   over those?

24        MR. TUBACH:  Your Honor, all I know is -- and I

25   apologize, I am looking at 793-1 and 2, but I don't see the

Telly Smith - Redirect

1   list.  We got a list from the government saying the documents

2   they intended to introduce after Mr. Smith and there are two,

3   four, six, eight, 10, 12, 14 documents on that list.  And some

4   of them have not been ruled on by the Court because we didn't

5   get to them on Friday.

6        THE COURT:  The documents that are -- or exhibits,

7   rather, that are listed on 793 on Page 3 are Exhibit 410,

8   Exhibit 422, Exhibit 424, Exhibits 448 through 449 and then

9   450, 452, 453 and 498.  Those each correspond to a *James* log

10  entry which are also listed on that particular page.

11       MR. TUBACH:  Yes, Your Honor.  So 454 and then the

12  other three have not been ruled on.

13       THE COURT:  I didn't cross-check it.  I assume that

14  since the government is offering them, they probably have not

15  already been admitted, but I think 424 was.

16       MR. TUBACH:  I was talking about 454 and 07, 08 and

17  09.

18       THE COURT:  They didn't list 454.

19       MS. HENRY:  Your Honor, the list that I had that was

20  sent around 9:00 o'clock last night does have that one.  And I

21  also have 433 to 447, 498.  There is quite a few more.

22       THE COURT:  Mr. Koenig, so could you read the list of

23  exhibits that you intended to move the admission of at this

24  time?

25       MR. KOENIG:  Yes, Your Honor.  Let me just add,

Telly Smith - Redirect

1    though, first that 433 and 447 were ruled upon Friday.  We did

2    get to those.

3        THE COURT:  Okay.  Once again, what are the ones that

4    you are going to seek the admission of now?

5        MR. KOENIG:  That would be 410, 422 -- well, 410, 422,

6    424, 448, 449, 450, 451, 452, 453, 454, 433 through 447, 498

7    and the three, 9707, 9708 and 9709.

8        THE COURT:  Okay.  Some of those we did cover on

9    Friday, but many of those we haven't.

10        MR. TUBACH:  Exactly, Your Honor.  That's why we

11    thought it would be more efficient outside the presence of the

12    jury to get all those squared away so we don't have to object.

13        THE COURT:  Why don't we go ahead and take an earlier

14    break.  It's almost 3:00 o'clock now.  Why don't we plan on

15    reconvening at 3:20.  And maybe if you can have a chance to

16    briefly confer with each other and figure out how you would

17    like to do this.  I do think for the reasons we talked about on

18    Friday it's inefficient to do what we are doing now, which is

19    to be on the transceivers for long blocks of time while the

20    jury just sits there listening to white noise.

21        So once again, Mr. Koenig, perhaps one consideration

22    would be whether we could call the next witness, presumably

23    Mr. Ledford, after the break and maybe figure out a different

24    time to move these into evidence, but obviously it's up to the

25    United States, all right?

Telly Smith - Redirect

1          MR. KOENIG:  Would we be able to move in the ones that

2   have already been ruled upon last Friday?

3          THE COURT:  Yeah, that would be a quick and easy

4   process.  And those would be 433 through -- I can't remember

5   what the number range was on that one.

6          MR. KOENIG:  447.  And then I think 424 is also in

7   evidence, but the jury didn't have a chance to read the

8   document.

9          THE COURT:  All right.  Right, it is in evidence.  So

10  if you want, we could do those right now.  And are those the

11  only exhibits?

12         MR. KOENIG:  I think that would be sufficient for now,

13  Your Honor.  And the other ones I think we can take care of

14  pretty quickly because they are all pretty short.  There is not

15  any lengthy exhibits.

16         THE COURT:  But take care of outside the presence of

17  the jury you mean?

18         MR. KOENIG:  Yeah, yeah, that's all I am saying.

19         THE COURT:  After Mr. Ledford or during sometime

20  outside the presence of the jury during his testimony?

21         MR. KOENIG:  Yes, yes.

22         THE COURT:  Okay.  All right.  Any problem with that

23  by defense counsel if we go ahead and do those, the ones that

24  have already been ruled on pursuant to rulings on Friday

25  afternoon, and then we'll take the break at 3:15 as usual?

Telly Smith - Redirect

1          MR. TUBACH:  That's fine, Your Honor.  Exhibit 434

2     through Exhibits 447, I believe.

3          MR. KOENIG:  Your Honor, I'd ask we do those that

4     relate to Golden Corral generally.  If we get a break during

5     Ledford's testimony to rule on these, would we be able to take

6     a break during his testimony to also show them to the jury?

7     Because I feel like it's -- it will be kind of distant in time

8     by the time we get done with Ledford.

9          THE COURT:  That's what I would like you to talk about

10    during the break the best way to do that.  I understand what

11    you're saying.  On the other hand, I don't want to necessarily

12    send the jury home early today because I don't know if we need

13    that much time to rule on these.  I just don't quite know how

14    much time it might take for us to get through all of these

15    exhibits.

16         MR. KOENIG:  Yeah.  All I was saying was if we do get

17    through all the objections and we have already started

18    Mr. Ledford, would we be able to take a break in his testimony

19    in order to put the exhibits into evidence?

20         THE COURT:  Yeah, that's the question.  The question

21    would be whether we, for instance, go with Ledford up until

22    5:00 o'clock, but then we have the jury come back later or some

23    other system like that.  But as part of that we could allow

24    time for the government to move them into evidence and the

25    jurors to look at them and then continue with Mr. Ledford.

Telly Smith - Redirect

 1    That would be a possible way we could do it, okay?

 2              MR. KOENIG:  That's fine.

 3              THE COURT:  Thank you.

 4        (In open court:)

 5              THE COURT:  Go ahead, Mr. Koenig.

 6              MR. KOENIG:  All right.  Thank you.

 7              At this time, Your Honor, the government moves to

 8    admit Exhibits 433 through 447.

 9              THE COURT:  By prior ruling, ladies and gentlemen,

10    those exhibits have been admitted.

11              MR. KOENIG:  Permission to publish them sequentially

12    to the jury?

13              THE COURT:  You may.  Mr. Koenig, if you don't mind

14    making a record of which exhibit you are showing.  And this is

15    I would assume is 433?

16              MR. KOENIG:  This is 433.  Thank you.

17              THE COURT:  Everyone good on that one?

18              MR. KOENIG:  434, thank you.

19              THE COURT:  Everyone good on that one?

20              All right.  Next exhibit.

21              MR. KOENIG:  435, please.

22              THE COURT:  All right.  Are you ready for the next?

23              MR. KOENIG:  436.

24              THE COURT:  All right.  I think we are ready for the

25    next one.

Telly Smith - Redirect

1        *MR. KOENIG:*  437.

2        *THE COURT:*  All right.  I think we are ready for the

3    next.

4        *MR. KOENIG:*  438.

5        *THE COURT:*  Ready for the next one.

6        *MR. KOENIG:*  439.

7        *THE COURT:*  Ready for the next.

8        *MR. KOENIG:*  440.

9        *THE COURT:*  Ready for the next.

10       *MR. KOENIG:*  441.

11       *THE COURT:*  Ready for the next.

12       *MR. KOENIG:*  442.

13       *THE COURT:*  Ready for the next.

14       *MR. KOENIG:*  443.

15       *THE COURT:*  Ready for the next.

16       *MR. KOENIG:*  444.

17       *THE COURT:*  All right.  Ready for the next.

18       *MR. KOENIG:*  445.

19       *THE COURT:*  Ready for the next.

20       *MR. KOENIG:*  446.

21       *THE COURT:*  All right.  Ready for the last exhibit.

22       *MR. KOENIG:*  447.

23       *THE COURT:*  Additional exhibits?

24       *MR. KOENIG:*  Yes, Your Honor.  424 is already in

25    evidence, I believe, but it has not been read through by the

Telly Smith - Redirect

1    jury, so permission to publish.

2          THE COURT:  You may.  And Mr. Koenig, is this a

3    multi-page exhibit?

4          MR. KOENIG:  Yes, it is.

5          If we could go to the first e-mail of the chain and

6    blow that up, please?

7          Let's do the next three e-mails, please.

8          Is that large enough to read?

9          THE COURT:  Can everyone see?  Do you want it

10   enlarged?

11         Yes, Mr. Kahler would.

12         MR. KOENIG:  All right.  Then the top two on that

13   page?

14         THE COURT:  All right.  Was that all of that exhibit,

15   Mr. Koenig?

16         MR. KOENIG:  No.  There is still two more pages.  This

17   is an unusually long one.

18         Just do the bottom two e-mails first.

19         And the next two, please.

20         THE COURT:  All right.

21         MR. KOENIG:  And the next one e-mail.

22         THE COURT:  Everyone had a chance to look at that?

23   Okay.

24         MR. KOENIG:  And finally.

25         THE COURT:  Everyone good on that one?

Telly Smith - Redirect

1          That's the end of that exhibit?

2          *MR. KOENIG:*  That is the end of that exhibit.  I don't

3    know if now or after the break is better.  There is one already

4    admitted that we would like to add to this, but --

5          *THE COURT:*  Why don't we do that after the break.

6          *MR. KOENIG:*  Fair enough.

7          *THE COURT:*  Ladies and gentlemen, it's about 20

8    minutes after 3:00 now.  We will take our break for 20 minutes

9    and we will reconvene at 20 minutes of 4:00, okay?  Keep the

10   admonitions in mind.  The jury is excused.

11          (Jury excused.)

12          We will be in recess and then we will talk about the

13   plan, okay?

14          Thank you.

15      (Recess at 3:20 p.m.)

16      (Reconvened at 3:40 p.m.)

17          *THE COURT:*  Mr. Koenig or Mr. Fagg, do we have a

18   suggestion?

