1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
   Criminal Action No. 20-CR-00152-PAB
3
   UNITED STATES OF AMERICA,
4
        Plaintiff,
5
   vs.
6
   JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
   SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
   TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
   JIMMIE LEE LITTLE,
10 WILLIAM WADE LOVETTE,
   GAR BRIAN ROBERTS,
11 RICKIE PATTERSON BLAKE,

12      Defendants

13 _____

                  REPORTER'S TRANSCRIPT
14                 Trial to Jury, Vol. 20

15 _____

16         Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 8:01 a.m., on the 23rd day of November,

19 2021, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106

APPEARANCES

1

2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul

3    Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of

4    Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing

5    for Plaintiff.

6          Anna Tryon Pletcher and Michael Tubach of

7    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

8    San Francisco, CA 94111-3823;

9          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

10   N.W., Washington, DC 20006, appearing for Defendant Penn.

11         David Beller, Richard Kornfeld and Kelly Page of

12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

13   CO 80202, appearing for Defendant Fries.

14         Bryan B. Lavine of Troutman Pepper Hamilton Sanders,

15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

16          Laura Kuykendall and Megan Rahman of Troutman Pepper

17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,

18   appearing for Defendant Brady.

19         Michael Felberg of Reichman, Jorgensen, Lehman,

20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21   10017;

22

23

24

25

```
 1              APPEARANCES (Continued)

 2          Laura F. Carwile of Reichman, Jorgensen, Lehman,

 3   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

 4   CA 94065; appearing for Defendant Austin.

 5          Elizabeth B. Prewitt of Latham & Watkins, LLP,

 6   555 11th Street, N.W., Suite 1000, Washington, DC 20004;

 7          Marci Gilligan LaBranche of Stimson, Stancil,

 8   LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

 9   80218, appearing for Defendant Mulrenin.

10          James A. Backstrom, Counselor at Law, 1515 Market

11   Street, Suite 1200, Philadelphia, PA 19102-1932;

12          Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13   Bethesda, MD 20814, appearing for Defendant Kantola.

14          Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15   Street, Suite 1100, Los Angeles, CA 90017;

16          Dennis J. Canty, Canty Law Corporation,

17   1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18   appearing for Defendant Little.

19          John Anderson Fagg, Jr. and James McLoughlin of

20   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25
```

```
 1                    APPEARANCES (Continued)

 2          Craig Allen Gillen and Anthony Charles Lake of

 3   Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

 4   Atlanta, GA 30339;

 5          Richard L. Tegtmeier of Sherman & Howard, LLC,

 6   633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

 7   for Defendant Roberts.

 8          Barry J. Pollack of Robbins, Russell, Englert, Orseck

 9   & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11          Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                       PROCEEDINGS

16        THE COURT:  We are back on the record in 20-CR-152.

17   The jury is not present.  We are going to talk about some

18   rulings that need to be made.  We will also talk about some

19   more exhibits.  So everyone is present.

20          Ms. Call, go ahead.

21        MS. CALL:  Which do you want to do first?  I will note

22   you may notice the government's table is a little thinned out

23   this morning.

24        THE COURT:  It is a little thinned out.

25        MS. CALL:  No more fevers reported, but our paralegal
```

1    situation is a little light right now with remote work.  We did

2    ask defendants if we could use them to display documents this

3    morning at least for the first 45 minutes.  And Mr. Torzilli

4    and Ms. Sweeney will be joining sometime within the next 45, so

5    I apologize for that.

6              On the documents, perhaps if we start with 518.

7              THE COURT:  So this is a new document?

8              MS. CALL:  Yes, Your Honor.  This was on the

9    government's *James* log as entry 26.

10             THE COURT:  Hold on one second, Mr. Beller.

11             All right.  Mr. Beller -- or Ms. Call, why don't you

12   give us some additional background on it.  It was *James* log?

13             MS. CALL:  *James* log 26.  The e-mail contains

14   statements by Mr. McGuire, Mr. Pate and I believe

15   Ms. Antoinette.  Mr. Pate and Mr. McGuire were both found to be

16   participants in the conspiracy, and then the statements by

17   Ms. Antoinette are not offered for the truth.

18             THE COURT:  Mr. Beller, go ahead.

19             MR. BELLER:  Thank you, Your Honor.

20             Your Honor, the Court may recall that I have objected

21   a couple of times that Pollo Tropical is unnoticed 404(b).  And

22   the representation that the government made in response, it was

23   indicated that Pollo Tropical is being introduced only as to

24   the 2015 contract of chicken prices.  The government -- while

25   it was included on the *James* log, this was also included in the

1    exhibits that the government disclosed to counsel at the

2    beginning of October.  It was not included in any of the

3    subsequent exhibit lists.

4         Your Honor, I had planned on discussing this or at

5    least cross-examining Mr. Brink regarding this particular

6    issue.  However, based upon the government indicating that

7    Pollo Tropical was only being introduced for the 2015 incident

8    and then on top of that Mr. Brink not being inquired about

9    anything prior to 2015 on direct examination, I did not ask

10   Mr. Brink about this particular exchange and this particular

11   contract and pricing.

12        Your Honor, I would notice the Court or advise the

13   Court that the bottom e-mail from Ms. Antoinette introduces

14   Georgia Dock which is wholly irrelevant to this.  It is a

15   market that has not been discussed in this case, although it

16   was heavily investigated in the government's case.  I believe

17   that reference to Dock Market duly prejudicial and has little

18   to no probative value.

19        I would also note that this particular e-mail when not

20   accompanied by testimony by Mr. Brink is also prejudicial and

21   misleading in that Claxton Poultry was never at 90 cents.  I

22   believe if the Court recalls the testimony from the *James*

23   hearing, there was testimony that Mr. Pate and Mr. Brink had

24   gotten together I believe days before, possibly the week before

25   in San Antonio.  I think there is great risk that we confuse

1   the jury with reference to the fact that Claxton Poultry or

2   here Walter Cooper is holding at 90 cents.

3          I am not certain that that came from Claxton Poultry.

4   I believe that that may have been a bluff that came from

5   Mr. Brink.  But nonetheless, even if it did come from

6   Mr. Cooper, Your Honor, Claxton Poultry was 89 cents, not at 90

7   cents, so I think that even if it comes from Claxton Poultry or

8   Mr. Cooper, that this is competitive bluffing.

9          I would also note I believe it was the next day that

10  Pilgrim's despite this did, in fact, come down to either 88 or

11  89 cents.  While I realize that all of that is factual and not

12  necessarily relevant to the Court's determination, I believe

13  that it is only insofar as the fact that this is, in fact,

14  misleading and prejudicial when not accompanied by any sort of

15  testimony.  And Mr. Brink is now off the stand and not subject

16  to recall based upon the scope of examination that was elicited

17  by the government.  Thank you.

18          THE COURT:  Thank you, Mr. Beller.

19          Ms. Call?

20          MS. CALL:  Yes, Your Honor.  So you may recall, I

21  believe I noted Exhibit 518 and our intention to introduce it

22  days ago on the record, I believe even during the testimony of

23  Mr. Brink if not before, and it was of course on the

24  government's exhibit list.  I believe the list Mr. Beller may

25  have been referring to was the list we had filed to provide as

1    much notice as possible of the documents that we were going to

2    introduce outside of sponsoring witnesses.  And I will note

3    this was not on that list, but I did, as soon as we made the

4    decision to introduce it, notify the Court and the parties, and

5    I believe it was before Mr. Brink or during his testimony.

6          With respect to the representation regarding 2014, I

7    believe in previous discussions counsel for Mr. Fries had, of

8    course, objected to the introduction of evidence relating to

9    Pollo Tropical.  The response was at the time when looking at

10   documents relating to 2014 and price increases that year, well,

11   of course, that's relevant.  Mr. Bryant's testimony has made it

12   relevant.  These price increases were sought across the small

13   bird industry.

14         I don't believe there is a representation that Pollo

15   Tropical's relevance to this conspiracy was limited to 2014.

16         With respect to Mr. Brink, as I said, I believe we

17   noticed this before his testimony, but nevertheless, he is also

18   not copied on this document, so the probative value of this

19   with cross-examination for Mr. Brink may be minimal.

20         THE COURT:  Was he -- did he discuss this in any

21   interview memos that were produced?

22         MS. CALL:  That is a good question.  I very much doubt

23   it.  I don't believe Mr. Brink was shown communications between

24   conspirators that he was not copied on during his interviews.

25         One moment.

1          And that representation is, of course, specific to

2     this document.  I'm not sure and I would have to confirm

3     whether Mr. Brink was asked about this time period of

4     negotiation in his interview.

5          With respect to the Georgia Dock, I don't quite see

6     the prejudice there.  I believe several defense counsel have

7     mentioned the Georgia Dock during their examinations in front

8     of the jury, so I don't believe a reference to that index alone

9     is prejudicial, particularly were this just a document simply

10    being shown to them.

11         Lastly, regarding to the accuracy of the information

12    as to whether Claxton and Mr. Cooper was holding strong at 90

13    cents, I don't believe that affects the determination that Your

14    Honor has already made as to whether this is in furtherance of

15    the conspiracy.  And from the language of the document where it

16    says, the customer is asking us to go to .89, we are both

17    holding firm at .90, it kind of shows a belief of Claxton's

18    future actions and its intent with respect to negotiations can

19    which would likely have come from Claxton, not from the

20    customer.

21         So I think there is indication just on the face of

22    this document that this is that kind of communication between

23    competitors about their status and negotiations that is a big

24    part of this conspiracy, and whether or not Claxton was

25    actually going to hold firm at 90 or not and bluffing to their

1   competitor here doesn't necessarily change this statement by

2   this person from Pilgrim's and their belief that these

3   communications were in furtherance of the conspiracy.

4        THE COURT:  Okay.  Mr. Beller, anything more?

5        MR. BELLER:  No.  Suffice it to say I disagree with

6   some of that, but nonetheless, Your Honor, in the interests of

7   time, I rest on the statement that has been made.

8        THE COURT:  I am going to overrule Mr. Beller's

9   objections.  It was on the *James* log.  I don't know, I really

10   can't resolve the conflict between counsel about whether there

11   was a representation that the government was only going to use

12   things for 2015.  The fact that it was on the *James* log does

13   give notice.  The government has it on its witness list.

14        I don't think that the Georgia Dock information is

15   unduly prejudicial.  As a matter of fact, I think Ms. Call is

16   right, it has come up in the trial before.  And I don't think

17   the 90-cent issue would justify the exclusion of this

18   particular exhibit either.  So Exhibit No. 518 will be

19   admitted.

20        Next one?

21        MS. CALL:  The next is Government Exhibit 1177.  This

22   is an e-mail from Defendant Mulrenin regarding the KFC meeting.

23   And I believe Your Honor was considering some law raised by

24   Mr. McLoughlin.

25        THE COURT:  That's right.  I withheld ruling on that.

1          Mr. McLoughlin, anything more on that document?

2              MR. McLOUGHLIN:  No.

3              THE COURT:  I have taken a look at the cases

4    Mr. McLoughlin cited.  I don't think that those are on point.

5    They are not statements of a defendant in the case.  They are

6    distinguishable for that reason, and I will admit Exhibit No.

7    1177.

8              MR. FAGG:  Your Honor?

9              THE COURT:  Yes.

10             MR. FAGG:  With respect to 1177, we would request on

11   behalf of Mr. Lovette a limiting instruction that that document

12   be admitted as to Mr. Mulrenin only.

13             THE COURT:  I think we talked about that.  Yes, and I

14   think that that is appropriate.

15             Okay.  Next?

16             MS. CALL:  All right.  The next we have covered, but I

17   recall yesterday afternoon Your Honor was not able to find it

18   on your list, so I wanted to see --

19             THE COURT:  I did find it finally.  It was in an odd

20   spot.

21             MS. CALL:  That was 1547.

22             THE COURT:  Yes, 1547, and -- but we were talking

23   about it in connection with another document; isn't that true?

24             MS. CALL:  I don't believe so, Your Honor.  I think

25   this was one that the government attempted to offer yesterday,

1   and at the time you were unable to find it in your list.

2             THE COURT:  Right.  But what about E-570?  That's what

3   we were talking about it.  And we also were discussing in

4   connection with the admission of I think E-570 a limiting

5   instruction.

6             MS. CALL:  Could E-570 be pulled up on the screen?

7             MR. TUBACH:  I believe this was a rule of completeness

8   argument that we made.

9             THE COURT:  That's correct.

10            MR. TUBACH:  I believe Mr. Austin's response to the

11  question.  The Court ruled that E-570 should come in under the

12  rule of completeness.

13            THE COURT:  Yes.  We also talked about -- I had

14  forgotten -- Mr. Penn had filed a brief regarding E-570 and in

15  Footnote 2 provided a proposed limiting instruction which I had

16  then ruled was an appropriate one.  That would say that

17  Exhibit 1547 is admitted for a limited purpose.  You may

18  consider Exhibit 1547 only in relation to Mr. Penn and you may

19  consider E-570 only as against Mr. Penn and Mr. Austin.

20            MS. CALL:  And, Your Honor, for the instruction will

21  you be doing it the same you have for others of this kind and

22  using the term against?

23            THE COURT:  Yes, I will be using the term against.

24            So the government will be admitting E-570 at the same

25  time, correct?

1          MS. CALL:  I imagine it would be directly after, yes,

2    in sequence.

3          THE COURT:  All right, directly after.

4          Anything more on that, Mr. Tubach?

5          MR. TUBACH:  No, Your Honor.  Thank you.

6          THE COURT:  Okay.  Next one?

7          MS. CALL:  The next is Government's Exhibit 9057 which

8    was also subject to briefing.

9          THE COURT:  I'm sorry, which one?  Oh, nine --

10         MS. CALL:  9057.

11         THE COURT:  Oh, yes, yes, the industry one.  Okay.  So

12   as you will recall, we had -- I had noted that that one was

13   discussed on the -- in my 404(b) order wherein I found it to be

14   extrinsic.  I think that that was wrong.  I don't think --

15   sorry, intrinsic.  I think that was wrong.  The exhibit relates

16   to something that is not within the conspiracy.

17         That doesn't mean that it can't be 404(b) evidence.

18   But in looking at 404(b) evidence on, you know, whether

19   something could be admissible as a means or method, which this

20   is essentially -- that's what it essentially is.  It would be

21   evidence that Mr. Penn was using a means or method of

22   contacting friendly competitors.

23         However, in order -- under 404(b) in order for a means

24   or method to be admissible as 404(b), it has to be unique

25   enough so that it identifies the means or method.  It helps to

1    prove the fact.  And I don't find that contacting friendly

2    competitors is sufficiently unique to be able to do that.  That

3    does not completely answer the question because you could argue

4    that 404(b) only relates to bad acts.  And as Mr. Penn argues,

5    these aren't really bad acts.  This is just what everyone does.

6         So the question then would be, okay, if it doesn't

7    come in under 404(b) because it's not really a bad act, can it

8    come in through some other rule just because it would have a

9    tendency to demonstrate that Mr. Penn used that particular

10   means or method in the past and inferentially could use it in

11   the future.  I haven't found any case law that's directly on

12   point there.

13        However, if it doesn't come in under 404(b) because

14   it's not sufficiently unique, then I just don't think it's

15   relevant.  I can't think that the jury could appropriately

16   determine that his means or methods or modus operandi or

17   something of that nature would have relevance in that different

18   context.  And I don't find it's part of the conspiracy to

19   compare to the charged conspiracy here and thereby determine

20   that it would fit within it.  So as a result, I will exclude

21   that exhibit.

22        Next, Ms. Call?

23        *MS. CALL:*  Your Honor, I don't believe you explicitly

24   stated it, but are you also then reversing your *James* hearing

25   ruling that this was in furtherance?

1          THE COURT:  Yes, I am.  To the extent I ruled it was

2     in furtherance, I am.  In looking more closely at that

3     document, I do agree with Mr. Penn that it's a wholly separate

4     organization.  That organization is not part of the conspiracy.

5          MS. CALL:  All right.  The next is Exhibit 9744.

6          THE COURT:  Okay.  This is a so-called new document?

7          MS. CALL:  Yes, Your Honor.  And this was one that

8     Mr. Tubach -- I mentioned and Mr. Tubach responded to briefly

9     yesterday saying that it had been admitted I think he said

10    three times over.  I will note there is several chains of the

11    e-mail chain following this e-mail that's at the top of

12    Exhibit 9744.  Those are e-mail chains largely involving

13    Defendant Penn and others.  There are several iterations of

14    that that have been admitted that had different strains of

15    communication that follow this.

16         THE COURT:  I am sorry, which part?

17         MS. CALL:  So the top e-mail from Mr. McGuire saying

18    "Roger did some checking around" in the second paragraph.  That

19    e-mail itself has been admitted within these three other chains

20    that followed from it.

21         The importance of this and why the government is

22    seeking to introduce it is because of this time zone -- I am

23    not going to call it an issue, but time zone issue in this

24    case.  And time zones matter in this case as we have talked

25    about.  The folks participating in this at the time were in

1    different time zones, so when e-mails were responded to, the

2    time changes.  For example, Exhibit 1074 -- if perhaps we could

3    pull it up side by side -- contains an e-mail following this

4    and then showing this same e-mail at I believe 5:56 p.m.  Let

5    me confirm.  I believe it's 1074, if I am correct.

6          So you see 1074 shows 5:46 which we believe to be

7    central time.  However, the evidence is the time zone that's in

8    the record here is, as we discussed, based on the testimony of

9    Mr. King and how these e-mails were processed which only

10   relates to the top e-mail in a given chain and his testimony is

11   those are in UTC.  However, there is no testimony or ability to

12   really verify the time zones unless indicated on the document

13   of those lower e-mails in the chain.

14         So 9744 is particularly important in establishing the

15   time that this e-mail was sent from Mr. McGuire which would be

16   based on the conversion here 6:46 Eastern which follows

17   communications between Mr. McGuire and Defendant Austin.  If

18   the jury were to inaccurately believe it was at 4:46 -- or,

19   sorry, 5:46, it would have preceded the communication that led

20   to this e-mail so it would be confusing and frankly somewhat

21   misleading to the jury, so we think it is important.

22         To Mr. Tubach's point about kind of the duplicative

23   entry of e-mails, the government won't plan to actually publish

24   this when it's introduced.  We are simply using it to establish

25   the time which is then contained on the summary exhibit that

1    the jury will be seeing.

2           *THE COURT:*  Mr. Tubach?

3           *MR. TUBACH:*  Your Honor, I do think three versions of

4    the document are enough.  The time zone issue is one that which

5    there had been testimony.  And essentially what the government

6    is saying is we should introduce a fourth version of this so

7    then we can do different time zone conversions.  There are

8    going to need to be time zone conversions no matter what one

9    does and there are already three versions the jury can look at

10   and the government can look at to use testimony to say, well,

11   here is when this was sent.

12          Exhibit 9744, they are not arguing it was sent at

13   10:46 p.m.  They are going to argue to the jury you have to

14   look at somebody's testimony to convert that to the actual time

15   it was sent.  And I believe there has been testimony about how

16   to convert -- or the time stamps in which other embedded

17   e-mails appear, so we just think everyone has got their

18   favorite exhibit, but I think three is enough.

19          *THE COURT:*  Thank you, Mr. Tubach.

20          Ms. Call?

21          *MS. CALL:*  I am not sure what testimony Mr. Tubach is

22   referring to regarding embedded e-mails.  I think it frankly

23   requires knowing where each the senders were and the jury

24   frankly doesn't know that.  And I think they have a right to

25   know the time line in this case, know when this e-mail was

1    sent.  And I think the government has a right to prove its

2    case.  Like I said, we are not trying to show the same e-mail

3    to the jury six times.  We are just trying to establish that

4    time line which is based on that time in the top e-mail and the

5    testimony is to that effect.

6         THE COURT:  The objection will be overruled.  There is

7    some additional information.  I am not exactly sure how the

8    jury is going to reconcile it all, but there is additional

9    information on this one, and for that reason I will overrule

10   the objection and will admit 9744.

11        Next one?

12        MR. FAGG:  Your Honor, with respect to 9744, since it

13   is a different document than what is on the *James* log, we would

14   request a limiting instruction with that.

15        THE COURT:  I will deny that request.  That would be

16   extraordinarily confusing to the jury.  And the time conversion

17   is not any type of a statement, and as a result, the fact that

18   that wasn't on the *James* log is irrelevant.

19        Go ahead, Ms. Call.

20        MS. CALL:  The next exhibit Is Government

21   Exhibit 9782.  This is an e-mail from Defendant Roberts.  It

22   contains a lower down communication from another individual at

23   Tyson that is not being offered for the truth.  The e-mail from

24   Roberts is being sought to be admitted under 801(d)(2)(A) as a

25   statement as his.  And this is in the summer of 2014, some

1    meetings he had with competitors surrounding the negotiations

2    that were going on at that time.

3         *THE COURT:*  And not on the *James* log?

4         *MS. CALL:*  Correct.

5         *MR. GILLEN:*  Your Honor, we object.  Not on the *James*

6    log, not on the government's exhibit list when we started this

7    case, and I am not sure whether the Tyson custodian

8    authenticated this document.  Is this something -- there has

9    been a little barrage of last minute Tyson documents that we've

10   gotten in at zero dark 30, and this seems to be one of them.

11        I am not sure whether this has been authenticated.  We

12   would object on authentication grounds.  We would object on the

13   fact that they did not list this on their exhibit list.  And we

14   would object on the fact that it has not been established to be

15   a business record.  Although they are introducing it against

16   Mr. Roberts individually, we would say it lacks authentication

17   and, of course, it's also tardy and was not in the exhibit

18   list.

19        And I think that my recollection from the barrage of

20   e-mails that we had received from the government about their

21   new documents say something about a Tyson presentation or a

22   Tyson delivery of documents here at the last minute.  If that's

23   the case, then as we know, Tyson, we have seen their leniency

24   agreements which have been discussed in this court and ruled

25   upon in terms of keeping this out, but if that's the case, then

1    why wasn't this document produced to the government and to us

2    well before this trial rather than literally I believe this one

3    was produced yesterday.  And then there are more that came in

4    literally after midnight last night, which would be this

5    morning.

6           So we object on all those grounds and would ask that

7    the Court would exclude it.  It's also just not relevant.  But

8    the key thing here is I don't think they have authenticated it.

9    And it's a -- if they had the document, it's an inexcusable

10   tardiness in not listing it as a government exhibit.  And we

11   have had so many iterations of the government exhibit list

12   throughout this case from their exhibit list to their summary

13   list, on and on it goes, and this to be dumped on us literally

14   the day before they close is simply too much.  And the other

15   documents which they have marked and we'll talk about later, we

16   got them this morning, so we would object.

17          THE COURT:  All right.  Thank you.

18          Mr. Beller?

19          MR. BELLER:  Thank you, Your Honor.

20          As to the bottom e-mail that lists my client, this is

21   from Ms. Sherman, Your Honor, I believe that the government

22   indicated that this is not being offered for the truth.  And

23   then the next statement is it is being offered -- sought to be

24   admitted as a statement of Mr. Roberts, and this is in the

25   summer of 2014, some meeting he had with competitors

 1   surrounding the negotiations that were going on at the time.

 2           And so it is my position that while the government --

 3   respectfully towards the government -- is indicating that it is

 4   not being offered for the truth, the follow-up response is that

 5   it is being offered to show that Mr. Roberts had lunch with my

 6   client sometime in July of that period of time which is by

 7   definition the truth of the matter asserted.  So I would object

 8   as hearsay as to the bottom, and I don't believe that there is

 9   a limiting instruction that can cure that prejudice.

10           To the extent over -- if the Court overrules

11   Mr. Roberts' objection, I would ask that the bottom e-mail be

12   completely redacted.

13           THE COURT:  Thank you, Mr. Beller.

14           MR. GILLEN:  Your Honor, I will supplement the

15   argument.  If they were to move to admit this against

16   Mr. Roberts solely, then it would appear candidly that there

17   would be Bruton considerations on behalf of Mr. Fries such that

18   there is -- it's a clear statement concerning Mr. Fries.  If

19   they are introducing it solely against Mr. Roberts, then you

20   have confrontation issues and Bruton issues which are

21   insurmountable in this document.

22           MR. TUBACH:  A brief point I would make, Your Honor.

23   This issue about the NCC, the National Chicken Council which is

24   referenced on this document is not anything new to the

25   government.  The government had sought to introduce I believe

3944

1    on the *James* log a document that relates to the NCC and the

2    supposed meeting of the NCC.   The fact that the government just

3    got this production yesterday from Tyson apparently means they

4    just requested it because Tyson has been cooperating with the

5    government for several years now.   And so this is nothing new

6    that the government just discovered.   They maybe just decided

7    they wanted more evidence about it and I join in the

8    objections.

9         Mr. McLoughlin, go ahead.

10         *MR. McLOUGHLIN:*   Very briefly, Your Honor heard some

11    testimony about the National Chicken Council from Mr. Brink.

12    It's an industry organization.   We would note here on the face

13    of the document the reference is for small bird marketing which

14    would be an industry procedure and for the benefit of the

15    entire industry and would not be in furtherance of the

16    conspiracy.   Now, the government says again they are not

17    introducing this for the truth of the matter asserted, but we

18    would respectfully dispute that.

19         Given the delay here and therefore the inability of

20    the defendants to get background on this information on the

21    particular meeting, what subjects were discussed, we have not

22    had the ability to do an investigation, to provide any rebuttal

23    to whatever argument the government is apparently going to

24    make.   Given the fact again that on its face it is not in

25    furtherance of the conspiracy because it relates to a national

1    organization meeting and our inability to have done the work to

2    confirm that given the great delay here, we would object on

3    behalf of Mr. Lovette.

4         THE COURT:  Thank you, Mr. McLoughlin.

5         Ms. Call?

6         MS. CALL:  All right.  I think I can clear up the time

7    line a little bit.  Defendants have had this document for at

8    least a year, if not longer.  It was provided in original

9    discovery.  There were some new items provided by Tyson Foods

10   this week.  This is not one of them.

11        I will then note as to our exhibit list counsel is

12   correct, this was not on the government's exhibit list.  But

13   the government can pivot during the trial just as defendants

14   do.  And counsel for the employees of Tyson Foods have put the

15   precise time line of that summer at issue in their openings and

16   their cross-examinations.  So the government is seeking to

17   clarify some of the events from that summer surrounding Tyson

18   Foods in 2014, not just when they were bidding with KFC, but

19   also their interactions with competitors throughout that time

20   period, including around the time of this national chicken

21   conference meeting.

22        THE COURT:  So what's the relevance?  I guess I don't

23   quite see it.  So they have a -- so why wouldn't they meet at a

24   national chicken conference?

25        MS. CALL:  So this National Chicken Council meeting

1    was end of July in 2014.  Tyson submitted its initial bid for

2    KFC on August 11th, so a couple weeks later.  The statements by

3    counsel have been, you know, Tyson submitted their bid a couple

4    days before their competitors, so there is no way there is

5    collusion.  The government is alleging calls that happened

6    August 15, August 18, after Tyson submitted its first bid, so

7    the conversations they had with competitors and the meetings

8    they had are relevant because this predated Tyson submitting

9    its initial bid seeking a large price increase in 2014.

10         THE COURT:  Ms. Prewitt?  We have to hurry because we

11    are getting late.

12         MR. GILLEN:  Very quickly, Your Honor.  No. 1, to say

13    we were put on notice because it was stuck in 16 million pages

14    that we got but it wasn't on their exhibit list does not alter

15    the fact that they have not put it on their exhibit list,

16    No. 1.

17         No. 2, the *Bruton* problems are insurmountable because

18    if you redacted Mr. Fries' name, they wouldn't even have it

19    admitted because they wouldn't think it's relevant.  You have

20    got the *Bruton* problem.  A bigger problem that we have here,

21    which sadly we have seen a pattern, the government is

22    representing that the inference that they wish to draw is that

23    somehow on July the 19th, that at the chicken conference that

24    somehow Tyson was formulating its business model in some sort

25    of conspiracy with folks at the chicken conference is deeply

1    troubling because for this reason.

2        The government knows and has the documents showing,

3    and this has been before this Court, that on July the 10th

4    Mr. Roberts forwarded to Mr. Lewis and to Mr. Pete Suerken

5    the -- a PowerPoint and the Tyson business model -- or pricing

6    model which was identical to the pricing model submitted on

7    August the 11th.  Tyson wanted to close their deal by the end

8    of July, but by July the 10th they had already sent in to KFC

9    the business model -- or the pricing model that was sent over

10   on August the 11th.  The government knows this.

11       And to argue to the Court that somehow this document

12   shows that on July the 19th they were cooking the books and

13   they had some conspiracy is a bit troubling because they see

14   these documents.  And they have seen documents internally from

15   Tyson where Tyson internally is working up, they're proposing

16   on their business model in June even before they submitted in

17   July the 10th.  So for all those reasons, Your Honor, we would

18   ask that the document be excluded.

19       THE COURT:  Ms. Prewitt?

20       MS. PREWITT:  Your Honor, I don't know how many more

21   documents the government is going to try to put in right now

22   along these sorts of lines.  Look, at this point obviously we

23   are trying to meet early to deal with these things before the

24   jury and not keep them waiting, but I will say, Your Honor, the

25   government has near unfettered access to Tyson employees from

1    which they could develop the factual basis to support their

2    inference here.

3           Tyson is a leniency applicant.  They are sitting on a

4    conditional leniency letter which they are at great risk of

5    losing because they have not produced a single Tyson witness

6    that will support the theory of a conspiracy that the

7    government has proffered in this case.  So they have a ton of

8    cooperation, last-minute production from Tyson Foods to help

9    assist them in their prosecution.  So I would like to know here

10   what their factual basis is other than their speculation about

11   what might have been discussed during this meeting and what

12   more we have coming down the pike, Your Honor.

13          THE COURT:  Ms. Call, real quick, and then we are

14   going to have to shift gears and get the jury back in here.

15          MS. CALL:  I just have a couple points because I

16   believe I was interrupted.  But as to the -- how many more

17   documents there are today, we sent that list to the defendants

18   yesterday, so they know what the remaining documents are.

19          As to the relevance here, just very briefly, again I

20   understand the time line Mr. Gillen stated, although I disagree

21   with his assertions of the government's case.  And part of the

22   salespeople's job at Tyson is ensuring that they can get the

23   price increase that they are seeking with a customer.  So just

24   because a bid was submitted does not mean there is no

25   conspiracy because there is negotiations that follow for quite

1    some time following the submission of the initial.

2          And the July 1 wasn't quite a bid.  It was sending a

3    proposed model.  The bid started in August.  They continued

4    into September.  So I don't quite agree with the representation

5    that just because Tyson had developed a number already doesn't

6    mean they were conspiring with their competitors to ensure that

7    they would get that historic price increase that they were

8    seeking.

9          As to authentication, because I think that was raised,

10   I believe Ms. Prewitt on cross-examination of Ms. Arens from

11   Tyson established testimony to the effect that she would

12   believe that every document beginning with a TY or TF Bates

13   stamp would be authentic based on her understanding of their

14   production process and her confirming from reviewing at least

15   the exhibits that the government had put before her to review.

16   This was not on that list, but she testified that based on her

17   review of those and her understanding of the process that Tyson

18   had used that she believes all the Bates stamped numbers

19   beginning with a TY prefix would be authentic.

20         THE COURT:  I am going to exclude the exhibit.  I just

21   don't find the relevance of it.  It's a just a reference back

22   into a meeting in July that involved the National Chicken

23   Council meeting, and that's the type of meeting that the

24   competitors would be at.  It's just way too much of a stretch

25   and inference to suggest that there is any relevance to that

1    particular document, so I am going to exclude that one.

2         Okay.  So real quick, Ms. Call, how many other

3    documents did we need to talk about because we are not going to

4    talk about them now.  410?

5         MS. CALL:  Yes, I believe I am running a count now.  I

6    believe it was 13 documents.  Four of them are toll excerpts,

7    so I think would be quick, and then so it's --

8         THE COURT:  Yeah, that's more than we thought.  We

9    didn't budget enough time.  There is no way we could finish all

10   that in half an hour, but I want to keep the jury on track.

11        MS. CALL:  Yes, Your Honor.  I believe all of these

12   are on the list I noted yesterday, and I do want to keep the

13   jury on time.

14        THE COURT:  I only recall four documents that were

15   new.

16        MS. CALL:  I believe there were four new ones.  There

17   were several that had been under the Court's consideration and

18   then I listed the tolls as well, and those together are the

19   total.  Let me just see because I think I could probably

20   address one and then we can move forward.

21        THE COURT:  No.  We are going to bring the jury back

22   now, so you will have to figure out a time when we are going to

23   talk about the rest of them.

24        MS. CALL:  All right.

25        THE COURT:  All right?  Let's bring the jury back in.

1          Yes, go ahead, Mr. Byrne.

2          *MR. BYRNE:*  Real quickly, I don't know if anyone else

3    wants to raise this or not.  We got a bunch of new summary

4    exhibits this morning that are different.  And if they are

5    going to put Ms. Evans on right now, then these are all

6    different than what we have been preparing for.

