IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br>v.<br>JAYSON JEFFREY PENN, *et al.*,<br>    Defendants. | No. 20-cr-00152-PAB |

## MR. BLAKE'S MOTION FOR JUDGMENT OF ACQUITTAL

Viewing the evidence in the most favorable light to the government, the evidence against Mr. Blake is insufficient to sustain a conviction. The government adduced no evidence that Mr. Blake's employer, George's, participated in a conspiracy to rig bids and fix prices. To the contrary, the evidence proves George's negotiated competitively with customers and often undercut the competitors with whom it had allegedly "conspired" to fix prices. But even if the evidence were sufficient to prove George's participated in the alleged conspiracy, the government has fallen far short of proving that Mr. Blake knowingly joined any such conspiracy. There is no evidence Mr. Blake exchanged competitor bid information or attempted to influence his superiors to align George's prices with the prices of its competitors.

The only two supposed members of the alleged conspiracy who testified at trial, Mr. Bryant and Mr. Pepper, did not provide the evidence connecting Mr. Blake to the charged conspiracy. Mr. Bryant testified he had no dealings with Mr. Blake and did not offer any evidence or testimony about Mr. Blake. Mar. 9 Tr. 178:19-179:1.[1] Mr. Pepper testified that he and Mr. Blake never

---

[1] Because Mr. Blake does not yet have a certified transcript, he refers to the unofficial daily transcript for the Court's convenience. He defers to the Court's recollection if it differs in any way.

exchanged any specific bid information. Mar. 7 Tr. 171:7-20. The only pricing information that Mr. Pepper testified he received from Mr. Blake was current period prices, *id.* at 257:6-19, which he testified, as did other witnesses, had nothing to do with bids for future contracts, *id.* at 263:10-23. Taking the evidence in the light most favorable to the government, a reasonable juror could not find Mr. Blake guilty.

## LEGAL STANDARD

On the motion of a defendant at the close of the government's case in chief, the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Cr. P. 29(a). "The evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt." *United States v. Anderson*, 189 F.3d 1201, 1205 (10th Cir. 1999) (internal quotations omitted). "The test is not whether a rational jury could decide that guilt was more likely than not, but beyond a reasonable doubt." *United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The government's case cannot depend on piling inference on inference, and the "jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility." *Id.* (quoting *United States v. Michel*, 446 F.3d 1122, 1127-28 (10th Cir. 2006)). Rather, the Court must be satisfied "the inferences are sufficiently supported" to permit a rational juror to find the elements established beyond a reasonable doubt. *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019); *United States v. Miller*, 178 F. Supp. 3d 1114, 1120 (D. Colo. 2016) (granting Rule 29 motion where "direct and circumstantial evidence together with the reasonable inferences which can be drawn from the evidence" were insufficient to convict).

Mr. Blake was charged with a single violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits "a contract, combination or conspiracy that unreasonably restrains trade." *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d. 745, 756 (10th Cir. 1999). For a jury to find Mr. Blake guilty, the government must prove beyond a reasonable doubt that (1) the conspiracy existed at or about the time alleged; (2) Mr. Blake knowingly became a member of the conspiracy, knowing its goal and intending to help accomplish it; and (3) the conspiracy affected interstate commerce. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 440-43 (1978); *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 473-78 (10th Cir. 1990).

The second element requires a two-pronged finding of intent. Not only must the government prove each defendant had the "basic intent to agree, which is necessary to establish the existence of the conspiracy," but it must also prove "the more traditional intent to effectuate the object of the conspiracy," which, under Section 1, is engaging in bid rigging or price fixing for the purpose of unreasonably restraining competition. *Gypsum*, 438 U.S. at 443 n.20; *see also Suntar Roofing*, 897 F.2d at 479. Therefore, the government must prove beyond a reasonable doubt that Mr. Blake voluntarily and intentionally joined a conspiracy to rig bids or fix prices, *and* that he did so with the specific intent to unlawfully restrain competition. *See Gypsum*, 438 U.S. at 435, 443; *United States v. Therm-All, Inc.*, 373 F.3d 625, 639 (5th Cir. 2004).

