1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2

Criminal Action No. 20-CR-00152-PAB
3   In Re: Penn II
UNITED STATES OF AMERICA,
4
        Plaintiff,
5
vs.
6
JAYSON JEFFREY PENN,
7   MIKELL REEVE FRIES,
SCOTT JAMES BRADY,
8   ROGER BORN AUSTIN,
TIMOTHY R. MULRENIN,
9   WILLIAM VINCENT KANTOLA,
JIMMIE LEE LITTLE,
10  WILLIAM WADE LOVETTE,
GARY BRIAN ROBERTS,
11  RICKIE PATTERSON BLAKE,

12      Defendants

13  _____

                    REPORTER'S TRANSCRIPT
14                  Trial to Jury, Vol. 4

15  _____

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17  Chief Judge, United States District Court for the District of

18  Colorado, commencing at 8:21 a.m., on the 28th day of February,

19  2022, in Courtroom A201, United States Courthouse, Denver,

20  Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Janet M. Coppock, 901 19th Street,
25         Room A257, Denver, Colorado, 80294, (303) 335-2106

```
1                         APPEARANCES
2              Michael Koenig, Carolyn Sweeney, Heather Call and Paul
3    Torzilli,, U.S. Department of Justice, 450 Fifth Street N.W.,
4    Washington, DC 20530, appearing for Plaintiff.
5              Anna Tryon Pletcher and Michael Tubach of
6    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
7    San Francisco, CA 94111-3823;
8              Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
9    N.W., Washington, DC 20006, appearing for Defendant Penn.
10             David Beller, Richard Kornfeld and Kelly Page of
11   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
12   CO 80202, appearing for Defendant Fries.
13             Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
14   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
15              Laura Kuykendall and Megan Rahman of Troutman Pepper
16   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
17   appearing for Defendant Brady.
18             Michael Felberg of Reichman, Jorgensen, Lehman,
19   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
20   10017;
21
22
23
24
25
```

1                     APPEARANCES (Continued)

2         Laura F. Carwile of Reichman, Jorgensen, Lehman,

3  Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4  CA 94065; appearing for Defendant Austin.

5         Elizabeth B. Prewitt of Latham & Watkins, LLP,

6  555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7         Marci Gilligan LaBranche of Stimson, Stancil,

8  LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9  80218, appearing for Defendant Mulrenin.

10         James A. Backstrom, Counselor at Law, 1515 Market

11  Street, Suite 1200, Philadelphia, PA 19102-1932;

12         Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13  Bethesda, MD 20814, appearing for Defendant Kantola.

14         Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15  Street, Suite 1100, Los Angeles, CA 90017;

16         Dennis J. Canty, Canty Law Corporation,

17  1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18  appearing for Defendant Little.

19         John Anderson Fagg, Jr. and James McLoughlin of

20  Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21  Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

1                      APPEARANCES (Continued)

2              Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5              Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8              Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11             Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                        PROCEEDINGS

16        THE COURT:  We are back on the record in 20-CR-152.

17   The jury is not present.  We are going to talk about a question

18   that we got from the jury on Thursday pertaining to having

19   people -- cross-examiners identify who they represent.  Anyone

20   have any different suggestions other than what we had talked

21   about previously?

22             Go ahead, Mr. Tubach.

23        MR. TUBACH:  Good morning, Your Honor.  Defendants

24   have conferred and our suggestion would be to respond as

25   follows:  In response to your first question, I have asked the

1  lawyers to try to remember at the beginning of their

2  questioning to give their own name and to identify their

3  client.  In response to your second question, while the lawyers

4  for the defendants are collaborating to be efficient and it is

5  appropriate for them to do so, each lawyer represents only one

6  defendant.  Regardless of whose lawyer is asking the questions,

7  unless I instruct you otherwise, it is entirely up to you to

8  determine which of the defendants, if any, the witness'

9  testimony is relevant.  You may consider all the evidence, some

10  of the evidence or none of the evidence.

11        THE COURT:  Mr. Koenig, response?

12        MR. KOENIG:  I mean, it seems to go well beyond what

13  the question asked for.  And while it certainly, it repeats

14  stuff the Court has already said, I think it reads into the

15  question a little too much.  Again, the government's position

16  would just be to answer with the simple -- I believe it was

17  yes, yes.

18        THE COURT:  Okay.  Do you have that written out,

19  Mr. Tubach?

20        MR. TUBACH:  I do.  If I were more efficient, I would

21  have printed it, but I can give the Court a copy.

22        THE COURT:  I think I am going to go ahead and read

23  what Mr. Tubach proposes, not that Mr. Koenig's response isn't

24  correct.  The yes, yes would be short and sweet, but I think

25  that a little bit of additional context would be -- kind of

1    have somewhat of an educational value for them and may be able

2    to stave off some other questions that they may have, so I

3    think that's good to do.

4         Mr. Koenig?

5         MR. KOENIG:  May we be able to get a copy of that just

6    before it's read so we can --

7         THE COURT:  Yes, maybe even one with some

8    magnification.

9         MR. TUBACH:  Yes.  I think counsel for the government

10   can photograph.  And again my apologies.  I should have printed

11   the version.

12        MR. KOENIG:  Just in case.  Hearing it once, we didn't

13   catch everything.

14        THE COURT:  And Mr. Koenig, is your suggestion, then,

15   you want a chance to look at that time a little bit more?

16        MR. KOENIG:  Just to read it once.  It shouldn't take

17   more than 30 seconds.

18        THE COURT:  Yeah, that's fine.

19        MR. TUBACH:  With the Court's permission, I will hand

20   this to Ms. Grimm.

21        THE COURT:  Yes, thank you.

22        MR. KOENIG:  One small nit well, I don't know if it's

23   a nit, but in the second to the last question -- or second to

24   the last sentence says it's up to you to is decide essentially

25   which defendant the evidence is relevant to.  And one concern I

372

1    have is that when you have something like an 801(d)(2)(E)

2    statement, that might imply that it doesn't apply to all

3    defendants.  It only applies to one defendant or it applies to

4    somebody who is not a defendant.  So I think that sentence

5    maybe goes a little far.

6         THE COURT:  Yeah, I will overrule that objection.

7    You're right, but on the other hand, once again, instead of

8    saying yes, yes, we could write a treatise for them.  But I

9    think this probably as I said before has some educational value

10   and may describe in a little more detail what the situation is

11   which would be of benefit to them.

12        So let us -- so we are a little bit early still.  Why

13   don't we talk just a bit about the latest motion objecting to

14   the summary exhibits.  This is after the government had filed

15   the revised version.  So in terms of our schedule and the fact

16   that I am not sure when the government intends on calling

17   Ms. Evans, but how do we anticipate that this will play out?

18   Do we need to have resolution on the summary exhibit issue

19   before Ms. Evans testifies.  Even though there is, of course,

20   the possibility that Ms. Evans could lay foundation, but the

21   exhibits would not necessarily have to come in at that time,

22   but could be moved into evidence or the attempt could be made

23   after she testified.

24        MS. CALL:  Yes, Your Honor.  I think the government

25   anticipates offering Exhibits 3, 4 and 9 at the time of

1  Ms. Evans's testimony.  I don't know that any of those are in

2  dispute.  Well, there is only one document in dispute on the

3  defendants' motion that I count relating to those exhibits, so

4  perhaps we could address that now.  And we can save resolution

5  of the other items for after Ms. Evans's testimony, and that is

6  Government Exhibit 330.

7        THE COURT:  330?

8        MS. CALL:  Yes.  And that, Your Honor, was ruled on by

9  the Court in ECF-559, the original *James* ruling as admissible

10  under 801(d)(2)(E).  The defendants again objected to its

11  admissibility pretrial in ECF-945 and the Court had reserved

12  ruling until the pretrial conference, but I do not believe this

13  exhibit was discussed at the pretrial conference.

14        THE COURT:  Can we display 330?  I am not sure about

15  that one.

16        MS. CALL:  Yes, Your Honor.  I believe we have it up

17  on the screen now.  As I noted, this was favorably ruled on in

18  the Court's *James* ruling, so I believe the basis of defendants'

19  objection is simply it wasn't on the initial summary and now it

20  is.

21        THE COURT:  So this is a document that's referenced in

22  one of the summaries; is that right?

23        MS. CALL:  Yes, Your Honor.

24        THE COURT:  Which summary is it mentioned in?

25        MS. CALL:  Summary Exhibit 3.

1          THE COURT:  Oh, okay.  And so what do the defendants

2     think?  Would it be helpful to take this up real quick now and

3     then -- I am not sure how we are doing on jurors.  We're not

4     there yet, so we have time.

5          Mr. Tubach?

6          MR. TUBACH:  Sure.  That would be fine, Your Honor.  I

7     do have just for the Court, I have the actual printed copy of

8     what I handed up to the Court in the tiny little --

9          THE COURT:  I am good at tiny little, so -- I think

10    what I will do, it's a little bit -- the note is somewhat

11    unusual.  It says juror one.  But presumably the other jurors

12    know about it or in any event my intention was just to read it

13    to them at the very beginning.  Once they come in, I will read

14    the first question and answer and then read the second question

15    and then read the answer.

16         MR. TUBACH:  Is the Court intending to tell the jurors

17    that one juror posed the question?  I just hesitate to

18    encourage them to do so.

19         THE COURT:  Yeah, I agree.  Whatever way it's done,

20    orally or in writing, they will all know about it, so they are

21    going to find that out regardless.  And I don't want to -- it's

22    a little bit tricky to tell people not to write questions, but

23    they may take that the wrong way.  They don't know what the

24    norms are, so I probably won't do anything to that effect right

25    now.  But hopefully as we go along they'll start to understand

1  the process a little bit more.  And we wouldn't want them all

2  to just be writing down things as it crosses their mind.

3          Mr. McLoughlin?

4          MR. McLOUGHLIN:  Your Honor, the government is not

5  correct with respect to Exhibits 4 and 9 that there is no

6  dispute.  Can we be heard briefly on that?

7          THE COURT:  Why don't we take up this issue regarding

8  Exhibit 330 first.  I am not sure we will have a chance to take

9  up that other issue, but we certainly aren't done with it.  Why

10  don't we stick with 330 first.  Any comments or any response on

11  that?  Are defendants ready to address that one?

12          Mr. Tubach?

13          MR. TUBACH:  I don't know if any of the other counsel

14  have anything.  We would simply rest on the arguments in our

15  brief.  We don't believe that this document which I believe

16  leads to antibiotic-free is related to the conspiracy here.

17  And we've made various arguments in the prior submissions that

18  we've made, so we don't believe it's properly admissible and

19  it's hearsay.

20          THE COURT:  Ms. Call?

21          MS. CALL:  Yes, Your Honor.

22          Summary Exhibit 3 is related to ABF chicken for

23  Chick-fil-A, so it is entirely related to the other exhibits

24  contained in that summary.  As Your Honor has already found,

25  the additions as of February 10th were timely, so I don't see a

1    basis for the exclusion of this document.  I think at a higher

2    level we will address this later, but the defendants are

3    repeatedly banging the drum of this late disclosure summaries

4    in violation of the Court's order.  And there was never a Court

5    order relating to disclosure of summary exhibits.

6         Defendants are excerpting a paragraph from the Court's

7    order regarding the pretrial conference and exhibits to be

8    offered without a sponsoring witness, which these just don't

9    relate to.  So to the extent there ever was an order regarding

10   summary exhibits, I think the government would at least request

11   clarification so that the defendants, of course, can provide

12   any summaries they intend to introduce to the government as

13   well.  But there has simply not been an order, at least to the

14   government's knowledge, relating to summary exhibits.

15        *THE COURT:*  The objection is overruled.  I do find

16   that 330 is properly included.  It is timely.  I know that in

17   some of the -- there are objections in the new motion to

18   timeliness which I already ruled on, not that that objection

19   isn't preserved, but I do find that this one is properly

20   included, so that objection is overruled.

21        Ms. Grimm, how do we look on the -- we don't have all

22   the jurors present?  Okay.  Ms. Becker called in.  We are going

23   to have to disconnect her because I think that we don't have a

24   good way of both having her remain connected and not hearing

25   what's going on right now, so we will have to wait and

1    reconnect at such time as we have all the jurors present.

2           Ms. Call?

3           *MS. CALL:*  If I may just for the record follow up on

4    some discussion at the end of the day Friday.  Ms. Becker was

5    informed of the sequestration order immediately after we exited

6    the courtroom, and she was instructed by her counsel not to

7    review any of the exhibits that she had.

8           *THE COURT:*  Okay, great.  Thank you for updating that.

9           Ms. Henry, go ahead.

10          *MS. HENRY:*  Your Honor, there are also two entries on

11   the summary chart which I believe is now labeled Exhibit 15

12   that we presume the government intends to seek to admit before

13   Ms. Evans testifies and has those charts in, so this may be an

14   appropriate time to deal with the issue.  They are Exhibits

15   1519, 1521, 1521-1.  There is a history here and some very

16   changed circumstances that relate to these exhibits which are,

17   as I said, summarized in the charts.

18          At the pretrial conference you may remember we had

19   noted that we had received some very rough notes of a

20   government interview of Bruce MacKenzie.

21          *THE COURT:*  Of who again?

22          *MS. HENRY:*  We had received some very rough notes of

23   the government's interview of Bruce MacKenzie.  And subsequent

24   to the pretrial conference, we did receive a formal memo of

25   that interview.  As professional courtesy and given the duty of

378

1    candor to the Court, we have allowed ample opportunity for the

2    government to provide the Court with the new information.

3             While what was presented at the *James* hearing may have

4    been true at the time, there is no question that what was

5    presented there is no longer the whole truth after the

6    government chose to interview Bruce MacKenzie earlier this

7    month.  We've marked for the record the interview memo as I-683

8    and we can pull it up on the screen.  I also have some

9    highlighted copies if the Court would like.  It may facilitate.

10            The memo directly contradicts what was presented at

11   the *James* hearing as the basis for the Court's preliminary

12   ruling that Bruce MacKenzie was a co-conspirator.  After he was

13   informed that he could be prosecuted for not being truthful, he

14   explicitly stated that he had never given nor received

15   competitor prices and had no reason to believe that anyone at

16   his company had done so.

17            He did not -- he was asked about the very specific

18   exhibits during the interview.  He did not recall the specific

19   e-mails from nine years ago, but he did remember and described

20   in detail how he went about getting prices approved and how the

21   e-mails were consistent with how he personally made analyses

22   that were the numbers that were in there and how he also

23   received information from the customer that related to the

24   information in the e-mails.

25            As noted, he provided his pricing process as explained

1    in the interview memo.  He provided the prior years' bids, what

2    Koch sold, what price he thought they should bid, where the

3    industry was going.  He did not set prices.  His goal was

4    always to work for his company and his philosophy came from his

5    own competitive nature.

6           The e-mail attachment he went through.  He described

7    how the feedback came from UFPC, which is RSCS or as we all

8    know, that how he got the information was based on that and the

9    information that he did in his own analysis.  He explained he

10   wanted more business or at least the same amount of business.

11   And he explicitly said, MacKenzie never had a competitor tell

12   him the competitor's price.  MacKenzie never heard a competitor

13   tell his co-workers the competitor's price.  And toward the end

14   he says, MacKenzie did not know about any conversations

15   Mr. Kantola had with competitors and he had no reason to

16   believe that anyone would share competitor pricing.

17          He stated he had -- the issue, of course, with regard

18   to whether Mr. MacKenzie's statements as a declarant can come

19   in under 801(d)(2)(E) or whether Mr. MacKenzie is a member of

20   the conspiracy, whether he is actually a co-conspirator.  At

21   the *James* hearing Special Agent Taylor testified that his

22   opinion that Mr. MacKenzie was a co-conspirator rested on his,

23   and I will quote, reading this e-mail.  That's the *James*

24   hearing, Page 84 in the rough transcript we had at Line 14.

25          With this we also note that the government had ample

1    opportunity to point to any other evidence that they have

2    regarding Mr. MacKenzie potentially being a co-conspirator

3    here.  There was no other information about that adduced at the

4    hearing.  There was no other information about that adduced in

5    any of the briefing.  There has been no information about that

6    adduced at the prior trial.

7          There is a lot of case law, *Glasser v. U.S.* 315 U.S.

8    60 at 74, just one of the times in 1942 the Supreme Court

9    repeated the fundamental rule that declarations of an alleged

10   co-conspirator are admissible only if there is proof aliunde

11   that he is connected with the conspiracy.  Otherwise, hearsay

12   would lift itself by its own bootstraps to the level of

13   competent evidence.

14         There is at this time no basis whatsoever for a

15   conclusion of seeing Mr. MacKenzie as a co-conspirator or

16   admitting his statements under 801(d)(2)(E).  We would then

17   object to admission of Exhibits 1519, 1521, 1521-1, and also

18   they would need to be removed from Government Exhibit 15.

19   Thank you.

20         *THE COURT:*  Thank you, Ms. Henry.

21         Response?

22         *MS. CALL:*  Yes, Your Honor.  I don't know if Ms. Henry

23   noted, but there was argument about these specific exhibits at

24   the pretrial conference as well, so I won't repeat everything

25   said there.  But essentially, you know, A, the duty of candor

1    comments are a bit out of line, especially because this exact

2    information was raised for the Court at the pretrial conference

3    and the government, of course, disclosed it to the defendants

4    as well.

5              But first, you know, a denial in participation of a

6    conspiracy by a conspirator is not necessarily proof at all

7    that something -- that they are not a co-conspirator and that

8    their statements are not admissible under 801(d)(2)(E) for

9    their participation in the charged conspiracy.  But second, you

10   know --

11             THE COURT:  That's true.  I suppose that the issue

12   is -- and for purposes of the James hearing, it's just a

13   preponderance of the evidence standard.  I guess the issue

14   would be whether given the interview that Ms. Henry has

15   tendered to the Court, which is the interview of Mr. MacKenzie

16   that took place I guess on February 3rd of this year, whether

17   the government now believes him and, you know, in light of the

18   interview thinks that he is credible, that, you know, he

19   essentially persuaded the government that, you know, in fact,

20   he is telling the truth.  And therefore, the government's basis

21   to -- or the testimony by Special Agent Taylor at the James

22   hearing in regard to the exhibit no longer has a foundation.

23             MS. CALL:  Yes, Your Honor.  And I think I addressed

24   that at the pretrial conference, but I will say our thinking

25   isn't really complete on his credibility.  And that's why I

1    kind of articulated the other grounds for admissibility under

2    801(d)(2)(E), which is regardless of his credibility, his

3    statements are admissible under 801(d)(2)(E) because the law is

4    clear that for 801(d)(2)(E) admissibility purposes, the word

5    conspiracy is not the same as the charged conspiracy.

6         It is law regarding just joint undertakings, common

7    undertakings, and this premise that people who, you know, join

8    together in sorts of undertakings can have their own statements

9    held against each other, which is what we articulated at the

10    pretrial conference and cited to a number of cases where that

11    specific point is made, that it is not the same as the charged

12    conspiracy.  And joint undertakings such as, you know, trying

13    to win business together, which I think was the case we cited

14    from the Fifth Circuit, does make statements admissible under

15    801(d)(2)(E) under -- against those who are in those kinds of,

16    you know, common undertakings with.

17         Mr. MacKenzie is clearly in a joint undertaking with

18    at least Mr. Kantola in gaining business for KFC.  So, you

19    know, I realize it's a bit -- leaving the issue aside of

20    Mr. MacKenzie's credibility, but it doesn't change the

21    admissibility.

22         THE COURT:  Anything else, Ms. Call?

23         MS. CALL:  No, Your Honor.

24         THE COURT:  Okay.

25         Ms. Henry?

1        MS. HENRY:  Your Honor, the argument that Ms. Call

2   just made about co-conspirator statements being just any old

3   grouping of people in a company, there is no precedent for

4   that.  It would make every single employee of a company a

5   co-conspirator and there is no law that supports that.

6        With regard to the credibility issue, though, there is

7   case law that's relevant to this which is that Rule 104 making

8   these preliminary decisions about admissibility, I believe it's

9   *U.S. v. Nixon* at 418 U.S. 683 that talks about these issues are

10  to be decided by the trial judge, including the concept that

11  the judge must make the decision with regard to credibility.

12  It is not for the government to decide credibility issues.  If

13  there were a credibility concern here, there would have to

14  be -- the issue on the resolution of that would go to Your

15  Honor, not to the government.

16        I just want to make certain that I-683 is put into the

17  record too.

18        THE COURT:  What do you mean?

19        MS. HENRY:  I am not sure if it's in or how it does

20  that, but just to be sure.

21        THE COURT:  What do you mean by that, goes into the

22  record?

23        MS. HENRY:  The exhibit, so that it can be referenced

24  for later.

25        THE COURT:  And is that what you handed up to me?

1          *MS. HENRY:*  Yes, Your Honor.

2          *THE COURT:*  It's not marked.

3          *MS. HENRY:*  I am sorry, the marked exhibit I didn't

4    get.  It is marked, actually, on the screen there.  I didn't

5    get the copies made.  Thank you, Your Honor.

6          *THE COURT:*  I am going to take that issue under

7    advisement so that I can take a look at the cases that were

8    referred to.

9          And Mr. McLoughlin, go ahead.

10         *MR. McLOUGHLIN:*  Your Honor, just very briefly, I want

11   to respond to the government's argument that the issue under

12   801 is this concept of a joint venture in which individuals,

13   including apparently competitors, are in some kind of joint

14   venture to get business from KFC, and somehow that creates

15   admissibility regardless of whether the individual is in the

16   charged conspiracy.

17         I would respectfully suggest, Your Honor, that that

18   theory is directly contradicted by the committee's notes and

19   the subsequent discussions with respect to 801(d)(2)(E) which

20   make it very clear that the admissibility is a function not of

21   some kind of agency theory or something else, which is what

22   apparently the government is implying, but it is, in fact,

23   participation in the charged conspiracy in furtherance of the

24   conspiracy.

25         The government I think quite rightly cites no case law

1    for this remarkable proposition.  It is directly contradicted

2    by the rules, by the text of the rule, by the commentaries in

3    the notes and the debate that follow it.  Thank you.

4         *THE COURT:*  Thank you, Mr. McLoughlin.

5         Ms. Call?

6         *MS. CALL:*  If I may, Your Honor, I didn't have the

7    cases handy that we cited at the pretrial conference, but I do

8    have the cites here.

9         *THE COURT:*  Go ahead.

10        *MS. CALL:*  So it is supported by law.  One is *United*

11   *States v. Coe,* 718 F.2d 830 at 835.  That's Seventh Circuit

12   1983.  And that stands for the proposition that conspiracy as

13   an evidentiary rule is distinct from conspiracy as a crime.

14        And then the common plan and joint undertaking realm

15   of admissibility that I described is -- has been cited quite

16   frequently by the Fifth Circuit in *United States v. El-Mezain*,

17   664 F.3d 467 at 502.  That's Fifth Circuit, 2011.  It's

18   commonly referred to as the joint venture exception under the

19   hearsay rules.

20        And that same term is used in *United States v.*

21   *Kendall*, 665 F.2d 126 at 130, and that's Seventh Circuit, 1981.

22   And the way the courts describe it is that the conspiracy as a

23   part of 801(d)(2)(E) has to just be factually intertwined in

24   some way with the offense that the defendant is being tried

25   for.  And I have several more cites including the Second

1    Circuit and another Seventh Circuit cite if that would be

2    helpful.

3            THE COURT:  I think I am good.  Thanks.

4            MS. CALL:  Thank you.

5            THE COURT:  Mr. Feldberg?

6            MR. FELDBERG:  Thank you, Your Honor.  I believe

7    Ms. Call indicated the government would be offering Exhibits 3,

8    4 and 9 during Ms. Evans testify.  I just want to inquire

9    whether they will be seeking to lay a foundation during

10   Ms. Evans' testimony for the remaining summary exhibits or

11   whether that will happen at a different time in the trial,

12   because we do want to have an opportunity to cross-examine

13   someone about the other summary exhibits.

14           THE COURT:  Yes.  And Ms. Henry, I will get to you in

15   just a second.  I know we somewhat changed topics, but --

16           MR. FELDBERG:  I apologize, Your Honor.

17           THE COURT:  Why don't we get a response from Ms. Call

18   on that question because I wasn't quite clear exactly what

19   Ms. Evans is going to be testifying about either.  Go ahead.

20           MS. CALL:  I believe we did articulate this in our

21   trial brief, but we do intend to lay foundation for all of the

22   summaries during Ms. Evans' testimony.  However, because of

23   obviously the requirement that all the underlying exhibits be

24   admissible and out of an abundance of caution we are waiting

25   until all the underlying exhibits are admitted until we offer

1    summaries containing them.  So to the extent some exhibits may

2    be admitted through later witnesses in the trial, we will hold

3    off on offering the summaries containing those until those

4    witnesses testify.

5         THE COURT:  Okay.  Yes, Ms. Henry, go ahead.

6         MS. HENRY:  Your Honor, I just believe that I may have

7    not given you the jump cite on *U.S. v. Nixon*, and it's 418 U.S.

8    at 701, Note 14.  Thank you.

9         THE COURT:  Thank you.

10        Mr. Beller?

11        MR. BELLER:  Thank you, Your Honor.  My request is on

12   a different subject.  As the Court knows, the CDC issued new

13   mask guidelines on Saturday.  I imagine that the Court will

14   likely be taking that under advisement regarding the district.

15   My request, however, is that when testifying witnesses are

16   seated, that the Court invites them to potentially -- or to

17   remove their masks if they are vaccinated.  Thank you.

18        THE COURT:  Yeah, we will take that up.  The Court is

19   going to take that up on Wednesday, not specifically that

20   issue, but just generally the issue of how the Court should

21   respond to the new CDC guidance and also the developments

22   within the State of Colorado.

23        The CDC has indicated that Denver County has now a low

24   risk, so Denver County would fall within that.  But as I have

25   been telling the jurors last week, there is a difference

1    between getting back to normal, which may mean taking the risk

2    and getting sick from Omicron the same way you might run the

3    risk of getting a cold or the flu, and having a bunch of jurors

4    or even attorneys getting sick and not being able to come to

5    court.  Those are two entirely different things.

6          And this trial will get -- will go off the rails if we

7    are waiting for jurors to recover like we did last time or

8    waiting for attorneys to recover.  I mean, obviously everyone

9    has multiple counsel, but, you know, it could easily spread

10   within a team.  Mr. Beller's point, of course, is not that the

11   jurors shouldn't be masked and not that the attorneys shouldn't

12   be masked, but he rather focused I think appropriately on the

13   issue of whether witnesses could -- who are fully vaccinated

14   could testify or be given the option of testifying without a

15   mask.

16         And I think that that's something that we should

17   consider.  I am not going to answer that question right now

18   because the Court through its general orders and through its

19   revised protocols sets that particular standard and the

20   standard now requires it.  There is a lower risk from a witness

21   testifying without a mask with the possible exception of a

22   witness who is on the witness stand for a long period of time.

23   We all are in here all day and that is a lot different in terms

24   of exposure.

25         Witnesses, especially if we have witnessed who aren't

1    testifying very long, even if they may be contagious aren't --

2    you know, don't have the same exposure because they are not

3    with us all day.  If you had a witness who was on the witness

4    stand for a long period of time, that would be a little bit

5    different.

6            I've worried that you -- because we have this low

7    volume system, that to use probably a not so good analogy, but

8    it would be kind of like a mushroom cloud of exhalation that

9    wouldn't be able to clear so fast.  And, in fact, we did smoke

10   tests trying to replicate something to that effect in this

11   courtroom and you do get that, you know, a sufficient amount of

12   talking up there could potentially cause air from the witness

13   to move away from the witness stand and not rise up

14   sufficiently to get above people's nose level, not that it goes

15   very far laterally, but some of those people closer like

16   Mr. Byrne, Mr. Canty, there is always a possibility.

17           So with a shorter witness, there may be -- that may be

18   good.  But on the other hand, it would be a little bit odd too

19   to have a rule that depended on the length of the testimony

20   because it seems like the witnesses maybe should all be treated

21   the same.  So those are some of the things that we will -- we

22   will think about.

23           Also, you know, the Court does not have a supply of

24   rapid tests, but -- and I don't know whether counsel have some,

25   but if you did, you know, another thing that we might be able

1     to think about is like doing a rapid test on one of these

2     witnesses who is going to be on the witness stand for a longer

3     period of time.  And that may give us some additional assurance

4     and make us feel comfortable about that.  And we could tell

5     without being specific as to a given witness, tell the jurors

6     that any witness that was going to be on the witness stand for

7     a longer period of time, we will administer a rapid test to

8     them.  And if it's fine, that person would be allowed to

9     testify without a mask.

10          So those are some of the things that we can think

11     about, but ultimately it's good news.  But it does pose some

12     tricky issues because I want to make sure that everyone not

13     only stays out of the hospital, but is able to be healthy and

14     here for the trial.

15          Mr. McLoughlin, did you have something?

16          *MR. McLOUGHLIN:*  Your Honor, very, very briefly.

17          When Your Honor reads *Kendall*, for example, *Swainson*,

18     which is 548 F.2d 657, on this joint venture argument,

19     respectfully the government mischaracterizes the joint venture

20     exception.  For example, in *Kendall* the defendant -- one of the

21     defendants was acquitted on a theory of entrapment.  And so

22     other defendants said, well, since he wasn't guilty of the

23     conspiracy, then you could not admit his statements against us.

24          And the entire purpose of the joint venture exception,

25     it is still foundationally contingent on proof that the

1    individual whose statements are at issue was a member of the

2    conspiracy, where there is sufficient evidence that he or she

3    was a member of the conspiracy acting in furtherance of its

4    illegal objectives.  The fact that down the road that person is

5    either not convicted of a crime, such as in *Kendall* because of

6    an entrapment or some other basis on which they are ultimately

7    not guilty of the charged crime such as Hobbs Act, is

8    irrelevant to the evidentiary exception because you first need

9    the evidentiary proof of 801(d)(2)(E).

10          The government wants to expand that to, well, this

11   person is just trying to get business from KFC and write out

12   the other requirements of the rule.  So their argument I think

13   when you read those questions simply does not follow from the

14   logic of the, quote, exception.  Thank you.

15          *THE COURT:*  Yeah, that's my intuition as well, but I

16   will take a look at those cases.  The jury is here now and so

17   why don't we try to get our witness, Ms. Becker, connected.

18          Mr. Tubach?

19          And then I will hear from you in just one second,

20   Ms. Call.

21          *MR. TUBACH:*  Just with respect to Ms. Becker, I don't

22   believe there is any relevance to any further questioning on

23   documents not related to Exhibit 1030.  I don't know if the

24   government is intending to go through all the other exhibits

25   they provided Ms. Becker, but I believe at this point it's

1    simply irrelevant and unduly prejudicial to go through all

2    those documents when there is no indication -- she has already

3    testified about what her belief is about Exhibit 1030.

4    Anything else wouldn't be relevant.

5              THE COURT:  I am sure about that.  Go ahead, Ms. Call.

6    You probably have two things to address.  Go ahead.

7              MS. CALL:  First, we don't plan to go through any

8    additional documents other than ones already reviewed with her

9    today.  And then second, on the 801(d)(2)(E) issue, I don't

10   have further argument for Your Honor.  But in anticipating a

11   motion for reconsideration which was not eventually filed, but

12   I did brief this issue and I would like to seek leave to file

13   just like a two or three-page brief this morning.

14             THE COURT:  What time this morning?

15             MS. CALL:  Likely within the next hour.

16             THE COURT:  Yeah, that's fine, because I was going to

17   try to use the mid-morning break to take a look at some of the

18   cases, but you can do that, sure.

19             MS. CALL:  Thank you, Your Honor.

20             THE COURT:  Anything that we should do before we bring

21   the jury in?

22             All right.  Let's bring the jury in.

23             (Jury present.)

24             THE COURT:  Good morning, ladies and gentlemen.  I

25   hope you had a good weekend.  As you recall, we left off with

Florence Becker - Direct

1    the testimony by video teleconference of Ms. Becker.  So I

2    think we have got Ms. Becker and her attorney -- yes, there we

3    go.

4            Ms. Becker, this is Judge Brimmer.  Can you hear me?

5            *THE WITNESS:*  Yes, I can.  Thank you, Your Honor.

6            *THE COURT:*  Ms. Barron, can you hear me as well?

7            *MS. BARRON:*  Yes, Your Honor.

8            *THE COURT:*  Are both of you ready to begin?

9            *THE WITNESS:*  Yes.

10           *MS. BARRON:*  Yes.

11           *THE COURT:*  Ms. Call, go ahead.

12      (**Florence Becker** was previously sworn.)

13                    **DIRECT EXAMINATION CONTINUED**

14   *BY MS. CALL:*

15   *Q.*  Good morning, Ms. Becker, and thank you for joining again.

16           On Friday we talked about a contract.  It was marked

17   as Government's Exhibit 9900, and I believe you described it as

18   relating to offal.  Do you recall that, Ms. Becker?

19   *A.*  Yes, I do.

20   *Q.*  Are contracts like Exhibit 9900 maintained in the normal

21   course of business at Mar-Jac from your experience?

22           *MR. TUBACH:*  Lack of foundation, Your Honor.

23           *THE COURT:*  Hold on.  Let me rule on that objection.

24   The objection will be overruled.  She can answer.

25   *A.*  Yes.  I believe they would be.

Florence Becker - Direct

1    *BY MS. CALL:*

2    Q.  Thank you.  Are they relied on in the usual course of

3    business?

4           *MR. TUBACH:*  Same objection, Your Honor.

5           *THE COURT:*  Overruled.

6    A.  How much they're reviewed, I don't know.  I think they are

7    all pretty standard.

8    *BY MS. CALL:*

9    Q.  Thank you, Ms. Becker.

10          Could you please pull up Government Exhibit 1030 that

11   we reviewed on Friday?

12   A.  Yes.

13   Q.  Do you have that in front of you, Ms. Becker?

14   A.  I do, yes.

15   Q.  Have you ever seen this document before?

16   A.  Not to my knowledge.

17   Q.  Has it ever been described to you?

18          *MR. BELLER:*  Objection, calls for hearsay.

19          *THE COURT:*  Overruled.

20   A.  Well, not really.  I mean, it's a normal looking type of

21   document.  There wouldn't have been any reason to describe it

22   to me.

23   *BY MS. CALL:*

24   Q.  All right.  So has anyone ever pointed out differences in

25   the handwriting in that document to you?

Florence Becker - Direct

1    *A.* No.

2    *Q.* All right.  Now, Ms. Becker, are you aware of

3    representatives from the Department of Justice seeking to speak

4    with you ahead of your testimony?

5    *A.* Yes, I am.

6    *Q.* All right.  And did you agree to speak with them?

7    *A.* No, I did not.

8         *MS. CALL:* Your Honor, the government offers into

9    evidence Exhibit 9900 and Exhibit 1030.

10        *THE COURT:* Let's take them one at a time.  Any

11   objections to the admission of Exhibit 9900?

12        *MR. TUBACH:* Yes, Your Honor.  The document is not --

13   it appears to be a markup of a contract, not a signed contract,

14   so I don't believe it would qualify as a business record in

15   that sense.  I believe Ms. Becker testified that she was --

16   perhaps we can even disconnect if there is no question -- if

17   there is no further questioning of Ms. Becker, but I don't know

18   if you want to do this admissibility now.  But this is not a

19   counter-signed document.  It's not an actual contract.  It

20   looks like to be a markup of some kind.  I don't see how this

21   is a business record.

22        *THE COURT:* Mr. Beller, go ahead.

23        *MR. BELLER:* Thank you, Your Honor.  My objection is

24   one of foundation.

25        *THE COURT:* All right.  And response?  Anyone else

Florence Becker - Direct

1    have an objection?  Okay.

2         *MS. CALL:*  Yes, Your Honor.  I believe there is three

3    bases of admissibility.  First, under 803(6) this is a signed

4    contract, at least signed by one party.  And Ms. Becker did

5    testify as to how documents such as this specific exhibit were

6    maintained and relied on in the normal course of business for

7    Mar-Jac.  Aside from that, she also authenticated the

8    handwriting on the document.  Although it wasn't a hundred

9    percent certainty, she did testify as to this exhibit that the

10   handwriting may very well be Pete Martin's, and that was on

11   Friday.

12        Thirdly, as to authentication, it's admissible simply

13   because it's created under circumstances indicating its

14   genuineness, which is the requirements of authenticity of known

15   samples of handwriting.  So for those three bases I would say

16   that 9900 is admissible.

17        *THE COURT:*  All right.  The Court will overrule the

18   objections and admit Exhibit 9900.  It is true that -- first of

19   all, in terms of it being a signed contract, I do find that it

20   qualifies as a business record.  However, other than the

21   signature, the other handwriting in the document is not

22   admissible on that basis.  However, the Court does find that

23   the testimony of Ms. Becker has provided a sufficient basis for

24   admissibility and for the jury to determine whether or not it

25   is indeed the testimony of -- sorry, the handwriting of

Florence Becker - Direct

1   Mr. Martin, so I will admit Exhibit 9900.

2          Next -- any objections to the admission of 1030?

3          *MR. TUBACH:*  Yes, Your Honor, we do object and we

4   might have a side bar on this.

5          *THE COURT:*  Yes.

6      (At the bench:)

7          *THE COURT:*  Mr. Tubach, go ahead.

8          *MR. TUBACH:*  Your Honor, Ms. Becker testified on

9   Thursday that she could not positively identify the handwriting

10  as Mr. Martin's.  She says according to the rough transcript,

11  said, "It's not the same, so I can't possibly identify it."

12  That's at 185 and 186.  Ms. Becker further testified, "I could

13  not swear on it that it is any particular person's

14  handwriting."  She said, "It is somewhat similar to Pete, but

15  again it's not exact, as far as I remember it, and I am sorry

16  about that."

17         She was quite clear that she could not identify this

18  is Pete Martin's handwriting.  The government tried to get her

19  to say that Pete Martin kept a notebook in which these notes

20  might have been kept, but she did not say that either.  She

21  didn't confirm that.  She testified he kept a calendar and

22  wrote on file folders.  She also said that given some of the

23  names that are on the document that she didn't recognize, that

24  made her, as she put it, a little suspect.

25         So I think given what she has testified does not

Florence Becker - Direct

1    qualify for admission under 901(b)(2), a non-expert's opinion

2    that the handwriting is genuine based on familiarity with it

3    that was not acquired during the current litigation.  I also

4    believe it would not be admissible under 901(b)(4) because

5    there is nothing about the contents of this that would show it

6    was Pete Martin's handwriting.  Pete Martin's name is nowhere

7    on the document.  He doesn't sign it.  She says that she worked

8    for both Mr. Martin and Joel Williams at the time of the date

9    that's on the document.

10        And so as a result, we don't believe there is anything

11   about its appearance or contents or substance or anything else

12   that would allow it to be admitted under 901(b)(4).

13   Particularly there are cases where much more strong testimony

14   about the handwriting was still rejected in terms of the

15   admissibility of a document.  An example is *Biers v. Cline*, 724

16   F. App'x. 189 at 192, a Fourth Circuit case wherein the

17   assistant said she was familiar with the author's handwriting,

18   the notes appeared to be written by the author, but she had

19   never seen the notes before and had no knowledge as to the

20   circumstances of their creation.  And the Court refused to

21   admit the handwritten notes because she didn't sufficiently

22   authenticate them.

23        I think the testimony here is far more equivocal, and

24   as a result the Court should not admit Government Exhibit 1030

25   based on the testimony of Ms. Becker.

Florence Becker - Direct

1          THE COURT:  All right.  Any other different

2     objections?

3          MR. BELLER:  Your Honor, not necessarily a different

4     objection.  I would simply note for the Court that at this

5     point the relevance of this document has not been established

6     in addition to the foundation that Mr. Tubach had articulated.

7     Your Honor, when -- as a bit of an aside, when Ms. Call had

8     indicated that Ms. Becker had identified the notes as being

9     Mr. Martin's, Ms. Becker on the screen did shake her head no.

10    Your Honor, I imagine there is probably going to be a similar

11    reaction from the witness if the witness were to be voir dired

12    or cross-examined on this particular document.

13         THE COURT:  Ms. Call, response?

14         MS. CALL:  Yes, Your Honor.  Ms. Becker has

15    unquestionably really met the low standard for authentication

16    under Rule 901, which I will note is a non-exhaustive list.

17    But under the two rules that counsel for Mr. Penn noted, and I

18    will go first with 901(b)(4), Ms. Becker did testify to the

19    distinctive characteristics of this document.  When asked about

20    the contents of the document and specifically the words

21    contained in it if that led her to any understanding as to who

22    wrote the document, she answered that, "From this time from

23    2014 I would expect it to be Pete.  I cannot guarantee it, but

24    I would expect it to be."  And that is on Page 182 of the rough

25    transcript.

Florence Becker - Direct

1        Under Rule 101 -- 901(b)(2) regarding lay witness

2    testimony authenticating handwriting, specifically she

3    similarly concluded that the handwriting was likely that of

4    Mr. Martin.  First she established her background of

5    familiarity as is required by the rule, and she was more than

6    familiar with Mr. Martin's handwriting having worked for him

7    for over 20 years as an executive assistant and seen his

8    handwriting on many, many times, as she said on the record.

9        She further provided with particularity instances of

10   seeing his handwriting such as she observed on file folders and

11   the desk calendar that Mr. Tubach referenced.  She later

12   testified that while she could not swear on her Bible that this

13   was Mr. Martin's handwriting, that was somewhat similar to

14   Pete, but again it's not exact as far as she could remember it,

15   and that's the transcript on 186.

16       This exact kind of testimony has been found sufficient

17   under the law of 901(b)(2).  And the Eleventh Circuit has

18   specifically admitted documents on almost this exact same kind

19   of testimony where a witness who was a co-worker of the author

20   of a document testified that the handwriting was similar to

21   that of the questioned individual.  And that's *United States v.*

22   *Barker,* B-A-R-K-E-R, 735 F.2d 1280 and that's in the Eleventh

23   Circuit, 1984.

24       Regarding that same level of certainty that counsel

25   for Mr. Penn cited, the Seventh Circuit has actually said we

Florence Becker - Direct

1  don't expect a hundred percent certainty from a witness and

2  that's *United States v. Tipton*, 964 F.2d 650, Seventh Circuit

3  1992.  And both of these cases I should note are cited in the

4  government's trial brief, but that case the Seventh Circuit

5  essentially said that the lack of certainty is the kind of

6  statement you would expect from a truthful witness and they are

7  not handwriting experts.  So based on her authentication of

8  this document under multiple rules, under 901, the government

9  would view that this 1030 has been sufficiently authenticated.

10      And I will note just to respond to some previous

11  issues that were raised, although I think it is moot right now

12  regarding the nature of how documents were shown to Ms. Becker,

13  but one district court, and that's in the Western District of

14  Missouri, has dealt with, you know, allegations of a suggestive

15  shows of handwriting to a witness.  I don't think that's the

16  case here since Ms. Becker testified she had not previously

17  seen 1030 and she was not shown documents before the testimony

18  I just referenced.  But I will note that district court did say

19  there doesn't appear to be any law on the topic of suggestive

20  handwriting testimony, this is a quote, which may indicate that

21  it does not exist.  And that's *United States v. Elder*, 2009 WL

22  1470377.  And that case did affirm the handwriting testimony

23  that happened in that case.

24      For relevance, I should note we do believe Agent

25  Taylor's testimony has been sufficient at this point to bring

Florence Becker - Direct

1    1030 into evidence, but if not, it can be subject to connecting

2    up with relevance at a later time in trial.

3         THE COURT:  Ms. Call, did you intend to ask any

4    additional questions of Ms. Becker?

5         MS. CALL:  No, Your Honor.

6         THE COURT:  Okay.  I am going to withhold the ruling

7    on admission as to 1030 until there is cross-examination,

8    assuming that anyone wants to cross-examine Ms. Becker, so we

9    can then use any additional answers that she has on

10   cross-examination and redirect to determine whether or not at

11   this point in time it is admissible, all right?

12        So we'll -- I will allow the government to renew its

13   request for the admission of 1030 after cross-examination and

14   redirect.  Thank you.

15        MR. McLOUGHLIN:  If I may just briefly note, if one

16   looks at *Barker*, the issue on the facts of *Barker* was that the

17   government also had an FBI handwriting expert who testified

18   that the signatures in question were the signatures of the

19   defendant.  While the Court does discuss later in the opinion

20   the issue of the lay testimony and whether it was sufficient, I

21   don't think per *Barker* you can separate out the reinforcement

22   of the testimony of the non-expert from the fact that the

23   government in that case had a FBI document examiner testify

24   that the signatures were, in fact, written by the defendant.

25   So I would argue that *Barker* is simply not that, in addition to

Florence Becker - Cross

1    it's from a different circuit.  It's simply not persuasive

2    authority here.

3              THE COURT:  All right.  Thank you.

4         (In open court:)

5              THE COURT:  I will take the government's request to

6    admit 1030 under advisement.

7              And at this time any additional questions, Ms. Call?

8              MS. CALL:  No further questions.

9              THE COURT:  All right.  Cross-examination.

10             MR. BELLER:  If we may have just a moment, Your Honor.

11             THE COURT:  Sure.

12             MR. TUBACH:  Good morning, Ms. Becker.  Can you hear

13    me?  Ut-oh.

14             THE COURT:  Ms. Becker, can you hear us?  This is

15    Judge Brimmer?

16             THE WITNESS:  Yes, I can.

17             THE COURT:  Okay.  We are going to do

18    cross-examination, and Mr. Tubach is going to ask you some

19    questions.

20             Go ahead, Mr. Tubach.

21                          **CROSS-EXAMINATION**

22    BY MR. TUBACH:

23    Q.  Good morning, Ms. Becker.  Can you hear me?

24    A.  Yes, I can.  Thank you.

25    Q.  I am right over here if you are looking at the camera.  I

404

Florence Becker - Cross

1  just have one question, Ms. Becker.  Can you tell us who wrote

2  the handwritten notes in Exhibit 1030?

3  *A.*  I cannot guarantee who wrote this not being a handwriting

4  expert.  It could well be Pete Martin.

5  *Q.*  But as you sit here today, you can't tell us it's Pete

6  Martin's handwriting; is that right?

7  *A.*  That's correct, not with 100 percent surety, I could not.

8          *MR. TUBACH:*  Thank you.  I have no further questions.

9          *THE COURT:*  Thank you.

10          Additional cross?

11          All right.  Ms. Call?

12      *MS. CALL:*  No further questions, Your Honor.  And the

13  government does reoffer Exhibit 1030.

14          *THE COURT:*  Any additional argument on 1030?

15      *MS. CALL:*  If I may just note *United States v. Barker*,

16  Your Honor, as counsel for Defendant Lovette noted, there was

17  additional authenticating testimony by a handwriting expert in

18  that case.  However, the evidence at issue involved forged

19  checks, so there is no characteristics of the document that in

20  addition to the testimony alone would authenticate the

21  document.  Here we have a combination of both the handwriting

22  testimony, as well as the characteristics of the documents

23  which both together do sufficiently go above the bar for

24  authentication, including on the relevance point that I believe

25  Ms. Becker did testify that she believed this document related

Florence Becker - Cross

1    to KFC.

2            THE COURT:  Okay.  And actually, Ms. Barron and

3    Ms. Becker don't have to stick around for this part because her

4    testimony is done.  So Ms. Becker, thank you very much for

5    appearing both on Thursday and again today.  And thank you,

6    Ms. Barron, as well.  You are excused.

7            MS. BARRON:  Thank you, Your Honor.

8            THE COURT:  All right.  The Court will overrule the

9    objections and admit examine Exhibit 1030.  The Court finds

10   that the testimony of Ms. Becker is sufficient, although she

11   lacks 100 percent certainty for the jury to be able to weigh

12   her testimony regarding the handwriting on that particular

13   document in terms of its authenticity.  I also overrule the

14   relevancy objection and believe that that foundation has

15   already been laid, so Exhibit 1030 will be admitted.

16           The United States may call its next witness.

17           MR. TORZILLI:  Thank you, Your Honor.  The United

18   States calls Theodore Sangalis.

19      (**Theodore Sangalis** was sworn.)

20           THE WITNESS:  I do.

21           COURT DEPUTY CLERK:  Please state your name and spell

22   your first and last name for the record.

23           THE WITNESS:  Theodore Sangalis, T-H-E-O-D-O-R-E,

24   S-A-N-G-A-L-I-S.

25           MR. TORZILLI:  Your Honor, may I approach with

406
Theodore Sangalis - Direct

1    binders?

2            THE COURT:  You may.

3                    **DIRECT EXAMINATION**

4    BY MR. TORZILLI:

5    Q.  Good morning, sir.

6    A.  Good morning.

7    Q.  Where do you work?

8    A.  I work at Pilgrim's Pride Corporation.

9    Q.  How long have you worked at Pilgrim's Pride Corporation?

10   A.  About two years.

11   Q.  What's your job title?

12   A.  Corporate counsel.

13   Q.  Could you briefly describe your job responsibilities?

14   A.  I handle the legal needs of the business, so everything

15   from corporate governance to contracts, litigation, whatever

16   they need.

17   Q.  Do you see the binder in front of you?

18   A.  Yes, sir.

19   Q.  Do you recognize the documents contained in the binder?

20   A.  I do, yes.

21   Q.  How do you recognize them?

22   A.  I reviewed them in preparation for my testimony today.

23   Q.  The very first page in the binder is a document that's been

24   marked for identification purposes as 9983.  Do you see that?

25   A.  Yes, sir.

Theodore Sangalis - Direct

1    Q.  What do you understand that to be?

2    A.  I understand it to be an index of what's in the binder.

3    Q.  You said that you had reviewed the documents contained in

4    that binder prior to your testimony.  For what purpose did you

5    conduct that review?

6    A.  In preparation for testimony.

7    Q.  Does the list of documents that appears on 9983 include

8    bids that Pilgrim's Pride Corporation submitted to customers?

9    A.  Yes, it does.

10   Q.  Does it include both formal bids and informal bids that are

11   transmitted in e-mails?

12   A.  Yes.

13   Q.  Does it contain a set of minutes from a meeting of

14   Pilgrim's Pride Corporation board of directors?

15   A.  It does.

16   Q.  And does it contain a travel expense -- portions of a

17   travel expense report?

18   A.  Yes.

19   Q.  Including receipts that were submitted as part of that

20   report?

21   A.  Yes, sir.

22   Q.  For the category of documents that you just identified, are

23   you familiar with the process for how those documents are

24   created?

25   A.  Yes, I am.

Theodore Sangalis - Direct

1  *Q.*  So for the bids that appear in the binder in front of you,

2  how are they created?

3  *A.*  It depends on the customer and the salesperson, but

4  sometimes by e-mail, sometimes it's a formal spreadsheet that's

5  sent or some sort of formal set of documents that's exchanged

6  between the customer and Pilgrim's.

7  *Q.*  For the minutes of the meeting of Pilgrim's Pride board of

8  directors, do you know how that document was created?

9  *A.*  Yes.

10  *Q.*  Could you explain?

11  *A.*  So there is usually someone from the legal department,

12  usually a general counsel, in those meetings taking those notes

13  and then storing them and having them signed duly.

14  *Q.*  Are you familiar with the process of how expense reports

15  are created at Pilgrim's Pride Corporation?

16  *A.*  Yes.

17  *Q.*  Could you describe that process, please?

18  *A.*  So when there is a trip that you go on for work purposes,

19  you save those receipts.  You then submit those receipts and

20  the expenses that you incurred on that trip.  It is approved by

21  your manager and then sent to accounting and payroll to

22  reimburse you.

23  *Q.*  For the same category of documents, are you familiar with

24  the process for how they are stored?

25  *A.*  Yes.

Theodore Sangalis - Direct

1    Q.  For bids how are they stored?

2    A.  So to the extent that they are via e-mail, we have an

3    e-mail archive system.  So even if you delete it, there is

4    always a record of it or they are stored in some sort of shared

5    drive if it's a more formal contract.  For -- I am sorry, that

6    was for the bids.

7    Q.  How about for minutes of meetings at Pilgrim's Pride board

8    of directors, how are they stored?

9    A.  They are stored in a shared dive that the legal department

10   has access to.

11   Q.  And for expense reports how are they stored at Pilgrim's

12   Pride?

13   A.  Expense reports are stored in SAP, which is our payroll

14   system, that allows us to reimburse the employee.

15   Q.  Are all the records in that binder in front of you made

16   during the regular course of regularly conducted business at

17   Pilgrim's Pride?

18   A.  They are, yes.

19   Q.  Are they kept in the course of regularly conducted business

20   at Pilgrim's Pride?

21   A.  Yes, sir.

22   Q.  For bids how are they kept and maintained?

23   A.  So again if it's via e-mail, it's in the archive system or

24   in a shared drive for more formal contracts.

25   Q.  And how about meetings of the board of directors at

Theodore Sangalis - Direct

1    Pilgrim's Pride?

2    A.   Those are in the shared drive that the legal department has

3    access to.

4    Q.   Are all the records that are contained in the binder in

5    front of you made by persons that have personal knowledge of

6    the information that's contained in those records?

7    A.   Yes, they --

8            MR. TUBACH:   Lack of foundation, Your Honor.

9            THE COURT:   Sustained.

10   BY MR. TORZILLI:

11   Q.   For bids that are kept and maintained in the regular course

12   of business at Pilgrim's Pride, how are those create -- how are

13   they produced?

14           MR. TUBACH:   Lack of foundation.

15           THE COURT:   Overruled.

16   A.   They are produced by usually the salesperson that's

17   submitting the bid.

18   BY MR. TORZILLI:

19   Q.   And how about for the meetings of the board of directors of

20   the company?

21   A.   Sorry, the question on that?

22   Q.   How is it -- how is it made?

23   A.   Oh, by the legal department, whoever the attorney is that's

24   in the meeting.

25   Q.   Is it by someone who attends the meeting of the board of

Theodore Sangalis - Direct

1   directors?

2   *A.*   Yes, sir.

3   *Q.*   Do you have an understanding of what the purpose of the

4   minutes of a board of directors meeting at Pilgrim's Pride are?

5   *A.*   So it's to take notes of what actually happens in the

6   meeting.  It's a publicly traded company, so we have an

7   obligation to record what happens in every board meeting.

8   *Q.*   Does the company have an interest in ensuring that the

9   board meetings are an accurate reflection of what occurred?

10   *A.*   Yes.

11   *Q.*   Does Pilgrim's Pride have an interest in ensuring that the

12   bid information that it keeps is an accurate reflection of the

13   bids that were submitted?

14   *A.*   Yes, it does.

15   *Q.*   And does Pilgrim's Pride have an interest in the records it

16   keeps pertaining to reimbursable employee expenses are

17   accurate?

18   *A.*   Yes.

19   *Q.*   Why?

20   *A.*   For purposes of being sure that the reimbursement is

21   accurate.

22         *MR. TORZILLI:*   Your Honor, at this time the United

23   States offers into evidence the documents identified on

24   Government Exhibit 9983.

25         *THE COURT:*   Any objection to the admission of the

412

Theodore Sangalis - Direct

1   exhibits listed on Exhibit 9983?

2          MR. TORZILLI:  With one friendly amendment, Your

3   Honor, with the exception of Exhibits 7046 and 7046-1.

4          THE COURT:  Right, which are at Tab 23.  So the ones

5   that are otherwise listed on Exhibit 9983.

6          Mr. Feldberg?

7          MR. FELDBERG:  Your Honor, we have an objection to one

8   of the exhibits, 9505.  I am happy to conduct a voir dire or

9   discuss it at a side bar, whatever the Court prefers.

10         THE COURT:  What tab number is that, Mr. Feldberg?

11         MR. FELDBERG:  9505.

12         THE COURT:  I see it, Tab 28.

13         Go ahead with any voir dire you have at this time.

14         Ladies and gentlemen, when you hear me make that --

15  when I say voir dire, what that means is that it's the ability

16  of someone who otherwise -- who didn't call the witness, an

17  opposing party, to ask some questions of the witness about that

18  particular document before the time of cross-examination would

19  normally occur.

20         Go ahead, Mr. Feldberg.

21         MR. FELDBERG:  Thank you, Your Honor.

22                    VOIR DIRE EXAMINATION

23  BY MR. FELDBERG:

24  Q.  Mr. Sangalis, I am Michael Feldberg.  I am Roger Austin's

25  lawyer.  Do you have Exhibit 9505 in front of you?

Theodore Sangalis - Direct

1   A.   Yes, sir.

2   Q.   That's a five-page document, correct?

3   A.   It looks like I have six, but...

4   Q.   You are right.  It's six.  Let's take a look at the third

5   page, please.

6   A.   Okay.

7   Q.   That looks like a travel record from a company called

8   EGENCIA.  Am I correct on that?

9   A.   Yes.

10  Q.   And can you identify from the document whose travel record

11  this is?

12  A.   It looks like the main contact is David Andrew Dodds.

13  Q.   Who is David Andrew Dodds?

14  A.   He was an employee of Pilgrim's.

15  Q.   He is not any of the people in this courtroom, is he?

16  A.   Not to my knowledge.

17  Q.   Okay.  And would you agree with me, sir, that the third,

18  fourth and fifth pages of Exhibit 9505 are this travel record

19  of David Andrew Dodds?

20  A.   Yes, I would agree with that.

21  Q.   Okay.  If you look at the first page, sir, of 9505, there

22  are three receipts on that page, correct?

23  A.   That's correct.

24  Q.   And if you look at the middle receipt, it looks like it's a

25  receipt from McDonald's for $5.30 for two Egg McMuffins and a

414

Theodore Sangalis - Direct

1    couple Cokes; am I right?

2    A.   It appears to be correct.

3    Q.   Is there a name on that receipt?

4    A.   Not that I see, sir.

5    Q.   How about the third -- the bottom receipt on that page?

6    There is the name Justin and the name Alex.  Do you see any

7    other names on there?

8    A.   No, sir.

9    Q.   Do you know who Justin and Alex are?

10   A.   I don't, sir.

11   Q.   Okay.  If you look at the sixth page, there are two

12   receipts, correct?

13   A.   Correct.

14   Q.   And the right-hand receipt for $6.89, the only name we can

15   see on that is Sandra, correct?

16   A.   That's the only name I see, yes, sir.

17           MR. FELDBERG:  Your Honor, we object to 9505.

18           THE COURT:  Thank you.

19           Mr. Torzilli, response?

20           MR. TORZILLI:  Your Honor, may I inquire?

21           THE COURT:  Yes, of course.

22   BY MR. TORZILLI:

23   Q.   Mr. Sangalis, are the receipts that appear in Exhibit 9505

24   part of a submission that was made to Pilgrim's Pride

25   Corporation for reimbursement by the company?

Theodore Sangalis - Direct

1   *A.*  Yes, they were.

2   *Q.*  Within Exhibit 9505 is there a hotel receipt for the Ritz

3   Carlton?

4   *A.*  Yes, there is.

5   *Q.*  Who was the guest?

6   *A.*  It appears to be Mr. Roger Austin.

7   *Q.*  What were the dates of the stay of Mr. Austin's stay at the

8   Ritz Carlton?

9   *A.*  July 20, 2014, through July 23rd of 2014.

10          *MR. TORZILLI:*  Thank you.  Your Honor.  We reoffer

11   9505.

12          *THE COURT:*  Anything more from you, Mr. Feldberg?

13          *MR. FELDBERG:*  With respect to those entries on 9505

14   that don't appear to have anything to do with Mr. Austin, we

15   object.

16          *THE COURT:*  And just for the record, those are

17   everything except the second page of it?

18          *MR. FELDBERG:*  That's correct.  But Your Honor, in

19   fairness, the top receipt on the first page.

20          *THE COURT:*  Oh, is from -- yeah, I understand.  I

21   think it contains or does have the name Austin.

22          *MR. FELDBERG:*  The objection to the other entries is

23   relevance.

24          *THE COURT:*  Response, Mr. Torzilli?

25          *MR. TORZILLI:*  This is part of a submission that was

Theodore Sangalis - Direct

1   made.  It's all relevant.  If Your Honor deems any of the pages

2   other than the one that I just inquired of the witness, we are

3   happy to supply appropriate redactions.

4          THE COURT:  All right.  So in terms of Exhibit 9505,

5   the first which is at the top of the page receipt is relevant

6   and admissible as a business record.  The other two receipts in

7   that page have no connection, apparent connection with

8   Mr. Austin.  Page 2 will be admitted.  That is a receipt of --

9   a hotel receipt with Mr. Austin's name on it.  And the rest,

10  Pages 3 and 4 and 5 will not be admitted.  In terms of Page 6,

11  the receipt on the left-hand side of the page will be admitted.

12  It does bear the name Austin.  And the other receipt has no

13  indication, so I will order that that be redacted.  So those

14  portions of that exhibit will be admitted.

15          Any objections to the other exhibits?

16          All right.  Then the other exhibits that Mr. Torzilli

17  moved the admission of, which I won't read at this time, but

18  which are found in Exhibit 9983, the tabs from 1 through 21, as

19  well as 24, 28, and 29 with the exception of Tab 23 will be

20  admitted as business records.

21          Mr. Torzilli?

22          MR. TORZILLI:  Thank you, Your Honor.  We will make

23  the appropriate redactions.  May I continue?

24          THE COURT:  I am sorry, did you move the admission of

25  9983 as well?

Theodore Sangalis - Direct

1      *MR. TORZILLI:*  I did not.

2      *THE COURT:*  Okay, go ahead.

3   *BY MR. TORZILLI:*

4   *Q.*  A few more questions, sir.  If you could turn to Tab 23 in

5   your binder.

6   *A.*  Okay.

7   *Q.*  Are you there?

8   *A.*  Yes, sir.

9   *Q.*  You should see Exhibits 7046 and 7046-1?

10  *A.*  Correct.

11  *Q.*  Are you familiar with those exhibits?

12  *A.*  I am, yes.

13  *Q.*  What are they?

14  *A.*  It is a spreadsheet with pricing.

15  *Q.*  Whose files does the spreadsheets with pricing contained in

16  Exhibit 7046 and 7046-1 come from?

17  *A.*  They came from Roger Austin's.

18  *Q.*  How do you know they are Defendant Roger Austin's

19  spreadsheets?

20  *A.*  I was granted access to his home drive and was able to find

21  them there.

22  *Q.*  Could you describe the process you undertook to go through

23  his home drive to find the spreadsheets there?

24  *A.*  Our IT department granted me access and I was able to open

25  the drive and locate the spreadsheet.

Theodore Sangalis - Direct

1    *Q.*  Sir, were you involved in the production by Pilgrim's Pride

2    of documents in response to subpoenas?

3    *A.*  I was part of that process, yes.

4    *Q.*  Could you describe your involvement?

5    *A.*  I would help direct our paralegal, our vendors, our outside

6    counsel to produce those documents.

7    *Q.*  Were you involved in the production of e-mails?

8    *A.*  Yes.

9    *Q.*  Do you have an understanding -- and do those e-mails that

10   were produced have date and time information on them?

11   *A.*  They do, yes.

12   *Q.*  Do you have an understanding of how the time zones were

13   processed for the e-mails in Pilgrim's productions?

14   *A.*  Yes.

15   *Q.*  What's the basis for your understanding?

16   *A.*  I reviewed with outside counsel, as well as reviewing

17   protocols.

18   *Q.*  And so what is your understanding of how time zones were

19   processed in Pilgrim's Pride's productions?

20   *A.*  In the e-mails for metadata, our vendor would make a

21   uniform time zone of UTC, which is Coordinated Universal Time.

22   *Q.*  To what -- if there is an e-mail chain, so multiple e-mails

23   in one document, which ones use the Universal Coordinated Time?

24   *A.*  Just the last one in time, the top e-mail in those chains.

25   *Q.*  What is Universal Coordinated Time to the best of your

419

Theodore Sangalis - Direct

1    understanding?

2    A.   My understanding is it's a time zone that anybody can

3    coordinate off of somewhere east of here.

4    Q.   Is it used for purposes of trying to standardize date and

5    time information?

6    A.   That's how I understand it.

7    Q.   As part of your work with Pilgrim's Pride's document

8    productions including e-mails, did you have an opportunity to

9    review e-mails from those productions?

10   A.   I did, yes.

11   Q.   And do the e-mails that you reviewed comport with your

12   understanding of how time zones were processed?

13   A.   They do, yes.

14           MR. TORZILLI:   One moment to confer, Your Honor.

15           THE COURT:   You may.

16           MR. TORZILLI:   No further questions.

17           THE COURT:   Thank you.

18           Cross-examination?

19           Thank you very much, Mr. Sangalis, you are excused.

20           The United States may call its next witness.

21           MS. SWEENEY:   Thank you.   The United States calls

22   Stephen Gresch.

23      (**Stephen Gresch** was sworn.)

24           THE WITNESS:   I do.

25           COURT DEPUTY CLERK:   Please state your name and spell

420

Stephen Gresch - Direct

1    your first and last name for the record.

2         THE WITNESS:  Stephen Gresch; S-T-E-P-H-E-N, Gresch,

3    G-R-E-S-C-H.

4                         **DIRECT EXAMINATION**

5    BY MS. SWEENEY:

6    Q.  Good morning, Mr. Gresch.  Where do you work?

7    A.  TransPerfect Legal Solutions.

8    Q.  And how long have you been employed there?

9    A.  About five years.

10   Q.  What is your job title?

11   A.  I am a manager of forensic technology and consulting.

12   Q.  I am sorry, could you just lean into the microphone?  I

13   couldn't hear that.  What is your job title?

14   A.  Manager of forensic technology and consulting.

15   Q.  Could you describe your responsibilities in that position

16   at TransPerfect?

17   A.  Sure.  So I oversee our Los Angeles forensics lab.  And the

18   day-to-day operations there are to consult on incoming

19   projects, to collect data and to store as evidence, to review

20   that data and analyze it, as well as do reporting and export it

21   to delivery to our clients and to our review and hosting teams

22   for review and production.

23   Q.  Mr. Gresch, was TransPerfect ever retained by Tyson Food or

24   its counsel?

25   A.  They were, yes.

Stephen Gresch - Direct

1   *Q.*  What was TransPerfect retained to do?

2   *A.*  To collect data as well as to host it for review and to use

    it for eventual production.

4   *Q.*  Did TransPerfect process e-mails?

5   *A.*  They did, yes.

6   *Q.*  With regard to e-mails specifically, how did TransPerfect

7   process time zones for those e-mails?

8   *A.*  E-mails were processed in UTC or Coordinated Universal

9   Time.

10  *Q.*  Is UTC a short name for Coordinated Universal Time?

11  *A.*  It is, yes.

12  *Q.*  If e-mails, if there was a chain of e-mails, which of those

13  chain of e-mails was processed in UTC?

14  *A.*  That would be the top level e-mail, so any quoted text

15  below or attachments may not have been.

16  *Q.*  Did TransPerfect process data from mobile devices?

17  *A.*  They did, yes.

18  *Q.*  And did TransPerfect process text messages from mobile

19  devices?

20  *A.*  They did, yes.

21  *Q.*  Focusing specifically on text messages, how did

22  TransPerfect process time zones?

23  *A.*  For text messages time zones were processed in both UTC,

24  Coordinated Universal Time, as well as in Central Time.

25  *Q.*  Are you familiar with the metadata field time zone?

Stephen Gresch - Direct

1   A.   I am.

2   Q.   How was the data for that field populated?

3   A.   The metadata for time zone field, is this specifically for

4   text messages?

5   Q.   Yes, sir.

6   A.   So that would have been populated both in UTC and in

7   Central Time depending on the data set.

8        MS. SWEENEY:   Your Honor, may I approach with a folder

9   of documents?

10        THE COURT:   You may.

11   BY MS. SWEENEY:

12   Q.   Mr. Gresch, you should now have in front of you a folder of

13   documents with exhibits marked Government Exhibit 751 all the

14   way through 759 inclusive.   Can you look through the list

15   and -- look through the documents and make sure you have those?

16   A.   Yes.   I have those documents.

17   Q.   What type of documents are these?

18   A.   These are text messages.

19   Q.   Were they processed by TransPerfect?

20   A.   They were, yes.

21   Q.   And what time zone were these text messages processed in?

22   A.   These were processed in universal time, the UTC,

23   Coordinated Universal Time.

24        MS. SWEENEY:   Your Honor, may I have just a moment to

25   confer.

Stephen Gresch - Cross

1      THE COURT:  You may.

2      MS. SWEENEY:  Thank you.  No further questions.

3      THE COURT:  All right.  Cross-examination?

4                      **CROSS-EXAMINATION**

5   BY MS. LaBRANCHE:

6   Q.  Mr. Gresch, my name is Marci LaBranche and I represent

7   Timothy Mulrenin.

8          So Ms. Sweeney asked you some questions about the

9   metadata for certain exhibits that you were just looking at.

10  And you indicated that the metadata, that when you processed --

11  that when your company processed these texts, that they

12  processed them in both UTC Time and Central Time?

13  A.  The texts specific to these exhibits were done in

14  Coordinated Universal Time.

15  Q.  Okay.  And to be clear, the texts that we are talking about

16  are texts that were taken from a device that was not actually

17  processed by your company.  It was processed by a different

18  company; is that correct?

19  A.  That's not correct.  The -- Carl Pepper's iPad was the

20  device that these came from and that was processed by

21  TransPerfect.

22  Q.  So TransPerfect got the actual iPad from Mr. Pepper and did

23  the data extraction?

24  A.  So TransPerfect received a iTunes backup of the device and

25  processed that.

424

Stephen Gresch - Cross

1   Q.   And who did TransPerfect receive the iTunes backup from?

2   A.   So they created the iTunes backup in a session with Carl

3   Pepper.

4   Q.   And that was a TransPerfect person working with Mr. Pepper?

5   A.   That's correct.

6   Q.   And then the information was provided to who?

7   A.   So when the collection occurred, we retained the iTunes

8   backup as evidence.  And then a TransPerfect technician created

9   the data export that went to our internal processing team to be

10  able to put into the review database.

11  Q.   And that TransPerfect person who conducted that, that was

12  not you, correct?

13  A.   That is correct.

14  Q.   And when you look at the exhibits that you have in front of

15  you, 751 through 759, there is a time stamp on those exhibits.

16  Do you see that?

17  A.   That is correct.

18  Q.   And is it your testimony that that time stamp is Universal

19  Time?

20  A.   That is correct.

21  Q.   And how is it that you know that this is not the version

22  that has the Central Time?

23  A.   Sorry, let me rephrase.  So the time zone processed for

24  this, which is in the time zone metadata field, would have been

25  UTC or the Coordinated Universal Time.  There is no time zone

Stephen Gresch - Cross

1   associated with the dates here.  There is no designation of a

2   time zone here.

3   Q.  Okay.  So when you look at Exhibits 751 through 759 and

4   there is -- for example, if we could pull up, if you could look

5   at 751, it says 9/16/2017 at 5:49 p.m., correct?

6   A.  Correct.

7   Q.  And you don't know as you're sitting here if that is the

8   Universal Time or it that Is Central Time.

9   A.  That is the Universal Time.  It just doesn't say UTC on it.

10  Q.  And how do you know that?

11  A.  Because that was the metadata associated with these

12  documents.

13  Q.  Okay.  How is it -- if you were to take Universal Time and

14  convert it to Eastern Time, what would the conversion be?

15  A.  So depending on daylight savings time, it's really minus

16  five.

17  Q.  It would be -- I am sorry?

18  A.  I believe it's minus five.

19          MS. LaBRANCHE:  I have no further questions, Your

20  Honor.

21          THE COURT:  Thank you.

22          Additional cross?

23          Yes, Mr. Pollack, go ahead.

24                        **CROSS-EXAMINATION**

25  BY MR. POLLACK:

Stephen Gresch - Cross

1   Q.  Good morning, Mr. Gresch.  My name is Barry Pollack.  I

2   represent Ric Blake.  Just a few questions to make sure I

3   understand it.

4           751 through 759 are all text messages?

5   A.  Correct.

6   Q.  But they were all taken from Mr. Pepper's iPad, not from

7   his phone?

8   A.  Correct.

9   Q.  Was his phone also processed?

10  A.  It was.

11  Q.  And was the time for these -- were these texts located on

12  his phone?

13  A.  So the texts that I am familiar with here were from the

14  iPad.  If they were also on the phone, I am not familiar with

15  that.

16  Q.  Okay.  So you didn't check the phone to make sure that the

17  time on the phone matched up with the time on the iPad?

18  A.  So I checked these documents specifically to see if they

19  matched the time zone in the metadata field and found that to

20  be true.

21  Q.  On the iPad.

22  A.  On the iPad.

23  Q.  Right.  You didn't compare it to the phone at all.

24  A.  My understanding is that the phone was processed in Central

25  Time, but I did not go back and check documents from the phone.

Stephen Gresch - Redirect

1           MR. POLLACK:  Okay.  Thank you.

2           THE COURT:  Thank you.

3           Additional cross-examination?

4           All right.  Redirect?

5                      **REDIRECT EXAMINATION**

6  BY MS. SWEENEY:

7  Q.  Yes, very briefly.  Mr. Gresch, you were speaking to

8  Ms. LaBranche about conversion between UTC and Eastern Time; is

9  that right?

10 A.  Correct.

11 Q.  And you testified that conversion is -- you subtract five

12 hours?

13 A.  I believe that for Eastern Time.

14 Q.  And throughout the whole course of the year, is it always a

15 five-hour difference?

16 A.  No.  There may be a difference for daylight savings time as

17 well.

18           MS. SWEENEY:  Thank you.

19           Your Honor, may I confer?

20           THE COURT:  You may.

21           MS. SWEENEY:  No further questions.

22           THE COURT:  All right.  Mr. Gresch, thank you very

23 much.  You are excused.

24           THE WITNESS:  Thank you.

25           THE COURT:  The United States may call its next

Stephen Gresch - Redirect

1   witness.

2              MS. CALL:  One moment, Your Honor.  Yes, Your Honor.

3   For the last several witnesses I don't believe we instructed

4   them on the sequestration order.  I don't know if they are

5   fully excused at this time.

6              THE COURT:  In terms of Mr. Sangalis and also

7   Mr. Gresch, are they subject to recall?  Looks like not.

8              MS. CALL:  May I inquire the same as to Ms. Becker?

9              THE COURT:  How about Ms. Becker, is she excused?

10  Yes.

11             Mr. Lavine?

12             MR. LAVINE:  I apologize, Ms. Call, but unfortunately

13  the way the podium was set and counsel, we are not able to look

14  at the witness.  I wonder if there is a way to do it because

15  none of us are able to view the witness on the witness stand.

16             THE COURT:  That is not good.  Well, I am worried that

17  wherever we move it we might have some blocking.  Now is that

18  better, Mr. Lavine?

19             MR. LAVINE:  I will move around, but --

20             THE COURT:  It's such tight quarters, it's a little

21  bit difficult to adjust.

22             MR. LAVINE:  Thank you, Your Honor.

23             THE COURT:  The United States may call its next

24  witness.

25             MS. CALL:  Your Honor, the government has a number of

429

Stephen Gresch - Redirect

1    documents to offer at this time, and those are the documents

2    listed in its filing ECF-1086 and the attachments thereto with

3    the exception of two documents that I believe the Court took

4    under advisement this morning which are 1519, 1521 and 1521-1.

5              THE COURT:  I don't think, Ms. Call, for some reason I

6    have a copy of that document handy.

7              MS. CALL:  Yes, Your Honor.  I have a copy if I could

8    pass it up through Ms. Grimm.

9              THE COURT:  That would be great.

10             MS. CALL:  And if I may approach just to grab it from

11   our cart, Your Honor.

12             THE COURT:  You may.  It turns out I did have a copy

13   of that.  Was this your only copy, Ms. Call?

14             MS. CALL:  I have an additional, Your Honor.

15             THE COURT:  Okay.  So with the exception of those

16   three documents that you noted, Ms. Call, the United States is

17   moving the admission of the exhibits that are listed in

18   Attachment 1 and Attachment 2?

19             MS. CALL:  Yes, Your Honor, and there is a few

20   additional spelled out in the motion which we can perhaps turn

21   to after Attachment 1 and 2.

22             THE COURT:  I am sorry, what was that last part?

23             MS. CALL:  There are several exhibits, I think perhaps

24   10, marked in Sections 3, 4 and 5 of the filing, and we will

25   move for the admissions of those, but those are not contained

Stephen Gresch - Redirect

1    in the attachments.

2              THE COURT:  Those are not what?

3              MS. CALL:  They are not listed in the Attachments 1

4    and 2.

5              THE COURT:  So let's focus on Attachment 1.  Any

6    objection to the admission of exhibits listed In Attachment 1

7    to Docket No. 1086?

8              MR. TUBACH:  Could we be heard on side bar just

9    briefly?

10             THE COURT:  Yes.

11        (At the bench:)

12             THE COURT:  Mr. Tubach, go ahead.

13             MR. TUBACH:  Just on a couple of overarching issues,

14   Your Honor.  We had talked at the last trial about redacting

15   the footers of these documents that say "confidential" on them

16   and that's -- they are still contained on all of the exhibits

17   that the government is offering into evidence.  In addition, I

18   don't know if this is true of Attachment 1, but certainly

19   Attachment 2 has those first pages of the RSCS contracts that

20   need to be redacted and not being redacted and there may also

21   be limiting instructions for some of these documents that need

22   to be given.  I think doing this en masse may have those things

23   simply slip through the cracks.

24             THE COURT:  First of all, Ms. Call, why don't you

25   address Mr. Tubach's first point first, not on limiting

Stephen Gresch - Redirect

1    instructions, but as to the other things that he mentioned.

2         MS. CALL:  Yes, Your Honor.  For the redactions for

3    the SBRA agreements, based on Your Honor's instruction at the

4    pretrial conference, it is the government's intention to redact

5    those first pages.  I believe it has been done.  Nevertheless

6    accident we do not intend to publish them at this time.  And we

7    will certainly ensure that they are redacted at the time they

8    are shown to the jury.

9         THE COURT:  Okay.  And then what about the

10   "confidential" notation at the bottom of many exhibits?

11        MS. CALL:  Yes, I believe that was discussed at the

12   last trial.  And it's simply not possible given that the volume

13   of documents and it's very much not a prejudice issue.  I

14   believe it appears very much like a standard mark on a document

15   which is subject to the protective order which these documents

16   are, so I don't believe it's proper or necessary.

17        MR. TUBACH:  Your Honor, it's Mr. Tubach.  I disagree

18   entirely.  The fact that documents are labeled as confidential

19   gives them some sort of heightened sense of secrecy which these

20   documents don't have or at least shouldn't give that imprimatur

21   just because someone slapped a label on them like that.  I

22   think it is technologically quite easy to make the redaction.

23   I believe we did that at the last trial.  And I believe at the

24   last trial the Court instructed the parties to remove the

25   confidentiality designations if it could be done.  And it

432

Stephen Gresch - Redirect

1    absolutely can be done and we object to the confidentiality

2    designation being shown to the jury.

3         THE COURT:  As to that point, I agree with Mr. Tubach

4    that it can be done.  If it turns out that there is some

5    problem at the end of the trial and we are ready to get

6    exhibits back to the jury, then we'll do as we did last time

7    and provide an instruction to the jury that they should

8    disregard those notations because they were added after the

9    fact.  But it seems certainly in the time we have between now

10   and then that we should be able to get those redacted, so I

11   will ask the government to endeavor to do that.

12        Moreover, I think we can probably display the

13   documents without that on it too, so let's try to do that.  But

14   in the event there is some insurmountable problem, I do agree

15   that a proper instruction would solve that problem.

16        Let's now talk about the idea of -- or what we are

17   going to do about limiting instructions.  As the defendants

18   know, the government has indicated that a lot of these

19   documents they don't intend to publish right away, and the

20   government has also requested that the limiting instruction be

21   provided at the time it's published to the jury.  I think that

22   that is really the only practical solution.  It would mean zero

23   to people to get a limiting instruction on some number and they

24   haven't seen anything.

25        So I will allow the government to shift that limiting

Stephen Gresch - Redirect

1  instruction in time.  Even though they -- a document may be

2  technically admitted without a limiting instruction, that

3  limiting instruction will follow when it's appropriate and it

4  will be appropriate at the time of publication so the jury,

5  when they get the limiting instruction, sees the document.

6          Anything on that, Mr. Tubach?

7          MR. TUBACH:  No, Your Honor.  That's fine.  We wanted

8  to make sure we weren't waiving our rights on the limiting

9  instruction given that the document is now being moved into

10  evidence.

11          THE COURT:  I agree it's appropriate to make that

12  record.

13          Anything more on that, Ms. Call?

14          MS. CALL:  No, Your Honor.

15          THE COURT:  Then why don't we take up the issue too --

16  I will bring this up and I'll put in on the record in just a

17  moment, but any objection to the documents in Exhibit -- sorry,

18  Attachment 2?  Attachment 2?

19          MR. TUBACH:  No additional objections.  Obviously, we

20  have made objections previously.  Without renewing them all, we

21  simply stand on our prior objections.

22          THE COURT:  Yes.  No one else?

23          MS. JOHNSON:  Your Honor, not specifically on this

24  topic, but I don't believe we ever answered the jury questions.

25          THE COURT:  That's a good point.  We didn't do that.

Stephen Gresch - Redirect

1    Why don't I do that right before the break which is coming up

2    shortly, but thanks for reminding me of that.  Okay.  Thank

3    you.

4         (In open court:)

5         THE COURT:  All right.  Then as to the government

6    moving the admission of those exhibits that are listed in

7    Attachment 1 to Docket No. 1086, those -- by prior ruling each

8    of those exhibits will be admitted.  And as to -- any objection

9    to the documents listed in Attachment 2?

10        MR. TUBACH:  No further objections, Your Honor.

11        THE COURT:  And by prior ruling, each of those

12   exhibits will also be admitted.

13        Ms. Call?

14        MS. CALL:  Yes, Your Honor.  I believe there is three

15   additional small sets.  The first are the documents listed in

16   Section 3 of ECF-1086, which are Government's Exhibit 108, 109,

17   113, 330, 498, 563 and 564.

18        THE COURT:  One second.  And Ms. Call, just so I am

19   clear, so those are not part of the attachments to Docket No.

20   1086.  These -- you separately move the admission of these

21   exhibits; is that correct?

22        MS. CALL:  That's correct.  They are listed in the

23   motion in Docket 1086, but the attachments only relate to part

24   one and part two of the motion, not parts three through five.

25        THE COURT:  Any objection to the admission of those

Stephen Gresch - Redirect

1    exhibits?

2         MR. TUBACH:  No further objection.

3         THE COURT:  Yes.  And by previous ruling and I do now

4    admit Exhibit Nos 108, 109, 330, 498, 563 and 564.

5         MS. CALL:  I believe there was one more in that list,

6    Your Honor, 113.

7         THE COURT:  And 113.

8         Ms. Henry, go ahead.

9         MS. HENRY:  Just a point of clarification.  Ms. Call

10   did not when she mentioned Attachment 1 and 2 move to admit

11   Exhibits 1519, 1521 and 1521-1.  So I am assuming that your

12   ruling when you said that the attachments were -- the documents

13   listed in those attachments that were admitted did not include

14   those.

15        THE COURT:  That is correct, Ms. Henry.  It did not

16   include those.  Those were excepted from the request.

17        MS. HENRY:  Thank you, Your Honor.

18        MS. CALL:  Next there are six documents the government

19   seeks to admit under 801(d)(2)(A) but not publish at this time.

20   That is Exhibits 247, 1700, 1256, 1713, 1258, and 8098.

21        THE COURT:  Any objection to the admission of

22   Exhibit 247, 1700, 1256, 1713, 1258 and 8098?

23        Mr. Pollack?

24        MR. POLLACK:  Does the government have copies of these

25   documents they can share with the defense?

436

Stephen Gresch - Redirect

1        THE COURT:  Let us see.  Do you have copies, Ms. Call?

2        MS. CALL:  I believe we have two copies.  These are

3    listed in the --

4        THE COURT:  Why don't we do this.  Why don't we take a

5    break early, and that will hopefully allow some time for

6    defense counsel to be able to see those.

7        Hold on, ladies and gentlemen.  I have got some

8    information to give you.  So we are not quite ready for the

9    break, but almost.  So ladies and gentlemen, Thursday at some

10   point in time the Court received a note, and it says:  Ask -

11   Juror 1.  And then the note says:  Given this trial of 10

12   individuals -- I may not be reading it correctly -- can

13   cross-examiners identify who they represent?

14       In response to that, in response to your first

15   question, I have asked lawyers to try to remember at the

16   beginning of their questioning to give their own name and to

17   identify their client.

18       The note then has a parenthesis and it says or do

19   they -- and I am not sure about this word -- possibly

20   collaborative or collaborating efforts to save time, close

21   quote, then bracket, as with the objections if redundant.

22       In response to your second question, while the lawyers

23   for the defendants are collaborating to be efficient and it is

24   appropriate for them to do so, each lawyer represents only one

25   defendant.  Regardless of whose lawyer is asking the questions,

Stephen Gresch - Redirect

1   unless I instruct you otherwise, it is entirely up to you to

2   determine to which of the defendants, if any, the witness'

3   testimony is relevant.  You may consider all of the evidence,

4   some of the evidence or none of the evidence, all right?

5          Ladies and gentlemen, why don't we plan on reconvening

6   after the break at 10:30.  Keep the admonitions in mind and the

7   Court will be in recess.  Thank you.

8          (Jury excused.)

9          So we will have Ms. Call pass those documents around.

10          Mr. Pollack, go ahead.

11          *MR. POLLACK:*  Yes, Your Honor.  I appreciate that.  We

12   have a witness list with an order of witnesses.  We don't seem

13   to be following it.  And these documents, while they were

14   referenced in a pleading that was filed at some point, there

15   have been over 1100 pleadings in this case, there is no

16   indication from the government that we were going to take these

17   up today or the government was going to try to admit them

18   today.  It would be very helpful if we could get a little

19   advance notice.

20          *THE COURT:*  Yeah, obviously things would go a lot

21   smoother that way.

22          Ms. Call, response?

23          *MS. CALL:*  Your Honor, we did note in the pleading we

24   would seek to admit these documents immediately before the

25   testimony of Ms. Evans, who was the next witness.  Perhaps I

Stephen Gresch - Redirect

1   should have noted it this morning, but we did try to flag it

2   for the parties.

3          THE COURT:  Let Ms. Grimm know if there is going to

4   be -- if there is some issues because I don't want do delay the

5   break too long.  But on the other hand, we'll -- if the lawyers

6   need time to look at these and don't know quite what the

7   position is going to be yet, we will -- there could be some

8   issues.  So it might be better to take it up before the jury is

9   brought back in as opposed to an extended side bar.

10          Ms. Prewitt?

11          MS. PREWITT:  If the government intends to display

12   documents like they did last time without a sponsoring witness,

13   we'd ask that they give us notice or at least add that to the

14   witness list as they did during the last trial so for planning

15   purposes we understand what the order is that they are going to

16   show, Your Honor.

17          THE COURT:  Okay.  I am not going to rule on that yet.

18   I don't have a good feel for it, but maybe you can talk to the

19   government about that.

20          MS. PREWITT:  Thank you, Your Honor.

21          THE COURT:  We will be in recess, then, until 10:30.

22   Thank you.

23      (Recess at 10:15 a.m.)

24      (Reconvened at 10:32 a.m.)

25          THE COURT:  Ms. Call, go ahead.

Stephen Gresch - Redirect

1      MS. CALL:  Yes, Your Honor.  I have a proposal just to

2  ensure the parties have time.  These six documents, since they

3  are actually not on the summaries anyways, we could table to

4  the end of the day discussion on these if we want to use the

5  jury's time efficiently.

6      THE COURT:  I think my intuition is that may make some

7  sense.  We need to make a record because you have moved the

8  admission of these.  I could either tell the jury that I am

9  going to defer consideration of those or you could withdraw,

10  but either way.  Probably the former is better to save you the

11  effort of having to go through it again.

12      MS. CALL:  That would be fine.  And that would just

13  leave one additional document which we can get to when the jury

14  does return which is Exhibit 356, and this is subject to a

15  pending stipulation between the parties which is at Docket

16  1107.

17      THE COURT:  Okay.  Let's bring the jury back in.

18      MS. CALL:  Ms. Grimm, if I may very momentarily.  I

19  realize there was one item we didn't cover this morning which

20  was the call durations in the summaries which does relate to

21  Ms. Evans' testimony which is the next witness.  We have

22  versions of the summaries with and without call durations.  The

23  government would like to include them on the calls with the

24  understanding that they were added after February 10th.

25      THE COURT:  Are call durations controversial?  That to

440

Stephen Gresch - Redirect

1   me sounded like a good change that was added after

2   February 10th.  Anyone have problems with call duration?

3   Sounds like not, Ms. Call.

4        *MS. CALL:*  Thank you.  And I apologize, Ms. Grimm, for

5   stopping you in your tracks.

6             (Jury present.)

7        *THE COURT:*  Ladies and gentlemen, so you will recall

8   that Ms. Call had moved the admission of six documents right

9   before the break.  I am going to take those under advisement

10  for the present time.  You have heard about a lot of exhibit

11  numbers or if you haven't heard about them, you suspect there

12  may be some.  Some of these documents are ones that outside of

13  your presence I have made rulings on.  It's to save you time so

14  that you don't have to sit here and listen to white noise while

15  we talk them through.  Sometimes you will have to sit there and

16  listen to white noise, but other ones we'll try to take up

17  outside of your presence to try to work things out just to

18  spare you having to wait while we conduct a bench conference.

19  We will just see how it goes, but please be patient if you

20  don't mind.  I know you have been very patient, but some of

21  those bench conferences are necessary.

22        Ms. Call, go ahead.

23        *MS. CALL:*  The government has one more document to

24  offer and that is Goverment's Exhibit 356.

25             *THE COURT:*  Any objection to the admission of

441

Rachel Evans - Direct

1    Exhibit 356?  The Exhibit 356 already admitted.

2          *MS. CALL:*  The government now calls Ms. Rachel Evans.

3          (**Rachel Evans** was sworn.)

4          *THE WITNESS:*  Yes.

5          *COURT DEPUTY CLERK:*  Please state your name and spell

6    your first and last name for the record.

7          *THE WITNESS:*  Rachel Evans, R-A-C-H-E-L, E-V-A-N-S.

8                         **DIRECT EXAMINATION**

9    *BY MS. CALL:*

10   *Q.*  Good morning, Ms. Evans.  Could you please tell the jury

11   where you work?

12   *A.*  The United States Department of Justice, antitrust

13   division.

14   *Q.*  What is your position at the Department of Justice?

15   *A.*  I am a paralegal specialist.

16   *Q.*  How long have you been a paralegal?

17   *A.*  Almost two years.

18   *Q.*  What kind of cases do you work on at the antitrust

19   division?

20   *A.*  I work on criminal and civil cases.

21   *Q.*  Is there any particular subject matter?

22   *A.*  Mostly antitrust.

23   *Q.*  Now, when you work on cases, what do your responsibilities

24   typically include?

25   *A.*  I take notes.  I review documents.  I summarize information

442

Rachel Evans - Direct

1   and I review that information for accuracy.

2   Q.  Did there come a time during your current position where

3   you were assigned to a case in the broiler chicken industry?

4   A.  Yes.

5   Q.  Now, you mentioned your kind of general responsibilities

6   earlier.  What's been your role in this case?

7   A.  Reviewing the summary exhibits for accuracy.

8   Q.  Did you participate in the investigation at all?

9   A.  No.

10  Q.  How many summary exhibits did you review?

11  A.  20.

12  Q.  Were you involved in the preparation of these charts?

13  A.  Yes, I was.

14  Q.  Was it just you alone or were there multiple people?

15  A.  There were multiple people.

16  Q.  What kind of people were involved in the preparation of

17  these charts with you?

18  A.  There were attorneys, agents and paralegals.

19  Q.  When you say agents, what do you mean, law enforcement

20  agents?

21  A.  Law enforcement agents.

22  Q.  At various times did you make changes in response to

23  direction from various members of that team?

24  A.  Yes, I did.

25  Q.  And does that include every kind of participant you just

Rachel Evans - Direct

1    described?

2    A.   Yes.

3    Q.   So was the creation of these charts a team effort?

4    A.   Yes, it was.

5    Q.   Now, when you first started was there a draft of each chart

6    given to you?

7    A.   Yes.

8    Q.   And when you got these drafts, were there already entries

9    selected for inclusion?

10   A.   Yes.

11   Q.   And from time to time have you made edits?

12   A.   Yes, I have.

13   Q.   Now, what did you do to confirm the accuracy of these

14   charts?

15   A.   I looked at the underlying exhibits and compared it with

16   the information that was in the summary exhibits to make sure

17   that the information in the summary exhibits was accurately

18   reflected.

19   Q.   About how many hours did you spend checking these charts?

20   A.   Over 150 hours.

21   Q.   150?

22   A.   Yes.

23   Q.   All right.  Well, let's take a look at some of those

24   summary exhibits.

25          MS. CALL:  Could I, Your Honor, pass up binders to the

Rachel Evans - Direct

1   witness through Ms. Grimm?

2           THE COURT:  You may.

3           MS. CALL:  And may I pass a copy up to the Court?

4           THE COURT:  Yes.

5   BY MS. CALL:

6   Q.  What does the binder or that binder contain?

7   A.  This binder contains the summary exhibits.

8   Q.  Now, would it help you to review some of the charts as you

9   testify about your verification process?

10  A.  Yes, it would.

11          MS. CALL:  Could we please pull up Exhibit 90-10 and

12  could we use it as a demonstrative at this time, Your Honor?

13          THE COURT:  You may.

14  BY MS. CALL:

15  Q.  And Ms. Grimm, if you would like to look at 90-10, I

16  believe it's Tab 17 your binder Ms. Evans.  I may have called

17  you Ms. Grimm and I apologize.  What is Government

18  Exhibit 90-10?  Do you recognize that?

19  A.  Yes, I do.

20  Q.  What is it?

21  A.  It's a chart that contains people's names in the first

22  column, their associated phone numbers in the second column,

23  and in the third column the company that they are employed at

24  or were employed at along with the employment time period for

25  that company.

Rachel Evans - Direct

1    *Q.*  Does the first line of this chart reference another

2    government's exhibit number?

3    *A.*  Yes.

4    *Q.*  And what is that?

5    *A.*  9748.

6    *Q.*  All right.

7          MS. CALL:  Your Honor, at this time the government

8    moves to admit 9748, which is a stipulation between the

9    parties.

10         THE COURT:  Any objection to the admission of

11   Exhibit 9748?  That exhibit will be admitted.

12   *BY MS. CALL:*

13   *Q.*  Now, Ms. Evans, in addition to reviewing 9748, did you take

14   additional steps to verify the accuracy of the information in

15   Exhibit 90-10?

16   *A.*  Yes, I did.

17   *Q.*  What did you do?

18   *A.*  I reviewed contact lists, phone subscriber information,

19   phone bills and e-mail signatures.

20   *Q.*  And did you also verify the employers of the individuals

21   listed in the chart?

22   *A.*  Yes.

23   *Q.*  Does Exhibit 90-10 fairly and accurately summarize the

24   information contained therein?

25   *A.*  Yes.

Rachel Evans - Direct

1          MS. CALL:  The government at this time moves for

2     admission of Government Exhibit 90-10.

3          THE COURT:  Any objection to the admission of

4     Exhibit 90-10?

5          MS. HENRY:  No additional objections, Your Honor.

6          THE COURT:  And same ruling as to previous objections.

7     Exhibit 90-10 will be admitted.

8          MS. CALL:  Permission to publish?

9          THE COURT:  You may.

10         Ladies and gentlemen, when you hear an attorney ask

11    for permission to publish, that means asking for permission to

12    show you.  So that will be displayed electronically.  So as you

13    realize, that will either appear on the big flat screen monitor

14    or on your individual monitors if you want to get those out.

15    BY MS. CALL:

16    Q.  Ms. Evans, if you could describe each column on

17    Exhibit 90-10?

18    A.  Yes.  The first column lists people's first and last names.

19    And the second column lists their associated phone numbers.

20    And then the third column you will see a company name and a

21    time period for each individual.

22    Q.  All right.  So the company name on the right-most column,

23    what individual does that relate to?

24    A.  The -- of the individual in the corresponding row.

25         MS. CALL:  All right.  We can take down Government

Rachel Evans - Direct

1    Exhibit 90-10.

2    *BY MS. CALL:*

3    *Q.*   Now, Ms. Evans, if you could look briefly through Tabs 1

4    through 16 of your binder.  Ms. Evans, do those tabs contain

5    Government's Exhibits 1, 2, 3, 4, 5, 7, and then 9 through 12

6    and 14 through 19?

7    *A.*   Yes.

8    *Q.*   Do you recognize the summaries in those tabs?

9    *A.*   Yes.

10   *Q.*   At a high level what are they?

11   *A.*   They are charts of communications for specific time

12   periods.

13   *Q.*   And are each of those charts in the different tabs similar

14   in nature?

15   *A.*   Yes.

16   *Q.*   For each did you take the same steps to confirm the

17   accuracy?

18   *A.*   I did.

19   *Q.*   Let's review an example.  Could you please turn to Tab 4

20   containing Government's Exhibit 4?

21            *MS. CALL:*   Your Honor, could we publish this as a

22   demonstrative at this time?

23            *THE COURT:*   To the jury?

24            *MS. CALL:*   Yes, Your Honor.

25            *THE COURT:*   Any objection to displaying -- publishing

Rachel Evans - Direct

1   Exhibit 4 as a demonstrative?

2        *MR. FAGG:*  Yes, Your Honor.  There is pending briefing

3   on --

4        *THE COURT:*  Sustained.

5   *BY MS. CALL:*

6   *Q.*  Ms. Evans, what kind of documents are summarized in these

7   charts?

8   *A.*  They are phone calls, e-mails, text messages and hard copy

9   documents.

10  *Q.*  Each of those documents you just described, are they marked

11  as exhibits?

12  *A.*  Yes.

13  *Q.*  Did you verify the information of each of these charts in

14  Tabs 1 through 16?

15  *A.*  Yes, I did.

16  *Q.*  How?

17  *A.*  I looked at the underlying exhibits that I listed in the

18  right-most column and I compared it with the information that

19  was listed in the summaries to make sure that it was accurately

20  reflected.

21  *Q.*  In your review did you discover errors?

22  *A.*  I did.

23  *Q.*  What did you do when you discovered an error?

24  *A.*  I fixed them.

25  *Q.*  Now, if you could describe some of the information in this

Rachel Evans - Direct

1    chart.  Looking at Exhibit 4, I see a date range at the top
2    there.  What is that?
3    A.  The date range at the top, it specifies the communications
4    that are listed in this particular summary chart.
5    Q.  And looking at the rows from top to bottom, how are they
6    ordered?
7    A.  They are in chronological order.
8    Q.  And did you review the underlying exhibits to confirm the
9    chronological order?
10   A.  I did.
11   Q.  Now, if we could go to the columns just moving from left to
12   right.  I see a date and time column; is that correct?
13   A.  Yes.
14   Q.  Now, I see certain entries say ET next to a time.  Could
15   you describe how you verified the information in those cells?
16   A.  Yes.  ET here stands for Eastern Time Zone.  And I looked
17   at the underlying exhibits and where there was a time zone
18   listed, I converted it -- I standardized it to Eastern Time
19   Zone and listed it here.
20   Q.  Were there documents where you reviewed other sources aside
21   from the face of the document to confirm what time zone the
22   document was in?
23   A.  Yes.
24   Q.  For example, did you determine whether top e-mails in
25   certain exhibits were in a particular time zone?

450

Rachel Evans - Direct

1    A.   I did.

2    Q.   Was there a particular time zone you found many of the

3    exhibits to be in?

4    A.   Yes.

5    Q.   And what is that?

6    A.   UTC.

7    Q.   Now, if you didn't have a means of verifying the time zone

8    of a particular document, what did you do?

9    A.   Could you repeat the question?

10   Q.   If you didn't have a way to tell what time zone a document

11   was in, what did you do for purposes of listing a time on the

12   charts?

13   A.   For instances where there was not a time zone, I would --

14   it's reflected as the time listed on the document or I did not

15   include it.

16   Q.   All right.  So for that first kind you described, you

17   listed the time.  Would you put an ET next to it or not?

18   A.   I would not if there was not a time zone listed next to it.

19   Q.   All right.  For that second example, perhaps you could look

20   at the entry on October 8 of 2014 on Government Exhibit 4.  I

21   see there is some entries there that don't contain a time.  Is

22   that what you were describing?

23   A.   Yes.

24   Q.   Can you explain why you did not include a time for that

25   entry?

451
Rachel Evans - Direct

1   *A.*  Yes, because including a time here would make it seem as if

2   the e-mails were out of order.

3   *Q.*  All right.  Would it help you to look at the underlying

4   document to explain that?

5   *A.*  Yes.

6        *MS. CALL:*  Could we please pull up Government

7   Exhibit 498?  Your Honor, permission to publish.  I believe

8   this was just admitted this morning.

9        *THE COURT:*  You may.

10       *MS. CALL:*  All right.  Mr. Berlin, if you could zoom

11  in on the last four e-mails in the document.

12  *BY MS. CALL:*

13  *Q.*  Ms. Evans, using this document, can you describe why you

14  stated it would appear confusing to include the times in your

15  chart?

16  *A.*  Yes.  So the first e-mail or the oldest e-mail is listed at

17  the bottom in e-mail chains which here is the 4:28 p.m. e-mail.

18  And then the next one is at 2:29 p.m.  And so I did not list

19  2:29 p.m., that specific time on the summary exhibit, because

20  it would make it look as if the second e-mail came before the

21  first one.  But looking at the order of the e-mail chain, you

22  know that the 2:29 p.m. actually came after the 4:28 p.m.

23  e-mail.

24  *Q.*  All right.  So did the time zones kind of change within the

25  e-mails?

452

Rachel Evans - Direct

1    A.   Yes.

2         MS. CALL:   All right.   We can take Government

3    Exhibit 498 down.

4    BY MS. CALL:

5    Q.   Ms. Evans, could you turn to Tab 3 in your binder?

6         MS. CALL:   And if we could show this to the parties

7    and the Court for demonstrative purposes.

8    BY MS. CALL:

9    Q.   Ms. Evans, I see on the first item in this summary there is

10   no time listed.   Why is that?

11   A.   Because there was not a time for the document.

12   Q.   All right.   Now, Ms. Evans, using this document as an

13   example, could you describe what information is contained now

14   in the From column?

15   A.   The From column, it represents who sent the communication.

16   Q.   And was that always apparent on the face of every

17   underlying document?

18   A.   No.

19   Q.   So, for example, for phone call, how did you identify who

20   to list in the From column?

21   A.   For phone calls I looked at the underlying exhibit which is

22   the phone record and I identified the phone numbers that were

23   involved in the phone call.   And then I looked at Government's

24   Exhibit 90-10 to confirm the phone numbers, who those phone

25   numbers are associated with.

Rachel Evans - Direct

1   Q.  Were there instances for phone calls where you looked at

2   sources other than Government's Exhibit 90-10?

3   A.  There were.

4   Q.  Did you also verify the company listed in the From column?

5   A.  Yes.

6   Q.  Let's kind of skip over right to the To column.  What does

7   that column represent?

8   A.  This column represents who received that information.

9   Q.  Did you verify the accuracy of that information?

10  A.  I did.

11  Q.  Does the To column list every single person that, for

12  example, an e-mail was sent to?

13  A.  No, it does not.

14  Q.  Now, moving in the middle to that Excerpt column, what does

15  that contain?

16  A.  This contains information from the underlying exhibits or

17  in the case of phone calls, it's a representation that a phone

18  call occurred.

19  Q.  And how did you verify that information?

20  A.  By looking at the underlying exhibits.

21  Q.  All right.  And I see for the phone call rows there is

22  sometimes information below the words Phone Call.  What is

23  that?

24  A.  In this case here it's the elapsed time, the phone call

25  duration.

Rachel Evans - Direct

1  Q.  Thank you.  Now if you could please turn to Exhibit 4 to

2  the third page.  I see there is bracketed information under the

3  excerpt in that entry.  Does that information come from the

4  underlying exhibit itself?

5  A.  No.

6      MS. CALL:  Mr. Berlin, if we could now turn back to

7  the first page.

8  BY MS. CALL:

9  Q.  I see there is color coding in this document.  Could you

10  explain, Ms. Evans, what the blue color signifies?

11  A.  The blue color signifies communications between an

12  individual who works for a chicken supplier and another

13  individual who works for the customer of a chicken supplier

14  company.

15  Q.  A chicken supplier and a customer?

16  A.  Yes.

17  Q.  Now, how about the orange color?

18  A.  The orange color represents communications that are between

19  two individuals who work at two different chicken supplier

20  companies.

21  Q.  And how about the salmon color?

22  A.  The salmon color, it represents communications that are

23  between two individuals who work at the same chicken supplier

24  company.

25  Q.  Now, did you verify the accuracy of the color coding

Rachel Evans - Direct

1  designations in these exhibits?

2  A.  I did.

3  Q.  In doing so, did you familiarize yourself with chicken

4  suppliers and customers?

5  A.  Yes.

6  Q.  How did you do that?

7  A.  I looked the companies up on Google.

8  Q.  On Google?

9  A.  On Google.

10  Q.  Now, do you believe the charts contained in Tabs 1 through

11  16 of your binder fairly and accurately summarize the

12  information from those underlying exhibits?

13  A.  Yes.

14  Q.  Do they also put the excerpted records in context with each

15  other in terms of dates and times?

16  A.  They do.

17  Q.  Now, approximately how many documents are excerpted between

18  those summary charts?

19  A.  Approximately 350.

20  Q.  350?

21  A.  Yeah, yes.

22       MS. CALL:  Your Honor, the government would now seek

23  to offer Exhibits 3, 4 and 9.

24       MR. McLOUGHLIN:  Your Honor, we have pending briefing.

25       THE COURT:  Okay.  Then I will defer consideration of

Rachel Evans - Cross

1    Exhibit 3, 4 and 9 until we have had an opportunity out of the

2    presence of the jury to resolve any objections to those

3    exhibits.

4            MS. CALL:  Yes, Your Honor.  No further questions from

5    the government.

6            Thank you.  Cross-examination?  Ms. Carwile?

7            MS. CARWILE:  Yes, thank you, Your Honor.

8                        **CROSS-EXAMINATION**

9    BY MS. CARWILE:

10   Q.  Good morning, Ms. Evans.  My name is Laura Carwile and I

11   represent Roger Austin.  I have some questions for you about

12   the charts in front of you, all right?  But before I get to

13   those, I just want to confirm a few things about your

14   background.

15           So you are a paralegal in the Department of Justice's

16   San Francisco office, correct?

17   A.  Yes.

18   Q.  And that's a different office than the prosecutors sitting

19   at this table?

20   A.  Yes.

21   Q.  When I say prosecutors, from now on I mean the attorneys

22   who represent the United States Government sitting at this

23   table, all right?

24   A.  Okay.

25   Q.  Okay.  You graduated from UC Berkeley undergrad in December

Rachel Evans - Cross

1  of 2019?

2  A.  Yes.

3  Q.  And you started working for the government at the

4  Department of Justice in July 2020, about six months later?

5  A.  That's right.

6  Q.  So you have been a paralegal for the government for less

7  than two years.

8  A.  Yes.

9  Q.  And you are not a supervising paralegal.

10  A.  I am not.

11  Q.  And you have never worked in the same office as the

12  prosecutors at the table.

13  A.  I have not.

14  Q.  Now, you told Ms. Call on direct that you were involved in

15  the preparation of these charts along with attorneys, agents

16  and paralegals, I believe you said.

17  A.  Yes.

18  Q.  And for starters, all of the people in that group work for

19  the Department of Justice for the United States Government,

20  correct?

21  A.  Yes.

22  Q.  All right.  And you have previously testified about charts

23  very similar to these at a prior hearing under oath.

24  A.  Yes.

25  Q.  And at that hearing you were asked the following question:

Rachel Evans - Cross

1          So it was the trial attorneys in this case who

2    actually prepared these charts and handed them to you to check

3    for accuracy, correct?

4              And your answer was:  Yes.

5              Was that correct at the time you said it under oath?

6    *A.*   Yes.

7    *Q.*   And am I correct that that is still the truth as to who

8    prepared these charts?

9    *A.*   I was involved in the preparation.

10   *Q.*   Right.  And we will get to your role, but it's true that

11   the trial attorneys sitting at this table created the charts

12   and handed them to you for review, correct?

13   *A.*   Yes.

14   *Q.*   Great.  So let's talk about that role.  You said your role

15   has been to review the government's charts.

16   *A.*   Yes.

17   *Q.*   You told Ms. Call on direct you didn't participate in the

18   investigation of this case.

19   *A.*   Right.

20   *Q.*   You didn't participate in any of the interviews conducted

21   in this case?

22   *A.*   Correct.

23   *Q.*   And generally it's your experience that a paralegal from

24   the Department of Justice would sit in in an interview

25   conducted by the Department of Justice; is that correct?

Rachel Evans - Cross

1          *MS. CALL:*  Objection, relevance.

2          *THE COURT:*  Overruled.

3    *A.*  Yes, that's right.

4    *BY MS. CARWILE:*

5    *Q.*  And you were not the paralegal who did that for any of the

6    interviews conducted in this case.

7    *A.*  I was not.

8    *Q.*  All right.  Now, you were not told by the prosecutors to

9    review all of the documents related to this case.

10   *A.*  Right.

11   *Q.*  And you were not told by the prosecutors to review all of

12   the e-mails relevant to this case.

13   *A.*  Correct.

14   *Q.*  You were not told to review all of the relevant phone calls

15   involved in this case?

16   *A.*  Correct.

17   *Q.*  Your job was to look at the government charts and the

18   information that the prosecutors put in those charts and only

19   that information, correct?

20   *A.*  Yes.

21   *Q.*  And I don't mean this to be disrespectful, but it's true

22   that you didn't have any discretion as to what went in the

23   charts, correct?

24   *A.*  That's correct.

25   *Q.*  So you were directed by these prosecutors about what

460

Rachel Evans - Cross

1   specific information you were to review.

2   *A.*   Yes.

3   *Q.*   Now, you didn't come up with the idea for these charts.

4   *A.*   I did not.

5   *Q.*   And I think you just stated this, but when you became

6   involved in this case, these government charts were already

7   created.

8   *A.*   Yes.

9   *Q.*   And you just told us that they were created by the

10  prosecutors at this table.

11  *A.*   Yes.

12  *Q.*   Now, you didn't decide which e-mails to include in the

13  charts.

14  *A.*   I did not.

15  *Q.*   You didn't decide what phone calls to include in the

16  charts.

17  *A.*   I did not.

18  *Q.*   You didn't decide what dates would be reflected on these

19  charts.

20  *A.*   I did not.

21  *Q.*   That was the prosecutors at this table who did that.

22  *A.*   Yes.

23  *Q.*   And similarly, you did not choose what to exclude from

24  these charts, correct?

25  *A.*   Correct.

461

Rachel Evans - Cross

1    *Q.*  Same question, you didn't decide which e-mails or phone

2    calls or documents to exclude.

3    *A.*  Right.

4    *Q.*  You didn't decide which dates to exclude.

5    *A.*  Correct.

6    *Q.*  So -- and I believe you just told us you also didn't choose

7    which documents to exclude from these charts, correct?

8    *A.*  That's correct.

9           *MS. CARWILE:*  All right.  So I would like to look at

10   an example of this.  And if we could pull up government chart

11   15, zoom in on the first entry, please.

12          Your Honor, if I may publish this entry for

13   demonstrative purposes only without waiving objection to the

14   chart as a whole.

15          *THE COURT:*  Hold on one second.  And this is part of

16   Exhibit 15?

17          *MS. CARWILE:*  Yes, Your Honor, Exhibit 15, correct.

18          *THE COURT:*  Any objection to displaying -- actually

19   it's changed.  Now I don't see that.

20          *MS. CARWILE:*  I think we were pulling it out to check

21   the number, but if we could go back to just the first entry.

22   Thank you.

23          *THE COURT:*  Any objection to this line being displayed

24   for demonstrative purposes?

25          *MS. CALL:*  Yes, Your Honor.  I think if the government

Rachel Evans - Cross

1    is not permitted to display these, that the defendant should

2    not be able to on their cross-examination.

3            THE COURT:  Objection is sustained.

4            MS. CARWILE:  All right.  We will do without that.

5    BY MS. CARWILE:

6    Q.  Ms. Evans, can you see the first entry on government chart

7    15?

8    A.  No.  Now I can.

9    Q.  Can you see it now?

10   A.  Yes.

11   Q.  Okay, great.  And you testified, I believe, on direct that

12   the far right-hand column indicates which exhibits the

13   prosecutors put in these charts, correct?

14   A.  Correct.

15   Q.  And on this entry which is the first entry on Government

16   chart 15, which exhibits does it list as included in this

17   entry?

18   A.  Government Exhibits 1526 and 1528.

19   Q.  All right.  So you reviewed Government Exhibits 1526 and

20   1528.

21   A.  Yes.

22   Q.  And you are aware that Government Exhibit 1526 is an

23   e-mail.

24   A.  I would have to confirm by looking at it.

25   Q.  We can pull it up.

Rachel Evans - Cross

1          *MS. CARWILE:*  Can we pull up Government's Exhibit

2     1526?

3     *BY MS. CARWILE:*

4     *Q.*  Let me know if you can confirm that that is an e-mail.

5     *A.*  This is an e-mail.

6          *MS. CARWILE:*  Okay.  And if we could pull up

7     Government 1528.

8     *BY MS. CARWILE:*

9     *Q.*  Ms. Evans, Government's Exhibit 1528 is one of two

10    attachments to Government's Exhibit 1526, correct?

11    *A.*  I don't know offhand how many attachments there are, but it

12    is one of them.

13    *Q.*  Okay.  Do you remember the prior hearing we just talked

14    about?

15    *A.*  Yes.

16    *Q.*  And do you remember testifying that you knew that the

17    attachments to Government 1526 were 1527 and 1528?

18    *A.*  I know that 1528 is an attachment, yes.

19    *Q.*  So previously you knew that 1527 was an attachment to this

20    e-mail, but you don't anymore?

21    *A.*  I would have to confirm.

22         *MS. CARWILE:*  Okay.  Could we pull up 1527?

23    *A.*  Okay.

24    *BY MS. CARWILE:*

25    *Q.*  We are pulling it up in native, Ms. Evans, so you can take

464

Rachel Evans - Cross

1    a look at the actual document.

2              Would you agree with me that 1527 is an attachment to

3    1526?

4    A.   Yes.

5    Q.   Okay.   And the government chart does not include attachment

6    1527.

7    A.   Correct.

8    Q.   And it doesn't include the portions of 1527 indicating that

9    Mr. Austin received competitor pricing information from a

10   customer, correct?

11             MS. CALL:   Objection, hearsay.

12             THE COURT:   Overruled.

13   A.   It does not.

14   BY MS. CARWILE:

15   Q.   So back to your role in the charts generally.   It was to

16   look at the underlying exhibit on the government charts and

17   make sure the correct exhibit was cited in the chart.   Is that

18   a fair description of your role?

19   A.   Yes, and that the information in the summary exhibit is

20   accurately reflected.

21   Q.   Yes, I am sorry, correct.   So you looked at the underlying

22   exhibit that the government chose and you confirmed that it was

23   placed in the chart in some respect accurately, correct?

24   A.   Yes.

25   Q.   So as a hypothetical example of that, let's say the

Rachel Evans - Cross

  1   government listed Exhibit A in one of the charts.  Your job was

  2   to look at Exhibit A and make sure that whatever the government

  3   pulled out of it was accurately typed into the chart, correct?

  4   A.  Correct.

  5   Q.  Now, these government charts do not often include the

  6   entire contents of an exhibit.

  7   A.  That's correct.

  8   Q.  And, for instance, when an e-mail is listed, usually the

  9   government did not include the full e-mail in their charts.

 10   A.  Correct.

 11   Q.  So I am not going to go through each time this happens.  We

 12   would be here all day.  But I want to look at a few examples.

 13         MS. CARWILE:  If we can pull up Exhibit 11, the first

 14   entry.

 15   BY MS. CARWILE:

 16   Q.  And this is an e-mail from Mr. Austin to his boss,

 17   Mr. Penn, summarizing his discussion with a customer, Pete

 18   Suerken, correct?

 19   A.  Yes.

 20         MS. CARWILE:  I would ask to publish this for

 21   demonstrative purposes.

 22         THE COURT:  Any objection?

 23         MS. CALL:  The chart?

 24         MS. CARWILE:  Just the top portion.

 25         MS. CALL:  Yes, Your Honor, same objection.

Rachel Evans - Cross

1           THE COURT:  Sustained.

2    *BY MS. CARWILE:*

3    *Q.*  Okay.  Ms. Evans, this chart excerpt is pulled out of

4    Government 1051, correct?

5    *A.*  I believe so.  Could I also open it up here just to --

6    *Q.*  Of course.  Yes, of course.  I am sorry, I didn't mean to

7    only limit you to the screen.  And we are on government chart

8    11, if that's helpful.

9    *A.*  Could you repeat the question?

10   *Q.*  Yes, no problem.  The underlying exhibit in the first entry

11   on government chart 11 is Government 1051, correct?

12   *A.*  Yes.

13   *Q.*  And the government chart entry only pulls five sentences

14   from e-mail 1051.

15   *A.*  Yes.

16   *Q.*  Okay.  So I am going to ask you to keep the paper copy you

17   have in front of you because I am going to ask you to compare

18   something, okay?

19   *A.*  Okay.

20           MS. CARWILE:  So if we could pull up Government

21   Exhibit 1051 which my understanding is has been admitted into

22   evidence at this time.

23           THE COURT:  You wish to publish it?

24           MS. CARWILE:  I do wish to publish it.  Yes, Your

25   Honor.

Rachel Evans - Cross

1              THE COURT:  Any problem with that?

2              MS. CALL:  No objection, Your Honor.

3              THE COURT:  Exhibit 1051 may be published to the jury.

4              MS. CARWILE:  Can we pull up both pages of the

5    exhibit, if possible?

6              THE COURT:  Yes.

7              MS. CARWILE:  Yes.

8              THE COURT:  They can be side by side displayed.

9              MS. CARWILE:  Thank you very much.

10   BY MS. CARWILE:

11   Q.   So Ms. Evans, this is Government Exhibit 1051, correct?

12   A.   Correct.

13   Q.   And I am going to ask my helpful document technician -- I

14   cannot do this myself, but I am going to ask him if he can

15   highlight the sentences that are included by the prosecutors in

16   their chart in this entry on government chart 11, okay?

17   A.   Okay.

18   Q.   And I believe he has done so.

19              Ms. Evans, can you compare the paper chart in front of

20   you, the entry, and make sure that the highlighting that's been

21   done is correct as to what was included in the government

22   charts?

23   A.   Yes.

24   Q.   Let us know when you are ready.

25   A.   I am ready.

Rachel Evans - Cross

1    *Q.* So is it accurate to say that the highlighted sentences on

2    your screen are the only ones that the government included in

3    their chart?

4    *A.* Yes.

5    *Q.* All right. And they did not include any other part of

6    Government 1051 in this excerpt?

7    *A.* Not in the body of the e-mail, no.

8    *Q.* They put in the From and the To and perhaps the time. But

9    in the body of the e-mail they didn't include anything else?

10   *A.* Correct.

11   *Q.* They didn't include the part of the e-mail where Mr. Austin

12   tells his boss that he told his customer he can't answer for

13   other suppliers' positions.

14        *MS. CALL:* Object, Your Honor. I object to scope.

15   This isn't a question as to accuracy. It doesn't seem relevant

16   to the testimony.

17        *THE COURT:* Sustained.

18   *BY MS. CARWILE:*

19   *Q.* Let's turn to another example, government chart 10, Page 5,

20   the e-mail from Mr. McGuire to Mr. Penn, please. I am sorry, I

21   misspoke. It's Page 4, thank you. And if we could just

22   excerpt the part where Mr. McGuire sends an e-mail to Mr. Penn

23   at 6:46 p.m.

24        So Ms. Evans, this is another excerpt from government

25   chart 10 where the entire e-mail was not included, correct?

469

Rachel Evans - Cross

1    A.   Yes.

2    Q.   And, in fact, do you see the line for the George's range of

     prices on this chart?

3

4    A.   Yes.

5    Q.   Do you see the ellipses that were placed at the end of that

     line?

6

7    A.   I do.

8    Q.   There was a sentence there, correct?

9    A.   Yes.

10   Q.   In the actual e-mail there is a sentence where there is

     ellipses on the government's chart.

11

12   A.   Yes.

13   Q.   And you were not asked to include that sentence in this

     chart.

14

15   A.   No.

16   Q.   I am sorry.  The government did not include the sentence in

     the chart and you were not asked to review it for accuracy,

17

     correct?

18

19   A.   Correct.

20   Q.   So it's fair to say that these government charts omit the

     full text of many of the e-mails that are even included in the

21

     chart.

22

23   A.   Yes.

24   Q.   And you would agree with me that means that there is

     context missing from this chart -- these charts?

25

Rachel Evans - Cross

 1  *A.*   Yes.

 2  *Q.*   So you also weren't asked to fact check the information

 3  within a chart entry.  And what I mean by that is you were not

 4  asked to confirm that the information listed in a chart entry

 5  was correct; is that true?

 6          *MS. CALL:*  Objection, misstates testimony.

 7          *MS. CARWILE:*  I can rephrase.

 8          *THE COURT:*  All right.

 9          *MS. CARWILE:*  We can take down the chart.  I didn't

10  hear what you said.

11          *THE COURT:*  You said you would rephrase.

12          *MS. CARWILE:*  Yes, thank you.

13          *THE COURT:*  I won't rule on the objection since you

14  will rephrase.  Go ahead.

15  *BY MS. CARWILE:*

16  *Q.*   So let me just ask it with an example.  If we can pull up

17  government chart 16, the entry from November 29th at 2:21 p.m.

18  It's actually 2:31, excuse me.

19          Now, you were asked to confirm that part of what was

20  written in the e-mail is reflected in the chart here, correct?

21  *A.*   Yes.

22  *Q.*   But you were not asked to confirm that the prices

23  Mr. Tucker listed in this e-mail are correct prices for these

24  companies, correct?

25  *A.*   Correct.

Rachel Evans - Cross

1   *Q.* So you were transcribing information from e-mails, but not

2   confirming the accuracy of that information.

3   *A.* Yes.

4   *Q.* Okay. And sticking with this entry, if we can highlight

5   the one below it, please, as well. Thank you.

6           I am on the same chart, Ms. Evans, for just a minute.

7   There are two e-mail entries listed in chronological order on

8   this chart. One is sent at 2:31 p.m. Eastern from Mr. Tucker

9   to Mr. Austin and another sent at 4:53 p.m. Eastern from

10  Mr. Austin to Mr. Tucker, correct?

11  *A.* Correct.

12  *Q.* But you were not asked to include the direct response to

13  Mr. Tucker's e-mail listed in Exhibit D-839 within this chart,

14  correct?

15  *A.* Correct.

16  *Q.* And that e-mail states that Mr. Austin was not suggesting

17  he meet his competitors' prices, correct?

18          *MS. CALL:* Objection, hearsay.

19          *THE COURT:* Sustained.

20  *BY MS. CARWILE:*

21  *Q.* So D-839 is not included in the government's charts?

22  *A.* Correct.

23  *Q.* So you would agree with me, then, that entire relevant

24  e-mails were left out of these government charts.

25          *MS. CALL:* Objection, calls for a legal conclusion.

472
Rachel Evans - Cross

1        MS. CARWILE:  I disagree.  If she was on the prep team

2   that helped, I think she can testify to that.

3        THE COURT:  I am going to sustain the objection.  You

4   can rephrase.

5   BY MS. CARWILE:

6   Q.  All right.  Entire e-mails that have relevance were left

7   out of these charts, correct?

8        MS. CALL:  Same objection.

9        THE COURT:  She can answer if she understands what the

10  question means.

11  BY MS. CARWILE:

12  Q.  Do you understand what I mean when I say relevant?

13  A.  I think so.

14  Q.  Okay.  So an e-mail, for instance, from one of the men on

15  trial here responding to an e-mail that was included by the

16  government in the chart might have relevance to this case.

17  A.  Yes.

18  Q.  And the e-mail I am suggesting is not included, D-839, may

19  have relevance to this case, correct?

20  A.  Correct.

21  Q.  And it is not included in the government charts.

22  A.  Yes, or it is not.

23  Q.  So you testified on direct that many of the phone calls and

24  e-mails on these charts do not list a time zone.

25  A.  Yes.

Rachel Evans - Cross

1    Q.  And for those calls -- let's start with the calls.  For the

2    calls that do not list a time zone, you were not able to verify

3    the accurate time zone for that call.

4    A.  Yes, that's correct.

5    Q.  So it would follow that you cannot be accurate as to what

6    time that call actually occurred.

7    A.  If there was context provided by communications.

8    Q.  I am just talking about the entries in the government

9    charts where there is no time zone listed.  You testified that

10   meant you could not verify the time zone that the call was

11   made, correct?

12   A.  Yes.

13   Q.  And so it was just a follow-up conclusion that you can't be

14   sure what time zone that call occurred in.

15   A.  I can't be sure, correct.

16   Q.  So you can't be sure if the call occurred at the time

17   reflected in the numbers on the chart or a different time hours

18   later or hours before since you don't know the time zone.

19   A.  For some entries that didn't have a time, I could tell by

20   where it was in the e-mail.  I think I may be misunderstanding

21   your question.

22   Q.  That's okay.  Let's start with just phone calls, okay,

23   instead of e-mails because those are different.  I understand.

24   Just for phone calls when the government did not list a time

25   zone for a phone call in their charts, that meant that you

Rachel Evans - Cross

1    could not confirm what time zone those calls occurred in.

2    A.  Yes.

3    Q.  And because you couldn't confirm what time zone those calls

4    occurred in, you cannot testify to the accuracy of what time

5    those calls actually occurred.

6    A.  Yes.

7    Q.  And so with e-mails the same general principle is true

8    except for when the e-mail is part of a chain where the time

9    zone is listed, correct?

10   A.  Correct.

11   Q.  But if it's a stand-alone e-mail that's not part of a chain

12   and there is no time zone listed, that also means you could not

13   confirm the accuracy of the time that e-mail was sent.

14   A.  Yes.

15   Q.  So let's talk a little more about -- excuse me.  I want to

16   bring up one example of such a stand-alone e-mail, right?  So

17   let's look at government chart 7, Page 1, the last two entries.

18   Do you see those on your screens, Ms. Evans?

19   A.  Yes.

20   Q.  Those are e-mails.  One e-mail is sent from someone by

21   Pilgrim's not in the court today and another one is sent by

22   someone from Claxton, correct?

23   A.  Yes.

24   Q.  And neither of those e-mails on the government chart lists

25   a time zone.

475

Rachel Evans - Cross

1    A.  Correct.

2    Q.  So just like we just said, generally this is an example of

3    when you can't testify to the accuracy of when these two

4    separate e-mails were sent.

5    A.  Yes.

6    Q.  So I want to talk a little bit more about the phone calls

7    the prosecutors included in their charts.  Now, obviously you

8    don't know what was said on any of these calls.

9    A.  Correct.

10   Q.  And by the time the prosecutors gave you these charts, they

11   had already chosen which phone calls to include in the charts.

12   A.  Yes.

13   Q.  And which phone calls to exclude from the charts.

14   A.  Yes.

15   Q.  And so the calls that they included in their charts had

16   already been categorized into certain charts before you ever

17   started reviewing them.

18   A.  Yes.

19   Q.  And the only phone calls included in these charts are the

20   ones the government chose to include.

21   A.  Correct.

22   Q.  These government charts don't even contain all of the phone

23   calls that occurred on a given day, correct?

24   A.  Correct.

25   Q.  And as you said, you don't know what any of the calls are

Rachel Evans - Cross

1    about.

2    A.   Right.

3    Q.   So in your review the prosecutors didn't ask you to confirm

4    whether a certain call they chose to include involved

5    discussions about, for instance, a shortage of chicken.

6    A.   Right.

7    Q.   Right.  Because you have no idea.

8    A.   That's right.

9    Q.   Right.  But you were essentially asked to assume that the

10   calls they included were related to other documents they

11   included in their charts.

12           MS. CALL:  Objection, scope.

13           THE COURT:  Sustained.

14   BY MS. CARWILE:

15   Q.   So you testified on direct that you made edits to these

16   charts.

17   A.   Yes.

18   Q.   Are those edits the ones where you saw there were

19   transcription errors or changes to time zones you confirmed?

20   A.   Yes.

21   Q.   No other edits, correct?

22   A.   Removing and -- removing entries is another example.

23   Q.   Okay.  But you had no choice on which entries to remove,

24   correct?

25   A.   Yes.

Rachel Evans - Cross

1    Q.  That is correct?

2    A.  That is correct.

3    Q.  The prosecutors told you to remove an entry, and then you

4    are the one who physically clicked on the entry and deleted it,

5    for instance.

6    A.  Correct.

7    Q.  And you stated that you fixed some errors on these charts,

8    correct?

9    A.  Yes.

10   Q.  And for every error you fixed, same procedure.  You

11   confirmed with the prosecutors at the table that you could make

12   the change and then you made that change.

13   A.  Yes.

14   Q.  You didn't have the discretion to add or remove anything

15   from the chart on your own.

16   A.  No.

17   Q.  I am almost done, Ms. Evans, I promise.

18            You are aware that these charts, these government

19   charts, do not contain all of the documents that the government

20   received in this case, correct?

21   A.  Correct.

22   Q.  And the top of each of these government charts has a date

23   range on it, correct?

24   A.  Correct.

25   Q.  One that the prosecutors chose to place on the top of the

Rachel Evans - Cross

1    charts.

2    A.   Yes.

3    Q.   You did not review any e-mails outside of those date

4    ranges, correct?

5    A.   Outside of --

6    Q.   So the charts that you reviewed have specific limited

7    ranges of dates on the top of them, correct?

8    A.   Yes.

9    Q.   And you would agree with me that they don't track

10   chronologically from 2012 to 2019 with no breaks.

11   A.   Correct.

12   Q.   They are limited ranges within those years.

13   A.   Yes.

14   Q.   You were not asked to review any e-mails outside of the

15   dates that the government listed in their charts.

16   A.   No, except some e-mail signatures to verify that the

17   individuals worked for the companies that's in 90-10.

18   Q.   Okay.  That's helpful.  So other than e-mails to confirm

19   telephone numbers or companies where someone may have worked,

20   you were not asked to include the body of e-mails outside of

21   these date ranges?

22   A.   Correct.

23   Q.   And similarly other than what the exception you just noted,

24   you were not asked to review any other documents outside of

25   these date ranges.

Rachel Evans - Cross

1    A.  Correct.

2    Q.  You were not asked to review any phone calls made outside

3    of these date ranges.

4    A.  Correct.

5    Q.  You were not asked to review any phone calls made between

6    competing chicken suppliers outside of these date ranges.

7    A.  That's correct.

8    Q.  So it's fair to say that you didn't review anything other

9    than what you just said about perhaps e-mail signatures outside

10   of the ranges that the government chose for you to look at.

11   A.  Yes.

12   Q.  Now, you referenced a chart with multiple phone numbers.  I

13   believe you actually had it in front of you on your direct,

14   Government Exhibit 9748.  Do you remember that?

15   A.  I remember it.

16       MS. CARWILE:  If we could pull it up, that would be

17   great.  And if we could go to the second page, I believe, yes.

18   BY MS. CARWILE:

19   Q.  So the chart that you reviewed lists a phone number for

20   Mike Ledford of KFC's negotiating arm, RSCS, correct?

21   A.  Yes.

22   Q.  And there are no calls between Mike Ledford and Roger

23   Austin on any of the government charts; is that correct?

24   A.  I don't believe so, but I would have to confirm.

25   Q.  Would you accept my representation that there are no calls

Rachel Evans - Cross

1   between Mr. Ledford and Mr. Austin on any of the government's

2   charts?

3   A.  I would prefer to confirm.  I don't know offhand.

4   Q.  Go ahead.  You have them in front of you.  Just let us know

5   when you are ready.

6   A.  Between?

7   Q.  All of the charts.

8          MS. CALL:  Your Honor, minor objection, but I would

9   object to the collective redaction of exhibits while they are

10  being shown.  I believe some portions were blacked out and

11  argumentative.

12         THE COURT:  Let's allow the witness to go ahead and do

13  her review.  We will take that up if we need to in a minute.

14  A.  I am ready.

15  BY MS. CARWILE:

16  Q.  So would you agree with me that there are no calls listed

17  in any of the government charts between Mike Ledford and Roger

18  Austin?

19  A.  Yes.

20  Q.  And, in fact, there are no calls between Mike Ledford and

21  any of the chicken suppliers listed on these charts, correct?

22  A.  I don't believe so.

23         MS. CARWILE:  Your Honor, I made a minor oversight.

24  If I could go back briefly to the part of my questioning where

25  I was asking about Exhibit D-839, and if it could be briefly

Rachel Evans - Cross

1    published to the jury.  It was admitted as part of Attachment

2    1.

3              *MS. CALL:*  Objection to scope.

4              *MS. CARWILE:*  Well, I discussed it in my cross in

5    chart 16 when I discussed it.

6              *THE COURT:*  The objection is overruled.  It may be

7    displayed.

8              *MS. CARWILE:*  If we can just display the top part

9    where the text actually is.  The rest is blank.  And just for

10   the record, this was when I was discussing government chart 16.

11   All right.

12             *THE COURT:*  You can take it down.

13             *MS. CARWILE:*  Thank you.

14   *BY MS. CARWILE:*

15   *Q.*  So Ms. Evans, it's fair to say that you can't testify to

16   the overall completeness of these government charts, correct?

17             *MS. CALL:*  Objection, vague.

18             *THE COURT:*  Overruled.

19   *A.*  Could you rephrase or repeat the question?

20   *BY MS. CARWILE:*

21   *Q.*  So you are not here to testify that these charts contain

22   all of the relevant e-mails in the case.

23   *A.*  Correct.

24   *Q.*  You are not here to testify these charts contain all of the

25   relevant contracts in the case, correct?

482

Rachel Evans - Cross

1   A.  Correct.

2   Q.  And you are not here to testify these charts contain all of

3   the relevant phone calls in this case.

4   A.  Correct.

5   Q.  So you cannot testify to the completeness of these

6   government charts.

7   A.  Correct.

8   Q.  And you're, again as we just said, not here to testify to

9   anything that happened outside of the date ranges of these

10  charts.

11  A.  Yes.

12  Q.  So what you can testify to is essentially that whatever

13  information the United States attorneys, the prosecutors

14  included in their charts, that it was essentially copied and

15  pasted correctly into their charts.

16  A.  Yes.

17          MS. CARWILE:  I don't have any further questions, Your

18  Honor.

19          THE COURT:  Thank you.

20          Additional cross-examination?

21          Ms. Henry, go ahead.

22                        **CROSS-EXAMINATION**

23  BY MS. HENRY:

24  Q.  Good morning, Ms. Evans.  My name is Roxann Henry and I

25  represent Mr. Bill Kantola.

483

Rachel Evans - Cross

1          If we can pull up for you Government Exhibit 1.

2          If you could look at the third entry there, you will

3   see a call with an estimated time of 50 seconds.  Do you see

4   that?

5   A.   I do.

6   Q.   And the government lawyers told you to verify the

7   identification of that call as a call to Mr. Kantola; is that

8   correct?

9   A.   Yes.

10          MS. HENRY:  Can we pull up Government Exhibit 9748?

11   And can we publish that to the jury?  It was admitted.

12          THE COURT:  You may.

13   BY MS. HENRY:

14   Q.   Can we scroll down on that to -- I think you'll see there

15   where it relates to a Koch office number.  Do you see that?

16   A.   I see that.

17   Q.   Is that Koch office number that you verified as actually a

18   call to Mr. Kantola, correct?

19   A.   I believe so.

20   Q.   That's what the government lawyers told you to do, correct?

21   A.   Yes.

22   Q.   Now, you've seen in your ordinary experience where people

23   on an e-mail signature sometimes list an office number in

24   addition to a different direct dial number or otherwise?

25   A.   Yes.

Rachel Evans - Cross

 1   *Q.*  And that doesn't mean that's the only person you can reach

 2   at that number, right?

 3   *A.*  Yeah, in some cases, right.

 4   *Q.*  And in your ordinary experience, you have seen contact

 5   lists where people may put down an office number for a person

 6   as well.

 7   *A.*  Yes.

 8   *Q.*  And again that doesn't mean that's the only person that

 9   could be reached at that number, right?

10   *A.*  Right.

11   *Q.*  And it's pretty common sense that people don't actually

12   call themselves and talk for a long time on the same number,

13   you know.

14   *A.*  Yes.

15           *MS. HENRY:*  Can we pull up for the witness I-323?  And

16   can we go to the last page and the last entry?

17   *BY MS. HENRY:*

18   *Q.*  And that has the same office phone number we were just

19   talking about, correct?

20   *A.*  In the receiving end, yes.

21   *Q.*  Yes.  And the number that was the correspondent number on

22   that was a number that was listed as Mr. Kantola's number on

23   Government Exhibit 9748, correct?

24   *A.*  Yes, that we looked at previously.

25   *Q.*  And this exhibit, this is the type of information that you

                                485
                    Rachel Evans - Cross

1   reviewed in your work to verify phone calls, correct?

2   A.   Correct.

3   Q.   It's an exhibit that came in from the AT&T phone numbers?

4   A.   Yes.

5   Q.   And it's pretty common sense that people don't actually

6   call themselves and talk for a long time as we've talked about,

7   right?

8   A.   Yes.

9   Q.   How long was that call between Mr. Kantola's number and

10  this office number?

11  A.   25 minutes and 17 seconds.

12  Q.   Okay.  But the prosecutors asked you to verify on these

13  charts the identification of Mr. Kantola's name each time you

14  saw that office number in a phone record; isn't that correct?

15  A.   Yes.

16        MS. HENRY:  Can we go to Government's Exhibit 1544?

17  BY MS. HENRY:

18  Q.   This is a document that you reviewed as part of your work,

19  correct?

20  A.   I believe so.

21  Q.   And can you please go to the second page at the top?  Can

22  you read the sentence that's on that page?

23  A.   Starting with, "We are"?

24  Q.   Yes.

25  A.   "We are hearing that Claxton and Koch were pretty

486

Rachel Evans - Cross

1    aggressive with pricing as well as Tyson."

2            MS. HENRY:  Can we pull up Government Exhibit 16,

3    please?

4    BY MS. HENRY:

5    Q.  And this is one of the charts that you worked on, correct?

6    A.  Correct.

7    Q.  And, in fact, it has an excerpt from that Government

8    Exhibit 1544 on it, doesn't it?

9    A.  Yes.

10   Q.  But it doesn't include the snippet part about how Koch and

11   others were being aggressive on pricing, does it?

12   A.  It does not.

13           MS. HENRY:  I have no further questions.  Thank you

14   very much, Ms. Evans.

15           THE COURT:  Thank you, Ms. Henry.

16           Ms. LaBranche?

17                        **CROSS-EXAMINATION**

18   BY MS. LaBRANCHE:

19   Q.  Good morning, Ms. Evans.

20   A.  Good morning.

21   Q.  My name is Marci LaBranche and I represent Tim Mulrenin.

22           MS. LaBRANCHE:  Could I start by pulling up Exhibit 7?

23   BY MS. LaBRANCHE:

24   Q.  So Ms. Evans, you testified on direct about what certain

25   colors meant on the charts.  And I just wanted to make sure

Rachel Evans - Cross

1    that I understand.  When we look at Exhibit 7, if a

2    communication is between two individuals who worked at the same

3    chicken supply company, those come up in the salmon color; is

4    that right?

5    A.   Yes.

6    Q.   And if it's a communication between individuals who worked

7    at two different chicken supply companies, those are in orange.

8    A.   Yes.

9    Q.   And then the ones that are in the light blue, that's where

10   there is a communication between somebody at a chicken supply

11   company and basically somebody at the customer company,

12   correct?

13   A.   Yes.

14   Q.   What colors did you use on these charts to identify

15   communications between two of the customer companies with each

16   other?

17          MS. CALL:  Objection, scope.

18          THE COURT:  Overruled.

19          MS. CALL:  Your Honor, there is a prior ruling, if I

20   may be heard on side bar.

21          THE COURT:  Yes.

22      (At the bench:)

23          THE COURT:  Go ahead, Ms. Call.

24          MS. CALL:  Yes, Your Honor.  In the original motions

25   in limine, the government did move to exclude references to,

Rachel Evans - Cross

1   you know, inappropriate communication between customers.  I

2   mean, first off, I don't see how communications between

3   customers has any relevance to Ms. Evans' testimony because

4   there aren't any included on these charts, so it doesn't even

5   go to the purpose of her testimony here and the accuracy of

6   these charts.  But I would just object to this line of

7   questioning because it seems to be implying some improper

8   nature of communications before it goes any further as to what

9   Your Honor has already excluded, and I believe the exclusion

10  was on the basis of counsel's representations that they did not

11  intend to elicit any testimony about communications between

12  customers.

13          THE COURT:  Ms. LaBranche, response?

14          MS. LaBRANCHE:  Your Honor, the purpose of my question

15  is the fact that there are no communications listed in the

16  chart.  My next question is okay, there are none, and that's

17  it.  There is not going to be a further line of questioning.  I

18  think it's fair for us to ask Ms. Evans about the verification

19  process, about what the colors mean on the chart, and about the

20  fact that there aren't any of those included.

21          THE COURT:  I am going to sustain the objection in

22  terms of the color.  There is certainly no problem with asking

23  whether customer communications are included, all right?

24          MR. TUBACH:  One further thing.  Michael Tubach.  I

25  want to make sure we don't leave Ms. Call's representations

Rachel Evans - Cross

1    incorrectly.  We have never stipulated or agreed we would not

2    be getting into customer-to-customer communications at all, so

3    I have serious doubts that we ever agreed to anything like

4    that.

5         THE COURT:  I think that Ms. Call is suggesting that

6    the Court had previously ruled on that.  I don't recall that

7    either.  But as I said, Ms. LaBranche can ask whether there is

8    any customer-to-customer listings.  But the color thing is not

9    necessary, so that objection will be sustained.  Thank you.

10        MS. LaBRANCHE:  Thank you, Your Honor.

11     (In open court:)

12   BY MS. LaBRANCHE:

13   Q.  Ms. Evans, if a customer, a chicken customer like

14   Mr. Kronauge who you identify in the first entry on this chart

15   were to talk to an individual at a competing chicken company,

16   you didn't include those on any of these charts; is that

17   correct?

18   A.  I don't believe so.

19   Q.  Ms. Evans, you testified about kind of the process that you

20   used to verify the charts after they were essentially given to

21   you, put together by the government, correct?

22   A.  I did.

23   Q.  And I want to direct your attention to the one we have up

24   right now which is chart 7 and kind of walk you through a

25   little bit so I understand what your verification process was.

490
Rachel Evans - Cross

1          So when you first were given this chart, the title

2   which is 8/16/17 to 9/7/17, that was already on the top of the

3   chart, right?

4   A.   I believe so.

5   Q.   So what you did as somebody who was going to be verifying

6   is you looked and you made sure that you had only

7   communications from that range in that chart; is that fair?

8   A.   Yes.

9   Q.   Then I assume the first thing you did was you went to the

10  first entry on the first page and kind of started there in

11  going through and doing your verification; is that right?

12  A.   Yes.

13  Q.   So in this chart the first entry is on August 16 of 2017 at

14  4:16 p.m. Eastern Time, right?

15  A.   Correct.

16  Q.   And if you jump over to the furthest left column, that has

17  the Exhibit No. 744.

18  A.   It does.

19  Q.   As I understand your testimony, when you were verifying

20  this first entry, you would pull up Exhibit 744 and almost kind

21  of put it next to the chart; is that fair?

22  A.   Yes.

23  Q.   And then you would look and you would make sure, okay, this

24  is the correct date, right?

25  A.   Yes.

Rachel Evans - Cross

1    *Q.*  This is the correct time.  It's from this person, Kent

2    Kronauge.  And then you would verify he worked at SMS.  You

3    would then go on to the excerpt part and make sure that the

4    language in the excerpt, like in this instance about the

5    pricing models for Popeye's, was also contained in that e-mail

6    you were looking at on 744?

7    *A.*  Yes.

8    *Q.*  And then I would assume you just moved on down the line for

9    that day for the 4:24 e-mail and the 4:44 e-mail that came

10   right after, correct?

11   *A.*  Yes.

12   *Q.*  And the reason that the entry at the top is in blue is

13   because Mr. Kronauge is a chicken customer sending out an

14   e-mail to chicken supplier companies.

15   *A.*  Yes.

16   *Q.*  And the reason the next two are salmon is because they are

17   communications between Mr. Pepper and Mr. Mulrenin who work at

18   the same company.

19   *A.*  Correct.

20   *Q.*  Okay.  So after you got done verifying that -- and that's

21   all the information you were asked to verify for August 16th of

22   '17, correct?

23   *A.*  Correct.

24   *Q.*  And so after you got done with that, then you went to the

25   next date on the chart, fair?

Rachel Evans - Cross

1   A.   Yes.

2   Q.   Okay.  And the next date on this chart isn't actually the

3   next day.  It's not August 17 of 2017, right?

4   A.   Right.

5   Q.   Because the next date on this chart is September 5th of

6   2017.

7   A.   Yes.

8   Q.   So that was actually 20 days later, correct?

9   A.   Yes.

10  Q.   And just so I am clear, you weren't asked to put anything

11  in this chart to verify that 20-day lapse.

12  A.   Correct.

13  Q.   And again jumping those 20 days in the chart, that doesn't

14  mean that you are sitting here today suggesting that nothing

15  happened during those 20 days related to any of these people,

16  right?

17          MS. CALL:  Objection to relevance and scope here.

18          THE COURT:  I will overrule the objection.

19  A.   Correct.

20  BY MS. LaBRANCHE:

21  Q.   So you're not suggesting by going through this chart that

22  like Mr. Kronauge and Mr. Pepper weren't communicating during

23  those 20 days.

24  A.   Correct.

25  Q.   You just don't know one way or the other.

Rachel Evans - Cross

 1    A.  Right.

 2    Q.  Okay.  Because if the communication wasn't on the chart

 3    when you got it, you didn't go looking for it to put it on.

 4    A.  Yes, that's right.

 5    Q.  Okay.  So looking at the 9/5/17 entry, it starts off the

 6    government had you verify quite a few calls, correct?

 7    A.  Yes, I see the calls.

 8    Q.  And then at the bottom of that first page of chart 7, the

 9    government had you verify some e-mails between Mr. Kronauge and

10    various of the chicken suppliers.

11    A.  Yes.

12    Q.  And I want to be clear about these calls.  You were not --

13    when you were going through and you were verifying these calls

14    on that day, you were not looking to see if there were any

15    other calls on that day between these individuals, correct?

16    A.  Correct.

17    Q.  So you would pull up the telephone chart and you would look

18    for the specific time and the specific numbers that the

19    government wanted you to verify.

20    A.  Yes.

21    Q.  And you certainly weren't looking to see if there were

22    other calls that the people on this chart had had with other

23    people that same day.

24    A.  Right.

25    Q.  Okay.  And I noticed as I am looking at this, I don't see

Rachel Evans - Cross

1   any calls to or from Mr. Kronauge on September 5th of 2017; is

2   that correct?

3   A.   Correct.

4   Q.   So if Mr. Kronauge had had calls with other -- with chicken

5   suppliers or with other chicken customers, you weren't asked to

6   verify those for that day.

7   A.   That's right.

8   Q.   If we could go to Page 2 on chart 7.  On Page 2 it appears

9   the government had you verify a series of e-mails, calls, texts

10  that are dated September 6 of 2017.

11  A.   Yes.

12  Q.   I see -- I want to direct your attention to the 9:48 a.m.

13  call with Mr. Pepper and Mr. Mulrenin.  Do you see that?

14  A.   I do.

15  Q.   And you have the exhibit number that you verified that call

16  with as 766.

17  A.   Yes.

18  Q.   Do you recall what Exhibit 766 is?

19  A.   It's most likely a phone record.

20  Q.   Okay.

21          MS. LaBRANCHE:  Could we pull up the front page of

22  Exhibit 766?

23          Your Honor, may I approach?  I don't have this in my

24  notebook to take a look at the screen.  May I approach?

25          THE COURT:  Yes, you may.

Rachel Evans - Cross

1    *BY MS. LaBRANCHE:*

2    Q.  Okay.  And this is the phone record for Mr. Pepper,

3    correct?

4    A.  Yes, it is.

5    Q.  And it's a document that was produced by AT&T?

6    A.  Yes.

7    Q.  In the third column over on that document has a designation

8    of conn.time.  Do you know what that is?

9    A.  I believe it means connection time.

10   Q.  And underneath it, it says UTC?

11   A.  Correct.

12   Q.  So we know based on the face of this document that all of

13   the calls -- all of the times on this record are in UTC time,

14   correct?

15   A.  Yes.

16   Q.  And so when we're looking at chart 7 and we see that

17   9:48 a.m. Eastern Time call, you're confident that that is, in

18   fact, the correct conversion for Eastern Time and you were able

19   to verify it because you had this document that says the call

20   was made at UTC.

21   A.  I believe so.

22   Q.  And then when we look down further on September 6, there is

23   another call at 1:41 between Mr. Kronauge and Mr. Pepper.  Do

24   you see that?

25           *THE COURT:*  Are you directing her attention to

                                  Rachel Evans - Cross

 1    Exhibit --

 2                 *MS. LaBRANCHE:*  I am sorry, we are back to chart 7.

 3                 Thank you, Your Honor.  I apologize.

 4    *BY MS. LaBRANCHE:*

 5    *Q.*  So you see that 1:41 p.m. Eastern Time call?

 6    *A.*  Yes.

 7    *Q.*  Mr. Kronauge and Mr. Pepper?

 8    *A.*  I do.

 9    *Q.*  Again, it's Exhibit 766 which you just testified were

10    Mr. Pepper's phone records?

11    *A.*  Yes.

12    *Q.*  In which we know were in UTC time?

13    *A.*  Yes.

14    *Q.*  So Ms. Evans, the last thing I want to ask you about is --

15    on this chart 7 is your testimony related to time zones that

16    you put on the charts, okay?  Is that okay?

17    *A.*  Yes.

18    *Q.*  And you testified on direct that there were times where you

19    had to like consider context in order to determine a time zone,

20    correct?

21    *A.*  Yes.

22    *Q.*  And that then influenced where you placed certain entries

23    on the charts; is that fair?

24    *A.*  Yes.

25    *Q.*  I want to specifically direct your attention to the series

497
Rachel Evans - Cross

1  of text messages on September 6 of 2017 beginning at 9:48 a.m.

2  and going down to 11:54 a.m.  Do you see those?

3  A.  I do.

4  Q.  And those are text messages between Carl Pepper and Tim

5  Mulrenin, correct?

6  A.  Yes.

7  Q.  And you've testified that you verified this chart where the

8  times are listed at 9:48 a.m. Eastern time to 11:54 Eastern

9  time, correct?

10 A.  Yes.

11 Q.  And each of these texts has a specific exhibit number that

12 you have identified as the source document.

13 A.  Yes.

14 Q.  So I would like to pull up Exhibit 752, please.

15        Exhibit 752 is what you have listed as the source

16 document for the 9:48 a.m. Eastern Time text from Mr. Pepper to

17 Mr. Mulrenin, correct?

18 A.  Correct.

19 Q.  And when we look at 752, what we actually see is that the

20 time on there is 1:48 p.m., correct?

21 A.  Correct, I see that.

22 Q.  It doesn't say Eastern.  It doesn't say UTC time.

23 A.  It does not.

24 Q.  It just says 1:48 p.m.

25 A.  Correct.

Rachel Evans - Cross

1   *Q.*  And you in your verification process didn't go back and

2   look up the metadata related to that text, did you?

3   *A.*  I did.

4   *Q.*  You personally went back and looked at the metadata?

5   *A.*  Yes.

6   *Q.*  And made the conversion yourself?

7   *A.*  Not based off the metadata.

8   *Q.*  Okay.  So you didn't make the -- did you not make the

9   conversion or did you make the conversion?

10  *A.*  I did.

11  *Q.*  You did make the conversion for the chart?

12  *A.*  Yes.

13  *Q.*  And who was it who provided you that metadata information?

14  *A.*  The attorneys.

15  *Q.*  I am sorry?

16  *A.*  The trial attorneys.

17  *Q.*  The government attorneys sitting here?

18  *A.*  Yes.

19  *Q.*  And were you instructed that what you were supposed to do

20  from looking at 742 is subtract four hours to get to Eastern

21  Time?  Is that what you were told?

22  *A.*  Yes.

23  *Q.*  So that's what you did.

24  *A.*  Yes.

25  *Q.*  And I just want to be clear that the first time you were

Rachel Evans - Cross

1    given this chart, the text messages were in this same --

2            Could we go back to chart 7?

3            The first time you were given chart 7, the text

4    messages between 9:48 and 11:54, those, the very first time you

5    got a version of this chart, those weren't listed as Eastern

6    Time, correct?

7    A.  I believe so, yes.

8    Q.  They were listed as a different time.  In fact, they were

9    listed with no time; is that fair?

10   A.  I believe so.  They didn't have Eastern.

11   Q.  Okay.  But nonetheless, when you got this chart, they were

12   already placed here in this chart.

13   A.  Yes.

14   Q.  Okay.  And you were then asked to verify that they were in

15   the right place.

16   A.  Yes.

17   Q.  When you testified earlier about how on some occasions you

18   needed to put some context around an entry to understand what

19   the proper time zone was and what the proper placement was on

20   the chart, sometimes you would look at content of what was

21   included in the e-mails or text messages; is that fair?

22   A.  Yes.

23   Q.  And when you look at -- I want to direct your attention to

24   the text message that you have listed as 11:33 a.m. Eastern.

25   A.  Yes, I see it.

Rachel Evans - Cross

1   Q.  And I actually apologize.  I want you to jump down to the

2   one that's 11:34, the last one that's 11:34, between

3   Mr. Mulrenin and Mr. Pepper.

4   A.  Yes, I see that.

5   Q.  Okay.  And you verified that the content of that 11:34 a.m.

6   Eastern Time text said -- was Mr. Mulrenin saying to

7   Mr. Pepper:  Ok.  Call Cullen.  I will call you as soon as I

8   can, correct?

9   A.  Correct.

10  Q.  And the next text in that chain is 10 minutes later.

11  A.  Yes.

12  Q.  And you verified it as being 11:44 Eastern Time?

13  A.  I did.

14  Q.  And you verified that the content included Mr. Pepper

15  saying:  Called Cullen and told him what I heard?

16  A.  Yes, it has that.

17          THE COURT:  Ms. LaBranche, can you look for a

18  convenient time to break because it's noon now.

19          MS. LaBRANCHE:  I only have three questions.

20          THE COURT:  That's fine.

21  BY MS. LaBRANCHE:

22  Q.  But you didn't go back to Mr. Pepper's records and check to

23  see if, in fact, there was a call during those 10 minutes, did

24  you?

25  A.  I did not.

Rachel Evans - Cross

1    *Q.*  And if you had, that would be pretty good context for you

2    to verify that these times were correct, correct?

3    *A.*  It could, yeah.

4    *Q.*  And if you were to go back and look at Mr. Pepper's

5    telephone records and see that the only time he talked to

6    Mr. Cullen that day was at 3:36 p.m. Eastern Time, that would

7    be an important thing for you to consider in the context of the

8    time zones as well, fair?

9    *A.*  It would.

10          *MS. LaBRANCHE:*  Thank you.

11          *THE COURT:*  Ladies and gentlemen, we will go ahead and

12   break for lunch at this time.  Keep the admonitions in mind.

13   Don't talk to yourselves about the case at all or in any way.

14   Don't look up any information.  It's warmer out today, but

15   nonetheless, if you could try to keep those yellow juror

16   buttons visible if you go outside of the courthouse or evening

17   walking around within the courthouse, all right?  The jury is

18   excused for the lunch break.  We will reconvene at 1:30.

19          (Jury excused.)

20          Ms. Evans, you can step down.  And you will come back

21   at 1:30, obviously.

22          Let me ask the government this.  The government filed

23   Docket No. 1107, a motion for order on agreement regarding

24   business records foundation.

25          Mr. Torzilli, assuming that you're the point person on

Rachel Evans - Cross

1    that, does that moot Docket No. 992, the original motion

2    regarding pretrial authentication?

3              MR. TORZILLI:  Correct assumption, Your Honor, and the

4    answer is yes.

5              THE COURT:  Thank you.

6              Here is what I propose, and that is -- or at least one

7    idea.  And that would be to reconvene outside the presence of

8    the jury at 1:00 and talk about summary exhibits, try to make a

9    little bit of progress.  We don't have to if people have things

10   that they are trying to do some other types of work.  I think

11   tonight we need to roll up our sleeves and get through those

12   summary exhibits.  We could use half an hour of our lunch

13   break.  We don't have to, but that's one idea.

14             Any thoughts on that?

15             MS. CALL:  No opposition by the government to that.

16             THE COURT:  Defendants have an idea?  It does cut

17   short your lunch break, but we could put in maybe half an hour

18   of time.

19             Mr. Tubach?

20             MR. TUBACH:  Your Honor, I think that's fine.

21             THE COURT:  Okay.  Why don't we -- we will reconvene

22   at 1:00, then, and we will talk about summary exhibit issues.

23   The Court will be in recess.  Thank you.

24        (Recess at 12:05 p.m.)

25        (Reconvened at 1:02 p.m.)

503

Rachel Evans - Cross

1          THE COURT:  Ms. Call, assuming that you're the point

2     person on the summary exhibits, I think we should start going

3     through them and taking up the objections to them.  And why

4     don't I let you pick which ones you want to start off with.

5          MS. CALL:  Yes, Your Honor.  And before we get

6     started, I will note there are two pending issues that I think

7     are going to be relevant to the testimony of Mr. Pepper and

8     perhaps Mike Ledford for one them who are the next two

9     witnesses that we may want to take up before those witnesses

10    are called.

11         THE COURT:  And when do you think you will call

12    Mr. Pepper?  Oh, they will come up with the next two witnesses.

13         MS. CALL:  So Mike Ledford is the next witness and

14    Mr. Pepper is the next one after that.

15         THE COURT:  Okay.  What are those issues?

16         MS. CALL:  My colleagues will be a little more prepped

17    to speak on them.  But with respect to Mr. Pepper, there is the

18    pending motion that was filed relating to Tyson Foods status

19    and his testimony, as well as a witness issue regarding a

20    subpoena that I believe was served on a defense witness over

21    the lunch hour who I believe has been in the courtroom during

22    the course of the trial that we wanted to raise.

23         THE COURT:  Okay.  Let's start with the last issue

24    first.

25         MS. CALL:  Mr. Koenig will take up these issues.

Rachel Evans - Cross                                     504

1           *MR. KOENIG:*  So the Defendant Mulrenin, and I don't

2     know who else joined the motion off the top of my head, but

3     filed a motion *in limine* yesterday seeking a ruling that we

4     can't elicit testimony from Mr. Pepper that he retired.  And

5     they said that if we do elicit the testimony, then all sorts of

6     leniency evidence comes in.  Relatedly, my understanding is

7     they served a subpoena on a Tyson lawyer who is in the

8     courtroom here today.  You know, I think -- it's not my motion,

9     but it's an issue that I think we should take up if not right

10    now, you know, fairly soon or at a break or something.

11          *THE COURT:*  Which issue?  On the Pepper retirement

12    testimony or the --

13          *MR. KOENIG:*  Yeah, and I think they are related

14    because I think calling the Tyson lawyer may relate to the

15    Pepper retirement motion as well.  In fact, it's mentioned in

16    the motion.

17          *THE COURT:*  That seems to be a separate issue whether

18    a witness is in the courtroom.

19          *MR. KOENIG:*  Well, to be clear, I mean, when, you

20    know, when interviews occurred, this was a person who

21    represented Tyson and was in the interviews with Mr. Pepper

22    representing the employer.  I am not sure I have seen precedent

23    for a witness to be called who is, you know, effectively

24    representing the company and, you know, I guess in some sense

25    the witness, but not really, but you know what I mean?  Like

505
Rachel Evans - Cross

1    they bring their employees in to talk to us.  And I just -- I

2    don't see any possible way that this gets around any sort of

3    privilege or other sort of client issues, so I just --

4              THE COURT:  Who is the witness?

5              MR. KOENIG:  Dan Oakes.

6              THE COURT:  Is Mr. Oakes -- is he -- and someone can

7    answer this representing Mr. Mulrenin, but is his purpose for

8    attending the trial separate from his being here to potentially

9    testify?

10             MR. KOENIG:  I don't know the purpose.

11             THE COURT:  Ms. Prewitt is right behind you.  She will

12   answer.

13             MS. PREWITT:  Well, I don't know if I know the purpose

14   other than he is external counsel for Tyson Foods and is

15   interested in the proceedings here on that basis, Your Honor.

16   I think it would be appropriate for him to be excused from the

17   courtroom considering the fact that he is a fact witness in

18   this case and the defense plans to call him in its case.

19             THE COURT:  Yeah.  Mr. Oakes, maybe you can come

20   forward, if you don't mind.  Can you state your full name for

21   the record just so we have that down?

22             MR. OAKES:  Daniel Kenton Oakes; D-A-N-I-E-L,

23   K-E-N-T-O-N, O-A-K-E-S.

24             THE COURT:  All right.  And Mr. Oakes, is it true that

25   have you been subpoenaed or otherwise received some indication

Rachel Evans - Cross

 1    that you may be called as a witness in this case?

 2         MR. OAKES:  I was subpoenaed at about 12:30 today as I

 3    left the courtroom.  I have been listening to testimony

 4    throughout this trial and throughout the prior trial.

 5         THE COURT:  And throughout the what?

 6         MR. OAKES:  Throughout the prior trial.  I was here

 7    for most of the proceedings of the prior trial.

 8         THE COURT:  Yeah.  Even though it may have come as a

 9    surprise to you to, Mr. Oakes, to get subpoenaed just over the

10    lunch hour today, the fact that you have been will prevent you

11    from being able to sit in once the jury comes in because you

12    will be sequestered.  You understand that?

13         MR. OAKES:  I do.

14         THE COURT:  Thank you, Mr. Oakes.

15         I am not prepared to rule on the other one.  I haven't

16    had a chance to read that particular motion.  But you don't

17    anticipate anything coming up this afternoon really as to that;

18    is that correct?

19         MR. KOENIG:  I think that's correct.  It's separating

20    the subpoena issue out, the issue about Mr. Pepper's

21    retirement, we don't know how long Mr. Ledford will be crossed

22    for, but he is the very next witness, Mr. Pepper is.  So that's

23    the first five minutes type question.

24         THE COURT:  On cross.

25         MR. KOENIG:  That he retired.  The motion was to

Rachel Evans - Cross

 1   exclude us from eliciting testimony that he retired.

 2          THE COURT:  Okay.  And you were intending to bring

 3   that up in the first five minutes of Mike Ledford's direct?

 4          MR. KOENIG:  No.  It could come up today if

 5   Mr. Ledford gets off the stand today and Mr. Pepper starts.

 6          THE COURT:  Well, let's see.  We will take it up then.

 7          Mr. Gillen?

 8          MR. GILLEN:  Your Honor, I don't think we are going to

 9   get to cross on Mr. Pepper today.  Is that a fair assessment?

10   I asked the Court to ask the government.

11          THE COURT:  I didn't anticipate it, but if it does, we

12   will have to take it up at that time is what I am suggesting.

13          MR. GILLEN:  Okay.  Because we have a lot to say about

14   this issue, about the leniency issue, the retirement and

15   Mr. Oakes.  They are all intermingled into one and we think

16   that we need to be heard on that.  Thank you.

17          THE COURT:  Yes, got it.  Okay.  There is that issue.

18          Was there another one, Ms. Call?

19          MS. CALL:  I think we can move on to the summaries.

20          THE COURT:  Okay.

21          Yeah, Mr. Fagg, go ahead.

22          MR. FAGG:  Your Honor, there is one issue with regard

23   to Mr. Ledford's testimony.  We have an agreement with the

24   government that they will provide documents to defense 48 hours

25   before a witness testifies.  We received last night, late last

Rachel Evans - Cross

1     night two documents from the government that they indicated

2     they may ask Mr. Ledford about on redirect that had previously

3     never even been on their exhibit list, the current exhibit list

4     as it exists today.  Neither one of those documents are on

5     there.

6              And I believe the government is seeking to ask

7     Mr. Ledford about one of those documents which may be

8     related -- the two documents may be related to one another.

9     It's not clear, but they are close in Bates number to each

10    other.  But one of the documents talks about confidentiality

11    expectations with respect to a bid.  And I apologize, I don't

12    have a copy of it for the Court.  We just got it late last

13    night.  But I think that that document goes against the Court's

14    prior rulings with respect to confidentiality associated with

15    these bids that were submitted, and so I wanted to raise that

16    for the Court before, since I understand Mr. Ledford is now the

17    next witness.

18             *THE COURT:*  Well, it sounds like, and Ms. Call can

19    correct me if I'm wrong, that it sounds like a document that

20    they anticipated would become relevant after the

21    cross-examination which is why apparently it was indicated that

22    it could be used on redirect.  I don't know if that's here or

23    there, but I don't know.

24             *MR. FAGG:*  Yeah, I am not sure whether it's here or

25    there either, Your Honor.

Rachel Evans - Cross

1           THE COURT:  Mr. Tubach?

2           MR. TUBACH:  The one thing I want to make sure doesn't

3    happen, though, is there is very little on redirect that

4    wouldn't have been covered on direct unless it's a totally new

5    topic that we cover on cross.  But what I to want make sure

6    doesn't happen here is the government decides it wants to use

7    some exhibits, hasn't met the 48-hour rule, so they decided we

8    will just use it in redirect.  That should not happen.

9           THE COURT:  Ms. Call?  Or sorry, Mr. Torzilli?

10          MR. TORZILLI:  Yeah, I appreciate it.  Thank you, Your

11   Honor.  First, and I realize based on the prior trial Your

12   Honor doesn't want to get involved at the level of agreement

13   amongst the parties on these types of topics, but just so the

14   record is clear, it's not a 48-hour rule.  It's actually a rule

15   two days in advance by 9:00 p.m. to provide documents for

16   potential use on direct examination is the agreement.  And

17   counsel is exactly right, we provided notice, which we don't

18   have to under the agreement, documents for potential use with

19   redirect, but we did on a non-precedential basis and as a

20   courtesy.

21          If the issue arises that requires us on redirect to

22   get into the document, we are prepared to do so and are happy

23   to have a side bar in advance so that Your Honor can give it

24   full consideration.  But just to be clear for the moment, this

25   is a document that helps to prove the defendants' state of

Rachel Evans - Cross

1    mind, the defendants' state of mind during the bidding and the

2    negotiation process during which they conspired to rig those

3    bids and fix prices.  So this is a different animal, so to

4    speak, than some of the other confidentiality issues that Your

5    Honor addressed both leading up to today in this trial and at

6    the first trial.

7         THE COURT:  Sorry, Mr. Torzilli.  Explain that again

8    to me.  Why is it a little bit different?

9         MR. TORZILLI:  It's a little bit different because

10   this document was in the possession of the chicken suppliers,

11   so there is an expectation the chicken suppliers would have

12   that and informed their state of mind about what the

13   expectations for the bidding process were going to be as set by

14   the customer.

15        THE COURT:  And why would an expectation of theirs

16   regarding the bidding process be relevant to an issue in this

17   case?

18        MR. TORZILLI:  Absolutely.  Because if they deviated

19   from what they knew the customers' expectation was for what the

20   competition was supposed to be, which is of course what the

21   Sherman Act protects, then that Pilgrim's applies that their

22   actions in sharing the bids tends to indicate that they

23   knowingly participated in the conspiracy and that the sharing

24   of the otherwise confidential information was not for one of

25   the non-conspiratorial purposes that's been raised during the

Rachel Evans - Cross

1    litigation.

2           THE COURT:  Okay.  Mr. Fagg?  And then I will hear

3    from Mr. Beller.

4           MR. FAGG:  Thank you, Your Honor.

5           The fact of the matter is this document is not on the

6    government's exhibit list, period, so we had no notice that the

7    government was intending to use this until late last night.  So

8    if the government wants to take a very narrow view of our

9    agreement that we had, it doesn't change the fact this was not

10   on their exhibit list, period.

11          The other thing, Your Honor, is that this is a

12   document that appears to have been produced by George's.  It is

13   not a document that indicates that it was in possession of the

14   chicken suppliers.  It was produced by George's.  The e-mail is

15   from Mr. Oechsli at UFPC -- to Mr. Oechsli at UFPC.  And I

16   guess the government will say other people were blind copied on

17   it, but this is a George's document.  It doesn't say who at

18   George's received it much less who at any other suppliers

19   received this document.  So I don't know how it could possibly

20   go to an individual's state of mind.

21          THE COURT:  Mr. Beller?

22          MR. BELLER:  Thank you, Your Honor.  Mr. Fagg covered

23   my comments.  Thank you.

24          THE COURT:  Ms. Henry?

25          MS. HENRY:  I just want to correct that Mr. Torzilli

Rachel Evans - Cross

1    in stating that the Sherman Act protects what the customer

2    expects is not actually the law.  And further, even if it went

3    to suppliers, again there is a confusion of company versus

4    individuals and that's a key point here as well.

5         THE COURT:  Okay.  Mr. Pollack, go ahead.

6         MR. POLLACK:  Your Honor, I would just make the

7    additional point that what is charged is a per se violation.

8    Their state of mind is relevant only as to whether or not they

9    knowingly agreed to fix -- rig bids and fix prices.  Whether or

10   not they knew that they were violating the customers'

11   confidentiality wishes is irrelevant.  I think this is very

12   similar to the issue of, you know, was what they were doing

13   wrong or was what they were doing immoral or was it in

14   violation of the compliance policy.

15        All of those things are irrelevant.  This is not a

16   case where we need to show corrupt intent or willfulness that

17   they knew that they were doing something that is wrong.  They

18   were either attempting to rig bids and fix prices and were

19   doing that knowingly or they weren't.  And whether or not they

20   knew they were violating the customers' wishes is wholly

21   irrelevant.

22        THE COURT:  Well, I think that what Mr. Torzilli's

23   point was, but he can correct me if I'm wrong, is that there

24   was some type of agreement among the competitors and that it

25   wasn't necessarily a customer thing, but that it would at least

Rachel Evans - Cross

1   have created some type of norm regarding -- and then not that

2   that is relevant.  It's just that in going outside of the norm

3   or breaking the norm, that might show a level of -- that might

4   reflect state of mind because it was sharing prices among

5   competitors in derogation of the norm.  I am not sure if that's

6   how Mr. Torzilli would characterize it.  And he seems to be

7   agreeing somewhat.

8          MR. POLLACK:  But the fact -- even if one could infer

9   from this single document that there was a norm, the fact that

10  they didn't comply with that norm doesn't tell us the reason

11  that they were not complying with that norm.  It doesn't tell

12  us that the reason that they were sharing information was

13  because they were attempting to coordinate bids, fix bids, fix

14  prices.

15         THE COURT:  Yeah, I don't know.  I haven't seen the

16  document.  And it's difficult for me to speculate about what

17  inferences could potentially be drawn.  You may be right.  I

18  just don't know.

19         MR. POLLACK:  Sure.  I am sure we can hand up the

20  document, but it essentially was saying that we would like you

21  to keep this process confidential, something to that effect.

22         THE COURT:  And, yeah, once again, I will have to take

23  a look at it.  I don't quite understand who it was between and

24  so forth and so on.

25         MR. POLLACK:  It is an e-mail from RSCS to a blind

514

Rachel Evans - Cross

 1   list, so we don't know who it went to.  It was produced by

 2   George's, so it clearly went to somebody at George's.

 3           THE COURT:  Okay.  But what you're saying,

 4   Mr. Pollack, is that it really is -- it was something that was

 5   sent out by a customer and the customer was setting out an

 6   expectation or ground rules.

 7           MR. POLLACK:  Correct.

 8           THE COURT:  And then is there some associated

 9   indication that, okay, we, suppliers, are abiding by this or --

10           MR. POLLACK:  It's simply an e-mail from the customer

11   to a blind list.  We don't know who it goes to.  The only thing

12   we know is that George's -- somebody at George's had a copy of

13   it.  But no, it doesn't -- it just says, you know, these are

14   our expectations for the bidding process.

15           THE COURT:  Okay.  Mr. Fagg, it looks like you might

16   have a copy of said document; is that true?

17           MR. FAGG:  Yes, Your Honor.

18           THE COURT:  If you don't mind handing that to

19   Ms. Grimm.  We are not going to work through that one now

20   because I would -- I think the context in which it comes up may

21   be important, but ...

22           MR. FAGG:  Your Honor, I just wanted to address -- so

23   first, it's two documents, I think which is why it's stamped as

24   two exhibits.  There is the e-mail and then there is the other

25   document.  But I did want to respond to the point about it

Rachel Evans - Cross

1    being the norm.  This exhibit is from 2013 for the 2014 bids,

2    and so there is no indication that this is somehow or another

3    the norm.  It's a single document from a single year.  And so I

4    don't think it would be correct to infer from that document

5    that there is some -- it establishes the norm as to the

6    practice.

7         THE COURT:  Well, and even if it was the norm or even

8    if it was the rule, I guess the issue would be to what extent

9    is that distinguishable from a policy.

10        MR. FAGG:  Correct, exactly.

11        THE COURT:  Mr. Canty?

12        MR. CANTY:  Briefly, Your Honor.  It's very close to

13   and in my view related to the Court's prior ruling in the last

14   trial about confidentiality agreements.  Essentially it's the

15   customer's expectation of the confidentiality.  And the Court's

16   ruling on that is on Page 2892 of the transcript.

17        THE COURT:  What was the page number again?

18        MR. CANTY:  2892.

19        THE COURT:  Mr. Torzilli?

20        MR. TORZILLI:  Just a couple final points.  Obviously,

21   this gets way ahead of where things are in terms of the

22   document and its potential use with Mr. Ledford and any other

23   witness.  And I think the discussion here sort of implies that

24   it's being submitted as an unsponsored document, which

25   obviously it's not.

Rachel Evans - Cross

1          A couple other points, though.  When Your Honor was

2     trying to summarize Your Honor's understanding of what I had

3     said, just one other point that I think was embedded in there,

4     but just to bring it out, is that the customer at least in the

5     example that we are talking about is setting the terms upon

6     which competition will occur and of the many things that are

7     terms of competition happens to be that this process be held

8     confidential.  And so if a competitor is going to deviate from

9     that, that implies a knowing participation in a conspiracy as

10    opposed to an innocuous use of the transmittal or sharing of

11    the bid information.

12          And then the final point is in no way is it

13    necessarily conclusive proof, obviously, of anyone's knowing

14    participation, but clearly could be at least relevant to

15    showing someone's knowing participation.

16          THE COURT:  Do you want to take five minutes right

17    now?  Because it's a long stretch before 3:15.  I think that

18    might be prudent for us to do.  We will reconvene at 1:30.

19    Thank you.

20        (Recess at 1:25 p.m.)

21        (Reconvened at 1:34 p.m.)

22          THE COURT:  All right.  Let's get the jury back in.

23          (Jury present.)

24          THE COURT:  Ms. LaBranche, you were done with your

25    cross; is that right?

1          *MS. LaBRANCHE:*  I was, Your Honor.

2          *THE COURT:*  Additional cross-examination of Ms. Evans?

3       All right.  Redirect?

4                    **REDIRECT EXAMINATION**

5    *BY MS. CALL:*

6    *Q.*  Ms. Evans, could you turn to Exhibit 1 in your binder?  Do

7    you recall being asked on cross-examination by counsel for

8    Mr. Kantola about a phone call between Carl Pepper and Bill

9    Kantola on this exhibit?

10   *A.*  Yes.

11   *Q.*  Did you review additional sources to confirm your

12   understanding of Mr. Kantola's association with the number

13   ending in 8818 that is attributed to Koch Foods?

14   *A.*  Yes, I did.

15   *Q.*  Did you review a contact list of a participant in this very

16   phone call?

17   *A.*  I did.

18   *Q.*  Whose contact list did you review?

19   *A.*  Carl Pepper's.

20   *Q.*  And who did Mr. Carl Pepper associate with that phone

21   number ending in 8818?

22   *A.*  Mr. Bill Kantola.

23   *Q.*  Thank you.  Ms. Evans, do you recall being asked about

24   sentences, e-mails, phone calls that were not included on these

25   summary charts on cross-examination?

518

Rachel Evans - Redirect

1    A.   Yes.

2    Q.   In your job as a paralegal, do you have experience

3    reviewing e-mails of business people?

4         MS. CARWILE:   I object.   Outside the scope and

5    irrelevant.

6         THE COURT:   Overruled.

7    A.   Yes.

8    BY MS. CALL:

9    Q.   And are you familiar with the volume of e-mails that

10   business people may have on a day-to-day basis?

11   A.   Yes.

12   Q.   Do you also have experience reviewing phone calls of

13   business people?

14   A.   Yes.

15   Q.   Are you familiar with the volume of phone calls that they

16   may have on a day-to-day basis?

17   A.   Yes.

18   Q.   If you were to add all those calls and e-mails of even just

19   one person from one day to one of these summaries, how long do

20   you think it would be?

21        MS. CARWILE:   I object as to speculation.

22        THE COURT:   Overruled.

23   A.   It would be very long.

24   BY MS. CALL:

25   Q.   And what was the word you used to describe these charts?

Michael Ledford - Direct

1    *A.*   I --

2    *Q.*   Was there a kind of exhibit?

3    *A.*   A chart?

4    *Q.*   Was it a summary exhibit?

5    *A.*   I did say summary exhibit.

6    *Q.*   Would it be much of a summary at all if you were to add all

7    those calls and e-mails?

8    *A.*   No.

9         *MS. CALL:*  Thank you, Ms. Evans.  No further questions

10   from the government.

11        *THE COURT:*  Thank you very much, Ms. Evans.  You are

12   excused.

13        The United States may call its next witness.

14        *MR. TORZILLI:*  Thank you, Your Honor.  The United

15   States calls Michael Ledford.

16      (**Michael Ledford** was sworn.)

17        *THE WITNESS:*  Yes.

18        *COURT DEPUTY CLERK:*  Please state your name and spell

19   your first and last name for the record.

20        *THE WITNESS:*  Michael Ledford, M-I-C-H-A-E-L,

21   L-E-D-F-O-R-D.

22        *THE COURT:*  Go ahead, Mr. Torzilli.

23        *MR. TORZILLI:*  Thank you, Your Honor.

24                    **DIRECT EXAMINATION**

25   *BY MR. TORZILLI:*

520

Michael Ledford - Direct

1   Q.  Good afternoon, Mr. Ledford.

2   A.  Good afternoon.

3   Q.  Where are you presently employed?

4   A.  Chick-fil-A.

5   Q.  What's Chick-fil-A?

6   A.  Chick-fil-A is a chicken quick-service restaurant company.

7   Q.  How long have you worked for Chick-fil-A?

8   A.  Almost eight years.

9   Q.  What's your current position there?

10  A.  I am senior director of supply continuity.

11  Q.  What are your principal job responsibilities?

12  A.  I am responsible for all of the sourcing of all food and

13  beverages, equipment, packaging.  Then I am also responsible

14  for what we call launch team which is basically program

15  management for test and rollout of new menu items.  In addition

16  to that, I am responsible for logistics and supply planning.

17  Q.  So you started at Chick-fil-A in 2014?

18  A.  Yes.

19  Q.  Where did you work before you started at Chick-fil-A in

20  2014?

21  A.  I worked for a company called Restaurant Supply Chain

22  Solutions, RSCS.

23  Q.  Did that ever go by a previous name?

24  A.  Yes.  It used to go by UFPC or Unified Foodservice

25  Purchasing Co-op.

521

Michael Ledford - Direct

1    *Q.*  How long did you work at RSCS or UFPC?

2    *A.*  I was there six years.

3    *Q.*  So from approximately 2008 to 2014?

4    *A.*  Yes.

5    *Q.*  And what is RSCS or UFPC?

6    *A.*  RSCS, UFPC, they are the purchasing cooperative for all the

7    supply chain functions for Yum Brand restaurants.

8    *Q.*  What is or what are the Yum Brand restaurants?

9    *A.*  In my time there, it was five brands.  It was KFC, Pizza

10   Hut, Taco Bell, Long John Silvers and A&W.

11   *Q.*  Which of those restaurant brands would be the largest of

12   the Yum Brands?

13   *A.*  In terms of chicken that they purchased, it would be KFC.

14   *Q.*  You mentioned that RSCS is a purchasing cooperative.  Can

15   you explain what that means?

16   *A.*  Yes.  A purchasing cooperative, it's -- in the case for Yum

17   Brands, it's a co-op made up of all of the franchisees that own

18   KFCs.  They essentially are your owners.  You're working for

19   them.  In addition, you are working for the corporate offices

20   of the brand for the corporate owned restaurants that they

21   have.  And for a pretty small fee that they pay to be part of

22   the co-op we would perform all the supply chain functions to

23   execute running any one of those five brands.

24   *Q.*  Does RSCS buy chicken?

25   *A.*  Yes.

Michael Ledford - Direct

1    Q.  Can you describe those circumstances, please?

2    A.  Sure.  So RSCS does all of the negotiations for all of the

3    chicken for all five of those restaurants.  While they don't

4    physically have purchase orders and take receipt of it, they

5    execute the contracts with the chicken suppliers for what price

6    and what quantities they will sell to the distribution parties

7    that KFC and the like use to ship their product to the

8    restaurants.

9    Q.  What was your job title when you were at RSCS?

10   A.  I was senior director of poultry purchasing.

11   Q.  What were your principal job responsibilities in that role?

12   A.  Negotiating and contracting all of the chicken for the five

13   brands.

14   Q.  Can you describe at least generally speaking what specific

15   products you were responsible for?

16   A.  Yes.  So at KFC the main products at the time were

17   eight-piece chicken.  So what you typically buy is called

18   chicken on the bone or COB as we would refer to it, two drums,

19   two thighs, two breasts, two wings, and all of the other

20   supplemental parts that go along with that, chicken nuggets,

21   popcorn chicken, hot wings, any of the pizza toppings for Pizza

22   Hut, hot wings for Pizza Hut, and then any of the meat, any of

23   the chicken meat that Taco Bell serves and Long John Silvers

24   and A&W, all their chicken products.

25   Q.  For KFC restaurants is there a chicken product -- what's

Michael Ledford - Direct

1   the biggest selling or biggest purchasing chicken product

2   during your time at RSCS for KFC restaurants?

3   A.  Eight-piece chicken on the bone.

4   Q.  Mr. Ledford, during your time at RSCS, did you have

5   individuals that reported to you?

6   A.  Yes, I did.

7   Q.  Were they part of your team?

8   A.  Yes, they were.

9   Q.  And you led them?

10  A.  Yes.

11  Q.  Could you identify the individuals that were on your team

12  during the 2012 to 2014 time period?

13  A.  Yes.  At that time period it would have been Mary Hester,

14  Mark Oechsli, Steve Campisano and Carol Knight.

15  Q.  For Ms. Hester could you generally describe what her role

16  was during that time period?

17  A.  Yes.  Mary Hester was director of further processed poultry

18  purchasing.  She was directly responsible for all of the

19  procurement of all of what we would call the further processed

20  items, so the items that had additional steps taken to get them

21  ready to cook like par-frying or fully cooked, things like the

22  hot wing or the filet that we used at the time or popcorn

23  chicken or the KFC bites.

24  Q.  Is eight-piece chicken on the bone a type of further

25  processed product?

Michael Ledford - Direct

1    *A.*   No.   We would consider that in the industry what we call

2    fresh chicken.

3    *Q.*   What was Mr. Campisano's role during this time period?

4    *A.*   Mr. Campisano was responsible at that time period for all

5    of the distribution of all of the fresh chicken.

6    *Q.*   And how about Mr. Oeschli, what was his role?

7    *A.*   Mr. Oeschli had a subset of the further processed chicken

8    items.   And he reported directly to Mary Hester, and he handled

9    a subset of the items that she was responsible for.

10   *Q.*   Did Mr. Oeschli have any role in negotiating chicken supply

11   contracts?

12   *A.*   Yes, he did.

13   *Q.*   Could you generally describe what his role was?

14   *A.*   Yes.   His main role was he was the one that was sort of the

15   system administrator, if you will, for our internal system.   It

16   was called combined net.   He was basically the one that was in

17   charge of sending out the bids, the invitations for our

18   sourcing process and collecting those back and then

19   disseminating those amongst the team, in addition to his

20   sourcing responsibilities.

21   *Q.*   And Carol Knight, what was Ms. Knight's role?

22   *A.*   Carol Knight's role was more clerical in nature.   She was

23   typically handling all of the clerical activities around

24   pricing, making sure that suppliers' pricing was in on time,

25   entered into the system, and ensuring that all the distribution

Michael Ledford - Direct

1    partners had the proper pricing for every pricing period.

2    Q.  Was it part of the job responsibilities of the four

3    individuals you identified to keep you informed about their

4    work?

5    A.  Yes.

6    Q.  And by what means did they keep you informed about their

7    work?

8    A.  It could be in various forms, conversations, verbal,

9    written e-mails, PowerPoint presentations, spreadsheets, things

10   of that nature.

11   Q.  Mr. Ledford, during your time with RSCS, approximately how

12   much chicken was purchased through contracts that RSCS handled?

13   A.  In my time period there, it ranged from about

14   1 billion pounds to -- I think at its lowest it was around

15   700 million pounds.

16   Q.  Was your job at RSCS the first job you had in the chicken

17   business?

18   A.  No, it was not.

19   Q.  When approximately did you start working in the chicken

20   business?

21   A.  Mid nineties, around 1996.

22   Q.  So about 25 years ago, approximately?

23   A.  Roughly, yes.

24   Q.  Have you ever worked for a chicken processor?

25   A.  Yes, I have.

Michael Ledford - Direct

1   Q.  Which ones?

2   A.  I have worked for two.  I have worked for Sea Board Farms

3   and I also worked for Gold Kissed.

4   Q.  At either of those two chicken processers, did you ever

5   have any role in negotiating chicken contracts with customers?

6   A.  Yes, I did.

7   Q.  Could you just generally describe what your

8   responsibilities were?

9   A.  My last role that I had with Gold Kissed, I was in the

10  sales area function.  I was division sales manager.  So I

11  handled all of the sales out of two of our plants in Alabama at

12  that time and also called on some key customers as my accounts,

13  such as UFPC and Popeye's and Wendy's and some of the customers

14  like that, and directly negotiated with them.

15  Q.  Mr. Ledford, from 2012 until your departure in 2014, who

16  were the chicken suppliers for chicken-on-the-bone products to

17  the Yum Brands?

18  A.  Yes.  In that time period, I believe we had seven or eight.

19  So we had George's, Pilgrim's, Tyson, Claxton, Mar-Jac,

20  Marshall Durbin, Koch Foods and Case Farms.

21  Q.  Does Marshall Durbin still exist as a chicken supplier to

22  your knowledge?

23  A.  No, they do not.

24  Q.  Do you know what happened to them?

25  A.  Yes.  They sold to Mar-Jac Poultry.

527
Michael Ledford - Direct

1   Q.  Do you know approximately when that occurred?

2   A.  I believe it was around 2012.

3   Q.  For Pilgrim's was there a primary person that you and your

4   team negotiated with for chicken-on-the-bone products?

5   A.  Yes, there was.

6   Q.  Who was that?

7   A.  Roger Austin.

8   Q.  For Claxton was there a primary person or persons that you

9   and your team negotiated with?

10  A.  I primarily dealt with Scott Brady and Mikell Fries.

11  Q.  For Tyson was there a primary person or persons that you

12  and your team negotiated with for chicken-on-the-bone products?

13  A.  Yes.  During that time period, it would have been Tim

14  Mulrenin and Brian Roberts.

15  Q.  And for Koch Foods was there a primary person or persons

16  that you and your team negotiated with?

17  A.  Yes.  For chicken on the bone it was Bill Kantola.  For

18  further processed items it was Bruce MacKenzie.

19  Q.  And for George's was there a primary person or persons that

20  you and your team negotiated with?

21  A.  Yes.  For negotiations it was Darrell Keck and Charles

22  George.

23  Q.  Did you have any interaction with Defendant Ric Blake?

24  A.  Yes.  Ric Blake was what I would call our day-to-day

25  contact and our account rep.

528

Michael Ledford - Direct

1    Q.  For the suppliers that you just identified, did you

2    consider them to be competitors of one another for the supply

3    of chicken-on-the-bone products to RSCS?

4    A.  Yes, I did.

5    Q.  And on what basis were they competing against one another

6    for RSCS's chicken-on-the-bone business?

7    A.  Yes.  They were competing against each other for volume of

8    products and also competing against each other in price for our

9    business.

10   Q.  Could you describe what you mean by them competing against

11   one another on volume?

12   A.  Yes.  So that 700 million pounds or so that we were doing

13   in this time period, they are all competing for a piece of that

14   pie, so to speak, of their share of the business that they

15   wanted, directly competing against each other for that.

16   Q.  And for competition on the basis of price, can you describe

17   what you mean?

18   A.  Yes.  Typically speaking we had a annual sourcing event

19   that we did that would take place in the fall of each year that

20   we would negotiate pricing and volumes for the upcoming

21   calendar year on all of our poultry items.

22   Q.  Why, if at all, was price competition important to you in

23   your role as director of negotiation for chicken-on-the-bone

24   products for RSCS?

25   A.  Yeah.  So in my time at Yum Brands, KFC was closing a lot

Michael Ledford - Direct

1    of restaurants.  They often had negative margins or very slim

2    margins, and especially starting in or about that 2012 period.

3    Cost was really something we were trying to drive out of the

4    system to help improve margins with the franchisees and

5    ultimately to help us stop the bleeding, so to speak, on the

6    restaurants that were closing.

7    Q.  Did you and your team have a process that you used to

8    negotiate prices with chicken suppliers in 2012?

9    A.  Yes, we did.

10   Q.  Could you outline what the stages of that process were?

11   A.  Yes.  So typically speaking, we would start off with what

12   we would refer to as an RFI or a request for information.  So

13   what an RFI is, we would send out to the suppliers two parts to

14   this.  We would have some sort of form questions that we had

15   come up with, some potential cost savings ideas, and you would

16   ask them for feedback on those ideas that we had already

17   previous thought of.  Then there was a second part to the RFIs

18   typically speaking that was more of a free form tell us ways

19   that you think your company, if you could come up with some

20   cost savings initiatives.  So that would have been the first

21   step.

22        After we issued that RFI, got information back from

23   them, we would look that information over to help us solidify a

24   strategy and a game plan and see if there was anything within

25   that RFI that we needed to proceed forward with and actually

Michael Ledford - Direct

1    have as part of the open bid and negotiate through that

2    process.

3            So then after we do that, we would formally invite the

4    suppliers to take part in what we would call an RFP, which

5    stands for request for proposal.  And that was essentially the

6    first round of the negotiations.  And we would give them a

7    deadline to get that information back in to us.  We would then

8    analyze that, come up with a strategy, provide feedback, and

9    then typically do the same thing again in the round two.

10           Most years I would say on average in my time at RSCS,

11   there was only two rounds.  There were a few circumstances or

12   there was at least one circumstance that we had to go beyond

13   that.  And then after round two, typically speaking you are

14   going to close things out, finalize the negotiations and award

15   business and write contracts.

16   Q.  Thank you, Mr. Ledford.

17           MR. TORZILLI:  May I approach, Your Honor?

18           THE COURT:  You may.  And you have some notebooks,

19   Mr. Torzilli?

20           MR. TORZILLI:  Yes, Your Honor.

21   BY MR. TORZILLI:

22   Q.  Mr. Ledford, in the binder that's just been handed to you,

23   could you turn to Tab 1, please?  Are you there?

24   A.  Yes.

25   Q.  Do you see a document marked as Government Exhibit 1438?

Michael Ledford - Direct

1   A.   Yes, I do.

2   Q.   Do you recognize Government Exhibit 1438?

3   A.   Yes, I do.

4   Q.   Is it an e-mail that you wrote?

5   A.   Yes.

6   Q.   When did you write it?

7   A.   I wrote it September the 28th of 2012.

8   Q.   And what is the e-mail relating to?

9   A.   This is what I was just referring to in that process, that

10  first step of issuing an RFI or request for information.

11  Q.   Who was this sent out to?

12  A.   This was sent out to the suppliers.

13  Q.   All of the chicken-on-the-bone suppliers?

14  A.   Yes.

15  Q.   Are you familiar with the term qualified supplier?

16  A.   Yes, I am.

17  Q.   Could you describe your understanding of that term?

18  A.   Yeah.  So to do business with a restaurant company, and

19  RSCS would be no different, you'd have to be what we would call

20  a qualified supplier.  And so in this case you might also hear

21  that referred to as an incumbent supplier.  What that means is

22  somebody that you are already doing business with, somebody

23  that's been approved by the QA department and also that you

24  have legal documents with and has passed the certain audits of

25  their facilities and their animal well-being practices and

Michael Ledford - Direct

1    things like that.

2    Q.  Thank you.  Could you turn to Tab 2 please?  In Tab 2 you

3    should find a document marked as Government Exhibit 1438-1.

4    A.  Yes.

5    Q.  Do you see it?

6    A.  Yes.

7    Q.  Do you recognize it?

8    A.  Yes, I do.

9    Q.  What is it?

10   A.  This is what would have been attached to that e-mail

11   before.  This is the RFI spreadsheet that we were asking the

12   suppliers to fill out.

13   Q.  And this spreadsheet went out with the e-mail that you

14   wrote that went out to all the chicken-on-the-bone suppliers

15   that RSCS was working with at the time?

16   A.  Yes.

17            MR. TORZILLI:  Your Honor, at this time the government

18   moves to admit 1438 and 1438-1.

19            THE COURT:  Any objection to the admission of 1438 and

20   1438-1?

21            Both exhibits will be admitted.

22            MR. TORZILLI:  Thank you, Your Honor.

23            And permission to publish 1438?

24            THE COURT:  You may.

25   BY MR. TORZILLI:

533

Michael Ledford - Direct

1   Q.  So Mr. Ledford, can you describe what's going on in this

2   e-mail, please?

3   A.  Yes.  In this e-mail we are asking him to fill out the

4   spreadsheet that is attached.  And the spreadsheet has several

5   different products or even -- maybe you might even call like

6   ideas that we had to potentially save on some price and drive

7   some cost out.  So we are asking them to give us things like

8   capacity and run rates of different items and if we change some

9   of the specifications, for instance, how would that impact

10  price.

11          MS. PREWITT:  Your Honor, we lost our connection.

12          THE COURT:  The monitor went out?

13          MS. PREWITT:  All of them.

14          THE COURT:  Oh, sorry.  Because one of the exhibits

15  was taken down, the other one wasn't displayed.  Do you ask

16  that 1438-1 be displayed?

17          MR. TORZILLI:  1438.

18          THE COURT:  Sorry, 1438.  Yes, it may be.

19          MR. TORZILLI:  Thank you.

20  BY MR. TORZILLI:

21  Q.  So Mr. Ledford, is it fair to say that you were providing

22  the chicken suppliers an opportunity to provide you information

23  and feedback on their capabilities?

24  A.  Yes.

25  Q.  And their ability to serve RSCS?

Michael Ledford - Direct

1    *A.*  Yes.

2    *Q.*  And did you set a deadline for the return of the responses

3    to your RFI?

4    *A.*  Yes, we did.

5    *Q.*  What was the deadline that you set?

6    *A.*  October the 10th, 2012.

7    *Q.*  Do you know whether, in fact, chicken suppliers provided

8    responses on or about that time?

9    *A.*  To the best of my knowledge, yes, they did.

10        *MR. TORZILLI:*  Thank you.  We can take the exhibit

11   down.

12   *BY MR. TORZILLI:*

13   *Q.*  Now, Mr. Ledford, you said that after you had the RFI stage

14   of the process, you then went to the RFP stage of the process,

15   correct?

16   *A.*  Yes.

17   *Q.*  And can you tell us how the RFP stage commenced?

18   *A.*  It was very similar to what you just saw on the RFI.  They

19   would get an e-mail from typically Mark Oechsli for a generic

20   mailbox from the CombineNet system.  They would have some

21   verbiage a little more robust than what you just saw.  It was

22   officially inviting them and kicking off the process.  And it

23   would have the spreadsheet basically, the fields that they had

24   to fill out.  It was really three parts.  We were wanting

25   freight rates from them for all of their shipped from locations

Michael Ledford - Direct

1    to all of our ship to locations, a price for each item, and

2    then a volume that they were bidding on each item.

3    Q.  Sir, if you could turn to Tab 3 in the binder in front of

4    you.  You should see what's been marked as Government

5    Exhibit 9710.  Do you see this?

6    A.  Yes.

7    Q.  Do you recognize it?

8    A.  Yes, I do.

9    Q.  What is it?

10   A.  It is a round one of the RFP invitation sent to Roger

11   Austin.

12   Q.  Who sent it out?

13   A.  It came from that generic mailbox from the CombineNet

14   system.

15   Q.  What, if any, role did you have in either the preparation

16   or transmittal of the communication that we are looking at

17   here?

18   A.  I would have supervised that.  In fact, my name along with

19   the rest of the team is in the bottom of that as the From, who

20   it's from.

21   Q.  And when did you send it?

22   A.  Sent that on September the 26th, 2012.

23        MR. TORZILLI:  Your Honor, the United States moves to

24   admit 9710.

25        THE COURT:  Any objection to the admission of

Michael Ledford - Direct

1    Exhibit 9710?

2            Exhibit 9710 will be admitted.

3        *MR. TORZILLI:*  Thank you, Your Honor.  Permission to

4    publish 9710.

5        *THE COURT:*  You may.

6    *BY MR. TORZILLI:*

7    *Q.*  So you said, Mr. Ledford, that the communication we are

8    looking at here in 9710 was sent to Defendant Roger Austin at

9    Pilgrim's, correct?

10   *A.*  Yes.

11   *Q.*  Did this communication go out to any of the other chicken

12   suppliers, chicken-on-the-bone suppliers you were dealing with

13   at this time?

14   *A.*  Yes.  This would have gone to all of them.

15   *Q.*  And why is that?

16   *A.*  Because we were officially kicking off rounds.  And we

17   would have included every incumbent supplier and then also some

18   non-incumbent suppliers or new suppliers at that point.

19   *Q.*  So you wanted everyone to have a chance to participate?

20   *A.*  Yes.

21   *Q.*  I would like to direct your attention to the first sentence

22   that appears in 9710.  It begins with, "In UFPC's continuing

23   efforts."  Do you see that?

24   *A.*  Yes.

25   *Q.*  Could you read that first sentence into the record, please?

Michael Ledford - Direct

1   *A.*  "In UFPC's continuing efforts to ensure uninterrupted

2   supply at the lowest sustainable price, negotiations for 2013

3   annual pricing on both fresh and further processed poultry

4   products is now open."

5   *Q.*  What did you mean by an effort to ensure uninterrupted

6   supply?

7   *A.*  Really we are signaling to the suppliers at this point what

8   two of our primary goals were in this process, and the first

9   being to ensure that we had supply and that it was

10  uninterrupted.  At this time period especially in the small

11  bird segment, which is what the KFC eight-piece chicken was,

12  there were tight supplies.  So you want to make sure that

13  suppliers that are bidding on this business can, in fact, do

14  that 52 weeks a year so you don't run the risk of having to

15  close restaurants because they don't have any chicken.

16  *Q.*  Is that one of the consequences of supply being

17  interrupted?

18  *A.*  Yes, it is.

19  *Q.*  You also say in the sentence you just read into the record,

20  "Part of your efforts to ensure the lowest sustainable price."

21  Could you explain to us what that means?

22  *A.*  Yes.  So we wanted the lowest price we could get, but we

23  didn't want to do it at the cost of not being profitable and

24  not where the poultry companies didn't have a viable business

25  option.  In this time period we are talking about and the

Michael Ledford - Direct

1    previous couple years before this year, it had numerous smaller

2    poultry suppliers go bankrupt.  And we certainly didn't want

3    anybody to price us at a price that would cause them to not

4    make a financial return.  And that's what we meant by

5    sustainable.

6           And that also played into the uninterrupted supply.

7    So if you sold us a price that was too cheap and you ran the

8    risk of going out of business, well, then ultimately that also

9    would be hurting ourselves and running ourselves out of in

10   essence poultry to supply our restaurants with.

11   Q.  Mr. Ledford, is it in RSCS's interest to be negotiating

12   prices from chicken suppliers that are too low?

13   A.  No, it is not.

14   Q.  And could you explain why?

15   A.  Yes.  Really, it's the example that I was just giving.  If

16   you negotiate the prices that are too low and the poultry

17   companies are not making a healthy margin, and they are not

18   making a profit for their shareholders or their owners and they

19   get upside down on their financials, especially in this time

20   period their cost inputs were extremely high and margins for

21   the poultry suppliers were not well overall.

22          And if they are selling you a price that's too low,

23   especially somebody like KFC that buys the large quantities of

24   chickens that they buy and have in many cases facilities that

25   are dedicated to do a lot of volume for them, if you buy that

Michael Ledford - Direct

1    too low, they are not making a margin.  They could go out of

2    business.  So ultimately you don't have supply.  We wouldn't

3    have supply for our restaurants, so that is not something that

4    we would want to do.

5    Q.  Did you, Mr. Ledford, have an understanding of what would

6    be a reasonable or a sustainable margin?

7         MS. HENRY:  Objection, lack of foundation.

8         THE COURT:  Sustained.  If you can lay foundation.

9         MR. TORZILLI:  Sure.

10   BY MR. TORZILLI:

11   Q.  Mr. Ledford, did you work at a chicken supply company?

12   A.  Yes, I did.

13   Q.  Did you work at two chicken supply companies?

14   A.  Yes, I did.

15   Q.  During your experience working at chicken supply companies,

16   did you gain an understanding of the range of margin for

17   chicken-on-the-bone products that would be sustainable for a

18   chicken supply business?

19        MR. BELLER:  I am going to object on both ongoing

20   foundation and also 702.

21        THE COURT:  I'll overrule both objections.  He can

22   answer that question yes or no.

23        MS. HENRY:  Objection also on the basis of relevance

24   because of the time difference.  We haven't established when

25   this -- when was the earlier period.

Michael Ledford - Direct

1      THE COURT:  I will sustain that objection.  If you can

2    clarify the time.

3    BY MR. TORZILLI:

4    Q.  What time period did you work for chicken suppliers,

5    Mr. Ledford?

6    A.  From approximately 1996 until early 2007.

7    Q.  During that time period that you worked at those chicken

8    suppliers, did you, yes or no, gain an understanding as to what

9    margin, what might be a sustainable margin for

10   chicken-on-the-bone products?

11   A.  Yes, I did.

12   Q.  Was it the understanding you gained from that experience

13   that you were applying in 2012 when you were, for example,

14   saying here that you wanted to achieve the lowest sustainable

15   price?

16   A.  Yes, that's right.

17   Q.  What deadline did you set for the return of first round

18   bids?

19   A.  October the 10th of 2012.

20   Q.  You've mentioned a couple times in your testimony,

21   Mr. Ledford, the CombineNet system?

22   A.  Yes.

23   Q.  Can you explain what that is?

24   A.  The CombineNet system was our internal system for handling

25   negotiations, not just for chicken, but for any of the products

Michael Ledford - Direct

541

1    that RSCS or UFPC was negotiating on.  It was a closed system.

2    Every supplier would have their own log-in and password that

3    they would enter it into and they could see only their

4    information and nobody else's.

5    *Q.*  Why did you provide each chicken supplier with a unique

6    log-in and password?

7    *A.*  In order to keep the information confidential.

8    *Q.*  And what did you mean when you said it's a closed system?

9    *A.*  Really by closed system, I mean the fact that nobody else

10   can see it.  And they can only see theirs and they cannot see

11   any of the other competing suppliers' information.

12   *Q.*  Why did you construct the system in that way?

13   *A.*  We felt like --

14            *MR. BELLER:*  Objecting, relevance, Your Honor.

15            *THE COURT:*  Overruled.

16   *A.*  We felt like a closed system was the best system for us to

17   meet our objectives and have a competitive bidding process.

18   *BY MR. TORZILLI:*

19   *Q.*  Now, you said the deadline for the submission of first

20   round bids was October 10, 2012.  At or around that time did

21   the chicken suppliers submit their first round bids?

22   *A.*  Yes, they did.

23   *Q.*  And who within RSCS was responsible for receiving those?

24   *A.*  Mark Oechsli.

25   *Q.*  When Mr. Oeschli received copies of those, what was he

Michael Ledford - Direct                          542

1    responsible for doing next?

2    A.  Mr. Oeschli basically would compile the information and put

3    it in summary format and then disseminate that amongst the rest

4    of the poultry purchasing team for us all to view.

5    Q.  What did you do with the first round bid information once

6    you received it?

7    A.  Once we received the information, we would really analyze

8    it.  And I had a spreadsheet, for instance, I would put all the

9    chicken-on-the-bone information in.  And we'd compare it to the

10   price that they sold us to in the current year that we were in,

11   so in this case that would have been 2012 to their first round,

12   compiled that on a spreadsheet, did some analysis, compared

13   where everybody was, and then ultimately provide feedback to

14   the suppliers.

15          MR. TORZILLI:  We can take this exhibit down.  Thank

16   you.

17   BY MR. TORZILLI:

18   Q.  Was that your typical process for each and every round of

19   bidding that occurred?

20   A.  Yes, it was.

21   Q.  How did you determine what information or what feedback you

22   were going to provide to the chicken suppliers that did submit

23   bids?

24   A.  Well, it was different for each supplier based on where

25   their bids were.  But typically speaking, we were giving them

543

Michael Ledford - Direct

 1    feedback on how far off they were from what we called at the

 2    time a competitive price.

 3    Q.   What do you mean by how far off?

 4    A.   Typically speaking, when round one came in, we were -- it

 5    wasn't just to fill out the RFP and we're going to take the

 6    price.  Typically there was going to be some negotiations

 7    involved.  I feel like all of the suppliers knew that.  And so

 8    it was typically not at a level by round one that we were

 9    willing to sign off on and agree to any business, so we were

10    going to have to negotiate them down lower.  And so when I say

11    how much they were off on, how much they were too high at that

12    period of time.

13    Q.   Mr. Ledford, now I would like you to look at the documents

14    behind Tabs 4 through 13, if you could take a moment to review

15    those.  And for the record, that includes Government

16    Exhibit 1505, 9692, 1410, 9691, 1406, 9690, 1569, 9696, 1524,

17    and 9693.

18    A.   Okay.

19    Q.   Sir, have you had a chance to review those exhibits?

20    A.   Yes.

21    Q.   Do you recognize them?

22    A.   Yes, I do.

23    Q.   What are they?

24    A.   They are the round one submissions from the

25    chicken-on-the-bone suppliers.

Michael Ledford - Direct

 1  Q.  For what year?

 2  A.  2012 for the 2013 time period.

 3  Q.  So these are the bids that were received by Mr. Oeschli and

 4  then processed in the manner you just described?

 5  A.  Yes.

 6       MR. TORZILLI:  Your Honor, move to admit, and I can

 7  read the list off once again, 1505, 9692, 1410, 9691, 1406,

 8  9690, 1569, 9696, 1524, and 9693.

 9       THE COURT:  Any objection to the admission of any of

10  those exhibits?

11       MR. TUBACH:  If we could have just one minute.

12       THE COURT:  Yes, sure.

13       MR. TUBACH:  No objection.  Thank you.

14       THE COURT:  Each of those exhibits will be admitted.

15  Go ahead.

16       MR. TORZILLI:  Thank you, Your Honor.  Permission to

17  publish 9692.

18       THE COURT:  You may.

19       MR. TORZILLI:  If we could go to the second page.

20  BY MR. TORZILLI:

21  Q.  Mr. Ledford, on your screen is the second page of

22  Government Exhibit 9692, which is also the second page of the

23  document in Tab 5, if you want to follow along in the hard

24  copy.  So can you tell us what this page represents, please?

25  A.  Yes.  This is what I would call a summary page of all the

Michael Ledford - Direct

1    fresh chicken items, and this was Claxton's submission for

2    round one.

3    Q.  Did you receive the same or similar type of summary page

4    from each of the chicken-on-the-bone suppliers?

5    A.  Yes.

6    Q.  Was a summary page something that you all at RSCS required

7    be submitted as part of the bid package?

8    A.  Yes.

9    Q.  I would like to ask you about some of the entries on Page 2

10   of Exhibit 9692.  The first one is the very first entry.  It

11   says, Injected 8-piece Code 9247 Purple.  Can you tell us what

12   that is?

13   A.  Yes.  That is the main eight-piece product for fried

14   chicken on the bone for eight-piece for KFC.  The purple stood

15   for purple label.  We had -- the different items had different

16   colored labels to help in the back of the kitchen, at the

17   distribution centers, at the processing facilities for quick

18   recognition of what products was what.

19   Q.  So is this the biggest selling product at KFC?  This is

20   the --

21   A.  Yes, this represented roughly about 70 percent of the

22   volume for the items that are on the page here.

23   Q.  And then the next column is headed by the title Price/Lb

24   FOB Plant.  What does that mean?

25   A.  Yes.  That means price per pound FOB the plant, so no

Michael Ledford - Direct

1    freight.  It's at their dock door, at the supplier.

2    *Q.*  So if someone is going to purchase chicken and have it

3    delivered to them, there would be an extra charge above the

4    price reflected here?

5    *A.*  Exactly.

6    *Q.*  And then the next column says Pricing Formula?

7    *A.*  Yes.

8    *Q.*  What does that mean?

9    *A.*  So in this particular case like the first few there

10   actually have a price model, a pricing model, a cost-plus model

11   or a feed flow-through model we have called it in the past

12   which determine the price.  And so that's in the subsequent

13   pages that are on this.  And then some of them were what we

14   would refer to as a formula, so you can see like eight-piece

15   minus .30 down on the dark meat on this.  That was the formula

16   price that you would take to figure out what the dark meat was.

17   You had to know the eight-piece price.  And then you would

18   subtract in this case on this bid 30 cents per pound less than

19   the eight-piece price to come up with a price for the dark

20   meat.

21   *Q.*  So if you go to -- picking up on your last answer, if you

22   go to the fifth column, the fifth row down where it says

23   Injected Dark Meat Code 9247 Red and then the price .6620?

24   *A.*  Yes.

25   *Q.*  Is that an example of a situation where you need to do a

Michael Ledford - Direct

1   little bit of subtraction to figure out what the bid is?

2   A.   Right.  So the .9620 on the first line minus 30 cents gives

3   you .6620 for dark meat.

4   Q.   And then the very last column has the title Case Weights?

5   A.   Yes.

6   Q.   Can you explain to us what that means, please?

7   A.   So that's how many pounds of chicken that they are going to

8   bill us for for those given items.  And those at points in time

9   were also allowed to be negotiated as well.

10  Q.   Is it literally physically the weight of any given case of

11  chicken that's delivered to a KFC restaurant?

12  A.   I mean, it's technically physically not the weight.  It's

13  the agreed to billed weight.  So every chicken is a little bit

14  of a different size.  And so this was a way instead of having

15  to scan each case for an individual weight, so some of them

16  might be 50 and a half, some of them might be 51, some of them

17  might be 52 and a half and everywhere in between.  Instead of

18  having to keep up with that on every item which made the jobs

19  throughout the supply chain even more difficult, you would

20  agree to a billed case weight with each supplier.  And no

21  matter if it was 51 and a half pounds in there, they were going

22  to charge you 51 pounds.  If there was 50 and a half, they were

23  still going to charge you 51 pounds because that was the agreed

24  to negotiation.

25  Q.   And speaking of weights, was there a particular weight or

548
Michael Ledford - Direct

1    size bird that KFC was looking for in this time frame?

2    *A.*  Yes, there was.  Typically speaking, from a live weight

3    standpoint we were targeting an average of a 4-pound live

4    weight chicken.  But more specifically, the KFC specification

5    was a target of a 2-pound, 8-ounce what we would call a WOG,

6    which is without giblets is what that stands for.

7    *Q.*  Why was KFC looking for a target 4-pound live weight or

8    2-pound, 8-ounce WOG?

9    *A.*  There were several reasons.  First of all, when Colonel

10   Harland Sanders started KFC, that was basically the size every

11   chicken was in the industry.  That is what everybody grew.  And

12   that's how KFC got -- started its business and what all of the

13   cooking requirements, the time in the fryers, temperature and

14   all that was predicated around.

15           So if you had a chicken that was too large, let's say

16   you still had those same cook time and temperatures, and if it

17   wasn't accurate, you would run the risk of having a food safety

18   issue, for instance, and not having a chicken cook long enough.

19   It also played in as part of the financial model that KFC

20   restaurants were predicated around on a price per piece and

21   ultimately what the menu prices were.

22   *Q.*  If you could turn to the next page now in Exhibit 9692.

23   It's Page 3.  At the top it says UFPC Feed Flow Through Pricing

24   Model, Claxton Poultry.

25   *A.*  Yes.

Michael Ledford - Direct

1    *Q.* What is this?

2    *A.* This is that pricing model for the eight-piece chicken on

3    the bone that I was referencing earlier. What this has in it

4    is it has line items for every individual cost that it takes to

5    run that chicken through the process of taking it, you know,

6    from the hatchery, to the farm, growing it, into the plant,

7    processing it and cutting it up to meet the KFC specifications.

8    *Q.* Was a feed flow-through model of the same or similar

9    organization and structure provided by all the chicken

10   suppliers with their bid submissions?

11   *A.* Yes, it was. This was a template that we provided

12   basically in this format so that they were -- that we could

13   compare apples to apples, so to speak, among suppliers.

14   *Q.* I would like to direct your attention toward the bottom to

15   an entry called Supplier Margin.

16   *A.* Yes.

17   *Q.* Do you see that?

18   *A.* Yes.

19   *Q.* What does that represent?

20   *A.* That represents in theory according to this cost model what

21   Claxton Poultry's margin was on every, you know, pound of

22   chicken that they were selling to KFC.

23   *Q.* You testified earlier one of the objectives of the process

24   was to obtain the lowest sustainable price, right?

25   *A.* Yes.

Michael Ledford - Direct

1   *Q.* How, if at all, did your review of the supplier margin

2   entry relate to your effort to obtain the lowest sustainable

3   price?

4   *A.* I mean, it was something that we would take into

5   consideration just like we would take into consideration a lot

6   of these, you know, individual line items.

7   *Q.* And then the entry beneath that, it says Big Bird

8   Adjustment?

9   *A.* Yes.

10  *Q.* And the entry there is negative 3 cents?

11  *A.* Yes.

12  *Q.* What does the negative 3 cents represent?

13  *A.* So this is under the far right column as the orange label

14  is what we called it.  That was another term for the grilled

15  chicken that KFC serves.  So since the grilled is not breaded,

16  it doesn't have basically a blanket laying over the top of it.

17  And those pieces would look smaller if you didn't cut that from

18  a larger chicken.  So the grilled pieces coming out of the

19  processing plant, so the chicken suppliers was a little bit

20  larger.  And so for that each supplier we had a negotiated

21  basically discount or price lower than for the grilled chicken

22  than we did have for the smaller pieces of chicken that were

23  going into the fried category.

24       *MR. TORZILLI:* We can take this exhibit down.  Thank

25  you.

Michael Ledford - Direct

1    *BY MR. TORZILLI:*

2    *Q.*  Mr. Ledford, who submitted Claxton's bid in the first round

3    of 2012?

4    *A.*  I believe it was Scott Brady.

5    *Q.*  Was it typical for Defendant Scott Brady to submit bids on

6    behalf of Claxton to RSCS in 2012?

7    *A.*  Yes, it was.

8    *Q.*  You had said that once the bids come in and they are

9    evaluated by you and the team, then you get to the feedback

10   phase of the process.  How is the feedback communicated to the

11   competing chicken suppliers?

12   *A.*  Yes.  That could look like several things.  It could be a

13   phone call.  It could be an in-person meeting.  Sometimes it

14   was an e-mail.  And that feedback could have also been given in

15   several different formats.  In the past I would give feedback

16   on a percentage basis, on an actual cents-per-pound basis.  And

17   typically that was you are X from a competitive price.

18   *Q.*  How did you determine what a competitive price ought to be?

19   *A.*  So it was really depending on which product it was, which

20   year it was in the negotiations and how many nonincumbents and

21   what their price looked like, really a competitive price could

22   be one of three things.  It could either be the lowest price

23   that we had.  In some cases, though, it would be the second

24   lowest.

25           And, in fact, I think in this particular year we had a

Michael Ledford - Direct

1    nonincumbent that we ended up ruling out because the price was

2    so low that we just determined that they didn't know what they

3    were bidding on and how tough the specs were to meet, and we

4    did not feel like it was a sustainable price.  So in that case

5    we would throw their number out and the feedback would actually

6    be the second lowest price we received on the RFP.  In some

7    cases it might even be the average.  Typically speaking, when

8    we did the average, that was probably going to be on the

9    further processed items though.

10   Q.   Was there a principal purpose for providing the feedback to

11   the chicken suppliers on their first round bids?

12   A.   Yes.  Ultimately it was to get the price lower.

13   Q.   Did you, in fact, provide feedback to the competing chicken

14   suppliers after their first round bids in 2012?

15   A.   Yes, I did.

16   Q.   What came next in the process?

17   A.   So after we provided them feedback, we would go through

18   just like in round one, but we would open up a round two of the

19   negotiations and send out another RFP from the system.  And it

20   was called round two of the RFP.

21   Q.   Who would that go out to?

22   A.   That would go out to all of the same individuals that

23   received round one, all of the chicken suppliers.

24   Q.   Could you look at the document behind Tab 14 of your

25   binder?  It should be the document marked as Government 1438.

553

Michael Ledford - Direct

1   Do you recognize this?

2   A.  Yes.

3   Q.  What is it?

4   A.  This is what we were just speaking about.  This was the

5   official invitation for round two from the CombineNet system to

6   Roger Austin at Pilgrim's.

7   Q.  And this is the invitation sent out to invite suppliers to

8   submit second round bids?

9   A.  Yes, it is.

10        MR. TORZILLI:  Your Honor, at this time government

11   offers 1439.

12        THE COURT:  Any objection to the admission of Exhibit

13   1439?

14        1439 will be admitted.

15        MR. TORZILLI:  Thank you, Your Honor.  Permission to

16   publish 1439?

17        THE COURT:  You may.

18   BY MR. TORZILLI:

19   Q.  Mr. Ledford, if we can focus in on the very first

20   paragraph.  Did you supply the -- did you provide the chicken

21   suppliers with a deadline by which they needed to submit their

22   second round bids?

23   A.  Yes, we did.

24   Q.  What was the deadline that you provided them?

25   A.  It was November the 14th at noon Eastern Time.

Michael Ledford - Direct

1   Q.  And what were you having the suppliers submit as part of

2   their second round bids?

3   A.  We were having them submit their price and the summary

4   sheets and attach the cost model.

5   Q.  So the same or similar materials that were provided in

6   round one?

7   A.  Yes.  I believe the only difference in round two was at

8   this point in time we did not ask them to update any freight

9   rates for the shipping of the product.  It was just the price

10  of the actual product.

11  Q.  Why was it unnecessary for them to update any freight

12  information?

13  A.  At this point we weren't negotiating the freight in this

14  particular -- we were mainly concerned with the product itself.

15  Q.  So did chicken suppliers, in fact, submit second round bids

16  on or around November 14 of 2012?

17  A.  Yes, they did.

18  Q.  What did you do once you received the second round bids?

19  A.  Similar to round one, we would take that and the whole team

20  would analyze it, come up with a strategy and then ultimately

21  provide the feedback to the suppliers.

22  Q.  I would like to now ask you to review the documents that

23  are behind Tabs 15 to 23.  Behind those tabs should be Exhibits

24  1529, 1531, 9694, 1500, 1501, G-605, G-606, C-023, and C-024

25  and 024-1.

                              Michael Ledford - Direct

 1    *A.*   Okay.

 2    *Q.*   Have you had a chance to review those exhibits?

 3    *A.*   Yes, I have.

 4    *Q.*   Do you recognize them?

 5    *A.*   Yes, I do.

 6    *Q.*   What are they?

 7    *A.*   They are the round two submissions from the

 8    chicken-on-the-bone suppliers.

 9    *Q.*   For what year?

10    *A.*   The 2013 calendar year, but the 2012 negotiation.

11    *Q.*   These are materials that you and/or your team received as

12    part of the bidding process that we have been discussing?

13    *A.*   Yes.

14              *MR. TORZILLI:*  Your Honor, government moves to admit

15    those exhibits which I can read off again.

16              *THE COURT:*  One second.  Any objection to the

17    admission of the exhibits starting at Exhibit 1529 through

18    C-024 and C-024-1?

19              *MR. TUBACH:*  Can I have just one moment, Your Honor?

20              *THE COURT:*  Yes.

21              *MR. BELLER:*  Your Honor, may I have a moment, please?

22              *MR. TORZILLI:*  I need to revise the list of exhibits

23    to be admitted.  So instead of 1500, the government is moving

24    to admit 1500-1.  Thanks to counsel for bringing that issue up.

25              *THE COURT:*  What tab is 1500 on?

Michael Ledford - Direct

1              MR. TORZILLI:  1500-1 appears behind Tab 18.

2              THE COURT:  I see.  Yes.  So instead of that one, what

3    are you substituting?

4              MR. TORZILLI:  Substituting out 1500 and substituting

5    in 1500-1, which is a redacted version of 1500.

6              THE COURT:  I understand.  Okay.  And with that

7    revision to the list of exhibits being moved for admission, any

8    objections?

9              Yes, Mr. Fagg?

10             MR. FAGG:  Can I have one moment, Your Honor?

11             THE COURT:  Yes, you can.  Go ahead.

12             MR. TORZILLI:  And Your Honor, just to be clear,

13   Government Exhibit 1500 I believe was admitted earlier today.

14   So we are not asking to withdraw the exhibit.  We are just

15   asking for this 1500-1 to be admitted.

16             MR. FAGG:  No further objections, Your Honor.

17             THE COURT:  Mr. Torzilli is correct.  1500 has been

18   admitted.  And I will admit Exhibits 1529, 1531, 9694, 1500-1,

19   1501, G-605, G-606, C-023, C-024 and C-024-1.

20             MR. TORZILLI:  Thank you, Your Honor.

21   BY MR. TORZILLI:

22   Q.  So the second round bids, Mr. Ledford, are submitted.  You

23   have processed them.  Please tell us what happens after you

24   complete your processing of the bid information that comes in.

25   A.  Yes.  In a typical year, which 2012 is a little bit not

Michael Ledford - Direct

1    typical, but in a typical year then we are trying to wrap that

2    up, get feedback to the suppliers and get to a final price, not

3    an official round usually, just some, you know, conversations

4    with the suppliers, final negotiations, close things out.  This

5    particular year we ended up having more rounds than that, so in

6    2012 we again provided feedback and then we actually officially

7    kicked off a round three.

8    Q.  Why did you decide to do more than two rounds for the year

9    2012?

10   A.  In this particular year, we did not feel like that we got

11   to the prices that we needed to get to and they were not low

12   enough from what our expectation was based on the market

13   conditions.  So we felt like it was incumbent upon us that we

14   needed to do an additional round and really partake in part of

15   the process that we didn't normally do to continue to help

16   drive down the price.

17   Q.  For the subsequent rounds in 2012, was the CombineNet

18   system used?

19   A.  Yes.

20   Q.  And could you just generally describe what the subsequent

21   round, how it went generally speaking?

22   A.  It was just like round one and round two.  We would have

23   sent out an invitation just like those rounds to the same exact

24   suppliers to update their price and volume information in the

25   system.

Michael Ledford - Direct

1   Q.  And you got responses back?

2   A.  Yes, we did.

3   Q.  And then what happened after that?

4   A.  After that we did the very similar thing once again.  We

5   got that information back.  We analyzed it internally.  And

6   then we conducted feedback sessions with the suppliers.

7   Q.  Did you as part of the process occasionally receive bid

8   information just in an e-mail communication or something

9   outside the CombineNet system?

10  A.  Yes.  We would get often e-mails.  They would sometimes

11  send direct e-mails to me with their cost model attached and

12  perhaps some verbiage and some dialogue around stipulations or

13  explaining things and what they did.  We took this down this

14  many cents.

15  Q.  Under what circumstances would bid information be provided

16  directly to you or someone on your team as opposed to through

17  the CombineNet system?

18  A.  Yeah, I think more often what would happen is right at the

19  end when again we are trying to close things out, get things

20  done, in particular in 2012 I think some of them actually would

21  have -- would say or we could say that we had a round four with

22  some suppliers.  We didn't with all of them.  Some of them we

23  were still working on to get lower.  We didn't necessarily open

24  up the RFP to every single supplier again.  And we would have

25  negotiated -- come to an agreement for them to submit something

Michael Ledford - Direct

1   even additional lower and then they would send that to me in an

2   e-mail.

3   Q.  Could you take a look at the documents behind Tabs 25 to 28

4   and 38 and 39.  You should find Exhibits 1403, 1404, G-600,

5   G-601, 1435 and C-020.

6   A.  What was after 28?  Did you skip to 30?

7   Q.  38 and 39.  You should see 1435 and C-020.

8   A.  Okay.

9   Q.  Do you recognize those exhibits?

10  A.  Yes, I do.

11  Q.  What are they?

12  A.  They are round three submissions.

13  Q.  And were some of those provided to you via e-mail as

14  opposed to through the CombineNet system?

15  A.  Yes, they were.

16  Q.  And these were submissions for what year?

17  A.  They came in 2012 for the 2013 RFP.

18        MR. TORZILLI:  Your Honor, government moves to admit

19  1403, 1404, G-600, G-601, 1435 and C-020.

20        THE COURT:  What was the last one, Mr. Torzilli?

21        MR. TORZILLI:  C-020.

22        THE COURT:  All right.  Any objection to the admission

23  of those exhibits?

24        MR. TUBACH:  Your Honor, only that two of those only

25  are e-mails without the bids themselves.  And I am not sure if

Michael Ledford - Direct

1    the government is intentionally not introducing the bids or

2    that's simply an oversight.  I do object to the e-mails without

3    the bids because they are not relevant.

4         THE COURT:  Which exhibit numbers are those,

5    Mr. Tubach?

6         MR. TUBACH:  1435 and C-020.

7         THE COURT:  Mr. Torzilli, any response as to 1435 and

8    C-020?

9         MR. TORZILLI:  Yes.  These are -- and I can inquire of

10   the witness, but I think these are examples of documents he has

11   indicated where the bids are contained within an e-mail

12   transmittal.

13        THE COURT:  All right.  The objection on 1435 and

14   C-020 will be overruled.  1403, 1404, G-600 and G-601 will be

15   admitted.

16        MR. TORZILLI:  Thank you, Your Honor.

17        MR. TUBACH:  Your Honor, can we have a quick side bar?

18        THE COURT:  Sure.

19     (At the bench:)

20        THE COURT:  Mr. Tubach, go ahead.

21        MR. TUBACH:  Yes, Your Honor.  Thank you.  On C-020,

22   the face of the document says there are two attachments, so I

23   have taken government counsel's word that the e-mails

24   themselves contained the revised bids, but obviously with C-020

25   that's not true.  And I don't know it would be true for the

Michael Ledford - Direct

1    other one without having been able to verify that yet.  So we

2    would continue to object to C-020 without the admission of the

3    two attachments that are attached to the e-mail.

4         THE COURT:  And Mr. Torzilli, how about that

5    particular document?  You had suggested that it contained the

6    bid information within the body of the e-mail.  Mr. Tubach says

7    looking at it that does not appear to be the case.  What tab is

8    that, Mr. Torzilli?

9         MR. TUBACH:  I can provide a copy to the Court if the

10   Court would like.

11        THE COURT:  No.  I have got the notebook.  Yeah,

12   that's not -- I am not sure if it's in the notebook.

13        MR. TORZILLI:  It's Tab 39, C-020.

14        MR. TUBACH:  C-020 does have sort of a summary of what

15   changes may have been made, but there are actually two

16   attachments of the e-mail which should be admitted under the

17   rule of completeness.

18        THE COURT:  I am going to overrule the objection as to

19   rule of completeness and maintain that C-020 is admitted.

20        MR. TUBACH:  Thank you.

21     (In open court:)

22   BY MR. TORZILLI:

23   Q.  So Mr. Ledford, all of the bids are in.  Okay.

24        Now, was this the last set of bids that was submitted

25   in 2012?

Michael Ledford - Direct

1    *A.*   No.

2    *Q.*   Okay.  Was there yet another round of bids that came in in

3    2012?

4    *A.*   There was a round four in 2012.

5    *Q.*   And why did you decide to go to four rounds of bidding?

6    *A.*   Very similar to round three, if not the same exact thing as

7    round three.  We still felt like we had not gotten to where we

8    needed to get.

9    *Q.*   Was there other than the year 2012 any other occasion when

10   you were at RSCS where you went to four rounds of bidding?

11   *A.*   I do not recall any.

12   *Q.*   And what happened after the fourth round of bidding?

13   *A.*   After the fourth round of bidding, at that point we awarded

14   the business and sent contracts to the suppliers to sign.

15   *Q.*   Did you shift any volume from one supplier to another in

16   2012?

17   *A.*   Yes, we did.

18   *Q.*   Can you first explain what shifting volume from one

19   supplier to another entails -- means or entails?

20   *A.*   Yes.  So shifting volume would be taking volume away from a

21   supplier, in this case that they had in 2012, and not awarding

22   them with the same amount of volume that they had for 2013.

23   And you would take that volume and give it to a supplier that

24   was lower priced, and you would give them -- you would award

25   them with additional business for 2013 that they did not have

Michael Ledford - Direct

1   in 2012.

2   Q.   And why might you decide to shift volume from one supplier

3   to another?

4   A.   To help improve our price and give more volume to the lower

5   price suppliers.

6   Q.   Were you in communication with the chicken suppliers about

7   the possibility of moving some of their volume to another

8   supplier?

9   A.   Yes.  We would have talked about that in each and every one

10  of those feedback sessions if we were talking about -- not in

11  each and every one, but the folks who were at the higher end,

12  we certainly would have been talking to the highest priced

13  supplier and probably the second highest price supplier and in

14  some cases even the third highest price supplier and telling

15  them if your price doesn't get lower than it is right now,

16  there is potential for you to lose business and for us to give

17  that to someone else.

18  Q.   And what were you trying to get those suppliers to do when

19  you had those conversations?

20  A.   Lower the price.

21  Q.   Would you view that as a way in which to get the suppliers

22  to compete against one another?

23  A.   Yes.

24  Q.   So you arrived at a point in time where you finalized

25  negotiations in 2012.  Then what happened?

564
Michael Ledford - Direct

1  *A.* After we finalized negotiations, we write up the contracts

2  or in this case we actually referred to them as exhibits.  And

3  we would send those exhibits out to the suppliers for signature

4  with the corresponding prices, volumes and cost models

5  attached.

6  *Q.* Exhibits to what?

7  *A.* Exhibits to our master contract at UFPC or RSCS at this

8  time that was referred to as an SBRA, which stands for Supplier

9  Business Relationship Agreement.

10 *Q.* What do you mean by a master contract?

11 *A.* It's got everything in it.  It's not just price.  It

12 actually lays out several legal stipulations between what they

13 are entering into with us in a business relationship and what

14 both parties can and cannot do.  And then the exhibits annually

15 laid out the exact price and volume for the subsequent year.

16 So the master contract or in this case the SBRA did not change.

17 It was sort of evergreen.  Just the volume and pricing changed

18 from year to year.

19 *Q.* In 2012 did you arrive to agreements with all the chicken

20 suppliers you identified earlier in your testimony?

21 *A.* Yes, we did.

22 *Q.* And do you recall which chicken suppliers you shifted

23 volume away from?

24 *A.* I do not recall all of them.

25 *Q.* Do you recall some of them?

Michael Ledford - Direct

1    A.   Yes.

2    Q.   Which ones do you recall?

3    A.   I remember shifting volume in 2012 away from Pilgrim's.

4    Q.   Why did you shift volume away from Pilgrim's?

5    A.   Because they were one of the highest priced suppliers.

6    Q.   And did you shift them to a supplier that had lower prices?

7    A.   Yes.

8    Q.   If you could look in your binder at the documents behind

9    Tabs 57 to 65.  You will find there documents marked as

10   Government Exhibits 1552, 1503, 1514, 1515, and then Exhibit

11   F-787, F-778, F-742, F-769, and F-799.

12   A.   Okay.

13   Q.   Do you recognize those exhibits?

14   A.   Yes, I do.

15   Q.   What are they?

16   A.   They are the exhibits or what we would refer to as the

17   contracts for this negotiation cycle for the 2013 calendar year

18   business.

19   Q.   And these are the contracts that were entered into as a

20   result of the negotiation process you've just described for us?

21   A.   Yes.

22        MR. TORZILLI:  Your Honor, at this time the government

23   moves to admit those exhibits.

24        THE COURT:  Any objection to the admission of those

25   exhibits?

Michael Ledford - Direct

1    All right.  Then Exhibits 1552, 1503, 1514, 1515,

2  F-787, F-778, F-742, F-769 and F-799 will be admitted.

3    *MR. TORZILLI:*  Thank you, Your Honor.

4    Just to go back to the last set of exhibits we moved

5  in, just so the record is clear, I understood Your Honor to

6  overrule objections and admit into evidence 1435 and C-020.

7    *THE COURT:*  Correct.

8    *MR. TORZILLI:*  Thank you.  Permission, Your Honor, to

9  publish Government Exhibit 1552?

10    *THE COURT:*  You may.

11    *MR. TORZILLI:*  Thank you.

12  *BY MR. TORZILLI:*

13  *Q.*  On the screen in front of you, sir, is Government

14  Exhibit 1552 also behind Tab 57.  What is this?

15  *A.*  This is the Pilgrim's Pride exhibit or contract for that

16  negotiation.

17  *Q.*  On the very first page, it says -- the subtitle there says

18  8-Piece COB Pricing Model?

19  *A.*  Yes.

20  *Q.*  What is the 8-Piece COB Pricing Model as it appears here?

21  *A.*  It is that fresh eight-piece purple label that we discussed

22  earlier today.

23  *Q.*  So as part of the process of drafting what become these

24  contracts, do you and your team take the information from the

25  bid where all the information in the margin over feed model and

Michael Ledford - Direct

1    put it into here?

2    *A.*   Yes.  We take their final bid and then drop that into this

3    document for the contract.

4    *Q.*   At the very, very bottom of the rows of entries, it says

5    Total FOB Plant Cost?

6    *A.*   Yes.

7    *Q.*   What does that represent?

8    *A.*   That is the total FOB price for fried eight-piece in that

9    first column for the contract year 2013.

10   *Q.*   For what period of time?

11   *A.*   It's for the entire year, the 12-month period.  However,

12   things would fluctuate based on the feed price that we would

13   take throughout the year.

14   *Q.*   How frequently does the price fluctuate based on feed?

15   *A.*   At KFC in this time we had 13 periods in the year, every

16   four weeks.

17   *Q.*   Why does the price fluctuate based on feed?

18   *A.*   Feed is the single largest input of cost into growing and

19   processing a chicken.  In rough terms it's about 40 percent of

20   the cost to produce the chicken.  This particular year it would

21   have been slightly higher than that.  I think if memory serves

22   me, I think it was something like 46 percent.

23          And so because that cost is such a huge driver of the

24   cost of chicken, we had our own commodity risk management

25   group.  And we would actually inform the suppliers of when to

Michael Ledford - Direct

1   take positions on the Chicago Board of Trade to procure corn

2   and the soybean meal that the chickens would eat to grow on.

3   Q.  You said grain is approximately 40 percent of the cost to

4   produce a chicken.  Is it the single largest cost to produce a

5   chicken?

6   A.  Yes, it is the single largest cost.

7            MR. TORZILLI:  We can take that exhibit down.

8            If we can publish Government Exhibit 1503.

9            THE COURT:  You may.

10            MR. TORZILLI:  Thank you, Your Honor.

11   BY MR. TORZILLI:

12   Q.  What is Government Exhibit 1503, Mr. Ledford?

13   A.  1503 is an exhibit for Claxton Poultry for that same year.

14   Q.  And who signed Government Exhibit 1503 on behalf of RSCS or

15   UFPC?

16   A.  I did.

17   Q.  And who signed it on behalf of Claxton Poultry?

18   A.  Scott Brady?

19            MR. TORZILLI:  We can take that exhibit down.

20   BY MR. TORZILLI:

21   Q.  Now, turning to the next year, 2013, were you involved in a

22   bidding and negotiation process?

23   A.  Yes.

24   Q.  What was your role?

25   A.  I directly did the chicken-on-the-bone items, and I was the

Michael Ledford - Direct

1   overall leader/supervisor of the entire process for all

2   chicken.

3   Q.  How similar or different was the process in 2013 compared

4   to the process in 2012?

5   A.  It was the same process except that was a more typical year

6   and we did not have as many rounds.

7   Q.  Did you use the CombineNet system again?

8   A.  Yes, we did.

9   Q.  And did you continue to provide feedback after each of the

10  rounds of bids were received and processed?

11  A.  Yes, we did.

12  Q.  And what different ways was feedback provided to the

13  chicken suppliers?

14  A.  Feedback would be provided verbally, written, face-to-face

15  meetings.

16  Q.  If you could turn to Tab 72 of your binder.  Behind tab 72

17  you should find Exhibit 1700-1.

18  A.  Yes.

19  Q.  Do you see it?

20  A.  Yes.

21  Q.  Do you recognize the information on this?

22  A.  Yes, I do.

23  Q.  What is it?

24  A.  It is an e-mail from Mark Oechsli to Scott Brady and it is

25  providing feedback for round one of the RFP.

570
Michael Ledford - Direct

1    *Q.* Did you receive a copy of this?

2    *A.* Yes, I did.

3    *Q.* How do you know that?

4    *A.* I am cc'd on the e-mail.

5    *Q.* Can you look at the next tab, Tab 73?  It's marked as

6    Defense Exhibit A-288?

7    *A.* Okay.

8    *Q.* Do you see it?

9    *A.* Yes.

10   *Q.* Do you recognize it?

11   *A.* I do.

12   *Q.* What is it?

13   *A.* It is the corresponding attachment that was the feedback

14   for that e-mail that we just looked at for Claxton.

15        *MR. TORZILLI:*  Your Honor, at this time the government

16   moves to admit 1700-1and A-288.

17        *THE COURT:*  Any objection to either of those?

18        Those exhibits will be admitted.

19        *MR. TORZILLI:*  Permission to publish Exhibit A-288?

20        *THE COURT:*  You may.

21   *BY MR. TORZILLI:*

22   *Q.* Mr. Ledford, what is this document?

23   *A.* This is the official feedback form that we used for round

24   one for Claxton.

25   *Q.* There is a chart in the middle of the page.  Do you see

Michael Ledford - Direct

1    that?

2    *A.*  Yes.

3    *Q.*  And could you tell us what the chart is attempting to

4    convey?

5    *A.*  It is attempting to convey on a line item detail by each

6    specific product that Claxton provided or bid on for KFC their

7    price for round one, their current price for 2013, and how far

8    off that was from what we deemed a competitive price during

9    this negotiation.

10   *Q.*  And how did you determine at this time what the competitive

11   price was going to be for the baseline for this feedback

12   process?

13   *A.*  Yes.  This would have been just like in previous years.  It

14   would have either been the lowest price, the second lowest

15   price or an average.

16   *Q.*  On the second and third lines there are negative numbers,

17   negative 30 cents, negative 30 and a half cents?

18   *A.*  Yes.

19   *Q.*  What do those represent?

20   *A.*  Those represent the formulas for those two items on how

21   many cents per pound less than the eight-piece price.

22   *Q.*  Okay.  And if you could turn back to the previous exhibit

23   in Tab 72, Government Exhibit 1700-1.

24        *MR. TORZILLI:*  Permission to publish 1700-1?

25        *THE COURT:*  You may.

Michael Ledford - Direct

1          MR. TORZILLI:  Thank you, Your Honor.

2     BY MR. TORZILLI:

3     Q.  So this information is provided to Mr. Brady when?

4     A.  On October the 31st, 2013.

5     Q.  And what is he being asked to do?

6     A.  We are asking him to look at this feedback.  And then we

7     are informing him that we will be sending additional

8     information to him on the next day.

9     Q.  And what was the additional information that would be

10    provided on the next day?

11    A.  The additional feedback typically speaking would be opening

12    up the next round of the negotiation.

13    Q.  So it would be round two?

14    A.  Right.

15    Q.  Did you ask Defendant Brady to communicate with any of his

16    competitors about the information contained within these

17    exhibits?

18    A.  No.

19    Q.  Did Defendant Brady ever tell you that he was in

20    communication with his competitors about those topics?

21    A.  No, he did not.

22    Q.  I would like you to look at the information behind -- the

23    document behind Tab 74.

24    A.  Okay.

25    Q.  You should find Government Exhibit 9004.  What is it?

573

Michael Ledford - Direct

1  *A.*  It is an e-mail from myself to Scott Brady dated October

2  the 1st, 2013.

3  *Q.*  What is it about?

4  *A.*  It is I am providing him feedback on where his price is at

5  compared to a competitive price.

6  *Q.*  By price, do you mean a bid or a proposal?

7  *A.*  Yes, I do.

8  *Q.*  Is this during the time the bidding negotiation was going

9  on in calendar year 2013?

10  *A.*  Yes, it is.

11       *MR. TORZILLI:*  Your Honor, at this time government

12  moves to admit 9004.

13       *THE COURT:*  Any objection to the admission of

14  Exhibit 9004?

15       *MR. LAVINE:*  No objection, Your Honor.

16       *THE COURT:*  That exhibit will be admitted.

17       *MR. TORZILLI:*  Thank you, Your Honor.  Permission to

18  publish?

19       *THE COURT:*  You may.

20  *BY MR. TORZILLI:*

21  *Q.*  So Mr. Ledford, can you tell us what's going on in this

22  e-mail that you wrote at the top of the page to Defendant Scott

23  Brady?

24  *A.*  Yes.  I am giving him feedback to how his price correlates

25  to the highest priced supplier that I have a bid from.

Michael Ledford - Direct                    574

1    Q.  And what are you telling him in that regard?

2    A.  I am telling him that he has a very tight margin, only

3    .0003 from my highest priced supplier.  So in essence I am

4    telling him you are basically right there with the highest

5    price supplier.  And then I communicated that typically I take

6    volume away from the highest price supplier.

7    Q.  So Defendant Scott Brady submitted what became the second

8    highest bid in the round that you were evaluating at the time?

9    A.  Correct.

10   Q.  So only one supplier was higher?

11   A.  Correct.

12   Q.  And so what does the .0003 represent?

13   A.  Cents per pound.  So in this case it is .03 cents per

14   pound.  So .01 would be 1 cent, so .003 is .03 cents per pound

15   from the highest priced supplier.

16   Q.  Now, that's out to four digits.  That's pretty specific.

17   Was it typical for you to provide information, feedback out to

18   four digits?

19   A.  Yes.

20   Q.  Why?

21   A.  That's how we priced our fresh chicken, out to four digits.

22   So typically speaking, if I was providing them feedback in

23   cents per pound, it was oftentimes out to four digits to match

24   exactly how we purchased that product.

25   Q.  Whose bid information would Defendant Scott Brady have been

Michael Ledford - Direct

1    able to glean from the information that you supplied him in

2    this e-mail in 9004?

3    *A.*  He would have known what the price was of the highest

4    priced supplier's bid.

5    *Q.*  Anyone else?

6    *A.*  No.

7    *Q.*  What was the purpose for providing Defendant Scott Brady

8    this information?

9    *A.*  To have Mr. Brady lower his price.

10   *Q.*  And why did you want him to lower his price?

11   *A.*  Because I wanted the lowest sustainable price I could get.

12   *Q.*  That was your overall objective for all of the bidding and

13   negotiation?

14   *A.*  That's correct.

15   *Q.*  If you could turn to Tab 75.  You should find Government

16   Exhibit 1713-1.

17   *A.*  Okay.

18   *Q.*  Do you recognize this?

19   *A.*  Yes, I do.

20   *Q.*  What is it?

21   *A.*  This is an e-mail from myself to Roger Austin at Pilgrim's

22   on November the 18th, 2013.

23   *Q.*  What is it about?

24   *A.*  I am providing him feedback on what I call in the e-mail

25   his final price.  And I am expressing my disappointment in

Michael Ledford - Direct                                                                  576

1    where his final submission came in.

2    Q.  So this is an example of feedback you provided to a chicken

3    supplier in response to a bid that was submitted?

4    A.  Yes.

5    Q.  And in this case it was Defendant Roger Austin that made

6    the submission?

7    A.  Yes.

8            MR. TORZILLI:  Your Honor, at this time the government

9    moves to admit 1713-1.

10           THE COURT:  Any objection to the admission of 1713-1?

11           MR. FELDBERG:  No objection, Your Honor.

12           THE COURT:  1713-1 will be admitted.

13           MR. TORZILLI:  Thank you, Your Honor.  Permission to

14   publish it?

15           THE COURT:  You may.

16           MR. BELLER:  Your Honor, thank you.  I believe there

17   is a limiting instruction as to this one.

18           THE COURT:  One second.  Any disagreement with that,

19   Mr. Torzilli?

20           MR. TORZILLI:  May we are a side bar?

21           THE COURT:  Yes, you may.

22       (At the bench:)

23           THE COURT:  Go ahead, Mr. Torzilli.

24           MR. TORZILLI:  Yes, Your Honor.  My belief is the

25   limiting instruction relates to the top e-mail, the e-mail

Michael Ledford - Direct

1    that's been redacted which is a statement by Defendant Austin,

2    and that that statement is against him by virtue of

3    801(d)(2)(A).

4         THE COURT:  Yeah, there were two issues last

5    go-around.  No. 1, that the top portion was inadmissible and

6    that his statement could only be admitted against Mr. Austin.

7    That portion of the e-mail I think has been now redacted so it

8    no longer exists.  So I don't believe that there would be any

9    limiting instruction.

10        Mr. Beller, do you agree?

11        MR. BELLER:  Your Honor, I believe that that's right.

12   And to the extent that I may have been incorrect in my memory

13   or my notes, I apologize.  I think that's right.

14        THE COURT:  No, that's right.  I think we need to be

15   careful on those limiting instructions, so there is no problem

16   if we have to suffer a few bench conferences.  I think that's

17   okay.  But it's better at the time the jury sees it to have any

18   limiting instruction that may be appropriate.

19        All right.  Thank you.

20     (In open court:)

21   BY MR. TORZILLI:

22   Q.  Mr. Ledford, can you explain what's going on in this

23   e-mail, please?

24   A.  I am providing Roger Austin some feedback on his final bid

25   submission for this negotiation.

Michael Ledford - Direct

1   *Q.*  What was the overall message you were trying to deliver to

2   Defendant Austin?

3   *A.*  The overall message was that I was disappointed in what he

4   had submitted and my intent was for it to be lower.

5   *Q.*  In what respect were you -- what aspect of the bid was

6   disappointing to you?

7   *A.*  The price for the purple label or the main fried

8   chicken-on-the-bone, eight-piece product, what we called purple

9   label.

10  *Q.*  You thought it was too high?

11  *A.*  Yes, I did.

12  *Q.*  Compared to his competitors?

13  *A.*  Yes.

14  *Q.*  And you were asking for him to do what?

15  *A.*  Basically what I am telling him here is that if he sticks

16  to these numbers and he doesn't lower it, which ultimately is

17  what I was wanting, that he was going to lose significant

18  volume.

19  *Q.*  Is there any way in which you could take all of

20  Pilgrim's -- Pilgrim's Pride's volume away if they remained at

21  the high price that you identified?

22  *A.*  No, there was not.

23  *Q.*  Why not?

24  *A.*  Pilgrim's at this time, they had roughly 40 percent share

25  of the small bird industry in the United States, and they

Michael Ledford - Direct

1    roughly represented just slightly under that, in the high

2    thirties.  It was 38 or 39, somewhere in that ball park in

3    2013.  So basically I was currently buying from them a

4    commensurate value to what they were in the market share.  So

5    when you are somebody the size of KFC and you have got a

6    supplier that represents 40 percent of the market and the

7    largest share, it is impossible to displace a hundred percent

8    of their volume.

9         THE COURT:  Would this be a convenient breaking spot,

10   Mr. Torzilli?

11        MR. TORZILLI:  Sure.

12        THE COURT:  Then ladies and gentlemen, we will go

13   ahead and take our mid-afternoon break.  We will plan on

14   reconvening at 3:30.

15        The jury is excused.

16        (Jury excused.)

17        Mr. Ledford, you can step down.  Thank you very much.

18        One brief thing, and that is be careful on the

19   highlighting of exhibits.  So remember that the highlighting

20   has to be connected with something that is being testified to

21   by the witness.  There have been a couple of examples where the

22   highlighting kind of magically appears, and that not only is

23   peculiar probably for the jury, but the effect of that can

24   either be to lead the witness or to, you know, be some unknown

25   person trying to call that to the jury's attention separate

Michael Ledford - Direct

1    from the testimony of the witness.

2          We will be -- Mr. McLoughlin, do you have something

3    real quick?

4          *MR. McLOUGHLIN:*  Yes, Your Honor.  We object to the

5    government constantly calling the men on trial here defendant

6    so and so, defendant so and so.  It emphasizes their utterness

7    to the jury.  It is an editorial comment.  And we ask that they

8    be given respect of being said Mr. So and so or Mr. So and so

9    with their first and last name, but the defendant so and so is

10   not appropriate, Your Honor.

11         *THE COURT:*  I am going to overrule that objection.

12   Right now for the jury there are lots of names swirling around.

13   The fact that someone is identified as a defendant I think is

14   appropriate.  It helps the jury figure out the significance of

15   that particular person, so I think that that's appropriate.

16   And they are defendants, so -- and I don't think the jury would

17   consider it some slight.  I mean, that's why they are here.

18   They are trying to determine the charge against the defendants.

19         Mr. Torzilli?

20         *MR. TORZILLI:*  Your Honor, on the redaction point,

21   it's certainly your point is taken.  I do want to point out

22   there are occasions where within the document itself the

23   document is highlighted.  So to the extent it gets published --

24   I don't know if this is, in fact, an example of what Your Honor

25   picked up on, but just an example in the binder, sometimes

Michael Ledford - Direct

1    there is yellow highlighting in the document itself and it's

2    not being applied when it's published.

3         THE COURT:  Right.  These are examples where the

4    highlighting was not there when the witness first saw it, but

5    then the highlighting appeared, so it was added to the document

6    after the fact and in a way that was disconnected with the

7    testimony.  There may be examples where you say let's take a

8    look at the first sentence of this exhibit.  It might be

9    appropriate to then highlight the first sentence.  But, you

10   know, if you asked a witness, and what about this exhibit were

11   you trying to get across to Mr. So and so, and then all of the

12   sudden highlighting appeared on it, that would be an example of

13   leading the witness through the highlighting.

14        We will be in recess, then.  Thank you.

15        (Recess at 3:20 p.m.)

16        (Reconvened at 3:35 p.m.)

17        THE COURT:  Why don't we bring the jury back in.

18        (Jury present.)

19        THE COURT:  Go ahead, Mr. Torzilli.

20        MR. TORZILLI:  Thank you, Your Honor.

21   BY MR. TORZILLI:

22   Q.  Mr. Ledford, you said before the break that you had

23   received bids from chicken suppliers in 2013?

24   A.  Yes.

25   Q.  If you could look at Tabs 29 to 37 and 40 to 49 in the

Michael Ledford - Direct

1    binder in front of you.  And the exhibits to be found there are

2    A-612, A-613, I-242, I-243, C-475, C-478, I-115 (sic), D-588,

3    D-589, A-622, A-623, C-480, C-482, C-882, C-883, A-626, A-627,

4    Government Exhibit 1736 and D-330.

5    A.  Mr. Torzilli, what were the tabs after the second group?

6    Q.  40 to 49, sir.

7    A.  Okay.

8    Q.  Do you recognize all of these exhibits?

9    A.  Yes, I do.

10   Q.  What are they?

11   A.  They are submissions for the round two and subsequent

12   rounds of the negotiation process for 2013.

13   Q.  Did they also sometimes include cover e-mails?

14   A.  Yes, they did.

15   Q.  So these are the bids and cover e-mails?

16   A.  Yes.

17        MR. TORZILLI:  At this time, Your Honor, the

18   government moves to admit those documents, those exhibits.

19        THE COURT:  Any objection to the admission of the list

20   of exhibits that Mr. Torzilli read?

21        All right.  Then those exhibits will be admitted.

22        MR. TORZILLI:  Thank you, Your Honor.

23   BY MR. TORZILLI:

24   Q.  If we can go back to an exhibit we were looking at before

25   the break.  It's behind Tab 75 of your binder.  It's Government

583

Michael Ledford - Direct

 1 │ Exhibit 1713-1.

 2 │          *MR. TORZILLI:*  Your Honor, permission to publish.

 3 │          *THE COURT:*  You may.

 4 │          *MR. TORZILLI:*  Thank you.

 5 │ *BY MR. TORZILLI:*

 6 │ *Q.*  So Mr. Ledford, can you remind us what was going on in this

 7 │ communication you were having with Defendant Roger Austin in

 8 │ November of 2013?

 9 │ *A.*  Yes.  I was providing him feedback on his pricing for his

10 │ final round submission.

11 │ *Q.*  How would you describe the message that you were giving to

12 │ Defendant Austin at this time?

13 │ *A.*  I was telling Mr. Austin that if his price did not lower,

14 │ he was potentially going to lose significant volume.

15 │ *Q.*  Telling him he would lose business?

16 │ *A.*  Yes.

17 │ *Q.*  A lot of business?

18 │ *A.*  Yes.

19 │ *Q.*  Did you have any subsequent communications with Defendant

20 │ Roger Austin on this topic?

21 │ *A.*  Yes, I did.

22 │ *Q.*  And can you summarize what the take-away was?

23 │ *A.*  Yes.  The take-away was I was asking him to lose -- I was

24 │ asking him to lower the price; and if they did not, they would

25 │ lose volume.

Michael Ledford - Direct

1   Q.  And what actually happened?  Did Defendant Austin lower his
2   price?
3   A.  I believe he did, yes.
4   Q.  How much?
5   A.  I do not recall.
6   Q.  Enough to keep the loads that you were considering moving
7   away from him?
8   A.  I think it was enough to at least keep some of them.  I do
9   not recall taking significant volume away from him that year.
10  Q.  At any time after you wrote this e-mail to him, did
11  Defendant Austin ever tell you he was in communication with his
12  competitors about the bid that you were discussing with him?
13          MR. BELLER:  Objection, assumes facts not in evidence.
14          THE COURT:  I will sustain it.  If you can rephrase
15  it, Mr. Torzilli.
16  BY MR. TORZILLI:
17  Q.  Mr. Ledford, at any time after the e-mail that appears in
18  1713-1, did Defendant Austin ever inform you that he was in
19  communication with any of his competitors about his bids?
20          MR. FELDBERG:  Same objection, Your Honor.  I think
21  it's the same question.
22          THE COURT:  I think so.  Maybe if it's rephrased as
23  whether or not.
24          MR. TORZILLI:  Your Honor, can we have a side bar?
25          THE COURT:  Yes.

Michael Ledford - Direct

1        (At the bench:)

2            THE COURT:  Go ahead.

3            MR. TORZILLI:  Your Honor, to the extent the objection

4    is being sustained on the assumption that facts are not in

5    evidence, I believe there are phone records indicating that --

6    well, there are phone records indicating that the defendant was

7    in communication with his competitors proximate to when this

8    e-mail was written, and then the subsequent e-mail which is, of

9    course, redacted because Mr. Ledford didn't see it.  Mr. Austin

10   says, I'll go out and do some scouting.

11           THE COURT:  There may be, but have those phone records

12   been admitted yet?

13           MR. TORZILLI:  The phone records have been admitted.

14           THE COURT:  Okay.  Response?

15           MR. BELLER:  Your Honor, the question specifically

16   asks about whether Mr. Austin informed him that there was

17   communication about the bids.  I would agree with

18   Mr. Torzilli's position if it was simply communication.  It's

19   the addition of the -- about the bids piece that I don't

20   believe is in evidence.

21           MR. FELDBERG:  May I add, Your Honor, the phone

22   records do not show what was said in any of the conversations,

23   so there is no foundation for the premise of the question.

24           THE COURT:  Okay.  Response, Mr. Torzilli?

25           MR. TORZILLI:  Absolutely.  Thank you, Your Honor.  So

586

Michael Ledford - Direct

1    in Government Exhibit 1734, there are a series of text messages

2    between the Claxton defendants, Defendant Brady and Defendant

3    Fries.  The first one from Defendant Brady, which incidentally

4    these are dated November 19, which is the day after the e-mail

5    that's currently being published was written.  And then Brady

6    says to Defendant Fries:  Just an FYI, last year we were 32

7    back on dark meat and this year we are 30 and a half back.

8         And then within a minute later, Defendant Brady sends

9    another text to Defendant Fries saying, Roger is at .30 back

10   and not moving.  And then Fries responds, K, can do 31 if want

11   and then says, 35 then.

12        THE COURT:  And 1734 has been admitted, right?

13        MR. TORZILLI:  Yes.

14        THE COURT:  All right.  Mr. Feldberg?

15        MR. FELDBERG:  Your Honor, that's not a statement of

16   Mr. Austin's.  It's a text between Mr. Fries and Mr. Brady.

17   And, you know, it does not -- it is not a statement of

18   Mr. Austin's.  It is purportedly a statement by Mr. Brady and

19   therefore it doesn't support, you know, our view of the premise

20   of the question that Mr. Torzilli has asked.

21        THE COURT:  Mr. Beller, anything more from you?

22        MR. BELLER:  Excuse me, Your Honor.  No, thank you.

23        THE COURT:  Yeah, I agree with Mr. Torzilli.  I think

24   that there is a sufficient foundation for the question and he

25   can pose that question to the witness.  Thank you.

Michael Ledford - Direct

1        (In open court:)

2            THE COURT:  The objection will be overruled.  Go

3    ahead, Mr. Torzilli.

4            MR. TORZILLI:  Thank you, Your Honor.

5    BY MR. TORZILLI:

6    Q.  So the document that's being published, the exhibit being

7    published now, Mr. Ledford, 1713-1, what was the date of that

8    e-mail?

9    A.  November 18, 2013.

10   Q.  Did Defendant Roger Austin ever inform you at any point

11   after this e-mail was written that he was in communication with

12   his competitors about his bids to RSCS?

13   A.  No.

14   Q.  Did you ask him to be in communication with any of his

15   competitors about the bid?

16   A.  No.

17   Q.  Why not?

18   A.  I didn't want suppliers talking to each other about their

19   bids.  I wanted the most competitive price I could get.

20   Q.  And that was your attitude throughout your time at RSCS?

21   A.  Yes, it was.

22   Q.  Including in 2012 and 2013, the years we have been focusing

23   on this afternoon?

24   A.  Yes.

25            MR. TORZILLI:  We can take that exhibit down.  Thank

Michael Ledford - Direct

1   you.

2   *BY MR. TORZILLI:*

3   *Q.*  So there came a time in 2013 where you concluded the

4   negotiation process.  Is that fair to say?

5   *A.*  Yes.

6   *Q.*  And remind us how many rounds of bidding you undertook.

7   *A.*  Looking at these documents, it appears that we had four

8   rounds again in some cases.

9   *Q.*  And why did you decide to go with four rounds rather than a

10  lower number of rounds?

11  *A.*  Similar to the year prior to this, we wanted to get -- we

12  needed to get to lower prices.  And we did not feel like we got

13  there in two rounds on this particular year.

14  *Q.*  And did you arrive at contracts at the conclusion of the

15  bidding and negotiation process?

16  *A.*  Yes, we did.

17  *Q.*  If you could look at the documents behind Tabs 66 to 71.

18       *MR. FAGG:*  Your Honor, may we have a brief side bar

19  before we move on from this group of documents?

20       *THE COURT:*  Yes, we can.

21     (At the bench:)

22       *THE COURT:*  Mr. Fagg, just so we are clear, what group

23  of documents are you referring to?

24       *MR. FAGG:*  I was referring to the last group of

25  documents that Mr. Torzilli asked Mr. Ledford about when he was

Michael Ledford - Direct

1    talking about 29 through 37 and then 40 through 49, and

2    specifically I was talking about Exhibit I-115.  That was not

3    on the government's exhibit list and so we didn't have a copy

4    of it, but we have since pulled it up.  And I believe that in

5    looking at that document, that that is -- it has nothing to do

6    with Mr. Ledford.  It has nothing to do with RSCS.  So I

7    believe that's a mistake and I just wanted to try and clarify

8    that.

9            THE COURT:  Mr. Torzilli?

10           MR. TORZILLI:  I don't have I-115 on my list.  I have

11   A-115 on my list.

12           THE COURT:  Yeah, I don't have I-115 either.

13           MR. TUBACH:  I think that's what all of us heard

14   Mr. Torzilli say and that's what we wrote down, so that's why

15   we were scrambling to locate that document.

16           THE COURT:  Understandably.

17           MR. TUBACH:  Just give us one minute to locate A-115.

18   That may resolve this quickly.

19           THE COURT:  Yes, go ahead.

20           MR. FAGG:  Your Honor, that does resolve it.

21           THE COURT:  Okay.

22           MS. HENRY:  Your Honor, we also have a question -- an

23   objection where Mr. Torzilli laid the foundation for a question

24   about a conversation with a single supplier and yet his

25   questions have been about suppliers generally.  And we object

Michael Ledford - Direct

1    that the -- this is inappropriate with regard to all of the

2    suppliers, and there is a spillover effect of the question that

3    is inappropriate.

4            THE COURT:  Okay.  We'll need contemporaneous

5    objections in the event that there is.  Mr. Ledford on the

6    whole has been talking about his collective approach, so I

7    assume that he probably was.  But if there is a potential

8    ambiguity, we'll look for the objection.

9            All right.  Thank you.

10       (In open court:)

11   BY MR. TORZILLI:

12   Q.  Mr. Ledford, did you have a chance to look at those

13   documents?

14   A.  Yes, I did.

15   Q.  And what are they?

16   A.  They are the contracts or the exhibits to the SBRA for the

17   calendar year 2014.

18   Q.  Are these the contracts that concluded the bidding and

19   negotiation process you've been describing that occurred in

20   2013?

21   A.  Yes.

22           MR. TORZILLI:  Your Honor, at this time the government

23   moves to admit Government Exhibits 1729, 1728, 9871, 1122,

24   1120, 1124.

25           THE COURT:  All right.  Any objection to the admission

Michael Ledford - Direct

1    of those exhibits?

2           *MR. TUBACH:*  I believe that's the first time those

3    numbers have been read out.  We just need a moment to look at

4    them.

5           *THE COURT:*  No problem.  Go ahead.

6           *MR. TUBACH:*  Thank you, Your Honor.

7           *THE COURT:*  Okay.  Anyone?  Mr. Fagg, go ahead.  Okay.

8    Anyone else?

9           All right.  Then each of those exhibits will be

10   admitted.

11          *MR. TORZILLI:*  Thank you, Your Honor.

12          One moment, Your Honor.

13          *THE COURT:*  Yes, go ahead.

14          *MR. TORZILLI:*  Thank you, Your Honor.

15   *BY MR. TORZILLI:*

16   *Q.*  Mr. Ledford, did there come -- well, first let me ask you,

17   are you familiar with the term period pricing?

18   *A.*  Yes.

19   *Q.*  What is period pricing?

20   *A.*  Period pricing for chicken on the bone was every four

21   weeks.  There was 13 periods in the year.  And the price would

22   change each of those four weeks in accordance to the grain

23   positions that we took.  And that's sort of the starting place

24   for the cost models that we just reviewed.

25   *Q.*  So a period price is built off of the contract price?

Michael Ledford - Direct

1    A.   Yes.

2    Q.   So a period price isn't a bid or a proposal?

3    A.   No, it is not.

4    Q.   Were there occasions where you provided suppliers feedback

5    on a period price?

6    A.   Yes.

7    Q.   Could you describe the circumstances where that would

8    arise?

9    A.   Sure.  So once we had these cost models in place, the only

10   thing that should have changed was our hedging positions that

11   we had taken on grain.  So typically speaking, we had a really

12   good ability to forecast what each supplier's period price when

13   they would submit it.  The reason we had them submit period

14   pricing instead of just doing it ourselves was to ensure that

15   we were in agreement and we didn't have any billing errors or

16   any -- after invoices starting going out conversations and we

17   would try to take that into consideration up front.

18         So if a supplier submitted their period pricing to

19   Carol Knight in this case, who did all that clerical work, and

20   it did not match with the forecast that I had provided her, she

21   would bring that to my attention.  And then I would review the

22   price, the period pricing that the suppliers had submitted, and

23   then give them feedback on where they were off from what the

24   price should have been.

25   Q.   Sir, if you could turn to Tab 77 in your binder, and you

Michael Ledford - Direct

 1   should find there Government Exhibit 9255-1.

 2   *A.*   Okay.

 3   *Q.*   Are you there, sir?

 4   *A.*   Yes.

 5   *Q.*   Do you recognize that exhibit?

 6   *A.*   Yes, I do.

 7   *Q.*   What is it?

 8   *A.*   This is an e-mail from myself to Greg Tench at Mar-Jac

 9   providing him feedback on period price submission.

10   *Q.*   And remind us what Mar-Jac is, please?

11   *A.*   Mar-Jac was one of our chicken-on-the-bone suppliers.

12   *Q.*   Who is Greg Tench?

13   *A.*   Greg Tench is the head of their sales program at Mar-Jac.

14   *Q.*   Is there an example of you communicating feedback on period

15   pricing?

16   *A.*   Yes, it is.

17        *MR. TORZILLI:*   Your Honor, move to admit 9255-1.

18        *THE COURT:*   Any objection to the admission of 9255-1?

19        Ms. Henry?

20        *MS. HENRY:*   Hearsay.

21        *THE COURT:*   Response?

22        *MR. TORZILLI:*   May I inquire?

23        *THE COURT:*   Yes, go ahead.

24   *BY MR. TORZILLI:*

25   *Q.*   Mr. Ledford, you wrote this e-mail?

Michael Ledford - Direct

1    A.  Yes, I did.

2    Q.  And is it -- does it reflect true and accurate information

3    to the best of your knowledge?

4    A.  Yes.

5    Q.  And you remember writing this e-mail?

6    A.  Yes.

7          THE COURT:  What about the bottom e-mail?

8          MR. TORZILLI:  That would be not for the truth, but

9    for the effect.

10         THE COURT:  Any objection to the admission of 9255-1?

11         MS. HENRY:  Hearsay.

12         THE COURT:  I am sorry, Ms. Henry.  I didn't hear you.

13         MS. HENRY:  Hearsay.

14         THE COURT:  The objection will be overruled.  I will

15   admit 9255-1, but for the -- but the e-mail from Randy Bruce,

16   why don't we go ahead and display -- did you want it displayed?

17         MR. TORZILLI:  Yes, Your Honor.  Permission to display

18   9255-1?

19         THE COURT:  That permission is granted.

20         So ladies and gentlemen, periodically I may provide

21   what are called limiting instructions as to given exhibits.

22   What a limiting instruction is, it instructs you on certain

23   purposes that you either can or perhaps cannot consider a given

24   exhibit for.

25         So if you look at this document, you will see at the

Michael Ledford - Direct

1    bottom of it there is an e-mail from a person named Randy Bruce

2    to Mr. Ledford.  That e-mail, the one -- the words of Mr. Bruce

3    should not be considered by you for the truth of the matter

4    asserted, but rather it only should be considered by you as to

5    how it may have prompted Mr. Ledford then to respond to that,

6    okay?

7              Go ahead, Mr. Torzilli.

8              *MR. TORZILLI:*  Thank you, Your Honor.

9    *BY MR. TORZILLI:*

10   *Q.*  So Mr. Ledford, can you tell us what's going on in the

11   e-mail that you wrote in the middle of Exhibit 9255-1?

12   *A.*  Yes.  So really period pricing submission was really in

13   essence a billing exercise.  There should not -- if everything

14   is done properly, there shouldn't be a need for feedback.  But

15   in this case he was so far out of line from what we were

16   expecting based on where we had agreed to in the negotiations

17   in the earlier fall, that I was providing him feedback on how

18   far from what our expectation was of his price for that

19   submission.

20   *Q.*  So you received information from Mar-Jac?

21   *A.*  Yes.

22   *Q.*  And you were responding to the information you received?

23   *A.*  Yes.

24   *Q.*  I want to ask you about, first of all, I see that the

25   information that you are reflecting here is in four decimal

Michael Ledford - Direct

1   places.  I think you testified earlier it was common for you to

2   express feedback in four decimal places.  Would this be an

3   example of that?

4   A.  Yes.

5   Q.  On the very, very last line in the very last sentence of

6   your e-mail, you say, "That combination makes this an

7   uncompetitive price."  Do you see that?

8   A.  Yes.

9   Q.  What did you mean by that?

10  A.  I am letting him know that really we cannot -- this

11  cannot -- we are not accepting this price for period pricing to

12  be what we bill, and that it is not competitive to the rest of

13  the seven suppliers we had.  And they needed to resubmit

14  something that was more in line with being competitive and more

15  in line with what we had agreed to in the previous negotiation.

16  Q.  Is it out of question for -- or was it out of question for

17  you at the time to move volume from one supplier to another if

18  their period price was uncompetitive?

19  A.  No.

20  Q.  Why not?

21  A.  We had a contract.  And from our standpoint, from the RSCS

22  standpoint, we were standing behind that contract.  And that

23  contract was not only on price but it was on volume.  And

24  really in essence what I'm doing here is I'm asking them to do

25  the same.

Michael Ledford - Direct

1   Q.  So what were you ultimately able to do if a supplier brings

2   an uncompetitive period price to you and does not move it down

3   to a range where in your view it would be competitive?

4   A.  I mean, we are very limited here on what we could do if

5   they were unwilling to move it.  I do recall some instances

6   when I was at RSCS where folks did not move it.  And we really

7   tried to just make sure that they got that right on the next

8   pricing period, but more often than not suppliers would adjust

9   it based on our feedback.

10  Q.  Thank you, Mr. Ledford.  I want to ask you about price

11  uniformity.  Is that a concept you are aware of from your time

12  at RSCS?

13  A.  Yes, it is.

14  Q.  Could you describe what that is?

15  A.  Sure.  So on chicken on the bone in particular, it was more

16  sensitive to price uniformity than the other products that we

17  purchased.  In the KFC system, you have a lot of franchisees

18  that have multiple restaurants and even multiple restaurants

19  across multiple states.  And so oftentimes you have a

20  franchisee that receives chicken for his various locations from

21  multiple suppliers.

22         And if there is a large discrepancy from the highest

23  priced supplier to the lowest priced supplier, that franchisee

24  could, in fact, get both of those in his various restaurants.

25  And so if there is a large range from the lowest to the

598

Michael Ledford - Direct

1    highest, often we would get phone calls and they went something

2    like, I don't want chicken from supplier X because they are

3    priced so much higher than supplier Y.  For all of my

4    restaurants across every state, I want chicken from supplier Y

5    because they are cheaper.

6         So in essence to keep our franchisees happy and to

7    keep that noise is what I would call it from the franchisees,

8    it behooved us also as a secondary goal to try to get as tight

9    of a range as we could when we negotiated the prices.

10   Therefore, if supplier X's price was .9625 and supplier Y's

11   price was .9615, we wouldn't get those phone calls from the

12   operators -- or from the franchisees because the prices were

13   close enough and they weren't going to call over something that

14   was that close.  So when we talk about price uniformity or

15   range from highest to lowest, that's what we're talking about.

16   Q.  How did you go about trying to achieve price uniformity

17   across the competing chicken suppliers?

18   A.  We tried to achieve that through our negotiation process,

19   through the closed bid cycle, through providing them feedback

20   and negotiating with them to get them to what we called the

21   competitive price.

22   Q.  Were the negotiations one on one between you and the

23   supplier?

24   A.  Yes.

25   Q.  Was there ever any occasion where you asked the chicken

1   suppliers to coordinate for purposes of trying to get to price

2   uniformity?

3   *A.* No.

4   *Q.* Why not?

5   *A.* We didn't want the chicken suppliers getting together and

6   talking about what they felt like our price should be. We

7   wanted to do that directly with them in a competitive manner.

8   And we wanted to try to drive to a fair price and the best

9   price that we could have.

10          *MR. BELLER:* Excuse me, Your Honor. If we are done

11  with the exhibit, if we could have that taken down, please.

12          *MR. TORZILLI:* Yeah, we're done, and the exhibit can

13  be removed. Thank you.

14  *BY MR. TORZILLI:*

15  *Q.* Mr. Ledford, you've testified about a closed bid system. I

16  am wondering whether you are familiar with any other types of

17  bidding systems.

18  *A.* Yes, I am.

19  *Q.* How are you familiar with other types of bidding systems?

20  *A.* In my time with Gold Kissed dealing with UFPC or RSCS when

21  I was selling chicken, they entered into one year a -- what's

22  known as a reverse auction, which is more of an open-type

23  pricing scenario. And in that reverse auction that they did

24  that year, you could -- you didn't see the supplier's names but

25  you logged into the system. It was a live event that happened

1    at a certain time.  And you could see everyone's price when

2    they made a bid.  You couldn't see who made that price

3    submission, but you could certainly see all of the other bids.

4    Q.  When you were at RSCS, did you ever use that method of

5    bidding?

6    A.  No, I did not.

7    Q.  So throughout your time at RSCS, you used the closed method

8    of bidding?

9    A.  Yes, I did.

10   Q.  Why did you choose the closed method of bidding rather than

11   another method such as the reverse auction that you just

12   described?

13          MR. LAVINE:  Objection, asked and answered.

14          THE COURT:  Overruled.

15   A.  We felt like that it provided the most competitive pricing

16   that was sustainable.  When UFPC did that in my time at Gold

17   Kissed on the seller's side, they actually awarded --

18          MR. FAGG:  Objection, Your Honor, relevance.

19          THE COURT:  Overruled.

20   A.  They actually awarded a significant amount of volume to a

21   nonincumbent that really undercut to get the business.  That

22   supplier ended up going bankrupt.  And they had to come back to

23   all of the previous incumbents and ask for business back.  So

24   it was kind of like they learned the lesson not to do that.

25   And I got to witness that on the seller's side of the desk and

Michael Ledford - Direct

 1   certainly was not going to employ that method because I did not

 2   feel like it was a sustainable method that got to the most

 3   competitive price.

 4   BY MR. TORZILLI:

 5   Q.  So you thought the closed bidding approach was the better

 6   way to produce competition?

 7            MR. TUBACH:  Leading.

 8            THE COURT:  Sustained.

 9   BY MR. TORZILLI:

10   Q.  What, if any, effect did you believe -- did you conclude

11   that a closed method would have on competition for your chicken

12   needs?

13            MR. FAGG:  Objection, Your Honor, 702.

14            THE COURT:  Overruled.

15   A.  We felt like it was the most competitive method to achieve

16   our goals.

17   BY MR. TORZILLI:

18   Q.  Did the -- did you and your team communicate to the chicken

19   suppliers that you would be conducting bidding using a closed

20   system?

21   A.  Yes, we did.

22   Q.  How so?

23   A.  It was part of the invitation that we sent out with the

24   instructions.

25   Q.  How, if at all, can competing chicken suppliers

Michael Ledford - Direct

1    communicating with one another impact the effectiveness of the

2    blind bidding system you used?

3              MR. FAGG:  Objection, Your Honor.

4              THE COURT:  What's the objection?

5              MR. FAGG:  Can we be heard on side bar?

6              THE COURT:  Yes.

7        (At the bench:)

8              THE COURT:  Go ahead, Mr. Fagg.

9              MR. FAGG:  Sure, Your Honor.  I am not sure how

10   Mr. Ledford is qualified to talk about the effectiveness of a

11   certain type of bidding system.  I think it's 702.  I also

12   think it's objectionable under 403.

13             THE COURT:  So is it in part a foundation objection?

14             MR. FAGG:  Yes, Your Honor.

15             THE COURT:  Response?

16             MR. TORZILLI:  Sure.  Mr. Ledford's had 20 years in

17   the business at this point in time.  He chose one bidding

18   system over another as a way to set up a competitive process.

19   And I think it's very fair to ask him whether that competitive

20   process was through competitor communications.

21             THE COURT:  Let's assume, Mr. Torzilli, that I

22   sustained the foundation objection.  What foundation -- and

23   then you asked him what his foundation was for his answer.

24   What do you anticipate he will answer?

25             MR. TORZILLI:  His foundation, his experience.

Michael Ledford - Direct

1              THE COURT:  But what is his experience?

2              MR. TORZILLI:  He has familiarity with the open bid

3       system when he was a chicken supplier competing for RSCS

4       business before he got to RSCS, had an experience with that

5       that made him believe that wasn't the best way to conduct the

6       competitive process and he chose the closed bidding system.

7              THE COURT:  But what is his experience -- you posed a

8       question do him what would happen.  Does he have any experience

9       with, you know, knowledge of competitors in the closed system

10      communicating with each other that he was aware of and

11      therefore knows how it affected the closed system?

12             MR. TORZILLI:  The answer to that is no, he is not

13      aware of communications between competitors, between these

14      conspirators regarding bids or negotiations with RSCS.

15             THE COURT:  Okay.  Mr. Fagg, anything more?

16             MR. FAGG:  The only thing I would add, Your Honor,

17      this seems to be opinion testimony that was never disclosed by

18      the government.  And we think it's improper on that ground as

19      well.

20             THE COURT:  Mr. Feldberg?

21             MR. FELDBERG:  Your Honor, two points.  First, this

22      is, at least as we understand the question, asking for his

23      belief based on prior experience.  In the trial brief we

24      submitted to the Court, we cited cases that say that is not a

25      proper basis in which to elicit belief testimony of this sort.

Michael Ledford - Direct

1    That's No. 1.

2         No. 2, the question as posed included the phrase blind

3    bidding, which is a phrase the witness has not used.  It's a

4    phrase the government likes, but the witness has very carefully

5    not used it.  And we would object to the form of the question

6    for that reason as well.

7         THE COURT:  Mr. Torzilli, if you can comment on both

8    the 701 -- or 702 objection, but also on Mr. Feldberg's last

9    point.

10        MR. TORZILLI:  Your Honor, Mr. Feldberg's last point,

11   I am happy to rephrase the question to call it closed bidding,

12   which is what Mr. Ledford referred to it as, although I believe

13   the terminology closed and blind are synonymous, but I can

14   limit myself to closed.

15        But on an expert or lay opinion, I think this is --

16   what is being asked is certainly well grounded and he has

17   personal knowledge.  And indeed the choice to go to a closed

18   system is in large part to avoid one competitor, in this case

19   chicken suppliers, having information about what the other

20   competitors are doing, which is the opposite of what happens in

21   a reverse auction or an open system.  So it seems like it's

22   very much within the wheelhouse of someone who has had numerous

23   experiences setting up competitor processes just like this.

24        MS. HENRY:  Your Honor, we would also object on the

25   grounds of relevance and 403.

Michael Ledford - Direct

 1          THE COURT:  Mr. Tubach?

 2          MR. TUBACH:  I believe this witness testified his own

 3   reason for not doing the reverse auction again was because one

 4   company went bankrupt because the price was too low.  It had

 5   nothing to do with competitors talking or not talking.  So I

 6   don't see how what he testified about has any relevance to the

 7   testimony that Mr. Torzilli is trying to relate which is -- or

 8   get out of the witness which is that somehow this closed

 9   bidding system is more competitive and that people are talking

10   together.

11          MR. POLLACK:  Your Honor, Barry Pollack on behalf of

12   Mr. Blake.  I have a separate grounds for objecting.  I know

13   Ms. Henry just objected on relevance grounds, but I think it is

14   irrelevant because it's really calling for him to give an

15   opinion as to the anti-competitive effects of information

16   sharing.

17          And this is a per se case.  The only issue is:  Was

18   there an agreement to fix bids or was there not.  And if there

19   was, it's irrelevant whether that agreement had pro-competitive

20   effects and irrelevant whether it had anti-competitive effects.

21   So I don't see how his opinion that there would be harm from

22   information sharing and that it would defeat the purpose of a

23   closed bidding system is relevant.

24          THE COURT:  Mr. Torzilli, can you respond to

25   Ms. Henry, Ms. Henry's point and also Mr. Pollack's point and

Michael Ledford - Direct

1    Mr. Tubach's point if you haven't had a chance yet?  I can't

2    remember.  Go ahead.

3            MR. TORZILLI:  Sure, Your Honor.

4            So on the competition point, what we are trying to

5    draw out here is that Mr. Ledford designed a system to foster

6    competition.  And there are ways in which that fostering

7    competition can be restricted and that's precisely what the

8    Sherman Act, the per se violation of the Sherman Act is

9    designed to get at, which is an agreement among competitors to

10   restrict price competition.

11           And in this case a significant element of that, a

12   significant fact that's in dispute is what is the nature of the

13   information sharing, the sharing of bids, the sharing of

14   negotiation information for the purpose of -- for the purpose

15   of advancing a price-fixing conspiracy or not.  So I think it's

16   highly relevant that a competitive system is being set up to

17   avoid precisely that in the context of conspiracy doing exactly

18   what the competitive system that's been designed is trying to

19   guard against.

20           THE COURT:  All right.  Well, I think Mr. Pollack is

21   right.  I think that -- and I think that it makes that

22   irrelevant or at least it raises issues of relevancy.  And also

23   in terms of some system designed to thwart Sherman Act

24   violations, I think that would be very far afield.  I don't

25   think that that's what -- there hasn't been any testimony from

Michael Ledford - Direct

1    Mr. Ledford that that was the purpose of it.

2            Mr. Ledford has already talked about the competitive

3    bidding system that he has, and he can talk at a high level

4    about that because that's a system that he adopted.  He thought

5    it was a better system.  And it's already perfectly obvious to

6    the jury that he -- and he has testified that he wanted to get

7    the best and lowest sustainable price.  But the question that

8    was posed to him, what would be the harmful effects or what

9    would be the effects of having the competitors talk to one

10   another, I think that that testimony is irrelevant, so I will

11   sustain the objection.

12           Also if it is reasked in some form, you need to

13   address Mr. Feldberg's objection.  But once again, he can

14   testify generally about what he considered the advantages of

15   the competitive bid system or the closed system that he talked

16   about.  He has already done some of that, but not the specific

17   question of talking about the harms, especially since it

18   doesn't seem like he had experienced any of those harms in the

19   past, and therefore he doesn't have any experience with it.  He

20   would just be offering something more along the line of an

21   opinion about what he thinks the harmful effect may be.

22           Any questions about that, Mr. Torzilli?

23           MR. TORZILLI:  No, Your Honor.

24           THE COURT:  Okay.  Thank you.

25       (In open court:)

Michael Ledford - Direct

 1  *BY MR. TORZILLI:*

 2  *Q.*  Mr. Ledford, were there advantages to the competition you

 3  were trying to engender to using the closed bidding system that

 4  you put in place for 2012 and 2013?

 5  *A.*  Yes, there was.

 6          *MR. FAGG:*  Objection, Your Honor.  Same objections,

 7  foundation.

 8          *THE COURT:*  Those will be overruled.

 9  *BY MR. TORZILLI:*

10  *Q.*  What are they or were they?

11  *A.*  Yes.  We felt like the main advantages were that the

12  suppliers were hearing the feedback directly from us and that

13  they weren't seeing things that would be involved in an open

14  system or interpreting things differently.  And it allowed us

15  to control the narrative a bit better.

16  *Q.*  How so?

17  *A.*  They were only seeing what we told them.  And ultimately we

18  felt like that helped us get -- during the negotiations to get

19  to the best price for RSCS.

20  *Q.*  I want to ask you about a few more names.  Are you familiar

21  with Mark McEwen?

22  *A.*  No, sir.

23  *Q.*  Are you familiar with Mitch Mitchell?

24  *A.*  Yes.

25  *Q.*  Who is Mitch Mitchell?

Michael Ledford - Direct

1   *A.*  Mitch Mitchell at this time period was in sales for Case

2   Farms, which was another one of the suppliers.

3   *Q.*  Are you familiar with Tommy Francis?

4   *A.*  Yes, I am.

5   *Q.*  What was he doing in the 2012, 2013 time period?

6   *A.*  Tommy Francis is in sales for Mar-Jac.

7   *Q.*  Are you familiar with Pete Martin?

8   *A.*  Yes.

9   *Q.*  Who is Pete Martin?

10  *A.*  At this time period Pete Martin was the president of

11  Mar-Jac Poultry.

12  *Q.*  So in the 2012, 2013, 2014 time period?

13  *A.*  Yes.

14  *Q.*  Just a couple more questions, sir.

15      Did any of the defendants that you identified as being

16  individuals you negotiated with in 2012 and 2013 ever tell you

17  they were in communication with each other about RSCS bids or

18  negotiations?

19      *MR. BELLER:*  Your Honor, objection.  This is asked and

20  answered as to some defendants and again assumes facts not in

21  evidence as to the others.

22      *THE COURT:*  I will overrule the objections.

23  *A.*  Could you repeat the question?  I am sorry.

24  *BY MR. TORZILLI:*

25  *Q.*  Sure.  Did any of the defendants that you identified today

Michael Ledford - Cross

1    as being people that you negotiated with in the 2012, 2013 time

2    frame ever tell you they were communicating with any of their

3    competitors about their RSCS bids or negotiations?

4    A.   No.

5             MR. TORZILLI:   Your Honor, moment to confer?

6             THE COURT:   You may.

7             MR. TORZILLI:   No further questions.

8             THE COURT:   Thank you.

9             Cross-examination?

10            Mr. Beller?

11            MR. BELLER:   Thank you, Your Honor.   If I may have

12   just a moment to set up, please.

13            THE COURT:   Yes, you may.

14                           **CROSS-EXAMINATION**

15   BY MR. BELLER:

16   Q.   Good afternoon, Mr. Ledford.

17   A.   Good afternoon.

18            MR. BELLER:   Your Honor, to get started, if I may hand

19   Ms. Grimm a binder for the witness.   I also have one for the

20   Court and one for the government.

21            THE COURT:   You may.

22            MR. BELLER:   Thank you.   And is the Court ready?

23            THE COURT:   I am.   Go ahead.

24   BY MR. BELLER:

25   Q.   Mr. Ledford, my name is David Beller.   I represent Mikell

Michael Ledford - Cross

1   Fries of Claxton Poultry.  It's nice to see you, sir.

2        So I want to start, Mr. Ledford, with a bit of a time

3   line and really understanding your knowledge and your

4   involvement in the case, okay?

5   A.  Okay.

6   Q.  Mr. Ledford, you found out about the Indictment in this

7   matter in June of 2020; is that right?

8   A.  That's correct.

9   Q.  Huge news in the industry.

10  A.  Huge.

11  Q.  KFC's name was part of the Indictment?

12  A.  Yes.

13  Q.  CFA's or Chick-fil-A's name was part of the Indictment?

14        MR. TORZILLI:  Your Honor, objection.  May we have a

15  side bar?

16        THE COURT:  Yes.

17     (At the bench:)

18        THE COURT:  Go ahead, Mr. Torzilli.

19        MR. TORZILLI:  Your Honor, the objection is that in

20  the Indictment and in the Superseding Indictment the names of

21  individuals including KFC, Chick-fil-A and purchasers are

22  anonymized, so I don't think the question is appropriate given

23  that the known names of these folks are actually specified in

24  the Indictment.

25        THE COURT:  Response, Mr. Beller?

Michael Ledford - Cross

1           *MR. BELLER:*  Thank you, Your Honor.  I am certainly

2      happy to inquire as to whether or not he has knowledge of the

3      individuals who are in the Indictment, and so it sounds like I

4      may need to lay a little bit more foundation.  And that's

5      really the basis of the objection as I am understanding it?

6           *THE COURT:*  I think maybe too your question was

7      whether Chick-fil-A and KFC's names were part of the

8      Indictment.  And Mr. Torzilli is indicating that they were not

9      because the Indictment was anonymized, so I think that is part

10     of it too.  Is that correct, Mr. Torzilli?

11          *MR. TORZILLI:*  Correct.  They were referred to, but

12     they are referred to in an anonymized fashion.

13          *THE COURT:*  Mr. Beller, anything else?

14          *MR. BELLER:*  Your Honor, I am happy to rephrase the

15     question if that's the concern.

16          *MR. TUBACH:*  One point.  If the witness was able to

17     look at the Indictment and figure out who his -- the companies

18     he had worked for, it wouldn't have been difficult to do.  That

19     would unanonymize it for him, at least his own employer.

20          *THE COURT:*  That might be another question that

21     Mr. Beller asks, but we'll see.

22               Anything else, Mr. Torzilli?

23          *MR. TORZILLI:*  No, Your Honor.

24          *THE COURT:*  All right.  Thank you.

25        (In open court:)

Michael Ledford - Cross

 1  *BY MR. BELLER:*

 2  Q.  Let me back up just a little bit.  We were talking about

 3  the Indictment, and you stated that you are aware or you

 4  learned of it in roughly June of 2020?

 5  A.  That's correct.

 6  Q.  Okay.  And part of the investigation -- or you came to

 7  learn about the investigation in this case; is that right?

 8  A.  Yes.

 9  Q.  You came to learn what was involved and who was involved.

10  A.  Correct.

11  Q.  And did you learn that KFC was involved in the scope of the

12  government's investigation?

13  A.  Yes, I did.

14  Q.  Did you come to learn that Chick-fil-A was involved in the

15  scope of the government's investigation?

16  A.  Yes, I did.

17  Q.  Popeye's?

18  A.  Yes.

19  Q.  And that your name was also involved in the course of this

20  investigation; is that right?

21  A.  In a manner of speaking, yes.

22  Q.  Certainly not having done any wrongdoing; rather, somebody

23  who has some information about the case.

24  A.  I believe it was listed as a co-op one, employee one or

25  something like that.

Michael Ledford - Cross

1    Q.   Okay.  Some of the biggest names in the QSR, chicken QSR

2    business or fast-food business involved in the case, fair?

3    A.   Fair.

4    Q.   So KFC was involved.  And you had worked at KFC or, more

5    accurately, RSCS.

6    A.   Yes.

7    Q.   CFA was involved and you had worked at CFA or Chick-fil-A.

8    A.   Yes.

9    Q.   Popeye's was involved.  And over the course of your career,

10   you also worked at Popeye's.

11   A.   Yes.

12   Q.   But, Mr. Ledford, by the time the Indictment was known in

13   June of 2020, you had not been interviewed by anyone at the

14   Department of Justice.

15   A.   That is correct.

16   Q.   Prior to the government's Indictment, you had never been

17   interviewed or even met Agent Taylor, for example.

18   A.   That is correct.

19   Q.   You had never met any one of these prosecutors.

20   A.   That's correct.

21   Q.   Or anyone else at the FBI.

22   A.   That's correct.

23   Q.   Or anyone else at the Department of Justice antitrust

24   division.

25   A.   That's right.

615

Michael Ledford - Cross

1   Q.  You weren't interviewed by anyone from the United States of

2   America until October of 2020.

3   A.  That's correct.

4   Q.  About four months after the government had handed down an

5   Indictment is the first time you were interviewed.

6   A.  Yes.

7   Q.  And following that October 2nd, 2020 interview from the

8   government, you were not interviewed by them again until almost

9   a year later.

10  A.  That's correct.

11  Q.  Last fall is the next time that you were interviewed.

12  A.  September, I believe.

13  Q.  Okay.  And fair to say, Mr. Ledford, that the government

14  has never interviewed you except for that October 2nd interview

15  unless they were preparing you for testimony.

16  A.  That is correct, yes, I believe so.

17  Q.  So they prepared you for testimony for a different hearing

18  that we had in September, and then they prepared you for

19  testimony last week and last night, right?

20  A.  That's correct.

21  Q.  And in that preparation for testimony, Mr. Torzilli

22  practiced his direct examination with you.

23  A.  Yes.

24  Q.  So these meetings with the Department of Justice was not

25  for the purpose of you teaching them about the chicken

Michael Ledford - Cross

1    industry.

2            *MR. TORZILLI:*  Objection, foundation.

3            *THE COURT:*  Overruled.

4    *A.*  I don't know that I could 100 percent speak to the purpose

5    of the preparation sessions.

6    *BY MR. BELLER:*

7    *Q.*  Well, did they ask you to teach them about the chicken

8    industry?

9    *A.*  No.

10   *Q.*  Did they ask you to teach them, hey, Mr. Ledford, can you

11   please just teach us the way negotiation works in this case?

12   *A.*  Teach them, no.  They never asked me -- they never used the

13   word teach.

14   *Q.*  Or asked you to teach them what happened during the 2012

15   negotiation process?

16   *A.*  Again, they have never used the word teach.

17   *Q.*  Because Mr. Torzilli already had his questions prepared

18   that he asked you today he asked you yesterday, for example.

19   *A.*  Some of them, yes.

20   *Q.*  Did he ask you to teach them about what it's like to work

21   on the supplier side of the business?

22   *A.*  No.  He did not ask me to teach them.

23   *Q.*  How about teaching them about being on the buyer side of

24   the business?

25   *A.*  He did not use the term teach, but certainly many of his

Michael Ledford - Cross

1    questions were around that subject.

2    Q.   Sure.  Similar questions to what he asked you today.

3    A.   Yes.

4    Q.   Okay.  Different than, say, an interview where somebody is

5    really wanting to understand your knowledge.

6    A.   I was not teaching, that's for sure.

7    Q.   How about teaching them the difference between small bird

8    versus big bird?

9    A.   No.

10   Q.   How about teaching them anything having to do with the 10

11   men that are sitting in this courtroom outside of the questions

12   they asked you today?

13   A.   No.

14   Q.   So let's go back, Mr. Ledford, to this October 2nd, 2020

15   interview the first time you have ever spoken to the

16   government, okay?

17   A.   Okay.

18   Q.   In that interview, Mr. Ledford, they asked you a lot about

19   different supplier communication; is that right?

20   A.   Yes.

21   Q.   And Mr. Torzilli spent some time today asking you about

22   whether suppliers should or should not be or disclose that they

23   were communicating.  Do you recall those questions?

24   A.   Yes.

25   Q.   And I believe your answer to the jury is that from your

Michael Ledford - Cross

1   perspective communication between suppliers could take some

2   leverage away from you as a buyer.

3   A.  It could, yes.

4   Q.  Because as the buyer, you want the leverage in

5   negotiations.

6   A.  Yes.

7   Q.  You prefer to have the leverage in negotiations.

8   A.  Yes.  I mean, both sides do.

9   Q.  Excuse me?

10  A.  I said yes, I think both sides prefer to have the leverage.

11  Q.  Right.  Anyone going into a negotiation, regardless of

12  which side of that negotiation, you hope you have the leverage;

13  fair?

14  A.  Right.

15  Q.  Mr. Torzilli asked you a little bit about volume, and I

16  want to ask you a little more about that.  Throughout your

17  tenure both with KFC as well as with Chick-fil-A, the suppliers

18  competed against each other for volume.

19  A.  Yes.

20  Q.  Volume meaning they wanted more business.

21  A.  Correct.

22  Q.  Volume meaning they wanted to sell more chicken.

23  A.  Correct.

24  Q.  And KFC only has a need for a certain number of chickens,

25  right?

Michael Ledford - Cross

1    A.   Yes.

2    Q.   So if suppliers are competing over volume, it means that

3    they are competing to steal business away from each other.

4    A.   Yes.

5    Q.   Pilgrim's may take volume from Tyson, for example?

6    A.   That's possible, yes.

7    Q.   Koch may take business or volume away from George's.

8    A.   That's possible.

9    Q.   Negotiating volume -- let me ask this a different way.

10   Understanding when the suppliers took volume from each other

11   during negotiation is something the government did not ask you

12   to teach them.

13   A.   No, they did not.

14   Q.   So when we are talking about the contracts, we're not just

15   talking about negotiating price of chicken, but we are also

16   talking about negotiating volume of chicken.

17   A.   Absolutely.

18   Q.   I am sorry?

19   A.   Absolutely.

20   Q.   Mr. Torzilli spoke about your background, so I am not going

21   to spend a lot of time on it, but I want to better understand

22   some of your experience.

23        You testified to the jury that you have worked both on

24   the buyer's side and you have also worked on the supplier's

25   side, right?

Michael Ledford - Cross

1   A.   Correct, yes.

2   Q.   The buyer's side meaning the person who is purchasing

3   chicken for restaurants and the supplier meaning the person who

4   is selling chicken to the restaurants.

5   A.   Yes.

6   Q.   So you started with Gold Kissed in the mid nineties.

7   A.   Yes.

8   Q.   And Gold Kissed is on the supplier side.

9   A.   Yes.

10   Q.   Or a simple way to put it, chicken grower side.

11   A.   Right.

12   Q.   And then after gaining experience with Gold Kissed, you

13   moved to Sea Board?

14   A.   That's correct.

15   Q.   Also on the supplier side.

16   A.   Yes.

17   Q.   And then after Sea Board you moved back to Gold Kissed?

18   A.   That's right.

19   Q.   And that's I think you told the jury when you became the

20   division sales manager.

21   A.   Yes.

22   Q.   You worked there until about 2007.

23   A.   Right.

24   Q.   And then you made the transition from the supplier side to

25   the buyer side.

Michael Ledford - Cross

1    A.   Yes.

2    Q.   And when you made the transition from the supplier side to

3    the buyer side, that was going to Popeye's?

4    A.   That's correct.

5    Q.   And if I say SMS, that's for our purposes a fancy way of

6    saying Popeye's; is that fair?

7    A.   That's correct.

8    Q.   So after spending time at Popeye's purchasing chicken, you

9    then take a position at RSCS, which is KFC/Yum Brands.

10   A.   That's correct.

11   Q.   And at RSCS you were the senior director of poultry

12   purchasing?

13   A.   Correct.

14   Q.   You were there until 2014?

15   A.   That's correct.

16   Q.   And then in May of 2014 you go to Chick-fil-A.

17   A.   Yes.

18   Q.   Which is where you are today.

19   A.   Yes.

20   Q.   Decades of experience in the broiler chicken industry; fair

21   to say?

22   A.   Yes.

23   Q.   Having worked for some of the biggest names in fast-food in

24   the United States.

25   A.   Yes.

Michael Ledford - Cross

1    *Q.*  Internationally or just the U.S.?

2    *A.*  Both.

3    *Q.*  You know the ins and outs of how the supply chain works.

4    *A.*  Yes, I do.

5    *Q.*  Humility aside, you probably know it better than the

6    majority of people in the industry.

7    *A.*  That's fair to say.

8    *Q.*  Your perspective or your experience was not called upon by

9    the United States of America when they were investigating this

10   case prior to charging the 10 men in this room, fair?

11   *A.*  Fair.

12   *Q.*  Your experience on the supplier side of the industry makes

13   you important to your current employer, Chick-fil-A.

14   *A.*  Yes.

15   *Q.*  And before that to RSCS or KFC/Yum.

16   *A.*  That's right.

17   *Q.*  You built relationships, Mr. Ledford, with those suppliers

18   of chicken while also working side by side with them.

19   *A.*  Yes.

20   *Q.*  You maintained those relationships even once you went on to

21   the buyer side of it.

22   *A.*  Yes.

23   *Q.*  And so it is these relationships as to why RSCS put you in

24   your role to negotiate for the purchase of chicken.

25        *MR. TORZILLI:*  Objection, foundation.

Michael Ledford - Cross

1           THE COURT:  Sustained.  If you could lay foundation.

2   *BY MR. BELLER:*

3   *Q.*  Do you know -- well, let's back up.  What was your role at

4   RSCS?

5   *A.*  My role at RSCS the majority of that time was senior --

6   director of poultry purchasing.  And the head -- the most

7   important thing that you're doing there is negotiating chicken

8   contracts.

9   *Q.*  So you think your experience working in the chicken

10  industry qualified you to be able to purchase poultry for

11  KFC/Yum.

12  *A.*  Yes.

13  *Q.*  You were negotiating major contracts.

14  *A.*  Yes.

15  *Q.*  I think you said to the jury on direct examination about

16  700 million to a billion pounds of chicken.

17  *A.*  Correct.

18  *Q.*  And that's annually; is that right?

19  *A.*  Yes, that's annually.

20  *Q.*  Now, you also have experience with a cost-plus model that

21  you explained to Mr. Torzilli.

22  *A.*  Yes.

23  *Q.*  You are familiar with the industry costs or specific costs

24  for what it takes to, say, grow a chicken.

25  *A.*  Yes.

624

Michael Ledford - Cross

1    Q.   Or to run a chicken plant.

2    A.   Yes.

3    Q.   What the overhead may be.

4    A.   Correct.

5    Q.   You know how much it costs to feed a chicken.

6    A.   Yes.

7    Q.   To pay the workers involved in that process.

8    A.   Yes.

9    Q.   And eventually to transport that chicken.  You are aware of

10   that cost as well?

11   A.   Correct.

12   Q.   So you had testified, and I want to understand that you

13   were prepared to push back on these suppliers if you saw any of

14   the costs that were out of line with your experience as a

15   supplier.

16   A.   Yes.  I would say, though, that's two parts, not just out

17   of line with my experience as a supplier, but also out of line

18   with the competitive landscape from the other bids that we were

19   receiving.

20   Q.   With each other.

21   A.   Yes.

22   Q.   If there is an outlier, you would recognize that there is

23   an outlier on one of these costs.

24   A.   Yes.

25   Q.   So the cost-plus model that we're talking about, really

Michael Ledford - Cross

1    it's a spreadsheet that is given to each one of the suppliers

2    who are competing for volume and price for your business.

3    A.   Yes.

4    Q.   It includes categories for costs and expenses.

5    A.   Correct.

6    Q.   So you e-mail it, as I understand it, to the suppliers.

7    The suppliers then fill it out with their costs and expenses

8    and e-mail it back to you.

9    A.   That's correct.

10   Q.   And when they e-mail it back to you, that's for the next

11   contract period.

12   A.   Right.

13   Q.   Whether that's a year or I suppose in some circumstances it

14   can be three.

15   A.   In my time there it was only annually.

16   Q.   In the 2013/2014 contract, it's just the one-year term.

17   A.   Yes.

18   Q.   So this cost-plus model, Mr. Ledford, includes things like

19   chick cost, right?

20   A.   Yes.

21   Q.   Chick cost is how much it costs to lay, incubate and hatch

22   a chick?

23   A.   Right.

24   Q.   There is a very specific cost that is incurred and tracked

25   by a chicken grower for that item.

Michael Ledford - Cross

1    A.   Correct.

2    Q.   Another cost is corn to feed the chickens.

3    A.   Right.

4    Q.   Soybean meal to feed the chickens.

5    A.   Yes.

6    Q.   Housing to feed -- let me try that one again.  Housing to

7    house the chickens.

8    A.   Yes.

9    Q.   It costs money to grow these chickens and support them,

10   fair?

11   A.   Fair.

12   Q.   So the chickens, Mr. Ledford, for the jury's understanding,

13   are grown in these huge long chicken houses.

14   A.   Right.

15   Q.   Is it fair to call it a broiler house?

16   A.   Yes.

17   Q.   In the broiler house the chickens are free to run around?

18   A.   That's correct.

19   Q.   They are not caged?

20   A.   They are not caged, no.

21   Q.   They have bedding that they walk on.

22   A.   They do.

23   Q.   There are fans to keep them cool in the summers to run air

24   through that house.

25   A.   That's right.

Michael Ledford - Cross

1    *Q.* There are cool cells for cooling in the hot southern

2    summer, for example.

3    *A.* Yes.

4    *Q.* That's called tunnel ventilation, the fan and the cooling

5    cells?

6    *A.* Yup.

7    *Q.* Heaters to keep them warm in the winter.

8         *MR. TORZILLI:* Objection. May we have a side bar?

9         *THE COURT:* Yes.

10        (At the bench:)

11        *THE COURT:* Mr. Torzilli?

12        *MR. TORZILLI:* I object to this line of questioning on

13   relevance grounds and it's outside the scope of his direct.

14   The intricacies of broiler houses and how the chickens are fed

15   and how they live I think is far beyond anything that was

16   covered in direct, and frankly isn't relevant to the elements

17   of the charged offense.

18        *THE COURT:* I am going to overrule the objection. I

19   think that it is within the scope. Mr. Ledford had testified

20   about his knowledge of the different components. Moreover, I

21   think that this type of background will be extremely helpful to

22   the jury and may, in fact, disabuse them of certain stereotypes

23   that they may have. The fact that the process that Mr. Ledford

24   is describing is the one that is relevant to this case and he

25   factored into the components of analyzing bids I think is

628

Michael Ledford - Cross

1    directly relevant.

2              Thank you.

3         (In open court:)

4    *BY MR. BELLER:*

5    *Q.*  All of these things we are discussing is part of the

6    cost-plus model.

7    *A.*  That's correct.

8    *Q.*  So continuing with what's in the cost-plus model, there are

9    expenses for heaters to warm the broiler house in the winter to

10   keep the chickens warm enough.

11   *A.*  Yes.

12   *Q.*  Lights so that the chickens can see.

13   *A.*  Yes.

14   *Q.*  There is a constant supply of water for the chickens.

15   *A.*  Correct.

16   *Q.*  The supplier has to pay a chicken grower or a chicken

17   farmer to go and check on the broiler chickens multiple times a

18   day.

19   *A.*  They don't do it multiple times a day at the same farm, but

20   they are doing that multiple times a day, yes.

21   *Q.*  There is a cost again associated with all of this.

22   *A.*  Correct.

23   *Q.*  Now, to understand, this is also -- I think I asked this,

24   but all of these things are in that cost-plus model that you

25   were explaining to the jury earlier.

Michael Ledford - Cross

1    A.   That's right.

2    Q.   The government never asked you any of these questions

3    regarding the life of the chicken or the growing of the

4    chicken.

5    A.   No, they have not.

6    Q.   How about asking you to take them on a tour of the broiler

7    house, is that something the government ever asked you to do?

8    A.   No, they have not.

9    Q.   Let's talk about processing of the chickens.  And I am

10   going to keep this high level for obvious reasons, okay?

11            It costs money to process the chickens.

12   A.   Yes.

13   Q.   All the chickens have to be gathered up from a chicken

14   house and transported to a plant for processing.

15   A.   Yes.

16   Q.   There is a cost associated with that?

17   A.   That's right.

18   Q.   Preparing them in the plant to be processed and packaged

19   and sen to KFC restaurants, there is a cost for that.

20   A.   Yes.

21   Q.   Now, in the case of Chick-fil-A or CFA, there is a further

22   cost which is the deboning of the chicken as well, right?

23   A.   That's right.

24   Q.   The processing also has labor expenses.

25   A.   Yes.

Michael Ledford - Cross

1    *Q.*  Has packaging expenses.

2    *A.*  Yes.

3    *Q.*  Transport expenses.

4    *A.*  That's right.

5    *Q.*  The government never asked you to explain any of that to

6    them either, right?

7    *A.*  No, they did not.

8    *Q.*  So we said that the government did not ask you to take them

9    on a tour of a broiler house.  How about asking you to take

10   them on a tour of a plant to understand the industry, did they

11   ever do that?

12   *A.*  No, they did not.

13   *Q.*  Now, Mr. Torzilli also asked you about another cost that's

14   on that cost-plus model and that one is margin.  Do you recall

15   that?

16   *A.*  Yes, I do.

17   *Q.*  Margin for the supplier.

18   *A.*  Correct.

19   *Q.*  So the suppliers fill out the model and they send it back

20   to you with all of these different numbers contained.  And you

21   review it and that is what you give them feedback for.

22   *A.*  That's correct.

23   *Q.*  Some suppliers, Mr. Ledford, it's fair to say are very

24   exact about the cost-plus model reflecting their actual costs.

25   *A.*  That's true, yes.

Michael Ledford - Cross

1   Q.  Others perhaps not quite as vigilant about making sure that
2   their actual costs are reflected in that model.
3   A.  That's also correct.
4   Q.  So we are talking about you giving feedback to the
5   suppliers regarding all of these different expenses.  And I
6   believe you said in your example, hey, you're 4 percent too
7   high, right?
8   A.  Right.
9   Q.  So you will often say you're 4 percent too high or you are
10  4 percent higher than the next competitive bid.
11  A.  That's correct.
12  Q.  And sometimes you actually go through the cost-plus model
13  and you say, hey, for example, your chick cost is too high.
14  Pull your chick cost down.
15  A.  Yes.
16  Q.  Mr. Ledford, you don't actually know what the suppliers'
17  actual chick cost is.
18  A.  I do not look at invoices, no.
19  Q.  But you're looking at a cost-plus model, and you're
20  recognizing that perhaps somebody's chick cost is higher than
21  all of their competitors.
22  A.  Exactly.
23  Q.  And so your feedback may very well be you need to pull your
24  chick cost down.
25  A.  Right.

Michael Ledford - Cross

1    Q.   And I am using chick cost as an example.  It may be you

2    need to pull your labor down.

3    A.   Well, I believe the feedback would not be more of me

4    directly telling them you need to pull your labor down or you

5    need to pull your chick cost down.  It would look more like

6    you're X cents off from competitive.  When I look at your

7    model, here are the areas where it seems like you're higher,

8    like chick cost or labor, grow-out expense, whatever.  I would

9    point out to them the points of differentiation within their

10   model that stood out to me across the other ones.

11   Q.   And I appreciate that explanation.  You may say you are X

12   percentage away from a competitive bid and, boy, it looks like

13   your labor cost is high compared to your competitors.

14   A.   Exactly.

15   Q.   Again, and while you are giving that feedback and saying it

16   looks like your labor cost is high compared to your

17   competitors, you don't actually know that any of these

18   suppliers' labor cost is.

19   A.   During that time period, no, I did not know exactly what

20   their labor cost was.

21   Q.   Because certainly labor in Claxton, Georgia can be

22   different than labor in downtown Denver, for example.

23   A.   It's very different.

24   Q.   Now, it's fair, Mr. Ledford, that some suppliers get to

25   their bottom line price by adding up all of these different

Michael Ledford - Cross

1    expenses and that shoots out that bottom line price, right?

2    A.   Yes.

3    Q.   Others may start at the bottom line price and then backfill

4    it up and sort of fill in all the different cost-plus pieces.

5    A.   That's certainly possible, yes.

6    Q.   So when Mr. Torzilli asked you about margin, margin is not

7    necessarily profit.

8    A.   Correct.  And I believe like earlier, that's why I called

9    it their theoretical margin.

10   Q.   You said, well, yeah, it's margin, I suppose,

11   theoretically.

12   A.   Right.

13   Q.   And that's because suppliers can change these numbers

14   within their cost model if they need to in order to arrive at

15   the price that you've directed.

16   A.   Correct.

17   Q.   So despite whatever their chick cost is, they can choose to

18   pull down their chick cost regardless of the actual expense or

19   they can choose to pull down a margin, for example, just so

20   long as they get to that bottom line number.

21   A.   Yes.  I wasn't as concerned on where exactly they -- if

22   they reacted to the feedback as long as they reacted to the

23   feedback.

24   Q.   And so it would be fair to say, Mr. Ledford, that comparing

25   margin from one supplier's cost-plus model to another

Michael Ledford - Cross

1   supplier's cost-plus model may not be a completely accurate

2   comparison of what the true margin is.

3   A.   That's correct.

4   Q.   You, Mr. Ledford, have historic pricing.  If it's an

5   incumbent supplier as you've called them, you have historic

6   pricing for this incumbent supplier.

7   A.   Right.

8   Q.   So by that what I mean is you can actually look at the

9   cost-plus model for Claxton Poultry for 2007, compare it to

10  2009, compare it to 2010, and see how all of their different

11  costs have changed.

12  A.   Yes.

13  Q.   And I think that you said this, but you can always put all

14  of the different cost models in front of you from different

15  suppliers and recognize where somebody may be off on one of

16  their costs or one of their expenses.

17  A.   That's right.

18  Q.   And that also allows you to be able to look at this and see

19  where somebody's cost has really gone up or if you're

20  negotiating down to see maybe where somebody's cost or expenses

21  have come down.

22  A.   Exactly.

23  Q.   From year to year and supplier to supplier.

24  A.   Yes.

25  Q.   The government has never asked you these questions either;

Michael Ledford - Cross

1   is that fair?

2   A.  They have not asked me those specific questions, no.

3   Q.  So when suppliers are filling out their cost-plus model,

4   they are also choosing which products they want to -- they hope

5   to supply KFC with.

6   A.  Yes.

7   Q.  Now, for our purposes we've been speaking mostly about

8   chicken on the bone, right?

9   A.  Right.

10  Q.  Or COB or FOB?

11  A.  Right.

12  Q.  A little bit different, but for our purposes more or less

13  the same?

14  A.  Right.  Well, hang on.  You just said FOB.  I don't think

15  you meant to say FOB.

16  Q.  I didn't mean to say FOB.  FOB is freight onboard?

17  A.  Right.

18  Q.  Let's stick with COB or eight-piece.

19  A.  Yes, that's correct.

20  Q.  Another product that KFC sells are tenders.

21  A.  Yes.

22  Q.  And so one supplier may choose to only bid on eight-piece.

23  Another supplier may choose to bid on both eight-piece and

24  tenders, for example.

25  A.  That's right.

Michael Ledford - Cross

1  Q.  So these are different suppliers bidding on different

2  products.

3  A.  Yes.

4  Q.  With some overlap to be fair.

5  A.  Right.

6  Q.  Okay.  Popcorn chicken I think you mentioned on direct

7  examination.

8  A.  Yes.

9  Q.  And also bidding on dark meat.

10  A.  Right.

11  Q.  So do I understand properly that not every supplier

12  supplies KFC with every product?

13  A.  That's correct.

14  Q.  So RSCS or KFC, as I am using the terms interchangeably, is

15  the one who really develops this cost-plus matrix or model that

16  then gets sent to the suppliers.

17  A.  Yes.  We certainly sort of standardized it or tried to so

18  that it was apples to apples across.  But I think in its

19  inception when it started in the mid 2000s, there were models

20  that were helped developed by the suppliers initially.  And

21  then RSCS or UFPC or KFC kind of went with a version and said

22  this is going to be our standard version and this is how we're

23  going to account for everything.

24  Q.  And they did that so that truly they could streamline it to

25  identify are we getting the same information from all the

1    suppliers to be able to, as you said, compare apples to apples.

2    A.  Correct.

3    Q.  And this is what was done in 2012 for the 2013 contract,

4    and this is also what was done in 2013 for the 2014 contract.

5    A.  Yes.

6    Q.  And you had the opportunity to review everybody's bid

7    submissions to be able to compare cost-plus models from

8    supplier to supplier.

9    A.  That's right.

10   Q.  For both years.

11   A.  Yes.

12        THE COURT:  Mr. Beller, could you look for a

13   convenient breaking time?

14        MR. BELLER:  This is a great breaking point.  Thank

15   you, Your Honor.

16        THE COURT:  Excellent.  Ladies and gentlemen, we will

17   go ahead and recess for the day, then.  Keep the admonitions in

18   mind.  Make sure you don't look up information.  With each

19   passing day of the trial you hear more and more, but don't you

20   try to look up any information.  All the information that

21   you'll need for the case has to come from the trial itself, all

22   right?  I hope you have a good evening.  We will reconvene

23   tomorrow, 8:30.  The jury is excused.

24        (Jury excused.)

25        Mr. Ledford, you are excused for the day.  Thank you

638

1    very much.

2           All right.  What I would propose is that we take 10

3    minutes, why don't we do that, and then we'll talk about some

4    things.  I will suggest, but we'll talk about it when we come

5    back, that we take up some of the -- maybe take up the Pepper

6    motion first.  We won't necessarily resolve that, but there may

7    be some things to think about overnight.  And then after that

8    we go into the summary exhibits and work through those.  I

9    don't know if there is particular urgency for tomorrow's

10   purposes, but on the other hand, we need to get that done at

11   some point anyway, so putting in a little bit of time this

12   evening probably makes sense, all right?

13          So we will be in recess until 10 minutes after 5:00.

14   Thank you.

15        (Recess at 5:02 p.m.)

16        (Reconvened at 5:15 p.m.)

17          THE COURT:  We are back on the record in 20-CR-152.

18   The jury is not present.  First of all, why don't we go ahead

19   and take up Docket No. 1105.  This is defendants' motion *in*

20   *limine* regarding evidence of Carl Pepper's employment status

21   with Tyson Foods.

22          Ms. Prewitt?

23          MS. PREWITT:  Thank you, Your Honor.

24          I must confess that I actually didn't think this was a

25   controversial ask when I first tried to confer with the

639

1    government on the issue.  Mr. Pepper, as I understand it,

2    retired -- or was retired functionally from Tyson just three

3    months ago and made the request of the government that they not

4    elicit that from him so to avoid a false inference being raised

5    with the jury.  And that request we just were never able to

6    confirm.  My attempts were rebuffed and I still don't actually

7    really understand or know what the government's position is as

8    to, one, relevance and how they believe that any prejudicial

9    impact is not outweighed by that.

10            THE COURT:  Why don't we find out.  Let's have the

11   government respond.  And then obviously, Ms. Prewitt, I will

12   give you a chance to reply to that.

13            Mr. Koenig, go ahead.

14            MR. KOENIG:  Sure.  Thank you, Your Honor.  Well,

15   first of all, it is relevant, relevant background.  It's

16   also -- you know, he has since taken on some other roles in the

17   industry, so, you know, it does help to establish his

18   credibility that he is, you know, still in the industry and

19   still knows this stuff and that people are still willing to

20   hire him for stuff and that his knowledge is not somehow --

21            THE COURT:  What if he doesn't indicate any failure of

22   knowledge?  What if he doesn't say things like, oh, boy, that

23   was so long ago, I don't know.

24            MR. KOENIG:  I couldn't understand the question.

25            THE COURT:  My question is how do we know that he has

640

1  to be warmed up in terms of his recollection of what he did at

2  Tyson because he is still in the business?

3       MR. KOENIG:  Well, I guess I don't know that he has to

4  be.  But, you know, it's odd to me that we can't ask a simple

5  question about:  Where did you work?  Do you still work there?

6  No.

7       THE COURT:  Well, Ms. Prewitt, she is concerned --

8  it's unusual circumstances, but what she is worried about is

9  that the jury, even if no one specifically asked him about it,

10 but the jury might say, hum, so he didn't say these magic words

11 or however it would be characterized until he was no longer a

12 Tyson employee and now he is doing it.  So it's not that he

13 didn't want to before, but now he feels at liberty to tell the

14 truth or something of that nature.

15       MR. KOENIG:  I understand the logic of it.  I just

16 think it's quite attenuated.  It's not like we're going to

17 dwell on it or anything.  It's one question or two.  I mean,

18 and the other side of it is that, you know, I think the issues

19 that Ms. Prewitt claims that she will have to raise are quite

20 thorny, and so I just don't think that it's really worth

21 excluding his testimony on that.

22       But I don't know.  It just -- it's just odd to me that

23 we can't ask a simple background question that really has no

24 realistic chance of being unfairly prejudicial.  And, you know,

25 when a person retires, you know, people assume that they are

641

1    out of the business and so forth and now he is consulting.  And

2    the fact that people are hiring him to consult on logistical

3    stuff that he always had done, it's more like he has moved on

4    and he is still in the industry.

5          THE COURT:  Let's talk about this just so I get a

6    better appreciation for how some of these immunity or leniency

7    issues could come up.  So with Mr. Bryant what we did is we

8    took some language that we kind of -- I can't remember exactly

9    whether it was part of a general agreement, but that we kind of

10   particularized it to Mr. Bryant.  Will we be having that type

11   of an issue with Mr. Pepper?  In other words, do people

12   contemplate asking him about a letter agreement or things of

13   that nature?

14         MR. KOENIG:  Well -- so you would say the letter

15   agreement with Tyson.

16         THE COURT:  I don't know.  I just don't know.  I am

17   just trying to anticipate whether some type of Tyson document

18   would -- that has to do with leniency or something like that

19   could potentially be used with Mr. Pepper.  And I don't know if

20   the government would do it, but Ms. Prewitt is ready to answer

21   that question too, but I am just trying to look forward.

22         MR. KOENIG:  Any such document if it exists would not

23   be something he would have any knowledge about.

24         THE COURT:  Okay.  He wouldn't know about it and

25   that's -- you don't contemplate --

642

1          MR. KOENIG:  He may know it exists in some theoretical

2     sense, but not anything he has ever seen or anything like that.

3          THE COURT:  I think there was some reference in the

4     defendants' brief, in the motion, that he was advised of

5     something in his very first interview that he fell within the

6     terms of that agreement?

7          MR. KOENIG:  Well, so I feel like if we go down this

8     road, it really shouldn't be in a public courtroom.  It more

9     should be at least at side bar given -- as a policy matter, we

10    do hold these things very close.  And I think we are kind of

11    getting to the line where I am not quite comfortable answering.

12    Of course I will answer anything Your Honor asks, but it's just

13    something I am trying to be sensitive to.

14         THE COURT:  Has the government -- just to see if the

15    government has been consistent on that, have any pleadings that

16    you filed about that topic been placed under restriction?

17         MR. KOENIG:  Yes, oh, yes.

18         THE COURT:  All right.  Any objection to going side

19    bar on that?

20         MS. PREWITT:  Your Honor, I will say that Tyson has

21    already disclosed that it is a leniency applicant.  So this is

22    all very much in the public forum because it was part of a

23    press release.  So I don't understand the need to go -- we can

24    go side bar if Your Honor wishes, but this all has been

25    discussed.  Mr. Pepper's status has been discussed in open

643

1    court and it was very much part of, you know, the public

2    record, Your Honor.

3           THE COURT:  Mr. Koenig?

4           MR. KOENIG:  That fact may be in a Tyson press

5    release, but there is a lot more to it.  And, you know, that

6    doesn't mean just because Tyson Foods says they're a leniency

7    applicant in a press release doesn't mean all the other details

8    are therefore --

9           THE COURT:  Understood.  Let's hear from Ms. Prewitt

10   because I kind of got off on that little detour.  And maybe we

11   don't need to get off on that detour for purposes of addressing

12   the motion.

13          MS. PREWITT:  Thank you, Your Honor.  I think in terms

14   of dealing with Mr. Pepper on the stand, I don't see that I

15   would have an intention, I don't anticipate others would have

16   an intention to specifically refer to the Tyson leniency

17   letter.

18          THE COURT:  In fact, you would have the incentive not

19   to by virtue of the motion.

20          MS. PREWITT:  He was a candidate to receive

21   non-prosecution protection for a period of time.  Then he no

22   longer became a candidate because the government was

23   dissatisfied.  I think that has been borne out and I think

24   that's no surprise that this would be an area of inquiry.  He

25   later entered into an actual formal non-prosecution agreement

1    later.  That was entered into in February.  And so that would

2    be the same basis as Mr. Bryant, Your Honor.

3         THE COURT:  So if you ask him questions, Mr. Pepper

4    questions about those early interviews or the first 13 or

5    whatever, to what extent would you refer to the Tyson leniency

6    program?

7         MS. PREWITT:  Look, I am hoping we can resolve this

8    issue regarding his employment status so we don't actually have

9    to reference the Tyson leniency program, Your Honor.  Because

10   we are just concerned about the inference that would be raised

11   by mentioning that like three months ago he left Tyson as

12   opposed to asking a leading question that would avoid delving

13   into the fact that he left.

14        THE COURT:  Let's assume that I granted Docket No.

15   1105, would you anticipate on behalf of Mr. Mulrenin asking him

16   questions about him being part of the leniency program?

17        MS. PREWITT:  I wouldn't have any plans to refer to

18   the leniency program per se.  I would look to inquire about his

19   expectation that he was a person in line himself for receiving

20   immunity benefits.  I don't think I need to actually bring in

21   Tyson's leniency application into that, just that he had an

22   expectation that he was on track to receive non-prosecution

23   benefits and he can respond to that as he will.

24        THE COURT:  Okay.  Let me hear from Mr. Gillen real

25   quick, and then, Mr. Koenig, I will go back to you.

1          MR. GILLEN:  Your Honor, this is the chronology.  We

2    have the series of interviews with Pepper that go on and on and

3    on.  Now, at the same time we have the Tyson leniency issues

4    that have been discussed.  The hope of Mr. Pepper is that he

5    will then -- he is going to then be protected from prosecution

6    and because he wants to -- he wants the government to like him

7    and so he wants to have the interview so that he is going to

8    get the deal of a non-prosecution.

9          THE COURT:  Has he stated that or is that your theory?

10         MR. GILLEN:  Well, it's my theory.  And I will read to

11   the Court the -- excuse me, I'll get the letter that was sent

12   to us.  Where is the letter?  Let me run back and see if we

13   have the letter.  It's on Page 15 of the letter that the

14   government wrote us on September the 29th, 2021.  What it talks

15   about -- it's a letter.  And what it talks about, it talks

16   about the time in which Tyson is making a presentation to the

17   government.  This is after Mr. Pepper has had his last

18   interview for 2021 which occurred on June the 24th.

19         What occurred then is we have a situation in which we

20   have -- yeah, thank you.  Thank you so much.  I was right,

21   Page 15 of the September 29th letter of 2021 the government

22   wrote to us.  They know, they know what they wrote to us and to

23   suggest that this wasn't in Pepper's mind is disturbing.  But

24   counsel for Tyson -- which gets into the Mr. Oakes issue which

25   we don't want to digress into now, but this is relevant to this

646

1    as well -- informed DOJ that counsel understood Carl Pepper's

2    description of his state of mind, the time the conspiracy as

3    follows, the customers would think that his state of mind he

4    was engaging in was unfair, but he did not want them to know

5    what he was doing, and the company's competition would be

6    disappointed in the conduct.

7         Counsel informed DOJ that when Pepper heard he was

8    going to be carved out, he wept.  And that Pepper believes he

9    has disappointed everyone and that the message he internalized

10   that the government doesn't believe him was a difficult one.

11   That's what was in Mr. Pepper's mind when he learned that it

12   wasn't good enough what he had told the government in his many

13   interviews from September of 2019 all the way to June 14th,

14   2021.  And then he received the bad news.  You're not going to

15   be -- you are going to be carved out.  And he wept.  And then

16   he said -- he internalized it because he felt badly that the

17   government didn't believe him.

18        So that's a breaking point with Mr. Pepper.  So what

19   happens after that is then Mr. Pepper -- we have the trial.

20   There is no Mr. Pepper.  Suddenly we have a revival for him in

21   January of 2022 when Mr. Pepper is contacted apparently by the

22   government and they want to sort of revisit this issue.  And

23   suddenly we have him saying all these things and he is having

24   epiphanies here and epiphanies there about in our view saying

25   things that he had not said in detail and using terms that he

647

1    had not used before.  So that's what we are trying to show to

2    the jury.  That's exactly it.

3              But the key thing here is we are not going to be -- we

4    don't need to get into the Tyson leniency issues to deal with

5    this issue, but we do need to get in Mr. Pepper's understanding

6    that he wasn't going to get the government protection he so

7    desperately sought and he cried.  And he thought that the

8    government had -- didn't believe him.

9              THE COURT:  Yeah, my question is that in terms of the

10   practicalities, obviously the term "carve out" would be a bad

11   one because it would suggest that he was part of some larger

12   agreement.  Would there be an attempt like we did with

13   Mr. Bryant to not suggest that Mr. Pepper, you know, had -- was

14   merely a part of some agreement with Tyson, but rather somehow

15   had his own agreement or own understanding or something of that

16   nature so that we can avoid that problem?

17             MR. GILLEN:  Which is precisely what I would like to

18   do.  What I would like to do is to ask Mr. Pepper without

19   getting into the Tyson leniency that isn't it a fact in the

20   summer of 2021, that he was asked -- that he was told that the

21   certain protections that he had been seeking from the

22   government were not going to be available to him and then he

23   wept.

24             THE COURT:  But was he actually seeking or did he just

25   happen to have by virtue of being a Tyson employee?

 1           MR. GILLEN:  Well, the cross-examination would be, you

 2    know, why is he going in and continuing to give these

 3    interviews unless he is seeking what he hopes to get, which is

 4    not to be out here with these other gentlemen indicted by the

 5    Department of Justice.  And that is why he wept.  And that is

 6    why he said, I feel internally that they just don't trust me,

 7    whatever the word is there, they don't believe me or trust me.

 8    That is critical to understanding the evolution of Carl Pepper

 9    because that's what Carl Pepper did.

10           And then our view of it is different than the

11    government's, but the reality of the situation is that is what

12    happened last summer when he learned about -- that he wasn't

13    going to get what he hoped for in terms of a coverage or

14    protection that would not allow him to be out here -- that

15    would allow him not to be out here with these other gentlemen.

16           THE COURT:  Right.  So my premise is that it would

17    be -- No. 1, I agree with the motion that I do not want the

18    Tyson leniency agreement or anything related to it to come in.

19    I think it's highly prejudicial.  My premise is that we should

20    figure out a way to phrase things with Mr. Pepper carefully so

21    that we don't imply that he sought leniency, because I am

22    assuming he didn't, but I can be corrected if I'm wrong.  He

23    may have had an expectation at the time he interviewed that

24    what he said was not going to be used against him, and I know

25    that the government has a view as to exactly what was available

1    to him or what his expectation would have been.

2         I just, you know, don't want to have terms like "carve

3    out," other things come up because that would imply that there

4    was some more generally applicable --

5         MR. GILLEN:  I can work with the language.  The key

6    thing here, Your Honor, is what the Tyson attorney told the

7    government and they wrote it down and they sent it to us.  He

8    wept because he internalized it and he believed that the DOJ

9    didn't believe him.  And then suddenly now he has reemerged.

10        THE COURT:  Sounds like fair game.  Let's here from

11   Mr. Koenig.

12        MR. KOENIG:  Well, it sounds like, you know, there may

13   be a path here to along the lines Your Honor is suggesting, but

14   I do think it still is relevant.  If it is, in fact, the truth

15   that we're after, and it is, that the fact that he retired is

16   also another -- I mean, that's the premise of the whole motion,

17   right, and I don't even know which way it cuts.

18        But what I am saying is that fact of retirement is

19   also a moment that can change a person's outlook.  But I guess

20   what I am saying is that, you know, they want this fact out

21   because it messes with their narrative, okay?  So I think if it

22   comes down to it, I think our preference would be to have

23   something along the lines of what Your Honor suggested, which

24   is, you know, you had -- in some vague way you had some

25   expectation and then it didn't come through.

650

1          THE COURT:  Well, here is the deal.  I am going to

2     grant the defendants' motion because I haven't heard anything

3     from the government as to why the fact that he is retired now

4     is important to the government in any way.  Normally, of

5     course, the fact that you're retired would be.  Why not?  But

6     in this case I think that were it to be used as some

7     explanation for why he has changed his tune or something to

8     that effect, it could potentially be substantially more

9     prejudicial than the probative value of it.  And the probative

10    value seems to be virtually nothing.

11          However, now we are back to our -- my other point,

12    which is that I think that we have to be real careful with

13    questioning Mr. Pepper so that there is not an implication that

14    he is the beneficiary of some Tyson-wide agreement, and that's

15    why I am trying to figure out if there is a way that we can do

16    that.  For instance, I am just thinking off the top of my head,

17    but, you know, if he were asked, for instance, okay, when you

18    show up at your first interview with the government, did you

19    have an expectation as to the fact that anything you said could

20    not be used against you in a subsequent prosecution or

21    whatever.

22          MR. KOENIG:  That's different.

23          THE COURT:  Okay, sorry, but use some type of

24    questioning like that because perhaps he had some expectation

25    about that so that we don't have to go into some broader

1    agreement.

2         MR. KOENIG:  Okay.  Well, just so you know, Your

3    Honor, Ms. Sweeney will be handling the direct examination.  So

4    if there is details here, she is more on the subject.  But I

5    would maybe suggest that there be some more leeway to lead him

6    in questioning around the issue.

7         THE COURT:  I think that's a good way typically to

8    tight rope walk.

9         Mr. Fagg?

10        MR. FAGG:  Just on that point, I want to make sure we

11   don't get too narrow.  My understanding is that Mr. Pepper's

12   expectation during the course of all that is that he would not

13   be prosecuted.  It's much more than just like a queen for a day

14   that the information wouldn't be used against him.  It was the

15   expectation that he wouldn't be prosecuted until he learned

16   about it in the meeting that Mr. Gillen was talking about.

17        THE COURT:  Okay.  Assuming that's true, assuming

18   there is a reasonable basis to confront him with that, that

19   sounds fine.

20        MS. PREWITT:  Just one point.  I think one really

21   important feature of the leniency program, Your Honor, is it

22   functionally takes discretion away from the Department of

23   Justice when you go in as part of a leniency application on

24   behalf of an employer as long as the -- you confess and the

25   prosecutor thinks that you are being cooperative and truthful.

1    It's more or less on automatic as part of the company's

2    confession.

3         So it's not like going into a interview scenario where

4    there is no expectation.  It's more akin to the understanding

5    that you come in for queen for a day with the expectation that

6    you are a candidate for a non-pros agreement where that ground

7    has already been laid and you are coming into the room with the

8    expectation that that is the likely course that you will be

9    immunized functionally.  So it is really quite different than

10   many other scenarios, Your Honor.  And that really goes

11   straight to his expectation in terms of what he said to the

12   government and what the incentives were for him to fully

13   confess because the confession is what sets you free.  That

14   confession if you cooperate is what leads you to immunity

15   without the discretion of the individual prosecutors playing

16   into it.

17        THE COURT:  Let's hear from Mr. Koenig real briefly on

18   that point.

19        MR. KOENIG:  I think Ms. Prewitt respectfully speaks a

20   little too simplistically about leniency in the sense that

21   there is multiple kinds.  I am not saying -- but it's not

22   always an automatic thing.  And, you know, so I guess that's my

23   only real point is I don't think that should carry much weight.

24        MR. GILLEN:  The key thing here is during the

25   interviews, of course, it's the traditional, gee, we're not

1    going to use your words against you.  We're evaluating.  And

2    that's kind of the way they would do it.  That's not the key

3    point here.  That's the way information is communicated when

4    someone is hoping something good will happen to them.  It's his

5    expectation and his hope.  Hope is what this is about.  He

6    didn't want to be indicted and that was his hope.

7            And here we get from the government what happened when

8    he was told and, to my knowledge, the only Tyson employee that

9    was carved out.  I believe he is the only one.  Correct me.

10   They can correct me if I'm wrong.  But he gets carved out.  And

11   suddenly his hope is stashed and he wept.  And that's what we

12   want to get in to -- to illustrate to the jury that something

13   happened to this man last summer.  And now suddenly after a

14   blizzard of interviews in January and February, we are going to

15   see a new and improved or government interview and created Carl

16   Pepper tomorrow.  So that's all we want to do.  And we don't

17   want to get into the Tyson leniency.

18           So verbiage is important.  I don't mind if the

19   government leads him around a little bit, but making sure that

20   they are not diminishing the real thrust of what has happened

21   in terms of his motives and how he reacted when he knew that

22   they were not -- they didn't believe him.

23           *THE COURT:*  Okay.  Yeah.  And I don't have any problem

24   with what Mr. Gillen said.  You know, I don't know if

25   Mr. Pepper's attorney is here, but it could also involve, you

654

1    know, a question of Mr. Pepper expounding more broadly on the

2    leniency program, which once again would be problematic, but

3    nothing that Mr. Gillen said seems like an out-of-bounds thing.

4          Once again, I am just trying to urge people to try to

5    be really careful with this area of inquiry because I would

6    like to -- you know, I think if we focused it on Mr. Pepper's

7    expectations, that sounds like a good way to do it as long as

8    the answer doesn't be, well, you know, I had to do it as part

9    of the company or things of that nature and all of the sudden

10   we are off into the areas that are potentially greatly

11   prejudicial.

12          MR. GILLEN:  And hopefully, Your Honor, the government

13   will so instruct their witness that he is not to get into this

14   area at all because we are not going to be asking him questions

15   which would be drawing him in that direction.

16          THE COURT:  And I trust the government is obviously

17   going to do that and have that conversation with Mr. Pepper's

18   lawyers.

19          MR. GILLEN:  Thank you, Your Honor.

20          THE COURT:  Ms. Call?

21          MS. CALL:  Would you like to go into the summaries

22   now?

23          THE COURT:  I think we should for a whopping 19

24   minutes.

25          MS. CALL:  Everyone's favorite topic, I know.

1          THE COURT:  No, our favorite topic is Exhibit 1030,

2    but I think maybe we are not going to be talking about that all

3    that much more, but we'll see.

4          MS. CALL:  I think that one has been put to bed.

5          So I realize this is defendants' motion, but very

6    briefly, you know, in reading this, we have as a courtesy been

7    holding their hands throughout the last two months giving them

8    drafts of these summaries.  I realize it sounds like a lot as

9    they talk about changes between each draft that they received,

10   but there was never a requirement to give a draft summary.  We

11   gave them up to the minute so that they could have every

12   opportunity to review them and review for accuracy, which all

13   the law technically requires is providing the underlying

14   documents in advance and having them a meaningful opportunity

15   to cross-examine which they, of course, have had.

16         There is a lot of standards in this motion that just

17   aren't the law that have led to this now eighth motion telling

18   the government to, you know, only include documents that were

19   on the original *James* log or admitted in the last trial or even

20   forcing us to put inadmissible documents in a summary is one

21   argument that was in here.  So there is a lot of stuff that

22   isn't the law.

23         But I think what might be helpful, I know there is

24   some kind of holistic challenges to the summaries, but it might

25   just be more efficient to at least start taking the

656

1   document-by-document ones they raise unless your Court has

2   another kind of direction you would like to go in.

3        THE COURT:  No, I think that we need to do that.  So I

4   gave you the option to choose one of them.  But if you want we

5   can -- since we are going to be working through them and

6   because Ms. Evans has already testified, we could start with 1

7   and work our way up.

8        MS. CALL:  I think that is fair.

9        THE COURT:  Okay.  Go ahead.

10        MS. CALL:  For Exhibit 1, I believe there were three

11   exhibits listed that defendants cite there is no good faith

12   basis to include or for failing to include previously.

13   Exhibits 113 and 118, which are two of the exhibits there, were

14   not ruled admissible by the Court as co-conspirator statements

15   until February 14th in the supplemental *James* log ruling, so it

16   was not until that time that the government included them on

17   summaries.

18        THE COURT:  Right.  What about 120?

19        MS. CALL:  That is a good question.  I am not sure why

20   it wasn't on the original summaries.  For some reason I believe

21   it was.  And I thought I had a note to it.  At least one reason

22   for the change would, of course, be the fact that Mr. Pepper is

23   testifying in this trial.  And there is more of a basis to

24   include some of his statements in these summaries which we

25   firmly obviously then believe would come into evidence, so that

1    I am guessing is a reason for 120.

2           THE COURT:  It may involve Mr. Pepper, but why was it

3    added after February 10th, the subject line?

4           MS. CALL:  Your Honor, I am looking.  The subject line

5    isn't on the summary.  I think that might be a moot issue

6    perhaps.  The subject line isn't on the summary, so perhaps

7    that was just mistaken by defendants.  It just says e-mail.

8    Oh, I was looking at the wrong e-mail in the chain.  I

9    apologize.  Yeah, sorry, I did not appreciate we were just

10   talking about an addition of a subject line.  Frankly, I don't

11   mind changing it, but I also don't see how it's prejudicial at

12   all.

13          THE COURT:  To make things more streamlined, I am

14   going to hold you to the February 10th edition.

15          Otherwise, any comments from the defendants on 113 and

16   118, the references there?  Ms. Call is, of course, correct

17   that in Docket 1050 I ruled that those two exhibits were

18   provisionally admissible.

19          So the objections to 113 and 118 will be overruled.

20   Objection as to 120 will be sustained.

21          Exhibit 2, go ahead.

22          MS. CALL:  The first is Exhibit 219.  I believe the

23   defendants' motion states this was not on the government's

24   James log.  It was on the government's James log.  It was log

25   No. 315.  That was favorably ruled on in ECF-559.  And Your

658

1    Honor did pretrial I believe as well in ECF-1031 also rule on

2    the pretrial admissibility of that exhibit.

3         THE COURT:  Okay.  Talking about 219?

4         MS. CALL:  Yes.

5         THE COURT:  Anyone disagree or want to comment further

6    on that?

7         MR. TUBACH:  That it wasn't admitted.  I believe he

8    was talking about Exhibit 230, 232 and 234.

9         THE COURT:  Yeah, that's the next issue.

10        MR. TUBACH:  I don't think anyone made any statement

11   about the James log as to 219, at least as I am reading our

12   motion.

13        THE COURT:  I don't know if Ms. Call said that.  I

14   think she just said that it had been admitted or ruled

15   admissible in the James log, but I am not sure.

16        MS. CALL:  I may have misunderstood, and perhaps I

17   don't see what the argument is about 219.  Maybe it's just

18   pointing out the addition of it.  So I will move on to 230.

19        THE COURT:  I am going to overrule any objection to

20   219.

21        Let's talk about those other exhibits, 230, 232 and

22   234.  Those have not yet been ruled on.

23        MS. CALL:  Correct.  They were not admitted in the

24   first trial on hearsay grounds.  The government did submit

25   these in its notice of exhibits for entry without a sponsoring

659

1    witness.  And Your Honor reserved ruling on these given the

2    fact that Mr. Pepper would be testifying at this trial.  The

3    government does anticipate that these documents will be

4    introduced through Mr. Pepper and have already notified the

5    defendants as such.

6         THE COURT:  I think we will have to hold off on that.

7    We will see if they get in through Mr. Pepper.

8         Exhibit 3?

9         MS. CALL:  Your Honor, I believe for Exhibit 3 the

10   defendants cite to Exhibit 330, which I could be incorrect, but

11   we may have discussed this morning already.  But the defendants

12   claim that this exhibit has not been admitted at the first

13   trial and the government has not shown its burden of showing

14   that it is admissible or that the materials summarized are

15   admissible.

16        This document was ruled admissible by the Court under

17   801(d)(2)(E) in its original *James* log ruling, 559 at Page 27.

18   The defendants did note that they objected again in ECF-945

19   pretrial and the Court reserved ruling.  But I do believe Your

20   Honor may have ruled on that this morning, if I am not making

21   things up in my head.

22        THE COURT:  I can't remember.

23        MR. TUBACH:  I believe the Court did rule on this one

24   this morning.

25        THE COURT:  It doesn't -- yeah, it is admitted now.

1   So that objection will be overruled.

2           Let's see, is the next one Exhibit 5?

3           *MS. CALL:*  Yes, Your Honor.  So regarding the two

4   exhibits that were added, 559 and 9750 -- I am sorry, 9740, for

5   9740 the defendants state that there is no reason the

6   government couldn't have included it sooner because they were

7   in the government's possession during the first trial.  As Your

8   Honor may remember, that document came into the government's

9   possession during the first trial and was then included on the

10  government's supplemental *James* log after Claxton had produced

11  that document to the government in the middle of trial, so that

12  is the basis and changed circumstances for including that

13  document in the summary now.

14          559 that the defendants point to was included on the

15  February 10th revision so are timely and it is relevant.  So I

16  don't think there is any rule barring its inclusion in this

17  summary exhibit.  It clearly relates to Pollo Tropical.

18          *THE COURT:*  Which one was that again?

19          *MS. CALL:*  559.

20          *THE COURT:*  Okay.  I am sorry, what was 9740?

21          *MS. CALL:*  9740 is the document in Exhibit 5 at

22  1:56 p.m.  That is one that was produced mid trial by Claxton

23  during the last trial and was then ruled favorably in the

24  supplemental *James* log ruling on I believe February 14th.

25          *THE COURT:*  If you don't mind repeating once again,

661

1   Ms. Call, as to Exhibit 500, was that admitted today?  I can't

2   remember.

3           MS. CALL:  500 I believe was.  Let me find it.  So 500

4   was on the original summaries from the last trial.  I would

5   have to look at exactly how the excerpt changed.  If anything,

6   it may have been just the addition of one sentence at the end.

7   I believe there is some lack of clarity in the motion at least

8   to when changes were made.  I believe that sentence was added

9   before February 10th.

10          THE COURT:  Mr. Feldberg?

11          MR. FELDBERG:  Your Honor, 559 --

12          THE COURT:  That was admitted today, by the way.

13          MR. FELDBERG:  I understand.  But it appears on both

14  Exhibit 5 and Exhibit 10 and I wonder if once is enough.  The

15  government can argue it's relevant to something, but it's the

16  same excerpt, at least as far as I can tell.

17          MS. CALL:  Your Honor, I think it's an e-mail

18  discussing Pollo Tropical negotiations where Defendant Austin

19  instructs Defendant Little to wait to give Pollo Tropical

20  numbers until the KFC numbers are finalized, so it's clearly

21  relevant to both sets of negotiations that are generally the

22  topical area of the two summaries that that is contained in.

23          THE COURT:  Anything more on that one, Mr. Feldberg?

24          MR. FELDBERG:  No, Your Honor.

25          THE COURT:  I think the government has articulated

662

1   relevancy as to both, so I will overrule that objection and

2   will also overrule the objection to 9740.  That is a document

3   that was -- came in mid trial through a production of documents

4   by Claxton.  And I will overrule the objection as to

5   Exhibit 500 as well.

6       MS. CALL:  Next would be Exhibit 10.  This August 7

7   calls claim, so how I recall and how I understand it even from

8   the motion is the government disclosed to the defendants before

9   February 10th that three calls were added on August 7th.  The

10  error they believe now makes this summary inadmissible is that

11  when we said that, we didn't say and we are citing a phone

12  record for those calls.  So I certainly don't think we need to

13  spell out every letter that changes in the summaries when we

14  are telling them what the change was, so I don't see a basis

15  for exclusion for those calls.

16      THE COURT:  Are those -- is that an issue coming up in

17  the first paragraph of the objection on Page 6 as to

18  Exhibit 10?

19      MS. CALL:  Yes.  It's the August 7 calls setting 9645.

20  It says in its February 13th e-mail, the government did not

21  disclose that the additional calls came from an exhibit not

22  included on the previously admitted chart.  So we gave them the

23  summary with the calls.  We told them in an e-mail we were

24  adding the calls.  We didn't specifically say and there is an

25  exhibit that has the excerpt for those calls.

1          *MS. HENRY:*  Your Honor?

2          *THE COURT:*  Yes, Ms. Henry, go ahead.

3          *MS. HENRY:*  I am just pulling it up and I don't see

4     that -- I see it now.

5          *THE COURT:*  Did you find it?  I didn't find it.

6          *MS. CALL:*  Are you talking about in the motion?

7          *THE COURT:*  Yeah, I was talking about in the motion.

8          *MS. CALL:*  What I was pointing to was Page 6 of the

9     motion, the paragraph starting GX-10, the second sentence

10    starting with:  In its February 13 e-mail.

11         *THE COURT:*  Now I see it.  Got it.  Any additional

12    argument on that?  I will overrule the objection in the first

13    paragraph.  What about the paragraph beginning with since

14    February 10th, further revisions?

15         *MS. CALL:*  So the first source, the call was already

16    there.  I think it is an addition of a source on the

17    realization that the number for Mr. Roberts that was the

18    subject of that call was not included in the stipulation by

19    defendants, so we just entered we had a source that was

20    something that was already in an exhibit admitted in the last

21    trial.  It's just subscriber information.

22         *THE COURT:*  Anything further on that objection?  I am

23    going to overrule those objections.  I think that it's

24    appropriate that it -- that 8058 be added as a source.  Time

25    zone change is a correction that I think is appropriate too.

664

1    And the fact that there may have been an omission of the

2    appropriate limiting instruction is not the type of thing we

3    could correct by omitting it, so it has to get in there some

4    way regardless, so I will overrule those objections.

5           And I don't think we would probably do the next one in

6    three minutes unless you are very hopeful, Ms. Call.

7           MS. CALL:  Let me see.  I have a word that says moot,

8    so that might make it helpful.

9           THE COURT:  That sounds hopeful.  Let's see if

10   Mr. Tubach is hopeful.

11          MR. TUBACH:  I am not as hopeful, Your Honor.

12          MS. CALL:  I think the answer is 1256 is not in there.

13   Let me look.

14          MR. TUBACH:  1256 is not listed in the Exhibit 12,

15   Your Honor.  We just didn't know.  The government listed it as

16   something they were adding to Exhibit 12, so we don't know

17   that.  There is an additional objection we have to Exhibit 12

18   that I would like to raise either now or we can do so -- maybe

19   I can raise it now so the government has an opportunity to

20   think about it.

21          THE COURT:  Yeah, that's a good idea.  Go ahead.

22          MR. TUBACH:  Your Honor, this exhibit covers -- with

23   one exception covers entries from August 29th until

24   September 3, so a very short five-day window.  And then there

25   is a two-week jump and they've added this e-mail at the bottom

665

1   that is from Tim Stiller to Lonnie Justice.  And we think

2   that's argument.  They can certainly argue that this is somehow

3   related to the prior exhibits that they want to get in, but as

4   far as an actual accurate summary, that last e-mail does not

5   belong in this chart and should be excluded.

6        THE COURT:  Because there is no natural inference that

7   it's part of the -- what's talked about in the first part of it

8   and as a result --

9        MR. TUBACH:  It's a five-day window and then a

10  two-week gap and then one e-mail two weeks later.  A lot

11  happens in two weeks.

12       THE COURT:  We will take that up, then, when we talk

13  about this next, which we'll have to decide on when we'll talk

14  about that next, but we won't decide that right now.

15       Mr. Gillen?

16       MR. GILLEN:  Very briefly, Your Honor.  In addition to

17  the summaries that we would be talking about today, we would

18  also raise to the Court's attention we got on the Pepper's

19  documents they produced apparently are several new summaries

20  that they are going to intend to introduce through Mr. Pepper.

21  We would object.  They blew the deadline on February the 10th.

22  They knew he was going to be a witness and they didn't do it.

23  Those for the record are Exhibits 9984, 9985, 9986, 9987, and

24  9988.

25       THE COURT:  Ms. Call, real briefly.

1          MS. CALL:  Yes.  I recognize Mr. Gillen was a little

2     fired up.  That did get clarified in an e-mail between the

3     parties this morning.  They are demonstratives, not summaries,

4     so we are not seeking to admit them.

5          THE COURT:  Except as demonstratives?

6          MS. CALL:  Yes, not offer them into evidence.

7          MR. TUBACH:  I don't believe that resolves it at all,

8     Your Honor.  Ms. Call thinks it does, but she would be mistaken

9     in that regard.

10          THE COURT:  We will have to fight through that one.

11     Have those been -- copies of those were provided today to

12     people or --

13          MS. CALL:  I believe it was last night -- Sunday --

14     Saturday.

15          MR. GILLEN:  Your Honor, I believe it was late

16     Saturday that we received them along with -- when they sent out

17     the exhibits to be used for the witnesses that would appear to

18     be -- so it was Saturday.

19          THE COURT:  Does anyone have copies of those that I

20     can look at overnight?

21          MR. TUBACH:  I thought, Your Honor, they were attached

22     to our motion, but I could be mistaken.

23          THE COURT:  Really?  Maybe.

24          MR. TUBACH:  They are attached to my copy of the

25     motion, but I don't know if they were.  I can try to give the

667

1    Court some copies.

2          MS. CALL:  If I may inquire before we depart for the

3    day.  I think the government's case is moving a little more

4    quickly this trial which is great for all parties, but at least

5    from the government's perspective we don't have a meaningful

6    witness list still.  It's alphabetized by first name again with

7    150 or so witnesses.  We don't have summary exhibits.  We are

8    kind of in the dark now as the defendants' case approaches

9    where these same issues may crop up given the representation

10   that there will be summaries.  So I wanted to inquire whether

11   the Court would rule on the government's request for a summary

12   deadline for the defendants.

13         THE COURT:  Does the government still think that the

14   schedule noted in the most recent exhibit list will hold?  You

15   seem to be on track.

16         MS. CALL:  Yes.  I believe we filed an updated witness

17   list this morning and that should have the most up-to-date

18   estimates.

19         THE COURT:  Okay.  Mr. Gillen?

20         MR. GILLEN:  Two quick points.  Your Honor, you may

21   have if you'd like my copy that I can pass up to the Court.

22         THE COURT:  Are you sure?  We can make a quick copy of

23   it too.

24         MR. GILLEN:  They are fine.  I have already looked at

25   them.  And if you bring them back to me tomorrow, then that

668

1   would be fine.

2        *THE COURT:*  We can do even better than that,

3   Mr. Gillen.  We can bring them back to you in just a few

4   minutes.

5        *MR. GILLEN:*  Okay.  That's fine.  The other point is

6   as it relates to defense summaries, and we discussed this with

7   the Court before, we don't know all the exhibits that are

8   coming in.  And like the government that spent a great deal of

9   time getting documents admitted and so that they know what's

10  going to be in their summary chart, we don't have that luxury.

11  So we cannot create our summaries right now because we don't

12  know what's going to be coming into evidence.  And so that is

13  the reason why the Court indicated earlier when this topic came

14  up that it would not be appropriate -- my recollection -- it

15  would not be appropriate to direct the defense to create their

16  summaries by a certain date.

17       *THE COURT:*  Yeah, that's probably correct.  Ms. Call,

18  though, is generally right that to the extent that they seem to

19  be shaping up to the point where it may be productive to wade

20  into them, that will obviously save us a lot of time.  What I

21  am trying to avoid in this trial is to have days off or things

22  of that nature.  So if we can avoid that, I think we should.

23       *MR. GILLEN:*  There will be defense summaries.

24       *THE COURT:*  Yeah, right.  I am just saying that once

25  we get to a point where we might have something to talk about,

669

1    it would be good to exchange them so that we can start that

2    process.

3            MR. GILLEN:  We are not there yet, Your Honor, but

4    when we get there, we will follow the Court's directive.

5            THE COURT:  Great.  Anything else we need to talk

6    about?  Why don't we give those to Ms. Grimm.  And let's make a

7    quick copy for Mr. Gillen so he has got something to read

8    tonight.

9            MR. BELLER:  My request is a quick one, and that is I

10   would ask for a general understanding or some kind of an order.

11   And that is when we are getting tranches of documents being

12   admitted, if the moving party knows of a limiting instruction,

13   if that can be included at the time that it's being moved.  My

14   concern is that there --

15           THE COURT:  What do you mean by included?

16           MR. BELLER:  Simply saying, Your Honor, we would move

17   for the introduction of this particular document.  It is

18   subject to a limiting instruction to the extent we already

19   know.  And I realize that some things may not necessarily get

20   caught, but it would help because we are going through these

21   documents so quickly because, of course, we are learning about

22   them in court.

23           THE COURT:  So we wouldn't be obviously reading the

24   jury the limiting instruction, but just what you are requesting

25   is at the time they are moved into admission, there would be

1      just a mention that it's subject to a limiting instruction.

2              MR. BELLER:  That's all.

3              THE COURT:  So to flag it so we don't collectively

4      forget about it.

5              MR. BELLER:  That's correct.  And so certainly if

6      there is not an objection, it's not an objection that is

7      somewhat informed as opposed to us missing a limiting

8      instruction.  And I think that goes for both sides.

9              THE COURT:  Ms. Call?

10             MS. CALL:  Yes, I don't think it will come up much.

11     When the government is publishing the ones that were admitted

12     this morning, we can certainly flag it.  For others, first, of

13     course, the defendants do have two days' notice of the

14     documents we are using with the witness.  But for many like

15     what happened with Mr. Ledford today, once he is on the stand

16     testifying to it to the extent there was a limiting instruction

17     because it got offered after his testimony or we had it on our

18     list for admission without a sponsoring witness, that

19     instruction may not even be proper anymore.  So it might be a

20     little bit of analyzing the situation.  But to the extent that

21     there is one that still should apply, we will try to flag it.

22             THE COURT:  Right.  I think what Mr. Beller is talking

23     about is when documents are being offered without a sponsoring

24     witness, and for instance, with Mr. Torzilli when he was

25     reading -- well, I guess actually we had Mr. Ledford.  Yeah,

671

1   when they're being admitted if there seems to be a relevant

2   limiting instruction or there is cause to have people take a

3   look at it because there was one in the past even if we not

4   necessarily need one now, I think it's a good idea to flag

5   that.  The jury won't recall, but it will help us out.

6          And I know that even though people had notice of

7   exhibits that may have been used with -- or are going to be

8   used with Mr. Ledford, that, you know, people want to

9   double-check them.  So I think that that's an important

10  process.  If it's possible to notes those just briefly at the

11  time the list is mentioned, that might help everyone out.

12         *MS. CALL:*  Yes, Your Honor.  I think most of those

13  were offered this morning, so I don't think it will come up

14  much.

15         *THE COURT:*  Okay.  Our security guards are probably

16  clock watching now; and as a result, we will be in recess until

17  8:30 tomorrow.  Thank you.

18      (Recess at 6:08 p.m.)

19

20

21

22

23

24

25

672

1                           INDEX

2   WITNESSES

3      Florence Becker

4           Direct Examination Continued By Ms. Call        393

5           Cross-examination By Mr. Tubach                 403

6      Theodore Sangalis

7           Direct Examination By Mr. Torzilli              406

8      Stephen Gresch

9           Direct Examination By Ms. Sweeney               420

10          Cross-examination By Ms. LaBranche              423

11          Cross-examination By Mr. Pollack                425

12          Redirect Examination By Ms. Sweeney             427

13     Rachel Evans

14          Direct Examination By Ms. Call                  441

15          Cross-examination By Ms. Carwile                456

16          Cross-examination By Ms. Henry                  482

17          Cross-examination By Ms. LaBranche              486

18          Redirect Examination By Ms. Call                517

19     Michael Ledford

20          Direct Examination By Mr. Torzilli              519

21          Cross-examination By Mr. Beller                 610

22                         EXHIBITS

23  Exhibit        Offered  Received  Refused  Reserved  Withdrawn

24  C-020                    560

25  C-023                    556

| | INDEX (Continued) | | | | |
|---|---|---|---|---|---|

EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| C-024   |         | 556      |         |          |           |
| C-024-1 |         | 556      |         |          |           |
| 90-10   |         | 446      |         |          |           |
| 108     |         | 435      |         |          |           |
| 109     |         | 435      |         |          |           |
| 113     |         | 435      |         |          |           |
| A-115   |         | 582      |         |          |           |
| I-242   |         | 582      |         |          |           |
| I-243   |         | 582      |         |          |           |
| A-288   |         | 570      |         |          |           |
| 330     |         | 435      |         |          |           |
| D-330   |         | 582      |         |          |           |
| 356     |         | 441      |         |          |           |
| C-475   |         | 582      |         |          |           |
| C-478   |         | 582      |         |          |           |
| C-480   |         | 582      |         |          |           |
| C-482   |         | 582      |         |          |           |
| 498     |         | 435      |         |          |           |
| 563     |         | 435      |         |          |           |
| 564     |         | 435      |         |          |           |
| D-588   |         | 582      |         |          |           |
| D-589   |         | 582      |         |          |           |

| | INDEX (Continued) | | | | |

EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| G-600 | | 560 | | | |
| G-601 | | 560 | | | |
| G-605 | | 556 | | | |
| G-606 | | 556 | | | |
| A-612 | | 582 | | | |
| A-613 | | 582 | | | |
| A-622 | | 582 | | | |
| A-623 | | 582 | | | |
| A-626 | | 582 | | | |
| A-627 | | 582 | | | |
| F-742 | | 566 | | | |
| F-769 | | 566 | | | |
| F-787 | | 566 | | | |
| F-799 | | 566 | | | |
| C-882 | | 582 | | | |
| C-883 | | 582 | | | |
| 1030 | | 405 | | | |
| 1086 | | 434 | | | |
| 1120 | | 591 | | | |
| 1122 | | 591 | | | |
| 1124 | | 591 | | | |
| 1403 | | 560 | | | |

| | | | | | |
|---|---|---|---|---|---|
| 1 | INDEX (Continued) | | | | |
| 2 | EXHIBITS | | | | |
| 3 | Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
| 4 | 1404 | | 560 | | | |
| 5 | 1406 | | 544 | | | |
| 6 | 1410 | | 544 | | | |
| 7 | 1435 | | 560 | | | |
| 8 | 1438 | | 532 | | | |
| 9 | 1438-1 | | 532 | | | |
| 10 | 1439 | | 553 | | | |
| 11 | 1500-1 | | 556 | | | |
| 12 | 1501 | | 556 | | | |
| 13 | 1503 | | 566 | | | |
| 14 | 1505 | | 544 | | | |
| 15 | 1514 | | 566 | | | |
| 16 | 1515 | | 566 | | | |
| 17 | 1524 | | 544 | | | |
| 18 | 1529 | | 556 | | | |
| 19 | 1531 | | 556 | | | |
| 20 | 1552 | | 566 | | | |
| 21 | 1569 | | 544 | | | |
| 22 | 1700-1 | | 570 | | | |
| 23 | 1713-1 | | 576 | | | |
| 24 | 1728 | | 591 | | | |
| 25 | 1729 | | 591 | | | |

1                          INDEX (Continued)

2                              EXHIBITS

3   Exhibit        Offered    Received   Refused   Reserved   Withdrawn

4   1736                        582

5   9004                        573

6   9505                        416

7   9690                        544

8   9691                        544

9   9692                        544

10  9693                        544

11  9694                        556

12  9696                        544

13  9710                        536

14  9748                        445

15  9871                        591

16  9983                        416

17                      REPORTER'S CERTIFICATE

18      I certify that the foregoing is a correct transcript from

19  the record of proceedings in the above-entitled matter.   Dated

20  at Denver, Colorado, this 15th day of May, 2022.

21

22                            S/Janet M. Coppock

23

24

25