1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO

2

3    Criminal Action No. 20-CR-00152-PAB
     In Re: Penn II
     UNITED STATES OF AMERICA,

4

         Plaintiff,

5

     vs.

6

     JAYSON JEFFREY PENN,
7    MIKELL REEVE FRIES,
     SCOTT JAMES BRADY,
8    ROGER BORN AUSTIN,
     TIMOTHY R. MULRENIN,
9    WILLIAM VINCENT KANTOLA,
     JIMMIE LEE LITTLE,
10   WILLIAM WADE LOVETTE,
     GARY BRIAN ROBERTS,
11   RICKIE PATTERSON BLAKE,

12       Defendants

13   _____

                      REPORTER'S TRANSCRIPT
14                    Trial to Jury, Vol. 5

15   _____

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17   Chief Judge, United States District Court for the District of

18   Colorado, commencing at 8:28 a.m., on the 1st day of March,

19   2022, in Courtroom A201, United States Courthouse, Denver,

20   Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Janet M. Coppock, 901 19th Street,
25       Room A257, Denver, Colorado, 80294, (303) 335-2106

APPEARANCES

1

2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul

3    Torzilli,, U.S. Department of Justice, 450 Fifth Street N.W.,

4    Washington, DC 20530, appearing for Plaintiff.

5          Anna Tryon Pletcher and Michael Tubach of

6    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

7    San Francisco, CA 94111-3823;

8          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

9    N.W., Washington, DC 20006, appearing for Defendant Penn.

10         David Beller, Richard Kornfeld and Kelly Page of

11   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

12   CO 80202, appearing for Defendant Fries.

13         Bryan B. Lavine of Troutman Pepper Hamilton Sanders,

14   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

15          Laura Kuykendall and Megan Rahman of Troutman Pepper

16   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,

17   appearing for Defendant Brady.

18         Michael Felberg of Reichman, Jorgensen, Lehman,

19   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

20   10017;

21

22

23

24

25

APPEARANCES (Continued)

1

2          Laura F. Carwile of Reichman, Jorgensen, Lehman,

3   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4   CA 94065; appearing for Defendant Austin.

5          Elizabeth B. Prewitt of Latham & Watkins, LLP,

6   555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7          Marci Gilligan LaBranche of Stimson, Stancil,

8   LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9   80218, appearing for Defendant Mulrenin.

10          James A. Backstrom, Counselor at Law, 1515 Market

11   Street, Suite 1200, Philadelphia, PA 19102-1932;

12          Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13   Bethesda, MD 20814, appearing for Defendant Kantola.

14          Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15   Street, Suite 1100, Los Angeles, CA 90017;

16          Dennis J. Canty, Canty Law Corporation,

17   1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18   appearing for Defendant Little.

19          John Anderson Fagg, Jr. and James McLoughlin of

20   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

1                    APPEARANCES (Continued)

2          Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5          Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8          Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                       PROCEEDINGS

16        *THE COURT:*  Back on the record in 20-CR-152.  The jury

17   is not present, but the government has an issue to raise.

18        Go ahead.

19        *MS. SWEENEY:*  Yes, Your Honor.  I just wanted to raise

20   one issue.  In conversations with Mr. Carl Pepper's counsel

21   last night about the questions and the conversations we were

22   having in the evening after court, she -- I am sure the parties

23   appreciate, but she raised that there would be the potential

24   that questions if phrased a certain way could implicate his

25   privilege, so any communications that he might have had with

1    counsel.

2         So we just wanted to raise for the Court's

3    understanding and the parties questions about what Mr. Pepper

4    understood or he knew seemed to not implicate privilege, but

5    about what he was told or what he learned could implicate

6    privilege.  She will be here in the courtroom for his

7    testimony, has entered an appearance and will object, as

8    obviously will the government if anything comes up, but I just

9    wanted to make Your Honor aware.

10        THE COURT:  Well, of course, that dichotomy is always

11   true because your attorney tells you things.  But I think we

12   will just have to see what happens, but obviously if counsel is

13   present, he or she can protect the privilege.

14        MS. SWEENEY:  Yes, Your Honor.

15        THE COURT:  But if there are things that you can share

16   with defense counsel to assist them or ask them to talk to his

17   counsel or something like that, that would -- that might help

18   them avoid the problem areas.

19        MS. SWEENEY:  Your Honor, I believe the salient facts

20   are two.  First, that the United States did not directly -- any

21   information that Mr. Pepper received about Tyson's status or

22   about his own status in August of 2022 did not come directly

23   from the United States.

24        THE COURT:  What didn't?

25        MS. SWEENEY:  Any information he may have learned

1    about the status of his company or his own personal status in

2    2021.

3              THE COURT:  What does that mean?

4              MS. SWEENEY:  So whether or not he -- well, when he

5    understood that he would not be receiving protections in 2021,

6    that information did not come directly from the government.  So

7    that communication it's possible could have been privileged is

8    the distinction I am trying to draw here.

9              THE COURT:  Right.  But the problem is that although

10   the communication may have been from his attorney, if that was

11   his understanding and that caused him to act in particular ways

12   or, you know -- Mr. Gillen is right behind you -- you know,

13   that causes him to cry or something like that, you know, that

14   in and of itself is not necessarily a privilege.

15             MS. SWEENEY:  Of course, Your Honor.  The distinction

16   I am drawing is that his understanding we agree would not be

17   privileged, but any communications or questions about the

18   communications could implicate privilege.

19             THE COURT:  Mr. Gillen?

20             MR. GILLEN:  Yes, Your Honor.  I understand the

21   distinction.  I also would like to point out that the basis for

22   our knowledge about this information derives not from

23   Mr. Pepper's lawyer.  It derives from Tyson's counsel reporting

24   to the government which then reported to us in its September

25   the 29th, 2021 letter about Mr. Pepper's reaction to the news

683

1    that he was not going to get that coverage.  So that's not

2    privilege.

3           And whether -- but I am going to handle it in the way

4    that hopefully this doesn't come up.  But for the record to be

5    straight, whatever either Tyson's counsel had with him would

6    not be privileged or if Mr. Pepper's lawyer conveyed to Tyson's

7    counsel Mr. Pepper's reaction and then he passed it on to the

8    government, that would not be privileged either.  So in any

9    event, I think we can work around it, but that's -- I just

10   wanted to set the record straight about what I believe to be

11   the chronology.

12          THE COURT:  Okay.

13          All right.  Ms. Grimm, how are we doing on jurors?

14   Not there yet?

15          Do you want to talk about summary exhibits for a bit?

16          MR. POLLACK:  Your Honor, could I raise a very quick

17   point before we move to summary exhibits?

18          THE COURT:  Sure.

19          MR. POLLACK:  Somebody can correct me if I'm wrong,

20   but it's my understanding there have been some documents that

21   have been introduced by the government under an exhibit number

22   that was used in the first trial, but the document that was

23   introduced was, in fact, different from the document that was

24   introduced in the first trial under that exhibit number.  And I

25   would just ask if we are going to use exhibit numbers from the

1   old trial, only use them if it's the same document because the

2   defense is relying on the fact we know what this document is

3   and we've seen it before.

4          THE COURT:  That could be true.  I think the

5   government has usually put a -1 behind it to indicate that it

6   is a variant, but --

7          MR. POLLACK:  I think there have been some occasions

8   where that has not happened.  And I understand if that is the

9   government's intention, that's great.  I just want to make sure

10  going forward that's what we're doing.

11         THE COURT:  Well, yes.  I think that we need to change

12  the exhibit number in some manner to indicate a difference.

13         MR. POLLACK:  And just to be clear, it's not just for

14  purposes of a later record if we need it.  We are not objecting

15  relying on the fact that it's a document that we know what it

16  is.  And if that's not true, we need to know that it's a

17  different document.

18         THE COURT:  Yeah, I think that's a good idea because,

19  for instance, yesterday a large number of documents came in.

20  And, you know, it's a bit of a challenge to make sure to track

21  everything.

22         MR. POLLACK:  Thank you, Your Honor.

23         MS. CALL:  If the Court could perhaps inquire as to

24  any examples of that because it certainly was not the

25  government's intention to introduce different exhibits with the

1    same number.

2         THE COURT:  Well, I will let you have that

3    conversation separately with Mr. Pollack, but we are just

4    raising it as a general matter right now.  We have got all the

5    jury here, so we will hold off on talking about summary

6    exhibits.  Ms. Call, we have got the jury here now.

7         MS. CALL:  Are we ready to start then?

8         THE COURT:  What's that?

9         MS. CALL:  You say the jury is here and ready?

10        THE COURT:  The jury is here and accounted for, so we

11   will bring them in.

12        Anything more before we bring the jury back in?

13        MS. CALL:  Not from the government.

14        THE COURT:  Why don't we have Mr. Ledford resume the

15   stand.

16        MR. BELLER:  May I get set up as well?

17        THE COURT:  Yes.  Go right ahead, Mr. Beller.

18        Good morning, Mr. Ledford.

19        THE WITNESS:  Good morning.

20        THE COURT:  All right.  Let's get the jury.

21        (Jury present.)

22        THE COURT:  Good morning, ladies and gentlemen.  An

23   on-time start, excellent.  And we are going to continue, then,

24   with the cross-examination of Mr. Ledford.

25        Mr. Beller, go ahead.

1          *MR. BELLER:*  Thank you.

2                     **CROSS-EXAMINATION CONTINUED**

3     *BY MR. BELLER:*

4     *Q.*  Good morning again, Mr. Ledford.

5     *A.*  Good morning.

6     *Q.*  Mr. Ledford, to remind the jury, my name is David Beller

7     and I represent Mikell Fries of Claxton Poultry.

8             Mr. Ledford, yesterday when we left off, we were

9     talking a little bit about the negotiation process and some

10    goals that you at RSCS had.  One of those goals was to ensure a

11    very low price disparity between the different suppliers of

12    chicken.

13    *A.*  Yes, that's correct.

14    *Q.*  So in other words, keeping the final contract price to be

15    in a very tight range.

16    *A.*  Correct.

17    *Q.*  So that your most expensive chicken supplier and your least

18    expensive chicken supplier were actually extremely close or

19    extremely tight in price.

20    *A.*  Yes, that's true.

21    *Q.*  And then all the other chicken suppliers that supplied KFC

22    with chicken was also within that range.

23    *A.*  Yes.

24    *Q.*  That range is usually pennies.

25    *A.*  Correct.

687

Michael Ledford - Cross

1   Q.  Or if you're really good at negotiation on your side, it's

2   even fractions of pennies.

3   A.  Correct.

4   Q.  So the way that you go about doing that or one of the ways

5   you go about doing that is by telling the supplier specifically

6   or directly if their price is not competitive.

7   A.  Yes.

8   Q.  You, as we saw yesterday, would sometimes show the supplier

9   percentages of how far out of line the price is from being

10  competitive.

11  A.  Correct.

12  Q.  For example, your eight-piece is 4 percent too high from a

13  competitive bid.

14  A.  Yes.

15  Q.  Now, when you told them that they were 4 percent too high

16  from a competitive bid, you did not also tell them what it

17  meant to be a competitive bid.

18  A.  No, I did not.

19  Q.  And by competitive bid, I think you had explained yesterday

20  that's usually either the lowest price bid that you would

21  receive or sometimes if there was a nonincumbent who was

22  perhaps not quite informed on what they were bidding on, they

23  may have been an outlier cut-out, so it was the second lowest

24  bid.

25  A.  Correct.

Michael Ledford - Cross

1   Q.   Okay.  Sometimes you would give feedback in actual dollars

2   and cents amount.

3   A.   That's right.

4   Q.   For example, you may say, hey, Mr. Fries, you're a penny

5   too high.

6   A.   Yes, that's possible.

7   Q.   This feedback that you're giving also is sort of

8   directional guidance that you're giving to the suppliers on

9   where they need to be for the next round.

10  A.   Yes, you could use that term.

11  Q.   Because the initial bid or the initial response to the RFP

12  that you're getting from the suppliers really is just like an

13  opening offer, right?

14  A.   Correct.

15  Q.   And your process is not one where you would receive this

16  opening offer and then say contract offer accepted, we're going

17  to sign on the bottom line.

18  A.   I don't believe that's ever happened.

19  Q.   And again, that's because you really needed to negotiate

20  back and forth to eventually get this really tight range

21  between the different suppliers.

22  A.   Correct.

23  Q.   Now, Mr. Ledford, with these different suppliers -- and I

24  am sorry, in 2011 you had how many suppliers supplying Yum

25  Brands with poultry products?

Michael Ledford - Cross

1    A.  All poultry?

2            MR. TORZILLI:  Objection, vague.

3            THE COURT:  Overruled.

4    A.  All poultry?

5    BY MR. BELLER:

6    Q.  Yes.

7    A.  I believe it was somewhere in the neighborhood of 15.

8    Q.  Okay.  And then how about fresh poultry, how many?

9    A.  In 2011, I believe we had seven.

10   Q.  Okay.  And in 2008 that went up?

11   A.  To eight.

12   Q.  To eight because of Case Farms.

13   A.  Yes.

14   Q.  Now, the gentlemen in this courtroom I think represents

15   five companies; is that right?

16   A.  Correct.

17   Q.  So in 2011 there were two companies.  Let me correct

18   myself.  In 2012 there were two companies.  In addition, in

19   2013 there were three companies in addition to the five that

20   were here?

21   A.  Yes.

22   Q.  All of these different suppliers still in that very tight

23   range.

24   A.  Yes.

25   Q.  Providing directional -- let me ask that a different way.

Michael Ledford - Cross

1    Taking your directional guidance is not something that any of

2    the different companies were required to do.

3    A.   No.

4    Q.   So if they are coming down on price, they are coming down

5    on price as part of negotiation.

6    A.   Yes.

7    Q.   And not because they have some sort of obligation to do

8    what you tell them to do.

9    A.   That's correct.

10   Q.   So this is a back-and-forth of, well, if you want our

11   business, you're going to come down.  And then it's up to the

12   different suppliers to choose at that point whether to come

13   down in order to gain your business.

14   A.   That's fair.

15   Q.   This is not a winner-takes-all kind of bidding process.

16   A.   No, it is not.

17   Q.   That everybody, assuming their price is competitive,

18   everybody is going to win at least some portion of the business

19   that you have to offer.

20   A.   Typically speaking, yes.

21   Q.   Unless you have to cut somebody off because they can't hit

22   your quality, they can't hit your supply or they can't hit your

23   price.

24   A.   Correct.

25   Q.   Now, when -- we just established that they are not

Michael Ledford - Cross

1   necessarily obligated to take your direction, but when you give

2   them direction, there is an expectation on your part that they

3   follow it.

4   A.   Yes.

5   Q.   And you did that through these different leverage points

6   that we had spoken about.  You can take volume away from them

7   if they do not follow the guidance of lowering their price.

8   A.   Yes.

9   Q.   Or I suppose you could at least threaten to do so.  Even

10  threatening to do so may prompt the different suppliers to

11  lower their price.

12  A.   Yes, that was certainly a possibility.

13  Q.   And a possibility.  But, in fact, over the years,

14  Mr. Ledford, that happened.

15  A.   Yes, it did.

16  Q.   And a specific example is that you took volume away from

17  George's --

18  A.   Yes, sir.

19  Q.   -- because -- I am sorry, I interrupted you.

20  A.   Yes, I did.

21  Q.   And you took volume away from George's because George's was

22  not coming down on price.

23  A.   That is correct.

24  Q.   And after you took volume away from George's, George's came

25  back to you and said in effect, Mr. Ledford, sorry.  We're more

692

Michael Ledford - Cross

1  than happy to come down on your price now, right?

2  A.  Yes, that happened.

3  Q.  And your response to them?

4  A.  Sorry, it's too late.  We've already given that business

5  away.

6  Q.  So that failure to follow your directional guidance even

7  coming to you hat in hand, it was too late?

8  A.  That's correct.

9  Q.  So based on that you would agree with me, Mr. Ledford, that

10  threatening to take away volume has proven to be a pretty

11  effective way of negotiating for you.

12  A.  Yes, I would agree with that.

13  Q.  That the supplier moves their price when you threaten to

14  take away their volume.

15  A.  Yes, most of the time, yes.

16  Q.  So we're talking about sort of this tight range of prices.

17  And you spoke just a little bit on direct examination for the

18  underlying purpose, and I want to explore that just a little

19  bit further than you -- or further with you, excuse me.

20        So having this very, very tight range of prices

21  benefits your franchisees.

22  A.  Yes.

23  Q.  And it benefits your franchisees because the franchisee and

24  the franchise expects all KFC chicken to be the same.

25  A.  That is correct.

693

Michael Ledford - Cross

1    Q.   They want a eight-piece bucket in Atlanta to look, taste

2    and be roughly the same size as an eight-piece price in Denver,

3    for example.

4    A.   That's correct.

5    Q.   And when you have chicken suppliers that supply chicken,

6    they are supplying chicken to at times many different

7    franchisees.

8    A.   Yes.

9    Q.   And that franchisee may be receiving chicken from George's

10   and it may be receiving chicken also from Pilgrim's, for

11   example.

12   A.   Yes.

13   Q.   And so you need those two different truckloads of chicken

14   to be roughly the same price.

15   A.   Yes.

16   Q.   And that's because you don't want the franchisee to say,

17   hey, wait a minute, I don't want to buy from George's.  I only

18   want to buy from, for example, Claxton because Claxton is

19   cheaper.

20   A.   Exactly.

21   Q.   And you also don't want a franchisee to say, well, how come

22   my restaurant in Macon is paying a different price than my

23   restaurant in Atlanta for chicken?

24   A.   Correct.

25   Q.   Now, you would agree with me that Claxton Poultry is a

Michael Ledford - Cross

1  one-plant chicken producer?

2  A.  Yes.

3  Q.  And some of the other larger companies have many plants,

4  right?

5  A.  That is correct.

6  Q.  Pilgrim's, for example, 20 or 22 plants that supply KFC

7  chicken?

8  A.  No, they do not have 22 plants that supply KFC.

9  Q.  Excuse me.  How many plants do they have that supply KFC?

10  A.  I think at that time it was in the neighborhood of five or

11  six.

12  Q.  Okay.  Fair enough.  So five or six plants.  So while they

13  have five or six plants that produce KFC, Claxton has one plant

14  that produces KFC, you still need that price to be relatively

15  similar, if not the same in this very tight range?

16  A.  Yes.  That was one of my goals.

17  Q.  And KFC has very exact specifications for its chicken as

18  well.

19  A.  Correct.

20  Q.  So you need to be purchasing from a supplier who can -- who

21  both knows and can meet these exact specifications for KFCs.

22  A.  Yes.

23  Q.  So that is one goal that RSCS has in negotiating.  Another

24  goal is ensuring ample supply of chicken for all of the

25  restaurants 365 days a year.

695

Michael Ledford - Cross

1    A.   Correct.

2    Q.   You didn't want a franchise to run out of chicken at any

3    period of time.

4    A.   That is right.

5    Q.   And to put your job in very simple terms, really the

6    overarching goal of your job is making sure that every

7    restaurant has chicken at a competitive price when they need

8    it.

9    A.   That's correct.

10   Q.   So I say the competitive price, so let's talk about that.

11   Fair to say at a low price or the lowest price possible?

12   A.   Correct.

13   Q.   Not just a low price, but also a stable price.

14   A.   Yes.

15   Q.   Something that's not going to vary widely if at all or if

16   we can help it, right?

17   A.   Correct, as predictable as we can get it.

18   Q.   As predictable as you can get.  And that's one of the

19   reasons you do or did year-long contracts.

20   A.   Correct.

21   Q.   So there would be some predictability during that one-year

22   period of time.

23   A.   Exactly.

24   Q.   Okay.  So we talked a little bit about sort of starting off

25   the negotiation.  We started off by saying that the feedback

696

Michael Ledford - Cross

1    comes after the first round.  So the negotiation with the

2    supplier really happens going into the second round; is that

3    fair?

4    A.  Yes, in between rounds one and round two is when the

5    negotiation starts.

6    Q.  Okay.  So part of that round two negotiation is that

7    presumably the suppliers have updated that cost-plus model,

8    those cost-plus numbers at your directional guidance and have

9    now submitted a second bid to you.

10   A.  Yes.

11   Q.  And you give feedback to the supplier.  Sometimes it's in

12   person.

13   A.  Yes.

14   Q.  Sometimes this feedback or directional guidance happens on

15   the telephone?

16   A.  Correct.

17   Q.  Sometimes it's via e-mail?

18   A.  Correct.

19   Q.  Sometimes RSCS or KFC, you, will actually bring suppliers

20   in for a more formal in-person meeting to discuss these bids?

21   A.  Yes.

22   Q.  Now, once the negotiation has gone back and forth and there

23   is a final contract that's worked out, that usually happens in

24   person, right?

25   A.  I'm sorry, could you say that again?

Michael Ledford - Cross

1   Q.  Yeah.  It was a terrible question.  Let me try it again.

2   After the different rounds of negotiation, there is that final

3   sort of tweaking of negotiation before a contract is signed.

4   That usually happens in person.

5   A.  I don't know that I would agree with that.

6   Q.  It can happen on the telephone?

7   A.  It can happen on the telephone.

8   Q.  It usually does not happen via e-mail.

9   A.  That's right, it usually does not happen via e-mail.

10  Q.  Okay.  But there is a discussion.  There is an actual

11  back-and-forth that happens live.

12  A.  Yes.

13  Q.  All right.  Thank you for clarifying.  I appreciate it.

14          After that time that's when this final contract is

15  usually inked out and reviewed by respective teams and signed.

16  A.  Correct.

17  Q.  So this process of initial negotiation, I think one example

18  you said started September 26, lasts for several weeks.

19  A.  Correct.

20  Q.  If not months.

21  A.  Right.

22  Q.  Before that final contract is signed, usually November,

23  December of every year.

24  A.  Yes.

25  Q.  So let's talk a little bit more about prices and how those

Michael Ledford - Cross

1    change.  They fluctuate from year to year.

2    A.  Yes, they do.

3    Q.  And that's because costs fluctuate from year to year.

4    A.  Cost and market conditions.

5    Q.  Market condition, also the need, right?

6    A.  Yeah, supply and demand.

7    Q.  Supply and demand.  So over your 20-some years of

8    experience, it's fair to say that you have seen this market ebb

9    and flow every year throughout this 20-some odd years that you

10   have been working.

11   A.  That's correct.

12   Q.  Also, Mr. Ledford, you know, or correct me, that the

13   different suppliers have different strategies regarding how

14   they price their chicken.

15        MR. TORZILLI:  Objection, foundation.

16   A.  Yes.

17        THE COURT:  Overruled.

18   A.  Yes.

19   BY MR. BELLER:

20   Q.  Mar-Jac, for example, did not sell prepared foods.

21   A.  That is correct.

22   Q.  They did not sell big bird.

23   A.  That is correct.

24   Q.  Mar-Jac did not sell case ready.

25   A.  That is correct.

Michael Ledford - Cross

1  Q.  George's business was primarily small bird.

2  A.  Yes.

3  Q.  Claxton was limited because they had one plant.

4  A.  Correct.

5  Q.  Pilgrim's on the other hand produced a wide range of

6  products and the eight-piece sales was a relatively small

7  percentage of their business.

8  A.  When you say business, you mean with KFC or in totality?

9  Q.  In totality.

10  A.  That is correct.

11  Q.  Koch was trying to increase KFC sales going into 2014.

12  A.  Yes, they were.

13  Q.  And knowing these suppliers, Mr. Ledford, was important

14  because KFC, you, dealt repeatedly with the same suppliers year

15  after year.

16  A.  Correct.

17  Q.  So going back to the ebbs and flows of the market in all of

18  your experience since the mid nineties, you would agree with me

19  that there was a price spike in 2008?

20  A.  Yes.

21  Q.  There was a price spike in 2011?

22  A.  Yes.

23  Q.  There was a price spike even more recently, 1920?

24  A.  2020.

25  Q.  2020.  Did I say 19?

700

Michael Ledford - Cross

1    A.  Yes, you did.

2    Q.  1920.  I am not yet that old.  Let's do this.  2019 into

3    2020.

4           MR. TORZILLI:  Objection, relevance.

5           THE COURT:  Sustained.

6    BY MR. BELLER:

7    Q.  The spikes that you had testified to, not in 1920 or 2020,

8    but let's go back to your answers in 2008 and 2011, those were

9    due to market and weather conditions.

10   A.  Correct.

11   Q.  So we've spoken quite a bit around background information.

12   Let's focus now more on the 2013 contract, okay?  Claxton as we

13   established was one of several suppliers that participated in

14   the bidding process that year.

15   A.  Yes.

16   Q.  Now, on your direct examination we saw e-mails from you or

17   from Mr. Oeschli announcing the kickoff process.  Do you recall

18   those?

19   A.  Yes, I do.

20   Q.  And we saw some of the bid responses.  Do you recall those?

21   A.  Yes.

22   Q.  We also saw some of the cost-plus models, for example?

23   A.  Yes.

24   Q.  Do you recall seeing that most of those that were shown to

25   the jury were from or to Scott Brady at Claxton Poultry?

Michael Ledford - Cross

1    A.   Yes.

2    Q.   Now, Mr. Ledford, those similar documents, the e-mails, the

3    responses, the contracts, are more or less the same for every

4    one of your suppliers.

5    A.   Yes.

6    Q.   All right.  The numbers, of course, are different, but

7    rather the fact that these correspondences occur is the same

8    throughout all suppliers.

9    A.   Yes, that's right.

10   Q.   Going into the negotiation for the 2013 contract, you were

11   aware that suppliers' margins were in the negative.

12   A.   Yes.

13   Q.   That there were record losses to the chicken growers or

14   poultry suppliers in 2011 and 2012.

15   A.   Yes.

16   Q.   In fact, that's something that you had accounted for or

17   became knowledgeable about going into the 2013 negotiation.

18   A.   Yes, that's right.

19   Q.   And you write and prepare a strategy slide deck to guide

20   how that negotiation process is going to go.

21   A.   Yes, that's right.

22   Q.   Mr. Ledford, in front of you is a tab labeled F-810.  If

23   you could turn to tab F-810.

24   A.   Okay.

25   Q.   Do you recognize F-810?

Michael Ledford - Cross

1   A.  Yes, I do.

2        *MR. BELLER:*  Your Honor, at this time I would move for

3   the introduction of F-810, and I believe that this is by

4   agreement of the parties as a business record.

5        *THE COURT:*  Any objection to the admission of F-810?

6        *MR. TORZILLI:*  No objection.

7        *THE COURT:*  F-810 will be admitted.

8   *BY MR. BELLER:*

9   Q.  So we were talking about the fact that there were record

10  losses for the poultry suppliers in 2011 and 2012.

11       Mr. Ledford, at least six poultry companies had gone

12  bankrupt in the prior 24 months; is that right?

13  A.  That is right.

14  Q.  Now, you had testified on direct examination that one of

15  the concerns -- or let me be clear, one of the things that

16  compromised your leverage is the fact that Pilgrim's, for

17  example, was such a huge part of the market, right?

18  A.  Yes.

19  Q.  And so with Pilgrim's being a huge part of the market, you

20  did not have quite as much leverage over Pilgrim's as you would

21  over, say, Claxton who was only 1 percent of the market.

22  A.  Yes, that's fair.

23  Q.  So when we say that six poultry companies went bankrupt in

24  the prior 24 months, that had some concern for you as a poultry

25  buyer.

703

Michael Ledford - Cross

1    A.   Yes.   It was very concerning.

2    Q.   Because now since margins are negative, poultry suppliers

3    are going bankrupt, it can have an input on your ability to

4    purchase chicken.

5    A.   Yes, it can.

6    Q.   To have the volume that you need to supply your

7    restaurants.

8    A.   Right.

9    Q.   And there is a lot of reasons as to why these different

10   companies went bankrupt, but one of them was severe drought

11   during that period of time.

12   A.   Right, and that impact it had on the grain prices.

13   Q.   Exactly.   So if there is a severe drought, then farmers are

14   not going to be able to grow as much corn or soy for the

15   soybean meal.

16   A.   Right.

17   Q.   And corn and soy, when there is not enough supply, supply

18   and demand, the price sky rockets up, right?

19   A.   Exactly.

20   Q.   And when the price sky rockets up, it makes it a lot more

21   expensive to be able to grow a chicken?

22   A.   Yes.

23   Q.   And if margins are in the negative, companies go bankrupt.

24   A.   Right.

25   Q.   Okay.   Basic seventh grade economics, right?

Michael Ledford - Cross

1    A.   Exactly.

2    Q.   Because of all this, small bird plants or small bird supply

3    was continuing to shrink, right?

4    A.   Yes.

5    Q.   And small bird supply was continuing to shrink, but big

6    bird supply margins were starting to grow.

7    A.   Yes.

8    Q.   In other words, it was much more economical or much more

9    profitable to grow a larger bird.

10   A.   Correct.

11   Q.   KFC did not buy larger birds.

12   A.   Not for chicken on the bone.

13   Q.   And demand nationally was expected to increase for chicken?

14   A.   Yes.

15   Q.   Hot wings, for example, was expected to go up in price 27

16   to 32 percent.

17   A.   That sounds right.

18   Q.   Supply was tighter than ever.

19   A.   Yes.

20   Q.   For most of 2012 wing price was averaging about $2.50 a

21   pound.

22   A.   Yes.

23   Q.   Now, $2.50 a pound, that's actually coming from something

24   called the Urner-Barry, right?

25   A.   Yes.

Michael Ledford - Cross

1   Q.   Do you mind explaining to the jury what the Urner-Barry is?

2   A.   Yes, sir.  The Urner-Barry is the quoted market for the

3   chicken business industry.  It's much like -- it would be

4   synonymous with like the New York Stock Exchange, the Chicago

5   Board of Trade or something like that.  It's a market that is

6   used in the chicken industry to price products.

7   Q.   And so Urner-Barry or the market had chicken wings at about

8   $2.50 a pound.

9   A.   Yes.

10   Q.   UFPC, RSCS, KFC -- I am using all the acronyms for the same

11   company -- was paying the suppliers an average of $1.70 a pound

12   for wings.

13   A.   That's right.

14   Q.   80 cents less than that market price.

15   A.   That's right.

16   Q.   Or about 30 percent under market; is that fair?

17   A.   Yes.

18   Q.   Chicken was in demand as a lower priced option for beef and

19   pork.

20   A.   Yes.

21   Q.   UFPC or RSCS, KFC, was paying less than market on not just

22   wings, but on tenders, right?

23   A.   Yes.

24   Q.   Less than market on dark meat.

25   A.   Yes.

Michael Ledford - Cross

1    Q.  And below market on the eight-piece price.

2    A.  Yes.

3    Q.  It's fair to say, Mr. Ledford, that you needed Claxton

4    Poultry even though they were only 1 percent of the market.

5    A.  Yes.

6    Q.  You needed them to ensure the supply.

7    A.  Correct.

8    Q.  And you needed them to meet RSCS's strategic advantages --

9    strategic objectives, excuse me.

10   A.  That's right.

11   Q.  And that's because Claxton Poultry tended to offer more

12   competitive pricing than the larger competitors.

13   A.  Yes, that's true.

14   Q.  And as we established going into the 2013 negotiation, you

15   wanted a very narrow spread between the different COB prices?

16   A.  Right.

17   Q.  And so wanting that narrow spread, you wanted to utilize

18   these lower price suppliers like Claxton to push the higher

19   cost suppliers down.

20   A.  Yes.

21   Q.  To encourage the other suppliers to also maintain this

22   small bird production.

23   A.  Yes.

24   Q.  So let's talk about your negotiations just a little bit

25   with Claxton Poultry.

Michael Ledford - Cross

1          During your negotiations with Claxton, you worked

2   primarily with Scott Brady, right?

3   A.  From my standpoint?  I dealt with him and Mikell.  And I

4   think Scott was the first contact, but typically speaking

5   throughout the negotiation process at some point Mikell and I

6   were going to speak.

7   Q.  Understood.  So you would speak with Mikell Fries as part

8   of the negotiation.  And then in 2012, Scott Brady joined

9   Claxton and you also spoke with Mr. Brady.

10  A.  That's correct.

11  Q.  Okay.  Mr. Brady you know to be the manager of national

12  accounts?

13  A.  Yes.

14  Q.  And as we just said, 2012 was your first year working with

15  Mr. Brady at Claxton Poultry.

16  A.  Yes.

17  Q.  Mr. Brady did not have final pricing authority.

18  A.  No, he did not.

19  Q.  And so as you said to the jury, you also worked with my

20  client, Mikell Fries.

21  A.  Yes.

22  Q.  And Mikell up until that point -- excuse me, Mr. Fries up

23  until that point was your usual point of contact for KFC

24  negotiations.

25  A.  Yes.

708

Michael Ledford - Cross

1   *Q.*  And his title at that time was also manager of national

2   accounts?

3   *A.*  Yes.

4   *Q.*  The president of Claxton at this point was a gentleman by

5   the name of Jerry Lane.

6   *A.*  Yes, that's right.

7   *Q.*  And Mr. Lane was the president of Claxton during both 2013

8   and 2014.

9   *A.*  Yes.

10        *MR. BELLER:*  If I may have just one moment, Your

11  Honor.

12        *THE COURT:*  You may.

13  *BY MR. BELLER:*

14  *Q.*  So we've been talking, Mr. Ledford, about the different

15  market conditions, what you had knowledge of, what your

16  expectation was, what your objectives were going into this

17  negotiation.  One of the things that you were considering in

18  going into the negotiation is what were the market conditions,

19  right?

20  *A.*  That's right.

21  *Q.*  And trying to make a prediction on how you think these

22  market conditions are going to impact pricing going into the

23  2013 year.

24  *A.*  Yes.

25  *Q.*  Taking into account all sorts of different things including

709

Michael Ledford - Cross

1    supply and cost of feed.

2    *A.*  Right.

3    *Q.*  And so in September of 2012 right before the kickoff, you

4    made some predictions regarding what the pricing was going to

5    look like at the end of negotiation.

6    *A.*  That's correct.

7    *Q.*  You guessed or you thought that your eight-piece price was

8    going to go up roughly 2 to 3 percent from the prior year.

9    *A.*  That's right.

10   *Q.*  You thought that the dark meat price was going to go up 4

11   to 5 percent from the prior year.

12   *A.*  That's right.

13   *Q.*  Do you recall that Claxton Poultry's purple price, meaning

14   the fried price, in 2012 was at .9618?

15   *A.*  I do not recall that specifically.

16        *MR. BELLER:*  No problem.

17        Your Honor, just for the witness and counsel, may I

18   please show the witness F-750?  Your Honor, this was not in my

19   binder, so if I can please hand documents to Ms. Grimm for you

20   and the witness and also I have a copy for counsel.

21        *THE COURT:*  Yes, that's fine.

22        *MR. BELLER:*  And for the Court and counsel, the

23   government number on this is 1461.  It is not admitted, but it

24   is on the agreed upon list under that exhibit number.

25        *THE COURT:*  Understood.

Michael Ledford - Cross

1          MR. BELLER:  Thank you.

2    BY MR. BELLER:

3    Q.  Mr. Ledford, I want to go back to -- I am going to have you

4    set that aside for just one moment and I am going to come back

5    to it.  I am going to go back to Exhibit F-10 which is in your

6    binder and it's also been admitted into evidence.  We were

7    talking about the percentages.

8          MR. TORZILLI:  Objection, there is no F-10.

9          MR. BELLER:  F-810, excuse me, F-810.

10         Your Honor, may F-810 be published to the jury,

11   please?

12         THE COURT:  It seems to be multi-page.  A particular

13   page, Mr. Beller?

14         MR. BELLER:  Just one moment, Your Honor.

15         THE COURT:  Yes.

16         MR. BELLER:  We will come back to that, Your Honor.

17         THE COURT:  Sure.

18   BY MR. BELLER:

19   Q.  So do you have 750 in front of you, F-750 in front of you,

20   sir?

21   A.  Yes, I do.

22   Q.  If you could take a moment and look at that.  Is that a

23   multi-page document?

24   A.  Yes, it is.

25   Q.  Is that something that looks familiar to you, Mr. Ledford?

Michael Ledford - Cross

1   Do you recognize it?

2   A.  Yes, I do.

3           MR. BELLER:  Your Honor, at this time based upon

4   agreement of the parties, I would move Exhibit F-750 into

5   evidence.

6           THE COURT:  Any objection to F-750?

7           MR. TORZILLI:  Without objection.

8           THE COURT:  F-750 will be admitted.

9   BY MR. BELLER:

10  Q.  So F-750, Mr. Ledford, is Claxton Poultry's 2012 contract

11  with RSCS or KFC; is that right?

12  A.  Yes.

13  Q.  And there is two --

14          MR. BELLER:  May it also be displayed and published to

15  the jury, please?

16          THE COURT:  It may be.

17          MR. BELLER:  Thank you.

18  BY MR. BELLER:

19  Q.  We have two different columns here.  One of them is purple.

20  One of them is orange; is that right?

21  A.  Yes.

22          THE COURT:  Mr. Beller, do you mind indicating what

23  page number you are displaying and asking the witness to look

24  at?

25  BY MR. BELLER:

Michael Ledford - Cross

1   Q.  Yes.  I believe this is Page 2, is that right, in front of

2   you?

3   A.  It was the second page of what was handed to me, but it

4   says Page 1 at the bottom if that helps.

5             MR. BELLER:  The first page is redacted, Your Honor,

6   and so this is the next page.  Thank you.

7             Thank you, Your Honor.

8   BY MR. BELLER:

9   Q.  There are two different columns.  One is purple.  One is

10  orange; is that right?

11  A.  Yes.

12  Q.  Now, to remind the jury, purple is the fried product?

13  A.  Right.

14  Q.  Breaded and fried.  Orange is the grilled product?

15  A.  Right.

16  Q.  Okay.  So purple, the contract price in 2012 was .9618; is

17  that right?

18  A.  Yes.

19  Q.  And the orange price, the grilled price, was -- well, 94

20  cents 95, right, .9495?

21  A.  Right.  And just to be clear, that's on the following page.

22  Q.  Thank you.  That's on the next page that actually has those

23  final numbers.  Thank you.  And dark price is .6418.

24  A.  Yes.

25  Q.  So keeping those numbers -- well, actually you know what,

713

Michael Ledford - Cross

1    let's do the math for just a moment.  If you estimated that

2    eight-piece price going into 2013 is going to go up 2 to

3    3 percent, you would expect Claxton's price fried to be

4    somewhere in the 98 to 99-cent price point, right?

5    A.   That's correct.

6    Q.   And you would expect the dark meat price, if it's going up

7    4 to 5 percent, to be somewhere in the 67-cent price mark.

8    A.   Yes.

9    Q.   So you are obviously expecting an increase.

10   A.   Yes, I was.

11   Q.   Okay.  Thank you.  You can put those away.  I appreciate

12   it.

13          So focusing then -- let me back up and ask a question.

14   Your predictions of going up in price to 3 percent or 4 to

15   5 percent, that's not anything you're sharing with anyone,

16   right?

17   A.   Not outside the company, no.

18   Q.   Not outside the company.  You're basically getting the

19   stakeholders inside the company prepared for, hey, prices are

20   going to be going up this year.

21   A.   Yes.

22   Q.   Okay.  You're not sharing it with any of the other people

23   who are actually bidding.

24   A.   That's correct.

25   Q.   Okay.  So you send out the e-mail that we saw.  And on

714

Michael Ledford - Cross

1    October 9th Claxton submits its initial price proposal to

2    supply in 2013; is that right?

3    *A.*   Yes.

4    *Q.*   Okay.   And the jury has already seen that particular

5    contract.   That was Exhibit 9692.

6            *MR. BELLER:*   If we can show to the jury a

7    demonstrative, Your Honor, this is Exhibit I-731, Page 1,

8    solely for the purpose of identification and not because I plan

9    on admitting.

10           *THE COURT:*   You are just showing it to the witness

11   right now?

12           *MR. BELLER:*   That's exactly right.   I am going to

13   start with the witness.

14           Excuse me.   May I have it be shown to witness and

15   counsel?   Excuse me.

16           *THE COURT:*   Yes.

17           *JUROR:*   Just to let you know, there is a lot of static

18   and it's not working when things get shown to us.

19           *THE COURT:*   Let's wait until we do display something

20   and see.

21           *JUROR:*   It didn't work last night, but I thought if

22   you need IT to come during the break or something.

23           *THE COURT:*   Good anticipation.   Yes, yes, we will.

24   Ms. Grimm will do that.   Thanks.

25   *BY MR. BELLER:*

715

Michael Ledford - Cross

1   Q.  Can you see the document in front of you?

2   A.  Not yet.  Okay, I have it now.  And it's gone.

3   Q.  Every three seconds can you see the document?  Mr. Ledford,

4   if you can look at the document very quickly, remember each

5   line.  I am going to ask you about it.

6           THE COURT:  Do we have a hard copy for Mr. Ledford?

7           MR. BELLER:  We do.  May I give this to Ms. Grimm,

8   Your Honor?

9           THE COURT:  Yes.

10  A.  Much better.

11  BY MR. BELLER:

12  Q.  Mr. Ledford, if you can take just a moment and look at

13  I-731, and let me know when you have had a chance to review it.

14  A.  Okay.

15  Q.  Does that appear to be the round one bid from Claxton

16  Poultry that you received on October the 9th, 2012?  And the

17  numbers are depicted in that round one bid that was admitted as

18  Exhibit 9692?

19  A.  This looks familiar, yes.

20          MR. BELLER:  Your Honor, based on that I would ask if

21  it's possible to be able to publish this to the jury for

22  demonstrative purposes.

23          THE COURT:  Any objection?  And this is just Page 1;

24  is that correct?

25          MR. BELLER:  Just Page 1.  And I will go through the

716

Michael Ledford - Cross

1   other pages, but just Page 1 is what I am asking for at this
2   point.
3           THE COURT:  Any objection to that, Mr. Torzilli?
4           MR. TORZILLI:  We don't object.
5           THE COURT:  Now is our technical problem.  What I
6   would suggest since we seem to have the blinking problem that's
7   ongoing is that why don't we use the very old-fashioned method.
8   Do we have a couple of extra copies and we will pass those to
9   the jury and have them pass it on down the row just so that
10  they can take a look at it?
11          MR. BELLER:  We do, Your Honor.
12          THE COURT:  It's just that one page, I think.
13          MR. BELLER:  I just have to unstaple them.
14          THE COURT:  Behind you, Mr. Beller, efforts are being
15  made to gather, so you may not need to unstaple yourself.
16          MR. BELLER:  Very good.  Another option, Your Honor,
17  is I am certainly happy to lay the foundation for all four
18  pages.
19          THE COURT:  Did you intend on --
20          MR. BELLER:  I do.
21          THE COURT:  Sorry.  Let's cease and desist on
22  unstapling.  Sounds like we are going to do the whole packet,
23  so now we may need to staple.
24          So why don't you lay the foundation for all of those,
25  Mr. Beller.

Michael Ledford - Cross

1          MR. BELLER:  I will.

2     BY MR. BELLER:

3     Q.  Let me ask you just a series of quick questions, and then I

4     will hopefully be able to display these, okay?  The information

5     that you received, the packet that you received that shows that

6     first page, are there multiple pages on that, Mr. Ledford?

7     A.  Yes, there is.

8     Q.  Would you turn to the second page, Mr. Ledford?  Take a

9     moment and just review that second page.  Does the second page

10    show Claxton 2013's round one and round two bid submission

11    numbers?

12    A.  Yes, it does.

13    Q.  If you can turn to the next page.  Does the next page again

14    repeat the first two rounds, but also add that third round

15    number?

16    A.  Yes, it does.

17    Q.  And the next page.  Now, this one shows those first three

18    rounds and now it shows a second third round; is that right?

19    A.  Yes.

20    Q.  And then finally the fourth page shows those prior four

21    submissions plus the final contract price.  Have you reviewed

22    that?

23    A.  Yes, I have.

24    Q.  Does that appear to be a correct and accurate demonstration

25    or demonstrative of the contracts that were introduced by

718

Michael Ledford - Cross

1   Mr. Torzilli in direct examination?

2   A.  Yes, it does.

3         MR. BELLER:  Your Honor, I am not submitting this

4   under 1006.  I am asking to use it as a demonstrative.  So at

5   this time I would request that permission.

6         THE COURT:  Why don't we maybe with the assistance of

7   Ms. Page, let's try the document viewer and see whether

8   somehow, some way that might solve our blinking problem.

9         MR. BELLER:  I am happy to.  And if I can relocate.

10        THE COURT:  Or maybe Ms. Page can go to that location.

11        MS. PAGE:  Your Honor, do we have this one plugged in

12   as well?

13        THE COURT:  Ms. Grimm is coming to the rescue.

14        That seemed to have worked.

15        So Mr. Beller, if you will just identify which page is

16   which, which is being displayed.

17        MR. BELLER:  I will.

18   BY MR. BELLER:

19   Q.  So in front of you, Mr. Ledford, do you see demonstrative

20   I-731, Page 1?

21   A.  Yes.

22        MR. BELLER:  Your Honor, since there was no objection,

23   can we have this projected to the jury as well, please?

24        THE COURT:  Absolutely.  I thought it was.

25   BY MR. BELLER:

Michael Ledford - Cross

1   Q.  Mr. Ledford, Claxton Poultry submitted their round one

2   offer to you at .9620 and that is for eight-piece; is that

3   right?

4   A.  Yes.

5   Q.  Now, to remind ourselves, the year before in 2012, as you

6   testified Claxton was .9618?

7   A.  That is right.

8   Q.  And you predicted that the market would go up 2 to

9   3 percent.

10  A.  Yes.

11  Q.  So Claxton instead is going up .0002 cents?

12  A.  That's right.

13  Q.  I think that is two 10-thousandths of a penny?

14  A.  Yes.

15  Q.  My seventh grade math teacher would be thrilled.  I think

16  it's two 10-thousandths of a penny between 2012 and their first

17  round one bid for 2013.

18          Now, on here we also have bulk wings, correct?

19  A.  Yes.

20  Q.  Now, bulk wings, their offer, their opening offer was

21  $1.8120 per pound, right?

22  A.  Right.

23  Q.  And we had established at this point that the Urner-Barry

24  for wings was around $2.50.

25  A.  Right.

Michael Ledford - Cross

1   Q.  So they are 70 cents roughly less than market as their

2   first round offer.

3   A.  At this time period, yes.

4   Q.  At this time period.  Now, in parentheticals there it says

5   plus 85.  And if we do the math, is that because when you take

6   the eight-piece price, you add 85 cents and that's how you get

7   to $1.8120?

8   A.  Right.

9   Q.  And precounted wings is $1.9120, right?

10  A.  Yes.

11  Q.  So the difference between those two is that wings bulk is

12  based on weight.  You put a bunch of wings into a box and then

13  weigh it.  It's $1.81 a pound.  On the other hand, if what

14  needs to be done is they have to be counted, either

15  hand-counted or by machine, there is a 10-cent increase for the

16  labor that goes into that 10 cents; is that right?

17  A.  That's right.

18  Q.  Okay.  So precounted wings is 95 cents over the eight-piece

19  price, right?

20  A.  Yes.

21  Q.  And then we have .30 back on dark meat.

22  A.  Correct.

23  Q.  Again, round one offer.  So I want to pause here and speak

24  just a little bit more about this dark meat price.

25              Dark meat, I think we know what dark meat is, right,

Michael Ledford - Cross

1   thighs and --

2   A.   Drumsticks.

3   Q.   Drumsticks, thank you.   Dark meat is not as expensive as an

4   eight-piece price.

5   A.   Correct.

6   Q.   Certainly less expensive than what I am going to call your

7   white meat, your breast, right?

8   A.   Right.

9   Q.   That's why dark meat is just a little bit cheaper than

10   either the eight-piece or breast meat.

11   A.   Correct.

12   Q.   So when suppliers are bidding on KFC's business, they will

13   frequently use a shorthand which is .30 back or 30 cents back

14   in this particular example.

15   A.   Yes.

16   Q.   30 cents back means you look at the eight-piece price and

17   you subtract 30 cents.

18   A.   Right.

19   Q.   So if I were to tell you or if I were to tell Mr. Torzilli,

20   hey, dark meat price is 30 cents back, you can't -- you don't

21   know what that actual dollar amount is unless you also know the

22   eight-piece price.

23   A.   That's right.

24   Q.   And that's because .30 back is formulaic, right?

25   A.   Yes.

Michael Ledford - Cross

1    Q.   .30 back is formulaic.  It's like going into a target and

2    seeing a sign for 20 percent off.  You have no way of knowing

3    what you're paying because you don't know 20 percent off of

4    right price.

5    A.   Right.

6    Q.   So this is the same thing it's fair to say.

7    A.   Yes, that's fair.

8    Q.   So when you tell the suppliers, hey, I want everyone to be

9    at .31 back, you're telling them what you want them to put in

10   their formula.

11   A.   Right.

12   Q.   Not necessarily what that dollar amount is going to be.

13   A.   Yes.

14   Q.   So just like in past negotiations after the suppliers give

15   you their first round bid and specifically Claxton Poultry

16   gives you their first round bid, you give them feedback on this

17   bid.

18   A.   Yes.

19   Q.   Again, it may have been a phone call.

20   A.   Right.

21   Q.   It may have been phone call, may have been e-mail, may have

22   been in person.

23   A.   Right.

24   Q.   And one of the feedbacks that you gave to everyone is that

25   you wanted everybody's formulaic dark meat bid to be .31 back.

723

Michael Ledford - Cross

1   A.  I do not recall that specifically.

2   Q.  Does that sound like something you would have said,

3   Mr. Ledford?

4   A.  I do not recall.

5   Q.  The average bid after round one came to about 98 cents when

6   you took in all the suppliers together.

7   A.  I do not recall.

8   Q.  So after negotiating with the suppliers, you asked them to

9   submit a second round bid, right?

10  A.  Yes.

11  Q.  And Claxton submitted its second round bid on November the

12  14th.

13  A.  Yes.

14       MR. BELLER:  If we can turn the page to Page 2,

15  please.

16  BY MR. BELLER:

17  Q.  Are you able to see on the exhibit round one and round two,

18  Mr. Ledford?

19  A.  Yes.

20  Q.  Okay.  Round two, again Claxton's eight-piece price is

21  still .9620, right?

22  A.  That's right.

23  Q.  Now, they are .9620 because you were okay with their

24  eight-piece price.

25  A.  I don't remember specifically, but just looking at the

Michael Ledford - Cross

1    numbers, that stands to reason.

2    Q.  Well, certainly if you gave feedback and told them pull the

3    eight-piece price down, it would be reflected based upon your

4    knowledge of working with Claxton.

5    A.  Typically speaking, yes.

6    Q.  Okay.  And so when we are talking about getting this tight

7    range amongst the different suppliers, you need some of the

8    suppliers that are at that bottom range to -- in order to be

9    able to pull the top numbers down.

10   A.  Yes.

11   Q.  Claxton's eight-piece price as we established remained at

12   .9620, so their price on eight-piece between round one and

13   round two did not go down.  And the dark meat also stayed at

14   .30 back, right?

15   A.  That's correct.

16   Q.  Okay.  So in other words, their dark meat price which you

17   can read here is the dark meat price would have been .6620.

18   A.  Yes.

19   Q.  Now, let's look at the wing price because the wing price

20   here did come down.  It went from $1.8120 on bulk to $1.7620 on

21   bulk, right?

22   A.  Right.

23   Q.  And the wings precounted went from 95 cents above the

24   eight-piece price to being just 90 cents above the eight-piece

25   price.

Michael Ledford - Cross

1   *A.*   Right.

2   *Q.*   Now, we have been talking about market and the Urner-Barry

3   market specifically.  A wing price being set at market is

4   pretty common in negotiations.

5   *A.*   Yes, it is.

6   *Q.*   It's a starting point in negotiation that happens quite

7   often, right?

8   *A.*   Yes.

9   *Q.*   And you would agree with me that it's a fair place to start

10   negotiations is market.

11   *A.*   Typically speaking, yes.

12   *Q.*   And we had just established that wing market in 2012 had

13   the record -- was a record high.

14   *A.*   Right.

15   *Q.*   So between round one and round two, Claxton actually lowers

16   their offer on wings.

17   *A.*   Yes.

18   *Q.*   Now, these numbers as we've established are derived out of

19   this cost-plus model, right?

20   *A.*   Right.

21   *Q.*   And the cost-plus model that's e-mailed to the different

22   suppliers has some instructions at the top of it.

23   *A.*   Correct.

24   *Q.*   The instructions for how to fill out a model.

25   *A.*   Right.

Michael Ledford - Cross

1   Q.  And that includes instructions about wing prices, right?

2   A.  Yes.

3          MR. BELLER:  If we can show -- and if we can't do it

4   electronically, I have paper copies -- Government Exhibit 1503.

5   I believe this is already in evidence.

6          THE COURT:  Yes, it is.  We are going to need to

7   switch displays, so we'll see how that works.

8          MR. BELLER:  And if I may have just one moment.

9          THE COURT:  Yes.

10          MR. BELLER:  Excuse me.  I can't read my own

11   handwriting.  May I have 1501, please?  And I do believe that

12   that is admitted.

13          THE COURT:  That is.

14          MR. BELLER:  Thank you, Your Honor.

15          And if it's possible --

16   BY MR. BELLER:

17   Q.  Do you see 1501 in front of you?

18   A.  Yes, I do.

19   Q.  It's very tiny print and there is a whole lot of words,

20   right?

21   A.  Right.

22          MR. BELLER:  If we can zoom in on bullet No. 4 of

23   1501, please.  And if we can highlight bullet No. 4 of 1501.

24   BY MR. BELLER:

25   Q.  And that bullet says, please enter your Urner-Barry Q1 wing

Michael Ledford - Cross

1  meat block price used in your Wing Cost Model to calculate your

2  quarter one FOB wing price, right?

3  A.  Yes, that's what that says.

4       MR. BELLER:  Thank you.  We can take that down.

5       THE COURT:  Mr. Beller, did you want that displayed to

6  the jury?

7       MR. BELLER:  Yes, I do want that displayed to the

8  jury.  I'm sorry.  I imagine that's why Mr. Tubach was calling

9  my name.  If we can have that displayed to the jury and give

10 them a moment to read that.

11      THE COURT:  Okay.

12 BY MR. BELLER:

13 Q.  Mr. Ledford, because wing prices were at historic or

14 all-time highs, you wanted a flat price on wings instead of a

15 market-based price, right?

16 A.  For that item, yes.

17 Q.  Yes.  Well, because a flat price allows you more stable

18 pricing that isn't so reliant on the market.

19 A.  Correct.

20 Q.  Following receiving the second round bid, you continued to

21 have negotiation calls and correspondence with Claxton before

22 they submitted yet another price proposal.

23 A.  Yes.

24 Q.  You had a call with them on November the 28th, 2012.

25 A.  I don't remember specifically.

Michael Ledford - Cross

1  Q.  In your binders, sir, there is a -- actually, let me back

2  up.  If I showed you a calendar invite, would that refresh your

3  recollection on the date of the call with Claxton Poultry?

4  A.  That would refresh my memory.

5  Q.  If you could turn to Defense Exhibit H-642 and take a look

6  at that, and then I will ask you questions.

7  A.  I don't know that I have an H.

8  Q.  Okay.  On your screen we are going to display Defense

9  Exhibit H-642.

10         This is for counsel and the witness only.

11         If you could take a moment and review that and let me

12  know if that refreshes your recollection.

13  A.  Yes, it does.

14  Q.  Does it refresh your recollection, sir, that you had a call

15  with Claxton Poultry on November 28th of 2012?

16         MR. TORZILLI:  Objection, Your Honor, ask that the

17  document be removed from the witness' view.

18         THE COURT:  Yes, it should be.

19         Can you ask that question again, Mr. Beller?

20  BY MR. BELLER:

21  Q.  Does that refresh your recollection?

22  A.  Yes, it does.

23         MR. BELLER:  If we can remove that document.

24  BY MR. BELLER:

25  Q.  Did you, in fact, have a call with Claxton Poultry on

Michael Ledford - Cross

1   November 28 of 2012?

2   A.   Yes.

3   Q.   And that call included Mr. Fries and Mr. Brady, right?

4   A.   Yes.

5   Q.   And the purpose of that call was to discuss their second

6   round submission that they had sent you the week before?

7   A.   Yes.

8   Q.   To provide them with additional feedback or directional

9   guidance regarding the negotiations?

10  A.   Yes.

11  Q.   And to hammer down the terms of the contract before the end

12  of the year; is that right?

13  A.   Yes.

14  Q.   So we now are going into Claxton Poultry's third round bid.

15  The third round bid, there is a cover proposal that is sent to

16  you December 3rd of 2012.  Do you recall that?

17  A.   Yes.

18        MR. BELLER:  If we can show the witness, please,

19  Page 3 of the demonstrative of I-731.  And I believe we can

20  display it to the jury please.

21        THE COURT:  You may.

22  BY MR. BELLER:

23  Q.   Are you able to see either through a flashing monitor or

24  through the document in your hand round three?

25  A.   Yes.

Michael Ledford - Cross

1    Q.   Again, round three, Claxton's eight-piece price continues

2    to be .9620, right?

3    A.   Right.

4    Q.   Their dark meat continues to be .30 back, correct?

5    A.   Yes.

6    Q.   And round three, they did not follow your directional

7    guidance and their wing price and their precounted price

8    remained the same.

9    A.   Right.

10   Q.   Fair to say they probably did not follow your directional

11   guidance at that point?

12   A.   That's fair.

13   Q.   Okay.  Do you recall that they did, in fact, change their

14   case weight?  And their case weight was the only change, but

15   the actual prices had remained the same.

16   A.   Right.

17   Q.   In other words, they agreed to pull down that number

18   regarding what the weight of their box was going to be and what

19   they would be paid for.

20   A.   Right.  I believe it was equivalent of roughly 1 cent per

21   pound.

22   Q.   Okay.  So there was a concession that Claxton gave you.  It

23   just is not reflected in the actual dollars and cents; is that

24   right?

25   A.   That's right.

Michael Ledford - Cross

1    Q.   Okay.  Four hours, if you recall, after receiving round

2    three you reach out to Mr. Brady, right?

3    A.   I believe that's right.

4    Q.   You reached out to Mr. Brady and you said something along

5    the lines of, if these are your numbers, you're losing volume,

6    right?

7    A.   Yes.

8    Q.   Because volume, as we've established, is leverage for you.

9    A.   Right.

10   Q.   And so you're explicit.  You will lose business, you will

11   lose volume unless you pull your numbers down.

12   A.   Right.

13   Q.   And your threat to take away volume had its intended effect

14   on Claxton Poultry.

15   A.   Yes, it did.

16   Q.   It had its intended effect because an hour later Claxton

17   Poultry gave you new numbers.

18   A.   That's correct.

19   Q.   They gave you new numbers and they pulled their numbers

20   down, right?

21   A.   Right.

22        MR. BELLER:   If you turn to the next page of the

23   exhibit, which I believe Your Honor, is Page 4 of the

24   exhibit -- of the demonstrative, excuse me, and if we can

25   project that to the witness and the jury, please.

732

Michael Ledford - Cross

1          *THE COURT:*  You may.

2    *BY MR. BELLER:*

3    Q.  Do you see in front of you, Mr. Ledford, that there is now

4    a new column that says, 2nd Round 3:  December 3rd, 2012?

5    A.  Yes, I do.

6    Q.  And are these the numbers that you received an hour after

7    threatening to take away volume?

8    A.  Yes, they are.

9    Q.  Again, eight-piece price remains at .9620.

10   A.  Yes.

11   Q.  The wing price has come down from $1.76 all the way down to

12   $1.6120.

13   A.  Yes.

14   Q.  It's almost 90 cents less than market now, right?

15   A.  Right.

16   Q.  The wings precounted came down to $1.7120.

17   A.  Yes.

18   Q.  With that common 10-cent difference for pre-counting.

19          *THE COURT:*  Mr. Beller, let's switch over to the

20   document viewer for that page since we are getting a blinking

21   problem.

22          All right.  Go ahead.

23          *MR. BELLER:*  Thank you, Your Honor.

24   *BY MR. BELLER:*

25   Q.  And dark meat came down further, right?

Michael Ledford - Cross

1   A.   Right.

2   Q.   So even though 30 and a half looks like a bigger number,

3   because we are subtracting it from that eight-piece price, that

4   means our dark piece price actually came down.

5   A.   Yes, it's a lower price.

6   Q.   It's a lower price, thank you.

7            Now, if we can turn to the last page of this exhibit,

8   please.  Does this accurately reflect -- so it's the prior four

9   pages that we went through, and now this one also includes that

10  final contract price, right?

11  A.   Yes, it does.

12  Q.   So between Claxton's second round three and the final

13  contract price, you did not have to give additional directional

14  guidance.

15  A.   That's right.

16  Q.   You didn't have to tell them, you are still too high.  Pull

17  those down even more, right?

18  A.   That's right.

19  Q.   You were content with or happy with or willing to contract

20  at the price that they had given you in that final round.

21  A.   Yes, with the exception of we added a fee to the

22  eight-piece.

23  Q.   You know exactly where I'm going.  That fee to the

24  eight-piece.  So it looks as though Claxton's price went from

25  .9620 to .9625, right?

734

Michael Ledford - Cross

1    A.  That's what it looks like, yes.

2    Q.  And do you recall what that .0005 represented?

3    A.  Yes.  We had them add that on as a surcharge or a fee, if

4    you will, to -- in this case in particular I believe it was for

5    helping pay for the third-party consultants we had in that

6    year.

7    Q.  And so this particular year specifically RSCS brought in

8    outside consultants to be able to assist with the negotiations?

9    A.  Yes.

10   Q.  And to be able to assist with making sure that there was

11   that ample supply?

12   A.  Right.

13   Q.  So while it looks like Claxton Poultry's price went up 5

14   ten-hundredths of a penny, that's actually a fee that went back

15   to RSCS.

16   A.  Right.  And they did that at our direction.

17       MR. BELLER:  Thank you.  And I am done with this

18   exhibit, Your Honor.

19       Thank you, Mr. Ledford.

20   BY MR. BELLER:

21   Q.  So Mr. Ledford, we just went through 2012.  Let's talk

22   about how it ended up, okay?  Despite the challenges that you

23   identified going into negotiations, you would agree with me

24   that you believe you had a successful negotiation in 2012.

25   A.  Yes.

Michael Ledford - Cross

1    Q.  You were able to negotiate a savings estimate of

2    $5.5 million on KFC fresh chicken.

3    A.  That's right.

4    Q.  And you were able to do that despite your earlier

5    predictions that prices would actually go up 1 to 3 percent on

6    eight-piece?

7    A.  Right.

8    Q.  And 5.5 million in savings even though you believed that

9    prices were going to go up 4 to 5 percent on dark meat.

10   A.  Right.

11   Q.  And through all of these different negotiations, you

12   negotiated a difference from the lowest supplier to the highest

13   supplier of .0085 cents per pound.

14   A.  That's correct.

15   Q.  The numbers were extremely close together.

16   A.  Yes.  I believe it was the tightest range it had ever been

17   at that time.

18   Q.  8 one-hundredths of a dollar in range between top and

19   bottom.

20   A.  Right.

21   Q.  I think you just said this, but it was the tightest range

22   in recent history.

23   A.  Yes.

24   Q.  You negotiated a price of .01 cents -- excuse me, .01 cents

25   per pound in case weight savings for Claxton Poultry.

Michael Ledford - Cross

1    A.   Yes.

2    Q.   Now, again this tight range, this .0085, included not just

3    the five companies that are here, but also the additional

4    suppliers that are not here.

5    A.   Yes.

6    Q.   You were able to be successful in negotiating a flat price

7    on wings instead of a market-based price.

8    A.   Right.

9    Q.   That provided for the more stable pricing.

10   A.   Yes.

11   Q.   You kept dark meat in the same 30-cent area that you had

12   targeted going into negotiations.

13   A.   That's right.

14   Q.   The wing inflation was below the forecast for the 2013

15   market.

16   A.   Yes.

17   Q.   All of that is to say it was a very successful year.

18   A.   Yes.

19   Q.   Yum Brands, so looking for Pizza Hut, A&W, all those

20   companies that you listed earlier in addition to KFC, had

21   negotiated a savings of almost $18 million across the company.

22   A.   That's right.

23   Q.   And KFC, we talked about fresh, but now we're talking about

24   KFC completely, had negotiated over $13 million in savings that

25   year.

Michael Ledford - Cross

1    A.   Yes.

2    Q.   And it was successful because you also added an additional

3    supplier in Case Farms.

4    A.   Right.

5    Q.   And by adding an additional supplier in Case Farms, you

6    were able to further secure that supply that you had sought out

7    to secure.

8    A.   Yes.

9    Q.   There were savings in both FOB cost and freight.

10   A.   Right.

11   Q.   Your two big suppliers, the ones who normally have

12   leverage, have some leverage, came back in line with where you

13   asked them to be.

14   A.   Yes.

15   Q.   And that was Tyson's and Pilgrim's.

16   A.   Yes.

17   Q.   You awarded the top three lowest priced suppliers with

18   additional volume.

19   A.   That is correct.

20   Q.   Claxton Poultry was awarded more volume.

21   A.   Yes.

22   Q.   And not just was Claxton Poultry awarded more volume, but

23   you reduced volume from your highest four priced suppliers.

24   A.   I don't remember specifically if it was four.

25   Q.   In front of you is document F-808, if you can take a moment

Michael Ledford - Cross

1   and flip to F-808.  Let me know when you get there.

2   A.   Okay.

3   Q.   Are you there?

4   A.   Yes.

5   Q.   Would you turn to Page 46, please.  Let me know when you're

6   there.

7   A.   Okay.

8   Q.   Is F-808 a document that you recognize, Mr. Ledford?

9   A.   Yes, it is.

10  Q.   Is this a document that you prepare, this one in

11  particular, at the end of negotiations?

12  A.   Yes.

13       MR. BELLER:  Your Honor, I believe that this was

14  agreed to by the parties, and at this time I would move for the

15  introduction of the exhibit.

16       THE COURT:  Any objection to the admission of F-808?

17       MR. TORZILLI:  No objection, Your Honor.

18       THE COURT:  F-808 will be admitted.

19       MR. BELLER:  If we can publish Page 46 to the jury,

20  please.  I believe it's on the screen right now, but not for

21  the jury.

22       THE COURT:  Yes, you may.

23       MR. BELLER:  Thank you.

24  BY MR. BELLER:

25  Q.   Is that in front of you on your screen as well,

Michael Ledford - Cross

1    Mr. Ledford?

2    A.   Yes, it is.

3    Q.   Okay.  So Mr. Ledford, fair to say that you awarded the top

4    three lowest priced suppliers with additional volume?

5    A.   Yes.

6    Q.   And reduced the volume from the highest four priced

7    suppliers?

8    A.   Yes.

9    Q.   That included Pilgrim's.

10   A.   Yes.

11   Q.   Pilgrim's went from 38 percent to 37-1/2 percent, right?

12   A.   Yes.

13   Q.   And when we are talking about millions of pounds of

14   chicken, even though it's half a percentage, that's a lot of

15   chicken that they lost.

16   A.   It is.

17   Q.   Tyson's, you reduced their volume from 15 percent to

18   13 percent.

19   A.   Yes.

20   Q.   Mar-Jac was reduced from 6.3 percent to 5.5 percent.

21   A.   Yes.

22   Q.   So that means in this one year Claxton Poultry, for

23   example, competed against Pilgrim's and Tyson's and stole some

24   of their business.

25   A.   Yes.

740

Michael Ledford - Cross

1    *Q.*  And they stole some of their business because of the price

2    they negotiated.

3    *A.*  Yes.  I think stole makes it sound like a little bit more

4    nefarious than it was, but yes.

5    *Q.*  All right.  Let me do this in a way that's not quite as

6    dramatic or graphic.  They competed at a price that earned them

7    the business that was taken away from the other suppliers.

8    *A.*  Yes.

9    *Q.*  Because they undercut or at least came in at a lower price

10   than these big guys.

11   *A.*  Yes.

12   *Q.*  Thank you.

13          *MR. BELLER:*  And I am done with this exhibit, thank

14   you.

15   *BY MR. BELLER:*

16   *Q.*  Let's move now to the 2013 negotiations for a 2014

17   contract, okay?

18   *A.*  Okay.

19   *Q.*  Again, that occurred in the fall of 2013?

20   *A.*  Yes.

21   *Q.*  Okay.  And going into that particular negotiation, you had

22   meetings with your five major suppliers?

23   *A.*  Yes.

24   *Q.*  Your five major suppliers at that time was George's?

25   *A.*  Yes.

741

Michael Ledford - Cross

1    Q.   Simmons?

2    A.   Yes.

3    Q.   Tyson's?

4    A.   Yes.

5    Q.   Koch?

6    A.   Yes.

7    Q.   And Pilgrim's Pride?

8    A.   Yes.

9    Q.   Did not include Claxton.

10   A.   Did not include Claxton.

11   Q.   1 percent, not one of your biggest suppliers.

12   A.   Not one of our biggest suppliers.

13   Q.   When you met with your five largest suppliers, you reviewed

14   your goals for the year.

15   A.   Yes.

16   Q.   You asked them for their points of view going into

17   negotiations.

18   A.   Yes.

19   Q.   This was a year where you knew there was more of a supply

20   for chicken.

21   A.   Yes.

22   Q.   That it wasn't the year before or the year after where

23   there was a shorter supply of chicken, right?

24   A.   That's right.

25   Q.   Fair to say that for you as a buyer, 2013 was a much more

742

Michael Ledford - Cross

1   ideal time to buy chicken?

2   A.   Yes.

3   Q.   You had more leverage over the suppliers that year.

4   A.   I think when you look at the leverage point of supply and

5   demand and what the grain prices were on those particular

6   aspects, we did feel like we had more leverage.

7   Q.   Thank you.  Now, despite Claxton not being invited to one

8   of these sit-downs, they were one of the suppliers who

9   submitted a price proposal to you for the 2014 contract.

10  A.   Yes.

11  Q.   In fact, I think invitations to submit were sent to 23

12  different suppliers.

13  A.   Yes.

14  Q.   And of those 23 different suppliers who were invited to

15  participate, 17 actually did participate, right?

16  A.   That sounds right.

17  Q.   And they did this sometime in October of 2013.

18  A.   Yes.

19  Q.   And in October of 2013 is when they -- when you received

20  the first round bids.

21  A.   Yes.

22  Q.   Now, I think that you were shown by Mr. Torzilli A-288, and

23  that's the correspondence where you respond to Claxton's first

24  round bid.  Do you recall that particular document?

25  A.   I don't recall the number of the document, but yes, I do

743
Michael Ledford - Cross

1    recall that document.

2    Q.  I am shocked you have not memorized all the documents you

3    have looked at, Mr. Ledford.

4         MR. BELLER:  Your Honor, I believe this is in

5    evidence.  May we please publish A-288?

6         THE COURT:  You may.

7    BY MR. BELLER:

8    Q.  Do you see that on your monitor, Mr. Ledford?

9    A.  Yes.

10   Q.  If your monitor starts blinking, please let me know because

11   I am sure we have a paper copy.

12        If we can zoom in on that top box that actually lists

13   the numbers.

14        Are you able to see, and specifically I am looking at

15   that Line 1 that says KFC eight-piece chicken on the bone

16   fried.  Do you see that?

17   A.  Yes.

18   Q.  Now, Mr. Ledford, it says here that the 2013 price is

19   .9496, right?

20   A.  Yes.

21   Q.  It also says that the round one offer from Claxton is

22   .9627.

23   A.  Yes.

24   Q.  And you gave a percentage feedback or directional guidance

25   to Claxton saying that Claxton is 4 percent from a competitive

Michael Ledford - Cross

1    bid.

2    A.   Yes.

3    Q.   Now, let me back up.  Do you recall Mr. Torzilli showing

4    you this document?

5    A.   Yes, I do.

6    Q.   And asking you about this document?

7    A.   Yes.

8    Q.   2013 Claxton's price as we just established, contract

9    price, was .9625, right?

10   A.   Yes.

11   Q.   And so what this document shows is .9496.

12   A.   Yes.

13   Q.   And that's because this is the period price.

14   A.   I don't remember specifically if this was the period price

15   when we started.  It was something similar at a minimum.

16   Typically when we kicked off negotiations, I would ask each of

17   the suppliers to use the exact same grain input, so I would

18   give them a number, use X for your price for corn.  Use Y for

19   your price for soybean meal.  And that was a way we could

20   compare apples to apples.

21   Q.   I appreciate that explanation because this price that's

22   reflected at least on paper looks like Claxton's 2014 round one

23   offer was a penny and a half higher than 2014, but, in fact --

24   excuse me, than 2013.  But, in fact, 2013 was --  .9625 was the

25   actual contract, right?

Michael Ledford - Cross

1  A.  Yes.

2  Q.  In all of your meetings, your prep meetings with the

3  government, did the government ever ask you to explain that

4  difference to them?

5  A.  No, I do not remember them ever asking me that.

6        MR. BELLER:  If I may have just one moment.

7        THE COURT:  You may.

8  BY MR. BELLER:

9  Q.  Claxton's eight-piece price round one is .9627, right?

10  A.  Yes.

11        MR. BELLER:  Mr. Ledford, I have a demonstrative that

12  looks a whole lot like the last demonstrative, although this

13  one goes through 2014.

14        Your Honor, I can display it or I also have paper

15  copies as well.  I would ask that it be shown to the witness,

16  and then I will move for it to be published for the jury.

17        THE COURT:  Why don't we try electronically first and

18  then we'll see how that works out.

19        MR. BELLER:  Thank you.

20  BY MR. BELLER:

21  Q.  And Mr. Ledford, on your screen and on the screen for

22  counsel, I am going to show I-732.  Will you let me know if

23  that comes up on your screen, sir?

24  A.  Okay.

25  Q.  Can you see that?

746

Michael Ledford - Cross

1    *A.*  Yes.

2    *Q.*  Okay.  Does this appear to accurately reflect the round one

3    bidding for the 2014 contract for Claxton Poultry?

4    *A.*  Yes, it does.

5            *MR. BELLER:*  Your Honor, I would ask that this be

6    published for the jury for demonstrative purposes.

7            *THE COURT:*  Are there multiple pages, Mr. Beller?

8            *MR. BELLER:*  Yes, there are, Your Honor.  At this time

9    I am only moving for one, but just like last time, I am happy

10   to do several.

11           *THE COURT:*  It seems stable right now, so you can do

12   it in the order that you wish.

13           Any objection, Mr. Torzilli, to the use and display to

14   the jury of I-732 for demonstrative purposes only Page 1?

15           *MR. TORZILLI:*  No objection.

16           *THE COURT:*  It may be displayed to the jury for

17   demonstrative purposes.

18           Ladies and gentlemen, I don't think I explained, but

19   if something is being displayed to you for demonstrative

20   purposes, what it means is that it will not be going back to

21   the jury room with you when you deliberate at the end of the

22   case, but you are able to take a look at it during the course

23   of the trial, but it won't be going back with you.

24           Go ahead, Mr. Beller.

25           *MR. BELLER:*  Thank you, Your Honor.

Michael Ledford - Cross

1   *BY MR. BELLER:*

2   *Q.*  Sir, in front of you 2014 round one bidding Claxton bids

3   .9627; is that right?

4   *A.*  That's right.

5   *Q.*  And that is .0002 higher than Claxton's final contract

6   price in 2013; is that right?

7   *A.*  That's correct.

8   *Q.*  Dark meat is 30 and a half back from that, correct?

9   *A.*  Correct.

10  *Q.*  I won't make you do the math off the top of your head, but

11  it's 30 and a half cents less than .9627.

12  *A.*  Right.

13  *Q.*  Again, going back to the prior year, 2013 contract was 30

14  and a half back from dark meat price as well.

15  *A.*  Yes.

16  *Q.*  And I said that I wouldn't make you do the math, and that's

17  because the actual dark meat price math is on the screen,

18  right?

19  *A.*  Right.

20       *MR. BELLER:*  Your Honor, this is flashing off and on.

21  May I provide a paper copy to the witness through Ms. Grimm?

22       *THE COURT:*  Sure.  And if you want to switch over to

23  the document viewer, that would be fine too.  Up to you.

24       *MR. BELLER:*  That might be easier.  That way we don't

25  have to hand them out.

748

Michael Ledford - Cross

1          THE COURT:  Yeah, that's fine.

2     BY MR. BELLER:

3     Q.  Are you able to see that on your screen, Mr. Ledford?

4     A.  Yes.

5     Q.  Okay.  Mr. Ledford, after you received the round one bid,

6     you provided feedback again or directional guidance to

7     Mr. Brady and to Mr. Fries; is that right?

8     A.  That's right.

9     Q.  And you let them know that this eight-piece price, this

10    .9627, was 4 percent away from a competitive bid.

11    A.  Yes.

12    Q.  That was the e-mail that we were just looking at.

13    A.  Right.

14    Q.  Which is your way of saying politely bring your eight-piece

15    price down.

16    A.  Yes.

17    Q.  Bring your eight-piece price down by roughly 4 percent.

18    A.  Right.

19    Q.  Now, to remind the jury, when somebody's eight-piece price

20    comes down 4 percent, the dark meat price also comes down since

21    it's a formulaic piece of the eight-piece price.

22    A.  That's right.

23    Q.  And wings also comes down, right?

24    A.  That's right.

25    Q.  Since the wing price is based on that eight-piece price.

Michael Ledford - Cross

1  A.  Yes.

2  Q.  So when you, I guess, pull a lever, if that lever is

3  eight-piece, that means most of the other products are also

4  going to come down with it.

5  A.  Right.

6  Q.  So you wanted Claxton to submit a second round bid by

7  November 5th.

8  A.  Yes.

9  Q.  And you expected Claxton to -- or that bid, rather, to

10  reflect the feedback that you had given them regarding that

11  spreadsheet that we had shown.

12  A.  Yes.

13  Q.  You provided Mr. Brady the feedback on October the 1st of

14  2013?

15  A.  I don't remember the specific date, but I did provide

16  feedback, I know that.

17  Q.  No problem.  Do you recall telling him something along the

18  lines of, "I take business away from the highest priced

19  supplier every chance I get"?

20  A.  Yes, I do remember typing that.

21  Q.  Okay.  Strong language.  You are clearly sending a signal

22  here as to what Claxton Poultry needs to do with their pricing,

23  right?

24  A.  Yes, I was.

25  Q.  They can either lower their price or they can lose volume.

Michael Ledford - Cross

1   Those are their two choices.

2   A.   That's right.

3   Q.   You also advised Claxton Poultry at that time that they

4   were .0003 cents away from being the highest price supplier.

5   A.   Yes.

6   Q.   3 ten-thousandths of a dollar.

7   A.   Yes.

8   Q.   In your experience in negotiating with Claxton Poultry, do

9   you know what Claxton Poultry's strategy is in terms of where

10   they would like to be in the group?

11   A.   Yes.

12   Q.   Claxton Poultry is it fair to say does not ever want to be

13   the price leader?

14   A.   Right.  They do not want to be the highest priced.

15   Q.   Claxton Poultry never wants to be the lowest price either,

16   right?

17   A.   In my experience with them, I would say that's correct.

18   Q.   They want to be somewhere in the middle.

19   A.   Exactly.

20   Q.   That's something that you've heard from them before?

21   A.   It is.

22   Q.   And so Claxton Poultry submitting a bid that is .0003 cents

23   away or dollars away from being the highest price bidder you

24   know is not a place that even they want to be.

25   A.   Right.  I believe I put that in the e-mail.  I said, I

Michael Ledford - Cross

1    don't think that's where you want to be.

2    Q.  Okay.  And that they would lose volume.

3    A.  Yes.

4    Q.  Claxton Poultry then submits a second round bid to you; is

5    that right?

6    A.  That's right.

7         MR. BELLER:  On your screen -- if we can take this one

8    down, please.

9         On Page 2 -- Your Honor, is there a way since this is

10   not in to only show it to the witness from that stand?

11        THE COURT:  I think so, yes.

12        MR. BELLER:  Okay.  And if we can show Mr. Ledford

13   Page 2, please.

14   BY MR. BELLER:

15   Q.  Are you able to see Page 2 of that document?

16   A.  Yes.

17   Q.  And does this accurately reflect Claxton Poultry's round

18   two bid?

19   A.  I do not recall exactly what the round two bid was.

20   Q.  Okay.  If we can show -- well, would it help refresh your

21   recollection if you had an opportunity to see the round two

22   bid?

23   A.  Yes, it would.

24        MR. BELLER:  Your Honor, if we may show the witness

25   A-612.  I believe that is already in evidence and I believe

Michael Ledford - Cross

1   that has been published to the jury.  I am going to correct

2   myself.  612 I believe is the cover e-mail and 613 is the

3   actual bid.

4          THE COURT:  Yes, you may.  It has been admitted.

5          MR. BELLER:  Thank you.

6   BY MR. BELLER:

7   Q.  If you could take a moment -- if we can show you

8   Exhibit 613, and if you can take a moment and look at 613,

9   please.

10         Do you recognize 613, Mr. Ledford?

11  A.  Can we scroll up to the top of the page?

12  Q.  Yes.

13  A.  Yes.  Okay, I do recognize it.

14  Q.  Okay.  So Mr. Ledford, is that Claxton Poultry's

15  November 5th, 2013 round two bid?

16  A.  Yes.

17  Q.  And the eight-piece price on that is .9503; is that right?

18  A.  Can we scroll down?  I haven't seen that yet.

19  Q.  Yes.

20  A.  Yes.

21  Q.  Is it fair, Mr. Ledford, that dark meat is 30 and a half

22  back?

23  A.  Yes.

24  Q.  Thank you.  If we can go back to Page 2 of I-732.  Do you

25  see those numbers reflected on Page 2 of I-732?

753

Michael Ledford - Cross

1    A.   Yes.

2    Q.   And are they accurately reflected, Mr. Ledford?

3    A.   Yes, they are.

4         MR. BELLER:   Your Honor, I would ask that we publish

5    the second page of I-732 to the jury, please.

6         THE COURT:   Any objection to that, Mr. Torzilli?

7         MR. TORZILLI:   No objection.

8         THE COURT:   And for demonstrative purposes once again,

9    correct?

10        MR. BELLER:   Thank you, that is correct.

11        THE COURT:   Page 2 may be displayed for demonstrative

12   purposes.

13   BY MR. BELLER:

14   Q.   So looking at round one to round two, Claxton reduced the

15   price of their eight-piece.

16   A.   Yes.

17   Q.   And that was in accordance with the guidance that you

18   needed -- or that you provided that they needed to lower their

19   price.

20   A.   Yes.

21   Q.   And while the dark meat formula stayed the same, that

22   formula number by pulling down the eight-piece price, they also

23   pulled down their dark meat price?

24   A.   That's correct.

25   Q.   Pulled down their dark meat price by over a penny.

754

Michael Ledford - Cross

1    A.   Yes.

2    Q.   You continued to provide directional guidance after having

3    seen round two.

4    A.   Yes.

5    Q.   After listening to your guidance, Claxton Poultry submits a

6    round three.

7    A.   Yes.

8    Q.   Do you recall that that was about November 18th?

9    A.   Yes, I do.

10   Q.   About a week and a half after the second round bid?

11   A.   Right.

12   Q.   And Claxton once again lowers its eight-piece price this

13   time to .9402; is that right?

14   A.   I don't recall specifically.

15   Q.   No problem.

16        MR. BELLER:  If we can show the witness A-623, please.

17   I believe that this is admitted.

18        THE COURT:  A-623?

19        MR. BELLER:  Yes, Your Honor.

20        THE COURT:  I am not sure if it is.

21        Ms. Grimm?

22        COURT DEPUTY CLERK:  It is.

23        THE COURT:  It has been.  You may display it.

24   BY MR. BELLER:

25   Q.   So Mr. Ledford, as you are reviewing A-623, I am going to

Michael Ledford - Cross

1   again ask you about the eight-piece price and the dark meat

2   price.  We are happy to scroll down as you need it.

3   A.  Okay.

4   Q.  Does that refresh your recollection?

5   A.  Yes, it does.

6   Q.  Claxton Poultry on their third round bid offers .9402; is

7   that right?

8   A.  Yes, that's right.

9   Q.  So between round one at .9627 and round three at .9402,

10  they have come down over 2 cents on their eight-piece price.

11  A.  Yes.

12      MR. BELLER:  If we can show I-732, Page 3, please.

13  BY MR. BELLER:

14  Q.  Are those numbers accurately reflected on Page 3?

15  A.  Yes.

16      MR. BELLER:  Your Honor, I will move to be able to

17  publish to the jury Page 3 of this document.

18      THE COURT:  For demonstrative purposes?

19      MR. BELLER:  For demonstrative purposes.

20      THE COURT:  Any objection, Mr. Torzilli?

21      MR. TORZILLI:  No objection.

22      THE COURT:  It may be.

23  BY MR. BELLER:

24  Q.  So by round three Claxton's eight-piece price has come down

25  about a penny and a half.  While their dark meat formula has

Michael Ledford - Cross

1  stayed the same at 30 and a half back, their dark meat price

2  has also now come down 2 cents.

3  *A.*  Yes.

4  *Q.*  Despite having come down 2 cents in both eight-piece and

5  dark meat, Claxton submits a round four, right?

6  *A.*  Yes.

7  *Q.*  And Claxton submits a round four again after you've told

8  them to come down on their price even further.

9  *A.*  Yes.

10  *Q.*  No obligation on their part to do so.

11  *A.*  Correct.

12  *Q.*  But they want the business; fair for say?

13  *A.*  Fair to say.

14  *Q.*  They want the volume.

15  *A.*  Fair.

16  *Q.*  They sent you the third round bid or what I am going to

17  call an updated bid again on November the 19th, right?

18  *A.*  Yes.

19          MR. BELLER:  If we can show only to the witness

20  demonstrative Page 4, please.

21  *BY MR. BELLER:*

22  *Q.*  Do you see demonstrative Page 4 in front of you,

23  Mr. Ledford?

24  *A.*  Yes, I do.

25  *Q.*  And do you see the numbers that are depicted on

Michael Ledford - Cross

1   demonstrative Page 4, round four?

2   *A.*   Yes, I do.

3   *Q.*   Do you believe those to be the accurate numbers that were

4   provided to you by Claxton regarding the round four bid?

5   *A.*   I don't recall.

6   *Q.*   If we can show the witness A-626 -- excuse me, A-627.

7            *MR. BELLER:*   Your Honor, I am sorry, my notes don't

8   depict whether or not that's in.

9            *COURT DEPUTY CLERK:*   It's in.

10           *MR. BELLER:*   Thank you, Ms. Grimm.

11           If I may show the witness A-627, please.

12  *BY MR. BELLER:*

13  *Q.*   Mr. Ledford, do you see A627 in front of you?

14  *A.*   Yes.

15  *Q.*   If you can take a moment and review that and let me know if

16  that refreshes your recollection as to Claxton's eight-piece

17  price and dark meat price.

18  *A.*   Yes, it does.

19  *Q.*   So if we go back to the demonstrative, I-732, and if you

20  can take a look at that, Page 4, please.   Are those numbers

21  reflected in the round four of this demonstrative?

22  *A.*   Yes, they are.

23           *MR. BELLER:*   Your Honor, at this time I would ask for

24  this to be published for the jury for demonstrative purposes.

25           *THE COURT:*   Any objection, Mr. Torzilli?

Michael Ledford - Cross

1            MR. TORZILLI:  No objection.

2            THE COURT:  It may be.

3            MR. BELLER:  Thank you.

4    BY MR. BELLER:

5    Q.  Claxton Poultry's eight-piece price between October and

6    November went from .9627 and it dropped, my math, 4 cents to

7    .9275; is that right?

8    A.  Yes.

9    Q.  And dark meat remained 30 and a half back, but the dark

10   meat price also came down because we are talking about

11   fractions of a penny about 3 cents, correct?

12   A.  That's right, yes.

13           THE COURT:  Actually, Mr. Beller, we are at that point

14   if you have a convenient breaking time.

15           MR. BELLER:  This is a convenient breaking time.

16   Thank you.

17           THE COURT:  Ladies and gentlemen, we went a little bit

18   past.  Why don't we plan on reconvening at 10:35, all right?

19   The jury is excused.  Thank you.

20           (Jury excused.)

21           We will be in recess.  Thank you.

22       (Recess at 10:20 a.m.)

23       (Reconvened at 10:40 a.m.)

24           THE COURT:  Let's go ahead and bring -- why don't we

25   get Mr. Ledford first.

759

Michael Ledford - Cross

1          (Jury present.)

2               THE COURT:  Go ahead, Mr. Beller.

3               MR. BELLER:  Thank you, Your Honor.

4    BY MR. BELLER:

5    Q.  Mr. Ledford, a couple more minutes with numbers and then

6    we're going to leave them behind, okay?

7    A.  Okay.

8    Q.  So we were talking a little bit about the different

9    contracts -- contract prices, the different rounds of bids in

10   2014, and specifically that Claxton was probably not where they

11   would "want to be," right?

12   A.  Yes.

13   Q.  Do you something called a poultry sourcing dashboard?

14   A.  Yes.

15   Q.  Are you familiar with what that is?

16   A.  Yes, I am.

17   Q.  And that's a PowerPoint deck that you draft that I guess

18   catalogs or otherwise records sort of where we are in terms of

19   negotiations, right?

20   A.  Yes, that's correct.

21   Q.  In your binder is Exhibit F-815.  And if you could turn to

22   F-815.

23   A.  Okay.

24   Q.  Does that look like that dashboard that we are talking

25   about?

Michael Ledford - Cross

1    A.   Yes, it does.

2         MR. BELLER:   Your Honor, at this time I would move for

3    admission of F-815.   I believe that this is stipulated to by

4    agreement.

5         THE COURT:   Any objection to the admission of F-815?

6         MR. TORZILLI:   No objection.

7         THE COURT:   F-815 will be admitted.

8    BY MR. BELLER:

9    Q.   So Mr. Ledford, we have spent a good part of the morning

10   talking about each round of negotiation as well as the

11   different feedback that you gave to the different suppliers.

12   A.   Yes.

13   Q.   And we actually looked at these on a chart to be able to

14   see in front of us how the numbers changed, at least for

15   Claxton, from round to round to round, right?

16   A.   Yes.

17   Q.   And really sort of applying your feedback in between these

18   rounds to understand what happened both in 2013 and in 2014.

19   A.   Yes.

20   Q.   Is that anything that the government has ever done with

21   you?

22   A.   No.

23   Q.   How about for any of these suppliers, has the government

24   asked you to explain each individual round, look at them on a

25   graph and teach them what happened during those years?

761
Michael Ledford - Cross

1   A.   No.

2   Q.   How about the FBI, when the FBI interviewed you four months

3   after the Indictment, did they ask you to explain any of that

4   to them?

5   A.   No.

6   Q.   So we've spent quite a bit of time, Mr. Ledford, talking

7   about volume.  And I want to switch gears and talk about volume

8   and really what volume means to a poultry grower, okay?

9   A.   Okay.

10  Q.   KFC uses a very specific sized bird for its -- as its

11  product.

12  A.   Yes.

13  Q.   Fair to say that CFA or Chick-fil-A also has very specific

14  specifications for size of bird?

15  A.   Yes.

16  Q.   As does Popeye's, for example?

17  A.   Yes.

18  Q.   These three sizes while there may be some overlap are

19  different.  They are different specifications.

20  A.   That's correct.

21  Q.   And to state the obvious, when someone takes the bun off of

22  their Chick-fil-A sandwich, they want to see a filet that is

23  the same size as the filet next to them and next to them.

24       MR. TORZILLI:  Objection, asked and answered.

25       THE COURT:  Overruled.

762

Michael Ledford - Cross

1   A.   Yes.

2   BY MR. BELLER:

3   Q.   You don't want to have a drastically smaller piece of meat?

4   A.   No.   You want to have consistency.

5   Q.   Okay.   Chick-fil-A, different than KFC, uses just a

6   slightly larger bird; is that right?

7   A.   That's right.

8   Q.   And then even larger birds are needed for grocery stores.

9   A.   Yes.

10  Q.   For products like tray packs.

11  A.   Right.

12  Q.   And when I say tray packs, I am talking about a pack of

13  chicken breast meat, for example.

14  A.   Yes.

15  Q.   That you would buy at your local King Soopers.

16          MR. TORZILLI:   Objection, scope.

17          THE COURT:   Overruled.

18  BY MR. BELLER:

19  Q.   And there is a different size for rotisserie chicken.

20  A.   Correct.

21  Q.   At the opposite end of sort of this bird continuum, you

22  have Popeye's, and that's a very, very small bird.

23  A.   That's right.

24  Q.   Bojangles uses a small bird.

25  A.   That's right.

763

Michael Ledford - Cross

1   Q.  You were asked on direct examination about small birds

2   versus big birds and this is really what we are talking about,

3   right?

4   A.  Yes.

5   Q.  Now, this differentiation in the sizes of birds can be

6   depicted as a bell curve.

7   A.  Right.

8   Q.  Or a histogram; is that right?

9   A.  Right.

10  Q.  And do you believe that it would be of assistance to the

11  jury for the jury to be able to understand what we're talking

12  about regarding bird sizes if they had the opportunity to see

13  such a bell curve?

14          MR. TORZILLI:  Objection, foundation.

15          THE COURT:  Overruled.

16  A.  Yes, I believe that would help.

17          MR. BELLER:  Your Honor, for demonstrative purposes

18  only if we can show the witness and counsel I-733, please.

19          THE COURT:  You may.

20          MR. BELLER:  Let me know if and when that shows up on

21  your screen, Mr. Ledford.

22          THE WITNESS:  Got it.

23  BY MR. BELLER:

24  Q.  Mr. Ledford, does this appear to be such a histogram or

25  bell curve that would show bird sizes?

Michael Ledford - Cross

1    A.  Yes.  I am very familiar with this.

2    Q.  And when we're talking about volume and we're talking about

3    taking volume away for a very specific customer, do you think

4    that it would assist the jury in understanding volume if the

5    jury was able to view I-733?

6    A.  Yes.

7          MR. BELLER:  Your Honor, at this time I would move for

8    I-733 to be published to the jury for demonstrative purposes.

9          THE COURT:  Any objection to that, Mr. Torzilli?

10         MR. TORZILLI:  Yes, we object.  It's an unsourced

11   document that purports to be an ordinary course piece of

12   information, but there is no source, so we object.

13         THE COURT:  The witness has indicated his familiarity

14   with this particular exhibit.  The objection will be overruled.

15   I-733 may be used for demonstrative purposes and may be

16   displayed.

17         MR. BELLER:  Thank you.  If we can publish that for

18   the jury, please.

19   BY MR. BELLER:

20   Q.  Mr. Beller, for purposes of the jury's understanding of

21   volume, is it fair to say that this bell curve represents a

22   targeted 4-pound live weight bird?

23   A.  Yes, it does.

24   Q.  And what I mean by a 4-pound live weight bird is that a

25   broiler house or a broiler grower, rather, will target a

Michael Ledford - Cross

1   specific weight of what that grower wants that bird to weigh

2   when it's alive, right?

3   A.   Yes.

4   Q.   Four pounds is a pretty common weight for a small bird

5   category.

6   A.   Yes.

7   Q.   And so a bell curve which is depicted here represents a

8   single broiler house; is that right?

9   A.   Right.

10  Q.   And as a single broiler house, is it also fair to say like

11  a flock?

12  A.   Yes.

13  Q.   So a flock consists of chicks or chickens, I should say,

14  that are all hatched the prior day and then put into a house.

15  A.   Yes.

16  Q.   And so every chick that is in this flock is the same age.

17  A.   Correct.

18  Q.   And you have both males and females in a broiler house?

19  A.   Yes.

20  Q.   Sizing the chicks before they go into that broiler house

21  would be impossible.

22  A.   That's right.

23  Q.   Just like any other living creature, chickens grow to be

24  different sizes.

25  A.   Right.

Michael Ledford - Cross

1    Q.  Males, for example, grow to be larger.

2    A.  Yes.

3    Q.  Females may be smaller than the males in the flock.

4    A.  That's right.

5    Q.  And just like people, there is going to be size

6    differentiations between not just the sexes, but overall just

7    the height and the weight and all these other categories, the

8    same is true for chickens.

9    A.  Yes.

10   Q.  So this histogram represents what is called a small bird

11   flock.

12   A.  Yes.

13   Q.  Now, you also have in the poultry industry a large bird,

14   right?

15   A.  Correct.

16   Q.  A large bird -- well, let me back up.  Let me explain this

17   a little bit better.  So at the top we have a 4-pound live

18   weight bird.  At the bottom we have something that's called WOG

19   weight in pounds.

20   A.  Yes.

21   Q.  What does WOG weight mean?

22   A.  WOG weight means it's after it's gone through the first

23   processing, so that's without the feathers, without blood,

24   without the internal organs, without the head.

25   Q.  So if you have a chicken that's 4 pounds alive, by the time

767

Michael Ledford - Cross

1   that chicken is processed, and we are going to call it the

2   first processing, that would be your WOG weight, what's left

3   over.

4   A.   Right.  It's roughly 72 percent of the live weight.

5   Q.   So here with a 4-pound live weight bird, you end up with

6   roughly 7.8 pounds of product.

7   A.   Correct.

8   Q.   Okay.  And after that first processing.

9   A.   Yes.

10  Q.   And on the far left column of this in what I am going to

11  call my Y axis, that's the percentage of those birds that are

12  available in that weight range for a single flock.

13  A.   Yes.

14  Q.   So a big bird then would be to the right of this histogram.

15  A.   Right.

16  Q.   It would be another bell curve that is to the right in

17  terms of weight.  It's heavier.  It's bigger.

18  A.   Exactly.

19  Q.   So when the birds are going to be processed, they all have

20  to be gathered up at the same time from the broiler house,

21  right?

22  A.   That's right.

23  Q.   Is it impossible to size those birds as you are trying to

24  gather them up from the house?

25  A.   Yes, that would be impossible.

768

Michael Ledford - Cross

1   Q.  A fairly chaotic process trying to gather up hundreds, if

2   not thousands, of chickens?

3   A.  Yes.

4   Q.  So you're gathering not just the large males and the small

5   females, but also everything in between.

6   A.  Right.

7   Q.  They are then loaded up and brought to the plant for

8   processing as a flock.

9   A.  Correct.

10  Q.  So in that one particular flock, the majority of your

11  birds, the largest percentage are going to be those that are

12  right in the middle of this sizing category here.  It's about

13  2.8 pounds of WOG weight.

14  A.  Correct.

15  Q.  In that exact same flock, you're also going to have birds

16  that are less than 2 pounds of WOG weight.

17  A.  Yes.

18  Q.  And you're going to have birds that are 3.87 or sometimes

19  even a little bit bigger of WOG weight.

20  A.  Yes.

21  Q.  And so what happens is that the different customers have a

22  different targeted weight for every single flock, right?

23  A.  Yes.

24  Q.  Here Popeye's and Bojangles purchases those smaller birds,

25  the 2.35 to 3.37 WOG weight.

Michael Ledford - Cross

1    A.   Yes.

2    Q.   KFC is in the 2.5 to 2.6 weight range?

3    A.   Right.

4    Q.   Pollo Tropical is a little bit bigger?

5    A.   Right.

6    Q.   And a little larger than that are your tray packs or

7    grocery stores?

8    A.   Yes.

9    Q.   And then even larger is that larger -- it's still a small

10   bird, but that large rotisserie chicken that goes to the

11   grocery stores.

12   A.   Yes.

13   Q.   Chick-fil-A has just a little bit of a larger targeted

14   bird, but the histograms overlap.

15   A.   Right.  Chick-fil-A is a 4-1/2 pound target.

16   Q.   So with a 4-1/2 pound target, even with this bell curve

17   histogram you're still going to have overlap between a 4-pound

18   target and a 4-1/2 pound target.

19   A.   Yes.

20   Q.   On the very small side of that histogram, and it's depicted

21   in these yellow bars, that is a very, very small chicken.

22   A.   Yes, it is.

23   Q.   It's a very small chicken such that there is probably not

24   going to be much of a QSR customer who's going to want that

25   small chicken.

1  A.  That's correct.

2  Q.  So small that it can't really be processed through

3  mechanical means.

4  A.  Right.  It would tear up easily.

5  Q.  If you try to put that through a machine, it's just going

6  to unfortunately not do good things to this meat, right?

7  A.  Right.

8  Q.  Now, when we're looking at the different sized birds on

9  this demonstrative -- actually, let me back up.  The size of

10  the chicken is extremely important to the customer because the

11  customer sells different products with different

12  specifications.

13  A.  Yes.

14  Q.  And so if we're talking about a Popeye's bird that's

15  2.4-ounce -- or excuse me, 2.4 pounds processed WOG weight and

16  that's what Popeye's purchases, if Popeye's ends up with a

17  4-pound rotisserie chicken, there is going to be problems at

18  the restaurant.

19  A.  Right.  They won't be able to cook it.

20  Q.  They won't be able to cook it.  And that's because

21  everything in the restaurant or most things in the restaurant

22  regarding the cooking is automated.

23  A.  Yes.

24  Q.  You put the chicken, for example, in a fryer basket and

25  drop it in the oil for a set period of time.

Michael Ledford - Cross

1    A.  Right.  The fryers are set, set time and temperature.

2    Q.  Time and temperature is set for each one of, insofar as you

3    know, right, for each one of these different buyers.

4    A.  Yes.

5    Q.  So if Popeye's ends up with a 4-pound WOG chicken, it's

6    going to go into the fryer and it's going to come out,

7    potentially be served to the customer and be raw.

8    A.  Correct.

9    Q.  On the other hand, if they were to end up with a chicken

10   that's less than 2 pounds WOG weight, it may come out of the

11   fryer burnt to a crisp.

12   A.  Yes.

13   Q.  So the chicken for the different suppliers needs to be

14   approximately the same weight with some overlap with other

15   suppliers.

16   A.  Yes.

17   Q.  And this again is also that eight-piece bucket of chicken

18   of KFC in Florida, looks, tastes and is the same size as the

19   eight-piece KFC bucket of chicken that's sold in Denver.

20          MR. TORZILLI:  Objection, asked and answered.

21          THE COURT:  Overruled.

22   A.  Yes.

23          MR. BELLER:  Thank you.  I am done with the

24   demonstrative.

25   BY MR. BELLER:

Michael Ledford - Cross

1    Q.  Suppliers allocate volume to their customers at least a

2    year out.

3    A.  Yes.

4    Q.  Sometimes it could be three years out.

5    A.  Yes.

6    Q.  You would agree with me, Mr. Ledford, that it takes a lot

7    of planning from egg laying to processing of the chicken

8    resulting in that product that is at the restaurants.

9    A.  Yes.

10   Q.  The suppliers are contractually obligated to fulfill their

11   volume commitments when they sign that contract with you.

12   A.  Yes.

13   Q.  And so if there was to be a shift in volume, it would take

14   approximately a year of planning in order to change that volume

15   allocation.

16   A.  That's right.

17           MR. BELLER:  If we can have the demonstrative up again

18   for just one moment.

19   BY MR. BELLER:

20   Q.  You would agree with me, Mr. Ledford, looking at this

21   demonstrative that it's a little bit of a dance making sure

22   that you have enough suppliers or the proper suppliers to take

23   this different volume.

24   A.  Yes, it is.

25   Q.  And so for example, if Claxton Poultry takes volume away

773

Michael Ledford - Cross

1    from Pilgrim's Pride through negotiation, Pilgrim's Pride needs

2    to find a new customer who can take that percentage of the

3    flock.

4    A.   Yes.

5    Q.   You can't automatically just shift it to another supplier.

6    A.   That's right.

7    Q.   And so anytime suppliers are competing for volume in

8    addition to price, it can be consequential to their business.

9    A.   It can.

10   Q.   And here, as you had testified to the jury, there are

11   multiple examples of these suppliers taking business or being

12   awarded business from the other.

13   A.   Yes.

14   Q.   Leaving a gap in this volume bell curve that we've been

15   talking about.

16   A.   Yes.

17         MR. BELLER:   Thank you.  I am done with the

18   demonstrative, please.

19   BY MR. BELLER:

20   Q.   Because of the very specific nature of both KFC's quality,

21   the ingredients and also the size, not any poultry supplier can

22   simply sell you chicken.

23   A.   That's right.

24   Q.   There is some days where a supplier may be short on your

25   particular size.

774

Michael Ledford - Cross

1    *A.*  Yes.

2    *Q.*  And so while the jury looked at this bell curve, looked at

3    this histogram, that is simply -- it's mathematical, but

4    chicken are living animals, so it doesn't always fit so

5    perfectly into that bell curve.

6    *A.*  Right.

7    *Q.*  There may be a house, for example, where a flock that for

8    whatever reason is -- has a larger number of larger chickens

9    and we don't have that same percentage of chickens that KFC

10   needs to buy.

11   *A.*  Yes.

12   *Q.*  And if that happens, that supplier would be short to supply

13   the order that they are committed to providing.

14   *A.*  That's right.

15   *Q.*  So when that happens, when a supplier is short, they have

16   to purchase chicken from another supplier of KFC.

17   *A.*  Yes, that's a possibility.

18   *Q.*  Because they still have to fulfill the order.

19   *A.*  Right.

20   *Q.*  They need to make sure that that KFC in Orlando, Georgia,

21   still has chicken for that day.

22   *A.*  Or Orlando, Florida, but yes.

23   *Q.*  Being -- having -- needing to do covers and shorts or

24   having a situation of covers and shorts happens with some

25   frequency.

775

Michael Ledford - Cross

1   A.   Yes, it did.

2   Q.   And it happens because KFC only uses fresh chicken.

3   A.   That's correct.

4   Q.   KFC does not freeze their chicken.

5   A.   Not in my time there, no, not for chicken on the bone.

6   Q.   Not for chicken on the bone.  So you don't have a freezer

7   that you can go into and pull out a flock of chicken to be able

8   to supplement when there is a problem at a house.

9   A.   That's correct.

10  Q.   Shorts happen for a multitude of reasons, not just because

11  of the broiler house or the life of the chicken, but there are

12  other issues that can cause a short.

13  A.   Yes.

14  Q.   A particular plant could have a maintenance issue.

15  A.   Right.

16  Q.   A particular plant could have a strike, for example.

17  A.   Yes.

18  Q.   A truck breaks down.

19  A.   Yes.

20  Q.   Regardless of the reason, Mr. Ledford, when you were at

21  KFC, you did not want to be -- or RSCS, excuse me, you did not

22  want to be called every time a supplier was short.

23  A.   No, I did not.

24  Q.   It would happen from time to time, and you expected your

25  suppliers to be professional and handle it.

Michael Ledford - Cross

1    A.   That's correct.

2    Q.   You expected them to solve the problem so that you wouldn't

3    have to get involved.  All you care about is that restaurant

4    having its chicken.

5    A.   That is right.

6    Q.   Now, that's different, of course, if it's a systemic

7    problem.

8    A.   That's right.

9    Q.   You talked a little bit earlier about one of your

10   nonincumbent suppliers underpricing their chicken and not being

11   able to produce the chicken that they had committed to.

12   A.   Right.

13   Q.   In that situation, you would need to know that.

14   A.   Yes.

15   Q.   On the other hand, if there is a diesel shortage across the

16   eastern seaboard and it's just one day of a truck not being

17   able to deliver, you're not interested in getting that

18   telephone call.

19   A.   That's correct.

20   Q.   There is no policy at RSCS that says suppliers need to pick

21   up the phone and notify you that they can't cover an order.

22   A.   No, not in my time there.

23   Q.   Distribution centers may also be short; is that right?

24   A.   Yes.

25   Q.   By distribution centers, what I mean is that the chicken

Michael Ledford - Cross

1    suppliers will oftentimes transport or freight their chicken to

2    a distribution center.

3    A.   Yes.

4    Q.   The distribution center then houses the chicken, puts it on

5    trucks and delivers it to a restaurant.

6    A.   Yes.

7    Q.   So from time to time distribution centers are running short

8    of chicken.

9    A.   That's a possibility, yes.

10   Q.   In which case the suppliers would need to supply or bring

11   chicken to that distribution center.

12   A.   Yes.

13   Q.   Suppliers would have to speak to each other in order to be

14   able to sell and purchase chicken from each other; is that

15   right?

16   A.   Yes.

17   Q.   So in other words, you were asked by Mr. Torzilli about are

18   the chicken suppliers competitors, and you answered yes, they

19   are competitors.

20   A.   Yes.

21   Q.   But because they have to buy and sell chicken to each

22   other, they are also customers of each other, right?

23   A.   In that instance, yes.

24   Q.   Right.  For these frequent shorts and covers, they are

25   buying and selling chicken from each other.

Michael Ledford - Cross

1   A.   Yes.

2   Q.   And not just chicken from each other, but specifically KFC

3   chicken from each other.

4   A.   Yes.

5   Q.   RSCS had already prenegotiated the price of the chicken for

6   each one of these individuals.

7   A.   Yes.

8   Q.   And I say individuals.  Let me correct myself.

9   A.   Companies.

10  Q.   For the companies.

11  A.   Right.

12  Q.   When there is a cover and short, the payment, the payment

13  for the purchase of that KFC chicken happened between the

14  different suppliers.

15  A.   Yes.

16  Q.   The buy-and-sell transactions between these different

17  customers of each other would not affect the market prices of

18  the chicken.

19  A.   No, it would not.

20  Q.   In fact, suppliers covering for each other was, in fact, in

21  RSCS's best interest because the cover transaction assured that

22  there were no gaps in the product supply chain.

23  A.   That's right.

24  Q.   RSCS received the product they ordered and they did so in a

25  timely fashion.

Michael Ledford - Cross

1    A.   Yes.

2    Q.   And because they are customers of each other, suppliers

3    would also know the price that was negotiated by the other

4    company because they are, in fact, writing an invoice and

5    paying a check.

6    A.   I don't know that I could say that with certainty since we

7    didn't get involved.  We did not dictate if they sold it at the

8    contracted price with RSCS or if they came up to a different

9    price amongst each other.

10   Q.   Let me ask this.  That was my bad question.  You weren't

11   sent the invoice and you are not the one who cut the check.

12   A.   That's correct.

13   Q.   That was a transaction that occurred individually between

14   the company that was selling the chicken and the company that

15   was buying the chicken.

16   A.   Yes.

17   Q.   So I want to take this opportunity to have the jury better

18   understand this small bird unavailability in 2014 regarding

19   your involvement in 2014.

20   A.   Okay.

21   Q.   We've already established that you know quite a bit about

22   the chicken industry.

23   A.   Yes.

24   Q.   You know about the market.

25   A.   Yes.

Michael Ledford - Cross

1    Q.   There is a lot that goes into pricing chicken.

2    A.   Yes, there is.

3    Q.   And there is a lot that goes into understanding chicken

4    availability.

5    A.   Right.

6    Q.   There is something called feed conversion.

7    A.   Yes.

8    Q.   How -- feed conversion is how much and for how long do you

9    feed the chicken and what does that result or what is the

10   weight of the meat.

11   A.   Yes.

12   Q.   Based on this amount of feed being given to the chicken,

13   right?

14   A.   Right.

15   Q.   How much and for how long you raise a chicken for it to get

16   it a certain targeted weight.

17   A.   Right.

18   Q.   Hopefully, this is self-explanatory.  If you continue to

19   feed a chicken, the chicken will continue to grow, right?

20   A.   Yes.

21   Q.   Okay.  So when feed is cheap, when corn and soy prices are

22   low, it is -- it makes sense to continue to feed the chicken

23   for a longer period of time to get it to grow bigger because

24   there is a larger yield for your investment.

25   A.   Yes.

Michael Ledford - Cross

1   Q.   Rotisserie chickens, for example, is an example of that.

2   A.   Yes.

3   Q.   They are bigger chickens.  You feed them for a week or two

4   longer and you get more money for a larger chicken, heavier

5   piece of meat, right?

6   A.   Right.

7   Q.   On the other hand, when corn and soy is extremely

8   expensive -- soybean meal, excuse me, is extremely expensive,

9   it may make sense to grow a smaller chicken so that you're not

10  spending so much money on feed and soy to grow a larger

11  chicken.

12  A.   Yes.

13  Q.   All of these are factors that played a part in 2014, right?

14  A.   They are, yes.

15  Q.   And all of these are factors that play a part in every

16  year.

17  A.   Yes, some more than others, but yes.

18  Q.   Especially in 2014.

19  A.   Yes.

20  Q.   So in 2014 demand was high for chicken.

21  A.   Yes.

22  Q.   Supply was low for chicken.

23  A.   Yes.

24  Q.   And as we likely learned in seventh grade economics, it's a

25  basic supply-and-demand calculation, right?

Michael Ledford - Cross

1    A.   Yes.

2    Q.   Buyers of chicken wanted to guarantee supply and

3    incentivize suppliers to keep growing small birds.

4    A.   Yes.

5    Q.   And as we established, supply could not change quickly to

6    adjust to changes in demand.

7    A.   Right.

8    Q.   It takes time for suppliers to build or convert plants.

9    A.   Yes.

10   Q.   So there is a need to plan ahead.

11   A.   Absolutely.

12   Q.   So you had indicated that you left KFC in May of 2014 and

13   you joined CFA or Chick-fil-A.

14   A.   That's correct.

15   Q.   So I want to stick with your 2014 experience for just a

16   moment.

17   A.   Okay.

18   Q.   There was a shortage of chickens in 2014 going into the

19   2015 negotiation.

20   A.   In small bird, yes.

21        MR. TORZILLI:   Objection, foundation, also outside the

22   scope.

23        THE COURT:   I will overrule both objections.

24   BY MR. BELLER:

25   Q.   There was a supply crisis of small birds.

Michael Ledford - Cross

1    *A.*   Yes.

2    *Q.*   There was this Mother's Day fiasco just as you are walking

3    out the door, right?

4              *MR. TORZILLI:*  Objection, foundation.

5              *THE COURT:*  I don't think he testified about that on

6    direct or at least I can't recall.  I will sustain that

7    objection.

8    *BY MR. BELLER:*

9    *Q.*   You had testified that there were several individuals who

10   worked as part of your team?

11   *A.*   Yes.

12   *Q.*   That you were not specifically involved in negotiating the

13   2015 contract, right?

14   *A.*   That's correct.

15   *Q.*   However, you were there for the first five months or four

16   and a half months of 2014.

17   *A.*   Yes.

18   *Q.*   And that you provided direction to your team in the time

19   that you were at KFC regarding going into the 2015 negotiation.

20   *A.*   Yes.

21             *MR. TORZILLI:*  Objection, misstates prior testimony.

22             *THE COURT:*  Overruled.

23   *A.*   Yes.

24   *BY MR. BELLER:*

25   *Q.*   And, in fact, you warned your team do not negotiate a price

Michael Ledford - Cross

1   during a supply crisis.

2   A.   I did give them that advice, yes.

3   Q.   They didn't follow it.

4           MR. TORZILLI:   Objection, foundation.

5           THE COURT:   Overruled.   He can answer.

6   A.   I was not there, but that is my understanding.

7   BY MR. BELLER:

8   Q.   This series of questions that I asked you about which is

9   feed conversion and the size of chickens and the economics

10  behind growing a chicken, this whole line of questions,

11  something that the government never asked you about, right?

12  A.   I do believe they generally asked me questions around

13  explaining the feed component of the cost model at some point

14  in time over the last couple years.   I do remember talking to

15  them about that aspect of it.

16  Q.   Did the agents sit down with you and say, Mr. Ledford, I

17  need you to help me understand this?

18  A.   No.

19  Q.   Or this is part of my investigation.   Can you aid in my

20  investigation?

21  A.   No.

22          MR. BELLER:   Your Honor, if I may have just one

23  moment, please.

24          THE COURT:   You may.

25  BY MR. BELLER:

Michael Ledford - Cross

1    *Q.*  Mr. Ledford, we are almost done.  Good news.

2             I want to ask you about your knowledge of different

3    suppliers and Claxton in particular, okay?

4    *A.*  Okay.

5    *Q.*  Are you aware that Claxton has been in business for 62

6    years?

7    *A.*  Yes, I am.

8    *Q.*  Sir, in your binder is Exhibit F-815.  If you could

9    reference that.

10   *A.*  Okay.

11   *Q.*  Does that look familiar to you, sir?

12   *A.*  Yes, it does.

13   *Q.*  What is F-813, please?

14   *A.*  It's a Poultry Category Profile that I compiled in

15   September of 2013.

16            *MR. BELLER:*  Your Honor, at this time I would move for

17   the introduction of F-813.  I believe this is through

18   agreement.

19            *THE COURT:*  Any objection to the admission of F-813?

20            *MR. TORZILLI:*  We don't object.

21            *THE COURT:*  F-813 will be admitted.

22   *BY MR. BELLER:*

23   *Q.*  So Claxton has been in business for 62 years and supplied

24   chicken to KFC for about 28; is that right?

25   *A.*  Yes.

Michael Ledford - Cross

1    *Q.* As we established, they are 1 percent of the market and a

2    single plant.

3    *A.* Right.

4    *Q.* You're aware that there are about 1700 employees through

5    Claxton.

6    *A.* Yes.

7              *MR. TORZILLI:* Objection, relevance.

8              *THE COURT:* Overruled.

9    *A.* Yes.

10   *BY MR. BELLER:*

11   *Q.* You are aware of Mar-Jac, another supplier at this period

12   of time.

13   *A.* Yes.

14   *Q.* Mar-Jac had about 1300 employees.

15             *MR. TORZILLI:* Objection, relevance.

16             *THE COURT:* Overruled.

17   *A.* Yes.

18   *BY MR. BELLER:*

19   *Q.* Koch Foods, another supplier during this period of time.

20   *A.* Yes.

21   *Q.* 15,000 employees.

22   *A.* That sounds right, yes.

23   *Q.* George's, another supplier during this time.

24   *A.* Yes.

25   *Q.* 4500 employees.

Michael Ledford - Cross

1    A.   Yes.

2    Q.   Pilgrim's, 38,000 employees.

3    A.   That sounds right.

4    Q.   Tyson Food, 115,000 employees.

5    A.   Yes.

6    Q.   Yum Brands in 2012, for example, had 15 different suppliers

7    and 41 plant locations to source poultry products.

8    A.   That's correct.

9    Q.   Amongst those were Foster Farms?

10   A.   Yes.

11   Q.   Keystone?

12   A.   Yes.

13   Q.   Simmons?

14   A.   Yes.

15   Q.   Case?

16   A.   Yes.

17   Q.   OK Foods?

18   A.   Yes.

19   Q.   Marshall Durbin?

20   A.   Yes.

21   Q.   Mr. Ledford, we have introduced several PowerPoint slides

22   that you've wrote.

23   A.   Yes.

24   Q.   You just got done looking at one of them.

25   A.   Yes.

Michael Ledford - Cross

1    *Q.* Has the government ever sat down with you with these

2    PowerPoint slides and said, can you please teach me this?

3    *A.* No, they have never asked that.

4    *Q.* Have they ever shown these to you?

5    *A.* I do not recall.

6    *Q.* Mr. Ledford, other than me meeting with you in court one

7    time at a hearing, you and I have never met, right?

8    *A.* That's correct.

9    *Q.* I have never interviewed you other than questioning you in

10   court.

11   *A.* That's correct.

12   *Q.* The government has interviewed you and questioned you many

13   times, right?

14   *A.* Yes.

15   *Q.* At no time did the government ever sit down with you and

16   ask you to simply teach them the industry.

17   *A.* No.

18   *Q.* At no time did the government ever look you in the eye and

19   say, Mr. Ledford, do you have any knowledge of Mikell Fries

20   ever agreeing with anyone to raise prices or broiler chickens?

21   *A.* I do not recall.

22   *Q.* Well, let me ask you the question, Mr. Ledford.  As you sit

23   here today in front of this jury, a witness of the United

24   States of America, you have no personal knowledge of Mikell

25   Fries agreeing with anyone to raise prices of broiler chicken.

Michael Ledford - Cross

1  *A.*  No, I do not.

2  *Q.*  Or fix prices.

3  *A.*  No, I do not.

4  *Q.*  Or rig bids.

5  *A.*  No, I do not.

6  *Q.*  As you sit here today, having been interviewed by the

7  United States of America multiple times, called as a government

8  witness, you have no knowledge that Scott Brady of Claxton

9  Poultry ever agreed with anyone to raise prices, maintain

10  prices or rig bids with anyone.

11  *A.*  No, I do not have any personal knowledge of that.

12  *Q.*  In fact, you have no knowledge of anyone at Claxton Poultry

13  fixing prices or rigging bids.

14  *A.*  No, I do not.

15  *Q.*  You have no personal knowledge of anyone charged in this

16  courtroom of agreeing with anyone else to rig bids, fix prices.

17  *A.*  No, I do not.

18         *MR. BELLER:*  Thank you, Your Honor.

19         *THE COURT:*  Thank you, Mr. Beller.

20         Additional cross-examination?

21         Mr. Feldberg?

22         *MR. FELDBERG:*  I am afraid I'm next, Your Honor.

23         *THE COURT:*  Go ahead.

24         *MR. FELDBERG:*  Your Honor, may we hand up a binder to

25  Mr. Ledford and to the Court and to the prosecution and

790

Michael Ledford - Cross

1    counsel?

2              THE COURT:  Yes, you may.

3                        **CROSS-EXAMINATION**

4    BY MR. FELDBERG:

5    Q.  Mr. Ledford, I am Michael Feldberg.  I represent Roger

6    Austin.  And like Mr. Beller, we've never had an occasion to

7    have an interview outside of court; is that correct?

8    A.  That's correct.

9    Q.  Mr. Beller asked you some questions about the successful

10   negotiations that you had in 2012 for the 2013 contract,

11   correct?

12   A.  Yes.

13   Q.  And you believed those were successful negotiations from

14   the customer's point of view, correct?

15   A.  Yes, I did.

16   Q.  Could you please turn to Tab 29 in the binder we have

17   handed to you?  And if we have counted correctly, this is

18   Exhibit F-808 which has been admitted into evidence.  Do you

19   have that in front of you?

20   A.  Yes, I do.

21   Q.  This is a document you prepared, correct?

22   A.  Yes, it is.

23   Q.  And what was the purpose of preparing this document?

24   A.  This was to communicate the results of the negotiations

25   internally both at RSCS and amongst the five brands.

Michael Ledford - Cross

1    *Q.*  And you shared this with your colleagues at RSCS?

2    *A.*  Yes.

3    *Q.*  And it was part of RSCS's business records, correct?

4    *A.*  Yes, it was.

5           MR. FELDBERG:  Could we display, please, for the

6    witness, the Court and the jury and counsel Page 6?  And I

7    wonder if it would be possible to highlight the section in the

8    middle of the page right-hand column that begins, "We had

9    anticipated."  And if we could enlarge that, it would be very

10   helpful.  Thank you.

11   *BY MR. FELDBERG:*

12   *Q.*  Mr. Ledford, this is a section that you wrote, correct?

13   *A.*  Yes, it is.

14   *Q.*  And you wrote, did you not:  We had anticipated there may

15   be a need to have follow-up calls with a couple of suppliers,

16   (Tyson and Pilgrim's).  However, they have come back generally

17   in-line with where we asked them to get on their "best and

18   final" numbers."

19   *A.*  Yes, that's correct.

20   *Q.*  And you meant that when you wrote it, correct?

21   *A.*  Yes, I did.

22   *Q.*  They came back where you asked them to get.

23   *A.*  Yes.

24   *Q.*  Could we take a look at Page 7, please?

25           You wrote for your colleagues that as a result of your

Michael Ledford - Cross

1    negotiations, you had saved a little more than $5-1/2 million

2    with respect to KFC fresh chicken, correct?

3    A.   Yes.

4    Q.   And could we turn to Page 11, please?

5         Page 11 reflects, does it not, the various contractual

6    prices for the different suppliers and the change from their

7    2012 eight-piece price, correct?

8    A.   Yes, it does.

9    Q.   Are the suppliers' prices the same or different?

10   A.   They are different.

11   Q.   And they are different notwithstanding that you negotiated

12   with the suppliers to get them into the tightest range you

13   could, correct?

14   A.   That's correct.

15   Q.   Now, it looks like -- my math is not good, but there is a

16   little less than a penny's difference from the highest price to

17   the lowest price for 2013.  You told us in Mr. Torzilli's

18   examination, I believe, that you bought between 700 million and

19   a billion pounds a year of fresh chicken, correct?

20   A.   Not fresh, total chicken.

21   Q.   Total chicken.

22   A.   Yes.

23   Q.   Fair enough.  Even taking the low end of that range,

24   700 million, a penny's difference would amount to a lot of

25   money, wouldn't it?

Michael Ledford - Cross

1   A.   Yes.

2   Q.   Millions of dollars?

3   A.   Millions of dollars.

4   Q.   So would it be fair to say, sir, that even small

5   differences in prices could be meaningful in terms of the

6   amount of money involved.

7   A.   Very meaningful.  That's why we took it out four decimal

8   places.

9   Q.   Could we turn, please, to Page 12 of Exhibit F-808?

10          And on Page 12 you summarize some of the successes

11   that you had in your negotiations with the suppliers.

12   A.   Yes.

13   Q.   Point 1 says:  Flat price on wings instead of market based

14   price provides for more stable pricing.

15          Could you explain what you meant by that?

16   A.   Yes.  Instead of being market related, if we did a flat

17   price -- and I believe this product in particular was referring

18   to the raw material that went into things like the KFC hot

19   wings -- if we had a flat price, we could plan our marketing

20   calendar promotions around that.  And we knew that well in

21   advance and it was going to be stable for the 12 months of the

22   year.

23          If we had gone off of a market-related price that was

24   going to fluctuate, especially typically the wing market

25   fluctuates significantly during football season and typically

Michael Ledford - Cross

1    speaking will culminate around the Super Bowl or March Madness

2    at its peak, and with having a flat price we were able to keep

3    the same menu prices year round and not have to fluctuate on

4    that as well and give our customers a varying experience when

5    they came to the restaurants.

6    Q.   And you listed on Page 12 a total of nine negotiation wins,

7    correct?

8    A.   Yes.

9    Q.   Resulting in a total negotiated savings from KFC of over

10   $13 million, correct?

11   A.   Yes.

12   Q.   And looking at Page 13, if we could call that up, please.

13            You note in Point 1 on Page 13 that you added Case

14   Farms as a chicken-on-the-bone supplier, correct?

15   A.   Yes.

16   Q.   And you estimated the potential savings there at about a

17   million dollars, correct?

18   A.   Yes.

19   Q.   Why was it in RSCS's interest to add another COB supplier?

20   A.   To continue to create more competition and help drive the

21   price lower.

22   Q.   Could we take a look, please, at Page 16?

23            What's Page 16, Mr. Ledford?

24   A.   Page 16 is all of the fresh eight-piece chicken suppliers

25   for chicken on the bone, all of their various rounds for that

795

Michael Ledford - Cross

1   year's negotiation, as well as the previous year's price.

2   Q.  Now, are the -- is the purple bar on Page 16 close to the

3   final price for each supplier?

4   A.  Yes.

5   Q.  Are the prices the same or different?

6   A.  Different.

7   Q.  Again, notwithstanding that you wanted as tight a range as

8   possible, correct?

9   A.  That's correct.

10  Q.  And did most of the suppliers reduce their bids each round

11  of bidding?

12  A.  Most of them did, yes.

13  Q.  And is that because in essence you told each supplier after

14  each round that it had to reduce its bid if it wanted to keep

15  its volume of business with RSCS?

16  A.  That's fair, yes.

17  Q.  Could we call up, please, Page 446 of Exhibit F-808?

18          Page 46 is your recommendation of business awards,

19  correct?

20  A.  Yes.

21  Q.  And would it be fair to say, sir, that you recommended

22  reducing Pilgrim's share?

23  A.  Yes, it is.

24  Q.  As well as recommended -- you recommended reducing Tyson's

25  share.

Michael Ledford - Cross

1    A.  Yes.

2         THE COURT:  Mr. Feldberg, you might want to adjust the

3    microphone just a little bit.  There you go.

4         MR. FELDBERG:  I wish I was as tall as Mr. Beller, but

5    things are what they are.

6    BY MR. FELDBERG:

7    Q.  And is that because Pilgrim's and Tyson were two of the

8    higher priced suppliers?

9    A.  Yes.

10   Q.  And you awarded the volume you took away from the high

11   priced suppliers to the low priced suppliers, correct?

12   A.  That's correct.

13   Q.  That's competition, isn't it?

14   A.  It is competition.

15        MR. FELDBERG:  Could we call up Page 47 of Exhibit

16   F-808, please?

17   BY MR. FELDBERG:

18   Q.  Now, it may not seem like a lot to go from 38 percent to

19   37-1/2 percent, but Page 47 compares the 2012 volume for the

20   companies to the 2013 volume, correct?

21   A.  Yes.

22   Q.  And what was the 2012 volume for Pilgrim's?

23   A.  27 percent.

24   Q.  And what was that in pounds?

25   A.  203 million.

797

Michael Ledford - Cross

1    *Q.*  How about 2013 in pounds?

2    *A.*  184 million.

3    *Q.*  So would it be fair to say that you reduced the volume of

4    awards to Pilgrim's from 2012 to 2013 by almost

5    19 million pounds?

6    *A.*  Yes, that's correct.

7    *Q.*  Now, you achieved all of these successes despite the fact

8    that going into the 2012 negotiations you recognized that you

9    faced some challenges, correct?

10   *A.*  That's correct.

11   *Q.*  Could you turn, please, to Tab 6.

12          And could we call up on the screen Exhibit F-810,

13   which is in evidence.

14          Now, Exhibit F-810 is a document you prepared in

15   September '12, correct?

16   *A.*  Yes.

17   *Q.*  September 2012?

18   *A.*  2012, yes.

19   *Q.*  Tell us, what was the purpose of preparing this document?

20   *A.*  The purpose of preparing this document was to inform the

21   rest of our company and the brands of our strategy and key

22   objectives and sort of where we saw the landscape of what we

23   were walking into when we started the negotiations.

24   *Q.*  Could we look at Page 3, please.

25          You noted on Page 3 that UFPC, which later then

Michael Ledford - Cross

 1    changed its name to RSCS, competed with other QSR chains for

 2    poultry supply, correct?

 3    A.   Yes.

 4    Q.   And QSR means quick-service restaurant?

 5    A.   Correct.

 6    Q.   We've talked a lot about the competition among the

 7    suppliers, but is there also competition among the customers?

 8    A.   Yes.

 9    Q.   Can you explain how that works, please?

10    A.   We are all -- in this example on this page, we are talking

11    about we are all competing for the same birds.

12    Q.   And there is only so many birds, correct?

13    A.   Exactly.

14    Q.   The suppliers need to sell them and the customers need to

15    find them, correct?

16    A.   Yes.

17    Q.   Could we call up Page 5 of this exhibit, please?

18             Page 5, Mr. Ledford, is called Poultry Industry

19    Supplier Ranking, correct?

20    A.   Yes.

21    Q.   And what are you trying to convey here?

22    A.   We are trying to demonstrate the landscape of the poultry

23    industry.  And we are indicating which suppliers within the

24    industry that we were currently doing business with.  And we

25    are also trying to indicate the amount of those suppliers that

Michael Ledford - Cross

 1   are in -- what size bird they are in.

 2           MR. FELDBERG:  Your Honor, has this document been

 3   published to the jury?

 4           THE COURT:  It can be.  It doesn't appear to have

 5   been.

 6           MR. FELDBERG:  I neglected to do that.  I apologize.

 7   May we publish it?

 8           THE COURT:  You may.

 9           MR. FELDBERG:  Thank you.

10   BY MR. FELDBERG:

11   Q.  Now, looking at Page 5, Mr. Ledford, Tyson and Pilgrim's

12   are the two largest suppliers, correct?

13   A.  Yes.

14   Q.  Where does Claxton rank?

15   A.  20th.

16   Q.  And what percent of the total ready-to-cook market did

17   Claxton have at this time?

18   A.  Just under 1 percent, .9 percent.

19   Q.  .9 percent as compared to 22.1 for Tyson and 17.4 for

20   Pilgrim's.

21   A.  Yes.

22   Q.  Would it be fair to say that Claxton was in a different

23   category of supplier than the two largest ones?

24   A.  Completely, yes.

25   Q.  And Page 5 uses the term RTC.  That means ready to cook,

Michael Ledford - Cross

1    does it not?

2    A.  Yes, it does.

3    Q.  Could we call up Page 4, please?

4            On Page 4, Mr. Ledford, you wrote that suppliers are

5    selected and evaluated based on the following criteria, right?

6    A.  Yes.

7    Q.  And one of those criteria, criterion was low cost producer,

8    correct?

9    A.  Yes.

10   Q.  But how many criteria were there all together?

11   A.  14.

12   Q.  And each of those 14 criteria mattered in terms of the

13   selection of suppliers, correct?

14   A.  Yes, they did.

15   Q.  For example, the ability to ensure supply was critical to

16   RSCS, was it not?

17   A.  Yes, it was.

18   Q.  Could we turn, please, to Page 9.?  Could we enlarge the

19   top section that discusses Pilgrim's?  Thank you.

20           Page 9 is an analysis of the top five suppliers,

21   correct?

22           MR. TORZILLI:  May we have a side bar?

23           THE COURT:  Yes, we may.

24      (At the bench:)

25           THE COURT:  Go ahead, Mr. Torzilli.

Michael Ledford - Cross

1           *MR. TORZILLI:*  So Your Honor, as part of the motion *in*

2    *limine* rulings back in the fall, Your Honor indicated that

3    there should be no reference or mention -- this was

4    incidentally a defendants' motion *in limine* to be clear -- but

5    no reference or mention to the parent company of Pilgrim's

6    Pride Corporation, JBS, and related entities.  And that motion

7    was granted, so the jury is seeing something that was barred by

8    a prior order.

9           *MR. FELDBERG:*  I will take down the page, Your Honor.

10          *THE COURT:*  Okay.  That's fine.  I mean, of course

11    this is an admitted exhibit, but Mr. Feldberg is agreeing not

12    to focus on it, so that's fine.

13       (In open court:)

14          *MR. FELDBERG:*  If you would take down this page,

15    please.

16    BY MR. FELDBERG:

17    *Q.*  Mr. Ledford, did you write on Page 9 that with respect to

18    Pilgrim's, pricing is competitive?

19    *A.*  I did.

20    *Q.*  Let's go to Page 10, please.

21          *MR. FELDBERG:*  Could we publish that to the jury,

22    please?

23          *THE COURT:*  You may.

24    BY MR. FELDBERG:

25    *Q.*  Page 10 describes some of the challenges that RSCS or UFPC

802

Michael Ledford - Cross

1   faced in 2012, correct?

2   A.   Yes.

3   Q.   High feed grain markets caused by severe drought, correct?

4   A.   Yes.

5   Q.   Negative margin structure for the poultry industry in 2012?

6   A.   Yes.

7   Q.   Supply of small bird chicken-on-the-bone plants continues

8   to shrink with higher long-term margins in the bigger bird

9   categories?

10  A.   Yes.

11  Q.   Demand is expected to increase for chicken?

12  A.   Yes.

13  Q.   So if supply shrinks and demand increases, what does fifth

14  grade economics, seventh grade economics teach us?

15  A.   The price goes up.

16  Q.   And that's what you were expecting, correct?

17  A.   Yes, it was.

18  Q.   Could we turn to Page 13, please?

19          And in Point 9 you noted that UFPC's pricing was below

20  market in 2012 on wings, tenders, dark meat and eight-piece,

21  correct?

22  A.   Yes.

23  Q.   Could we go back to Page 12, please?

24          You noted in Point 1 on Page 12 that corn and soybean

25  meal inflation were at record high levels, correct?

Michael Ledford - Cross

1    *A.*  Yes.

2    *Q.*  And are corn and soybean meal important components of the

3    cost of raising chickens?

4    *A.*  Very important.

5    *Q.*  They are like the largest single cost?

6    *A.*  Exactly.

7         *MR. FELDBERG:*  And could we call up Page 18, please?

8         *MR. TORZILLI:*  Can I have another side bar, please?

9         *THE COURT:*  Yes.

10    (At the bench:)

11        *THE COURT:*  Go ahead.

12        *MR. TORZILLI:*  The one thing I wanted to raise was I

13   see that this slide deck is being published to the jury.  And

14   when an entire slide is being published, several things are

15   being redacted, one of which is the confidentiality designation

16   in the lower right-hand corner that was applied by the

17   producing party, but also the confidentiality designation in

18   the center of the slide where it says Confidential - Do Not

19   Distribute.  That was applied, that was emblazoned in the

20   ordinary course of RSCS's business.

21        So just to be entirely clear about Your Honor's ruling

22   with respect to the redaction of confidentiality information,

23   it's our view that the confidentiality information that would

24   be applied in the ordinary course would be outside the scope of

25   what Your Honor is seeking to have redacted back as opposed to

804

Michael Ledford - Cross

1    the confidentiality designations that were applied associated

2    with the production of the documents either to the government

3    or the defendants.

4            THE COURT:  Mr. Feldberg?

5            MR. FELDBERG:  Your Honor, we are going to highlight

6    only a portion of this page that does not involve either of

7    those designations, so I think the point need not be decided at

8    this time.

9            THE COURT:  Well, I will decide the point, and that is

10   Mr. Torzilli is correct that something that's applied for

11   litigation purposes appropriately can be blacked out.  But if

12   something, not the cover page as we already talked about those,

13   but something like on this if in the ordinary course of

14   business the words Confidential - Do Not Duplicate appeared on

15   it, then it should not be redacted out unless we've had some

16   type of ruling as to that particular thing.  But it sounds like

17   we can avoid those issues with slides from this deck, so go

18   ahead.

19           MR. FELDBERG:  Thank you, Your Honor.

20      (In open court:)

21           MR. FELDBERG:  Would you please call up and just the

22   portion that says Supplier Bargaining Power.

23   BY MR. FELDBERG:

24   Q.  Mr. Ledford, in the portion that's on the screen in front

25   of you and the document in front of you, this summarizes

805

Michael Ledford - Cross

1   essentially the bargaining power that the suppliers had in your

2   view at that time and in effect the challenges that RSCS faced,

3   correct?

4   A.   Correct.

5   Q.   Suppliers had been experiencing record losses.  KFC doesn't

6   use the entire bell curve, et cetera, correct?

7   A.   Yes.

8   Q.   KFC's spec requirements remained some of the toughest in

9   the industry, correct?

10  A.   Yes.

11  Q.   So despite all these challenges, you ended up having a very

12  successful negotiation from RSCS's point of view in 2012,

13  correct?

14  A.   Yes.

15  Q.   That's because you are a very skillful negotiator, correct?

16  A.   I don't know if I could exactly say that or not.  Either

17  that or I am a very poor predictor of the future.

18  Q.   Well, Mr. Ledford, when you were at RSCS, you determined

19  who could bid, correct?

20  A.   Yes.

21  Q.   You determined what the bids had to contain, correct?

22  A.   Yes.

23  Q.   You determined when the bids had to be submitted.

24  A.   Yes.

25  Q.   And you determined which distribution centers the product

806
Michael Ledford - Cross

1    would ultimately be shipped to, correct?

2    A.  Correct.

3    Q.  And at what point did you tell the suppliers which

4    distribution centers their product would be shipped to?

5    A.  After we awarded the business.

6    Q.  And would it be fair to say, sir, that it costs the

7    suppliers a different amount of freight depending on which

8    distribution center the product was going to be shipped to?

9    A.  Yes.

10   Q.  In other words, if your plant is in Kentucky and you're

11   shipping product to Virginia, it might cost one thing.  But if

12   you're shipping it to Texas, it might cost something else,

13   correct?

14   A.  Correct.

15   Q.  And is it correct, sir, that at the time the suppliers

16   submitted their final bids, they didn't know to which

17   distribution centers you were going to direct their product to

18   be shipped?

19   A.  No.  That's why we were negotiating on FOB prices and not

20   delivered.

21   Q.  And FOB prices mean freight onboard, correct?

22   A.  Yeah.  It's at their dock door.

23   Q.  And therefore the freight that they would have to pay would

24   be on top of that, correct?

25   A.  Yes.

807

Michael Ledford - Cross

1    Q.  And at the time they submitted the final bids, they didn't

2    know what that freight would amount to, correct?

3    A.  Well, we had them -- in the first rounds -- you may recall

4    we talked about this I believe yesterday -- we had them give us

5    freight rates in the first round.  They would have known at the

6    time of award.

7    Q.  At the time of award, but not at the time of bid, correct?

8    A.  No, they would have known their freight rates from the

9    first bid on.

10   Q.  Their freight rates for each distribution center.

11   A.  Yes.

12   Q.  But they didn't know which distribution center you would

13   direct the product to.

14   A.  Correct.

15   Q.  There is something called lowest landed cost, correct?

16   A.  Correct.

17   Q.  What is lowest landed cost?

18   A.  Lowest landed cost was -- it's the term that we would use

19   for the process on our end when we are looking at everybody's

20   price and where to award them which distribution centers.  It's

21   a way of ensuring that each individual distribution center has

22   the lowest cost possible for it since, like an example you just

23   gave, we wouldn't ship product from Texas to Virginia.  We are

24   going to ship product from Georgia to Virginia because it's a

25   lower cost because the freight is lower.

Michael Ledford - Cross

1    Q.  And that's something that RSCS determined, correct?

2    A.  Yes, it is.

3    Q.  And in addition to deciding who could bid, you also charged

4    a fee for the suppliers to bid, correct?

5    A.  Yes, we did.

6    Q.  You charged a $20,000 per supplier fee to be awarded the

7    right to bid?

8    A.  Yes.

9    Q.  Now, Mr. Ledford, I want to talk to you a little bit about

10   your dealings with Pilgrim's and in particular Mr. Austin.

11   A.  Okay.

12   Q.  Mr. Austin was the Pilgrim's interface with RSCS during

13   your time there, correct?

14   A.  Yes, he was.

15   Q.  But you knew he was not the final decision maker on price

16   and bids, correct?

17   A.  No, he was not.

18   Q.  You knew that he communicated what you told him back up the

19   chain to his superiors and came back with their response,

20   correct?

21   A.  Correct.

22   Q.  You spoke with Mr. Austin regularly, correct?

23   A.  Yes.

24   Q.  Mr. Austin lived in Louisville, Kentucky?

25   A.  Yes, he did.

809

Michael Ledford - Cross

1    Q.   Near you?

2    A.   Yes.

3    Q.   Did you know that he had relocated to Louisville so he

4    could be close to KFC?

5    A.   Yes.

6    Q.   And when you spoke with Mr. Austin, it wasn't just about

7    bidding, was it?

8    A.   No.

9    Q.   Talk about operations?

10   A.   Yes.

11   Q.   Quality control?

12   A.   Yes.

13   Q.   Continuous supply?

14   A.   Yes.

15   Q.   You talked to him regularly, not just during the bidding

16   season, correct?

17   A.   I talked to him all the time.

18   Q.   All the time.  Often daily, correct?

19   A.   Yes.

20   Q.   Almost every business day?

21   A.   That's a fair statement.

22   Q.   And is it -- do you recall that Mr. Austin and Pilgrim's

23   built a research and development center for KFC in Louisville?

24   A.   Yes.

25   Q.   And was that helpful to KFC?

Michael Ledford - Cross

1    A.   Yes, and all the brands.

2    Q.   Now, Mr. Beller discussed with you the directional guidance

3    that you gave to suppliers, in particular to Claxton, correct?

4    A.   Yes.

5    Q.   Would it be fair to say that you gave the same sort of

6    directional guidance regularly to Pilgrim's?

7    A.   Yes.

8    Q.   And you gave that guidance most often to Mr. Austin,

9    knowing he would communicate it back up the chain, correct?

10   A.   Yes.

11   Q.   And would it be fair to say that very often the thrust of

12   your directional guidance was your price is too high, and

13   unless you lower it, I'm going to take volume away from you.

14   A.   Yes, on average, yes.

15   Q.   And sometimes you did take volume away.

16   A.   Yes.

17   Q.   And when you gave Pilgrim's directional guidance through

18   Mr. Austin, very often Pilgrim's took your directional guidance

19   and lowered its price, correct?

20   A.   That's a fair statement, yes.

21   Q.   And sometimes you would give guidance in terms of you're X

22   percent too high, correct?

23   A.   Yes.

24   Q.   Or X percent from the highest price or the average price,

25   correct?

811

Michael Ledford - Cross

1    A.  Yes, yes.

2    Q.  And sometimes you would do it in dollars and cents,

3    correct?

4    A.  Yes.

5    Q.  You'd say, "You're 4 cents too high," just using that as a

6    hypothetical.

7    A.  Yes.

8    Q.  Let's take a look at an example.  Could you turn, please,

9    to Tab 4 in your binder?

10         Please do not -- could we display this not to the

11   jury, please, but to the witness and the Court and counsel?

12   This is Exhibit D-509 for identification.  And could you just

13   display, please, the e-mail from Mr. Ledford that's in the

14   middle of the page.  D-509.  And if you could, sir, could you

15   just display the e-mail from Mr. Ledford that's one -- two

16   sentences -- three sentences, I am sorry.  Thank you.

17         Mr. Ledford, do you see your e-mail dated

18   November 4th, 2011 that's in the middle of D-509 for

19   identification?

20   A.  Yes, I do.

21   Q.  And is that an e-mail you wrote to Mr. Austin on

22   November 4th, 2011?

23   A.  Yes, it is.

24   Q.  And did that relate to Pilgrim's bid for the 2012 contract?

25   A.  Yes, it did.

Michael Ledford - Cross

1   *Q.*  Is this an example of the type of feedback that you

2   regularly gave Mr. Austin?

3   *A.*  Yes, it is.

4         *MR. FELDBERG:*  Your Honor, we offer just this portion

5   of D-509.

6         *THE COURT:*  And Mr. Feldberg, do you mind making a

7   record of what this portion means?  We can see it, but do you

8   mind describing it in words?

9         *MR. FELDBERG:*  Sure.

10  *BY MR. FELDBERG:*

11  *Q.*  Did you advise --

12        *THE COURT:*  You don't have to ask it through a

13  question.  I am just saying that what you are talking about,

14  then, is an e-mail from Mr. Ledford.  And you are talking about

15  of that particular e-mail just the first two sentences of it?

16  Is that what you are moving the admission of?

17        *MR. FELDBERG:*  Yes, just the portion from Mr. Ledford

18  at 10:38 a.m. on November 4th.

19        *THE COURT:*  Okay.  But the entirety of Mr. Ledford's

20  e-mail as opposed to just those two sentences?

21        *MR. FELDBERG:*  I think the entirety is three

22  sentences, Your Honor, and that's what we are offering.

23        *THE COURT:*  Oh, I see.  Okay.

24        Mr. Torzilli, any objection to the admission of that

25  portion of D-509?

813

Michael Ledford - Cross

1          MR. TORZILLI:  We don't object to the admission of

2    Mr. Ledford's e-mail.  I do object on hearsay grounds to any of

3    the other e-mails.

4          MR. FELDBERG:  We are not offering the other e-mails,

5    Your Honor.

6          THE COURT:  Right.  So that portion of D-509 will be

7    admitted.

8    BY MR. FELDBERG:

9    Q.  Mr. Ledford, can you just read for the jury what you wrote

10   to Mr. Austin -- it's very short -- on November 4th, 2011?

11   A.  "We need to talk then, you are the highest priced supplier.

12   Per pound and per case.  We would definitely have to move

13   volume at current pricing."

14         MR. FELDBERG:  Could we publish that to the jury, Your

15   Honor?

16         THE COURT:  You may.

17   BY MR. FELDBERG:

18   Q.  And Mr. Ledford, I believe you told us this is an example

19   of the kind of thing you said to Pilgrim's from time to time,

20   correct?

21   A.  Yes.

22   Q.  And they generally followed your advice, correct?

23   A.  Generally speaking, yes.

24   Q.  Could you turn, please, to Tab 11 in your binder?

25         MR. FELDBERG:  And this is Government Exhibit 1528

Michael Ledford - Cross

1   which I believe is in evidence, Your Honor.

2           THE COURT:  It is.  And it may be displayed to the

3   jury.

4           MR. FELDBERG:  Thank you.

5   BY MR. FELDBERG:

6   Q.  Now, Mr. Ledford, Exhibit 1528 in evidence is a document

7   written by Mr. Austin on October 26, 2012, following a

8   conversation with you.  And I recognize you didn't write this,

9   but it is Mr. Austin's recitation of what you told him,

10  correct?

11  A.  Okay.

12  Q.  Did you tell Mr. Austin on or about October 26, 2012, that

13  there are two new players in the market that year?  Did you

14  tell him there were two new players in the market that year?

15  A.  I don't recall specifically telling him that, but there

16  were two new players that year.

17  Q.  And is that something you told him to try to give him

18  feedback that the marketplace was more competitive?

19  A.  Yes.  And I was probably also indicating that that meant

20  volume was going to be more limited.

21  Q.  Did you tell him that several suppliers had dropped their

22  prices going into the bid?

23  A.  I do not recall.

24  Q.  Don't recall one way or the other?

25  A.  I do not.

815

Michael Ledford - Cross

1    Q.  Is that the kind of thing that from time to time you told

2    Mr. Austin?

3    A.  Yes.

4    Q.  Did you tell him that Pilgrim's price was the highest of

5    any of the suppliers at that time?

6    A.  Yes, I believe I did.

7    Q.  Did you tell him that the price -- the bids averaged .9812?

8    A.  I do not recall one way or the other.

9    Q.  Did you tell him that there were two places of opportunity

10   in Pilgrim's bid?  Feed convert -- one is feed conversion and

11   the other is GIB yield.

12   A.  I do not remember that specifically, but that is something

13   that I would tell him.

14   Q.  What does GIB yield mean?

15   A.  GIB, I am assuming that what he is referring to there would

16   be the liver and gizzard yield.

17   Q.  Fair enough.  Did you tell him that some suppliers were at

18   .30 back on dark that year and some at .32?

19   A.  I do not recall.

20   Q.  Did you tell him that you were asking all the suppliers to

21   go to .31 back on dark?

22   A.  I do not recall.

23   Q.  Was there a time -- did you in October of 2012 ask all the

24   suppliers to go to .31 back?

25   A.  I do not recall.

Michael Ledford - Cross

1   Q.  Were there times in your experience at RSCS, Mr. Ledford,

2   where you asked all the suppliers to go to the same number of

3   cents back for dark meat?

4   A.  Yes.

5   Q.  Why did you do that?

6   A.  For a consistent price.

7          MR. FELDBERG:  Could we turn, please, to Tab 17.

8          And, Your Honor, this is Government Exhibit 1531.  I

9   believe it's in evidence.

10          THE COURT:  It is.

11          MR. FELDBERG:  Could we display it, please?

12          THE COURT:  You may.

13  BY MR. FELDBERG:

14  Q.  Mr. Ledford, this is a note from Mr. Austin to you dated

15  November 5th, 2012, conveying Pilgrim's round two bid, correct?

16  A.  Yes.

17  Q.  The round two bids in 2012 were due on November 14th, I

18  think you told us yesterday in Mr. Torzilli's examination,

19  correct?

20  A.  Correct.

21  Q.  So this is nine days before that.

22  A.  Right.

23  Q.  Would it be fair to say that Mr. Austin was giving you a

24  preview of Pilgrim's bid to get your blessing?

25  A.  He was certainly giving me a preview, I don't know

817

Michael Ledford - Cross

1   necessarily if it was my blessing.  I think -- I might recount

2   it as bouncing it off of me, so to speak.

3   Q.  He wanted to get your reaction.

4   A.  Yes.

5   Q.  And he wrote to you, did he not, "This should put us in the

6   position that you need us to be," correct?

7   A.  Yes.

8   Q.  You interpreted that to mean he was trying to meet your

9   goals for Pilgrim's submission, correct?

10  A.  Yes, or my feedback.

11       THE COURT:  Mr. Feldberg, can you look for a

12  convenient breaking spot?  A few more questions on this

13  document, whatever you want to do is fine.

14       MR. FELDBERG:  Your Honor, I think this is as good a

15  place as any.

16       THE COURT:  Okay, great.  Ladies and gentlemen, we

17  will go ahead and take the lunch recess.  We will plan on

18  reconvening at 1:30.  Keep the admonitions in mind.  The jury

19  is excused for lunch.  Thank you.

20       (Jury excused.)

21       Mr. Ledford, you can be excused.  Thank you very much.

22       THE WITNESS:  Thank you, Your Honor.

23       THE COURT:  All right.  Because I don't think it will

24  take us too much time to go through the remaining summary

25  exhibits, my suggestion is that we wait until 5:00 or shortly

Michael Ledford - Cross

 1   after 5:00 to do that and that we take a regular lunch hour,

 2   but I am open to suggestion.

 3        MR. TUBACH:  That seems like a good idea, Your Honor.

 4   Thank you.

 5        THE COURT:  Mr. McLoughlin?

 6        MR. McLOUGHLIN:  Your Honor, the only thing I would

 7   note is that for purposes of your planning, in addition to the

 8   chart-by-chart discussion of this change and that change, we do

 9   have some broader objections, more fundamental objections to

10   the charts that at some point before publication we would like

11   to discuss with Your Honor.

12        THE COURT:  Okay.  I will keep that in mind.

13        Mr. Koenig?

14        MR. KOENIG:  That sounds fine by our plan.

15        One other scheduling thing is the cross, if it

16   continues at this pace, we may need to call Mr. Suerken before

17   Mr. Pepper because he has to be out of here by tomorrow, I

18   think it is, yeah.

19        THE COURT:  At the end of the day tomorrow?

20        MR. KOENIG:  Yeah.

21        THE COURT:  Well, I think we'll see.  Make sure that

22   defense counsel understand what his limitations are and then we

23   will play it by ear.  I don't know if there is a plan to

24   continue with his cross-examination up until 5:00 tomorrow,

25   but --

Michael Ledford - Cross

1          MR. KOENIG:  Yeah.

2          THE COURT:  Just in case, right.  I mean, you don't

3    know, obviously, Mr. Koenig, but you might be able to get some

4    estimates from other people.  And maybe defense counsel can

5    talk about that too.

6          Ms. Prewitt?

7          MS. PREWITT:  Your Honor, I just want to make sure

8    you're aware that Carl Pepper is expected to be the next

9    witness on the list.

10         THE COURT:  Well, we have to accommodate schedules, so

11   I just don't know if we needed somehow to get Mr. Suerken in,

12   then that might affect that schedule.

13         All right.  We will be in recess, then, until 1:30.

14         MR. GILLEN:  Your Honor, before we break, if we can

15   find out now because we have a lot of documents we had put into

16   place to get ready.  If it's Pete Suerken, then it's Pete

17   Suerken.  If it's Carl Pepper, then it's Carl Pepper.  But at

18   the last minute here logistically we have issues about what we

19   have to do to get prepared for the afternoon.  So I would like

20   for them to make a decision right now about what's going to

21   happen in the afternoon.

22         THE COURT:  Well, I think that the government's

23   estimate of time for Mr. Ledford was exactly what it was the

24   last trial.  So to the extent that's now differing because the

25   cross-examination is more extensive, the government is put in a

820

Michael Ledford - Cross

1    tough situation.  They don't know.  That's why feedback from

2    the defendants may be the best way for the government to be

3    able to determine whether there could be an issue with

4    Mr. Suerken.  So to the extent that you can, that information

5    should be communicated to Mr. Koenig.

6              All right.  We will be in recess.

7              (Recess at 12:05 p.m.)

8              Reconvened at 1:37 p.m.)

9              (Jury present.)

10             THE COURT:  Mr. Feldberg, go ahead.

11             MR. FELDBERG:  Thank you, Your Honor.

12             THE COURT:  Mr. Feldberg, go ahead.

13             MR. FELDBERG:  Thank you, Your Honor.

14   BY MR. FELDBERG:

15   Q.  Mr. Ledford, when we broke for lunch, we were discussing

16   your negotiations with Pilgrim's in the fall of 2012.  Do you

17   recall?

18   A.  Yes.

19   Q.  As part of those negotiations, do you recall whether you

20   and Mr. Austin had a conversation on November 27, 2012?

21   A.  I do not remember that specific date.

22   Q.  If I showed you a calendar invitation from you to a number

23   of people including Mr. Austin, would that refresh your

24   recollection?

25             MR. TORZILLI:  Your Honor, side bar, please.

Michael Ledford - Cross

1          THE COURT:  Sure.

2      (At the bench:)

3          THE COURT:  Go ahead, Mr. Torzilli.

4          MR. TORZILLI:  Your Honor, it's the government's

5   position that this is an improper form of refreshing

6   recollection.  As we indicated in our trial brief, I think it's

7   inappropriate to be indicating to the witness, "If I show you a

8   calendar invite, would it refresh your recollection," as

9   opposed to, "If I showed you something, do you think it might

10  refresh your recollection."

11         THE COURT:  Response, Mr. Feldberg?

12         MR. FELDBERG:  I am not sure I see the significance of

13  the distinction, Your Honor, but I am perfectly happy to ask

14  the question as Mr. Torzilli suggested.

15         THE COURT:  Yeah, I think in the nature of that

16  document, it would be appropriate to do as Mr. Torzilli

17  suggests because otherwise it's essentially telling the jury

18  that something exists and then would that refresh your

19  recollection.  So I think it would be appropriate to show

20  the -- obviously you don't know in advance whether it could

21  refresh recollection, but if you show it to him, then ask if

22  that refreshes recollection, then that probably would be

23  appropriate for one of those calendar invites or whatever they

24  are called.

25      (In open court:)

Michael Ledford - Cross

1   BY MR. FELDBERG:

2   Q.  Let me rephrase the question, Mr. Ledford.  If I show you

3   something, might that refresh your recollection?

4   A.  Yes.

5   Q.  Could you please take a look at Tab 25 in your binder?

6           We don't need to call this up on the screen.

7   A.  Okay.

8   Q.  Looking away from Tab 25, is your recollection refreshed?

9   A.  Yes, it is.

10  Q.  Did you have a conversation with Mr. Austin on or about

11  November 27, 2012?

12  A.  Yes, I did.

13          MR. FELDBERG:  Okay.  Could we call up, please,

14  Exhibit 1544, which I believe is in evidence.

15          And that is at Tab 26 in your binder, sir.

16          Your Honor, can we confirm that this is in evidence?

17          THE COURT:  It is.

18          MR. FELDBERG:  Can we publish this, please, to the

19  jury?

20          THE COURT:  You may.

21  BY MR. FELDBERG:

22  Q.  Mr. Ledford, I am inviting your attention to the e-mail at

23  the bottom of the first page which carries over into the second

24  page.  Do you see that?

25  A.  Yes.

823

Michael Ledford - Cross

 1   Q.  That's an e-mail from Roger Austin to Justin Gay and Scott

 2   Tucker on November 28th, 2012, correct?

 3   A.  Yes.

 4   Q.  And it begins, "We, (Scott, Justin and I) had the semi

 5   final round call yesterday with Mike and his team plus a couple

 6   of franchisees and a couple of Yum! Financial guys," correct?

 7   A.  Yes.

 8   Q.  And from the context the Mike referred to there is you,

 9   correct.

10   A.  Yes.

11   Q.  Taking a look at what Mr. Austin described as the result of

12   the call, is there anything that he got wrong in terms of

13   summarizing what you told him?

14   A.  I am not sure.

15   Q.  Does anything stand out to you as wrong?

16   A.  I don't know -- I don't know if anything particularly

17   stands out is wrong.  More so that I don't recall much of this.

18   Q.  Well, let me see if we can take it piece by piece.

19   A.  Okay.

20   Q.  Do you recall if you told Mr. Austin that Pilgrim's was the

21   second highest on eight-piece?

22   A.  Yes, I do recall that.

23   Q.  And did you tell him that one of the other suppliers was

24   .0010 higher than Pilgrim's, and you told him that that

25   supplier would lose business if they didn't react.

Michael Ledford - Cross                                    824

1   *A.*  I don't remember that specifically.

2   *Q.*  Did you tell him that the next after Pilgrim's was .0054

3   below Pilgrim's?

4   *A.*  I don't recall.

5   *Q.*  Did you tell him that Claxton and Koch were pretty

6   aggressive with pricing as well as Tyson?

7   *A.*  I doubt that I said that.

8   *Q.*  Okay.

9   *A.*  But I do not know for certain.

10  *Q.*  Did you discuss with Mr. Austin the opportunity for more

11  business, and if the forecast was correct, Pilgrim's would have

12  to take out a small plant due to lack of business?

13  *A.*  I don't recall.

14  *Q.*  Did you discuss at any point with Mr. Austin the

15  possibility that Pilgrim's might have to close a plant?

16  *A.*  Yes.

17  *Q.*  And do you recall which plant that was?

18  *A.*  I do not.

19  *Q.*  Was it Mayfield?

20  *A.*  I do not recall.

21  *Q.*  Okay.  Do you know whether one of Pilgrim's plants is

22  located in Mayfield, Kentucky?

23  *A.*  Yes, it is.

24  *Q.*  And that plant produced small birds during your experience

25  at RSCS, correct?

825

Michael Ledford - Cross

1    A.  Yes.

2    Q.  And did the plant have a locational advantage over other

3    plants?

4    A.  Yes.

5    Q.  And what was that advantage?

6    A.  It was close to the midwest.

7    Q.  And that meant it was less expensive to transport chicken

8    from Mayfield to distribution centers than it was to transport

9    from other places?

10   A.  Yes.

11   Q.  Was Mayfield the single largest small bird plant in the

12   United States?

13   A.  At that time I believe that is correct.

14   Q.  Did you in your conversation with Mr. Austin on

15   November 27, did you push him to drop his Pilgrim's -- did you

16   push Pilgrim's to drop their price on dark below 30 cents back?

17   A.  Yes.

18   Q.  Did you discuss wings with Mr. Austin?

19   A.  I do not recall.

20        MR. FELDBERG:  Could we call up, please, not for

21   publication to the jury at this time, Exhibit D-546?

22   BY MR. FELDBERG:

23   Q.  And Mr. Ledford, this is at Tab 27 in your binder.

24        Mr. Ledford, what is Exhibit D-546 for identification?

25   A.  It is an e-mail from myself to Roger Austin dated December

Michael Ledford - Cross

1  the 4th, 2012.

2  Q.  And did you write this in the ordinary course of RSCS's

3  business?

4  A.  Yes.

5  Q.  And did you intend for Mr. Austin to rely on what you told

6  him?

7  A.  Yes, I did.

8          MR. FELDBERG:  We offer D-546, Your Honor.

9          THE COURT:  Any objection to D-546?

10         MR. TORZILLI:  No objection.

11         THE COURT:  D-546 will be admitted.

12         MR. FELDBERG:  Could we highlight Paragraph No. 1 and

13  enlarge it, please?

14         And could we publish this to the jury, please?

15         THE COURT:  You may.

16  BY MR. FELDBERG:

17  Q.  You told Mr. Austin, did you not, that you were

18  disappointed, correct?

19  A.  Yes.

20  Q.  Is that a phrase you used fairly often with Mr. Austin?

21  A.  I believe it is, yes.

22  Q.  He regularly disappointed you, correct?

23  A.  He regularly disappointed me, yes.

24  Q.  And when he disappointed you, you gave him feedback and

25  Pilgrim's responded to that feedback, correct?

Michael Ledford - Cross

1    A.  Yes.

2    Q.  You told Mr. Austin on December 4th, 2012 that Pilgrim's

3    was 80 cents higher than the best price and 48 cents higher

4    than the average price on wings, correct?

5    A.  Yes.

6    Q.  And you told him that "Perhaps we take you out of centers

7    that buy wings"?

8    A.  Yes.

9    Q.  What's that mean?

10   A.  Take all of their business out of a given distribution

11   center if that distribution center was one that bought

12   supplemental wings.

13   Q.  You threatened to take all of their business out of the

14   distribution center.

15   A.  Yes.

16   Q.  Did Pilgrim's respond to this feedback?

17   A.  I do not recall.

18   Q.  Did Pilgrim's reduce its price on wings from its prior

19   price in 2012?

20   A.  I do not remember, but I do not recall taking them out of

21   distribution centers.

22   Q.  And do you conclude from that that they reduced their price

23   on wings?

24   A.  Yes, I do.

25   Q.  Let's take a look, please, Mr. Ledford, at Tab 31.

Michael Ledford - Cross

1          And could we call this up not for the jury and just

2    the portion of the document in the middle that is Mr. Ledford's

3    e-mail.  It is Government Exhibit 1707.

4          We are now in 2013.  Do you see that, Mr. Ledford?

5    A.  Yes, I do.

6    Q.  Did you write that middle e-mail in Exhibit 1707 to

7    Mr. Austin copying Mr. Oeschli at RSCS?

8    A.  Yes, I did.

9    Q.  What was the purpose of this e-mail?

10   A.  I was providing him feedback from a price he had given us

11   on a new product.

12   Q.  What was the new product?

13   A.  It was a large bird boneless item that we were selling

14   basically trying to recreate a eight-piece chicken like bucket,

15   but do it with boneless meat.

16        MR. TORZILLI:  Your Honor, may we have a side bar?

17        THE COURT:  We may.

18      (At the bench:)

19        THE COURT:  Go ahead, Mr. Torzilli.

20        MR. TORZILLI:  Your Honor, we object to the use of

21   this document on relevance grounds.  This is an entirely

22   different product.  This is a boneless product that was being

23   developed.  It has really no relevance to the case.  And it's

24   not me saying that, that's Mr. Tubach and the defendants saying

25   that at the last trial when you excluded this document.

Michael Ledford - Cross

1        THE COURT:  Mr. Feldberg, what's the relevance of this

2    document and line of questioning?

3        MR. FELDBERG:  Another example of Mr. Ledford

4    providing feedback and saying he was disappointed in a position

5    that Pilgrim's took.

6        THE COURT:  I am going to sustain the objection.

7     (In open court:)

8    BY MR. FELDBERG:

9    Q.  Moving to the fall of 2013, Mr. Ledford, could you remind

10   us who Mary Hester was at that time?

11   A.  Yes.  Mary Hester was director of further processed poultry

12   purchasing.

13   Q.  And did she work with you at RSCS?

14   A.  Yes, she did.

15   Q.  Was she involved in the pricing discussions with the

16   various chicken suppliers?

17   A.  For further processed products, yes.

18   Q.  Could you yourself look at Tab 43, which is Defense

19   Exhibit 563.  And is that an e-mail sent on behalf of Mary

20   Hester to Roger Austin, Subject:  RFP Round 1 Feedback?

21   A.  Yes.

22   Q.  Could you look at Tab 44, please, Defense Exhibit 564?

23        Is that the round one feedback?

24   A.  Yes, it is.

25        MR. FELDBERG:  Could we call that up on the -- Defense

Michael Ledford - Cross

1  Exhibit 564, D-564, sorry.

2        *MR. TORZILLI:*  And the preceding exhibit I believe is

3  D-563.

4        *MR. FELDBERG:*  Thank you.  The preceding exhibit was

5  D-563.  Thank you.

6        Let's call up D-564, not for the jury.

7  *BY MR. FELDBERG:*

8  *Q.*  Mr. Ledford, is D-564 the feedback that RSCS provided to

9  Pilgrim's in the fall of 2013 after the round one bid?

10 *A.*  Yes, it is.

11       *MR. FELDBERG:*  We offer it, Your Honor.

12       *THE COURT:*  D-564?

13       *MR. FELDBERG:*  Just D-564.

14       *THE COURT:*  Any objection to the admission of that

15 exhibit?

16       *MR. TORZILLI:*  No objection.

17       *THE COURT:*  D-564 will be admitted.

18 *BY MR. FELDBERG:*

19 *Q.*  In the feedback that RSCS provided to Pilgrim's --

20       *MR. FELDBERG:*  Could we publish it to the jury,

21 please, Your Honor?

22       *THE COURT:*  You may.

23 *BY MR. FELDBERG:*

24 *Q.*  In the feedback that RSCS provided to Pilgrim's in the fall

25 of 2013, did you tell them that they were 3 percent from a

831

Michael Ledford - Cross

1   competitive price on eight-piece fried?

2   A.   Yes.

3   Q.   So if the people at Pilgrim's are better at math or were

4   better at math than I am, they could figure out exactly what

5   you told them was the competitive price, correct?

6   A.   Yes.

7   Q.   Could we turn to Page 2 of this document, please?

8        You asked Pilgrim's, did you not, to take into account

9   the feedback and consider adjusting its quote, correct?

10  A.   Yes.

11  Q.   Did they do so?

12  A.   Yes.

13  Q.   And did they reduce their bids?

14  A.   I don't know if they reduced every single one of them.

15  Q.   They reduced some of them?

16  A.   Yes.

17  Q.   They took your feedback into account?

18  A.   Yes.

19  Q.   They responded to it?

20  A.   Yes.

21       MR. FELDBERG:   Could you turn, sir, to Tab 52?  And

22  this is defense Exhibit 15 -- I am sorry, it's Government

23  Exhibit 1713-1.  I am sorry, I gave you the wrong number.

24  Could you turn to Tab 50, please, and that is government

25  Exhibit 1713-1, which, Your Honor, I believe is in evidence.

Michael Ledford - Cross

1          *THE COURT:*  It is in evidence.

2          *MR. FELDBERG:*  May we publish it to the jury?

3          *THE COURT:*  You may.

4   *BY MR. FELDBERG:*

5   Q.  So Mr. Ledford, this is an e-mail from you to Mr. Austin on

6   November 18th, 2013, correct?

7   A.  Yes.

8   Q.  And notwithstanding that Pilgrim's had reduced at least

9   some of its bids, you remained disappointed, correct?

10  A.  Yes.

11  Q.  They had adjusted purple label down 58 points.  And you

12  told them, did you not, that if they stayed with that position,

13  you would be moving a significant amount of volume.

14  A.  Yes.

15  Q.  And by the way, you referred in this e-mail to the

16  consultants in here.  Was that PriceWaterhouseCoopers?

17  A.  Yes, it was.

18  Q.  And I think you referred to them during Mr. Torzilli's

19  examination.  You had hired consultants to assist with the

20  purchasing process in 2013?

21  A.  That's correct.

22  Q.  Was that just to deal with Pilgrim's or with all of the

23  suppliers?

24  A.  With all of the suppliers.

25  Q.  Could you take a look, please, at Tab 51?

833

Michael Ledford - Cross

1          And could we display this on the monitor, but not to

2    the jury?  This is Exhibit E-799 for identification only at

3    this time.  And could you just display the top e-mail from

4    Mr. Ledford to Mr. Austin.

5          Mr. Ledford, the top e-mail is from you to Mr. Austin

6    on November 19th, 2013, correct?

7    A.   Yes.

8    Q.   And what was your purpose in sending him this e-mail?

9    A.   I was trying to get him to lower his prices.

10         MR. FELDBERG:  Your Honor, we offer E-799, only the

11   top e-mail from Mr. Ledford to Mr. Austin.

12         THE COURT:  Any objection to the admission of E-799,

13   only the top e-mail from Mr. Ledford to Mr. Austin?

14         MR. TORZILLI:  We object to the rest of the e-mail,

15   but don't object to the very top e-mail, that one that's being

16   displayed now.

17         THE COURT:  So just that portion of E-799 will be

18   admitted.

19         MR. FELDBERG:  And may we publish that to the jury,

20   Your Honor?

21         THE COURT:  You may.

22   BY MR. FELDBERG:

23   Q.   Mr. Ledford, on November 19, 2013, did you in substance

24   tell Mr. Austin the price that Pilgrim's had to meet?

25   A.   Yes.

834

Michael Ledford - Cross

1          MR. FELDBERG:  Could we call up, please, Exhibit

2   D-588, which I believe is in evidence?

3          And Mr. Ledford, I believe it's at Tab 57 in your

4   binder.

5          THE COURT:  What was the exhibit number again,

6   Mr. Feldberg?

7          MR. FELDBERG:  D-588.

8          THE COURT:  Yes.  This is in evidence.

9   BY MR. FELDBERG:

10  Q.  Is this an e-mail from Mr. Austin to Mr. Oeschli in your

11  organization?

12  A.  Yes.

13  Q.  And it's transmitting a bid submission, is it not?

14  A.  Yes.

15  Q.  Could you turn to Tab 58, please?

16         THE COURT:  Did you want to display that to the jury,

17  Mr. Feldberg?

18         MR. FELDBERG:  Sure.  Thank you, Your Honor.  Could we

19  briefly display Exhibit D-588?

20  BY MR. FELDBERG:

21  Q.  And let's now turn to Tab 58 in your binder, Exhibit D-589,

22  which I believe is in evidence.

23         THE COURT:  That is.

24         MR. FELDBERG:  May we publish it, Your Honor?

25         THE COURT:  You may.

835

Michael Ledford - Cross

1   *BY MR. FELDBERG:*

2   *Q.*  Mr. Ledford, is Exhibit D-589 Pilgrim's final round bid

3   submission in 2013 for the 2014 contract?

4   *A.*  Yes.

5   *Q.*  And if you look at the top, and maybe we could enlarge the

6   top box if possible, that tracks, does it not, Pilgrim's round

7   one, round two and final bids, correct?

8   *A.*  Yes.

9   *Q.*  And looking at the line for eight-piece fried, which is I

10  think the bottom line of that box, you see that?

11  *A.*  Yes.

12  *Q.*  What was Pilgrim's first round bid?

13  *A.*  .9558.

14  *Q.*  And its second round bid?

15  *A.*  9458.

16  *Q.*  And its final bid?

17  *A.*  .9250.

18  *Q.*  Mr. Ledford, I apologize, but could I ask you to turn back,

19  please, to Tab 43, which is Exhibit D-563.  And that's the

20  cover e-mail from Ms. Hester with the round one feedback,

21  correct?

22  *A.*  Correct.

23        *MR. FELDBERG:*  Your Honor, we offer 563.

24        *THE COURT:*  Any objection to D-563?

25        *MR. TORZILLI:*  No objection.

Michael Ledford - Cross

1              *THE COURT:*  D-563 will be admitted.

2              *MR. FELDBERG:*  Thank you.

3     *BY MR. FELDBERG:*

4     *Q.*  Now, Mr. Ledford, to save some time, rather than walking

5     you through every bid and every contract which could take some

6     time, can I show you a chart, please, which is Defendants'

7     Exhibit I-241, not for the present time for the jury.

8              You've seen this chart before, have you not,

9     Mr. Ledford?

10    *A.*  Yes, I have.

11    *Q.*  And can you tell the jury, please, what it is?

12    *A.*  This is a chart comprising the prices for the years 2012

13    through 2014 with all the chicken-on-the-bone suppliers.

14    *Q.*  And is it accurate in terms of their -- the prices listed?

15    *A.*  To the best of my recollection, yes.

16             *MR. FELDBERG:*  Your Honor, may we display this to the

17    jury for demonstrative purposes?

18             *THE COURT:*  Any objection to the use of I-241 for

19    demonstrative purposes only?

20             *MR. TORZILLI:*  No objection.

21             *THE COURT:*  All right.  Then it may be displayed to

22    the jury for demonstrative purposes.

23    *BY MR. FELDBERG:*

24    *Q.*  Mr. Ledford, looking at I-241, did the suppliers have the

25    same prices for eight-piece or different prices?

Michael Ledford - Cross

1    A.   Different prices.

2    Q.   Every year, correct?

3    A.   Every year.

4    Q.   And from 2013 to 2014, do the prices go up or down?

5    A.   They went down.

6    Q.   They went down generally between 4 and 5 cents, correct,

7    per pound?

8    A.   Yes, that's correct.

9    Q.   Now, you testified during Mr. Torzilli's examination that

10   RSCS wanted the lowest sustainable price, correct?

11   A.   Correct.

12   Q.   And one of the reasons is that you had seen a number of

13   suppliers go bankrupt, correct?

14   A.   Correct.

15   Q.   Was one of them Pilgrim's?

16   A.   Yes.

17   Q.   So Pilgrim's had had a bankruptcy before the years we're

18   talking about, correct?

19   A.   Yes.  I believe it was '09.

20   Q.   And it had since emerged from that bankruptcy, correct?

21   A.   Yes.

22   Q.   We talked a little bit about wings.  What percentage of the

23   business constitutes wings?

24   A.   The percentage of KFC business?

25   Q.   Yes.

838

Michael Ledford - Cross

1  A.  A very small percentage, single digits.

2  Q.  I am sorry?

3  A.  Single digits.

4  Q.  Is it less than 1 percent?

5  A.  Yes, more than likely.

6  Q.  You talked a little bit in Mr. Torzilli's examination about

7  franchisees.  Who owns the KFC businesses?

8  A.  The franchisees.

9  Q.  And therefore, is it important to keep them satisfied?

10  A.  Yes.

11  Q.  Why is that?

12  A.  At the end of the day, that's who you are working for.

13  That's your boss.

14          MR. FELDBERG:  May I confer a moment, Your Honor?

15          THE COURT:  You may.

16          MR. FELDBERG:  Thank you, Mr. Ledford.  I have nothing

17  further.

18          THE COURT:  Thank you, Mr. Feldberg.

19          Additional cross-examination?

20          Mr. Pollack?  So you are up, Mr. Pollack.  Go ahead.

21          MR. POLLACK:  Thank you, Your Honor.

22                          **CROSS-EXAMINATION**

23  BY MR. POLLACK:

24  Q.  Mr. Ledford, my name is Barry Pollack and I represent Ric

25  Blake.  Good afternoon.

Michael Ledford - Cross

1    *A.*  Good afternoon.

2    *Q.*  I want to start with something that Mr. Beller had asked

3    you about.  He had said that there was a year in which you had

4    given direction or guidance or advice to George's to decrease

5    its price from whatever it was bidding at that point and had

6    told them quite clearly that if they didn't, they were going to

7    lose volume.  Do you remember talking to Mr. Beller about that?

8    *A.*  I do, yes.

9    *Q.*  And they didn't reduce the price, at least not as much as

10   you had wanted them to.  And so you followed through and you

11   took volume from them, correct?

12   *A.*  Yes, correct.

13   *Q.*  And after the negotiation was over and after you had taken

14   volume from them, they came back to you and said, just kidding.

15   We'll lower our price now.  And you told them it's too late,

16   right?

17   *A.*  Correct.

18   *Q.*  Can you tell me, what year was that that that that happened?

19   *A.*  I do not recall, but it was before the time period we've

20   been discussing here today.

21   *Q.*  When you say the time period we've been discussing, you

22   have been discussing a negotiation in 2012 that was for the

23   2013 contract year and a negotiation in 2013 that was for the

24   2014 contract year.

25   *A.*  Correct.

840

Michael Ledford - Cross

1   *Q.* And so this happened before that.

2   *A.* Yes, it did.

3   *Q.* Some time before that?

4   *A.* Yes.

5   *Q.* And so George's certainly knew going into the negotiations

6   that you've been describing that if you said you were going to

7   take away volume, you meant it.

8   *A.* Yes.

9   *Q.* Now, you testified that these contracts were based on a

10  cost-plus model?

11  *A.* Yes.

12  *Q.* And to state the obvious, that's a model that accounts for

13  the various costs that go into the production of the chicken,

14  and then the plus is some sort of margin or profit for the

15  supplier.

16  *A.* Right.

17  *Q.* And you wanted the suppliers to have some profit because

18  you wanted them to be sustainable businesses, correct?

19  *A.* Absolutely.

20  *Q.* In fact, that was a significant concern since a number had

21  gone out of business.

22  *A.* Yes.

23  *Q.* Now, once a contract is in place, once a contract has been

24  signed, all of those cost items are set for the entirety of the

25  contract term with the exception of the feed cost; is that

Michael Ledford - Cross

1    correct?

2    A.   That's correct.

3    Q.   And the margin or profit has -- is set for the entirety of

4    the contract term; is that correct?

5    A.   Yes.

6    Q.   So there is only one variable that changes during the

7    contract term and that's the feed cost.

8    A.   Correct.

9    Q.   But if you change one variable, that changes the bottom

10   line price, correct?

11   A.   Right.

12   Q.   And so the price might fluctuate from period to period

13   within a contract term based on changes in the feed cost.

14   A.   That's right.

15   Q.   And the cost of the feed each period was largely dictated

16   by you, by the customer, because you would tell the suppliers

17   the price and timing at which they should buy the feed on the

18   Chicago Board of Trade.

19   A.   Yes.

20   Q.   And, sir, I think you had described, and I don't remember

21   anymore if this was on direct or cross-examination, that

22   figuring out the period price each month should, if everybody

23   is doing it right, be essentially just a billing exercise,

24   correct.

25   A.   Exactly, yes.

Michael Ledford - Cross

1    Q.  You would only give feedback in that process if there was

2    some sort of discrepancy.  It looked like somebody had made a

3    mistake?

4    A.  Right.

5    Q.  There would be no new RFP or no new negotiation, no new

6    bidding from period to period.

7    A.  No.

8    Q.  Because the contract was already set.

9    A.  Right.

10   Q.  There would not be another RFP until the end of the

11   contract term and that RFP would be for the following contract,

12   correct?

13   A.  That's right.

14   Q.  You had indicated that the negotiation in the RFP process

15   really starts after everybody puts in their first round bids,

16   correct?

17   A.  That's when the negotiations start, yes.

18   Q.  That's when the negotiations start.  And it starts with you

19   giving feedback to the supplier on what you think of their

20   first round bid.

21   A.  Right.

22   Q.  And that might be what you think overall about how

23   competitive it is.  It might be if you think that they are

24   overstating a particular cost or particular line item, if you

25   think they are giving themselves too much margin, what have

Michael Ledford - Cross

1    you.

2    A.   Right.

3    Q.   And when you gave them that feedback after any particular

4    round of bidding, would they just sit and listen and then come

5    back to you with a new bid or is it more of a back-and-forth

6    process where they might say to you, no, Mike, we don't agree.

7    We think this cost is reasonable.  Would it be that kind of a

8    back-and-forth?

9    A.   Yes, there would be a lot of dialogue back and forth.

10   Q.   And that's why you call it a negotiation.

11   A.   Yes.

12   Q.   So it's not just you giving feedback.  It's a negotiation.

13   A.   Right.  It's a two-way street.

14   Q.   I am sorry?

15   A.   It's a two-way street.

16   Q.   It's a two-way street.

17          When a supplier responds to your request for proposal,

18   we call that a bid, correct?

19   A.   Correct.

20   Q.   It doesn't matter which round it is.  It's a bid.

21   A.   Right.

22   Q.   No contract has been set yet.

23   A.   Right.

24   Q.   And there is not agreed upon price yet.  It's a bidding

25   process?

Michael Ledford - Cross

1   *A.*   That's right.

2   *Q.*   When the contract is signed, now we have a contract price,

3   correct?

4   *A.*   Yes.

5   *Q.*   So there is a difference between a bid and a price that's

6   set by the contract, correct?

7   *A.*   Yes.

8   *Q.*   And we just talked about the fact that the price might vary

9   from period to period, correct?

10  *A.*   Correct.

11  *Q.*   But each period is still a period price because it's

12  dictated by the contract.

13  *A.*   Right.

14  *Q.*   It's not a bid.

15  *A.*   Right.

16  *Q.*   A bid is something that is future looking.  We haven't yet

17  set the -- the contract is not yet set.

18  *A.*   Right.

19  *Q.*   Whereas a price is something that is either current or

20  historical.  It's already been set.

21  *A.*   Yes.

22  *Q.*   I want to switch gears for a minute.  You've also talked

23  about what we've been referring to as covers and shorts,

24  correct?

25  *A.*   Yes.

Michael Ledford - Cross

1   Q.  And the concept here is if a particular supplier under

2   their contract is obligated to give you a particular volume for

3   a particular day or a particular week and they don't have

4   enough to fulfill that obligation, they're short, correct?

5   A.  Correct.

6   Q.  And so they might look to one of the other suppliers, a

7   company that's normally their competitor, to, quote, cover that

8   short, correct?

9   A.  Yes, that's correct.

10  Q.  In other words, they are going to buy the amount of chicken

11  that they're short from their competitor.

12  A.  Right.

13  Q.  And you said that this was -- this happened frequently,

14  correct?

15  A.  Yes.  It was not uncommon.

16  Q.  Birds are unpredictable.  They might not get to the exact

17  size that you want them to be at at the time you need to sell

18  them, right?

19  A.  It is not an exact science.

20  Q.  It is not an exact science.  So when this happened, and it

21  happened frequently, you knew that one supplier was going to

22  buy directly from another supplier.

23  A.  Yes.  We certainly knew that that happened.

24  Q.  In fact, you didn't want to be involved in that process.

25  You preferred that one supplier buy directly from another

Michael Ledford - Cross

1   supplier.

2   A.  Yes, that's correct.

3   Q.  And you said because you didn't get involved, you didn't

4   know at what price supplier one was selling to supplier two

5   for, correct?

6   A.  Correct.

7   Q.  But you understood that they might simply be selling at

8   whatever the period price was that they had agreed to with KFC

9   for that period.

10  A.  Yes, they could certainly do that.

11  Q.  And when you knew that one supplier was buying from another

12  supplier, you knew that they might be learning that other

13  supplier's period price.

14  A.  Yes, I did.

15  Q.  And the fact that one supplier might be learning another

16  supplier's period price was not of concern to you, correct?

17  A.  No, it was not.

18  Q.  And the reason that it was not a concern to you is that

19  simply knowing another supplier's period price doesn't have an

20  impact on the competitiveness of the bid process, correct?

21  A.  That is correct.

22  Q.  Because the period price is something that's been set under

23  a prior contract, correct?

24  A.  Right.

25  Q.  And it's just the bottom line price.

Michael Ledford - Cross

 1  *A.*  Correct.

 2  *Q.*  It doesn't tell you all those component costs, correct?

 3  *A.*  Correct.

 4  *Q.*  A lot of variables there.

 5  *A.*  Yes.

 6  *Q.*  And it certainly doesn't tell you what that supplier's

 7  going to bid for the coming contract year.

 8  *A.*  No, it does not.

 9  *Q.*  So if you didn't know anything about what your competitor

10  was bidding when we are in the bid process, even if you knew

11  their period prices, that would not give you any kind of

12  competitive advantage.

13  *A.*  That is right.

14  *Q.*  And it wouldn't have any meaningful impact on what you

15  called that closed bidding system, correct?

16  *A.*  Correct.

17  *Q.*  So let's talk, then, Mr. Ledford, about the bidding

18  process, the RFP process.  Amongst other products you would ask

19  for a bid on the eight-piece chicken-on-the-bone product,

20  right?

21  *A.*  Yes.

22  *Q.*  And that was a very significant product to KFC, correct?

23  *A.*  Yes.  It was the most important.

24  *Q.*  The most important.  In fact, it was 70 percent of the

25  chicken that KFC was buying, correct?

848
Michael Ledford - Cross

1    A.   That's correct.

2    Q.   You would also ask for a formula bid on dark meat, correct?

3    A.   Yes.

4    Q.   And dark meat was substantially less significant in terms

5    of how much chicken KFC was buying than the eight-piece chicken

6    on the bone?

7    A.   Yes.  It was roughly 10 percent.

8    Q.   Okay.  So rather than being 70 percent of the chicken KFC

9    was buying, it was 7 percent of the chicken KFC was buying.

10   A.   No, it was 10 percent, I believe.

11   Q.   10 percent of the total?

12   A.   10 percent of the total.

13   Q.   Okay, so 70 percent.  It's 10 percent?

14   A.   Right.

15   Q.   So chicken on the bone is seven times more significant than

16   the amount that you are buying on the dark meat?

17   A.   Exactly.

18   Q.   And because chicken on the bone is more expensive, it's

19   significantly more than 70 percent in terms of dollars to

20   dollars what you're spending.

21   A.   Yes.

22   Q.   And in the negotiation if you're successful in lowering the

23   price of the eight-piece chicken on the bone, that sort of

24   automatically lowers the price on dark meat as well, right?

25   A.   Yes, it does.

Michael Ledford - Cross

1    Q.  So it's a two for one for you.

2    A.  Yes.

3    Q.  Conversely, if you are successful in lowering the price or

4    the formula for dark meat, all you've done is affected the dark

5    meat price.

6    A.  Yes.

7    Q.  That 10 percent.

8         MR. TORZILLI:  May we have a side bar?

9         THE COURT:  Yes.

10    (At the bench:)

11         THE COURT:  Mr. Torzilli, go ahead.

12         MR. TORZILLI:  Your Honor, some folks at our table

13    noticed some jurors might be getting a little sleepy and dozing

14    off, so we'd suggest maybe this is a good opportunity for a

15    stand-up-and-stretch break.

16         MR. POLLACK:  Your Honor, I find people frequently

17    have that reaction to me.

18         THE COURT:  I don't think it has anything to do with

19    you, Mr. Pollack.  Ms. Carroll was leaning back, but I didn't

20    notice anyone sleeping, but I think it might be a good

21    opportunity.  So why don't we.  We will do our first one.

22    Thank you.

23    (In open court:)

24         We are going to do something new.  We are going to do

25    a stand-up-and-stretch break right now.  So please feel free to

850

Michael Ledford - Cross

1    stand up, stretch.  You don't all have to.  Let me take an

2    informal poll.  Hands up if you think the courtroom is hot.

3    Maybe, Ms. Grimm, do you mind letting people know?  I think

4    with the warmer weather outside, I think the settings are a

5    little bit off.

6              Mr. Pollack, go ahead.

7         MR. POLLACK:  Thank you, Your Honor.

8    BY MR. POLLACK:

9    Q.  So when you impact the price of the eight-piece chicken on

10   the bone, you kind of automatically impact the price of the

11   dark meat, correct?

12   A.  Right.

13   Q.  But the opposite is not true if you impact the formula for

14   the dark meat.  It doesn't do anything for that big 70 percent

15   of the chicken you are buying, correct?

16   A.  That's right.

17   Q.  Nonetheless, you said earlier that there were occasions

18   where you would try to get all the suppliers to the same

19   formula for dark meat, correct?

20   A.  Yes.

21   Q.  And you said that the reason that you wanted to do that was

22   I think you said for consistency of prices?

23   A.  Yes.

24   Q.  Or uniformity of prices?

25   A.  Right.

Michael Ledford - Cross

1   Q.  But getting the dark meat to the same formula only results

2   in uniformity of prices if you've been successful in driving

3   the COB price into a narrow range, correct?

4   A.  Yes.

5   Q.  If the COB is a wide range among the suppliers, then even

6   if they are all .30 back, there is going to be a wide variety

7   in the dark meat prices, correct?

8   A.  Right.

9   Q.  So everything is really dependent on that COB negotiation.

10  A.  Yes, it is.

11  Q.  And I think as was covered with Mr. Beller, if all you knew

12  was how far back somebody was on dark meat, it would tell you

13  nothing about either what their COB price was or even what

14  their dark meat price was.

15  A.  That's right.

16  Q.  Now, you had mentioned that Mr. Blake was your day-to-day

17  account representative at George's, correct?

18  A.  Yes.

19  Q.  He was the salesperson for whom KFC was assigned.

20  A.  Yes.

21  Q.  But you said when it came to negotiating throughout the RFP

22  process, talking about bids and then ultimately negotiating a

23  contract price, that was not with Mr. Blake, correct?

24  A.  No, that was not with Mr. Blake.

25  Q.  That was with a gentleman by the name of Darrell Keck,

852

Michael Ledford - Cross

1  correct?

2  A.  Yes.

3  Q.  And another gentleman by the name of Charles George?

4  A.  Yes.

5  Q.  We are going to get back to them in a second, but I want to

6  ask you about your interaction and your team's interaction with

7  Mr. Blake as the day-to-day account representative.  Let's take

8  it outside of the RFP process.  Sometime in the year there is

9  not even a RFP negotiation going on.  What kinds of contacts

10  would you and your team have with Mr. Blake?  What sort of

11  issues would you deal with him on?

12  A.  Typical things we would talk to Mr. Blake about would be

13  service issues, quality problems, credits, requests that

14  operators were getting, feedback we were getting from operators

15  on what their chicken was looking like in the restaurants.  If

16  we had distribution centers complaining about their trucks

17  being late, you would talk about, hey, we need to get your

18  trucks there on time, things like that.

19  Q.  Those were the sorts of things that your team would look to

20  Mr. Blake for.

21  A.  Yes.

22  Q.  But when it came to negotiation and prices, they would look

23  to Mr. Keck and Mr. George?

24  A.  Yes.

25  Q.  Because you knew they're the ones who were responsible for

853

Michael Ledford - Cross

 1  negotiating bids and prices for George's.

 2  *A.*  That's right.

 3  *Q.*  And they are the ones who had the authority to decide what

 4  to bid and to decide what contract price to accept.

 5  *A.*  Right.  They were the decision makers.

 6  *Q.*  And Mr. Keck was Mr. Blake's boss?

 7  *A.*  Yes.

 8  *Q.*  Do you recall, his title was vice-president of sales and

 9  marketing?

10  *A.*  Yes, that's right.

11  *Q.*  Mr. Blake was not a vice-president.

12  *A.*  No, he was not.

13  *Q.*  He was not an officer of the company at all.

14  *A.*  No, he was not.

15  *Q.*  And Mr. George -- the name of the company is George's.

16  Mr. George was one of the owners of the company, correct?

17  *A.*  Yes, he was.

18  *Q.*  George's is a family-owned business?

19  *A.*  Yes.

20  *Q.*  Been around for a long time, but it's still a family-owned

21  business.

22  *A.*  Yes.

23  *Q.*  In fact, Charles George is in the fourth generation of

24  George's, correct?

25  *A.*  That's right.

854

Michael Ledford - Cross

1  Q.  Mr. George, Charles George who you negotiated with, was at

2  least two levels above Mr. Blake in the company?

3  A.  Yes, at least.

4        MR. POLLACK:  Your Honor, I would like to show to the

5  witness and the witness only at this point B-927, B, as in boy,

6  927.  Can we put that up on the screen?

7        THE COURT:  Yes.

8  BY MR. POLLACK:

9  Q.  Mr. Ledford, are you able to see that?

10  A.  Not yet.  Now it is.

11  Q.  And Mr. Ledford, there is a date in the upper left-hand

12  corner.  Can you tell us what it is that you're looking at

13  there?

14  A.  Yes.  This is the contract for the 2012 calendar year with

15  George's.

16  Q.  Okay.

17        MR. POLLACK:  Your Honor, I move the admission of

18  B-927.

19        THE COURT:  Any objection to the admission of B-927?

20        MR. TORZILLI:  No objection, Your Honor.

21        THE COURT:  B-927 will be admitted.

22        MR. POLLACK:  May we publish the first page of B-927

23  to the jury?

24        THE COURT:  You may.

25  BY MR. POLLACK:

Michael Ledford - Cross

1    Q.  Let's go down to the bottom of that page to the signature

2    lines.  Who signs this contract on behalf of George's?

3    A.  Darrell Keck.

4    Q.  And is that your signature on the right on behalf of UFPC?

5    A.  Yes, it is.

6    Q.  And UFPC again is the buying arm for Kentucky Fried

7    Chicken?

8    A.  Yes.

9    Q.  And if we can go to the second page of that document.  What

10   was the contract price for eight-piece COB for the 2012

11   contract year?  What was George's contract price?

12   A.  .9686.

13   Q.  And what was their price for dark meat?

14   A.  It was 30 less than that.

15   Q.  What we've been calling .30 back?

16   A.  Yes.

17        MR. POLLACK:  Your Honor, I would like to use a

18   demonstrative, I-698.  And I have given the government the

19   entirety of I-698, but what I would ask permission to do is at

20   this point to just publish to the jury the top portion of that

21   demonstrative that lists the 2012 contract prices for George's.

22   And I can give Ms. Grimm a copy of the demonstrative to hand up

23   to the Court --

24        THE COURT:  All right.

25        MR. POLLACK:  -- if that would be helpful.

856

Michael Ledford - Cross

1          *THE COURT:*  It would.

2     *BY MR. POLLACK:*

3     *Q.*  Mr. Ledford, does this accurately reflect what we just saw,

4     the 2012 contract prices for George's?

5     *A.*  Yes.

6          *MR. POLLACK:*  May I publish that to the jury as a

7     demonstrative, the top portion of I-698?

8          *THE COURT:*  Any objection to periodically showing the

9     jury portions of I-698, assuming a foundation is laid for

10    demonstrative purposes only?

11         *MR. TORZILLI:*  No objection under the conditions, Your

12    Honor, just like that.

13         *THE COURT:*  Then we may display what has been shown

14    now on the screen, just that first top portion of the exhibit

15    to the jury as a demonstrative exhibit.

16         *MR. POLLACK:*  Thank you, Your Honor.

17    *BY MR. POLLACK:*

18    *Q.*  And so this is the contract price that is in place for the

19    entirety of the 2012 calendar year, correct?

20    *A.*  Yes.

21    *Q.*  So when the negotiation process starts for the 2013 year,

22    when the bidding starts for 2013, this remains the contract

23    price that is in effect, correct?

24    *A.*  Yes.

25    *Q.*  And you asked for first round bids for the 2013 year on

857

Michael Ledford - Cross

1   September 26, 2012?

2   *A.*  Yes.

3   *Q.*  And I think the government showed you 9710 which happened

4   to be the invitation that went out to Roger Austin at Pilgrim's

5   for first round bidding, but one of those went out to each of

6   the approved suppliers, correct?

7   *A.*  Yes.

8         *MR. POLLACK:*  And if I can show just Mr. Ledford

9   H-855.

10  *BY MR. POLLACK:*

11  *Q.*  Mr. Ledford, was this the invitation for first round bids

12  that went out to George's?

13  *A.*  Yes.

14        *MR. POLLACK:*  Your Honor, I would like to move the

15  admission of H-855.

16        *THE COURT:*  Any objection to H-855?

17        *MR. TORZILLI:*  No, Your Honor.

18        *THE COURT:*  That exhibit will be admitted.

19        *MR. POLLACK:*  May I publish that, Your Honor?

20        *THE COURT:*  You may.

21  *BY MR. POLLACK:*

22  *Q.*  And the invitation that went to George's went to Darrell

23  Keck, correct?

24  *A.*  That's right.

25  *Q.*  Didn't even copy Mr. Blake.

Michael Ledford - Cross

1    A.   No, we did not.

2    Q.   And why did it go to Mr. Keck?

3    A.   Because he was the principal person that we were

4    negotiating with throughout the process.

5    Q.   And when you say the principal person, the other person

6    would have been Charles George?

7    A.   Yes.

8    Q.   Not Mr. Blake.

9    A.   Not Mr. Blake.

10   Q.   And your invitation asks that first round bids be made by

11   October 10th, 2012, right?

12   A.   That's right.

13   Q.   And did George's submit a first round bid on October 10,

14   2012?

15   A.   Yes, they did.

16   Q.   I would like you, if you would, to take a look at 1406,

17   which I believe is in evidence.

18        MR. POLLACK:  And if Your Honor can confirm that, we

19   can publish that.

20        THE COURT:  It is, and you may publish it.

21        MR. POLLACK:  Thank you, Your Honor.

22   BY MR. POLLACK:

23   Q.   Is this Mr. Keck submitting George's first round bid?

24   A.   Yes, it is.

25   Q.   And he copies Mr. Blake?

Michael Ledford - Cross

1   A.  Yes, he did.

2   Q.  But he is the one who is submitting it.

3   A.  Right.

4   Q.  On behalf of George's.

5   A.  Yes.

6   Q.  And he submits it to Mark Oechsli, who is a member of your

7   team, correct?

8   A.  Correct.

9           MR. POLLACK:  And if we can show just Mr. Ledford

10  1407.  And 1407 is the attachment to 1406.

11  BY MR. POLLACK:

12  Q.  Mr. Ledford, do you recognize 1407?

13  A.  Yes, I do.

14  Q.  Was that, in fact, George's first round bid submitted by

15  Mr. Keck?

16  A.  Yes.

17          MR. POLLACK:  Your Honor, I move the admission of

18  1407.

19          THE COURT:  Any objection to the admission of 1407?

20          MR. TORZILLI:  No, Your Honor.

21          THE COURT:  Exhibit 1407 will be admitted.

22          MR. POLLACK:  If we may publish that, Your Honor.

23          THE COURT:  You may.

24  BY MR. POLLACK:

25  Q.  And so Mr. Keck, can you tell us from 1407 what George's

Michael Ledford - Cross

1    first round bid was for the eight-piece chicken-on-the-bone

2    product?

3    A.  For the record, I am not Mr. Keck.

4    Q.  I am sorry.

5    A.  Their first round bid was .9694.

6    Q.  And Mr. Ledford, I don't even have the excuse of I only got

7    to stand and stretch for a minute because I have been standing

8    the whole time, so thank you for correcting me.

9          So Mr. Ledford, the first round bid for the

10   eight-piece chicken on the bone was .9694?

11   A.  Correct.

12   Q.  And what was the first round bid for dark meat?

13   A.  28 cents back.

14   Q.  And then if I can go back to the demonstrative 698 and just

15   show that next line item, round one, October 10, 2012 from that

16   point up.

17          MR. POLLACK:  May I publish the demonstrative?

18          THE COURT:  Yes, you may.  Why don't we have

19   Mr. Ledford just confirm those numbers.  I don't think he has

20   done that yet.  But as long as he confirms it, then we will

21   display it.

22          MR. POLLACK:  Certainly, Your Honor.

23   BY MR. POLLACK:

24   Q.  Mr. Ledford, have I correctly captured the round one bid

25   both for the eight-piece chicken-on-the-bone product and then

Michael Ledford - Cross

1    the formula first round bid for dark meat?

2    A.  Yes, you have.

3           THE COURT:  It can be displayed now.

4           MR. POLLACK:  Thank you, Your Honor.

5    BY MR. POLLACK:

6    Q.  And I think you indicated this before.  A first round bid

7    is just that.  It's an opening bid?

8    A.  Yes.

9    Q.  Never in your experience have you gotten a first round bid

10   and said, thanks, we've got a contract?

11   A.  Never.

12   Q.  And in this case for round one, George's increased the

13   price from the then in effect contract price because the

14   contract price is .9686 and they are asking for .9694, correct?

15   A.  Correct.

16   Q.  They have also increased the price of dark meat because .28

17   back is actually a higher dark meat price than .30 back,

18   correct?

19   A.  Yes.

20   Q.  Because you are only giving 28 cents off the

21   chicken-on-the-bone price.

22   A.  You're right.

23   Q.  And because it's 28 cents off, a slightly higher price, you

24   have actually increased it in two ways.

25   A.  Yes.

Michael Ledford - Cross

1    *Q.* And after that first round bid was received, the various

2    suppliers were asked to submit a second round bid, correct?

3    *A.* Correct.

4    *Q.* And again they were given a date by which to get those

5    second round bids in.

6    *A.* Yes.

7    *Q.* And at some point before the second round bids were

8    submitted, did you have a phone call with your counterparts

9    that you were negotiating with at George's to give them your

10   feedback on their first round bid?

11   *A.* Yes, we did.

12   *Q.* Do you recall when that conversation took place?

13   *A.* I do not.

14   *Q.* Do you recall if it was November 8th, 2012?

15   *A.* I do not recall.

16        *MR. POLLACK:* Your Honor, I would like to show

17   Mr. Ledford -- didn't call you Mr. Keck that time -- I would

18   like to show Mr. Ledford C-072 solely for the purpose of seeing

19   whether it refreshes his recollection about when the meeting

20   took place in which he gave the feedback on the first round

21   bid.

22        *THE COURT:* You may.

23   *A.* Okay.

24   *BY MR. POLLACK:*

25   *Q.* And having looked at that -- look away from it -- my

 1   question is simply do you now recall that that conversation or

 2   meeting took place on November 8, 2012?

 3   A.   Yes, I do.

 4   Q.   And in that call you gave feedback; is that correct?

 5   A.   Yes.

 6   Q.   Do you recall in that meeting or phone call -- do you

 7   consider it a meeting even though it takes place by phone?

 8   A.   Yes.

 9   Q.   In that meeting do you recall telling your counterparts at

10   George's that that first round bid -- let me start with this.

11   Do you recall telling them that for the COB you wanted them to

12   find 63 points?

13   A.   Yes, I do.

14   Q.   And when you say find 63 points, can you explain what that

15   means?

16   A.   63 points would be over half a cent per pound.

17   Q.   63/100ths?

18   A.   Yes.

19   Q.   So you are not being very subtle in signaling to them where

20   you would like them to be on their second round bid for chicken

21   on the bone.

22   A.   No, I'm not.

23   Q.   And do you recall in that meeting telling the individuals

24   from George's that you were negotiating with that you would

25   like the suppliers, all of the suppliers, to get to .31 back on

Michael Ledford - Cross

1    dark meat?

2    *A.* I do not remember that specifically, but I do know that I

3    was not happy with 28 cents.

4    *Q.* Okay.

5          *MR. POLLACK:* Your Honor, I would like to show

6    Mr. Ledford Exhibits 1510 and 1511, as an initial matter simply

7    to see if it refreshes his recollection as to what he told

8    George's about where he would like the suppliers to go with

9    respect to dark meat.

10          *THE COURT:* You may.

11          *MR. POLLACK:* If you can do 1510 and 1511 side by

12   side.

13   *BY MR. POLLACK:*

14   *Q.* Have you had a chance to look at that?

15   *A.* I have.

16   *Q.* Does that help in terms of refreshing your recollection

17   that you communicated that you wanted George's to get to .31

18   back?

19   *A.* It does not.  Mr. Keck's notes, whoever's notes these are

20   did not refresh my memory.  But if you had something from me,

21   that would help.

22   *Q.* Unfortunately, I do not.  But you said that you do recall

23   meeting with them on November 8th, 2012, correct?

24          *MR. TORZILLI:* Your Honor, request that the display be

25   removed from the witness' view.

Michael Ledford - Cross

1           *THE COURT:*  It has been.

2      *A.*  Yes.

3           *MR. POLLACK:*  I actually would like him to be able to

4      look at this document.

5           *THE COURT:*  For what reason?

6           *MR. POLLACK:*  I am going to ask him if there are other

7      notes that jog his recollection that these are, in fact, notes

8      of the meeting that took place, the meeting that he

9      participated in; in other words, does this sound like the

10     conversation that he had.

11          *THE COURT:*  You can do so.

12          *MR. POLLACK:*  Thank you, Your Honor.

13          It might be easier, Brian, just to do 1511.  It's a

14     little easier to read.

15     *BY MR. POLLACK:*

16     *Q.*  Take as much time as you need, Mr. Ledford, but I would

17     like to know if this sounds like the conversation that you had

18     with George's.

19     *A.*  I can confirm the 63 points mentioned on eight-piece is

20     accurate to the feedback I recall from that day.

21     *Q.*  Is there anything else in there that you can confirm as

22     accurate?

23     *A.*  Not to my memory, no.

24     *Q.*  So you do recall asking for 63 on the COB and you do recall

25     expressing your displeasure with the 28 formula.

866
Michael Ledford - Cross

1    *A.*  Yes.

2    *Q.*  Meaning you wanted a formula that had a bigger number in it

3    than 28?

4    *A.*  Exactly.

5    *Q.*  You can't remember specifically if you asked for 30 or 31?

6    *A.*  I maybe was going to ask for 32.  I recall in this

7    particular year we had some suppliers that we got to 32.

8    *Q.*  But we can say definitively you asked for something bigger

9    than 28.

10   *A.*  Yes.

11   *Q.*  And then that meeting was on November 8th.  On

12   November 14th did George's submit its second round bid after

13   having received that feedback from you?

14   *A.*  Yes.

15         *MR. POLLACK:*  And let me, if I might, Your Honor,

16   publish C-023 and C-024, both of which I believe are in

17   evidence and are the second round bid from George's.

18         *THE COURT:*  Yes, both are in, and you may display

19   them.

20         *MR. POLLACK:*  Thank you, Your Honor.

21   *BY MR. POLLACK:*

22   *Q.*  Is this the cover e-mail --

23         So this is for the record C-023.

24         Is this the cover e-mail that went with George's

25   second round submission?

Michael Ledford - Cross

1   A.   Yes, it is.

2   Q.   And who is it coming from?

3   A.   It's coming from Darrell Keck.

4   Q.   Copies Mr. Blake?

5   A.   Yes.

6   Q.   But it's coming from Mr. Keck?

7   A.   Yes.

8   Q.   Also copies Charles George?  I am sorry.

9   A.   No.  I don't see that.

10  Q.   I will blame that one on my eyesight.  It copies Mr. Blake.

11  It's coming from Mr. Keck.

12  A.   Right.

13  Q.   And again goes to Mark Oechsli who is in your -- on your

14  team?

15  A.   Yes.

16  Q.   If we can then go to C-024.  This is George's second round

17  bid, correct?

18  A.   Correct.

19  Q.   And can you tell me what their second round bid was for the

20  eight-piece chicken on the bone?

21  A.   .9632.

22  Q.   And can you tell me what their second round formula bid was

23  for dark meat?

24  A.   .30 back.

25  Q.   And now if I can go back to I-698 initially just for

Michael Ledford - Cross

1    Mr. Ledford.

2            And when it comes up, Mr. Ledford, I am going to ask

3    if you can confirm that I have correctly recorded George's

4    second round bid for chicken on the bone and dark meat.

5    A.  Yes, that is correct.

6            MR. POLLACK:  May I publish, Your Honor?

7            THE COURT:  It may be.

8    BY MR. POLLACK:

9    Q.  And the feedback that you had given to George's

10   negotiators, you said you wanted them to find 63 points on the

11   chicken-on-the-bone product, correct?

12   A.  Yes.

13   Q.  And as you said, this is a negotiation, correct?

14   A.  Correct.

15   Q.  I think you would agree with me and all of us know from

16   life that when you have a negotiation, you don't always get a

17   hundred percent of what you want.

18   A.  That's correct.

19   Q.  But in this case you asked for 63 points.  How many points

20   did George's lower their price?

21   A.  62.

22   Q.  So you didn't get a hundred percent of what you wanted, but

23   you came awfully close.

24   A.  Exactly.

25   Q.  They met you more than halfway.

Michael Ledford - Cross

1    *A.*   Right.

2    *Q.*   Well more than halfway?

3    *A.*   99 percent probably.

4    *Q.*   You don't remember exactly what you asked them for in terms

5    of a dark meat formula, but plainly they have responded because

6    they've lowered the dark meat formula from minus 28 to minus

7    30?

8    *A.*   Yes.

9    *Q.*   And again in a sense that represents a two-tier reduction

10   in the dark meat price because it's now 30 cents off of the

11   white meat price rather than 28, and the white meat price

12   itself -- I am sorry, the eight-piece price itself has also

13   come down.

14   *A.*   Yes.

15   *Q.*   So they didn't give you a hundred percent of what you

16   wanted, but they gave you a heck of a lot.

17   *A.*   Yes.

18   *Q.*   Fair to say they didn't say, sorry, Mr. Ledford.  Our first

19   round bid, the price is the price.  Take it or leave it.

20   *A.*   That's fair.

21   *Q.*   Didn't say anything like that.

22   *A.*   That's right.

23   *Q.*   They responded to precisely what you had told them.

24   *A.*   Very closely, yes.

25   *Q.*   Now, if we can go back to the cover e-mail which is C-023.

870

Michael Ledford - Cross

1          As we discussed, Mr. Blake is copied on that

2   submission from Mr. Keck, correct?

3   A.   Yes.

4   Q.   So it's fair to say that as of November 14th, 2012 at

5   whatever time this is sent, it looks like maybe 2:22 in the

6   afternoon, as of that point Mr. Blake knows what George's is

7   bidding in the second round, correct?

8   A.   Yes.

9   Q.   But you don't have any reason to believe that he knew

10  anytime prior to that what George's was going to bid.

11  A.   I do not know that.

12  Q.   If we can go back just to the same portion of I-698 that

13  we've already shown.

14          On November 13, 2012, the day before that second round

15  submission, what was the pending bid for dark meat, pending

16  formula for dark meat?

17  A.   .28 back.

18  Q.   What was the current contract formula for dark meat?

19  A.   .30 back.

20  Q.   So on November 13, 2012 if somebody said that George's was

21  .30 back on dark meat, were they giving a bid or were they

22  giving the contract price?

23  A.   .30 back at that point in time was the contract price.

24  Q.   And the dark meat formula is set under the contract?

25  A.   Yes.

Michael Ledford - Cross

1    *Q.*  It doesn't vary from period to period?

2    *A.*  No, it does not.

3    *Q.*  So we know that on November 13, 2012, George's actually is

4    charging .30 back for dark meat.

5    *A.*  Yes.

6    *Q.*  That would be their period price for dark meat at that

7    time.

8    *A.*  Yes.

9    *Q.*  Do you remember having a further discussion with the

10   negotiators for George's to give them feedback on that second

11   round bid?

12   *A.*  Yes.

13   *Q.*  And do you recall if that meeting or telephone conversation

14   took place on November 28th, 2012?

15   *A.*  I do not remember the exact date.

16        *MR. POLLACK:*  Brian, you can go ahead and take down

17   the demonstrative.

18        Your Honor, may we show Mr. Ledford and Mr. Ledford

19   only C-064 to see if that refreshes his recollection as to when

20   the meeting for feedback on the second round took place?

21        *THE COURT:*  You may.

22   *BY MR. POLLACK:*

23   *Q.*  And having the opportunity to review that, do you recall

24   that the meeting for negotiation over the second round bid took

25   place on November 28, 2012?

872

Michael Ledford - Cross

1    A.  Yes.

2    Q.  And do you recall that in that meeting you told Mr. Keck

3    and Mr. George that you wanted George's to reduce the

4    eight-piece chicken-on-the-bone price by another 15 cents -- I

5    am sorry, 15 points?

6    A.  I do not recall that specifically.

7         MR. POLLACK:  Your Honor, may I show Mr. Ledford

8    Page 2523 of a transcript from a prior hearing to see if it

9    refreshes his recollection?

10        THE COURT:  You may.

11        MR. POLLACK:  Do you have that?  You don't have that.

12        Let me see if I can hand that up.

13   A.  Okay.  That refreshes my memory.

14        MR. POLLACK:  Okay.  Go ahead and take that back down.

15   BY MR. POLLACK:

16   Q.  Now that you have had the opportunity to review that, do

17   you recall that in that meeting for the second round bid you

18   told Mr. George and Mr. Keck that you would like a further

19   15-point reduction in the COB price?

20   A.  Yes.

21        MR. POLLACK:  And C-020, Your Honor, I believe is

22   already in evidence.  If you can confirm that, I would ask to

23   publish that to the jury.

24        THE COURT:  It is in evidence and it may be published.

25   BY MR. POLLACK:

Michael Ledford - Cross

1   Q.  And C-020, Mr. Ledford, is this where George's submits its

2   third round bid?

3   A.  Yes, it is.

4   Q.  And who is the e-mail coming from?

5   A.  Darrell Keck.

6   Q.  And this one does copy Mr. Blake?

7   A.  Yes.

8   Q.  It also copies Charles George?

9   A.  Yes.

10  Q.  It also copies Greg Nelson.

11  A.  Yes.

12  Q.  Do you know who Greg Nelson is?

13  A.  Yes, I do.

14  Q.  Who is -- at this time what was his role?

15  A.  Greg was Ric's counterpart out of their Virginia plant.

16  Q.  Another salesperson?

17  A.  Yes.

18  Q.  At Mr. Blake's level?

19  A.  Yes.

20  Q.  Also someone you didn't negotiate bids or prices with,

21  correct?

22  A.  No.

23  Q.  Because Mr. Keck and Mr. George would be above that sales

24  level.

25  A.  Right.

Michael Ledford - Cross

1        MR. POLLACK:  And if I can, Your Honor, show

2    Mr. Ledford I believe it is C-021 and C-022 which would have

3    been the attachments to that e-mail.

4        THE COURT:  You may.

5        MR. POLLACK:  Mr. Torzilli, do you need those?

6    BY MR. POLLACK:

7    Q.  So you're looking right now, Mr. Ledford, at C-021.  Can

8    you just tell us generally what it is that you are looking at?

9    A.  It is George's submission for that next round.

10   Q.  Okay.

11   A.  Round three.

12       MR. POLLACK:  Brian, can you put up C-022?

13   BY MR. POLLACK:

14   Q.  And what is C-022?

15   A.  It is the corresponding cost model.

16   Q.  Can you tell from either document what their bid was for

17   eight-piece chicken on the bone?

18   A.  If we scroll down, I can.  Okay.  For that last round,

19   .9617.

20   Q.  For round two, right?

21   A.  Oh, for round two it's .9632.

22   Q.  I am sorry, you're right.  We have already done round two.

23   For round three.

24   A.  Right.  That round three was .9617.

25       MR. POLLACK:  Your Honor, I would move the admission

875

Michael Ledford - Cross

1    of C-021, C-022 and then C-022-1, which is simply a PDF version

2    of this native document.

3            THE COURT:  Okay.  And C-022-1 is the PDF version of

4    C-022.

5            MR. POLLACK:  That's correct.  C-022 is an Excel

6    spreadsheet, so 022-1 is simply PDF of the same thing.

7            THE COURT:  Any objection to C-021, C-022 and C-022-1?

8            MR. TORZILLI:  No objection.

9            THE COURT:  Each of those will be admitted.

10   BY MR. POLLACK:

11   Q.  So Mr. Ledford, can you tell us what was George's price

12   that they submitted in the third round for eight-piece COB?

13   A.  .9617.

14   Q.  And what was their formula that they submitted in round

15   three for dark meat?

16   A.  .30 back.

17   Q.  And so then if I can go back initially for Mr. Ledford only

18   to I-698.

19           Have I correctly captured the round three bids for

20   George's and for COB and dark meat?

21   A.  Yes, you have.

22           MR. POLLACK:  Permission to publish I-698?

23           THE COURT:  You may.

24   BY MR. POLLACK:

25   Q.  And Mr. Ledford, after the second round did George's refuse

Michael Ledford - Cross

1  to negotiate?

2  *A.*  After the second round?

3  *Q.*  After the second round.

4  *A.*  No, they did not.

5  *Q.*  Did they say sorry, the second round price is the price?

6  *A.*  No.

7  *Q.*  Did they say take it or leave it?

8  *A.*  No, they did not.

9  *Q.*  You said you wanted another 15 points reduction on

10  eight-piece COB.

11  *A.*  Correct.

12  *Q.*  How much did they reduce the price of eight-piece COB from

13  their second round submission to their third round submission?

14  *A.*  15 points.

15  *Q.*  So this is one of those rare occasions where you do get a

16  hundred percent of what you asked for in the negotiation.

17  *A.*  This happened here, yes.

18  *Q.*  And the dark meat formula did not change, but again because

19  they lowered the COB price, they were also lowering the price

20  of dark meat, correct?

21  *A.*  Correct.

22  *Q.*  And was a contract ultimately signed with George's for the

23  2013 year?

24  *A.*  Yes.

25          *MR. POLLACK:*  Your Honor, permission to publish

Michael Ledford - Cross

1    1120 -- no, I apologize.  Permission to publish 1515 which is

2    the signed contract.

3              THE COURT:  It's been admitted and you may publish it.

4              MR. POLLACK:  And let me actually go back, if I could,

5    to 1514, which is the cover e-mail which is also in evidence.

6              THE COURT:  Yes, it is in evidence, and you may

7    publish that too.

8              MR. POLLACK:  Thank you, Your Honor.

9    BY MR. POLLACK:

10   Q.  The e-mail actually -- cover e-mail actually comes from

11   Mr. Blake, correct?

12   A.  Yes.

13   Q.  The person who had day-to-day responsibilities for KFC?

14   A.  Yes.

15   Q.  There is no new negotiation taking place at the time he is

16   sending this contract?

17   A.  No.

18   Q.  The negotiation's already finished, over and done with,

19   correct?

20   A.  Yes.  This is a clerical matter at this point.

21   Q.  So what Mr. Blake is doing is simply the clerical process

22   of giving you the signed contract?

23   A.  Correct.

24   Q.  That you have negotiated with Mr. Keck and Mr. George.

25   A.  Yes.

Michael Ledford - Cross

1   Q.   Okay.   Now, let's go to 1515.   Is that the contract for

2   George's with KFC for the 2013 contract year?

3   A.   Yes, it is.

4   Q.   And who signs on behalf of George's?

5   A.   Darrell Keck.

6   Q.   And what is the price in the contract for the eight-piece

7   COB?

8   A.   .9622.

9   Q.   And what is the price or the formula for dark meat?   And

10  you may need to turn the page for that, maybe two pages.   I'm

11  not sure.   I think the next page.   Let's see.   No.   If you can

12  go to the page that ends 2911.   You are a step ahead of me as

13  usual.

14         What was the contract formula for dark meat?

15  A.   .30 back.

16         MR. POLLACK:   If we can go back just for Mr. Ledford

17  to I-698.

18  BY MR. POLLACK:

19  Q.   Have I accurately reflected the final contract prices?

20  A.   Yes.

21  Q.   And what is the final contract price for the eight-piece?

22  A.   .9622.

23  Q.   And the formula for dark meat?

24  A.   .30 back.

25  Q.   So the formula for dark meat did not change, correct?

Michael Ledford - Cross

1   A.   Correct.

2   Q.   But the contract price actually went up five points from

3   the third round bid.  And I think you described this earlier in

4   your testimony, but you were putting a surcharge of five points

5   because there was a need to pay a third-party consultant; is

6   that correct?

7   A.   That's correct.

8   Q.   So George's doesn't keep that extra five points, correct?

9   A.   No, they did not.

10  Q.   What George's got for their white meat, their six-piece --

11  A.   Eight-piece.

12  Q.   The eight-piece COB was the .9617.

13  A.   That's right.

14       MR. POLLACK:  So Your Honor, permission to continue to

15  publish the demonstrative, show the change from prior year.

16       THE COURT:  You may.

17       MR. POLLACK:  If you can show the next two lines,

18  please.

19  BY MR. POLLACK:

20  Q.   And so if you just do the math from the contract price from

21  last year of .9686 to the contract price of this year, .9622,

22  you see it drops 64 points, correct?

23  A.   Yes.

24  Q.   And but in terms of what the actual decrease was to

25  George's and what they were getting paid, it drops 69 points,

Michael Ledford - Cross

1  correct?

2  *A.*  That's right.

3  *Q.*  And the dark meat formula stayed the same.

4  *A.*  That's right.

5  *Q.*  Meaning that they were selling the dark meat at 69 points

6  less than what they were selling it for the year before.

7  *A.*  Yes.

8  *Q.*  So even though their first round bid was higher than their

9  prior year contract price, by the time you were done

10  negotiating with them it was lower.

11  *A.*  Yes.

12       *THE COURT:*  Would this be a convenient breaking spot,

13  Mr. Pollack?

14       *MR. POLLACK:*  That's just fine, Your Honor.  Thank

15  you.

16       *THE COURT:*  Ladies and gentlemen, let's go ahead and

17  take our afternoon break.  Keep the admonitions in mind.  We

18  will plan on reconvening at 3:30.  The jury is excused.

19       (Jury excused.)

20       We will be in recess.

21       *MR. GILLEN:*  Your Honor?

22       *THE COURT:*  Yes.

23       *MR. GILLEN:*  The Court said we would have time to

24  address the issue before the testimony of Mr. Suerken.  During

25  the afternoon testimony of Mr. Ledford, we received a 302 or

Michael Ledford - Cross

1    report on Mr. Suerken dated March the 1st of 2022 in which we

2    can go into this contents later, but it is clearly -- if this

3    were his testimony, it would be in violation of the Court's

4    order as to issues concerning no witnesses giving testimony

5    about their opinion about something being wrong, morally wrong,

6    that sort of thing.  So I am alerting this to the Court.  We

7    can get into it now or later depending on what the Court wants

8    to do, but it is of vital importance in our view and is

9    directly in violation of the Court's order.

10          THE COURT:  Well, I didn't order that in an interview

11   he couldn't say such a thing.  The question is whether or not

12   he would say something to that effect in court.

13          MR. GILLEN:  Exactly.

14          THE COURT:  Does the government have any anticipation

15   of eliciting some type of opinion along those lines?

16          MR. TORZILLI:  We don't.  And we are very well aware

17   of Your Honor's order on that subject.

18          THE COURT:  I think that's probably a nonissue.

19          Anything else, Mr. Gillen?

20          MR. GILLEN:  Other than, for example, they also have

21   in this summary that he no longer believes he got a good deal

22   from Tyson and the whole thing could have been contrived.  That

23   kind of speculation should not be elicited either in our view.

24          THE COURT:  Unless there was some type of foundation

25   for it, then I would agree with you.

Michael Ledford - Cross

1           Any -- Mr. Torzilli, do you anticipate soliciting some

2    type of statement like that from Mr. Suerken?

3           *MR. TORZILLI:*  I don't think so.

4           *THE COURT:*  Maybe in thinking through it if you do,

5    maybe you can alert Mr. Gillen to that effect.  But anything

6    else, Mr. Gillen?

7           *MR. GILLEN:*  No, Your Honor.  Thank you.

8           *THE COURT:*  All right.  We will be in recess.  Thank

9    you.

10        (Recess at 3:16 p.m.)

11        (Reconvened at 3:35 p.m.)

12           *THE COURT:*  Mr. Fagg?

13           *MR. FAGG:*  May I raise an issue before the jury comes

14    in?

15           *THE COURT:*  Yes.

16           *MR. FAGG:*  Yesterday I had raised a concern about some

17    documents that the government had disclosed that they may

18    intend to use on redirect, one of which was an e-mail that went

19    to George's.  It didn't show who it went to and it talks about

20    the confidential terms of the bid submission process.  So I

21    just wanted to re-raise our concerns about that.

22           I have spoken with Mr. Torzilli and he said that they

23    do intend to use these documents on redirect with Mr. Ledford.

24    I believe that it is outside of the scope of the

25    cross-examination.  They addressed on direct examination that

Michael Ledford - Cross

1    Mr. Ledford believed that the bid submission process was

2    confidential.  And I believe based upon the questions that have

3    proceeded so far on cross, that would be outside the scope in

4    addition to the relevance and the prejudicial issues that we

5    raised yesterday.

6              THE COURT:  Okay.  Is it a marked exhibit?

7              MR. FAGG:  Yes, Your Honor.  It's 9989 and 9990.  I

8    will be happy to hand a copy up.

9              MR. TORZILLI:  Your Honor, if you have the binder that

10   we handed up for Mr. Ledford, it's Tabs 81 and 82.

11             THE COURT:  Okay.  I have got those.

12             And Mr. Fagg, what about Exhibit 9989 do you think is

13   objectionable or would be outside the scope of direct?

14             MR. FAGG:  Your Honor, actually as it relates to 9989,

15   I only raise it because I believe that the government will

16   contend that that is the cover e-mail that contained 9990.

17   It's unclear to me that -- whether that's the case or not.  But

18   as it relates to 9990, it is primarily the opening sentence of

19   the opening paragraph in that document.

20             THE COURT:  Okay.

21             MR. FAGG:  And then the other point that we did raise

22   yesterday, which was neither one of these documents were ever

23   even on the government's exhibit list.

24             THE COURT:  Mr. Torzilli?

25             MR. TORZILLI:  It's on the exhibit list now.  And

Michael Ledford - Cross

 1   obviously the defendants -- this was produced out months and

 2   probably at this point years ago.  It's -- I think this is

 3   simply a case of it's clearly in the scope.  I think this is

 4   probably the broadest scope cross-examination of the trial and

 5   that's not even close, so it's clearly in the scope.  It won't

 6   be hearsay.

 7        We should be able to establish foundation I suspect

 8   with Mr. Ledford.  And it's clearly relevant both to set the

 9   terms of competition, this is an invitation to bid, and also to

10   establish the state of mind of the recipients for what the

11   terms of competition would entail.

12        THE COURT:  One question.  Assuming all those were

13   true, Mr. Torzilli, why didn't you use it in your direct?

14        MR. TORZILLI:  We didn't use it in our direct because

15   we disclosed the direct exam exhibits two days in advance and

16   it didn't occur to us to include it in there, so we produced it

17   later.

18        MR. FAGG:  Those were the only two documents disclosed

19   as redirect documents and they were not on any exhibit list

20   prior to that time.

21        MR. TORZILLI:  The reason we disclosed them was

22   frankly to have the evidentiary issues that are being raised

23   now raised ahead of time.  Our agreement, just to be clear,

24   does not require the disclosure of documents that are to be

25   used on redirect.

Michael Ledford - Cross

1              THE COURT:  Mr. Beller?

2              MR. BELLER:  Two points.  No. 1, I would note for the

3    Court that Mr. Ledford was asked on his direct examination

4    whether or not the "suppliers" had been provided notice that

5    this bid was closed.  The answer was yes, they were provided

6    that notice.  How were they provided that notice?  And he

7    testified that it was in the instructions.

8              So the problem we have now, of course, is that

9    testimony is out there from direct examination.  Mr. Torzilli

10   cannot open his own door to these documents to be able to now

11   bolster that earlier testimony, No. 1.

12             No. 2, of course, and that is we have a foundational

13   problem, and that is that this particular document does not

14   have a recipient list.  And so there is a lack of foundation as

15   to who received these documents.  What we do know, of course,

16   is that there is a George's Bates label on the bottom

17   right-hand corner.  So we know that this was at least at some

18   point produced by George's to the Department of Justice, but we

19   do not know who received these documents.  And even though it

20   does say George's, we, of course, don't know even that

21   Mr. Blake received these documents.  So for all of those

22   reasons, I join in the objection of Mr. Fagg and ask the Court

23   to not permit the government to introduce these.

24             THE COURT:  Mr. Pollack?

25             MR. POLLACK:  Yes, Your Honor.  Just a couple of

Michael Ledford - Cross

1    additional points.  One is the point that I started to make

2    yesterday, which is that even assuming all those foundational

3    issues could be resolved, the only state of mind issue that

4    it's relevant to is whether or not you were following the

5    rules -- the customers' rules of the bidding process, not

6    whether or not you were sharing information in violation of

7    those rules to gain market intelligence or whether it was to

8    align bids.  And as we've discussed ad nauseam, merely sharing

9    information is not the same as price-fixing.  And we don't know

10   which of the two it is regardless of whether or not they were

11   doing it in violation of the bidding rules.

12          The second point is the point about not using it on

13   direct.  What that would do is it would deprive the defendants

14   of the ability to cross-examine after having heard the

15   testimony about this document.  The ordinary course, we would

16   have heard that in direct and we would have been able to cross

17   on it.  So if the Court is considering permitting it, I would

18   ask for the opportunity to recross because it's something new

19   coming up in redirect.

20          THE COURT:  Mr. Fagg, real quick.

21          MR. FAGG:  The last point is I will concede

22   Mr. Torzilli's point that we've already received this document

23   months ago, if not years ago, I think that goes to the Court's

24   question, which is why didn't the government address it on

25   direct.  If we received it, it means the government also had

Michael Ledford - Cross

1    it.  And they could have chosen to use it in their direct

2    examination.  It was something that they chose not to use.

3              THE COURT:  Mr. Canty, real quick.

4              MR. CANTY:  Real quick, I want to focus the Court's

5    attention to the same issue that I think comes up in the

6    Court's order on a motion *in limine*, basically.  The

7    government's argument that evidence of the defendants believing

8    that price sharing was improper presumably based on customer

9    expectations about the norms of competitive bidding is not

10   persuasive.  And that's where you held the government has

11   provided no evidence linking price sharing in derogation of the

12   supplier's rules with the propensity to violate the Sherman

13   Act.

14             THE COURT:  Thank you.

15             MR. TORZILLI:  Two points.  One in response to that is

16   of course we are talking about something very different than

17   what's in the order.  What's talking about there is basically

18   an opinion in essence from customers as opposed to this which

19   goes to the defendants' and other conspirators' states of mind.

20             The second point is -- I think it's a bigger point.  I

21   just want to kind of dwell on it just for a second is we have

22   heard in opening statements and we hear repeatedly the idea

23   that price sharing is legal which, of course, is a canard.  But

24   we need to have the opportunity to rebut that clearly and this

25   is one opportunity for us to do that.

Michael Ledford - Cross

1          So in that sense, it's highly relevant to show that

2     during the ordinary course, that the way that the competition

3     was set up by RSCS and Mr. Ledford, who the defendants hold in

4     extremely high regard obviously, that he was telling them that

5     this is a confidential and restricted process contrary to the

6     texts and the e-mails, of course, that are in evidence that

7     show the conspirators acting to the contrary is highly

8     relevant.

9          THE COURT:  Yeah, I agree with the defendants on this

10    one.  I think that the point that was made yesterday by

11    Mr. Fagg, I believe, was that this gets to the distinction

12    between a policy and a -- some type of illegal price-fixing

13    act.  And these are the rules of the game, but a violation of

14    the rules of the game I don't believe is material to the

15    Sherman Act issue here.

16          And moreover, I don't believe that it's relevant to

17    state of mind, too, because, once again, the state of mind to

18    simply violate the rules of the game by sharing prices, even

19    assuming that that was improper, is not the same as the state

20    of mind to agree among competitors to fix prices.  So as a

21    result, the Court will not allow the government to bring up

22    that particular issue in 9990.

23          Mr. McLoughlin?

24          MR. McLOUGHLIN:  I will ask the Court's indulgence for

25    30 seconds and I will betray my age a little bit.  We just

Michael Ledford - Cross

 1   heard the government state in response to the fact that these

 2   documents were not on the government's exhibit list on

 3   January 24th when that order that the Court issued said that

 4   they should be.  They were not published to us prior to the

 5   pretrial conference or after.  The response of the government

 6   was they are on the exhibit list now.

 7          We are now in Sixth Amendment violation territory here

 8   because the defense had schedules like motions *in limine*,

 9   preparation of witnesses, preparations of cross-examinations

10   that are triggered and are essential for the Sixth Amendment

11   for trial of these defendants to the deadlines that this Court

12   ordered.  The government has just told the world they don't

13   give a damn.

14          Your Honor, if this is the way the trial is going to

15   go forward that we cannot rely upon the government's reliance

16   on the Court's orders, including issues of exhibits, then

17   that's, you know, a very different Sixth Amendment circumstance

18   than a government that will comply with this Court's orders.

19   We would ask the Court to consider what response the Court

20   should make to the government's position that, quote, it's on

21   the list now.

22          *THE COURT:*  I don't have to rely upon that.

23   Occasionally in trials things that are not -- I mean, this

24   happens in virtually every trial -- things that are not on a

25   witness list, there may be some good reason to bring them up.

Michael Ledford - Cross

 1 I am not commenting on whether this particular exhibit falls

 2 within that exception because we don't need to do that yet.  So

 3 I have already ruled.

 4          Let's get the jury back in.

 5          And let's get Mr. Ledford back in quickly.  Could

 6 someone from the government see if Mr. Ledford is ready?

 7          (Jury present.)

 8          *THE COURT:*  Sorry for that delay, ladies and

 9 gentlemen.  Something came up.  We had to deal with it.

10          But Mr. Pollack, go right ahead.

11          *MR. POLLACK:*  Thank you, Your Honor.

12 *BY MR. POLLACK:*

13 *Q.*  So Mr. Ledford, we had just talked about the conclusion of

14 the 2012 negotiation for the 2013 year, and the bottom line was

15 that George's had gone down from 69 points in their COB price

16 and because they used the same formula for dark meat also went

17 down 69 points for dark meat, correct?

18 *A.*  Yes.

19 *Q.*  And you had predicted at the beginning of that RFP process

20 that you thought that the COB price would go up as much as

21 3 percent that year, correct?

22 *A.*  That's correct.

23 *Q.*  And you had predicted that the dark meat price might go up

24 as much as 5 percent that year.

25 *A.*  That's right.

Michael Ledford - Cross

1    Q.  So safe to say that this negotiation with George's exceeded

2    your expectations in terms of how successful the negotiation

3    was.

4    A.  Yes, from where we started, it did.

5         MR. POLLACK:  And if we can call up F-808, which I

6    believe is already in evidence, and go to Page 46.

7         And Your Honor, permission to publish Page 46 of

8    F-808.

9         THE COURT:  You may.

10        MR. POLLACK:  And Brian, if you can just make it a

11   little bit larger, that would be helpful.  Thank you.

12   BY MR. POLLACK:

13   Q.  And I think you looked at this document with Mr. Feldberg

14   on or this particular page and I want to focus on George's.

15   You awarded a larger share of volume to the three lowest priced

16   suppliers, correct?

17   A.  Yes.

18   Q.  And George's was one of those?

19   A.  Yes.

20   Q.  So you recommended that their share go from the current

21   year share of 15.7 percent for the 2013 year the 16.25 percent.

22   A.  Yes.

23   Q.  A significant increase in volume.

24   A.  Yes.

25   Q.  And that's volume that George's through this competition is

Michael Ledford - Cross

1    taking away from its competitors.

2    A.   Yes.

3    Q.   And the reason that you did that is because you were

4    satisfied with the price that you ultimately negotiated with

5    George's.

6    A.   Yes.

7    Q.   And if we could go to Page 11 of the same document.

8         And if we look at George's, we see the .9617 which is

9    where they ended up after you take off that five points that

10   doesn't actually go to them, right?

11   A.   Right.

12   Q.   And you see -- well, you tell me, in that first column

13   where it says change from the 2012 eight-piece model per pound,

14   what does that represent?

15   A.   That's how much lower George's price was than the year

16   before.

17   Q.   And is it fair to say that of all of the suppliers,

18   George's had the biggest decrease in price --

19   A.   Yes.

20   Q.   -- from the year before.

21   A.   That's correct.

22   Q.   And at .9617, George's was the second lowest priced

23   supplier?

24   A.   Yes.

25   Q.   Only Case Farms who hadn't been part of the competition the

Michael Ledford - Cross

1    year before came in lower.

2    A.   That's right.

3    Q.   And when we say that George's came down the most, in fact,

4    George's came down almost two and a half times what the average

5    supplier came down; is that correct?

6    A.   Yes.

7    Q.   Now, at the end -- so this contract that we've been talking

8    about, the one that was entered into at the end of 2012, then

9    set the price for the 2013 calendar year, correct?

10   A.   Yes.

11   Q.   And then when we get toward the end of the 2013 calendar

12   year, we get to do it all over again, right?

13   A.   That's right.

14   Q.   And now there is a negotiation for the 2014 contract,

15   correct?

16   A.   Yes.

17        MR. POLLACK:   If we can go to 1120, which is I believe

18   is already in evidence.   And if the Court can confirm that, I

19   would like to publish that to the jury.

20        THE COURT:   You may.

21   BY MR. POLLACK:

22   Q.   Mr. Ledford, is Exhibit 1120 the contract for -- between

23   George's and KFC for the 2014 contract year entered into in

24   late 2013?

25   A.   Yes.

Michael Ledford - Cross

1  Q.  And who signs it on behalf of George's?

2  A.  Charles George.

3  Q.  And what is the 2014 contract year price for George's for

4  the eight-piece COB?

5  A.  We will need to go to the next page.  .9215.

6  Q.  And what is the 2014 dark meat formula for George's?

7  A.  We will need to go to another page.  .31 back.

8         MR. POLLACK:  And if I can go back, then, to

9  demonstrative I-698 and publish that for the jury.

10        THE COURT:  If you could just have him confirm that

11  change first.

12        MR. POLLACK:  Thank you, Your Honor.  If we can give

13  I-698 just to Mr. Ledford at this point.

14        THE COURT:  Sure.

15  BY MR. POLLACK:

16  Q.  Mr. Ledford, did I accurately record the 2014 contract

17  price for George's both for eight-piece COB and for dark meat?

18  A.  Yes, you did.

19        MR. POLLACK:  Now if I may publish for the jury I-698,

20  Your Honor.

21        THE COURT:  And just to be picky, Mr. Ledford, should

22  the 31 have a negative sign?

23        THE WITNESS:  Yes, it should.

24        THE COURT:  You may, Mr. Pollack.

25        MR. POLLACK:  Thank you, Your Honor.

Michael Ledford - Cross

1    *BY MR. POLLACK:*

2    *Q.*   And so the .9215 for the COB, George's has come down again

3    from the 2013 contract year to the 2014 contract year; is that

4    correct?

5    *A.*   Yes, that's correct.

6    *Q.*   And on dark meat, as the Court points out, the formula is

7    now negative or .31 back, correct?

8    *A.*   Correct.

9    *Q.*   So they've come down on dark meat as well.

10   *A.*   Yes.

11   *Q.*   In fact, they've come down on dark meat in two different

12   ways because they are now giving you 31 cents rather than 30

13   cents off the COB price and the COB price itself is lower.

14   *A.*   That's right.

15   *Q.*   Correct?

16   *A.*   That's right.

17           *MR. POLLACK:*  And then finally, Mr. Ledford -- if I

18   can, Your Honor, publish to the jury I-241, which is a

19   demonstrative that Mr. Feldberg had published.

20           *THE COURT:*  You may.

21   *BY MR. POLLACK:*

22   *Q.*   And this gives us the 2012, 2013 and 2014 prices?

23   *A.*   Yes.

24   *Q.*   And George's goes down in every one of those years.

25   *A.*   Yes, they did.

1   *Q.* And the prices are all different.

2   *A.* Right.

3   *Q.* And, in fact, from year to year some suppliers go up in

4   price and some go down in price.

5   *A.* Yes.

6   *Q.* But George's went down in each of those three years?

7   *A.* That's right.

8   *Q.* So if George's was aligning its bids to fix prices with its

9   competitors, it was doing it in a way that George's prices went

10  down every year.

11  *A.* Yes.

12          *MR. POLLACK:* Thank you.

13          *THE COURT:* Thank you, Mr. Pollack.

14          *MR. POLLACK:* Thank you, Your Honor.

15          *THE COURT:* Additional cross-examination?

16          Ms. Henry.

17                          **CROSS-EXAMINATION**

18  *BY MS. HENRY:*

19  *Q.* Good afternoon, Mr. Ledford.

20  *A.* Good afternoon.

21  *Q.* My name is Roxann Henry and I represent Mr. William

22  Kantola.  I am going to try and get through this quickly, so

23  bear with me.

24          *MS. HENRY:* If we could pull up Exhibits 1410 and

25  9691.

897

Michael Ledford - Cross

1          And, Your Honor, I believe these have already been

2   admitted, and may we please publish them?

3          THE COURT:  Let me just check real quick.  1410 has

4   been.  What was the other exhibit number?

5          MS. HENRY:  9691.

6          THE COURT:  Yes, that has been admitted as well.  And

7   you may publish both.

8          MS. HENRY:  And you can just put up 9691, please.

9   BY MS. HENRY:

10  Q.  Mr. Ledford, this is the first proposal that was submitted

11  by Koch Foods related to the negotiations for the 2013

12  contract; is that correct?

13  A.  Yes.

14  Q.  This was the one you said was submitted early in the

15  process, the same time as the RFIs?

16  A.  Yes.

17  Q.  Mr. Bruce MacKenzie is the person who submitted this?

18  A.  That's correct.

19  Q.  He was a salesman also at Koch Foods at the time?

20  A.  Yes.

21  Q.  Would you please tell the jury the actual price for the COB

22  eight-piece in Koch's proposal?

23          And I think for that we need to go to Page 3.  And you

24  can just put up 9691 at Page 3.

25  A.  .9710.

Michael Ledford - Cross

1   *Q.*  We have had so many numbers spinning around here, but I

2   want you to confirm that was not .9561, right?

3   *A.*  No, it is not.

4   *Q.*  Thank you.

5          *MS. HENRY:*  Could we please pull up F-769?  And, Your

6   Honor, I believe this also has been admitted and may we please

7   publish it?

8          *THE COURT:*  It has been admitted and you may publish

9   it.

10  *BY MS. HENRY:*

11  *Q.*  This is the 2013 contract for Koch Foods?

12  *A.*  Yes, it is.

13  *Q.*  And the person who signed the contract for Koch Foods was

14  also Mr. Bruce MacKenzie?

15  *A.*  Yes.

16  *Q.*  And would you please tell the jury what the actual contract

17  price was for the COB eight-piece?  And again, I am not certain

18  whether we need to --

19  *A.*  We need to get another page.

20         *MS. HENRY:*  Go to the next page.  Thank you.

21  *BY MS. HENRY:*

22  *Q.*  Can you please tell the jury what the actual contract price

23  was for the COB eight-piece?

24  *A.*  We are still not there on my screen.

25         *MS. HENRY:*  Getting there. keep going.  Can you keep

Michael Ledford - Cross

1   going?

2   *BY MS. HENRY:*

3   *Q.*   I am sorry, it was on the first page.

4   *A.*   Okay, .9662.

5   *Q.*   And that also was not .9561, was it?

6   *A.*   No, it is not.

7   *Q.*   Let's turn to Page 4 of the contract.  Can we pull that up?

8        And what was the actual price for the dark meat?  It

9   was .3050 less than the price of the COB eight-piece, correct?

10  *A.*   Yes.

11  *Q.*   And that was not .30 back?

12  *A.*   No, it is not.

13       *MS. HENRY:*  Can we please pull up F-808 and turn to

14  Page 18?  And I believe that also was admitted and may we

15  please publish that?

16       *THE COURT:*  You may.

17       *MS. HENRY:*  Thank you.

18  *BY MS. HENRY:*

19  *Q.*   Now, this shows the different proposals for dark meat and

20  the different rounds of them, correct?

21  *A.*   Yes.

22  *Q.*   And this shows that Koch had lowered its price on the dark

23  meat from its very initial proposal by the very next proposal

24  which was round two, right?

25  *A.*   Yes.

Michael Ledford - Cross

1           *MS. HENRY:*  Can we go back to F-769, please, and turn

2    to Page 6.?  Can you please publish that when you get it up?

3    *BY MS. HENRY:*

4    *Q.*  Would you please tell the jury the volume of the dark meat

5    in the 2013 contract for Koch Foods?

6    *A.*  490,000 points per week.

7    *Q.*  And that was a 50,000 pounds per week increase from the

8    prior year, wasn't it?

9    *A.*  I do not recall.

10          *MS. HENRY:*  So let's pull up F-768 and just for the

11   witness and the lawyers, please.

12   *BY MS. HENRY:*

13   *Q.*  Mr. Ledford, is this the 2012 contract for Koch Foods with

14   RSCS?

15   *A.*  Yes, it is.

16          *MS. HENRY:*  Your Honor, we move to admit F-768.

17          *THE COURT:*  Any objection to the admission of F-768?

18          *MR. TORZILLI:*  No objection.

19          *THE COURT:*  That will be admitted.

20          *MS. HENRY:*  Can we please go to Page 6?  May we please

21   publish it for the jury?

22          *THE COURT:*  Yes, you may.

23   *BY MS. HENRY:*

24   *Q.*  So if we were looking previously at 490,000 pounds per

25   week, my math isn't great, but that's about 50,000 extra pounds

Michael Ledford - Cross

1   that were increased in the 2016 contract -- 2013 contract?

2   A.  I do not have that on my screen.

3          MS. HENRY:  All right.  Can we pull up the previous

4   and put them next to each other that we just had up, 769,

5   F-769, as well as?  Just put them side by side, please.  Can

6   you pull up the page of 769 that has the dark meat volume on

7   it, which I believe is Page 6 on F-769?

8   BY MS. HENRY:

9   Q.  Mr. Ledford, does that --

10  A.  I am still not seeing the volume pages for either of the

11  years on my screen.

12  Q.  All right.  Maybe we have got the wrong volume page.  Let's

13  pull up -- I am trying to do this quickly.  I believe it

14  should -- it says Page 6, but it's actually the seventh page on

15  the contract, I think.

16  A.  You just went past it.  There it is.  440,000 pounds.

17  Q.  Okay.  So 440,000 pounds from 490,000 pounds is

18  50,000 pounds?

19  A.  That's correct.

20  Q.  And that was the amount of the increase?

21  A.  Yes.

22  Q.  Thank you, sir.  Sorry.

23         Do you recall that Koch was the only incumbent

24  supplier to increase its dark meat volume from 2012 to 2013?

25  A.  I did not.

902

Michael Ledford - Cross

1   Q.  Rather than wade through that, if we took each individual

2   contract for just looking at the contracts for 2012 and 2013

3   and we compared the numbers, would we be able to show that?

4   A.  Yes, you would.

5   Q.  Thank you.  We'll save you that.

6          We just went through a number of documents where you

7   were able to see 2012 prices and 2013 prices for all the

8   suppliers.  Do you recall that for all of them, the pricing

9   that was negotiated in 2011 was actually a higher price than

10  the prices that were negotiated in 2013?  And if you want, we

11  can pull up I-241 again which is a demonstrative that has

12  already been shown.

13  A.  So you said the negotiations in '11, so the 2012 contracts,

14  is that what you are asking about?

15  Q.  Yes, the 2012 contracts were all negotiated in 2011; isn't

16  that correct, sir?

17  A.  That's correct.

18  Q.  And the pricing for 2014 was the pricing that was

19  negotiated in 2013, correct?

20  A.  Yes.

21  Q.  So the pricing in 2013 was actually lower -- I mean higher.

22  You tell me.

23  A.  The 2014 prices are lower than the 2012 prices.

24  Q.  Perfect.  We can take that down.  Just a few more

25  questions.

Michael Ledford - Cross

1        You know that Koch Foods' owner is an outsider to the

2   industry from Chicago and known for being cut-throat?

3        MR. TORZILLI:  Objection, foundation, relevance.

4        THE COURT:  He can answer if he knows.

5   A.  Yes, that is a fair statement.

6   BY MS. HENRY:

7   Q.  And you understood that Mr. Kantola wasn't the one at Koch

8   Foods setting its prices.

9   A.  No, he was not.

10  Q.  And the same types of customer service things that were

11  discussed with Mr. Blake would have been discussed with

12  Mr. Kantola.

13  A.  Yes, that's correct.

14       MS. HENRY:  Thank you very much, sir.

15       THE COURT:  Ms. Prewitt?

16                    **CROSS-EXAMINATION**

17  BY MS. PREWITT:

18  Q.  Good afternoon, Mr. Ledford.

19  A.  Good afternoon.

20  Q.  I am not going to be asking you about bids or about

21  contracts.

22  A.  That's great.

23  Q.  I figured you might not be disappointed to hear that, okay?

24  I am going to ask you a little bit about Tim Mulrenin because I

25  represent Mr. Mulrenin.  And Mr. Ledford, you know Mr. Mulrenin

Michael Ledford - Cross

1   from the time when he was at Tyson and you were at RSCS,

2   correct.

3   *A.*   That's correct.

4   *Q.*   And he was a salesman, right?

5   *A.*   Yes.

6   *Q.*   And you knew him when he was a Tyson salesman and was

7   servicing Chick-fil-A when you were at Chick-fil-A?

8   *A.*   Yes.

9   *Q.*   Were you currently are.

10  *A.*   Yes.

11  *Q.*   And, in fact, Mr. Mulrenin currently services Chick-fil-A,

12  but at another chicken supplier.

13  *A.*   That's correct.

14  *Q.*   And that's Perdue, correct?

15  *A.*   That's correct.

16  *Q.*   And he continues to service Chick-fil-A to this day.

17  *A.*   Yes, he does.

18  *Q.*   And, in fact, you specifically consented and agreed that

19  Mr. Mulrenin would continue to service Chick-fil-A while at

20  Perdue to this day.

21        *MR. TORZILLI:*   Objection, relevance and outside the

22  scope.

23        *THE COURT:*   Overruled.

24  *A.*   Yes, that's correct.

25  *BY MS. PREWITT:*

Michael Ledford - Cross                                905

1   Q.  And that was after learning about the allegations in this

2   case contained in the Indictment that you testified on direct

3   that you have review.

4   A.  Yes.

5           MS. PREWITT:  Thank you very much, Mr. Ledford.

6           THE COURT:  Thank you.

7           Mr. Canty, go ahead.

8                        **CROSS-EXAMINATION**

9   BY MR. CANTY:

10  Q.  Hello, Mr. Ledford.  My name is Dennis Canty.  I represent

11  Jimmie Little.  Hope to be similarly brief.

12  A.  Okay.

13  Q.  I believe that Mr. Torzilli asked you who your main contact

14  was at Pilgrim's Pride and you said it was Roger Austin.  Do

15  you recall that?

16  A.  Yes.

17  Q.  Do you recall that Jimmie Little worked at Pilgrim's?

18  A.  Yes, I do.

19  Q.  Would it be fair to say that Mr. Little had a customer

20  service kind of role in connection with KFC?

21  A.  Yes.

22  Q.  Would it be fair to say that he was available to assist KFC

23  with problems such as if Pilgrim's had distribution problems

24  with filling KFC orders?

25  A.  Yes.

Michael Ledford - Cross

1    Q.  Did Mr. Little ever attend a meeting with you and Pilgrim's

2    representatives where bids or pricing for chicken were

3    discussed?

4    A.  No.  That's not something he was typically involved in.

5    Q.  Did you ever receive a telephone call or an e-mail from

6    Mr. Little regarding bids or pricing for chicken?

7    A.  No, I do not believe I ever have.

8    Q.  In your years of knowledge and experience negotiating KFC

9    chicken contracts with Pilgrim's Pride, was Jimmie Little ever

10   involved?

11   A.  No.

12          THE COURT:  Thank you.

13          Thank you, Mr. Canty.

14          Mr. Gillen?

15                    **CROSS-EXAMINATION**

16   BY MR. GILLEN:

17   Q.  I am Craig Gillen and I represent Brian Roberts.  Good

18   news, I am the last one.  And I have very few questions.

19          You talked to us a little bit earlier about your

20   strategy that you would use when folks -- you thought the

21   prices were too high, right?

22   A.  Right.

23   Q.  And part of your strategy would be, all right.  Price is

24   too high, then I'm going to cut you on volume.

25   A.  Correct.

Michael Ledford - Cross

1  Q.  And that way somebody would have to make a choice about

2  what they were going to do, correct?

3  A.  Yes.

4  Q.  And that's a strategy that you used.  You have used that

5  throughout your career, correct?

6  A.  That's correct.

7  Q.  You used it when you were with RSCS and you use it at

8  Chick-fil-A as well, correct?

9  A.  Yes.

10  Q.  As a matter of fact, in terms of issuing those sorts of

11  strategic ultimatums, if you will, in August of 2014 you issued

12  such an ultimatum to Tyson, didn't you?

13  A.  Yes, I did.

14  Q.  And so the first couple weeks in August of 2014, the crisis

15  at Tyson was whether or not they were going to be responding to

16  your ultimatum about cutting back substantially on their volume

17  or reducing their price, correct?

18  A.  Yes.  I believe it was 40 percent of their volume.

19  Q.  And at some point I think you told them -- or did you tell

20  them that if you don't come back, then I may eliminate you all

21  together and you will be in a five-year hole digging yourself

22  out?

23  A.  Yes.  I believe we told them we would reduce them

24  40 percent that first year and we would take them out of the

25  Chick-fil-A supply in the subsequent year.

908

Michael Ledford - Cross

1    Q.   Okay.  Big deal at Tyson.  This is right there in the first

2    two weeks of August of 2014, right?

3    A.   Correct.

4    Q.   Now, what happens is that the individuals at Tyson's

5    headquarters, Nick Tyler and Charlie Solomon who had been

6    responsible for those price raises got on the plane, flew to

7    Atlanta, Georgia, met with Brian Roberts and they came out to

8    your office, correct?

9    A.   That's correct.

10   Q.   Nick Tyler said, I am so sorry.  This is on August the

11   18th, 2014, wasn't it?

12   A.   Yes.

13   Q.   On August the 18th, 2014, Brian Roberts goes out to the

14   airport, gets the two big shots from Tyson and drives out

15   there.  And Mr. Tyler says, I'm sorry.  It was all on me.  You

16   know, forgive us, correct?

17   A.   Yeah, something like that.

18   Q.   And you did.

19   A.   Yes.

20   Q.   You forgave them.

21   A.   Yes.

22   Q.   And in dealing with Tyson, one of the things that you were

23   aware of in terms of Tyson was that the business unit and the

24   pricing units were the ones that set price, correct?

25   A.   Absolutely.

Michael Ledford - Redirect

1          MR. GILLEN:  Thank you so much.  Have a pleasant trip

2    back to Atlanta.

3          THE WITNESS:  Thank you.

4          THE COURT:  Thank you, Mr. Gillen.

5          Redirect?

6                    **REDIRECT EXAMINATION**

7    BY MR. TORZILLI:

8    Q.  Good afternoon, Mr. Ledford.

9    A.  Good afternoon.

10         MR. TORZILLI:  Can we call up government Exhibit 1544,

11   please, and have it published to the jury?

12         THE COURT:  You may.

13         MR. TORZILLI:  Thank you, Your Honor.

14   BY MR. TORZILLI:

15   Q.  Do you have it on the screen in front of you, Mr. Ledford?

16   A.  Yes, I do.

17   Q.  Do you recognize this document?

18         Let me withdraw that question and ask perhaps a more

19   appropriate question.

20         Was this document shown to you on cross-examination

21   earlier today?

22         MR. TUBACH:  I believe only the bottom part of that

23   document was shown to the witness.

24   A.  Yes, that bottom part was, yes.

25   BY MR. TORZILLI:

910

Michael Ledford - Redirect

1    Q.   That is an e-mail that you were not on, correct?

2    A.   That is correct.

3    Q.   Let's a little closer look at the e-mail that was shown to

4    you earlier today.  So first, it's an e-mail from Roger Austin?

5    A.   Correct.

6    Q.   And he wrote it to two individuals, Justin Gay and Scott

7    Tucker.  Do you know who they are?

8    A.   Yes, I do.

9    Q.   Who are they?

10   A.   They were on Roger Austin's sales staff at Pilgrim's at the

11   time.

12   Q.   And the first sentence of this e-mail says:  We (Scott

13   Justin and I) had the semi final round call yesterday with

14   Mike.  Do you see that?

15   A.   Yes, I do.

16   Q.   And you go by the name Mike, don't you, Mr. Ledford?

17   A.   Yes, I do.

18   Q.   And was a semi-final round call an example of a feedback

19   session where you would talk to a competing chicken supplier

20   like Pilgrim's about they're then existing bid?

21   A.   Yes.

22   Q.   Okay.  And at the bottom of that page of that document,

23   there are the words "Marshall Durbin."  Do you see that?

24   A.   Yes.

25   Q.   What's Marshall Durbin?

Michael Ledford - Redirect

1    A.  They were one of the other chicken suppliers.

2    Q.  And they were a competitor of Pilgrim's at the time.  Is

3    that fair to say?

4    A.  That is fair to say.

5    Q.  And they were submitting bids in competition with Pilgrim's

6    at this time?

7    A.  Yes.

8    Q.  Did you in your meeting with Defendant Roger Austin and the

9    others at Pilgrims tell Defendant Austin to reach out and

10   communicate with anyone at Marshall Durbin about bids?

11   A.  No, I did not.

12   Q.  Why not?

13   A.  Because I did not want them communicating about bids.

14   Q.  Okay.  Let's go to the next page of Government

15   Exhibit 1544.  Up at the very, very top left-hand corner in the

16   parenthetical on the first sentence, if we can zoom in on that.

17   It says "that is George's.)"  Do you see that?

18   A.  Yes, I do.

19   Q.  Is George's a supplier that was in competition with

20   Pilgrim's and Marshall Durbin at the time?

21        MR. FELDBERG:  Your Honor, the parenthetical is, "I

22   think that is George's."  It's not just, "that is George's."

23   It's "I think."

24        MR. TORZILLI:  I withdraw the question.

25   BY MR. TORZILLI:

Michael Ledford - Redirect

1    Q.  At the end of the first page beginning at the second page

2    there is a parenthetical saying, "I think that is George's."

3    Do you see the last three words of that parenthetical on the

4    screen in front of you?

5    A.  Yes.

6    Q.  Was George's a competitor of Pilgrim's at the time that

7    Defendant Austin wrote this e-mail apparently reporting on his

8    meeting with you?

9    A.  Yes.

10   Q.  And did you ask Defendant Austin to contact anyone at

11   George's to discuss bids?

12   A.  No, I did not.

13   Q.  Why not?

14   A.  I did not want them discussing bids.

15   Q.  And further along in the first line of Page 2 of government

16   Exhibit 1544, there is a reference to Claxton?

17   A.  Yes.

18   Q.  You talked a lot of about Claxton today, right?

19   A.  Yes.

20   Q.  They are a poultry supplier?

21   A.  Yes.

22   Q.  And they too were a poultry supplier in competition with

23   George's and Marshall Durbin and Pilgrim's at this time.

24        MR. BELLER:  Your Honor, I am going to object to the

25   ongoing leading questions.

Michael Ledford - Redirect

1          THE COURT:  Sustained.

2    BY MR. TORZILLI:

3    Q.  Was Claxton in competition with any other chicken suppliers

4    for RSCS's business at this time?

5    A.  Yes, they were.

6    Q.  With all the other chicken suppliers, bone-in chicken

7    suppliers you were dealing with?

8    A.  Yes.

9    Q.  And Pilgrim's would be -- what would be an example of a

10   chicken supplier that Claxton was in competition with at this

11   time?

12   A.  Pilgrim's or any other of the seven chicken-on-the-bone

13   suppliers.

14   Q.  And then further along in the first line of the second

15   page, there is a reference to Koch?

16   A.  Yes.

17   Q.  Were they in -- was Koch a chicken supplier in competition

18   with other chicken suppliers for RSCS bone-in business at this

19   time?

20   A.  Yes.

21   Q.  Did you ask Defendant Austin at any time during this

22   meeting that's being reported on here to contact anyone at

23   Claxton and/or Koch to discuss bids?

24          MR. FELDBERG:  Objection to the use of the term

25   meeting.  This is about a conversation between Mr. Austin and

Michael Ledford - Redirect

1    Mr. Ledford.

2           *THE COURT:*  Overruled.

3    *BY MR. TORZILLI:*

4    *Q.*  You can answer, sir.

5    *A.*  I am sorry, could you repeat the question?

6    *Q.*  Sure.  During your meeting or conversation that you had

7    that's being reported on here in 1544, did you ask Defendant

8    Austin to communicate with anyone at Claxton and/or Koch about

9    their bids?

10   *A.*  No, I did not.

11   *Q.*  And again why not?

12   *A.*  Because I did not want them talking about the --

13          *MR. BELLER:*  I am going to object to the ongoing

14   question of why not as being irrelevant and in violation of the

15   Court's earlier ruling in 1069.

16          *THE COURT:*  Overruled.

17   *BY MR. TORZILLI:*

18   *Q.*  Could you repeat your answer, sir?

19   *A.*  Because I did not want them talking about bids.

20   *Q.*  I would like to direct your attention to the very last

21   sentence of the paragraph we are focusing on.  And there is a

22   sentence there that says, "I will also be having some other

23   discussions today to get the pulse."  Do you see that?

24   *A.*  Yes, I do.

25   *Q.*  Did that topic to the best of your recollection come up in

Michael Ledford - Redirect

1    your conversation with Defendant Austin?

2    A.   No, it did not.

3    Q.   And in the previous sentence it says, "I am going to try

4    and have a one on one with Mike today, but he has these calls

5    all day."

6          MR. LAVINE:   Your Honor, I am going to object to this.

7    He didn't write this.  He has no idea what's in this.  He

8    doesn't know what anybody meant one way or the other.

9          THE COURT:   Is the objection calls for speculation?

10          MR. LAVINE:   Yes, absolutely.

11          THE COURT:   Sustained.

12          MR. TORZILLI:   Can we have a side bar?

13          THE COURT:   I have ruled.  Go ahead and ask your next

14    question, Mr. Torzilli.

15    BY MR. TORZILLI:

16    Q.   So did you ask --

17          MR. POLLACK:   Your Honor, I have an objection to

18    continuing to show the incomplete version of this on the

19    screen.  If we are going to have it on the screen, let's have

20    the rest of it.

21          THE COURT:   He is just explaining a paragraph. It

22    happens to be cut off, but he doesn't have to display

23    everything.  We have already made the record clear that part of

24    it is cut off.

25          MR. POLLACK:   Then if we don't have further questions

Michael Ledford - Redirect

1    about it, I request it be taken down.  I think continuing to

2    display part of it is misleading.

3              THE COURT:  I am not sure.  We may have additional

4    questions on it.

5              Go ahead, Mr. Torzilli.

6              MR. TORZILLI:  Just one more question.  If we could go

7    back to the first page of 1544.

8    BY MR. TORZILLI:

9    Q.  Who did Roger Austin forward this e-mail to?

10             MR. TUBACH:  Objection, Your Honor, lacks foundation.

11   He is not on any of those communications.

12             THE COURT:  Sustained.

13   BY MR. TORZILLI:

14   Q.  Mr. Ledford, did you know that on the same day after the

15   e-mail we just looked at was written Roger Austin had a

16   telephone call with Ric Blake at George's?

17             MR. FAGG:  Objection, leading.

18             THE COURT:  Well, the question -- the question was did

19   you know, so that objection is overruled.

20             MR. FAGG:  Also lack of foundation, Your Honor.

21             THE COURT:  That objection is sustained.

22             MR. POLLACK:  Your Honor, I would also object that

23   it's beyond the scope and I would like to recross on this if we

24   are going to go into this new area.

25             THE COURT:  Objection has been sustained, Mr. Pollack.

Michael Ledford - Redirect

1          MR. POLLACK:  I am sorry, it was a different one.

2          THE COURT:  We'll see whether that -- whether what you

3    are worried about happens.

4          MR. POLLACK:  I understand.  Thank you, Your Honor.

5          MR. TORZILLI:  Your Honor, just to be clear, the

6    objection was sustained on foundation grounds?

7          THE COURT:  Correct.

8    BY MR. TORZILLI:

9    Q.  Mr. Ledford, do you know whether Defendant Roger Austin had

10   a telephone call with Defendant Ric Blake at George's on the

11   same day as the e-mail but after it was written?

12         MR. POLLACK:  Objection, beyond the scope.

13         THE COURT:  Sustained.

14         MR. TORZILLI:  Your Honor, may we have a side bar?

15         THE COURT:  Yes.

16      (At the bench:)

17         THE COURT:  Mr. Torzilli, go ahead.

18         MR. TORZILLI:  Two points.  One, the defendants

19   introduced this document into the cross-examination of the

20   witness.  It seems like appropriate for us to be able to

21   respond with rebuttal points to the document that they brought

22   up on cross.  Also, they raised in terms of the substance here

23   for hours that to give an impression, albeit falsely, that it

24   was competition rather than collusion that drove the ultimate

25   prices here.  So it seems like we should have an opportunity to

Michael Ledford - Redirect

1    be able to draw out contrary evidence such as calls amongst

2    competitors at the time that key bidding or key feedback events

3    occurred.

4            THE COURT:  Briefly, Mr. Pollack, go ahead.

5            MR. POLLACK:  As to the latter of point, I think there

6    would be no boundaries on scope if that were the rule that

7    anything that is relevant to the case can be brought in on

8    redirect because the cross was about things relevant to the

9    case.  The specific issue here is not asking about the document

10   that he was shown during cross-examination.  It's asking him

11   about a phone call that he was not asked about during

12   cross-examination and a phone call that he was not a party to

13   and a phone call that I haven't had the opportunity to examine

14   the witness on because it didn't come up in direct, so there

15   was no reason for me to cross on it.

16           So if he goes into it now, he is introducing something

17   completely new in redirect which I think is beyond the scope.

18   But again in the alternative, if he is going to be allowed to

19   do that, I would want to recross on that point.

20           MR. FAGG:  This is John Fagg.  Just briefly, in

21   addition to that, Mr. Ledford has absolutely no foundation to

22   talk about a phone call that he wasn't on.

23           THE COURT:  Yeah, I am going to sustain the

24   objections.  I mean, it is beyond the scope.  There is no

25   foundation.  And the nature of the question implies that there

Michael Ledford - Redirect

1    are facts out there, none of which there is any basis for

2    Mr. Ledford knowing about them.  And as a result, they are

3    loaded questions which the witness doesn't know about and

4    that's objectionable in and of itself.  So that line of

5    questioning will not be permitted.

6            Anything else on that, Mr. Torzilli?

7            MR. TORZILLI:  The defendants have spent a lot of time

8    including in opening statements discussing Mr. Ledford,

9    including his lack of knowledge of the conspiracy.  It seems

10   appropriate to be able to bring to his attention that there was

11   collusion going on and it was behind his back.

12           THE COURT:  I don't believe that that would be

13   appropriate for a witness to be informed of facts that he does

14   not know about and then simply ask for his reaction to that, so

15   that would be an inappropriate line of questioning.

16           Thank you.

17       (In open court:)

18   BY MR. TORZILLI:

19   Q.  Mr. Ledford, can you open the binder in front of you up to

20   Tab 58?

21   A.  The government binder?

22   Q.  Yeah, the one that I provided you.  Thanks for the

23   clarification.

24           And if we could have Government Exhibit 1503

25   published.

Michael Ledford - Redirect

1    *A.*  What tab was that, Mr. Torzilli?

2    *Q.*  58.

3             *THE COURT:*  And that may be published.

4             *MR. TORZILLI:*  Thank you, Your Honor.

5    *BY MR. TORZILLI:*

6    *Q.*  So you were asked -- are you there?

7    *A.*  Yes, I am.

8    *Q.*  And what is this document?

9    *A.*  This is the contract for 2013 with Claxton.

10   *Q.*  And you were asked on cross-examination about whether Scott

11   Brady had -- was it pricing authority?  Is that what you were

12   asked?

13   *A.*  I believe that's right, yes.

14   *Q.*  And if you look at Government Exhibit 1503, the contract

15   that you said was a contract, what year is this contract for?

16   *A.*  2013.

17   *Q.*  Who signed the contract on behalf of UFPC?

18   *A.*  I did.

19   *Q.*  So that's your signature?

20   *A.*  Yes, it is.

21   *Q.*  And who signed the contract on behalf of Claxton Poultry?

22   *A.*  Scott Brady.

23   *Q.*  So as far as you and -- you or UFPC and or RSCS were

24   concerned at the time, Scott Brady had sufficient authority to

25   be able to bind Claxton to a contract with UFPC for eight-piece

Michael Ledford - Redirect

1   chicken supply.

2   *A.*  Yes.

3   *Q.*  And do you know approximately the dollar value associated

4   with this contract?

5   *A.*  Not exactly, but it's a big number.

6   *Q.*  Could you give an approximation?

7         *MR. FAGG:*  Objection, speculation.

8         *THE COURT:*  Overruled.

9   *A.*  Yes, give me just a second.  It's probably a $70 million

10  contract.

11  *BY MR. TORZILLI:*

12  *Q.*  70, 70?

13  *A.*  Yes.

14        *MR. TORZILLI:*  We can put that exhibit aside.

15        If you can flip now to Tab 69 in that same binder, and

16  you should find Government Exhibit 1122.

17        If we could have that called up.

18        Permission to publish, Your Honor?

19        *THE COURT:*  Let me just double-check that.  I think

20  it's in.  Yes, you may.

21        *MR. TORZILLI:*  Thank you.

22  *BY MR. TORZILLI:*

23  *Q.*  Are you there, Mr. Ledford?

24  *A.*  Yes.

25  *Q.*  What's this?

Michael Ledford - Redirect

1   A.   This is the 2014 contract with Koch Foods.

2   Q.   For chicken on the bone?

3   A.   Yes.

4   Q.   Were you asked on cross-examination a little while ago

5   about the extent to which Bill Kantola has pricing authority at

6   Koch Foods?

7   A.   Yes, I was.

8   Q.   And what was your answer?

9   A.   That he did not.

10  Q.   Who signed this contract on behalf of UFPC?

11  A.   I did.

12  Q.   Who signed this contract on behalf of Koch Foods?

13  A.   Bill Kantola.

14  Q.   As far as UFPC was concerned, did Bill Kantola have

15  sufficient authority to bind Koch Foods to a contract for

16  eight-piece bone-in chicken supply?

17  A.   Yes, he did.

18  Q.   And what was the approximate dollar value, if you know,

19  associated with this contract?

20  A.   It would have been similar to the last one.

21  Q.   So about $70 million.

22  A.   Yes.

23  Q.   You can put that exhibit aside.

24        You were asked earlier today about Claxton's market

25  share.  Do you remember that?

923

Michael Ledford - Redirect

1    A.   Yes, I do.

2    Q.   Do you know in the 2012, 2013 time period what Claxton's

     market share was for KFC business?

3

4    A.   Approximately.

5    Q.   What was their approximate market share for KFC business?

6    A.   I believe they were somewhere in the neighborhood of around

7    10 percent.

8    Q.   10 percent?  So 10 percent of KFC's business was through

9    the purchases of Claxton Poultry chicken?

10   A.   Yes, for the fresh eight-piece chicken, yes.

11   Q.   So that's 10 times the market share that you were citing

12   this morning when you said they had 1 percent market share?

13   A.   Yes.

14   Q.   You were asked yesterday about whether you ever gave a tour

15   to me and the team, the government team, of a chicken

16   processing facility.  Do you remember that?

17   A.   Yes, I do.

18   Q.   Can you briefly describe how a chicken goes from a

19   processing facility to a KFC restaurant?

20   A.   Yes.  So the live chickens come in on a truck.  They are

21   hung on shackles.  They go through first processing, which is

22   basically taking the internal organs out, cutting the head off,

23   bleeding, getting the blood out of the chicken.

24        Then they go through what's called a chiller to cool

25   the product down in the WOG form at that stage.  That's what we

Michael Ledford - Redirect

1    talked about at some point in the last two days on where the

2    WOG was without giblets.  That's a multi-hour process typically

3    to go through that chiller.

4          After it goes through that chiller, it goes into what

5    we call second processing.  Those birds are then rehung on

6    shackles that take them through for the KFC eight-piece product

7    that's known as a Dapec machine.  And it's going to cut the

8    product, the chickens into the eight-pieces.

9          After they are cut into eight pieces, it's going to go

10   on a different belt and go through what we call an inject

11   marinator.  That's going to put the KFC recipe marinate into

12   the meat with little needles.  And after it goes through that,

13   it's going to go through a bagging system.  It's going to be

14   put into bags with two chickens in a bag or 16 pieces in a bag.

15         Then those bags are going to be packed into boxes.

16   The boxes are going to be strapped, labeled.  They are going to

17   be weighed.  Then the USDA compliant label is going to be

18   affixed to those boxes.  That also has all the pertinent KFC

19   information on it.  And the label will be applied.  It's going

20   to be stacked off onto a pallet.  And then it's going to go to

21   a holding cooler within their processing facilities.

22         And then after you have enough for a truckload or

23   after the driver shows up for that load, it is then going to be

24   loaded onto a truck.  After it's loaded onto a truck, it is

25   then going to in most cases go to one of the distribution

925

Michael Ledford - Redirect

1    centers.

2            The distribution center is going to receive that into

3    their inventory.  Some cases they might keep it in their

4    inventory, in their cooler for a couple of days.  Then

5    ultimately it's going to be loaded out amongst other products

6    that are also at those distribution centers that are also

7    delivering to the KFC restaurants and delivered store by store.

8    Q.  Does a substantial amount of the chicken that goes through

9    the process you just described cross state lines?

10   A.  Yes, it does.

11   Q.  Thank you.  You were asked mostly yesterday and a little

12   bit today about what you did or didn't teach to me and others

13   on the team.  Do you remember that?

14   A.  Yes.

15   Q.  Did you in the course of meeting with me and the team

16   explain to us how competition worked during your time at RSCS?

17   A.  Yes, I did.

18   Q.  And did you explain to us how you operated a multiple round

19   bidding system?

20   A.  Yes, I did.

21   Q.  And did you have an opportunity to explain the feedback and

22   the way in which you tried to cultivate and engender

23   competition among chicken suppliers?

24   A.  Yes, I did.

25   Q.  And whenever you thought me or the team had any information

Michael Ledford - Redirect

1    incorrect or weren't thinking about things properly, did you

2    correct us or inform us of the correct way to look at things?

3    A.   If I thought it was incorrect, yes.

4    Q.   And did you explain to us your point of view about

5    competitors sharing bid information?

6    A.   Yes, I did.

7    Q.   And what did you explain to us?

8            MR. TUBACH:  Objection, asked and answered, Your

9    Honor.

10           THE COURT:  Sustained.  Sustained.

11           MR. TORZILLI:  Thank you, Your Honor.

12   BY MR. TORZILLI:

13   Q.   Did you explain to us how you wanted the lowest sustainable

14   price?

15           MR. TUBACH:  Objection, leading.

16           THE COURT:  Overruled.

17   A.   Yes, I did.

18   BY MR. TORZILLI:

19   Q.   Is it fair to say that you tried your very best to get the

20   lowest sustainable price and secure appropriate and continuous

21   supply from the chicken suppliers?

22   A.   Yes.

23   Q.   You did everything you could to -- is it fair to say you

24   did everything you could to engender competition amongst the

25   suppliers?

Michael Ledford - Redirect

1    A.   Yes.

2    Q.   And was it your view the suppliers were well aware of your

3    efforts to engender competition among them?

4         MR. BELLER:   Objection, speculation, lack of

5    foundation.

6         THE COURT:   Overruled.

7    A.   Yes.

8    BY MR. TORZILLI:

9    Q.   You were asked about whether you had any personal knowledge

10   of any agreements to raise prices or fix prices or rig bids

11   earlier today.  Do you remember that?

12   A.   I do.

13   Q.   And what were your answers to all those?

14   A.   My answer was that I did not have any personal knowledge.

15   Q.   Given what you said about your efforts to engender

16   competition, is it fair to say you are probably the last person

17   in the world people who are engaged in that conduct would

18   inform of what they're doing?

19        MR. BELLER:   Objection, lack of foundation,

20   speculation and leading.

21        THE COURT:   I am going to sustain that objection.

22        MR. TORZILLI:   May I have moment to confer?

23        THE COURT:   You may.

24   BY MR. TORZILLI:

25   Q.   Just a few more questions, Mr. Ledford.  I appreciate your

928

Michael Ledford - Redirect

1    patience.

2           MR. TORZILLI:  If we could call up 1713-1.  Permission

3    to publish.  I believe it's been admitted into evidence.

4           THE COURT:  You may.

5    BY MR. TORZILLI:

6    Q.  You were asked about this document on cross-examination.

7    A.  Yes.

8    Q.  Is that right?  And can you just remind us just generally

9    what the document concerns?

10   A.  I am providing feedback to Roger Austin on a bid

11   submission.

12   Q.  Did you ask Defendant Austin to do any scouting after you

13   submitted this e-mail to him?

14   A.  No, I did not.

15          MR. TORZILLI:  One moment to confer, Your Honor.

16          THE COURT:  You may.

17          MR. TORZILLI:  Nothing further.

18          THE COURT:  Mr. Ledford, you are excused.

19          THE WITNESS:  Thank you, Your Honor.

20          MR. BELLER:  Your Honor, he is subject to recall.

21          THE COURT:  Subject to recall.  I will have to amend

22   that slightly, Mr. Ledford, but for now excused.

23          The United States may call its next witness.

24          MS. CALL:  Your Honor, before the next witness, the

25   United States would like to offer one document and publish one

Michael Ledford - Redirect

1    additional.  And the document I would like to offer is 1713.  I

2    believe we reserved ruling on it yesterday.

3            THE COURT:  Do you mind displaying 1713 for me?

4            MR. TUBACH:  Your Honor, perhaps we could take this up

5    after the witnesses are excused -- after the jury is excused at

6    5:00 o'clock.

7            MS. CALL:  I believe it could be a very brief side

8    bar, if any.  But I will note the top e-mail should be redacted

9    and we are pulling that up now, the very top e-mail.

10           THE COURT:  I guess the question is do you have a

11   witness for the next 10 minutes or so?

12           MS. CALL:  We do.

13           THE COURT:  Okay.  Yeah, I think then it might be best

14   to take up the issue of 1713 --

15           MS. CALL:  Sorry, Your Honor.  May I publish one

16   previously admitted document?

17           THE COURT:  Do what?

18           MS. CALL:  May I publish one previously admitted

19   document?

20           THE COURT:  You may.

21           MS. CALL:  The government seeks to publish 1544.

22           THE COURT:  Yes.  That may be published to the jury.

23           MS. CALL:  I apologize.  I believe I said the wrong

24   number.  1427.

25           THE COURT:  Yes, you may.

Michael Ledford - Redirect

1          MS. CALL:  Thank you, Your Honor.

2          THE COURT:  Ladies and gentlemen, as you will recall

3    yesterday, quite a few of documents were admitted.  You didn't

4    see all of those.  If a document is shown to you such as now,

5    why don't we use the following process.  It might help me out.

6    And that is once you're done looking at it, why don't you look

7    at me.  Once I see all eyes on me, I will know that you have

8    had a chance to each look at it.  Of course, for Mr. Barrett

9    the difference between looking at the big screen and looking at

10   me is probably so slight, I won't know for sure.  But why don't

11   we follow that.  So once you have had a chance to look at it,

12   if you look at me, then I will have a sense that you're done

13   looking at it.

14          Okay.

15          MS. CALL:  If I may inquire, I should have done this

16   before, but are the jurors screens working?  I am not sure if

17   the text was large enough to read at the distance it was.

18          THE COURT:  Yes.

19          MS. CALL:  All right.  The United States calls Pete

20   Suerken.

21      (**Pete Suerken** was sworn.)

22          THE WITNESS:  I do.

23          COURT DEPUTY CLERK:  Please state your name and spell

24   your first and last name for the record.

25          THE DEFENDANT:  Pete Suerken, P-E-T-E, S-U-E-R-K-E-N.

1          *MR. TORZILLI:*  May I approach?

2          *THE COURT:*  You may.

3                         **DIRECT EXAMINATION**

4     *BY MR. TORZILLI:*

5     *Q.*  Good afternoon, sir.

6     *A.*  Yes, sir.

7     *Q.*  Where do you work?

8     *A.*  Wendy's Quality Supply Chain Co-op currently.

9     *Q.*  What's Wendy's Quality Supply Chain Co-op?

10    *A.*  We are the exclusive supply chain provider for Wendy's in

11    North America.

12    *Q.*  What is Wendy's?

13    *A.*  Wendy's is a large quick-service restaurant chain based in

14    Dublin, Ohio.

15    *Q.*  And what is the function of a co-op for Wendy's?

16    *A.*  We are the procurement organization that does all of the

17    buying, as well as the supply chain logistics to make sure that

18    we get -- the stores get everything they need.  It's a co-op

19    because all of the members are the store -- are the franchisees

20    that own the stores.  And therefore, we operate on a nonprofit

21    basis and we pass back any savings we generate back to our

22    members, which are the franchisees.

23    *Q.*  Does your organization go by a nickname or a shorter name?

24    *A.*  QSCC.

25    *Q.*  Does Wendy's serve chicken in its restaurants?

Pete Suerken - Direct

1    A.   It does.

2    Q.   Does QSCC have any responsibility for procuring chicken to

3    be sold in Wendy's restaurants?

4    A.   We do.

5    Q.   Could you explain the role QSCC has?

6    A.   We procure and distribute chicken to all of the stores.

7    Q.   Were you working in the chicken business in the year 2014?

8    A.   I was, sir.

9    Q.   Where were you working in 2014?

10   A.   RSCS, Restaurant Supply Chain Solutions, I believe.

11   Q.   And what was your -- what were you doing for RSCS in 2014?

12   A.   I was the executive vice-president of food and packaging

13   procurement.

14   Q.   And if you could briefly describe what your job

15   responsibilities were at that time.

16   A.   I bought all of the food, as well as packaging for Yum

17   Brands, which consisted of Taco Bell, Pizza Hut, KFC, Long John

18   Silvers and A&W.

19   Q.   Were you involved in negotiations for bone-in chicken

20   supply?

21   A.   I was.

22   Q.   Was 2014 the first year you were involved in bone-in

23   chicken supply at RSCS?

24   A.   Yes, sir.

25   Q.   Could you describe the circumstances under which you became

Pete Suerken - Direct

1    involved in negotiations for bone-in chicken supply?

2    A.  I was brought in shortly after Mother's Day when the system

3    had run out of chicken.  We were continuing to have shortages,

4    outages throughout that spring.  And Mike Ledford left the

5    company, and therefore I was kind of thrust into the role of

6    trying to figure out how to fix it.

7    Q.  Mr. Ledford left the company approximately when?

8    A.  It would have been after Mother's Day, I believe, that

9    year.

10   Q.  So sometime in the May -- maybe late May or June time

11   frame?

12   A.  Yes, sir.

13   Q.  Did you assume Mr. Ledford's responsibilities upon his

14   departure?

15   A.  To an extent, yes, sir.

16   Q.  You mentioned Mother's Day.  Why -- or is Mother's Day a

17   significant date on the calendar for KFC?

18   A.  KFC historically does a significant portion of its first,

19   second quarter business over that weekend.  It's very --

20   incredibly dependent upon whether they make money or not is

21   that weekend.

22   Q.  Is Mother's Day a busy day at KFC restaurants?

23   A.  It is a huge day at KFC restaurants.

24   Q.  Do you have an understanding of why?

25   A.  Because ironically families don't want their moms to cook,

934

Pete Suerken - Direct

1    so they believe it's a home replacement meal.  They go get a

2    home-cooked meal at KFC and take it home.

3    Q.  So when you were at RSCS in 2014 experiencing shortages,

4    how consequential was it, if at all, that KFC was running out

5    of chicken?

6    A.  Approximately 40 to 50 percent of everything that KFC sells

7    is chicken on the bone, which would have been that specific

8    chicken, so you would have had 50 percent of the menu missing.

9    Q.  As part of this investigation, Mr. Suerken, were you

10   interviewed by the FBI?

11   A.  I was.

12   Q.  Can you just briefly describe where and when the interview

13   occurred?

14   A.  I was interviewed in Aledo, Texas at my home.  And I don't

15   know the dates, sir.

16   Q.  Who were -- were there multiple agents involved in the

17   interview?

18   A.  There was an agent from the FBI, as well as an agent from

19   the Department of Commerce.

20   Q.  Was Special Agent Taylor the FBI agent that interviewed

21   you?

22   A.  I believe so.

23   Q.  And approximately how long a time did you spend in your

24   interview with the agents, approximately?

25   A.  An hour and 45 minutes to two and a half hours, something

1    like that.

2    Q.  Was the interview recorded?

3    A.  It was.

4    Q.  Did you know at the time the interview was recorded?

5    A.  I did not.

6    Q.  You didn't learn until later?

7    A.  Yes.

8    Q.  Did the agents ask you about Defendant Brian Roberts?

9    A.  They did.

10   Q.  What did you tell the agents with respect to the

11   chicken-on-the-bone negotiations in 2014 regarding Defendant

12   Brian Roberts?

13   A.  I believe the transcript said that I thought he gave us a

14   fair deal.

15   Q.  And is that your recollection of what you told the agents?

16   A.  That is what I told the agents.

17   Q.  Since the time that you were interviewed by the agents,

18   have you had an opportunity to reflect on that?

19           MR. GILLEN:  Your Honor, I object and ask for a side

20   bar.

21           THE COURT:  Why don't we -- Mr. Torzilli, why don't we

22   break for the day.  We will take up that side bar.

23           Ladies and gentlemen, just about 5:00 so we will go

24   ahead and break for the day.  Keep the admonitions in mind.  Be

25   especially careful, ladies and gentlemen, about people, you

1    know, at home perhaps talking to you about the case.  Don't let

2    people who may have been exposed to publicity or anything else

3    come and start trying to tell you things about it.  Just, you

4    know, in no uncertain terms tell them, can't talk about it.

5    Can't listen to it.  Don't get drawn into that.  Like I said,

6    it would not be a good thing.  Even if it's someone who you

7    normally would not be so abrupt with, be abrupt with them if

8    they try to do that, okay?

9            We will reconvene with you tomorrow at 8:30.  So hope

10   you have a good evening.  The jury is excused.

11           (Jury excused.)

12           THE COURT:  Mr. Suerken, you are excused, so if you

13   can come back tomorrow at 8:30.

14           THE WITNESS:  Yes, sir.

15           THE COURT:  Thank you.

16           Why don't we take up the issue that just came up.

17   Mr. Gillen?

18           MR. GILLEN:  Your Honor, it appears from the nature of

19   the question that the government was going to ask him whether

20   upon he has reflected and whether he has changed his opinion of

21   whether he likes Mr. Roberts or thinks he is a good guy or

22   whether he was treated fairly.  The problem is that is improper

23   and prejudicial for this reason.

24           What has caused him to have a differing opinion I

25   believe is that he has been interviewed by the government,

937

1    perhaps shown telephone charts.  He has read the Indictment.

2    He has looked at things outside of his personal knowledge that

3    would be information that would be, you know, in the --

4    contained within the Indictment, for example.  That is

5    something that may change his opinion, but it's not admissible

6    before this jury nor should we allow the witness to say now I

7    don't think he is a good guy.  That's a comment frankly on his

8    character, No. 1.

9         But No. 2, more importantly, the nature of what has

10   caused him to, quote, change his mind about Mr. Roberts and

11   that's the problem that we have here.  What they are attempting

12   to do is take information given to this witness either by

13   himself either reading Indictments or doing whatever else he is

14   doing or information that he has received from the government

15   to then cause him to change his mind, and this is prejudicial.

16   We would ask that the government not be permitted to entertain

17   this line of direct examination.

18        THE COURT:  Thank you, Mr. Gillen.

19        Mr. Beller?  Hold on one second, Mr. Torzilli.  Let's

20   see what the various objections are and then I will get you go.

21        Go ahead, Mr. Beller.

22        MR. BELLER:  Thank you, Your Honor.

23        Your Honor, the Court issued an opinion in -- or an

24   order, excuse me, in Docket No. 1069.  And 1069 analyzes, as

25   the Court is well aware, witnesses' personal opinions over

938

1    whether or not something is wrong, whether it is in this case

2    fair, if somebody got a fair deal.  The Court's order is

3    unequivocal regarding the lack of relevance.

4          The question that was posed by Mr. Torzilli is one of

5    have you had a chance to reflect on whether or not you got a

6    fair deal, contrary to what had been said earlier.  Your Honor,

7    I would note that on redirect of Mr. Ledford, despite the

8    Court's Docket No. 1069, the question asked of Mr. Ledford is:

9    Did you tell the government your point of view?

10         The Court has already informed the parties that this

11   type of opinion evidence is inappropriate and is irrelevant

12   despite the Court's order.  Whether Mr. Ledford's point of view

13   about competitors sharing bid information was inquired on and

14   when he answered yes, I did share my point of view, the

15   follow-up question was:  And what did you explain to us?

16         It is these repeated questions despite the Court's

17   order, quite frankly, Your Honor, that leads to mistrials.  And

18   I think most individuals in this courtroom have suffered such a

19   mistrial in the past due to counsel contravening or trying to

20   go around court orders or simply running over court orders.  So

21   that is the larger issue.  I would simply ask the Court to

22   remind all parties of Docket No. 1069 and to the extent it's

23   necessary to advise witnesses of the Court's order in 1069 so

24   that we do not suffer a mistrial in this case.

25         More importantly as to the question that is on the

939

1    table, and that is whether or not RSCS received "a fair deal,"

2    that is a pretty clear violation of 701.  In this case it goes

3    into 702 evidence as to whether or not a particular increase in

4    price is warranted by market information or market status or

5    whether or not it is fair since, of course, we don't know what

6    information this witness is relying upon to make a

7    determination as to what is fair or unfair.

8         So for these reasons, I object not only to the

9    question, but also to the ongoing types of questions that I

10   believe are in violation of 1069 for all the reasons

11   articulated in earlier pleadings.

12        *THE COURT:*  Mr. Gillen?

13        *MR. GILLEN:*  Thank you, Your Honor.

14        To briefly supplement, this is a point that I raised

15   prior when we -- after the break with Mr. Ledford.  We received

16   today a report attributed to Mr. Suerken on actually today's

17   date, March the 1st.  The report says originally believed he

18   got a good deal from Tyson, but no longer believes he got a

19   good deal from Tyson and the whole thing could have been

20   contrived.  Believed Tyson could have done a better job on

21   pricing, but believed they did a better job on geography.

22        Now, this is what we mentioned before, alerted the

23   Court, alerted the government to this very sort of thing they

24   shouldn't be getting into.  My recollection is that counsel for

25   the government indicated they weren't going to be getting into

1    that and the first thing he does is charge into this very

2    thing.

3          He then goes on to say that, following through on

4    that, it's a good business for one company to learn information

5    from what another company was doing on price.  That would be

6    considered market intelligence, but there are limitations to

7    market intelligence.  Market intelligence includes AgriStats,

8    Urner-Barry, et cetera.  Calling another competitor to ask for

9    their price is not permissible market intelligence.  Believes

10   he is the fall guy for pricing inflation that RSCS took in

11   2014.  Therefore, he lost his job.

12         So again, these are the sorts of things that we are

13   trying not to poison the jury with this kind of improper

14   opinion evidence from Mr. Suerken regarding whether he now

15   thinks he got a good deal or not and specifically it was

16   attributed toward Mr. Roberts.

17         So for all those reasons, Your Honor, we would ask

18   that this line of questioning, which is exactly what we flagged

19   to the Court before and the government seemed to actually get

20   it when we referenced it earlier, and they go into it straight

21   out of the box.

22         THE COURT:  Mr. Torzilli, go ahead.  Why don't we hear

23   from Mr. Torzilli, and then I will take up the rest of the

24   points.

25         MR. TORZILLI:  Thank you.  I appreciate it, Your

1    Honor.  I think what you just witnessed in the past couple

2    minutes is the logical fallacy of conflation.  So three things

3    are being conflated it seems to me:  Whether Pete Suerken

4    thinks Brian Roberts is a good guy, which frankly I personally

5    don't want to get into on direct examination and I am sure that

6    the Court doesn't want us to either.  Second is whether his

7    views about whether the circumstances involving Tyson were some

8    sort of contrivance and so forth.  That's what I had understood

9    my conversation with the Court to be earlier today.  And when I

10   was saying we didn't plan to get into it, that's what I was

11   responding to, and we continue to have no intention of getting

12   into that.

13        But the third thing that's within this three-part

14   conflation is the idea of a good deal and that's what I was

15   asking about.  When the agents confronted Mr. Suerken at the

16   door and had the interview with him, he thought that Tyson gave

17   him a good deal.  And incidentally, we heard numerous questions

18   on cross-examination just in the preceding hours directed

19   towards Mr. Ledford about whether competition was working and

20   whether these prices yielded a good deal.  So it clearly is a

21   situation where we should be able to elicit the same or similar

22   type information as the defendants are on cross-examination of

23   Mr. Ledford.

24        So that was the intent of the discussion I was having

25   with Mr. Suerken to elicit that he at one point in time at

1    least as an initial reaction got a good deal from Tyson.  But

2    after reflection, including reading ordinary course documents

3    from the time that were provided to him through his counsel to

4    refresh his memory of events, that he realizes things weren't

5    precisely as he had indicated to the agents at the time of the

6    interview.

7         THE COURT:  Well, one of the questions was -- anytime

8    you get a witness who is saying on reflection, it does raise

9    the specter of the witness having informed his new opinion

10   based upon materials that he would not have known about and

11   could, in fact, be ones such as the Indictment or something of

12   that nature that would cause him to think that he didn't get a

13   fair deal.  So to what extent has the witness been exposed to

14   those types of documents?

15        MR. TORZILLI:  He has clearly read the Indictment.  He

16   said that in the interview with the agents.  He has also --

17   actually, he read the Indictment.  And I believe at the

18   interview having read the Indictment said to the agents, I've

19   read the Indictment.  I think Tyson has gotten a good deal.

20   After that received ordinary course documents that he was a

21   party to from the 2014 time frame and after studying those had

22   the reflection that he is relating.

23        THE COURT:  I am sorry, what did you call the

24   documents that he looked at?

25        MR. TORZILLI:  Yeah, ordinary course documents, so bid

1    information and the contracts, not only for Tyson, but for the

2    other chicken suppliers, so documents that he would have

3    received in the ordinary course of his business back in 2014

4    when he was negotiating these contracts.

5            THE COURT:  Okay.  And do you know what has caused his

6    change of opinion?

7            MR. TORZILLI:  Reviewing those documents and seeing

8    that Tyson, like all the other chicken suppliers as Your Honor

9    is well aware from this trial and the previous one in 2014, all

10   maintains the same significant historic price increase and

11   raised their prices together.

12           THE COURT:  Well, he would have known that back in --

13   at the time that he was working.  I mean, who would know better

14   than Mr. Suerken, who is the negotiator for RSCS?  So and then

15   with the passage of time, I am not sure what the date of the

16   FBI interview was, but why would his memory get better later on

17   than it would have been when he was at RSCS and doing the 2014

18   negotiations?

19           MR. TORZILLI:  Well, I'm talking about the -- at the

20   time of the knock-and-talk, at the time of the interview when

21   he said that he thought he got a good deal from Tyson.  So he

22   said that and I am sure part of it was having the FBI agents

23   knock on his door unannounced, that maybe he didn't -- wasn't

24   thinking things through at the level that maybe he would in a

25   different setting.  But he had an opportunity to review the

944

1    ordinary course documents that he perhaps lost sight of going

2    back to 2014 because that was seven years prior, I believe,

3    seven years before the interview, and then after reviewing

4    those realized what the circumstances actually were like in

5    2014 a little better.

6         THE COURT:  But he would have seen all those documents

7    back in 2014.

8         MR. TORZILLI:  Yeah, in 2014 he did not think he got a

9    good deal really from anyone.  And that's clear from the

10   documents and that's clear from communications with Defendant

11   Brian Roberts.  That's clear from the things he said in the

12   interview as well.  He was just not crystal clear on the Tyson

13   element of that.

14        THE COURT:  Okay.  Thank you, Mr. Torzilli.

15        Mr. Gillen?  And then I will get to Ms. Johnson.

16        MR. GILLEN:  Your Honor, I think there is a little bit

17   more here than meets the eye.  I believe that what has happened

18   is not a focusing on documents that he reviewed.  He reviewed

19   them.  He studied them.  He was the man who worked through the

20   documents and made the decisions and could see the difference

21   in pricing, No. 1.  The difference is the focus that the

22   government has put on the telephone records that took place in

23   August of 2014.

24        This sort of emphasis is exactly what you see in the

25   interview that they had with him when he was going on about

1    talking about market intelligence and that's wrong and I think

2    that's unacceptable.  It's the focus on these August telephone

3    calls that I think is something that is changed, has been a

4    change.

5              THE COURT:  So when you say August telephone calls --

6              MR. GILLEN:  I am referring to the government's charts

7    that have been introduced in the previous trial and are summary

8    charts here dealing with telephone call -- indicating calls

9    between people from different companies during August of 2014.

10   And so --

11             THE COURT:  Let me ask you this, Mr. Gillen.  When the

12   FBI interview took place, was he, meaning Mr. Suerken, told

13   about those calls?

14             MR. GILLEN:  I don't know whether he was told about

15   the calls in the interview.  Having read the interview, I don't

16   believe that he was.  I think he had said that he had given the

17   Indictment a review, probably a cursory review.  But I believe

18   there has been more of an emphasis by the government on these

19   calls.  And the other thing is I would suggest that prior to,

20   you know, prior to the government beginning to speak with him,

21   Mr. Suerken did not attribute the loss of his job to anyone

22   that was involved in the 2014 negotiations.  Now suddenly we

23   have a situation where he is saying, oh, I believe I lost my

24   job because of this.

25             So I think what's happening here is that the

1    government and perhaps other individuals who are involved in

2    civil litigation, maybe RSCS counsel, I don't know, may be

3    focusing on certain things that have caused him to change his

4    mind.  But I am -- one thing is certain.  The one thing that is

5    certain is that he reviewed all of these documents even to the

6    point where he says in the recording that he remembers

7    spreading out all the bids, going over them after the dust had

8    settled, and was concerned that the Tyson bid was too low and

9    was actually concerned about whether Mr. Roberts might actually

10   lose his job or have his job impaired because of the difference

11   between the Pilgrim's and the Tyson pricing.  And this is what

12   he says he had -- in the interview with the government, he said

13   he has a specific recollection of that.

14          But now we have a situation where after, you know,

15   whatever contact he has had with the government, suddenly now

16   right out of the box they want to dirty up Brian Roberts and

17   say, oh, yeah, I think we got a good deal before.  And then --

18   just one moment.  Excuse me, Your Honor.

19          THE COURT:  Sure.

20          MR. GILLEN:  So in any event, I think that sort of

21   input and data into his recollections or his view point, that

22   is outside of what he remembers at the time and what he did and

23   didn't do.  This is what we need to confine him to, not his

24   reading of the Indictment or what information he might have

25   gotten from any of the lawyers involved in the case.  Just we

947

1    need to get back to what he remembers, not how he now has

2    changed his mind after having this reflection.

3              THE COURT:  Ms. Johnson?

4              MS. JOHNSON:  Thank you, Your Honor.

5              THE COURT:  Then I will let you go again.

6    Mr. Torzilli.  Then I will hear from Mr. McLoughlin.

7              MS. JOHNSON:  I just want to point out for the Court,

8    Your Honor, that Mr. Torzilli was completely and factually

9    inaccurate to what he just told the Court.  And I am going to

10   look back, and I know I am not citing the transcript, but he

11   said, yeah, in 2014 he, referring to Mr. Suerken, did not think

12   he got a good deal really from anyone.  And that's clear from

13   the documents.  Luckily for the defense this interview was

14   actually recorded.  We actually know what happened.  We

15   actually know what documents.

16        They weren't just ordinary course documents that he

17   suddenly reflected on some years later.  We know what he did

18   and we know what he said.  And even today, Your Honor,

19   literally an hour before he took the stand, he gave yet another

20   interview in his prep session and he said he originally

21   believed the deal with George's was fair and he still believed

22   that.

23        So I take issue with the government's narrative that

24   he suddenly reflected and changed his mind on all matters.  And

25   it is improper to mislead the Court by saying what Mr. Torzilli

1    just said.

2            THE COURT:  So tell me about the chronology again.  So

3    when does the Indictment come out relative to when the FBI

4    interview takes place?

5            MS. JOHNSON:  It was at least a year later, Your

6    Honor.

7            THE COURT:  Okay.

8            Mr. Torzilli, go ahead.

9            MR. TORZILLI:  So first, let me start out with an

10   apology to Ms. Johnson.  It's absolutely correct that

11   Mr. Suerken has said that -- something along the lines of a

12   fair deal or a good deal for George's, which incidentally by

13   their lights is, of course, inadmissible.  But in any event, it

14   looks like a lot of this information is perfectly appropriate

15   fodder for cross-examination, frankly.

16           To go to the phone records point, I don't want to let

17   that go.  We have never shown Mr. Suerken any phone records.

18   And the reality is that when the agents showed up at

19   Mr. Suerken's door, he had read the Indictment, seen whatever

20   is in the Indictment, and concluded that Brian Roberts and

21   Tyson gave him a good deal.

22           So to the extent he was "poisoned" by the Indictment,

23   it seems like by the defendants' lights that the poisoning of

24   the Indictment actually made him think he got a good deal.  But

25   when looking at the actual ordinary course documents after the

1    interview, it turns out that his memory was brought back to the

2    time in 2014 when he realizes he hadn't gotten a good deal.

3             And incidentally the interview I have just been

4    handed, this was March 24, 2021, so it was after the

5    superseding Indictment by about five months.

6             THE COURT:  Okay.  Thank you, Mr. Torzilli.

7             MR. TORZILLI:  Just one other point because I heard

8    counsel for Mr. Roberts talk about RSCS counsel, and we don't

9    have, you know, privy into what's going on there.  But

10   Mr. Suerken is represented by counsel that is not RSCS counsel.

11   It's his counsel, not RSCS.

12            MR. GILLEN:  I will note, Your Honor, in one of the

13   interviews I believe that RSCS counsel was present.  He hasn't

14   worked at RSCS in a long time, but Mr. Demno from my

15   recollection at one of these interviews was present with

16   Mr. Suerken meeting with the government and also his personal

17   counsel.  He does have personal counsel.

18            THE COURT:  Go ahead, Mr. McLoughlin.

19            MR. McLOUGHLIN:  Your Honor, there are a couple of

20   factual and legal issues I think to be worked through here.

21            First, the government represents to the Court that

22   Mr. Suerken was reviewing ordinary course documents provided to

23   him by his lawyer.  Mr. Suerken, of course, was no longer an

24   employee of RSCS.  The only source for those documents would

25   have been the government conveying them to his lawyer.  So when

950

1    the government says we didn't show Mr. Suerken documents, it's

2    very possible in the six interviews they did, they didn't show

3    him all of the documents to which they refer.

4         However, we would respectfully suggest to the Court

5    that either directly from the government or in coordination

6    with RSCS Mr. Suerken's attorney was provided with documents

7    including, not unlikely, communications that would have been

8    educational for Mr. Suerken.

9         The first issue is all of this should be *Jencks* and

10   *Brady* material, and we request every document that the

11   government provided to Mr. Suerken's lawyer or that RSCS or any

12   other associated person provided to Mr. Suerken's lawyer so we

13   can explore exactly what it is he reflected upon to change his

14   opinion.  So that's the first factual and legal issue here.

15        The second issue here is, of course, he is not

16   competent under 602 and 704 here.  Under 602 it has to be based

17   on his personal knowledge.  He is being asked to speculate and

18   opine about a number of issues including what's in the

19   Superseding Indictment, which he had read in 2014, which

20   clearly was not -- information was not within the scope of his

21   personal knowledge.  And so he is being asked to testify as to

22   an opinion about something that could not be in his personal

23   knowledge.

24        Second thing is he is being asked in some respect to

25   opine on something very akin to the ultimate issue in violation

1    of 704.

2            But more importantly, Your Honor, this is exactly,

3    this did you get a fair deal, exactly what was briefed and this

4    Court has issued an order on with respect to the decision in

5    *Connolly v. United States*, the Second Circuit opinion in which

6    the antitrust division, including some people at this table,

7    and the fraud section of the Department of Justice tried a case

8    in which they repeatedly asked, quote, victims -- actually, it

9    was an expert and three co-employees whether they thought they

10   had been cheating or whether they had been fair to the market.

11   That is the LIBOR manipulation case.

12           The Second Circuit in that case said the opinion or

13   the issue of whether or not it was fair, and in this case fair

14   deal equals fair because certainly fair deal doesn't equal a

15   violation of the Sherman Act, this kind of melding and

16   confusing and conflating of fairness of a violation of the

17   Sherman Act is a tactic that the Second Circuit rejected in the

18   *Connolly* decision, which this Court based in part on the

19   *Connolly* decision in the briefing said should not be discussed

20   in front of a jury.  And yet as we have identified, it's the

21   first place the government goes.

22           Also the government's own notes don't list all the

23   documents that they showed him in the interviews.  We do know

24   in at least one interview there is a document called 10-4-1.

25   We don't at this point -- others may know.  I do not know what

952

1   it was or is.  I do not believe it was attached to the

2   interview notes.  I could be wrong about that, but I don't

3   believe it was.  I can be corrected.

4         And to the extent that was some chart with a variety

5   of data prepared by the government, that, of course, would be

6   *Jencks* and Brady if it affected his opinion.  We are entitled

7   to see that and have it identified.  The fact, by the way, that

8   it might have been in some discovery we got among the millions

9   of pages we received is not sufficient to allow us to dig it

10  out.  And so that again under *Jencks* along with all of these,

11  quote, ordinary course and other documents the government quite

12  knowledgeably apparently refers to should be documents that we

13  would receive.

14        But the underlying legal issue here in addition to

15  602, 704, is this is a -- this is well tread ground with

16  respect to the prejudicial impact of this kind of information,

17  which, of course, in *Connolly* resulted in -- was part of the

18  contributing factor as to irreversible error in the district

19  court that led to the vacating of those convictions.

20        Thank you.

21        *THE COURT:*  Thank you, Mr. McLoughlin.

22        *MR. GILLEN:*  Your Honor, two points, briefly.  One, as

23  it relates to what was said in the interview with the agents

24  about recordings, they were talking about, you know, the

25  Indictment, Agent Taylor says:

1              Well, listen, you know, to your point, when you read

2      that Indictment, the stuff that's in there, it's in there for a

3      reason.  You know, there is a conversation that was had or

4      something that's referenced in there.  It ain't because we

5      thought that it happened.

6              No, that's something that you know.

7              Agent Taylor:  It happened.

8              So this is the kind of information that's being fed in

9      to Mr. Suerken.

10             One thing I do need to clarify as an officer of the

11     Court because I don't want the Court to reach a conclusion that

12     the only way that information after this interview had been

13     accessible to Mr. Suerken is either through the government or

14     through RSCS counsel is inaccurate.  And the reason why it's

15     inaccurate is that, you know, when I was preparing for the

16     first trial and I was going to call Mr. Suerken as a witness, I

17     did preparation for Mr. Suerken.  And so part of that had to do

18     with some of the documents that I felt were important in the

19     summer of 2014.

20             I state this as an officer of the Court because I

21     don't want the Court to think the only way there was an

22     infusion of information or documents to him was through either

23     the government or through RSCS counsel, which I can speculate

24     about.  But I can tell you that, you know, in preparation for

25     him, he was actually -- we had actually called him and he was

954

```
 1    here in Denver and we were considering using him and we didn't,
 2    but he was prepared.
 3              However, as it relates to the issues concerning the --
 4    what I think poisoning of the mind concerning the Indictment,
 5    that just about sums it up right there. this is what happens
 6    when the agents go into their house.  Thank goodness they
 7    recorded him without his permission.  But now we know what they
 8    are telling him.  Stuff is in the Indictment.  Hey, we didn't
 9    make that stuff up.  It happened.
10              And the FBI is placing an imprimatur of the FBI and
11    the Department of Justice on their Indictment and on the very
12    things we are talking about, the very things that I am talking
13    about.  When we talk about, you know, there is a conversation
14    that was had, something that's referenced in there.  It ain't
15    because we thought that happened.
16              That's absolutely improper for them to then do this to
17    a witness and then call him up and then make somebody think
18    that they have -- that he has just had some sort of epiphany
19    and now remembers the documents better years later and that he
20    now upon reflection thinks that he got a bad deal.  This is the
21    sort of thing that is frightening to defense counsel and the
22    defendants in the course of justice.  To do this in his home
23    telling him we didn't put it down there.  There has got to be a
24    reason we put it in there.  It happened.  And they are vouching
25    for the allegations in their Indictment to the witness that
```

1    they are now putting on the stand.

2            THE COURT:  All right.  Thank you, Mr. Gillen.

3            Ms. Henry?

4            MS. HENRY:  Your Honor, I just wanted to point out

5    that the dialogue that Mr. Gillen just went through occurred

6    really toward the very end of his interview.  And at that point

7    he had said:  I'm completely perplexed.  You guys have not

8    talked to me ever.  I am literally employee to customer one.

9    That tells me that there is a ton of something else out there

10   that I don't know about.

11           Then again it was right -- it's not directly, but it's

12   after that and there is a little dialogue, that's when Agent

13   Taylor says the part about, you know, to your point, when you

14   read that Indictment, the stuff that's in there, it's in there

15   for a reason.  You know there was a conversation that was had

16   and something that's referenced in there.  It ain't because we

17   thought it happened.

18           Suerken says:  No, there is something that you know.

19           Agent Taylor says:  It happened.

20           And then Agent Koppenhaver says:  Yeah.

21           And this all occurred at the very end of the

22   conversation that was in the recording.

23           THE COURT:  Okay.  Mr. Beller?

24           MR. BELLER:  Thank you, Your Honor.  And I will be

25   brief in the interest of the Court having the full information.

956

1    Mr. Torzilli had informed the Court that the government has not

2    shown Mr. Suerken any phone records, and I have no reason to

3    doubt that, Your Honor.  Following the covert recording or the

4    secret recording, the government did not contact, insofar as we

5    are aware, or ever speak with Mr. Suerken again until February

6    the 18th of this year.  So about two weeks ago is the first

7    time that Mr. Suerken was interviewed.  The government did

8    provide us three pages of what I believe are *Jencks* materials.

9    It is a report.  It's not technically a 302.  It is notes of

10   the interview where Mr. Suerken --

11        *THE COURT:*  What's the date of that one, do you know,

12   Mr. Beller?

13        *MR. BELLER:*  Yes, Your Honor.  The interview was done

14   on February the 18th of this month.  I believe that it was

15   disclosed to us on the 22nd.

16        Your Honor, in that interview, which is the very first

17   time the defendants learned that Mr. Suerken had this change of

18   mind, the narrative states:  With what Suerken knew at the time

19   of his interview or this interview, meaning this earlier

20   recorded interview, he now questioned everything that he had

21   said or believed when it came to Tyson's.  Suerken could not

22   explain why the Tyson sales representative was making phone

23   calls to certain people during the RFP which was inexcusable.

24        Suerken looked at pieces of Tyson's bid information

25   and contracts and Tyson's number stuck out as high.  Suerken

957

1     would not have purchased from Tyson with that price, but could

2     not remember the specific reason he bought from them.

3          So while it is clear from that narrative, and

4     certainly I believe, as I said, Mr. Torzilli when he said that

5     Mr. Suerken was not shown phone records, but based upon that

6     excerpt, it's very clear that Mr. Suerken was, if not informed,

7     certainly questioned about what the benefit of why were there

8     all these telephone calls, meaning Mr. Suerken had to have

9     learned of them at some point, No. 1.

10         If it was during the Indictment period -- or excuse

11    me, read it from the Indictment, well, then that would have

12    been covered in the recording.  If, on the other hand, he

13    learned from it after the fact, it certainly appears that he

14    was told of these questions -- or excuse me, of these calls

15    during the interview.  It is also clear based upon this

16    narrative that he was also shown bid information and contracts

17    and asked to opine as to whether or not that information

18    provided by the Department of Justice changed his opinion.

19         *THE COURT:*  Thank you, Mr. Beller.

20         Mr. Torzilli?

21         *MR. TORZILLI:*  Thank you, Your Honor.

22         This has been a helpful discussion.  So it looks like

23    what happened was the defendants were looking to call

24    Mr. Suerken.  They were prepping him maybe with phone records,

25    maybe not, but certainly with documents and information.  And

958

1   Mr. Suerken got refreshed and got turned around on the facts.

2           What's a little kind of strange to me is typically the

3   charge is that when a person is -- reads an Indictment or is

4   shown an Indictment, they have a unfavorable view of the

5   circumstances, not a more favorable view.  And in this

6   situation when the agents came to the door, Mr. Suerken had

7   read the Indictment, had a favorable view of Tyson and

8   Mr. Roberts as a result of reading the Indictment.

9           So it's a very, very strange, unusual paradoxical,

10  upside down sort of argument that the defendants are urging

11  here and seem to be fighting against the notion that Suerken

12  had told the agents that he thought he got a good deal from

13  Tyson.  That seems like a good thing, not a bad thing from

14  their perspective.  So in any event, all of the foregoing

15  comments from counsel seem to me appropriate fodder for

16  cross-examination.

17          *THE COURT:*  Here is the thing.  Mr. Suerken looked at

18  the Indictment and that didn't -- that wasn't because the FBI

19  talked to him or anyone was prepping him.  He looked at it

20  because there was a lot of publicity presumably surrounding the

21  Indictment.  And because he had been in the business, he was

22  curious and he accessed it.  He looked at it.

23          What's important about Mr. Suerken's impressions, I

24  don't know if you would necessarily call them opinions, but for

25  purposes of this case what is relevant is what Mr. Suerken did

959

1    during the time that he was negotiating prices for RSCS.  I am

2    going to rule that any opinion that he may have about getting a

3    fair deal or a fair anything is -- no one can go into that

4    because it's not relevant.

5        The fact that -- and part of the process, the bid

6    process that's going on here, the bids, the back-and-forth, the

7    ultimate contract price reflects what people thought were fair

8    because they signed the contract.  The fact that RSCS thought

9    that they were, you know, that their prices were outrageously

10   high and all that, that's totally fair game.  In the last trial

11   there was lots of testimony about that.  Nothing wrong with the

12   government going into that.

13       However, Mr. Suerken and his attorney need to be

14   informed of the fact that Mr. Suerken -- what's relevant to

15   Mr. Suerken's testimony is what he thought at the time, what he

16   thought at the time, not on reflection, not informed by prep

17   sessions, not informed by documents that he looked at way after

18   the fact after he had left because that isn't relevant.  What's

19   relevant is what he believed at the time.

20       So he needs to -- he's going to have to focus on that.

21   Those are the facts.  And, you know, his reflections on things,

22   his -- you know, even if he has a better informed opinion and,

23   you know, what he thought at the time he thinks is now wrong,

24   that doesn't matter.  Because unfortunately he has been

25   subjected to documents and in particular the Indictment, even

960

1    it didn't necessarily change his opinion right there when they

2    had the interview, as to fairness in regard to some people at

3    least.  Nonetheless, the fact that he was exposed to the

4    Indictment could color his view of things.

5           But what he needs to do when he testifies is to focus

6    on what he believed at the time and that's what's relevant to

7    his testimony in this case.  And I am not going to allow

8    questions about, you know, whether he thought he was getting a

9    fair price at the -- back then or fair a deal, I think the

10   phrase was, because that is getting really close to what I said

11   was not going to be allowed, which is whether people had an

12   opinion about whether they thought it was fair, immoral, that

13   type of thing.  We don't need to go into that and so I am not

14   going to allow that.

15          Mr. Torzilli?

16          *MR. TORZILLI:*  Thank you, Your Honor.

17          Just one point of clarification.  I take it, then,

18   that the defendants won't be permitted on cross-examination to

19   ask him about his beliefs or his views or his state of mind at

20   the time that the agents conducted the knock-and-talk.

21          *THE COURT:*  Well, that's a very broad topic.  I

22   haven't read the interview memo.  I'm not sure quite sure.  But

23   once again, he needs to testify just about what he thought at

24   the time.  And, you know, I would hope that we don't get into

25   the fact that he has looked at the Indictment and all these

1    other things because it's just going to cause a million

2    question marks to swirl around in the jurors' heads.  They are

3    going to wonder what the Indictment actually says.  And, of

4    course, the Indictment is just a charge.

5         So that is dangerous territory.  What I am trying to

6    do is focus on what's relevant to this witness and not get into

7    the fact that he has been exposed to things after the fact that

8    could have influenced his thoughts or opinions about what

9    happened, and so that's why I am trying to draw that line.

10        Mr. Fagg?  I am sorry, why don't I hear from

11   Mr. Feldberg.  He has been attempting to make a comment.

12        MR. FELDBERG:  It was a long line, Your Honor.

13        In this interview in March of 2021, Mr. Suerken

14   relieved himself of a couple of scarless opinions about

15   Mr. Austin.  They are unfounded.

16        THE COURT:  About whom?

17        MR. FELDBERG:  Mr. Austin.  He doesn't specify whether

18   he thought what he thought at the time of the events in

19   question.  This is an interview in 2021 and he has some

20   negative opinions about Mr. Austin.  I am assuming the

21   government is not going to try to elicit that kind of

22   testimony, but given the way the testimony started today, I

23   have a new found concern.  And I am hoping that the Court's

24   ruling just articulated would apply to opinions delivered in

25   2021 or -- about the character of Mr. Austin or, quite frankly,

1    any of the defendants.

2            *THE COURT:*  Let me hear from Mr. Torzilli on that

3    while we are on the subject.

4            *MR. TORZILLI:*  Thank you, Your Honor.

5            So given Your Honor's ruling, we are not going to be

6    asking about his opinion, let alone opinions that he provided

7    to the agents at a knock-and-talk in 2021.  I mean, my concern

8    is that we are going to be abiding by that.  We are going to be

9    focusing on the facts.  And then on cross-examination what he

10   did or did not tell the agents is going to be cherry-picked for

11   cross-examination purposes and then we won't have an

12   opportunity to rectify that on redirect.  So my hope is that it

13   will be a rule that both sides will be required to abide by.

14           *THE COURT:*  Mr. Gillen?

15           *MR. GILLEN:*  Critical point of the Court's ruling is

16   that it is what Pete Suerken thought at the time, and we

17   understand that and we are going to be focusing on that.

18   Second point, we would ask that the Court, given the Court's

19   ruling, I would assume it also encompasses his opinion formed

20   after he spoke with the FBI or during when he spoke with the

21   FBI in 2021 that he lost his job in 2017 because of the

22   Kentucky Fried Chicken negotiations in 2014.  And I would

23   assume that would be a part of the area the government is not

24   permitted to go into.

25           *THE COURT:*  I agree.  If he has subsequently formed an

1    opinion about why he lost his job, then that's irrelevant.

2    What's relevant is -- I don't even know it's relevant about him

3    losing his job.  Frankly, I don't know, but it would have to be

4    what he thought at the time.

5            Mr. Torzilli?

6            MR. TORZILLI:  Your Honor, if the defendants will

7    agree, we'll agree that his -- other than the fact of his

8    departure from RSCS in February '17, the idea of him losing his

9    job or whatever you want to call it could be completely off

10   limits for purposes of direct, cross and redirect, we would be

11   willing to agree to that.

12           THE COURT:  When did he stop working at RSCS?

13           MR. TORZILLI:  I think it was February 23rd of 2017,

14   but it's that give or take a week or two.

15           THE COURT:  Okay.  And then his replacement was -- I

16   am forgetting.

17           MR. TORZILLI:  Effectively his replacement was a

18   combination of Sara Fisher and Rich Eddington, both of whom

19   were already there, but just kind of assumed elevated roles.

20           MR. GILLEN:  And I am assuming the government will

21   instruct Mr. Suerken as to the Court's ruling in this area.

22           THE COURT:  Can you do that, Mr. Torzilli?

23           MR. TORZILLI:  Just one -- the answer is yes.  But

24   just to inform Your Honor because you mentioned Mr. Suerken's

25   counsel, and just to be clear, Mr. Suerken's counsel had a

1    significant surgery and is not in Denver.  He is in Columbus,

2    Ohio.  But we are in communication with him, so we can pass it

3    along for further communication to the witness, but that's kind

4    of the way that things are playing out as far as Mr. Axelrod

5    not being here.

6         *THE COURT:*  But presumably you have the authority to

7    communicate directly with Mr. Suerken because that's why some

8    of these interviews have taken place.

9         *MR. TORZILLI:*  The interviews have taken place with

10   Mr. Axelrod either on Teams or on the telephone.  So our

11   communications directly with Mr. Suerken are limited to showing

12   up at the courthouse at a particular time.  If it's substance,

13   we are doing those communications only in the presence of his

14   attorney.

15        *THE COURT:*  Got it.  And obviously whatever form of

16   communication is appropriate given his representation is all

17   that I am requesting that the government do.

18        *MR. TORZILLI:*  Thank you, Your Honor.

19        *THE COURT:*  Thank you.

20        Well, my suggestion is that we go home, but -- or back

21   to hotels, but I will entertain just suggestions about what

22   more we may do.

23        *MS. CALL:*  Your Honor, I got the feeling over the last

24   hour no one wanted to talk about the summaries, which I think

25   was the plan for the end of the day.  But I am wondering since

1    it is -- the government's case in chief is moving forward and

2    we kind of still have these in limbo now if it makes sense to

3    start early tomorrow morning, if Your Honor would be receptive

4    to that, to just get through these issues, which I don't think

5    will take much time.  But the government does kind of need the

6    opportunity to make any corrections to the summaries based on

7    changes to limiting instructions or anything that may happen.

8            THE COURT:  Let me ask people this.  Tomorrow is Ash

9    Wednesday for those who may be wanting to attend some type of

10   service.  If starting early would prevent someone from -- we

11   aren't going to go late tomorrow.  I will let people know that.

12   So I throw that out just in case some people are sensitive to

13   that type of thing.  I am available to start at 8:00, but up

14   to -- I don't know what people want to do.

15           MR. TUBACH:  I don't see any shaking of the heads no,

16   Your Honor.  We would be fine starting at 8:00 o'clock tomorrow

17   morning.

18           THE COURT:  Why don't we go ahead and do that.

19           Mr. Pollack?

20           MR. TUBACH:  I was going to say one other piece of

21   what might qualify as good news.  In the last trial our team

22   had actually already done all of the confidentiality redactions

23   for all the exhibits that were admitted.

24           THE COURT:  I remember you saying so.

25           MR. TUBACH:  So we would be pleased to provide those

1    to the government.  And then whatever new ones are admitted,

2    the government can simply redact the confidentiality

3    designations.  That ought to eliminate the burden the

4    government has identified in a filing I believe they made last

5    night.

6         THE COURT:  Yeah, I don't want this to loom too large,

7    but I am not wholly persuaded by the government's argument.  I

8    just don't want it to cause some big problem, but yeah, that

9    offer was made the last go-around.  So if that's possible, it

10   would seem like a good idea.  But once again, I don't want to

11   turn the mole hill into a mountain.

12        Thank you, Mr. Tubach.

13        Mr. Pollack?

14        MR. POLLACK:  Real briefly, Your Honor, right before

15   Mr. Suerken took the stand, the government announced that it

16   wanted to admit an exhibit without a witness and called out an

17   exhibit number and then called out a different exhibit number.

18   I recognize that we've seen these documents and we've reached

19   some agreements, but it is very difficult to know what is

20   happening.  And I still like to follow along.

21        So it would be very helpful if the government could,

22   as they did last time, tell us when they are going to be

23   introducing exhibits and what exhibits they are going to be

24   introducing so that we can have the exhibits.  And just

25   speaking on behalf of the back table, when they come up on the

1    screen, I cannot read them.  The screen is so far away from my

2    seat, that that is just not a -- I can't review a document on

3    the fly because it's on the screen.  And that's even when it's

4    a one-page document.

5         THE COURT:  Got it.

6         MS. CALL:  There may have been two requests there.

7    The document we seek to offer today we put in a notice over a

8    week ago that then we raised yesterday morning and counsel

9    wanted time to look at the six documents that the list was,

10   which we gave them, you know, 36 hours to do.  So, you know, I

11   think it's reasonable for the government to offer one document

12   when counsel has had days and hours to review it.  But I

13   suppose I don't understand the request because the notice was

14   given and the government waited to offer it until an

15   appropriate time.

16        MR. POLLACK:  The request is to simply know when.

17   There are a lot of documents that the government has given us

18   notice that at some point they are going to want to introduce.

19   I just would like to know as we did last time.  On this date we

20   are going to be introducing these documents without a sponsor.

21   On this date we are going to be introducing these other

22   documents without a sponsor.

23        THE COURT:  I am not going to police that particular

24   issue, but everyone has been really doing well.  Things are

25   much more efficient.  Mr. Feldberg could use that previously --

1    that handwritten summary to save some time.  These are all good

2    things, but yet the more notice the better because it just

3    makes everyone's operations go more smoothly.  It's good for

4    the jury.

5            And I am not criticizing Ms. Call at all because all

6    of the sudden we have 10 minutes left and we are trying to fill

7    the time and she brings up something that was brought up the

8    day before, but it should go for both sides.  Advanced notice,

9    even if it's not much advance notice, can be provided.  It just

10   makes things go more smoothly.

11           *MS. PREWITT:*  Your Honor, we are really trying to be

12   adaptive here.  Mr. Suerken was slated for seven hours,

13   switched him around to accommodate schedules.  I understand

14   that it may seem like a couple documents, but we are just

15   like -- even getting binders done on time, with last minute

16   additions it's been a real challenge.  And not every defense

17   team has resources to keep up with those adaptations, Your

18   Honor.  So I don't want to make light of -- I want to make sure

19   that is addressed, that point, because I think it is --

20           *THE COURT:*  Once again, I am not going to police that.

21   I am not going to create that type of a rule because I think

22   people can work it out.  But Ms. Prewitt is right, it's great

23   that people were able to roll with the Suerken availability.

24   That's really good.  And even though there is just 10 minutes,

25   an eventful 10 minutes or eventful ninth minute, but that's

969

1    good.  People are really doing a good job.  If there is some

2    additional things that can be done just so that things continue

3    to go well, I would encourage that.

4              *MS. CALL:*  Yes, Your Honor.  I think the clarity on

5    the government's point, 99 percent of the documents it intends

6    to offer without a sponsoring witness were admitted yesterday.

7    There is six, I think, remaining which are the ones we want to

8    offer as soon as possible, so we tried to offer one today.  We

9    can do it whenever works for everyone else, but the sooner the

10   better, which are the six that are in ECF -- the notice filed

11   on February 22nd in Section 5.  There were six that were sought

12   under 801(d)(2)(A).

13             *THE COURT:*  Mr. Pollack?

14             *MR. POLLACK:*  I don't have anything further.  I just

15   wanted to thank the Court for entertaining my request.

16             *THE COURT:*  No problem.  We will be in recess until

17   tomorrow at 8:00 a.m.  Thank you.

18        (Recess at 5:54 p.m.)

19

20

21

22

23

24

25

1                                      INDEX

2     WITNESSES

3        Michael Ledford

4            Cross-Examination Continued By Mr. Beller        686

5            Cross-examination By Mr. Feldberg               790

6            Cross-examination By Mr. Pollack                838

7            Cross-examination By Ms. Henry                  896

8            Cross-examination By Ms. Prewitt                903

9            Cross-examination By Mr. Canty                  905

10           Cross-examination By Mr. Gillen                 906

11           Redirect Examination By Mr. Torzilli            909

12       Pete Suerken

13           Direct Examination By Mr. Torzilli              931

14                                    EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| C-021 |  | 875 |  |  |  |
| C-022 |  | 875 |  |  |  |
| C-022-1 |  | 875 |  |  |  |
| D-509 |  | 813 |  |  |  |
| D-546 |  | 826 |  |  |  |
| D-563 |  | 836 |  |  |  |
| D-564 |  | 830 |  |  |  |
| F-750 |  | 711 |  |  |  |
| F-768 |  | 900 |  |  |  |
| E-799 |  | 833 |  |  |  |

1              INDEX (Continued)

2                EXHIBITS

3    Exhibit      Offered   Received   Refused   Reserved   Withdrawn

4    F-808                 738

5    F-810                 702

6    F-813                 785

7    F-815                 760

8    H-855                 857

9    B-927                 854

10   1407                  859

11              REPORTER'S CERTIFICATE

12       I certify that the foregoing is a correct transcript from

13   the record of proceedings in the above-entitled matter.  Dated

14   at Denver, Colorado, this 15th day of May, 2022.

15

16                          S/Janet M. Coppock

17

18

19

20

21

22

23

24

25