19          *MR. KOENIG:*  Sure.  I was able to speak with Mr. Fagg

20   over the break.  And obviously he is one of many, so I don't

21   know what others' opinions are on this, but what I suggested is

22   perhaps tomorrow morning having the jury come in at like

23   10:00 and then we could spend 8:30 to 10:00 going through the

24   dozen or so exhibits.  As soon as we are done with court -- I

25   am not confident that my scratchings got down all the numbers,

2040

Telly Smith - Redirect

1    but -- and then -- and then the other thing we were going to

2    propose is just looking at the amount of time it took on Friday

3    to go through the relatively small number of exhibits, we were

4    thinking maybe we could do some sort of like briefing with

5    just, you know, bullets, like why this is admissible, why this

6    is admissible.  And then the Court could rule in a more

7    efficient fashion rather than having five different lawyers

8    stand up and argue over every single document.

9         THE COURT:  Okay.  And I would just announce -- we'd

10   have no argument?  The argument would be on paper?

11        MR. KOENIG:  On paper, yeah.

12        THE COURT:  Or that the argument would be set forth on

13   paper and then there would be supplemental arguments?  I am not

14   sure.

15        MR. FAGG:  Your Honor, can I respond to that?

16        THE COURT:  Yes, go ahead.

17        MR. FAGG:  So we do agree on behalf of all the

18   defendants that it makes sense to come in tomorrow morning and

19   run through the exhibits that Mr. Koenig referenced earlier.

20   If there is some slight difference, no problem.

21        We don't think it would make sense to do written

22   submissions on each one of those exhibits.  In just dealing

23   with the *James* hearing process and trying to coordinate the

24   objections in a consolidated way among defendants, that was

25   extremely challenging.  And I think under each client's

Telly Smith - Redirect

1    individual right they would reserve their objections.

2    Obviously, we will try to move through those as quickly as we

3    can, but we do not think that submitting written submissions to

4    Your Honor would make sense.  But as to the first idea that

5    Mr. Koenig had proposed, we are in agreement with that.

6         THE COURT:  The coming in and doing it between

7    8:30 and 10:00?

8         MR. FAGG:  Yes, Your Honor.

9         THE COURT:  What about 8:00 and 10:00?

10        MR. FAGG:  Sure, Your Honor.

11        MR. KOENIG:  We could try to get through more than

12   just the dozen.

13        THE COURT:  Right.  We would try to use all the time

14   that we could to make progress.

15        MR. KOENIG:  To be clear, I wasn't thinking of written

16   submissions on these 12.  It was the remainder.

17        THE COURT:  Okay.  Well, I am obviously open to

18   suggestion on any ways that we can get it done more quickly.

19   But there were a few examples on Friday where one defendant

20   wasn't 100 percent sure that his interests aligned with others,

21   so I think that we do need to allow that opportunity.  You can

22   do it in written fashion, but I don't think that's really the

23   proposal anyway.

24        But Mr. Fagg, go ahead.

25        MR. FAGG:  Sure, Your Honor.  I think the only thing

Telly Smith - Redirect

1    we would ask is that the defendants be provided a list of the

2    documents in the order in which the government intends to go

3    through them tomorrow.  We will be prepared to use that full

4    8:00 to 10:00 a.m. time period.  If we could have a list of

5    those exhibits and the order in which the government intends to

6    go through them, that will expedite it.

7            THE COURT:  Mr. Koenig is nodding in agreement.

8            MR. KOENIG:  Let the record reflect.

9            THE COURT:  Yeah, I think that's a good way to do it.

10   That way people can prepare themselves this evening for that

11   process and hopefully we can move through it efficiently.

12           MR. FAGG:  The only other thing, Your Honor, just for

13   point of procedural clarification, I think defendants would

14   respectfully request that we have this hearing in the morning.

15   But to the extent that Mr. Ledford is still on the stand, that

16   Mr. Ledford's testimony continue at least through direct, and

17   then at that time we would -- the government could move to

18   admit any documents, but we would object to taking a break in

19   Mr. Ledford's testimony for purposes of admitting the documents

20   that we'll discuss tomorrow.

21           THE COURT:  Mr. Koenig, response?

22           MR. KOENIG:  That's fine with us.

23           THE COURT:  Okay.

24           MR. KOENIG:  As long as it's right after direct, not

25   after, you know, two days of cross.

Telly Smith - Redirect

1          THE COURT:  Right.  The proposal was we get through

2     the direct first.

3          MR. KOENIG:  I think that's fine.

4          THE COURT:  Mr. Gillen?

5          MR. GILLEN:  Yes, Your Honor.  Very quickly, we are in

6     favor of the morning session.  We would like to have that -- we

7     have been getting things at O dark 30 in the middle of the

8     night and the early morning which is not helpful for

9     preparation in the morning.  If we can get this list in a

10    reasonable time without modifications or amendments, which I

11    don't think we've gone one night without modifications and

12    amendments, we are all for that.

13         The other issue is, of course -- I would like to state

14    our position from the Tyson position.  I think that the others

15    would agree -- that we don't want to do the objections on their

16    other documents on paper.  We would prefer to take the time to

17    address those issues directly with the Court.

18         THE COURT:  Okay.  Perhaps if possible even a

19    cellphone photo of a legal pad list by 5:30 tonight would be a

20    good way to do it, just something so that people know what the

21    order is, if that's possible, or at least part of the list.

22         MR. KOENIG:  It's hard to know how far we'll get, but

23    yeah.

24         THE COURT:  Yeah, you'd think that maybe the first

25    part of the list would be known early.

Telly Smith - Redirect

1          MR. KOENIG:  One other thing.  The document right

2     before the break I wanted to display is 9672.  It's a toll

3     record that I believe was offered and accepted this morning.

4     And we just wanted to put it side by side with one of those

5     texts so that -- because they didn't have the name in the text

6     header for one of the numbers.  And so we just wanted to

7     display them side by side so the jury could understand whose

8     number that was in those text.

9          MR. TUBACH:  Your Honor, we object to that.  These

10    documents are in evidence.  This is sort of a summary mini

11    closing argument they want to do.

12         MS. PREWITT:  We object to that as well.  If they

13    wanted to put on a witness for that, they could have.

14         THE COURT:  Yeah, I think putting them side by side,

15    once again, it suggests to the jury some conclusion to be

16    reached.  But if you want to put the toll record up, you can.

17         MR. KOENIG:  Fair enough.

18         THE COURT:  Let's bring the jury back in.

19         (Jury present.)

20         THE COURT:  Mr. Koenig, go ahead.

21         MR. KOENIG:  Thank you, Your Honor.  Permission to

22    publish Government Exhibit 9672, which was admitted this

23    morning, I believe.

24         THE COURT:  You may.  Is this a multi-page exhibit?  I

25    can't recall.

Telly Smith - Redirect

1          *MR. KOENIG:*  Oh, it is?  Okay.

2          *THE COURT:*  I can't recall.

3          *MR. KOENIG:*  Yes, I guess it is.

4          *THE COURT:*  Which pages do you want to display?

5          *MR. KOENIG:*  The first page is fine.

6          *THE COURT:*  Is everyone good?  Is it too small to

7     read?  Sorry.  I think we will need to highlight portions of

8     it.

9          *MR. KOENIG:*  Can we just do the header?  Just blow up

10    the header.

11         I believe Mr. Torzilli will call the next witness, if

12    we may.

13         *THE COURT:*  You may.

14         Go ahead, Mr. Torzilli.

15         *MR. TORZILLI:*  The United States calls Michael

16    Ledford.

17       (**Michael Ledford** was sworn.)

18         *THE WITNESS:*  Yes.

19         *COURT DEPUTY CLERK:*  Please state your name and spell

20    your first and last name for the record.

21         *THE WITNESS:*  Michael Ledford, M-I-C-H-A-E-L,

22    L-E-D-F-O-R-D.

23         *MR. TORZILLI:*  Your Honor, with the assistance of

24    Ms. Grimm, may I approach?

25         *THE COURT:*  You may.

2046

Michael Ledford - Direct

1                    **DIRECT EXAMINATION**

2    *BY MR. TORZILLI:*

3    *Q.*  Good afternoon, sir.

4    *A.*  Good afternoon.

5    *Q.*  Where do you work?

6    *A.*  I work for Chick-fil-A.

7    *Q.*  What's Chick-fil-A?

8    *A.*  Chick-fil-A is a restaurant company.

9    *Q.*  How long have you worked for Chick-fil-A?

10   *A.*  About seven and a half years.

11   *Q.*  Approximately when did you start?

12   *A.*  May of 2014.

13   *Q.*  What's your current position at the company?

14   *A.*  I am senior director of supply continuity.

15   *Q.*  Could you briefly describe what your main responsibilities

16   are in that role?

17   *A.*  It's really like a three-legged stool.  The first one would

18   be I am responsible for all sourcing of all food, beverage,

19   equipment, anything that it takes to run a Chick-fil-A

20   restaurant.  The next part of that responsibility would be

21   something that we call the launch team, which is program

22   management of all test and roll-outs of new menu items or

23   limited time flavors, limited time offers, things like that,

24   and then the supply planning and logistics part of the supply

25   chain.

2047

Michael Ledford - Direct

1    Q.  Can you explain what the last part of the three parts

2    involves a little bit, please?

3    A.  Yes.  Supply planning and logistics would be the forecast

4    for all of our promotions, safety stock level saying on how

5    much we carry of inventory of each item and where we store that

6    at; also our redistribution points that we have that moves the

7    low moving volume items, like a kids' meal premium toy that you

8    don't move as much of as chicken or waffle fries or something

9    like that; and then all the transportation, the trucking to get

10   product from the suppliers to the distribution centers.