7          *THE COURT:*  Ms. Call?

8          *MS. CALL:*  Yes.  That is half of the reason the

9    government counsel was late this morning.  With some of our

10   issues with remote work and not having paralegals as readily

11   available, there was a miscommunication last night when we sent

12   the updated summaries to the defendants.  And I believe four of

13   them did not contain the updates that were made yesterday.  We

14   corrected that error I believe this morning.  Seeing my

15   colleagues, I believe we corrected it, and that's why they

16   would be here.

17         So we apologize for that error.  It was simply redoing

18   the changes that were made yesterday following the lunch hour.

19   So we have now, I think, paper copies as well for all defense

20   counsel.  And it was just the limited changes that were

21   discussed yesterday and that the government then effectuated.

22         *MR. BYRNE:*  Your Honor, just to follow up on that.  I

23   just noticed by looking at a couple of them while we have been

24   talking that some of the underlying exhibits that supposedly

25   are the basis of this have been switched out and also there

1    have been some that have been removed.  And I don't think that

2    they were because we discussed them yesterday.  I think they

3    are for other reasons or unknown reasons.  So I think there are

4    some other changes that have not been discussed as a result of

5    yesterday.

6         THE COURT:  Well, obviously defense counsel need the

7    opportunity to review the latest copies of these and

8    double-check them before there is any use of them in court.  So

9    if those need to be distributed right now, they should be

10   distributed right now.

11        Ms. Johnson?

12        MS. JOHNSON:  Yes, Your Honor.  I was going to add to

13   that some in the defense group received these at 12:30 this

14   morning.  Not everybody was included in that.  Some in our team

15   had only received them as early as 6:00 o'clock this morning

16   and that was due to the defense forwarding them ourselves.  And

17   so I think there is a real issue with getting the

18   communications from the government.  And as Mr. Byrne stated,

19   we still don't have the corrected summaries for the witness

20   that's going to take the stand.

21        MR. BELLER:  Ms. Call does not know this because

22   obviously she has been in court, but only in the last probably

23   10 minutes I think I have noticed the government of about six

24   corrections that need to be made.  I don't know if that

25   happened while Mr. Torzilli was walking over to court, but

1    these are not ready for publishing at this point.

2         THE COURT:  Okay.  So here is one idea, and

3    unfortunately this comes at the expense of our infinitely

4    patient jury, but one thing that we could do if people can

5    multi-task is that we could pass out the revised summaries.

6    Someone from the team could compare those while Ms. Call goes

7    through the rest of the documents at issue.  Once people are

8    ready on the summaries, we could then discuss those and see

9    what exhibits remain.

10        The alternative is that we could have a recess to have

11   people take a look at the summaries and make sure that those

12   are in proper order.

13        MR. TUBACH:  Your Honor, to speak on behalf of

14   Mr. Penn, we are fine multi-tasking.  We do want these final

15   exhibits.  This is getting a little crazy at this point.

16        THE COURT:  Yeah.  Ms. Call?

17        MS. CALL:  Respectfully, we raised these issues like

18   two months ago, so some of the last minute nature is because of

19   the repeated requests from defendants, but I understand that's

20   where we are.  I think your proposal sounds reasonable.  And I

21   will apologize to Ms. Johnson.  I think frankly we responded to

22   an e-mail from the defendants and sometimes they forget to copy

23   each other on the e-mail, so it was an oversight that we didn't

24   double-check the recipients.

25        THE COURT:  Let's not get into those recurring issues,

 1  but let's get the revised summaries passed out right now.

 2          MS. JOHNSON:  Your Honor, can we have them digitally

 3  as well?

 4          THE COURT:  That, I don't know.

 5          MS. CALL:  We are attempting to connect so we can send

 6  them.  We will try our best.

 7          THE COURT:  Okay.

 8          MS. CALL:  I understand the error only applied to a

 9  subset of the exhibits, so right now seven of the 19 are being

10  passed out.  The other 12 were correct as they were sent.

11          MR. FELDBERG:  Your Honor, may government counsel

12  identify which new charts are being passed out?

13          THE COURT:  Let's wait for a little order in the court

14  and then we'll have her identify them.

15          MR. McLOUGHLIN:  Your Honor, I know we are having lots

16  of fun here --

17          THE COURT:  Let's hold off for one second,

18  Mr. McLoughlin, so everyone is paying attention.  One second

19  still, Mr. McLoughlin.

20  Go ahead.

21          MR. McLOUGHLIN:  Your Honor, two things.  First,

22  because of the way on the defense teams we have assigned

23  responsibility within our team, having an electronic version

24  that the people who have been really tracking things can then

25  see, some of whom are not in the courtroom, is really

1    essentially.  So we would request whatever steps the government

2    needs to take to send out electronic versions, that they do so

3    right away.

4         The second thing is if the government could simply

5    list for us on the record which exhibits they changed between

6    the version that went out at midnight, and I will say for the

7    record I was in bed, I will confess to that, but whatever they

8    sent out at midnight versus this morning, if they could confirm

9    what's new, that would be very helpful.

10        THE COURT:  Right.  Mr. Feldberg had asked for

11   something similar.  I think that's a good idea.

12        So Ms. Call, first of all, in terms of sending out the

13   electronic version, how are you doing on that?

14        MS. CALL:  One moment, Your Honor.

15        Your Honor, not to side step the issue, but it may be

16   the basis for some of this confusion.  We just received while

17   sitting at the table in the last minute or two a notice that

18   there has been another positive COVID case on the government

19   team.  There may have been close contact from an individual at

20   government's table.  May we take a recess to figure out what to

21   do and what our regulations allow in this circumstance?

22        THE COURT:  I think that's a good idea.  So we'll be

23   in recess until you let me know that we are -- that we are all

24   ready to go.  And if you could figure out -- one thing that

25   defense counsel may want to do is take a look at the CDC

1    website.  Close contact is defined, as you may know, cumulative

2    15 minute contact I think within 6 feet.  But we will be in

3    recess until such time as -- but we will let Mr. McLoughlin

4    make a quick point and then we will go into recess.

5         MR. McLOUGHLIN:  We appreciate the government's

6    letting us all know and the issue and concern there, but if we

7    are going to have 15 minutes, the defense teams, if we can just

8    get a reading of which exhibits --

9         THE COURT:  Yes.  Could you do that, Ms. Call?  I

10   think that would be really helpful to people.

11        MS. CALL:  Yes.  The list is in front of me.  The ones

12   that have been revised from what was sent by last night, and by

13   revised I mean I think reverted back to what they were

14   yesterday afternoon, are 14-2, 14-3, 18-1, 18-3, 10-2, 5-1, and

15   2-1.  I will note because of the slight rush during the lunch

16   hour, we did double-check that the instructions were accurately

17   conveyed so there is a chance there might be slight changes

18   from yesterday afternoon, so I don't want to say that they are

19   exactly the same, but that is the list of what was changed from

20   what was sent last night.

21        We are still trying to connect to the internet, so we

22   will try to send out electronic copies if we can handle those

23   situations at the same time.  To the extent we determine that

24   the procedures do not allow us to be in court, I will call

25   chambers, if that would be appropriate, to convey so we don't

1     risk any unnecessary close contacts.

2           THE COURT:  Just so we are real clear, the list that

3     you just read, those are the instructions which differ from

4     that sent out around midnight last night.

5           MS. CALL:  Yes.  I think what we'll do to try to clear

6     the air and make sure all everyone is looking at the right ones

7     is send the whole set to defendants electronically.

8           THE COURT:  That will be helpful too.

9           MR. BELLER:  Very quickly, if the government has to

10    call chambers, if we could simply ask for -- we don't know need

11    to know the identity, of course, but perhaps where the

12    individual was sitting on what day.  Because per the CDC

13    guidelines, I believe the lectern will be within 6 feet.  We

14    just need to know who on this side may also need to be

15    immediately tested.  Thank you.

16          THE COURT:  Yes.  I think that that is good.

17    Unfortunately, we are in somewhat close quarters, so knowing

18    relative position I think would be -- you know, we want

19    everyone to feel comfortable with his or her own potential

20    exposure.

21          Okay.  Anything else, Ms. Call?

22          MS. CALL:  No, Your Honor.

23          THE COURT:  So we will be in recess until such time as

24    we hear back from the government on the issue described, all

25    right?  Thank you.

1              (Recess at 8:56 a.m.)

2              (Reconvened at 10:06 a.m.)

3              THE COURT:  We are back on the record in 20-CR-152.

4    The jury is not present.  We have established a VTC connection

5    with the government attorneys.

6              Ms. Call, just so that we put it on the record, can

7    you indicate what the state of affairs is concerning the

8    government attorneys' ability to be in court?

9              MS. CALL:  Yes, Your Honor, and I will try to provide

10   an up-to-the-minute update if I can.  In the last four days, we

11   now have two confirmed COVID cases on the government's team.

12   One we learned of on Friday and one we learned of this morning

13   while in court.  Counsel table, everyone at government's table

14   has tested negative since close contacts with those

15   individuals.

16             However, there are now two additional individuals that

17   are experiencing fevers.  Within the last couple of minutes, I

18   believe we learned that both have had negative rapid tests, so

19   we believe and we're just double-checking that we may be able

20   to return to the courtroom based on those negative tests, but I

21   do just want to confirm that before we do.  So if we could

22   perhaps start going through exhibits and we'll confirm that if

23   that is the case for the remainder of the day.

24             THE COURT:  Okay.  So bottom line, though, is we are

25   not waiting for the rapid test results anymore because you have

 1   received them and both were negative.

 2           MS. CALL:  Yes.

 3           THE COURT:  Okay.  Then why don't we go through

 4   exhibits first and then switch to summaries.

 5           MS. CALL:  All right.  The next exhibit is

 6   Government's Exhibit 410-1.

 7           MR. BELLER:  Your Honor, before we start on that, may

 8   I inquire if the jury is still present and what the jury has

 9   been told, if anything?

10           THE COURT:  The jury has been -- were told that they

11   can go and they can leave the courthouse for 20 minutes.  I

12   think maybe they are due back in like five minutes.  So what I

13   would suggest is that we will get through the exhibits.  We

14   talk about the summaries so I get a feel for if there are

15   issues with the summaries.  And by that time hopefully the

16   government will know whether they can return.  If so, then we

17   can have the jury proceed.

18           The government should maybe think about, and not that

19   Ms. Call can think about this simultaneously with discussing

20   the exhibits, but if for some reason the government can't come

21   back, the government should consider whether it's possible to

22   conduct that direct examination of Ms. Evans remotely.

23   Ms. Evans can, of course, be present, but the government should

24   think through those logistics, particularly if it would be

25   possible to either use the defense IT person to display things

 1   or to bring in someone who could come into court to potentially

 2   do that.  So that would seem to be at least possible, and that

 3   would enable us to make some progress today with the jury which

 4   I think is important, okay?

 5          All right.  So let's go ahead and talk about that

 6   exhibit.  So this is Exhibit 410-1.

 7          Ms. Call, can you describe what is the -1 aspect of

 8   it?

 9          *MS. CALL:*  Yes, Your Honor.  10-1 is redacted.  There

10   were two e-mails.  On Government's Exhibit 410 the top portion

11   was redacted to remove the statements there.  I will note that

12   Exhibit 410, I believe the underlying e-mail that's here, the

13   e-mail from Mr. Grindle, had an attachment which was the

14   Mar-Jac bid for Golden Corral in 2014.  That's actually already

15   admitted as C-862.  However, the underlying e-mail is not.  And

16   this is essentially that underlying e-mail.

17          *THE COURT:*  I am sorry, so C-862 is what?

18          *MS. CALL:*  C-862 is the attachment to the e-mail that

19   you see on the lower portion here from Mr. Grindle to

20   Ms. Moriggia.

21          *THE COURT:*  All right.  Okay.  And not *James* log.

22          *MS. CALL:*  Correct, not *James* log.  I believe this

23   e-mail is admissible as a bid transmission that would have

24   independent legal significance.  I will note that at the least

25   the government would be seeking under 803(6) to admit the

1    e-mail signature and the information contained in the

2    auto-generated portion at the bottom through that Mar-Jac logo

3    and that contact information there.

4            THE COURT:  If we could, could we display 410-1 again?

5            Ms. Call, what contact information are you talking

6    about, Mr. Grindle?

7            MS. CALL:  Yes.  Mr. Grindle's and the company

8    information are on the second page.

9            THE COURT:  Objections to 410-1?

10           MR. TUBACH:  I apologize.  I don't have a physical

11   copy.

12           THE COURT:  Do you mind going to the microphone just

13   because it may be important for Ms. Call to be able to hear.

14           MR. TUBACH:  The Court has ruled previously the bids

15   may have independent legal significance.  I don't know that

16   covers e-mails describing --

17           MS. CALL:  Mr. Tubach, if you don't mind me

18   interrupting, I don't know if the microphone is turn on.

19           MR. TUBACH:  It's on now, Ms. Call.

20           I understand the Court has ruled previously that bids

21   themselves have independent legal significance and can be

22   admitted as such, but cover e-mails, especially ones describing

23   potential future events and that aren't part of the bid itself,

24   I don't know that they have independent legal significance.

25   And this is a hearsay document not on the *James* log.  We would

1    object to its admission.

2         THE COURT:  Thank you.  Additional objections to

3    410-1?  Mr. Beller?

4         MR. BELLER:  Thank you, Your Honor.

5         Your Honor, as to contact information for Mr. Grindle,

6    I believe that's already stipulated to and already included in

7    the exhibit of stipulations that was submitted, so in addition

8    to what Mr. Tubach argued.  Thank you.

9         THE COURT:  Additional objections?

10         Ms. Call, response?

11         MS. CALL:  Just very briefly, Mr. Beller is correct,

12    some of the information in that contact line is already

13    stipulated to, but not all of it.  So if the Court was not

14    inclined to believe this e-mail was of independent legal

15    significance, I believe we would just simply introduce that

16    second page which doesn't appear to really contain any hearsay.

17    It would be either 803(6) or auto-generated content.

18         THE COURT:  Anything else, Mr. Tubach or Mr. Beller?

19         The objection as to hearsay will be sustained. I do

20    find it is admissible for a non-hearsay purpose for the contact

21    page which would be Page 2.  And by the way, Ms. Call, although

22    you mentioned it's marked 410-1, this bears an exhibit sticker

23    of just 410.  However you want to mark it, the second page is

24    admissible and it should be remarked.  Are you going to remark

25    it 410-1 or 410?

1          MS. CALL:  We will do 410-1 just for clarity and will

2     just produce the second page with the sticker bearing 10-1,

3     Your Honor.

4          THE COURT:  Okay.  Next one?

5          MS. CALL:  Next is Government Exhibit 7046, which is

6     the native file.  I believe we have now created 7046-1 which is

7     the same item in a printed form.

8          THE COURT:  So 7046-1 would be a paper version?

9          MS. CALL:  Yes.  And it would contain printouts of all

10    the tabs.

11         THE COURT:  We had talked about this exhibit about an

12    appropriate limiting instruction for it.  Does the government

13    have a proposal?

14         MS. CALL:  Your Honor, I don't believe this would be

15    404(b) which I believe was the basis of a limiting instruction.

16    But one other thing I will note is this evidence in another

17    form essentially is already before the jury in that Mr. Bryant

18    testified that Defendant Austin had told him that he had a

19    spreadsheet tracking competitors' prices going back I believe

20    to the nineties, I believe may have been Mr. Bryant's

21    testimony.  As you see on the first tab, which I believe may be

22    labeled 2000 on it, it has a date that was 1999, the receipt of

23    the document Mr. Bryant already testified about.

24         THE COURT:  Mr. Feldberg?

25         MR. FELDBERG:  We discussed this a couple times, Your

1    Honor.  This is a historical record which Mr. Austin kept of

2    past prices.  We do not object from Mr. Austin to the admission

3    of the document.  Our view is the entire document should come

4    in to show that this is something he did.  It's not limited to

5    the period of the alleged conspiracy.  It is something that he

6    and many other business people would do to keep track of

7    competitor information as a data point for independence

8    decision making.  So our view is the entire document going back

9    as far as it goes back should come in, if anything comes in.

10           Thank you, Your Honor.

11           THE COURT:  Okay.  Mr. Beller, go ahead.

12           MR. BELLER:  Thank you, Your Honor.

13           I may have started this inconsistency in objections

14   just a bit.  It is my position because this is a document that

15   quite clearly is historical pricing, not future pricing, that

16   it is not relevant.  And I think I had objected under 404(b).

17   With that said -- so my objection stands.  I don't believe it's

18   relevant and should come in.  If it does come in, I join the

19   position of Mr. Feldberg in that it should come in in its

20   entirety.

21           THE COURT:  Mr. Tubach?

22           MR. TUBACH:  Briefly, Your Honor, I can't recall that

23   this was on the James log.  I don't believe it was.  If it was

24   not, then we would be asking for a limiting instruction that

25   the document only be admissible against or as to Mr. Austin.

1          THE COURT:  I can't recall.  Ms. Call, was this on the
2     *James* log?
3          MS. CALL:  I don't believe so, Your Honor.  Let me
4     double-check that one moment.  I was looking at the one
5     document.  I don't believe so.
6          THE COURT:  That's my recollection too.  I don't think
7     that it was.
8          MS. CALL:  I believe, and I may be incorrect, that it
9     was contained in the government's supplemental filing following
10    the *James* hearing, but I would have to double-check that.  And
11    that was Your Honor deemed untimely given the inability to
12    cross-examine the agent regarding it.
13         MR. KOENIG:  I am sorry, we are in separate worlds,
14    but if I may.
15         THE COURT:  Go ahead.
16         MR. KOENIG:  I thought that this was on the 404(b).
17    Wasn't it a 404(b) exhibit?
18         THE COURT:  And I think that's a question posed to
19    Ms. Call.
20         MR. KOENIG:  I am sorry, yes.
21         THE COURT:  That's all right.  I understand
22    logistically you've got some problems, so that's perfectly
23    fine.
24         Ms. Call, do you know?
25         MS. CALL:  You may be correct.  I am attempting to

1    check that now.  I think -- I apologize because we did

2    obviously discuss this on the record last week and I left off

3    my notes for a lot of the bases that were already argued.  Let

4    me look.  One moment while I pull up the file.

5         THE COURT:  No problem.  While Ms. Call looks that up,

6    Mr. Feldberg, my recollection is that some of the data on

7    Exhibit 7046 involves time periods during the conspiracy.  It's

8    just not all of it.  And you wanted the whole thing because

9    there was a discussion about whether it could be -- portions of

10   it could be admitted.

11        MR. FELDBERG:  That's correct, Your Honor.  It

12   includes the time period of the alleged conspiracy but dates

13   back to 1999 or 2000.

14        MS. CALL:  Your Honor, I don't believe this was on the

15   404(b).

16        THE COURT:  Yeah, I think Mr. Beller was just about

17   ready to make that point, but confirmatory of that.

18        I am going to overrule the objections.  It is true

19   that this is a record that goes back before the period.

20   Portions of the document do include it.  Mr. Austin has

21   requested that the entire document should come in and I believe

22   that it is relevant.  I will admit the entire document, but I

23   will provide the jury with a limiting instruction that it can

24   only can be used against Mr. Austin.

25        Next document?

1          *MS. CALL:*  The next is Government's Exhibit 959 and

2     the attachment 960.

3          *THE COURT:*  And I believe, Ms. Call, yesterday at the

4     end of the day you indicated that you only intend to introduce

5     959 at this time; is that correct?

6          *MS. CALL:*  Yes, Your Honor.

7          *THE COURT:*  Any objection to the admission of 959?

8          Mr. Gillen?

9          *MR. GILLEN:*  Your Honor, I believe -- was this on the

10    *James* log?

11         *THE COURT:*  I can't remember.

12         Ms. Call?

13         *MS. CALL:*  I don't believe, so, Your Honor.  We were

14    seeking admission under 801(d)(2)(A).

15         *MR. GILLEN:*  If it wasn't on the *James* log, we would

16    object.  This particular e-mail, you know, we think could not

17    be construed as being in furtherance of any particular

18    conspiracy, and so we would object on that ground.  We noted

19    they would be attempting to introduce it against Brian Roberts

20    alone, but we do not see the relevance to the charged

21    conspiracy here, so we would object.

22         *THE COURT:*  Ms. Call, go ahead.

23         *MS. CALL:*  I stand corrected -- or correcting myself.

24    This was contained on the *James* log.  It was entry 143 and was

25    ruled on favorably.

1          THE COURT:  Mr. Gillen, back to you.

2          MR. GILLEN:  That was my recollection.  I thought it

3     was on the *James* log which is why I mentioned it.  I would

4     preserve the arguments that we made at that time.  And other

5     than that, with their withdrawing of 960, I would stand on our

6     earlier objections.

7          THE COURT:  Right, because Mr. Gillen was checking on

8     whether 960 was, in fact, the attachment, I think.  The

9     government is not moving the admission of that.  I will admit

10    959.

11         All right.  Mr. Beller, go ahead.

12         MR. BELLER:  Only for the purpose of having a clear

13    record, is 959 being admitted under 801(d)(2)(E) or

14    801(d)(2)(A)?

15         THE COURT:  The former, against all.

16         MR. BELLER:  Got it.  Thank you.

17         THE COURT:  Ms. Call, next?

18         MS. CALL:  The next are three that we discussed the

19    other day and I can't recall if Your Honor actually made a

20    ruling.  These are three that are contained as sources on

21    Government 90-10.  Counsel for Mr. Austin had proposed

22    redactions to them showing only From, Sent and signature

23    information.  And the exhibit numbers are 9745, 9746 and 9747.

24    The government has since applied, I believe, the same

25    redactions and we will be offering those with those redactions.

1          THE COURT:  Are they in the same form that

2     Mr. Feldberg had tendered?

3          MS. CALL:  I believe so.  I don't know if it's the

4     precise, you know, inch-and-a-half portion of the screen, but

5     it's the same content, only the From, the dates and the

6     signature.

7          THE COURT:  And you can't see, I don't think,

8     Ms. Call, but we do have certain marked exhibits being

9     displayed.  Given the fact that they bear stickers, I would

10    assume that they are updates to the government's exhibit list.

11         Mr. Feldberg?

12         MR. FELDBERG:  The only issue we have, Your Honor, is

13    the word "Confidential" which appears in the lower left, I

14    believe, of each of these exhibits and I wonder if that should

15    be --

16         THE COURT:  Well, as you may recall, that is something

17    that we talked about before.  And we're going to give the jury

18    an instruction in the jury instruction packet regarding those

19    because almost all of the documents bear some type of marking.

20         The words vary and we should be tracking all the

21    different variations, but bottom line is I wouldn't take that

22    off this one just because so many of the documents contain the

23    exact same thing.  But we will need to make sure that we

24    instruct the jury that there is no significance in terms of the

25    content of the documents of those particular markings because

1    those were added after the fact.

2         *MR. FELDBERG:*  Thank you, Your Honor.

3         *THE COURT:*  Thank you, Mr. Feldberg.

4         Mr. Tubach?

5         *MR. TUBACH:*  Just on that point briefly, Your Honor,

6    if we hadn't, I propose now the defense would be prepared to

7    simply take whatever exhibits are ultimately admitted and just

8    redact all those off the documents and provide versions that

9    don't contain "confidential" or "highly confidential" on them.

10   I know we talked about this quite some time ago and I thought

11   it was sort of a meta issue that we were postponing until

12   everything was done.

13        *THE COURT:*  We could do that.  We will still need to

14   instruct the jury because they have seen the documents already,

15   but if it's logistically possible, and I don't want to

16   complicate anything further, but if it's logistically possible,

17   I think that's fine.  We just need to make sure that the jury

18   understands that these things that they may have seen on

19   various documents are irrelevant, added after the fact, they

20   were taken off.

21        Ms. Call, if you don't mind, could you list those

22   exhibits one more time?

23        *MS. CALL:*  Yes, Your Honor.  They are 9745, 9746, and

24   9747.

25        *THE COURT:*  Okay.  Each of those will be admitted.

1          Next, Ms. Call?

2          MS. CALL:  Next is Government Exhibit 9785.  The top

3    e-mail from Mr. Alsberg was not contained on the government's

4    James log.  The bottom e-mail from Ms. Ray was.  That is

5    already contained in Government Exhibit 3037 and 6198 which

6    have both already been admitted.  This is a separate e-mail

7    thread, I suppose is the right term, with the response from

8    Mr. Alsberg.  And we are simply seeking this admission as

9    non-hearsay.  I don't believe there is any actual assertion in

10   Mr. Alsberg's statement there.

11         THE COURT:  If Mr. Fronsaglia can blow the document up

12   and make it a little bigger.

13         COURT DEPUTY CLERK:  Ms. Grimm, is there a way to

14   enlarge the document?

15         MR. TUBACH:  Your Honor, we might have a physical copy

16   we can hand up to the Court.

17         THE COURT:  Mr. Pollack, go ahead.

18         Do you mind going to the podium, Mr. Pollack?

19         MR. POLLACK:  Your Honor, the underlying e-mail, I

20   don't know if it's on the screen.  In 9785 is the same e-mail

21   from Brenda Ray that we have seen previously where she talks

22   about a friendly competitor, and from the other exhibit she

23   identifies that friendly competitor as George's.  We all know

24   but the jury does not that the person that she spoke with at

25   George's was not Ric Blake.

1              The Court when this e-mail has been used in other

2      exhibits has instructed the jury that they may not use that,

3      that e-mail as any evidence of whether or not any particular

4      defendant joined the conspiracy and that the document could

5      only be used to determine whether or not a conspiracy existed,

6      so I would ask for the same limiting instruction with respect

7      to this exhibit.

8              THE COURT:  Ms. Call, go ahead.

9              MS. CALL:  Your Honor, I would have to review the

10     particular limiting instruction.  I believe with respect to

11     Exhibit 6198, Mr. Pollack's assertion is correct.  I would have

12     to take a look at 3037 because I think Your Honor considered

13     differently 6198, which included the assertion that that

14     friendly competitor was George's.  And I believe based on the

15     concerns there, Your Honor made the instruction as to

16     participation versus existence of the conspiracy.

17             I don't know that that instruction was quite the same

18     for 3037 which did not contain the statement about George's.

19     The exhibit we are now on does not contain that statement about

20     George's, so I don't believe that limiting instruction would be

21     necessary here.

22             MR. POLLAK:  Your Honor, that is not my recollection.

23     My recollection is that the instruction was given with both

24     versions of this same e-mail chain because the problem, of

25     course, is that the jury has the other chain.  So they know who

1    the friendly -- they know the friendly competitor is George's

2    from the remainder of the other chain.  So I believe the Court

3    agreed that the limiting instruction was appropriate when this

4    same underlying e-mail was shown and it would be fully

5    appropriate here.

6         THE COURT:  Okay.  Let me just check 3037.  I don't

7    show a limiting instruction on that one, but I am not saying it

8    didn't happen.  I just don't happen to show one coming in at

9    the same time, but your point still exists as to 6198.

10        MR. POLLAK:  Yes, Your Honor.  And I have a strong

11   recollection that we specifically instructed -- specifically

12   discussed this and the Court did agree that the limiting

13   instruction was appropriate on both.  If somehow the Court

14   inadvertently didn't give the limiting instruction on the other

15   one and I missed that, it's possible that that happened, but I

16   know the Court articulated that it intended to give that

17   instruction and I would ask for it here.

18        THE COURT:  Thank you, Mr. Pollack.

19        Mr. Tubach?

20        MR. TUBACH:  On the 9785, Your Honor, I hope to moot

21   the issue with regard to a limiting instruction.  This document

22   was not on the *James* log.  Mr. Alsberg is not a co-conspirator,

23   not found to be a co-conspirator at the *James* hearing, and this

24   is late.  I don't know when this document was first marked as

25   an exhibit or offered by the government to be an exhibit, but

 1   9785 suggested it was yesterday.  Perhaps it was earlier than

 2   that, but I don't have that.

 3         The claim by Ms. Call that the statement above by

 4   Mr. Alsberg is not hearsay, I just don't even -- I honestly

 5   don't understand the argument.  It is a statement.  It is out

 6   of court.  Why else would she be wanting to introduce this if

 7   not for that statement?  The lower email is already coming into

 8   evidence, so that's not the issue.  The issue is, "Nice, rising

 9   tide and all that good stuff."  Clearly the only reason the

10   government wants to get it in just for the assertion of

11   Mr. Alsberg thinks it's a nice rising tide and all that good

12   stuff.  That is the truth of the matter asserted.  It is

13   plainly hearsay and there is no exception.

14         *THE COURT:*  Response, Ms. Call?

15         *MS. CALL:*  Yes, and I know Mr. Tubach can read the

16   Rules of Evidence just as well as I can, but hearsay needs to

17   be offered for the truth of the matter asserted.  As he said,

18   he believes the government's intention is to show what

19   Mr. Alsberg thinks, which would not be the truth of anything

20   asserted there.  And this is essentially kind of effect on the

21   listener, kind of non-hearsay purpose, that Mr. Alsberg at

22   Pilgrim's receives this e-mail.  And his response is, "Nice,

23   rising tide and all that good stuff."

24         It's not being introduced to say read that and assert

25   there was a rising tide and all that good stuff.  It's

1    Mr. Alsberg reads this e-mail and that is his response.  It
2    doesn't rely on the truth of what's being said here.  Frankly
3    this is a kind of phrase or idiom he is saying, the truth of
4    which isn't necessary for the reading.  It isn't why it's being
5    offered.  So I think this really falls within non-hearsay when
6    looking at the definition of hearsay under the Federal Rules
7    and I believe it would admissible on that basis.  And it's
8    relevant what individuals at Pilgrim's and how they responded
9    when receiving this conspiratorial e-mail from Ms. Ray.
10           THE COURT:  The hearsay objection will be sustained.
11   There is not a difference between literal and figurative in
12   terms of the tide comment, but I do agree that what's been
13   articulated as the non-hearsay basis is, in fact, hearsay.  The
14   only relevance would be the words of the e-mail and the content
15   of them whether taken literally or figuratively.  In either
16   event, it's hearsay, so I will sustain that objection.
17           Next one, Ms. Call?
18           MS. CALL:  The next is Government's Exhibit 746-1.
19   And this is, Your Honor, one that Your Honor had already
20   considered that I believe we were introducing as 746 at that
21   time for effect on the listener, as well as the "I did not
22   receive your bid," as more of a question than any kind of
23   assertion, the effect being that after receiving this e-mail,
24   Mr. Pepper who received it 30 minutes later reached out to
25   Defendant Blake.  And there is a text message later that day

1    where Mr. Pepper tells Defendant Mulrenin, "Got a general idea

2    what George's is doing."  And George's is, of course, where

3    Defendant Blake worked at the time.

4         Your Honor had at the time identified there being a

5    problem that because Mr. Kronaugue seems to have bcc'd the

6    recipients of the e-mail, you weren't able to identify a person

7    who the effect was being proffered about.

8         We have since pulled the metadata from the document

9    and incorporated it into this exhibit, and that is found on

10   Pages 2 to 3 which identifies Carl Pepper as the custodian of

11   this e-mail.  And then even further if you were to even attempt

12   to decipher the information at the top of the third page, which

13   is a long string of -- I can't even claim to exactly identify

14   that, but it does list his e-mail address on the third line,

15   carl.pepper@tyson, so we believe this establishes the fact that

16   the e-mail had been sent to him and was in his records where it

17   came from to establish the necessary effect for a non-hearsay

18   purpose.

19        THE COURT:  Objections to 746-1?

20        Mr. Beller?

21        MR. BELLER:  Your Honor, I appreciate the record that

22   Ms. Call made, and obviously we are hearing this for the first

23   time.  And so I am objecting because this was actually -- this

24   was on November the 12th presented to the Court.  The Court

25   heard lengthy argument and following that lengthy argument the

1    objection was sustained.  So what the government is now doing

2    is submitting the same documents to the Court with a -1 with

3    different argument and additional information.

4           And as I said, this is information that I am hearing

5    for the first time, and so I am a bit unable to respond to the

6    exact arguments that were made other than I believe that the

7    law of the case already stands, and that is the Court has

8    already sustained the objection, found that this document

9    cannot be admitted.  And so now it's going to take just a bit

10   more time for us to actually look at the metadata to be able to

11   respond appropriately to Ms. Call.  But I would ask that we not

12   have to do that and the Court simply rely on its earlier ruling

13   that the objection was sustained and this document is not

14   admissible.

15           THE COURT:  As I recall, after indicating that ruling

16   the government asked for an opportunity to figure out if there

17   was evidence that would establish -- that would essentially

18   prove there was someone to be affected by the e-mail.  And

19   this, then, is the result.  The metadata does, I think, show

20   that Mr. Pepper was copied on it, so I believe that that is the

21   justification for it is that the metadata then demonstrates

22   that Mr. Pepper got it for what that's worth.