**ARGUMENT**

**I.   NO RATIONAL JURY COULD FIND THAT MR. BLAKE'S EMPLOYER, GEORGE'S, JOINED A CONSPIRACY TO RIG BIDS OR FIX PRICES.**

Mr. Blake is entitled to a judgment of acquittal because the government failed to prove that his employer, George's, participated in a conspiracy to unreasonably restrain competition by rigging bid and fixing prices. The government did not even attempt to prove the alleged conspiracy

3

"unreasonably" restrained trade, relying instead on a *per se* presumption that is an unconstitutional conclusive presumption and cannot be applied in this case. *See Gypsum,* 438 U.S. at 441 n.16 (*per se* presumption does not apply when the evidence concerns solely information exchanges). The failure to prove an "unreasonable" restraint alone requires a judgment of acquittal. But even if the government could rely on a *per se* presumption, the evidence proved George's never joined the alleged conspiracy. It negotiated competitively with customers and always came down in price.

> A.  **The evidence does not support a finding that George's was involved in any alleged conspiracy.**

The 2014 negotiations for the 2015 contract with KFC were the centerpiece of the government's case. Pete Suerken led those negotiations at RSCS, the purchasing cooperative for KFC. He testified that he "knew there would be a price increase coming in 2015," and that market conditions "warranted a higher price." Mar. 2 Tr. 164:1-8, 166:1-8. But Mr. Suerken also acknowledged that, while George's bids for the 2015 contract were higher than the price of its 2014 contract with KFC, George's was "a complete outlier because of how low their bid was compared to the other suppliers" who bid on the 2015 contract. *Id.* at 171:19-22. Mr. Suerken admitted "[t]here was a gap between the suppliers on the high end and the suppliers on the low end," and that George's was "the lowest" of all the bidders. *Id.* at 171:23-172:3. In Mr. Suerken's view, George's "provided the most value" of all the suppliers and probably could have charged even higher prices. *Id.* at 176:6-21.

Not only did George's come in as an "outlier" with the lowest bid of its competitors, but it was also competitive and flexible throughout the negotiations for the 2015 KFC contract. While other suppliers "did not move" in the negotiations, Mr. Suerken testified that George's did, and not just by a small amount. *Id.* at 177:10-18. George's came down six cents—a "substantial

4

amount"—from its initial bid of $1.0913 to its final contract price of $1.0307. *Id.* at 180:11-181:5. When asked if statements like "the price is the price" and "we're not moving" applied to George's during its negotiations, Mr. Suerken testified that "Charles George never uttered those words to [him]." *Id.* at 180:20-22. He thought George's "conducted themselves above board and did a great job for the system." *Id.* at 185:14-16.

Moreover, while the 2015 KFC contracts were, for many suppliers, 15-25% higher than their contracts for the prior year, *id.* at 166:15-18, George's 2015 contract with KFC was not—it was only 11.85% (roughly 11 cents) higher than its 2014 contract. *Id.* at 170:25-171:4; J-008. While this may have been slightly higher than the five-cent increase some had anticipated, it is hardly so out of proportion that a rational jury could infer George's was engaged in a price fixing conspiracy with other suppliers who increased their prices by a substantially greater amount.[2]

The evidence of the other contracts at issue in the indictment reflects the same competitive negotiations from George's and absence of any evidence that George's conspired with competitors to rig bids or fix prices. For example, in the 2012 negotiations for the 2013 KFC contract, George's submitted its first-round bid of 0.9694 on 8-piece COB and 0.28 back from the 8-piece COB price for dark meat. GX-1406, GX-9690. In response to a request by Mr. Ledford to lower its bid by 63 points, George's submitted a second-round bid that was 62 points lower for 8-piece COB (0.9632)