11   Q.  How long have you had your current position?

12   A.  In its current form, about three years.

13   Q.  And prior to those three years, what was your position at

14   Chick-fil-A?

15   A.  I was same title, but the responsibilities were all of

16   sourcing, just the food and nonfood sourcing piece of that, the

17   sourcing part, not the logistics or the launch team.

18   Q.  Do you know approximately how much chicken Chick-fil-A

19   sells on an annual basis?

20   A.  This year we will do around 640 million pounds a year.

21   Q.  Is your position at Chick-fil-A the first job that you've

22   had in the chicken business?

23   A.  No.

24   Q.  When did you first start working in the chicken business?

25   A.  1996.

Michael Ledford - Direct

1   Q.   What was your position in 1996?

2   A.   In 1996 I was a management trainee for a fully integrated

3   chicken processor called Gold Kissed.

4   Q.   Does Gold Kissed still exist?

5   A.   No, they do not.

6   Q.   What happened to Gold Kissed, if you know?

7   A.   Gold Kissed was bought by Pilgrim's Pride.

8   Q.   At what point in time did you leave the job at Gold Kissed?

9   A.   I left in early 2007, I believe.  That was after Pilgrim's

10  had bought it.

11  Q.   Where did you work next?

12  A.   Then I went to the purchasing co-op for Popeye's, Supply

13  Management Services or SMS.

14  Q.   What did you do at SMS?

15  A.   I was director of protein purchasing.

16  Q.   And could you describe what the director of protein

17  purchasing job entailed?

18  A.   I was responsible for purchasing all chicken and seafood

19  for all of the Popeye's restaurants in the U.S.

20  Q.   Did you have any occasion to negotiate contracts with

21  chicken suppliers?

22  A.   Yes.

23  Q.   Where did you work after you -- well, when did you leave

24  SMS?

25  A.   I left SMS in 2008.

2049

Michael Ledford - Direct

1   Q.  And where did you work after you left SMS?

2   A.  I went to the purchasing co-op for Yum Brands which at the

3   time was UFPC.  They later changed their name to RSCS.

4   Q.  Can you remind us what UFPC stands for?

5   A.  Unified Food Service Purchasing Co-op.

6   Q.  Can you remind us what RSCS stands for?

7   A.  Restaurant Supply Chain Solutions.

8   Q.  When you got to RSCS, what was your job position?

9   A.  I was senior director of protein purchasing.

10  Q.  What did that job entail?

11  A.  It entailed -- I was responsible for all the purchasing for

12  all chicken for all of the Yum Brands concepts, which at that

13  time was KFC, Pizza Hut, Taco Bell, Long John Silvers and A&W.

14  Q.  As part of your job responsibilities, did you negotiate

15  contracts with chicken suppliers?

16  A.  Yes.

17  Q.  When did you leave RSCS?

18  A.  I left RSCS in May of 2014.

19  Q.  Did you have any role in negotiating contracts at RSCS with

20  chicken suppliers in calendar year 2014 before you departed?

21  A.  No, I did not.

22  Q.  I want to direct your attention to the years 2012 and 2013

23  now.

24          Did you work as part of a team at RSCS?

25  A.  Yes.

Michael Ledford - Direct

1   Q.  Who were the individuals who were the members of your team

2   during that time period?

3   A.  Mary Hester, Mark Oechsli, Steve Campisano, Carol Knight.

4   That was the chicken team when I left RSCS.

5   Q.  What was Ms. Hester's role during that time frame?

6   A.  She was director of poultry purchasing.

7   Q.  And what was her scope or responsibilities?

8   A.  She was overall responsible for all of what we called

9   further processed items.

10  Q.  How about Mr. Oeschli?  And if you could spell that name

11  for the record, it would be greatly appreciated.

12  A.  Okay.  I believe it is O-E-C-H-S-L-I, something close to

13  that.  I might have butchered that a little bit.  Mark was

14  responsible for some of the further processed products and

15  reported to Mary Hester.  He had a subset of the further

16  processed chicken products.

17  Q.  Can you give us some examples of what further processed

18  chicken products are?

19  A.  Yes.  So like KFC hot wings, they were par-fried, KFC

20  bites, popcorn chicken, things like that that weren't what we

21  would consider fresh chicken.  They were things that had been

22  further processed or an additional step made to them to make

23  them ready to be cooked in a restaurant.

24  Q.  Can you give us some examples of fresh chicken products?

25  A.  Yes.  Fresh chicken products would have been like COB which

2051

Michael Ledford - Direct

1    is short for chicken on the bone, eight-piece chicken that you

2    would normally get at a KFC or a Popeye's-type restaurant.

3    Q.  Going back to the team that you worked with in 2012, 2013

4    at RSCS, what was Mr. Campisano's responsibilities?

5    A.  Back then Mr. Campisano was in charge of all of the fresh

6    poultry distribution.

7    Q.  And how about Ms. Knight, her responsibilities?

8    A.  Ms. Knight was responsible for a lot of our reporting and a

9    lot of the pricing.  She would receive the pricing in from the

10   suppliers and make sure it was entered into the system

11   properly, make sure everything was entered for the distribution

12   centers and made sure everybody had basically a lot of clerical

13   and administrative work to get the pricing correct in the

14   system and billed out through the distribution partners and the

15   suppliers.

16   Q.  During the 2012, 2013 time frame, approximately how much

17   chicken was purchased through contracts RSCS handled?

18   A.  On average we were doing about 1 billion pounds of chicken

19   a year.

20   Q.  Mr. Ledford, during your time at RSCS and in particular the

21   2012, 2013 time frame, when you and your team were negotiating

22   contracts with chicken suppliers, what were the most important

23   factors you were taking into account?

24   A.  Yes.  So first there would have to be a supplier that could

25   do volumes in a large quantity to meet our needs and also meet

Michael Ledford - Direct

1    our high and rigid quality standards.  You know, I would call

2    those -- both of those would have been table stakes to even get

3    invited to do business with Yum Brands.  And then once you have

4    those and you had an approved supplier, price was -- in my time

5    at RSCS and UFPC was the most important.

6    Q.  You mentioned in your previous answer the term table

7    stakes.

8    A.  Yes.

9    Q.  Can you explain what that means or what you are referring

10   to?

11   A.  Yes.  So when I say table stakes, I mean you have got to

12   have those qualifiers to even be involved in the process.  If

13   you can't produce a large enough quantity for somebody that's

14   buying 1 billion pounds of chicken a year and if you don't have

15   a high enough quality to meet the quality standards, then you

16   are not going to be involved at all.

17   Q.  And were there any other important factors besides volume

18   and quality that you took into account?

19   A.  Well, of course price.

20   Q.  Okay.  And can you explain what you mean by price and how

21   it factored in?

22   A.  So typically speaking, at Yum Brands we were -- at the time

23   I was there in particular KFC margins were very low, if not

24   negative.  They closed I believe 1200 restaurants, somewhere

25   around that in my time period there, so certainly price was

Michael Ledford - Direct

1    very important.  And cutting cost, cost savings measures,

2    things like that were paramount as we were going through a

3    negotiation process.

4    Q.  You mentioned in your previous answer that margins were low

5    or negative.  Whose margins were low and negative?

6    A.  The franchisees.

7    Q.  And how did you develop an understanding that their margins

8    were low or negative?

9    A.  We had reports that you would see that got disseminated

10   amongst the company on how margins were doing for all of the

11   different brands on a holistic level.  We wouldn't see

12   individual franchisee's numbers, but you certainly would see

13   the average numbers.  And, you know, we as a purchasing co-op,

14   in essence you work for the franchisees, so you know them very

15   well.  You have conversations with them on a regular basis.

16   And they would tell you what their individual numbers.  They

17   would tell you how many restaurants they were closing.  And

18   also in my time there some of the franchisees were filing

19   bankruptcy and going out of business and selling the

20   restaurants, so it was widely known.

21   Q.  So it was a regular part of business in RSCS to have a

22   handle on how the KFC restaurants and other Yum Brand stores

23   were performing?

24   A.  That's correct.

25            MR. BELLER:  Objection, leading.

Michael Ledford - Direct

1          *THE COURT:*  Sustained.

*BY MR. TORZILLI:*

3    Q.  Was one of your goals with regard to price when you were

4    conducting contract negotiations to -- or what were your goals

5    with regard to price when you were conducting contract

6    negotiations with chicken suppliers?

7    A.  I mean, in particular on chicken on the bone we always had

8    a goal to have a tight range from lowest to highest supplier,

9    that certainly would have been one of our top goals, and then

10   like I said earlier, to try to get any cost savings initiatives

11   we could or to get a low price.

12   Q.  Why did you try to get suppliers into a tight range on

13   prices?

14   A.  It was really a matter of -- so in the Yum system,

15   especially KFC, you had a lot of operators who had multiple

16   stores.  You had operators that had hundreds of restaurants.

17   So across that they may get chicken from one supplier for one

18   of the restaurants and another supplier for another handful of

19   the restaurants.  Also the franchisees in the KFC system would

20   talk and talk regularly amongst each other and share what their

21   price was that they were getting on chicken.

22          Obviously, chicken was their highest input cost.  And

23   if you didn't have a tight range, you being the purchasing

24   co-op, we would have franchisees that would often say I don't

25   want chicken that you're sending me from supplier X.  I want

2055

Michael Ledford - Direct

1   from supplier Y because I talked to John Smith and their price

2   is a lot cheaper than mine.

3          Well, supplier Y only has so much product to go

4   around, and you can't ship every franchisee one supplier's

5   product if he is the cheapest supplier.  So therefore to keep

6   that noise to a minimum amongst franchisees and keep them

7   happy, in my time we always had a goal to keep that range as

8   tight as we could.