23           Ms. Prewitt?

24           MS. PREWITT:  Your Honor, I was going to object to

25   this -- I am going to object to this as untimely which has been

1    a consistent theme, Your Honor.  These charts, this hearing is

2    something we could have had several weeks ago.  And we are

3    constantly, members of the defense here, having to answer on

4    the fly to these questions.  The government could have

5    presented this information earlier and now we are hearing it in

6    court.

7         In terms of are our ability to respond and effectively

8    place objections on the record, we are severely challenged by

9    this.  I have to say I have had no experience having prosecuted

10   cases for the antitrust division for 16 years ever seen charts

11   like this come in and come in with so many revisions right up

12   to the point where we are placed at a disadvantage in terms of

13   placing objections.  So Your Honor, I just want to make the

14   record clear on that point.  Thank you.

15        *THE COURT:*  Thank you, Ms. Prewitt.

16        Mr. Pollack?

17        *MR. POLLAK:*  Thank you, Your Honor.  I have an

18   additional objection relating to effect on the listener.

19   Mr. Pepper has not testified.  There is no evidence that he is

20   receiving Mr. Kronauge's message that, "I did not receive your

21   bid," has caused him to do anything, much less was what was

22   caused him to call Mr. Blake 30 minutes later.  And we have no

23   testimony about what happened in that call, what that call was

24   about.  There is no recording of that call.  And so I just

25   don't think there is a link between this document that shows

1    that this document caused the listener to do anything, even if

2    one assumes that Mr. Pepper was the listener.

3              THE COURT:  All right.  Thank you.

4              Ms. Call, response?

5              MS. CALL:  Yes, Your Honor.

6              First, and I have been searching the transcript, but I

7    believe you are correct with respect to we did request the

8    ability to search for that metadata information which we then

9    provided to defendants I believe a long time ago or several

10   days ago for their opportunity to review it.  As to the effect,

11   that is in evidence.  I don't think there is any requirement

12   that all evidence needs to be testimony.

13             Government Exhibit 755 is that text message indicating

14   "Got a general idea of what George's is doing," and the call

15   from Mr. Pepper to Mr. Blake is also in evidence.  I don't

16   believe there is any requirement that a non-hearsay statement

17   offered for the effect on the listener need to be appearing on

18   the face of that very same document, which is frankly somewhat

19   common sense because effect on the listener can be for a

20   non-hearsay purpose, for example for the introduction of a

21   statement or testimony that may otherwise be hearsay which

22   obviously couldn't show the effect on the face of the

23   testimony.  So I don't think that hearsay rule is quite so

24   limited as defense counsel argue.  And the effect can be

25   subsequent acts in time that are -- especially here have such a

1    close time period between the events being, as I said, it was

2    within about 30 minutes of this e-mail that Mr. Pepper called

3    Defendant Blake.

4         So I think that the effect is clear from the evidence

5    that's already on the record on this trial, so I do believe

6    that the non-hearsay purpose still stands.

7         THE COURT:  Mr. Pollack?

8         MR. POLLAK:  Your Honor, the "Got a general idea of

9    what George's is doing," under the government's theory, that's

10   something that Mr. Blake and Mr. Pepper discussed in the

11   subsequent conversation.  We believe that the evidence is, in

12   fact, that he got a general idea of what George's is doing from

13   Mr. Kronaugue.  But in any event, it's irrelevant.  That would

14   simply be some explanation of the subsequent phone call.

15        What is missing is the link between this e-mail and

16   that phone call.  Regardless of what the content of that phone

17   call was, there is nothing that shows that the reason that

18   Mr. Pepper called Mr. Brady is because he received this e-mail.

19   There is no evidence that Mr. Pepper did anything as a result

20   of receiving this e-mail.  So I think Ms. Call may

21   misunderstand my argument.  I'm not saying that the evidence

22   has to be testimonial.  The problem is that there is no

23   evidence.

24        THE COURT:  I understand.

25        Ms. Call, anything else from you?

1              MS. CALL:  I will be brief as to the link in that the

2      text message immediately preceding "Got a general idea what

3      George's is doing" is Government Exhibit 754 where Mr. Pepper

4      says, "Popeye's proposal."  So this e-mail relates to the

5      Popeye's RFP.  And Mr. Kronaugue is asking for Tyson's

6      proposal.  Mr. Pepper then calls Defendant Blake and texts

7      Defendant Mulrenin after Mr. Mulrenin says, "What's up?"

8      Mr. Pepper says, "Popeye's proposal," and then "Got a general

9      idea of what George's is doing," so I think the chain of events

10     here in that link for the effect is quite clear.

11             THE COURT:  Mr. Pollack?

12             MR. POLLAK:  Your Honor, I don't think there is any

13     question that this is during the period when the Popeye's

14     proposals are at issue.  But the fact that there is a

15     subsequent conversation that is on the same subject matter,

16     there were a lot of conversations that were on this subject

17     matter in this time frame.  The government has alluded to any

18     number of them.  The question is a very narrow one.  Is there

19     any evidence in the record that this e-mail caused Mr. Pepper

20     to do something?  And there isn't.

21             THE COURT:  Okay.  I am going to overrule the

22     objections.  I think that there is enough of a link established

23     by the government to admit this for effect on the listener.

24     The fact that someone is copied on an e-mail is not necessarily

25     sufficient.  Here, however, the government has shown some

1    communications within a relative short period of time that

2    could allow a reasonable jury to draw an inference regarding

3    it.  So I will overrule the objection as to untimeliness.  It's

4    come in late, but I think that the document itself by its

5    nature allows the -- allowed defense counsel to be able to tell

6    that Mr. Pepper was -- appeared to be copied on it.

7          I do believe it's relevant.  And I did give the

8    government an opportunity to provide some additional

9    information, so I will admit 746-1, but with a limiting

10   instruction that Mr. McLoughlin was about ready to mention that

11   it can only be -- that the jury cannot consider Mr. Kronaugue's

12   statements for the truth of the matter asserted, but rather

13   only as to the effect on the listener.

14         Next, Ms. Call?

15         *MS. CALL:*  Next are a series of four phone excerpts

16   that I noted yesterday.  I'll go one by one through them.  The

17   first is Government's Exhibit 9716, which is an excerpt of

18   phone records relating to Defendant Brady.  I will note that it

19   is an excerpt of Government's Exhibit 8003 which is already in

20   evidence.

21         For all of these what's going on here I will note is

22   that there were a number of phone records that were admitted

23   during the testimony of Mr. Fanara and Ms. Sandoval that are

24   many thousands of pages.  I believe the government only intends

25   to submit those in electronic form.  So for any particular

1    pages that are being referenced, we would intend to admit these

2    one or two-page excerpts like Exhibit 9716.

3             *THE COURT:*  How many pages is Exhibit 9716?

4             *MS. CALL:*  Let me confirm, Your Honor.

5             *MR. TUBACH:*  It's three pages, Your Honor.

6             *THE COURT:*  Mr. Tubach indicates that it's three

7    pages.

8             *MS. CALL:*  Thank you, Mr. Tubach.

9             *THE COURT:*  Any objections to 9716?

10            *MR. BELLER:*  Can we have just a moment?

11            *THE COURT:*  Yes.

12            *MR. BELLER:*  Thank you, Your Honor.

13            Your Honor, I would note that this is, in fact,

14   already in evidence and so introducing it again is cumulative.

15   The Court has given the government the opportunity to utilize

16   or perhaps the Rules have given the government the opportunity

17   to utilize 611 and 1006 for this same purpose, so it seems

18   unduly cumulative and for that reason prejudicial.

19            *THE COURT:*  Additional objections as to 9716?

20            Ms. Call, response?

21            *MS. CALL:*  Yes, Your Honor.  I think I frankly just

22   don't agree.  I am trying to think of the legal basis for this.

23   I don't see how three pages of a phone record could be

24   prejudicial to the defendants.  I think the jury should be

25   entitled to look at the phone records if they so wish, so I

 1    think that they should be admitted on that basis.

 2              THE COURT:  All right.  The objection will be

 3    overruled.  I'm not sure if 8003 is the gigantic one, but in

 4    any event, it is only going to be submitted electronically.

 5    And the ability to extract a few relevant pages is perfectly

 6    appropriate and I will admit 9716.

 7              Next one, Ms. Call?

 8              MS. CALL:  I think Exhibit 8000 -- your ears must have

 9    been hearing.  So the next is Exhibit 9720 which is an excerpt

10    of Exhibit 8000, which I think is the gigantic exhibit.  I

11    think 8000 is something of several thousand, if not several

12    hundred thousand pages.

13              THE COURT:  I think it was 99,000 pages.

14              MS. CALL:  That sounds right.

15              THE COURT:  Ms. Call, just for the record, is this a

16    two-page document?

17              MS. CALL:  9720 is three pages, Your Honor.

18              THE COURT:  And are these -- whose phone records are

19    these?

20              MS. CALL:  These are Defendant Mulrenin's phone

21    records.

22              Objections to Exhibit 9720?

23              MR. BELLER:  Your Honor, if the Court will allow me to

24    just carry over the same objection to any additional records

25    where we have excerpts of phone records.

1          *THE COURT:*  Yes.  That will be allowed.

2          Any additional objections?

3          Exhibit 9720 will be admitted.  I will overrule the

4     objection for the same reasons.

5          Next, Ms. Call?

6          *MS. CALL:*  The next is Exhibit 9721.  That is an

7     excerpt of phone records relating to Claxton Poultry which

8     identified them as relating to Defendant Fries.  And that is an

9     excerpt of Government Exhibit 8026, which is another lengthy

10    phone record.  And Exhibit 9721 for the record is four pages.

11         *THE COURT:*  All right.  Why don't we take these -- do

12    you have any more of that nature?

13         *MS. CALL:*  There is one more.  It is Exhibit 9722,

14    which is an excerpt of phone records relating to Defendant

15    Little.  And that is an excerpt of the lengthy phone record

16    contained in 8026 as well.

17         *THE COURT:*  Okay.  Additional objections other than

18    the one that Mr. Beller has articulated which I am applying to

19    both of these as well.

20         Mr. Beller, go ahead.

21         *MR. BELLER:*  Your Honor, I would note that 9721

22    includes the first two pages which indicate the amount owing,

23    as well as the amount of last month.  The third page is

24    specific to Mikell Fries, so I believe that it gives the

25    impression that my client speaks so much, that his phone bill

1    is $1,500 a month.  So while I maintain the same objection, I

2    would specifically note that for this document in particular I

3    don't believe that it's necessary to have the first two pages

4    included if what they need is that next page which shows that

5    the account is attributable to Mikell Fries.

6         THE COURT:  Response, Ms. Call, as to Mr. Beller's

7    objection as to 9721, the first two pages?

8         MS. CALL:  I'll note I don't know that I have one.  I

9    don't know that I anticipated that argument.  I don't think

10   that is a real risk in the record that identifies the company

11   as the account holder.  I don't believe it's prejudicial.

12        THE COURT:  Well, that wasn't Mr. Beller's point.

13   Mr. Beller's point is that the bill is suggesting that

14   Mr. Fries was racking up all those phone calls.  I don't know

15   if it's true, but his point is basically that there is at least

16   a possibility of some adverse inference regarding the money

17   owed and since it doesn't seem to be relevant.  He wasn't

18   objecting to the information on the first two pages that links

19   Mr. Fries to the phone bill, but just rather the amount of the

20   bill.

21        MS. CALL:  Yes, understood, Your Honor.  I will note

22   the second page where it says -- there is a line that says

23   total current charges for 912-614-6833 which appears to show

24   the current charge for Mr. Fries' specific number.  So I don't

25   know that that risk of confusion is there.

1          THE COURT:  Can we go back to the first page?  Let's

2     go to the second page.  Thank you.

3          Mr. Beller?

4          MR. BELLER:  Your Honor, seeing these closer on the

5     screen, my concern would only be as to Page 1, not as to Page 2

6     or the subsequent pages.

7          THE COURT:  Right.  I am going to overrule the

8     objection.  Having a better chance to look at it, the bill is

9     being sent to Claxton.  The amount that is contained on the

10    first page is not specific to Mr. Fries at all.  The second

11    page is.  And that indicates at the top it's a summary for

12    Mr. Fries and that indicates, as a matter of fact, a quite

13    small number.  I don't think that that number would have any

14    type of prejudicial value.  Obviously, those two -- well, the

15    second page links Mr. Fries to that.  The first page has some

16    relevance because it indicates that it's a phone bill, so I

17    will overrule that specific objection.

18          Any additional objections to either 9721 or 9722?

19          All right.  Then the objections will be overruled

20    generally as Mr. Beller had articulated previously in regard to

21    one of the earlier exhibits and 9721 and 9722 will be admitted.

22          Next, Ms. Call?

23          MS. CALL:  That is all on the exhibits front, Your

24    Honor.

25          THE COURT:  Let's switch over to the summary exhibit

1   front, then.  Have defendants had an opportunity to look at

2   those exhibits that were revised sometime between midnight and

3   this morning?

4        MR. BELLER:  Yes, Your Honor, although I don't know

5   that everybody knows this.  In the last couple of minutes we

6   got new ones, so if we can go through these one at a time.  And

7   if the Court will just have some patience as we are opening

8   these on our computer because I am uncertain what all the

9   changes are that have been made.

10       THE COURT:  Maybe it would be more efficient -- I am

11   open to suggestion because I am not sure exactly what's being

12   double-checked.  We could take 10 minutes or 15 minutes or

13   whatever if there has been a new submission just to have people

14   perhaps look them over and confer with each other or we can

15   work through them in court now, whatever you think is the most

16   efficient and would take less time.

17       Ms. Prewitt?

18       MS. PREWITT:  Your Honor, I think it would be good to

19   know from the government what exactly they changed.

20       THE COURT:  Yes, we will get that description too and

21   then we can consider that.

22       Ms. Call, do you mind -- so Mr. Beller has indicated

23   that defense counsel have just received some summary exhibits

24   that have been revised.  Are you familiar with those?  And if

25   so, do you mind giving us a description of what the changes

1  were and which summaries are at issue?

2     *MS. CALL:*  Yes, Your Honor.  So for the most part I

3  believe the changes were to the exhibits, and I don't have the

4  list in front of me, but the list I read into the record this

5  morning with the paper copies we handed out this morning as

6  well.  We received several e-mails from defense counsel that I

7  believe noted other things they believed to be errors, some of

8  which we did correct.  I don't believe it was all of them.  So

9  I believe what we sent out now responded to those e-mails as

10  well.

11     And one suggestion perhaps is I believe government

12  counsel has received the A-okay to return to the courtroom.  So

13  if we were to perhaps take a recess, defense counsel can have

14  the opportunity to look at what was sent to them.  And I will

15  note the exhibits that are in their e-mails are not currently

16  stickered because of our logistics with paralegals now working

17  in maybe 10 different locations.  It takes a little more time

18  for us to apply the stickers, but we have done that now and

19  will be sending those as well which will be these same

20  exhibits, just bearing the actual exhibit sticker.  And I

21  believe we will be bringing hard copies with us to the

22  courtroom.

23     *MS. PREWITT:*  Your Honor, we would just like to know

24  what has changed because it's very hard to track all the

25  different changes.  So if we could just walk through each

1  exhibit and exactly what the changes are, we can take the

2  opportunity to review that.

3           THE COURT:  Do you know that, Ms. Call?  Are you able

4  at this point to go through each of the ones that was re-sent

5  and describe what information was changed on it?

6           MS. CALL:  I can't say I have that in my head at the

7  moment.  I imagine if we were able to take a recess and return,

8  we would be able to identify the changes.

9           THE COURT:  Why don't we do that.  We will go ahead

10 and take a break.  Mr. Call, you and Mr. Koenig and perhaps

11 some of the other attorneys will then return to the courtroom.

12 And will you then be prepared to provide that walking tour of

13 the most recent changes?

14          MS. CALL:  Yes, Your Honor.

15          THE COURT:  Okay.  Mr. Beller?

16          MR. BELLER:  One final question on the COVID issue,

17 and that is the individuals who have tested positive, when the

18 last time was they were in the courtroom and where they were

19 seated in the courtroom because the lectern is within 6 feet

20 and.  As the Court may imagine, many of us are traveling to

21 families tomorrow.

22          THE COURT:  Yes.  Ms. Call, I received that

23 information, but could you describe that in terms of the two

24 individuals who are of concern, where in the courtroom they

25 were and maybe a rough estimate of what periods of time?

1          *MS. CALL:*  Yes, Your Honor.

2          So the individual who tested positive last Friday, so

3    the 19th, was last in the courtroom last Wednesday the 17th and

4    was seated at the front of government's counsel table I suppose

5    closest to the lectern, the front left corner of the table

6    closest to where Your Honor is seated.  So that is for the

7    first case.  For the second confirmed case, that individual has

8    never been in the courtroom.

9          *THE COURT:*  Okay.  We will be in recess.  Then once we

10   are assembled, we will take it up from there.

11         One last thing, though, from Mr. McLoughlin.  Go

12   ahead.

13         *MR. McLOUGHLIN:*  Your Honor, this is very helpful

14   information.  With respect to the third individual who we

15   understand correctly is running a fever, it would also be

16   helpful for us to know was that person in the courtroom and

17   where he or she may have been seated.

18         *THE COURT:*  Yes.  I'm not sure that you included that

19   person.  As I understand, Ms. Call, that person did receive a

20   negative rapid test today, but have you described where that

21   person was in the courtroom assuming the person was in the

22   courtroom?

23         *MS. CALL:*  I don't believe I described it, Your Honor,

24   and we are trying to keep track of all this information as we

25   receive it.  So there have been two individuals who have

1    developed a fever in the last 24 hours.  One was yesterday and

2    that person has tested negative via rapid test.  The other was

3    today and that test was negative via rapid test.  I will have

4    to follow up to get the precise information as to those

5    individuals and if and whether they have been in the court

6    within the last week.

7              THE COURT:  But can you tell us whether they were at

8    counsel table?

9              MS. CALL:  Let me defer to Mr. Koenig and his memory

10   if he has a recollection of that.  I believe the answer is no,

11   but I don't want to be misleading.

12             MR. KOENIG:  Yeah, so I think only one of the two

13   would have been, but I am going to have to check.  I am going

14   to have to look into that.  I don't think either were at

15   counsel table in the last week, but I don't want to

16   misrepresent anything.

17             THE COURT:  And if at counsel table, would it have

18   been a particular place at counsel table, for instance, closer

19   to the bench as opposed to closer to Mr. Lavine?

20             MR. KOENIG:  Right, closer the bench.

21             MS. PREWITT:  Your Honor, I think it would be more

22   efficient to the extent possible if the government could limit

23   its ex parte communications with the Court on this so we are

24   all being advised in real-time as opposed to reports after the

25   fact.  So I just make that request.

1        THE COURT:  Yeah, I think it was appropriate in this

2   case because the government was communicating health

3   information, so I don't think that was inappropriate.

4   Moreover, I had my law clerk call back to Ms. Call to gain some

5   additional information so we could figure out how we were going

6   to proceed for the rest of the morning.

7        Okay.  We will be in recess, then, until government

8   counsel is back in and we are all ready to go.

9        (Recess at 11:12 a.m.)

10       (Reconvened at 11:40 a.m.)

11       THE COURT:  We are back on the record.  And government

12   counsel have rejoined us but without paralegal support I think

13   would be accurate to say.

14       Let us go ahead, then, if --

15       MR. KOENIG:  Your Honor, I said I was going to check

16   into the dates two of the people were here.

17       THE COURT:  Yes.

18       MR. KOENIG:  One was November 10th and the other was

19   November 16 at the table.

20       THE COURT:  Okay.  I appreciate that.

21       Mr. Beller?

22       MR. BELLER:  And, Your Honor, if I may inquire if any

23   of these individuals were in the courtroom because as the Court

24   knows, we only have two individuals at counsel table at any

25   given time, and so several lawyers have been rotating through

1  the gallery and may be sitting next to or in front of these

2  individuals as well.

3          THE COURT:  Do you know that information, Mr. Koenig?

4          MR. KOENIG:  Let's see here.  So one of them was at

5  counsel table -- I have my dates a little off.  One of them was

6  at counsel table for the Skalak direct on November 10th.  Last

7  time being in court at all was November 16.  That's for one

8  person.

9          THE COURT:  And that's somewhere in the back of the

10 courtroom?

11         MR. KOENIG:  Yes.  And then the other one was at

12 counsel table when Robbie Bryant was testifying, I don't recall

13 the exact dates.  And then we can follow up -- I don't have a

14 second date for that second person, but we are looking for it

15 right now.

16         THE COURT:  All right.  Was the person although at

17 counsel table during Mr. Bryant's testimony in the courtroom

18 albeit in the gallery at some later point?

19         MR. KOENIG:  For the two people we have two dates.  We

20 have three out of the four and we are waiting to hear about the

21 gallery question for the second.

22         THE COURT:  Okay.  Mr. Beller?

23         MR. BELLER:  Your Honor, I don't make this record

24 lightly because obviously the government's team is obviously

25 suffering a great deal of stress right now, but I believe that

 1    there is a relatively strong voice within the defense group.  I

 2    will not say that it's unanimous, and that is a preference that

 3    the government conduct today's examination of Ms. Evans from

 4    VTC.  We believe that it's appropriate under the circumstances.

 5    It certainly appears as if there may be an outbreak amongst

 6    that team due to no fault of anyone on that team.

 7         But given the uncertainties, Your Honor, given the

 8    extraordinarily close quarters, the fact we are all using the

 9    same podiums and microphones that in an abundance of caution,

10    especially two days prior to a holiday where many of the

11    individuals in the courtroom are going to be flying home to

12    individuals who are somewhat susceptible, that it may make some

13    sense.

14         We are very well aware of the CDC guidelines.  I will

15    advise the Court that over the break we have been able to

16    secure 10 at-home COVID tests.  I think we are going to be

17    doing some more as well.  But under the circumstances and with

18    the unknowns, it certainly makes sense for the government to do

19    the examination through VTC and have Ms. Evans be present in

20    the courtroom.  It sounds like she may have not been exposed or

21    with the rest of the group.  So that is the request of -- as I

22    said, I don't want to speak for every defendant, but I have

23    heard from several, and that is the polite and respectful

24    request of the Court and the government.

25         *THE COURT:*  Thank you, Mr. Beller.

1          Mr. Koenig, reaction?

2          *MR. KOENIG:*  I understand the sentiment.  However, you

3    know, we are here within allowable guidelines, DOJ regulations.

4    If it's the podium that's the issue, perhaps we could use the

5    microphone here and not share the podium.  I just, you know, I

6    think that it's -- examining a witness and defending a witness

7    during cross remotely is just -- that's going to be really

8    tough, I think.

9          *THE COURT:*  It may be difficult.  It may depend to

10   some extent -- I am not asking for you to describe this, but if

11   there is a reason to believe that some of the transmission,

12   assuming that the route is known or predictable, whether that

13   was happening despite everyone being masked all the time or

14   whether people were unmasked, in other words, whether it could

15   be comparable to some type of condition that may exist in the

16   courtroom.  Any sense of that, Mr. Koenig?

17         *MR. KOENIG:*  I am not sure I follow.  I'm sorry.

18         *THE COURT:*  In other words, were members of the team

19   unmasked during off hours and is that a possible route of

20   exposure as opposed to people on the team always being masked

21   up the entire time, but nonetheless, there seems to be multiple

22   team members having break-through cases?

23         *MR. KOENIG:*  So, I mean, the way -- we followed the

24   protocols even in rented office space.  And the protocol is

25   that when you are in common areas, you wear a mask.  If you are

1    in your own office, you don't have to.  And so the people who

2    have shared offices are supposed to be wearing them all the

3    time.  I haven't noticed people breaking the rules.  You know,

4    occasionally somebody forgets a mask or something, but we sent

5    around e-mails at the very beginning of this explaining what

6    rules we had to follow, and as far as I can tell, they have

7    been followed.  I can't be everywhere and we can't be

8    everywhere all the time.

9             THE COURT:  I was not suggesting that.  I was just

10   saying typically people are required to wear masks and that's

11   been the rule generally.  Okay.

12            MR. KOENIG:  Yes.

13            THE COURT:  Mr. Gillen, I will hear a few more

14   comments.

15            MR. GILLEN:  Yes, very briefly.

16            We have two positive COVID tests from the government.

17   We have two other people who have a fever, but on the rapid

18   test they say were tested negative.  Whether that is an

19   accurate or inaccurate test, I have concerns about what David

20   was saying seems to be somewhat of an outbreak around the

21   government team.  We not only show the podium, we walk out that

22   door together and everyone grabs that handle to leave this

23   courtroom.

24            It seems to me that given the uncertainty of this and

25   the very nature of -- the insidious nature of this virus, it

1    would be prudent for the government to conduct its examination

2    of Ms. Evans remotely so that we air on the side of medical

3    caution rather than government expediency in terms of wanting

4    to be in the courtroom with their witness.

5            They can handle their examination and their objections

6    remotely.  We have seen them -- we have done that earlier.  I

7    am just concerned that we have taken the DOJ position about

8    it's okay for them to come back when we have a track record and

9    this -- there is no aspersions cast to anyone.  This virus will

10   get its grip on anyone it can.  And we all have our hopes and

11   prayers for the quick and complete recovery of those who have

12   been infected, but I do think prudence would dictate that they

13   handle this witness remotely.

14           Thank you.

15           THE COURT:  Mr. Pollack, did you have a comment?

16           MR. POLLAK:  I really had more of a question.  I may

17   have missed it, but I don't think I heard what was the last

18   time that the folks who are in the courtroom now were exposed

19   to any of the people that are feeling ill or have -- either are

20   feeling ill or have tested positive.

21           THE COURT:  I would assume that they have been, but

22   Mr. Koenig can correct that.

23           MR. KOENIG:  I missed the last part of the question.

24           THE COURT:  I think he was wondering to what extent

25   have you, the attorneys, been in close contact with the people

 1   who are now feeling ill.  Is that your question, Mr. Pollack?

 2          MR. POLLAK:  And how recently they have been in

 3   contact.

 4          MR. KOENIG:  Sure, sure.  The one person who is -- had

 5   a fever this morning or -- I forget the timing of it, but this

 6   morning Ms. Sweeney and Mr. Torzilli were, you know, working to

 7   print with the person who ended up going home because of fever.

 8   But, of course, in the world of the 24-hour news cycle, we have

 9   just learned that the -- one of the two people who had a fever

10   has tested positive now even though the rapid came back

11   negative.

12          I would say, though, that -- I mean, it's a really

13   difficult situation.  I don't know, though, that the government

14   is -- we are all in tight quarters here.  I don't know if

15   excusing the government changes a whole lot because, you know,

16   we sit 3 feet away from defense tables all the time.  So I

17   don't know what -- how they are in a -- really that much

18   differently situated.  I understand that we have the people in

19   our office, but, you know, if it's prudent for those of us who

20   have been tested negative to have to do it remote, then I don't

21   see how the defendants are any differently situated.

22          The other thing is I believe Ms. Evans was close to

23   the person who just tested positive as well, so now that brings

24   us the issue not -- she has a work space in our building and we

25   keep her sequestered, but I think just being friends or

1    whatever, you know, they were in contact.

2           THE COURT:  Well, the question would be whether they

3    are in close contact.

4           MR. TORZILLI:  Can we have one moment, Your Honor?

5           THE COURT:  Yes.

6           I am going to send the jury out to lunch and return at

7    1:30.

8           MR. KOENIG:  Mr. Torzilli is going to go consult with

9    Ms. Evans.  I may have had my facts -- I may have overstated --

10          MR. TORZILLI:  Ms. Evans is in the witness room?

11          MR. KOENIG:  Yes.  I will say that the recent positive

12   that I just literally learned about was the one who -- the

13   person who was at counsel table November 10th last and again in

14   the gallery November 16 last.  Nobody from the government's

15   table has been in close contact with her since Friday.  We all

16   dispersed to go take tests.

17          So I am not sure where that leaves us, but that's the

18   latest information I have.  And again, you know, the remote

19   thing is just -- is not ideal.  And we certainly would oppose

20   it and hope there is a different solution we can come up with.

21          THE COURT:  Yeah, I don't think that defense counsel

22   are in a similar posture because obviously they don't have the

23   after-hours contact with those persons who have tested positive

24   since.  Moreover, they haven't even -- you know, they didn't

25   have the close contact just in the trial.  I'm not sure

1  about -- I haven't tried to figure out and I don't even frankly

2  recall exactly what CDC says is the incubation period these

3  days, but somewhere between maybe eight and 10 days.

4          Let's hear what Mr. Torzilli has to say about

5  Ms. Evans, but I think that -- I am inclined to require the

6  government to do it remotely.  I think it can be done.  It's an

7  unusual posture, but we -- the fact that there have now been a

8  number of positive tests among the government team certainly

9  suggests that there should be -- we would want to make sure to

10  draw a line around that and contain things as best as possible.

11  And it would be very bad if some people outside of the

12  government team started to test positive for related reasons,

13  but I don't think it would be much -- we are lucky these days

14  that things can be done by VTC and I think it can be

15  accomplished.  It wouldn't be great, but I think it would be

16  effective.

17          Mr. Koenig?

18          Mr. Torzilli, did you get that information?  Go ahead.

19  Why don't we get that from Mr. Torzilli.

20          MR. TORZILLI:  So Ms. Evans has taken -- I can

21  provide -- Your Honor, I talked to Ms. Evans.  Ms. Evans took a

22  rapid test today that was negative, a rapid test yesterday that

23  was negative, a PCR test taken Friday.  She got the results

24  back Saturday.  Those were all negative tests.

25          And with respect to interactions with the individuals

1     we are talking about, she had minimal interaction with any of

2     the individuals at issue today, minimal interaction which she

3     describes as probably less than two minutes of interaction with

4     any of the individuals yesterday or today.  And the most

5     sustained interaction she has had with anyone was probably

6     Thursday morning.

7               THE COURT:  Okay.  And would that be contact that

8     would fall below the CDC definition of close contact?

9               MR. TORZILLI:  I am sorry, Your Honor.  Can you repeat

10    your question?

11              THE COURT:  Sure.  Would those various contacts be

12    less than 15 minutes total contact in any 24-hour period?

13              MR. TORZILLI:  The way that Ms. Evans described it to

14    me is it would probably be on the order of one or two minutes.

15              And just one other point, the four individuals sitting

16    at counsel table presently have been tested, have had PCR tests

17    within the past I think four or five days and have taken rapid

18    tests since then, and all of those tests are negative.  And I

19    think we are all asymptomatic for what that's worth.

20              THE COURT:  Right.  The issue is, of course, the test

21    just indicates that you're in the state of affairs as of the

22    time of the test.  We have had people who despite having been

23    tested are feeling ill today, so things change.  I think that

24    that is the basis for the concern is not that anyone is sick

25    today, but rather that there is at least a possibility that

1    someone may be asymptomatic and capable of spreading.  And

2    given the number of people on the government team who have

3    recently been either feeling ill or testing positive, the

4    probability is a little bit greater in terms of even the

5    government attorneys.

6            Anything else, Mr. Koenig?

7            MR. KOENIG:  Yeah.  So I guess what we'll have to do

8    is ask if defense counsel can run our exhibits for us.

9            THE COURT:  I think that -- that is obviously a

10   necessary component to the government's ability to do that

11   direct examination remotely, but I think that that can be

12   accomplished because we've had good luck with Mr. Fronsaglia

13   being able to do that.

14           MR. FAGG:  Just confirming, Your Honor, we are

15   absolutely happy to do that.

16           MR. KOENIG:  I guess the only other option, also not

17   ideal is, you know, we have a day of jury today -- or between

18   today and tomorrow and one day next week.  Is a continuance a

19   possibility or --

20           THE COURT:  I would be hesitant to do that.  Even

21   though you're right that we don't have much court time, I think

22   that court time, we just have to take advantage of it.  So I

23   would say that that would not be a good option unless -- it

24   would be different if the government attorneys, you know, got

25   ill, then we would have to figure out a solution, but we are

1    not there yet.  In fact, we are trying to avoid people getting

2    ill.

3            Mr. McLoughlin?

4            MR. McLOUGHLIN:  Your Honor, to respond to the

5    government's question, I think in light of the discussions that

6    we had during the break, I think I can represent on behalf of

7    the defense group that we would object vehemently to any

8    continuance where there is a perfectly viable option to proceed

9    immediately and that is very much our request.

10           THE COURT:  Right.  And just for the record, I am not

11   worried about the podium, I am not worried about door handles.

12   There is just zero evidence that it could possibly communicate,

13   but COVID-19 is an airborne illness.  That's the issue.  Of

14   course, we are all wearing masks.  And it looks like the

15   defense team have their KN95s on, which are excellent, at least

16   Ms. Call does, which are -- Ms. Sweeney does.  I don't know

17   about Mr. Koenig's.  I don't know with beards how those work,

18   but ...

19           MR. KOENIG:  It is the same color.

20           THE COURT:  It is the same color.  I know it's a bit

21   of an extreme thing and it's airing on the side of caution, but

22   I think it can be done effectively and that's the only reason.

23   Just with the number of outbreaks on the government team, I

24   think it is justifiable and can be done without much prejudice

25   to the government.  It's not ideal, obviously, to have to do it

 1   remotely, but I think it can be done.