---

[2] Mr. Lewis testified that he had anticipated a five-cent increase for the 2015 contracts. Mar. 14 Tr. 16:14-19. But Mr. Eddington, also of RSCS, testified that, based on market conditions, he expected at least a five to ten-cent increase and "recognized the worst case could be higher." Mar. 15 Tr. 101:19-102:6. Moreover, while George's price increased 11 cents, its margin increased only eight cents, J-008, which Mr. Eddington testified was appropriate given the change in market conditions, Mar. 15 Tr. 102:7-15. If the Court reserves ruling on this motion until the close of all evidence, it may consider this testimony from Mr. Eddington, as well as any other defense witness, in deciding the motion.

and reduced the bid for dark meat to 0.30 back. C-023, C-024-1; Mar. 1 Tr. 182:15-24. Mr. Ledford asked George's to *further* reduce its bid for 8-piece COB by another .0015, and it did. At Mr. Ledford's direction, George's submitted a third-round bid for 8-piece COB that was .0015 lower than its second-round bid (0.9617). C-020, C-021-1; Mar. 1 Tr. 195:11-17. Through three rounds of negotiation, George's agreed to an 8-piece COB price of 0.9617, which was 0.0072 *lower* than its opening bid, with a dark meat price that was 0.02 lower than its opening bid and "69 points less than what they were selling it for the year before," even though George's "first-round bid was *higher* than the prior year contract price." Mar. 1 Tr. 199:7-13.

Mr. Ledford testified that, through this negotiation, George's came down more than two and a half times what the average suppliers came down. *Id.* at 211:21-24. Not once did George's refuse to negotiate or take the position "the price is the price." *Id.* at 195:2-10. Mr. Ledford testified that, at each round of negotiations, George's gave him "99" and "a hundred percent [of] what [he] asked for," and that he was satisfied with George's price, *id.* at 188:2-5, 195:18-20, 210:21-24.[3]

The same failure of proof exists for every other contract George's negotiated with KFC between 2012 and 2019. After explaining the 2013 negotiations that resulted in the 2014 KFC contract, Mr. Ledford testified George's went down in price "in every one of those years"—2013, 2014, and 2015—even though the prices were different every year and some suppliers went up in price while others went down. *Id.* at 214:15-25. When negotiating the 2018 contract, George's

---

[3] The government points to phone records in which Mr. Blake appears to have called Mr. Austin on November 28, 2012, to suggest that Mr. Blake shared the amount that George's was bidding on the 2013 KFC contract. GX-1428; GX-1538. However, after the call allegedly took place, George's and Pilgrim's *both reduced* their bids for 8-piece COB at the customer's direction. GX-1524, GX-1525, GX-1552. That George's reductions tracked what Mr. Ledford requested can only rationally lead to the inference that George's was setting its bids based on feedback from the customer, not information from competitors about what the competitors were bidding.

utilized a stair step approach in which it continually went down in price, from .9622 (the prior contract price) to .9537, to .9445, and ending with an FOB price of .9412. Mar. 8 Tr. 61:20-63:2; F-765. Starting in 2017 and through 2018 and 2019, George's continuously decreased the price of chicken it sold to KFC. *Id.* at 63:3-5. George's did not align its bids with competitors to increase the cost of chicken it sold. "[I]f George's was aligning its bids to fix prices with its competitors, it was doing it in a way that George's prices went *down* every year." Mar. 1 Tr. 215:1-4.

### B. The only evidence the government elicited to support a finding that George's was involved in a conspiracy was demonstrably false.

In denying Mr. Blake's Rule 29 motion after the first trial, this Court cited the testimony of Mr. Bryant as sufficient evidence to support a finding beyond a reasonable doubt that George's was part of the alleged conspiracy, thereby implicating Mr. Blake. Doc. 932 at 28. But Mr. Bryant offered no testimony in this trial linking George's to a price-fixing or bid-rigging conspiracy.[4]

The only evidence Mr. Bryant offered in this trial that could possibly support the inference George's was part of the conspiracy is testimony that he obtained competitor *bid* information from Mr. Austin, reflected in his handwritten notes in GX-1919, which included so-called "bid" information from George's, Mar. 9 Tr. 9:1-13. The problem with this testimony is that it is demonstrably false. As the Defendants demonstrated in the first trial, the figures contained in Mr. Bryant's notes were identical—save a transcription error in Koch's price by .0002 cents—to suppliers' then-existing contract prices with RSCS, 2017 period two prices. *See* Exhibit A. In this