9   Q.  Mr. Ledford, did you ever ask chicken suppliers to

10  communicate with one another for purposes of getting their

11  prices into a tighter range?

12         MR. BELLER:  Objection, calls for hearsay.

13         THE COURT:  Overruled.

14  A.  No, I did not.

15  BY MR. TORZILLI:

16  Q.  Why not?

17         MR. BELLER:  Relevance, and it's asking him to

18  speculate on a fact that didn't occur.

19         THE COURT:  Overruled.

20  BY MR. TORZILLI:

21  Q.  You can answer, sir.

22  A.  I didn't want them talking about what my price should be

23  amongst each other.  I wanted the best price from each of them

24  and a fair price, not folks getting together and talking,

25  deciding what my price should be.

2056

Michael Ledford - Direct

1  *Q.* Did chicken suppliers need to be qualified in order to sell

2  chicken products to ultimately KFC restaurants?

3  *A.* They would have had to have been approved by the quality --

4  by the QA department, yes.

5  *Q.* Could you briefly describe your understanding of how that

6  process worked?

7  *A.* Typically speaking, when you are adding a new supplier,

8  it's going to first start with a general food safety audit.

9  And they are going to go to that facility and perform an audit

10  of just their general practices of food safety that they

11  follow.  That would have been the first step.

12      Then typically you are going to do what's called an

13  animal welfare audit to make sure that those live chickens

14  throughout their process from their farms as they come into the

15  processing plant are treated with care.  And then if they pass

16  those first two steps, then you are actually going to get into

17  the supplier running product, having QA there during the run,

18  approving the run.  And then typically speaking, they would

19  ship product back to the corporate office at Yum Brands or KFC

20  and have them look at the product, do an evaluation, sometimes

21  do sensory taste testing against controlled product before you

22  have an official approval.

23  *Q.* In calendar year 2012, did you and your team conduct

24  contract negotiations with chicken suppliers?

25  *A.* Yes, we did.

Michael Ledford - Direct

1   Q.  Can you identify which chicken suppliers were involved in

2   that process?

3   A.  Well, we would have used every -- we had, I think, in 2012,

4   we had roughly about 14 or 15 chicken suppliers, and we would

5   have included all of them.  And we would have called those

6   incumbent suppliers.  And then I believe in 2012 we also

7   included a few nonincumbent suppliers that year.

8   Q.  How about for fresh chicken?

9   A.  Yeah, for fresh chicken we would have included all of the

10  incumbent suppliers.  In 2012 I do not recall if we had any

11  nonincumbents that year in fresh chicken.

12  Q.  Could you identify the fresh -- the incumbent fresh chicken

13  suppliers that you recall participating in contract

14  negotiations with RSCS in calendar year 2012?

15  A.  Yes.  It would have been George's, Tyson, Pilgrim's,

16  Mar-Jac, Marshall Durbin, Koch Foods -- and I think I am

17  leaving one off -- Claxton.

18  Q.  Were those -- was there also in calendar year 2013 a

19  contract negotiation process that you and your team undertook?

20  A.  Yes.

21  Q.  And were the chicken suppliers that were invited to

22  participate in that process the same as the suppliers that

23  participated in 2012 with the exception of Marshall Durbin?

24  A.  Yes.  And I believe there would have been one additional

25  supplier that year.

2058

Michael Ledford - Direct

1   Q.   Who was --

2   A.   I believe we added Case Farms that year.

3   Q.   Thank you.  Were those companies you just identified

4   competitors in 2012 and in 2013 for RSCS contracts?

5   A.   Yes.

6   Q.   Can you describe in what ways they were competing against

7   each other for RSCS contracts?

8   A.   Yes.  They were competing against each other for the same

9   products and volume that we would be giving out our awards on

10   both of those years.

11   Q.   And when they were competing with each other for those

12   contracts, what in particular were you looking for from them?

13   A.   We were looking for their best price.  And typically what

14   that meant at RSCS and in particular those two years was a low

15   price.

16   Q.   Who at -- was there someone at Pilgrim's who was the

17   primary person for your contract negotiations with them?

18   A.   Yes.

19   Q.   Who was that person?

20   A.   I mainly dealt with Roger Austin.

21   Q.   Do you see Mr. Austin in the courtroom today?

22   A.   Yes.

23   Q.   Can you identify him, please?

24   A.   Yes.

25            MR. FELDBERG:  His identity is conceded, Your Honor.

Michael Ledford - Direct

1          *THE COURT:* Do you accept the concession?

2          *MR. TORZILLI:* I accept it, Your Honor, if the record

3   will reflect that the witness has identified the defendant.

4          *THE COURT:* Well, rather it was conceded.

5          *MR. TORZILLI:* Then I would prefer that the witness do

6   the in-court identification.

7          *THE COURT:* He may.

8   *A.* Yes, Roger is at the table in front of you wearing a dark

9   suit, blue shirt and yellow tie.

10         *MR. TORZILLI:* May the record reflect that the witness

11  identified Roger Austin?

12         *THE COURT:* It shall.

13  *BY MR. TORZILLI:*

14  *Q.* Was there anyone at Claxton that was the primary person for

15  your contract negotiations with that company?

16  *A.* I really personally dealt with two different folks at

17  Claxton.

18  *Q.* Who were the two different folks you dealt with at Claxton?

19  *A.* Scott Brady and Mikell Fries.

20  *Q.* Do you see Mr. Brady in the courtroom today?

21  *A.* Yes, I do.

22  *Q.* Can you pick him out, please?

23  *A.* Yes.  He is at the table directly behind you in the blue

24  suit, red tie, blue shirt with glasses.

25         *MR. TORZILLI:* Your Honor, may the record reflect the

Michael Ledford - Direct

1    identification of Defendant Scott Brady?

2             THE COURT:  It shall.

3    BY MR. TORZILLI:

4    Q.  And can you identify or do you see Mikell Fries in the

5    courtroom?

6    A.  I do.

7    Q.  Can you pick him out, please?

8    A.  He is at that same table behind you standing up right now

9    wearing a gray suit and a pink and blue tie.

10            MR. TORZILLI:  Your Honor, may I ask the record

11   reflect the witness has identified Defendant Mikell Fries?

12            THE COURT:  It shall.

13   BY MR. TORZILLI:

14   Q.  You said you dealt with Tyson as well in contract

15   negotiations both in 2012 and 2013?

16   A.  Yes.

17   Q.  Was there a primary person at Tyson that you dealt with in

18   those contract negotiations?

19   A.  Yes.  I dealt with both Tim Mulrenin and Brian Roberts.

20   Q.  Do you see Defendant Tim Mulrenin in the courtroom today?

21   A.  Yes, I do.

22   Q.  Can you pick him out, please?

23   A.  Yes.  He is standing at the table diagonally behind you

24   standing up right now in a blue suit, blue shirt, red tie.

25            MR. TORZILLI:  Your Honor, may the record reflect

Michael Ledford - Direct

1    identification of Defendant Mulrenin?

2           *THE COURT:*  It shall.

3    *BY MR. TORZILLI:*

4    *Q.*  Do you see Brian Roberts in the courtroom today?

5    *A.*  Yes, I do.

6    *Q.*  Can you identify him, please, sir?

7    *A.*  He is standing up behind you at that same table

8    Mr. Mulrenin was at in a blue suit and a reddish tie, red and

9    blue tie.

10          *MR. TORZILLI:*  May the record reflect, Your Honor, the

11   identification of Defendant Brian Roberts?

12          *THE COURT:*  It shall.

13   *BY MR. TORZILLI:*

14   *Q.*  You mentioned Koch as one of the competing suppliers in

15   both 2012 and 2013; was that correct?

16   *A.*  Yes.

17   *Q.*  Was there someone at Koch that was the primary person that

18   you were dealing with in contract negotiations with that

19   company?

20   *A.*  Yes.

21   *Q.*  Who was that person?

22   *A.*  Bill Kantola.

23   *Q.*  Do you see Mr. Kantola in the courtroom today?

24   *A.*  Yes, I do.

25   *Q.*  Can you identify him, please?

Michael Ledford - Direct

 1   A.  He is at the table two tables to my right wearing a gray

 2   suit, blue shirt, yellow tie.

 3            MR. TORZILLI:  Your Honor, may the record reflect

 4   identification of Defendant Kantola?

 5            THE COURT:  It shall.

 6            MR. TORZILLI:  Thank you, Your Honor.

 7   BY MR. TORZILLI:

 8   Q.  And you mentioned George's was a competing supplier in both

 9   2012 and 2013.  Did I understand you correctly?

10   A.  Yes.

11   Q.  Was there someone at George's who was the primary person

12   for your contract negotiations with that company?

13   A.  I mainly dealt with Ric Blake and Darrell Keck.

14   Q.  And could you spell Mr. Keck's name, if you know?

15   A.  I believe Darrell is D-A-R-R-E-L-L; Keck, K-E-C-K.

16   Q.  Do you see Mr. Blake in the courtroom today?

17   A.  Yes, I do.

18            MR. POLLACK:  Your Honor, we will stipulate that

19   Mr. Ledford can identify Mr. Blake.

20            THE COURT:  Do you accept the stipulation?

21            MR. TORZILLI:  Yes.

22            THE COURT:  All right It shall.

23   BY MR. TORZILLI:

24   Q.  Mr. Ledford, are you familiar with a company called

25   Marshall Durbin?

Michael Ledford - Direct

1    A.  Yes, I am.

2    Q.  What was -- what is or what was Marshall Durbin?

3    A.  Marshall Durbin was a fully integrated poultry processor

4    that was bought by Mar-Jac.

5    Q.  Do you know approximately when Mar-Jac acquired Marshall

6    Durbin?

7    A.  I believe that was around 2012.

8    Q.  Focusing in on 2012 now, did you and your team have a

9    process that you undertook to negotiate with competing chicken

10   suppliers for the following calendar year's contract?