 2        MR. KOENIG:  So I guess my question is how long is

 3   this going to be the case?  Like is it just for one witness?

 4   If we rest -- I think crossing somebody on video is really not

 5   possible.  It may be possible, but it's really less than ideal.

 6   You know, I guess -- I don't know how long this is going to --

 7   are we effectively quarantined from court, then, or what is

 8   the -- and for the duration?  I am not sure how it's going to

 9   work.

10        THE COURT:  Mr. Beller?

11        MR. BELLER:  At the risk of getting jeers from my

12   colleagues, I don't think Mr. Koenig is being unreasonable in

13   expressing concern about cross-examining over VTC.  And so to

14   the extent that we are going to finish documents and to the

15   extent we are going to finish Ms. Evans' testimony, perhaps

16   over the lunch hour, Your Honor, the defense will get together

17   and determine -- really put pen to paper as to whether or not

18   we need Monday.  And if we do not need Monday, that will allow

19   everyone to, you know, perhaps go through any sort of

20   quarantine period, especially following the holidays, so that

21   the government is not in a position of having to cross-examine.

22        So I don't want to speak for everybody other than to

23   say I don't think Mr. Koenig is unreasonable.  And that is

24   something we can perhaps touch base about over the lunch hour

25   to make sure that they have the opportunity to present their

1   cross-examination that they are imagining.

2          *THE COURT:*  Ms. Call?

3          *MS. CALL:*  One perhaps middle ground proposal,

4   Mr. Koenig and myself have not been in close contact with

5   either of the individuals who tested positive or those who have

6   fever.  We are essentially in the same boat as Ms. Evans.  So I

7   understand that Ms. Evans is allowed to be here present.  We

8   would perhaps request the same opportunity to be here and

9   conduct the examination.

10          *THE COURT:*  Okay.  Describe that for me, Ms. Call.  So

11   what contact -- to what extent have either you or Mr. Koenig

12   been in close contact with any of the individuals who have been

13   testing positive?

14          *MS. CALL:*  I will speak for myself first.  For any of

15   those individuals it has been limited to certainly less than 15

16   minutes per day.  I believe the only contacts I have had was

17   handing a flash drive to someone two days ago and one I saw

18   this morning, but it was from a distance, not even in the same

19   room I don't believe, and certainly not more than 15 minutes

20   and wearing masks, of course.

21          *MR. KOENIG:*  I think I have had even less.  I can't

22   even -- with one of them maybe a few minutes, but that's about

23   it.

24          *MS. CALL:*  For understanding, essentially since Friday

25   since we learned of the first positive case, the majority of

1   the team has been working remotely aside from probably counsel

2   at table who have been here.  And the one person who now has a

3   fever was in the office this morning, but we do have separate

4   office spaces in which the attorneys have been for the most

5   part in their separate office spaces.  The exception this

6   morning was some time printing since we did not have paralegal

7   support which caused Mr. Torzilli and Ms. Sweeney to have a

8   little more contact with one of the individuals.

9        THE COURT:  That may put things in a little bit

10  different light.  So let's discuss the proposition of limiting

11  the presence to just Ms. Call and Mr. Koenig, who have had less

12  than any type of close contact, but requiring Mr. Torzilli and

13  Ms. Sweeney not be present.

14       MR. BELLER:  Your Honor, I take government counsel at

15  their word.  I have no reason to doubt anything that they have

16  said.  I raise this question not necessarily even expecting an

17  answer from them, but I don't know who is local.  I don't know

18  who has flown in and whether they all stay at the same hotel,

19  if they have social time together after work.  And I don't need

20  that level of response from them.  It's just something to sort

21  of think about as we move forward.

22       THE COURT:  Well, I with would include that, and I

23  assume that the government did in responding to the question.

24  It wouldn't be, of course, on-the-clock time as opposed to any

25  contact.  Given the -- go ahead, Mr. Beller, if you have

1    anything else to add.

2         MR. BELLER:  Only that we have been fortunate to have

3    Special Agent Taylor join us.  So to the extent the answers are

4    different for him, I would expect counsel to represent the

5    same.

6         THE COURT:  Yes, that's right.

7         So based on what I have heard, I think we can proceed

8    with Ms. Call and Mr. Koenig.  They have had -- they represent

9    that they've had far less than what would constitute close

10   contact under CDC guidelines.  I'm not sure about Special Agent

11   Taylor, but -- and then with Ms. Sweeney and Mr. Torzilli, who

12   may have had closer contact in terms of getting those copies

13   made, they would be excluded.

14        Mr. McLoughlin?

15        MR. McLOUGHLIN:  Your Honor, this is a very difficult

16   discussion, but of course, there are a number of us, at least

17   on the defense side, who are over 65 and so have particular

18   concerns.  Given the risk profile here, it seems that one could

19   be very risk averse.  The remote option is particularly viable,

20   so it's unclear why it's necessary to take any risk.

21        However, if the Court were to determine that some risk

22   were warranted, we haven't really talked so much about the jury

23   who are in close proximity to the government's table.  And if

24   we were going to have a government representative in the

25   courtroom, I would respectfully request that it just be one,

1    not two, not three, not an agent, just the lawyer doing the

2    examination to keep the risk as rationally minimized as

3    possible.

4           I would note that with all respect to Mr. Torzilli and

5    Ms. Sweeney, they indicated that they were exposed to these

6    individuals this morning, but they chose to come to the

7    courtroom.  And we have watched as they have been within inches

8    of Ms. Call and Mr. Koenig as they have had discussions.  So

9    the incubation time average median is four days.  It's a little

10   difficult to tell where we are in light of that.  A test

11   yesterday doesn't tell us very much.  So with those

12   observations, we would request that we stick with the do it

13   remotely, but if Your Honor is going to otherwise, then just

14   have one lawyer.

15          THE COURT:  Okay.  Thank you.

16          Yeah, I am going to allow both Ms. Call and Mr. Koenig

17   to be present.  Mr. McLoughlin is right about the fact that if

18   Mr. Torzilli and Ms. Sweeney have being exposed.  However, they

19   would not be contagious at this point in time under any

20   description of the course of COVID-19 that I have ever read, so

21   I don't think that that is a concern.  I would have them both

22   be on -- Mr. Koenig reposition so he is further away from the

23   jury when he is present and Ms. Call can remain in the seat she

24   is typically at.

25   Mr. Koenig?

1          MR. KOENIG:  I was going to ask the question I just

2     answered.  So I would sit over here?

3          THE COURT:  Right.

4          MR. KOENIG:  And Special Agent Taylor has had zero

5     exposure to any of the four individuals, so I don't know that

6     there is a reason to exclude him from the courtroom.

7          THE COURT:  The government is entitled to an advisory

8     witness, so he can remain.

9          Now, we are a little bit sidetracked from what we were

10    going to talk about and what we were going to talk were the

11    summaries.  Has everyone had a chance to take a look at the

12    summaries?

13         Ms. Carwile?

14         MS. CARWILE:  Yes.  I am going to raise just a few

15    issues that we looked at over the break in regards to limiting

16    instructions only.

17         MR. FAGG:  Can I raise one issue, Your Honor?  And

18    this feels awkwardly personal, but if we are going to excuse

19    Mr. Torzilli and Ms. Sweeney because of their possible

20    exposure, I think the prudent thing to do would be to excuse

21    them at this time.

22         THE COURT:  I agree, yeah.  I think that that makes

23    perfect sense because of the exposure.

24         So Mr. Torzilli and Ms. Sweeney, if you don't mind.

25         MR. McLOUGHLIN:  Your Honor, apologies.  Just one more

1   question.  Are there any representatives of the DOJ who are in

2   the gallery who may have been exposed who we should be aware

3   of?  I assume there are people in the gallery, and to the point

4   that we have two lawyers, I would request that those

5   individuals also be quarantined, I guess is the best word.

6       THE COURT:  I think that's probably a good point.  If

7   anyone has had close contact under CDC definitions with the

8   individuals who have become ill, I think it would be a good

9   idea if, assuming that that can --

10       MR. KOENIG:  The only person I have seen here is

11   Special Agent Koppenhaver from Commerce, but he again has had

12   zero.  He has been sequestered, so he has had the least

13   exposure of anybody, so that's the only person that I see here.

14       THE COURT:  Well, and he wouldn't be in here during

15   the course of the testimony anyway, right?  He is not being

16   called, so he is not sequestered, right.  I understand.  He

17   doesn't need to be if he hasn't had contact.

18       Ms. Carwile.

19       MS. CARWILE:  Thank you.  I will try to be really

20   quick.  And for the record, I am working off the charts we were

21   provided via e-mail that are unstamped, so to the extent the

22   stamped versions reflect the changes I am about to request, I

23   will withdraw that.

24       But the first is on government chart 2-1, the entry on

25   December 26th has a limiting instruction, and it appears that

1    Mr. Lubert's name was removed from that.  And we would ask that

2    that be added there.

3            THE COURT:  Consistent with my ruling that the

4    limiting instruction needs to be reflected on the exhibit.

5            MS. CARWILE:  Yes.  Thank you, Your Honor.  That's

6    correct.  I believe there is a limiting instruction.  It just

7    does not include Mr. Lubert's name.  And so to the extent that

8    he is part of that, we would ask that he be included in the

9    list of people.

10           THE COURT:  I see.  Do you understand that one,

11   Ms. Call?  I think that he was on that list.

12           MS. CALL:  Yeah, I believe this was one that had

13   e-mails from several folks because there are five names already

14   here with the limiting instruction.

15           Could we perhaps pull up the exhibit just to confirm,

16   221?  Thank you.  This may be the one, Your Honor, where when

17   you first provided the instruction, it may have been missed, so

18   it may have been harder to find on the transcript.

19           THE COURT:  That's exactly what happened.  I had

20   missed Mr. Lubert.  And then it was brought to my attention

21   that he was also on the e-mail.  I think Mr. Feldberg mentioned

22   that, if I recall.  That should be added.

23           Go ahead, Ms. Carwile.

24           MS. CARWILE:  The second of four is chart 7-1.  The

25   first entry on September 6 is an e-mail from Mr. Kronaugue to

1    Mr. Pepper.  And I believe that this morning the Court admitted

2    that exhibit with a limiting instruction, so we would ask that

3    in the same vein of others there be a limiting instruction

4    provided there.  My notes indicate Mr. Kronaugue's statement

5    was admitted for the effect on the listener.

6              THE COURT:  Ms. Call?

7              MS. CALL:  Could Ms. Carwile just repeat the exhibit

8    or line she was referring to?

9              MS. CARWILE:  Sure.  Chart 7-1, line beginning

10   September 6, 2017 listed as 9:07, 746-1.

11             MS. CALL:  I know we discussed doing the limiting

12   instructions as they were provided for the jury.  Obviously,

13   this one has not been provided to the jury yet, so I suppose we

14   will use what was reflected on the record from this morning?

15             THE COURT:  Yes.

16             MS. CARWILE:  I am going to skip the third chart

17   because I think the third will be easy to reconcile.  That's

18   chart 20-1.

19             So I am looking at the excerpts that reflect

20   Government Exhibit 2002.  There are -- there is an e-mail chain

21   to -- the first two excerpts include the proper limiting

22   instruction.  The third e-mail from Mr. Penn to Mr. Baker does

23   not include that instruction.  And it looks like that may have

24   been incorrectly placed on the following excerpt from 2000

25   which does not have a limiting instruction.  So we just ask

 1    that that be moved to the correct excerpt.

 2          THE COURT:  Can we zoom back out of that excerpt?  So

 3    you think it accidentally got carried over to a lower one?

 4          MS. CARWILE:  Yes, Your Honor.  It looks like it may

 5    just have been in the wrong box there.

 6          THE COURT:  Could be.

 7          MS. CARWILE:  My notes indicate that, and I am sure I

 8    will be corrected if I am wrong on this, but Government 2000

 9    does not have a limiting instruction, so it looks like it just

10    was a mistake in placement.

11          THE COURT:  It may not have Mr. Baker in it either,

12    who knows.

13          MS. CARWILE:  Correct.  I can move on to the last one

14    if we are ready.

15          THE COURT:  Does that make sense to you, Ms. Call?

16          MS. CALL:  Yes, Your Honor.

17          MS. CARWILE:  The fourth one is a bit more substantive

18    which is why I waited.  It's on government chart 17-1.  It is

19    the excerpt listed on November 18th as coming from Government's

20    Exhibit 1713, Mr. Ledford e-mails Mr. Austin.  In the most

21    recent iteration of this chart that I have seen, the government

22    has added the proper limiting instruction as to this exhibit.

23    And I would point out that that limiting instruction includes a

24    statement, Mr. Austin's statement in the middle can only be

25    considered against Mr. Austin and that Mr. Ledford's e-mail is

1    only being considered for his effect on Mr. Austin, the

2    listener.  So in that case consistent with the Court's other

3    rulings on exhibits of this nature, we would ask that be

4    removed from this chart given that it can only be used in any

5    respect against Mr. Austin.

6          THE COURT:  Let me understand your argument.  So did

7    you want to say that this -- this exhibit can only be

8    considered as against Mr. Austin or how did you --

9          MS. CARWILE:  No.  Our request is actually that this

10   excerpt or this line be removed from the chart.  My

11   understanding is that for other exhibits where the exhibit was

12   being used only as to one defendant in this case, those were

13   removed from this chart because of the potential prejudice as

14   to using an exhibit for one defendant in a chart that was

15   presumably being used against all.  So we would just ask that

16   this excerpt -- or this exhibit be removed from the chart

17   consistent with that policy that has previously been done on

18   other charts.

19         THE COURT:  Okay.  Ms. Call, response on that one?

20         MS. CALL:  Could we perhaps pull up Exhibit 1713?

21   Yes, Your Honor.  Reading your instruction, it appears that it

22   was only Defendant Austin's statement in that middle e-mail

23   that had that limiting instruction that it may be considered

24   only as to Defendant Austin.  The other statements aren't by

25   Defendant Austin, so I don't believe it would be appropriate to

1    include those here.

2           I think in the alternative what the government would

3    propose doing if Ms. Carwile is concerned about Mr. Ledford's

4    statement being considered in the context of this exhibit, we

5    could offer a separate redacted version of this exhibit

6    redacting out Mr. Austin's statement, and then the limiting

7    instruction would only be necessary as to Mr. Ledford.  But I

8    don't believe it's consistent with the instruction here that

9    the jury can't consider Mr. Ledford's statement with respect to

10   all 10 defendants.

11          MS. CARWILE:  Can I respond to that?

12          THE COURT:  Yes.

13          MS. CARWILE:  The Court provided a limiting

14   instruction for Mr. Ledford's statements with the specific

15   purpose that they may only be considered for their effect on

16   the listener.  And it's clear on the face of this document that

17   the listener is Mr. Austin and his statements could only be

18   used against him.  So to the extent that Ms. Call wants to use

19   Mr. Ledford's statements against all 10 defendants, I am not

20   sure how that works given the Court's limiting instruction

21   here.

22          THE COURT:  Because presumably this was not on the

23   James log I am guessing.

24          All right.  Ms. Call?

25          MS. CALL:  Yes, Your Honor.  I believe some of the

1    effect that was articulated was not just Defendant Austin's

2    e-mail here, but the fact that the day following this e-mail as

3    is shown actually in Government Exhibit 17-1, Defendant Austin

4    spoke to Defendant Brady at Pilgrim's, the contents of which

5    are later reflected in a text message.  So as much as the

6    statement by Defendant Austin here is only to be considered

7    against him, I think we are swallowing one hearsay rule in the

8    other which is the effect on the listener which is the

9    non-hearsay purpose of Mr. Ledford isn't limited to one

10   particular defendant, although one of the statements that is

11   that effect is -- I realize this is perhaps a complex issue,

12   but I don't believe effect on the listener has to be tied to

13   801(d)(2)(A) because there are two statements in the same

14   conversation that fall under those different rules.

15           MS. CARWILE:  Just to be clear, we are no longer

16   litigating whether this exhibit is admissible.  My

17   understanding is the Court has ruled on that.  My request is

18   that it be removed from the summary charts because --

19           THE COURT:  Can we go back to the summary chart just

20   so I can take a look at that?

21           MS. CARWILE:  It's 17-1 and the excerpt is from

22   November 18th.

23           THE COURT:  All right.  Ms. Call, anything else?

24           MS. CALL:  I don't believe so, Your Honor.  I would

25   just put once more my suggestion that we would submit a

1    redacted 1713 removing Defendant Austin's statements, but

2    frankly I think your instruction was clear that it's only

3    Mr. Austin's statement that can be considered against

4    Mr. Austin and not with respect to Mr. Ledford.

5              THE COURT:  Yeah, I am going to sustain that

6    objection.  As we talked about before, the purpose -- the

7    summaries were going to be admitted and would only be

8    considering -- by their nature couldn't be against just one

9    defendant because the rest of the exhibit had relationship

10   contacts that were designed to help the jury understand the

11   evidence.  But if we have some type of relationship that is

12   only -- can only be considered against one defendant only, and

13   despite what Ms. Call says, I understand her point about the

14   person who was at the top of the e-mail, but nonetheless, the

15   heart of the matter is the statement by Mr. Austin and that was

16   really the focus of the effect on the listener.  Even if it

17   wasn't the sole focus, it's the main focus, and that can only

18   be considered against Mr. Austin.  So as a result, I think that

19   that entry needs to go.

20             Given that fact, Ms. Call, is the government -- is

21   that salvageable from the government's perspective or is that

22   going to be withdrawn?

23             MS. CALL:  I think the jury risks not having the aid

24   that Your Honor has already found helpful in understanding this

25   evidence.  And I am trying to think on my feet here, but the

 1    statements by Mr. Ledford obviously in part motivate Defendant

 2    Austin to then speak to Defendant Brady this next day as shown

 3    in the summary.  And then the statement that's -- and, of

 4    course, those phone calls and the text message that's in

 5    Government Exhibit 1734 are admissible against -- and perhaps

 6    we could zoom in on the broader portion showing both the 18th

 7    to the bottom of the page there.  All of that conspiratorial

 8    activity is admissible to all 10 defendants and what motivated

 9    this is the statement by Mr. Ledford.

10         THE COURT:  But that's not 1713.  That's the problem.

11    1713 is an e-mail string that has statements of Mr. Austin.

12         MS. CALL:  If the government were to provide just the

13    e-mail from Mr. Ledford to Defendant Austin, I imagine it would

14    be admissible for that same non-hearsay purpose as the effect

15    on Defendant Austin as borne out in these phone calls and text

16    messages.  Would we be able to identify that and substitute

17    that for this line?

18         THE COURT:  I think we are just getting late in the

19    game.  And we just -- we can't have round threes on everything

20    unfortunately.  We need to get the government in a position

21    where it can rest.  Of course, this information can -- it's not

22    as if it can't be presented in some form perhaps by way of

23    argument or a demonstrative later or during closings, but at

24    this point in time that was a defect.  It was something that we

25    talked about in relationship to other summaries before, so not

1    a surprise.  So I am going to sustain that objection.

2           The entry can be removed.  The government can admit

3    it, but obviously I understand that by its very nature it

4    somewhat diminishes the effect of that particular summary.

5           Ms. Carwile, did you have anything else?

6           MS. CARWILE:  No.  My understanding is that's all of

7    our heads together as to the limiting instructions on these

8    charts.  If we come across one --

9           THE COURT:  But nonetheless, Mr. Beller is ready to

10   say something.

11          MS. CALL:  Your Honor, for the sake of the record

12   based on what you just said, I presume your holding still

13   stands true that even without the line 1713, that you believe

14   Exhibit 17-1 will still be a useful aid to the jury and would

15   still be admissible --

16          THE COURT:  Yes, if that's taken out.  Obviously, it

17   may defeat some of the purpose of the exhibit.  But if there

18   are other purposes of the exhibit, the government can certainly

19   admit that as amended.

20          Mr. Beller, go ahead.

21          MR. BELLER:  Thank you, Your Honor.

22          At the risk of sounding picky, my concern is the

23   jury's proper understanding of your instructions.  So I want to

24   start with Exhibit 2-1.  I will note for Ms. Call that I had

25   e-mailed members of her team this morning regarding these

 1    issues, so this may already be in the works; but nonetheless,

 2    the four limiting instructions, they are referring to multiple

 3    people that uses the male pronoun of "his."  And I believe that

 4    needs to be changed to "their" to be plural to make sure the

 5    jury understands that your limiting instruction applies to all

 6    the speakers as opposed to just a single speaker.

 7           THE COURT:  Ms. Call?

 8           MS. CALL:  Yes, Your Honor.  I don't have the

 9    transcript handy, and I understand Mr. Beller was not meaning

10    to criticize anyone's grammar, but my only question was in what

11    way this was actually instructed to the jury at the time of

12    their introduction of those exhibits.

13           THE COURT:  Well, that is a small point, but hopefully

14    I used the term "their" for plural, but even if I didn't, I

15    think his point -- I am not sure the jury would really

16    misunderstand it.  The question is really if the government

17    properly can effectuate that change.  It seems like one that

18    would be appropriate, but I don't think it would loom so large

19    that we couldn't necessarily substitute it later and use it

20    with Ms. Evans.  But for purposes of it then going back to the

21    jury, it probably should be corrected.

22           MS. CALL:  Yes, Your Honor.  I think maybe -- and I

23    will have to look at the various objections that are raised

24    today, but given that it is practically Mr. Koenig and myself

25    now that are able to work in our office space, we may not be

4022

1    able to make all these changes before calling Ms. Evans.

2          THE COURT:  Sure.  That's understood.  And

3    logistically we have got to figure out what we can do, but I

4    think the suggestion would be even though it may be displayed

5    to the jury with just saying "his," we would substitute in a

6    corrected version of that.  We could tell the jury that same

7    thing, not that anyone would really notice, but so that when it

8    goes back to the jury, it would have that correction.

9          Anything else, Mr. Beller?

10         MR. BELLER:  Your Honor, only that 5-1, the 9/3 entry

11   or 9/3 instruction contains the same grammatical error.  It's

12   "his" as opposed to "their."

13         The last piece I would raise is on Government's

14   Exhibit 14-2.  This is entry No. 2 and that still contains the

15   reference to metadata.  I believe the government appropriately

16   removed it in all of the other entries with the exception of

17   that one that was missed.

18         THE COURT:  Okay.  That's a good point.

19         Do you see that, Ms. Call?

20         MS. CALL:  Yes, Your Honor.  And I frankly may have

21   misunderstood the Court's instruction previously on this.  I

22   had understood, and maybe I was incorrect, the objection

23   previously to be to reference to metadata when an attachment

24   was being forwarded.  This is not that.  This is a different

25   document, so I just wanted to confirm.  The native of this will

1    be in evidence.  This is a reference to the metadata in that

2    native.  It's essentially what the attachment name is.  Is it

3    Your Honor's instruction that that would be improper for the

4    summary?

5         THE COURT:  Well, the point that Mr. Fagg made was

6    that these types of indications are not really descriptions of

7    exhibits or excerpts from exhibits, but rather are

8    explanations.  And that's why the objection was made and I

9    sustained it that the summary should not contain that type of

10   explanation.  So it wouldn't be just to the term "metadata."

11   It would simply be deleting that information because it talks

12   about the attachment down below.

13        MS. CALL:  Before I do agree with Your Honor, could we

14   just pull up 1521, please?  I am just wondering whether the

15   attachment name is on the document, which it is, so perhaps we

16   will just change it to attachment Round 2 rather than

17   attachment metadata.

18        THE COURT:  I don't think that -- let's go back to --

19   so what are you proposing?  Let's go back to the summary, 14-2,

20   if possible.

21        MS. CALL:  It's essentially excerpting that part of

22   the e-mail where it the says attachment Round 2, which is

23   obviously the name of the attachment, so where it currently

24   says -- oh, I see what the difference is.  Yeah, I think we can

25   remove it.  Yeah, we can remove that and we are happy to do

1   that.  It may not be today if it will be published.  The other

2   option would be if defense counsel is able to cover that

3   portion when it gets displayed to the jury.

4           THE COURT:  Perhaps so.  In any event, I will let that

5   get displayed as long as it gets corrected afterwards.

6           Mr. Tubach?

7           MR. TUBACH:  Your Honor, very quickly, I apologize for

8   interruption this.  I have a 12:45 rapid test and I thought

9   that would be safe.

10          THE COURT:  I think that we are almost done, but you

11  are excused at the present time.  Anyone else who needs to, if

12  they have a test or anything of that nature, can certainly exit

13  too.  Ms. Pletcher will carry on.

14          All right.  Any other issues with the summaries?

15          Okay.  So we are going to have the jury back at 1:30.

16  And Ms. Evans, I take it, will be our first order of business

17  or --

18          MS. CALL:  I believe it will be entering the 10 or so

19  documents that we discussed this morning and then Ms. Evans.

20          THE COURT:  Anything else real briefly before we

21  break?

22          Ms. Prewitt?

23          MS. PREWITT:  Are they going to be entered or shown to

24  the jury?

25          THE COURT:  If at all possible, and you can show them

4025

```
 1    if you really need to, but if we can streamline it a little bit
 2    by not showing everything, that would be, I think, helpful.
 3              Mr. Kornfeld?
 4              MR. KORNFELD:  Your Honor, from the peanut gallery,
 5    but just for the Court's and parties' edification going back to
 6    the COVID-19 discussion, Mayor Hancock has just imposed a mask
 7    or vacs mandate in the City and County of Denver effective
 8    tomorrow morning consistent with the other three counties that
 9    did it yesterday.
10              THE COURT:  That's interesting.  I will take a look at
11    that.  I am not sure it really affects us so much, but it does
12    kind of show the state of transmission within the community.
13              We will be in recess, then, until 1:30.
14              (Recess at 12:31 p.m.)
15              (Reconvened at 2:01 p.m.)
16              THE COURT:  Mr. Byrne, I wanted to let you know that I
17    decided not to mention anything about the dismissal of the
18    count.  I was going to do it as soon as we got the jury back
19    in.  I was a little worried for the reasons you articulated
20    that there could be an association drawn.  Do you agree?  Or if
21    you want, I can go ahead and let them know.
22              MR. BYRNE:  No, I agree.  I am wondering what instead
23    you were planning on telling them.
24              THE COURT:  I am going to say the same thing, just not
25    right now.
```

1          MR. BYRNE:  That's fine.

2          THE COURT:  I talked about doing it, but because we

3    had such a long unanticipated delay, I didn't want to go ahead

4    and then mention it just in case the jury thought that the

5    delay had anything to do with that.

6          MR. BYRNE:  No, no, I think if we wait, that's fine.

7          THE COURT:  Everyone ready for the jury?  So when we

8    have our mid-afternoon break, that's when we'll talk about what

9    we tell the jury in terms of the schedule.  We need to tell

10   them too about the schedule for tomorrow, for instance, so we

11   will talk about that at the mid-afternoon break.

12         Let's go ahead and bring the jury back in.

13         (Jury present.)

14         THE COURT:  Ladies and gentlemen, sorry for the long

15   delay.  We had some unanticipated logistical issues and it's

16   really my fault.  I kept optimistically thinking that we would

17   get it solved, bring you back in, and then it didn't.  So here

18   we are at 1:30, but we are ready to proceed now.

19         Mr. Torzilli and Ms. Sweeney are joining us by VTC, so

20   you can actually see what Mr. Torzilli looks like.  There is

21   Ms. Sweeney there with no masks just by way of explanation.

22         Okay.  The United States may call its next witness or

23   if there are documents to introduce, go ahead.

24         MS. CALL:  Yes, Your Honor.  We have several documents

25   to introduce now.

4027

1          THE COURT:  Go ahead.

2          MS. CALL:  The first is Government Exhibit 1177.

3          THE COURT:  And is 1177 one of the ones that we just

4   recently talked about or not?

5          MS. CALL:  Yes, Your Honor.

6          THE COURT:  Oh, yes.  Yes, ladies and gentlemen,

7   Exhibit 1177 has been admitted, but only as against

8   Mr. Mulrenin.

9          MS. CALL:  I believe because of the limiting

10  instruction it would be appropriate to publish.

11         THE COURT:  It may.

12         MS. CALL:  If perhaps for the jury we could zoom in on

13  the top half and then the bottom half.

14         THE COURT:  Okay.

15         MS. CALL:  The next exhibit is Government's Exhibit --

16  I will list three -- 9745, 9746, 9747.  And we're not seeking

17  to publish these at this time.

18         THE COURT:  What day did we discuss those?

19         MS. CALL:  Today, Your Honor.

20         THE COURT:  You would think I would remember.  Oh, I

21  see, yes.  I don't see my ruling on 9745, but I think that that

22  was admitted without any type of limiting instruction.  Okay.

23  Each of those are admitted.

24         MS. CALL:  All right, Your Honor.  I can do the next

25  four in a group as well.  That is 9716, 9720, 9721 and 9722.

 1          THE COURT:  The first one was 9716?

 2          MS. CALL:  Correct.

 3          THE COURT:  Yeah, ladies and gentlemen, each of those

 4   has been admitted.

 5          MS. CALL:  May I proceed?

 6          THE COURT:  Yes.  Go ahead.

 7          MS. CALL:  Next is Government Exhibit 146-1.

 8          THE COURT:  What day was this?  146?

 9          MS. CALL:  146, that was today as well.

10          MR. FELDBERG:  Do you mean 746?

11          MS. CALL:  I do mean 746-1.

12          THE COURT:  Yes.  That makes a difference.  746-1,

13   ladies and gentlemen, has been admitted, but not for the truth

14   of the matters asserted by Mr. Kronaugue, but rather only for

15   the effect on the listener.

16          MS. CALL:  Permission to publish?

17          THE COURT:  You may.

18          All right.

19          MS. CALL:  All right.  The next is Government Exhibit

20   528.

21          THE COURT:  What was the date on that one?

22          MS. CALL:  I was just asking the same thing, Your

23   Honor.  We are hoping to pull that up.  It was not today.

24          THE COURT:  Yes, ladies and gentlemen, that has been

25   admitted.  But the statements of Mr. Brink should not be

4029

1    considered for the truth of the matters associated, but rather

2    only for the effect that those statements may have on the

3    listener.

4              *MS. CALL:*  And permission to publish?

5              *THE COURT:*  You may.

6              *MS. CALL:*  Since this is voluminous, if we could

7    possibly do the bottom portion of the second page and then

8    perhaps move up from there.

9              *THE COURT:*  Okay.

10             *MS. CALL:*  If we could please move higher on the page?

11             *THE COURT:*  Okay.  I think we are good.

12             *MS. CALL:*  The next is Government's Exhibit 518.

13             *THE COURT:*  Exhibit 518 has been admitted, ladies and

14   gentlemen.

15             *MS. CALL:*  We will not publish that at this time.

16             *THE COURT:*  All right.

17             *MS. CALL:*  The next is Government's Exhibit 9744.

18             *THE COURT:*  9744 has been admitted.

19             *MS. CALL:*  The next is Government's Exhibit 1547.

20             *THE COURT:*  All right.  Yes, ladies and gentlemen,

21   Exhibit 1547 has been admitted, but only as against Mr. Penn.

22             *MS. CALL:*  Permission to publish?

23             *THE COURT:*  You may.

24             All right.

25             *MS. CALL:*  Next is Exhibit E-570.

1    THE COURT:  Ladies and gentlemen, Exhibit E-570 has

2  been admitted, but only as against Mr. Penn and Mr. Austin.

3    MS. CALL:  Permission to publish?

4    THE COURT:  You may.

5    Okay.

6    MS. CALL:  Next is Exhibit 410-1.

7    THE COURT:  Ladies and gentlemen, 410-1 has been

8  admitted.

9    MS. CALL:  The next exhibit is Government's Exhibit

10  7046, and that's a native file, and 7046-1 which is the printed

11  sticker version.

12    MR. BELLER:  Can we go side bar quickly on 410-1,

13  please?

14    THE COURT:  Yes, you may.

15    (At the bench:)

16    THE COURT:  Mr. Beller, go ahead.

17    MR. BELLER:  Thank you, and excuse the interruption.

18  Your Honor, as to 410-1, I believe that the Court ruled this

19  morning that it was only Page 2 that was admitted.

20    THE COURT:  That's correct.  I didn't happen to look

21  what was displayed.  Was something other than Page 2 displayed?

22    MR. BELLER:  Your Honor, Page 1 and 2 is displayed,

23  but let me be fair.  I don't know if it was published to the

24  jury, but that's the reason I asked for the side bar.

25    THE COURT:  Yeah.  That's right.  And given the fact

4031

1    we are having defense counsel's IT person, this is the types of

2    things.  But given the fact it wasn't published, we will just

3    publish Page 2, then.  And I am not sure if it has a sticker,

4    but it might have to be re-stickered.

5              Anything else on that, Ms. Call?

6         MS. CALL:  The government won't actually publish it

7    today, so we will submit --

8         THE COURT:  Good, thank you.

9       (In open court:)

10        THE COURT:  Go ahead, Ms. Call.

11        MS. CALL:  I believe we are on Exhibit 7046.  The

12   native is an Excel file and the stickered version is 7046-1.