---

[4] At one point during his examination, Mr. Bryant speculated that George's and others reached an agreement to raise prices. Mar. 8 Tr. 232:1-9. But the Court sustained counsel's objection to Mr. Bryant's unfounded opinion, striking the testimony and instructing the jury: "…you heard testimony from Mr. Bryant where he expressed an opinion that there was an agreement to raise prices in 2014. I am going to strike that particular testimony and instruct you to disregard that." *Id*. at 239:20-24.

trial, the government elicited false testimony from Mr. Bryant that the handwritten prices were competitors' bids. Mar. 9 Tr. 9:11-12. But that is directly contrary to the documentary evidence and what Mr. Bryant himself told agents as recently as February 27, 2022. The agent's notes from that interview make clear the "Handwritten notes: *current prices and not bids.*" I-799.[5]

Of course, in a conspiracy case, the crime is the agreement. But the evidence at trial negates any possible inference that George's participated in the charged conspiracy, because George's bids were *not* aligned with competitors and George's competitively negotiated with purchasers for each of its contracts. *See Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1034 (8th Cir. 2000) (affirming judgment for defendants where price increases did not result from price verification); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999) (granting judgment to defendants where information exchanges had no impact on pricing).

## II.   NO RATIONAL JURY COULD FIND MR. BLAKE GUILTY BASED ON THE CIRCUMSTANTIAL EVIDENCE THE GOVERNMENT ADDUCED.

Even if the evidence were sufficient to show that George's participated in the alleged conspiracy, the evidence would still be insufficient for a rational jury to conclude Mr. Blake knowingly joined that conspiracy with the intent to accomplish its objectives. The only evidence the government presented against Mr. Blake consists of: (1) phone records reflecting calls between Mr. Blake and competitors, without evidence that Mr. Blake ever shared or received future bid

---

[5] The government elicited testimony from Mr. Bryant on redirect that Claxton and Tyson had not changed their model. Mar. 10 Tr. 66:25-67:17 While this might be true, the government's implication that the suppliers' bids were the same as their period two prices is false. Kochs's period two price was 1.0123 (I-054), but its bid was .9935 (C-465), and Claxton's period two price was .9943 (I-054), but its bid was .9939 (F-852, F-853). Further, Mr. Bryant said he took these notes prior to Tyson's February 3, 2017 bid submission, but George's did not even have its pre-bid submission meeting until February 13 (GX-1942). There is no evidence George's had even formulated its bid at the time Bryant says he made these notes.

information on those calls, alongside emails and text messages to which Mr. Blake was not a party, referencing George's without any mention of Mr. Blake, and (2) a single spreadsheet that Mr. Blake sent to another employee at George's, containing current and historical period pricing for competitors—not information about future bids and not during any RFP.

### A.   Phone records of calls involving Mr. Blake and emails and texts of competitors

The government introduced phone records to demonstrate that, during the eight-year duration of the alleged conspiracy, there were 14 occasions on which Mr. Blake or an employee of George's competitors contacted or attempted to contact each other during the portion of the year in which suppliers were negotiating with customers. *See* GX-766, GX-1234, GX-1236, GX-1248, GX-1426, GX-1428, GX-1429, GX-1430, GX-1431, GX-1440, GX-1441, GX-1960, GX-1961. These phone calls were not recorded. The only evidence of their content came from Carl Pepper, a former salesman at Tyson, who testified at trial pursuant to a non-prosecution agreement.