11   A.  Yes, we did.

12   Q.  Could you summarize the process that you and your team

13   undertook?

14   A.  Yes.  Typically we would start with what we called an RFI,

15   which was a request for information.  The purpose of that was

16   to gather information typically around cost savings

17   initiatives, bounce ideas off the suppliers and see if there

18   was anything we needed to go after specifically and target it

19   during that negotiation cycle.  After we sent them the RFI, got

20   the responses back, we would then issue what we called an RFP

21   or request for proposal.  Typically speaking, on average there

22   was two rounds of negotiations, a round one and a round two of

23   those negotiations before we would finalize pricing and award

24   business, sign contracts.

25   Q.  Mr. Ledford, would you turn in the binder in front of you

2064

Michael Ledford - Direct

1    to Tab 24.  And you should find there an exhibit that's been

2    marked as Government Exhibit 1438.

3              Are you there?

4    A.  Yes.

5    Q.  Do you recognize Exhibit 1438?

6    A.  Yes.

7    Q.  What is it?

8    A.  It is an e-mail from myself to the suppliers asking for

9    them to fill out the attached document for the request for

10   information.

11   Q.  And does a request for information have a shorthand that

12   you used?

13   A.  RFI.

14   Q.  There should be a second page and that second page should

15   be marked 1438-1.

16             Do you see it?

17   A.  Yes.

18   Q.  Do you recognize 1438-1?

19   A.  Yes, I do.

20   Q.  What is 1438-1?

21   A.  It is the accompanying document that's referenced in the

22   e-mail before for them to fill out for that RFI.

23   Q.  Was the accompanying document that's been marked as 1438-1,

24   was that sent as part of the e-mail that you transmitted to the

25   chicken suppliers with the RFI?

2065
Michael Ledford - Direct

1    A.  Yes.

2           MR. TORZILLI:  Your Honor, government offers 1438 and

3    1438-1 into evidence.

4           THE COURT:  Any objection to the admission of

5    Exhibits 1438 and 1438-1?  Both will be admitted.

6           MR. TORZILLI:  Thank you, Your Honor.  And permission

7    to publish 1438.

8           THE COURT:  You may.

9    BY MR. TORZILLI:

10   Q.  Mr. Ledford, I would like to direct your attention in

11   Exhibit 1438 to the very last sentence that starts with the

12   words, "The deadline."  Do you see it?

13   A.  Oh, yes.

14   Q.  Would you please read that into the record.

15   A.  The deadline for returning this information is next Friday,

16   October 10th, 2012 or sooner.

17   Q.  And what were you telling the recipients of this e-mail

18   with that sentence?

19   A.  I was telling them when I wanted this information filled

20   out and returned to us.

21   Q.  And when did you want it filled out and returned to you?

22   A.  October 10th, 2012.

23   Q.  And did the competing chicken suppliers provide the

24   response on or around that time?

25   A.  Yes.

Michael Ledford - Direct

1   Q.   To whom were the responses directed?  Were they directed to

2   you or someone else?

3   A.   Typically speaking, they were directed to Mark Oechsli.

4   Q.   What was Mr. Oechsli's job responsibilities when he

5   received RFI responses?

6   A.   He would collect those and he was the one on our team that

7   managed our internal system for bids called CombineNet.  And he

8   would make sure everything was entered in there properly and

9   everything was synced up, and he would disseminate that

10   information back out to the rest of the poultry team.

11   Q.   Was it part of your job responsibilities to review the

12   information as it came in even if it wasn't sent directly to

13   you by the suppliers?

14   A.   Yes.

15   Q.   Sir, what happened next?  What happened on or around the

16   due date of October 10th?

17   A.   We would get that information and typically we would have

18   internal meetings after we received the RFI information.  And

19   we would develop a strategy for how to proceed forward with our

20   negotiations and what exactly to ask for, if any, of the

21   initiatives in the RFI or any of the questions that we asked if

22   that helped us formulate a better strategy to move forward and

23   develop the RFP.

24   Q.   And then what happened after that?

25   A.   After that we would issue an RFP to each of the suppliers.

Michael Ledford - Direct

1   Q.  And what does RFP stand for in this context?

2   A.  Request for Proposal.

3   Q.  And what specifically were you asking the suppliers to do?

4   A.  At that point we were asking them to enter in typically

5   volume information and pricing by each item that we purchased.

6   Q.  And what did you expect in return from the competing

7   suppliers?

8   A.  I expected them to put forth their best effort and complete

9   that task and get us responses by when we asked and meet the

10  deadlines.

11  Q.  Sir, if you will turn in the binder in front of you to Tab

12  33, and we should find there a document that's been marked as

13  Government Exhibit 1524.  Do you see it?

14  A.  Yes.

15  Q.  What is this?

16  A.  This is an e-mail from Roger Austin to Mark Oechsli dated

17  October 10, 2012 that looks like he is turning in his model for

18  bone-in chicken.

19  Q.  Now, this is on October 10 and the model is coming in.  Was

20  it your expectation that the suppliers would be submitting

21  pricing models on October 10th?

22  A.  Yes.

23  Q.  And if you can now turn to the next tab which is Tab 34,

24  and we should find there an exhibit marked as 9693.

25  A.  Yes.

2068

Michael Ledford - Direct

1   Q.   Do you see it?

2   A.   Yes.

3   Q.   Do you recognize this?

4   A.   Yes, I do.

5   Q.   What is it?

6   A.   This is a -- the first page is a cover sheet for Pilgrim's

7   cost model during that bid cycle.

8   Q.   Can you explain what a cost model is, please?

9   A.   A cost model is a model we use to determine the pricing for

10  the suppliers, in this case for the chicken-on-the-bone

11  products that started with their cost to hatch a baby chick, to

12  feed that chick, grow it into a broiler chicken and bring that

13  into the plant, process it, run it through KFC's processing

14  requirements.  And then typically speaking there was a margin

15  line in there for them as well to then come to an output of the

16  final cost of the product.

17       MR. TORZILLI:  At this time the government offers

18  Exhibits 1524 and 9693 into evidence, including the native file

19  version of 9693.

20       THE COURT:  Let's start with 1524 first.

21       Go ahead, Mr. Torzilli.

22       MR. TORZILLI:  May I just make one more note for the

23  record?  I will just cross-reference Your Honor to James log

24  entry No. 18 where these two documents were logged and were

25  conditionally --

Michael Ledford - Direct

1          *THE COURT:*  Any objections to 1524?

2          *MR. FELDBERG:*  None from us, Your Honor.

3          *THE COURT:*  Exhibit 1524 will be admitted.

4          *COURT DEPUTY CLERK:*  Your Honor, 1524 is already in.

5          *THE COURT:*  And any objection to Exhibit 9693

6     including the native version and the printed pages of this

7     particular exhibit?

8          *MR. FELDBERG:*  Again, no objection, Your Honor.

9          *THE COURT:*  Then 9693 both as a native version and as

10    the printed pages will be admitted.

11         *MR. TUBACH:*  Can we have a brief side bar?

12         *THE COURT:*  Yes.

13       (At the bench:)

14         *THE COURT:*  Go ahead, Mr. Tubach.

15         *MR. TUBACH:*  My only concern Your Honor, Mr. Torzilli

16    is now referencing a *James* log.  I don't think the jury is

17    going to know what that means, but I am concerned that is going

18    to veer off into other topics.  I don't think there is any

19    *James* log and *James* hearing with this witness.

20         *THE COURT:*  Response, Mr. Torzilli?

21         *MR. TORZILLI:*  Sure.  I understood that the *James*

22    hearing had meaning and my understanding of the *James*

23    proceeding is that it rendered certain statements including

24    certain documents at least conditionally admissible.  And I

25    think it's appropriate whether it be at side bar if there is an

Michael Ledford - Direct

1    issue, but to bring to Your Honor's attention that there has

2    been a conditional admissibility ruling already.

3            THE COURT:  Why don't we refer to that by shorthand as

4    Docket No. -- is it 599?

5            MR. TORZILLI:  559 is Your Honor's order.

6            THE COURT:  Yeah, 559.  Why don't we do that.

7            Is that acceptable to you, Mr. Tubach?

8            MR. TUBACH:  That's fine.  Thank you, Your Honor.

9            THE COURT:  Let's do that.  Thank you.

10       (In open court:)

11           THE COURT:  Go ahead, Mr. Torzilli.

12           MR. TORZILLI:  Permission to publish the second page

13   of 9693, the printed version.

14           THE COURT:  You may.

15           MR. TORZILLI:  Thank you.

16   BY MR. TORZILLI:

17   Q.  Mr. Ledford, on the screen in front of you is the second

18   page of what's been marked as Government Exhibit 9693.  And can

19   you summarize what this page is, please?

20   A.  It is the cover sheet with the prices for all of their

21   fresh chicken items for Pilgrim's Pride for the 2013 bid.

22   Q.  And you used the term bid.  Could you explain what at least

23   in RSCS terminology what that signifies?

24   A.  A bid would have been synonymous with what they entered in

25   for the RFP.

Michael Ledford - Direct

1   Q.  If you could go down to the chart.  And the first entry on

2   the chart says Injected 8-Piece.  Do you see that?

3   A.  Yes.

4   Q.  Can you tell us what that is?

5   A.  So Injected 8-Piece would have been the main product that

6   KFC serves for their eight-piece chicken.  It is injected with

7   a marinate.

8   Q.  And the column next to it says 0.9885.  What does that

9   signify?

10  A.  That would be the price per pound, so 98.85 cents per

11  pound.