13        THE COURT:  Ladies and gentlemen, both of those have

14   been admitted, but only against Mr. Austin.

15        MS. CALL:  Permission to publish 7046-1?  I think 7046

16   is currently up.  Thank you very much.  I believe this is it.

17             Permission to publish?

18        THE COURT:  You may.

19        MS. CALL:  Thank you.

20        THE COURT:  Okay.

21        MS. CALL:  There is multiple pages.  I suppose we

22   could go to the second page and on from there.

23             The next is Government Exhibit 6088 and 6089.

24        THE COURT:  Both of those, ladies and gentlemen, have

25   been admitted.

4032

Rachel Evans - Direct

1        MS. CALL:  Next is Government Exhibit 959.

2        THE COURT:  Ladies and gentlemen, Exhibit 959 has been

3    admitted.

4        MS. CALL:  Permission to publish?

5        THE COURT:  You may.

6        MS. CALL:  The government will now call its next

7    witness, Ms. Rachel Evans.

8        (**Rachel Evans** was sworn.)

9        THE WITNESS:  Yes.

10       COURT DEPUTY CLERK:  Please state your name and spell

11   your first and last name for the record.

12       THE WITNESS:  Rachel Evans, R-A-C-H-E-L, E-V-A-N-S.

13                      **DIRECT EXAMINATION**

14   BY MS. CALL:

15   Q.  Good afternoon, Ms. Evans.

16       Could you please tell the jury where you work?

17   A.  The United States Department of Justice, antitrust

18   division.

19   Q.  What is your position at the antitrust division?

20   A.  I am a paralegal specialist.

21   Q.  Ms. Evans, how long have you been a paralegal specialist?

22   A.  About a year and a half.

23   Q.  So is that since around July of 2020?

24   A.  Yes.

25   Q.  Now, where were you working before you became a paralegal?

4033

Rachel Evans - Direct

1    A.   I was working at CITRIS in the Banatao Institute on the

2    University of California-Berkeley's campus.

3    Q.   You mentioned the University of California-Berkeley.  Were

4    you a student before?

5    A.   Yes, I was.

6    Q.   Where were you a student?

7    A.   At UC Berkeley.

8    Q.   What did you study there?

9    A.   Economics.

10   Q.   Now, when did you graduate from Berkeley?

11   A.   December 2019.

12   Q.   All right.  So as a paralegal at the antitrust division,

13   what kind of cases do you work on?

14   A.   I work on civil and criminal cases.

15   Q.   Is there a particular subject matter?

16   A.   Generally antitrust.

17   Q.   Now, when you're assigned to a matter, what do your

18   responsibilities typically include?

19   A.   Yeah.  My responsibilities include taking notes, reviewing

20   documents, summarizing information and reviewing it for

21   accuracy.

22   Q.   And I think I used the word "matter" earlier.  Do you work

23   on both charged cases and investigations?

24   A.   Yes, I do.

25   Q.   Have you actually worked on a criminal trial before?

Rachel Evans - Direct

 1   A.   Yes, I have.

 2   Q.   Have you ever testified before?

 3   A.   No, I have not.

 4   Q.   Now, did there come a time during the course of your

 5   current position where you began participating in a case in the

 6   chicken industry?

 7   A.   Yes.

 8   Q.   And you mentioned your general responsibilities earlier as

 9   a paralegal.  What has your role been in this case?

10   A.   Reviewing the summary exhibits for accuracy.

11   Q.   About how many hours did you spend reviewing those summary

12   exhibits for accuracy?

13   A.   Over a hundred hours.

14   Q.   And over how long a time period were you reviewing those

15   summary exhibits for accuracy?

16   A.   Approximately, two weeks.

17   Q.   All right.  So you said your role in the case has been

18   those summaries.  How long have you been assigned to the case?

19   A.   Approximately, two weeks.

20   Q.   Two weeks?

21   A.   Yes.

22   Q.   Did you participate in the investigation of the case?

23   A.   No, I did not.

24   Q.   How many summary exhibits did you review?

25   A.   20.

Rachel Evans - Direct

1   Q.  Now, were you involved in the preparation of those

2   exhibits?

3   A.  Yes.

4   Q.  Was it just you alone?

5   A.  No.

6   Q.  Were there multiple people?

7   A.  Yes, there were.

8   Q.  Did you add information to the exhibits?

9   A.  Yes, I did.

10  Q.  Did you remove information from them?

11  A.  I did.

12  Q.  Now, when you started working on these summaries and you

13  said two weeks ago, was there already a draft form of them?

14  A.  Yes, there was.

15  Q.  So when you got those drafts, were there already I suppose

16  exhibits included in them and you worked from there?

17  A.  Yes.

18  Q.  All right.  So back to your -- I guess your role in what

19  you did with these summaries, what did you do to confirm the

20  entries for accuracy?

21  A.  I looked at the underlying exhibits and compared it to the

22  summary exhibits to make sure the information was accurate.

23  Q.  So would you say you have personal knowledge of those

24  underlying exhibits?

25  A.  Yes.

4036

Rachel Evans - Direct

1   Q.  Did you also confirm the order in the charts of the entries

2   in terms of dates and times?

3   A.  Yes, I did.

4   Q.  What kind of order were they in?

5   A.  They were -- they are in chronological order.

6   Q.  Let's take a look at some of those summaries.

7       MS. CALL:  And if I could pass two binders up to the

8   witness through Ms. Grimm.

9       THE COURT:  You may.

10      MS. CALL:  Your Honor, I have additional paper copies

11  if you would like a binder as well.

12      THE COURT:  Yes, I would, if you don't mind.

13  BY MS. CALL:

14  Q.  Ms. Evans, I realize you have a big stack in front of you.

15      What do these binders contain?

16  A.  They contain the summary exhibits and the underlying

17  exhibits of those summary exhibits.

18  Q.  All right.  Thank you.

19      Could we turn to and if we could display for the

20  counsel, the parties, the Court and the witness, but not the

21  jury at this time, Exhibit 90-10.

22      Do you recognize this, Ms. Evans?

23  A.  Yes, I do.

24  Q.  What is it?

25  A.  It's a chart that lists people's names in the first column,

Rachel Evans - Direct

1  their associated phone numbers and the company they worked at

2  along with an employment period where applicable.

3  Q.  All right.  And does the first line of that reference

4  another exhibit?

5  A.  It does.

6  Q.  All right.

7       MS. CALL:  At this time, Your Honor, the government

8  would like to introduce Exhibit 9748, which is a stipulation

9  entered by the parties.

10       THE COURT:  Exhibit 90-10 will be admitted.

11       MS. CALL:  Could we also admit but not publish 9748?

12       THE COURT:  Actually, let me take that back.  It can

13  be displayed for demonstrative purposes at the present time

14  subject to cross-examination by the attorneys, but it may be

15  displayed at this time for demonstrative purposes.

16       MS. CALL:  And you are referring to 90-10?

17       THE COURT:  Was that the one that there is a

18  stipulation?

19       MS. CALL:  So yes, the stipulation is numbered 9748

20  and we would seek to introduce that.

21       THE COURT:  Is it correct there is a stipulation as to

22  90-10 that may be admitted?

23       MS. CALL:  Can you say that one more time, Your Honor?

24       THE COURT:  Sure.  I believe that you moved the

25  admission of 90-10; is that correct?

Rachel Evans - Direct

1              MS. CALL:  I believe I said 9748, but I was going to

2      do both, so we could go out of order.

3              THE COURT:  I am sorry.  So it's 9748 and that's the

4      stipulation.

5              MS. CALL:  Yes, Your Honor.

6              THE COURT:  Is that correct as to 9748, exhibit

7      stipulated?

8              MR. LAVINE:  Yes, Your Honor.

9              THE COURT:  So that exhibit is admitted, 9748.  It may

10     be displayed if you choose to.

11             MS. CALL:  May we display 90-10?

12             THE COURT:  What's that?

13             MS. CALL:  May we display 90-10 for demonstrative

14     purposes?

15             THE COURT:  Right.  And then as to 90-10, it can be

16     displayed at this time for demonstrative purposes.

17             MS. CALL:  Thank you.

18     BY MS. CALL:

19     Q.  All right.  So looking to Exhibit 90-10, Ms. Evans, what

20     does that first line say?

21     A.  The first line reads, "Unless otherwise noted, all

22     information contained in this summary exhibit is drawn from

23     GX"-- government exhibit -- "9748."

24     Q.  And 9748, is that the stipulation that we just referenced?

25     A.  Yes.

4039

Rachel Evans - Direct

1   Q.  All right.  Now, could you explain for the jury exactly

2   what steps did you take to verify the phone numbers listed in

3   90-10?

4   A.  I looked at phone bills, subscriber information and e-mail

5   signatures to verify that the phone number here, that the phone

6   numbers correspond to the individual they are listed for.

7   Q.  Did you also take steps to verify the employers of the

8   individuals listed?

9   A.  Yes, I did.

10  Q.  Does this chart fairly and accurately summarize the

11  information based on your review of those sources?

12  A.  Yes, it does.

13  Q.  Now, were there additional summary exhibits that you

14  reviewed?

15  A.  Yes.

16  Q.  Could you please take a look in your binder?  Is there a

17  tab labeled Summary EXS?

18  A.  Yes, there is.

19  Q.  Behind that tab are there tabs containing Government's

20  Exhibits 1-1, 2-1 -- this is going to take a moment, 3-1, 4-1,

21  5-1, 7-1, 9-1, 10-1, 10-2, 10-3, 14-1, 14-2, 14-3, 16-1, 17-1,

22  18-1, 18-3, and 20-1?

23  A.  Yes.

24      MS. CALL:  Could we display at this moment for

25  demonstrative purposes Exhibit 4-1?

Rachel Evans - Direct

1        *THE COURT:*  You may.

2   *BY MS. CALL:*

3   *Q.*  And Ms. Evans, if you could turn to that in your binder.

4            Do you recognize Government's Exhibit 4-1?

5   *A.*  Yes.

6   *Q.*  What is it?

7   *A.*  It's a chart that outlines communications for a specific

8   time period.  And information here is sourced from the exhibits

9   that are listed in the right-hand column, the right-most

10  column.

11  *Q.*  When you say the exhibits here, so do you mean for any

12  particular row that information is sourced from the exhibit on

13  the right-hand side?

14  *A.*  Yes.

15  *Q.*  All right.  I believe you said communications.  What are

16  the kinds of communications that are summarized?

17  *A.*  There are phone calls, e-mails, text messages and some hard

18  copy documents.

19  *Q.*  And right now I know we are looking at 4-1, but does your

20  testimony apply to the same to the other exhibits I just

21  mentioned?

22  *A.*  Yes.

23  *Q.*  Did you verify the information contained in these charts?

24  *A.*  I did.

25  *Q.*  How?

4041

Rachel Evans - Direct

1   *A.*  I looked at the exhibits that are listed here, and I

2   compared it with the summary exhibits to make sure that the

3   information listed here is what appears in the exhibit --

4   exhibits.

5   *Q.*  And in your review, did you discover errors?

6   *A.*  I did.

7   *Q.*  What did you do when you found an error?

8   *A.*  I fixed them.

9   *Q.*  I see a time period at the top here.  What is that?

10  *A.*  This is a time period that it lists the communications for

11  this particular summary exhibit, the time period for the

12  communications here.

13  *Q.*  And if you could remind the jury from top to bottom, how

14  are the items in here ordered?

15  *A.*  They are in chronological order.

16  *Q.*  I would like to ask you about time zones.  I see there is a

17  date and time column; is that correct?

18  *A.*  Yes.

19  *Q.*  Now, I see some of the items say ET next to a time.  Could

20  you describe how you verified the information contained in

21  those cells?

22  *A.*  Yes.  So ET here stands for Eastern Time Zone.  And I

23  looked at the underlying exhibit, and if the time there was

24  listed as Eastern Time Zone, then I listed that on the summary

25  chart.  And if it was in a different time zone, I standardized

4042

Rachel Evans - Direct

1    it to Eastern Time Zone.

2         *MS. CALL:*  And can we please zoom in to include the

3    top row through the entries of September 30th and October 8th?

4    Thank you.

5    *BY MS. CALL:*

6    *Q.*  So you said for items where there was a time zone apparent

7    on the document you've standardized the time into Eastern?

8    *A.*  Yes.

9    *Q.*  Now, for the documents that don't have a time zone on them,

10   what did you do to verify that information?

11   *A.*  I also looked at the underlying exhibits, and I listed the

12   time as it was listed on the document so there wasn't a time

13   zone.

14   *Q.*  All right.  So that's just the time listed on the document.

15   *A.*  Yes.

16   *Q.*  All right.  Now, I see just looking at the portion we have

17   blown up here on 4-1, there is some entries that don't contain

18   a time.  Can you describe why in your verification process you

19   did not add a time there when you looked at that document?

20   *A.*  So there either wasn't a time listed or, as the case here,

21   I -- it was better to not list the time because it would appear

22   confusing and it would make it seem like the e-mails were out

23   of order.

24   *Q.*  Would it help you to look at the underlying document to

25   explain that?

Rachel Evans - Direct

1    *A.*  Yes.

2         *MS. CALL:*  Could we please pull up government

3    Exhibit 498?

4         Permission to publish 498, Your Honor?

5         *THE COURT:*  One moment.  Yes, you may.

6         *MS. CALL:*  If we could zoom in on the last four

7    e-mails on this document.

8    *BY MS. CALL:*

9    *Q.*  Ms. Evans, using 498, can you describe why you stated it

10   would be confusing to include the times?

11   *A.*  Yes.  So the oldest e-mail or the first e-mail is listed at

12   the bottom, and the newer e-mails are listed towards the top as

13   is the convention for e-mail chains.  And so on the chart I

14   have listed 4:28 p.m., which you can see is at the very bottom,

15   so it's the first e-mail in the chain.  But the next e-mail is

16   listed as 2:29 p.m., and so that would make it appear as if

17   that e-mail was sent before.  But looking at the chain, you

18   know that it was sent afterwards, so I didn't list that.

19   *Q.*  Do you have a basis for understanding why the times appear

20   in different order in that e-mail?

21   *A.*  Yes, I do.

22   *Q.*  And what is that?

23   *A.*  I read e-mail chains in my everyday life and at work I

24   review e-mails.

25   *Q.*  Thank you, Ms. Evans.

4044
Rachel Evans - Direct

1              MS. CALL:  And we can take Exhibit 498 down.

2              If we could pull up 4-1 up, please, and display that

3     for demonstrative purposes.

4              THE COURT:  You may.

5              MS. CALL:  If we could zoom starting in the top row

6     again just down through the end of October 8th so it's

7     readable.

8     BY MS. CALL:

9     Q.  All right.  Ms. Evans, I believe we talked about the Date

10    and the Time columns.  Could you now tell us what the From

11    column signifies?

12    A.  Yes.  The From column signifies who sent the communication.

13    Q.  All right.  Was that always apparent on the face of the

14    document you were looking at?

15    A.  No.

16    Q.  So let's say for a phone call, for example, how did you

17    identify who the call was from?

18    A.  I looked at The government Exhibit 90-10 to -- well, first,

19    actually, I looked at the underlying phone record and I could

20    see the two phone numbers that related to a particular phone

21    call.  And then I looked at Government Exhibit 90-10 to see who

22    is associated with the phone number that I am looking at.

23    Q.  And did you also identify what company that person worked

24    for?

25    A.  Yes.

Rachel Evans - Direct

1    *Q.*   Now, let's skip to the To column.  What does that

2    represent?

3    *A.*   That represents who received the communication.

4    *Q.*   And did you -- did you employ a similar process to verify

5    that information?

6    *A.*   Yes.

7    *Q.*   Does it list every single person that, let's say, an e-mail

8    was to?

9    *A.*   No, it does not.

10   *Q.*   Just a subset in some cases?

11   *A.*   Yes.

12   *Q.*   All right.  How did you verify the information in the

13   excerpt column?

14   *A.*   The excerpt column is -- so the information there is from

15   the underlying exhibit or for, you know, in the case of the

16   phone calls, that is simply there as a description to indicate

17   there was a phone call.

18   *Q.*   All right.  Now, in your review of the phone records, does

19   the indication phone call here necessarily mean that the person

20   called picked up the phone?

21   *A.*   No.

22   *Q.*   Now, I see there is color coding in this document.  Could

23   you please explain what the salmon color signifies?

24   *A.*   The salmon color signifies phone calls that were between

25   two individuals who worked for two different chicken suppliers.

Rachel Evans - Direct

1    *Q.*  Did you say two different chicken suppliers?

2    *A.*  Yes.

3    *Q.*  And how about the blue color?

4    *A.*  The blue color represents all other phone calls, so phone

5    calls between two individuals who worked for the same chicken

6    supplier or a phone call between an individual who worked for a

7    chicken supplier and an individual who worked for a chicken

8    supplier customer.

9    *Q.*  Thank you.  And could you now explain what the green color

10   signifies?

11   *A.*  The green color signifies written communications such as

12   e-mails and text messages.

13   *Q.*  Do you believe these charts contained in the tabs of your

14   binder that I've listed previously fairly and accurately

15   summarize the information from those sources?

16   *A.*  Yes, I do.

17   *Q.*  Do they also put the excerpted records in context in terms

18   of the date and the time?

19   *A.*  They do.

20   *Q.*  And approximately how many documents are excerpted among

21   these summary charts?

22   *A.*  Approximately 350.

23          *MS. CALL:*  Could we please pull up Government's

24   Exhibit 14-1?

25   *BY MS. CALL:*

4047

Rachel Evans - Direct

 1   Q.  And if, Ms. Evans, you could turn to the same.

 2        Ms. Evans, is it your testimony to review this as a

 3   demonstrative?

 4   A.  Yes.

 5        MS. CALL:  Permission to publish 14-1?

 6        THE COURT:  As a demonstrative, yes.

 7        MS. CALL:  All right.  If we could just go to the

 8   first page and perhaps zoom in on the chart portion from the

 9   upper left where it says Date to the bottom right above the

10   sticker.  Thank you.

11   BY MS. CALL:

12   Q.  Ms. Evans, what time period is covered by this chart?

13   A.  September 28, 2012 to October 10th, 2012.

14   Q.  All right.  So just to get a sense of how you reviewed the

15   information here, so what did you find looking at the exhibit

16   identified as 1438 in that top row?

17   A.  I found that there was an e-mail at 8:24 p.m. on

18   September 28th, 2012 from Mike Ledford, UFPC, to valued

19   suppliers.

20   Q.  And did you review records of phone calls that occurred

21   after that time?

22   A.  I did.

23   Q.  And the e-mail from Mr. Ledford, was there a date provided

24   in his e-mail?

25   A.  Yes.

Rachel Evans - Direct

1  Q.  What was that date?

2  A.  Friday, October 10th, 2012.

3  Q.  All right.  So before that October 10th date, did you

4  review records of phone calls that occurred?

5  A.  Yes.

6  Q.  And are those the calls listed on Page 1 of Exhibit 14-1?

7  A.  Yes.

8      MS. CALL:  Can we just highlight the October 10th date

9  in the first row of this column -- or this spreadsheet?  It's

10  the last line of the item in the excerpt column.  Thank you.

11  BY MS. CALL:

12  Q.  All right.  Now, after these phone calls that you have

13  identified here, what do you find occurred on October 9th in

14  that last row in Government's Exhibit 14-1?

15  A.  That there was an e-mail at 8:59 p.m. from Scott Brady,

16  Claxton, to Mark Oechsli, UFPC.

17  Q.  Now, did you identify additional communications following

18  that that you verified for this chart?

19  A.  Yes.

20      MS. CALL:  Could we please turn to the second page of

21  Exhibit 14-1?  And if we could please zoom on from the date in

22  the upper left to the exhibit numbers in the lower right.

23  Thank you.

24  BY MS. CALL:

25  Q.  All right.  Could you just review the communications that

Rachel Evans - Direct

1   you reviewed for accuracy what's in this chart from

2   October 10th?

3   *A.*  Could you repeat that?

4   *Q.*  Yes.  What did you find occurred at 8:15 a.m. based on your

5   review of the underlying sources on October 10th?

6   *A.*  Yes.  So at 8:15 a.m. Eastern time there was an e-mail from

7   Bill Kantola of Koch to Lance Buckert, Koch.

8   *Q.*  Is there a portion of that e-mail that you verified for

9   this chart?

10   *A.*  Yes.

11   *Q.*  Can you read that?

12   *A.*  It reads, "We are changing the dark meat to .3000 from

13   .3050 to see if we can pull that off."

14   *Q.*  And just to orient us from that last page, was this e-mail

15   after those phone calls that you reviewed?

16   *A.*  Yes.

17         *MS. CALL:*  All right.  Now, could we please turn to

18   Government's Exhibit 14-2?

19         Your Honor, could we display this for demonstrative

20   purposes.

21         *THE COURT:*  Yes, you may, for demonstrative purposes.

22   *BY MS. CALL:*

23   *Q.*  Ms. Evans, have you turned to 14-2?

24   *A.*  Yes.

25   *Q.*  What is the time period covered in this chart?

Rachel Evans - Direct

1    *A.*  October 26, 2012 to November 14, 2012.

2            *MS. CALL:*  If we could zoom again from the top left

3    portion to the bottom right.  Thank you.

4    *BY MS. CALL:*

5    *Q.*  All right.  And what did you review based on your review of

6    these documents occurred on October 26 at 2:41 p.m.?

7    *A.*  That there was an e-mail from Roger Austin, Pilgrim's, to

8    Justin Gay and Scott Tucker, Pilgrim's.

9    *Q.*  Is there a portion of that e-mail attachment that you

10   confirmed was accurate?

11   *A.*  Yes.

12   *Q.*  Could you read that?

13   *A.*  The attachment reads in part, "Having talked to Mike I will

14   summarize our discussion... I am hearing that several suppliers

15   have dropped their price going into this bid...Dark meat is

16   currently at .30 back of 8 piece... Mike is asking all to go to

17   .31."

18   *Q.*  Thank you.  Did you review another e-mail from November 2nd

19   at 1:18 p.m.?

20   *A.*  Yes.

21   *Q.*  Who was that from?

22   *A.*  It's from Bruce MacKenzie, Koch.

23   *Q.*  Did you review a portion of that attachment for accuracy?

24   *A.*  Yes.

25   *Q.*  And what does that say?

4051

Rachel Evans - Direct

1    *A.*  The e-mail attachment reads in part:  Product...Volume...

2    1st round... Lowest Competition...where we need to

3    be...current.

4    *Q.*  Following these e-mails did you identify and did you review

5    calls between -- additional call records?

6    *A.*  Yes.

7    *Q.*  Are those reflected on this 11/5/2012 row?

8    *A.*  Yes.

9    *Q.*  And did they include calls from Defendant Kantola?

10   *A.*  Yes.

11   *Q.*  And who to?

12   *A.*  The first one at 9:46 a.m. Eastern time is to Roger Austin,

13   Pilgrim's.  The second call at 9:59 a.m. Eastern time is to Ric

14   Blake, George's.

15   *Q.*  Did you review an e-mail from 10:25 a.m. that same day?

16   *A.*  Yes.

17   *Q.*  And could you review the portion of that e-mail that you

18   reviewed for accuracy?

19   *A.*  Could you repeat the question?

20   *Q.*  Yes.  Could you read the portion of that e-mail that you

21   reviewed?

22   *A.*  Yes.  It's an e-mail from Bruce MacKenzie, Koch to Joe

23   Grendys, Koch.  The e-mail reads in part, "We are 5th out of 6

24   incumbents at 2.08.  The 6th one doesn't have any wings -- my

25   guess Pilgrim's.  Bill is getting us pricing."

4052

Rachel Evans - Direct

1   *Q.*  Did you review a phone record containing a call from

2   Defendant Bill Kantola that same afternoon -- or morning, I

3   apologize.

4   *A.*  Yes.

5   *Q.*  All right.  And who was that to?

6   *A.*  It was to Scott Brady, Claxton.

7   *Q.*  All right.

8          *MR. FAGG:*  Your Honor, may we be heard on said bar?

9          *THE COURT:*  Yes, you may.

10       (At the bench:)

11         *THE COURT:*  Mr. Fagg, go ahead.

12         *MR. FAGG:*  Your Honor, we object to the witness simply

13   reading all of these e-mails into the record.  As she is

14   reading them, she is giving the appearance to the jury it's

15   some sort of endorsement that what they say is true and we

16   don't think it's appropriate for this summary witness to be

17   doing.

18         *THE COURT:*  Ms. Call, response?

19         *MS. CALL:*  Your Honor, Ms. Evans is simply reading

20   portions of documents.  I have not heard her giving any

21   inflection.  And as to the truth, I believe all she stated is

22   she confirmed that the words in those e-mails are accurate, so

23   I don't believe there is any sort of vouching, for lack of a

24   better word, she is giving to words in the documents.

25         *THE COURT:*  I am going to sustain the objection.

Rachel Evans - Direct

1   There is no reason that she needs to read things.  She simply

2   is vouching for the accuracy of the entirety of it, so by

3   bringing out particular portions of it and in particular have

4   her read it goes beyond really what her purpose of being called

5   is, beyond what her duties were.  She is not necessarily --

6   it's just inappropriate for this particular witness with no

7   knowledge other than having confirmed things.  So I will

8   sustain that.

9        MS. CALL:  Would Your Honor find it appropriate for

10  her to just identify that there was an e-mail at that time and

11  then she did review phone records following a given e-mail?

12       THE COURT:  Well, once again, given the fact that she

13  has testified and has checked the entirety of the exhibit, to

14  highlight particular things unless there was some --

15  particularly, you know, for instance, with an earlier exhibit

16  she testified about how she filled in time zone information,

17  that type of thing, that's perfectly appropriate and there is

18  no problem with that.  But to pick out an otherwise ordinary

19  looking line and then have her testify about that particular

20  line, it's emphasizing it to the jury and that's not her

21  particular role and that's not what her assignment was.

22       MS. CALL:  Yes, Your Honor.  And, of course, it's a

23  little more unusual here that we will not be offering these

24  exhibits into evidence until the defendants have an opportunity

25  to cross-examine Ms. Evans, but I would like the jury to have

Rachel Evans - Direct

1    the ability to view these summaries.  Would it be appropriate

2    to have them do that now and, you know, have Ms. Evans sit

3    there while they review them or should we wait until after

4    cross-examination for that?

5        THE COURT:  Well, I think they are being displayed to

6    the jury right now and that can take place now.  Once again, I

7    wouldn't want you to dwell on it, but -- and I wouldn't want to

8    take too much time because there will be cross-examination, but

9    just to reiterate, she can be asked about relevant aspects of

10   them, but not ordinary entries just for what would appear to be

11   the sake of calling it to the jury's attention.

12       MR. TUBACH:  Your Honor, Michael Tubach.  I think if

13   we are going to display all of these charts to the jury now,

14   this is probably 40 pages of documents, multiple entries, this

15   is going to take hours to do.  I don't know if that's what the

16   government is intending to do, but I think that is not an

17   appropriate use of this chart.

18       THE COURT:  Maybe you can display pages you want to

19   call her attention to because she needs to explain something.

20   After cross-examination maybe once they have been admitted, it

21   may be an appropriate time to let the jury view them, all

22   right?

23       MS. CALL:  All right.  Thank you, Your Honor.

24     (In open court:)

25       THE COURT:  Go ahead, Ms. Call.

Rachel Evans - Direct

 1   *BY MS. CALL:*

 2   *Q.*  All right, Ms. Evans.  Ms. Evans, can you please turn to

 3   Exhibit 1-1?

 4           *MS. CALL:*  Can we please display that for

 5   demonstrative purposes at this time?

 6           *THE COURT:*  You may.

 7           *MS. CALL:*  And if we could zoom from the top left to

 8   the lower right, please.

 9   *BY MS. CALL:*

10   *Q.*  Ms. Evans I see on the electronic version there is no date

11   on the upper left-hand side.  How recently did you most

12   recently identify an error in one of these charts?

13   *A.*  At lunchtime.

14   *Q.*  Lunchtime?

15   *A.*  Lunchtime.

16   *Q.*  Was that today?

17   *A.*  Yes.

18   *Q.*  And did you fix that error?

19   *A.*  Yes.

20   *Q.*  Is it in that hard copy in front of you?

21   *A.*  It is.

22   *Q.*  What is the date of those communications?

23   *A.*  The date is May 31st, 2013.

24   *Q.*  Thank you, Ms. Evans.  And without stating what's in any of

25   the bracketed portion, when I've asked you about excerpts in

4056
Rachel Evans - Direct

1    confirming the accuracy and the information, is that limited to

2    the material not contained in the bracketed portions of these

3    charts?

4    A.  Yes.

5    Q.  So those bracketed portions, they are not in the documents,

6    correct?

7    A.  Right.

8         MS. CALL:  Could we please turn to Exhibit 2-1 and

9    display that for demonstrative purposes?

10        THE COURT:  You may.

11        MS. CALL:  If we could zoom from the top left to the

12   lower right again.

13   BY MS. CALL:

14   Q.  On the right-hand side here, Ms. Evans, I see there is one

15   exhibit cited for three rows.  Could you please describe what

16   that signifies?

17   A.  Yes.  This means that all three e-mails are -- they are

18   part of the chain and so they can be found in the same exhibit

19   which is Exhibit 224.

20   Q.  All right.  And I see different participants in the

21   different items here.  Is that -- why is that?

22   A.  Could you repeat the question?

23   Q.  Of course.  So I see a 1035 e-mail from Mike Hannigan to

24   Carl Pepper and Defendant Mulrenin, but above that an e-mail

25   just from Sara Knust to Mike Hannigan.  Why would that be?

4057

Rachel Evans - Direct

1    Well, perhaps would it assist you in looking at the underlying

2    document?

3    A.  It would.

4           MS. CALL:  Could we please pull up Government

5    Exhibit 224?

6           Permission to publish, Your Honor?

7           THE COURT:  You may.

8           MS. CALL:  I don't know if we will zoom all that much,

9    but if we could go from the From and To on the top left and to

10   the bottom of the second e-mail.

11   BY MS. CALL:

12   Q.  So in this e-mail chain, Ms. Evans, are there different

13   participants in certain of the e-mails?

14   A.  Yes.

15          MS. PREWITT:  Objection, Your Honor.  Actually, the

16   witness never said she needed to see the document.  Ms. Call

17   actually offered it and now she is trying to testify from the

18   document.

19          THE COURT:  Overruled.

20   BY MS. CALL:

21   Q.  Thank you, Ms. Evans.

22          MS. CALL:  And we can take down Exhibit 224?

23   BY MS. CALL:

24   Q.  Can you please turn to Exhibit 3-1?

25          MS. CALL:  Permission to publish for demonstrative

Rachel Evans - Direct

1    purposes?

2            *THE COURT:*  You may.

3            *MS. CALL:*  Can we please zoom in on the content of

4    that exhibit?

5    *BY MS. CALL:*

6    *Q.*  Ms. Evans, I see there is no time listed on one of the

7    lines in here.  Why in your verification process did you not

8    include a time?

9    *A.*  Because -- oh, because the entry here is a press release

10   document and there was no time listed on it, but there was a

11   date.

12   *Q.*  Thank you, Ms. Evans.

13           Can you please turn to Exhibit 7-1 in your binder?

14           *MS. CALL:*  And if we could display that for

15   demonstrative purposes.

16           *THE COURT:*  You may.

17           *MS. CALL:*  Could we please zoom in on the table

18   portion of the document?

19   *BY MS. CALL:*

20   *Q.*  Ms. Evans, I see there is no recipient listed in that top

21   line.  Do you recall why that is?

22   *A.*  It's because there wasn't one.

23   *Q.*  And is this an e-mail?

24   *A.*  It is.

25   *Q.*  Based on your experience with e-mails, why do you believe

4059

Rachel Evans - Direct

1   there were no recipients on that e-mail?

2   *A.*   There is ways where you can, you know, bcc someone or make

3   it so the recipient isn't listed.

4   *Q.*   All right.  So on your understanding of that process, do

5   you believe that e-mail actually went to people?

6        *MS. PREWITT:*   Objection, Your Honor.  I don't know

7   that this witness is qualified to testify on that subject.

8        *THE COURT:*   Sustained.

9   *BY MS. CALL:*

10  *Q.*   All right, Ms. Evans.  Could you turn to Exhibit 10-1?

11       *MS. CALL:*   I believe it's already up, Your Honor, but

12  permission to publish 10-1 for demonstrative purposes.

13       *THE COURT:*   Yes, you may.

14  *BY MS. CALL:*

15  *Q.*   And just so I make sure I ask the question correctly the

16  first time, have you reviewed all of these summaries from 1-1

17  to 20-1 for accuracy?

18       *MS. PREWITT:*   Objection, Your Honor, asked and

19  answered.

20       *THE COURT:*   Overruled.

21  *BY MS. CALL:*

22  *Q.*   I suppose that answers my question, but you can answer the

23  question.