#### 1.   Phone calls between Mr. Blake and Mr. Pepper

Mr. Pepper's phone calls to Mr. Blake account for four of the 14 calls the government has offered in an attempt to prove Mr. Blake's involvement in the alleged conspiracy. *See* GX-766, GX-1234, GX-1430, GX-1440. At the first trial, the jury was left to speculate as to what may have transpired in those calls, but in this trial, the government called Mr. Pepper. Mr. Pepper, however, made clear during his testimony that while he had no independent recollection of *any* call with Mr. Blake—not the time, date, duration of any alleged call, or the precise content of what was discussed, Mar. 7 Tr. 145:10-17, 164:14-18, 169:21-170:1—Mr. Blake "never shared *any specifics* related to [the] actual price of George's for contracts, volume," and Mr. Pepper "never shared" Tyson's bid information with Mr. Blake—not for any of the contracts on which George's or Tyson

had bid, *id.* at 171:12-20 (emphasis added). On redirect, the government elicited testimony from Mr. Pepper that he occasionally received "monthly period pricing" from Mr. Blake. *Id.* at 257:6-19. But Mr. Pepper made clear this information was "current pricing" that was "already set under a contract" and "had nothing to do with bids … or future pricing." *Id.* at 263:10-23, 264:11-13.

A significant portion of Mr. Pepper's direct testimony was about the calls he made with Mr. Blake and other competitors regarding the 2015 KFC contract. Mr. Pepper's testimony, however, was merely that, in 2014, he called Mr. Blake to see if George's, like Tyson, was planning to "also have a substantial price increase" in their KFC contract for 2015. *Id.* at 141:1-7.[6] Mr. Pepper described the purpose of these calls as simply "trying to see what Mr. Blake had heard" from his superiors at George's about whether there was "going to be a substantial increase." *Id.* at 140:25-141:14. Mr. Pepper admitted these conversations were "akin to shop talk or water cooler talk or rumors." *Id.* at 140:14-22. He "did not know the actual amount" that *any* competitor was planning to bid because none of the competitors told him. *Id.* at 143:1-11.[7]

The information Mr. Pepper claims he and Mr. Blake exchanged and their purported "understanding" that Tyson's and George's would seek an undefined price increase plainly lacks the requisite specificity to allow Tyson and George's to align their bids in 2014, much less to align bids with other suppliers. Mr. Pepper testified that he was "always competing with other

---

[6] Every government witness who worked for RSCS, the buying cooperative for KFC, on the 2015 contract testified that they, too, expected a price increase based on market conditions. Mar. 2 Tr. 164:1-8 (testimony of P. Suerken); Mar. 14 Tr. 18:10-15 (testimony of R. Lewis). Mr. Bryant, the government's other "conspiracy insider," testified that everyone in the industry should have known this. Mar. 9 Tr. 188:13-17.

[7] Mr. Pepper also testified about a call with Mr. Blake in 2012 that Mr. Pepper claimed was about the Church's RFP. But Mr. Pepper admitted he was "100 percent incorrect" when he testified that those calls "may have been about the Church's RFP," because George's did not do business with Church's after 2011. *Id.* at 152:4-153:11.

competitors." *Id.* at 145:5. And Mr. Pepper's testimony about his supposed conversations with Mr. Blake do not lead to the rational inference that Mr. Blake knowingly joined a multi-year conspiracy to align prices and fix bids with other suppliers.

As for the one call between Mr. Pepper and Mr. Blake in September 2017 (GX-766), Mr. Pepper testified that Mr. Blake indicated to him on the phone that "George's was doing a two-year deal" with Popeye's. *Id.* at 154:7-21. Mr. Pepper admitted, however, that he "*never discussed specifics*," "*never discussed price*," and "*never discussed volume*" with Mr. Blake. *Id.* at 154:19-25 (emphases added). Mr. Pepper also admitted that he learned from the *customer*, Kent Kronauge, that all of the suppliers were bidding on a two-year deal. While he qualified that testimony by saying he learned this "eventually," the government demonstrated that he learned this information from Mr. Kronauge that same day, within hours. *Id.* at 163:21-24, 167:15-17; GX-7. Thus, Mr. Pepper's testimony cannot possibly establish that Mr. Blake gave Mr. Pepper information Mr. Pepper could then use to restrain competition, much less that Mr. Blake did so intending to enter into an agreement with Mr. Pepper to restrain competition.