12  Q.  And then to the right of that it says (FOB Price From Cost

13  Model).  What does that represent?

14  A.  So that represents the FOB price which would not include

15  any freight to get it.  It's just at their dock door at the

16  chicken processing plant.

17  Q.  Is it then fair to say that at least for the eight-piece

18  product that Pilgrim's bid was 98.85 cents per pound?

19  A.  Yes.

20  Q.  A few entries down -- it's toward the bottom -- there is an

21  entry called Non-Inject Wings - Bulk Packed, with the D cut

22  off.  Do you see that?

23  A.  Yes.

24  Q.  What type of product is that?

25  A.  So these were what we would have called supplemental wings,

Michael Ledford - Direct

1   wings that we needed above and beyond the two wings that would

2   come on every chicken in the eight-piece cut up.  And we bought

3   some level of supplemental wings.  In this case the bulk pack

4   means just what it says.  It's just wings bulk in a 40-pound

5   case, no inner liner, not separated by any inner bagging or

6   anything like that.  It's just 40 pounds of wings in a box.

7   Q.  And the next entry is Non-Inject Wings - Precounted.

8   What's that product?

9   A.  Yes.  That would be a similar product to the product above

10  except for in this case instead of just having a certain

11  poundage in there, these wings would have actually been counted

12  and you would have had a case count for the product that was in

13  that case.  So there was a little bit more labor that was

14  involved.  And that product, so typically speaking it was a

15  little bit more expensive.

16  Q.  Mr. Ledford, can I now ask you to turn to Tab 25 in your

17  binder?  You should find there Government Exhibit 1505.

18  A.  Okay.

19  Q.  Do you see it?

20  A.  Yes.

21  Q.  Do you recognize Government Exhibit 1505?

22  A.  Yes, I do.

23  Q.  What is it?

24  A.  It is an e-mail from Scott Brady to Mark Oechsli dated

25  October 9, 2012 with their chicken-on-the-bone cost model for

Michael Ledford - Direct

1    the 2013 bid.

2    *Q.*  And if you flip to the next tab, you will see what's been

3    marked as Government Exhibit 9692.  Do you see that?

4    *A.*  Yes.

5    *Q.*  And could you take a moment to just flip through the two

6    sheets of paper that comprise that tab?

7    *A.*  Okay.

8    *Q.*  Have you done that?

9    *A.*  Yes.

10   *Q.*  Do you recognize 9692?

11   *A.*  Yes, I do.

12   *Q.*  What is it?

13   *A.*  It is Claxton's model that was referenced in that earlier

14   e-mail.

15          *MR. TORZILLI:*  Your Honor, at this time the government

16   would move for the entry of Exhibits 1505 and 9692 including

17   the Excel or so-called native version of 9692.

18          *THE COURT:*  All right.  First of all, any objection to

19   the admission of Exhibit 1505?

20          *MR. BELLER:*  No objection.

21          *THE COURT:*  Exhibit 1505 will be admitted.

22          *MR. TORZILLI:*  Thank you, Your Honor.

23          *THE COURT:*  And next any objection to the admission of

24   the printed pages, but also the native version of Exhibit 9692?

25          *MR. BELLER:*  No objection.

Michael Ledford - Direct

1          *THE COURT:*  All right.  And that exhibit including the

2     native version will be admitted as well.

3          *MR. TORZILLI:*  Thank you, Your Honor.

4          Permission to publish Page 2 of 9692?

5          *THE COURT:*  You may.

6     *BY MR. TORZILLI:*

7     Q.  Thank you.

8          Mr. Ledford, on the screen to your left there you

9     should see Page 2 of 9692.  What is this, please?

10    A.  It is a summary page of Claxton's bid for 2013 for all of

11    their fresh chicken or chicken-on-the-bone items.

12    Q.  What's their bid for the eight-piece purple label product?

13    A.   .9620 or 96.20 cents per pound.

14    Q.  What is the purple product or purple label product?

15    A.  The purple label was the chicken for the fried chicken

16    eight-piece.

17    Q.  And did Claxton submit bids here for their bulk packed and

18    precounted wings?

19    A.  Yes, they did.

20    Q.  And what are the bids for those products?

21    A.  The bid for the bulk wings was $1.8120 per pound.  And the

22    bid for the pre-counted was $1.9120 per pound.

23    Q.  And then if you can look at the -- I think it's the fourth,

24    fifth and sixth entries are various forms of dark meat.  Do you

25    see those?

Michael Ledford - Direct

1   A.   Yes.

2   Q.   First, can you just summarize what those three products

3   are?

4   A.   Sort of like supplemental wings, supplemental dark meat was

5   the additional pieces of dark meat, so in this case the drum

6   and the thigh that KFC needed to fill their volume needs that

7   was above and beyond the dark meat pieces that would come in

8   the eight-piece chicken.

9   Q.   And if you look at the pricing formula column for those

10  three products, they each say eight-piece minus .30.  Do you

11  see that?

12  A.   Yes.

13  Q.   Could you explain what that means?

14  A.   Yes.  We tied the dark meat price in relation to the

15  eight-piece price.  So in this case we were referring to that

16  as 30 back of the eight-piece or said another way 30 cents less

17  than the price of the eight-piece chicken.

18  Q.   So for the injected dark meat, the middle one, the injected

19  dark meat code 9249 red --

20  A.   Yes.

21  Q.   -- can you just walk us through the math to get to that

22  .6620 figure that appears?

23  A.   Yes.  You take the eight-piece price on the first line of

24  the .9620 and take 30 cents off of it or subtract 30 cents from

25  it to get the .6620.

Michael Ledford - Direct

1  Q.  Thank you.  Can you turn to Tab 27 in your binder and you

2  should find there Government Exhibit 1410, 1410.

3  A.  Okay.

4  Q.  Do you recognize 1410?

5  A.  Yes.

6  Q.  What is this, Mr. Ledford?

7  A.  This is an e-mail from Bruce MacKenzie at Koch Foods to

8  Mark Oechsli that is attaching their fresh cost model for the

9  bid cycle.

10 Q.  What is the date of this communication?

11 A.  It is dated October 10, 2012.

12 Q.  And can you now turn to the next tab, Tab 28?  And you

13 should find there Government Exhibit 9691.

14      Do you see it?

15 A.  Yes.

16 Q.  Do you recognize this?

17 A.  Yes.  This is the cost model that was attached to the

18 document before.

19 Q.  Okay.  And is this a bid that Koch submitted to RSCS around

20 October 10 of 2012?

21 A.  Yes, it is.

22      MR. TORZILLI:  I would offer into evidence Government

23 Exhibit 1410 and 9691, both printed and native versions.

24      MS. HENRY:  No objection.

25      THE COURT:  All right.  Any objections to Exhibit

Michael Ledford - Direct

1    1410?

2              1410 will be admitted.

3              And any objection to Exhibit 9691 including the native

4    file version?

5              That exhibit will be admitted as well.

6         *MR. TORZILLI:*  Thank you, Your Honor.

7    *BY MR. TORZILLI:*

8    *Q.*  Mr. Ledford, would you -- well, first let me ask whether

9    when we discussed earlier this afternoon the chicken suppliers

10   that were competing for contracts in 2012, whether the

11   companies that were involved included George's?

12   *A.*  Yes.

13   *Q.*  And did George's submit bids to RSCS in that calendar year?

14   *A.*  Yes, they did.

15   *Q.*  Could you please turn to Tab 29 of your binder?  And you

16   should find there Exhibit 1406.

17   *A.*  Okay.

18   *Q.*  Do you recognize 1406?

19   *A.*  Yes, I do.

20   *Q.*  What is 1406?

21   *A.*  This is an e-mail from Darrell Keck at George's to Mark

22   Oechsli attaching their fresh chicken-on-the-bone cost model

23   for that 2012 bid cycle for the 2013 calendar year.

24   *Q.*  What's the date of the communication in 1406?

25   *A.*  October 10th, 2012.

Michael Ledford - Direct

1  Q.  And now can you turn to Tab 30 in your binder?  You should

2  find there Government Exhibit 9690.

3  A.  Yes.

4  Q.  Do you recognize 9690?

5  A.  Yes, I do.

6  Q.  What is it?

7  A.  It is George's cost model for chicken on the bone for the

8  2013 calendar year.

9       MR. TORZILLI:  Your Honor, at this time we offer 1406

10 and 9690, printed and native versions.

11      THE COURT:  First of all, any objection to Exhibit

12 1406?

13      MR. POLLACK:  No, Your Honor.

14      THE COURT:  Exhibit 1406 will be admitted.

15      Any objection to 9690, including the native file

16 version?

17      MR. POLLACK:  Can we see it, Your Honor?

18      THE COURT:  Yes.

19      MR. POLLACK:  Is it four pages in total?

20      MR. TORZILLI:  It's four printed pages and then the

21 fifth page is just the cover sheet.

22      THE COURT:  Mr. Torzilli, you have to address your

23 comments to me.

24      MR. TORZILLI:  If I may clarify the printed version --

25      THE COURT:  Mr. Pollack, the exhibit sticker is on a

Michael Ledford - Direct

1    cover sheet that says produced in native, but then there does

2    appear to be four pages after that.

3           MR. POLLACK:  Could I just clarify, is it identical --

4    is it simply the electronic version of 1407?

5           MR. TORZILLI:  The underlying -- may I respond to

6    that, Your Honor?

7           THE COURT:  Sure.

8           MR. TORZILLI:  The underlying native file, so the

9    Excel spreadsheet of both the printed what's been marked as

10   1407 and 9691, it's the same underlying native file.

11          MR. POLLACK:  With that, Your Honor, no objection.

12          THE COURT:  Ms. Henry, did you have anything?

13          MS. HENRY:  I think he said 9691 and I think that's --

14          THE COURT:  Mr. Torzilli is moving 9690 in.

15          MS. HENRY:  Correct.

16          THE COURT:  9690 including the native file version

17   will be admitted.