24  *A.*   Yes, I have.

25  *Q.*   And if you could please turn to Page 3, and if we could

Rachel Evans - Direct

1   turn to Page 3 of this exhibit on the display as well.

2          I see that there is a line marked 6:01 p.m.  Did you

3   review that?

4   A.  Yes.

5   Q.  Did you review the underlying document?

6   A.  Yes.

7          MS. CALL:  Could we please show at this time for the

8   parties and the Court and the witness Exhibit 1035.

9          MS. PREWITT:  Objection, Your Honor.  The question was

10  posed without the witness requesting a need to look at the

11  document.

12         THE COURT:  Overruled.

13  BY MS. CALL:

14  Q.  Ms. Evans, did you review this document?

15  A.  Yes, I did.

16  Q.  Was there an attachment?

17  A.  Yes.

18  Q.  Did you review that?

19  A.  I did.

20         MS. CALL:  Can we please pull up 1036, the native

21  file?  I believe it should be an Excel spreadsheet in the

22  native form.  Thank you.

23  BY MS. CALL:

24  Q.  And Ms. Evans, did you review this document?

25  A.  Yes, I did.

4061

Rachel Evans - Direct

1    Q.  Did you review it in its native form?

2    A.  Yes.

3    Q.  And in reviewing this document, did you identify any

4    additional information in this spreadsheet?

5    A.  I did.

6    Q.  And where was that information?

7    A.  It's in Columns L and M.

8         MS. CALL:  And I don't believe we can see Column L and

9    M currently.  One moment.

10        Permission to publish 1036, Your Honor.

11        THE COURT:  You may.

12        COURT DEPUTY CLERK:  Your Honor, it's not admitted.

13        THE COURT:  I don't think 1036 has been admitted, but

14   1036-1 has.

15        MS. CALL:  All right.  May I offer 1036 at this time?

16        THE COURT:  That's the native version.  Any objections

17   to the admission of Exhibit 1036 in native version?

18        MR. TUBACH:  Your Honor, we had extended discussions

19   about this previously.  I won't repeat the objections.

20        THE COURT:  I don't remember that.

21        MR. TUBACH:  I think it was a long time ago.

22        Perhaps have a brief side bar?

23        THE COURT:  Yes, let's do.

24      (At the bench:)

25        THE COURT:  Go ahead, Mr. Tubach.

4062
Rachel Evans - Direct

1          MR. TUBACH:  Your Honor, we would object to the

2     admission of the native version because there was no evidence

3     that these hidden columns the government is going to now

4     display were visible to Mr. Penn and when he would have

5     received or opened the spreadsheet, if he even did that.  And

6     so we've had a long colloquy about this maybe 10 days or more

7     ago and it's not clear to me this witness is going to be

8     qualified to answer any questions about how the document would

9     have been received, how Mr. Penn would have looked at it, if at

10    all, and whether anyone ever looked at the hidden columns that

11    are about to be displayed in Columns L and M.

12         THE COURT:  But Ms. Call, in 1036-1, isn't that

13    information displayed?

14         MS. CALL:  Your Honor, in 1036-1 the hidden columns

15    are not shown.  In 1036-2 they are.  And if I recall the

16    discussion correctly previously, I believe Mr. Tubach had

17    objected to the introduction of the native of 1036 without a

18    sponsoring witness and the government had agreed to offer it

19    into admission with a sponsoring witness that would be able to

20    testify to the process of unhiding columns.  And I believe it's

21    clear that in the form she viewed it originally that those

22    columns were not hidden -- sorry, were hidden, I apologize.

23         THE COURT:  But in any event, she is summarizing the

24    information listed in the two exhibits on the summary, so why

25    would she be testifying about a native version containing other

4063

Rachel Evans - Direct

1    information?

2         *MS. CALL:*  She is testifying to her review of those

3    documents to confirm that they contain the information listed

4    in 10-1.

5         *THE COURT:*  Right.  But the two exhibits, all of which

6    must be admitted, are 1035 and 1036-1, so why would her review

7    of hidden columns that aren't reflected on either of those

8    exhibits be relevant to her testimony?

9         *MR. TUBACH:*  And 1036, which is what we are looking at

10   in native format, is not one of the exhibits listed in the

11   chart.  I believe that's what the Court may have said unless I

12   misheard.

13        *THE COURT:*  Yeah, that's my point.  So her reviewing a

14   non-listed exhibit in reference to the summary chart seems to

15   be outside of the scope of the summary chart.

16        *MS. CALL:*  All right, Your Honor.  We would seek for

17   her to testify to her review of the Excel spreadsheet as well.

18        *THE COURT:*  Well, that's not admitted and the

19   defendants haven't had any notice.  We spent a lot of time on

20   the summaries, but she is only testifying about documents that

21   are listed as the underlying exhibits, so she can't testify

22   about looking at other sources that aren't listed on the

23   summaries in order to confirm the accuracy of what's listed.

24        *MS. CALL:*  Respectfully, Your Honor, we did disclose

25   to the defendants days ago that Ms. Evans would be testifying

Rachel Evans - Direct

1    to these documents and we did provide the No. 1036.  She has

2    testified that a part of her job is reviewing documents.  And I

3    believe this is a fairly simple question just asking her about

4    these hidden columns and something that paralegals do quite

5    frequently and review and find in documents.

6         THE COURT:  Once again, the summary is a summary of

7    the listed exhibits.  1036 is not listed, and therefore any

8    discussion about the native version of 1036 is beyond the scope

9    of this particular summary and therefore she can't be asked

10   about that.

11        MS. CALL:  Your Honor, can she be asked about this

12   after we get beyond the summaries?

13        MR. TUBACH:  The purpose of this witness was to

14   provide the basis of the admissibility of these charts.  That's

15   what we spent an ungodly amount of time going over outside the

16   presence of the jury.  Now what they are trying to do is

17   something entirely different which is not at all what we are

18   prepared for.

19        THE COURT:  I don't know, but the discussion -- I

20   would assume that Ms. Evans' purpose in terms of her being

21   called to testify is to testify about the summary charts.

22        MS. CALL:  Yes, Your Honor, that's certainly one

23   purpose of her testimony.  But the government had requested to

24   put in this document through a witness.  We said we would later

25   in trial and then we notified defendants that we intended to

Rachel Evans - Direct

1   review this documents with Ms. Evans, so I don't see how this

2   is something they didn't have an opportunity to prepare for.

3   And I haven't heard how it's not something that a paralegal

4   could testify to.

5        THE COURT:  Well, I don't know.  All I know is that in

6   terms of this particular exhibit which she is testifying about

7   now on the summaries, it's not an appropriate question.

8   Whether or not she -- the defendants knew that she was going to

9   be testifying about other subjects or other documents, I really

10  don't know.

11       MR. TUBACH:  I don't believe we have ever been

12  provided notice Ms. Evans was going to be testifying about any

13  1036 chart.  I can correct that, but in any event, she is here

14  to testify about the charts now and we don't need to take up

15  more time with this at this point.

16       THE COURT:  Maybe someone on your team can take a look

17  at the previous discussion and there would be something on the

18  record on that point, but I think we need to move ahead on the

19  summary exhibits right now.

20       MS. CALL:  Yes, we will move on.  And Mr. Tubach --

21  well, to the Court if the defendants were looking for that

22  notice, it was in an e-mail last week regarding the documents

23  we would be covering with Ms. Evans.

24      (In open court:)

25       THE COURT:  Go ahead, Ms. Call.

Rachel Evans - Direct

1           *MS. CALL:*  Thank you, Your Honor.

2           *MS. CALL:*  If we could pull up 10-1 once again for

3      demonstrative purposes.

4           *THE COURT:*  You may.

5           *MS. CALL:*  If you could please go to the third page.

6      *BY MS. CALL:*

7      *Q.*  Now, Ms. Evans, I see this top e-mail here is listed as

8      6:01 p.m. Eastern; is that correct?

9      *A.*  Yes.

10     *Q.*  All right.  And did you review the underlying e-mail to

11     confirm that time?

12     *A.*  I did.

13     *Q.*  Was the time listed on that e-mail 6:01 p.m. Eastern?

14     *A.*  I would need to see the e-mail to know if it was listed as

15     Eastern or I converted it.  I don't remember.

16          *MS. CALL:*  Could we pull up 1035 for the witness?

17     *BY MS. CALL:*

18     *Q.*  Ms. Evans, what is the time listed on that document?

19     *A.*  The time here is 10:01 p.m.

20     *Q.*  Does it list the time zone?

21     *A.*  No.

22     *Q.*  Did you have a basis for understanding what time zone that

23     e-mail was in?

24     *A.*  Yes, I did.

25     *Q.*  What is that?

4067

Rachel Evans - Direct

1  A.  I reviewed a memo between DOJ staff and Pilgrim's

2  counsel --

3       MS. PREWITT:  Objection, Your Honor.  It sounds like

4  she is relaying the contents contained in the e-mail.

5       THE COURT:  Sustained.

6  BY MS. CALL:

7  Q.  What was your understanding as to what time zone this

8  e-mail was in?

9  A.  UTC.

10  Q.  And so then how did you convert it to 6:01 Eastern?

11  A.  I subtracted 4 hours, 10 minus 4 to get 6, yeah.

12  Q.  Thank you.  So for other -- I believe you testified earlier

13  to standardizing time zones.  Did you apply a similar process

14  for other documents?

15  A.  Yes, I did.

16       MS. CALL:  The Court's indulgence one moment.

17       THE COURT:  Sure.  Ms. Call, you had referenced

18  Exhibit 1036-1.  That has not been admitted either.

19       MS. CALL:  Thank you, Your Honor.  The government

20  would move to admit 1035 and 1036-1.

21       THE COURT:  All right.  Ladies and gentlemen, both of

22  those exhibits have been admitted.

23       MS. CALL:  Can we go to 7-1?

24       THE COURT:  You may, for demonstrative purposes.

25       MS. CALL:  Thank you.  May we publish that for

4068

Rachel Evans - Direct

1    demonstrative purposes?

2              THE COURT:  Yes.

3              MS. CALL:  Can we turn to the second page?  If we

4    could zoom in on the content there.

5    BY MS. CALL:

6    Q.  Ms. Evans, there is some entries here listed in Eastern and

7    some not.  In the course of your review, did you take steps to

8    confirm the order that the items on this page are listed in?

9    A.  Yes.

10   Q.  And what did you do?

11   A.  I looked at the underlying exhibits.

12   Q.  All right.  And the text messages, did they have a time

13   zone?

14   A.  No.

15   Q.  All right.  So how did you determine what order to put

16   these text messages in with respect to the calls that you have

17   listed in Eastern time?

18   A.  I looked at the underlying exhibits and the context of the

19   substance in the excerpt.

20   Q.  Okay.  Could you explain that a little further?

21   A.  Yes.  So for the entry that's listed as 1:48 p.m., the

22   excerpt reads, "You with your customers"--

23             MS. PREWITT:  Objection, Your Honor.

24             THE COURT:  Sustained.

25   BY MS. CALL:

Rachel Evans - Direct

1    Q.  Did anything about the content of the text message lead to

2    your determination as to the time frame with respect to the

3    documents surrounding it in this chart?

4    A.  Yes.  It led me to believe that these text messages

5    occurred after the phone call listed as 9:48 a.m. Eastern time.

6    Q.  Okay.  And did you identify whether that call was answered

7    or could you from the underlying document?

8    A.  Yes, based on the amount of time that the call was for.

9    Q.  And so what was your belief after reviewing that phone

10   record?

11   A.  My belief was that it was not answered.

12   Q.  All right.  Can we turn to Exhibit 14-3?

13          MS. CALL:  Permission to publish 14-3 for

14   demonstrative purposes?

15          THE COURT:  Yes.

16          MS. CALL:  If we could zoom in on the content of that

17   page.

18   BY MS. CALL:

19   Q.  Ms. Evans, could you explain -- I see this entry at

20   2:21 p.m.  Is everything listed in the excerpt portion a

21   quotation from that document?

22   A.  Could you repeat the question?

23   Q.  Yes.  So in the excerpt cell of the row marked 221, is this

24   all a direct quote or not?

25   A.  Yes, it is.

4070

Rachel Evans - Direct

1    Q.  I suppose my question a little more clearly would be I see

2    it says "e-mail subject:"  Is that a quote from the document?

3    A.  Yes.

4    Q.  Does the document say e-mail in it?

5    A.  No.

6    Q.  Okay.  So could you explain that a little bit just your

7    process in reviewing and how it's articulated here?

8    A.  Okay.  So where it says "e-mail:" that's explaining where

9    the body of the e-mail substance is beginning.

10   Q.  All right.  So where it says "e-mail subject," what's

11   listed after that?  Is that the subject of the e-mail?

12   A.  In quotations there, yes.

13   Q.  And how about the line that says "Attachment reads in

14   part," what does that signify?

15   A.  That signifies an excerpt from the attachment.

16   Q.  And I see two documents cited on the right-hand side.  Is

17   one of those the attachment?

18   A.  Yes.

19          MS. CALL:  All right, Ms. Evans.  One moment.  The

20   Court's indulgence one moment to confer?

21          MS. PREWITT:  Is Ms. Call done with the document?

22   Thank you.

23          MS. CALL:  You can take it down.  Thank you.

24          May I confer?

25          You may have stated it earlier.  Is Exhibit 1035

Rachel Evans - Cross

1    already admitted?

2            *THE COURT:*  Yes, it is.

3            *MS. CALL:*  Thank you.  No further questions,

4    Ms. Evans.

5            *THE COURT:*  All right.  Thank you.

6            Cross-examination?

7            Ms. Prewitt, go ahead.

8                    **CROSS-EXAMINATION**

9    *BY MS. PREWITT:*

10   *Q.*  Hello, Ms. Evans.

11   *A.*  Hello.

12   *Q.*  My name is Elizabeth Prewitt and I represent Timothy

13   Mulrenin, okay?  I would like to ask you some questions about

14   your work at the antitrust division and also your work working

15   on these summaries, okay?  Now, if I speak too quickly or if

16   you don't understand a question I asked, stop me.  I will try

17   to rephrase it if you need that.  And if I can't remember the

18   question I asked you, we have Ms. Coppock here who can read

19   back the transcript, okay?

20   *A.*  Okay.

21   *Q.*  Just let me know, all right?

22   *A.*  Okay.

23   *Q.*  Now, you in response to Ms. Call's questions mentioned that

24   you have been a paralegal for a year and a half.

25   *A.*  Yes.

4072

Rachel Evans - Cross

1    Q.   So you're pretty new to the job, right?

2    A.   I guess it depends.

3    Q.   Compared to your colleagues you work with in San Francisco,

4    you are fairly new to the job, right?

5    A.   You could say that, yes.

6    Q.   And you go to them for direction and supervision, correct?

7    A.   Yes.

8    Q.   And you are not a supervising paralegal, are you?

9    A.   No.

10   Q.   Thank you.  And you testified earlier that you have been

11   working on these summaries for about two weeks?

12   A.   Yes.

13   Q.   And you spent about a hundred hours working on those charts

14   over the last two weeks.

15   A.   Over a hundred, actually, yes.

16   Q.   So it's been a busy couple of weeks for you; fair to say?

17   A.   Yes.

18   Q.   Now, when you -- so you first started working with the

19   prosecution team two weeks ago working on these charts and

20   reviewing them for accuracy; is that right?

21   A.   Yes.

22   Q.   And when you started working, you were -- on this project,

23   you were handed a completed set of these charts, as least as

24   far as you are aware, filled out, populated, a complete set of

25   these charts, correct?

Rachel Evans - Cross

1   A.   Yeah, it was a draft.

2   Q.   But the information had been filled in in these charts.

3   Some of the content changed later, but the information was

4   filled in from what you could observe, correct?

5   A.   Yes.

6   Q.   Now, over time you were asked to make changes to this

7   chart, correct, or these charts let's call them.  There are a

8   number of them, right?

9   A.   Yes.

10  Q.   And you were asked to add things, correct?

11  A.   Uh-huh, yes.

12  Q.   And verify things.

13  A.   That's right.

14  Q.   Now, how many times did that happen where you were asked to

15  take a particular chart and make changes to it over the last

16  couple of weeks?

17  A.   Multiple times.

18  Q.   Probably a lot.  A hundred plus hours, that's a lot of time

19  on these charts, correct?

20  A.   Yes.

21  Q.   Now, you didn't actually come up with the idea for these

22  charts, right, because you received them already fully filled

23  out when you started working on this two weeks ago; isn't that

24  right?

25  A.   That's right.

4074

Rachel Evans - Cross

1    Q.  And you didn't decide what categories of information should

2    go on these charts, did you?

3    A.  Right.

4    Q.  And you didn't decide what information should go in these

5    charts, correct?

6    A.  Yes.

7    Q.  And you testified that there were exhibits that were

8    referenced on the chart, correct?

9    A.  Yes.

10   Q.  And those exhibits were selected by other people.  You

11   didn't select those; isn't that right?

12   A.  Yes.

13   Q.  Now, so in effect you didn't actually prepare these charts,

14   did you?

15   A.  I would say that I was part of the process in preparing.

16   Q.  Fair enough.  You were a part of the process.  So you added

17   some information to them, right?

18   A.  Yes.

19   Q.  And you took some information away.

20   A.  Yes.

21   Q.  And you checked the accuracy, checked the entries on the

22   chart to underlying documents, correct?

23   A.  Right.

24   Q.  But isn't it a fact that you did all of that at the

25   instruction of the prosecutors in this case?

Rachel Evans - Cross

1        *MS. CALL:*  Objection, calls for hearsay.

2        *MS. PREWITT:*  Your Honor --

3        *THE COURT:*  I will allow it.  I would caution the

4   witness that she shouldn't reveal the contents of anything that

5   could be construed as some type of attorney work product, but

6   that question can be answered.

7        Go ahead.

8   *BY MS. PREWITT:*

9   *Q.*  So it was the trial attorneys in this case who actually

10  prepared these charts and handed them to you to check for

11  accuracy, correct?

12  *A.*  Yes.

13  *Q.*  And that's really what you did.  You went through the

14  charts and you checked off to make sure the information was

15  accurate based on the information the prosecutors had provided

16  you, correct?

17  *A.*  That's right.

18  *Q.*  Okay.  Now, in fact, you testified on direct examination

19  when Ms. Call was posing questions to you about fixing errors.

20  Do you recall that?

21  *A.*  Yes.

22  *Q.*  And it would be fair to say that every error you fixed you

23  checked with the prosecutors on this case, the trial attorney,

24  to make sure that was okay for you to change, correct?

25  *A.*  Yes.

Rachel Evans - Cross

1    Q.  Now, in terms of even standardizing time zones, you talked

2    about that earlier.  But before you made that decision to do

3    that, you did so at the instruction of the attorneys on this

4    case; isn't that right?

5    A.  That's right.

6    Q.  Now, and some of those attorneys are, in fact, sitting at

7    this table.

8    A.  Yes.

9    Q.  Maybe some not at the table, but you see some here today.

10   A.  Yes.

11   Q.  So who was your primary contact for actually making the

12   changes on this chart?

13            MS. CALL:  Objection, relevance.

14            THE COURT:  Sustained.

15   BY MS. PREWITT:

16   Q.  But it was one of the trial attorneys.

17   A.  Yes.

18   Q.  Thank you.  Now, you work out of the San Francisco office

19   of the antitrust division, don't you?

20   A.  Yes, I do.

21   Q.  And to your knowledge, do any of the trial attorneys or

22   case agents work in the state of California?

23   A.  Not to my knowledge.

24   Q.  So as far as you know, you're the only person on the case

25   team working out of California.

Rachel Evans - Cross

1              MS. CALL:  Objection, relevance.

2              THE COURT:  Relevance?

3              MS. PREWITT:  Only a few more questions, Your Honor,

4    on this line of questioning.

5              THE COURT:  Sustained.

6              MS. CALL:  Objection foundation.

7              THE COURT:  I am going to sustain the objection.

8    BY MS. PREWITT:

9    Q.  You don't report -- who do you report to in your office?

10   A.  My supervisor is Steven Taylor.

11   Q.  And you have a chief in that office, correct?

12   A.  Yes.

13   Q.  But you don't report to any of the trial attorneys on this

14   team in terms of your chain of command that you report to in

15   California, correct?

16   A.  Right.

17   Q.  Now, so you testified earlier that you have a year and a

18   half experience as a paralegal.  You have been working for two

19   weeks on this matter.  And you work in a different state from

20   the rest of the prosecution team.  How did it come that you

21   became tasked with this job of verifying these charts?

22             MS. CALL:  Objection, deliberative process.

23             THE COURT:  Sustained.

24   BY MS. PREWITT:

25   Q.  Now, you were aware that there are case agents who have

Rachel Evans - Cross

1   been working on this case for years; isn't that right?

2   A.   Yes.

3   Q.   And, in fact, one of them had been working on these charts

4   previously verifying their accuracy; isn't that right?

5   A.   I -- I think so, yeah, yes.

6          MS. CALL:   Objection, relevancy.

7          THE COURT:   Overruled.

8   BY MS. PREWITT:

9   Q.   And you took over responsibility for checking the charts

10   from the case agent.

11   A.   Yes.

12   Q.   Now, to your knowledge, I mean, you spent a little time

13   working with the prosecution team here, correct?

14   A.   Yes.

15   Q.   Two weeks?

16   A.   Yes.

17   Q.   And you know there were a lot of interviews conducted in

18   this case, right?

19   A.   I believe so.

20   Q.   Hundreds.

21   A.   I don't know the number, but yeah.

22   Q.   Fair enough.   So how many interviews have you participated

23   in?

24   A.   None.

25   Q.   And that would normally be one of the functions that you

Rachel Evans - Cross

1    perform as a paralegal, correct?

2    *A.*   Right.

3    *Q.*   Sitting in interviews, taking notes, correct?

4    *A.*   Yes.

5    *Q.*   And without referring to any of the summary charts that you

6    were checking the accuracy of, do you know which individuals

7    listed on the charts are associated with a customer versus a

8    supplier?

9    *A.*   Like -- sorry, could you just rephrase the question?

10   *Q.*   Sorry.  You spent a lot of time working on these charts,

11   right?

12   *A.*   Yes.

13   *Q.*   But without referring to them, do you think you could

14   identify if I asked you questions about which individual is

15   associated with a supplier versus which individual is

16   associated with a customer?  Do you think you could put them in

17   the appropriate bucket?

18   *A.*   I would like to look at the summary chart to make sure I

19   get it right.

20   *Q.*   So you would need to look at the summary chart to do that.

21   *A.*   Yes.

22   *Q.*   Even when it comes to the 10 defendants in this case, you

23   spent a lot of time working on these charts, but could you

24   without looking at a document name their first and last name?

25   *A.*   Not everyone.

Rachel Evans - Cross

1    *Q.*   Now, I am going to ask you a little bit about the charts

2    themselves.  Now, you testified earlier about there are

3    different colors that are used, right, on the chart?

4    *A.*   Yes.

5    *Q.*   And Ms. Call asked you about a salmon color.  Do you recall

6    that?

7    *A.*   I do.

8    *Q.*   And when you were -- when you discussed this earlier with

9    the prosecutor, you identified this as light red; isn't that

10   right?

11          *MS. CALL:*  Objection, hearsay.

12          *THE COURT:*  Overruled.

13   *A.*   At one point I did.

14   *BY MS. PREWITT:*

15   *Q.*   Okay.  And just, you know, as a matter of sort of common

16   understanding, do you believe that colors have an association

17   to human beings in our culture?

18          *MS. CALL:*  Objection, foundation.

19          *THE COURT:*  Overruled.

20   *A.*   Yeah, yes.

21   *BY MS. PREWITT:*

22   *Q.*   What does red -- what association does red have for you?

23   *A.*   For me to could be like love or the holidays or --

24   *Q.*   Anything else?

25   *A.*   An error.

Rachel Evans - Cross

1   *Q.* Like a stop sign, for example?

2   *A.* That's red.

3   *Q.* Is that an association you would have with the color red?

4   *A.* Yes.

5   *Q.* Okay. And were you informed at all why certain colors were

6   chosen to be placed on these charts?

7   *A.* Yes.

8   *Q.* And were you told why the color light red would be placed

9   on the chart?

10   *A.* It wasn't -- it was to signify certain categories.

11   *Q.* What category?

12   *A.* Of phone calls between two individuals who work at two

13   different chicken suppliers.

14   *Q.* But you didn't pick out which color to put on the charts,

15   did you?

16   *A.* No.

17   *Q.* And that was picked out by the trial attorneys in this

18   case, right?

19   *A.* Yes.

20   *Q.* Now, the choices of the date ranges on these charts, right,

21   reflected along the top, the date selected, that was something

22   that was also chosen by the trial attorneys. You didn't choose

23   that on your own, did you?

24        *MS. CALL:* Objection, deliberative process.

25        *MS. PREWITT:* Your Honor, if I can be heard.

Rachel Evans - Cross

1              *THE COURT:*  Yes.

2              *MS. PREWITT:*  I think that really goes to one of the

3    core issues about this particular witness acting as a preparer

4    for these versus taking instructions from the prosecution team

5    and namely the trial attorneys on this case.  So I don't have

6    many more questions on that, but I do want to --

7              *THE COURT:*  I am going to sustain the objection.

8    It's irrelevant.  She testified that she was just trying to

9    confirm information.

10   *BY MS. PREWITT:*

11   *Q.*  All right.  Now, when -- you added excerpts of e-mails and

12   texts into the columns that were already in place, right?  Do

13   you recall that that you added some information in there?

14   *A.*  I did add some information.

15   *Q.*  Okay.  But the information you put in there, what you

16   selected to put in that particular column or cell was something

17   that you were told to do, correct?

18   *A.*  Yes.

19   *Q.*  That wasn't something you decided.

20   *A.*  Right.

21   *Q.*  And but for most of the charts, in fact, you weren't

22   filling in or taking out anything.  You were just verifying

23   that it was accurate, right, that what was already in the cell

24   was accurate in comparison to the exhibit, correct?

25   *A.*  Yes.

4083

Rachel Evans - Cross

1   Q.  And, in fact, you didn't read all the texts of all the

2   e-mails that were excerpted, did you?

3   A.  I am sorry, could you repeat that?

4   Q.  Sure.  Thank you.  I think that I was not particularly

5   clear with that question, so thank you for stopping me.

6           So when you were checking accuracy of a cell that

7   included an excerpt from an e-mail or text, in that

8   circumstance you didn't read thoroughly the entire e-mail

9   chain, did you?

10  A.  No.

11  Q.  Were just -- just so I am clear, you were just checking to

12  make sure that what was in that cell was right, correct?

13  A.  Right.

14  Q.  You weren't selecting what should go in or go out.

15  A.  Yes, correct.

16  Q.  Now, so your involvement in this case has been really

17  isolated to checking the accuracy of these charts before that

18  you testified about, correct?

19  A.  That's correct.

20  Q.  And you were -- why don't we move on to some of the charts,

21  okay?  And I will walk through those.  And I have -- I can pass

22  up to Ms. Grimm --

23          THE COURT:  Actually, we are past the time for a

24  break.  Ms. Prewitt looked at her watch and I lost track of the

25  time, ladies and gentlemen.  Why don't we go ahead and take our

Rachel Evans - Cross

1   mid-afternoon break.  Why don't we plan on 20 minutes and plan

2   on reconvening -- assuming Ms. Prewitt, this is a convenient

3   time.

4            MS. PREWITT:  This is a great time.

5            THE COURT:  Let's plan on reconvening 20 minutes to

6   4:00.  Keep the admonitions in mind.  The jury is excused.

7   Thank you.

8            (Jury excused.)

9            Thank you.  Ms. Evans, you are excused until after the

10  break, all right?  Thank you.

11           So have we talked about or do we have a game plan for

12  tomorrow?  Are we going to have the jury return at 8:30 and

13  then as we discussed previously go to noon and was there any

14  decision about Monday of next week?  There was some talk about

15  that, but I just wanted to see what the plan was.

16           MR. BELLER:  Your Honor, is the government planning on

17  resting at the conclusion of Ms. Evans testimony?  And I think

18  that may dictate what we do tomorrow and Monday.

19           THE COURT:  That's a good question.

20           Go ahead, Mr. Koenig.

21           MR. KOENIG:  Sure, that's the plan, although we would

22  want to move our exhibits, our summaries from demonstrative to

23  summary exhibits.

24           THE COURT:  Right, any miscellaneous exhibits that

25  haven't been, sure.

Rachel Evans - Cross

1             MR. BELLER:  If that's the case, Your Honor, having

2    consulted over the lunch hour, the suggestion of the defense

3    would be let's finish with Ms. Evans.  Our hope is we may be

4    able to finish Ms. Evans this afternoon, not recognizing or

5    not, I guess, considering how much cross-examination may exist.

6    I think at that point it probably makes sense to send defense

7    witnesses home.  There are defense witnesses that are here in

8    Denver ready to be called.  I think it is unlikely that we are

9    going to call them and finish them tomorrow.

10            And so the suggestion would also be that we are

11   willing to be very judicious in the use of our time to make

12   sure that we can finish well in advance of December 21st,

13   including the possibility of the government putting on a

14   rebuttal case which would allow us to be able to vacate this

15   coming Monday.  What is driving that primarily, Your Honor, is

16   that the defense would like to be able to spend some time with

17   family.  And given sort of the events of the day, it may make

18   sense for individuals to be able to quarantine as much as they

19   can and make sure that they are starting on December 6th

20   healthy and safe.

21            THE COURT:  Mr. Koenig or Ms. Call, reaction to that

22   proposal?

23            MR. KOENIG:  I think that's just fine.

24            THE COURT:  Okay.  And what I want to make sure is

25   that the defendants provided their witness lists and made a

4086

Rachel Evans - Cross

1    prediction about when they would be done and that seemed good.

2    I mean, I was happy to see that because it would appear that

3    the defendants would all rest and we would still have about

4    five days at least, I think, that would allow the government to

5    put on a rebuttal case if it chose, and then as I said before,

6    I don't know how long closings may last, but we need a block of

7    time, probably days to get the closings in.

8         So as long as the proposal that Mr. Beller just

9    articulated does not change that estimation, and in fact, I am

10   hopeful that he is taking that into account and compressing it

11   a little bit more because we wouldn't be doing anything

12   tomorrow and we wouldn't do anything on Monday, the odd week.

13   If that's the situation, then I am willing to do that.  I think

14   that it makes sense in some respects.

15        The jury would be -- I think the jury will be worried.

16   I think what I will need to inform the jury is that we are on

17   track and the loss of those days is not going to jeopardize

18   that.  And in fact, it's just a streamlining that's taking

19   place and we wanted to, because of the holidays coming up and

20   because of the odd just Monday of next week, wanted to have a

21   bigger block of time that they wouldn't need to come in, but we

22   are still on track to get things finished up.  So if that's the

23   case, I am agreeable to that.

24        *MR. BELLER:*  Your Honor, I do believe that's the case.

25   To the extent our time estimates are going to be compressed, we

Rachel Evans - Cross

1   will let the government know.  But based on an earlier

2   discussion, we do believe that we are going to be able to still

3   stay on track and perhaps even be just a little bit ahead of

4   the estimate that we provided.

5           Your Honor, I am also being informed that there may be

6   depending on timing one witness, defense witness, that may be

7   available to go on tomorrow.  And so we are not asking for any

8   additional time past noon, but just know we do have a backup

9   plan to make sure that we are making good use of our time.

10          THE COURT:  So let's assume that the government rests

11  today.  Would we then have the jury come back at 8:30 tomorrow?

12          MR. BELLER:  Your Honor, if we can talk about it

13  outside during the break if that's possible.

14          THE COURT:  That's fine.  And then let's discuss that

15  point because I think that's fine.  The jury is obviously by

16  definition local or at least from Colorado, so they are

17  certainly -- I am sure they are planning on that and we could

18  do that.  And I'll let you discuss over the break, which is

19  growing shorter for you by the moment, but we'll -- we can do

20  that then.

21          Mr. Feldberg?

22          MR. FELDBERG:  Your Honor, I just wanted to raise one

23  point.  When we thought the government was going to rest by

24  midday today, Your Honor asked that written Rule 29 motions be

25  submitted.

Rachel Evans - Cross

1        THE COURT:  I can tell what's coming, but it's not

2   unreasonable.  Go ahead, Mr. Feldberg.

3        MR. FELDBERG:  I was going to ask for a little bit of

4   grace.  We can make oral place holder motions at the conclusion

5   of the government's case, but I am wondering if we could get a

6   couple days of grace on filing the written motions.

7        THE COURT:  Yeah.  What would you propose, Thursday?

8   No.

9        MR. FELDBERG:  We would all love to, but I don't think

10  it would be fair to the Court.

11       THE COURT:  Mr. Tubach always kind of rushes up to

12  assist.

13       MR. TUBACH:  Especially if we are going to be getting

14  rid of the Monday, that would give the Court substantially more

15  time to review the Rule 29 before we start up.  If we could

16  have maybe like Friday?  Monday?  That wouldn't be too late?