### 2. Phone calls between Mr. Blake and other competitors

Aside from the calls between Mr. Pepper and Mr. Blake, the government presented no direct evidence of what was said on any of the remaining calls between Mr. Blake and competitors, in which Mr. Blake allegedly exchanged bid information. *See* GX-1248, GX-1426, GX-1428, GX-1429, GX-1431, GX-1441, GX-1960, GX-1961. There were no recordings of the calls and no witness testified about their content. In the absence of direct evidence, the government attempted to prove circumstantially that bids were being discussed on these calls by introducing a handful of texts or emails of competitors—communications to which Mr. Blake was not a party—that

11

suggested that, at some point after speaking to Mr. Blake, a competitor was in possession of information about George's bids. *See e.g.*, GX-1035; GX-1428, GX-1538; GX-9744.

None of these texts or emails, however, cites Mr. Blake as the source of the information about George's. While the information could have come from a customer, another employee of George's, or may have been nothing more than supposition, the government seeks to draw an inference that, on each of these occasions, Mr. Blake was the source of the information and communicated it to a competitor in an unrecorded call. Whether this inference is based, impermissibly, on rank speculation, or is a permissible, reasonable inference, is, for purposes of this motion, of no moment. Even assuming on each of these occasions Mr. Blake shared information about George's bids with competitors, the government is still left with no evidence Mr. Blake received bidding information from any of George's competitors or provided such information to his superiors in order to align George's bids with those of its competitors.

*First*, there is no evidence Mr. Blake *received* bid information from competitors. None of the emails or texts on which the government relies indicates that a competitor shared its bid information with Mr. Blake or that Mr. Blake ever asked for such information. One could conclude that Mr. Blake received bid information from competitors not through any reasonable inference but only through sheer speculation. Mr. Blake could not have aligned George's bids with those of its competitors if he did not know what its competitors were bidding. The lack of evidence that

12

Mr. Blake learned, or even attempted to learn, what George's competitors were bidding is fatal to the government's case.[8]

*Second,* there is no evidence, direct or circumstantial, that Mr. Blake ever agreed to align George's bids with competitors' bids. It was undisputed that Mr. Blake did not have pricing authority at George's and did not negotiate prices on behalf of George's. *See* Mar. 1 Tr. 171:5-172:23 (testimony of M. Ledford); Mar. 2 Tr. 181:6-15 (testimony of P. Suerken); Mar. 14 Tr. 53:11 (testimony of R. Lewis). Nor is there evidence that Mr. Blake attempted to influence those who *did* have authority to set George's bids—Darrel Keck and Charles George, and in 2017, Brian Coan—to do so in a manner that aligned them with those of George's competitors. There is no evidence Mr. Blake communicated competitor bid information to Mr. Keck, Mr. George, Mr. Coan or anyone else at George's who set George's bids, or that Mr. Blake acted in any other manner in an attempt to influence his superiors to align George's bids with competitors.

Indeed, there is no evidence Mr. Blake even knew of the existence of a bid-rigging conspiracy, much less that he intended to join it. *See United States v. Guzman-Ortiz*, 975 F.3d 43, 47-48 (1st Cir. 2020) ("Mere association with conspirators or mere presence during conduct that is part of the conspiracy is insufficient to establish knowing participation; the defendant must … share[] his co-conspirators' intent …."); *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019) (granting Rule 29 motion for judgment of acquittal where government's case consisted entirely of "inferences" about meaning of incriminating telephone conversations without corroborating

---

[8] Evidence of even a two-way exchange of pricing information between competitors is insufficient to establish a conspiracy to fix prices. *See Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999). Against Mr. Blake, however, the government failed to adduce evidence of a two-way exchange, much less additional evidence of an illegal agreement.

evidence defendant was actually engaged in alleged scheme); *United States v. Evans*, 970 F.2d 663, 674 (10th Cir. 1992) (reversing conspiracy conviction where evidence was insufficient to prove defendant "intended to join [the] conspiracy as alleged").