18          MR. TORZILLI:  Thank you, Your Honor.

19          Permission to publish Page 2.

20          THE COURT:  Of 9690?

21          MR. TORZILLI:  Yes, Your Honor.

22          THE COURT:  You may.

23          MR. TORZILLI:  Thank you.

24   BY MR. TORZILLI:

25   Q.  Mr. Ledford, on the screen to your left is Page 2 of what's

2080

Michael Ledford - Direct

1   been admitted into evidence as 9690.

2        What is this?

3   A.  This is the cover sheet for George's for the 2013 calendar

4   year RFP with all of their prices submitted for round one of

5   the fresh chicken-on-the-bone products.

6   Q.  What's George's purple -- bid for their purple label

7   product that appears on this page?

8   A.  .9694 or 96.94 cents per pound.

9        MR. TORZILLI:  Thank you.  You can take that exhibit

10  down.

11  BY MR. TORZILLI:

12  Q.  If you will turn to Tab 31.  You should find what's been

13  marked as 1569.

14  A.  Okay.

15  Q.  Do you recognize 1569?

16  A.  Yes, I do.

17  Q.  What do you recognize it to be?

18  A.  It is an e-mail from Tim Scheiderer at Tyson Foods to Mark

19  Oechsli with their bid sheet for that same 2012 bid for the

20  2013 calendar year.

21  Q.  What was the date of the communication?

22  A.  It is dated 10th of October 2012.

23  Q.  Now will you turn to the next tab, Tab 32?  You should find

24  Exhibit 9696 there.

25        Do you recognize the printouts that appear in 9696?

Michael Ledford - Direct

1   A.   Yes.

2   Q.   What does it appear to be?

3   A.   It is the printout for all of their bids for products for

4   that 2012 RFP.

5   Q.   And is this something that Tyson would have provided to you

6   in an Excel type -- or provided to Mr. Oeschli in an Excel type

7   format?

8   A.   Yes.  They would have provided this to Mr. Oeschli.

9           MR. TORZILLI:  Your Honor, at this time we would offer

10  into evidence 1569 and the printed and native versions of 9696.

11          THE COURT:  Any objection, first of all, to

12  Exhibit 1569?

13          MS. PREWITT:  Objection, Your Honor.  I would like to

14  be heard if it can be on side bar.

15          THE COURT:  Yes.

16     (At the bench:)

17          THE COURT:  Ms. Prewitt, go ahead.

18          MR. FAGG:  Your Honor, this is John Fagg.  One point

19  quickly.  At the last side bar Mr. Torzilli inadvertently was

20  speaking quite loudly.  We would just ask that everyone keep

21  their voices down.

22          THE COURT:  Yes.  And Mr. Torzilli, if you don't mind

23  moving away from the microphone just in case.  The podium mic

24  is on.

25          Ms. Prewitt, go ahead.

Michael Ledford - Direct

1        *MS. PREWITT:*  Thank you, Your Honor.

2        I would like to raise a 401 and 403 objection too.  I

3   will say that this particular incident, I don't think the

4   government has any factual basis to assume there is involvement

5   of anyone at Tyson Foods in the alleged collusion.  I will say

6   that you will see this is a repeated pattern as we saw with

7   respect to the Golden Corral where questions were raised that

8   created a specter of collusive activity for which the

9   government has zero factual basis.  And, in fact, what we have

10  seen in the texts shown to the jury indicated that no one had

11  Pilgrim prices and, in fact, the competitor thought the prices

12  submitted by Tyson were so low that they were "morons."

13       I believe this is a continual issue we will see with

14  respect to the Sysco Food allegations, the Pollo Tropical

15  allegations.  So Your Honor, this is going to be a continued

16  issue we feel from Defendant Mulrenin, and I think Defendant

17  Roberts will join in the objection.

18       *MR. GILLEN:*  Your Honor this is Craig Gillen.  We join

19  in that objection, Your Honor.  There is a disturbing pattern

20  that Ms. Prewitt has articulated that is of concern to us.  And

21  we would -- the inferences that the government is attempting to

22  draw, particularly with some of the questions we don't think

23  had a factual basis or good faith basis with the last witness,

24  the pattern seems to be continuing.

25       *THE COURT:*  Mr. Torzilli, response?

Michael Ledford - Direct

1        MR. TORZILLI:  Yeah, absolutely, Your Honor.  What

2   we're asking here is for the admission into evidence of bids

3   that Tyson submitted.  I don't think we put these bids on our

4   559 log that went to the 559 ruling and so forth, so I think

5   the submission of bids at a very minimum is relevant for the

6   purpose of having the jury see the entire competitive landscape

7   as it played out in this bid process.

8        MR. GILLEN:  Your Honor, Craig Gillen here.  This

9   again is a pattern that we've seen where they tried to drag

10  Tyson and Mr. Roberts and Mr. Mulrenin into this sort of

11  inference by association and in our view bad faith questioning

12  and we would object to this.  It wasn't in their *James* log

13  presentation for a reason.  And we would ask -- and I renew the

14  objection of 401 and 403 articulated by Ms. Prewitt.

15        THE COURT:  Okay.

16        MS. PREWITT:  Your Honor, will you permit me to make

17  one more statement?

18        THE COURT:  Yes.

19        MS. PREWITT:  Thank you, Your Honor.  If you look at

20  the indictment, Paragraph 54 to 64, you will see that not only

21  is Tyson not mentioned, they are specifically excluded from the

22  group of alleged co-conspirators in relation to this particular

23  episode.  So I would like to point that out for Your Honor's

24  consideration as well, so that is all quite -- not what we

25  would expect, to be honest.

Michael Ledford - Direct

1          MR. TORZILLI:  So Your Honor, if I may.

2          THE COURT:  Yes, go ahead.

3          MR. TORZILLI:  So Your Honor, I will direct your

4   attention to Government Exhibit 1427 where Defendant Brady says

5   about six weeks from the current period we're talking about, we

6   are talking about October 10, so now in mid November he is

7   talking about Tyson being 31 back on dark meat.  And Mr. Brady

8   and Tyson are competitors at that point in time, so I think at

9   a minimum that's an indication that Tyson is involved in the

10  collusion that occurred in this time frame.

11         MR. GILLEN:  Craig Gillen again.  Absolutely no

12  evidence to that assertion.  And again, if you look at the --

13         THE COURT:  Mr. Gillen, I can't hear you right now.

14         MR. GILLEN:  Looking at that exhibit, I believe it

15  says, Ol Mike is bluffing hard.  So there is nothing that

16  connects Tyson and Roberts and Mulrenin to this.  And of course

17  the indictment, although it doesn't go out with the jury, has

18  put us on notice about what the Grand Jury thought was a

19  violation.  Ms. Prewitt has articulated that we are not within

20  that particular episode found by the Grand Jury, and so this

21  would be prejudicial and also frankly a material variance from

22  the indictment as charged and upon which we were put on notice

23  of the charges against us.  And therefore we would ask that

24  this be excluded and that the government be admonished and

25  directed not to continue to ask questions like they did with

Michael Ledford - Direct

1    the last witness with no factual basis whatsoever, but simply

2    just sort of an inference out there upon which they have no --

3    in our view no good faith to be asking those sorts of questions

4    they did with Mr. Smith.

5         THE COURT:  I am going to overrule the objections.  I

6    think that the point that Mr. Torzilli made is that the jury

7    would at least be entitled to see the overview of different

8    people who were competing in this particular bidding year.

9    However, I will take a look overnight at the indictment and

10   also the exhibits and documents that have been referred to so

11   that in the event that there is a pattern, I will at least be a

12   little better informed.  It's difficult for me not having those

13   materials at the ready to fully put the argument in context,

14   but I do believe that Mr. Torzilli has a proper basis to ask

15   about these two exhibits of the witness.

16        MR. POLLACK:  Your Honor, Mr. Pollack on behalf of

17   Mr. Blake.  I would just ask you do the same review with

18   respect to the Golden Corral allegations, and you will note

19   that there is no allegation in the indictment that George's

20   even bid on Golden Corral.

21        THE COURT:  Right.  I will do that too.  Thank you.

22      (In open court:)

23        THE COURT:  The objection is overruled.  Go ahead.

24        MR. TORZILLI:  Thank you, Your Honor.  The United

25   States offers to the extent it's not already in evidence 1569

Michael Ledford - Direct

1    and 9692, both printed and native versions.

2         THE COURT:  You mean 9696?

3         MR. TORZILLI:  I am sorry, Your Honor.  It's late in

4    the day.  9696.

5         THE COURT:  I don't think that we got to it, but any

6    objection to the admission -- I think there was.  Ms. Prewitt

7    made the objection.  Any other objections to 1569?  So 1569

8    will be admitted.

9         MR. TORZILLI:  Thank you, Your Honor.

10        THE COURT:  And any -- same objection, Ms. Prewitt, to

11   9696?

12        MS. PREWITT:  Yes, Your Honor.

13        THE COURT:  Any additional objections?  That objection

14   will be overruled and Exhibit 9696 including -- Mr. Torzilli,

15   you moved the native version as well?

16        MR. TORZILLI:  Yes, sir.

17        THE COURT:  -- including the native version will be

18   admitted.

19        MR. TORZILLI:  Thank you, Your Honor.

20   BY MR. TORZILLI:

21   Q.  Mr. Ledford, the submissions that we just looked at over

22   the course of the past few minutes, is it fair to say that

23   those were the first round submissions that the competing

24   suppliers provided to RSCS?

25   A.  Yes, that's correct.

2087

1   *Q.*  And can you describe what happened next in the process that

2   you had in place for the negotiations at this time?