17  It's going to be difficult to coordinate.

18       THE COURT:  Let's get the government's reaction to

19  that.

20       MR. KOENIG:  I think that's all right too.

21       THE COURT:  Then how much time did we -- had we talked

22  about the government having before we changed our -- before we

23  discussed the current change?

24       MS. CALL:  I think it depended on the length of what

25  was submitted.

Rachel Evans - Cross

1          *THE COURT:*  Okay.  So the fact that we have this block

2     of time away next week, I would suggest that the government

3     propose based upon what's filed on Monday, then suggest when

4     it's in a position to do so and the defendants can comment on

5     that, okay?  And we'll do it that way.

6          When the government rests, first of all, I will inform

7     the jury what that means, namely that the government has

8     concluded the evidentiary portion of its case in chief.  I will

9     then -- we will do a side bar.  I will let the defendants

10    articulate the place holder Rule 29 motions, but the motions

11    will be due on Monday.  And then as I just discussed, we'll

12    figure out when the government reasonably can respond to that,

13    okay?

14         Anything else that we should talk about before we

15    break?

16         Mr. Byrne, go ahead.

17         *MR. BYRNE:*  I think maybe at the conclusion of the

18    government's case, is that when it will be good to give the

19    jury instruction about Mr. Little?

20         *THE COURT:*  Or at the -- well, yeah, I could do it at

21    the end of the day today too if the government hasn't rested by

22    that time, but...

23         *MR. BYRNE:*  You can give it as many times as you want

24    as far as I'm concerned.

25         *THE COURT:*  But I do agree that it should be at least

Rachel Evans - Cross

1    as of the time the government rests.  So we will play it by

2    ear, but remind me of that, Mr. Byrne, just in case I forget,

3    but we will do that hopefully today.

4         MR. BELLER:  And for purposes of timing, how long does

5    the government estimate it's going to need to publish

6    documents?  And that may inform what we do tomorrow.

7         MS. CALL:  As far as the summaries, there is 19 of

8    them.  They differ in length from one page to three.  I think

9    on a reasonable reading a page takes about a minute and a half,

10   so doing that math maybe like 45 minutes.  My math may not be

11   as good as Mr. Tubach's, but that would be an approximation.

12        MR. BELLER:  Thank you.  That will give us an idea of

13   what to do tomorrow with defense witnesses depending on whether

14   we are able to finish today.

15        THE COURT:  Yeah, so we'll see how it plays out, but

16   the plan right now will be to have the jury come back at 8:30,

17   okay?  We will be in recess.  Thank you.

18        (Recess at 3:30 p.m.)

19        (Reconvened at 3:41 p.m.)

20        THE COURT:  Anything that we needed to share based on

21   some conferral over the break?

22        MR. BELLER:  Excuse me for interrupting you.  Your

23   Honor, if we can simply see where we today and then do a quick

24   2-minute side bar before we release the jury, I think that

25   makes sense.

4091
Rachel Evans - Cross

1          THE COURT:  That's fine.  Let's bring the jury back

2     in.  Oh, we need Mr. Byrne.  Here he is.  Okay.  You can get

3     the jury.

4          (Jury present.)

5          THE COURT:  All right.  Let's get Ms. Evans back.

6          If you don't mind resuming the witness stand.

7          Go ahead, Ms. Prewitt.

8     BY MS. PREWITT:

9     Q.  Hello, Ms. Evans.

10    A.  Hello.

11    Q.  I will apologize because I was admonished for speaking too

12    quickly.  I will try to slow down.

13         You talked before about agents involved in this

14    prosecution and the investigation generally, but your

15    instructions came from the trial attorneys in this case, isn't

16    that right, when it comes to preparing these charts?

17    A.  That's right.

18    Q.  Now, you pointed out earlier in response to Ms. Call's

19    question that there was one call entry that was for zero

20    minutes, right?  Do you recall that?  I think it might have

21    been on perhaps 17.1, if I have it correctly?

22    A.  7-1.

23    Q.  17-1?  So, well, suffice it to say you can't be a hundred

24    percent sure that what's in this -- on these charts are

25    accurate.  You have checked them, but you can't be a hundred

Rachel Evans - Cross

1    percent sure, can you?

2    A.   That would be -- it's hard to -- hard to be a hundred

3    percent.

4    Q.   Hard to be a hundred percent, right.  There could be

5    mistakes in it.

6    A.   There could be.

7    Q.   But you did your best to check and to make sure that they

8    are accurate based on the information that you had available,

9    correct?

10   A.   Yes.

11   Q.   But you didn't listen to any audio calls of telephone

12   conversations, did you?

13   A.   No, I did not.

14   Q.   You just took the information the trial attorneys gave you

15   and made sure that what they asked you to put on those charts

16   was accurately reflected on those charts, right?

17   A.   Yes.

18        MS. PREWITT:  Your Honor, I have no further questions

19   for this witness.  Thank you very much, Ms. Evans.

20        THE COURT:  Thank you, Ms. Prewitt.

21        Additional cross-examination?

22        MS. JOHNSON:  Yes, Your Honor.

23        THE COURT:  Go ahead, Ms. Johnson.

24                       **CROSS-EXAMINATION**

25   BY MS. JOHNSON:

Rachel Evans - Cross

1    *Q.*  Good afternoon, Ms. Evans.  My name is Wendy Johnson.

2    *A.*  Hi.

3    *Q.*  And I represent Ric Blake.  I am going to ask you just a

4    few questions about some of the summary charts that you went

5    over.  Is that okay?

6    *A.*  Yes.

7            *MS. JOHNSON:*  I would like to start with summary

8    Exhibit 14-3, if we could display that.

9            *THE COURT:*  Yes, once again for demonstrative

10   purposes.

11           *MS. JOHNSON:*  Thank you, Your Honor.

12   *BY MS. JOHNSON:*

13   *Q.*  And I believe you testified to the jury, Ms. Evans, that

14   you for this relevant time period for 14-3, you reviewed the

15   documents and the phone records and the texts, et cetera, to

16   ensure them for accuracy, right?

17   *A.*  Yes.

18   *Q.*  I would like you to look at Government Exhibit 28.

19           *MS. JOHNSON:*  Your Honor, it's been admitted, and I

20   would like to publish for the jury.

21           *THE COURT:*  Yes.  Is that referenced in 14-3?  Just

22   because it's not displayed now, I just wanted to check.

23           *MS. JOHNSON:*  Yes, Your Honor, it is.

24           *THE COURT:*  Yes, then you may publish it.

25   *BY MS. JOHNSON:*

Rachel Evans - Cross

1  Q.  Ms. Evans, is this -- do you recognize 1428 as one of the

2  phone records that you examined in order to place phone calls

3  into this chart and ensure their accuracy?

4  A.  Yes.

5  Q.  Can you look with me on the date 11/28 at 9:15?

6  A.  Yes.

7  Q.  Do you see a call involving 502-896-5884?

8  A.  I do.

9  Q.  Do you recognize that phone number as the phone number for

10  Mary Hester?

11         MS. CALL:  Objection, scope.

12         THE COURT:  Overruled.

13  A.  I would have to look at 90-10 just to see.  I'm not sure.

14         MS. JOHNSON:  Can we look at 9748, just the

15  stipulation, Your Honor?

16         THE COURT:  Yes.

17         MS. JOHNSON:  If we can pull up 9748, the second page

18  in the middle.

19  BY MS. JOHNSON:

20  Q.  Do you see the name Mary Hester?

21  A.  I do.

22  Q.  What's her number?

23  A.  50 --

24         MS. CALL:  Object to foundation as this witness to

25  testify about this phone number.

Rachel Evans - Cross

1           *THE COURT:*  Overruled.

2    *BY MS. JOHNSON:*

3    *Q.*  Is her No. 502-896-5884?

4    *A.*  Yes.

5    *Q.*  Now, if we could go back to 9748.  Do you know who Mary

6    Hester is?

7    *A.*  No.

8    *Q.*  Do you know her to work at RSCS?

9    *A.*  Sorry, could you repeat that?

10   *Q.*  Sure.  Do you know Ms. Hester to work at RSCS?

11   *A.*  Yes.

12   *Q.*  Thank you.

13   *A.*  Of course.

14   *Q.*  On 11/28 at 9:42 a.m. --

15          *MS. JOHNSON:*  I am sorry.  Can we go back to 9748?

16   *BY MS. JOHNSON:*

17   *Q.*  11/28, 9:42 a.m., do you see the same phone number?

18   *A.*  You said 9:42?

19   *Q.*  Yes, ma'am.

20   *A.*  Yes, at the bottom.

21   *Q.*  Do you see the same phone?

22   *A.*  I see -- 502-896-5884, yes.

23   *Q.*  One more time.  11/28 on this same exhibit at 2:48 p.m., do

24   you see the exact same number, the number we have just

25   determined belongs to Mary Hester?

Rachel Evans - Cross

 1   *A.*   You said 2:48?  Yes, 502-896-5884.

 2   *Q.*   Same number, right?

 3   *A.*   I think so.  5884.

 4          *MS. CALL:*  Object to scope and relevance.  May we have

 5   a side bar?

 6          *THE COURT:*  Yes.

 7      (At the bench:)

 8          *THE COURT:*  Ms. Call, go ahead.

 9          *MS. CALL:*  Your Honor, I don't see how this line of

10   questioning is in the scope of this witness' direct examination

11   regarding her checking these charts for accuracy.  Ms. Johnson

12   seems to be pointing her to different phone calls outside of

13   what this witness has reviewed and essentially trying to put on

14   the defense's version of the line of events here.  And I don't

15   see how that has anything to do with this witness' testimony

16   who wasn't involved in the investigation.

17          *THE COURT:*  All right.  Ms. Johnson, response?

18          *MS. JOHNSON:*  Yes, Your Honor.  Can you hear me?

19          *THE COURT:*  Yes.

20          *MS. JOHNSON:*  This witness is testifying as a summary

21   witness for charts that the government is trying to send back

22   with the jury.  She testified she knew the names of the people

23   involved in the investigation or involved in the case.  She

24   testified to these specific days and times and the accuracy of

25   certain calls that took place on that date.  It's fair to

4097

Rachel Evans - Cross

1   assume that she examined those dates and times and the relevant

2   documents.  We are simply asking if there are other calls

3   during that date and time.  And we do intend to show a

4   demonstrative that would add those calls to this chart because

5   they are relevant, Your Honor.  This witness testified that she

6   examined all these documents and these dates relevant for these

7   calls.

8        THE COURT:  Yeah, the objection is going to be

9   sustained.  She is only testifying about the information that's

10  on the chart, not information that should have been added to

11  the chart.  She could be asked about inaccuracies in the chart,

12  but in terms of whether she reviewed documents -- other

13  documents or other phone records and should have added

14  information to the chart, that's outside of the scope of this

15  particular witness.

16       MS. JOHNSON:  Thank you.

17     (In open court:)

18       MS. JOHNSON:  Can we pull up summary Exhibit 10-1?

19  BY MS. JOHNSON:

20  Q.  Do you see a call --

21       THE COURT:  That can be displayed for demonstrative

22  purposes.

23  BY MS. JOHNSON:

24  Q.  Do you see a call on 8/18 at 1:52?

25  A.  Yes, I do.

Rachel Evans - Cross

1    Q.  And who was the call to?

2    A.  To George's.

3    Q.  Are you aware that that's the 1-800 number of George's?

4    A.  The main line?

5    Q.  Yes.

6    A.  Yes.

7    Q.  When you were checking your chart for accuracy, did you

8    check to see and confirm if Mr. Blake was at work on the date

9    of this call?

10   A.  No, I did not.

11   Q.  Of all the summary charts that you examined for accuracy, I

12   believe there were 14 calls involving Mr. Blake, one of which

13   was the George's 1-800 number.  Is there even one single call

14   that you know exactly what was said during that call?

15   A.  No.

16   Q.  And of all the documents you reviewed for accuracy during

17   the summaries that you've reviewed, is there any documents that

18   suggest Mr. Blake was receiving bidding information?

19           MS. CALL:  Objecting, relevance.

20           THE COURT:  Sustained.

21           MS. JOHNSON:  Thank you, Your Honor.  That's all.

22           THE COURT:  Thank you, Ms. Johnson.

23           Additional cross-examination?

24           Ms. Carwile, go ahead.

25                           **CROSS-EXAMINATION**

Rachel Evans - Cross

1   *BY MS. CARWILE:*

2   *Q.*   Good afternoon, Ms. Evans.  It feels like evening.  I just

3   have a few -- my name is Laura Carwile.  I represent Roger

4   Austin.  And I just have a few questions about the charts.

5              Before I get into those, though, I want to go back to

6   the testimony you gave that many of the entries on these charts

7   don't list time zones.  Do you remember saying that?

8   *A.*   Yes.

9   *Q.*   And for some of those entries without time zones, that's

10  because they're coming from a Verizon call record; is that

11  right?

12  *A.*   For -- yes, that's right.

13  *Q.*   Verizon call records don't actually list accurate time zone

14  data, do they?

15  *A.*   They don't list a time zone.

16  *Q.*   And when you reviewed them, you could not tell from the

17  records that you reviewed what time zone each of those calls

18  were made in; isn't that right?

19  *A.*   No.  I do have an understanding of what the origination

20  data can convey for Verizon.

21  *Q.*   Right.  Sometimes it can convey the time zone, right?

22  *A.*   Yeah.

23  *Q.*   But you can't always with accuracy convey the time zone of

24  the call; isn't that right?

25  *A.*   Yes.

Rachel Evans - Cross

1    Q.  And I know you already talked about this, but I just want

2    to make sure, you are not the person who decided which

3    documents to include or take away from these charts, right?

4    A.  Right.

5    Q.  And you weren't the person who decided which calls to

6    include or not include in these charts, right?

7    A.  That's correct.

8    Q.  You were told by the DOJ team which ones to put in or take

9    out, right?

10   A.  Yes.

11   Q.  Okay.  So can we briefly -- well, let me start off by

12   asking this.  You said that for some of these charts you only

13   include -- the chart only includes part of an e-mail, for

14   instance, right?

15   A.  Right.

16   Q.  Maybe it just includes even one line from an e-mail, right?

17   A.  Yes.

18   Q.  And you're not the person who decided which line to put in

19   the chart, correct?

20   A.  Correct.

21   Q.  You just checked the exhibit to see if the lines in the

22   chart are also in the exhibit, right?

23   A.  Yes.

24   Q.  Okay.

25          MS. CARWILE:  So can we go quickly to chart 10-1,

4101

Rachel Evans - Cross

1    please?  And I believe it's the third page of that chart.  If

2    we could turn to Page 3.

3    BY MS. CARWILE:

4    Q.  And do you see the middle -- it's the second row on that

5    chart, Ms. Evans.  Do you see that?

6    A.  Yes.

7         MS. CARWILE:  If we could zoom in on the specific

8    cell, thank you.

9    BY MS. CARWILE:

10   Q.  So you were asked to verify the accuracy of the e-mail as

11   it's written in this cell; is that right?

12   A.  Yes.

13   Q.  Okay.  And can you look --

14        THE COURT:  Ms. Carwile, sorry to interrupt.  Did you

15   want that displayed to the jury for demonstrative purposes?

16        MS. CARWILE:  I appreciate that.  I would.  Thank you

17   for reminding me of that, Your Honor.

18   BY MS. CARWILE:

19   Q.  So now I would like us to look at the underlying exhibit

20   for that cell, okay?  So can we pull up Government Exhibit --

21   right before we do that, I would like you to take a look at the

22   middle of the cell.  And do you see the ranges of chicken

23   suppliers' prices there; is that right?

24   A.  Yes.

25   Q.  You don't see anything else in that highlighted portion of

Rachel Evans - Cross

 1   this cell, correct?

 2   A.   Correct.

 3        MS. CARWILE:   Okay.   So could we pull up now

 4   Government's Exhibit 9744?   And could we highlight the center

 5   part where the ranges are, just the center part where the

 6   ranges are?   I think we are getting that done.   Sorry about

 7   that.   It might be a technical thing.   Thank you.

 8   BY MS. CARWILE:

 9   Q.   So do you see the line in 9744 that says, "Roger says these

10   guys are the cheapest in the bunch today by more than .01

11   pound?"

12   A.   I do.

13   Q.   That line is not included in the chart, is it?

14   A.   It is not.

15   Q.   Okay.   Let's move on.

16        MS. CARWILE:   Let's move to chart 1022 very briefly --

17   I am sorry, 10-2, thank you.   Let's look at the first e-mail,

18   if we can zoom in on the first row on that chart.

19   BY MS. CARWILE:

20   Q.   There is an e-mail from Mr. Austin to Mr. Penn.   Do you see

21   that?

22   A.   Yes.

23        THE COURT:   Ms. Carwile, did you want that displayed?

24        MS. CARWILE:   Yes, thank you again.

25        THE COURT:   That may be displayed for demonstrative

Rachel Evans - Cross

1    purposes.

2            *MS. CARWILE:*  I appreciate that, Your Honor.  I will

3    try to do that.  Thank you very much.

4    *BY MS. CARWILE:*

5    *Q.*  So in this cell you have included certain sentences from

6    the e-mail 1051, right, or they have been -- sentences from

7    Government's Exhibit 1051 have been included in this chart.

8    *A.*  Yes.

9    *Q.*  But the whole e-mail is not in the chart, correct?

10   *A.*  Correct.

11   *Q.*  And again you're not the person who decided which sentences

12   from 1051 made their way into this chart, correct?

13   *A.*  That's correct.

14           *MS. CARWILE:*  So if we could just pull up Government's

15   1051, and I would like to go through the few sentences that are

16   in the chart.  And I will ask our tech wizard to highlight and

17   I will ask it to be published.  I believe this has already been

18   admitted, Your Honor.

19           *THE COURT:*  It may be.

20   *BY MS. CARWILE:*

21   *Q.*  So Ms. Evans, included in that cell of the chart is the

22   sentence at the top from Mr. Austin, "Here is a run down of

23   discussion we had last Friday," correct?

24   *A.*  Could I look at it too?

25   *Q.*  Of course.  Thank you for asking, and yes, to compare.  We

Rachel Evans - Cross

1    are on 10-2.

2            THE COURT:   Ms. Evans, she is looking in her book

3    which has the underlying document, so that's perfectly fine.

4            MS. CARWILE:   Thank you.

5    BY MS. CARWILE:

6    Q.   Do you see that sentence included in the chart?

7    A.   Yes.

8    Q.   So I would ask us to highlight that sentence, please.

9            And then the next sentence in this chart is in the

10   fourth paragraph of the e-mail.  "There was a general

11   discussion about our pricing and Pete stating that stores would

12   close if they paid what we proposed."  That line is also

13   included in your chart, correct?

14   A.   Yes, it's -- it starts right there.

15   Q.   Yes.  And if we could highlight that line as well.

16           And then the next line in your chart is the following

17   paragraph, "Pete offered 9 cents versus our 17.86."  That's in

18   your chart, right?

19   A.   It is.

20   Q.   Or that's in this chart, correct?

21   A.   Yes.

22   Q.   The next sentence or the next phrase in that chart is, "I

23   told him I would check with you."

24   A.   Yes.

25   Q.   And the final phrase is on Page 2 of Government's 1051 in

Rachel Evans - Cross

1    that chart, "and that I thought we would stand firm with our

2    number," correct?

3    A.   Yes.

4    Q.   So if we could pull up Government 1051 and show both pages

5    of it side by side if that's possible.  On your viewer the page

6    on the right is actually the first page of Government's 1051,

7    right?

8    A.   Yes.

9    Q.   So of this entire e-mail the only sentences or phrases that

10   are included in that chart are the ones that have been

11   highlighted, correct?

12   A.   The ones that were highlighted, yes.

13   Q.   And you weren't asked to put any other sentence in this

14   e-mail into this chart, right?

15   A.   Right.

16   Q.   Okay.  So I'm just going to highlight a few of these.  I am

17   not going to go through the entire e-mail.  I think that would

18   take us far too long, but I just want to ask you about a few

19   sentences, okay?

20   A.   Okay.

21   Q.   So, for instance, you did not -- the chart does not include

22   the sentence under "My Response," which is Mr. Austin's

23   response in this e-mail, correct?

24            MS. CALL:  Objection, scope.

25            THE COURT:  I am going to sustain the objection.

4106

Rachel Evans - Cross

1          *MS. CARWILE:*  Thank you, Your Honor.  I will move on.

2   *BY MS. CARWILE:*

3   *Q.*  Can we move now to chart 14-1?  And again, I am going to

4   ask you, Ms. Evans, to look at the very first entry in 14- -- I

5   am sorry, 14-2, excuse me.  Let me know when you see that.

6   *A.*  Okay.  Yes, I see 14-2.

7          *MS. CARWILE:*  Could we have that portion of chart 14-2

8   zoomed in on and ask to be published to the jury, Your Honor.

9          *THE COURT:*  It may be for demonstrative purposes.

10         *MS. CARWILE:*  Yes, thank you, Your Honor.

11  *BY MS. CARWILE:*

12  *Q.*  So this portion of the chart is again Mr. Austin sending

13  his co-workers at Pilgrim's information about his meeting with

14  Mr. Ledford, his customer at RSCS, correct?

15  *A.*  I only know what's in -- like in the document.

16  *Q.*  That's absolutely fair enough.  I understand.  You only

17  know what you are reading in the chart, right?

18  *A.*  Yes.

19  *Q.*  Okay.  Let me ask you this.  Do you see the exhibit numbers

20  to the right of that entry where it underlies what you checked

21  for in this chart?

22  *A.*  Yes.

23  *Q.*  You see Exhibit 1526, correct?

24  *A.*  Yes.

25  *Q.*  And you see Exhibit 1528.

Rachel Evans - Cross

1    A.   Yes.

2    Q.   Now, you are aware because you looked at Government's 1526

3    that it actually has two attachments, right?

4    A.   Yes.

5    Q.   The other attachment is Government's 1527 right in the

6    middle, right?

7    A.   Yes.

8    Q.   And you weren't asked to put 1527 in this chart, right?

9    A.   Right.

10   Q.   Okay.  Just a few more questions.  Thank you, Ms. Evans.

11             Now, speaking of Mr. Ledford, you -- there was a phone

12   number that you were provided for Mr. Ledford in that chart

13   that you looked at with Ms. Johnson, correct?

14   A.   Yes.

15   Q.   You weren't asked to put any call from between Mr. Ledford

16   and Mr. Austin in any chart, were you?

17   A.   I don't really remember right now.  I would have to look at

18   the charts.  I just don't know offhand.

19   Q.   I completely understand.  You don't recall whether you were

20   asked to put any calls between Mr. Ledford and Mr. Austin in

21   these charts?

22   A.   I don't right now, no.

23   Q.   Okay.  If you want to take a look, they are in front of

24   you.  If you want to just review them and let me know if you

25   were asked to put any calls between Mr. Ledford and Mr. Austin

4108

Rachel Evans - Cross

1   in any of these charts.

2          MS. CALL:  Objection, relevance.

3          THE COURT:  Overruled.

4   BY MS. CARWILE:

5   Q.  Actually, instead of making you waste your time doing that,

6   would you accept my representation that there are no calls

7   between Mr. Austin and Mr. Ledford in any of these charts?  If

8   you want to double-check, that's fine.  I am just trying to

9   save us a little time.

10  A.  Okay, I will just quickly.

11  Q.  Of course.  Take your time.

12  A.  Okay.  Thank you.

13  Q.  I am going to remind you of the question just because it's

14  been a few minutes.  Is that all right with you?

15  A.  Yes.

16  Q.  Now that you have reviewed the charts, would you agree with

17  me that there are no calls anywhere in any of those charts

18  between Mr. Ledford of RSCS and Mr. Austin?

19  A.  Yes.

20  Q.  Okay.  Last chart, if we could turn to 14-3, please, and I

21  am going to do this one more time with you, Ms. Evans.

22          MS. CARWILE:  Can we please highlight the first entry

23  of 14-3 which is an e-mail from Mr. Austin?

24          So that's an entry -- and if we could have the

25  published to the jury, Your Honor.

Rachel Evans - Cross

1          THE COURT:  You may for demonstrative purposes.

2          MS. CARWILE:  Thank you.

3   BY MS. CARWILE:

4   Q.  So Ms. Evans, this is another entry in these charts where

5   Mr. Austin is sending an e-mail to someone in his own company,

6   right?

7   A.  Yes.

8   Q.  And there is one sentence from the e-mail included in this

9   chart, right?

10  A.  Right.

11  Q.  If we could pull up Government's Exhibit 1544 which is the

12  exhibit that underlies that chart entry, right?

13  A.  Right.

14         MS. CARWILE:  And if we could put both pages side by

15  side if that's possible.  Thank you.

16  BY MS. CARWILE:

17  Q.  So this exhibit is the entirety of Government Exhibit 1544,

18  right?

19  A.  Yes.

20  Q.  And that is -- other than the sentence that you just looked

21  at in your chart, none of the other parts of this e-mail are

22  included in the chart entry for Mr. Austin's e-mail, are they?

23  A.  That's correct.

24  Q.  Okay.  And let's stay on 14-3 briefly, the first page of

25  the chart.

4110

Rachel Evans - Cross

1          MS. CARWILE:  And may I publish that to the jury, Your

2    Honor?

3          THE COURT:  Yes, you may.

4    BY MS. CARWILE:

5    Q.  So Ms. Evans, you can see -- hold on.  Now I am getting to

6    the chart.  Excuse me.

7          So you see the e-mail that was drawn to your attention

8    by government counsel on direct sent at 2:21 p.m. Eastern from

9    Mr. Tucker, right?  Do you remember being directed to that

10   e-mail?

11   A.  Yes.

12   Q.  And you have a response -- well, you have Mr. Austin

13   sending an e-mail to Mr. Tucker over two hours later after that

14   e-mail is sent by Mr. Tucker, correct?

15   A.  Yes.

16   Q.  And you weren't asked to put any other e-mail related to

17   this conversation between -- from Mr. Austin to Mr. Tucker in

18   this chart, were you?  Do you want me to ask it a different

19   way?

20   A.  I think I understand the question.  I mean, I see at

21   9:59 p.m. Roger Austin sent an e-mail to Scott Tucker.

22   Q.  Well --

23   A.  Maybe I misunderstood the question.

24   Q.  I might have asked it a little bit confusingly.

25         So you see the e-mail that you have listed as being

Rachel Evans - Cross

1    sent from Mr. Tucker to Mr. Austin at 2:21 Eastern, right?

2    A.  Yes.

3    Q.  Then you see the next e-mail you were told to include in

4    this chart sent at I have 4:53 p.m. Eastern from Mr. Austin to

5    Mr. Tucker, right?

6    A.  Yes.

7    Q.  And my question to you is between those two e-mails you

8    were not asked to include any other e-mail from Mr. Austin to

9    Mr. Tucker in this chart, were you?

10   A.  That's correct.

11           MS. CARWILE:  Okay.  I don't have anything further,

12   Your Honor.  Thank you.

13           THE COURT:  Thank you, Ms. Carwile.

14           Ms. Pletcher, go ahead.

15                       **CROSS-EXAMINATION**

16   BY MS. PLETCHER:

17   Q.  Good afternoon, Ms. Evans.

18   A.  Good afternoon.

19   Q.  This must be a long day for you.  I am just going to ask a

20   few short questions here.  I represent Mr. Penn.  My name is

21   Anna Pletcher.

22           When you were speaking with Ms. Call, you testified

23   that the charts at issue here fairly and accurately summarized

24   the information from the underlying sources.  Did I get that

25   right?

4112
Rachel Evans - Cross

1    A.   Yes.

2    Q.   Now, what you meant by that is that the information from

3    the underlying sources that the prosecutors told you to include

4    is accurately replicated in the chart, right?

5    A.   Yes.

6    Q.   You're not saying that the information in the chart is a

7    fair and accurate summary of what is in the underlying sources.

8    A.   Could you repeat that?  I just want to make sure I am

9    processing it.

10   Q.   Sure.  I just want to make sure I understand what you were

11   saying with that comment.

12   A.   Thank you.

13   Q.   So you are not saying that the information in the chart

14   itself is a fair and accurate representation of the underlying

15   sources.

16   A.   It's a partial representation.  They are excerpts.

17           MS. PLETCHER:  Thank you.

18           No more questions, Your Honor.

19           THE COURT:  Thank you, Ms. Pletcher.

20           Mr. Byrne, go ahead.

21                          **CROSS-EXAMINATION**

22   BY MR. BYRNE:

23   Q.   Just briefly.  Good afternoon, Ms. Evans.  I represent

24   Jimmie Little.  First of all, go Bears.

25           I just want to ask you one question or maybe two.

Rachel Evans - Cross

1   Each chart has a date range on it; is that correct?

2   A.   Yes.

3   Q.   And the government lawyers decided that date range, not

4   you, correct?

5   A.   Right.   It's based on the documents that are listed in the

6   chart.

7   Q.   Right.   But you weren't given any documents before or after

8   those date ranges to review, correct?

9        MS. CALL:   Objection, misstates testimony.

10        THE COURT:   Overruled.

11   A.   Well, some of the -- how do I explain -- some of the charts

12   appear after each other in chronological order, so I think --

13   BY MR. BYRNE:

14   Q.   I am sorry, I am talking about each specific chart.   So for

15   example, 1-1 has a date range.

16   A.   Yeah.

17   Q.   And you were given specific documents to fit within that

18   date range, but not for chart 1-1 any other documents --

19   A.   Yes.

20   Q.   -- outside of the date range, correct?

21   A.   That's correct.

22        MR. BYRNE:   I have no other questions.

23        THE COURT:   Thank you, Mr. Byrne.

24        Ms. Henry, go ahead.

25                          **CROSS-EXAMINATION**

4114

Rachel Evans - Cross

1  *BY MS. HENRY:*

2  *Q.*  Good afternoon.

3  *A.*  Good afternoon.

4  *Q.*  My name is Roxann Henry and I represent Mr. William

5  Kantola.

6       *MS. HENRY:*  Could we start with pulling up Government

7  Exhibit 1-1?

8  *BY MS. HENRY:*

9  *Q.*  First of all, I want to point you to the entry at 3:38 p.m.

10  And it talks about, Koch told me that they were at a certain

11  number.  Do you see that?

12  *A.*  Yes.

13  *Q.*  That document didn't say anything about William Kantola,

14  did it?

15  *A.*  The excerpt here does not.

16  *Q.*  Nothing in the document did either.  Would you like to see

17  the document?

18  *A.*  To be sure, yes.

19  *Q.*  Do you want to look it up or would you like us to pull it

20  up on the screen?  Either way works.

21  *A.*  The screen is good.  Thank you.

22  *Q.*  It's correct there is nothing there about Mr. Kantola,

23  correct?

24  *A.*  Correct.

25  *Q.*  So I would like to go back to above that you have a phone

Rachel Evans - Cross

1    call listed at 2:20 p.m. between Carl Pepper you say.  And

2    listed in the To line is Bill Kantola with Koch.  Do you see

3    that?

4    A.  Yes.

5              MS. HENRY:  Now, let's pull up -- and I think we can

6    publish this, Your Honor, it's been admitted -- Government

7    Exhibit 9748.

8              THE COURT:  Yes, you may.

9              MS. HENRY:  If we could go to the page with the Ks on

10   it.

11   BY MS. HENRY:

12   Q.  Now, on that stipulation the phone number 770-536-8818, on

13   the stipulation that the government entered into, what is the

14   to or who is that number associated with?

15   A.  It says Koch Foods office telephone.

16   Q.  Now, looking at your entry on Exhibit 1-1, the phone call

17   at 2:20, the phone call that you have here attributed to Bill

18   Kantola is actually to that 770-536-8818 number; isn't that

19   correct?

20   A.  I do recall this one, yes.

21   Q.  And do you know how many of Koch's 15,000 employees can be

22   reached on that number?

23             MS. CALL:  Objection, form.

24             THE COURT:  Sustained.

25             MS. HENRY:  Your Honor, could we understand the basis

Rachel Evans - Cross

1    for the objection?

2         THE COURT:  Well, the question includes facts that are

3    not in evidence.

4         MS. HENRY:  The fact that the 15,000 is in evidence,

5    Your Honor.  It was put in evidence earlier.

6         MS. CALL:  Objection as to referring to other

7    testimony in this trial.

8         THE COURT:  Well, it's appropriate to mention.  I

9    don't recall it being, but if the government believes that it

10   had, there is some evidence of that, but still this witness

11   doesn't have that foundation so the objection is sustained.

12   BY MS. HENRY:

13   Q.  Well, do you know how many Koch employees could be reached

14   at that number?

15   A.  No, I don't know how many.

16   Q.  And you talked earlier in your testimony about just using

17   common sense, right?  And it's pretty common sense that people

18   don't actually call themselves and talk for a long time on the

19   same number to each other?

20   A.  Okay, yes.

21        MS. HENRY:  So if we could call up I-323, the last

22   page of that exhibit, the bottom line on that exhibit.