### B.     Current and historical period pricing information

The government adduced evidence that Mr. Blake sent period pricing of George's competitors to Mr. Keck, his superior at George's. *See* GX-6088 (cover email from Mr. Blake to Mr. Keck, dated August 15, 2016), GX-6089 (attached excel spreadsheet reflecting period prices from 2009 to August 2016). The information sent by Mr. Blake to Mr. Keck related entirely to the prices charged by the various suppliers under current, executed contracts, not to bids any supplier was making in response to an RFP to obtain a future contract. Further, there was no RFP process underway in August of 2016. Mar. 9 Tr. 216:23-24 (testimony of R. Bryant).[9]

The government's witnesses acknowledged that period pricing could be learned by suppliers in the process of covering a short. Mar. 1 Tr. 165:21-24 (testimony of M. Ledford). Moreover, Mr. Ledford testified that a supplier's period prices would *not* be useful in formulating a bid in response to an RFP. *Id.* at 165:25-166:23. He testified that knowing a supplier's period pricing would not indicate what that supplier is "going to bid for the coming contract year," nor would it give the supplier's competitor "any kind of competitive advantage" or have "any

---

[9] It is apparent from the documents that Mr. Blake was sharing only period pricing, not information about future bids. GX-6089 is a spreadsheet containing 20 tabs, each of which reflects yearly pricing for various competitors under existing contracts. They are broken down by monthly periods for Popeye's and by 13 four-week periods for KFC. The latest information in the spreadsheet is from August 2016, the month in which Mr. Blake sent the spreadsheet to Mr. Keck. There is no forward-looking information in the spreadsheet, and the government did not elicit any testimony suggesting this information was anything other than period pricing.

14

meaningful impact on … th[e] closed bidding system." *Id.* at 166:16-167:1.[10] In sum, period prices do not tell a competitor what another competitor will bid in response to an RFP for a future contract. The fact that Mr. Blake emailed period pricing to Mr. Keck at a time when no RFP was occurring and no bids being submitted does nothing to further the government's effort to prove Mr. Blake conspired to align George's bids for future contracts with those of its competitors.

## CONCLUSION

The government adduced no evidence in this trial that Mr. Blake's employer, George's, participated in a conspiracy to rig bids and fix prices. But even if the evidence were sufficient to prove George's participated in the alleged conspiracy, the evidence is insufficient for a rational jury to conclude Mr. Blake knew such a conspiracy existed, much less that he knowingly joined it and did so with the specific intent to help accomplish its objectives. There is no evidence Mr. Blake exchanged bid information or attempted to influence his superiors to align George's prices with competitors. Rule 29 mandates the entry of a judgment of acquittal for Mr. Blake.

Date: March 21, 2022　　　　　　　　　　　Respectfully submitted,

*/s/ Wendy W. Johnson*　　　　　　　　　　*/s/ Barry J. Pollack*
Wendy W. Johnson　　　　　　　　　　　　Barry J. Pollack
RMP LLP　　　　　　　　　　　　　　　　ROBBINS, RUSSELL, ENGLERT, ORSECK
5519 Hackett Road, Suite 300　　　　　　　　& UNTEREINER LLP
Springdale, Arkansas 72762　　　　　　　　2000 K Street N.W., 4th Floor
Telephone: (479) 443-2705　　　　　　　　Washington, D.C. 20006
wjohnson@rmp.law　　　　　　　　　　　Telephone: (202) 775 4500
　　　　　　　　　　　　　　　　　　　　bpollack@robbinsrussell.com

　　　　　　　　　　　　　　　　　　　　*Counsel for Mr. Blake*

---

[10] Mr. Lewis, also of RSCS, did not think one supplier should know another supplier's period prices, but he agreed that knowledge of period prices alone would not tell one supplier what another might bid in response to an RFP for a future contract. Mar. 14 Tr. 177:24-178:24.

**CERTIFICATE OF SERVICE**

On this 21st day of March, 2022, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States District Court for the District of Colorado by using the Court's CM/ECF system, which will serve electronic notification of this filing on all counsel of record.

Respectfully submitted,

*/s/ Wendy W. Johnson*

Wendy W. Johnson

*Counsel for Mr. Blake*