3   *A.*  Yes.  Typically speaking we would gather the submissions

4   that we got.  We would meet internally for a game plan,

5   strategize next steps.  Then we would typically have feedback

6   discussions or meetings with the suppliers on their round one

7   submissions before we would issue a round two of the bid.

8        *MR. TORZILLI:*  Your Honor, the microphone appears to

9   be not working.

10        *THE COURT:*  The battery appears to be out.  And

11   because it's two minutes until 5:00, we will consider that to

12   be a convenient opportunity to go ahead and excuse you for the

13   day.  Keep the admonitions in mind, if you would.  Don't try to

14   look up anything no matter what.  Don't try to look up any

15   information about the case.  All your information has to come

16   from the trial.  And I hope you have a good evening.

17        And at one of the side bars we talked about and we

18   talked about it a little bit during the break, so tomorrow we

19   are going to -- just the attorneys and me are going to meet and

20   we are going to work through some more of those exhibits, so

21   tomorrow I will have you return at 10:00 a.m., okay?

22   10:00 a.m. tomorrow.  And then we won't be having a mid-morning

23   break, but we'll just go straight through until noon, all

24   right?  So if you will return and be ready to go at 10:00 a.m.,

25   we will be working hard up until that point, okay?

1          Thank you very much, ladies and gentlemen.  You are

2     excused.

3          (Jury excused.)

4          Please be seated.

5          Mr. Ledford, you are excused.  Can you come back

6     tomorrow at 10:00?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  Great.  Thank you very much.

9          All right.  So we will meet tomorrow at 8:00 and then

10    we will work through as many as we can.

11         Mr. Feldberg, did you have something?

12         MR. FELDBERG:  Just a question, Your Honor.  Does the

13    Court require the defendants to be present from the 8:00 to

14    10:00 session?

15         THE COURT:  They do not need to be present just as we

16    did on Friday afternoon.  They can if they wish.  If they

17    choose not to, they do not need to be present.

18         Mr. Koenig?

19         MR. KOENIG:  Two things.  I know I agreed to 5:30 to

20    the list, but can we have until 6:00?  Because by the time we

21    walk back to our offices --

22         THE COURT:  6:00 o'clock is fine.

23         MR. KOENIG:  One other issue we noticed a few times

24    and haven't said anything is during cross there will be an

25    exhibit up, and I think Mr. Tubach did this a couple times,

1    they will blank out part of the exhibit and say, well, if you

2    take out this part of the exhibit, you know, here is what it

3    looks like and what do you see?  And I do think that's a bit

4    argumentative, so we would ask the Court to direct them not to

5    do that.

6         THE COURT:  Yeah, I don't think the exhibits should be

7    manipulated to that extent.  I don't think that's appropriate,

8    so I would hope that we don't do that in the future.  I didn't

9    notice that, but assuming it happened.

10        MR. TUBACH:  I certainly didn't mean to manipulate any

11   document.  The witness had the full document for every

12   cross-examination that I conducted.  I don't believe there was

13   any manipulation.

14        THE COURT:  Once again, just as there have been

15   objections to the government displaying two things side by side

16   is argumentative, so too with documents.  Even if the witness

17   has an exhibit, if an exhibit is blanked out or something like

18   that, that's argumentative as well.

19        MR. KOENIG:  And one more thing.  Can I pass to

20   Ms. Sweeney for one final issue?

21        THE COURT:  Yes.

22        MS. SWEENEY:  Yes, Your Honor.  We received a request

23   at the lunch break, we have a witness who may testify as early

24   as tomorrow.  It was requested to testify by video

25   teleconference for two reasons.  We understand this request is

1    late under the district's jury protocols, but I think they are

2    good reasons.  The first is that there are --

3             THE COURT:  Who is the witness?

4             MS. SWEENEY:  Mr. Skalak.  There are some health

5    concerns that were confirmed to the government after trial

6    started.  And the anxiety I should say increased with the

7    potential COVID exposure of the jury over the weekend, so we

8    just wanted to make this request to Your Honor.  He would be

9    testifying after Mr. Ledford.

10            THE COURT:  This is the witness that was discussed on

11   Friday; is that correct?

12            MS. SWEENEY:  I don't believe so.

13            THE COURT:  Okay.  So go over those again.

14            MS. SWEENEY:  Sure.  There were -- and I don't want to

15   get into too much detail for obvious reasons -- but some health

16   concerns that were confirmed around the start of trial and the

17   government learned about them a little bit after the start of

18   trial and then the potential of COVID exposure in the jury this

19   morning.

20            THE COURT:  Let me make the following record, and that

21   is as to the juror who was in seat number 11 previously, she

22   had a rapid test performed this afternoon.  It came back

23   negative.  But not knowing what the health concerns are, and I

24   am not sure if defense counsel do either, I think that that

25   information would need to be shared before they could make an

1    intelligent -- to take a position based on, you know, some

2    reason.  So too me.  I just don't know with that little

3    information.

4         MS. SWEENEY:  Sure.  I will confer with counsel.  And

5    if they are amenable, we can file something under seal tonight.

6    We don't obviously want to reveal health conditions.

7         THE COURT:  I understand completely.  The information

8    could be submitted to the Court under seal or under some type

9    of limitation as long as it is also provided to defense counsel

10   that way.

11        MS. SWEENEY:  Yes, Your Honor.  And I will confer with

12   his counsel to confirm that that is all right.  So if you don't

13   see anything from us, that's why.

14        THE COURT:  Thank you.

15        Mr. Beller?

16        MR. BELLER:  Your Honor, we will certainly read any

17   information we are provided with a very open mind.  I would

18   note for the Court that I believe that these health issues were

19   disclosed to the government on October the 6th.  It is

20   contained in his interview on October the 6th, which to my

21   knowledge is the very first time the government ever contacted

22   and/or met with Mr. Skalak despite the indictment being almost

23   at that point a year and a half old.

24        The government did disclose to us that they would

25   contact -- or rather put on either Mr. Skalak or Mr. Rothmeier.

1    We are now in what is starting as our third week of trial with

2    Mr. Skalak, according to the government, being put on the stand

3    tomorrow.  And so certainly we have prepared as though

4    Mr. Skalak and not Mr. Rothmeier is, in fact, going to be

5    testifying.  This is a choice that the government did make.

6         Understanding he may have health issues that the

7    government apparently did not either appreciate or know despite

8    their disclosure and its inclusion in a report on October the

9    6th, our clients obviously have certain confrontation rights.

10   We would strenuously object to this change of course at this

11   point.  With all of that said and with that, I guess, blatant

12   statement of lack of humanity, we are certainly willing to

13   listen to anything the government may have to say.

14        *THE COURT:*  Okay.  Anything else before we recess?

15        All right.  We will in recess, then, until 8:00 a.m.

16   tomorrow.  Thank you.

17       (Recess at 5:07 p.m.)

18

19

20

21

22

23

24

25

1                                    INDEX

2    WITNESSES

3        Telly Smith

4            Direct Examination By Mr. Koenig           1877

5            Cross-examination By Mr. Tubach            1922

6            Cross-examination By Ms. Henry             1997

7            Cross-examination By Mr. Pollack           1998

8            Cross-examination By Ms. Prewitt           2005

9            Cross-examination By Mr. Fagg              2012

10           Cross-examination By Mr. Feldberg          2021

11           Redirect Examination By Mr. Koenig         2026

12       Michael Ledford

13           Direct Examination By Mr. Torzilli         2046

14                                  EXHIBITS

15   Exhibit        Offered   Received   Refused   Reserved   Withdrawn

16   401                      1901

17   404                      1970

18   413                      1889

19   424                      1964

20   433                      2036

21   434                      2036

22   435                      2036

23   436                      2036

24   437                      2036

25   438                      2036

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | | INDEX (Continued) | | | | |
| 2 | | EXHIBITS | | | | |
| 3 | Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
| 4 | 439 | | 2036 | | | |
| 5 | 440 | | 2036 | | | |
| 6 | 441 | | 2036 | | | |
| 7 | 442 | | 2036 | | | |
| 8 | 443 | | 2036 | | | |
| 9 | 444 | | 2036 | | | |
| 10 | 445 | | 2036 | | | |
| 11 | 446 | | 2036 | | | |
| 12 | 447 | | 2036 | | | |
| 13 | 480 | | 1911 | | | |
| 14 | 481 | | 2015 | | | |
| 15 | E-568 | | 1991 | | | |
| 16 | E-569 | | 1991 | | | |
| 17 | D-789 | | 1941 | | | |
| 18 | C-862 | | 1943 | | | |
| 19 | 940 | | 1876 | | | |
| 20 | 953 | | 1876 | | | |
| 21 | 955 | | 1875 | | | |
| 22 | 1051 | | 1874 | | | |
| 23 | 1058 | | 1872 | | | |
| 24 | 1074 | | 1871 | | | |
| 25 | 1075 | | 1872 | | | |

1               INDEX (Continued)

2                  EXHIBITS

3    Exhibit      Offered   Received   Refused   Reserved   Withdrawn

4    1160                   1875

5    1175                   1871

6    1190                   1871

7    1191                   1871

8    1238                   1874

9    1247                   1873

10   1406                   2078

11   1410                   2077

12   1438                   2065

13   1438-1                 2065

14   1505                   2073

15   1524                   2069

16   1569                   2086

17   3037                   1870

18   6198                   1869

19   9672                   1875

20   9690                   2079

21   9691                   2077

22   9692                   2074

23   9693                   2069

24   9696                   2086

25

1                         REPORTER'S CERTIFICATE

2          I certify that the foregoing is a correct transcript from

3     the record of proceedings in the above-entitled matter.  Dated

4     at Denver, Colorado, this 24th day of January, 2022.

5

6                              S/Janet M. Coppock

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25