23   BY MS. HENRY:

24   Q.  Do you see that the No. 770-329-7505 is talking to

25   770-536-8818 and that those are both numbers that you have on

                         Rachel Evans - Cross

1    these charts attributed to Mr. Kantola and the conversation

2    went on for 25 minutes?

3              MS. CALL:  Objection to scope and form.

4              THE COURT:  Sustained.

5    BY MS. HENRY:

6    Q.  Well, let me turn back to the phone call that you have

7    listed at 2:20 p.m. Eastern time.  And let me first look at the

8    phone call that you have at 2:40 Eastern time.  There is an ET

9    there.  Do you know what the ET that you put on the chart or

10   that you may not have put to the chart, excuse me, that was on

11   the chart when you got it, what the ET stands for?

12   A.  Elapsed time, I believe.

13   Q.  But on the 2:20 call you didn't put down an elapsed time,

14   correct?

15   A.  Yes.

16   Q.  You weren't told to put it there?

17   A.  Correct.

18   Q.  So looking back at the phone record, isn't it correct that

19   that's a 50-second call?  The call to the office number is a

20   50-second call?

21   A.  Looking at the phone record?

22   Q.  Sorry.  Let's pull up the phone records.  I believe you've

23   got the exhibit number right there.  I believe it's 143.

24             MS. CALL:  Objection to scope.

25             THE COURT:  Overruled.

Rachel Evans - Cross

1   *A.* Sorry, could you remind me what summary exhibit this is?

2   And then I can look at it.

3   *BY MS. HENRY:*

4   *Q.* I think we should be able to pull it up for you.  It's

5   Government Exhibit 143.

6   *A.* Yes.

7   *Q.* Do you see the number that you checked there?

8   *A.* I just -- I forgot which date and time we are looking at

9   here.  Sorry.

10   *Q.* On your chart you list it as a phone call that took place

11   on five -- it's kind of interesting.  I don't know -- on my

12   chart it actually doesn't show a date, but apparently that was

13   corrected.  Okay.  So it's a 5/31/2013 phone call at 2:20.

14   *A.* Okay.

15   *Q.* And the number that was called was the office number,

16   770-536-8818.

17   *A.* I'm not seeing it here.

18        *MS. CALL:* I think there may be another page to this

19   document.

20        *MS. HENRY:* It's on the second page of the document.

21        *THE COURT:* That's being displayed now, I think, the

22   second page is.

23   *A.* Okay.  I see it.

24   *BY MS. HENRY:*

25   *Q.* Does that help you?

Rachel Evans - Cross

1   A.   Yes.

2   Q.   So you could see it is a 50-second call; is that correct?

3   A.   Yes.

4   Q.   And throughout the exhibits whenever it was that office

5   number, you verified it as the number for Bill Kantola,

6   correct?

7   A.   Yes.

8   Q.   Where there were phone calls that were all of 4 seconds,

9   you included those in your verification of a phone call; is

10  that correct?

11  A.   I'm not sure I understand the question.

12  Q.   Okay.  Well, let's turn to Government Exhibit 2-1.  And on

13  that exhibit there is -- on January 29, 2014 there is a phone

14  call that you list from Jimmie Little to Bill Kantola.  And the

15  source document that you give is 246.  Would it help you to

16  pull up 246?

17  A.   Yes, thank you.

18  Q.   And then I think the fourth page may be helpful to you,

19  maybe the last entry on the fourth page.

20  A.   Okay.  Yes, I see it.

21  Q.   And that was a 4 second call?

22  A.   It was.

23  Q.   And there were other calls that I think you mentioned that

24  were zero, right?

25  A.   Yes.

Rachel Evans - Cross

1   Q.  Now, with regard to the office line, you've seen in your

2   ordinary experience where people on an e-mail signature

3   sometimes list the office number?

4   A.  Yes.

5   Q.  And that doesn't mean that it's -- they're the only person

6   that you can reach at that number.  It's the office number,

7   right?

8           MS. CALL:  Objection, foundation.

9           THE COURT:  Foundation?  Overruled.

10  A.  Right.

11  BY MS. HENRY:

12  Q.  And it's what the lawyers told you to put on there for Bill

13  Kantola.  You didn't choose to put Bill Kantola's name there,

14  right?

15  A.  It's what the --

16  Q.  On the phone calls for the office number?

17  A.  Yes.

18  Q.  And again in your ordinary experience you talked about is

19  the basis for some of your work here, you've seen in contact

20  lists where people may put down an office number for a person

21  as well, right?

22  A.  Yes.

23  Q.  And in some of these exhibits when you were verifying,

24  again you were just looking for the snippet to see if it was in

25  the document, right?  You weren't trying to do anything else.

4121

Rachel Evans - Cross

1   When you say accuracy, it's just that that snippet appeared

2   somewhere within that document, right?

3   A.  Yes.

4        MS. HENRY:  So if we could pull up Exhibit 1544, which

5   I believe has already been published, Your Honor.  And if we

6   could publish that to the jury, the second page, the top of the

7   second page there?

8        THE COURT:  It may be.

9   BY MS. HENRY:

10  Q.  That talks about Koch being aggressive with pricing.  Do

11  you see that?

12       MS. CALL:  Objection, scope.

13       THE COURT:  Which exhibit are you referring to now?

14       MS. HENRY:  I am going to ask her to compare it to

15  Exhibit 14-3 where she lists 1544 as the exhibit she is

16  summarizing or that the government prosecutors are summarizing.

17       THE COURT:  Overruled.

18  BY MS. HENRY:

19  Q.  So you do see there where it talks about Koch being

20  aggressive with pricing?

21  A.  Yes.

22  Q.  Now, let's turn to Government Exhibit 14-3.  And there is

23  an entry on the first page of 14-3 which you have listed as the

24  exhibit number 1544, the document that we just viewed, correct?

25  A.  Yes.

4122

Rachel Evans - Cross

1    Q.  And on that -- let's pull that up.  Let's just -- we can

2    save it.  It doesn't include that part of the document at all,

3    does it?

4    A.  Yes.

5    Q.  That's correct, it does not?

6    A.  Yes.

7    Q.  The point that I raised earlier about where the document

8    says Koch, it does not say William Kantola.  You did not see

9    the name William Kantola.  You verified strictly the name Koch,

10   right, whenever that appears on the summary?

11   A.  For all the summaries?  I think it was just the one

12   document.

13   Q.  I am asking you in a broader sense.  And if you want to

14   take the time to look at the summaries, I would be happy for

15   you to do that.

16   A.  Can you repeat the question, please?

17   Q.  Where it says Koch, it doesn't say William Kantola.

18   A.  Right, correct.

19   Q.  And again, you may want to take a moment, but the summaries

20   3-1, 4-1, 5-1, 7-1, 9-1, 16-1, 20-1, Mr. Kantola isn't even

21   mentioned in those summaries, right?

22   A.  I don't know offhand.

23        THE COURT:  Yeah, I think that obviously the summaries

24   may not have a number of things on them, but it's so time

25   consuming.

4123

Rachel Evans - Cross

1          *MS. HENRY:*  In the interests of time, we'll let folks

2     read that for themselves.

3          *THE COURT:*  All right.

4          *MS. HENRY:*  Thank you very much.

5          *THE COURT:*  Thank you, Ms. Henry.

6          Additional cross-examination?

7          Mr. Gillen, go ahead.

8                          **CROSS-EXAMINATION**

9     *BY MR. GILLEN:*

10    *Q.*  Good afternoon.  My name is Craig Gillen and I represent

11    Mr. Roberts.

12    *A.*  Good afternoon.

13    *Q.*  Pleasure to meet you.  I want you to turn to 10-1.

14         *MR. GILLEN:*  And if we could have that on the screen

15    for demonstrative purposes, Your Honor, I would appreciate it.

16         *THE COURT:*  Yes, you may.

17    *BY MR. GILLEN:*

18    *Q.*  Now, 10-1 is where you have listed frankly a number of

19    telephone calls, correct?  You have got a couple of pages of

20    telephone calls, right?

21    *A.*  Yes.

22    *Q.*  You don't know what was said on any of those calls, do you?

23    *A.*  I am sorry, what was that?

24    *Q.*  You don't know what was said on any of the calls, do you?

25    *A.*  That's right.

4124

Rachel Evans - Cross

1   Q.  And one of the things that you do, you have not listed on

2   the call the length of the call, have you?

3   A.  Right.

4   Q.  Some of them 4 seconds, some of them longer, right?

5   A.  Yeah, they could be any amount.

6   Q.  Did you get instructions about why to leave off the length

7   of the calls?  Did you get instructions from government counsel

8   to leave the length of the calls off?

9         MS. CALL:  Objection, deliberative process and

10  hearsay.

11        THE COURT:  I am going to overrule the objection.  She

12  can answer that question.

13  BY MR. GILLEN:

14  Q.  Did you get instructions from the government counsel to

15  leave off on your chart so the jury wouldn't be able to see how

16  long these calls were, some of them lasting 3 seconds, 6

17  seconds?

18  A.  Yes, to not include them.

19  Q.  No, no.  My question is did you get instructions from the

20  government counsel to leave off the duration of the calls?

21  A.  Yes, they instructed -- the instructions were to not

22  include them.

23  Q.  So the answer is yes, they did give you those instructions,

24  correct?

25  A.  Yes.

Rachel Evans - Cross

1  *Q.*  Now, I want you to turn to the third page of this exhibit

2  and ask you a few questions about this.  If we could, I would

3  like to blow up if we could the top part of this exhibit, the

4  one that starts with the 6:01.

5         Now, the date of this is August the 18th, 2014,

6  correct?

7  *A.*  Yes.

8  *Q.*  And this time period is the August the 7th, 2014 to August

9  the 20th, 2014, correct?

10  *A.*  Correct.

11  *Q.*  Now, the date here we have August the 18th and this entry

12  here is 6:01 p.m., correct?

13  *A.*  Correct.

14  *Q.*  This indicates a Jason McGuire from Pilgrim's e-mail

15  regarding KFC, correct?

16  *A.*  Yes.

17  *Q.*  Your summary chart says:  Attachment Reads in Part," KFC

18  pricing model Pilgrim's Pride Corporation."  Is that a correct

19  reading?

20  *A.*  Yes.

21  *Q.*  And then below that there are a list of companies to the

22  left, correct?

23  *A.*  Yes.

24  *Q.*  And then, for example, they've got Koch, Case, Claxton,

25  George's, Mar-Jac, correct?

Rachel Evans - Cross

1    A.   Yes.

2    Q.   And to the right of that it has current M and then there is

3    some numbers there, right?

4    A.   Yes.

5    Q.   To the right of that new margin and then there is some

6    additional numbers, correct?

7    A.   Yes.

8    Q.   Now, I'm assuming what you did is you went back to make

9    sure that this entry was exactly correct and nothing was left

10   out, correct?

11   A.   That -- that this excerpt is in the underlying exhibit.

12   Q.   Yeah.  So when I'm reading these company names, Koch and

13   Case, Claxton, and George's and Mar-Jac, I see no Tyson there,

14   right?

15   A.   Correct.

16             MS. CALL:  Objection, scope.

17             THE COURT:  Sustained.

18   BY MR. GILLEN:

19   Q.   But your -- you wrote it down exactly correct, right?

20   A.   Yes.

21   Q.   And if we go down to the next entry at 6:46, "Roger did

22   some checking around today and I included the below regarding

23   the range of the total increases (margin and costs) folks are

24   going in with."  Now, there are companies listed there,

25   correct?

Rachel Evans - Redirect

1    A.   Yes.

2    Q.   Koch, Case, Claxton, George's, Mar-Jac, correct?

3    A.   Yes.

4    Q.   And those are the only -- you didn't leave anybody out, did

5    you?

6    A.   I confirmed that what is listed here is in the exhibit.

7    Q.   That it was accurate, correct?

8    A.   Yes, correct.

9              MR. GILLEN:   That's all I have, Your Honor.

10             THE COURT:   Thank you, Mr. Gillen.

11             Additional cross-examination?

12             MR. FAGG:   No more questions, Your Honor.

13             THE COURT:   Redirect?

14                      **REDIRECT EXAMINATION**

15   BY MS. CALL:

16   Q.   Ms. Evans, these summaries, do they summarize voluminous

17   information?

18   A.   Yes, they do.

19   Q.   So they don't contain each and every word of the documents

20   that were summarized?

21             MR. TUBACH:   Objection, leading.

22             THE COURT:   Sustained.

23   BY MS. CALL:

24   Q.   All right.   Ms. Evans, you were asked on direct about

25   whether you knew each and every person appearing on these

Rachel Evans - Redirect

1    charts and where they worked.  Do you recall that -- on cross,

2    asked on cross about that.

3    A.  Yes.

4    Q.  All right.  Did you take steps to verify where each person

5    on these charts worked?

6    A.  Yes.

7    Q.  And did you familiarize yourself with whether they were

8    chicken suppliers or chicken customers?

9    A.  Yes.

10   Q.  How did you do that?

11   A.  I Googled the companies.

12   Q.  And you looked at those web pages?

13   A.  I did.

14   Q.  Okay.  All right.  You were also asked by Ms. Henry about

15   your association of Defendant Kantola with a number for Koch;

16   is that correct?

17   A.  Yes.

18   Q.  And did you verify his association with that number?

19   A.  I did.

20   Q.  What was the exhibit you used to do that?

21   A.  I believe it was -- I believe it was 7040.  I don't know if

22   that's the right one.

23          MS. CALL:  Can we pull up Government Exhibit 7040?

24   Permission to publish?

25          THE COURT:  You may.

1    *BY MS. CALL:*

2    *Q.*  What do you see on this exhibit?

3    *A.*  I see an e-mail from Bill Kantola with an e-mail signature

4    that says Koch Foods and it lists two numbers and a fax.

5    *Q.*  Is one of the numbers in that e-mail signature the one you

6    were asked about on cross-examination?

7    *A.*  Yes.

8    *Q.*  And is that -- how is that listed there?

9    *A.*  It's listed as his office.

10   *Q.*  All right.  Now, you were also asked on cross-examination

11   about how you were involved in preparing these charts.  Do you

12   recall that?

13   *A.*  Yes.

14   *Q.*  And that process, did it include some attorneys?

15   *A.*  Yes.

16   *Q.*  Did it also include other paralegals?

17   *A.*  Yes.

18   *Q.*  And did it also include agents?

19   *A.*  Yes.

20   *Q.*  Were you part of a team, a team effort on those charts?

21   *A.*  I was.

22        *MS. CALL:*  No further questions.  One moment, Your

23   Honor.

24        May I confer?

25        *THE COURT:*  You may.

1        *MS. CALL:*  Your Honor, the government would now like

2   to introduce the summary exhibits.  And may I take the time to

3   read them all?

4        *THE COURT:*  The list of ones you tend to admit?

5        Mr. McLoughlin, did you have something?

6        *MR. McLOUGHLIN:*  Yes.  Can we be heard on issues that

7   relate to this Your Honor?  Side bar might make sense.

8        *THE COURT:*  Yes.

9     (At the bench:)

10        *THE COURT:*  Mr. McLoughlin, go ahead.

11        *MR. McLOUGHLIN:*  Yes, Your Honor.  Your Honor, other

12   counsel may have some other points, but there are a couple

13   points to make here, the first of which is that the

14   admissibility of summary charts like these is dependent in all

15   of the cases on a variety of factors including the opportunity

16   to do a fulsome cross-examination with the preparer of the

17   chart who is knowledgeable, who, for example, you can

18   cross-examine about selectivity, bias and other factors.

19        The government has quite purposefully apparently

20   provided someone who has absolutely no ability to provide

21   information about those issues, so we would argue that they

22   were not admissible.  However, others may want to come in on

23   this after -- however, we have for, Your Honor, a proposed

24   submission which I can hand up and provide to the government

25   which modifies the -- if Your Honor rules against that after

1    this discussion, we have a proposed jury instruction.  We have

2    looked at the pattern Sixth Circuit instruction, the pattern

3    Eighth Circuit instruction, as well as cases from the Third,

4    Fourth, Fifth and Sixth Circuits.

5           And in all of those instructions there is an

6    additional element when the defense challenges the fairness of

7    the summary, the accuracy of the summary or whether the summary

8    is worthy of belief.  And in all of those there is an

9    instruction to the jury that they may give a summary either

10   entire weight, some weight or no weight at all depending on the

11   jury's assessment of the underlying evidence and the accuracy

12   of the summary.  And of, course, the Court makes the initial

13   determination about whether for purposes of admissibility it

14   meets an initial standard of fairness, accuracy, et cetera, but

15   ultimately, of course, it's for the jury.

16          Here the Sixth Circuit instruction does not include

17   that element.  The *Paulino* case, which the Sixth Circuit

18   instruction cites at Instruction 712, does include that

19   element.  And we would respectfully request the opportunity to

20   hand up the document which includes the excerpts from the

21   various circuits as to what they say about the issue of the

22   jury giving weight.  So, for example, the Third Circuit says if

23   the summaries are not -- do not correctly reflect the evidence

24   in the case, you should disregard them and determine the facts

25   from the underlying evidence.

1           So in the Sixth Circuit *Paulino* says so if and to the

2    extent that you find that they are not in truth summaries of

3    facts or figures shown in the evidence of the case, you are to

4    disregard them entirely.

5           What we would request, Your Honor -- we have a similar

6    piece from the Fifth Circuit -- we would request if Your Honor

7    admits these at all, and we propose they should not, at most

8    they should be demonstratives, at most, but if Your Honor does

9    determine that they can go back to the jury as substantive

10   evidence, we would request the additional element of the

11   instruction to tell the jury that they are free, based on their

12   determination of fairness given there is a good faith basis in

13   the record at this point to challenge selectivity, bias and

14   other factors, that it is up to the jury to make that

15   determination.

16          That's all from me, Your Honor.

17          *THE COURT:*  Why don't we go ahead and have the

18   materials that Mr. McLoughlin proposed be handed up to the

19   government and also to the Court.

20          *MR. TUBACH:*  Does the Court want to hear additional

21   argument now or -- I should rephrase that, Your Honor.  Is the

22   Court willing to hear additional argument?

23          *THE COURT:*  Let me take a look.  We are 10 minutes of

24   5:00, so we may need to continue this tomorrow.

25          *MR. TUBACH:*  Your Honor, just to preview the argument

1    I was going to make, that I believe this witness' testimony has

2    made it abundantly clear she is not the preparer of these

3    charts in any meaningful sense of that word.  And we have been

4    deprived the opportunity to test certain portions of documents,

5    phone calls and texts and et cetera that have been included in

6    this chart and others that have been omitted.

7         MS. PREWITT:  Your Honor, Elizabeth Prewitt.  I just

8    want to add to that.  As Your Honor pointed out the two-part

9    test in *Ray*, the second part is also obviously prejudice to the

10   defendants.  The charts here in this manner are the

11   government's case.  The defendants have had very little else to

12   confront because there have been very, very few fact witnesses,

13   and those have not been core to the government's proof on

14   participation of any of the defendants.  So being in a position

15   of not being able to cross-examine the preparer because the

16   preparer were the attorneys in this case is a material

17   prejudice to the defendants here.

18        And, Your Honor, I will just point out that the trial

19   attorneys in this case had every ability to develop their

20   evidence as they wished, and to the extent that they made

21   choices that would limit their ability to offer these charts as

22   demonstratives under 611(a), *U.S. v. Ray*, they have made that

23   choice and they should live with it.

24        THE COURT:  Hold on.  I think what we need to do is to

25   take this issue up tomorrow.  We can talk about it once the

 1    jury is excused, but, for instance, we may need to do another

 2    8:00 a.m. session.  I would suggest that if the government

 3    wants to submit some different exhibits, some of the other

 4    ones -- I am not sure that there are any.  If not, that we go

 5    ahead and propose that we excuse the jury for today with

 6    instructions to come back at 8:30 tomorrow.  That will give

 7    everyone, including the government and myself, the opportunity

 8    to review the materials that Mr. McLoughlin submitted.  Then we

 9    can take this issue up, resolve it, and then we will see where

10    we are tomorrow.

11         MR. TUBACH:  Your Honor, we could also excuse the

12    witness at this point.  I believe if to the extent the Court

13    determines these charts are admissible over our objections, she

14    is not going to need to be there.  They just need to be

15    published.

16         THE COURT:  I doubt there would be any further need

17    for the witness.  Do you agree with that, Ms. Call?

18         MS. CALL:  Yes, Your Honor.  But I will note as far as

19    timing, I do think tomorrow morning would be appropriate.  This

20    does seem to be trial by fire that I was just handed a

21    seven-page written brief by defense counsel as they mound

22    objections to an instruction that you already ordered

23    yesterday.

24         THE COURT:  In any event, I think we will need to take

25    that up tomorrow.  So now we are getting much closer to 5:00.

4135

1    My proposal would be to have the jury return.  So would it be

2    appropriate at this time to also inform the jury of the fact

3    that we are going to, No. 1, end at noon tomorrow, No. 2 not

4    have court on Monday so the jury can do some advanced planning?

5    Anyone have any problem with that?

6          *MR. GILLEN:*  No, we would agree with that, Your Honor.

7          *MR. McLOUGHLIN:*  Your Honor, I think that's contingent

8    on the government resting before the jury is told they can't --

9    they don't need to be here.  If the government hasn't rested,

10   then I think that's a different question.

11         *THE COURT:*  For what day?

12         *MR. McLOUGHLIN:*  Well, certainly noon tomorrow is

13   fine, Your Honor, but I think it leaves open where we wind up.

14   If the government is going to rest tomorrow, then I think there

15   is no issue.

16         *THE COURT:*  Well, I don't need to tell the jury that

17   they are excused at noon tomorrow if we don't think that, but

18   my guess is that the government is going to rest by that time.

19         Ms. Call, any anticipation otherwise?

20         *MS. CALL:*  One moment, Your Honor.

21         I don't understand how the government resting has to

22   do with the schedule.  I understand trials involve strategy,

23   but there seems to be some fairness issues at play that the

24   government is currently suffering from a lack of almost its

25   entire team and has two people at the table when there are

1  nearly 50 people on behalf of the defendants in this courtroom.

2  The defendants vehemently objected when the government sought a

3  continuance based on the health issues that their team are

4  suffering, and then defense counsel just within an hour or two

5  later asked to be excused from additional time in court so that

6  they could enjoy the holiday.  That just seems to be a fairness

7  issue at play with the request of some of the defendants here.

8       *MR. BELLER:*  This is David Beller speaking and I will

9  speak only for myself and my client.  While there may be 50 of

10  us in the courtroom, I guarantee the Court and Ms. Call that

11  that is not by choice, No. 1.

12       No. 2, in terms of predicating upon the government

13  resting, that was only because during the discussion at lunch,

14  as I represented to the Court in terms of us being able to

15  anticipate how much time we need, we did not anticipate

16  potentially the government not resting tomorrow.  And so that

17  is not intended by any means as being an ambush, but rather

18  making a good faith basis to the Court as to how long the

19  defense may take as we consider which witnesses are going to be

20  put on and the fact that at least insofar as my client is

21  concerned, we have to contend with co-defendants potentially

22  calling dozens of additional witnesses.  That is not at all

23  being presented on behalf of my client, so that is the reason

24  for the discussion, not because of any trial by ambush

25  strategy.

1          THE COURT:  I think we are in danger of getting a

2     little bit sidetracked.  The real logistical question is rather

3     simple, and that is does the government anticipate resting

4     tomorrow, assuming, once again, that we can resolve the issues

5     regarding the -- what Mr. McLoughlin just presented hopefully

6     by 8:30 and then continue at that time.  And if the government

7     does anticipate resting, then we can take up the next issue

8     which is whether we can tell the jury now that they'll be

9     excused at noon tomorrow.

10          MS. CALL:  Yes, that is our current intention is after

11     we would display the summaries, we would likely rest, if not

12     perhaps put in like one additional document.

13          THE COURT:  Sure.  Okay.  So given that fact, can I

14     tell the jury that they will be excused at noon tomorrow?

15          MR. BELLER:  On behalf of Mr. Fries -- this is David

16     Beller -- yes, please.

17          THE COURT:  I am seeing all head nods.  If there is a

18     dissent, let me know.  I also will tell the jury, then, we

19     won't be having court on Monday.  Is that agreed to?

20          MR. FELDBERG:  Yes, Your Honor.

21          THE COURT:  Thank you.

22       (In open court:)

23          THE COURT:  Ladies and gentlemen, it's almost 5:00.

24     And let me tell you a few things and first of all inform you of

25     the following:  So at the beginning of the trial, I described

1    to you that Mr. Little in addition to being charged with

2    violating Section 1 of the Sherman Act was charged with

3    obstruction of justice.  For reasons that do not concern you,

4    the obstruction of justice charge against Mr. Little is no

5    longer before you.  Do not speculate about why that charge is

6    no longer part of this trial.

7            Also, ladies and gentlemen, let me give you the

8    schedule.  So as you know, we're going to meet tomorrow 8:30,

9    all right?  However, at noon tomorrow I am going to dismiss

10   you.  With some of the schedules that we have for various

11   people, we are going to go ahead and do that.  Also, as you may

12   recall, you probably do recall, on Monday we have court, but

13   not the rest of the week.

14           I have conferred with counsel and we have

15   determined -- spent part of that time that we've been -- you

16   haven't been in court to try to streamline things and people

17   believe that we'll be on schedule if we cancel Monday, okay?  I

18   assure you that we are not doing that and then putting the end

19   date of the trial in danger.  The end date is not in danger.

20   But rather we are not going to have court on Monday, so that

21   means that all next week you will be off.  You will then come

22   back the following Monday, okay?  I wanted to let you know that

23   for planning purposes.

24           So tomorrow we may go until noon, but we will dismiss

25   at noon and then you will be off until -- the whole next week

1    until the Monday after that, okay?

2            Ladies and gentlemen, keep the admonitions in mind.

3    Make sure that you don't talk to each other about the case.

4    Don't look up any information that you may have been curious

5    about.  The evidence in the trial has got to answer those

6    questions for you in the course of your applying the burden of

7    proof.

8            Hope you have a good evening.  See you back tomorrow

9    at 8:30.  The jury is excused.

10           (Jury excused.)

11           Thank you, Ms. Evans.  You are excused.  And actually,

12   I forgot to excuse Ms. Evans.  I should have done that in front

13   of the jury.  Is she going to be here tomorrow?

14           MS. CALL:  You mean will she be called again or --

15           THE COURT:  No.  Will she be here just generally?

16   Usually we would have the witnesses excused, but anyone have a

17   problem if she is excused?  I can inform the jury that tomorrow

18   morning.

19           MR. TUBACH:  That's totally fine, Your Honor.

20           THE COURT:  Okay.  Thank you, Ms. Evans.  You are

21   excused.  Okay.  So we'll plan on meeting at 8:00 tomorrow and

22   we will work on the issues that were just presented.

23           Anything else that we should take up at this time?

24   Mr. Beller?

25           MR. BELLER:  Your Honor, with a number of attorneys

1   ringing in, I did not have the opportunity to also voice an

2   objection, so I do have an additional objection.  I am happy to

3   make that tomorrow morning if the Court would prefer as opposed

4   to making it this evening.

5           THE COURT:  If you don't mind, Mr. Beller, why don't

6   you preview that now just so we're aware of it and can think

7   about it, but I won't have Ms. Call or Mr. Koenig respond at

8   this time.

9           MR. BELLER:  Understood.

10          Your Honor, the other attorneys have already voiced a

11  concern regarding what the word preparer may mean under

12  *Renteria*.  I will note that in all of the -- rather that

13  preparer must be available under *Renteria*.  Under all of the

14  notes that have been provided to us, defense counsel or at

15  least I'll speak for myself was unaware at Ms. Evans' utter

16  lack of involvement in the actual strategy that went into

17  making these records.

18          I would note for the Court that a Ninth Circuit case

19  of *United States v. Baker*, that's at 10 F.3d 1374, it speaks of

20  the defense having a full opportunity to cross-examine the

21  testifying government agent about her methods of preparing the

22  summaries, her alleged selectivity and her partiality.  So in

23  doing so, Your Honor, here what the government has done is

24  taken different summaries, not simply a Money Gram transaction

25  or a bank transaction or telephone records, but they've taken

1    e-mails from one data set, telephone records from another,

2    e-mails from different companies, text messages from different

3    companies, and they have combined those.

4         And it is my position that by combining those, the

5    documents themselves have become a testimonial statement,

6    testimonial under *Bullcoming*.  So I believe, Your Honor, that

7    we have a confrontational issue at this point if, in fact,

8    these summary charts are statements.  And certainly Ms. Evans

9    testifying to the extent that she was, in fact, a preparer

10   under the case law I believe satisfies the defendants'

11   confrontation rights.  However, because of her lack of

12   involvement and, in fact, it's the attorneys who actually

13   created these and it's the attorneys who, based on her

14   testimony, who determined the strategy behind what is included

15   and what is not included, I believe we have a serious

16   confrontation issue under the Sixth Amendment in this case.

17        Now, that creates an additional problem because, of

18   course, we are not going to be putting Ms. Call or Mr. Koenig

19   or any of the other attorneys on the witness stand, but because

20   the confrontation issue has not been satisfied, I believe that

21   the summaries are admissible only under 611, but are not

22   admissible under 1006 that can go back to the jury.

23        In full candor for the Court, I want to tell the Court

24   that the 10th Circuit has considered this argument previously.

25   *Bullcoming*, of course, was decided in 2011, so there is not a

1   whole lot of case law out there that has analyzed these.  But

2   *United States v. Keck*, 643 F.3d 789, that's a 10th Circuit case

3   from 2011, and *U.S. v. Yeley-Davis*, 632 F.3d 673.  That is also

4   a 10th Circuit case from 2011.

5           And Your Honor, as we were in court, I was doing some

6   research and those are the two that I'm aware of.  In *Keck* it

7   was a Money Gram transaction as a business record.  And in

8   *Yeley-Davis* it was cellphone records again as a business

9   record.  As we know from I believe Justice Sotomayor's dissent,

10  I don't believe that business records under *Bullcoming*,

11  *Melendez-Diaz* or *Crawford* are, in fact, confrontation.  They

12  are not testimonial, so we have no confrontation right.  But

13  here what we don't have is Money Gram records or cellphone

14  records.  We have a statement in and of itself.  And for that

15  reason I believe the two cases are distinguishable.

16          Thank you, Mr. Beller.

17          *THE COURT:*  Ms. Henry?

18          *MS. HENRY:*  Your Honor, just before we leave, I wanted

19  to make it clear Mr. McLoughlin's point about the instruction,

20  we would view that instruction as something that should be

21  given even for a demonstrative, as well as any exhibit.

22          *THE COURT:*  Okay.

23          Mr. Tubach?

24          *MR. TUBACH:*  Just briefly, Your Honor, to preview, and

25  I won't argue this now, but there is another case that the

1    Court should be aware of, an Eighth Circuit case *U.S. v.*

2    *Grajales-Montoya,* and it's cited 117 F.3d 356.  And we believe

3    that decision makes very clear that the chart has to be

4    prepared by someone who is available for cross-examination, not

5    by the lawyers trying the case.  So we will talk about that

6    more tomorrow.

7            *THE COURT:*  Thank you for providing that citation.  I

8    will give everyone a chance to look that up, all right?

9            Anything else?

10           We will be in recess until 8:00 a.m. tomorrow.  Thank

11   you.

12      (Recess at 5:10 p.m.)

13                              INDEX

14   WITNESSES

15      Rachel Evans

16           Direct Examination By Ms. Call                    4032

17           Cross-examination By Ms. Prewitt                  4071

18           Cross-examination By Ms. Johnson                  4092

19           Cross-examination By Ms. Carwile                  4099

20           Cross-examination By Ms. Pletcher                 4111

21           Cross-examination By Mr. Byrne                    4112

22           Cross-examination By Ms. Henry                    4114

23           Cross-examination By Mr. Gillen                   4123

24           Redirect Examination By Ms. Call                  4127

25

1                          INDEX (Continued)

2                             EXHIBITS

3     Exhibit        Offered   Received   Refused   Reserved   Withdrawn

4     90-10                    4037

5     410-1                    4030

6     518                      4029

7     528                      4029

8     E-570                    4030

9     746-1                    4028

10    959                      4032

11    1035                     4067

12    1036-1                   4067

13    1177                     4027

14    1547                     4029

15    6088                     4032

16    6089                     4032

17    7046                     4031

18    7046-1                   4031

19    9716                     4028

20    9720                     4028

21    9721                     4028

22    9722                     4028

23    9744                     4029

24    9745                     4027

25    9746                     4027

1                          INDEX (Continued)

2                              EXHIBITS

3   Exhibit      Offered  Received  Refused  Reserved  Withdrawn

4   9747                    4027

5   9748                    4038

6                      REPORTER'S CERTIFICATE

7       I certify that the foregoing is a correct transcript from

8   the record of proceedings in the above-entitled matter.  Dated

9   at Denver, Colorado, this 4th day of February, 2022.

10

11                          S/Janet M. Coppock

12

13

14

15

16

17

18

19

20

21

22

23

24

25